**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| WILLIAM WHITFORD, ROGER ANCLAM, | ) | |
| EMILY BUNTING, MARY LYNNE DONOHUE, | ) | |
| HELEN HARRIS, WAYNE JENSEN, | ) | |
| WENDY SUE JOHNSON, JANET MITCHELL, | ) | No. |
| ALLISON SEATON, JAMES SEATON, | ) | |
| JEROME WALLACE, and DONALD WINTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Three Judge Panel Requested |
| v. | ) | 28 U.S.C. 2284(a) |
| | ) | |
| GERALD C. NICHOL, THOMAS BARLAND, | ) | |
| JOHN FRANKE, HAROLD V. FROEHLICH, | ) | |
| KEVIN J. KENNEDY, ELSA LAMELAS, and | ) | |
| TIMOTHY VOCKE, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COME Plaintiffs  William Whitford, Roger Anclam, Emily Bunting, Mary Lynne Donohue, Helen Harris, Wayne Jensen, Wendy Sue Johnson, Janet Mitchell, Allison Seaton, James Seaton, Jerome Wallace, and Donald Winter, by their undersigned attorneys, and complain of Defendants Gerald C. Nichol, Thomas Barland, John Franke, Harold V. Froehlich, Elsa Lamelas, Kevin J. Kennedy, and Timothy Vocke, not personally, but solely in their official capacities as members of the Wisconsin Government Accountability Board, as follows:

**INTRODUCTION**

1.     Plaintiffs seek both a declaratory judgment that the Wisconsin State Assembly district plan adopted in 2012 by Wisconsin Act 43 (the "Current Plan") violates the First and Fourteenth Amendments of the United States Constitution and an order permanently enjoining the implementation of the Current Plan in the 2016 election.  As explained in greater detail below, the Current Plan is, by any measure, one of the worst partisan gerrymanders in modern

1

American history.  In the first election in which it was in force in 2012, the Current Plan enabled Republican candidates to win sixty of the Assembly's ninety-nine seats even though Democratic candidates won a ***majority*** of the statewide Assembly vote. The evidence is overwhelming that the Current Plan was adopted to achieve precisely that result:  indeed, before submitting the map for approval, the Republican leadership retained an expert (at State expense) who predicted the partisan performance of each proposed district—as it turned out, with remarkable accuracy.

2.     This kind of partisan gerrymandering is both unconstitutional and profoundly undemocratic.  It is unconstitutional because it treats voters unequally, diluting their voting power based on their political beliefs, in violation of the Fourteenth Amendment's guarantee of equal protection, and because it unreasonably burdens their First Amendment rights of association and free speech.   Extreme partisan gerrymandering is also contrary to core democratic values because it enables a political party to win more legislative districts—and thus more legislative power—than is warranted by that party's popular support. By distorting the relationship between votes and assembly seats, it causes policies to be enacted that do not accurately reflect the public will. In the end, a political minority is able to rule the majority and to entrench itself in power by periodically manipulating election boundaries.

3.     Partisan gerrymandering has increased throughout the United States in recent years as a result of both a rising tide of partisanship and greater technological sophistication, which enables maps to be drawn in ways that are likely to enable the party in power to remain in power even if it no longer represents the views of the majority of voters.  This nationwide trend threatens a "'core principle of republican government,' namely, 'that the voters should choose their representatives, not the other way around.'"  *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, No. 13-1314 (U.S. June 29, 2015), slip op. at 35.

4.     The United States Supreme Court has recognized that partisan gerrymandering can be unconstitutional.  Nevertheless, a constitutional challenge has yet to succeed on that ground because plaintiffs have been unable to offer a workable standard to distinguish between permissible political line-drawing and unconstitutional partisan gerrymandering.  In this case, plaintiffs propose a new test that *is* workable, based on the concept of partisan symmetry—the idea that a district plan should treat the major parties symmetrically with respect to the conversion of votes to seats and that neither party should have a systematic advantage in how efficiently its popular support translates into legislative power.

5.     One way to measure a district plan's performance in terms of partisan symmetry is to determine whether there is an "efficiency gap" between the performances of the two major parties and, if so, to compare the magnitude of that gap to comparable district plans in the modern era nationwide.  The efficiency gap captures in a single number all of a district plan's *cracking* and *packing*—the two fundamental ways in which partisan gerrymanders are constructed. Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins. Both cracking and packing result in "wasted" votes: votes cast either for a losing candidate (in the case of cracking) or for a winning candidate but in excess of what he or she needed to prevail (in the case of packing). The efficiency gap is the difference between the parties' respective wasted votes in an election, divided by the total number of votes cast.

6.     When the efficiency gap is relatively small and roughly equivalent to the efficiency gaps that have traditionally existed, the map should not be deemed unconstitutional. In such cases, there may be no intent to treat voters unequally; in any event, the effects of any

3

gerrymandering are likely to be redressable through the political process.  But where the efficiency gap is large and much greater than the historical norm, there should be a presumption of unconstitutionality.  In such a case, an intent to systematically disadvantage voters based on their political beliefs can be inferred from the severity of the gerrymander alone.  And because such severe gerrymanders are likely to be extremely durable as well, it is unlikely that the disadvantaged party's adherents will be able to protect themselves through the political process. Where partisan gerrymandering is extreme, the process itself is broken:  current legislators have no incentive to alter it, and adherents of the disadvantaged party are unable to do so because their votes have been unfairly diluted.

7.     Wisconsin's Current Plan is presumptively unconstitutional under this analysis. In the 2012 election, the Current Plan resulted in an efficiency gap of roughly 13% in favor of Republican candidates.  Between 1972 and 2014, fewer than **four percent** of all state house plans in the country benefited a party to that extent.  In the 2014 election, the efficiency gap remained extremely high at 10%.  Between 1972 and 2010, not a **single** plan anywhere in the United States had an efficiency gap as high as the Current Plan in the first two elections after redistricting.  A district plan this lopsided is also highly unlikely ever to become neutral over its ten-year lifespan. Indeed, we can predict with nearly 100% confidence that, absent this Court's intervention, Wisconsin's Current Plan will continue to unfairly favor Republican voters and candidates—and unfairly disadvantage Democratic voters and candidates—throughout the remainder of the decade.

