UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

WILLIAM WHITFORD, ROGER ALCLAM,
EMILY BUNTING, MARY LYNNE DONOHUE,
HELEN HARRIS, WAYNE JENSEN, WENDY
SUE JOHNSON, JANET MITCHELL, ALLISON
SEATON, JAMES SEATON, JEROME
WALLACE, and DONALD WINTER,

       Plaintiffs,

–vs–                                    Case No. 15-CV-421-BBC

GERALD NICHOL, THOMAS BARLAND,     Madison, Wisconsin
JOHN FRANKE, HAROLD FROEHLICH,     November 4, 2015
KEVIN KENNEDY, ELSA LAMELAS,       1:33 p.m.
and TIMOTHY VOCKE,

       Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF MOTION HEARING
HELD BEFORE HONORABLE JUDGE KENNETH RIPPLE,
HONORABLE JUDGE BARBARA B. CRABB
and HONORABLE JUDGE WILLIAM GRIESBACH

APPEARANCES:

For the Plaintiff:
          University of Chicago Law School
          BY:  NICHOLAS STEPHANOPOULOU
          1111 E. 60th Street, Ste. 510
          Chicago, Illinois  60637

          Mayer & Brown LLP
          BY:  MICHELE ODORIZZI
          71 South Wacker Drive
          Chicago, Illinois  60606

Lynette Swenson   RMR, CRR, CBC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703

```
                         608-255-3821
For the Defendant:
                    Department of Justice
                    BY:  BRIAN KEENAN
                         ANTHONY RUSSOMANNO
                    17 East Main Street
                    Madison, Wisconsin  53703
```

                         * * * * *

     (Proceedings called to order.)

          THE CLERK:  Case Number 15-CV-421-BBC.  *William Whitford, et al. v. Gerald Nichols, et al.*  Court is called for oral argument.  May we have the appearances, please.

          MR. KEENAN:  For the defendants, Assistant Attorneys General Brian Keenan and Anthony Russomanno.

          MS. ODORIZZI:  For the plaintiffs, Michele Odorizzi and Nicholas Stephanopoulou.

          JUDGE RIPPLE:  We'll be hearing oral argument on the motion to dismiss today and we've allotted 30 minutes to each side.  And we'll hear from the moving party first and then from the responding party on the motion.  If the moving party would like to reserve any time for rebuttal, if you'd please let the court clerk know that at the beginning, we'd appreciate it.

          MR. KEENAN:  I'll just reserve five minutes rebuttal.

          JUDGE RIPPLE:  Thank you, Counsel.  Counsel,

1    the podium is yours.

2            MR. KEENAN:  May it please the Court.  The

3    Court should dismiss this case because the plaintiffs do

4    not state a claim on which relief can be granted.  The

5    Supreme Court has rejected partisan gerrymandering

6    claims in *Vieth v. Jubelirer*.  A plurality found or held

7    that they would be nonjusticiable political questions.

8    While Justice Kennedy wasn't willing to go that far, he

9    did dismiss the case in front of him -- the *Vieth* court

10   based on the failure to state a claim.  The reasoning

11   was that the plaintiffs in that case had not put forward

12   a judicially discernible standard that was tied to an

13   actual constitutional violation and the weaknesses that

14   plagued the *Vieth* plaintiffs' standard are also present

15   here.

16       The plaintiffs offered a standard based on what

17   they called the *efficiency gap*, the difference between

18   the parties' ability to translate the total statewide

19   votes for their candidates into legislative seats.  They

20   say that there's a constitutional right for both major

21   political parties to be able to translate their

22   statewide support into legislative seats with equal

23   ease; however, there just is no such constitutional

24   right.  The *Vieth* court addressed a similar proposition

25   from their plaintiffs and said that the Constitution

1   guarantees equal protection of the laws, not equal

2   representation in the government for equivalent-size

3   groups.

4          JUDGE RIPPLE:  How does this case differ

5   significantly from *Vieth* --

6          MR. KEENAN:  Well --

7          JUDGE RIPPLE:  -- on the facts?

8          MR. KEENAN:  On the facts, I'm not sure that it

9   differs a lot.  In *Vieth*, there was also the contention

10  that a minority of voters -- that dealt with the

11  Pennsylvania congressional districts -- would be able to

12  enact a majority or elect a majority of congressional

13  seats.  Here the allegation is the same, that the

14  Democrats secured a majority of the statewide

15  legislative vote in 2012.  I don't think they've proven

16  that for 2014 or even alleged that for 2014.  But yet

17  we're only able to get 39 percent of the seats.  I think

18  it may differ in the manner of degree of the difference

19  between the seats and the votes, but essentially it's

20  the same problem, same difference.  In fact, all

21  gerrymandering claims are based on this essential

22  contention that the system is unfair in that it's

23  weighted to favor one party or the other; that one party

24  is going to get more seats with the same amount of

25  votes.

1        JUDGE RIPPLE:  This may seem like a very simple

2 question, but I guess it's usually the first question

3 you usually ask on a motion to dismiss.  From your

4 perspective, what are the elements of the cause of

5 action here?

6        MR. KEENAN:  Well, this is a unique case in

7 that I don't think there are any elements of a cause of

8 action in that the Supreme Court by Justice Kennedy has

9 left it up to plaintiffs in cases to devise a workable

10 standard for these claims.  So I don't see that there

11 are elements.  The plaintiffs have offered what they

12 consider to be a test and our argument is more along the

13 lines of that test --

14        JUDGE RIPPLE:  But does that go to the elements

15 of the cause of action or really to the quantum of

16 proof, how one proves up those elements?

17        MR. KEENAN:  I think it's both.  They're trying

18 to equate the cause of action with a quantum of proof;

19 that the cause of action only begins to exist once the

20 efficiency gap grows to a certain number, which they say

21 is 7 percent, but perhaps might be some other number,

22 which is kind of the opposite of what the one-person,

23 one-vote cases they rely on did which was develop what

24 the theory and the elements would be and then arrive at

25 a numerical test where you can judge that.

1    While the plaintiffs deny it, their standard does

2  rest upon the principle that groups have a right to

3  proportional representation.  What they're saying is

4  wrong about the Wisconsin system is that it's -- what's

5  wrong is that the Democrats got 51 percent of the vote;

6  only get 39 percent of the seats.  Their strength in the

7  legislature isn't in proportion to their number of

8  statewide votes.

9    THE COURT:  This raises a question of concern I

10  think to all of us and that is the named plaintiffs here

11  are residents of only certain districts; is that right?

12    MR. KEENAN:  Yes.  And the Complaint lays them

13  out and we laid them out in our motion to dismiss.  I

14  believe there's like six, seven, eight districts that

15  they're --

16    THE COURT:  How would these people have

17  standing to object to the statewide districting?

