IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM WHITFORD, ROGER ANCLAM,
EMILY BUNTING, MARY LYNNE DONOHUE,
HELEN HARRIS, WAYNE JENSEN,
WENDY SUE JOHNSON, JANET MITCHELL,
ALLISON SEATON, JAMES SEATON,
JEROME WALLACE and DONALD WINTER,

                OPINION and ORDER

                Plaintiffs,                    15-cv-421-bbc

        v.

GERALD C. NICHOL, THOMAS BARLAND,
JOHN FRANKE, HAROLD V. FROEHLICH,
KEVIN J. KENNEDY, ELSA LAMELAS and
TIMOTHY VOCKE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action brought under 42 U.S.C. § 1983, plaintiffs are Wisconsin residents and Democratic voters who are challenging the 2012 districting plan for the Wisconsin Assembly on the ground that the plan is an example of "extreme partisan gerrymandering." Cpt. ¶ 2, dkt. #1. Plaintiffs contend that the plan violates the First and Fourteenth Amendments to the United States Constitution because the plan "treats voters unequally, diluting their voting power based on their political beliefs, in violation of the Fourteenth Amendment's guarantee of equal protection" and "unreasonably burdens their First Amendment rights of association and free speech." Id.

Defendants have filed a motion to dismiss, dkt. #24, which is ready for review. Although we believe that plaintiffs face significant challenges in prevailing on their claims, we conclude that plaintiffs' complaint is sufficient to state a claim upon which relief may be granted. Accordingly, we are denying defendants' motion to dismiss.

In their complaint, plaintiffs allege the following facts.

## ALLEGATIONS OF FACT

### A. <u>Parties</u>

Plaintiffs William Whitford, Roger Anclam, Emily Bunting, Mary Lynne Donohue, Helen Harris, Wayne Jensen, Wendy Sue Johnson, Janet Mitchell, James Seaton, Allison Seaton, Jerome Wallace and Don Winter are United States citizens registered to vote in Wisconsin. They reside in various counties and legislative districts throughout the state. All of them are "supporters of the public policies espoused by the Democratic Party and of Democratic Party candidates." Cpt. ¶ 15, dkt. #1.

Defendant Gerald C. Nichol is the chair of the Wisconsin Government Accountability Board, which is responsible for the administration of Wisconsin's laws relating to elections and election campaigns. Defendants Thomas Barland, John Franke, Harold V. Froehlich, Elsa Lamelas and Timothy Vocke are all members of the board. Defendant Kevin J. Kennedy is the director and general counsel for the board.

B.  <u>Passage of Wisconsin Act 43</u>

In January 2011, Scott Fitzgerald, Republican member of the Wisconsin State Senate and Senate Majority Leader, and Jeff Fitzgerald, Republican member of the Wisconsin State Assembly and Speaker of the Assembly, hired lawyer Eric McLeod and the law firm of Michael, Best & Friedrich, LLP, to assist with the reapportionment of the state legislative districts after the 2010 Census.   The intent of the speaker and majority leader was to design a pro-Republican partisan gerrymander.  To accomplish this goal, the firm supervised the work of legislative aides in planning, drafting and negotiating Wisconsin Act 43, which contains the 2012 Assembly districting plan.

The law firm and the aides used past election results to measure the partisanship of the electorate and to design districts that would maximize the number of districts that would elect a Republican and minimize the number of districts that would elect a Democrat. This would be accomplished in two ways, by "cracking" or "packing."  Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins.  Both cracking and packing result in "wasted" votes, that is, votes cast either for a losing candidate (in the case of cracking) or for a winning candidate but in excess of what he or she needed to prevail (in the case of packing).

The firm and the aides received assistance from Dr. Ronald Keith Gaddie, a professor of political science at the University of Oklahoma.  Gaddie created a model that analyzed the expected partisan performance of all of the districts established by Act 43. Gaddie's

model forecast that the Assembly plan would have a pro-Republican "efficiency gap" of 12 percent. The efficiency gap is the difference between the parties' respective wasted votes in an election, divided by the total number of votes cast.

All redistricting work was done in the firm's office.  Only the speaker, the majority leader, their aides, McLeod and legal staff designated by McLeod would have unlimited access to the plan while it was prepared.  The access policy provided for limited access by other Republican legislators:

> Legislators will be allowed into the office for the sole purpose of looking at and discussing their district. They are only to be present when an All Access member is present. No statewide or regional printouts will be on display while they are present (with the exception of existing districts). They will be asked at each visit to sign an agreement that the meeting they are attending is confidential and they are not to discuss it.

