UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WILLIAM WHITFORD, ROGER ALCLAM,
EMILY BUNTING, MARY LYNNE DONOHUE,
HELEN HARRIS, WAYNE JENSEN, WENDY
SUE JOHNSON, JANET MITCHELL, ALLISON
SEATON, JAMES SEATON, JEROME
WALLACE, and DONALD WINTER,

       Plaintiffs,

-vs-                 Case No. 15-CV-421-BBC

GERALD NICHOL, THOMAS BARLAND,   Madison, Wisconsin
JOHN FRANKE, HAROLD FROEHLICH,   March 23, 2016
KEVIN KENNEDY, ELSA LAMELAS,     9:30 a.m.
and TIMOTHY VOCKE,

       Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF MOTION HEARING
HELD BEFORE the HONORABLE JUDGE KENNETH RIPPLE,
HONORABLE JUDGE BARBARA B. CRABB,
and HONORABLE JUDGE WILLIAM GRIESBACH

APPEARANCES:

For the Plaintiffs:
        University of Chicago Law School
        BY: NICHOLAS STEPHANOPOULOS, Professor
        1111 E. 60th Street, Ste. 510
        Chicago, Illinois 60637

        Mayer & Brown LLP
        BY: MICHELE ODORIZZI
        71 South Wacker Drive
        Chicago, Illinois 60606

       Lynette Swenson   RMR, CRR, CRC
     U.S. District Court Federal Reporter
       United States District Court
     120 North Henry Street, Rm. 520
      Madison, Wisconsin  53703
        (608)255-3821

```
 1   For the Defendants:
                 Department of Justice
 2               BY: BRIAN KEENAN
                     ANTHONY RUSSOMANNO
 3               Assistant Attorneys General
                 17 East Main Street
 4               Madison, Wisconsin 53703

 5

 6

 7                         *  *  *  *  *

 8        (Proceedings called to order.)

 9          THE CLERK:  Case Number 15-CV-421.  William

10   Whitford, et al. v. Gerald C. Nichols, et al.  Court is

11   called for oral argument hearing.  May we have the

12   appearances, please.

13          MS. ODORIZZI:  Michele Odorizzi for plaintiffs.

14          MR. STEPHANOPOULOS:  Nicholas Stephanopoulos for

15   the plaintiffs.

16          MR. KEENAN:  For the defendants, Brian Keenan,

17   and with me is Anthony Russomanno.

18          JUDGE RIPPLE:  Good morning to everyone.  We're

19   here today to hear the arguments on the defendants'

20   motion for summary judgment, and as we have indicated, we

21   have allotted an hour to each side for their primary

22   arguments and a half hour for rebuttal for the movants.

23   You don't need to use all the time; you're masters of

24   your own time.  But we thought that would be the best way

25   to handle things.  We will take a break at some point in
```

1    the morning as well.  Okay?

2         So with that, we'll ask the movants to please begin.

3         MR. KEENAN:  May it please the Court.  The Court

4    should grant the defendants' motion for summary judgment

5    because there's no genuine issue of material fact that

6    the plaintiffs' proposed standard is not a legal standard

7    by which an unconstitutional partisan gerrymander can be

8    judged.  There's no issue of material fact because the

9    defendants' motion is based on the plaintiffs' own expert

10   reports and undisputed results of Wisconsin elections in

11   -- historical elections.

12        JUDGE RIPPLE:  Before you get to that point, and

13   of course it's a very important one, maybe you could

14   spend a little bit of time on the first element of the

15   test that has been tendered by the plaintiffs in the

16   case, the matter of intent.  There is disagreement

17   between both of you on that.  Could you please describe

18   to us your position and why you think the position taken

19   by the plaintiffs is infirm.

20        MR. KEENAN:  Yes, I will.  The plaintiffs have a

21   standard that has three stages and the first is the

22   intent element.  The plaintiffs feel that an

23   unconstitutional gerrymander, the intent element, would

24   be established by any sort of partisan intent to favor

25   the party that's districting and disadvantage the party

1  that's out of control.  The defendants see that as an

2  inappropriate and infirm intent element because that type

3  of intent is not actually unconstitutional in and of

4  itself and that's been well established through Supreme

5  Court case law dating back many years to the *Gaffney*

6  decision, I believe in the 70's, and into the *Vieth*

7  decision, recently in the *LULAC* decision; that the use of

8  partisan classifications, the use of a partisan motive

9  isn't constitutional in and of itself.  And the problem

10  with partisan gerrymandering claims is determining the

11  level of partisan intent that would move something from

12  being a normal and ordinary consideration, I believe was

13  the language used in *Vieth*, into something that now has

14  turned into unconstitutional.

15      The defendants don't believe that the plaintiffs'

16  intent element works because it takes just that

17  constitutional motive of partisan intent and finds that's

18  enough to meet the test, then moves it to an effects

19  element that looks at the partisan asymmetry in

20  converting statewide vote shares into seats and counts

21  that entire asymmetry as a discriminatory effect such

22  that you can have a test -- a plan becomes

23  unconstitutional with a bare partisan motive and then a

24  large effect.

25          JUDGE RIPPLE:  So an intent to distinguish one

1   party from another in gerrymandering is constitutionally

2   permissible and therefore wouldn't be an intent to create

3   an invidious classification?  Is that your point?

4          MR. KEENAN:  Correct.  And the plaintiffs'

5   standard hasn't attempted to delineate where

6   invidiousness would jump into the --

7          JUDGE RIPPLE:  And then the next point, I

8   suppose, would be well then what is an invidious

9   classification and what would be -- how do we measure the

10  intent to create such an invidious classification.

11         MR. KEENAN:  Well, as counsel for the defendant,

12  it's hard for me to come up with what a plaintiff's

13  standard should be.  But I think invidiousness should

14  have to be measured by, as Justice Kennedy has outlined

15  in his *Vieth* concurrence, some sort of departure from

16  normal districting principles and criteria.

17         JUDGE RIPPLE:  Let me see if I could help you on

18  that.  Suppose the plaintiffs were able to prove that the

19  defendants had the intent to create a plan that would

20  simply not be subject to change for the entire decennial

21  period; in other words, that would be frozen in place

22  with no possibility of a flip for the entire decennial

23  period.  Would that be a sufficient unconstitutional --

24  invidious -- would that be a sufficient intent to create

25  an invidious classification?

1          MR. KEENAN:  No, it would not.

2          JUDGE RIPPLE:  Why not?

3          MR. KEENAN:  And I assume you're referring to a

4   flip of the efficiency gap and not a flip of control of

5   the legislature?

6          THE COURT:  Flip of the control of the

7   legislature is what I was --

8          MR. KEENAN:  Oh, control of the legislature.  I

9   still think that would not necessarily show

10  invidiousness.  That invidiousness would have to be shown

11  -- how does that result differ from a plan that's enacted

12  using solely traditional districting principles.

13         JUDGE RIPPLE:  Well, that would be the third

14  element and one where we'd have to deal with allocation

15  of burden of proof later on.  But just in terms of the

16  first element, the intent, would it be enough if we could

17  -- if the plaintiffs could prove that the intent was to

18  create a plan that would be in concrete for the ten

19  years; no possibility this thing was going to create a

20  legislature with another party in leadership.

21         MR. KEENAN:  I don't think that would

22  necessarily be enough and I think it would depend on the

23  state and it would depend on the electoral circumstances.

24  I can imagine there are states where it's practically

25  impossible for one of the parties to win control of the

1    legislature if there's so much support for one of the

2    other parties in that --

3         JUDGE RIPPLE:  That's the key.  What would be

4    enough then in your view?

5         MR. KEENAN:  I'm not sure that this is something

6    that can be solved.  The *Vieth* plurality examined a

7    predominant intent test that looked at the *Vieth*

8    plaintiffs' offer that the partisan advantage outweighed

9    all the other concerns of districting like equal

10   population and Voting Rights Act and compactness,

11   contiguity, things like that, and the *Vieth* plurality

12   found that to be just completely unworkable because on a

13   statewide basis, it was just impossible to determine the

14   relative weight of all these different factors.  To me

15   it's hard to see how, and this has been the problem

16   that's plagued these cases since *Bandemer*, is what -- how

17   do you establish some sort of intent where it goes beyond

18   the normal to something abnormal that's unconstitutional.

19   No one else has been able to figure it out.  I don't know

20   that I can.  And I think it would be challenging to

21   delineate a line anywhere that would show that.

22        And I think one of the concerns is that embedded in

23   the question was that there's an assumption that things

24   would never change and I don't know that that's even a

25   valid assumption to make about the future.  For example,

1  the *Vieth* case itself, the plaintiffs allege that the

2  Democrats would never be able to win a majority of the

3  congressional districts in that case.  It went up to the

4  Supreme Court.  In 2004 they lost.  Well, in 2006 the

5  Democrats won a majority of the congressional seats in

6  Pennsylvania, and again in 2008, they were able to secure

7  through the political process what they claimed in court

8  was going to be impossible.  So I don't know that it's

9  possible to even make a prediction about the future as to

10  what the likely consequences are of a plan over a

11  ten-year period, at least with a certainty enough to say

12  something is unconstitutional.

13       JUDGE RIPPLE:  Thank you for your views on

14  intent.  I interrupted you.  You may want to go on and

15  talk about the efficiency gap.

16       MR. KEENAN:  Sure.  Well, the intent was one of

17  my elements, so it just kind of leads me into my argument

18  about the plaintiffs' intent element seems to focus more

19  as a way to avoid the consequences of the efficiency gap

20  rather than actually showing how much partisanship is too

21  much.  The plaintiffs, as I'll show, the efficiency gap

22  ends up capturing a large number of plans as

23  presumptively unconstitutional.  The number of plans that

24  have large efficiency gaps that trip the various

25  thresholds the plaintiffs would want to establish is

1  quite large and the plaintiffs use the intent element

2  mainly as a way to try to prevent the -- to avoid the

3  consequences of this, which would be to show that a large

4  number of plans that have no partisan intent at all are

5  showing this asymmetry and thus aren't partisan

6  gerrymanders and this asymmetry is present when there's

7  no partisan intent.  And the intent element mainly serves

8  as a way for them to say well hey, our test doesn't

9  actually capture the Wisconsin 2000's plan.  That doesn't

10 have intent.  But I mean the defendants' argument is that

11 that just shows that the efficiency gap is a poor metric

12 for measuring partisan gerrymandering.

13      JUDGE CRABB:  I have one question.  For the

14 purpose of summary judgment, are you denying that the

15 legislature had any partisan intent when it -- you're

16 not.

17      MR. KEENAN:  No, we're not.

18      JUDGE CRABB:  That's good.

19      MR. KEENAN:  Our argument is that even assuming

20 there's partisan intent and that there was some partisan

21 intent, that the standard still doesn't work.

22      JUDGE GRIESBACH:  For purposes of trial would

23 you even deny the Court is partisan?

24      MR. KEENAN:  No, we would not plan to dispute

25 that at trial either.

1          JUDGE RIPPLE:  Would you dispute the fact that
2     they had the partisan intent to attempt to create a plan
3     that would stay in place throughout the decennial period
4     that would be not capable of producing a legislature in
5     control of the other party?
6          MR. KEENAN:  Yes, I think we would dispute that.
7          JUDGE RIPPLE:  You would dispute that.
8          MR. KEENAN:  Yeah.  I mean that's not in the
9     summary judgment record, but I think at trial to the
10    extent --
11         JUDGE CRABB:  You would dispute it as to whether
12    that was the intent or whether that was what actually
13    happened?
14         MR. KEENAN:  I think whether it was the intent
15    and then whether it actually does happen is in the future
16    and so I wouldn't really be able to say what will happen.
17         JUDGE GRIESBACH:  Is your rejection -- and this
18    may be jumping ahead and I'm sorry if I am.  But is your
19    rejection of the efficiency gap -- I take it it's not
20    just the level that the plaintiffs argue.  Is there no
21    efficiency gap that you think would be unconstitutional
22    if it's the result of redistricting?
23         MR. KEENAN:  Yeah, I think it's a two-fold
24    thing.  One is just that the efficiency gap has no tie to
25    a constitutional violation so that a high efficiency gap

1   just doesn't show a constitutional violation in and of

2   itself.  But then secondarily, that even the levels that

3   the plaintiffs have suggested end up presenting

4   themselves in cases where there's no partisan intent.  So

5   it's not even showing any sort of gerrymandering at all.

6       But I think one of the important things is that the

7   efficiency gap, and hopefully the brief has made clear

8   the different versions of the efficiency gap that are

9   used by the plaintiffs, that the historical analysis that

10  they've used by Professor Jackman to set their thresholds

11  is based on a seats-to-votes line that expects a party to

12  win a certain proportion of seats in a legislature based

13  on their percentage of the vote share.  That's based on a

14  two-to-one slope.

15      So I mean the way to kind of understand that, I

16  think, is in simple terms that a 51 percent vote share is

17  implied that they should win 52 percent of the seats.

