IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM WHITFORD, ROGER ANCLAM,
EMILY BUNTING, MARY LYNNE DONOHUE,
HELEN HARRIS, WAYNE JENSEN,
WENDY SUE JOHNSON, JANET MITCHELL,
ALLISON SEATON, JAMES SEATON,
JEROME WALLACE and DONALD WINTER,

                                   OPINION and ORDER

            Plaintiffs,

                                   15-cv-421-bbc

     v.

GERALD C. NICHOL, THOMAS BARLAND,
JOHN FRANKE, HAROLD V. FROEHLICH,
KEVIN J. KENNEDY, ELSA LAMELAS and
TIMOTHY VOCKE,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     The question in this case is whether Wisconsin Act 43—the 2012 districting plan for the Wisconsin Assembly—is an unconstitutional partisan gerrymander. Plaintiffs are Wisconsin residents and Democratic voters who allege that the plan is "one of the worst partisan gerrymanders in modern American history." Cpt. ¶ 1, dkt. #1. In particular, plaintiffs allege that Republican legislators drew the plan in secret, in consultation with a political scientist and without any input from Democrats, in an attempt to maximize Republican wins and minimize Democratic influence over the political process for as long as the plan was in place. In addition, plaintiffs allege that Republicans were successful in

1

their attempt, gaining significantly more Assembly seats in 2012 and 2014 than their level of public support suggests.  As proof that Republicans unfairly manipulated district lines, plaintiffs created their own plan, which they say satisfies traditional districting criteria such as compactness, contiguity and respect for political subdivisions as well or better than Act 43 but treats Democrat and Republican voters much more equally.

In an order dated December 17, 2015, dkt. #43, we denied defendants' motion to dismiss after concluding that plaintiffs' allegations were sufficient to state a plausible claim for relief.  Now defendants have filed a motion for summary judgment, dkt. #45, which is ready for review.  In addition, plaintiffs have filed what they call a "motion in limine" to exclude the opinions of one of defendants' named experts, Sean Trende.  Dkt. #70.

Defendants raise many important points in their summary judgment submissions. It may be that one or more of these objections carries the day in the end.  However, we believe that deciding the case now as a matter of law would be premature because there are factual disputes regarding the validity of plaintiffs' proposed measurement for determining the existence of a constitutional violation.  Accordingly, we deny defendants' motion for summary judgment and allow the case to proceed to trial.

We are also denying plaintiffs' motion in limine without prejudice to plaintiffs' renewing the motion at the conclusion of trial.  Plaintiffs raise significant objections in their motion.  However, because it is not necessary to consider Trende's opinions in order to resolve the motion for summary judgment and because the trial will be to a court rather than to a jury, we believe the prudent course of action is to rule on the admissibility of Trende's

opinions after he has an opportunity to testify.  <u>Metavante Corp. v. Emigrant Savings Bank</u>, 619 F.3d 748, 760 (7th Cir. 2010) ("[T]he court in a bench trial need not make reliability determinations [regarding experts] before evidence is presented."); <u>In re Salem</u>, 465 F.3d 767, 777 (7th Cir. 2006) ("[W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the [expert] evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.").

To accommodate a court scheduling conflict, the trial will begin on Tuesday, May 24, 2016, at 9:00 a.m.  The parties should be prepared to finish the trial in four days.


OPINION

In the order denying the motion to dismiss, we considered three issues: (1) whether challenges to a partisan gerrymander were justiciable; (2) whether plaintiffs had standing to sue; and (3) whether plaintiffs stated a plausible claim for relief.  We answered each of these questions in the affirmative.  Because defendants do not raise any new arguments about justiciability or standing in their summary judgment submissions, we see no reason to discuss those issues in this opinion.  Instead, we will focus on whether plaintiffs have raised any genuine issues of material fact with respect to the various objections raised in defendants' motion for summary judgment.  Fed. R. Civ. P. 56.

A.  <u>Legal Background</u>

As the parties well know, there is much uncertainty in the law regarding partisan gerrymandering.  Although the Supreme Court has well-established tests for analyzing alleged gerrymanders with respect to race, <u>e.g.</u>, <u>Miller v. Johnson</u>, 515 U.S. 900, 916-17 (1995), and equal population, <u>e.g.</u>, <u>Evenwel v. Abbott</u>, No. 14-940, 2016 WL 1278477, at *3 (U.S. Apr. 4, 2016); <u>Brown v. Thomson</u>, 462 U.S. 835, 842-43 (1983), the Court has struggled to determine the appropriate test for gerrymanders based on political affiliation. In <u>Davis v. Bandemer</u>, 478 U.S. 109, 118-27 (1986), a majority of the Court agreed that partisan gerrymander claims are justiciable under the equal protection clause and that the plaintiffs must prove a discriminatory intent and a discriminatory effect.  However, the Court could not agree on a specific standard to apply, particularly with respect to determining a discriminatory effect.  <u>Compare</u> <u>Bandemer</u>, 478 U.S. at 133 (plurality opinion) ("[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole."), with <u>id.</u> at 161 (Powell, J., concurring in part and dissenting in part) (question is whether legislature acted solely for partisan ends to the exclusion of  "all other neutral factors relevant to the fairness of redistricting").

In <u>Vieth v. Jubelirer</u>, 541 U.S. 267 (2004), four Justices concluded that <u>Bandemer</u> should be overruled because partisan gerrymanders present political questions that cannot be answered by federal courts.  <u>Id.</u> at 305 (plurality opinion).  Four other Justices agreed that the <u>Bandemer</u> plurality did not provide a workable standard, but they disagreed with the

4

plurality regarding justiciability and they proposed alternative standards for reviewing a partisan gerrymandering claim.  Compare Vieth, 541 U.S. at 339 (Stevens, J., dissenting) (question is "whether the legislature allowed partisan considerations to dominate and control the lines drawn, forsaking all neutral principles"), with Vieth, 541 U.S. at 346-51 (Souter, J., dissenting) (proposing burden-shifting framework modeled after McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)), and Vieth, 541 U.S. at 360-61 (Breyer, J., dissenting) (question is whether there was "unjustified use of political factors to entrench a minority in power").

In the middle, Justice Kennedy concluded that neither the Justices nor the parties had provided a workable standard, but he declined to close the door on future partisan gerrymandering claims.  Id. at 306-08 (Kennedy, J., concurring in the judgment).  Rather, he stated that "courts should be prepared to order relief" if "workable standards do emerge." Id. at 317.  He suggested that future cases could be guided not just by the equal protection clause but also by the First Amendment, focusing on the question whether a plan "burden[s] or penaliz[es] citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views."  Id. at 314.  See also Baldus, 849 F. Supp. 2d at 853 ("[P]erhaps the Court will find some day that the First Amendment also protects persons against state action that intentionally uses their partisan affiliation to affect the weight of their vote.").