8.     There are three additional facts that reinforce the conclusion that the Current Plan is unconstitutional.  First, the Current Plan was not the result of an ordinary political process, where a bill is formulated through a give-and-take between political adversaries and subject to

4

open debate.  Instead, it was drawn up in secret by the Legislature's Republican leadership, without consultation with Democratic leaders or rank-and-file members of either party, with the purpose and intent of altering what was already a favorable map to maximize the Republican Party's partisan advantage.  Then the proposal was rammed through the Assembly, without any opportunity for real debate.

9.      Second, the Current Plan is also an outlier by another measure of partisan symmetry—partisan bias.  Partisan bias is the difference in the share of seats that each party would win if they tied statewide, each receiving 50% of the vote.   In 2012, there was a 13% bias in favor of Republicans; in a tied election, Republicans would have won 63% of the Assembly seats, with Democrats winning only 37%.  In 2014, there was a 12% bias in favor of Republicans.

10.     Third, the Current Plan's extreme partisan skew was entirely unnecessary. Plaintiffs have designed a Demonstration Plan that complies at least as well as the Current Plan with every legal requirement—equal population, the Voting Rights Act, compactness, and respect for political subdivisions—but that is almost perfectly balanced in its partisan consequences. Thus, defendants cannot salvage the Current Plan on the theory that adherence to redistricting criteria or the State's underlying political geography made an unfair plan unavoidable.

11.     To be clear, plaintiffs do not seek to replace a pro-Republican gerrymander with a plan that is gerrymandered to be pro-Democratic.  Rather, plaintiffs seek as a remedy the creation of a neutral plan that is not gerrymandered to give either side an unfair partisan advantage.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,

1343(a)(3) and (4), and 2284. It also has jurisdiction under 28 U.S.C. §§ 2201 and 2202, the

Declaratory Judgments Act, to grant the declaratory relief requested.

13.     Pursuant to 28 U.S.C. § 2284(a), a three-judge panel should be convened to hear

this case.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b). At least one of

the Defendants resides in the Western District of Wisconsin. In addition, at least six of the

plaintiffs reside and vote in this judicial district.

## PARTIES

15.     Plaintiffs are qualified, registered voters in the State of Wisconsin, who reside in

various counties and legislative districts. Plaintiffs are all supporters of the public policies

espoused by the Democratic Party and of Democratic Party candidates.  Together with other

Democratic voters, plaintiffs have been harmed by the Current Plan's unlawful partisan

gerrymandering because it treats Democrats unequally based on their political beliefs and

impermissibly burdens their First Amendment right of association.  Some of the plaintiffs have

been packed into districts with other Democratic voters, while others live in districts that have

been cracked by the Current Plan to disadvantage Democratic candidates in close races. Either

way, the purpose and effect of the Current Plan is to dilute their voting strength because of their

political affiliations.

16.     Regardless of where they reside in Wisconsin and whether they themselves reside

in a district that has been packed or cracked, all of the plaintiffs have been harmed by the

manipulation of district boundaries in the Current Plan to dilute Democratic voting strength.   As

a result of the statewide partisan gerrymandering, Democrats do not have the same opportunity provided to Republicans to elect representatives of their choice to the Assembly.  As a result, the electoral influence of plaintiffs and other Democratic voters statewide has been unfairly, disproportionately, and undemocratically reduced.

17.     Plaintiff William Whitford, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 76th Assembly District in Madison in Dane County, Wisconsin.

18.     Plaintiff Roger Anclam, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 31st Assembly District in Beloit in Rock County, Wisconsin.

19.     Plaintiff Emily Bunting, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 49th Assembly District in Richland County, Wisconsin.

20.     Plaintiff Mary Lynne Donohue, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 26th Assembly District in Sheboygan in Sheboygan County, Wisconsin.  In addition to the injury suffered by all Democrats in Wisconsin, Ms. Donohue was harmed when the City of Sheboygan was split into Districts 26 and 27 and District 26 was cracked and converted from a Democratic to a Republican district. *See infra* ¶¶ 63-65.

21.     Plaintiff Helen Harris, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 22nd Assembly District in Milwaukee, in Milwaukee County, Wisconsin.

22.     Plaintiff Wayne Jensen, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 63rd Assembly District in Rochester, in Racine County, Wisconsin.

23.     Plaintiff Wendy Sue Johnson, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 91st Assembly District in Eau Claire, in Eau Claire County, Wisconsin.  In addition to the injury suffered by all Democrats in Wisconsin, Ms. Johnson was harmed when Democratic voters were packed into District 91, wasting their votes and diluting the influence of Ms. Johnson's vote, as part of a gerrymander that reduced the number of Democratic seats in her region. *See infra* ¶¶ 69-71.

24.     Plaintiff Janet Mitchell, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 66th Assembly District in Racine, in Racine County, Wisconsin.  In addition to the injury suffered by all Democrats in Wisconsin, Ms. Mitchell was harmed when Democratic voters were packed into District 66, wasting their votes and diluting the influence of Ms. Mitchell's vote, as part of a gerrymander that reduced the number of Democratic seats in her region.  *See infra* ¶¶ 66-68.

25.     Plaintiffs James and Allison Seaton, citizens of the United States and of the State of Wisconsin, are residents and registered voters in the 42nd Assembly District in Lodi, in Columbia County, Wisconsin.

26.     Plaintiff Jerome Wallace, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 23rd Assembly District, in Fox Point, in Milwaukee County, Wisconsin.  In addition to the injury suffered by all Democrats in Wisconsin, Mr. Wallace was harmed when Democrats in District 22 were cracked so that his previously Democratic district is now a Republican district. *See infra* ¶¶ 60-62.