18    MR. KEENAN:  Yeah.  And we've raised that

19  argument that our contention is they don't, because even

20  in the *Vieth* dissents, for example, I think it's Justice

21  Souter's dissent, wanted a district-by-district

22  challenge where you'd only have standing to challenge

23  your own district.  That's the rule that applies in the

24  racial gerrymandering context and really doesn't seem

25  why there would be a different reason to apply a

1  different rule here.

2      And it also speaks to the difficulty of this type

3  of claim in that, for example, if someone in District 8

4  is unhappy with their district and that district gets

5  redrawn, well, that may necessitate redrawing districts

6  all across the state in which once you start changing,

7  there's a ripple effect all over the state.  And so

8  whose constitutional rights are at issue?  It's almost

9  everyone in the whole state's interest is at issue and

10  that someone in Fond du Lac may like their

11  representative the way it is, but now they have to be

12  changed.  And they've now been either packed or cracked,

13  whichever way, because they're kind of flip sides of the

14  same coin.  Every time you crack a Democrat, you pack a

15  Republican, et cetera.  And really the challenge to the

16  statewide map just isn't feasible.

17      I would just like to clarify the plaintiffs say

18  that their standard isn't based on proportional

19  representation because it recognizes that, for example,

20  a party might get 55 percent of the seats and 60 percent

21  of the vote and that would be acceptable because that's

22  sometimes what happens in an election is that several

23  close seats swing one way or the other.  So you can get

24  a bump, kind of.  But at the same time, the underlying

25  principle is still proportional representation.

1    The *Vieth* courts mention a proportional

2    representation wasn't about strict proportion but just a

3    correlation between the numerical strength and seats in

4    the legislature.

5        JUDGE RIPPLE:  What differences do you see, if

6    any, between the proportional representation approach

7    and the approach which your colleagues on the other side

8    are suggesting here?

9        MR. KEENAN:  Well, I think the main difference

10   is that -- at least the way Professor Jackman, who is

11   one of the experts that they've submitted a report

12   from -- the way he measures the efficiency gap measured

13   a difference in the statewide vote share to the seat

14   chair based on, like, this hypothetical seats-to-votes

15   curve, what you should have got.  So a party, you know,

16   should, with 55 percent, should get 60 percent.  Well,

17   the Democrats here got 50 but only got 45, so it's a 15

18   percent gap or that's basically the model of the way it

19   works.

20       So in that sense, I would say the only difference

21   is that they're accepting that proportional isn't

22   necessarily strictly 55 to 55, it's measuring it based

23   off of 55.  Instead of using the vote total, they're

24   using like what the expected seat total would be.  So

25   like 60 percent.  But in essence, it's the same thing,

1  it's just using a different baseline as to what the

2  seats should be gained from a certain vote share.

3      JUDGE CRABB:  Do you take the position that

4  there's no limit to the amount of gerrymandering

5  redistricting that can be done for partisan reasons?  Is

6  it a constitutional problem?

7      MR. KEENAN:  Our position is that there is no

8  judicially manageable standard to determine where you

9  end up crossing the line, so that you wouldn't really

10  know what is too much gerrymandering and

11  unconstitutional gerrymandering and what is the

12  appropriate amount, what is enough.  And even aside from

13  that though, the plaintiffs, even if there was some

14  hypothetical standard, the plaintiffs haven't offered it

15  in this case in that -- yeah.

16      JUDGE CRABB:  I understand that's one of your

17  positions, but I'm just wondering is there -- would you

18  ever see a possibility that the gerrymandering would be

19  so severe that it would create a constitutional problem?

20      MR. KEENAN:  I have a difficult time imagining

21  how you would separate that from something else, just

22  given the number of variables at issue in all these

23  decisions and the different political make-ups of the

24  states, the concentration of voters.  Each state is a

25  little bit different in that matter where, for example,

1  something might be a really bad gerrymander but end up

2  looking so bad under certain tests.  But something might

3  not be a gerrymander and look like a gerrymander.  For

4  example, the 2000s plan in Wisconsin comes out as a

5  gerrymander under the plaintiffs' test even though three

6  judges drew that plan, obviously not as some sort of

7  unconstitutional way to hurt the Democrats.

8      So I think it would be difficult to come up with a

9  standard that judges partisan gerrymander across all

10 states and also across time periods as well.

11     JUDGE GRIESBACH:  Do you agree that the

12 districts -- the manner in which the districts were

13 drawn in this case is significantly different than the

14 manner in which they were drawn in previous

15 redistricting?

16     MR. KEENAN:  The manner, do you mean the shape

17 of the districts or the process that was --

18     JUDGE GRIESBACH:  The process described in the

19 plaintiffs' Complaint.

20     MR. KEENAN:  Yes, the process is different from

21 previous redistrictings because they were all done by

22 courts.  The political branches cannot agree and this

23 was done by the Legislature and the Governor and --

24     JUDGE GRIESBACH:  The legislative branches have

25 never agreed in all of the prior -- as far back as 1990,

1    I guess it was.

2         MR. KEENAN:   Yeah, I believe in 1980 as well.

3    It may also have been a court-drawn plan.  I'm not sure

4    of the 80's, but at least the 90's and the 2000's.

5         I'd like to just address the intent element that's

6    part of the plaintiffs' test.  We didn't spend a lot of

7    time briefing this because to the extent that the

8    intent -- all the intent element does is ask whether the

9    partisan body that entered -- whether the body that

10   entered the plan intended the result that it would

11   benefit that party, I think it will always be met by any

12   districting done by a certain party.  The *Davis v.*

13   *Bandemer* court said that they would assume that

14   politicians would know the political results of what

15   they do and that you could basically assume the intent.

16   So if it's that minimal level of intent, that's almost

17   meaningless.  It has to arise to a higher level of

18   intent, to some sort of predominant intent.  The *Vieth*

19   court rejected such a test because it's just impossible

20   to determine, to pierce out intent in the legislative

21   body when there's so many other factors going on in

22   which some of the lines aren't drawn for partisan

23   intent, they're drawn to comply with the Voting Rights

24   Act or to keep communities of interest together, things

25   like that.

1   In addition to being -- not being judicially

2   discernible, the standard is also not judicially

3   manageable.  First, the partisan symmetry that they've

4   relied on has not been endorsed by the Supreme Court as

5   the plaintiffs intimate.  In the *LULAC* case, Justice

6   Kennedy -- his quote was -- he said he considered

7   partisan symmetry and he would not altogether discount

8   its utility.  I mean that's a pretty weak praise of

9   partisan symmetry.  And Souter and Ginsburg also said

10  they just would not rule it out as a criterion for a

11  test.  But Scalia, Thomas, Alito, Roberts were not on

12  board with this partisan symmetry and Kennedy was quite

13  weak and pointed out some of the problems with it.