Cpt. ¶ 38, dkt. #1.  Democratic legislators were not granted any access to the office.  They had no involvement in drafting the plan.

After signing the secrecy agreements contemplated by the policy, Republican legislators were allowed to see only small portions of the map.  This included information regarding how their own districts would be affected.  Under the direction and supervision of McLeod, the aides met with Republican members of both houses.  Each of the members signed a secrecy agreement entitled "Confidentiality and Nondisclosure Related to Reapportionment" before being allowed to review and discuss the plan.

On July 11, 2011, the plan was introduced by the Committee on Senate Organization.  At that time, no Democratic members of the legislature had seen their districts or the plan as a whole.

On July 13, 2011, a public hearing was held.  On July 19, 2011, the Senate passed the bill; on July 20, 2011, the Assembly passed it.  On August 23, 2011, Act 43 was published.

The firm received $431,000 from public funds for their work on the plan.

## C.   Comparison of Wisconsin Act 43 to Other Plans

From 1972 to 2014, the median efficiency gap for state house plans across the country was close to zero.  This indicates that neither party has enjoyed an overall advantage in state legislative redistricting during the modern era.  However, recently the average absolute efficiency gap, that is,  the mean of the absolute values of all plans' efficiency gaps in a given year, has increased sharply. This metric stayed roughly constant from 1972 to 2010, but in the current cycle, it spiked to the highest level recorded in the modern era, more than 6 percent for state house plans.

Between 1972 and the present, the efficiency gaps of Wisconsin's Assembly plans became steadily larger and more pro-Republican. The current plan represents the culmination of this trend, exhibiting the largest and most pro-Republican efficiency gap ever recorded in modern Wisconsin history. In the 1970s, the Assembly plan had an average efficiency gap close to zero. In both the 1980s and the 1990s, it had an average pro-Republican gap of 2 percent. The Republican advantage deepened in the 2000s to an average gap of 8 percent.  Under the current plan, the average gap is 11 percent.

A 7 percent efficiency gap is at the edges of the overall distribution of all state house

plans in the modern era, making it indicative of uncommonly severe gerrymandering. Historical analysis shows that with a 7 percent efficiency gap, the gerrymandering is also likely to be unusually durable.  Over its lifespan, a plan with an efficiency gap of that magnitude is unlikely ever to favor the opposing party.

In 2012, the current plan produced a pro-Republican efficiency gap of 13 percent. In 2014, it was 10 percent. The 2012 figure represents the 28th largest score in modern American history (out of nearly 800 total plans), placing the current plan in the most partisan 4 percent of this distribution, more than two standard deviations from the mean. This historical data suggests that there is close to a zero percent chance that the current plan's efficiency gap will ever favor the Democrats during the remainder of the decade.  Prior to the current cycle, not a single plan in the country had efficiency gaps as high as the current plan's in the first two elections after redistricting.

Using a more detailed methodology available only for Wisconsin, the current plan produced a pro-Republican efficiency gap of 12 percent in 2012. This is a figure nearly identical to the one calculated using the national data. It is also the same efficiency gap predicted by Dr. Gaddie when the plan was being drafted.

Under the current plan, Republican candidates have been far more likely to prevail in close races.  In addition, there were eight districts in which Democrats won with more than 80 percent of the vote. There were no districts in which Republicans won by such a wide margin.  Across Wisconsin, the current plan systematically alters prior district configurations to waste larger numbers of Democratic votes and smaller numbers of

Republican votes.

### D.  Possible Alternatives to Wisconsin Act 43

It would have been possible for Wisconsin to enact an Assembly plan that treated both parties symmetrically.  Under a plan prepared by plaintiffs, the efficiency gap would have been 2 percent in 2012 (assuming that races were contested and that no races included an incumbent).  This score is attributable to plaintiffs' efforts not to crack and pack Democratic voters and instead to enable both parties to convert their popular support into legislative seats with equal ease.

Plaintiffs' plan performs at least as well as the current plan on every other metric used by courts to evaluate the validity of a districting plan.  Both plans have total population deviations of less than 1 percent. Both plans have six African American opportunity districts and one Hispanic opportunity district.  Plaintiffs' plan splits one fewer municipal boundary than the current plan.  The districts in plaintiffs' plan are substantially more compact than the current plan (average compactness of 0.41 versus 0.28).