18  And then a 52 percent vote share is implied to win 54

19  percent of the seats.  You kind of get a bump in seats

20  for each vote share.  And we agree that's not saying that

21  proportional representation is required, but we think

22  it's actually worse in that it's judging plans based on

23  how they deliver hyperproportional representation.  For

24  example, you could have perfectly proportional

25  representation in an efficiency gap if -- and this is

1    what happened in Wisconsin, I believe, in 2008 is the

2    Democrats won 54 percent of the vote and win 53 percent

3    of the seats roughly proportional.  But the efficiency

4    gap implies that they should win 58 percent of the seats.

5    And so therefore you still get a negative 5 percent

6    efficiency gap when you're delivering roughly

7    proportional representation probably as close as you can

8    in a situation like this.

9        And so we do think that there's no tie to the

10   constitution such that the efficiency gap just has a

11   fundamental problem being used as a test irrespective of

12   the particular level that ends up being reached.

13        JUDGE RIPPLE:  Isn't it a test though that at

14   least is helpful in measuring the degree to which the

15   plan might be susceptible to producing a legislature that

16   would be dominated by the other party?

17        MR. KEENAN:  I would say not necessarily.  It's

18   more concerned about how the vote share matches up with

19   the seat share.  So for example, our expert, Sean Trende,

20   went through, and there's a list of 17 plans that were

21   unambiguously one side or the other that Professor

22   Jackman found through time.  That means that they were

23   always either negative or positive every single election

24   in them.  And what Sean Trende found is that in a number

25   of those plans, the control of the legislature actually

1  flipped even though the efficiency gap sign stayed the

2  same.

3      And I think some of this is illustrated by the

4  New York example which keeps appearing as an efficiency

5  gap, negative efficiency gap favorable to Republicans

6  even though the Democrats actually control the New York

7  legislature quite a bit of the time.  And the reason the

8  efficiency gap presents itself is that maybe the

9  Democrats have 55 percent of the seats, but they actually

10 won 60 percent of the vote which implies that they should

11 win, you know, 70 percent of the seats.  So you end up

12 with a large efficiency gap.

13      JUDGE RIPPLE:  Mr. Keenan, on that point I'm

14 beginning to have a little bit of trouble keeping the

15 summary judgment matrix in place.  Is that argument -- I

16 can see how that argument might be very helpful to you at

17 trial in impeaching the position taken by the plaintiffs

18 and their experts, but how is it helpful to you in

19 prevailing in this motion for summary judgment?

20      MR. KEENAN:  Well, because all that information

21 is just taken straight from the plaintiffs' reports.

22 That's undisputed that this is what is happening.

23      JUDGE RIPPLE:  You're talking about Professor

24 Trende and Professor Trende's views on things.

25      MR. KEENAN:  Well, Professor Trende looked at

1    what Jackman had done and just looked at -- and the

2    plaintiffs haven't disputed that that's, in fact, what

3    happened in these cases.  So that's an undisputed fact.

4         And so I think the efficiency gap is -- what it

5    shows is that -- is how a party can convert statewide

6    vote share into how they compare to, like, the two-to-one

7    vote curve, two-to-one seat-to-vote curve.  So that's

8    what it tells you.  And then it actually doesn't tell you

9    much about who's going to win control of the legislature.

10   I mean some of the examples here are 1994 is the last

11   year Wisconsin had a positive efficiency gap, which is a

12   gap that favors Democrats.  Well, 1994 was the first year

13   that Republicans won control of the legislature in

14   Wisconsin -- or the Assembly in Wisconsin in a number of

15   years.  So it's like in a sense, it's the worst year for

16   Democrats electorally, but it looks like under the

17   efficiency gap a good year for them.  And the most

18   favorable, so to speak, year for Democrats on the

19   efficiency gap in the last plan was 2010, it was negative

20   4, and that was also a year where the Republicans did

21   very well and won 60 seats and a large vote share, like

22   54 percent, I think.

23        So the efficiency gap does not correlate necessarily

24   with who's winning control of the legislative seats.

25   It's measuring who is getting more or less seats compared

1    to what you would expect under this vote line.

2              JUDGE CRABB:  I wanted to ask you about

3    clustering because I understand that you're arguing that

4    the maps are pro-Republican because Democrats naturally

5    cluster more.  Is that a recent trend?

6              MR. KEENAN:  We believe that it's a fairly

7    recent trend, and it shows up in the Jackman report

8    starting in the mid 90's, and that's when the efficiency

9    gaps naturally start changing in favor of the Republicans

10   and it's continued through the 2010's and -- or 2000's

11   and 2010's.

12             JUDGE CRABB:  Do you have evidence that the

13   Democrats have been more clustered in recent years?

14             MR. KEENAN:  Our evidence would be -- yeah,

15   would be the Sean Trende analysis that we performed.

16             JUDGE CRABB:  That's your only evidence?

17             MR. KEENAN:  Yes.  And then just the inferences

18   from what's happened through Jackman's own report which

19   shows the trend.  And I would say that I think -- it's

20   important to note that we aren't asking the Court to make

21   a finding on that basis.  We don't think we need to make

22   a finding -- the Court needs to find that.  The fact that

23   the high efficiency gaps present themselves in plans with

24   no partisan intent shows that it's not a discriminatory

25   effect and it shows that it's not something that's

1  necessarily inconsistent with traditional districting

2  principles.  We have provided the analysis to provide

3  some context so that the Court could understand, like,

4  was this just -- is it an accident that

5  Republican-favored efficiency gaps are more durable; that

6  they're more common; that even in neutral plans that we

7  see pro-Republican efficiency gaps more commonly than

8  Democratic efficiency gaps.

9        JUDGE CRABB:  But isn't it the case that there's

10 quite a bit of clustering of Republicans?

11       MR. KEENAN:  There is.  I mean that's true.  I

12 mean there's clustering of all groups.  And so the

13 question is how does that clustering then affect the

14 ability to win states on a sea wide -- seats on a

15 statewide basis.  And then, for example, the clustering

16 of Republicans isn't quite at the level of the Democrats.

17 If you look at -- for example, Waukesha County is used as

18 the, you know, Republican equivalent.  And if you look at

19 the City of Milwaukee, they're both fairly strong for

20 each party, but Milwaukee votes more strongly Democrat

21 than Waukesha votes Republican.

22       So when you're tallying up wasted votes district by

23 district, Republicans will win all seats in Waukesha,

24 Democrats will win all seats in Milwaukee.  But Democrats

25 will just have more wasted votes because if you win the

1   district 90 to 10, you'll have more wasted votes than

2   winning at 80 to 20 or 75 to 25.  And so when you do a

3   wasted vote analysis, it ends up going one way or the

4   other.

5          JUDGE CRABB:  But if you have a lot of

6   clustering for both parties, you have all these counties

7   in southeastern Wisconsin that are heavily Republican and

8   you have clustering of Democrats in three cities, why are

9   the Democrats always hurt by the clustering and the

10  Republicans are not hurt by the clustering?

11         MR. KEENAN:  Well, I think in some ways it's --

12  I think the answer isn't always knowable why certain

13  districts vote certain ways.  But I think one of the

14  problems is that just drawing those districts in the

15  outer areas that aren't really strongly one or the other,

16  you're going to end up with fairly close districts and

17  then you end up drawing them.  If you're looking at

18  statewide vote share and a big chunk of that is taken up

19  by safe seats, which is true in the case of Democrats,

20  then there just aren't as many of them in the outlying

21  areas.  And the Republican vote share, if it's 75 percent

22  in Waukesha, there's still more vote share out in the

23  outlying areas where it's available to win legislative

24  seats.

25         I do want to be clear that we don't think on summary

1   judgment it is necessary to make any sort of finding like

2   this.  It's something that's occurred in many different

3   neutral plans.  Our main argument is that the presence of

4   a high efficiency gap doesn't show -- departure from

5   districting principles doesn't show discrimination and

6   doesn't show -- on a more fundamental level is just not

7   based on the constitution.

8           JUDGE CRABB:  It could show discrimination, but

9   not a kind that has been recognized.

10          MR. KEENAN:  Yes, perhaps.

11          JUDGE RIPPLE:  If we were to assume for the sake

12  of argument that whoever we decide has the burden of

13  proof but nobody can show that these neutral factors of

14  political geography really impact or justify the plan,

15  impacted the plan, does the efficiency gap then take on a

16  new meaning if that's really -- if we were to determine

17  that?

18          MR. KEENAN:  I don't believe so.

19          JUDGE RIPPLE:  Why not?

20          MR. KEENAN:  Well, the efficiency gap still is

21  just measuring how you conform to the two-to-one vote

22  share.  It's still not based on the constitution.  It is

23  showing how you convert a statewide vote share into

24  seats, but that's not based on the constitution.  As

25  well, it is affected by a host of other factors in the

1   sense that really the legislature -- legislative races

2   come down to -- I think we've shown that in 2012 five

3   seats were decided by .1 percent of the vote, which can

4   swing the efficiency gap a lot one way or the other.

5   That in a sense, it's more important where you get your

6   votes rather than, like, what your statewide vote share

7   is when it comes to winning legislative seats.  So I

8   still would think the efficiency gap doesn't provide

9   much, and even so -- I mean the last plan was enacted

10  with no partisan intent.  It had certain effects that

11  were seen.  Those were caused by something.  We don't

12  know -- I think it's many different things:  You know,

13  concentration; it's the candidates; the amount of money

14  spent; the issues that were salient at a certain point in

15  time, things like that that I'm not sure how you can

16  distinguish how much of a efficiency gap is really made

17  up of discrimination or partisanship versus other things.

18          JUDGE CRABB:  So your position is that

19  efficiency gaps are not particularly helpful in deciding

20  whether there's been overly partisan redistricting.

21          MR. KEENAN:  Correct.  Basically, yes.  Good

22  summary.  Thank you.  And I think a key point here is

23  that the plaintiffs style their test as partisan intent

24  and partisan effect, but it's not a partisan effect

25  that's unconstitutional; that the language used in

1  *Bandemer* and that was used by this Court in its ruling on

2  the motion to dismiss is the discriminatory effect.  And

3  so we don't think that an efficiency gap can really show

4  a discriminatory effect when, for example, there was a 12

5  percent efficiency gap under a plan with no

6  discrimination at all and then now there's a 12 percent

7  efficiency gap in a plan that has partisan intent, that

8  that actually shows any sort of discriminatory effect.  I

9  mean it shows an electoral effect, but it doesn't show a

10  discriminatory effect.  And I'm trying to use the word

11  partisan effect as sort of like muddying the waters and

12  not actually tieing this to the constitution, which is a

13  discriminatory effect.

14       And then I think a further problem is then -- we

15  talked about the intent and the fact is then this burden

16  shifting.  Third step that the plaintiffs have proposed,

17  which they say is based off of the one-person, one-vote

18  cases, but the burden-shifting analysis that the

19  plaintiffs have provided is actually not at all like

20  what's done in one-person, one-vote cases.  In

21  one-person, one-vote cases the court examines not whether

22  something is a necessary consequence or an unavoidable

23  consequence, which is the language the plaintiffs use,

24  it's whether the plan may reasonably be said to advance

25  the rational state policy of, for example, preserving

subdivision lines or county lines or whatever the
rationale is for the departure from the equal population.
And I got that from the *Voinovich v. Quilter* case.

      And the plaintiffs, it seems that the burden
shifting is all that's required is then to produce an
alternative plan that meets a few benchmarks and then
you've met this, where -- I mean there's no discussion of
whether things advance state policy, whether the
justifications -- and I believe that's because once you
get into that realm, now we're in the judicially
manageable -- a problem of judicial manageability and
weighing who districts better, who's more complying with
districting principles, and that there's really no way to
judge that once, if you're going to do a true burden
shifting where there's some sort of like weighing of the
interests and determining whose -- like whether the plan
meets certain criteria, the plaintiffs basically have
said well, we put forward a plan that is equivalent to
your plan, therefore, you know, sorry, your plan is
unconstitutional.

      JUDGE RIPPLE:  Wouldn't you have somewhat of a
better idea of exactly what of the so-called politically
neutral elements in drawing up a plan might have been
used and why they were used on the other side?  Isn't
that a good reason to put a burden on you to at least

1   make some showing with respect to -- with respect to how

2   this whole thing is explainable by these so-called

3   neutral factors?

4          MR. KEENAN:  Well, I don't know that we would

5   necessarily -- the plaintiffs would be free to take

6   discovery and they can analyze the plan on all the

7   various -- whatever various factors they can analyze on:

8   compactness and equal population, things like that.

9   There was a large amount of discovery in the prior

10  litigation, the *Baldus* case, about what the process that

11  went into the districting and things like that.  So I

12  mean in a sense I would say no, and then also that the

13  burden is on plaintiffs to prove a violation of the

14  constitution and I would say especially in this case

15  where there's -- it's hard for courts to find a

16  manageable standard.  This process is entrusted to

17  legislative branches who have exercised that process who

18  were elected fairly under a neutral plan, even in a

19  statewide governor's race, and so I would say that no,

20  the burden should still remain on the plaintiffs.

21         THE COURT:  Mr. Keenan, you touched on an

22  ancillary problem that I know concerns at least me and

23  that is to what degree can we take judicial notice of the

24  proceedings in the earlier case?