Finally, in League of United Latin American Citizens v. Perry, 548 U.S. 399 (2006), the Court assumed that partisan gerrymanders are justiciable, but a majority concluded that

the plaintiffs had failed to identify "a manageable, reliable measure of fairness for determining whether a partisan gerrymander violates the Constitution." Id. at 414.  Again, the dissenting Justices proposed alternative standards in line with those they proposed in Vieth.  Compare LULAC, 548 U.S. at 474 (Stevens, J., concurring in part and dissenting in part), with  LULAC, 548 U.S. at 391-92 (Breyer, J., concurring in part and dissenting in part).

Since LULAC, the Supreme Court has not considered a partisan gerrymandering claim.  Thus, it is left to parties bringing those claims and the lower courts considering them to continue to search for a workable standard that reflects a voter's right to "fair and effective representation."  Reynolds v. Sims, 377 U.S. 533, 565 (1964).  See also Baldus, 849 F. Supp. 2d at 853 ("Justice Kennedy's pivotal opinion [in Vieth] appeared to throw the ball to the litigating parties to come up with a manageable legal standard.").

## B.  Plaintiffs' Proposed Standard

In this case, plaintiffs' proposed test adopts the basic structure of a claim brought under the equal protection clause, which generally requires a showing of discriminatory intent and discriminatory effect.  Bandemer, 478 U.S. at 127 (plurality opinion) (citing City of Mobile, Alabama v. Bolden, 446 U.S. 55, 67–68 (1980)).  Perhaps in response to Justice Kennedy's opinion in Vieth, plaintiffs' complaint includes a claim under the First Amendment as well, but at this point, neither side has developed a separate argument under the First Amendment or identified any analytical differences between plaintiffs' First

6

Amendment and equal protection claims.

Plaintiffs' proposed test has three parts.  First, the plaintiffs must show that the defendants acted with discriminatory intent.  More specifically, plaintiffs frame the question as whether the "plan was designed with the intention of benefiting one party and disadvantaging its adversary."  Plts.' Br., dkt. #68, at 58.  At oral argument, plaintiffs summarized this element as an intent to disadvantage on the basis of political affiliation and they said that they modeled the element on the standard in Bandemer.  Trans., dkt. #89, at 47.

Plaintiffs' most significant innovation in their test is the second part, with respect to discriminatory effect.  Under this part, the plaintiffs must show that the plan "exhibited a high and durable level of partisan asymmetry in the first election after redistricting."  Id. at 59.  Plaintiffs define "partisan symmetry" as "the idea that the electoral system should treat similarly-situated parties equally, so that they are able to convert their popular support into legislative representation with approximately equal ease."  Id. at 49 (internal quotations omitted).  Plaintiffs say that partisan symmetry provides an appropriate basis for evaluating discriminatory effect because several Justices in LULAC relied on it or otherwise discussed it favorably.  E.g., LULAC, 548 U.S. at 466 (Stevens, J., concurring in part and dissenting in part) (partisan symmetry is "undoubtedly a reliable standard for measuring a burden on the complainants' representative rights") (internal quotations omitted); id. at 483-84 (Souter, J., concurring in part and dissenting in part) ("[N]or do I rule out the utility of a criterion of symmetry as a test.  Interest in exploring this notion is evident.  Perhaps further

7

attention could be devoted to the administrability of such a criterion at all levels of redistricting and its review.") (internal citations omitted). <u>See also id.</u> at 420 (opinion of Kennedy, J.) (declining to "altogether discount[] [partisan symmetry's] utility in redistricting planning and litigation").

In addition, plaintiffs say that partisan symmetry reflects the Supreme Court's description of partisan gerrymandering in other cases. <u>Arizona State Legislature v. Arizona Independent Redistricting Commission</u>, 135 S. Ct. 2652, 2658 (2015) (partisan gerrymandering is "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power"); <u>Vieth</u>, 541 U.S. at 271 n.1 (plurality opinion) (gerrymandering is "giv[ing] one political party an unfair advantage by diluting the opposition's voting strength"); <u>Bandemer</u>, 478 U.S. at 127 (plurality opinion) (gerrymandering is "the manipulation of individual district lines" causing a party's "voters over the State as a whole" to be "subjected to unconstitutional discrimination."). <u>See also</u> <u>Vieth</u>, 541 U.S. at 335 (Stevens, J., dissenting) ("Gerrymandering always involves the drawing of district boundaries to maximize the voting strength of the dominant political faction and to minimize the strength of one or more groups of opponents.").

Finally, plaintiffs say that partisan symmetry is widely accepted among scholars as the most appropriate way to measure partisan fairness. Plts.' Br., dkt. #68, at 50 (citing Bernard Grofman & Gary King, <u>The Future of Partisan Symmetry As A Judicial Test for Partisan Gerrymandering After <i>Lulac v. Perry</i></u>, 6 Election L.J. 2, 6 (2007) ("We are aware of no published disagreement or even clear misunderstanding in the scholarly community about

8

partisan symmetry as a standard for partisan fairness in plurality-based American elections since [1987.]")).

Plaintiffs measure partisan symmetry with a metric they call the "efficiency gap," which is a figure that represents the difference between the parties' "wasted votes" in an election.    A vote is "wasted" under this analysis if it is either (1) cast for a candidate who lost the election or (2) cast for the winning candidate, but in excess of what the candidate needed to win.  Plts.' PFOF ¶ 6, dkt. #79.  The efficiency gap for a particular election is the difference between the parties' total wasted votes among all of the districts, divided by the total number of votes cast.

In the December 17, 2015 order, we noted the following example of an efficiency gap calculation provided in plaintiffs' complaint:

> Suppose, for example, that there are five districts in a plan with 100 voters each. Suppose also that Party A wins three of the districts by a margin of 60 votes to 40, and that Party B wins two of them by a margin of 80 votes to 20. Then Party A wastes 10 votes in each of the three districts it wins and 20 votes in each of the two districts it loses, adding up to 70 wasted votes. Likewise, Party B wastes 30 votes in each of the two districts it wins and 40 votes in each of the three districts it loses, adding up to 180 wasted votes. The difference between the parties' respective wasted votes is 110, which, when divided by 500 total votes, yields an efficiency gap of 22% in favor of Party A.