27.     Plaintiff Don Winter, a citizen of the United States and of the State of Wisconsin, is a resident and registered voter in the 55th Assembly District in Neenah, in Winnebago County, Wisconsin.

28.     Defendant Gerald C. Nichol is the Chair of the Wisconsin Government Accountability Board ("G.A.B.") and is named solely in his official capacity as such.   The G.A.B. is a state agency under Wis. Stat. § 15.60, which has "general authority" over and "responsibility for the administration of . . . [the State's] laws relating to elections and election campaigns," Wis. Stat. § 5.05(1), including the election every two years of Wisconsin's representatives in the Assembly.

29.     Defendants Thomas Barland, John Franke, Harold V. Froehlich, Elsa Lamelas, and Timothy Vocke are all members of the G.A.B. and are named solely in their official capacities as such.

30.     Defendant Kevin J. Kennedy is the Director and General Counsel of the G.A.B. and is named solely in his official capacity as such.

## BACKGROUND

### The Current Plan Was Intended To Discriminate Against Democrats

31.     The Current Plan was drafted and enacted with the specific intent to maximize the electoral advantage of Republicans and harm Democrats to the greatest possible extent, by packing and cracking Democratic voters and thus wasting as many Democratic votes as possible. Indeed, after a trial in prior litigation, a three-judge court characterized claims by the Current Plan's drafters that they had not been influenced by partisan factors as "almost laughable" and concluded that "partisan motivation. . .clearly lay behind Act 43." *Baldus v. Wisconsin Government Accountability Board*, 849 F.Supp.2d 840, 851 (E.D. Wis. 2012).

9

32.     The Current Plan was drafted via a secret process run solely by Republicans in the State Assembly and their agents, entirely excluding from participation all Democratic members of the Assembly as well as the public, and preventing public knowledge of and deliberation about the parameters of the Plan.

33.     In January 2011, Scott Fitzgerald, Republican member of the Wisconsin State Senate and Wisconsin Senate Majority Leader, and Jeff Fitzgerald, Republican member of the Wisconsin State Assembly and Speaker of the Assembly, hired attorney Eric McLeod ("McLeod") and the law firm of Michael, Best & Friedrich, LLP ("Michael Best"), ostensibly to represent the entire Wisconsin State Senate and Wisconsin State Assembly in connection with the reapportionment of the state legislative districts after the 2010 Census.  In fact, McLeod and Michael Best were retained to assist the Republican leadership in the Legislature in designing a pro-Republican partisan gerrymander.

34.     To accomplish this goal, McLeod and Michael Best supervised the work of the legislative aide to the Republican Speaker of the Assembly, Adam Foltz, and the legislative aide to the Republican Majority Leader of the Senate, Tad Ottman, in planning, drafting, negotiating, and gaining the favorable vote commitments of a majority of Republican legislators sufficient to obtain passage of the Current Plan through Wisconsin Act 43.

35.     In creating the Current Plan, McLeod, Michael Best, Foltz, and Ottman used past election results to measure the partisanship of the electorate and to design districts, through packing and cracking, that would maximize the number of districts that would elect a Republican and minimize the number of districts that would elect a Democrat.  Thus, they intentionally diluted the electoral influence of Democrats, including that of plaintiffs, and discriminated against Democrats, including plaintiffs, because of their political views.

10

36.     McLeod, Michael Best, Foltz, and Ottman were assisted in their work by Dr. Ronald Keith Gaddie, a professor of political science at the University of Oklahoma. Dr. Gaddie created a model that analyzed the expected partisan performance of all of the districts established by Act 43. Dr. Gaddie's model forecast that the Assembly plan would have a pro-Republican efficiency gap of 12%.  When a common methodology is used to ensure an apples-to-apples comparison, this is almost exactly the efficiency gap that the Assembly plan actually exhibited in the 2012 election.

37.     Preparation of the Current Plan was done in complete secrecy, excluding Democrats and the public from any part of the process. Indeed, even Republican state legislators were prevented from receiving any information that would allow public discussion or deliberation about the plan. All redistricting work was done in Michael Best's office and the "map room" was located there.   A formal written policy provided that only the Senate Majority Leader, the Speaker of the House and their aides Ottman and Foltz, and McLeod and legal staff designated by McLeod would have unlimited access to the map room.

38.     The access policy provided for limited access by rank-and-file legislators: "Legislators will be allowed into the office for the sole purpose of looking at and discussing their district. They are only to be present when an All Access member is present. No statewide or regional printouts will be on display while they are present (with the exception of existing districts). They will be asked at each visit to sign an agreement that the meeting they are attending is confidential and they are not to discuss it."  But only Republican legislators were allowed even this limited access.  After signing the secrecy agreements contemplated by the policy, Republican legislators were allowed to see only small portions of the map: how their own

11

districts would be affected and details of the partisan performance of voters in their districts in the past, showing that they would be reliable Republican districts.

39.     Under the direction and supervision of McLeod, Ottman met with 17 Republican members of the Wisconsin State Senate, identified in Ex. 4 hereto. Each of them signed a secrecy agreement entitled "Confidentiality and Nondisclosure Related to Reapportionment" before being allowed to review and discuss the plan that Michael Best had been hired to develop. The secrecy agreement said that McLeod had "instructed" Ottman to meet with certain members of the Senate to discuss the reapportionment process and characterized such conversations as privileged communications pursuant to the attorney-client and attorney work product privileges —even though the assertion of the privilege was a part of an elaborate "charade" designed "to cover up a process that should have been public from the outset." *Baldus v. Wisconsin Government Accountability Board*, 843 F.Supp.2d 955, 958-61 (E.D. Wis. 2012).