14      I think the main problem with it though is it

15  doesn't actually measure gerrymandering and there's no

16  -- the problem with this test is what is a gerrymander.

17  It's easily thought of as just ignoring traditional

18  districting principles to benefit a party.  Elbridge

19  Gerry's Salamander, that was very oddly shaped to

20  benefit his party.

21      The plaintiffs' standard just starts from the

22  assumption that any system that benefits one party to a

23  certain extent is a gerrymander, which isn't necessarily

24  the case.  Given that the Supreme Court has recognized

25  that the concentration of voters, and this is just a

1   common sense proposition, the geographic location of

2   your voters matters in terms of converting statewide

3   vote totals into seats; that groups that tend to be

4   concentrated in particular areas, any sort of geographic

5   districting will disadvantage those groups because you

6   can run up a 90-to-10 vote total in five different

7   districts and it gives you a big statewide vote total,

8   but it can't possibly translate into more seats even if

9   you get that up to 95 or drive your turnout so that 95

10  percent is a bigger share of the state pie, it just

11  doesn't yield more legislative seats.

12      And this is why the Court -- why their plan sort of

13  erroneously detects the court-enacted plan from 2002 as

14  a gerrymander.  A 3-judge panel in that case

15  specifically stated that they couldn't enact a plan that

16  had sort of symmetry because of the concentration issue

17  in Wisconsin.  They recognized that issue.

18          JUDGE CRABB:  Did they have experts to help

19  them with that question?

20          THE COURT:  There were many experts in the 2002

21  case and both -- the way that case went, from reading

22  the opinion, was that there was a Republican plan

23  submitted and a Democratic plan submitted and there was

24  experts that testified on behalf of both of those plans.

25  And then the Court ended up drawing its own plan based

1    on its own ideas of what should be done.  But there were

2    experts who testified about the strengths.

3         JUDGE CRABB:  Experts helping the court draw up

4    its plan as far as you know?

5         MR. KEENAN:  I don't think the Court retained

6    its own expert.

7         JUDGE CRABB:  Why do you think that the

8    efficiency gap is not a judicially cognizable manageable

9    standard?

10        MR. KEENAN:  I began to explain this.  Because

11   it doesn't actually measure gerrymandering, it just

12   measures different political outcomes that could be the

13   result of nothing to do with gerrymandering.  Wisconsin

14   has had --

15        JUDGE CRABB:  If the intent is as easy to prove

16   as you seem to suggest it is, I think that's legitimate.

17   Then you measure a gap.

18        MR. KEENAN:  Well, I think the problem is if,

19   for example, the 3-judge panel that did the 2000s plan

20   wasn't intending to benefit either side and it ended up

21   benefiting one side according to their test.  So under

22   their test that would be a gerrymander.  Well, the

23   result of that wasn't because of gerrymandering, it was

24   just a result of the underlying dynamics of where people

25   are located in the state.  And so if a test is finding

1 gerrymandering where it doesn't exist, then it's not

2 really a valid test for gerrymandering.

3      The flip side is that it could fail to detect

4 gerrymandering where it does exist.  For example, the

5 Illinois -- recent redistricting in Illinois was

6 controlled by Democrats and there was a lawsuit brought

7 to a district court just like this alleging a partisan

8 gerrymander.  It was dismissed, but then when I looked

9 at Mr. Jackman's calculations for Illinois, it actually

10 shows one of those years was a Republican efficiency gap

11 under a Democratic gerrymander.  That was controlled by

12 Democrats.  I don't think they were trying to benefit

13 the Republicans with the plan they enacted, it was just

14 probably the limits of what they could do in terms of

15 benefiting their own party ended up with a

16 pro-Republican plan.  It's not showing gerrymandering,

17 it's just showing different outcomes.

18           JUDGE CRABB:  As I understand the plaintiffs'

19 plan, it would require a showing first of intent.  If

20 there weren't any intent shown, it wouldn't go any

21 farther.  Then if the efficiency gap showed a sizable

22 gap, then it would be left to the state.  The state

23 would have the opportunity to show that there were

24 reasons that explained the efficiency gap that had

25 nothing to do with any intent to benefit one party or

1    another, which is pretty much what you're saying when

2    you say well, the Court -- after the Court held the

3    hearing in 2012 redistricting and then it made up its

4    own map and it ended up with a result that was favorable

5    to the Republicans, you wouldn't say that was

6    gerrymandering because the Court had done it and it had

7    no intent to do it in favor of one party or another.

8           MR. KEENAN:  Yeah.  But I think it's passing

9    the buck on the difficult questions in these cases to

10   the people who are, like, by constitution and statute

11   authorized to enter a plan to justify it, which is --

12   the problem with these plans is -- the problem with

13   these claims is mixing all the different elements of

14   districting principles with political results, with

15   one-person, one-vote Voting Rights Act.  It's a very

16   difficult exercise.  In fact, there's probably an

17   infinite numbers of lines you could draw for a state.

18       And the plaintiffs are essentially saying well,

19   defendants, you have to -- now you have to decide.  You

20   have to justify everything.  The hard part is on you.

21   Where the Supreme Court is putting the -- rightly

22   putting the burden on people who are challenging a plan

23   enacted by legislators who were elected by the people

24   and a governor enacted by the people.  They're

25   challenging a duly enacted law they should have the

1  burden of proving that it's unconstitutional instead of

2  kind of foisting that burden on defendants.  But

3  anyways, their test isn't managed --

4       JUDGE RIPPLE:  Let's talk burdens of proof for

5  a moment.  In paragraph 10 and again in paragraph 78,

6  the plaintiffs assert in their Complaint that the plan

7  is at least subject to or might be salvaged by your --

8  by a demonstration that traditional tools of

9  redistricting had been used or that the bands of the

10  state's geography require a particular line drawing.

11  Who has, in your view, the ultimate burden on this

12  issue?  The plaintiffs or you?

13       MR. KEENAN:  The plaintiffs would -- in our

14  view, the plaintiffs would have to have the burden of

15  proving that a duly enacted law was unconstitutional and

16  it wouldn't be on the -- the burden wouldn't --

17       JUDGE RIPPLE:  The League of Women Voters

18  against Chicago case, Judge Cudahy said that that issue

19  wasn't part of the plaintiffs' prima facie case, and

20  that raises the question as to whether it's a true

21  affirmative defense or whether it's a question upon

22  which you have the burden of perhaps going forward,

23  placing in issue the fact that there was another reason

24  for drawing lines where they were drawn, and that then

25  the burden switched, shifting back to the plaintiff to

1    prove their case to rebut, in effect, what you have

2    placed on the table.  I gather that you think the latter

3    is the way this ought to be done.