### OPINION

### A.  Standard of Review

To satisfy federal pleading standards, a plaintiff need only draft a complaint that provides the defendants adequate notice and "state[s] a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Ashcroft v.

Iqbal, 556 U.S. 662, 678  (2009).  "Plausible" does not mean "probable."  Iqbal, 556 U.S. at 678.  See also Alexander v. United States, 721 F.3d 418, 422 (7th Cir. 2013) ("[I]t is not . . . necessary (or appropriate) to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences.") (internal quotations omitted).  Rather, "plausible" means that the plaintiffs' allegations are sufficient to raise a right to relief above the speculative level.  Twombly, 550 U.S. at 555.  The same standard applies to both the merits and jurisdiction.  Silha v. Act, Inc., No. 15-1083, — F.3d —, 2015 WL 7281602, at *4 (7th Cir. Nov. 18, 2015) ("When evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use Twombly–Iqbal's 'plausibility' requirement.").  We must accept all well-pleaded factual allegations as true and view them in the light most favorable to the plaintiffs.  Luevano v. Wal–Mart Stores, Inc., 722 F.3d 1014, 1027 (7th Cir. 2013).

## B.  Political Question Doctrine

In their opening brief, defendants ask this court to grant their motion to dismiss on the ground that plaintiffs' claims are not justiciable, or, more specifically, that partisan gerrymandering claims raise political questions that only other branches of government can resolve because the claims lack a judicially manageable standard.  Zivotofsky ex rel. Zivotofsky v. Clinton, 132 S. Ct. 1421, 1427 (2012) ("[A] controversy involves a political question where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable

standards for resolving it.") (internal quotations and alterations omitted).  We decline this request because defendants' position has not been adopted by a majority of the justices on the Supreme Court.  In Davis v. Bandemer, 478 U.S. 109, 123 (1986), the Court rejected the argument that partisan gerrymandering claims are nonjusticiable political questions.  In Vieth v. Jubelirer, 541 U.S. 267, 305 (2004), four justices expressed the view that partisan gerrymandering is a political question, but the other five justices rejected that view.  In League of United Latin American Citizens v. Perry, 548 U.S. 399, 420 (2006), the Court declined to revisit the issue.  Since LULAC, the Court has not considered the merits of a partisan gerrymandering claim, so we conclude that Bandemer still controls on the narrow question whether partisan gerrymandering claims are barred under the political question doctrine.  See also Shapiro v. McManus, No. 14-990, — U.S. — 2015 WL 8074453, at *5 (U.S. Dec. 8, 2015) (acknowledging that a majority of the Court has declined to find partisan gerrymandering claims nonjusticiable).  Until a majority of the Supreme Court rules otherwise, lower courts must continue to search for a judicially manageable standard.

## C.  Standing

In an order dated November 17, 2015, dkt. #38, we asked the parties to submit supplemental briefs on the threshold question whether plaintiffs have standing to sue under the test articulated in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), which requires the plaintiffs to show that they have suffered a concrete and particularized injury that is fairly traceable to the defendants' conduct and that is likely to be redressed by

winning the lawsuit.  In particular, we asked the parties to discuss  whether a voter has a legal interest in the election results outside his or her own district. Having reviewed the parties' submissions, we are persuaded that plaintiffs have met their burden at the pleading stage to allege that they have standing.

In their supplemental briefs, plaintiffs say that their injury is set forth in paragraph 16 of their complaint:

> Regardless of where they reside in Wisconsin and whether they themselves reside in a district that have been cracked or packed, all of the plaintiffs have been harmed by the manipulation of district boundaries in the Current Plan to dilute Democratic voting strength. As a result of the statewide partisan gerrymandering, Democrats do not have the same opportunity provided to Republicans to elect representatives of their choice to the Assembly.  As a result, the electoral influence of plaintiffs and other Democratic voters statewide has been unfairly, disproportionately, and undemocratically reduced.

In other words, we understand plaintiffs to identify their injury as not simply their inability to elect a representative in their own districts, but also their reduced opportunity to be represented by Democratic legislators across the state.  Plts.' Supp. Br., dkt. #41, at 5 ("The Current Plan's enormous (and intentional) pro-Republican efficiency gap injures all Democrats in Wisconsin by diluting the collective value of their individual votes on a statewide basis.").