25         MR. KEENAN:  By earlier case you mean the *Baldus*

1    case?

2            JUDGE RIPPLE:  Yes.

3            MR. KEENAN:  I would think what's in the -- what

4    is in the record in that case would be available for

5    judicial notice and then the decision itself.  I would

6    also say the same would be true for the *Baumgart* and the

7    *Prosser* cases, which were the districting cases that

8    enacted the 90's plan and the 2000's plan.  I mean I

9    would say, like, perhaps to the extent there's issues

10   with -- I would say, like, testimony that was given in

11   those cases might have to be regiven here in the sense

12   that there was different issues and so I don't know that,

13   and we didn't have a chance to ask witnesses followup

14   questions or things like that.  So I might have a problem

15   with that kind of thing.

16       But in terms of the -- you know, things that

17   happened, I would say like the opinion in the *Baldus* case

18   or generally I don't necessarily have a problem.  There

19   may be some things where we would have a problem with the

20   testimony if it wouldn't meet the criteria under the

21   rules.

22           JUDGE RIPPLE:  There's an intermediate position

23   we could take on this last element of the plaintiffs'

24   case as well.  Rather than saying you have the burden of

25   proof, we could say you at least have the burden of going

1   forward, of suggesting what the neutral factors that

2   might justify the plan are, keeping the ultimate burden

3   of proof on the plaintiffs.  How does that sound to you?

4          MR. KEENAN:  Well, it's better.  I would still

5   say it's a little bit -- I'm not sure how it would work

6   given that I think we'd still need a standard by which

7   that would then be judged.  I think that's where the

8   problem comes in is that we could have witnesses testify

9   about the reasons that went into the districting, but

10  then -- and the plaintiffs would have the right obviously

11  to present evidence on their opinions on that and facts

12  and then ultimately what's -- how is the decision made.

13         JUDGE CRABB:  You're not really disputing that

14  the Republicans drew this plan with the desire to create

15  the best possible election process for the Republicans,

16  are you?

17         MR. KEENAN:  I would say I would dispute whether

18  it's the best possible.

19         JUDGE CRABB:  I'm not saying it turned out to be

20  the best, but that their intent was to do the best job

21  they could to safeguard the common seats and to increase

22  the number of seats that would be available to

23  Republicans.

24         MR. KEENAN:  I think -- I'm not disputing that

25  they districted with partisan advantage.  I think there's

1   a problem with saying they would -- for example, the

2   language the plaintiffs use of maximizing Republican

3   advantage or making this the best map possible in the

4   sense that -- and I guess we're going away from the

5   summary judgment record here -- but this would be at

6   trial that --

7           JUDGE CRABB:   Right.

8           MR. KEENAN:   -- there's competing factors here

9   that go into the districting plan which would be to have

10  a plan that passes the House and the individuals who vote

11  on that are most interested in what their individual

12  district looks like, whereas perhaps the Republican Party

13  as a whole is interested in what the overall map looks

14  like and that the best map for Republicans might be the

15  most districts at 52 percent Republican, but that the

16  individual legislators may not really want to be running

17  in a district that's only 52 percent Republican but would

18  rather be 55 percent Republican or 60 or, you know.  And

19  then there's balancing of all sorts of different

20  concerns.

21      So I think after the fact you probably could reverse

22  engineer a map that's even more favorable to Republicans,

23  but -- so I would say in a sense, yes, we're not

24  disputing that there's partisan advantage being looked

25  at.  But the level of it and maximizing the Republican

1  advantage or making the most favorable plan, I don't know

2  that that's really what is the case.

3          JUDGE GRIESBACH:  Well, you wouldn't dispute

4  though, as going to the third prong, you wouldn't argue

5  that you were compelled by traditional factors or other

6  considerations such as population and voting rights

7  considerations to adopt the plan you did.

8          MR. KEENAN:  The specific plan, no.

9          JUDGE GRIESBACH:  And that's the third prong.

10 So really there is no issue on the third prong, is there?

11 If we adopt the plaintiffs' test and accept -- I don't

12 think there's a dispute on intent.  And if we say 7 is a

13 sufficient efficiency gap to presume unconstitutionality,

14 they win, don't they?

15         MR. KEENAN:  I mean I think they way they've

16 phrased their test, they do, because I think any

17 plaintiff that gets to make up their own test would make

18 one that they would win.  But I guess our point would be

19 that --

20         JUDGE GRIESBACH:  I mean at trial there's

21 nothing to try on the third prong, is there?

22         MR. KEENAN:  The way they phrased it there isn't

23 and that's why we think it's --

24         JUDGE GRIESBACH:  Well, is there another way of

25 phrasing that that you think would leave you something?

1    I mean once -- if we adopt 1 and 2, 3 follows

2    necessarily, doesn't it?

3              MR. KEENAN:  That's been our argument.  Then it

4    seems like it's not even really a burden shifting because

5    I don't know that there's any plan that's required to be

6    adopted.

7              JUDGE GRIESBACH:  Right.

8              MR. KEENAN:  I mean there's any number of plans.

9              JUDGE GRIESBACH:  For considerations, they give

10   you a whole range of plans you can adopt and obviously

11   the intent was to adopt one that was electorally

12   advantageous to the Republican Party that was in control.

13             MR. KEENAN:  Correct.  And our position is that

14   there's nothing unconstitutional about that; that

15   basically there's nothing unconstitutional about the

16   Republicans winning control in 2010, deciding to enact a

17   plan that is favorable to themselves, even more favorable

18   than the prior plan had been.  Conversely there would

19   have been nothing unconstitutional had Democrats won in

20   2010, unified control, and actually a plan that was more

21   favorable to themselves than what a neutral plan

22   conceivably would have been.  That partisan motive just

23   isn't unconstitutional.  And then moving to the

24   efficiency gap, that's not showing discriminatory effect.

25       In a sense I think you're also showing -- the

1  asymmetry here is that working off of the baseline of the

2  2000's plan, which was favorable to Republicans, the

3  Democrats could have engaged in conceivably what's

4  traditionally understood as gerrymandering, drawing

5  strange districts, kind of ignoring some districting

6  principles, and maybe end up with even still a negative

7  efficiency gap, maybe a slightly positive one.  And that

8  kind of escapes review under this plan because perhaps

9  there's a limit to what -- you know, how positive an

10  efficiency gap can even be in Wisconsin if we've only

11  seen a plus two as the most favorable to the Democrats in

12  the last 20 years or 24 years.  I think that's our

13  example that we showed with Illinois which, using

14  Jackman's numbers, was alleged to be a Democrat

15  gerrymander.  Jackman finds that even at one year, it

16  actually was a pro-Republican bias map even though it was

17  a Democratic gerrymander.  I mean Democrats would seem to

18  be -- might be able to be free to gerrymander under this

19  standard because they would just, like, escape review

20  because the efficiency gap wouldn't get to such a level.

21     Jackman finds that it's rare to have Democratic

22  efficiency gaps that exceed the 7 or 10 percent threshold

23  in the first election, or as is relatively common for

24  Republican plans, seems to be an asymmetry, which a

25  standard is going to be applied differently depending on

1    the party in control.

2              JUDGE GRIESBACH:  Even the Demonstration Plan

3    here has a small Republican efficiency gap.

4              MR. KEENAN:  That's true.

5              JUDGE GRIESBACH:  What does that tell us?

6              MR. KEENAN:  I think it tells us that the

7    natural baseline of any sort of plan is going to end up

8    being a pro-Republican plan, and in Wisconsin as of now,

9    who knows what that becomes in the future, but I mean Ken

10   Mayer's plan, the Demonstration Plan, it was a negative

11   2.2 when he did his no incumbent, every seat contested.

12   Then when he, in his rebuttal report, added back in the

13   incumbency effects, it turned into, I believe, a

14   three-and-a-half percent efficiency gap in favor of

15   Republicans, which is half the way to the presumptive

16   unconstitutionality, and this is, you know, a districting

17   by someone who's, you know, hired by Democrats to draw a

18   plan that's less -- that isn't discriminating against

19   them and his plan shows a negative three-and-a-half

20   percent efficiency gap.

21       You know, I think he doesn't determine what it would

22   be in 2014 when things change, so I mean it's conceivable

23   they would even have a negative 7 percent efficiency gap

24   under that plan in 2014.

25             JUDGE GRIESBACH:  And is that a

1    reverse-engineered plan?

2          MR. KEENAN:  I think it is because it's taking

3    the electoral results that happened after the fact, going

4    back and then districting to get particular results,

5    which as I said before, I mean I think you could do that

6    after the fact.  You can look at what the election

7    results were, you know what they were, and then you back

8    -- kind of like work your way back to what the district

9    is going to be so then you can say well yeah, the

10   Democrats would have won the seat with 50.2 percent of

11   the vote.  Ahead of time I don't think you would really

12   know one way or the other what exactly is going to

13   happen.  I mean you can make predictions, but in a sense

14   Mayer is making predictions about the past about what

15   already happened.  And so yeah, I think it is a

16   reverse-engineered plan when you get to district after

17   the election has already occurred.  You can get the

18   result you want.

19       I think another problem with the standard here is it

20   doesn't meet what Justice Kennedy has been calling for in

21   a standard in his *Vieth* concurrence when he held out hope

22   that perhaps some day a standard would emerge that courts

23   could apply; that he wanted a limited and precise

24   rationale that could correct any existing violation of

25   the constitution.  What Professor Jackman's own numbers

show is that at the 7 percent level, which is what the
plaintiffs have offered, 36 percent of all plans had an
efficiency gap above 7 percent in their first election.
So it shows a fairly common thing, you know, when over
one-third of plans are tripping this threshold.

Now, he finds that an acceptable level because out
of that 36 percent, he believes that they won't change
sign over the course of the plan.  That's a key fact he
uses; that when you look at the first election, you see a
7 percent gap.  It's unlikely that the plan is going to
then flip to have a positive EG at some point.  We would
say that's not tied to the constitution either, to have a
plan that flip sign.  But I think it also, I mean, shows
that just the level of intrusion this could be.

In the response, the plaintiffs say well, 16 percent
of those plans wouldn't actually be affected because they
had no partisan control.  So you're down to 20 percent of
plans that had unified partisan control and the 7 percent
efficiency gap.  I think that shows still that one-fifth
of plans are being roped into this standard which isn't
-- doesn't seem to me that that's what Justice Kennedy
envisioned in his *Vieth* concurrence.

But second, I think it shows that when 16 percent of
plans have the 7 percent efficiency gap with no partisan
control, it just highlights why the efficiency gap isn't

1   connecting up with any sort of discrimination or

2   discriminatory effect or constitutional violation.

3       Even upping the standard 10 percent in the first

4   election, 18 percent of plans had an EG above 10 percent

5   in their first election, so now we're talking about one

6   in five plans are above 10 percent.  That's made up of 10

7   percent of plans with unified partisan control and 8 had

8   no unified partisan control.  So even at 10 percent as

9   relatively common, 8 percent of all plans trigger the 10

10  percent threshold with no partisan control at all.  So I

11  think it shows that even these high efficiency gaps

12  aren't really all that uncommon and so they can't really

13  be seen as outliers of extreme partisan gerrymandering

14  when they're showing up in, you know, 8 percent of --

15  like one-fifth of all plans have a 10 percent efficiency

16  gap in the first election and then it's not that

17  uncommon.

18      I think the Jackman standard too is -- I just want

19  to be clear on what he actually did -- is that he

20  examined the -- for example, you could look at the

21  Wisconsin plan.  He just looks at what the first EG was

22  and then does an analysis looking at the next EG's in

23  line.  So say Wisconsin in 2002 had a negative

24  seven-and-a-half EG, that would count as a negative

25  seven-and-a-half.  And then he looks at the future

results and sees what happened.  But I would say that
this -- it shows what happened in the future, but it's
not necessarily a guide to what's going to happen -- or
it shows what happened in the past; it's not necessarily
a guide to what will happen in the future in the 2022
election, 2030 election which is when the standard was,
should the Court adopt the standard, that's when this is
going to be applied in full.  It would be in the 2022
election.

Actually, I believe it's 53 percent of plans have an
EG above 7 at any point in their existence, so it's like
half of plans are triggered in that threshold.  If you
don't just limit yourself to the first election, you look
at all of them in the plan.

And a plan is just going to produce a range of
results.  The first one isn't magic or anything, it's
just what happened to occur first.  And as a necessity,
the plaintiffs are relying on that because that's what a
plaintiff would look like is the first election.  But
where does that election fall on the spectrum of what
this plan could expect?  You know, we don't know.

If you look at the Wisconsin 2000's plan, the gap
was negative seven-and-a-half, I believe negative 10,
negative 12, negative 4, negative 5, something like that.
Any one of those could have occurred first.  So if, say,

1    the waive election of 2012 happened in 2002, well now

2    it's a negative 4 percent efficiency gap in its first

3    election escapes review, even though it goes on to

4    produce efficiency gaps of negative 10 and negative 12.

5    If those negative 10 and negative 12 show up first, well

6    now it seems like this wide extreme partisan gerrymander

7    when it did produce gaps of negative 4, negative 5, and

8    negative 7.