Cpt. ¶ 50, Dkt. #1.[1]

_____

[1]  It would seem that the number of wasted votes for the winner should be one vote less than what plaintiffs' calculation suggests for each district.  In this example, the party would need *51* votes to win, so Party A would have nine rather than ten wasted votes for each district it won (60-51=9) and Party B would have 29 rather than 30 wasted votes for the districts it won (80-51=29).   Regardless, the parties do not discuss this potential discrepancy, so we need not consider it.

The purpose of the efficiency gap is to capture in one number the extent to which voters of a particular party are "packed" and "cracked." Packing means concentrating one party's supporters in a few districts so that they win by overwhelming margins. Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Vieth, 541 U.S. at 287 n.7. Plaintiffs say that a high level of cracking and packing (and thus a large efficiency gap) is indicative of discriminatory effect because, all things being equal, the number of wasted votes for both parties should be about the same. Moreover, plaintiffs say that if a plan produces an efficiency gap of greater than 7 percent after the first election, subsequent elections under the same plan are highly likely to continue to be skewed in favor of the same party, even if another party significantly increases its vote share. Plts.' PFOF ¶¶ 12, 85-93, 114-18, 154, 170, dkt. #79. Thus, plaintiffs believe that an efficiency gap of more than 7 percent, combined with a showing of discriminatory intent, should trigger a presumption that the districting plan is unconstitutional.

Plaintiffs identify an alternative measure of partisan symmetry called "partisan bias," which they defined previously as "the difference between the shares of seats that the parties would win if they each received the same share of the statewide vote." Plts.' Br., dkt. #31, at 9. However, neither side develops an argument in their briefs regarding the application of partisan bias to this case. At oral argument, plaintiffs suggested that partisan bias could be used as a kind of "robustness check" on the accuracy of the efficiency gap. Trans., dkt. #89, at 70. Because the parties did not explore this issue in their briefs, we decline to consider it at this time.

10

Finally, under the third part of plaintiffs' proposed test, if plaintiffs prove both discriminatory intent and discriminatory effect, the burden shifts to defendants. In particular, the defendants must show that the plan's "severe asymmetry" was "unavoidable" in light of "the state's political geography and legitimate redistricting objectives." Plts.' Br., dkt. #68, at 1, 59. Plaintiffs say that they modeled this part of their test after the equal apportionment cases, in which the burden shifts to the state to justify a plan if the plaintiffs show more than a ten percent population deviation among the districts. E.g., Brown, 462 U.S. 835 at 842–43.

## C. Application of Plaintiffs' Standard

For the purpose of their motion for summary judgment, defendants do not deny that plaintiffs could prove their claim under their proposed standard. With respect to the first element, discriminatory intent, plaintiffs allege that Republican leaders in the state legislature hired a law firm and a political scientist to design an Assembly plan that would maximize the electoral advantage of Republicans. In particular, plaintiffs allege that the Republicans used past election results to measure the partisanship of the electorate and then to design districts that would either "crack" Democratic voters (dividing them into multiple districts to prevent them from reaching a majority) or "pack" those voters (concentrating them into a small number of districts). In this way, Republicans hoped to maximize the number of districts that would elect a Republican and minimize the number of districts that would elect a Democrat. Republican leaders drafted the plan in secret, without any input

11

from Democrats, and then enacted the plan as Act 43 with little debate.    Baldus, 849 F. Supp. 2d at 845, 851 (summarizing process of enacting Act 43 and finding statements that drafters were not influenced by partisan factors "to be almost laughable").    During oral argument, defendants conceded that plaintiffs can prove this element of the test as plaintiffs have framed it.  Trans., dkt. #89, at 9, 88.[2]

With respect to the second element, discriminatory effect, plaintiffs' expert Simon Jackman, a political scientist, measured a 13 percent efficiency gap in the Republicans' favor for the 2012 Assembly election; plaintiff's other expert, Kenneth Mayer, also a political scientist, calculated a 12 percent pro-Republican efficiency gap, using a more elaborate method.  Plts.' PFOF ¶¶ 10 and 15, dkt. #79. (Mayer used the "full form" method, which means that he tallied wasted votes district by district.  Id. at ¶ 120.  Jackman used the "simplified" method, using the formula $(S - 0.5) - 2(V - 0.5)$, where S was a party's statewide seat share and V was a party's statewide vote share.  Id. at ¶ 121.)  These election results, plaintiffs say, were consistent with what the legislature's consultant predicted when he aided the Republicans in drafting the plan.  Id. at ¶ 97.  It is undisputed that, from 1972 to 2010, not a single legislative map in the country was as asymmetric in its first two elections as those generated in 2012 and 2014 Wisconsin Assembly elections.  Id. at ¶ 11. According to Jackman, the map is so skewed in favor of the Republicans that there is a nearly 100 percent chance that the plan will continue to disadvantage Democrats, as measured by

---

[2]  They have not conceded, however, that the plaintiffs could meet a more demanding showing of partisan intent. Trans., dkt. #89, at 88.

the efficiency gap, throughout the life of the plan.  Id. at ¶¶ 11, 84.

With respect to the third element, whether the Republican advantage can be justified by neutral reasons, defendants have made no effort in their summary judgment submissions to defend Act 43 on neutral grounds.  However, as evidence that Act 43 cannot be justified by neutral measures, plaintiffs submitted their own proposed plan, which plaintiffs say has a much smaller efficiency gap of 2 percent in favor of Republicans, but still satisfies other legitimate districting criteria at least as well as Act 43.  Plts.' PFOF ¶¶ 16, 142.

### D.  Defendants' Challenges to Plaintiffs' Standard

Rather than challenge plaintiffs' ability to meet the standard, defendants challenge the standard itself.  However, a review of defendants' objections show that there are fact issues that need to be resolved at trial.

### 1.  Efficiency gap

a.  Efficiency gap as a measure of discriminatory effect

The bulk of defendants' objections relate to plaintiffs' proposed measure of discriminatory effect, the efficiency gap.  Of these, the primary objection seems to be that the efficiency gap is not a good measure of discriminatory effect because even seemingly neutral plans can have a large efficiency gap.  For example, defendants point to Wisconsin's 2002 Assembly plan.  Although a federal court drew that plan (based on plans submitted by the political parties), Baumgart v. Wendelberger, No. 01-C-0121, 2002 WL 34127471, at

*4 (E.D. Wis. May 30, 2002) amended, No. 01-C-0121, 2002 WL 34127473 (E.D. Wis. July 11, 2002), the efficiency gap for the plan was 7.5 percent in favor of the Republicans in 2002 and then fluctuated between 4 percent and 12 percent in favor of the Republicans for the remainder of the decade.  Dfts.' PFOF ¶¶ 212-216, dkt. #74.  Defendants also point to other states that have had pro-Republican efficiency gaps of more than 5 percent in recent years, even when the plan was drawn by a neutral body.  Dfts.' Br., dkt. #46, at 38.  More generally, defendants rely on the opinion of one of their experts, Sean Trende, to argue that legislative plans in Wisconsin and around the country are more likely to favor Republicans in recent years because of political geography, not partisan intent.  Dfts.' Br., dkt. #48, at 26-30; Dfts.' PFOF ¶¶ 234-45, dkt. #74.  In other words, defendants argue that Democrats are *naturally* packed into a smaller number of districts, which makes it more likely that their share of the votes statewide will be greater than their share of the legislative seats.