40.     Under the direction and supervision of McLeod, Foltz met with 58 Republican members of the Wisconsin State Assembly, identified in Ex. 4 hereto. Each of them signed the same secrecy agreement entitled "Confidentiality and Nondisclosure Related to Reapportionment" before being allowed to review and discuss the plan that Michael Best had been hired to develop, which also improperly described their conversations as privileged.

41.     On July 11, 2011, the plan was introduced by the Committee on Senate Organization without any Democratic members of the Legislature having previously seen their districts or the plan as a whole. As noted above, all Republican members of the Legislature had previously seen their individual districts along with visual aids demonstrating the partisan performance of these districts, but had not seen the overall map.

12

42.     Act 43 was passed in extraordinarily rushed proceedings with little opportunity for input by the public. A public hearing was held on July 13, 2011. The bill was then passed by the Senate on July 19, 2011, and by the Assembly the next day on July 20, 2011. Act 43 was published on August 23, 2011.

43.     McLeod and Michael Best were paid $431,000 in State taxpayer funds for their work on the plan, even though they worked solely for Republican leaders of the Legislature and for the benefit of Republicans, and even though they provided no services to Democrats, entirely excluded them from the process, and concealed their work from the public, preventing any public deliberation about the plan.

### The Current Plan Has The Effect of Discriminating Against Democrats

*The Efficiency Gap Reliably Measures Partisan Gerrymandering*

44.     The Supreme Court has unanimously agreed that partisan gerrymandering can rise to the level of a constitutional violation. See *Vieth v. Jubelirer*, 541 U.S. 267, 293 (2004) ("[A]n **excessive** injection of politics is **un**lawful") (emphasis added). To date, though, partisan gerrymandering plaintiffs have failed to propose a judicially manageable standard for deciding what constitutes an "excessive" injection of politics into the redistricting process.

45.     In the Court's most recent gerrymandering case, *LULAC v. Perry*, 548 U.S. 399 (2006), a majority of the Justices expressed support for a test based on the concept of partisan symmetry. Partisan symmetry is a "require[ment] that the electoral system treat similarly-situated parties equally." *Id.* at 466 (Stevens, J., concurring in part and dissenting in part). In other words, a map is symmetrical when it creates a level playing field, giving neither major party a systematic advantage over its opponent in the conversion of electoral votes into legislative seats.

46.     In *LULAC*, the Court considered one particular measure of partisan symmetry, called partisan bias. As described above, partisan bias refers to the divergence in the share of seats that each party would win given the same share (typically 50%) of the statewide vote. *See id.* at 419-20 (opinion of Kennedy, J.); *id.* at 466 (Stevens, J., concurring in part and dissenting in part).

47.     Partisan bias is not the only measure of partisan symmetry. In the last few years, political scientists and legal academics have developed a new symmetry metric, called the efficiency gap, which improves on partisan bias in several respects. *See* Eric M. McGhee, *Measuring Partisan Bias in Single-Member District Electoral Systems*, 39 Legis Stud. Q. 55 (2014); Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 101 (2015); Expert Report of Prof. Kenneth R. Mayer (July 3, 2015) ("Mayer Report"), attached hereto as Ex. 2; Expert Report of Prof. Simon D. Jackman (July 7, 2015) ("Jackman Report") attached hereto as Ex. 3.

48.     The efficiency gap is rooted in the insight that, in a legal regime in which each district must have an approximately equal population, there are only two ways to implement a partisan gerrymander.   First, a party's supporters can be cracked among a large number of districts so that they fall somewhat short of a majority in each one. These voters' preferred candidates then predictably lose each race. Second, a party's backers can be packed into a small number of districts in which they make up enormous majorities. These voters' preferred candidates then prevail by overwhelming margins. All partisan gerrymandering is accomplished through cracking and packing, which enables the party controlling the map to manipulate vote margins in its favor.

49.     Both cracking and packing produce so-called "wasted" votes—that is, votes that do not directly contribute to a candidate's election. When voters are cracked, their votes are wasted because they are cast for losing candidates. Similarly, when voters are packed, their votes are wasted to the extent they exceed the 50%-plus-one threshold required for victory (in a two-candidate race). Partisan gerrymandering also can be understood as the manipulation of wasted votes in favor of the gerrymandering party, so that it wastes fewer votes than its adversary.

50.     The efficiency gap is the difference between the parties' respective wasted votes in an election, divided by the total number of votes cast. Suppose, for example, that there are five districts in a plan with 100 voters each. Suppose also that Party A wins three of the districts by a margin of 60 votes to 40, and that Party B wins two of them by a margin of 80 votes to 20. Then Party A wastes 10 votes in each of the three districts it wins and 20 votes in each of the two districts it loses, adding up to 70 wasted votes. Likewise, Party B wastes 30 votes in each of the two districts it wins and 40 votes in each of the three districts it loses, adding up to 180 wasted votes. The difference between the parties' respective wasted votes is 110, which, when divided by 500 total votes, yields an efficiency gap of 22% in favor of Party A.

51.     The efficiency gap is *not* based on the principle that parties have a right to proportional representation based on their share of the statewide vote, nor does it measure the deviation from seat-vote proportionality.  Instead, by aggregating all of a plan's cracking and packing into a single number, the efficiency gap measures a party's *undeserved* seat share: the proportion of seats a party receives that it would *not* have received under a balanced plan in which both sides had approximately equal wasted votes. In the above example, for instance, the 22% efficiency gap in favor of Party A means that it won 22% more seats—in this example, 1 more seat out of 5—than it would have under a balanced plan.

15

52.     Over the 1972-2014 period—since the end of the reapportionment revolution of the 1960s— the distribution of state house plans' efficiency gaps has been normal and has had a median of almost exactly zero. *See* Jackman Report at 61; Stephanopoulos & McGhee, *supra*, at 140-42. This indicates that neither party has enjoyed an overall advantage in state legislative redistricting during the modern era.