4           MR. KEENAN:  Yeah -- yes, although I think it

5    really shouldn't get to that point in any event because

6    the efficiency gap is sort of an arbitrary number that

7    has no basis in, like, reality and the plaintiff

8    shouldn't be able to bootstrap, like, this number

9    they've created into making the defendants prove the

10   constitutionality of the plan.  And further, that

11   there's really no guidance provided as to how the

12   defendants are supposed to prove that.  I mean what are

13   we going to prove?  They use the word necessary, that

14   it's necessary.  Well, frankly nothing is necessary in

15   districting.  You could draw a million different lines

16   and probably justify them just as easily.  I would guess

17   it's always hypothetically possible to do different

18   lines that result in different efficiency gaps.

19          JUDGE RIPPLE:  Justice Kennedy in the *Vieth*

20   case says that they have to show that the plan impairs

21   fair and effective representation and that a political

22   burden has been placed on the residents.  That's a --

23   that's a burden that -- how would they meet that burden?

24   How would a hypothetical plaintiff meet that burden?

25   Somebody -- what would you do if not what they ask?

1        MR. KEENAN:  Well, I think you'd have to

2   develop some sort of constitutional theory as to what

3   fair representation is required.  Because right now

4   we're dealing with what is fair and what is unfair.

5   Well, what's fair to one person might not be fair to

6   another person and I don't know what is a fair level of

7   representation.  That's the first question.  That's what

8   Justice Kennedy is asking is one, development of

9   districting principles.

10       JUDGE RIPPLE:  Does *Bandemer* help at all on

11  that?

12       MR. KEENAN:  At this point I think that part of

13  *Bandemer* has been overruled by *Vieth*, but they said,

14  like, just not getting enough of the -- enough seats

15  corresponding to your votes was not enough.  It had to

16  have -- I'm forgetting the term they used -- but they

17  had a standard that had never been met from the time it

18  was announced until *Vieth*.

19       JUDGE RIPPLE:  What do you think is the role,

20  if any, of -- what entrenchment in this -- that word --

21  you see that word or words like it in *Bandemer* and you

22  see it in some of the circuit opinions.  It seems to

23  indicate that something more than one electoral cycle

24  has to be shown.  Does historical entrenchment have

25  anything to do with whether a plan is constitutional or

1    not?

2           MR. KEENAN:  Well, various justices have

3    suggested that.  It would be difficult to show that

4    though in practical -- in practicality in that each plan

5    only have five elections underneath it and if you're

6    going to rely on past election results, perhaps the

7    earliest you could challenge it would be after the first

8    election.  But then maybe that's not enough information

9    to know whether this plan is truly entrenching someone.

10          JUDGE RIPPLE:  You mean districting could be

11   shown to perpetuate entrenchment that had occurred

12   earlier?

13          MR. KEENAN:  I suppose, although that seems to

14   lose its force when the entrenchment was done by federal

15   courts.  I wouldn't think that they were intending to

16   entrench Republicans in power, although that's sort of

17   been the result in Wisconsin.  At least every election

18   since 199 -- since the 1994 election, the Republicans

19   have won the State Assembly in every election other than

20   one, which was in 2008, which was a very good year for

21   Democrats.  President Obama, I believe, won 57 percent

22   of the vote or something.  And in that year, the

23   Democrats won I think 51 seats, so they barely got over

24   the majority, and that's in a historical good year for

25   them.  Of course they promptly lost it back in 2010

where the Republicans then won 60 seats.  And those were all under court plan.  So I don't see that there's a problem with one party entrenching itself.  And even if there is, there's a remedy there and winning -- for example, the State Senate, which hasn't been challenged. The Democrats have controlled that through various times.  And then also the governor is elected statewide. The state can't be gerrymandered.  So there's always the ability to win the governors's race, in which case that would stop one party from controlling the districting process.

At this point, the plan will only be in place for 2016, 2018, 2020.  At that point there will be another census and another redistricting plan, at which point we can't say who will enact that plan, whether it will be a court; it could be the Republicans again; it could be Democrats; it could be, like, the parties actually agree, you know, they split control, but they agree on a plan.  Perhaps unlikely, although in researching this, I saw that there's even some plans where one party controlled and they couldn't agree themselves on a plan and it went to the courts anyway.  So you can never be quite be sure what's going to happen.

JUDGE CRABB:  If you want to save five minutes you better stop.

1          MR. KEENAN:  Okay.  I'll stop.

2          MS. ODORIZZI:  Good afternoon.  May it please

3     the Court, Michelle Odorizzi for the plaintiffs.  I

4     think going back to first principles, we have to look at

5     the three Supreme Court decisions and say that they

6     absolutely recognize that it is unconstitutional to have

7     excessive partisan gerrymandering.  And the problem has

8     been how do you draw the line between partisan

9     gerrymandering that is excessive and hence

10    unconstitutional and politics as usual.  And that in all

11    the cases is -- there's a cause of action there, but the

12    court is hunting for a standard, and as I say, a

13    standard that is related to constitutional rights and

14    that's judicially manageable.  And we think we've come

15    up with a standard like that in this case and it's based

16    on a concept of not proportional representation but

17    rather the concept of partisan symmetry which is simply

18    that the electoral system should treat voters' adherence

19    of both parties in a similar manner and not treat them

20    in a different manner.

21         So partisan symmetry focuses not on how many seats

22    you get for your statewide vote but rather on what kind

23    of cracking and packing has been done because that's how

24    you do a partisan gerrymander.  You pack all of the

25    opposing parties' adherence into districts where you can

1 and where you can't do that, you crack them so that

2 they're distributed and can't make a difference.

3     And the efficiency gap is a way of measuring that

4 by looking at how many votes for each party were wasted;

5 they weren't necessary to elect the person in the

6 particular district.  And what they found in the first

7 two election cycles under this plan is that you have an

8 extraordinarily high efficiency gap.  We've compared it.

9 Our expert has compared it to statehouse races in the

10 modern era over 40 years.  And if you put it on a curve,

11 it is way far out on one side.  It's an outlier.  And

12 our expert has looked at that and said not only is it an

13 outlier, it's big on the absolute terms.  It's an

14 outlier in relative terms.  And he also has opined that

15 it's likely to be extremely durable.  So even if people

16 change their minds, even if people change their votes,

17 even if you get out more votes during the ten years of

18 this cycle, it's not likely to change from a Republican

19 plan.

20     JUDGE GRIESBACH:  There are four more years,

21 five more years left of this cycle, and Mr. Keenan just

22 pointed out things that can change.  You win a

23 governor's race in a statewide election or you win the

24 Senate, which is not the --

25     MS. ODORIZZI:  You're right, Your Honor, but

1    that doesn't change who you have in the Assembly.