In arguing that plaintiffs do not have standing to bring a statewide challenge, defendants point to Justice Stevens' dissent in Vieth, 541 U.S. at 327-28, in which he suggested that a plaintiff's standing in a political gerrymandering case should be governed by the same standard as a racial gerrymandering case under the equal protection clause, which generally limits a plaintiff's standing to the district in which he or she lives.  Alabama

10

Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1265 (2015) ("[A] voter who lives elsewhere in the State. . . normally lacks standing to pursue a racial gerrymandering claim."). Because plaintiffs have not joined a Democrat from each of the 99 Assembly districts, defendants argue that plaintiffs lack standing to bring a statewide challenge.  Lower courts and commentators have also raised questions about whether the type of injury plaintiffs allege is sufficiently concrete and particularized to confer standing.  E.g., Radogno v. Illinois State Bd. of Elections, No. 1:11-CV-04884, 2011 WL 5025251, at *4 (N.D. Ill. Oct. 21, 2011) ("The standing analysis for political gerrymandering claims is complicated by the largely unresolved status of political gerrymandering claims in general. That is, even if such claims are theoretically viable . . .  it is not particularly clear who would have standing to bring them."); Heather K. Gerken, Lost in the Political Thicket: The Court, Election Law, and the Doctrinal Interregnum, 153 U. Pa. L. Rev. 503, 509 n.31 (2004) (noting "the difficulty that those endorsing a purely individualist approach to the partisan gerrymander would encounter in describing the injury in sufficiently concrete terms to confer standing").

Although the answer is not free from doubt, we conclude that plaintiffs' alleged injury is sufficiently concrete and particularized under current law to satisfy Lujan with respect to a statewide challenge to the districting plan, even without a plaintiff from every legislative district.  In each of the three cases in which the Supreme Court considered partisan gerrymandering claims, the plaintiffs were challenging the plan statewide, yet only one justice (Justice Stevens) questioned the plaintiffs' standing.   LULAC, 548 U.S. at 419-20 (opinion of Kennedy, J.) (discussing statewide scope of plaintiffs' partisan gerrymandering

11

claims); <u>Vieth</u>, 541 U.S. at 285 (plurality opinion) ("[A]ppellants propose a test that is satisfied only when partisan advantage was the predominant motivation behind the entire statewide plan.") (internal quotations omitted); <u>Bandemer</u>, 478 U.S. at 127 ("[T]he claim made by the appellees in this case is a claim that the 1981 apportionment discriminates against Democrats on a statewide basis.").  Arguably, Justice O'Connor raised a similar concern in <u>Bandemer</u>, although she treated the issue as one related to the merits rather than standing.  <u>Bandemer</u>, 478 U.S. at 153 ("To treat the loss of candidates nominated by the party of a voter's choice as a harm to the individual voter, when that voter cannot vote for such candidates and is not represented by them in any direct sense, clearly exceeds the limits of the Equal Protection Clause.").

　　As we noted in the November 17 order, the Supreme Court's failure to address standing in <u>Bandemer</u>, <u>Vieth</u> and <u>LULAC</u> is not dispositive because "assumptions—even on jurisdictional issues—are not binding."  <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470, 478–79 (2006).   However, it seems telling that the Supreme Court has not rested its determinations on this threshold issue.  Even in <u>Vieth</u>, in which the district court found expressly that the plaintiffs had standing to raise a statewide claim, <u>Vieth v. Pennsylvania</u>, 188 F. Supp. 2d 532, 539-40 (M.D. Pa. 2002), and Justice Stevens raised standing concerns, the other justices did not think it necessary to consider the issue, even though dismissing the case for lack of standing would have involved a more straightforward analysis than a discussion of the political question doctrine or the merits.  Again, when the Court decided <u>LULAC</u> two years later, only Justice Stevens discussed standing.