9         So just conditioning on the first election is a

10   little bit difficult because there's no way to know where

11   does that fall, how is that representative of the whole.

12   Jackman has done a historical analysis, but going forward

13   in the future it's hard to say how that's going to play

14   out.  I mean you could even adopt the standard, have the

15   Republican waive election in 2022 and have a bunch of

16   plans escape review as gerrymanders even if they were

17   because 2010 is the lowest EG that Wisconsin saw since,

18   like, 1996 maybe, and that was actually a really good

19   Republican year.  So if that year happens in the first

20   year, the efficiency gaps are low and you're evading

21   review.

22        Or conversely maybe you just have a fluke year where

23   there's a lot of high efficiency gaps that will

24   eventually move down for whatever reason in 2022.  Would

25   those be unconstitutional?  Everyone has to redistrict

1   when it was just a fluke election year that caused that

2   result or perhaps even a fluke election in one state that

3   caused a high efficiency gap and then you would expect

4   maybe it will normalize over the rest of the plan.

5        I just had a question about the motion in limine,

6   whether I should address that now or should I wait until

7   the plaintiffs go.

8        JUDGE RIPPLE:   I think you can go right ahead

9   and address that now.

10       MR. KEENAN:   Okay.  On the motion in limine, our

11  point mainly is that at this point in time, the Court

12  need only resolve the parts of Mr. Trende's opinion that

13  were actually submitted on summary judgment.  And those

14  aren't actually even disputed, like the opinions he

15  offered aren't disputed.  What's disputed is what the

16  Court should make of those opinions.  The plaintiffs

17  don't dispute that he accurately -- that he accurately

18  calculated the partisan index the way he did.  They don't

19  contest that he accurately cites the vote totals that he

20  cited that we used on summary judgment.  In that sense I

21  think there's really no reason to exclude that evidence

22  given that they didn't contest it.

23       JUDGE GRIESBACH:   Is that expert testimony or

24  are those historical facts?

25       MR. KEENAN:   In some sense they're historical.

1   I would say that the election results are historical

2   facts, but you kind of need a way to get them in.  The

3   partisan index, I think, is more of an expert analysis

4   because it requires some calculation, although, I mean --

5   yeah, I would say that partisan index is more along the

6   lines.  But for example, Trende's reliance on the fact

7   that Bill Clinton's election results, how his vote,

8   statewide vote share compared to Obama's in 2012, I mean

9   you could get that from the GAB website and the Wisconsin

10  Blue Book.  We need a way to get that into the evidence.

11      But -- and I think the plaintiffs' motion more

12  broadly suffers from a -- stems from a false premise that

13  you need to be a Ph.D. in political science who publishes

14  in peer-reviewed journals in order to be an expert

15  witness.  That's definitely not the case.  Someone just

16  needs to be qualified.  We believe Mr. Trende is

17  qualified, that he's a professional elections analyst

18  who's --

19          JUDGE CRABB:  What would you say his

20  qualifications are?

21          MR. KEENAN:  Sure.  He has a master's in

22  political science from Duke University.  He's --

23          JUDGE CRABB:  Was he specializing in any kind of

24  election analysis?

25          MR. KEENAN:  I think it's just a master's in

1    political science.  I don't -- he has written now for, I
2    believe it's seven or eight years professionally as an
3    elections analyst for a website called
4    realclearpolitics.com.
5            JUDGE CRABB:  There's no peer review of that.
6            MR. KEENAN:  No, there not, and there doesn't
7    need to be peer review of experts when they testify.
8    That's one factor that the courts can consider, but I
9    think the *Kumho* case and the Seventh Circuit cases made
10   clear that peer review isn't required.
11       I will say that the plaintiffs rely on some things
12   that aren't peer reviewed.  Everything that comes before
13   a court doesn't need to be --
14           JUDGE CRABB:  But it is something to be
15   considered if it does exist.
16           MR. KEENAN:  Correct.  He has written a book on
17   demographic trends in politic study in American history
18   from, like, the 20's onward and the part shifts and
19   parties in their coalitions and their demographics.  It's
20   called *The Lost Majority*.  He's contributed to a number
21   of books and written articles.  He writes professionally
22   just day-to-day on elections using statistical analysis
23   to look at election results and project elections and
24   also, like, analyze past elections.
25       So we think he's well qualified to offer for what we

1    offered him for which is to provide some context and

2    history as to elections that occurred in Wisconsin and

3    how Wisconsin has changed over time, which I mean I think

4    we also have to be clear that we're aren't offering --

5    what we're offering it for is that, not some sort of,

6    like, overarching theory of redistricting or that he's

7    going to come up with a quantifiable number as to what

8    the expected efficiency gap is going to be or anything

9    like that.  We just thought given the plaintiffs'

10   analysis by Mr. Jackman is looking over time at election

11   results, someone should look at the history of how those

12   election results have actually occurred, how has it

13   changed over time, and that would be useful to the Court

14   in trying to evaluate whether the efficiency gap is

15   really a standard that should be adopted by the courts.

16   Because they use -- they're basically using historical

17   averages and what's happened in the past that without

18   context, it's really hard to determine whether someone

19   should treat what's happened in the past is what should

20   continue on in the future as a legal standard or is it

21   something that was the result of a particular moment in

22   time.

23           JUDGE CRABB:  What do you understand his basis

24   is for saying that the reason that the Republicans have

25   gained more seats in state legislatures is because there

1  are just natural pro-Republican advantages?

2          MR. KEENAN:  Sure.  It's based of his study of

3  presidential election returns.

4          JUDGE CRABB:  What kind of study did he make of

5  the actual numbers of Republicans in certain districts as

6  opposed to the number of Democrats?

7          MR. KEENAN:  Well, what he does is he looks --

8  he doesn't -- you don't look at specific districts,

9  because those can change.  So we need to look at --

10          JUDGE CRABB:  Well then let's say the state.

11          MR. KEENAN:  Yeah.  So what he does is he looks

12  at election results on smaller levels, like the counties

13  or congressional districts, and then sees how has that

14  changed over time.  Where was the Democratic strength and

15  the Republican strength versus now?  So -- and what he

16  does is he uses presidential vote share, which is

17  recognized as an indicator of partisanship that you could

18  expect.  I mean parties go above and below that, but it's

19  a baseline measure for partisanship.  And then he adjusts

20  that based on the electoral conditions of that year.  So

21  that the partisan index is a way to control for the fact

22  that, for example, the presidential vote in 1984 is very

23  Republican for Reagan.  It's more Democratic obviously in

24  2008 or 2012 when Obama wins.  But you wouldn't

25  necessarily think that's always going to be the case that

1    the presidential vote share, so you take it back to the

2    national average with the partisan index.  And he just

3    compares how does that differ over time.  So it's a way

4    to see what does Wisconsin look like in '88, '96 versus

5    today.  Does it look the same?  Does it look different?

6    And it looks very different.

7         That's basically the basis is the presidential vote

8    share and then compare using the partisan index, which is

9    controlling for the national vote share.  So who is more

10   or less, you can look at it either way, Democratic or

11   Republican in the nation as a whole, what parts of the

12   state.  So obviously Milwaukee ends up being more

13   Democratic than the state as a whole or the country as a

14   whole, so that shows up as a Democratic strength in all

15   years.  But then you can also measure well, how much more

16   is it in each year and it's actually more strong now than

17   it was in the past.  So it shows increasing

18   concentration.  So that's a basis for his opinion.

19        I think -- you know, I think the plaintiffs'

20   criticisms of the opinion, they're fine to raise on

21   cross-examination.  The Court can take those into

22   consideration when considering Mr. Trende's opinions.  We

23   don't think they're a reason to, like, not hear him at

24   all.  And we think, with respect to the motion more

25   broadly, that really now isn't the right time to rule on

1   it; that the preferred procedure would be to hear him

2   testify.  We don't disagree that *Daubert* still applies in

3   a bench trial, but that the *Salem* case and the *Medavante*

4   case, I believe, are the ones that say a court -- you

5   know, let the expert witness testify and then after the

6   trial, the Court can make the *Daubert* findings after

7   hearing the expert himself explain his qualifications and

8   his reasoning and see the cross-exam and see all that and

9   then make the *Daubert* determination.  We think that's the

10  process that should be followed here.

11      We think that basically if you read the plaintiffs'

12  motion, a lot of it is this quibbling about methodology

13  and it's not about what he himself did, but about what

14  should the Court make of this.  They say well, this isn't

15  useful.  Well, that's more an argument to the Court about

16  what usage you make of his analysis rather than not

17  letting him testify and offer the analysis in the first

18  place.

19      I guess I'd say to the extent that the Court does

20  want to rule on it, like the entirety of the motion

21  before trial, that seems like it can even still do that

22  on a more regular schedule when motions in limine would

23  come before the court -- before, like, in general when

24  most motions in limine would come rather than now.  I

25  think it only needs to rule on the summary judgment

1    portion of it for summary judgment.  We think you could

2    probably even avoid that because I think the plaintiffs'

3    standard fails, even assuming that none of Trende's

4    opinions that were cited in the summary judgment

5    materials are adopted.

6        So I guess I may have more to say about it in the

7    rebuttal after I hear the plaintiffs on their motion, and

8    same with -- I think I'm done with the summary -- my main

9    argument on summary judgment unless there's further

10   questions from the Court.

11       JUDGE RIPPLE:  I don't think so, Mr. Keenan.

12   Thank you very much.  The Court will take a ten-minute

13   recess before we hear from the plaintiffs.

14       (Recess     10:30-10:41 a.m.)

15       THE CLERK:  This Honorable Court is again in

16   session.  Please be seated and come to order.

17       JUDGE RIPPLE:  We're ready to hear now from the

18   plaintiffs.  Ms. Odorizzi.

19       MS. ODORIZZI:  Thank you, Your Honor.  Michele

20   Odorizzi for plaintiffs.

21       With the Court's permission, we'd like to split our

22   argument, and I'm going to talk about intent, the

23   relationship between the intent and effects prong,

24   clustering in the Trende motion, and Professor

25   Stephanopoulos is going to talk about the efficiency gap,

1    our Demonstration Plan, and our third prong.

2              JUDGE RIPPLE:   That's fine.

3              MS. ODORIZZI:   Okay.   Thank you, Your Honor.   We

4    were a little surprised to see in defendants' reply brief

5    that they argued that -- about the legal test for intent

6    because we really didn't see that in their opening brief,

7    which probably in some sense they probably waived it by

8    not raising it in their opening brief.   But in any event,

9    their argument, I think, fails because it's basically an

10   argument that there can't be any intent prong.   They say

11   that partisan intent is ordinary and lawful in

12   districting, and that comes from the *Vieth* case from a

13   four-person plurality, a four-justice plurality.   The

14   rest of the court didn't necessarily adopt that and even

15   the plurality agrees that there is such a thing as

16   unconstitutional partisan gerrymandering in violation of

17   the Equal Protection Clause, and it is Equal Protection

18   Clause 101 that you have to have both discriminatory

19   intent and discriminatory effects.

20        Defendants throughout their briefs and throughout

21   their presentation tend to lump those two together and

22   mix them up.   So they say in their reply brief that we

23   haven't shown that we can show that the partisan intent

24   was excessive.   I don't know what that means to have

25   intent that's excessive.   You really want to discriminate

against people?  I don't know what it means and --

JUDGE RIPPLE:  But the object of the intent is an important one.

MS. ODORIZZI:  Yes.  Exactly, Your Honor.  So it's not that the intent itself has to be at a certain level.  We know what discriminatory intent is.  *Bandemer* tells us what it is.  It's the intent to treat a particular political group differently and to denigrate them and to dilute their votes.

JUDGE RIPPLE:  There's been a lot of water under the dam since *Bandemer*.  Is that still viable?

MS. ODORIZZI:  Yes.  I think the intent test there is still viable.  It was adopted by six justices, and in later cases the court -- people have tried to make the test more manageable by saying well, let's make it a predominant intent.  And in *Vieth*, the court really didn't bite on that because they said -- the plurality anyway said predominance -- it's too hard to tell what motive predominates.  And in *LULAC*, the plaintiffs there tried the notion that if we can prove it was a sole intent, then we don't have to prove effects, and the Court said no, no, no.  Even if it's the sole intent, you still have to prove both intent and discriminatory effect.

So I think that does put us back to *Bandemer*, which

1    in the normal equal protection standard which is partisan

2    intent, a discriminatory intent was a motivating factor

3    in the plan.

4            JUDGE RIPPLE:  You can have somewhat of a

5    discriminatory intent in this area and be just fine,

6    can't you?

7            MS. ODORIZZI:  You can, Your Honor, but the

8    excessiveness part of it I think comes in the effect

9    part.

10           JUDGE RIPPLE:  Well, are you saying that what is

11   proven in the effect is, in fact, relevant and probative

12   evidence that one had the intent to discriminate at a

13   constitutional magnitude?  Is that what you're telling

14   me?