In response, plaintiffs say that Wisconsin's 2002 plan is an anomaly.  The average efficiency gap for the Wisconsin Assembly in the 1970s, 1980s and 1990s ranged between 0.3 percent and 2.4 percent.  Plts.' PFOF ¶¶ 44-46, dkt. #79.  Further, plaintiffs say that the efficiency gap may have been high in the 2002 plan because the court adopted a plan more similar to the one proposed by Republicans.  Plts.' Br., dkt. #68, at 18.  As a general rule, plaintiffs say, it is much more common for plans drafted by one party to have a significantly larger efficiency gap than plans drafted through a nonpartisan or bipartisan process.  Plts.' PFOF ¶ 174, dkt. #79.

In any event, plaintiffs say that political geography does *not* explain why efficiency

14

gaps in Wisconsin and elsewhere have become increasingly pro-Republican in recent decades. Rather, according to Mayer, Democrats and Republicans in Wisconsin have comparable spatial distributions.  Plts.' PFOF ¶¶ 51-58, dkt. #79.  More generally, plaintiffs cite evidence that there is no national trend of increasing Democratic clustering.  Id. at ¶¶ 26-27. Rather, plaintiffs say, the reason for larger efficiency gaps favoring Republicans is increasing Republican control of state legislatures.  Id. at ¶¶ 49-50, 58, 156.  If control over state legislatures had remained constant, efficiency gaps across the country would have remained relatively constant as well, including in Wisconsin.  Id. at ¶¶ 23-24, 31, 49-50, 58, 156.

Defendants disagree with some of plaintiffs' conclusions, but they do not object to the admissibility of their experts' opinions.  Accordingly, we conclude that there is a genuine dispute on the question whether a large efficiency gap is a strong indicator of a discriminatory effect.

In their reply brief and at oral argument, defendants seemed to concede that there is a genuine dispute on this issue, but they argued that the dispute is not material because the mere existence of large efficiency gaps in plans adopted by neutral bodies is sufficient to discredit the efficiency gap as a tool for measuring a constitutional violation.  We are not willing to go that far, at least not in the context of a motion for summary judgment. Plaintiffs are not arguing that voters have a right to equal results such that any plan with a large efficiency gap must be invalidated.  Rather, they are arguing that they have a right to be free from being *intentionally disadvantaged* when they vote.  This is consistent with case law under both the First Amendment and the equal protection clause, which recognizes that

15

there are many instances in which a government act or policy may have a disparate impact even in the absence of intentional discrimination and that disparate impact alone is not enough to sustain a constitutional claim.  Bond v. Atkinson, 728 F.3d 690, 692-93 (7th Cir. 2013) ("[T]he Supreme Court held in Washington v. Davis, 426 U.S. 229 (1976), that disparate impact does not violate the equal protection clause of the fourteenth amendment."); Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez, 561 U.S. 661, 700 (2010) (Stevens, J., concurring) ("[I]t is a basic tenet of First Amendment law that disparate impact does not, in itself, constitute viewpoint discrimination.") (citing cases).  Defendants cite no authority for the view that discriminatory intent and discriminatory effect must be borne out by the same evidence.

As an alternative to their broader argument that the efficiency gap is inherently a poor measure of discriminatory effect, defendants say that what is considered a neutral efficiency gap should not be zero.  This is because using zero as a baseline does not isolate the portion of the efficiency gap that is attributable to partisan bias.  Dfts.' Br., dkt. #46, at 36.  Rather, defendants say that the baseline should incorporate whatever natural advantage a party has as a result of political geography.

Defendants raise an interesting point that may be worth exploring at trial, but we do not believe that it is a ground for granting summary judgment.  At most, this is a suggestion to alter the threshold of the plaintiffs' test and, perhaps, shift the burdens of production or proof.  Because it is genuinely disputed whether Wisconsin's political geography has played a significant role in contributing to Act 43's efficiency gap, an adjustment to the baseline

16

would not be dispositive at this stage of the case.  However, if the facts show at trial that political geography can and does have an impact on Wisconsin's and other states' efficiency gaps, then that would support a view that some burden should be placed on plaintiffs to show as part of their prima facie case the extent to which political geography cannot explain the efficiency gap generated by Act 43.

b.  Other objections to the efficiency gap

Defendants raise various other objections, both to the efficiency gap as a general concept for measuring discriminatory effect and to the way that plaintiffs have chosen to implement the efficiency gap in this case:  (1) plaintiffs' experts made assumptions about incumbency and voter turnout that undermine the accuracy of the efficiency gap; (2) by calculating the efficiency gap using the results of only one election, plaintiffs cannot show that the efficiency gap will be a predictable and reliable indicator of discriminatory effect throughout the life of a districting plan; (3) plaintiffs' experts failed to come up with a consistent way to calculate the efficiency gap; (4) plaintiffs' experts did not include all the data that they should have in their analyses; (5) plaintiffs' standard implies that they have a constitutional right to an efficiency gap favoring the Democrats; (6) the efficiency gap constitutionalizes a proportionality standard; and (7) a large number of districting plans around  the country have what plaintiffs view as an unreasonably large efficiency gap.

The first four of these objections require little discussion because it is clear that plaintiffs have raised factual disputes requiring a trial.  In particular, with respect to the use

of assumptions about incumbency and voter turn out, plaintiffs' experts conducted additional analysis (what they call "robustness checks") to make sure their assumptions did not have a significant effect on their results. Plts.' PFOF ¶¶ 94-113. Defendants are free to argue at trial that plaintiffs' methods are not sufficiently reliable to be helpful in determining a constitutional violation.