53.     However, recently the average absolute efficiency gap (*i.e.*, the mean of the absolute values of all plans' efficiency gaps in a given year) has increased sharply. This metric stayed roughly constant from 1972 to 2010. But in the current cycle, fueled by rising partisanship and greater technological sophistication, it spiked to the highest level recorded in the modern era: over 6% for state house plans. *See* Jackman Report at 47; Stephanopoulos & McGhee, *supra*, at 142-45. This means that the severity of today's partisan gerrymandering is historically unprecedented—as is the need for judicial intervention.

### *Wisconsin's Current Plan Is an Outlier*

54.     Between 1972 and the present, the efficiency gaps of Wisconsin's Assembly plans became steadily larger and more pro-Republican. The Current Plan represents the culmination of this trend, exhibiting the largest and most pro-Republican efficiency gap ever recorded in modern Wisconsin history. In the 1970s, the Assembly plan had an average efficiency gap close to zero.  In both the 1980s and the 1990s, it had an average pro-Republican gap of 2%. The Republican advantage deepened in the 2000s to an average gap of 8%. And it then surged, thanks to the Current Plan, to an average gap of *11%* in 2012 and 2014. *See* Jackman Report at 34; Stephanopoulos & McGhee, *supra*, at 154-56.

55.     More specifically, using the same methodology as for all other states, the Current Plan produced a pro-Republican efficiency gap of 13% in 2012 and 10% in 2014. The 2012

figure represents the 28th-worst score in modern American history (out of nearly 800 total plans), placing the Current Plan in the worst 4% of this distribution, more than two standard deviations from the mean. Based on this historical data, there is close to a zero percent chance that the Current Plan's efficiency gap will ever switch signs and favor the Democrats during the remainder of the decade. Furthermore, prior to the current cycle, not a *single* plan in the country had efficiency gaps as high as the Current Plan's in the first two elections after redistricting. *See* Jackman Report at 63.

56.     Using a more detailed methodology available only for Wisconsin, the Current Plan produced a pro-Republican efficiency gap of 12% in 2012. This is a figure nearly identical to the one calculated using the national data. Using the Wisconsin-specific methodology as well as data compiled prior to 2012 by Dr. Gaddie, the expert retained by the Legislature's Republican leadership to assist them in drafting the Current Plan, that Plan was *forecast* to produce an efficiency gap of 12%. This figure also is nearly identical, and shows that the Current Plan performed precisely as its authors hoped and expected. *See* Mayer Report at 46.

57.     This extraordinary level of partisan unfairness was achieved through the rampant cracking and packing of Wisconsin's Democratic voters, which resulted in their votes being disproportionately wasted. The Mayer Report shows that Democratic voters were cracked so that Republican candidates were far more likely to prevail in close races (where the winner had 60% or less of the vote): Republicans were likely to win 42 such districts, while Democrats would win only 17.[1] Democrats were also packed into a number of districts where they would win overwhelmingly (by getting 80% or more of the vote):  there were eight districts where

---

[1] In making this analysis, the Mayer Report used 2012 election results and further assumed that all districts had been contested and no incumbents had run.   These are both standard assumptions made by political scientists to determine a plan's underlying partisanship.

Democrats would win by this margin, compared to *zero* districts where Republicans would win

such a lopsided victory.  Thus, through gerrymandering, Republican votes were used more

efficiently than Democratic votes to elect representatives, producing an undemocratic result that

does not accurately reflect the preferences of the Wisconsin electorate.  *See* Mayer Report at 38-

41.

58.     The forecasts of Dr. Gaddie, the Republican consultant, prior to the 2012 election

confirm that the Current Plan was expected and intended to crack and pack Wisconsin's

Democratic voters to this extent.  Dr. Gaddie predicted that Republicans would win 46 Assembly

districts by a margin smaller than 60%-40%, compared to just 20 such victories for Democrats.

He also predicted that Democrats would prevail in seven districts by a margin greater than 80%-

20%, compared to zero such wins for Republicans. *See* Mayer Report at 38-41. These figures are

nearly identical to plaintiffs' estimates, and further demonstrate that the Current Plan was

intended to disadvantage Democrats and waste Democratic votes to the maximum extent

possible.

### Examples of Cracking and Packing in the Current Plan

59.     These plan-level statistics are the product of innumerable local cracking and

packing decisions. Across Wisconsin, the Current Plan systematically alters prior district

configurations to waste larger numbers of Democratic votes and smaller numbers of Republican

votes. The following regional examples (depicted in map form in Exhibit 1 hereto) show how the

Current Plan deliberately allocates Democratic voters less efficiently and Republican voters

more efficiently. These are only illustrative examples; they do not show *all* of the ways in which

Wisconsin's current pro-Republican gerrymander was achieved. In addition, the examples focus

on: (1) the 2012 election because it was the first one held after this cycle's redistricting; (2) the

2008 election because it was the most comparable prior election, featuring a similar share of the statewide Assembly vote for each party (53.9% Democratic in 2008, 51.4% Democratic in 2012) and also coinciding with a presidential election; and (3) Plaintiffs' Demonstration Plan, because it reveals the fair results that could have been, but were not, attained in 2012.

*Milwaukee, Ozaukee, Washington, and Waukesha Counties:*

60.    Under the prior Assembly plan that was in force from 2002-2010 (the "Prior Plan"), District 22 included part of northeastern Milwaukee County; District 23 included part of northern Milwaukee County (home to Plaintiff Wallace) and part of southern Ozaukee County; and District 24 included part of Washington and Waukesha Counties. In the 2008 election, a Democratic candidate won District 22, and Republican candidates won Districts 23 and 24. Under the Demonstration Plan, a Democratic candidate would win District 22, and Republican candidates would win Districts 23 and 24.

61.    As a result of the Current Plan, Democratic voters who were in the old District 22 were cracked into the new Districts 23 and 24. Due to these changes, Districts 22, 23, and 24 were won by Republican candidates in 2012.