2           JUDGE GRIESBACH:  Right.  But that means it's

3    going to be thrown to the courts unless you get a

4    veto-proof majority with the governor's seat or if you

5    win a senator seat, you either hold out, get a

6    compromise or it's thrown to the court, which, of

7    course, by definition, I think you assume is not a

8    political partisan gerrymander.

9           MS. ODORIZZI:  That's right, Your Honor.

10          THE COURT:  That is -- it's not -- that is one

11   way of dealing with it without the courts becoming

12   involved; correct?

13          MS. ODORIZZI:  It is one way to say well, we

14   can just wait a decade.

15          JUDGE GRIESBACH:  It's not a decade anymore.

16          MS. ODORIZZI:  Well, it's not anymore.  But if

17   you say a partisan gerrymandering that there's no way to

18   control it by this type of analysis, then legislatures

19   will just do it to the nth degree.  They have the tools

20   to do it.  They will maximize their advantages, and then

21   they will have a decade during which legislative bodies

22   are gerrymandered in one area and not reflecting the

23   will of the people.  That's the problem with it of just

24   having courts say no.  And Justice Kennedy, after all,

25   who was -- four justices would love to say it's not

1  justiciable.  Let the political system handle it.  But

2  Justice Kennedy isn't willing to throw the towel in yet.

3  He thinks that there might be a way of doing it and he

4  did open the door at least to this idea of partisan

5  symmetry, which is what our efficiency gap is based on.

6          JUDGE RIPPLE:  But isn't it different?  The

7  partisan symmetry and scholars have talked about that

8  too.

9          MS. ODORIZZI:  It's actually -- I think there

10  are actually three things at issue here.  The concept is

11  partisan symmetry, which is you have to treat everybody

12  in the electoral system more or less equally.  Not

13  perfectly equally, but more or less equally.  Partisan

14  bias is a metric of partisan symmetry, so it's an

15  expression of it.  And that's what they were talking

16  about in the *LULAC* case.  Partisan bias, which is

17  calculated in a different way and it's kind of a

18  hypothetical calculation of what -- how many seats would

19  you get if you had a 50/50 vote.  And Justice Kennedy

20  said there's a lot of things I don't like about partisan

21  bias, and he listed them.  We have the efficiency gap is

22  different.  It's not hypothetical.  It's based on what

23  the actual votes were.  And we've articulated in our

24  brief, I think, why we think it meets the objections

25  that Justice Kennedy had to partisan bias.

1    So it's a way of looking at the concept of partisan

2   symmetry, the idea of equal treatment of people and not

3   disparate treatment based on their political briefs,

4   which is what the Equal Protection Clause prohibits.

5   It's a way of measuring that, and measuring cracking and

6   packing, which is how you do partisan gerrymandering, so

7   that you can look at it and look at it in historical

8   context and say is this too much.

9    JUDGE GRIESBACH:  Isn't a significant problem

10  though just the fact that the Democratic votes are

11  naturally packed as sometimes they are or concentrated

12  in the urban areas?  So absent some kind of careful

13  manipulation and study of voting practices, if you

14  create districts without regard to partisanship at all,

15  aren't you going to naturally end up with a result that

16  would have a significant gap, efficiency gap?

17   MS. ODORIZZI:  I don't think so, Your Honor.

18  First of all, I'm not sure that you can ever kind of

19  just draw a random map.  So you say well, you pay

20  attention to everything else and you don't look at this.

21   JUDGE GRIESBACH:  You have to pay attention to

22  population.

23   MS. ODORIZZI:  Population, right.

24   JUDGE GRIESBACH:  You have to pay attention

25  also to minorities, voting rights.

1          MS. ODORIZZI:  Right, right.  But --

2          JUDGE GRIESBACH:  Now you're adding another

3    matter to pay attention to.  In order to accomplish the

4    result you're talking about which is an acceptable level

5    of partisan -- of efficiency gap, don't you have to

6    study those voting patterns and, in fact, create a

7    manipulated district so you will avoid the efficiency

8    gap that you're decrying today?

9          MS. ODORIZZI:  You may have to, Your Honor,

10   because we know that --

11         JUDGE GRIESBACH:  It's not enough not to let

12   partisanship enter the picture.  You have to actually --

13         MS. ODORIZZI:  Take account of it.

14         JUDGE GRIESBACH:  -- take account of it.

15         MS. ODORIZZI:  So that you are treating people

16   equally.

17         JUDGE GRIESBACH:  You're treating them

18   differently because you're taking into consideration the

19   Democratic voters are all in one place and the

20   Republicans are more disbursed.

21         MS. ODORIZZI:  Well, Your Honor, there are an

22   infinite number of maps you can draw, and what this case

23   shows and our allegations show is that when you put a

24   map-making process in the hands of politicians, they're

25   going to look at the political impact of it.

1      JUDGE GRIESBACH:  So we're going to put the

2   map-making process in the hands of academic instead of

3   politicians.

4      MS. ODORIZZI:  No, I think it's perfectly fine

5   for politicians to do it.  The problem is here and the

6   interesting part about -- it's all alleged in our

7   Complaint what the Legislature did here is they didn't

8   just engage in cracking/packing, they hired a political

9   scientist who looked at and forecast what was going to

10   happen in every district.  And so to see did we really

11   pack and crack those Democrats so that we will get a

12   maximum Republican result and he was remarkably

13   accurate.  If we take what he did and apply our

14   efficiency gap to it, he predicted it to a tee 12

15   percent.

16      JUDGE CRABB:  Can I ask you something about the

17   efficiency gap?  It seems to me that the two experts

18   measure that in two different ways.

19      MS. ODORIZZI:  They arrive at a result

20   differently.  Professor Mayer actually did it by looking

21   at a district by district -- every district he saw what

22   the differences were.  What's the gap in a particular

23   district and he added them all up.  So he really did it

24   from the ground up.

25      Professor Jackman did kind of a shortcut because he

1    was doing them with, you know, statehouses over 40 years

2    and he applied a consistent methodology.  So he did a

3    shortcut, but he's measuring the same thing.  And we

4    believe that if you look at it, you'll see you can't do

5    it on a motion to dismiss.  But we think if you looked

6    at it at trial, you would see that the methodologies

7    mesh and that they are measuring, in fact, the very same

8    thing.  I think that's a question of fact.

9         JUDGE RIPPLE:  When you spoke about the experts

10   earlier, you didn't mention that they had addressed the

11   issue of durability.

12        MS. ODORIZZI:  Yes.

13        THE COURT:  Can you please tell me what role

14   you think durability plays in the analysis.

15        MS. ODORIZZI:  Well, I think the *Bandemer* court

16   talked about a sustained impact, looking at the specific

17   language.

18        JUDGE RIPPLE:  I'm familiar with *Bandemer* --

19        MS. ODORIZZI:  Right.

20        JUDGE RIPPLE:  -- and other courts have talked

21   about it as well.