In other cases, the Supreme Court has recognized injuries similar to those alleged by plaintiffs in this case.  For example,  in cases challenging the drawing of legislative districts under Section 2 of the Voting Rights Act, the harm may include the dilution of a racial minority's political power through "cracking" and "packing" that minority in order to minimize the number of districts in which that minority may elect the candidate of its choice.  E.g., Johnson v. De Grandy, 512 U.S. 997, 107 (1994) ("[M]anipulation of district lines can dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.").  See also LULAC, 548 U.S. at 496 (Roberts, C.J., concurring in part, concurring in the judgment and dissenting in part) ("[A] § 2 plaintiff must at least show an apportionment that is likely to perform better for minority voters, compared to the existing one.").  Under Section 2, the scope of the claim is tied to the scope of the injury, so standing to sue is limited to "[p]laintiffs [who] reside in a reasonably compact area that could support additional" majority-minority districts.  Pope v. Cty. of Albany, No. 1:11-CV-0736 LEK/CFH, 2014 WL 316703, at *5-6 (N.D.N.Y. Jan. 28, 2014) (citing Johnson, 512 U.S. at 1013-15).

Because plaintiffs' alleged injury in this case relates to their statewide representation, it follows that they should be permitted to bring a statewide claim.  As plaintiffs point out, the  Supreme Court has found that individual plaintiffs have standing to bring challenges to the entire state's districting map in "one-person, one-vote" cases, in which the plaintiffs

allege that population differences among legislative districts violate the equal protection clause.  Baker v. Carr, 369 U.S. 186, 204-08 (1962).  At this stage, this is further support for a more general view that plaintiffs challenging legislative districts have standing to challenge the entire state plan when the nature of the injury is statewide.  Defendants say that Baker is only about the dilution of an individual vote, but that is not necessarily true.  Bandemer, 478 U.S. at 166-67 ("While population disparities do dilute the weight of individual votes, *their discriminatory effect is felt only when those individual votes are combined*.") (emphasis added) (opinion of Powell, J.).

We acknowledge that the Supreme Court's limited discussion of standing in the context of gerrymandering claims leaves some questions unanswered.  E.g., Richard H. Fallon, Jr., The Fragmentation of Standing, 93 Tex. L. Rev. 1061, 1117 (2015) (stating that injury recognized in "one-person, one-vote" cases does "not fit comfortably within the conceptual bounds" of Lujan framework); Timothy G. O'Rourk, Shaw v. Reno: The Shape of Things to Come, 26 Rutgers L.J. 723, 773 (1995) (questioning whether standing in "one-person, one-vote" cases should be treated differently from racial gerrymandering cases).  Although it may be that ultimately the Supreme Court decides to limit standing in all gerrymandering cases the same way it has limited racial gerrymandering claims under the equal protection clause, we believe that, under current law, plaintiffs have adequately alleged an injury in fact.

We reach the same conclusion with respect to the second and third elements of standing, which are causation and redressability.  Plaintiffs have alleged that defendants'

14

districting plan has denied them a fair chance to elect representatives across the state and that adopting a new plan that complies with their theory of partisan symmetry would make it easier for them to gain representation.  At this stage of the proceedings, we must accept those allegations as true.

Our conclusion that plaintiffs have adequately alleged standing is supported by defendants' failure to cite any cases in which a court found in a partisan gerrymandering case that the plaintiffs did not have standing to bring a statewide challenge.  Although the cases plaintiffs cite contain little discussion of standing, we are hesitant to dismiss a case for lack of standing based solely on the pleadings when other courts considering partisan gerrymandering consistently have assumed that standing exists to challenge a statewide plan. E.g., Perez v. Perry, 26 F. Supp. 3d 612 (W.D. Tex. 2014); Baldus v. Members of Wisconsin Government Accountability Board, 849 F. Supp. 2d 840 (E.D. Wis. 2012); Committee for a Fair and Balanced Map v. Illinois State Board of Elections, 835 F. Supp. 2d 563 (N.D. Ill. 2011); Fletcher v. Lamone, 831 F. Supp. 2d 887, 903-04 (D. Md. 2011); Perez v. Texas, 2011 WL 9160142, at *9 (W.D. Tex. 2011); Radogno v. Illinois State B of Elections, 2011 WL 5868225 (N.D. Ill. 2011); Radogno v. Illinois State Board of Elections, 2011 WL 5025251, at *4 (N.D. Ill. 2011).

Accordingly, we are denying defendants' motion to dismiss for lack of standing. However, defendants are free to raise this issue again on a more developed record in the context of a motion for summary judgment.