15           MS. ODORIZZI:  It can be, Your Honor.

16   Absolutely.  That there is certainly a synergy between

17   the two.  You can have a plan, and I'll get to this a

18   little bit later, but you can have a plan that creates

19   discriminatory effects that was not intended.

20           JUDGE RIPPLE:  In other words, what you show in

21   your prong two might be able to substantiate that the

22   defendants did want it to do more than simply favor one

23   party to a permissible degree.

24           MS. ODORIZZI:  That's right, Your Honor.

25   Exactly.  And that's how we show that it's excessive

partisan gerrymandering.  To show the intent, I mean the
state concedes that the Republican leadership had the
intent.  And we didn't talk about the evidence because in
our brief --

          JUDGE RIPPLE:  Counsel was very careful to say
though while he'll concede they had the intent to favor
the Republican Party, he will not concede that they had
the intent to create a plan that would keep the
Republican Party --

          MS. ODORIZZI:  Right.

          JUDGE RIPPLE:  -- in control --

          MS. ODORIZZI:  Right.

          JUDGE RIPPLE:  -- for the entire period.

          MS. ODORIZZI:  Right.

          JUDGE RIPPLE:  Is it necessary to have such an
intent --

          MS. ODORIZZI:  I don't think --

          JUDGE RIPPLE:  -- to violate the constitution?

          MS. ODORIZZI:  I don't think it has to be that
level, Your Honor.  I think the intent to discriminate
against an identifiable political group is enough.  But
if the standard were an intent to maximize your advantage
by packing and cracking your opponents as much as
possible, if that's the standard, we can meet it here.
We can show that that happened here.

1          JUDGE RIPPLE:  Can you meet the intent -- if the

2    standard is that the defendants intended to keep the

3    Democrats out of control for the entire decennial period,

4    can you prove that?

5          MS. ODORIZZI:  That they wanted a durable

6    gerrymander that would last as long as it possibly could?

7          JUDGE RIPPLE:  That's right.

8          MS. ODORIZZI:  I think we can show that, Your

9    Honor, that they thought about that issue and that they

10   thought about it and that they went through various

11   iterations of the plan in order to absolutely maximize

12   their advantage for as long as possible.

13         JUDGE RIPPLE:  My difficulty at least is in that

14   if you want wasteland where the intent was clearly to do

15   more than most state legislatures do, whatever that is.

16         MS. ODORIZZI:  Whatever that is.

17         JUDGE RIPPLE:  And what -- and trying to put it

18   in concrete for the whole decennial period, how would we

19   ever measure the intent in between those two extremes?

20         MS. ODORIZZI:  I don't think you should be

21   measuring intent, Your Honor.  I think here that it

22   should be the intent to disadvantage people based on

23   politics; that that's enough.  And then you look at the

24   effects, and I think you can have kind of a synergy

25   between the two where you say good Lord, this was the

1   worst gerrymander, one of the worst in history.  Yes,

2   they were planning to do something of exactly that

3   magnitude.  That is constitutionally intolerable.  They

4   have hit the level where they have both the intentional

5   gerrymandering is constitutionally intolerable.

6        JUDGE RIPPLE:  As I read your pleadings on this,

7   I kept thinking of what would happen would be the usual

8   practice of state legislatures will just get worse and

9   worse and that that line between trying to ice it for the

10  entire decennial period and what's common, the law of the

11  shop, if you want, among state legislators, is just going

12  to increase and increase and increase.

13       MS. ODORIZZI:  That's right, Your Honor.  If you

14  have unified control of the redistricting process and

15  it's okay, as defendants say, basically any partisan

16  intent is okay.

17       JUDGE RIPPLE:  What's the constitution -- what

18  does the constitution prohibit?  If the state

19  legislatures just get, you know, raw and then more raw

20  and then more raw in the way they do things, at what

21  point is the constitution violated?

22       MS. ODORIZZI:  Well, I think, Your Honor, in our

23  test in that situation where you have unified control and

24  you have proof of partisan intent that the map was drawn

25  with the intent to disadvantage your political opponents,

then you look at the efficiency gap to see what the
effects would cause and if the effects are so far out of
what has been previously the historical norm for the
efficiency gap and it's durable, it's likely to last
throughout the entire period, then you have a
constitutional violation unless the state can come and
show that was really the political geography of this
particular state and there was no other way around it.  I
mean I think that is a discernible test because it's
related to the concept that people have to be treated
equally and it's a manageable test and it's not going to
create a whole raft of new litigation because there are
very few plans that actually would be subject to this.

I'd like, if I might, to address defendants' -- one
of their big arguments is courts, neutral parties
sometimes in the past have created plans with big
efficiency gaps.  And that's true.  And under our test,
those plans are not at risk because there's no partisan
intent.  And counsel said well, we're using intent as,
you know, a way of protecting our efficiency gap
analysis.  But we're using intent and effect because that
is the basic equal protection analysis.  You look at
intent.  You look at effect.

You have a lot of cases under the Equal Protection
Clause where somebody can say they are discriminatory

1    effects.  Because discriminatory effects happen for a lot
2    of different reasons.  But you don't have a claim that
3    the state action violates the Equal Protection Clause
4    unless you can show intent.  So this is not anything
5    unusual or strange.
6         And if you go back to *Bandemer*, I think it's
7    interesting that Justice White noted, if I can find this
8    here, that if you do, if you draw a map in a -- he called
9    it a politically mindless fashion -- where you don't pay
10   attention to partisan issues and to how you're
11   districting and you're looking only at things like
12   compactness and trying to respect boundaries and making
13   sure that you have equal population, he says you can get
14   a gross partisan gerrymander out of that.  He recognized
15   that.
16        And that's what happened in Wisconsin in the 2000's.
17   If you look back at the decision in that case, the court
18   looked and it rejected the plans that were tendered to it
19   because it thought they were too partisan.  But then in
20   drawing its own plan, the court didn't look at these
21   partisan issues.  Unlike the court in the previous decade
22   which had really tried and succeeded in coming up with a
23   map that was very balanced, the court this time around
24   said we're going to try and do as little as possible to
25   disturb the current boundaries and we're going to

1   equalize the population.  And that had the unintentional

2   effect of creating a fairly large pro-Republican

3   efficiency gap.  But that doesn't show that what the

4   legislature did in 2011 was somehow appropriate

5   constitutional because you had an accidental gerrymander.

6   There was nothing accidental about what happened here.

7        At one point in their reply brief defendants say

8   well, the fact that because of the lawful -- what they

9   called the *lawful partisan intent* of the legislature,

10  there just happened to be this big efficiency gap.  It

11  didn't just happen to be.  It wasn't an accident.  They

12  planned for it and they achieved it.

13       So in that sense, the fact that we do have

14  efficiency gaps that come out of who knows why they came

15  out of those other maps, that's not relevant because

16  there was no intent in that case.  But that doesn't mean

17  that you can create discriminatory effects that are

18  excessive in a case like this intentionally, just like

19  the race discrimination cases we would say.

20            JUDGE CRABB:  I have a question about your

21  proposal.  There seems to be agreement among the justices

22  who believe that partisan gerrymandering is justiciable;

23  that court intervention for that kind of partisan

24  gerrymandering should be very limited and it should be

25  limited to extreme situations.  And you seem to say that

1    approximately 20 percent of the plans you could make a

2    prima facie case for showing that they're extreme

3    partisan gerrymandering.  So how do we -- how do we

4    narrow this to the few extreme circumstances that the

5    court seems to have been willing to consider?

6         MS. ODORIZZI:  Well, Your Honor, I think

7    Professor Stephanopoulos can give you the exact numbers.

8    I don't have them in my head and he does.  But when you

9    take out -- when you look only at the plans where you had

10   unified control of redistricting by one party, which is a

11   good proxy for partisan intent, that cuts the number way

12   down of the plans that would be -- you could challenge.

13   And as to the rest, if they could be challenged, and

14   there's a number of current ones that could be challenged

15   under our standard, those are subject to the standard and

16   in the overall scheme of things there's not that many of

17   them.

18      So I think the standard works in that it's getting

19   really the outliers.  It's getting the ones where you

20   have partisan intent and where you have an extreme

21   efficiency gap that was intentionally created and

22   intentionally discriminates against a particular

23   political group.

24        JUDGE GRIESBACH:  I think, if I understand the

25   defendants correctly, they don't argue that they did not

have intent to benefit the Republican Party.  They do not argue that they were compelled to enact this plan because of the traditional considerations.  What's at issue here? What are the facts we have to decide?

    Is the efficiency gap, is that a standard that we either adopt as a matter of law?  Or -- and if so, is that a factual dispute?  What are the -- why do you think we need a trial?  Why aren't you moving for summary judgment given your position?

        MS. ODORIZZI:  Well --

        JUDGE GRIESBACH:  What are the facts that you think we need a trial to hear and to decide?

        MS. ODORIZZI:  They do -- well, first of all on the intent prong, they've admitted some but not all.

        JUDGE GRIESBACH:  But your argument is all you need to show is an intent to benefit the parties.

        MS. ODORIZZI:  Right.

        JUDGE GRIESBACH:  And you have that.

        MS. ODORIZZI:  Right.  Right.  But Your Honors have to decide what they -- they also argue that there is no standard, legal standard for intent.  So I'm not sure what they're asking the Court to do except grant summary judgment because it doesn't matter what their intent is.

        JUDGE GRIESBACH:  My question to you is what do you think are the facts that we have to decide.

1          MS. ODORIZZI:  Well, they've challenged.  They

2    have an expert who we haven't challenged who challenges

3    various aspects of the efficiency gap and whether it's

4    the appropriate methodology to use, and we think that,

5    you know, it's looking at those experts and hearing their

6    testimony and you have to decide whether, in fact, the

7    efficiency gap is that test that the Supreme Court has

8    been searching for that enables you to decide and where

9    the line is between, you know, kind of politics as usual

10   and unconstitutional gerrymandering.

11         JUDGE GRIESBACH:  What facts do we need to

12   determine in order to make that assessment, that

13   decision?

14         MS. ODORIZZI:  Well, I think first of all you

15   have to look at the efficiency gap and see if you agree

16   with the way we've used it.  We have questions of

17   durability, which again Professor Stephanopoulos, if you

18   want to get into those facts, can talk more about it.

19   And the defendants have challenged those -- some of what

20   we've done on the efficiency gap, and that creates

21   questions of fact.

22         Just like on the clustering issue which they argued

23   sort of in their brief, we say Democrats and Republicans

24   -- we have expert testimony that Democrats and

25   Republicans are equally clustered in Wisconsin.  So to

1    the extent they want to argue about that it's clustering

2    of adherence of various parties explains the efficiency

3    gap, we have an issue of fact for the Court to decide.

4           JUDGE GRIESBACH:  It's -- I mean it is

5    demographically provable pretty -- and I doubt if there

6    would be much dispute based on whatever statistics as to

7    the density of the particular clusters, the respective

8    clusters, and I think that was the argument here that the

9    Democratic clusters are much more dense than the

10   Republican clusters.  But is that -- I mean if we decide

11   that, that decides the case.  I'm trying to figure out

12   and understand what specific factual issues we're going

13   to hear about at a trial that we'll need to resolve that

14   will -- that require a trial, I guess, that you think we

15   need to decide in order to determine whether or not the

16   measure you're offering, which is the efficiency gap.

17          MS. ODORIZZI:  Right.

18          JUDGE GRIESBACH:  There's no dispute as to what

19   it is or how it's calculated.

20          MS. ODORIZZI:  Calculated; right.

21          JUDGE GRIESBACH:  So I'm wondering do we need a

22   trial?  And what are the facts that we have to decide at

23   such a trial?  Where are we going to hear disputes as to

24   facts that aren't a matter of some historical event or

25   record that are already -- you know, that are already in

1   the record that are not --

2           MS. ODORIZZI:  Well, I think, Your Honor, we

3   didn't move for summary judgment because we viewed this

4   as having a battle of the experts about the efficiency

5   gap and how it applies.

6           JUDGE GRIESBACH:  So every one of these cases

7   will be a battle of the expert?  Or did the Supreme Court

8   envision, you know, some -- not multiple -- I mean once

9   we arrive at the standard, now we know.

10          MS. ODORIZZI:  Now we know.

11          JUDGE GRIESBACH:  But I mean is it your view

12  that if, for example, this Court ends up adopting the

13  efficiency gap as a reasonable and manageable standard,

14  that will be still a factual issue in every other

15  redistricting case that comes up?

16          MS. ODORIZZI:  It may or may not be, Your Honor.

17  If you adopt the efficiency gap, it's easy to calculate

18  it and so you may have issues as to intent and you may

19  also have issues on the third prong as to whether or not

20  the efficiency gap is unavoidable.  Because of the

21  political geography of the state, we don't have that

22  issue in Wisconsin, but it may be in other states.

23          JUDGE GRIESBACH:  Thank you.

24          JUDGE CRABB:  Who do you think should have the

25  burden of proof on that last question?

1          MS. ODORIZZI:  On that last question, we think

2     the burden should shift to the state.  Once we've shown

3     both intent and that the gerrymander is excessive under

4     the efficiency gap, they should have to explain.  They're

5     in the best position to explain.  They say that's not

6     fair, you know, and that they don't like the unavoidable

7     standard, but what other standard would you use when

8     they've done this with the intent to give themselves a

9     partisan advantage.