With respect to the reliability of the efficiency gap to predict whether the same party will have an unfair advantage in future elections, plaintiffs cite expert evidence that historically a large initial efficiency gap has been a very strong indicator of a large efficiency gap throughout the life of the districting plan. Plts.' PFOF ¶¶ 80-84, 89-93, 166-69, dkt. #79. In addition, plaintiffs' experts conducted "sensitivity testing" in order to control for swings in elections; the results of that testing did not undermine their conclusions regarding the reliability of the efficiency gap. Id. at ¶¶ 85-88, 114-18, 154, 170. With respect to the differences between plaintiffs' "full form" and "simplified" methods for calculating an efficiency gap, plaintiffs cite evidence that there is little practical difference between the results generated by the methods, so the choice of method does not affect the measure's viability. Id. at ¶ 122-35. Finally, defendants' arguments about data that plaintiffs' experts should have included in their analysis are classic examples of issues that can be raised during cross examination at trial. Manpower, Inc. v. Insurance Co. of Pennsylvania, 732 F.3d 796, 809 (7th Cir. 2013) ("Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility. Our system relies on cross-examination

18

to alert the jury to the difference between good data and speculation.") (internal quotations omitted).

Defendants may be able to show at trial that the court should not accept plaintiffs' version of the facts.  Again, however, defendants do not object to the admissibility of plaintiffs' evidence, so we cannot resolve these issues on summary judgment.

Defendants' last three objections require more analysis.  These are discussed below.

a.  Implications of plaintiffs' durability threshold

As noted above, plaintiffs argue that an efficiency gap of seven percent or greater should qualify as a discriminatory effect under their test.  Plaintiffs chose seven percent as a threshold in part because of their experts' opinion that a plan with such a large gap is "durable," meaning that the plan is likely to continue to give the majority party an advantage in subsequent elections under the plan, even if the minority party increases its vote share. Plts.' PFOF ¶¶ 12, 85-93, 114-18, 154, 170, dkt. #79.

Defendants argue that plaintiffs do not have a right to an efficiency gap that favors Democrats, Dfts.' Reply Br., dkt. #73, at 23, but this appears to be a misinterpretation of plaintiffs' position.  Plaintiffs are not saying that they have a right to regain control of the legislature.  Rather, plaintiffs say that they picked a threshold that was durable in an attempt to answer the question raised repeatedly by the Supreme Court, which is how extreme the discriminatory effects of the gerrymander must be, or, in other words, "how much is too much." Vieth, 541 U.S. at 298–99 (plurality opinion).  Justice Breyer echoed this view when

19

he said that court intervention should be limited to "the unjustified use of political factors to *entrench* a minority in power." <u>Vieth</u>, 541 U.S. at 360 (Breyer, J., dissenting) (emphasis added).  However, other members of the Court want more specificity.  In <u>Vieth</u>, 541 U.S. at 307-08, Justice Kennedy expressed the need "to define clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights."  This is exactly what plaintiffs are attempting to do with the efficiency gap.

Focusing on durability makes some sense because it is an indication that ordinary political processes cannot fix the problem, so court intervention is needed.  <u>Reynolds v. Sims</u>, 377 U.S. 533, 553-54 (1964) (in context of gerrymandering claim for population deviations, recognizing that "[n]o effective political remedy to obtain relief against the alleged malapportionment . . . appears to have been available"); <u>Vieth</u>, 541 U.S. at 361 (Breyer, J., dissenting) ("Where unjustified entrenchment takes place, voters find it far more difficult to remove those responsible for a government they do not want; and these democratic values are dishonored.").   Focusing specifically on the life span of the plan also makes obvious sense because the political landscape changes each time a new plan is enacted.  Defendants do not challenge plaintiffs' view that durability is an appropriate measure of discriminatory effect, so we need not resolve that issue in this opinion.  It is enough to say that a judgment in plaintiffs' favor would not give plaintiffs or anyone else a constitutional right to gain control of the legislature or to draw a plan that is biased in their favor.

b.  Efficiency gap as a constitutional requirement for "hyper-proportional" representation

Defendants say that the efficiency gap is an inadequate measurement of a plan's partisan effect because it is "a measure of proportionality," Dfts.' Br., dkt. #46, at 47, which the Supreme Court has said repeatedly is not required by the Constitution. E.g., LULAC, 548 U.S. at 419 ("[T]here is no constitutional requirement of proportional representation."); Bandemer, 478 U.S. at 132 (plurality opinion) ("[T]he mere lack of proportional representation will not be sufficient to prove unconstitutional discrimination."). Defendants seem to acknowledge that plaintiffs' test does not require proportional representation per se, in the sense that a party's seat share must be the same as that party's share of votes.  Rather, defendants say that plaintiffs' standard requires what defendants call "hyper-proportionality." Dfts.' Br., dkt. #46, at 48.  This is because, under plaintiffs' "simplified method" for calculating the efficiency gap, the efficiency gap remains zero only if the party receiving more than 50 percent of the vote receives a 2 percent increase in its share of the seats for every 1 percent increase in its share of the votes.  Plts.' PFOF ¶ 136, dkt. #79.  For example, 51 percent of the votes would translate into 52 percent of the seats, 52 percent of the votes would translate into 54 percent of the seats and 75 percent of the votes would translate to 100 percent of the seats.  Perhaps "hyper-majoritarianism" would be a more accurate name for defendants' objection because the formula suggests that a majority of voters should have an even larger majority of seats.

Defendants' argument is important, but it would be premature to conclude that precedent forecloses plaintiffs' claim because of this formula.  For one thing, plaintiffs say

21

that the ratio is not a normative requirement of their test; it is simply what happens when a districting plan treats the parties symmetrically.  Plts.' PFOF ¶ 145, dkt. #79. This seems to be borne out by history, which shows that a 1 percent increase in vote share generally leads to a two percent increase in seat share.  Plts.' PFOF ¶¶ 137-39, 146, dkt. #79.  See also LULAC, 548 U.S. at 464-65 (Stevens, J., concurring in part and dissenting in part) ("[O]ur electoral system tends to produce a 'seat bonus' in which a party that wins a majority of the vote generally wins an even larger majority of the seats.").

Further, plaintiffs' standard does not *require* a 2:1 ratio between seat share and vote share.  The efficiency gap is only part of plaintiffs' test, so no claim can prevail simply because a districting plan produces a particular vote share to seat share ratio.  Even without considering the other elements of the standard, the 2:1 ratio appears in plaintiffs' formula only when the efficiency gap is zero.  Plts.' PFOF ¶ 136, dkt. #79.  Because plaintiffs' standard allows for a significant deviation from a zero efficiency gap, it also allows for a significant deviation from the 2:1 ratio.  Id. at ¶ 148.

Perhaps defendants mean to make a more subtle point, which is that the efficiency gap is an improper measure simply because it treats a particular vote share to seat share ratio as  the "ideal" result.  Again, however, the "ideal" result proposed by plaintiffs is the situation in which no voter has an unfair advantage over another in obtaining representation by the party of his or her choice.  Defendants have not cited any authority that forecloses plaintiffs' view, but both parties should be prepared to present evidence on this point at trial.