62.    The shift from one Democratic seat and two Republican seats in the Prior Plan and the Demonstration Plan in Milwaukee, Ozaukee, Washington, and Waukesha Counties, to zero Democratic seats and three Republican seats in the Current Plan, contributed to Wisconsin's current pro-Republican efficiency gap. This gerrymandering and its results are shown in the maps attached hereto as Ex. 1.

*Calumet, Fond du Lac, Manitowoc and Sheboygan Counties:*

63.    Under the Prior Plan, District 26 centered on the City of Sheboygan in the central eastern part of Wisconsin (home to Plaintiff Donohue) and District 27 consisted of the northern

part of Sheboygan County as well as parts of Fond du Lac, Calumet, and Manitowoc Counties. In the 2008 election, a Democratic candidate won District 26 and a Republican candidate won District 27. Under the Demonstration Plan, a Democratic candidate would win District 26, and a Republican candidate would win District 27.

64.     As a result of the Current Plan, Democratic voters who were in District 26 were cracked so that roughly half of that district was distributed to District 27 and additional voters from south of Sheboygan County were added to District 26. Due to these changes, Districts 26 and 27 were won by Republican candidates in 2012.

65.     The shift from one Democratic seat and one Republican seat in the Prior Plan and the Demonstration Plan in Sheboygan County and southern Fond du Lac, Manitowoc and Calumet Counties, to zero Democratic seats and two Republican seats in the Current Plan, contributed to Wisconsin's current pro-Republican efficiency gap. This gerrymandering and its results are shown in the maps attached hereto as Ex. 1.

*Racine and Kenosha Counties:*

66.     Under the Prior Plan, Districts 61, 62, 63, 64, 65, and 66 were almost entirely within Racine and Kenosha Counties in the southeastern edge of Wisconsin (the City of Racine is home to Plaintiff Mitchell). Districts 61 and 62 centered on the City of Racine, with District 63 covering the western side of Racine County. Districts 64 and 65 centered on the City of Kenosha, with District 66 covering the western edge of Kenosha County. In the 2008 election, Democratic candidates won Districts 61, 62, 64, and 65, while Republican candidates won Districts 63 and 66. Under the Demonstration Plan, Democratic candidates would win Districts 62, 63, 64, and 66, while Republican candidates would win Districts 61 and 65.

67.     As a result of the Current Plan, Democratic voters who were in the old Districts 61 and 62 were packed into the new District 66, thus wasting more Democratic votes in the region. Due to these changes, Districts 64, 65, and 66 were won by Democratic candidates in 2012, while Districts 61, 62, and 63 were won by Republican candidates.

68.     The shift from four Democratic seats and two Republican seats in the Prior Plan and the Demonstration Plan in Racine and Kenosha Counties, to three Democratic seats and three Republican seats in the Current Plan, contributed to Wisconsin's current pro-Republican efficiency gap. This gerrymandering and its results are shown in the maps attached hereto as Ex. 1.

*Buffalo, Chippewa, Eau Claire, Jackson, La Crosse, Pepin, Pierce, St. Croix, and Trempealeau Counties:*

69.     Under the Prior Plan, most of seven Districts (67, 68, 91, 92, 93, 94, and 95) were spread across Buffalo, Chippewa, Eau Claire, Jackson, La Crosse, Pepin, Pierce, St. Croix, and Trempealeau Counties in northwestern Wisconsin (Eau Claire is home to Plaintiff Johnson). In the 2008 election, Democratic candidates won five of the seven Districts (68, 91, 92, 93, and 95), and Republicans won two of them (67 and 94). The district numbers in the Demonstration Plan are slightly different; instead of District 68, District 69 is in Eau Claire County. Under the Demonstration Plan, Democratic candidates would win six of seven Districts (67, 69, 91, 92, 94, and 95) and a Republican candidate would win one of them (93).

70.     As a result of the Current Plan, Democratic voters who were in the old District 68 were packed into the new District 91, and Democrats in the rest of old District 68 as well as old Districts 91 and 93 were cracked into the new Districts 68, 92, and 93. Due to these changes, Democratic candidates won only four of the seven districts in 2012 (91, 92, 94, and 95), and Republican candidates won three of them (67, 68, and 93).

71.     The shift from five or six Democratic seats, in the Prior Plan and Demonstration Plan respectively, and two or one Republican seats in the Prior Plan and Demonstration Plan respectively, to four Democratic seats and three Republican seats in the Current Plan, in Buffalo, Chippewa, Eau Claire, Jackson, La Crosse, Pepin, Pierce, St. Croix, and Trempealeau Counties, contributed to Wisconsin's current pro-Republican efficiency gap. This gerrymandering and its results are shown in the maps attached hereto as Ex. 1.

*Adams, Columbia, Marathon, Marquette, Portage, and Wood Counties:*

72.     Under the Prior Plan, most of eight Districts (42, 47, 69, 70, 71, 72, 85, and 86) were spread across Adams, Columbia, Marathon, Marquette, Portage, and Wood counties in central Wisconsin (Columbia County is home to Plaintiffs Allison and James Seaton). In the 2008 election, Democratic candidates won five of the eight Districts (42, 70, 71, 72, and 85), and Republicans won three Districts (47, 69, and 86). In the Demonstration Plan the district numbers are different (5, 40, 41, 42, 71, 72, 86, and 87), but of these eight Districts, Democratic candidates would win five (71, 86, 40, 41, and 42), and Republican candidates would win three (5, 72, and 87).

73.     As a result of the Current Plan, Democratic voters who were in the old Districts 42, 70, and 72 were cracked, and the new Districts 41, 42, 69, 70, 71, 72, 85, and 86 were created in areas of Adams, Columbia, Marathon, Marquette, Portage, and Wood Counties. Due to these changes, Democratic candidates won only three of the eight Districts (70, 71, and 85) in 2012, and Republican candidates won five of them (41, 42, 69, 72, and 86).