22        MS. ODORIZZI:  Right.

23        JUDGE RIPPLE:  I'm trying to see how your

24   particular approach to the problem speaks to durability.

25        MS. ODORIZZI:  Well, it does, Your Honor,

1  because what our expert says, and again, this is expert

2  testimony that, of course, has to be taken as true on a

3  motion to dismiss.

4          JUDGE RIPPLE:  Exactly.

5          MS. ODORIZZI:  But what our expert says is that

6  looking historically, you can predict with a high level

7  of accuracy that this map is going to stay a Republican

8  map.  It's very durable for the entire election cycle no

9  matter that you have population changes, no matter that

10  you may have ticket splitters, no matter that you have

11  some people changing their affiliation.

12          JUDGE RIPPLE:  So therefore it would be

13  relevant to Justice Kennedy's two points of fair and

14  effective representation --

15          MS. ODORIZZI:  Yes.

16          JUDGE RIPPLE:  -- as well as to extent or depth

17  of political burden.

18          MS. ODORIZZI:  Exactly, Your Honor.  I think

19  that's exactly right.  So we have all of those things.

20  We have intent to create this partisan political

21  advantage, absolutely accomplish the intent, and did it

22  in a way that is off the charts historically, that is

23  going to be highly durable, and we say that creates at

24  least a presumption that this is an unconstitutional --

25  that this is the excessive partisan gerrymandering.  And

then if the state wants to come back and say no, no, no,
it was necessary, there's no other way to do it, it had
to be this, they can because of the political geography
of the state.

But we have a report from Professor Mayer who's
created a map that is as good or better than the current
map in all of the traditional redistricting terms.  It
may be even a little better on some measures and it has
a 2 percent efficiency gap.

JUDGE CRABB:  As I understand it, the proposed
plan assumes that the districts are contested and that
there are no incumbents.  And I want to know why those
assumptions are necessary and do they skew the results.

MS. ODORIZZI:  Right.  They had to make certain
assumptions on where you have uncontested races in
actuality about what you would get if there were
contested races.  So Professor Jackman, Professor Mayer,
they do make certain assumptions looking at what is
happening in that same election about if you had a
contested race, how many wasted votes you would have.
Because otherwise you would be skewing the analysis by
saying well, if there was a Democrat running
uncontested, all of the Democratic votes practically are
wasted because they're unnecessary to elect that person.
They only need one vote.

1    So that's something that the political scientists

2    do.  And again, I think that's an issue for a trial, not

3    for a motion to dismiss.

4        JUDGE RIPPLE:  If I could ask you to address

5    something I know has puzzled me.  In your papers you

6    talk about, pardon me if I don't use your exact

7    language, a victory margin; that the prevailing party

8    should win some more seats than the votes garnered I

9    gathered.  You don't quite tell us why and I must say

10   I'm dumbfounded.  I really had difficulty following that

11   discussion.

12       MS. ODORIZZI:  Well, Your Honor, I think if

13   you're talking about whether we're trying to distinguish

14   between proposal representation and partisan symmetry,

15   the fact is that you can have plans that have efficiency

16   gaps that nevertheless aren't going to lead to

17   proportional representation.  And you can have gap or

18   plans where you have proportional representation so that

19   your seat -- number of seats is the same as your

20   percentage of the statewide vote but yet they do have an

21   efficiency gap.  So the only point we were trying to

22   make is that the efficiency gap, the concept of partisan

23   symmetry is not the same as the kind of more simplistic

24   notion that, you know, if you get 60 percent of the

25   statewide vote, you'll have to get 60 percent of the

1  seats.  We don't think that's the case.  There is no

2  constitutional principle.  Our view is you just have to

3  be treated fairly in the system and the system can't be

4  rigged against you structurally so that more of your

5  votes are wasted than the other side's votes.

6      I don't know if I answered your question or not.

7      JUDGE RIPPLE:  You came closer than the written

8  material, yes.

9      JUDGE CRABB:  Do you think that the

10 redistricting in this case, the problems are more severe

11 than the ones that were at issue in *Bandemer* and *Vieth*

12 and *Radogno* or do you think they are just better tools

13 now for assessing a constitutional violation?

14     MS. ODORIZZI:  Well, I think, Your Honor, in

15 *Bandemer* the court said -- I think Justice White said we

16 can't be sure this is going to endure.  We really don't

17 know if this is kind of an artifact that we had one

18 election cycle.  And I think that here we do know and so

19 we do have better tools now to analyze it.  In the other

20 cases, they had not gone through this kind of analysis

21 and, in fact, the whole idea of partisan symmetry which

22 was raised in *LULAC* was really raised by an amicus and

23 they calculated a partisan bias.  But it really wasn't

24 the test that the plaintiffs were putting forward.  So

25 it didn't get the kind of vetting that we hope this

1  court will give us by having a trial of the case.

2       So I think it's hard to tell going backwards what

3  they would do, how the Court would have reacted to this.

4  All we can say is that they haven't said it's not

5  justiciable.  They haven't said that it's constitutional

6  to have excessive partisan gerrymandering, and they've

7  left the door open to this precise type of concept and

8  now we've come forward with a metric that we think is

9  manageable and it's logical, it's similar to the

10  one-person, one-vote cases in terms of figuring out what

11  a cutoff is.  It didn't force everybody to have kind of

12  the platonic ideal of perfect symmetry.  It allows a lot

13  of play in the joints, but it would enable the court to

14  strike down the kind of gerrymandering that we think is

15  at issue here that's really extreme.

16       And I just wanted to say something about the

17  court-ordered plan because I think counsel misspoke when

18  he said that the court looked at partisan issues.  It

19  did not --

20            JUDGE CRABB:  It did not.

21            MS. ODORIZZI:  -- in the 2000s plan.  In the

22  1990 plan, I think the court really did try to avoid any

23  partisan tilt in it.  It succeeded.  In 2000, the court

24  was more interested in just fixing the skewing of the

25  numbers that had happened through population shifts and

1    it really didn't look at this question of what's going
2    to be the impact on this in terms of partisanship.  It
3    looked a little bit at incumbency because people
4    complained that they were pitting two incumbents against
5    each other, and the court fixed some of that.  But it
6    really wasn't conducting this kind of analysis.
7         And if you look, I think it's page 72 of our filing
8    of our Complaint, you will see it gives Wisconsin's --
9    the Assembly's efficiency gap over the years and you
10   will see that the efficiency gap from the quarterly plan
11   of the 2000s is kind of all over the lot, and at the
12   end, in the last election, in the 2010 election, it was
13   pretty small, the efficiency gap was.  And what happened
14   then from the redistricting that the Republican
15   leadership did, with the idea again of creating a very
16   large efficiency gap, they didn't call it that, but of
17   having that resolved, there's a very big swing and that
18   to us is the essence of partisan gerrymandering.
19        Your Honor, asked a question about standing that
20   I'd just like to address briefly.  We only have voters
21   from certain parts of the state.  If the court thought
22   that this was an issue that should be done more
23   statewide, we could turn it into a class action.  We
24   could add more plaintiffs.  And we would want to amend
25   our complaint if the court thought that was an issue.