D. <u>Merits</u>

With respect to the merits, the parties focus on plaintiffs' equal protection claim, so we will do the same.  (The parties debate whether defendants' motion seeks dismissal of plaintiffs' First Amendment claim, but we need not resolve that issue because neither side identifies an analytical difference between the two claims.)   Generally, an equal protection claim requires a showing of a discriminatory intent and a discriminatory effect.  <u>Bandemer</u>, 478 U.S. at 127 (plurality opinion) (citing <u>City of Mobile, Alabama v. Bolden</u>, 446 U.S. 55, 67-68 (1980)).  However, because the Supreme Court has stated that some amount of partisan bias is inevitable in redistricting, <u>e.g.</u>, <u>id.</u> at 129 (plurality opinion), the challenge in partisan gerrymandering claims has been in determining "how much is too much" and in choosing the appropriate standard for making that determination.  <u>Vieth</u>, 541 U.S. at 298-99 (plurality opinion); <u>id.</u> at 344 (Souter, J., dissenting).  Thus far, the Supreme Court has not identified a standard for reviewing a partisan gerrymandering claim, but it has left open the possibility that an appropriate standard may be found.  <u>Vieth</u>, 541 U.S. at 306 (Kennedy, J., concurring in the judgment) ("I would not foreclose all possibility of judicial relief if some limited and precise rationale were found to correct an established violation of the Constitution in some redistricting cases.").

Plaintiffs set forth a three-part test for establishing a constitutional violation.  In step one, the plaintiffs must show that the defendants intended to discriminate against an "identifiable political group" of which the plaintiffs are a member.  Plts.' Br., dkt. #31, at 9 (quoting <u>Bandemer</u>, 478 U.S. at 127 (plurality opinion)).  In step two, the plaintiffs must

show a discriminatory effect through a metric called the "efficiency gap," which is discussed more below. If the plaintiffs make the first two showings, the burden shifts to the defendants in step three to show that the efficiency gap was "the necessary result of either a legitimate state policy or the state's underlying political geography." Id. at 10.  Plaintiffs say that they modeled steps two and three after the standard for "one-person, one-vote" gerrymandering cases, under which the state must show that population deviations over ten percent are justified by a legitimate state interest.  E.g., Brown v. Thomson, 462 U.S. 835, 842-43 (1983).

With respect to the first element, plaintiffs point to their allegations that Republican state legislators hired lawyers and an expert for the purpose of redrawing all district lines to maximize Republican victories and minimize wins for Democratic candidates. Cpt. ¶¶ 8, 31, 33-36, dkt. #1. The plan was drafted in secret and without any input from Democrats.  Id. at ¶¶ 8, 31-32, 37-40.  Defendants do not challenge this part of plaintiffs' standard and they do not deny that plaintiffs have adequately alleged discriminatory intent against an identifiable political group (Democratic voters).

The parties focus on whether plaintiffs have adequately pleaded a discriminatory effect and, more generally, whether plaintiffs have identified a judicially discernible and manageable standard for making a showing of discriminatory effect.  Plaintiffs' theory of equal representation comes from a concept called "partisan symmetry," which plaintiffs define as "the idea that a district plan should treat the major parties symmetrically with respect to the conversion of votes to seats and that neither party should have a systematic

advantage in how efficiently its popular support translates into legislative power."  Cpt. ¶ 4, dkt. #1.  See also LULAC, 548 U.S. at 466-67 (Stevens, J., concurring in part and dissenting in part) ("The symmetry standard requires that the electoral system treat similarly-situated parties equally.").

Plaintiffs measure partisan symmetry through what they call the "efficiency gap," which plaintiffs describe as follows:

> [t]he efficiency gap captures in a single number all of a district plan's cracking and packing—the two fundamental ways in which partisan gerrymanders are constructed. Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins. Both cracking and packing result in "wasted" votes: votes cast either for a losing candidate (in the case of cracking) or for a winning candidate but in excess of what he or she needed to prevail (in the case of packing).  The efficiency gap is the difference between the parties' respective wasted votes in an election, divided by the total number of votes cast.

 Cpt. ¶ 5, dkt. #1.  Plaintiffs provide an example to demonstrate how the efficiency gap is calculated:

> Suppose, for example, that there are five districts in a plan with 100 voters each. Suppose also that Party A wins three of the districts by a margin of 60 votes to 40, and that Party B wins two of them by a margin of 80 votes to 20. Then Party A wastes 10 votes in each of the three districts it wins and 20 votes in each of the two districts it loses, adding up to 70 wasted votes. Likewise, Party B wastes 30 votes in each of the two districts it wins and 40 votes in each of the three districts it loses, adding up to 180 wasted votes. The difference between the parties' respective wasted votes is 110, which, when divided by 500 total votes, yields an efficiency gap of 22% in favor of Party A.