10          JUDGE CRABB:  Are you proceeding from the

11    one-person, one-vote cases when you say that the burden

12    should be --

13          MS. ODORIZZI:  Yes.

14          JUDGE CRABB:  -- on the defendants?

15          MS. ODORIZZI:  Yes.  And also, I mean, they say

16    here we've reverse engineered a Demonstration Plan.  But

17    Professor Gaddie, who was their expert before the fact,

18    made the same predictions.  We could have used his

19    predictions and come up with the same thing because he

20    was remarkably accurate about how the districts would

21    perform.  If we translate what he did into our efficiency

22    gap, he gets the same efficiency gap that we found after

23    the election.  So...

24          JUDGE CRABB:  Do you know of any case in which

25    the Supreme Court or any justice of the Supreme Court has

1   said that the burden should be on the defendants to show

2   that the gerrymandering was unavoidable?

3          MS. ODORIZZI:  No, Your Honor.  I think that

4   this is, you know -- this is -- we proceed from the

5   one-person, one-vote cases because there there's a

6   presumption that when you are over a certain limit, that

7   it's unconstitutional.  Here we think you should have a

8   presumption when you have both intent and the proper

9   amount of effect that when you've gotten to that level,

10  you have excessive partisan gerrymandering, then you also

11  should have a presumption.

12         And, you know, it's interesting because their

13  opening brief says very confidently that Wisconsin is a

14  pro-Republican state.  It's just political geography.

15  And then in their reply they say well, that's too high a

16  burden.  You can't put that burden on us.  And it's

17  impossible and plaintiffs could always do it.  But if you

18  read the Chen article, which they rely on, which talks

19  about Florida, it says in Florida it would be

20  unavoidable, because according to this article, they say

21  that the way Democrats are clustered in Florida, the only

22  way to create districts that were balanced under an

23  efficiency gap analysis would be by creating snake-like

24  districts coming out of the -- one of the cities.

25         So there would be a place for defendants in some

1    states to be able to come back and say we had to do this

2    in order to preserve ordinary districting rules.

3         JUDGE CRABB:  Are you imposing a standard of

4    necessity?

5         MS. ODORIZZI:  We are of being unavoidable, but

6    of course, you know, all of these standards are subject

7    to whatever Your Honors decide they should be.  And

8    whatever it is, we think we can meet it on the facts of

9    this particular case.

10        On the clustering point, I think for purposes of

11   summary judgment that that's really a question of fact.

12   So to the extent defendants are still relying on

13   clustering and those maps that are in their brief, those

14   are all the question of facts.  Because as I say, our

15   Professor Mayer, who does have a Ph.D. and used the kind

16   of analysis that a social scientist used -- uses to

17   decide population clustering, said Democrats and

18   Republicans in Wisconsin are equally clustered.  So

19   that's really not an issue in this state.  And at the

20   very least, there's a question of fact.

21        JUDGE CRABB:  If I could go back to this

22   justified necessity factor.  If you said that the

23   defendants had to show that the plan they are using was

24   necessary, isn't that -- anything could be necessary.

25        MS. ODORIZZI:  Well, I think --

1          JUDGE CRABB:  The realm of plans that they could

2    propose.

3          MS. ODORIZZI:  Right.  What they would have to

4    be able to show is that their supernormal, if you will,

5    efficiency gap, pro-Republican efficiency gap is really

6    inherent.  And yes, they could draw different maps.  But

7    no matter what map they drew, so long as it adhered to

8    the other requirements of districting, it would produce a

9    similar kind of efficiency gap.  I don't think they have

10   to show that these particular district lines were

11   absolutely necessary, but what they have to show is that

12   any alternative would have resulted in roughly the same

13   kind of excessive, if you will, efficiency gap.

14       I'm going to say two words about Mr. Trende before I

15   sit down and let Professor Stephanopoulos talk.  We have

16   a lengthy motion.  We think the motion in limine should

17   be decided before trial so nobody wastes their time and

18   effort preparing and you don't waste your time listening

19   to something that isn't admissible under *Daubert*.

20   Mr. Trende does not have a Ph.D.  But it's not just that

21   he doesn't have a Ph.D., he didn't even read the

22   literature on this issue and there is literature on how

23   you do clustering studies.  He did not employ the kinds

24   of methodologies that social scientists do to decide

25   clustering.  Instead he came up with his own methodology,

1 which at the end of the day doesn't show you anything

2 because it only shows geographic clusters, and when

3 you're doing districting, how far people are away from

4 each other, you know, if something is blue on a map in a

5 county really doesn't matter because the question is how

6 can you district.  Where is the population.  And Trende

7 doesn't deal with that at all.  So... (11:11 a.m.)

8          THE COURT:  Professor Stephanopoulos.

9          MR. STEPHANOPOULOS:  Thank you, Your Honor.  May

10 it please the Court.

11     I'd like to begin by saying a few more words about

12 defendants' principle argument which is that there's no

13 problem with or there is a problem with the efficiency

14 gap because it's not exclusively a product of partisan

15 intent, and then I'll address some other major issues

16 that have come up during the argument with respect to the

17 durability of gerrymandering, with respect to the

18 workability of the third prong of our test, and with

19 respect to the constitutional roots of our proposal.

20     So the single argument the defendants hammer at

21 throughout their briefing is that it's a fatal flaw with

22 the efficiency gap; that it has causes other than

23 partisan intent.  And I think there are several things to

24 say about that.  This is just an error of law on the part

25 of the defendants.

1          First of all, they're repeating the mistake that the

2    *Bandemer* plurality identified, which is to conflate, to

3    blur the intent and effect prongs.  It's clear both in

4    the partisan gerrymandering context and in equal

5    protection law more generally that the discriminatory

6    effect does not have to stem exclusively from the

7    discriminatory intent that underlies a challenged policy.

8    The discriminatory effect has to stem from the policy

9    that's being challenged, which in this case is a district

10   plan, but it does not have to stem 100 percent from

11   whatever discriminatory motivation underlies that policy.

12   And the court has said so in *Bandemer*.

13          I would also point out that this supposed weakness

14   of the efficiency gap is also a weakness of any

15   conceivable measure of partisan effect in this area.  So

16   whether you look at partisan bias, which is the metric

17   the court considered in *Vieth*; whether you consider

18   something cruder like simple disproportionality, all of

19   those other measures of partisan effect also are

20   functions of (a) partisan intent, (b) political

21   geography, (c) the candidates who are running.  There's

22   nothing distinctive about the efficiency gap in this

23   regard.

24          I'd also point out that the partisan bias figures

25   that the court itself cited in *LULAC* did not attempt to

make any adjustment for the proportion of the partisan

bias that was attributable to the Texas legislature's

partisan intent.  They were raw partisan bias figures.

There is no hint that those numbers had to be changed or

modified in some way to reflect only the contribution of

the Texas legislature's partisan intent.

And furthermore to the extent that causality matters

here, that's specifically the point of the third prong of

our proposed test.  So if, in fact, it turns out that

there are innocent explanations for a large efficiency

gap, that's going to come out when the state tries to

make its showing at the third prong.  So there's no need

for that causality question to also be intertwined with

the second element, the calculation of efficiency gap

itself.  And so let me turn then to that burden-shifting

inquiry which has been a topic of conversation.

So first of all, I would say we've plucked the

language for that third prong directly from the Supreme

Court's one-person, one-vote cases.  If this court wants

to adapt or modify the third prong, we don't have an

objection.  But we thought that the most reliable

intuitive place to look to figure out how this prong

should operate are the court's one-person, one-vote

precedence like *Brown v. Thompson*, like *Connor v. Finch*,

like *Voinovich*.  So we envision the same exact inquiry

1    taking place here at the third stage as takes place in

2    the one-person, one-vote cases at the third stage.

3        Now, is this an impossible burden for the state to

4    carry as defendants claim?  Clearly not.  When the same

5    precise question presents itself in the one-person,

6    one-vote context, states routinely are able to

7    demonstrate that large population deviations were the

8    necessary product of some legitimate state policy like

9    respecting county boundaries.  Ohio succeeded in making

10   that showing in *Voinovich*, Virginia succeeded in making

11   that showing in *Mahan v. Howell*, and there are other

12   similar examples.

13       Moreover, it will often not be the case that a

14   Demonstration Plan like Professor Mayer's will be

15   possible.  So my co-counsel mentioned the example of

16   Florida where if you credit Chen and Rodden's analysis,

17   it would not be possible to come up with a map that has a

18   low efficiency gap and that complies with traditional

19   redistricting criteria as well as the actual map in

20   Florida.  That's because Florida's geography prevents

21   this kind of map from being drawn.

22       Judge Crabb asked whether there's any precedent in

23   partisan gerrymandering law specifically for this kind of

24   burden-shifting inquiry, and the answer actually is yes

25   to that.  So when Justice Stevens first addressed

1    partisan gerrymandering in *Karcher*, he suggested that if

2    a state could produce legitimate justifications for its

3    plan, and this again is a plan that is intentionally and

4    significantly discriminatory against a particular group,

5    those legitimate justifications would rescue the plan.

6        The *Bandemer* plurality said the same thing, that

7    once you finish with the intent and effect prongs, you

8    also ought to consider what potential legitimate

9    justifications might underlie the plan.  And Justice

10   Souter more recently in *Vieth* also said the same thing,

11   that the fifth of his five stages in his proposal was

12   whether there happened to be -- whether the state can

13   show that there happened to be legitimate justifications

14   underlying its plan.  So there is precedent for this sort

15   of burden-shifting inquiry, not only in one-person,

16   one-vote law, but also in partisan gerrymandering law,

17   including in a plurality opinion in *Bandemer*.

18       Let me address the issue of durability which has

19   come up in Judge Ripple's comments in particular.  We

20   agree that the durability of a gerrymander is a very

21   significant consideration in this area.  The *Bandemer*

22   court clearly said that durability was central.  In fact,

23   durability featured in the specific legal test that the

24   *Bandemer* plurality adopted.  You know, was there a

25   consistent degradation of a group of voters' influence on

1   the political process.  And so we think that the partisan

2   effect that has to be demonstrated in these cases is that

3   a plan both significantly and durably disadvantages the

4   supporters of a particular party.

5        We think if there's evidence that the bias would not

6   be durable, that ought to be considered and it ought to

7   weigh heavily against the plaintiffs in this kind of

8   case.  And so we've presented evidence that Wisconsin's

9   Act 43 is extremely likely to retain a very large

10  pro-Republican bias throughout the decade, no matter what

11  sorts of changes in the electoral environment take place.

12       In fact, the plan is skewed enough and durably

13  skewed enough that it would give Republicans a lockhold

14  on the legislative majority even if Democrats are able to

15  win a substantial majority of the popular vote.  This is

16  one of the scenarios that Professor Mayer tackled in his

17  rebuttal report and he found that the -- that Act 43

18  retains its large efficiency gap and retains a Republican

19  majority even in the face of a Democratic waive election

20  like that of 2006 or 2008.  So we think durability

21  matters and we think it's clearly demonstrated here.

22       On the intent side as well, we would have no

23  objection to taking durability into account.  And here

24  also its present.  There is overwhelming evidence that

25  the drafters of Act 43 did not only intend to

1  significantly benefit the Republicans, they also intended

2  to durably benefit the Republicans.  And we'll be

3  presenting explicit evidence to that effect at trial,

4  that they considered both the magnitude of the expected

5  bias and the durability of the expected bias when they

6  were crafting Act 43.

7       Let me turn to an argument that defendants' counsel

8  made repeatedly which is that there are no constitutional

9  roots to plaintiffs' proposed approach, and let me

10  outline what I see as the constitutional roots of the

11  approach.  The proximate constitutional foundation is the

12  principle of partisan symmetry in which five justices

13  expressed interest in *LULAC*.  So a majority of the court

14  expressed at least some interest in that principle.

15  Partisan symmetry again is just the idea that the

16  electoral system has to treat the major parties

17  symmetrically when it comes to the conversion of their

18  popular support in the state into legislative

19  representation.

20       Now, that principle of partisan symmetry didn't come

21  out of nowhere in *LULAC*.  It's also implicit in all of

22  the court's partisan gerrymandering decisions.  Every

23  time the court defines the practice of partisan

24  gerrymandering, it does so in language that is clearly

25  consistent with the principle of partisan symmetry.

1   That's true in *Vieth*, it's true in *Bandemer*, it's true in

2   the more recent Arizona state legislature decision, it's

3   true throughout.

4         And furthermore, this principle of partisan symmetry

5   itself has clear constitutional roots in well-established

6   doctrines under the First Amendment and the Fourteenth

7   Amendment.  So it's very clear that there's an individual

8   right for the voter not to be discriminated against based

9   on the voters' political views or partisan affiliation.

10  That's true in the First Amendment context, in the

11  political patronage cases like *Elrod v. Burns*, and it's

12  also true in the Fourteenth Amendment right-to-vote

13  context in cases like *Harper* and *Crawford* where the court

14  explicitly says that partisan justifications are not a

15  valid reason to burden the exercise of the franchise.