Further, it is likely that *any* objective standard for measuring partisan gerrymandering

will have some connection to the basic principle that the collective will of the people should not be subverted indefinitely by an entrenched minority, a principle long recognized by the Supreme Court.  Reynolds, 377 U.S. at 565 ("[L]egislatures . . . should be bodies which are collectively responsive to the popular will.").  As the plurality in Bandemer recognized, "a preference for a level of parity between votes and representation sufficient to ensure that significant minority voices are heard and that majorities are not consigned to minority status, is hardly an illegitimate extrapolation from our general majoritarian ethic and the objective of fair and adequate representation recognized in Reynolds."  Bandemer, 478 U.S. at 126 n.6.  Opinions by other Justices reflect the same basic understanding.  LULAC, 548 U.S. at 419 (opinion of Kennedy, J.) ("[A] congressional plan that more closely reflects the distribution of state party power seems a less likely vehicle for partisan discrimination than one that entrenches an electoral minority.");  LULAC, 548 U.S. at 467-68 (Stevens, J., concurring in part and dissenting in part) (districting plan is presumptively unconstitutional if equal share of votes for two parties produces large seat differential because in that case the plan "imposes . . . a significant disadvantage on a politically salient group of voters");  Vieth, 541 U.S. at 352 n.7 (Souter, J., dissenting) ("[T]he Constitution guarantees no right to proportional representation . . . It does not follow that the Constitution permits every state action intended to achieve any extreme form of disproportionate representation.");  Vieth, 541 U.S. at 360-61 (Breyer, J., dissenting) (gerrymandering that allows "a party that enjoys only minority support among the populace . . . to take, and hold, legislative power . . . violates basic democratic norms").

Perhaps at trial it will become clear that the efficiency gap cannot be reconciled with Supreme Court precedent. At this stage, however, we are not persuaded that defendants have made that showing.

c.  Potential breadth of plaintiffs' standard

Defendants say that plaintiffs' test is not "limited and precise" as Justice Kennedy suggested it should be in <u>Vieth</u>, 541 U.S. at 306 (Kennedy, J., concurring in the judgment), because such a large number of state districting plans across the country have an efficiency gap of at least seven percent. According to plaintiffs' own experts, approximately 20 to 25 percent of plans adopted by a party with unified control of the state government (both houses and the governorship) have an initial efficiency gap of seven percent or more. Plts.' PFOF ¶¶ 69, 74, dkt. #79. (The parties agree that unified control of the government generally leads to an attempt to manipulate districts for partisan gain, though plaintiffs point to examples in which that is not the case. <u>Id.</u> at ¶¶ 76 and 172 (citing plans enacted under unified party control in California, Maine and Vermont that did not lead to partisan gerrymanders).)

As an initial matter, plaintiffs say that the 20 to 25 percent figure is inflated because it does not take into consideration plans that can be justified with neutral reasons. More generally, plaintiffs say that, to the extent there is a large number of suspect plans, that is not evidence of a weakness of their test, but evidence that "the practice of partisan gerrymandering is ubiquitous and very severe." Trans., dkt. #89, at 76. They also argue

that federal courts invalidated many districting plans after recognizing other types of gerrymandering claims, so the potential effect of plaintiffs' proposed standard on current districting plans should not be a reason to reject the standard.  Plts.' PFOF ¶¶ 77-78, dkt. #79 (citing Gary W. Cox & Jonathan N. Katz, Elbridge Gerry's Salamander (2002), and Ellen D. Katz et al., Documenting Discrimination in Voting: Judicial Findings under Section 2 of the Voting Rights Act, 39 U. Mich. J.L. Reform 643, 655 (2006)).

Of course, plaintiffs are correct that courts cannot decline their duty to enforce the Constitution simply because a ruling may have far reaching effects. However, we agree with defendants that the usefulness of the efficiency gap as a tool for measuring partisan effect may be lessened if a large efficiency gap is a common feature of districting plans. A theme in a number of opinions by Supreme Court Justices is that court intervention in partisan gerrymandering cases should be limited to rare and extreme circumstances. E.g., Bandemer, 478 U.S. at 133 (plurality opinion) (raising concern that "a low threshold for legal action would invite attack on all or almost all reapportionment statutes"); Vieth, 541 U.S. at 339 (Stevens, J., dissenting) (proposing what he described as "a narrow test [that] would cover only a few meritorious claims, but . . . would preclude extreme abuses"); Vieth, 541 U.S. at 354 (Souter, J., dissenting) (courts should be able to "identify at least the worst cases of gerrymandering"); Vieth, 541 U.S. at 362 (Breyer, J., dissenting) ("Courts need not intervene often to prevent the kind of abuse I have described.").  This view could be undermined if we were to adopt a standard that rendered suspect a large swath of districting plans around the country.

Again, however, this objection is not a ground for granting summary judgment. As discussed above, the extent to which Wisconsin's and other states' efficiency gaps are caused by partisan bias is a disputed fact. If the facts at trial show that Wisconsin's efficiency gap is caused by neutral factors, then it will not be necessary to determine the potential implications of a ruling in plaintiffs' favor.

Further, this seems to be another objection that relates less to the validity of the efficiency gap as a general matter and more to the choice of how large an efficiency gap must be to sustain a constitutional claim. If plaintiffs' proposed formulation is not sufficiently demanding, this may support raising the threshold necessary to support a claim. Another possibility would be to incorporate into plaintiffs' prima facie case a requirement to show that any large efficiency gap cannot be justified by legitimate interests, possibilities the panel has not foreclosed.

Even if this court were to grant relief to plaintiffs, it might not be necessary to establish a threshold in this case. As plaintiffs point out, in the equal apportionment cases, the Supreme Court did not determine at first how large a population deviation must be in order to trigger a presumption of unconstitutionality. Rather, the Court proceeded on a case by case basis, settling on ten percent as the threshold only after several years. Nicholas O. Stephanopoulos & Eric M. McGhee, Partisan Gerrymandering and the Efficiency Gap, 82 U. Chi. L. Rev. 831, 890-91 (2015). Because plaintiffs allege in this case that the efficiency gap created by Act 43 is one of the largest in recent history, determining a threshold may be something that can wait for another day. Bandemer, 478 U.S. at 123 ("arithmetic

presumption" not necessary to adjudicate partisan gerrymandering claim).