74.     The shift from five Democratic seats and three Republican seats in the Prior Plan and the Demonstration Plan in Adams, Columbia, Marathon, Marquette, Portage, and Wood Counties, to three Democratic seats and five Republican seats in the Current Plan, contributed to

Wisconsin's current pro-Republican efficiency gap. This gerrymandering and its results are shown in the maps attached hereto as Ex. 1.

*Brown and Manitowoc Counties:*

75.     Under the Prior Plan, Brown and Manitowoc Counties were split to include parts of Districts 1, 2, 4, 5, 25, 88, 89, and 90 in the Green Bay area of Wisconsin. In the 2008 election, Democratic candidates won Districts 2, 5, 25, and 88, and Republican candidates won Districts 1, 4, 89, and 90. Under the Demonstration Plan, Brown and Manitowoc Counties would include Districts 1, 2, 3, 25, 26, 88, 89, and 90. Under the Demonstration Plan, Democrats would win Districts 2 and 88, and Republicans would win the remaining six districts.

76.     As a result of the Current Plan, Democratic voters who were in the old Districts 2, 5 and 25 were cracked into the new Districts 2, 5, 25, and 88. Due to these changes, seven of the eight districts in the Brown and Manitowoc County area (1, 2, 4, 5, 25, 88, and 89) were won by Republican candidates in 2012, and one District (90) was won by a Democratic candidate in 2012.

77.     The shift from four or two Democratic seats in the Prior Plan and the Demonstration Plan, respectively, and four or six Republican seats in the Prior Plan and the Demonstration Plan, respectively, to one Democratic seat and seven Republican seats in the Current Plan, in Brown and Manitowoc Counties, contributed to Wisconsin's current pro-Republican efficiency gap. This gerrymandering and its results are shown in the maps attached hereto as Ex.1.

**Wisconsin Does Not Need to Have a Gerrymandered Plan**

78.     Not only did the Current Plan exhibit extremely large efficiency gaps in 2012 and 2014, but this poor performance was entirely unnecessary and served no legitimate purpose. It

would have been possible for Wisconsin to enact an Assembly plan that treated both parties symmetrically and did not disproportionately waste Democratic votes. To prove this point, plaintiffs' expert has designed a Demonstration Plan that would have had an efficiency gap of just *2%* in 2012 (assuming all contested districts and no incumbents). *See* Mayer Report at 46. This far better score is attributable to plaintiffs' efforts *not* to crack and pack Democratic voters, and instead to enable both parties to convert their popular support into legislative seats with equal ease.

79.     Plaintiffs' Demonstration Plan performs at least as well as the Current Plan on every other relevant metric. Both plans have total population deviations of less than 1%—far below the courts' 10% threshold for presumptive constitutionality. Both plans have six African American opportunity districts and one Hispanic opportunity district, and so are identical for Voting Rights Act purposes. The Demonstration Plan splits one fewer municipal boundary than the Current Plan (119 versus 120), and so is superior in that regard. And the Demonstration Plan's districts are substantially more compact than the Current Plan's (average compactness of 0.41 versus 0.28). *See* Mayer Report at 37.

80.     The Demonstration Plan proves that the Current Plan's extreme pro-Republican tilt cannot be blamed on either an effort to comply with legitimate redistricting criteria or Wisconsin's underlying political geography. Both of those factors were perfectly compatible with a neutral map.

## COUNT I – FOURTEENTH AMENDMENT VIOLATION

81.     Plaintiffs incorporate and re-allege paragraphs 1-80 of this Complaint as paragraphs 1-80 of this Count I.

82.     The Current Plan is a partisan gerrymander so extreme that it violates Plaintiffs'
Fourteenth Amendment right to equal protection of the laws. The Current Plan intentionally and
severely packs and cracks Democratic voters, thus disproportionately wasting their votes, even
though a neutral map could have been drawn instead. Accordingly, Wisconsin's Act 43 deprives
plaintiffs of their civil rights under color of state law in violation of 42 U.S.C. §§ 1983 and 1988.

83.     The efficiency gap provides a workable test to identify unconstitutional partisan
gerrymandering similar to the two-part approach applied to state legislative reapportionment
claims. In a reapportionment challenge, the first issue is whether a district plan's total population
deviation exceeds 10%. If so, the plan is presumptively unconstitutional, and if not, it is
presumptively valid. The second issue, which is reached only if the total population deviation is
greater than 10%, is whether the malapportionment is necessary to achieve a legitimate state
goal. The state bears the burden at this stage of rebutting the presumption of unconstitutionality.
*See Voinovich v. Quilter*, 507 U.S. 146, 161-62 (1993); *Brown v. Thomson*, 462 U.S. 835, 842-43
(1983); *Connor v. Finch*, 431 U.S. 407, 418 (1977).

84.     The same two-part approach should be applied to partisan gerrymandering claims,
only with the efficiency gap substituted for total population deviation. The first step in the
analysis is whether a plan's efficiency gap exceeds a certain numerical threshold. If so, the plan
is presumptively unconstitutional, and if not, it is presumptively valid. The second step, which is
reached only if the efficiency gap is sufficiently large, is whether the plan's severe partisan
unfairness is the necessary result of a legitimate state policy, or inevitable given the state's
underlying political geography. The state would bear the burden at this stage of rebutting the
presumption of unconstitutionality.

85. The Current Plan is plainly unlawful under this two-part test. First, it was ***forecast*** to produce, and then ***did*** produce, an efficiency gap of approximately 13% in the 2012 election. This is an extraordinarily high level of partisan unfairness, more than two standard deviations from the mean: as noted above, the 2012 figure represents the 28th-worst score in modern American history (out of nearly 800 total plans), placing the Current Plan in the worst 4% of this distribution. This is also not a temporary or transient gerrymander. The Current Plan's efficiency gap means that there is close to a zero percent chance that the Plan will ever favor Democrats during its lifespan. *See* Jackman Report at 60. Given its severity and predicted durability, the Current Plan's efficiency gap far exceeds any plausible threshold for presumptive unconstitutionality.