1    But we would point out that in the Supreme Court

2  cases, the courts did not -- those were all statewide

3  gerrymandering cases and the majority did not strike

4  them down and say well, you cannot do that.  Instead you

5  have to have specific districts.  And this really is a

6  different kind of situation than the racial

7  gerrymandering cases where you're talking about a

8  specific district line.  Here the impact is statewide.

9  The efficiency gap only makes sense statewide.

10    In *Vieth*, it's true that you had a couple of the

11  dissenters talk about partisan gerrymandering on a

12  district basis, but that was more yes, we would do that,

13  than boy, there's no way that you could possibly do this

14  on a statewide basis.  So we think that that's a little

15  bit of a red herring.

16    If the Court has no more questions, I'll just end

17  with a plea that what we're seeing today, and I think

18  the expert reports support it, is a historic level of

19  partisan gerrymandering all over the United States.  It

20  is at levels that you've just never seen in 40 years.

21  And if the courts look at this and say well, there's

22  really nothing we can do about it, there's no way we can

23  deal with it, that is just going to go on and on and

24  eventually it is going to disrupt not only the rights of

25  people to be treated equally as voters, but also basic

1    principles of constitutional democracy.

2        So we would ask the Court to please deny the

3    motion, let us have a trial, figure out what the facts

4    are here, and then however the case comes out, we see

5    what happens at the next level.

6            JUDGE RIPPLE:  I hate to ask a question after a

7    conclusion like that, but --

8            MS. ODORIZZI:  That's fine, Your Honor.

9            JUDGE RIPPLE:  -- I do have one.  The same

10   question I asked your brother a few moments ago, and

11   that is, with respect to the possibility of these

12   traditional tools of gerrymandering or geographical

13   necessity, the cases seem to indicate that they have

14   some sort of a burden of introducing those.  But I

15   wonder is it a burden of simply placing them at issue or

16   is it an absolute affirmative defense that they have to

17   establish?

18           MS. ODORIZZI:  I think, Your Honor, under our

19   test as we've proposed it, once we show that you have

20   this intent, the big efficiency gap, durable efficiency

21   gap, the burden shifts to them to show that it was

22   really necessary in order to achieve other goals, just

23   like you would in one-person, one-vote cases.  You can

24   go over 10 percent, but you have to show it was really

25   necessary.

1       Now, Your Honors obviously can fiddle with that

2  burden.  We think we've met it and that we could meet it

3  and that we could show it was not necessary.  But

4  whoever has the burden, I think the question at the end

5  of the day has to be is the gerrymander here, is it

6  necessary in light of these other issues, Voting Rights

7  Act issues, political subdivisions, all of those things

8  that are normal.  And again, we have done a plan that

9  meets all of those at least as well and we think better

10 in some ways than the current plan and still has only a

11 2 percent efficiency gap.

12      Thank you.  Oh, I'm sorry, Your Honor.

13      JUDGE CRABB:  You still have time, so I'm going

14 to use it up.  You argued in your brief that the right

15 at issue is the constitutional right to equal treatment

16 in the electoral system; the right not to be treated

17 differently based on the voters' political beliefs, and

18 that a necessary consequence of that right is that both

19 major parties should be able to translate their popular

20 support into legislative representation with

21 approximately equal ease, and I think that sounds

22 terrific.  But I can't see that the Supreme Court has

23 ever recognized that right, and, in fact, it seems to me

24 from the cases that I read that it has rejected that as

25 a right.

1        MS. ODORIZZI:  Well, Your Honor, I think going

2   back, what I said at the beginning, excessive partisan

3   gerrymandering is -- I think the court unanimously has

4   said it is unconstitutional.  So you have to kind of

5   look at well, why is it unconstitutional.  And I think

6   the reason is because you can't treat voters differently

7   based on their political beliefs.  And we think the

8   corollary of that is if you're putting -- if you're

9   packing and cracking voters because you perceive them to

10  be Democrats, that that can't possibly be

11  constitutional.  So the expression of that, we've kind

12  of turned that around so if you look at the other end of

13  the telescope, what that tells you is you have to -- the

14  system has to treat people more or less equally in terms

15  of their opportunity to turn their votes into seats.

16  And so I guess, you know, maybe that's the missing step

17  because when you crack and pack adherence of your

18  opponent's party the way they did in this case, you are

19  really discriminating against them based on their

20  political beliefs and diluting their voting power based

21  on your desire to entrench yourself.

22        JUDGE CRABB:  But isn't that what was done in

23  *LULAC* and --

24        MS. ODORIZZI:  I think it was, yes, Your Honor.

25  But again, in those cases what the court said was

1  missing is you can do a little bit of that, and that's

2  the problem.  You can do some of it.  The question --

3  when it becomes excessive, it's unconstitutional.  So

4  the problem is just how do we draw that line between

5  what we accept as being just part of the political

6  system and the fact that we have legislatures draw these

7  lines who have conflicts of interest, of course.

8          JUDGE CRABB:  It's sounding a lot like the

9  standards for pornography.

10         MS. ODORIZZI:  How do I know it when I see it.

11 Yes, Your Honor.  But here I think, and what the court

12 is looking for, what Justice Kennedy is clearly looking

13 for, is somebody come up with a metric, a standard that

14 I can look at and not be making arbitrary decisions on.

15 And we think that we've come up with one.  You can't

16 decide it all in one shot.  But like the one-person,

17 one-vote cases, it's the kind of thing that can be

18 decided over time as you get one case and maybe another

19 case and another case and hopefully then we won't have

20 the need for a whole lot of more cases because

21 legislators will restrain themselves and not try and

22 engage in this activity to this extent where the

23 political system just can't cure itself because it's

24 structurally biased against a particular group of

25 voters.

1        Thank you.

2            JUDGE RIPPLE:   Thank you, Counsel.

3  Mr. Assistant Attorney General, you have reserved five

4  minutes.

5            MR. KEENAN:   Yeah, I will just address a couple

6  of points.   To the burden of proof, burden of production

7  question, I think -- I haven't seen it in the post-*Vieth*

8  world and the plaintiffs didn't point out any case that

9  survived past a motion to dismiss where this has come

10 into play.   So I don't -- I think the answer is that we

11 never get to that point because the case gets dismissed.

12       Secondly, the efficiently gap --

13            JUDGE GRIESBACH:   Do you have any cases that

14 involve this same type of expert report?