Id. at  ¶ 50. (Another measure of partisan symmetry is "partisan bias," which plaintiffs define as "the difference between the shares of seats that the parties would win if they each

received the same share of the statewide vote." Plts.' Br., dkt. #31, at 9.  Although plaintiffs allege that the 2012 Assembly plan demonstrates a high level of partisan bias, the parties focus on the efficiency gap, so we will do the same.)

According to plaintiffs, the efficiency gap accurately measures discriminatory effect because it shows the extent to which a "party . . . enjoy[s] a significant advantage in how efficiently its votes convert into seats." Plts.' Br., dkt. #31, at 18.  Plaintiffs say that such an advantage violates "every voter['s]constitutional right to equal treatment in the electoral system—and the right not to be treated differently based on the voter's political beliefs." Id. Thus, plaintiffs argue,  if they can show that the defendants acted with partisan intent and that the efficiency gap exceeds a "reasonable threshold," then the plan is presumptively unconstitutional. Plts.' Br., dkt. #31, at 9.  In determining the threshold, the court looks at the efficiency gap from other elections over time and across the country.  Id. at 4. Plaintiffs contend that a gap of more than 7 percent is a strong indicator that the bias in favor of a particular party is likely to endure for the life of the districting plan.  Id.

Plaintiffs assert that the 2012 Assembly Plan meets their test because the efficiency gap for the 2012 election was 12 percent and the efficiency gap for the 2014 election was 10 percent, both of which are greater than the threshold.  In their motion, defendants do not challenge the sufficiency of plaintiffs' allegations that a district plan with an efficiency gap as high as Wisconsin's Assembly plan is "highly unlikely ever to become neutral over its ten-year lifespan" or that plaintiffs "can predict with nearly 100% confidence that . . . Wisconsin's Current Plan will continue to unfairly favor Republican voters and

19

candidates—and unfairly disadvantage Democratic voters and candidates—throughout the remainder of the decade." Cpt. ¶ 7, dkt. #1. In addition, defendants do not challenge the sufficiency of plaintiffs' allegations that the Assembly plan's efficiency gap cannot be justified by traditional districting criteria or any other legitimate factor.

Defendants' primary argument is that partisan symmetry is no different from the theories that the Supreme Court has rejected in the past. In particular, defendants say that partisan symmetry is simply a form of proportional representation, which the Supreme Court has said repeatedly is not required by the Constitution. E.g., Bandemer, 478 U.S. at 129-30 (plurality opinion) ("Our cases, however, clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be.").

Plaintiffs argue that the efficiency gap is about comparing the wasted votes of each party, not determining whether the party's percentage of the statewide vote share is reflected in the number of representatives that party elects successfully. At this stage, we must accept as true the allegation that an election's results may have a small efficiency gap without being proportional or they may be proportional and still have a large efficiency gap. Plts.' Br., dkt. #31, at 24 (citing Nicholas O. Stephanopoulos & Eric M. McGhee, Partisan Gerrymandering and the Efficiency Gap, 82 U. Chi. L. Rev. 831, 854 & n.118 (2015)).[1]

---

[1] Plaintiffs provide the following example in their brief:

[A]ssume that a state has ten districts, each with a hundred voters, and two parties, Party A and Party B. Assume also that Party A wins two districts by a

Further, the plaintiffs in <u>Bandemer</u>, <u>Vieth</u> and <u>LULAC</u> did not rely on partisan symmetry in their arguments before the Court and the Court did not reject partisan symmetry as a tool in determining whether partisan gerrymandering is unconstitutional.  <u>LULAC</u>, 548 U.S. at 417 (opinion of Kennedy, J.) (rejecting standard requiring plaintiffs to show "single-minded purpose . . . to gain partisan advantage"); <u>Vieth</u>, 541 U.S. at 284-87 (plurality opinion) (rejecting standard requiring plaintiffs to show "predominant intent to achieve partisan advantage," "systematically 'pack[ing]' and 'crack[ing]' the rival party's voters" and "thwart[ing] plaintiffs' ability to translate a majority of votes into a majority of seats"); <u>Bandemer</u>, 478 U.S. at 129-30 (rejecting proportional representation requirement).