16        So I think here we have a principle recognized in

17  *LULAC* that is just an articulation of an idea that's been

18  floating around all of the Supreme Court's partisan

19  gerrymandering decisions and that is just the obvious

20  corollary at the party level of the fundamental

21  individual principle that you can't discriminate against

22  somebody based on their political views or party

23  affiliation.

24        Now, defendants say how in the world could you

25  constitutionalize something like a two-to-one

seat-to-vote relationship, and they return to that point

numerous times.  And of course you wouldn't

constitutionalize a two-to-one seat-to-vote relationship

or any other seat-to-vote relationship.  With the full

method for calculating the efficiency gap, there is no

necessary seat-to-vote relationship that's implied.  With

the simplified method for calculating the efficiency gap,

there is also no seat-to-vote relationship implied

whenever the efficiency gap is not precisely equal to

zero.  And if we allow, for example, the efficiency gap

to vary between, say, plus or minus 7 percent, that

allows any of myriad different seat-to-vote relationships

to occur.  So the Court would absolutely not be

entrenching or constitutionalizing any particular

seat-to-vote relationship by adopting our approach.

        And moreover, to the extent that the efficiency gap

prods or encourages states to move toward the two-to-one

relationship, that's a positive consequence.  This is the

historical norm for generations in American elections at

both the state legislative and the congressional level.

The fact that this is the norm is precisely why the

defendants' own expert uses a measure effectively

identical to the efficiency gap in his own analyses.  He

recognizes that the efficiency gap is really measuring

the deviation of a particular plan from historical norms

1    and that's the same appeal that we see for the efficiency

2    gap, that it really captures the extent to which a plan

3    is more gerrymandered than you would expect based on the

4    historical norms that have applied for generations in

5    American elections.

6          JUDGE CRABB:  Excuse me.  Can I intervene?

7          MR. STEPHANOPOULOS:  Sure.

8          JUDGE CRABB:  At one point in your brief you say

9    the court could use partisan bias in addition to the

10   efficiency gap if the court thinks the efficiency gap is

11   not as sufficient.  How would that work?

12         MR. STEPHANOPOULOS:  So we envision that working

13   sort of as a robustness check.  So we have these two

14   different measures of partisan symmetry out there:

15   There's the older measure partisan bias and there's the

16   more sophisticated newer measure of the efficiency gap.

17   We might worry if partisan bias tells us that a plan is

18   completely fair when the efficiency gap tells us that a

19   plan is manifestly unfair.  There are reasons in that

20   conflict scenario to prefer the reading that's given by

21   the efficiency gap.  But to the extent that both of the

22   metrics are consistent, that provides a court with even

23   more of a basis for concluding that a particular plan

24   really does have a very lopsided partisan impact.

25         And here that's absolutely the case.  So the Act 43

had nearly identical partisan bias scores in both 2012

and 2014, as it did efficiency gap scores.  So here both

the older metric and a newer metric are completely

consistent in the message that they're sending, which is

that Act 43 is one of the most egregious and most tilted

plans that had been observed over the last 40 odd years

or so.

JUDGE CRABB:  Do you know any other measures for

determining partisan symmetry other than these two?

MR. STEPHANOPOULOS:  These are the two that are

featured in the literature.  I suppose even older than

partisan bias would be just literally to compare the seat

share and the vote share for a party and just to look at

the difference between the two.  But that is literally a

measure of the deviation from perfect proportionality.

And so it's clear that that measure is prohibited by the

court's precedence.  That would tell you how much a plan

is disproportional relative to perfect one-to-one

proportionality.  That can't be the test in this area.

But I can tell you though that -- so since the

concept of partisan symmetry emerged, partisan bias was

the first and the only scholar-designed measure of

partisan symmetry up until the last few years when the

efficiency gap also emerged in order to address some of

the deficiencies that had been identified with partisan

1    bias.  I'm happy to address those deficiencies if that's

2    of interest to the Court.

3           JUDGE CRABB:  That's okay.

4           JUDGE GRIESBACH:  I want to ask you the same

5    question I asked Ms. Odorizzi, Mr. Stephanopoulos.  What

6    facts do you think we need to decide in order to make the

7    judgment, arrive at a judgment that the efficiency gap is

8    that elusive standard that the Supreme Court has been

9    seeking all these years?  What factual disputes do you

10   think exist here that would -- we'll be resolving at a

11   trial in this case?

12          MR. STEPHANOPOULOS:  Sure.  So I think there are

13   factual disputes related to Wisconsin's own facts, but I

14   take Your Honor to be addressing the more general

15   question of what facts are in dispute with respect to the

16   efficiency gap and with respect to setting a general

17   standard as opposed to the particular case at hand.

18       So defendants have made a host of factual arguments

19   that the efficiency gap is too volatile, too changeable

20   from election to election; that a 7 percent threshold is

21   not reasonable.  Maybe the threshold has to be calibrated

22   up or down.  They've argued that the clustering of

23   Democratic and Republican voters has some impact on the

24   efficiency gap, but we don't know yet how much of an

25   impact.  And we also don't know whether that's a legally

1   significant fact or not.

2       The question of avoidability, so was a large

3   efficiency gap avoidable, is also, I think, a

4   quintessentially factual question on which the parties

5   differ.

6           JUDGE GRIESBACH:  I thought that was conceded

7   here.

8           MR. STEPHANOPOULOS:  What's that?

9           JUDGE GRIESBACH:  I thought that was conceded

10  here.  I mean as I see this, intent and avoidability are

11  really not in dispute.

12          MR. STEPHANOPOULOS:  Well, I don't believe, if

13  we went to trial, the defendants would concede those two

14  points.  Maybe they would and we would be happy to accept

15  those concessions.  I think that they would likely offer

16  justifications, reasons for the large efficiency gap that

17  we observed.  I think it's likely they would claim that

18  Act 43's large efficiency gap is the result of a

19  pro-Democratic -- I'm sorry, pro-Republican political

20  geography in the state of Wisconsin.  Certainly they've

21  argued at length in their briefing that Wisconsin has a

22  natural pro-Republican geography and this accounts for

23  large efficiency gaps.  I take that to be specifically an

24  argument about whether a large efficiency gap is or is

25  not inevitable in Wisconsin.

1    So without knowing what particular stipulations
2  defendants would make, I think it's hard to answer the
3  question, but certainly their brief suggests that there
4  are disputed factual issues at the third prong as well.
5         JUDGE GRIESBACH:  Thank you.
6         MR. STEPHANOPOULOS:  Let me address now one of
7  Judge Crabb's questions from earlier about the volume of
8  plans affected.  So when defendants comment on the volume
9  of plans affected, they completely overlook the first
10 prong of our test.  They assert that you would have to
11 jeopardize all plans that are over "X" percent in their
12 efficiency gap, whether that's in the first election or
13 in any election over the course of the cycle.  That's
14 incorrect because our test does have these multiple
15 prongs.  You would also have to make sure that partisan
16 intent was present.
17    Once we take partisan intent into account, at least
18 by proxy by looking at how many cases are there where a
19 single party had unified control over redistricting, the
20 number of potentially affected cases drops dramatically
21 to a few dozen all time, and only roughly ten today.  And
22 these numbers, I think, ought to be taken in perspective
23 relative to the enormous volume of redistricting
24 litigation that has taken place in the past and that
25 currently takes place.

1        So in a world where the one-person, one-vote
2   principle led to hundreds of plans being invalidated and
3   in a world where Section 2 of the Voting Rights Act has
4   prompted hundreds upon hundreds of lawsuits over the
5   years, in a world where in every cycle there are hundreds
6   of cases in almost every state resulting in roughly two
7   dozen plans being either invalidated or drawn by the
8   courts, it's only an incremental increase if another ten
9   plans might be in some jeopardy under plaintiffs'
10  proposed test.  So this is not a dramatic increase in the
11  degree of judicial intervention in this area.  We think
12  it's a degree of judicial intervention that's perfectly
13  consistent with current practice.
14       We'd also point out that to the extent the numbers
15  of problematic plans still seem high, that's because the
16  practice of partisan gerrymandering is ubiquitous and
17  very severe.  So if you have a clearly undemocratic
18  practice taking place around the country, it doesn't
19  strike us as a bad thing if there are a number of cases
20  that emerge to tackle that undemocratic practice and to
21  curb that undemocratic practice.
22       Let me also address one of counsel's arguments about
23  the changeability of the efficiency gap.  So counsel
24  rightly points out that the efficiency gap can vary
25  somewhat from election to election.  That's because

1  different candidates run.  National trends go in

2  different directions in different years.  But empirically

3  this was one of the principal things that Professor

4  Jackman examined in his two reports, just how volatile is

5  the efficiency gap.  What he found is that the vast

6  majority of variability of the efficiency gap is across

7  plans, not within plans.  So within plans, you have a

8  relatively high level of stickiness of the efficiency

9  gap.  Across plans, you see significant differences in

10  the efficiency gap consistent with different plans being

11  more or less symmetric in their treatment of the parties.

12      Professor Jackman also included a great deal of

13  evidence on the dependability of the first score that you

14  observe under a plan.  And what he found confirms the

15  plaintiffs' view that the efficiency gap is a

16  sufficiently robust and reliable metric to be used in

17  litigation.  So he found that the first efficiency gap

18  recorded predicts with a quite high degree of precision

19  the lifetime average efficiency gap of the plan.  So if a

20  plan opens with a great deal of asymmetry, we can be

21  quite confident that this plan over its lifetime will end

22  up averaging out to have been a quite a symmetric plan.

23      He also arrived at extremely high confidence rates

24  associated with the 7 percent threshold that he

25  recommended.  He further found that the rate of false

1 positives would be extremely low with a 7 percent

2 threshold.  So in other words, with a 7 percent

3 threshold, the volume of cases where you might have

4 thought based on the first efficiency gap that the

5 lifetime average of the efficiency gap would be in the

6 same direction, but it turns out that the lifetime

7 average actually was in the opposite direction.  There

8 are very few of those cases, lower than 5 percent, with

9 an efficiency gap threshold of 7 percent.

10     And he further found that if you take all of the

11 current plans in effect around the country and you shift

12 them by up to 5 percentage points in either direction,

13 the original efficiency gaps end up being overwhelmingly

14 highly correlated with the efficiency gaps that you get

15 after you do the shifting.  So this again addresses Judge

16 Ripple's concern about durability and it shows us that

17 current plans with large efficiency gaps have very

18 durably very large efficiency gaps.  They're going to

19 preserve their current level of asymmetry under just

20 about any electoral environment that you can

21 realistically conceive of over the remainder of the

22 decade.

23     I'm coming to the end of my points so I'll be happy

24 to sit down soon.  With respect to the changeability,

25 defendants complain that it's arbitrary to focus on the

1    first election and instead any analysis ought to take

2    into account all of the elections under a plan.  But

3    there are good reasons for focusing on the first

4    election.  First of all, based on Justice Kennedy's

5    comments in *LULAC*, it appears that lawsuits before the

6    first election are not allowed because those would be

7    based on a counterfactual state of affairs.  So the first

8    election represents the moment at which lawsuits are

9    allowed to be filed.

10       Second, plaintiffs are going to have every incentive

11   to file suit as soon as they're allowed to.  If they

12   wait, that's another election that they have to endure

13   under a plan that they consider to be fundamentally

14   unconstitutional.  And moreover, if plaintiffs wait until

15   two or three or four elections have occurred under a

16   plan, they won't be able to cherrypick the efficiency gap

17   scores that look best for them.  They'll have to accept

18   the record as they find it, which will include all of the

19   efficiency gaps that have been produced by that plan.

20       So here, for example, we absolutely could not ignore

21   the 2014 efficiency gap score of Act 43.  That's played a

22   central role in our litigation and we think the same

23   would be true any time that plaintiffs sue after multiple

24   elections have taken place.  They'll have to accept and

25   work with and deal with all of the observed scores that

1  the plan has generated.

2       I think I've covered the points I wanted to hit, so

3  let me close with two final brief observations.  The

4  first is how factual most of defendants' arguments are.

5  So in their opening brief in particular, they've raised

6  the issues of how geographically clustered are the

7  two-party supporters in Wisconsin?  How geographically

8  clustered are the two-party supporters in the nation as a

9  whole?  How many plans would be jeopardized by

10 plaintiffs' proposed test?  How variable are efficiency

11 gap scores from election to election?  Did Professor

12 Mayer and Professor Jackman make certain methodological

13 mistakes or did they rely on certain problematic

14 assumptions in carrying out their analyses?  These are

15 exactly the kinds of contested factual issues that can't

16 be resolved at this stage and that require a trial to be

17 decided.

18      And the second point is just to reiterate the

19 defendants don't even try in their briefs to argue that

20 Act 43 would be valid under plaintiffs' proposed test.

21 And I think that's for good reason.  There's overwhelming

22 evidence that the plan was devised in order to maximize

23 the number of districts the Republican candidates would

24 win.  Prior to the current cycle, there wasn't a single

25 map in American history or modern American history that

1   was as severely asymmetric as the current plan in its

2   first two elections.  And it's also clear that this

3   extreme level of asymmetry was immanently unavoidable.