2.  <u>Intent element</u>

Plaintiffs' proposed element regarding intent requires them to prove that defendants disadvantaged plaintiffs intentionally on the basis of political affiliation.  Plts.' Br., dkt. #68, at 58.  In their opening brief, defendants limited their discussion of this element to an argument that a requirement to prove intent did not help to overcome the alleged problems with the efficiency gap as a measure of discriminatory effect.  They did not challenge the validity of the element itself.  However, in their reply brief, defendants argued for the first time that "plaintiffs' intent element is inconsistent with Supreme Court precedent" because it is not sufficiently demanding.  Dfts.' Reply Br., dkt. #73, at 3.  In particular, defendants rely on the plurality opinion in <u>Vieth</u>, 541 U.S. at 286, for the view that "partisan districting is a lawful and common practice," so that any successful partisan gerrymandering claim must show an "excess" of a partisan motive.

Because defendants did not raise this issue until their reply brief, we are not required to consider it.  <u>Narducci v. Moore</u>, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").  However, we will discuss some of the potential issues raised by this element to provide guidance at trial.

In attempting to craft an intent element in a partisan gerrymandering case, a litigant or a court must navigate the minefield of Supreme Court precedent on this issue.  In <u>Vieth</u>,

541 U.S. at 284, the plurality rejected a partisan gerrymandering standard that required a showing that the defendants acted with "a predominant intent to achieve partisan advantage." In LULAC, 548 U.S. at 418, the Court rejected a standard that required a showing that partisan gain was the "sole motive" for the map's design.

Perhaps cognizant of the Court's skepticism of heightened intent requirements, plaintiffs went back to Bandemer for their intent element. In that case, the plurality required only a showing of an intent to discriminate against an identifiable political group. Bandemer, 478 U.S. at 127 (plurality opinion). The plurality declined to adopt a more demanding intent requirement, even though it acknowledged that, "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." Id. at 128-29. In other words, the assumption is that members of a particular party generally will try to benefit themselves and hurt their adversaries.

In their opening brief, defendants seem to agree with the view that a heightened intent requirement would be inconsistent with Supreme Court precedent. Dfts.' Br., dkt. #46, at 41 ("If the intent element calls for a more searching inquiry, then the standard fails under Vieth" because "[t]he Vieth plurality and Justice Kennedy both rejected a standard that incorporated a 'predominant intent' standard."). Further, defendants did not directly criticize the intent requirement in Bandemer anywhere in their briefs or during oral argument. However, in their reply brief, defendants seem to suggest that a heightened intent element is *required* by Vieth. Thus, defendants' position now seems to be that there is *no*

viable intent element for a partisan gerrymandering claim.  Defendants reiterated that position during oral argument.  When asked by the court what defendants believed the intent requirement should be, counsel stated, "I'm not sure that this is something that can be solved."  Trans., dkt. #89, at 7.

     As discussed above, a majority of the Supreme Court has directed litigants and lower courts to continue searching for an appropriate standard for deciding partisan gerrymandering claims.  In light of that directive, it would be inappropriate to interpret prior case law as rejecting all formulations of the intent requirement for those claims.

     During oral argument, plaintiffs' counsel stated her view that the Bandemer holding regarding intent remains controlling precedent, even after Veith and LULAC.  Trans., dkt. #89, at 44.  That view may be debatable, but the parties have not fully addressed that issue, so we believe that it would be premature to decide it now.

     At least one Justice has questioned the constitutionality of any districting plan that disadvantages members of a particular party.  Vieth, 541 U.S. at 324 (Stevens, J., dissenting) ("[T]he plurality errs in assuming that politics is 'an ordinary and lawful motive.' We have squarely rejected the notion that a 'purpose to discriminate on the basis of politics' is never subject to strict scrutiny.") (citation omitted).  However, a majority of the Justices in Vieth appeared to accept the view that "[a] determination that a gerrymander violates the law must rest on something more than the conclusion that political classifications were applied," id. at 307 (Kennedy, J., concurring in the judgment).  The plurality in Vieth identified the "excessive injection of politics" as the basis for a constitutional violation.  Id. at 293

(plurality opinion). Justice Kennedy, however, was more circumspect; he noted that "[e]xcessiveness is not easily determined." Id. at 316 (Kennedy, J., concurring in the judgment), and suggested focusing on evidence that a legislature's plan is unrelated to neutral districting criteria. Id. at 312-13.

At oral argument, other alternative formulations of intent emerged. One suggestion was that plaintiffs show that defendants had the intent to prevent the minority party from regaining control throughout the life of the districting plan. Trans., dkt #89, at 5-6.

Accordingly, it would be inappropriate to grant summary judgment on this ground. That being said, plaintiffs will have the burden at trial to prove that defendants acted with discriminatory intent, so they should be prepared to present the strongest evidence that they have on this issue—including comparative evidence of prior redistricting plans in the State of Wisconsin—in order to meet even the most demanding intent requirement. Specifically, the parties should be prepared to address the evidence bearing on intent in light of the Justices' concerns in Vieth, the discussion with this court at argument, and the parties own formulations on that element.

3.  Burden shifting

If plaintiffs prove discriminatory intent and effect in steps one and two, plaintiffs' proposed test then shifts the burden to defendants to show that the large efficiency gap was "unavoidable" in light of the state's political geography and legitimate districting objectives. In their opening brief, defendants' primary objection to this portion of plaintiffs' test was

really another objection to the efficiency gap.  In particular, defendants argued that it was "fundamentally unfair" to shift the burden to defendants because the efficiency gap was not an adequate measure of discriminatory effect.  Dfts.' Br., dkt. #46, at 42.  Because this is simply a repackaging of arguments that we have said we cannot resolve on a motion for summary judgment, it is unnecessary to consider this issue further.

In their reply brief, defendants argue that plaintiffs' standard is unfair because it will be impossible to show that a particular efficiency gap was "unavoidable."  Rather, with the near-infinite number of ways to draw a plan, there will always be a way to "reverse-engineer a plan that has a better political result for one side while coming close in population deviation, compactness and municipal splits."  Dfts.' Reply Br., dkt. #73, at 10.  At oral argument, plaintiffs addressed this objection by stating that defendants would not "have to show that these particular district lines were absolutely necessary."  Trans., dkt. #89, at 60.  Rather, defendants would have to show  that any alternative plan would have "roughly the same kind of excessive . . . efficiency gap."  Id.  We understand plaintiffs to mean that defendants would retain some flexibility in choosing how to draw district lines.

When asked at oral argument whether anyone on the Supreme Court had proposed a similar burden-shifting scheme as part of a partisan gerrymandering claim, plaintiffs' counsel's initial response was that no one had.  Id. at 58.  Instead, counsel stated that plaintiffs had adapted the burden-shifting portion of their standard from cases involving equal apportionment, such as Voinovich v. Quilter, 507 U.S. 146 (1993), Brown, 462 U.S. 835, and Connor v. Finch, 431 U.S. 407, 414 (1977).  Id. at 63.  However, later in the

31

argument, plaintiffs' counsel stated that a similar burden-shifting standard could be found in the partisan gerrymandering context in the plurality's opinion in <u>Bandemer</u>, in Justice Stevens's opinion in <u>Karcher v. Daggett</u>, 462 U.S. 725 (1983), and in Justice Souter's opinion in <u>Vieth</u>.  Trans., dkt. #89, at 65.