86. Indeed, even a 7% efficiency gap should be presumptively unconstitutional. A 7% efficiency gap is at the edges of the overall distribution of all state house plans in the modern era, making it indicative of uncommonly severe gerrymandering. See Jackman Report at 61. Historical analysis shows that with a 7% efficiency gap, the gerrymandering is also likely to be unusually durable—over its lifespan, a plan with an efficiency gap of that magnitude is unlikely ever to favor the opposing party. See Jackman Report at 61. However, this Court need not decide at what point an efficiency gap is large enough to trigger a presumption of unconstitutionality. In the state legislative reapportionment context, the applicable cutoff (10%) emerged over a series of cases, in which extreme population deviations (of 34%, then 26%, then 20%) were struck down and deviations of 8% and 10% were upheld before the 10% threshold was adopted. Here too the Current Plan's extreme efficiency gap should be deemed presumptively unconstitutional, without the need to decide what the cut-off should be.

87.     Second, the State cannot rebut the presumption that the Current Plan is unlawful. Plaintiffs' Demonstration Plan would have had an efficiency gap of just 2% in 2012 while complying with all federal and state criteria at least as well as the Current Plan. *See* Mayer Report at 46. Accordingly, neither an attempt to achieve legitimate redistricting goals nor Wisconsin's underlying political geography could have necessitated the Current Plan's partisan imbalance.

88.     In addition to its extreme efficiency gap, the Current Plan exhibits a severe partisan bias. The Current Plan produced a partisan bias of 13% in 2012 and 12% in 2014—scores that in and of themselves demonstrate the unconstitutional effects produced by the Current Plan.

89.     Finally, there is no doubt that the Current Plan was specifically intended and indeed designed to benefit Republican candidates, and to disadvantage Democratic candidates, to the greatest possible extent.  Thus, the Current Plan had both the purpose and effect of subordinating the adherents of one political party and entrenching a rival party in power, in violation of their right to equal protection under the law.

### COUNT II—FIRST AMENDMENT VIOLATION

90.     Plaintiffs incorporate and re-allege paragraphs 1-89 of this Complaint as paragraphs 1-89 of this Count II.

91.     Plaintiffs and other Democratic voters in the state of Wisconsin have a First Amendment right to freely associate with each other without discrimination by the State based on that association; to participate in the political process and vote in favor of Democratic candidates without discrimination by the State because of the way they vote; and to express their political views without discrimination by the State because of the expression of those views or the content of their expression.

92.     Wisconsin Act 43 violates the First and Fourteenth Amendments because it intentionally uses voters' partisan affiliation to affect the weight of their votes.  By taking the actions described above, the drafters of the Current Plan deliberately discriminated against plaintiffs and other Democratic voters because they are Democrats and have voted for and will vote for Democratic candidates and because of the positions they have expressed and will take on public affairs — that is, because of their views and the content of their expression.

93.     By excessively and unreasonably cracking and packing groups of Democratic voters to intentionally weaken their voting power, the State of Wisconsin discriminated against Democratic voters, including the plaintiffs, on the basis of their voting choices, their political views, and the content of their expression.

94.     The unusual extent of the partisan gerrymandering in this case, as shown by the extremely high efficiency gap and the factors described above, indicates that the gerrymandering in this case is so high that the Current Plan denies to plaintiffs and other Democratic voters in Wisconsin their rights to free association and freedom of expression guaranteed by the First and Fourteenth Amendments.

95.     For these reasons, and because Act 43 and the Current Plan have the purpose and effect of subjecting Democrats to disfavored treatment by reason of their views, Act 43 and the Current Plan are subject to strict scrutiny and cannot be upheld absent a compelling government interest, which is not present in this case.

96.     Accordingly, Wisconsin's Act 43 deprives plaintiffs of their civil rights under color of state law in violation of 42 U.S.C. §§ 1983 and 1988.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

97.    Declare Wisconsin's 99 State Assembly Districts, established by Act 43, unconstitutional and invalid, and the maintenance of these districts for any primary, general, special, or recall election a violation of plaintiffs' constitutional rights;

98.    Enjoin Defendants and the G.A.B.'s employees and agents, including the county clerks in each of Wisconsin's 72 counties, from administering, preparing for, and in any way permitting the nomination or election of members of the State Assembly from the unconstitutional districts that now exist;

99.    In the absence of a state law establishing a constitutional district plan for the Assembly districts, adopted by the Legislature and signed by the Governor in a timely fashion, establish a redistricting plan that meets the requirements of the U.S. Constitution and federal statutes and the Wisconsin Constitution and state statutes;

100.    Award plaintiffs their reasonable attorneys' fees, costs, and litigation expenses incurred in bringing this action; and

101.    Grant such further relief as the Court deems just and proper.


By: */s/ Peter G. Earle*
　　　Peter G. Earle
　　　One of the attorneys for plaintiffs

Peter G. Earle
Law Office of Peter G. Earle
839 North Jefferson Street
Suite 300
Milwaukee, WI 53202
(414) 276-1076
peter@earle-law.com
SBN 1012176

Michele Odorizzi
Mayer Brown LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 701-7309
modorizzi@mayerbrown.com

Nicholas O. Stephanopoulos
Assistant Professor
University of Chicago Law School
1111 E. 60th St., Suite 510
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

Paul Strauss
Ruth Greenwood
Chicago Lawyers' Committee
 for Civil Rights Under Law, Inc.
100 N. LaSalle St., Suite 600
Chicago, IL 60602
(312) 202-3649
pstrauss@clccrul.org
rgreenwood@clccrul.org
 *Applications for admission pro hac
 vice pending*