15            MR. KEENAN:   I don't -- none of the efficiency

16 gap expert reports.   I'm not sure if they involved --

17            JUDGE GRIESBACH:   This is new --

18            MR. KEENAN:   This is new, yes.

19            JUDGE GRIESBACH:   -- I thought.

20            MR. KEENAN:   Professor Mayer's efficiency gap,

21 which is like a district-by-district calculation, is not

22 just the actual votes.   There's various adjustments that

23 are made to them, which Judge Crabb pointed out one of

24 them is for uncontested seats, which seems reasonable.

25 The other one is incumbency they adjust for, which I

1    don't know if that's appropriate.  I mean the incumbents

2    are running, and if there is an advantage there, that's

3    affecting the vote totals.  Perhaps it's a reason to

4    back it out, but perhaps it's not.  But it isn't actual

5    votes.

6            JUDGE GRIESBACH:  Perhaps you need an expert to

7    let us know.

8            MR. KEENAN:  No.  I think you could say that

9    that's just a sign that it's not a manageable standard.

10   But the reason -- and where does -- you were asking some

11   questions about the vote curve and, like, where does

12   that come from.  From my -- my reading of the Jackman

13   report is that that's the way things have happened in

14   the past.  Like looking at past elections, this is how

15   things tend to happen.  But it's a very nice perfect

16   curve which would show that it's not actually real, it's

17   just an average of a bunch of things that you put

18   together.  But obviously an average is made up of things

19   below that, things above it.  So the fact that you

20   happen to be one of the people that's below that curve

21   or above that curve shouldn't seem to be an indication

22   that it's unconstitutional because it's not in

23   accordance with elections that happen in other

24   jurisdictions that have different districts and

25   different populations and things.

1        Going to the durability question, it isn't

2   impossible for districts to flip back and forth between

3   Democratic and Republican districts.  I looked at the

4   plaintiffs' Complaint.  They go through a number of

5   examples of alleged cracking and packing where they say

6   well, in Kenosha you did this in District 26 and

7   District 27, and in Brown County and Manitowac County

8   you did this.

9        Now, they say that in the 2008 election the

10  Democrats won this many seats and the Republicans won

11  this many seats.  So I decided to look at the 2010

12  election how those fared.  Of the 20 seats that were

13  "Democratic seats," nine of them were won by Republicans

14  in the 2010 election.  I mean it shows that these seats,

15  particularly ones that are, like, maybe a 55/45, 52/48,

16  something like that, can go back and forth depending on

17  the candidate, depending on the year, depending on who

18  knows what.  Wisconsin has had very high turnout

19  elections lately in state law, very high profile issues.

20  The voters are paying attention and candidates could win

21  and lose based on these issues.  So I don't think we can

22  say that this is durable and that a Republican seat

23  can't go to a Democrat or a Democrat seat can't go to

24  Republican.  I mean some of them are going to be hard,

25  in Milwaukee or Madison or Waukesha or somewhere like

1    that.  But a lot of them, they could go either way

2    depending on the candidate, depending on the issues,

3    depending on the year, so the economy, things like that.

4         JUDGE RIPPLE:  That's something that should be

5    established in a factual nature, none of them are

6    speculating --

7         MR. KEENAN:  Yes.  Although frankly --

8         THE COURT:  -- on the availability of a blind

9    drawing?

10        MR. KEENAN:  But in any event, you're always

11   going to be speculating as to what's happening in the

12   future and we just can't know what the election is going

13   -- what's going to happen in the 2016 election.  Do we

14   know which presidential candidate will win Wisconsin?  I

15   don't think anybody could know that right now.  I don't

16   think anyone can know what governor candidate is going

17   to win the 2018 election.  Who knows what the issues

18   will be and what will be important to voters and which

19   side will turn out, which side won't turn out.  It's a

20   lot of speculation about the future.

21        In terms of the comment that the gerrymandering in

22   the past two elections is unprecedented, if you look at

23   Mr. Jackman's report on page 75, Figure 36, you notice

24   that a lot of the efficiency gaps are on the left side,

25   which is pro-Republican.  But a lot of these states have

1  pro-Republican efficiency gaps where they don't have

2  Republicans enacting the plans.  For example, Minnesota

3  was a court-enacted plan.  They're right on the border

4  of unconstitutional.  Missouri has one that's about 12

5  percent it looks like.  That was a court plan.  Kansas

6  is both years over 10 percent.  That's the side that had

7  a court plan even though Republicans controlled

8  everything.  There's a fight between moderate and

9  conservative Republicans.  New York shows up as a bad

10 state.  One of them looks to be 13 percent, one of them

11 is 8 percent.  New York is controlled by Democrats.

12 They're not districting to benefit Republicans.

13      The fact is it's not all gerrymandering.  It's just

14 the underlying nature of these districting decisions.

15 If your test is finding all these court plans and

16 Democrat plans to be gerrymanders; for example, I

17 mentioned Illinois has one where that's a

18 pro-Republican, and Iowa, which is often held up as a

19 mile of districting because they use neutral

20 commissions, one of theirs has a -- looks to be like a 7

21 percent efficiency gap for one of the years at least.  I

22 think that shows that when you refer to partisan tilt,

23 what does that mean?  What does that mean?  If a perfect

24 districting body could come down and district and it

25 ended up 6 percent pro-Republican, was that a partisan

1  tilt that's unfair or is that just the nature of the way

2  it should be?  And then are you actually gerrymandering

3  when you go back to a zero percent tilt because you're

4  ignoring districting principles to get it to symmetry?

5  It's hard to say and it's one of the reasons why the

6  Court has just not been able to develop any sort of

7  standards for this and frankly why this court and this

8  case should be dismissed.

9        JUDGE RIPPLE:  Thank you, Counsel.  The Court

10  will take the motion under advisement and expresses its

11  deep thanks to both attorneys for very fine oral

12  arguments today.  We very much appreciate the

13  illumination and help.  The Court will rise until the

14  time and place appointed by law.

15        (Proceedings concluded at 2:36 p.m.)

16                    *  *  *  *  *

17        I, LYNETTE SWENSON, Certified Realtime and
    Merit Reporter in and for the State of Wisconsin,
18  certify that the foregoing is a true and accurate record
    of the proceedings held on the 4th day of November 2015
19  before the Honorable Barbara B. Crabb, Honorable Kenneth
    Ripple and Honorable William Griesbach, the Western
20  District of Wisconsin, in my presence and reduced to
    writing in accordance with my stenographic notes made at
21  said time and place.
    Dated this 12th day of November 2015.

22

                    /s/_____
23                  Lynette Swenson, RMR, CRR
                    Federal Court Reporter

24

25  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means

1  unless under the direct control and/or direction of the
2  certifying court reporter.