In fact, some of the justices have pointed to partisan symmetry as a theory with promise. <u>LULAC</u>, 548 U.S. at 465-66 (Stevens, J., concurring in part and dissenting in part)("[T]he symmetry standard, a measure social scientists use to assess partisan bias . . . is undoubtedly a reliable standard for measuring a burden on the complainants' representative rights.") (internal quotations and alterations omitted); <u>id.</u> at 483-84 (Souter, J., concurring in part and dissenting in part) ("[N]or do I rule out the utility of a criterion

---

margin of 80 to 20 and four districts by a margin of 70 to 30, and that Party B wins four districts by a margin of 60 to 40. Then there is perfectly proportional representation; Party A receives 600 of the 1000 votes in the state ((2 x 80) + (4 x 70) + (4 x 40)) and wins six of the ten seats. But the efficiency gap here is not zero. It is actually 10%, the difference between Party A's 300 wasted votes ((2 x 30) + (4 x 20) + (4 x 40)) and Party B's 200 wasted votes ((2 x 20) + (4 x 30) + (4 x 10)), divided by the 1000 total votes cast.

Plts.' Br., dkt. #31, at 24.  <u>See also</u> Stephanopoulos & McGhee, <u>supra</u>, 82 U. Chi. L. Rev. at 854 n.118 ("According to the efficiency gap equation, . . . [i]f a party receives 60 percent of the vote and 60 percent of the seats, for example, a plan would have an efficiency gap of 10 percent against the party.").

of symmetry as a test. Interest in exploring this notion is evident.  Perhaps further attention could be devoted to the administrability of such a criterion at all levels of redistricting and its review.") (citations omitted).  Justice Kennedy's support for partisan symmetry is tepid at best, but he left room for partisan symmetry to play some role in the analysis.  Id. at 419-20 (opinion of Kennedy, J.)) ("Without altogether discounting its utility in redistricting planning and litigation, I would conclude asymmetry alone is not a reliable measure of unconstitutional partisanship.").  See also id. at 468 n.9 (Stevens, J., concurring in part and dissenting in part) ("I appreciate Justice Kennedy's leaving the door open to the use of the [partisan symmetry] standard in future cases.").

Much of defendants' remaining argument is devoted to mischaracterizations of plaintiffs' proposed standard.  For example, defendants argue that plaintiffs' test does not take into account traditional districting principles or the reasons unrelated to partisan intent that voters of a particular party might be "cracked" or "packed," such as the natural concentration of Democrats into urban areas.  Dfts.' Br., dkt. #25, at 22-23.  In addition, defendants say that, under plaintiffs' proposed standard, the 2002 Wisconsin Assembly plan would be unconstitutional because it had a large efficiency gap, even though it was drawn by a court.  Id. at 24.

These arguments rely on the assumption that plaintiffs' proposed standard consists of nothing except a calculation of the efficiency gap.  Defendants simply have ignored step one and step three of plaintiff's standard.  Even if the plaintiffs were able to establish that the efficiency gap is a sufficiently strong pillar to support a constitutional violation, the

22

plaintiffs still must prove partisan intent (step one).   The defendants also might be able to show that a large efficiency gap is justified by a legitimate state interest, which may include traditional districting criteria such as equal population, compliance with the Voting Rights Act, compactness, respect for political subdivisions or respect for communities of interest (step three).

We have reviewed defendants' remaining arguments and conclude that they are unpersuasive or premature.   A determination whether plaintiffs' proposed standard is judicially manageable relies at least in part on the validity of plaintiffs' expert opinions, which we must accept as true in the context of a motion a dismiss.   A more developed record may show that plaintiffs' claims cannot be legally distinguished from the partisan gerrymandering claims that the Supreme Court has rejected in the past.   However, current law does not foreclose plaintiffs' claims and those claims are modeled after a standard that the Supreme Court has adopted in other contexts.   Accordingly, we conclude that plaintiffs have stated a claim for relief that is plausible on its face and we are denying defendants' motion to dismiss.

ORDER

IT IS ORDERED that the motion to dismiss filed by defendants Gerald C. Nichol,

Thomas Barland, John Franke, Harold V. Froehlich, Elsa Lamelas,Timothy Vocke and Kevin

J. Kennedy, dkt. #24, is DENIED.

Entered this 17th day of December, 2015.

BY THE COURT:

/s/
_____
KENNETH F. RIPPLE
Circuit Judge


/s/
_____
BARBARA B. CRABB
District Judge


/s/
_____
WILLIAM C. GRIESBACH
District Judge

24