4   The Wisconsin Legislature easily could have, but chose

5   not to, devise a plan that would have been much more fair

6   to both parties and also would have accomplished all of

7   its legitimate objectives just as well.

8        So our view is that if the courts are ever going to

9   curb the deeply undemocratic practice of partisan

10  gerrymandering, this case presents as good a place as

11  could be imagined to begin that project.

12       Thank you, Your Honors.  (11:42 a.m.)

13       JUDGE RIPPLE:  Thank you, Professor.  And we'll

14  hear now in rebuttal Mr. Keenan.

15       MR. KEENAN:  Well, I'll start by saying that the

16  plaintiffs' argument assumes what the definition of

17  fairness in a districting plan is is equal results of

18  elections in converting votes to seats.  But that's not

19  what the Supreme Court has said that fairness in

20  districting is.  Both the federal courts in the District

21  of Wisconsin in 1990 and 2000 were trying their utmost to

22  be fair in districting.  Those plans have resulted in

23  very asymmetric results.

24       Now in 2010 when Republicans win control of the

25  legislature, what the plaintiffs would demand is that the

Republicans enact a plan that's actually less favorable
to themselves than the one that's been in place for 20
years.

This just can't be the standard for partisan
gerrymandering claims to have a standard that would
require such results when partisan motivation just isn't
unconstitutional.  I would say that that's not just a
finding of or a holding of the *Vieth* plurality.  The
appropriateness of considering political factors is also
in *Gaffney v. Cummings*, which is a majority decision of
the Supreme Court.

I think the problem is that the plaintiffs say this
is extreme or an outlier or -- I'm trying to see some of
the other terms used, but it's not.  The elections that
were seen in Wisconsin are actually entirely consistent
with what just happened last decade.  Mr. Stephanopoulos
says well, the first two elections in this plan are just
as, you know, have the highest efficiency gaps of any
plan prior to this cycle.  Well, that's true in the first
two elections, but if you look at last time in Wisconsin,
there is efficiency gaps of negative 10 and negative 12.
They happened to occurred in 2004 and 2006 so they aren't
the first two elections in the cycle, but they were two
elections in that plan.  And so to the defendants, you
can't look at the first two elections under this plan and

1   then conclude that there's extreme partisan

2   gerrymandering going on when we saw the exact same

3   results under the last plan which was enacted by

4   disinterested federal judges.

5        I think that's the key is they say it's out of the

6   norm.  Well, the norm of what?  The norm in Wisconsin as

7   seen is what was seen in the last two plans.  Why is

8   Wisconsin being judged against the norm of all the other

9   states dating back to the 1970's and 1980's when the

10  political conditions were quite different?  Frankly, I

11  don't know that it is possible to have a standard like

12  this that would apply to every single state equally

13  because each state is different.

14       They also say that it would affect relatively few

15  plans, but that's just not true.  I mean in this last

16  cycle, their own expert says when you consider partisan

17  intent, 25 percent of plans are being implicated at the 7

18  percent threshold and 16 percent at the 10 percent

19  threshold.

20       I think some of this is like what is a partisan

21  plan.  Well, they just say a partisan plan is one with a

22  asymmetrical result, but if you look at the *Baumgart*

23  case, it rejected the Democrat's plan as too partisan,

24  not because of the results but because, in their words,

25  they said the plan -- the district in Madison by starting

1   at the state capitol and lines radiating out in the shape

2   of a pizza, kind of a pizza-mander, that it's a way to

3   maximize their seats.  It wasn't -- that was partisan

4   because it was ignoring traditional districting

5   principles to create more Democratic seats.  It wasn't --

6   but under the plaintiffs' standard that might be totally

7   appropriate if statewide you end up with a more balanced

8   map.  But the districting decisions aren't judged just on

9   the pure statewide vote as the Supreme Court makes clear

10  that there's individual districts that candidates have to

11  win, not just a statewide vote total yielding into a seat

12  chair.

13       Mr. Stephanopoulos said that the efficiency gap

14  doesn't make a particular seats-to-votes relationship

15  constitutional, but it does.  I mean the way they've

16  structured their test is based on the one-person,

17  one-vote, and the one-person, one-vote takes that

18  deviation from equal population.  You get to a certain

19  point and then you're presumptively unconstitutional.

20  Well, the reason that is is because that is actually the

21  constitutional rule is equal population and that is what

22  is normalized.  Well here, you're going to take the

23  efficiency gap and make that your baseline and see how

24  far you deviate from it.  Well, if that's not

25  constitutionalizing the seats-to-votes relationship, then

1    I don't even really know what it's doing.

2        And I think just to reiterate the durability point,

3    I would just like to clarify that their expert examined

4    the durability of the efficiency gap, not the durability

5    of party control of the House.  Judge Ripple had asked

6    about whether I was getting into a dispute of

7    Findings-of-Facts land about how the efficiency gap did

8    not translate, but our proposed finding 185 was not

9    disputed.  The plaintiffs say it's undisputed that the

10   sign of the efficiency gap does not necessarily correlate

11   to control the state legislature or that in five of the

12   seven plans enacted under unified party control -- this

13   is from the Jackman chart -- the party in control of the

14   state House changed despite the fact that the efficiency

15   gap remained the same sign.

16       So the efficiency gap in all the tests Jackman has

17   done are looking at the efficiency gap, they're not

18   necessarily looking at control of the state House and

19   showing that that is durable.  In the uniform swing they

20   do, that's the same thing in that his analysis looks --

21   well, say you shift the votes from 50 percent to 51

22   percent.  That will change seats, but what he's measuring

23   is then on the 51 percent line, how does that compare to

24   the expected 52 percent share, not whether it's giving

25   you control of the legislature.

1      And I think the main problem here is that the

2  plaintiffs say this is a traditional equal protection

3  case, but if that's really the case, then there is no

4  protected class here.  Shouldn't we just be in

5  rational-basis review?  Shouldn't the defendants just be

6  able to say there is a rational basis for our plan?  The

7  plaintiffs have another plan, which they say is equally

8  rational with a better result for the Democrats, but in a

9  rational-basis review, that wouldn't be enough to

10 invalidate a plan.

11      And I think going to Judge Griesbach's point, I also

12 am not sure what we would try in terms of establishing

13 the efficiency gap as a standard.  We've put forward what

14 I think is a fair view of what the plaintiffs' experts

15 did as the basis for our motion and our argument is that

16 that just isn't enough to constitutionalize the standard.

17 I'm not sure what more you get by having Professor

18 Jackman or Professor Mayer get up on the stand and

19 testify to that.

20      I think to the extent the way this third part of the

21 test works, I guess I would want to be able to meet the

22 test if it truly isn't satisfied by the mere presence of

23 the Demonstration Plan.  I'm a little bit confused by the

24 wording unavoidable and necessary.  It seems like it's

25 impossible to meet for a state.  But to the extent it's

1    not, I guess I would like to put in evidence on that.

2              JUDGE GRIESBACH:  Why don't you think that the

3    factual assertions that Mr. or Professor Stephanopoulos

4    mentioned aren't proper factual issues that this Court

5    needs to determine in order to assess whether the

6    efficiency gap is that elusive standard the Supreme Court

7    has been looking for?

8              MR. KEENAN:  Sure.  And I think that the facts

9    that we've used are not disputed, it's what the Court

10   wants to make of those facts.  I mean we've just tried to

11   accurately lay out what the plaintiffs' experts have

12   done --

13             JUDGE GRIESBACH:  Apparently there's a

14   significant dispute over clustering.

15             MR. KEENAN:  And I say that clustering, you

16   don't need to make a finding on that.  So that could just

17   be avoided.  But in terms of what the plaintiff -- we're

18   relying primarily on the --

19             JUDGE GRIESBACH:  Isn't clustering part of your

20   argument as to why efficiency gap isn't a fair measure?

21             MR. KEENAN:  It's context to explain why we've

22   seen efficiency gaps in Wisconsin.  I think, one, they

23   haven't actually disputed the evidence we've offered on

24   that.  But further, I don't think it's necessary to make

25   a particular finding on that.  It is undisputed that

1      their proposal of it --

2              JUDGE GRIESBACH:  If it exists, then it does

3      skew that type of thing.

4              MR. KEENAN:  It's something that would have to

5      be considered in a standard it would seem; that it's

6      recognized in Supreme Court case law that the geographic

7      distribution of your voters is going to affect how you

8      translate a statewide vote into seats.  So that's

9      something that should be considered in a legal standard

10     that's trying to show partisan gerrymandering.  The

11     plaintiffs' first two steps don't look at it at all.  We

12     think that's a weakness.

13             JUDGE GRIESBACH:  Do you think there are factual

14     disputes as to the intent of the legislature?

15             MR. KEENAN:  I would say for purposes of the

16     summary judgment motion, I don't think so.  I think there

17     might be --

18             JUDGE GRIESBACH:  At trial are there going to be

19     factual disputes?

20             MR. KEENAN:  Depending on what this intent

21     element ends up being, there could be.  The way the

22     plaintiffs have phrased it where you just needed like a

23     bare intent --

24             JUDGE GRIESBACH:  You're not going to admit you

25     intended to violate the constitution.

1          MR. KEENAN:  Yeah.  And I think as we discussed

2     earlier, there's not going to be an admission that -- I

3     think the witnesses would testify that they did not

4     intend to maximize Republicans seats; that there was

5     other concerns that would limit how much you really could

6     maximize the seats.

7          JUDGE GRIESBACH:  Nor would the individual

8     members?

9          MR. KEENAN:  The legislators, you know, just a

10     host of different things, that would just -- the

11     individual legislators, demands from the legislature what

12     their districts should be, things like that.

13          JUDGE GRIESBACH:  So there's no dispute they

14     wanted an advantage.

15          MR. KEENAN:  Yeah, there's no dispute on that,

16     to that point.  Now, to the extent this element goes

17     other ways, maybe there's disputes to the extent --

18          JUDGE GRIESBACH:  And there's really no dispute

19     that they could have designed a plan that would have

20     given them less advantage.

21          MR. KEENAN:  Yeah.

22          JUDGE GRIESBACH:  And consistent with the rules

23     governing traditional redistricting.

24          MR. KEENAN:  Yeah.  I think there's no dispute

25     that a different plan could have been enacted that had a

1   better or less advantageous results for the Republicans.

2   There's probably -- I think that there's probably also no

3   dispute that there probably could even enacted a plan

4   that would be more favorable to them.  So like depending

5   on how the third prong goes, if it really is truly like

6   the one-person, one-vote, that test is about whether you

7   were advancing a legitimate state policy, not about

8   whether it's necessary and unavoidable.  So if that's it,

9   then we would need to put in evidence to show, like, that

10  there is, you know, legitimate reasons behind the

11  decisions that were made.

12       But in terms of using the efficiency gap and using

13  the intent element as the plaintiffs have described it, I

14  don't know what facts we're going to be trying at a trial

15  on that.  We've, I think, made a fair representation of

16  what the plaintiffs' experts -- what the support is for

17  using those standards.  And there's no dispute about what

18  they did and what they didn't do.  It's just like what to

19  make of that as a legal matter, which is a question of

20  law for the Court, not really a political science issue.

21       And I guess I would just like to close with, like,

22  the partisan bias and partisan symmetry.  The plaintiffs

23  act as if that's been constitutionalized and it's been

24  accepted as a constitutional principle, and it hasn't.

25  Justice Kennedy says he wouldn't use it alone.  He didn't

1    say that his problems with it were like very specific,

2    that he really likes it.  But, you know, just address

3    these few concerns.  It was like skepticism about it.

4    But maybe in the future it would provide some guidance.

5    But there is no holding that that type of analysis really

6    should guide -- should be what determines these claims.

7         I think that's all I have.  Unless there's any

8    further questions, I'll sit down.

9              JUDGE RIPPLE:  Thank you, Mr. Keenan.  The Court

10   would like to express its deep thanks to all counsel for

11   elucidating the very complex issues that we have to wade

12   our way through in this case.  It's been a very

13   informative morning and we very much appreciate it and

14   we'll take the motion under advisement.

15        The Court will rise and determine a date depending

16   on a decision.

17        (Proceedings concluded at 11:55 a.m.)

18

19

20

21

22

23

24

25

1              I, LYNETTE SWENSON, Certified Realtime and

2     Merit Reporter in and for the State of Wisconsin, certify

3     that the foregoing is a true and accurate record of the

4     proceedings held on the 23rd day of March 2016 before the

5     Honorable Barbara B. Crabb, the Honorable William

6     Griesbach and the Honorable Kenneth Ripple, in my

7     presence and reduced to writing in accordance with my

8     stenographic notes made at said time and place.

9     Dated this 25th day of March 2016.

10

11

12

13                              ___/s/_____

14                              Lynette Swenson, RMR, CRR, CRC
                                Federal Court Reporter
15

16

17

18    The foregoing certification of this transcript does not
      apply to any reproduction of the same by any means unless
19    under the direct control and/or direction of the
      certifying court reporter.
20

21

22

23

24

25