The cases plaintiffs cite may support an argument that some type of burden-shifting is appropriate, but they do not support plaintiffs' view that defendants must show that their plan was "unavoidable."  In <u>Bandemer</u>, 478 U.S. at 127-43, the plurality focused most of its opinion on the issue of discriminatory effect.  Because the plurality found that the plaintiffs had not met their burden on that element, it did not have to go any further.  However, in responding to Justice Powell's dissenting opinion, the plurality stated that the various factors he proposed in his test "might well be relevant to an equal protection claim."  <u>Bandemer</u>, 478 U.S. at 141.  The plurality elaborated, "[t]he equal protection argument would proceed along the following lines: If there were a discriminatory effect and a discriminatory intent, then the legislation would be examined for valid underpinnings."  <u>Id</u>.  However, because the plurality "found that there was insufficient discriminatory effect to constitute an equal protection violation," it "did not reach the question of the state interests (legitimate or otherwise) served by the particular districts as they were created by the legislature."  <u>Id</u>. at 141-42.  Thus, although the plurality suggested that it would consider the state's interests as part of any test, the plurality did not specify which party should shoulder the burden on that issue.

Plaintiffs are correct that Justice Stevens and Justice Souter both proposed a burden-

32

shifting standard for partisan gerrymandering claims, but neither of them proposed placing a burden on defendants as demanding as the one plaintiffs propose.  In Karcher, 462 U.S. at 751, Justice Stevens stated that he "would consider whether the plan has a significant adverse impact on an identifiable political group, whether the plan has objective indicia of irregularity, and then, whether the State is able to produce convincing evidence that the plan nevertheless serves neutral, legitimate interests of the community as a whole."  Under Justice Souter's standard, after the plaintiffs met their prima facie case, Justice Souter "would then shift the burden to the defendants to justify their decision by reference to objectives other than naked partisan advantage."  Vieth,  541 U.S. at 351 (Souter J., dissenting).

Neither Justice suggested that the defendants should be required to show that a plan was "unavoidable" in light of traditional districting criteria.  In fact, under Justice Souter's test, the plaintiffs would have to show as part of their prima facie case both that the legislature "paid little or no heed to those traditional districting principles whose disregard can be shown straightforwardly" and that the legislature could have drawn a fairer plan that "deviated less from traditional districting principles."  Vieth, 541 U.S. at 348 (Souter, J., dissenting).  See also LULAC, 548 U.S. at 491 (Breyer, J., concurring in part and dissenting in part) (including evidence of "a radical departure from traditional boundary-drawing criteria" as part of plaintiffs' prima facie case).

The equal apportionment cases plaintiffs cite are similar.  After a plaintiff challenging population disparities in state legislative districts establishes her prima facie case, the burden shifts to the defendants to show that their plan is "justified."  Brown, 462 U.S. at 843.  In

particular, the question is "whether the legislature's plan 'may reasonably be said to advance [a] rational state policy.'" <u>Id.</u> (quoting <u>Mahan v. Howell</u>, 410 U.S. 315, 328 (1973)). Again, there is no requirement to show that the plan was "unavoidable."

Plaintiffs' proposed standard seems to be most similar to the one that applies to equal apportionment requirements in *congressional* redistricting. In those cases, if the plaintiffs meet their prima facie case, "the burden shifts to the State to 'show with some specificity' that the population differences 'were *necessary* to achieve some legitimate state objective.'" <u>Tennant v. Jefferson County Commission</u>, 133 S. Ct. 3, 5 (2012) (quoting <u>Karcher</u>, 462 U.S. at 740-41) (emphasis added). However, the Supreme Court has expressly declined to adopt the "necessity" standard in the context of state legislative districting because the two types of challenges are governed by different constitutional provisions, Article I, § 2 (with respect to congressional districts) and the equal protection clause (with respect to state legislative districts). <u>Mahan</u>, 410 U.S. at 321 ("[M]ore flexibility [i]s constitutionally permissible with respect to state legislative reapportionment than in congressional redistricting."). Because plaintiffs in this case are relying on the equal protection clause rather than Article I, § 2, the more lenient standard is more instructive.

Further, even with respect to congressional districts, the plaintiffs are required to show as part of their prima facie case that "the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." <u>Karcher</u>, 462 U.S. at 730. Under their proposed test, plaintiffs have *no* burden to show that defendants could have drafted a better plan.

34

In sum, we believe that plaintiffs have overstated defendants' burden in part three of their proposed test. However, this conclusion does not require summary judgment in defendants' favor. As noted above, defendants have made no effort to justify the plan using neutral criteria. Thus, to the extent that defendants have any burden to prove the legitimacy of the plan, this element must be resolved at trial. Further, to the extent that plaintiffs have an initial burden to show that defendants' plan cannot be justified using neutral criteria, we believe that plaintiffs have met that burden for the purpose of defendants' motion for summary judgment by drafting a plan with a dramatically lower efficiency gap while still satisfying neutral criteria.

Again, because the parties have not fully briefed the question of how this element should be formulated, it would be premature to answer the question in this order. At trial, both sides should be prepared to submit whatever evidence they have to show whether Act 43 can be justified by neutral criteria.


ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Gerald C. Nichol, Thomas Barland, John Franke, Harold V. Froehlich, Elsa Lamelas, Timothy Vocke and Kevin J. Kennedy, dkt. #45, is DENIED.

2. The motion filed by plaintiffs William Whitford, Roger Anclam, Emily Bunting, Mary Lynne Donohue, Helen Harris, Wayne Jensen, Wendy Sue Johnson, Janet Mitchell,

James Seaton, Allison Seaton, Jerome Wallace and Don Winter to exclude the opinions of

Sean Trende, dkt. #70, is DENIED WITHOUT PREJUDICE to plaintiffs' refiling it at the

conclusion of trial.

     3.  Trial will begin on Tuesday, May, 24, 2016 and should be completed by Friday,

May 27, 2016.  If the parties believe that is not a sufficient amount of time, they should

explain their concerns in writing no later than April 18, 2016.

     Entered this 7th day of April, 2016.


BY THE COURT:

/s/
_____
KENNETH F. RIPPLE
Circuit Judge


/s/
_____
BARBARA B. CRABB
District Judge


/s/
_____
WILLIAM C. GRIESBACH
District Judge