UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

ALVIN BALDUS, CINDY BARBERA,
CARLENE BECHEN, RONALD BIENDSEIL,
RON BOONE, VERA BOONE, ELVIRA BUMPUS,
EVANJELINA CLEEREMAN, SHEILA COCHRAN,
LESLIE W. DAVIS III, BRETT ECKSTEIN,
MAXINE HOUGH, CLARENCE JOHNSON,
RICHARD KRESBACH, RICHARD LANGE,
GLADYS MANZANET, ROCHELLE MOORE,
AMY RISSEEUW, JUDY ROBSON, GLORIA ROGERS,
JEANNE SANCHEZ-BELL, CECELIA SCHLIEPP,
and TRAVIS THYSSEN,

            Plaintiffs,

TAMMY BALDWIN, GWENDOLYNNE MOORE,
and RONALD KIND,

            Intervenor-Plaintiffs,

v.                                File No. 11-CV-562

Members of the Wisconsin Government
Accountability Board, each only in
his official capacity:
MICHAEL BRENNAN, DAVID DEININGER,
GERALD NICHOL, THOMAS CANE,
THOMAS BARLAND, and TIMOTHY VOCKE,

            [Caption Continued]
_____

VIDEOTAPE DEPOSITION

JOSEPH W. HANDRICK

Madison, Wisconsin
December 20, 2011

Carmen Harder, RPR
Registered Professional Reporter

---

and KEVIN KENNEDY, Director and
General Counsel for the Wisconsin
Government Accountability Board,

            Defendants.

F. JAMES SENSENBRENNER, JR.,
THOMAS E. PETRI, PAUL D. RYAN, JR.,
REID J. RIBBLE, and SEAN P. DUFFY,

            Intervenor-Defendants.

_____

VOCES DE LA FRONTERA, INC.,
RAMIRO VARA, OLGA WARA,
JOSE PEREZ, and ERICA RAMIREZ,

            Plaintiffs,

v.                               Case No. 11-CV-1011
                                         JPS-DPW-RMD
Members of the Wisconsin Government
Accountability Board, each only in
his official capacity:
MICHAEL BRENNAN, DAVID DEININGER,
GERALD NICHOL, THOMAS CANE,
THOMAS BARLAND, and TIMOTHY VOCKE,
and KEVIN KENNEDY, Director and
General Counsel for the Wisconsin
Government Accountability Board,

            Defendants.

_____

                    I N D E X

Witness                                            Pages

JOSEPH W. HANDRICK

        Examination by Mr. Poland            8/233

        Examination by Mr. Earle               224

        Examination by Mr. Hassett             252


                 E X H I B I T S

| No. | Description | Identified |
|-----|-------------|------------|
| 1 | 12/13/2011 letter to Joseph Handrick from Douglas M. Poland with an attached subpoena | 12 |
| 2 | Packet of documents produced by Joseph Handrick via Eric M. McLeod pursuant to the subpoena | 17 |
| 2A | Population Totals | 19 |
| 3 | CD labeled *Joe Handrick Draft Maps - Block Assignments* | 17 |
| 4 | 2/15/2011 letter to Don M. Millis and Joseph W. Handrick from Eric M. McLeod | 34 |
| 5 | 2/17/2011 letter to Eric M. McLeod from Don M. Millis | 34 |
| 6 | 2/18/2011 letter to Eric M. McLeod from Don M. Millis | 34 |
| 7 | Bio of Joseph M. Handrick from the website of Reinhart | 53 |
| 8 | Joe Handrick's lobbyist license dated 1/25/2011 | 54 |

             E X H I B I T S  (Continued)

| No. | Description | Identified |
|-----|-------------|------------|
| 9 | Excerpts from the book *Born to Run* by Ronald Keith Gaddie | 66 |
| 10 | Defendants' Amended Initial Rule 26(a) Disclosures | 91 |
| 11 | Second Amended Complaint for Declaratory and Injunctive Relief | 104 |
| 12 | Defendants' Answer and Affirmative Defenses to Second Amended Complaint for Declaratory and Injunctive Relief | 106 |
| 13 | Plaintiff's First Set of Interrogatories and First Request for Production of Documents | 108 |
| 14 | Chapter 801.17, Commencement of Action and Venue | 188 |
| 15 | Chapter 751, Supreme Court | 188 |
| 16 | Petition for Appointment of Three Judge Panel Pursuant to Wis. Stat. 751.035 and 801.50(4m) or, in the Alternative, for Leave to Commence an Original Action Seeking Declaratory Judgement and Other Relief | 190 |
| 17 | Summons and Complaint for Declaratory and Other Relief and Appointment of Three Judge Panel Pursuant to Wis. Stat. 751.035 and 801.50(4m) | 194 |
| 18 | 12/2/2011 letter to Kathleen Madden from Joseph Louis Olson with attached Amended Summons and Amended Complaint for Declaratory and Other Relief | 195 |
| 19 | Transcript of Joint Public Hearing on Redistricting on 7/13/2011 | 197 |
| 20 | Map entitled *State of Wisconsin Act 43 Assembly Districts* | 232 |

**Page 5**

E X H I B I T S (Continued)

| No. | Description | Identified |
|-----|-------------|------------|
| 21  | Map entitled *2011 Act 44* | 232 |
| 22  | Map entitled *2011 Act 43* | 232 |

(The original Exhibits 1-22 were attached to the
original transcript, and copies of Exhibits 1-19
were provided to counsel)

(The original deposition transcript was filed with
Attorney Douglas M. Poland)

**Page 7**

A P P E A R A N C E S (Continued)

P. SCOTT HASSETT and JAMES A. OLSON, Attorneys,
for LAWTON & CATES, S.C., Attorneys at Law,
    Ten East Doty Street, Suite 400, Madison,
    Wisconsin 53703, appearing on behalf of the
    Intervenor-Plaintiffs.

MARIA S. LAZAR, Assistant Attorney General,
for STATE OF WISCONSIN DEPARTMENT OF JUSTICE,
    17 West Main Street, Madison, Wisconsin 53703,
    appearing on behalf of the Defendants.

DANIEL KELLY, Attorney,
for REINHART BOERNER VAN DEUREN S.C.,
    Attorneys at Law, 1000 North Water Street,
    Suite 2100, Milwaukee, Wisconsin 53202,
    appearing on behalf of the Defendants.

KELLEN C. KASPER, Attorney,
for FOLEY & LARDNER, LLP, Attorneys at Law,
    777 East Wisconsin Avenue, Milwaukee,
    Wisconsin 53202, appearing on behalf of the
    Intervenor-Defendants.

ERIC M. MCLEOD, Attorney,
for MICHAEL BEST & FRIEDRICH LLP, Attorneys at Law,
    One South Pinckney Street, Suite 700, Madison,
    Wisconsin 53703, appearing on behalf of the
    Wisconsin State Senate by its Majority Leader
    Scott Fitzgerald, the Wisconsin Assembly by its
    Speaker Jeff Fitzgerald, and
    Joseph W. Handrick.

Also present:   Todd S. Campbell, CLVS
                Campbell Legal Video Company
                417 Heather Lane, Suite B
                Fredonia, WI 53021
                (262) 447-2199

**Page 6**

                VIDEOTAPE DEPOSITION OF JOSEPH W. HANDRICK,
a witness of lawful age, taken on behalf of the
Plaintiffs, wherein Alvin Baldus, et al., are
Plaintiffs, and Members of the Wisconsin Government
Accountability Board, et al., are Defendants, pending
in the United States District Court for the
Eastern District of Wisconsin, pursuant to subpoena,
before Carmen Harder, a Registered Professional
Reporter and Notary Public in and for the State of
Wisconsin, at the offices of Godfrey & Kahn, S.C.,
Attorneys at Law, One East Main Street, in the City
of Madison, County of Dane, and State of Wisconsin,
on the 20th day of December 2011, commencing at 9:26
in the forenoon.

                A P P E A R A N C E S

DOUGLAS M. POLAND, Attorney,
for GODFREY & KAHN, S.C., Attorneys at Law,
    One East Main Street, Suite 500, Madison,
    Wisconsin 53703, appearing on behalf of
    Plaintiffs Alvin Baldus, et al.

PETER G. EARLE, Attorney,
for LAW OFFICE OF PETER EARLE, LLC, Attorneys at Law,
    839 North Jefferson Street, Suite 300,
    Milwaukee, Wisconsin 53202, appearing by
    telephone on behalf of Plaintiffs
    Voces De La Frontera, Inc., et al.

**Page 8**

                JOSEPH W. HANDRICK,

        called as a witness, being first duly sworn,

        testified on oath as follows:


                EXAMINATION

By Mr. Poland:

Q  Good morning, Mr. Handrick.

        MR. KELLY:  I'm sorry.  Before we

start, could we put the --

        MR. POLAND:  Oh, that's right.

        MR. KELLY:  -- agreement on the

record?

        MR. POLAND:  Yep.  Go ahead.

        MR. KELLY:  Thank you.  This is

Daniel Kelly on behalf of the defendants, as

well as Maria Lazar.  Prior to going on the

record we had a discussion amongst counsel

with respect to interposing objections.  We

agreed that if one person made an objection

to a question it would stand as an objection

for each of the attorneys on behalf of their

clients without the need to have each

attorney repeating the objection.

        Counsel, is that your understanding?

        MR. HASSETT:  Yes.

1    MR. MCLEOD:   Yes.
2    MR. KASPER:   Yes.
3    MR. POLAND:   Yes.
4    MR. MCLEOD:   And, Doug, if I may
5    before we begin the deposition, I just wanted
6    to state for the record the continuing
7    objection that we have to this deposition as
8    well as the information that has been
9    produced in response to the subpoena as
10   stated in our motion to quash and our
11   subsequent motion for clarification
12   concerning the motion to quash.
13        It is our position that any information
14   sought from Mr. Handrick is privileged
15   pursuant to one of three privileges, the
16   legislative privilege, attorney-client
17   privilege, and attorney work product
18   privilege.  Mr. Handrick was retained by
19   counsel for the purpose of assisting counsel
20   in the provision of legal services to our
21   clients, the legislature, senate assembly in
22   anticipation of litigation.  Again, the
23   specific grounds and the support for that
24   objection are set forth in the motion that we
25   filed, so I won't burden everybody with
                        9

1    restating those grounds here.
2        I also understand from speaking to the
3    plaintiffs' counsel here prior to the
4    deposition that a standing objection will not
5    be sufficient throughout the course of this
6    deposition, so to the extent necessary, I
7    will be asserting individual objections on
8    these privileged grounds.  I will be
9    abbreviating the objection to privilege,
10   attorney work product, attorney-client,
11   et cetera, so as not to spend time
12   unnecessarily on objections.
13        The goal here is not to obstruct or
14   delay in any way the deposition.  It's simply
15   to make sure that we have preserved those
16   objections for purposes of any subsequent
17   appeal.  And recognizing the Court's order is
18   what it is, we're obviously appearing, and
19   we're going to be providing that information
20   which we understand to be required according
21   to that order.
22        So I appreciate your patience in
23   allowing me to make that objection
24   preliminarily.  And, again, I will be
25   restating that in a very abbreviated fashion
                        10

1    as necessary during the course of the
2    deposition today.
3        MR. POLAND:  And I understand that.
4    This is Doug Poland for the plaintiffs.  I
5    understand Mr. McLeod's position.  And we
6    likewise will incorporate the arguments that
7    we raised in our papers that we filed in
8    opposition to the motion for clarification
9    that Mr. McLeod filed.  So we'll understand
10   that the short -- the objections are
11   shorthand for what's already pending in front
12   of the Court, incorporating those arguments.
13        MR. MCLEOD:  Very well.
14        MR. POLAND:  Anything else anyone
15   needs to state on the record before we begin?
16   Okay.
17   (By Mr. Poland)
18 Q Good morning, Mr. Handrick.  You're here -- I
19   should -- I should ask you before we start.  Have
20   you given a deposition before?
21 A No.
22 Q Okay.  The reason that I ask is that you nodded
23   your head in response to the first statement that
24   I made.  And since we're at a deposition, the
25   court reporter is taking down everything that you
                        11

1    say, so you need to answer audibly.  Shakes of the
2    head, nods of the head yes or no, the court
3    reporter can't get those down in the transcript.
4        We obviously have a videographer as well.
5    We'll see that, but many people will look at a
6    transcript, and they won't be able to tell if
7    you're responding in one way affirmatively or not.
8    So we do need to have you answer each of the
9    questions audibly.  Do you understand that?
10 A Yes.
11 Q Okay.  Great.  Thank you.  You're here today
12   pursuant to a subpoena; is that correct?
13 A Yes.
14 Q Okay.  I'm going to ask the court reporter to mark
15   as Exhibit 1 the subpoena.
16        (Exhibit No. 1 marked for
17        identification)
18 Q Mr. Handrick, I'm handing to you a document that's
19   been marked as deposition Exhibit No. 1.  Do you
20   see that in front of you?
21 A Yes.
22 Q Okay.  And that is a subpoena for your deposition
23   here today.  Have you seen this document before?
24 A Yes.
25 Q Do you recall when you saw a copy of Exhibit 1 for
                        12

| | |
|---|---|

**Page 13**

1  the first time?
2  A  No, I don't.
3  Q  Do you know when it -- if it was within the last
4     week or so?
5  A  I don't recall exactly.
6  Q  Okay.  The cover letter, as you'll see on
7     Exhibit 1, is dated December 13.  Do you see that?
8  A  Yes.
9  Q  Would you assume that you saw this document on or
10    after December 13?
11 A  Yes.
12 Q  I'm going to ask you to turn to the very last page
13    of Exhibit No. 1.  And do you see there at the top
14    of the last page of Exhibit No. 1 there's a header
15    that says *Exhibit A*?
16 A  Yes.
17 Q  All right.  And you see that there are
18    five numbered paragraphs on that page?
19 A  Yes.
20 Q  All right.  Do you understand that this was a
21    request that you bring with you documents to the
22    deposition this morning?
23 A  Yes.
24 Q  All right.  Who gave you a copy of Exhibit 1, the
25    deposition subpoena?

**Page 14**

1  A  I don't recall.
2  Q  You're represented by counsel here today,
3     Mr. McLeod?
4  A  Yes.
5  Q  All right.  And you're employed by
6     Reinhart Boerner Van Deuren law firm; is that
7     correct?
8  A  Yes.
9  Q  And Mr. Kelly also is employed by the Reinhart law
10    firm; is that correct?
11 A  Yes.
12 Q  And he is representing the
13    Government Accountability Board; is that your
14    understanding?
15 A  That's my understanding.
16 Q  In this lawsuit, correct?
17    Is he representing you here personally today
18    as a witness?
19 A  Not that I'm aware of.
20 Q  Okay.
21    MR. KELLY:  Just so the record is
22    clear, to the extent that any questions
23    should touch on matters subsequent to
24    November 26 -- or November 22, in which our
25    law firm was retained by the defendants in

**Page 15**

1  this case, we will be representing
2  Mr. Handrick.
3     MR. POLAND:  Just to make sure I
4  understand that, Dan, for anything that comes
5  up that postdates November 22?
6     MR. KELLY:  November 22 and
7  forward, correct.
8     MR. POLAND:  Okay.  For the purpose
9  of responding to the subpoena, which was
10 served after November 22 --
11    MR. KELLY:  Not.
12    MR. POLAND:  -- you're not
13 representing.  Okay.
14    MR. KELLY:  Correct.
15    MR. POLAND:  All right.  I'll see
16 if I can keep that straight.
17 Q  Do you recall whether you were given a copy of the
18    subpoena by somebody with Mr. McLeod's law firm,
19    Michael Best & Friedrich, or by your own law firm?
20 A  No, I don't recall.
21 Q  Okay.  Turning your attention back to this last
22    page of Exhibit 1, and these are the categories of
23    documents.  Did you have an opportunity to read
24    through each of the categories of documents that
25    are enumerated on Exhibit 1?

**Page 16**

1  A  Yes.
2  Q  All right.  And you understood that you were to
3     look through materials in your, in your
4     possession, custody, or control that fell into
5     these categories of documents?
6  A  Yes.
7  Q  And did you do that, sir?
8  A  Yes.
9  Q  All right.  Did you bring documents with you this
10    morning?
11 A  I did not bring documents with me.
12 Q  You did not bring any documents personally with
13    you this morning?
14 A  No.
15 Q  Okay.  Did you have -- when you looked through
16    these categories of documents and you looked for
17    documents in your possession, custody, or control
18    that were requested in Exhibit No. 1 here, did you
19    find any documents that were responsive to these
20    categories?
21    MR. MCLEOD:  Let me assert an
22    objection.  Documents were brought today by
23    Mr. Handrick through his counsel here.  So to
24    the extent there's some misunderstanding
25    about the question, he certainly did.  I'm

**Page 17**

```
 1         not trying to make a speaking objection here,
 2         but documents were produced by Mr. Handrick
 3         through his representative as directed by
 4         the, by the subpoena.
 5   Q  Okay.  Did you look through materials in your
 6         possession, custody, or control for documents that
 7         were responsive to Exhibit No. 1?
 8   A  Yes.
 9   Q  All right.  And did you find any documents that
10         were responsive to Exhibit No. 1?
11   A  Yes.
12   Q  All right.  What did you do with those documents?
13   A  I provided those to counsel.
14   Q  Okay.  You provided those to Mr. McLeod?
15   A  Yes.
16   Q  All right.  And are those the documents that you
17         brought with you this morning?
18         Why don't we mark them as an exhibit, and
19         then we can see.  Let's mark -- let's mark the
20         paper copies here as a group exhibit,
21         Exhibit No. 2.  And let's mark this -- it's either
22         a CD or DVD -- as Exhibit No. 3.
23             (Exhibit Nos. 2 and 3 marked for
24              identification)
25   Q  Mr. Handrick, I'm going to hand to you
```
17

**Page 18**

```
 1         two exhibits.  One has been marked Exhibit No. 2,
 2         and that's a collection of papers.  And another
 3         has been marked Exhibit No. 3, and it's a disk.
 4         It's either a CD or a DVD.  I can't tell.  Okay.
 5         So you have these documents in front of you, sir?
 6   A  Yes.
 7   Q  All right.  Are these documents -- these were
 8         documents I'll represent that were handed to me
 9         this morning when you arrived here by your
10         counsel, Mr. McLeod.  And the question is whether
11         Exhibit No. 2 and Exhibit No. 3 are documents that
12         you gave to Mr. McLeod.  And you can take -- you
13         can look through them.
14             (Witness reviews document)
15   A  Could you please restate your question?
16             MR. POLAND:  Sure.  Could you read
17         the question back?
18             (Question read)
19   A  Only a portion.
20   Q  Okay.  Of the documents that have been marked
21         Exhibit No. 2 and Exhibit No. 3, you only gave a
22         portion of those documents to Mr. McLeod --
23   A  Yes.
24   Q  -- is that correct?  All right.
25         And you've separated out -- you separated out
```
18

**Page 19**

```
 1         two pages; is that correct?
 2   A  Yes.
 3   Q  All right.  And those are -- could you describe
 4         what it is that you've separated out.
 5   A  This is a population total of the old state
 6         legislative map.
 7   Q  Okay.  And let's mark that separately as
 8         Exhibit 2A.  Can you do that?  So we keep the
 9         record clear.
10             (Exhibit No. 2A marked for
11              identification)
12   Q  Mr. Handrick, I'm handing you what we've now
13         marked as Exhibit 2A.  And is Exhibit 2A -- that's
14         the only document that's contained within
15         Exhibits 2 and 3 that you gave to Mr. McLeod?
16   A  Yes.
17   Q  All right.  So in response to Exhibit No. 1, which
18         is the subpoena and the document requests, of all
19         the files, all the records that you searched,
20         Exhibit 2A was the only document that you found
21         that was responsive to these requests?
22   A  Yes.
23   Q  Okay.  Do you know what the, what the other
24         materials are in Exhibit 2 that were produced here
25         this morning?
```
19

**Page 20**

```
 1   A  Yes.
 2   Q  Have you seen those documents before?
 3   A  Partially.
 4   Q  Okay.  Which of those documents have you seen
 5         before?
 6   A  This document (indicating), this document
 7         (indicating), this document (indicating), this
 8         document (indicating), and these pages of this
 9         document (indicating).
10   Q  Okay.  So we can just take these apart here.  So
11         these ones right here (indicating) are the ones
12         that you had seen?
13   A  These (indicating) --
14   Q  Okay.
15   A  -- no.  The answer to your question, I've seen
16         this portion (indicating).
17   Q  That portion.  Okay.  Got it.  All right.  So
18         let's go through these here just quickly so I
19         understand what we are dealing with.  Documents
20         that you've seen before within Exhibit No. 2 -- or
21         actually, strike that question.
22         The only document within Exhibit 2 that you
23         haven't seen before is which one?
24   A  This document (indicating).
25   Q  Okay.
```
20

```
 1  A  This portion of this document (indicating).
 2  Q  Okay.  And so you're referring there to -- there's
 3     a stapled collection of invoices; is that correct?
 4     My copy is stapled.  Yours is paper clipped.
 5  A  Yes.
 6  Q  All right.  And that begins with an invoice dated
 7     March 23; that's the first page?
 8  A  Yes.
 9  Q  And if you flip to the very back page of that, it
10     says at the top invoice -- that's an invoice dated
11     August 31, 2011, last page of it?
12  A  Yes.
13  Q  All right.  And so that of Exhibit 2, that
14     collection of invoices, that's the only part of
15     Exhibit 2 that you haven't seen before; is that
16     correct?
17  A  That is correct.
18  Q  All right.  Great.  Of the other -- of the other
19     materials contained within Exhibit 2, there is a
20     letter dated February 18, and that has attached to
21     it a copy of a letter dated February 17 and a
22     letter dated February 15 and then a memorandum at
23     the very back?
24  A  Yes.
25  Q  Okay.  And that's a document you have seen before,
```
                              21

```
 1     correct?
 2  A  Yes.
 3  Q  All right.  Then of the other documents that are
 4     contained within Exhibit No. 2, there is two pages
 5     of handwritten notes.  You've seen that document
 6     before?
 7  A  Yes.
 8  Q  Whose notes are those?
 9  A  Those are my notes.
10  Q  Okay.  Did you retain a copy of these notes in
11     your own files?
12  A  No.
13  Q  Do you know when you made these notes?
14  A  No.
15  Q  Do you know where this copy of the notes came
16     from?
17  A  No.
18  Q  You can set those to the side for just a moment.
19         There's another document then that has some
20     numbers on it, some red printing, and it says
21     "Districts that have been cleaned up through
22     Thursday are."  Do you see that document?
23  A  Yes.
24  Q  And that's two pages, correct, or are those two
25     separate pages?
```
                              22

```
 1  A  They are two separate pages.
 2  Q  All right.  Does it appear to be the same?
 3  A  No.
 4  Q  It does not appear to be the same.  Okay.  What
 5     are the differences?
 6  A  In one of the two documents the number 91 is in
 7     red.
 8  Q  Okay.  Did you create this, these two pages?
 9  A  Yes.
10  Q  When did you create them?
11  A  I don't recall.
12  Q  Do you recall what you used to create these with?
13     Was it in terms of, like, a software package or a
14     specific program or application?
15  A  I don't recall specifically.
16  Q  Were they created within the 2011 calendar year?
17  A  Yes.
18  Q  All right.  And so they were created as part of
19     your work in the legislative redistricting?
20  A  Yes.
21  Q  Did you retain a copy of these two pages in your
22     own materials?
23  A  No.
24  Q  Do you know who -- whose copy this is that was
25     produced here this morning?
```
                              23

```
 1  A  No, I do not.
 2  Q  All right.  And then the portion of Exhibit 2 that
 3     actually has the exhibit sticker on it, at the
 4     very top it says Census Geography Splits.  Do you
 5     see that?  Can you tell me what this document is.
 6  A  This is a report for a map that indicates counties
 7     and municipalities that have been divided between
 8     one or more legislative districts.
 9  Q  Did you create the report, this particular report?
10  A  No.
11  Q  Do you know who did create it?
12  A  No.
13  Q  At the bottom of the first page of this document,
14     the Census Geography Splits document, do you see
15     it has an icon in the lower left corner that says
16     autoBound?
17  A  Yes.
18  Q  Can you tell me what autoBound is.
19  A  AutoBound is a software that is used in the
20     redistricting process.
21  Q  Have you used autoBound before?
22  A  Yes.
23  Q  Are you trained on autoBound, or have you received
24     training on autoBound?
25  A  No.
```
                              24

**Page 25**

1  Q  Did you use autoBound for any of your work in the
2     redistricting that's reflected in the 2000
3     Wisconsin -- 2011 Wisconsin Acts 43 and 44?
4  A  Yes.
5  Q  When was the first time that you used autoBound,
6     period, in your entire career doing redistricting
7     work?
8  A  2001.
9  Q  Okay.  You did not use it for the 1991 or 1992
10    redistricting?
11 A  I don't recall what was used.
12 Q  Do you know, was autoBound available back then?
13 A  I don't know.
14 Q  Don't know.  You can set that to the side for just
15    a moment.  Oh, one other question.  Did you -- the
16    work that you did on autoBound for the 2011
17    Wisconsin Acts 43 and 44 in the redistricting, did
18    you retain any of the reports or work that you did
19    with autoBound?
20 A  Yes.
21 Q  Okay.  And what was it that you retained?
22 A  This document (indicating).
23 Q  Okay.  That we've marked as Exhibit 2A?
24 A  Yes.
25 Q  All right.  So the Exhibit 2A, that's a report

**Page 26**

1     that was printed in autoBound?
2  A  Yes.
3  Q  And I notice that the report, the thicker report
4     that had the Exhibit 2 sticker on it, it has the
5     date up at the top, June 15, 2011 date.  The
6     report that's been marked as 2A does not have a
7     date on it; is that correct?
8  A  That is correct.
9  Q  Do you know whether Exhibit 2A would have been
10    created on or around the same time as Exhibit 2,
11    the date that's June 15, 2011?
12 A  No.
13 Q  Would it have been created before?
14 A  Yes.
15 Q  Do you know when it would have been created
16    before?
17 A  No, I do not.
18 Q  Okay.  Is there a way to determine from the file
19    that you've retained when it was created?
20 A  Only that it was created after the census was
21    taken.
22 Q  Or after the census data became available?
23 A  Yes.
24 Q  When did the census data become available?  And
25    this is for the 2010 decennial census.

**Page 27**

1  A  I don't know that date.
2  Q  Roughly, do you know if March, April time frame?
3  A  I believe it's roughly April, early April.
4  Q  Okay.  Do you recall how you received the census
5     data?
6  A  No.
7  Q  Do you remember whether you pulled it off a
8     website or somebody gave it to you?
9  A  No.
10 Q  Do you recall whether you received it from
11    Mr. McLeod's law firm?
12        MR. MCLEOD:  I'm going to assert --
13        I'm going to assert a privilege to the extent
14        that the question calls for communications
15        between counsel and Mr. Handrick, which would
16        be subject to the attorney-client, attorney
17        work product privilege.  Subject to that you
18        can answer the question.
19 A  When I saw census data, it was at the law firm.
20 Q  And *at the law firm*, you mean at Michael Best &
21    Friedrich?
22 A  Yes.
23 Q  As opposed to your own law firm, Reinhart?  All
24    right.  I'm just trying to keep the two --
25 A  Yes.

**Page 28**

1  Q  -- okay, separate.
2        When you worked at Michael Best & Friedrich
3     and saw the census data, was that in the Milwaukee
4     office or the Madison office?
5  A  In the Madison office.
6  Q  Do you work out of -- your own firm, Reinhart, do
7     you work out of the Milwaukee office or the
8     Madison office --
9  A  Both.
10 Q  -- or both?
11        Do you currently live in the Milwaukee area?
12 A  Yes.
13 Q  Is your primary residence in the Milwaukee area?
14 A  No.
15 Q  Where is your primary residence?
16 A  Minocqua.
17 Q  And then you also have a residence in the
18    Milwaukee area?
19 A  Not a residence.
20 Q  Okay.
21 A  I live there.
22 Q  Okay.  Live in Milwaukee, in the city of Milwaukee
23    itself?
24 A  No.
25 Q  Where do you -- where do you live in the Milwaukee

1     area?
2  A  The city of Port Washington.
3  Q  So two residences, one in Port Washington and then
4     one in Minocqua?
5  A  Yes.
6  Q  And you work out of both the Reinhart office in
7     Madison and in Milwaukee?
8  A  Yes.
9  Q  Do you maintain files relating to your
10    redistricting work in both Reinhart's Madison
11    office and the Milwaukee office?
12 A  No.
13 Q  All right.  Do you have them only in one office?
14 A  I do not retain files related to redistricting.
15 Q  Why don't you retain files related to
16    redistricting?
17 A  Reinhart was retained by Michael Best & Friedrich
18    to assist them, so I did not retain files on the
19    matter.
20 Q  Okay.  Did somebody tell you not to retain files?
21 A  Yes.
22 Q  Okay.  Who told you not to retain files?
23         MR. MCLEOD:  I'm going to assert
24    the same objection to the extent it calls for
25    attorney-client privileged information,
                        29

1     attorney work product.
2  Q  Okay.  You can answer the question.
3  A  Can you please restate the question?
4         MR. POLAND:  Sure.  Can you read it
5     back?
6         (Question read)
7  A  As someone who's assisting legal counsel, I was
8     requested by legal counsel to not remove any files
9     from their offices.
10 Q  So everything that you looked at was at
11    Michael Best & Friedrich; is that correct?
12 A  Yes.
13 Q  All right.  You didn't take anything off of the
14    premises of Michael Best & Friedrich relating to
15    redistricting?
16 A  That is not correct.
17 Q  Okay.  What did you take off the premises of
18    Michael Best & Friedrich that relates to
19    redistricting?
20 A  This document (indicating).
21         MR. KELLY:  I'll object to the
22    extent the question calls for a response with
23    respect to any work that he's done on
24    November 22 or subsequent thereto as being
25    covered by the attorney-client privilege and
                        30

1     work product doctrine and to the extent the
2     question requires you to answer with respect
3     to that topic.  And I instruct you not to
4     answer.
5         If you can answer the question without
6     discussing anything that occurred on
7     November 22 or after, then you may.
8  Q  Okay.  Let's talk first about before November 22.
9     Okay.  What did you take off the premises of
10    Michael Best & Friedrich that related to
11    redistricting?
12 A  This document (indicating).
13 Q  Okay.  So -- and by *this document*, you mean
14    Exhibit -- what's been marked as Exhibit 2A?
15 A  Yes.
16 Q  All right.  And that's the, that's the only piece
17    of paper or other file that you took off the
18    premises of Michael Best & Friedrich that relates
19    to redistricting; is that correct?
20 A  Yes.
21 Q  All right.  I actually need to go back because I
22    did forget to ask you about one other item that
23    you brought with you today.  And that's been
24    marked as deposition Exhibit 3.  It is a -- it's
25    either a CD or a DVD for the record here that has
                        31

1     a label *Joe Handrick, Draft Maps - Block*
2     *Assignment Files.*  I'm going to hand a copy of
3     that to you and ask you have you seen Exhibit 3
4     before?
5  A  Yes.
6  Q  And what is Exhibit 3?
7  A  My understanding is this is a disk containing maps
8     upon which I worked.
9  Q  Okay.  And the work that you did, that was work
10    that would have been performed at Michael Best &
11    Friedrich's offices as well?
12 A  Yes.
13 Q  And that was at the Michael Best offices in
14    Milwaukee, is that correct, or in Madison?
15 A  Michael Best offices in Madison.
16 Q  In Madison.  Did you -- did you ever perform any
17    work on the maps in Michael Best's Milwaukee
18    office?
19 A  No.
20 Q  All right.  So all of the work that you performed
21    on redistricting in 2011 was performed in
22    Michael Best's offices in Madison; is that
23    correct?
24 A  Yes.
25 Q  Who was present during the time that -- at
                        32

| | |
|---|---|
| 1 Michael Best's offices in Madison during the time | 1 February 15, 2011? |
| 2 you were doing redistricting work there? | 2 A Yes. |
| 3         MR. MCLEOD:  I'm going to assert | 3 Q I'd like you to take a look at the first |
| 4 the objection to the extent it calls for | 4 paragraph, please.  Do you see where it states |
| 5 attorney-client, attorney work product | 5 "This letter confirms our engagement of |
| 6 information.  To the extent it does, I'd | 6 Joseph W. Handrick as a consultant in connection |
| 7 instruct the witness not to answer. | 7 with our representation of the Wisconsin State |
| 8         MR. KELLY:  And I assert the same | 8 Senate, by its Majority Leader Scott L. Fitzgerald |
| 9 objection. | 9 and the Wisconsin State Assembly, by its Speaker |
| 10 Q Okay.  I'm only talking about the time here now | 10 Jeff Fitzgerald"?  And then in parens it says |
| 11 before November 22, so that should take care of | 11 "(the 'client') in the above matter, which |
| 12 Mr. Kelly's objection for the time being. | 12 involves potential litigation."  Do you see that? |
| 13         So let me -- can you read back the question? | 13 A Yes. |
| 14         (Question read) | 14 Q All right.  Does this refresh your recollection |
| 15         MR. MCLEOD:  I'm going to object to | 15 that you were retained on or about February 15, |
| 16 the form of the question as vague.  Subject | 16 2011 by Mr. McLeod's law firm? |
| 17 to my privilege objection and to my form | 17 A Yes. |
| 18 objection Mr. Handrick can answer. | 18 Q All right.  If you look in the second paragraph, |
| 19         MS. LAZAR:  I would also object | 19 do you see that first sentence?  There's a |
| 20 that it's not temporally limited in scope. | 20 reference to the consulting work that you'll be |
| 21 Are you talking -- could you give him a time | 21 doing, correct? |
| 22 frame, please? | 22 A Yes. |
| 23 Q Sure.  When were you first retained by | 23 Q And that states that you'll be providing |
| 24 Michael Best & Friedrich to perform work on | 24 consultation on Wisconsin demographic matters, and |
| 25 redistricting? | 25 then it goes on the rest of the paragraph? |
| 33 | 35 |
| 1 A I do not recall. | 1 A Yes. |
| 2 Q Okay.  I'm going to ask you to take a look at -- | 2 Q Okay.  And then I'd like you to turn your |
| 3 actually, this is a separate exhibit here.  We'll | 3 attention to the third paragraph.  Do you see that |
| 4 make it a little bit cleaner here. | 4 it states you will be paid $5,000 per month, |
| 5         (Exhibit No. 4 marked for | 5 beginning of the date of this engagement letter |
| 6         identification) | 6 and continuing through May 2012 or until the |
| 7 Q I'm going to hand you that.  We can go ahead and | 7 retention is terminated, correct? |
| 8 mark two other exhibits here. | 8 A Yes. |
| 9         (Exhibit Nos. 5 and 6 marked for | 9 Q And then if you turn the page, you'll see |
| 10         identification) | 10 two signatures there, correct?  One under |
| 11 Q Mr. Handrick, I've had the court reporter mark | 11 Mr. McLeod's signature line, correct? |
| 12 three documents as exhibits, and you should have | 12 A Yes. |
| 13 those in front of you now.  They should be marked | 13 Q And then there is another signature line further |
| 14 as Exhibits 4, 5, and 6.  Do you see those? | 14 down, and there appears to be a signature in that |
| 15 A Yes. | 15 line as well, doesn't there? |
| 16 Q Okay.  I'd like you to take a look at | 16 A Yes. |
| 17 Exhibit No. 4, please.  Can you identify | 17 Q Do you know whose signature that is? |
| 18 Exhibit No. 4 for me, please. | 18 A I do not. |
| 19 A Yes. | 19 Q Okay.  Do you know whether it's Mr. Millis's |
| 20 Q What is Exhibit No. 4? | 20 signature? |
| 21 A It is a letter to Don Millis and myself from | 21 A I do not. |
| 22 Michael Best & Friedrich. | 22 Q Who is Mr. Millis? |
| 23 Q Have you seen Exhibit No. 4 previously? | 23 A Mr. Millis is an attorney at the Reinhart law |
| 24 A Yes. | 24 firm. |
| 25 Q And did you receive Exhibit No. 4 on or about | 25 Q Do you work with Mr. Millis? |
| 34 | 36 |

1  A  Yes.
2  Q  And it appears that it's -- the signature is dated
3     February 17, 2011?
4  A  Yes.
5  Q  Is it your understanding that on or about
6     February -- sometime between February 15 and
7     February 17, 2011 you were retained to work on the
8     redistricting?
9  A  Yes.
10 Q  I'd like you to -- you can set that aside.  I'd
11    like you to look at Exhibits 5 and 6.  Have you
12    seen Exhibits 5 and 6 before?
13 A  Yes.
14 Q  Could you identify them, please, for the record.
15 A  Exhibit 5 is a letter to Eric McLeod from
16    Don Millis.  Exhibit 6, the same.
17 Q  Okay.  And Exhibit 5 is a letter dated
18    February 17, correct?
19 A  Yes.
20 Q  And Exhibit No. 6 is a letter dated February 18,
21    correct?
22 A  Yes.
23 Q  Okay.  And you are copied on both those letters;
24    you're identified as a cc?
25 A  Yes.

37

1  Q  All right.  I'd like you to turn to the last page
2     of both of those letters, Exhibits 5 and 6, and
3     I'd like you to look at the last paragraph of both
4     letters.  And I'll read -- I believe that
5     they're -- they are the same, but let me read it.
6     It states "You will be deemed to have accepted
7     this arrangement on the terms and conditions of
8     this letter and its enclosure upon your failure to
9     object to these terms in writing within ten days
10    of the date of this letter."  Do you see that
11    language?
12 A  Yes.
13 Q  All right.  Do you know whether Mr. McLeod or
14    anyone from Michael Best & Friedrich ever objected
15    to the terms stated in those letters?
16 A  I do not know that.
17 Q  Is it your understanding that your engagement was
18    pursuant to Mr. McLeod's original letter that's
19    Exhibit 4 and then the two letters from Mr. Millis
20    that are Exhibits 5 and 6?
21 A  The Reinhart engagement.
22 Q  Correct.  You're saying Reinhart's engagement as
23    opposed to your engagement?
24 A  Yes.
25 Q  All right.  So you're making a distinction between

38

1     the two?
2  A  Yes.
3  Q  All right.  Do you -- you were retained as an
4     employee of the Reinhart law firm; is that
5     correct?
6  A  No.
7  Q  All right.  What's your understanding of your
8     engagement?
9  A  Reinhart -- my understanding is Reinhart was
10    retained by Michael Best & Friedrich.
11 Q  Okay.  So the law firm of Reinhart in general?
12 A  Yes.
13 Q  Why were the -- why was Mr. McLeod's original
14    letter sent to you, and why were you cc'd on the
15    two letters from Mr. Millis back to Mr. McLeod?
16 A  I don't know.
17 Q  Is it your understanding that you were primarily
18    going to be responsible for doing the work with
19    Michael Best & Friedrich on the redistricting?
20 A  My understanding is that Reinhart was going to ask
21    me to provide assistance to the client that they
22    had retained.
23 Q  Or the client that had retained Reinhart?
24 A  Yes.  I'm sorry.
25 Q  Now, you were just hired by Reinhart about a year

39

1     ago, correct?
2  A  Yes.
3  Q  That was in around December of 2010?
4  A  Yes.
5  Q  Do you have a curriculum vitae or a resume?
6  A  No.
7  Q  All right.  I want to go back to a question that I
8     was asking you before we went down and established
9     Reinhart's engagement on or around February 15 for
10    the purpose of legislative redistricting.  And so
11    I want to ask you between that time and
12    November 22, which is the date Mr. Kelly
13    identified, who did you -- who was present while
14    you were working at Michael Best & Friedrich on
15    redistricting?
16       MR. MCLEOD:  I'm going to assert
17    the same objection on the grounds of
18    attorney-client, attorney work product
19    privileges to the extent that the answer
20    requires disclosure of information.  Subject
21    to those privileges I'd instruct Mr. Handrick
22    not to answer.
23 Q  So you can answer the question.
24 A  Please restate the question.
25       (Question read)

40

**Page 41**

```
 1        MR. MCLEOD:  I'm also going to
 2    restate the objections raised previously
 3    concerning vagueness and relatedly the
 4    failure to describe any time period, which is
 5    a problem with the form of the question.
 6    Subject to that you can answer.
 7  A I can't recall.
 8  Q Are -- your counsel had instructed you not to
 9    answer to the extent it was going to reveal
10    attorney-client privileged information.  Are you
11    following your counsel's instruction not to answer
12    the question with respect to privileged
13    information?
14  A No.  I can't recall the answer to your question.
15  Q Okay.  You don't recall anyone who was present at
16    any time during -- between February 15, 2011 and
17    November 22, 2011 when you were working on
18    redistricting matters at Michael Best & Friedrich?
19  A Certainly I do.
20  Q Okay.  Who was present?
21        MR. MCLEOD:  I'm going to assert
22      the same objections as I did before.
23  A At all times?
24  Q Not at all times.  Just identify for me as many
25    people as you can remember who were present, and
```

**Page 42**

```
 1    we'll go through them, and we'll take them one by
 2    one.
 3  A Tad Ottman, Adam Foltz, Jim Troupis, Eric McLeod,
 4    Ray Taffora, legislative leadership.
 5  Q Okay.  And who among the legislative leadership
 6    was present?
 7  A Speaker Jeff Fitzgerald, Majority Leader
 8    Scott Fitzgerald.
 9  Q During that entire time period, February 15, 2011
10    to November 22, 2011, while you were at
11    Michael Best & Friedrich, were there any other
12    people who were present with you at that time
13    other than the people you've just mentioned?
14  A Yes.
15  Q Who else was present?
16  A Sarah Troupis, Robin Vos, Rich Zipperer,
17    Keith Gaddie.
18  Q Okay.  Anyone else that you can remember being
19    present?
20  A I can't recall anyone else.
21  Q All right.  So let's go back through and identify
22    each of these people.  You mentioned Tad Ottman.
23    Who is Mr. Ottman?
24  A Mr. Ottman is an employee of the state
25    legislature.
```

**Page 43**

```
 1  Q Do you know who specifically he works for?
 2  A My understanding is he works for the
 3    Senator Scott Fitzgerald.
 4  Q Why was he present during the time that you were
 5    working on legislative redistricting at
 6    Michael Best & Friedrich?
 7        MR. MCLEOD:  I'm going to object --
 8      I'm sorry.  I'm going to object to the form
 9      of the question.  I think it's vague and
10      ambiguous.
11  Q You can answer.
12        MR. MCLEOD:  To the extent you
13      understand the question, you can answer.
14  A Please repeat the question.
15  Q Sure.
16        (Question read)
17  A He's an assistant to Senator Scott Fitzgerald.
18  Q And what did Mr. Ottman do while he was with you
19    at Michael Best & Friedrich working on legislative
20    redistricting?
21        MR. MCLEOD:  I'm going to object to
22      the form of the question.  I think it's vague
23      and ambiguous.
24  Q You can answer.
25  A Can you please repeat the question?
```

**Page 44**

```
 1        (Question read)
 2  A He worked on behalf of his employer.
 3  Q What did you observe him doing?
 4  A He would -- he would develop -- he would develop
 5    maps at the direction of -- actually, I don't know
 6    whose direction.  He would develop maps.
 7  Q Okay.  How many times did you see him at
 8    Michael Best & Friedrich when you were there?
 9  A Oh, I don't know.
10  Q Can you give me a ballpark?
11  A Dozens.
12  Q You were both present at Michael Best together
13    working on legislative redistricting dozens of
14    times; is that correct?
15  A Yes.
16  Q What was he physically doing when he was -- when
17    you saw him developing maps?
18        MR. MCLEOD:  Object to the form of
19      the question.  I think it's vague and
20      ambiguous.
21  A I did not observe him or monitor him as he, as he
22    drew maps.
23  Q You didn't see him drawing any maps at all?
24  A I'm sorry?
25  Q If you answered the question, I didn't hear it.
```

| | |
|---|---|
| 1 A Oh. | 1 A Could you please repeat your original question? |
| 2 Q You didn't see him drawing any maps? | 2 Q Well, let me ask it this way: How many times were |
| 3 A I'm aware that he was drawing maps. | 3   you and Mr. Foltz at Michael Best & Friedrich when |
| 4 Q Okay. | 4   Mr. Ottman was not present? |
| 5 A I did not oversee him drawing the maps. | 5 A Not present? |
| 6 Q But did you physically observe him drawing maps? | 6 Q Yes. |
| 7 A Oh, yes. | 7 A I don't recall the exact number. |
| 8 Q Was he sitting at a computer as he was drawing | 8 Q Would it have been as many as dozens of times that |
| 9   maps? | 9   you mentioned with Mr. Ottman? |
| 10 A Yes. | 10 A No. |
| 11 Q Was he -- did he have his hand on the mouse? Was | 11 Q What did you observe Mr. Foltz doing when you were |
| 12   he clicking things? Was he typing on a keyboard? | 12   together at Michael Best & Friedrich? |
| 13   What was he doing physically when you saw him | 13 A Same work that Mr. Ottman was performing. |
| 14   working on the maps? | 14 Q Did you ever observe either Mr. Foltz or |
| 15 A I would imagine all of the above. | 15   Mr. Ottman working on any physical pieces of |
| 16 Q Okay. Was anybody else in the room with | 16   paper? |
| 17   Mr. Ottman when you observed him working on the | 17 A Yes. |
| 18   maps? | 18 Q What were the -- what were the physical pieces of |
| 19 A Sometimes. | 19   paper that they were working on? |
| 20 Q Who did you see in the room with Mr. Ottman when | 20 A It was a large map that takes this data |
| 21   he was working on the maps? | 21   (indicating) and makes it spatial. |
| 22 A Adam Foltz. | 22 Q Okay. And by *this data*, you're referring to |
| 23 Q Anyone else? | 23   Exhibit 2A? |
| 24 A While he was working on maps, no. | 24 A Correct. |
| 25 Q Okay. Was there anyone else communicating with | 25 Q And that was the -- that reflects the old |
| 45 | 47 |

| | |
|---|---|
| 1   Mr. Ottman or Mr. Foltz while you saw Mr. Ottman | 1   legislative districts, correct? |
| 2   working on the maps? | 2 A Correct. |
| 3 A Yes. | 3 Q And by the *old legislative districts*, we mean the |
| 4 Q Who was communicating with him? | 4   districts that were put into place in 2002 by the |
| 5 A Legal counsel. | 5   Court, correct? |
| 6 Q Who -- which legal counsel? | 6 A Yes. |
| 7 A The legal counsel I recall, Eric McLeod, | 7 Q All right. Is there a specific software program |
| 8   Ray Taffora, Jim Troupis, and Sarah Troupis. | 8   that does that? |
| 9 Q Were they present in the room as well? | 9 A I don't know -- |
| 10 A At times. | 10 Q Okay. |
| 11 Q At times. Okay. Were they ever on the telephone? | 11 A -- how that's produced. |
| 12 A Oh, I don't recall. | 12 Q So they were looking at -- they were looking at |
| 13 Q What about Mr. Gaddie; was Mr. Gaddie ever present | 13   maps that were, that were printed, and it was a |
| 14   with Mr. Ottman or Mr. Foltz when you saw them | 14   spatial representation of the data in Exhibit 2A? |
| 15   working on maps? | 15 A Of some of the data. |
| 16 A Not that I recall. | 16 Q Of some of the data. Okay. Do you know which of |
| 17 Q Did you ever see -- were you ever present with | 17   the data in particular? |
| 18   Mr. Foltz at Michael Best & Friedrich when | 18 A Yes. |
| 19   Mr. Ottman wasn't there? | 19 Q And which data was that? |
| 20 A Yes. | 20 A That data would have been the left-hand column and |
| 21 Q And what was the -- strike that question. | 21   the column headed *Difference*. |
| 22       How many times did you see Mr. Foltz there | 22 Q So the left-hand column, that was -- that was the |
| 23   when Mr. Ottman was not there? | 23   district, correct? |
| 24 A I don't -- I don't recall that number. | 24 A Correct. |
| 25 Q As many times as with Mr. Ottman, dozens of times? | 25 Q And these are the assembly districts? |
| 46 | 48 |

1  A  Yes.

2  Q  And then the column that's headed with the word

3    *Difference*?

4  A  Yes.

5  Q  What does the *Difference* column represent?

6  A  My understanding is that the *Difference* column

7    represents the variance from the target population

8    of each of the districts enumerated following the

9    2010 census.

10  Q  You mentioned that also present with you at times

11    at Michael Best & Friedrich were Jeff Fitzgerald

12    and Scott Fitzgerald, correct?

13  A  Yes.

14  Q  When was Jeff Fitzgerald present with you at

15    Michael Best & Friedrich?

16  A  I don't recall exactly.

17  Q  Do you recall what Jeff Fitzgerald was doing when

18    he was with you at Michael Best & Friedrich?

19            MR. MCLEOD:  I'm going to object to

20        the form of the question.  I think it

21        misstates a prior answer, and it's vague and

22        ambiguous.

23  Q  You can answer the question.

24  A  Can you please repeat the question?

25            (Question read)

49

1  A  Yes.

2  Q  What was he doing?

3  A  He was reviewing regional options for a map.

4  Q  And when you say *regional options for a map*, what

5    do you mean by that?

6  A  The legislative assistants, Tad and Adam, would

7    present to their employer various options for each

8    region of the state.

9  Q  And when you say *for each region of the state*, how

10    are you defining what was a region?

11  A  I don't recall exactly how the regions were broken

12    down.

13  Q  Were they broken down on district lines, existing

14    district lines, or was there some other criteria?

15  A  My recollection is that they were broken down more

16    geographical.

17  Q  Okay.  Were you present when these options were

18    presented to Jeff Fitzgerald?

19  A  Yes.

20  Q  Were these presented to Mr. Fitzgerald on a

21    computer screen or on a printed copy?

22  A  They were presented on a printed copy.

23  Q  Did you work at all on assisting -- you said Tad

24    and Adam before.  I assume that you mean

25    Mr. Ottman and Mr. Foltz, correct?

50

1  A  Yes.

2  Q  Did you assist Mr. Ottman and Mr. Foltz in

3    creating these regional options that they

4    presented to Mr. Fitzgerald?

5  A  I created some of them.

6  Q  Which ones specifically did you create?

7  A  I don't -- I don't recall.

8  Q  Did Mr. Fitzgerald direct you to create any

9    specific options or specific maps?

10  A  No.

11  Q  Did he direct Mr. Ottman or Mr. Foltz to your

12    knowledge to create any specific options or

13    specific maps?

14  A  No.

15  Q  You mentioned also that Mr. Scott Fitzgerald also

16    was present with you at times at Michael Best &

17    Friedrich, correct?

18  A  Yes.

19  Q  All right.  What did you observe

20    Mr. Scott Fitzgerald doing when you were together

21    at Michael Best & Friedrich?

22  A  Same as Speaker Fitzgerald.

23  Q  Were both Jeff and Scott Fitzgerald together at

24    Michael Best & Friedrich with you at the same

25    time?

51

1  A  To the best of my recollection, yes.

2  Q  When Mr. Foltz and Mr. Ottman presented these

3    options to Jeff Fitzgerald, did they present them

4    to Scott Fitzgerald at the same time?

5  A  Yes.

6  Q  So both Scott and Jeff Fitzgerald were present

7    when Mr. Foltz and Mr. Ottman were presenting

8    these options to them; is that correct?

9  A  Yes.

10  Q  Do you know how -- do you recall how many times

11    this occurred, that Mr. Ottman and Mr. Foltz

12    presented options to both Jeff and

13    Scott Fitzgerald?

14  A  No.

15  Q  Do you recall the dates on which or roughly the

16    time frames in which this occurred?

17  A  My recollection is that that would have been in

18    June of 2011.

19  Q  You mentioned before that you do not have a CV or

20    a resume, correct?

21  A  That is correct.

22  Q  Okay.  You do have a file on your firm's website,

23    correct?

24  A  I believe so.

25            MR. POLAND:  All right.  I'm going

52

1    to ask if you'd mark this as Exhibit 7.
2         (Exhibit No. 7 marked for
3         identification)
4  Q  Mr. Handrick, I'm handing you what the court
5     reporter has marked as deposition Exhibit No. 7.
6     Do you have that in front of you?
7  A  Yes.
8  Q  And can you identify Exhibit No. 7.
9  A  This is a bio that I believe appears on the
10    Reinhart web page.
11 Q  All right.  Have you seen this bio before?
12 A  Yes.
13 Q  All right.  Is the information that's reflected in
14    this bio correct and accurate as of today's date
15    to the best of your knowledge?
16 A  Yes.
17 Q  Your bio states, Mr. Handrick, that you have a BS
18    from the University of Wisconsin-Madison,
19    occupational therapy; is that correct?
20 A  Yes.
21 Q  And you earned that in 1996?
22 A  Yes.
23 Q  You do not have a law degree; is that correct?
24 A  That is correct.
25 Q  Have you ever attended law school?

53

1  A  No.
2  Q  Other than your undergraduate studies, have you
3     had any formal education beyond high school?
4  A  No.
5  Q  Your bio identifies you as a government relations
6     specialist; is that correct?
7  A  Yes.
8  Q  And that's a position that you've held since
9     December 2010?
10 A  Yes.
11 Q  Do you have any, any clients other than the
12    clients as they've been defined in the engagement
13    letters that we looked at before for the
14    legislative redistricting matter?
15 A  I am -- yes, I do.
16 Q  Okay.  You are a lobbyist licensed with the state
17    of Wisconsin, correct?
18 A  Yes.
19         (Exhibit No. 8 marked for
20         identification)
21 Q  Mr. Handrick, I've handed you a copy of a document
22    that's been marked as Exhibit No. 8.  And do you
23    have that in front of you?
24 A  Yes.
25 Q  And does that represent the organizations on which

54

1    you've been licensed to lobby for the current
2    legislative session?
3  A  Yes.
4  Q  This printout, you'll look at the bottom and see
5     it's dated as of November 30, 2011; do you see
6     that?
7  A  Yes.
8  Q  Are there any other, any other organizations that
9     you've been licensed to represent in the current
10    legislative session?
11 A  No.
12 Q  And your license was issued on January 25, 2011,
13    correct?
14 A  Yes.
15 Q  Did you obtain that license -- or strike that
16    question.
17         Did you apply for that license to represent
18    any particular organization in the current
19    legislative session?
20 A  No.
21 Q  Now, before you joined the Reinhart law firm, you
22    were the town chair for Minocqua, correct?
23 A  Yes.
24 Q  And that's a position that you began in 2005?
25 A  That is not correct.

55

1  Q  Okay.  When did you begin as the town chair?
2  A  January 3, 2006.
3  Q  While you were serving as the Minocqua town chair
4     from January 3, 2006 through the time that you
5     started at Reinhart in 2010, did you have any
6     other jobs or professional positions?
7  A  Yes.
8  Q  What else did you do?
9  A  I stocked produce at Wal-Mart.
10 Q  And that was up in Minocqua?
11 A  Yes.
12 Q  Were you also the legislative director for the
13    Wisconsin Occupational Therapy Association?
14 A  Yes.
15 Q  And how long did you hold that position?
16 A  I held that position through March 9 of 2011.
17 Q  And you're no longer serving as the legislative
18    director for the Wisconsin Occupational Therapy
19    Association?
20 A  I would have to look at what exactly my title is
21    on the -- on my new contract.
22 Q  Okay.  So you have a separate contract with that
23    entity?
24 A  Yes.
25 Q  Is that contract ongoing?  Is it current?

56

**Page 57**

1   A   Yes.
2   Q   And you were a -- you were licensed as a lobbyist
3       on behalf of the Wisconsin Occupational Therapy
4       Association in the 2009-2010 legislative session?
5   A   I do not believe I was a licensed lobbyist in 2009
6       or 2010.
7   Q   Okay.  In the 2005 to 2010 time frame, were you
8       licensed as a lobbyist on behalf of any other
9       organizations?
10   A   I believe so.
11   Q   Do you recall what they were?
12   A   I believe the Wisconsin Bear Hunters Association.
13   Q   Okay.  Any others that you can recall?
14   A   That's all I can recall.
15   Q   All right.  Were there any other jobs that you
16       held other than the job at Wal-Mart that you
17       mentioned and the positions that we've just talked
18       about here, any other jobs you held during the
19       2005 to 2010 time frame?
20   A   Not that I can recall.
21   Q   All right.  Now, you were a lobbyist for the
22       Wisconsin Society of Anesthesiologists at one
23       point, correct?
24   A   Yes.
25   Q   And that was in the 2003-2004 legislative session?

**Page 58**

1   A   In that time frame, yes.
2   Q   Okay.  Were there any other jobs that you held in
3       the 2003 to 2004 time frame?
4   A   None that I recall.
5   Q   Any other organizations on whose behalf you
6       lobbied in the 2003-2004 legislative session?
7   A   Yes.
8   Q   And which were those?
9   A   I can recall Smoke Free Wisconsin.  I can recall
10       the United States Sportsmen's Alliance.  I can
11       recall the Wisconsin Occupational Therapy
12       Association.
13   Q   Any others that you can recall?
14   A   That's all I can recall.
15   Q   I'd like to take you back to the 2000 and 2002
16       time frame.  Now, you were a legislature in the
17       state assembly from 1994 to 2000, correct?
18   A   That's not correct.
19   Q   That's not.  Okay.  What was the time frame when
20       you were in the state assembly?
21   A   I was a state legislature from January of 1995 to
22       approximately January 2 of 2001.
23   Q   Okay.  And we'll get back to that in just a
24       minute.  What did you do for a living between the
25       time that you left the assembly on January 2, 2001

**Page 59**

1       and the time that you started working for the
2       anesthesiologists in 2003?
3   A   I was self-employed.
4   Q   Was that up in Minocqua?
5   A   No.
6   Q   Where were you self-employed?
7   A   In Madison.
8   Q   Okay.  And what were you doing?
9   A   I was retained by Michael Best & Friedrich to
10       assist them in the redistricting that followed the
11       2000 census.
12   Q   Was that under a contract as well?
13   A   I believe so.
14   Q   Okay.  Do you recall when you were retained for
15       that work?
16   A   No, I don't.
17   Q   All right.  And you were doing consulting work for
18       Michael Best at that time with the 2001
19       redistricting litigation?
20   A   Yes.
21   Q   Do you remember who Michael Best & Friedrich was
22       representing in that litigation?
23   A   Yes.
24   Q   Who were they representing?
25   A   They were representing the plaintiffs.

**Page 60**

1   Q   And do you know who specifically the plaintiffs
2       were in that redistricting litigation?
3   A   My recollection is that the plaintiffs were
4       Jensen/Panzer.
5   Q   Was it just the -- do you remember if it was just
6       the assembly that were the plaintiffs in there,
7       members of the assembly?
8   A   I don't recall.
9   Q   And you were retained to develop legislative maps
10       for Michael Best & Friedrich; is that correct?
11   A   Yes.
12   Q   At that time the republican party controlled the
13       assembly, correct?
14   A   Yes.
15   Q   And your retention was specifically to develop
16       legislative maps that would be favorable to the
17       republicans, correct?
18   A   No.
19   Q   That's not correct?
20   A   No.
21   Q   You were well compensated for your work, correct?
22           MR. MCLEOD:  Object to the form of
23       the question, vague and ambiguous.  To the
24       extent you understand the question, please
25       answer.

| | |
|---|---|
| 1 A Could you please restate the question? | 1 on -- you gave me the date before.  I'm looking |
| 2 Q Sure. | 2 for it.  Well, January 1995.  And you were elected |
| 3 (Question read) | 3 as a republican representing Assembly District 34, |
| 4 A Yes. | 4 correct? |
| 5 Q Who paid you for the work that you performed in | 5 A Yes. |
| 6 2001? | 6 Q You were re-elected in 1996 and 1998, correct? |
| 7 A Michael Best & Friedrich. | 7 A Yes. |
| 8 Q Did you work with anyone on creating the | 8 Q All right.  And again both times, that was as a |
| 9 redistricting maps in 2001? | 9 republican representing District 34? |
| 10 A Did I work -- would you please -- | 10 A Yes. |
| 11 Q With anyone -- did you work with anyone in | 11 Q When you were at UW-Madison -- strike that |
| 12 creating the legislative redistricting maps in | 12 question. |
| 13 2001? | 13 You were a student at University of |
| 14 A Yes. | 14 Wisconsin-Madison in 1990, correct? |
| 15 Q Who did you work with? | 15 A I don't -- I don't recall. |
| 16 A Legal counsel. | 16 Q Okay.  Do you recall working part-time for |
| 17 Q Michael Best & Friedrich? | 17 Randy Radtke, a republican in the assembly? |
| 18 A Yes. | 18 A Yes. |
| 19 Q All right.  Who were those lawyers? | 19 Q All right.  And was that on or around 1990? |
| 20 A My recollection is Jim Troupis, Eric McLeod. | 20 A 1990, 1991. |
| 21 Q Anyone else? | 21 Q Okay.  Do you recall that Mr. Radtke was the |
| 22 A Other legal counsel. | 22 republican chair for the legislative redistricting |
| 23 Q Okay.  Do you recall any specific people? | 23 following the 1990 decennial census? |
| 24 A Yes. | 24 A Yes. |
| 25 Q Who were the other people that you worked with? | 25 Q And you became involved in that redistricting |
| 61 | 63 |
| 1 A Greg Hubbard. | 1 effort on behalf of the republicans as well, |
| 2 Q Was Mr. Hubbard a lawyer with Michael Best at the | 2 correct? |
| 3 time? | 3 A Yes. |
| 4 A No. | 4 Q And the redistricting efforts in the early 1990s |
| 5 Q Do you know what law firm Mr. Hubbard was with? | 5 ended up in litigation, correct? |
| 6 A No. | 6 A Yes. |
| 7 Q Okay.  Were you working with the autoBound | 7 Q And in that, you participated in that in drawing |
| 8 software in 2001? | 8 the maps for that redistricting effort in 1992, |
| 9 A That's my recollection. | 9 correct? |
| 10 Q Did you have your own office in Madison at the | 10 A Yes. |
| 11 time? | 11 Q You were working for Mr. Radtke at the time that |
| 12 A Yes. | 12 you did that? |
| 13 Q All right.  Were you doing your legislative | 13 A Yes. |
| 14 redistricting work in 2001 in your own office? | 14 Q Were you retained by any law firm in 1992 to work |
| 15 A No. | 15 on redistricting? |
| 16 Q Were you doing that work at Michael Best & | 16 A No. |
| 17 Friedrich? | 17 Q It was working as an employee of Mr. Radtke? |
| 18 A Yes. | 18 A Yes. |
| 19 Q In their Madison office? | 19 Q And you mentioned Mr. Gaddie before, correct? |
| 20 A Yes. | 20 A Yes. |
| 21 Q Now, you were elected to the state assembly you | 21 Q Who is Mr. Gaddie? |
| 22 said -- I want to make sure I get the date right. | 22 A Mr. Gaddie is a professor from the University of |
| 23 You were elected in 1994, correct? | 23 Oklahoma. |
| 24 A Yes. | 24 Q What -- does Mr. Gaddie have a specialty? |
| 25 Q And you started working in the state assembly | 25 A I believe he's a political scientist. |
| 62 | 64 |

1 Q All right. How long have you known Mr. Gaddie?
2 A Approximately ten years.
3 Q I should probably call him Professor Gaddie,
4 right? He's a professor there?
5 A I believe so.
6 Q Have you ever been down to his office at the
7 University of Oklahoma to meet with him?
8 A No.
9 Q Have you ever met with him in Wisconsin?
10 A Yes.
11 Q How many times have you met with Professor Gaddie
12 in Wisconsin?
13 A Going back to 2001. I don't know the exact
14 number.
15 Q Okay. Did you meet him during the 2001
16 redistricting?
17 A Yes.
18 Q Did you meet Professor Gaddie at Michael Best &
19 Friedrich?
20 A I don't recall.
21 Q Did you work with Mr. Gaddie on the 2001
22 redistricting?
23 A Yes.
24 Q And Mr. Gaddie testified in the trial in the 2001
25 redistricting, correct?

65

1 A Yes.
2 Q You did not testify in that litigation, correct?
3 A I did not.
4 Q All right. Either in deposition or at the trial,
5 correct?
6 A That is correct.
7 Q Did you assist Mr. Gaddie in preparing for his
8 testimony in that redistricting litigation, in the
9 2001, 2002 time frame?
10 A Yes.
11 Q Now, in addition to working with Mr. Gaddie on
12 that, you also worked with Mr. Gaddie on a book,
13 correct?
14 A Yes.
15 Q Or a portion of a book, right?
16 A Yes.
17 Q All right. Let's mark that.
18          (Exhibit No. 9 marked for
19          identification)
20 Q I hand you Exhibit No. 9. Mr. Handrick, the court
21 reporter has handed you a document here that's
22 been marked as Exhibit No. 9. I will represent
23 for the record that this is an excerpt from a
24 book. It's obviously not the entire book. Have
25 you seen the book that the excerpts are from

66

1 that's been marked as Exhibit 9 before?
2 A Yes.
3 Q All right. Can you identify it for the record,
4 please.
5 A It's excerpts from a book entitled *Born to Run*.
6 Q And it's authored by Ronald Keith Gaddie, correct?
7 A Yes.
8 Q And that is the Professor Gaddie that we were just
9 talking about?
10 A Yes.
11 Q This is the man that you met during the
12 redistricting effort in 2001 time frame?
13 A Yes.
14 Q If you'd flip to the inside page, so that's the
15 second page of the exhibit, you'll see it's got a
16 publication date of 2004. Do you see that?
17 A Yes.
18 Q Did you -- did you conduct any interviews with
19 Mr. Gaddie for the purpose of this book?
20 A Yes.
21 Q And he interviewed you, correct?
22 A Yes.
23 Q So the chapter that we have included here in
24 Exhibit No. 9 is Chapter 4. Do you see that?
25 A Yes.

67

1 Q And that's on page 3. And that's *The Life and*
2 *Times of Joe from Minocqua*?
3 A Yes.
4 Q And that would be you, correct?
5 A That would be me.
6 Q Okay. 15 minutes of fame, right?
7          If we flip to the -- and I'm going to refer
8 to the pages in the book. I think that's an
9 easier thing to do. They're along the top of the
10 exhibit so you can see that. If we turn to
11 page -- the top of page 47, do you see that it
12 says *Meet Joe Handrick*?
13 A Yes.
14 Q All right. And that's you, correct?
15 A Yes.
16 Q All right. Did you have an opportunity to review
17 the galleys? Do you know what galleys are,
18 publication galleys --
19 A No.
20 Q -- before the book was published? Okay.
21          Did you get a chance to look at a draft of
22 this particular chapter, Chapter 4, before
23 Mr. Gaddie published the book?
24 A Not that I recall.
25 Q Okay. He didn't give you any kind of a

68

1   pre-publication version and ask if these things
2   were correct?
3  A  Not that I recall.
4  Q  Okay.  Well, let's turn to -- look at a couple of
5     pages here.  Do you recall generally that
6     Mr. Gaddie in his book addressed the legislative
7     redistricting work that you did in the 1990, 1991,
8     '92 time frame?
9  A  I recall that, yes.
10  Q  Okay.  Did you give interviews with him where you
11     discussed that?
12  A  My recollection is yes.
13  Q  And also same question with respect to the 2001,
14     2002 legislative redistricting.  Is that a topic
15     that you and Mr. Gaddie discussed?
16  A  Yes.
17        MR. POLAND:  Oops.  Can you still
18     hear me okay?  The microphone just slipped
19     there.
20        So I'd like you to -- I'm sorry?  You
21     know what, why don't we take a five-minute
22     break.  We'll fix the microphone issues.
23        (Recess)
24  Q  Mr. Handrick, just before we broke we were taking
25     a look at Exhibit No. 9, which is

69

1     Professor Gaddie's book.  Do you recall that
2     discussion?
3  A  Yes.
4  Q  All right.  I'd like to turn your attention to
5     page 54.  So this is in the heading at the top.
6     And I'd like you to look at the last full
7     paragraph on page 54 that's on the left-hand side
8     of the page.  I'd like to draw your attention
9     about halfway down that page.  There's a sentence
10     there, and I'm just going to read it here.
11        It says -- a couple of sentences actually.
12     It says "Handrick was not initially a principal in
13     the crafting of maps, but, when exposed to the
14     technology and asked to participate, his spatial
15     analytic abilities became evident to Republican
16     mapmakers."
17        Do you see that --
18  A  Yes.
19  Q  -- language?  All right.
20        And that's referring to the early 1990s,
21     correct?
22  A  Yes.
23  Q  All right.  And Mr. -- or Professor Gaddie
24     continues on, and this appears to be a quote that
25     Professor Gaddie is attributing to you.  And the

70

1     quote is as follows:  "When they sat me down at
2     the terminal, I just had a knack for being able to
3     see how to craft the kind of districts they
4     wanted, with the right political skew and in a
5     fashion that would be attractive to a court."
6        Do you see that quotation?
7  A  Yes.
8  Q  And is that a correct quotation?
9  A  I wouldn't be able to recall that far back, but I
10     presume it is.
11  Q  Okay.  Turning to the top of page 55, do you see
12     Professor Gaddie's statement that says "Joe would
13     ultimately craft the legislative map" proposed --
14     strike that.  Let me reread that because I was
15     reading it wrong:
16        "Joe would ultimately craft the legislative
17     map proposal Republicans forwarded to the federal
18     courts."
19        Do you see that statement?
20  A  Yes.
21  Q  And again that relates to the 1991-1992
22     redistricting, correct?
23  A  Yes.
24  Q  And Professor Gaddie's statement there is a
25     correct statement?

71

1  A  Yes.
2  Q  All right.  Now -- so you've been involved,
3     according to Professor Gaddie's book, you've been
4     involved with drawing legislative districts for
5     republicans in Wisconsin since the early 1990s,
6     correct?
7  A  Yes.
8  Q  Almost 20 years.  All right.  I'd like to draw
9     your attention to page 68 -- actually, back up a
10     second.  Take you to page 67.  All right.
11     Actually, back up one more.  66, other side of the
12     page.
13  A  Okay.
14  Q  All right.  There is a reference -- about halfway
15     down there's a heading that says
16     *Postlegislative Career*.  Do you see that?
17  A  Yes.
18  Q  And the second full paragraph begins with a
19     statement "Handrick was a master of electoral
20     analysis.  He knew where to find information and
21     how to glean useable knowledge from numbers that
22     is implicit and based on understanding the
23     totality of issues and messages associated with
24     particular candidates and their circumstances."
25        Do you see that language?

72

1  A  Yes.
2  Q  And is that a correct statement?
3  A  I wouldn't argue with it.
4  Q  Okay.  A little further down on that same page
5     toward the end of the paragraph there's a final
6     sentence, and they're talking here about the 2001
7     redistricting.  And the sentence reads as follows:
8     "Again a federal court would craft the maps, and,
9     again, Handrick demonstrated remarkable skill in
10    crafting a set of map proposals that, while not
11    adopted by the court, again reflected the
12    priorities of the court and anticipated the design
13    of the map created by a three-judge panel."
14       Would you argue with that statement?
15 A  No.
16 Q  And then drawing your attention to the top of
17    page 67.  The first paragraph reads "Handrick,
18    together with former Republican caucus staff from
19    the assembly, was contracted as an independent
20    consultant, working through the law firm
21    representing the assembly in redistricting, to
22    develop legislative maps that would stand up to a
23    high degree of scrutiny by the courts and that
24    would also be favorable to Republicans."
25       Do you see that paragraph?

73

1  A  Yes.
2  Q  Do you agree with that paragraph?
3  A  I don't disagree.
4  Q  Okay.  And then I'd like to turn your attention to
5     page 68.  And you'll see a heading about
6     two-thirds of the way down page 68.  It says
7     *Running the Conduit*.  Do you see that?
8  A  Yes.
9  Q  All right.  And so the second sentence -- I'm
10    sorry, the third sentence in that paragraph is the
11    one I want to focus on.  And that states
12    "Joe Handrick was a talented artisan of electoral
13    maps, and he planned to develop future consulting
14    opportunities for the next reapportionment and
15    redistricting after 2010."
16       Do you see that statement?
17 A  Yes.
18 Q  And would you argue with that statement?
19 A  Yes, I would.
20 Q  Okay.  What would you contest in that statement?
21 A  The use of the word -- phrase "planned to develop
22    future consulting opportunities for the next
23    reapportionment and redistricting after 2010."
24 Q  What would you contest about that statement?
25 A  I -- back -- I had -- I would have had no plans.

74

1  Q  In 2004 when the book was written?
2  A  Right, correct.
3  Q  Would you have had aspirations back in 2004 of
4     participating in the redistricting effort after
5     the 2010 decennial census?
6  A  Likely not.
7  Q  When did that -- when did those aspirations arise?
8  A  In -- beginning likely in May of 2009.
9  Q  Okay.  Was there anything in particular that
10    triggered your interest in becoming involved in
11    the 2010, the reapportionment following the 2010
12    census?
13 A  Yes.  In 2009 I became engaged.
14 Q  Okay.  And how did that affect your desire to get
15    involved in the redistricting?
16 A  My fiancee lived in the Milwaukee area.
17 Q  Okay.  How did your fiancee living in the
18    Milwaukee area make you want to get involved in
19    the redistricting following the 2010 decennial
20    census?
21 A  It didn't directly, but getting married to someone
22    in the Milwaukee area meant I could no longer
23    continue to be the town chairman of Minocqua.
24 Q  Okay.  Was that the time then that you -- in 2009
25    did you move down to Port Washington?

75

1  A  No.
2  Q  Okay.  That came later?
3  A  Yes.
4  Q  When did you move to Port Washington?
5  A  December 2010.
6  Q  Okay.
7  A  Actually, strike that.  January 2010 -- of 2011.
8  Q  January of 2011?
9  A  Yes.
10 Q  After you were done with your position as the town
11    chairman in Minocqua, that's when you moved to
12    Port Washington?
13 A  Correct.
14 Q  Was it the fact that you were going to be getting
15    married and had to do something other than being
16    the town chair; that's why you decided to get into
17    the redistricting after the 2010 decennial census?
18 A  No.
19 Q  What was it then that made you want to do that?
20 A  That's why I decided -- or that's why I needed to
21    get employment in the Milwaukee area.
22 Q  Okay.  But as opposed to doing something different
23    in Milwaukee, why is it that you chose to get into
24    legislative redistricting after the 2010 census?
25 A  Because I was retained by the Reinhart law firm to

76

1  join their government relations practice, and this
2  is part of that practice.
3  Q  Okay.  Before you joined Reinhart did you have any
4  plans to participate in legislative redistricting
5  following the 2010 census?
6  A  No.
7  Q  Were you approached by anyone before the time that
8  you joined Reinhart to work on the legislative
9  redistricting?
10  A  No.
11  Q  Now, you mentioned you met Professor Gaddie during
12  the 2001 redistricting effort; is that correct?
13  A  Yes.
14  Q  Was that before the litigation commenced that you
15  met him?
16  A  I don't -- I don't recall the exact date.
17  Q  Do you understand that Professor Gaddie will
18  testify as an expert witness in this particular
19  case?
20  A  That's my understanding.
21  Q  Have you -- have you been involved at all in the
22  engagement of Professor Gaddie to serve as an
23  expert witness in this case?
24  A  No.
25  Q  All right.  Were you involved at all with
                        77

1  the Reinhart law firm for data, or was he asking
2  Mr. McLeod?
3  A  The Reinhart law firm.
4  Q  And then they would -- they would turn to you and
5  ask you to provide that data for Professor Gaddie?
6  A  No.
7  Q  Okay.  How were you involved in providing data to
8  Professor Gaddie?
9        MR. KELLY:  Objection.  The
10        question calls for material covered by the
11        work product doctrine, which is privileged
12        from disclosing that, so I instruct the
13        witness not to answer.
14  Q  Are you going to follow counsel's instruction not
15  to answer the question?
16  A  Yes.
17  Q  Was anybody else involved in the process of
18  collecting data for Professor Gaddie?
19  A  Yes.
20  Q  Who else was involved in that process?
21  A  My understanding is the Legislative Reference
22  Bureau.
23  Q  Anyone else that you know of?
24  A  Not to my recollection.
25  Q  Okay.  Did you ever personally provide any data to
                        79

1  Professor Gaddie's engagement to participate in
2  the redistricting process before the lawsuit was
3  filed?
4  A  No.
5  Q  Have you spoken with Professor Gaddie about his
6  work in the litigation?
7        MR. KELLY:  Objection.  Time frame?
8  Q  Any time frame.
9        MR. KELLY:  All right.  Go ahead.
10  A  Please repeat the question.
11        MR. POLAND:  Can you read it back?
12        (Question read)
13  A  Yes.
14  Q  What did you talk about with Professor Gaddie?
15  A  Specifically, I don't recall.
16  Q  All right.  Generally speaking?
17  A  Generally speaking, Professor Gaddie would inform
18  us of his needs for data.
19  Q  And when you say *us*, you mean you and other people
20  as well?
21  A  I mean my legal counsel.
22  Q  Okay.  Was he asking -- was he asking -- when you
23  say your *legal counsel*, I want to make sure I
24  understand Mr. McLeod's law firm versus the
25  Reinhart law firm.  Was Professor Gaddie asking
                        78

1  Professor Gaddie?
2        MR. KELLY:  Objection, calls for
3        information protected by the work product
4        doctrine.
5        MR. POLAND:  I'm not asking what
6        was conveyed.  I'm just asking whether he did
7        personally.
8        MR. KELLY:  That's still covered by
9        the work product doctrine.
10        MR. POLAND:  What he did?
11        MR. KELLY:  Yes.
12        MR. POLAND:  I'm just asking if he
13        did.  I'm not asking what was conveyed, just
14        asking if he conveyed anything.
15        MR. KELLY:  To the extent you can
16        answer the question with a simple *yes* or *no*,
17        you may answer but nothing beyond that as it
18        would invade the work product doctrine.
19  A  Can you please restate the question?
20        MR. POLAND:  Can you read it back
21        to him?
22        (Question read)
23  A  Yes.
24  Q  Okay.  When did you provide data to
25  Professor Gaddie?  And I'm limiting it now to the
                        80

VIDEOTAPE DEPOSITION OF JOSEPH W. HANDRICK 12/20/2011

1   2011 redistricting as opposed to 2002.
2   A   After November 22.
3   Q   Okay.  Did you provide -- you didn't provide any
4       data to Professor Gaddie before November 22?
5   A   No.
6   Q   Did you provide him with any data outside of the
7       context of litigation, in other words, before the
8       complaint was filed in this case in June?
9   A   No.
10  Q   Did Professor Gaddie ever provide you with any
11      data before the complaint was filed in June?
12  A   Not that I recall.
13  Q   You understand that Professor Gaddie has submitted
14      a report in this litigation?
15  A   Yes.
16  Q   Have you seen the final report?
17  A   I have.
18  Q   All right.  Did you see a draft of the report?
19          MR. KELLY:  Objection.  That calls
20      for information protected by the work product
21      doctrine.
22          MR. POLAND:  I'm just asking if he
23      saw it.  I'm not asking what was conveyed,
24      just asking if he saw it.
25          MR. KELLY:  I understand, but

81

1       that's still getting into our thoughts,
2       mental impressions, and plans.
3   Q   Okay.  You haven't been instructed not to answer,
4       so I'm going to --
5           MR. KELLY:  I will -- to the extent
6       you can answer that question with a simple
7       *yes* or *no*, you may, but go no further because
8       it would invade information protected by the
9       work product doctrine.
10  A   Please repeat the question.
11          (Question read)
12  A   Yes.
13  Q   When did you see a draft of Professor Gaddie's
14      report?
15  A   I can't recall that date.
16  Q   Did you provide any comments on Professor Gaddie's
17      draft report?
18          MR. KELLY:  I object.  It does call
19      for information protected by the work product
20      doctrine.  To the extent that we have
21      Mr. Handrick performing any functions with
22      respect to the conducts of this litigation,
23      that is covered by the doctrine.  And I
24      instruct you not to answer.
25  Q   Are you going to follow counsel's instruction not

82

1       to answer the question?
2   A   Yes.
3   Q   Did you give any input at all into
4       Professor Gaddie's report?
5           MR. KELLY:  Same objection.  Do not
6       answer.
7   Q   And you're going to follow counsel's instruction?
8   A   Yes.
9   Q   Did you work with Professor Gaddie at all between
10      the 2002 and the 2011 redistricting litigation?
11  A   Outside of these interviews?  No.
12  Q   Okay.  So -- and let me back up just a second.  We
13      established before that you did work with
14      Professor Gaddie in the 2002 redistricting
15      litigation, correct?  All right.  So after that
16      was done and before the time that you were engaged
17      for the purpose of the 2011 redistricting, did you
18      work with Professor Gaddie outside the context of
19      this book?
20  A   Not that I can recall.
21  Q   When you were retained for your work in
22      redistricting back in February of this year, were
23      you told you were being retained by or on behalf
24      of any particular person or entity or group?
25          MR. MCLEOD:  Could I have -- I'm

83

1       sorry.  Could I have the question reread
2       back?
3           (Question read)
4           MR. MCLEOD:  Just one second.  I'm
5       going to object to the question as vague and
6       ambiguous.  It's a form objection.  But to
7       the extent you understand the question,
8       please answer.
9   A   I was retained -- Reinhart law firm was retained
10      by Michael Best & Friedrich to provide them
11      assistance as they provide counsel to the state
12      legislature.
13  Q   And was it your understanding that the client was
14      as is stated in the engagement letters that we
15      looked at earlier?  We can pull them out if we
16      need to.  Take a look at Exhibit 4, for example.
17      You should have a copy there in front of you.
18          In the first paragraph you'll see there's a
19      definition of *Client.*  It's defined as
20      "Wisconsin State Senate, by its Majority Leader
21      Scott L. Fitzgerald and the Wisconsin State
22      Assembly, by its Speaker Jeff Fitzgerald."  Do you
23      see that?
24  A   Yes.
25  Q   Is that your understanding of who the client was?

84

**85**

1  A  Yes.
2  Q  Were you told what you were being retained to do?
3  A  Yes.
4  Q  Okay.  What were you told you were being retained
5     to do?
6  A  To provide assistance to legal counsel as they
7     provided advice on the preparation of
8     redistricting maps following the 2010 census.
9  Q  Was there anything more specific that you were
10    told they were going to want you to do?
11 A  Yes.
12 Q  And what were you told that was more specific they
13    wanted you to do?
14 A  In legal counsel's role of providing advice and
15    counsel to the legislature on adoption of a -- or
16    development of a redistricting map following the
17    2010 census, they would give, give constitutional
18    and other legal advice regarding redistricting.
19    And they tasked me with helping translate that
20    legal advice into tangible work products or assist
21    them in the creation of tangible work products for
22    their clients.
23 Q  And so physically they wanted to use the mapping
24    skills that you had used in 2002 and 1991
25    redistricting, correct?

**87**

1  A  That's my understanding.
2  Q  Did you prepare any of the invoices that Reinhart
3     sends to Michael Best & Friedrich?
4  A  No.
5  Q  As a matter of fact, you mentioned, when we looked
6     at it before, you looked at the invoices as part
7     of Exhibit 1, and you said those were documents
8     you hadn't seen before; is that correct?
9  A  That is correct.
10          MS. LAZAR:  Clarification.  That
11       was Exhibit 2.
12          MR. POLAND:  It's Exhibit 2.
13       Thank you for the correction, Maria.
14       Exhibit 2.
15 Q  Do you enter your time at all when you're doing
16    work on the redistricting matter?
17 A  Yes.
18          MR. KELLY:  Objection as to time
19       frame.
20 Q  Beginning with your engagement in February of
21    2011.
22          MR. KELLY:  And would that be
23       ending prior to November 22?
24 Q  Sure.  Let's take it up through November -- before
25    November 22.  Do you enter time into a system that

**86**

1  A  I think that's a fair assessment.
2  Q  And also data analysis skills?
3  A  No.
4  Q  Now, did you do any data analysis for the purpose
5     of redistricting in 2011?
6  A  Not that I recall.
7  Q  Now, the engagement -- and we looked again at the
8     letters.  And we can look at -- let's take a look
9     at Exhibit No. -- Exhibit No. 6 is probably the
10    best one to look at.  It's in front of you.
11        If you look at the -- there's a fee schedule
12    that's referred to in there.  Do you see that?
13 A  Yes.
14 Q  And there are fees that Reinhart is charging of
15    $5,000 per month, correct?
16 A  Correct.
17 Q  That began on February 15, 2011, correct?
18 A  Yes.
19 Q  And ends on May 15, 2012; is that right?
20 A  Yes.
21 Q  All right.  Is that a flat rate; do you know?
22 A  As far as I know, yes.
23 Q  Reinhart is paid the $5,000 per month regardless
24    of whether there's any work done in that
25    particular month or not?

**88**

1     Reinhart has?
2  A  Yes.
3  Q  Okay.  And are those time entries reflected in the
4     invoices that are transmitted to Michael Best &
5     Friedrich?
6  A  I do not know.
7  Q  If we take a look at -- this is the portion of
8     Exhibit No. 2 that has the invoices.  Here, we can
9     have you -- let me hand that to you.  So this is
10    the portion of Exhibit No. 2 that has the
11    invoices.  And, again, these are invoices.  You
12    have not seen these before, correct?
13 A  That is correct.
14 Q  These do not reflect any of your time entries,
15    correct?
16 A  That is correct.
17 Q  And all of these invoices predate November 22,
18    2011, correct?
19 A  That is correct.
20 Q  Do you know which entity writes the check, cuts
21    the check to Reinhart?
22 A  I do not.
23 Q  And you're not paid for your redistricting work
24    outside of the bills that Reinhart sends, correct?
25 A  That is correct.

**Page 89**

1  Q  Mr. Handrick, who have you discussed with -- this
2     deposition with before you came today?
3  A  My counsel to my right.
4  Q  Okay.  Mr. McLeod?
5  A  Yes.
6  Q  All right.  Have you discussed the deposition with
7     anyone else?
8  A  Yes.
9  Q  Who else have you discussed it with?
10 A  My employers.
11 Q  The Reinhart law firm?
12 A  Yes.
13 Q  Anyone in particular at Reinhart?
14 A  Yes, Patrick Hodan.
15 Q  What did you discuss with Mr. McLeod?
16        MR. MCLEOD:  I'm going to object on
17     the grounds that it is subject to the
18     attorney-client privilege, and I'll instruct
19     the witness not to answer.
20 Q  Are you going to follow counsel's instruction not
21    to answer?
22 A  Yes.
23 Q  What did you discuss with Mr. Hodan?
24        MR. KELLY:  I object on the basis
25     it invades the attorney-client privilege, and

**Page 90**

1        I instruct the witness not to answer.
2  Q  And you're going to follow counsel's advice?
3  A  Yes.
4  Q  Did you review any documents to prepare for your
5     deposition today?
6  A  Yes.
7  Q  What documents did you review?
8  A  The documents that I brought with me.
9  Q  Okay.  And so those would be the documents that
10    are contained in Exhibits 2 and 3?
11 A  Yes.
12 Q  Did you review any other documents in preparation
13    for your deposition today?
14 A  No.
15 Q  Were you ever told that you would not have to be
16    deposed in this lawsuit?
17 A  No.
18 Q  Now, do you understand that you've been identified
19    by the defendants in this lawsuit as a potential
20    trial witness?
21        MR. KELLY:  Objection, form.  You
22     can answer.
23 A  I had heard that.
24 Q  Okay.  Who told you that you would be named as a
25    potential witness?

**Page 91**

1  A  I don't recall from whom that I heard.
2        (Exhibit No. 10 marked for
3         identification)
4  Q  Mr. Handrick, I've handed you a document that the
5     court reporter has marked as Exhibit No. 10.  Do
6     you have that in front of you?
7  A  Yes.
8  Q  All right.  I'd like you to turn to the
9     second page, and you'll see that the document is
10    *Defendants' Amended Initial Rule 26(a)*
11    *Disclosures.*  Do you see that?
12 A  Yes.
13 Q  Have you seen Exhibit 10 before?
14 A  No.
15 Q  I'd like to turn your attention to page No. 5 of
16    Exhibit 10 and specifically to paragraph 10.
17    Okay.  And I'll just represent to you this is --
18    this is an identification of people who have
19    knowledge that the defendants might use to support
20    their claims or defenses, okay?
21        So paragraph 10 states "Individuals from the
22    Legislature, and/or its various bodies, are those
23    individuals on the Legislature's behalf, who were
24    involved in drawing the redistricting maps that
25    were signed into law on August 9, 2011, including

**Page 92**

1     without limitation, those individuals who reviewed
2     the 2010 decennial census and assisted in
3     determining the appropriate, constitutional
4     boundaries for state and Congressional districts
5     as memorialized in Acts 43 and 44."  Do you see
6     that?
7  A  Yes.
8  Q  Okay.  And then if you turn the page, do you see
9     that your name is listed there?
10 A  Yes.
11 Q  Okay.  Did anybody ever discuss with you or talk
12    to you about providing that kind of testimony at
13    trial?
14 A  No.
15        MR. KELLY:  Objection to the extent
16     it calls for information covered by the
17     attorney-client privilege.  And I instruct
18     the witness not to answer.
19 Q  Are you going to follow your counsel's instruction
20    not to answer the question?
21 A  Yes.
22 Q  All right.  Second paragraph, page -- I'm sorry.
23    Next paragraph down, paragraph 11.  Again, it
24    identifies witnesses who may be called to testify,
25    and it states "Individuals from the Legislature,

1   and/or its various bodies, or those individuals on
2   the Legislature's behalf, who were involved in
3   reviewing census and population data for the 2010
4   decennial census to insure" -- that's
5   i-n-s-u-r-e -- "minimum population deviation for
6   the new districts."  Do you see that?
7  A  Yes.
8  Q  And do you see that your name is listed there as
9   well?
10 A  Yes.
11 Q  Did you ever discuss with anyone whether you would
12   be called as a witness to testify to the matters
13   identified in paragraph 11?
14      MR. KELLY:  Objection on
15   two grounds.  The first is to form,
16   mischaracterizes the nature of the
17   Rule 26(a)(1), initial disclosure.  No. 2, it
18   calls for information protected by the
19   attorney-client privilege.  And I instruct
20   this witness not to answer.
21 Q  Are you going to follow counsel's instruction not
22   to answer that question?
23 A  Yes.
24 Q  I'd like you to look at paragraph 12.  And do you
25   see that it states -- it identifies "Individuals
                        93

1   from the Legislature, and/or its various bodies,
2   or those individuals on the Legislature's behalf,
3   who were involved in reviewing population and
4   other data so as to preserve, to the extent
5   possible and practicable, the core population of
6   prior districts as well as communities of
7   interest."  Do you see that language?
8  A  Yes.
9  Q  And if you turn the page, you'll see that you are
10   identified there as well, correct?
11 A  Yes.
12 Q  All right.  Did you ever have any conversations
13   with anyone about providing testimony relating to
14   the issues identified in paragraph 12?
15      MR. KELLY:  Objection on the basis,
16   excuse me, of the attorney-client privilege.
17   And I instruct the witness not to answer.
18 Q  And you're going to follow counsel's instruction?
19 A  Yes.
20 Q  Okay.  Let's -- I'll shortcut this, and I'm going
21   to -- what I'm going to do here is go over
22   paragraphs 13, 14, 15, 16, and 17, okay?  The
23   introductory language on each one is pretty much
24   the same.  Do you see that?
25      Paragraph 13 identifies individuals who --
                        94

1   well, strike that.  There's no way to do this
2   other than to go through each one.  Sorry.
3      Let's do paragraph 13.  Paragraph 13
4   identifies "Individuals from the Legislature,
5   and/or its various bodies, or those individuals on
6   the Legislature's behalf, who assisted the
7   Legislature in insuring that the new redistricting
8   maps, to the extent possible, kept wards and
9   municipalities whole within legislative district
10   boundaries and to the extent possible, recognized
11   local government boundaries."  Do you see that
12   language?
13 A  Yes.
14 Q  And you're identified there as well, correct?
15 A  Yes.
16 Q  All right.  Did you ever have any discussions with
17   anyone about testifying at trial on those
18   particular topics?
19      MR. KELLY:  Objection on the basis
20   of the attorney-client privilege.  And I
21   instruct the witness not to answer.
22 Q  And you're going to follow counsel's instructions?
23 A  Yes.
24 Q  And with respect to paragraph -- all right.  We
25   have to change the tape.  Let's go off the record.
                        95

1      (Discussion off the record)
2  Q  Mr. Handrick, just before the tape was changed we
3   were going over categories of testimony or
4   knowledge in Exhibit No. 10.  I'd like to actually
5   go back to paragraph 10 for a minute, if you'd
6   turn to page 5, and ask you, did you actually as
7   part of your work on the redistricting, did you
8   actually review the 2010 decennial census data and
9   assist in determining appropriate constitutional
10   boundaries for the state and congressional
11   districts as memorialized in Acts 43 and 44?
12      MR. MCLEOD:  I'm going to object to
13   the form of the question on the grounds that
14   it's vague and ambiguous.  To the extent you
15   can understand the question and can answer,
16   please do so.
17 A  Please restate the question.
18 Q  It really is as stated right in here in the
19   language.  Did you actually do this?  Did you
20   actually review the 2010 decennial census and
21   assist in determining the appropriate
22   constitutional boundaries for the state and
23   congressional districts as memorialized in Acts 43
24   and 44?
25      MR. MCLEOD:  I assert the
                        96

1    objection.  To the extent you can answer,
2    please do so.
3  A  Yes, I reviewed the 2010 decennial census and
4    assisted the legal counsel and the remainder of
5    that paragraph.
6  Q  Okay.  Turning to paragraph No. 11.  Did you in
7    fact review census and population data from the
8    2010 decennial census to insure minimum population
9    deviation for new districts?
10  A  Yes.
11  Q  Okay.  In paragraph 12, did you in fact as part of
12    your, as part of your redistricting work review
13    population and other data so as to preserve, to
14    the extent possible and practicable, the core
15    population of prior districts as well as
16    communities of interest?
17        MR. MCLEOD:  I'm going to assert
18    the same objection as to the form.  It's
19    vague and ambiguous.  To the extent you
20    understand the question and can answer it,
21    please do so.
22  A  Yes.
23  Q  Paragraph No. 13 then.  Did you assist the
24    legislature in insuring that the new redistricting
25    maps, to the extent possible, kept wards and

97

1    municipalities whole within legislative boundaries
2    and to the extent possible recognize local
3    government boundaries?
4  A  Yes.
5  Q  All right.  Did you ever discuss with anyone
6    testifying at trial about that work that you did?
7        MR. KELLY:  Objection based on the
8    attorney-client privilege and work product
9    doctrine.  I instruct the witness not to
10    answer.
11        Additionally, to the extent that I've
12    interposed an attorney-client privilege
13    objection to any of the other responses based
14    on Exhibit 10, that also incorporates an
15    objection based on the work product doctrine.
16  Q  Counsel hasn't instructed you not to answer.
17        MR. KELLY:  I have.
18        MS. LAZAR:  He did.
19        MR. POLAND:  You did.  Okay.
20  Q  Are you going to follow counsel's instruction not
21    to answer?
22  A  Yes.
23  Q  Let's turn to page 14.  Did you assist legislature
24    to insure that if voters were shifted from odd to
25    even senate districts they were not unnecessarily

98

1    disenfranchised by being deprived of the
2    opportunity to vote?
3  A  No.
4  Q  Anybody ever talk to you about potentially
5    testifying at trial on that issue?
6        MR. KELLY:  Objection based on the
7    attorney-client privilege and work product
8    doctrine.  And I instruct the witness not to
9    answer.
10  Q  And will you follow counsel's instruction not to
11    answer?
12  A  Yes.
13  Q  Paragraph No. 15.  Did you review the 2010
14    decennial census data and the previous districting
15    maps to insure that the new districts were as
16    geographically compact as practicable?
17  A  No.
18  Q  Did you ever talk with anyone about testifying at
19    trial on that topic?
20        MR. KELLY:  Objection based on the
21    attorney-client privilege and work product
22    doctrine.  And I instruct the witness not to
23    answer.
24  Q  And are you going to follow counsel's instruction
25    to not answer the question?

99

1  A  Yes.
2  Q  Turning back quickly here to paragraph 14.  You
3    mentioned -- you said you did not provide that
4    assistance.  Do you know anyone who did?
5  A  No.
6  Q  Same question for No. 15.  Do you know anyone who
7    did review the decennial census data in previous
8    districting maps to insure the new districts were
9    geographically compact as practicable?
10  A  Yes.
11  Q  Who did?
12  A  I don't know, but I am aware that there was --
13    there have -- there was a report produced on
14    compactness.
15  Q  Do you know who produced that report?
16  A  No.
17  Q  Do you know when you saw it?
18  A  No.
19  Q  Would it have been sometime before the legislation
20    was passed?
21  A  Possibly.
22  Q  Were you at Michael Best & Friedrich when you saw
23    that report on compactness?
24  A  Yes.
25  Q  Was it in paper copy?

100

1   A   Yes.
2   Q   Any idea how thick it was?
3   A   No.
4   Q   Any estimate as to how many pages?
5   A   No.
6   Q   Did you discuss that report with anyone?
7   A   No.
8   Q   Who was with you when you saw that report?
9   A   My recollection would be Tad and Adam.
10  Q   Were you asked to do anything with respect to that
11      report?
12  A   No.
13  Q   Did they ask you to give any opinions about what
14      was stated in the report?
15  A   No.
16  Q   Paragraph 16.  Did you in fact assist the
17      legislature to prevent unnecessary and
18      unconstitutional voter dilution of minority
19      voters?
20  A   I assisted the legal team in the provision of
21      advice to the legislature on such matters.
22  Q   Did anyone talk to you about testifying at trial
23      on that topic?
24          MR. KELLY:  Objection, calls for
25          information protected by the attorney-client
                            101

1           privilege and work product doctrine.  And I
2           instruct the witness not to answer.
3   Q   And are you going to follow counsel's instructions
4       and not answer the question?
5   A   Yes.
6   Q   And paragraph 17.  Did you assist the legislature
7       to insure that the new districts reflected
8       communities of interest?
9   A   Yes.
10  Q   And did -- and has anyone talked to you about
11      testifying at trial on that topic?
12          MR. KELLY:  Objection, calls for
13          information protected by the work product
14          doctrine and the attorney-client privilege.
15          And I instruct the witness not to answer.
16  Q   And are you going to follow counsel's instruction
17      and not answer the question?
18  A   Yes.
19  Q   Were you ever told that you would or would not
20      testify at trial?
21          MR. KELLY:  Objection to the extent
22          that that calls for information that you
23          obtained or were given with respect to your
24          participation in the defense of this map
25          since November 22, 2011.  It invades the
                            102

1           attorney-client privilege and the work
2           product doctrine.  And I instruct you not to
3           answer.  If you can answer outside of those
4           parameters, you may.
5   A   Can you repeat the question?
6           MR. POLAND:  Could you read it
7           back?
8           (Question read)
9   A   No.
10  Q   Did you ever discuss with anyone whether you would
11      or would not testify at trial?
12          MR. KELLY:  Objection, calls for
13          information protected by the attorney-client
14          privilege and the work product doctrine.  And
15          I instruct the witness not to answer.
16  Q   Are you going to follow counsel's instruction not
17      to answer?
18  A   Yes.
19  Q   Do you expect to testify at trial?
20  A   No.
21  Q   If subpoenaed to testify at trial or if called as
22      a witness at trial, would you testify at trial?
23  A   Certainly.
24  Q   Have you seen a copy of the complaint in this
25      case, Mr. Handrick?
                            103

1   A   Yes.
2   Q   Okay.  And there actually have been several
3       complaints filed.  There was -- it was not a trick
4       question, not intended to be a trick question.
5       Do you recall which of the complaints you've
6       seen?
7   A   I believe I recall seeing the original, the
8       original complaint.
9   Q   Okay.  Have you seen a copy of the most recent
10      complaint filed in the case?
11          MS. LAZAR:  Objection.  Could you
12          clarify which case?  They're consolidated.
13          MR. POLAND:  Sure.  Let's just
14          go ahead and mark it as an exhibit.
15          (Exhibit No. 11 marked for
16          identification)
17  Q   Mr. Handrick, I'm handing you a copy of a document
18      that's been marked as Exhibit No. 11.  I'll give
19      you a minute to take a look at it.
20  A   Okay.
21          (Witness reviews document)
22  Q   So for the record, Exhibit No. 11 is a document
23      that's titled *Second Amended Complaint for*
24      *Declaratory and Injunctive Relief,* and it's dated
25      November 18, 2011.  Mr. Handrick, have you seen a
                            104

**Page 105**

1  copy of this document before, Exhibit 11?

2  A  Yes.

3  Q  Okay.  When did you see it?

4  A  Late November.

5  Q  Do you recall who gave it to you?

6  A  No, I don't.

7  Q  Were you asked to provide any comments on it?

8       MR. KELLY:  Objection to the extent

9      that that calls for information protected by

10      the attorney-client privilege or the work

11      product doctrine.  I instruct you not to

12      answer.  And that instruction goes this far.

13      To the extent that you were asked to

14      provide any commentary or opinion on it by

15      counsel for the defendants in this case, the

16      Members of the GAB and the Executive

17      Director, that would be covered by the

18      attorney-client privilege and the work

19      product doctrine.  If you were asked to

20      provide commentary by anyone else, you may

21      answer.  Otherwise, I instruct you not to

22      answer.

23  Q  So let's take the easy part first.  Anybody other

24    than legal counsel for the

25    Government Accountability Board ask you to comment

**Page 106**

1  on the second amended complaint?

2  A  No.

3  Q  Did any members of any of the counsel for the

4    Government Accountability Board ask you to comment

5    on the second amended complaint?

6       MR. KELLY:  Object to the extent

7      that it invades the attorney-client privilege

8      and the work product doctrine.  And I

9      instruct the witness not to answer.

10  Q  Are you going to follow counsel's instructions not

11    to answer the question?

12  A  Yes.

13  Q  Have you seen a copy of the answer that the

14    defendants filed to the second amended complaint?

15  A  I don't know.

16      (Exhibit No. 12 marked for

17      identification)

18  Q  Mr. Handrick, I've handed you a copy of a document

19    that the court reporter has marked as deposition

20    Exhibit No. 12.  And if you turn to the

21    second page, you'll see that the document has a

22    title.  It says *Defendants' Answer and Affirmative*

23    *Defenses to Second Amended Complaint for*

24    *Declaratory and Injunctive Relief*.  Do you see

25    that?

**Page 107**

1  A  Yes.

2  Q  Okay.  And is this a document that you've seen

3    before?

4  A  I do not recall ever seeing this document.

5  Q  Were you asked to provide any input into answers

6    to the allegations that were contained in

7    Exhibit 11, which is the *Plaintiffs' Second*

8    *Amended Complaint*?

9       MR. KELLY:  Object.  The question

10      calls for information that invades the

11      attorney-client privilege and the work

12      product doctrine.  I instruct the witness not

13      to answer.

14  Q  Are you going to follow counsel's instruction not

15    to answer the question?

16  A  Yes.

17  Q  All right.  Did you ever see copies of discovery

18    requests that were served on the parties in this

19    case?

20  A  No.

21  Q  Okay.  Do you know what discovery requests are?

22  A  Not really.

23  Q  Fancy lawyer terms for questions that we ask of

24    the other side and for -- we send requests to

25    produce documents.  Did you ever see anything like

**Page 108**

1  that in this case?

2  A  No.

3  Q  Okay.

4      (Exhibit No. 13 marked for

5      identification)

6  Q  Mr. Handrick, I've handed you a copy of a document

7    that's been marked as Exhibit No. 13.  And as

8    you'll see on the front page, it says *Plaintiffs'*

9    *First Set of Interrogatories and First Request for*

10    *Production of Documents*.  Do you see that?

11  A  Yes.

12  Q  Were you ever asked -- strike that question.

13      Were you ever given a copy of Exhibit 13?

14  A  No.

15  Q  If you turn to page No. 5, you see it says *Request*

16    *for Production of Documents*.  And if you kind of

17    flip through pages, you'll see a number of

18    document production requests up to No. 13.  Do you

19    see those?

20  A  Yes, I see that.

21  Q  Were you ever asked -- other than through your

22    subpoena for this deposition, were you ever asked

23    to look for or gather documents responsive to

24    these requests?

25       MR. KELLY:  Object.  The question

**Page 109**

1 calls for information protected by the
2 attorney-client privilege and work product
3 doctrine. I instruct the witness not to
4 answer.
5 Q Are you going to follow counsel's advice and not
6 answer the question?
7 A Yes.
8 Q Mr. Handrick, when did you actually physically
9 begin working on the redistricting plans that were
10 embodied in Wisconsin Acts 43 and 44?
11 MR. MCLEOD: Object to the form of
12 the question on the grounds that it's vague
13 and ambiguous. To the extent you can
14 understand the question and respond, please
15 do so.
16 A Please repeat the question.
17 (Question read)
18 A I do not specifically recall.
19 Q Okay. Do you recall -- you mentioned before that
20 you enter time into Reinhart's time keeping
21 system, correct?
22 A Yes.
23 Q Do you recall when the first time was that you
24 actually entered time on the redistricting matter?
25 A I don't recall specifically.

**Page 110**

1 Q Do you recall how far after -- how long after it
2 was before Reinhart was retained in February 2011
3 that you started that work?
4 A Not specifically.
5 Q As best you recall, was it in the month of
6 February?
7 A Probably.
8 Q Now, you had given me a list of names earlier in
9 the deposition of people who were present with you
10 at Michael Best & Friedrich when you were working
11 on the redistricting plans. In addition to those
12 names, was there anybody else that you worked with
13 on the redistricting plans? I can read those
14 names back if you need me to refresh your memory
15 on that.
16 A I cannot recall any additional names.
17 Q Okay. During -- from the time that you were --
18 that Reinhart was engaged in February up until the
19 present, with whom have you discussed at any time
20 the redistricting process itself?
21 MR. KELLY: Objection to the extent
22 it calls for information protected by the
23 attorney-client privilege, the work product
24 doctrine. I instruct the witness not to
25 answer.

**Page 111**

1 The instruction goes so far as
2 conversations with counsel either at Reinhart
3 or DOJ or the client from November 22
4 forward. If there's any responsive
5 information you have prior to that time, you
6 may answer.
7 A Please restate the question.
8 (Question read)
9 MR. MCLEOD: I'm going to object to
10 the question on the grounds that it's vague
11 and ambiguous. To the extent you understand
12 the question, please answer.
13 A I can't answer that question with specifics.
14 Q Okay. What is it that you can't answer, or why
15 can't you answer the question?
16 A The question was the redistricting process.
17 Q Correct.
18 A Because of my past involvement, people all the
19 time ask me about the process.
20 Q Okay. You're talking about outside of the work
21 that you were engaged to do in February?
22 A Yes.
23 Q All right. Let's limit it then for the purpose of
24 the redistricting that you were engaged to
25 perform, okay, in 2011, all right? With that

**Page 112**

1 qualification on it then, with whom have you
2 discussed that redistricting process?
3 MR. KELLY: Objection on the same
4 basis as my prior objection. It calls for
5 information protected by the attorney-client
6 privilege and work product doctrine. And I
7 instruct the witness not to answer unless the
8 response of information relates to the time
9 period prior to November 22, in which you may
10 answer.
11 MR. MCLEOD: And I apologize.
12 Could you read the question back? I'm trying
13 to understand it.
14 (Question read)
15 MR. MCLEOD: I'm going to object to
16 the form of the question as vague and
17 ambiguous. To the extent you understand it,
18 please answer.
19 A The list of names I supplied before.
20 Q Okay. Is there anyone else other than the people
21 who were on the list of names you supplied before
22 that you've discussed the redistricting process
23 with?
24 MR. KELLY: Same objection. To the
25 extent that your answer would involve

1  individuals you spoke with subsequent to
2  November 22, either with counsel or at the
3  direction of counsel, that information would
4  be protected by the work product doctrine and
5  the attorney-client privilege. And to that
6  extent, I instruct you not to answer.
7         MR. MCLEOD: And I'm going to
8  assert the same form objection as to vague
9  and ambiguous.
10 Q  To the extent that you've been instructed by
11    counsel not to answer the question, are you going
12    to follow counsel's instructions and not answer
13    the question?
14 A  Yes.
15 Q  I'd like to go back to the list of names that we
16    talked about before. You mentioned Mr. Ottman who
17    had been present with you at Michael Best &
18    Friedrich at times, correct?
19 A  Correct.
20 Q  All right. Did you have any conversations with
21    Mr. Ottman about the redistricting process?
22         MR. MCLEOD: I'm going to object to
23    the form, vague and ambiguous.
24         MR. KELLY: Also object to the
25    extent that it calls for information related
                    113

1  to conversations occurring at the instruction
2  of counsel for the defendants in this case.
3  And to the extent that your answer would
4  involve information obtained or directed by
5  counsel subsequent to November 22, I instruct
6  you not to answer. If you can answer the
7  question without relaying information on or
8  after November 22, you may answer.
9 A  Please restate the question.
10         (Question read)
11 A  Yes.
12 Q  Okay. When did you have those conversations with
13    Mr. Ottman?
14 A  I could not recall that.
15 Q  All right. What was the earliest that you had
16    conversations with Mr. Ottman about the 2011
17    redistricting process?
18 A  I don't recall specifically.
19 Q  Did you have conversations with Mr. Ottman about
20    the redistricting process that occurred outside of
21    Michael Best & Friedrich's offices?
22         MR. KELLY: Objection to the extent
23    it calls for information protected by the
24    attorney-client privilege and the work
25    product doctrine. To the extent that that
                    114

1  question requires you to discuss any
2  conversations that occurred subsequent to
3  November 22 at the direction of counsel, I
4  instruct you not to answer. If it does not
5  cover that, you may answer if you know.
6 A  Not that I recall.
7 Q  Have you -- are you going to follow counsel's
8    instruction and not answer the question with
9    respect to conversations with Mr. Ottman after
10    November 22, 2011?
11 A  Yes.
12 Q  All right. Did you ever speak with Mr. Ottman by
13    telephone about the 2011 redistricting process?
14         MR. KELLY: Objection. Mr. Poland,
15    perhaps just for purposes of expediting
16    things, can we segment things between
17    conversations that he's had at the direction
18    of counsel from those that are not?
19         MR. POLAND: Sure. Yeah, I'll --
20    well, why don't I do it by date. That will
21    probably be the easiest way to do it.
22 Q  So before November 22, 2011, did you have any
23    conversations with Mr. Ottman about the 2011
24    redistricting process?
25         MR. MCLEOD: I'm going to assert
                    115

1  the same form objection. It's vague and
2  ambiguous. Please answer if you can.
3 A  Yes.
4 Q  All right. Did any of those conversations occur
5    by telephone?
6 A  Yes.
7 Q  Where were you when you had those phone calls with
8    Mr. Ottman?
9 A  Outside of the Michael Best office.
10 Q  Where were you physically? Were you in Reinhart's
11    offices?
12 A  I can't recall.
13 Q  Do you know where Mr. Ottman was when he was
14    speaking with you?
15 A  Not necessarily, no.
16 Q  Did you have any of those conversations by cell
17    phone?
18 A  I can't -- I can't say that for sure.
19 Q  Did you communicate with Mr. Ottman at all by text
20    messaging?
21         MR. KELLY: Objection. Could we
22    interpose the time frame?
23 Q  Time frame before November 22, 2011. Did you
24    communicate with Mr. Ottman about redistricting by
25    text messaging?
                    116

1  A  Not that I recall.
2  Q  Before November 22, 2011, did you communicate with
3     Mr. Ottman about redistricting through instant
4     messaging?
5  A  I don't -- I'm not sure what instant messaging is.
6  Q  Do you have a Yahoo! account?
7  A  No.
8  Q  Do you have a Google account?
9  A  No.
10 Q  All right.  Do you have a Facebook account?
11 A  Yes.
12 Q  All right.  Have you ever used the instant
13    messaging feature on Facebook for the purpose of
14    redistricting?
15 A  No.
16 Q  Did you ever meet with Mr. Ottman to discuss
17    redistricting in the state capitol building?
18         MR. KELLY:  Prior to November 22?
19 Q  Prior to November 22.
20 A  Yes.
21 Q  When did you meet with Mr. Ottman in the state
22    capitol building?
23 A  I cannot recall the specific date.
24 Q  Do you recall what month it was?
25 A  It was the month -- it was the month when the

                         117

1     assembly and senate actually were taking up that
2     matter.
3  Q  Actually voting on it?
4  A  Yes.
5  Q  Okay.  There was testimony given in support of the
6     acts.  Do you recall that?
7  A  Yes.
8  Q  All right.  And that was in the month of July; do
9     you remember that?
10 A  Yes.
11 Q  And were you present for that testimony when it
12    was given?
13 A  No.
14 Q  All right.  Were you -- did you meet with
15    Mr. Ottman on or around the time that the
16    testimony was given?
17 A  Not that I recall.
18 Q  When you spoke with Mr. Ottman by telephone, what
19    did you discuss about the redistricting?
20 A  Those type of specifics I would have no
21    recollection of.
22 Q  Do you recall how many times you spoke with
23    Mr. Ottman by phone about redistricting?  This is
24    again before November 22.
25 A  No.

                         118

1  Q  When you were present with Mr. Ottman at
2     Michael Best & Friedrich's offices, what did
3     you -- what did you discuss with him about, about
4     the specific redistricting plans that were being
5     drawn?
6          MR. MCLEOD:  I'm going to assert
7     the objection that it constitutes legislative
8     privilege.  It also may be subject to the
9     attorney-client, attorney work product
10    privilege.  As to the latter,
11    attorney-client, attorney work product, I
12    would instruct you not to answer as it
13    relates to the legislative privilege.  In
14    light of the Court's order, if you can
15    answer, please do so.
16 Q  Are you going to follow counsel's instruction not
17    to answer the question?
18 A  Yes.
19 Q  I'd like to ask you -- Mr. Foltz is another person
20    that you had mentioned that was present with you
21    at Michael Best & Friedrich, correct?
22 A  Yes.
23 Q  All right.  And -- actually, strike that question.
24    One cleanup point on discussions with
25    Mr. Ottman.  Have you spoken with Mr. Ottman about

                         119

1     the legislative redistricting process after
2     November 22, 2011?
3  A  Yes.
4  Q  All right.  And what have you discussed with
5     Mr. Ottman after November 22, 2011?
6          MR. KELLY:  Objection, calls for
7     information protected by the attorney-client
8     privilege and work product doctrine.  I
9     instruct the witness not to answer.
10 Q  And are you going to follow counsel's
11    instructions?
12 A  Yes.
13 Q  All right.  Mr. Foltz, you did meet with Mr. Foltz
14    at Michael Best & Friedrich's offices to work on
15    the redistricting plans, correct?
16 A  Yes.
17 Q  All right.  Let's talk first about since
18    November 22.  Have you had conversations with
19    Mr. Foltz, Mr. Foltz since November 22, 2011
20    relating to redistricting?
21 A  Yes.
22 Q  And what are the nature of those conversations?
23         MR. KELLY:  Objection, calls for
24    information protected by the attorney-client
25    privilege and the work product doctrine.  I

                         120

**Page 121**

1    instruct the witness not to answer.
2  Q  And are you going to follow counsel's instruction
3     not to answer the question?
4  A  Yes.
5  Q  All right.  So for Mr. Foltz, the rest of my
6     questions are -- will range from February 15, 2011
7     up until before November 22, okay?
8  A  Okay.
9  Q  Did you know Mr. Foltz before you met with him at
10    Michael Best for the purpose of the 2011
11    redistricting?
12 A  Yes.
13 Q  All right.  How did you know Mr. Foltz beforehand?
14 A  He was and is a staff member in the Office of
15    State Assembly.
16 Q  Okay.  And you knew him through that relationship?
17 A  Yes.
18 Q  Did you -- did you know him in any way outside of
19    that relationship?
20 A  No.
21 Q  Okay.  Do you know anybody else in Mr. Foltz's
22    family?
23 A  Not that I know of.
24 Q  Is Mr. Foltz from Minocqua?
25 A  No.

**Page 122**

1  Q  All right.  There's a Foltz family in Minocqua,
2     correct?
3  A  Yes.
4  Q  And they had been -- the Foltz family in Minocqua
5     had been donors to your campaign when you were
6     serving in the assembly, correct?
7  A  Yes.
8  Q  All right.  Do you know whether Mr. Foltz is
9     related to the Foltz family from Minocqua?
10 A  I do not know that.
11 Q  When you and Mr. Foltz were together at
12    Michael Best & Friedrich, what did you discuss
13    generally with respect to redistricting?
14       MR. MCLEOD:  I'm going to assert
15    the same objection I did before, which is to
16    the extent it calls for information subject
17    to the attorney-client or attorney work
18    product privileges, I instruct the witness
19    not to answer.  To the extent it falls within
20    the scope of the legislative privilege,
21    recognizing the Court's order, you may
22    answer.
23 Q  Can you answer the question?
24 A  No.
25 Q  Okay.  Are you going to follow counsel's

**Page 123**

1     instructions not to answer the question?
2  A  Yes.
3  Q  All right.  Did you ever discuss redistricting
4     with any democratic member of the legislature?
5  A  Yes.
6  Q  And who did you discuss -- which democrats did you
7     discuss redistricting with?
8  A  In 2002 after the maps were unveiled in federal
9     court I had an interchange with Representative
10    Barbara Gronemus.
11 Q  I'm sorry.  Can you spell that?
12 A  Barbara Gronemus.
13 Q  Barbara is the easy one, right?
14 A  Yeah.  G-r-o-n -- I couldn't -- I couldn't -- you
15    couldn't count on my spelling.
16 Q  Okay.  That was around the 2002 time frame?
17 A  Yes.
18 Q  Okay.  Have you discussed the 2011 redistricting
19    process with any member of the democratic party
20    serving in the Wisconsin State Legislature?
21 A  Yes.
22 Q  And who have you spoken with?
23 A  Senator Robert Wirch.
24 Q  When did you speak with Mr. Wirch?
25 A  I can't give you the exact date.

**Page 124**

1  Q  Can you recall approximately what month?
2  A  August.
3  Q  Do you know if it was before or after Acts 43 and
4     44 were passed?
5  A  My recollection is it was after.
6  Q  Any other democratic members of the legislature
7     you can recall discussing the 2011 redistricting
8     with?
9  A  No.
10 Q  Have you ever told anyone that you were not
11    working on the 2011 redistricting process?
12 A  I don't recall that, no.
13 Q  What was your goal in developing the map, the map
14    that became Act 43?
15       MR. KELLY:  Objection, form.
16 A  Can you restate the question?
17 Q  Sure.
18       (Question read)
19 A  I was retained -- Reinhart was retained by
20    Michael Best & Friedrich to give them assistance
21    as they gave counsel to the legislature and
22    development of the apportionment plans following
23    the 2010 census.  My goal was to, as best I could,
24    provide that assistance to the legal counsel so
25    that in the end they were successful in their

1    advice that they would then give to the
2    legislature.
3  Q  Was it not the goal to increase the republican
4    membership in the legislature?
5  A  That is not my goal.
6  Q  What about Act 44; was it not the goal to increase
7    republican membership through Act 44?
8          MR. KELLY:  Objection, form.
9  A  I did not participate in Act 44.
10  Q  Okay.  You had nothing at all to do with Act 44?
11  A  That is correct.
12  Q  When you were at -- when you were at
13    Michael Best & Friedrich working there on the
14    redistricting, did you give any kind of input or
15    commentary on maps that eventually became Act 44?
16  A  Not that I recall.
17  Q  Have you ever discussed the question of district
18    boundaries for senate recall elections?
19          MR. KELLY:  Objection.  Do you want
20        to give a time frame?
21  Q  At any time.
22          MR. KELLY:  I'll object to the
23        extent it calls for information protected by
24        the attorney-client privilege and work
25        product doctrine.  To the extent that you

125

1        can -- that you have information responsive
2        to the question relating to material prior to
3        November 22, 2011, you may answer.  To the
4        extent that your response would involve
5        information subsequent -- or on or after
6        November 22, 2011, I instruct you not to
7        answer.
8  A  Please restate the question.
9  Q  Sure.  Actually, let me withdraw that, and let's
10    limit it in time.
11        So let's talk about before November 22, 2011.
12    Did you ever discuss the question of district
13    boundaries for senate recall elections with
14    anyone?
15  A  Yes.
16  Q  Okay.  Who did you discuss that topic with?
17  A  I know I discussed it with my wife.
18  Q  Okay.  Anyone other than your wife?
19  A  Not that, not that I can recall specifically.
20  Q  Do you recall generally any conversations that you
21    had with anyone on that topic?
22  A  No, I can't.
23  Q  All right.  Now, what about after November 22,
24    2011; did you have -- did you ever discuss the
25    question of the district boundaries for the senate

126

1    recall elections with anyone after November 22,
2    2011?
3          MR. KELLY:  The
4        question calls for information potentially
5        covered by the attorney-client privilege and
6        the work product doctrine.  To the extent the
7        response would involve identifying
8        conversations you had with counsel for the
9        defendants or at the instruction of counsel,
10        then I instruct you not to answer.  If there
11        were other conversations outside of those
12        parameters, then you may answer.
13  Q  Are you going to follow counsel's instructions and
14    not answer the question?
15  A  Yes.
16  Q  Were you involved in drafting the provision that
17    established the effective date for Act 43?
18  A  No.
19  Q  Before November 22, 2011, did you ever have any
20    conversations with anyone about the effective date
21    for Act 43?
22  A  Yes.
23  Q  Okay.  And who did you speak with about that
24    topic?
25  A  Legal counsel.

127

1  Q  And who is that specifically?
2  A  My recollection is that it was Patrick Hodan.
3  Q  And what were the nature of your -- what was the
4    nature of your conversation with Mr. Hodan on that
5    topic?
6          MR. KELLY:  Objection -- or just a
7        clarification.  Was that a conversation
8        before or after November 22?
9        THE WITNESS:  I believe it was
10        before.
11  Q  And what was the nature of your conversation with
12    Mr. Hodan on that subject?
13  A  He asked me the exact question you asked a few
14    moments ago regarding did I have any knowledge of
15    the effective date of Act 43.
16  Q  And how did you respond to Mr. Hodan when he asked
17    you that question?
18  A  No.
19  Q  Have you had any conversations since November 22,
20    2011 with anyone the effective date for
21    Act 43?
22          MR. KELLY:  Objection to the extent
23        the question calls for information covered by
24        the attorney-client privilege or the work
25        product doctrine.  And to that extent I

128

| | |
|---|---|
| 1 instruct the witness not to answer. However, | 1 since that time? |
| 2 you may answer with respect to any | 2 MR. KELLY: Objection to the extent |
| 3 conversations you had that were either not | 3 the question calls for information protected |
| 4 with counsel for the defendants or not at | 4 by the attorney-client privilege or the work |
| 5 counsel's direction. | 5 product doctrine. I instruct the witness not |
| 6 Q Did you have any conversations, non-privileged | 6 to answer to the extent that it does. |
| 7 conversations since November 22? | 7 However, to the extent that you had |
| 8 A Not that I can recall. | 8 conversations that were not with counsel for |
| 9 Q And with respect to any conversations that counsel | 9 the defendants or at the instruction of |
| 10 has objected to, are you going to follow counsel's | 10 counsel, then you may answer. |
| 11 instructions not to answer the question? | 11 A None that I recall. |
| 12 A Yes. | 12 Q And then as far as any privileged conversations or |
| 13 Q Do you have an opinion on the appropriate | 13 any conversations you might have had that counsel |
| 14 boundaries for the pending or potential recall | 14 has asserted a privilege over, are you going to |
| 15 elections? | 15 follow counsel's instructions and not answer the |
| 16 MR. KELLY: Objection, form. You | 16 question? |
| 17 may answer if you can. | 17 A Yes. |
| 18 A Yes. | 18 Q You mentioned before when we were talking about |
| 19 Q Okay. And what is that opinion? | 19 people who were present when you were working at |
| 20 MR. KELLY: Objection, form, but | 20 Michael Best & Friedrich a number of lawyers, |
| 21 you may answer if you can. | 21 correct? |
| 22 A Please restate the underlying question. | 22 A Yes. |
| 23 MR. POLAND: Sure. Can you read | 23 Q All right. And so you mentioned Mr. McLeod was |
| 24 back the question? | 24 present, correct? |
| 25 (Question read) | 25 A Occasionally. |
| 129 | 131 |

| | |
|---|---|
| 1 A I answered that yes. | 1 Q Occasionally. And Mr. Taffora was present |
| 2 Q Yes. | 2 occasionally? |
| 3 A And then -- | 3 A Occasionally. |
| 4 Q And then I asked *What are those opinions?* | 4 Q All right. Which law firm does Mr. Taffora work |
| 5 A What are those opinions? My opinion is I'm just | 5 for? |
| 6 greatly confused how the plaintiffs can charge | 6 A My understanding is that he works at |
| 7 that the map is unconstitutional and then how any | 7 Michael Best & Friedrich. |
| 8 elections can be held under that map. | 8 Q Okay. And then you mentioned Mr. Troupis, |
| 9 Q Okay. And what's the basis for that opinion? | 9 correct? |
| 10 A Purely personal. | 10 A Yes. |
| 11 Q Have you discussed that issue with anyone? | 11 Q And Mr. Troupis formerly was at Michael Best & |
| 12 MR. KELLY: Objection. Would you | 12 Friedrich, correct? |
| 13 care to narrow the scope of the question? | 13 A Yes. |
| 14 Q Is that an opinion that you held before | 14 Q And he now has his own law firm, correct? |
| 15 November 22, 2011? | 15 A That's my understanding. |
| 16 A Yes. | 16 Q Okay. You mentioned Sarah Troupis as well. Is |
| 17 Q Okay. Did you discuss that opinion that you hold | 17 Sarah Troupis a lawyer? |
| 18 with anyone before that time? | 18 A My understanding is she is an attorney, yes. |
| 19 A Yes. | 19 Q Do you know where she -- whether she works for a |
| 20 Q All right. Who did you discuss that with? | 20 law firm? |
| 21 A My wife. | 21 A I don't know for certain. |
| 22 Q Okay. Anyone else? | 22 Q And you mentioned Robin Vos, correct? |
| 23 A Not that I, not that I recall specifically. | 23 A Yes. |
| 24 Q Okay. And then after November 22, 2011, have you | 24 Q Does Robin Vos hold a law degree; do you know? |
| 25 discussed that opinion that you hold with anyone | 25 A Not to my knowledge. |
| 130 | 132 |

1  Q  What about Rich Zipperer?
2  A  My understanding is that, yes, he possesses a law
3     degree.
4  Q  Okay.  But not currently practicing law?
5  A  I would have no knowledge --
6  Q  Okay.
7  A  -- on that.
8  Q  Other than the people that I've just mentioned,
9     Mr. McLeod, Mr. Taffora, Mr. Troupis,
10    Sarah Troupis, depending on whether you want to
11    include Zipperer or not because he has a law
12    degree, are there any other lawyers or people
13    holding law degrees that were present at
14    Michael Best & Friedrich when you were there
15    working on redistricting?
16 A  I do not recall any additional.
17 Q  What was the role that Mr. Troupis was playing in
18    redistricting when you were with him at
19    Michael Best & Friedrich?
20            MR. MCLEOD:  I'm going to assert an
21       objection.  The -- as a matter of record,
22       Attorney Troupis is retained as counsel for
23       the legislature on matters related to
24       redistricting.  To the extent that the answer
25       calls for matters within the scope of the

133

1        attorney-client privilege or the attorney
2        work product, I would instruct the witness
3        not to answer.  I'll leave it at that.
4  Q  Are you going to follow counsel's instruction and
5     not answer the question?
6  A  Yes.
7  Q  Same question with respect to Mr. McLeod.  Did
8     Mr. McLeod have a specific role in the
9     redistricting work that you were doing at
10    Michael Best & Friedrich?
11            MR. MCLEOD:  I'm going to assert
12       the same objection.
13 Q  Okay.  Are you going to follow counsel's
14    instruction not to answer the question?
15 A  Yes.
16 Q  Okay.  Same question with respect to Mr. Taffora.
17            MR. MCLEOD:  I assert the same
18       objection.
19 Q  Okay.  And you're going to follow counsel's
20    instruction and not answer the question?
21 A  Yes.
22 Q  What about Sarah Troupis?
23            MR. MCLEOD:  Same objection.
24 A  Yes.
25 Q  And you're going to -- you're going to follow

134

1        counsel's instruction and not answer the question.
2        Okay.
3            What about -- what about Mr. Vos's role?
4        What role did Mr. Vos have in the redistricting
5        process when you worked together at Michael Best &
6        Friedrich?
7  A  Mr. Vos is a legislature who was assisting the
8     speaker in the legislative process.
9  Q  How many times was Mr. Vos present with you at
10    Michael Best when you were working on the
11    redistricting process?
12 A  I can't recall that exact number.
13 Q  Can you give me a ballpark, dozen times, couple
14    dozen times?
15 A  Ballpark would be two, three.
16 Q  Do you remember around what time frame that was?
17 A  Not exactly.
18 Q  Can you recall whether it was, whether it was
19    still winter or whether it was into the summer?
20 A  It roughly would have been June.
21 Q  Did you have any discussions with Mr. Vos about
22    the specific redistricting plans that were being
23    proposed?
24 A  Yes.
25 Q  Okay.  And what's the nature of those discussions

135

1        you had with Mr. Vos?
2  A  Those type of specifics I couldn't possibly
3     recount or recall.
4  Q  Did you ever talk about any specific districts
5     with Mr. Vos?
6  A  No.
7  Q  Did you ever look at any proposed redistricting
8     maps together and talk about specific boundaries
9     of districts?
10 A  Regionally.
11 Q  And were those the same regions that you had
12    conversations with both Jeff and Scott Fitzgerald
13    about?
14 A  Yes.
15 Q  Do the proposed regional maps still exist; do you
16    know?
17 A  I do not know.
18 Q  The regional maps you were looking at with
19    Mr. Vos, were those also on paper?
20 A  Yes.
21 Q  Did you ever have any kind of an image, a scan, or
22    anything that reflected those regional maps that
23    was sent to you outside of Michael Best's offices?
24 A  No.
25 Q  Did you ever take a CD of those maps out of

136

**Page 137**

1 Michael Best's offices with you?
2 A No.
3 Q Did you communicate at all with Mr. Ottman or
4 Mr. Foltz, Mr. Vos, or Jeff or Scott Fitzgerald by
5 e-mail about the 2011 redistricting?
6 MR. KELLY: Objection. Can we put
7 in a time frame?
8 Q Sure. At any time.
9 MR. KELLY: Then objection to the
10 extent the question calls for information
11 protected by the attorney-client privilege or
12 the work product doctrine. And I instruct
13 the witness not to answer.
14 However, to the extent that you can
15 answer the question with respect to
16 information prior to November 22, 2011, you
17 may answer if you can.
18 Q Are you going to take counsel's instructions and
19 not answer the question with respect to any e-mail
20 after November 22, 2011?
21 A Yes.
22 Q How about before November 22, 2011; did you have
23 any e-mail communications with Mr. Ottman,
24 Mr. Foltz, Scott Fitzgerald, Jeff Fitzgerald, or
25 Robin Vos?

**Page 138**

1 A Yes.
2 Q Okay. Let's break it down and talk about
3 Mr. Ottman. So for Mr. Ottman before November 22,
4 2011, did you have any communications with him by
5 e-mail about redistricting?
6 A Yes.
7 Q How often did you e-mail Mr. Ottman about
8 redistricting?
9 A I cannot recall that specifically.
10 Q And did you send those e-mails through your
11 Reinhart e-mail address?
12 A Sometimes.
13 Q And when you didn't send Mr. Ottman e-mails
14 through your Reinhart e-mail address, what e-mail
15 address did you use?
16 A My personal.
17 Q Okay. And I'm not going to ask you for the e-mail
18 address itself, but is it a Gmail? Is it a Yahoo!
19 mail, Hotmail? Who is the service provider?
20 A It's a dot MSN.
21 Q MSN. Okay. And so you did communicate with
22 Mr. Ottman about redistricting through your
23 dot MSN e-mail address, correct?
24 A Yes.
25 Q Do you recall how many times you communicated with

**Page 139**

1 Mr. Ottman by e-mail?
2 A Specifically, no.
3 Q Do you retain copies of the e-mail correspondence
4 between you and Mr. Ottman about redistricting?
5 A No.
6 Q Did you ever communicate with Mr. Ottman by
7 instant messaging or text messaging about
8 redistricting matters? And, again, this is before
9 November 22, 2011.
10 A Not that I recall.
11 Q Did you communicate with Mr. Foltz before
12 November 22, 2011 by e-mail?
13 A Yes.
14 Q Including specifically with respect to
15 redistricting matters?
16 A Yes.
17 Q All right. Did you communicate with Mr. Foltz
18 both using your Reinhart e-mail account and your
19 dot MSN account?
20 A To my recollection, yes.
21 Q All right. Did you retain any of those e-mail
22 communications?
23 A No.
24 Q Did anyone ever tell you or instruct you not to
25 retain e-mail communications regarding

**Page 140**

1 redistricting?
2 A No.
3 Q Did you ever communicate with Mr. Foltz about
4 redistricting by text messaging or instant
5 messaging?
6 MR. KELLY: Objection. Prior to
7 November 22?
8 Q Prior to November 22.
9 A Yes.
10 Q How did you communicate with Mr. Foltz -- strike
11 that question.
12 Did you communicate with Mr. Foltz by text
13 messaging?
14 A Yes.
15 Q How often did you text Mr. Foltz about
16 redistricting matters?
17 A Oh, I cannot recall that specifically.
18 Q You were using a cell phone when you were texting;
19 is that correct?
20 A Yes.
21 Q And was that a cell phone that was issued to you
22 by the Reinhart law firm?
23 A Yes.
24 Q Is that a cell phone that you still have?
25 A Yes.

1  Q  Did you retain any of the texts that you sent to
2     Mr. Foltz?
3  A  I don't -- I don't believe so.
4  Q  Did Mr. Foltz text back to you as well?
5  A  I believe so.
6  Q  Did you communicate with Mr. Foltz by instant
7     messaging?
8  A  Not that I can recall.
9  Q  Did you communicate with Jeff Fitzgerald
10    personally as opposed to through one of the
11    members of his staff?  Did you communicate with
12    Jeff Fitzgerald personally by e-mail about
13    redistricting matters?
14            MR. KELLY:  Objection.  Time frame?
15 Q  Before November 22, 2011.
16 A  No.
17 Q  Did you communicate with Jeff Fitzgerald by e-mail
18    or text messaging before November 22, 2011 about
19    redistricting matters?
20 A  No.
21 Q  Did you speak by telephone with Jeff Fitzgerald
22    before November 22, 2011 about redistricting
23    matters?
24 A  No.
25 Q  I'm going ask the same questions with respect to

141

1  Q  Scott Fitzgerald.  Before November 22, 2011, did
2     you communicate with Scott Fitzgerald by telephone
3     about redistricting matters?
4  A  No.
5  Q  Did you communicate -- in that same time frame,
6     did you communicate with Scott Fitzgerald by text
7     messaging or instant messaging about redistricting
8     matters?
9  A  No.
10 Q  Did you have any conversations with either
11    Jeff Fitzgerald or Scott Fitzgerald before
12    November 22, 2011 about redistricting matters in
13    person?
14 A  Yes.
15 Q  All right.  Did any of those conversations occur
16    outside of Michael Best & Friedrich's offices?
17 A  Yes.
18 Q  What was the nature of those conversations?
19            MR. MCLEOD:  Object to the form of
20       the question.  To the extent you can answer,
21       please do so.
22 A  I can't -- I can't recall that specifically.
23 Q  Okay.  Generally can you recall what you
24    discussed?
25 A  They were the dates at which the bills were being

142

1     brought up before the legislature.
2  Q  That's when they would have occurred?
3  A  Yes.
4  Q  Okay.  Did you speak with Jeff and
5     Scott Fitzgerald individually, or were they
6     together?
7  A  Together.
8  Q  How many times did you meet with them outside of
9     Michael Best & Friedrich's offices to talk about
10    redistricting?
11 A  Once.
12 Q  Was it before or after the time that the bills
13    were passed into law?
14 A  During.
15 Q  It was during, during the session where they were
16    actually passed.  So you were present when the
17    legislature was voting on those bills?
18 A  Yes.
19 Q  And what did you say to them about, about the
20    redistricting process?
21 A  Specifically, I don't recall.
22 Q  Do you recall generally what was said, what you
23    said?
24 A  Generally I said *I'm here if you have any*
25    *technical questions that come up that I can help*

143

1     *with.*
2  Q  And did they say anything to you generally?
3  A  No.
4  Q  Did you -- did you communicate at all with
5     Robin Vos outside of Michael Best & Friedrich's
6     offices to discuss redistricting?
7            MR. KELLY:  Objection.  Prior to
8       November 22?
9  Q  Prior to November 22.
10 A  Not that I recall.
11 Q  All right.  Did you speak with Robin Vos at all by
12    telephone about redistricting before November 22,
13    2011?
14 A  Not that I recall.
15 Q  What about -- strike that.
16    Did you communicate with Robin Vos about
17    redistricting matters for November 22 by text
18    messaging or instant messaging?
19 A  Not that I recall.
20 Q  Before November 22, 2011, did you communicate with
21    Rich Zipperer about redistricting matters by
22    telephone, e-mail, instant messaging, or text
23    messaging?
24 A  Yes.
25 Q  All right.  What method did you communicate with

144

**145**

1  Rich Zipperer by?
2  A  E-mail.
3  Q  Okay.  When did you and Rich Zipperer communicate
4     by e-mail about redistricting matters?
5  A  I can't recall that specific.
6  Q  Do you recall how often you e-mailed to discuss
7     redistricting matters?
8  A  Not specifically, no.
9  Q  Would that again have been from both your dot MSN
10    account and your Reinhart account?
11 A  I don't recall.
12 Q  Do you recall generally the nature of the
13    discussions or the e-mail correspondence?
14 A  Yes.
15 Q  And what was that?
16 A  He was conducting a hearing on Act 43 and had a
17    couple of questions.
18 Q  What were the questions that he had?
19 A  I don't recall specifically.
20 Q  Did you have answers for him at that time?
21 A  My recollection is that his questions were of the
22    type of things that legal counsel would have to
23    answer.
24 Q  Okay.  Did you --
25 A  So I -- no, I did not have answers for him.

**147**

1  A  Yes.
2  Q  Did you speak with Mr. Gaddie by telephone at all
3     before November 22 about redistricting matters?
4  A  Yes.
5  Q  All right.  How often did you speak with
6     Mr. Gaddie by phone?
7  A  I can't give you a specific number.
8  Q  Was it just a few times?  Was it 15, 20, 30?
9     Could you give me an estimate?
10 A  Just a few.
11 Q  A few times.  All right.  How long were the
12    conversations that you had with -- I should call
13    him Professor Gaddie?
14 A  I can't remember specifically, but they were
15    short.
16 Q  Generally what did you discuss with
17    Professor Gaddie?
18 A  When I was going to pick him up at the airport,
19    how long he would be staying, logistics.
20 Q  How many times did he fly in from Oklahoma to
21    Madison to work on redistricting?
22 A  I can't remember specifically.
23 Q  Was it a handful of times, more than ten?
24 A  Roughly less than a handful.
25 Q  Okay.  Can you ballpark it?  Less than five?

**146**

1  Q  Okay.  So you did not send Mr. Vos answers to --
2     I'm sorry, Mr. Zipperer answers to the questions
3     that he posed to you by e-mail?
4  A  I responded.
5  Q  Okay.  But you didn't have answers?
6  A  I did not provide answers.
7  Q  All right.  Did you forward Mr. Zipperer's e-mail
8     to anyone else to answer his questions?
9  A  I don't -- I don't recall.
10 Q  What about Mr. Gaddie; did you have
11    conversations -- this is before November 22.  Did
12    you have conversations with Mr. Gaddie outside of
13    Michael Best & Friedrich's offices with respect to
14    redistricting?
15 A  Yes.
16 Q  Okay.  Did you meet with Mr. Gaddie in person to
17    talk about redistricting before November 22?
18 A  Yes.
19 Q  All right.  And did any of those meetings occur
20    outside of Michael Best & Friedrich's offices?
21 A  No.
22 Q  So every time that you met with Mr. Gaddie before
23    November 22 for the purpose of the redistricting
24    plan it was always at Michael Best's offices; is
25    that correct?

**148**

1  A  Less than five.
2  Q  When Professor Gaddie came into Madison to work on
3     redistricting, how long did he stay?
4  A  I believe it varied.
5  Q  What was the shortest stay that he had?
6  A  My recollection is a day and a half.
7  Q  How about what was the longest stay?
8  A  My recollection is three days.
9  Q  When he was at Michael Best & Friedrich with you
10    working on redistricting, did Mr. Gaddie direct
11    the preparation of any maps?
12 A  No.
13 Q  Did he give input on any maps that anyone drew?
14 A  No.
15 Q  What was his role in the redistricting process?
16 A  His role was to assist legal counsel in their
17    advice of the legislature on drawing
18    reapportionment plans and was reflective in
19    nature.
20 Q  Okay.  What did you see him physically doing when
21    he was present at Michael Best & Friedrich's
22    offices?
23 A  He physically was engaging in numbers.
24 Q  Okay.  Was he sitting at a computer engaging in
25    numbers?

1  A  No.
2  Q  So what was he doing engaging in numbers?
3  A  More specifically, I can't recall because I --
4     that's -- I didn't fully -- never knew what he was
5     doing.
6  Q  Okay.
7  A  So --
8  Q  All right.  You didn't participate in any
9     calculations with Professor Gaddie?
10 A  No.
11 Q  Did you observe him talking to anyone else who was
12    also present at Michael Best & Friedrich?
13 A  Yes.
14 Q  Who was he speaking with?
15 A  Legal counsel.
16 Q  Mr. McLeod?
17 A  Yes, I have a recollection of him speaking to
18    Mr. McLeod.
19 Q  Mr. Troupis?
20 A  I have a recollection of him speaking with
21    Mr. Troupis.
22 Q  Sarah Troupis?
23 A  I do not have a recollection of him speaking with
24    Sarah Troupis.
25 Q  Ray Taffora?

149

1  Q  Did you -- did you do any work in the
2     redistricting process with respect to the
3     Voting Rights Act?
4  A  Yes.
5  Q  What work did you do with respect to the
6     Voting Rights Act?
7  A  I drew maps that included districts in
8     Milwaukee County.
9  Q  Were those Assembly Districts 8 and 9?
10 A  That includes Assembly Districts 8 and 9.
11 Q  Okay.  So you drew assembly districts in
12    Milwaukee County generally?
13 A  Yes.
14 Q  Did anyone else participate in drawing the
15    assembly districts in Milwaukee County?
16 A  Yes.
17 Q  Who else participated in that process?
18 A  Adam and Tad also drew.
19 Q  They also drew assembly districts in
20    Milwaukee County?
21 A  Yes.
22 Q  Okay.  Did the three of you work together to draw
23    assembly districts in Milwaukee County, or were
24    you drawing them separately?
25 A  We did not draw them together.

151

1  A  I do not have a recollection of him just talking
2     with Ray Taffora.
3  Q  Okay.  Any other legal -- any counsel, legal
4     counsel other than Mr. McLeod or Mr. Troupis that
5     you saw Professor Gaddie speaking with?
6  A  Not to my best recollection.
7  Q  Did you see him, Professor Gaddie, speaking with
8     any non-lawyers?
9  A  Yes.
10 Q  Who was he speaking with who -- people who were
11    not lawyers?
12 A  Tad.
13 Q  Okay.
14 A  Adam.
15 Q  So Mr. Ottman and Mr. Foltz?
16 A  Yes.
17 Q  Okay.  Anyone else?
18 A  Not that I can recall.
19 Q  Do you know what Professor Gaddie was speaking
20    about with Mr. McLeod and Mr. Troupis?
21 A  Yes.
22 Q  Okay.  What were they speaking about?
23 A  The Voting Rights Act.
24 Q  Okay.  What was the nature of those conversations?
25 A  I do not know.  I was not part of those.

150

1  Q  All right.  When you drew assembly districts in
2     Milwaukee County, did you use autoBound software
3     to do that?
4  A  Yes.
5  Q  So that was drawn on a computer as opposed to
6     being drawn on a piece of paper?
7  A  Correct.
8  Q  Did you ever physically draw districts in
9     Milwaukee County on a piece of paper?
10 A  No.
11 Q  What about Mr. Foltz and Mr. Ottman; did they use
12    the autoBound software as well to draw assembly
13    districts in Milwaukee County?
14 A  That's my understanding.
15 Q  Did you ever see them doing that, going through
16    that process of drawing with autoBound?
17 A  Yes.
18 Q  And did you see the maps that they drew for the
19    assembly districts in Milwaukee County?
20 A  Yes.
21 Q  Did you give them any feedback on the maps that
22    they drew in Milwaukee County?
23 A  No.
24 Q  Were the assembly districts that you drew in
25    Milwaukee County different than the ones that

152

VIDEOTAPE DEPOSITION OF JOSEPH W. HANDRICK 12/20/2011

| | |
|---|---|
| 1 | Mr. Foltz and Mr. Ottman drew? |
| 2 A | Yes. |
| 3 Q | All right. Did you compare between the two sets |
| 4 | of assembly districts that were drawn? |
| 5 A | Did we? |
| 6 Q | Yes, you and Mr. Foltz and Mr. Ottman. |
| 7 A | Yes. |
| 8 Q | All right. And what was the nature of the |
| 9 | comparison that was being made? |
| 10 A | That was when that -- those were then presented to |
| 11 | the leaders that we discussed earlier as that |
| 12 | region. |
| 13 Q | Okay. So these are the options that were then |
| 14 | presented to, to -- I've got my list here |
| 15 | somewhere -- that were presented to the |
| 16 | Jeff Fitzgerald and Scott Fitzgerald and then |
| 17 | Robin Vos; is that correct? |
| 18 A | Yes. |
| 19 Q | And did Rich Zipperer have, have a say also in the |
| 20 | options that were presented? |
| 21 A | I don't understand your question. |
| 22 Q | You talked about options that were presented, |
| 23 | right, and they were presented to the legislative |
| 24 | leaders who were there. And so I was wondering |
| 25 | whether in terms of giving input into the options |

153

| | |
|---|---|
| 1 | that were presented whether, whether that was done |
| 2 | for decisions by Jeff and Scott Fitzgerald and |
| 3 | Robin Vos or whether Rich Zipperer also had a say. |
| 4 A | He did not have a say in any of those options that |
| 5 | were presented. |
| 6 Q | Were the Milwaukee -- the assembly districts that |
| 7 | you draw in Milwaukee County, that was one region |
| 8 | then that was being considered; is that correct? |
| 9 A | Yes. |
| 10 Q | Who made the final decision with respect to which |
| 11 | assembly districts were, were used in Act 43? |
| 12 | MR. MCLEOD: Object to the form of |
| 13 | the question. I think it's vague and |
| 14 | ambiguous. To the extent you can answer the |
| 15 | question, please do so. |
| 16 A | The state legislature. |
| 17 Q | Okay. Did -- was there a selection made by any of |
| 18 | the legislatures who were present at |
| 19 | Michael Best & Friedrich's offices about which |
| 20 | assembly districts in Milwaukee County would be |
| 21 | the ones included in Act 43? |
| 22 A | Can you please restate that question? |
| 23 | MR. POLAND: Can you read it? |
| 24 | (Question read) |
| 25 A | I don't believe so. |

154

| | |
|---|---|
| 1 Q | Do you know, was there -- do you know who decided |
| 2 | selecting from the various options that were |
| 3 | presented at Michael Best's offices which ones |
| 4 | would be included in Act 43? |
| 5 A | I believe they deferred to their legal counsel. |
| 6 | MR. POLAND: Okay. Do you want to |
| 7 | take a break now? |
| 8 | MR. MCLEOD: Sure. |
| 9 | (Lunch Recess) |
| 10 Q | Mr. Handrick, we just had a lunch break. During |
| 11 | the lunch break did you talk to anybody about the |
| 12 | redistricting process or about the redistricting |
| 13 | litigation? |
| 14 A | No. |
| 15 Q | You didn't. Okay. I'm going to try to do |
| 16 | something here to speed things up a little bit for |
| 17 | at least some of us present. There are different |
| 18 | claims that pertain to Act 43 and 44 that are at |
| 19 | issue in this lawsuit. Do you understand that? |
| 20 A | Yes. |
| 21 Q | There are some challenges to Act 43 and then to |
| 22 | Act 44. Do you understand that? |
| 23 A | Yes. |
| 24 Q | All right. And Act 44 is the congressional |
| 25 | districts, correct? |

155

| | |
|---|---|
| 1 A | Yes. |
| 2 Q | All right. Did you have anything to do with the |
| 3 | drawing districts for the congressional districts |
| 4 | for Act 44? |
| 5 A | No. |
| 6 Q | I'd like you to take a look at Exhibit 10, please, |
| 7 | which are the Rule 26 disclosures. And I'd like |
| 8 | you to turn to page 5, which is paragraph 10. We |
| 9 | talked about this one a little bit before, but I |
| 10 | want to go back specifically and ask you with |
| 11 | respect to Act 44. If you flip the page over to |
| 12 | page 6, you'll see that your name is identified in |
| 13 | conjunction with the answer to paragraph 10. Do |
| 14 | you see that? |
| 15 A | Yes. |
| 16 Q | All right. Do you see also then in paragraph 10 |
| 17 | it refers to state and congressional districts as |
| 18 | memorialized in Acts 43 and 44; do you see that? |
| 19 A | Yes. |
| 20 Q | All right. Did you have anything to do with the |
| 21 | determining the appropriate constitutional |
| 22 | boundaries for the congressional districts as |
| 23 | memorialized in Act 44? |
| 24 A | No. |
| 25 Q | Then we had gone over the same paragraphs earlier |

156

VIDEOTAPE DEPOSITION OF JOSEPH W. HANDRICK 12/20/2011

1   today as well, the following paragraphs, 11, 12,
2   13, 14, 15, 16, and 17 where your name also
3   appears.  And did you do anything with respect to
4   the congressional districts or Act 44 with respect
5   to the items that are identified in those
6   paragraphs?  You can take a minute to look through
7   if you want.
8 A That's 11 through --
9 Q 11 through 17.
10 A No.
11 Q Do you know who -- do you know who did?  Do you
12   know who was involved in drawing the redistricting
13   plans for the congressional districts?
14 A No.
15 Q Did you have any conversations with anyone about
16   the drawing of the districts, the congressional
17   districts for Act 44?
18 A Yes.
19 Q Who did you speak with about that?
20 A Tad Ottman.
21 Q When did you speak with Mr. Ottman about the
22   congressional districts?
23 A I can't remember the particular date.
24 Q Was it before or after the Act 44 was passed by
25   the legislature?

157

1 A That would have been before.
2 Q What was the nature of the conversations that you
3   had with Mr. Ottman about congressional districts?
4 A The nature of it was I read in the
5   Milwaukee Journal that the congressmen had agreed
6   to a plan.
7 Q Okay.  And you made that comment to Mr. Ottman?
8 A I -- we had a discussion whether or not he saw the
9   same thing.
10 Q Okay.  And what was Mr. Ottman's response to that?
11 A He -- he had.
12 Q Okay.  Did he -- did Mr. Ottman indicate to you
13   that he participated in the drawing of the
14   congressional districts?
15 A No.
16 Q Did Mr. Ottman identify anyone who had
17   participated in determining what the boundaries
18   should be for the congressional districts?
19 A No.
20 Q And other than Mr. Ottman, did you ever have any
21   communications with anyone else about, about
22   drawing the congressional districts in Act 44?
23 A None that I recall.
24          MR. POLAND:  Let's go off the
25   record just a second.

158

1          (Discussion off the record)
2 Q Mr. Handrick, looking at that document that's in
3   front of you still -- and that's Exhibit No. 10 --
4   I'd like to draw your attention to page 12 of that
5   document.  And you'll see a heading B there that
6   says *Potentially relevant documents*.  Do you see
7   that?
8 A Yes.
9 Q And if you jump down to the very last one that's
10   identified, paragraph No. 7, it states -- well, to
11   read the introductory part of that it says
12   "Defendants may use the following documents to
13   support their defenses in this matter."  I'm going
14   to jump down to No. 7, which says "Expert reports
15   and analysis, if any, in the possession of the
16   Legislature, and/or its various bodies, that were
17   utilized to draft the 2011 legislative maps at
18   issue."  Do you see that language?
19 A Yes.
20 Q All right.  Did you prepare any reports or
21   analysis that were provided to the legislature or
22   members of the legislature as part of your work in
23   redistricting?
24 A No.
25 Q Did you -- did you prepare any reports generally

159

1   as part of your work on legislative redistricting
2   in 2011?
3          MR. MCLEOD:  Can I have the
4   question read back, please.
5          (Question read)
6 A No.
7 Q Did you prepare any analysis as part of your work
8   in the 2011 legislative redistricting?
9 A Yes.
10 Q Do you -- who did you prepare that for -- or
11   strike that question.
12     Who did you provide with that analysis?
13 A That would have been provided to Tad and/or Adam.
14 Q And did you provide it to them when you were
15   working together at Michael Best & Friedrich's
16   offices?
17 A Yes.
18 Q Did you ever provide them with any analysis
19   outside of Michael Best & Friedrich's offices?
20 A No.
21 Q Was the analysis that you gave to them in written
22   form, electronic form?  Was it verbal?
23 A It would have been written.
24 Q What was the nature of the written analysis that
25   you provided to Mr. Ottman and Mr. Foltz?

160

1  A  I would have provided them something like this
2     (indicating).
3  Q  Okay.  So now this is part of Exhibit No. 2,
4     correct?
5  A  I believe so, yes.
6  Q  I think it is part of Exhibit 2.  And these were
7     your handwritten notes?
8              COURT REPORTER:  Is that a yes or
9          no?
10 A  Yes.
11 Q  I'm sorry.  That's right.  I should remember --
12    remind you to answer audibly.  Okay.
13        What is -- what's represented in these
14    handwritten notes that are part of Exhibit 1?
15 A  This is for a map, a listing of MCD, ASM splits.
16 Q  Okay.  And what are ACD -- I'm sorry, MCD, ASM
17    splits?
18 A  MCD stands for minor civil division.  ASM is an
19    abbreviation for assembly.
20 Q  Okay.  What is minor civil division?  What's the
21    meaning of that term?
22 A  That would be a town, a village, or a city.
23 Q  Okay.  And so there are -- is this a listing then
24    of the counties in Wisconsin?
25 A  Yes, this is a listing of the counties.

161

1  Q  And let's -- so I understand this, up at the top
2     in the left-hand corner, it looks like -- is that
3     EDL at the very top?
4  A  It looks to me to be FDL.
5  Q  That's an FDL.  Okay.  And what does the FDL stand
6     for?
7  A  Fond du Lac.
8  Q  Got it.  Okay.  And then there's an equal sign
9     next to Fond -- the FDL, correct?
10 A  Yes.
11 Q  It says equal zero; is that correct?
12 A  Correct.
13 Q  And then does it say Calumet after that?
14 A  Yes.
15 Q  All right.  So what does the FDL equal zero
16    signify?
17 A  For all the other counties it appears that if
18    there was no municipality split, the zero meant
19    there were no municipalities within that county
20    split.
21 Q  And that would be -- would that be both minor
22    civil divisions and -- or I'm sorry.  Strike that
23    question.
24        And so that means even municipalities
25    regardless of size that would be split; is that

162

1     correct?
2  A  Correct.
3  Q  Okay.  And do you know what the Calumet after the
4     FDL equals zero signifies?
5  A  Calumet is a town within Fond du Lac County.
6  Q  Okay.  And why was that written down there?
7  A  Because to the left there's a 1.
8  Q  Okay.
9  A  And that would be the 1 within FDL.
10 Q  Okay.  So what does the zero then signify next to
11    it?
12 A  I believe that that zero was then crossed out.
13 Q  Oh, I see.  Okay.  That's not like a computer zero
14    where you put a line through it.  Okay.  All
15    right.
16        What about below that?  Now, there's an
17    Adams, and it says Adams equals zero, but it's got
18    that same line through it.
19 A  That would indicate within Adams County there were
20    no municipalities on this map that I could see
21    that were split.
22 Q  Okay.  So if we've got -- for example, we've got
23    Ashland, Bayfield, Burnett, Barron.  Those all
24    have zeros next to them, so there were no
25    municipalities split in those counties, according

163

1     to the map that this pertains to?
2  A  That's my understanding, yes.
3  Q  Up in the right-hand corner it appears there is
4     a -- it looks like a 58 scratched out and 57.
5     What's the significance of that 57?
6  A  I can't state for certain, but it appears to be
7     the number of municipalities that are listed added
8     together.
9  Q  Okay.  And that would be the municipalities that
10    were split?
11 A  Yes.
12 Q  Okay.  So if we go to Brown County, we've got
13    four municipalities split, Green Bay, Howard,
14    De Pere, and I can't quite make out the last one.
15    Can you read that one?
16 A  I believe it says Ledgeview.
17 Q  Ledgeview.  Okay.  So with this map that this
18    pertains to, there was a split in those
19    municipalities; they were split among different
20    assembly districts?
21 A  Correct.
22 Q  All right.  And then for Calumet County, there was
23    one split, and that is Menasha; is that right?
24 A  Menasha city.
25 Q  Menasha city.  Okay.  And for Dane County there

164

1   were nine splits, correct?
2   A   Correct.
3   Q   And that was the -- those splits were among the
4       municipalities that are listed, correct?
5   A   Correct.
6   Q   And so we could go through and follow those
7       through.  In each place where there's a number on
8       the left, it signifies the number of
9       municipalities split, and then you've written down
10      which municipalities those were, correct?
11  A   Correct.
12  Q   Is there any way that you can tell what particular
13      map this pertained to?
14  A   No, there's not.
15  Q   So this, this is a report or this is an analysis I
16      should say that, that you created, correct, and
17      that you gave to Mr. Ottman and to Mr. Foltz?
18  A   Correct.
19  Q   What was the purpose of giving this particular
20      analysis to Mr. Ottman and Mr. Foltz?
21  A   I did not have the ability to run reports, so I
22      would do my own.
23  Q   Okay.  In handwritten form?
24  A   Yes.
25  Q   All right.  And when you say you didn't have the

                        165

1       ability to run reports, is there a particular
2       software program or application that reports can
3       be run in with this kind of information?
4   A   I believe autoBound can run a report.
5   Q   All right.  Why did you not have the ability to
6       run reports in autoBound?
7   A   I never learned how to run any reports off of the
8       software.
9   Q   So you could operate the autoBound software for
10      the purpose of drawing districts, but you didn't
11      have the technical training to be able to print
12      the reports?
13  A   That's correct.
14  Q   If you wanted to have a report printed while you
15      were doing the redistricting work at
16      Michael Best's offices, did you typically ask
17      Mr. Ottman or Mr. Foltz to run a report for you?
18  A   Yes.
19  Q   All right.  Did they then give the reports to you
20      in a printed format, or did you look at them on a
21      computer screen?
22  A   Printed.
23  Q   Do you know approximately how many printed reports
24      you would have created as part of the
25      redistricting process?

                        166

1   A   No, I don't.
2   Q   Any idea whether it's a handful, a dozen, a couple
3       dozen?
4   A   I would roughly say a couple dozen.
5   Q   Do you know what happened to those printed
6       reports, whether they were retained or whether
7       they were given to anyone?
8   A   No, I don't.
9   Q   But you didn't retain them yourself; you didn't
10      take them out of Michael Best's offices and retain
11      them?
12  A   That's correct.
13  Q   Do you know -- and I'm just asking for your own
14      personal knowledge.  Do you know whether any of
15      those reports were given to any members of the
16      legislature?
17  A   I do not know that.
18  Q   What other types of reports did you ask Mr. Ottman
19      and Mr. Foltz to print for you?
20  A   Primarily population report.
21  Q   And what would a population report consist of?
22      The one with the red --
23  A   A population report would show a district number,
24      the total number of persons, the target
25      population, the deviation percent, the difference,

                        167

1       and four -- the four categories on the right side.
2   Q   Okay.  And so that's -- that's -- the columns are
3       Black, Hispanic, Black 18 percent,
4       Hispanic 18 percent; is that correct?
5   A   Yes.
6   Q   So this -- the document that you're holding that
7       we marked as Exhibit 2A, I believe, that is an
8       example of a population report printed from
9       autoBound?
10  A   Yes.
11  Q   All right.  What is the -- what is the column --
12      or what do the columns Black and Hispanic signify
13      in Exhibit 2A?
14  A   My understanding is the Black column represents
15      the total number of African-American residents in,
16      in that column.
17  Q   Okay.
18  A   I do not know precisely what the Hispanic category
19      to which that refers.
20  Q   And what about the columns that follow
21      Black 18 percent, Hispanic 18 percent; what does
22      that signify?
23  A   Black 18 percent, as I understand it, is the -- of
24      the people that are over 18 years of age, what
25      percent are African-American.

                        168

1  Q  So that would be the voting age population?
2  A  Yes.
3  Q  And does that hold true as well with the
4     Hispanic 18 percent column?
5  A  Yes.
6  Q  What was the purpose of having that data on a
7     population report printed from autoBound?
8  A  I believe that was the standard way in which those
9     reports were produced.
10 Q  It would format it automatically to print in that
11    way?
12 A  That's my understanding, yes.
13 Q  Did you have -- did you ask Mr. Foltz or
14    Mr. Ottman to print additional population reports
15    for you as you went through the redistricting
16    process between February and in the time that the
17    act was passed?
18 A  Yes.
19 Q  Did you ask that data other than categories of
20    data -- other than the data that's reflected in
21    Exhibit 2A be included in any of the reports that
22    were printed?
23 A  No.
24 Q  So they all contained the same data -- well,
25    strike that question.

169

1     They all contained the same kind of data, the
2     same headings and the columns as with Exhibit 2A?
3  A  That's correct.
4  Q  What use did you make of the population reports
5     when they were printed for you?
6  A  One use is at the bottom of page 2.  It says
7     Unassigned.  If there were blocks or people
8     unassigned, they would show up there.
9  Q  And so the unassigned, would that have been --
10    would that have been census blocks that were
11    unassigned to a district that would show up there?
12 A  Could be.
13 Q  What other -- what other kinds of categories would
14    show up as unassigned?
15 A  It could be any level of geography that is
16    unassigned.
17 Q  Okay.  So it could be a ward boundary if wards
18    were being used; is that correct?
19 A  Not a boundary.
20 Q  I'm sorry.  What would it be with respect to a
21    ward; what would it be?
22 A  If there was any unit of geography that was not
23    assigned, the number of people in that unit of
24    geography would appear at the bottom.
25 Q  I see.  Okay.  I got you.  Would -- strike that

170

1     question.
2        The level of geography that was being used
3     for the redistricting process was census blocks,
4     correct?
5  A  Depends.
6  Q  All right.  Were there other units of geography or
7     levels of geography being used for redistricting
8     in 2011 other than census blocks?
9  A  Yes.
10 Q  What other levels of geography were used?
11 A  Counties, municipalities.
12 Q  Anything else?
13 A  No.
14 Q  Other than the population reports, were there any
15    other kinds of reports that you asked to be
16    created for you, printed for you as part of the
17    redistricting process?
18 A  Yes.
19 Q  What other kinds of reports did you ask to be
20    created or printed?
21 A  I would ask for a splits report to be created.
22 Q  And what is a splits report?
23 A  It's a report that would indicate municipalities
24    and/or counties that are divided between one or
25    more legislative districts.

171

1  Q  And so that was the -- the handwritten example
2     that you showed us before from Exhibit 2, would
3     that be a handwritten example of what would then
4     be reflected in the splits report?
5  A  Yes.
6  Q  Did a splits report -- strike that question.
7        Were splits reports generated from autoBound?
8  A  As far as I know, yes.
9  Q  Did splits reports reflect any information other
10    than what was reflected in the handwritten notes
11    included with Exhibit 2?
12 A  I would -- I would have to compare that
13    appropriate splits report to the handwritten
14    equivalent.
15 Q  Okay.  Did you have splits reports actually
16    printed for you by Mr. Foltz and Mr. Ottman?
17 A  Yes.
18 Q  All right.  So you -- that was done over at
19    Michael Best & Friedrich's offices?
20 A  Yes.
21 Q  And you did not retain any copies of those
22    reports, correct?
23 A  That is correct.
24 Q  What were splits reports used for?
25 A  As I would prepare this handwritten splits report,

172

1  I would then use the splits report to compare it
2  to the handwritten version to see if the computer
3  identified splits that I was not aware of.
4  Q  And once you had the information that there were
5  splits, what did you do with that information?
6  A  If there were discrepancies, I would seek to find
7  those splits that I was not aware of.
8  Q  And then what would you do with respect to splits
9  that you found that you hadn't been aware of?
10  A  I would go and find those and try to identify the
11  reason the computer was identifying them.
12  Q  Identifying them as being split?  Okay.  You have
13  to answer audibly.
14  A  Yes.
15  Q  And then if you found that -- if you found the
16  reason that the computer had identified them as
17  being split, what did you do with that
18  information?
19  A  If the computer identified it as being split and I
20  wasn't aware that it was split, that indicated
21  that there was just a technical provision in the
22  map that then -- that was not intended, so I would
23  go in and find that municipality and find the
24  source of the split and correct it.
25  Q  Meaning you'd try to keep the municipality from

173

1  being split?
2  A  Yes.
3  Q  Did that happen very often, that the computer had
4  some kind of a technical issue that you had to go
5  back and correct the split?
6  A  No.
7  Q  Any idea how many times that happened during the
8  2011 redistricting process?
9  A  Not precisely, no.
10  Q  If you could set that back down, set that aside.
11      Mr. Ottman, just before we broke for lunch we
12  were talking about conversations that you had with
13  some of the people who were not lawyers when you
14  were working over at Michael Best & Friedrich on
15  the redistricting earlier this year.  I want to go
16  back, and I want to ask you some questions about
17  the lawyers that you were working with when you
18  were there.
19      You mentioned before that Jim Troupis,
20  Sarah Troupis, Eric McLeod, and Ray Taffora all
21  were over at Michael Best, not saying at the same
22  time, but at various times during your work there
23  and that you were, you were present at the same
24  time they were present, correct?
25  A  Yes.

174

1  Q  All right.  With respect to Jim Troupis, did you
2  work directly with Mr. Troupis in developing the
3  maps that would become 2011 Wisconsin Act 43?
4  A  No.
5  Q  What was Mr. Troupis's role at Michael Best &
6  Friedrich during the redistricting process that
7  you went through in the Michael Best & Friedrich
8  offices?
9  A  Mr. Troupis's role was the same role as
10  Michael Best & Friedrich.
11  Q  Okay.  And that was what?
12  A  My understanding is they were retained by the
13  legislatures to give advice as to the development
14  of redistricting plans following the 2010 census.
15  Q  All right.  And in terms of drawing -- in terms of
16  drawing maps, was Mr. Troupis present when
17  legislative district maps were being drawn?
18  A  No.
19  Q  Did you ever observe Mr. Troupis working with
20  Mr. Ottman or Mr. Foltz when Mr. Ottman and
21  Mr. Foltz were in the process of drawing
22  legislative district maps?
23  A  No.
24  Q  Was Mr. Troupis ever on the telephone with
25  Mr. Foltz and Mr. Ottman that you observed or

175

1  heard when they were in the process of drawing
2  legislative district maps?
3  A  Not that I can recall.
4  Q  Did you ever -- did you ever observe Mr. Troupis
5  giving any direction to Mr. Foltz or Mr. Ottman
6  with respect to the legislative districts?
7  A  No.
8  Q  Did you ever speak with Mr. Troupis by telephone
9  about the legislative redistricting process?
10  A  Yes.
11  Q  When did you speak with Mr. Troupis about the
12  legislative redistricting process by phone?
13  A  I can't recall.
14  Q  It was after the time that you were retained in
15  February; is that correct?
16  A  Yes.
17  Q  What was the nature of the conversation that you
18  had with Mr. Troupis?
19      MR. MCLEOD:  I'm going to object to
20  the question on the grounds that it calls for
21  attorney-client, attorney work product
22  information, conversations between counsel
23  and experts retained.  Non-testifying expert
24  consultants are within the scope of the
25  privilege, and I'm going to direct the

176

**177**

1  witness not to answer that question.
2 Q Are you going to take counsel's advice and not
3  answer the question?
4 A Yes.
5 Q What about text messaging, e-mail, or instant
6  messaging with Mr. Troupis; did you ever engage in
7  any of those with respect to redistricting?
8 A Possibly e-mailing.
9 Q Do you recall when you would have e-mailed
10  Mr. Troupis about redistricting?
11 A Not specifically, no.
12 Q Would that have been from your Reinhart e-mail
13  account or your dot MSN account?
14 A It would depend where I was at the time.
15 Q Do you have any specific recollection of sitting
16  in your office at Reinhart and e-mailing with
17  Mr. Troupis?
18 A No.
19 Q Do you have a handheld device that e-mails, a
20  BlackBerry or an iPhone?
21 A Yes.
22 Q Is it a BlackBerry?
23 A Yes.
24 Q The e-mails that you exchanged with Mr. Troupis --
25  strike that question.

**178**

1      How often did you e-mail with Mr. Troupis
2  about legislative redistricting?
3 A I don't recall specifically.
4 Q How about Sarah Troupis; was she present at
5  Michael Best's offices when Mr. Foltz and
6  Mr. Ottman were engaging in work with maps for the
7  new legislative districts?
8 A Not to my knowledge.
9 Q What was Sarah Troupis's role, as far as you could
10  tell, in the legislative redistricting process?
11 A I don't know.
12 Q When she was present at the Michael Best offices
13  and you were there as well, what did you observe
14  her doing?
15 A I did not observe her doing anything.
16 Q You just saw her; she was there?
17 A Yes.
18 Q Did you overhear her having conversations with
19  anyone at Michael Best?
20 A No.
21 Q Did you speak with her when you were both at
22  Michael Best & Friedrich at the same time during
23  the time that you were working on the
24  redistricting?
25 A Aside from pleasantries, hello and good-bye, no.

**179**

1 Q So no substantive discussions about the
2  redistricting process?
3 A That's correct.
4 Q Did you ever send any e-mails to Sarah Troupis or
5  receive any e-mails from her regarding the
6  legislative redistricting process?
7 A No.
8 Q What about text messages or instant messaging; did
9  you ever engage in either of those forms of
10  communication with Sarah Troupis about
11  redistricting?
12 A No.
13 Q Ray Taffora you also mentioned is a Michael Best &
14  Friedrich attorney who was present with you at
15  times while you were engaging in your legislative
16  redistricting work, correct?
17 A Yes.
18 Q Was Mr. Taffora present with you every time that
19  you were at Michael Best doing that work?
20 A No.
21 Q Can you give me any idea of the percentage of
22  times that Mr. Taffora was present?
23 A Under ten.
24 Q What did you observe Mr. Taffora doing while he
25  was, while he was present and you were working on

**180**

1  legislative redistricting at Michael Best?
2      MR. MCLEOD: Can I hear the
3      question back again, please?
4      (Question read)
5 A I did not observe him doing anything.
6 Q You simply noted that he was present; is that
7  correct?
8 A Yes.
9 Q Did you ever observe Mr. Taffora speaking with
10  Mr. Ottman or Mr. Foltz?
11 A Yes.
12 Q How often did you see Mr. Taffora speaking with
13  Mr. Foltz and Mr. Ottman?
14 A I can't recall that specifically.
15 Q Were you able to hear the conversations that they
16  were having?
17 A No.
18 Q Did you ever overhear anything Mr. Taffora was
19  saying to Mr. Ottman or Mr. Foltz about
20  redistricting?
21 A Not that I can recall.
22 Q Did Mr. Taffora ever give you any instructions
23  about legislative redistricting?
24 A No.
25 Q Did you ever talk with Mr. Taffora about the

1     legislative redistricting process?
2 A  Yes.
3 Q  What was the nature of the conversations that you
4     had with Mr. Taffora about the legislative
5     redistricting process?
6         MR. MCLEOD: I'm going to assert
7     the same objection as the one previously, and
8     that is that it constitutes attorney-client,
9     attorney work product because Mr. Handrick is
10    a retained non-testifying expert. And I'll
11    instruct him not to answer the question.
12 Q  Are you going to follow counsel's instruction and
13    not answer the question?
14 A  Yes.
15 Q  Did you ever communicate with Mr. Taffora by
16    e-mail about legislative redistricting?
17 A  Yes.
18 Q  How often did you communicate with Mr. Taffora by
19    e-mail?
20 A  I don't know.
21 Q  Was it a regular thing that you and Mr. Taffora
22    e-mailed back and forth?
23 A  No.
24 Q  Did you also communicate with Mr. Taffora by
25    e-mail through your Reinhart and your dot MSN

                181

1     accounts?
2 A  Yes.
3 Q  Did you ever text message or instant message
4     Mr. Taffora regarding legislative redistricting?
5 A  Not that I recall.
6 Q  What was the nature of the e-mail communications
7     that you had with Mr. Taffora about legislative
8     redistricting?
9         MR. MCLEOD: I'm going to assert
10    the same objection. It constitutes
11    attorney-client, attorney work product
12    information. I'm going to instruct the
13    witness not to answer.
14 Q  And you're going to follow counsel's instruction
15    not to answer the question?
16 A  Yes.
17 Q  And then the other lawyer that you had mentioned
18    is Mr. McLeod. He was present as well during the
19    time that you were working on legislative
20    redistricting at Michael Best?
21 A  Yes.
22 Q  Did you have -- strike that question.
23     How often was Mr. McLeod present while you
24    were working at Michael Best's offices?
25 A  I can't recall specifically.

                182

1 Q  Was it more or less often than Mr. Taffora was
2     there?
3 A  My recollection would be more.
4 Q  What did you observe Mr. McLeod doing while you
5     were working on legislative redistricting at
6     Michael Best?
7 A  You dropped your mike.
8 Q  Oh, thank you.
9 A  Mr. McLeod -- I observed Mr. McLeod giving me
10    guidance and direction as to the objective
11    redistricting criteria.
12 Q  What was the nature of the guidance and direction
13    that Mr. McLeod gave you regarding redistricting
14    criteria?
15         MR. MCLEOD: I'm going to assert
16    the same objection. It constitutes
17    attorney-client, attorney work product
18    communication. I'm going to instruct the
19    witness not to answer.
20 Q  Are you going to follow counsel's instructions and
21    not answer the question?
22 A  Yes.
23 Q  Did you observe Mr. McLeod speaking with
24    Mr. Ottman and Mr. Foltz about redistricting
25    matters?

                183

1 A  Yes.
2 Q  Were you able to hear what Mr. McLeod was saying
3     to Mr. Foltz and Mr. Ottman?
4 A  Not that I recall.
5 Q  All right. Do you know whether Mr. McLeod was
6     giving direction to Mr. Foltz and Mr. Ottman about
7     drawing legislative district boundaries?
8 A  I would have -- I would not know that, no.
9 Q  Did you communicate with Mr. McLeod by e-mail
10    regarding legislative redistricting matters?
11 A  Yes.
12 Q  How often did you communicate with Mr. McLeod by
13    e-mail?
14 A  I can't recall specifically.
15 Q  Was it frequent?
16 A  No.
17 Q  Would it be perhaps on the order of weekly?
18 A  No.
19 Q  Less often than weekly?
20 A  Yes.
21 Q  And when you did communicate with Mr. McLeod by
22    e-mail, was that again through your Reinhart
23    e-mail account and your dot MSN account?
24 A  My recollection is that would have only been
25    through the Reinhart e-mail account.

                184

```
 1   Q  What was the nature of the communications that you
 2      and Mr. McLeod had by e-mail regarding legislative
 3      redistricting?
 4              MR. MCLEOD:  I'm going to assert
 5      the same objection.  It's attorney-client,
 6      attorney work product information.  And I'll
 7      instruct the witness not to answer.
 8              MR. EARLE:  Doug, this is
 9      Peter Earle on the line.
10              MR. POLAND:  Yes, Peter.
11              MR. EARLE:  Are you aware that the
12      Court just issued an order a few seconds ago?
13              MR. POLAND:  No, I wasn't.
14              MR. EARLE:  With regards to the
15      issues of attorney-client privilege and
16      perhaps -- I've not had a chance to review
17      it, but it may be pertinent to the -- some of
18      the objections that are being asserted here.
19              MR. POLAND:  Okay.  I haven't had
20      the opportunity to look at it either.  Let me
21      just finish up two more questions.  Then
22      we'll take a break here for the changing of
23      the videotape.
24          Did you -- I'm sorry.  Can you read back
25      the last question and answer?
```
185

```
 1          (Question read)
 2              MR. POLAND:  Okay.  Did I ask him
 3      if he's going to follow counsel's
 4      instruction?
 5   Q  Are you going to follow counsel's instruction and
 6      not answer the question?
 7   A  Yes.
 8   Q  Did you ever text message with Mr. McLeod
 9      regarding legislative redistricting?
10   A  Not that I recall.
11   Q  Did you ever instant message with Mr. McLeod
12      regarding legislative redistricting?
13   A  Not that I recall.
14              MR. POLAND:  All right.  Let's take
15      a break.  Then we can change the tape.
16              (Recess)
17              MR. MCLEOD:  This is Eric McLeod.
18      While we were off the record we discussed a
19      decision from Judge Stadtmiller concerning a
20      motion for clarification that the non-parties
21      I represent have filed in relation to the
22      prior motion to quash and the Court's order
23      on that motion.
24          We have agreed off the record that we
25      will proceed as we had prior to this order
```
186

```
 1      being issued today.  We will assert relevant
 2      objections we think are appropriate
 3      concerning attorney-client, attorney work
 4      product privileges and may instruct the
 5      witness not to answer on those grounds with
 6      the assumption that we will be pursuing an
 7      appeal of Judge Stadtmiller's orders
 8      concerning attorney-client, attorney work
 9      product privilege and that we'll do so by the
10      end of this week.
11          And if there is no action from an
12      appellate court or other court that would
13      result in a stay of any further deposition of
14      Mr. Handrick or reversal of this order in a
15      way that changes the issues here, that -- and
16      if that does not occur by the end of next
17      week, which I believe would be the 20 -- the
18      30th of -- the Friday of next week, which I
19      believe is the 30th of December, that we
20      would make Mr. Handrick available during the
21      following week after the new year for a
22      continuation of his deposition.
23          And obviously if for any reason we
24      refuse to do that under the circumstances, we
25      would acknowledge that the other parties
```
187

```
 1      could move to compel as they deem
 2      appropriate.
 3              MR. POLAND:  We're in agreement.
 4              MR. MCLEOD:  Okay.  Thank you.
 5      Peter, do we have your agreement too?
 6              MR. EARLE:  Yes, we do.  I'm sorry.
 7              MR. MCLEOD:  And Scott?
 8              MR. HASSETT:  Yes.
 9          (Exhibit Nos. 14 and 15 marked for
10          identification)
11   Q  Mr. Handrick, I'm going to hand you two documents
12      that the court reporter has marked as Exhibits 14
13      and 15.  This is going to be 14 (indicating).
14      This is 15 (indicating).
15          On Exhibit No. 14, Mr. Handrick, this is a
16      printout of a Wisconsin State Statute, and I'd
17      like to draw your attention to Statute
18      Section 801.50.  Then about halfway down the page
19      there's a sub 4m.  Do you see that, sir?
20   A  Yes.
21   Q  All right.  And that statute provides "Venue of an
22      action to challenge the apportionment of any
23      congressional" state -- I'm sorry, "any
24      congressional or state legislative district shall
25      be as provided in s. 751.035.  Not more than
```
188

1  5 days after an action to challenge the
2  apportionment of a congressional or state
3  legislative district is filed, the clerk of courts
4  for the county where the action is filed shall
5  notify the clerk of the supreme court of the
6  filing."
7      Do you see that language?
8  A  Yes.
9  Q  All right.  Were you involved in any way in the
10  development of that particular provision,
11  801.50(4m)?
12  A  Does it have a date of enactment -- or a year of
13  enactment?
14  Q  This was enacted if you -- actually, yes.  If you
15  look -- if you look at the very, at the very end,
16  you will see in the notes that follow -- it should
17  be in there at least.  I believe it was this year,
18  2011.  I'm looking for the reference in the notes
19  at the end, however.
20  A  If it was not between 1995 and 2001, I would not
21  have had any role.
22  Q  All right.  So the consulting work that you're
23  doing now as a consultant for Reinhart doesn't go
24  to the drafting of -- or did not at least go to
25  the drafting of this particular statute,

189

1      801.50(4m)?
2  A  That is correct.
3  Q  All right.  And then looking at Exhibit No. 15,
4  I'd like to draw your attention to
5  Section 751.035, *Assignment to a judicial panel;*
6  *appeals.*  Do you see that?
7  A  Yes.
8  Q  Okay.  And that was the section that was
9  referenced in the portion of Exhibit 14 that we
10  read.  And if you see at the bottom of 751.035,
11  you'll see *History.*  Do you see it says 2011?
12  Okay.  And same question.  Did you participate or
13  were you involved in any way in the development of
14  this particular statute, 751.035?
15  A  No.
16  Q  Okay.  You can set those to the side.
17      Mr. Handrick, are you aware of pending
18  lawsuits either in the Wisconsin Supreme Court or
19  in Waukesha County on the subject of
20  redistricting?
21  A  Yes.
22  Q  Okay.  And addressing the Supreme Court case --
23  can you mark a copy of this?
24      (Exhibit No. 16 marked for
25      identification)

190

1  Q  This is Exhibit 16.  I've just handed you a copy
2  of a document that the court reporter has marked
3  as Exhibit No. 16.  And I will represent to you
4  that this is a copy of petition for -- to commence
5  an original jurisdiction action that was filed in
6  the Wisconsin Supreme Court on November 21.  This
7  does not have all the exhibits attached to it, so
8  there's a much thicker packet of exhibits, but I
9  just wanted to ask you about the filing of the
10  complaint itself.
11      Have you discussed this particular complaint
12  or this action with anyone?
13          MR. KELLY:  Objection.  Would you
14      care to cavern off counsel for the
15      defendants?
16          MR. POLAND:  No.  I'm first going
17      to ask a broad question with anyone.
18          MR. KELLY:  Okay.  I object to the
19      extent the question calls for information
20      protected by the attorney-client privilege
21      and the work product doctrine.  And I
22      instruct the witness not to answer.
23      However, if there are conversations that
24      you have had about Exhibit 16 that were not
25      with counsel for the defendants or had at the

191

1      direction of counsel for the defendants, then
2      you may answer.
3  Q  With respect to anyone that Mr. Kelly has asserted
4  a privilege over, are you going to follow his
5  instruction and not answer the question?
6  A  Yes.
7  Q  All right.  Is there anyone who falls outside that
8  category, privileged category that you've
9  discussed the filing of the petition for original
10  jurisdiction with?
11  A  No.
12  Q  All right.  Did you have any input into the
13  drafting of Exhibit 16?
14          MR. KELLY:  Objection to the extent
15      that the question calls for information
16      protected by the attorney-client privilege,
17      the work product doctrine.  I instruct the
18      witness not to answer.
19      However, if there is -- if there are
20      any -- if there's any input that did not go
21      through counsel for the defendants or at
22      their direction, you may answer if you can.
23  A  Please restate the question.
24          MR. POLAND:  Yeah.  Can you read it
25      back?

192

**Page 193**

```
 1            (Question read)
 2  A  No.
 3  Q  Is that with respect to people over whom Mr. Kelly
 4     has not asserted an objection?
 5  A  State that again, please.
 6  Q  Strike that question.
 7            MR. KELLY:  Yeah, let me -- yeah,
 8     let me do it.
 9            MR. POLAND:  Go ahead.
10            MR. KELLY:  I've instructed you not
11     to answer the question with respect to any
12     conversations you've had with counsel for the
13     defendants or at counsel's direction.  To the
14     extent that there's anything responsive to
15     that question outside of conversations with
16     counsel for the defendants or at their
17     direction, then you can answer.
18  Q  All right.  Are you following counsel's
19     instruction with respect to privileged
20     conversations that you had that you won't answer
21     the question?
22  A  Yes.
23  Q  All right.  Are there any non-privileged people
24     that -- people who fall outside the privilege that
25     you've discussed Exhibit 16 with or given them
```

**Page 194**

```
 1     input on the drafting of Exhibit 16?
 2  A  No.
 3  Q  You can set that to the side.
 4            Are you aware also that there have been
 5     lawsuits filed -- there was a lawsuit filed in
 6     Waukesha County having to do with redistricting?
 7  A  Yes.
 8  Q  All right.
 9            (Exhibit Nos. 17 and 18 marked for
10              identification)
11  Q  This is 17 (indicating), and this is 18
12     (indicating).  Mr. Handrick, I've handed you
13     two documents that the court reporter has marked
14     as Exhibits 17 and 18.  Do you have those in front
15     of you?
16  A  Yes.
17  Q  Okay.  First taking a look at Exhibit No. 17, a
18     complaint that was filed in Waukesha County
19     Circuit Court on November 28, 2011.  Do you see
20     that?
21  A  Yes.
22  Q  All right.  And again this -- I have not appended
23     the exhibits to this document.  It simply consists
24     of the complaint itself.
25            Is this a document that you've seen before?
```

**Page 195**

```
 1  A  No.
 2  Q  Have you discussed the filing of the
 3     Waukesha County action with anyone?
 4            MR. KELLY:  Object to the extent
 5     that it calls -- the question calls for
 6     information protected by the attorney-client
 7     privilege, the work product doctrine.  And as
 8     a result of that, I instruct the witness not
 9     to answer.
10  Q  And are you going to follow counsel's instruction
11     not to answer the question?
12  A  Yes.
13  Q  All right.  Were there any people with whom --
14     strike that question.
15            Is there anyone over whom there's no --
16     strike that.  It's getting late in the day.
17            Are there any non-privileged conversations
18     that you had with anyone about the complaint that
19     is Exhibit No. 17?
20  A  No.
21  Q  Were you aware of the Waukesha County litigation
22     before that action was commenced?
23  A  No.
24  Q  All right.  If you'd take a look at
25     Exhibit No. 18, please.  And do you see that
```

**Page 196**

```
 1     Exhibit No. 18 consists of a cover letter, an
 2     amended summons, an amended complaint filed in the
 3     Waukesha County redistricting action?
 4  A  Yes.
 5  Q  And this one actually does attach the exhibits,
 6     were much smaller and shorter, and so it does
 7     attach an exhibit.
 8            Looking at Exhibit No. 18, have you seen this
 9     document before?
10  A  No.
11  Q  Have you discussed Exhibit No. 18 with anyone
12     before?
13            MR. KELLY:  I object to the extent
14     the question calls for information protected
15     by the attorney-client privilege or the work
16     product doctrine.  And to that extent I
17     instruct the witness not to answer.
18  Q  Are you going to follow counsel's instruction not
19     to answer the question?
20  A  Yes.
21  Q  Have you had any conversations about Exhibit 18 or
22     the Waukesha County lawsuit with anyone who does
23     not fall with any attorney-client or work product
24     privileges?
25  A  No.
```

1  Q  Were you aware of this particular complaint before
2     it was filed?
3  A  No.
4  Q  You didn't participate in the drafting of
5     Exhibit No. 18?
6  A  No.
7  Q  You can set that to the side.
8        Mr. Handrick, you're aware there was a
9     hearing held in July regarding the proposed
10    redistricting plans, Acts 43 and 44?
11 A  Yes.
12 Q  All right.  And were you present at that hearing?
13 A  No.
14              (Exhibit No. 19 marked for
15              identification)
16              (Discussion off the record)
17 Q  Mr. Handrick, I've handed you a thick document,
18    which is a Transcript of Proceedings dated
19    July 13, 2011.  Do you see that?
20 A  Yes.
21 Q  Okay.  And I'll represent for the record that this
22    is a document that was produced to us by the
23    defendants in this litigation.  You did not
24    testify at this hearing, correct?
25 A  That is correct.

197

1  Q  All right.  Did you consult with any of the
2     witnesses who did testify at the hearing before
3     the hearing?
4  A  No.
5  Q  So Mr. -- were you aware that Mr. Ottman testified
6     at the hearing?
7  A  Yes.
8  Q  And you didn't consult with Mr. Ottman about his
9     testimony before the hearing?
10 A  No.
11 Q  And you're aware that Mr. Foltz testified at the
12    hearing on July 13, correct?
13 A  Yes.
14 Q  Did you consult with Mr. Foltz before he testified
15    at the hearing about his testimony?
16 A  No.
17 Q  All right.  Did you speak with either Mr. Foltz or
18    Mr. Ottman about their testimony after the
19    hearing?
20              MR. KELLY:  Objection to the extent
21         the question calls for information subject to
22         the attorney-client privilege or the work
23         product doctrine.  And to the extent that the
24         question asks about conversations you've had
25         with counsel for the defendants or at

198

1         counsel's instructions or direction, I
2         instruct the witness not to answer.
3  Q  Are you going to -- sorry.
4              MR. KELLY:  If there are -- if
5         there are conversations outside of those
6         parameters, you may answer.
7  Q  Are you going to follow counsel's instructions not
8     to answer the question with respect to the
9     assertion of the attorney-client or work product
10    privilege?
11 A  Yes.
12 Q  Are there any non- --
13              MR. KELLY:  So -- I'm sorry.  And
14         so the witness is aware of the scope of the
15         privilege we are claiming, that would be any
16         conversations about the -- about this
17         testimony subsequent, on or after
18         November 22, 2011.
19 Q  Are there any conversations that you had that fall
20    outside of the privileged category that Mr. Kelly
21    just mentioned?
22 A  Conversations with?
23 Q  With either Mr. Ottman or Mr. Foltz about their
24    testimony.
25 A  Yes.

199

1  Q  When -- who did you talk to about the testimony
2     after they had given it?
3  A  Mr. Foltz and Mr. Ottman.
4  Q  When did you speak with Mr. Foltz about his
5     testimony?
6  A  I don't recall precisely.
7  Q  Was it very shortly after the hearing itself?
8  A  Within 48 hours.
9  Q  Okay.  Where were you and Mr. Foltz when you spoke
10    with him about his testimony?
11 A  My recollection is at Michael Best & Friedrich.
12 Q  Was anyone else present for your conversation with
13    Mr. Foltz about his testimony?
14 A  Yes.
15 Q  Who else was present?
16 A  Mr. Ottman.
17 Q  Anyone other than Mr. Foltz or Mr. Ottman and you
18    present for that conversation?
19 A  Not that I recall.
20 Q  What was said during that conversation about their
21    testimony?
22 A  Precisely, I don't recall.
23 Q  Okay.  Generally what was the nature of the
24    discussion?
25 A  I stopped by to tell them that I thought that they

200

**Page 201**

1  did a nice job presenting the two bills before the
2  committee.
3  Q  Did you have any conversation with them
4  specifically about any particular portions of
5  either of the bills?
6  A  No.
7  Q  Did they say anything to you about their testimony
8  regarding specific portions of either of the
9  bills?
10  A  Yes.
11  Q  And what did they say?
12  A  *Thank you.*
13  Q  Did both of them say thank you?
14  A  To my recollection, yes.
15  Q  Any -- was there any other conversation that you
16  had with Mr. Ottman or Mr. Foltz about their
17  testimony?
18  A  No.
19  Q  Other than Mr. Ottman and Mr. Foltz, did you speak
20  with anyone else about the testimony given at the
21  July 13, 2011 hearing?
22      MR. KELLY:  I object to the extent
23  the question calls for information related to
24  conversations occurring on or after
25  November 22, 2011 on the basis that they

**Page 202**

1  would invade the attorney-client privilege
2  and the work product doctrine.  And on that
3  basis I instruct the witness not to answer.
4  Q  Are you going to follow counsel's instruction not
5  to answer the question with respect to privileged
6  conversations?
7  A  Yes.
8  Q  All right.  Were there any non-privileged
9  conversations that you had with anyone other than
10  Mr. Ottman or Mr. Foltz regarding their testimony
11  on July 13, 2011?
12  A  Not that I recall.
13  Q  Have you read through the transcript before,
14  Mr. Handrick?
15  A  No.
16  Q  Have you seen portions of it before?
17  A  Yes.
18  Q  All right.  When did you see portions of the
19  transcript that's Exhibit 19?
20  A  The date that it was -- the date that it occurred.
21  Q  On the same date you saw a transcript of the
22  proceedings?
23  A  No.  I'm sorry.  Restate the question.
24      MR. POLAND:  Yeah.  Could you read
25  it back?

**Page 203**

1      (Question read)
2  A  Oh, I misunderstood your question.  I saw portions
3  of the transcript when you gave it to me today.
4  Q  Had you seen -- before today had you seen any
5  portions at all of the transcript of the July 13,
6  2011 proceedings?
7  A  No.
8  Q  Did you watch the proceedings on TV?
9  A  Partially.
10  Q  What parts did you see on TV?
11  A  My recollection, I watched a portion of Mr. Ottman
12  and Mr. Foltz's testimony before the committee,
13  and I recall a short portion I saw of
14  Mr. David Obey's testimony before the committee.
15  Q  Where were you when you were watching the
16  proceedings on TV?
17  A  I don't -- I don't recall.
18  Q  Were you watching it on WisconsinEye?
19  A  I believe so, yes.
20  Q  Do you recall if you were watching it on your
21  computer or on a computer?
22  A  I believe so.
23  Q  Was anyone else with you when you were watching
24  the testimony on July 13?
25  A  Not that I recall.

**Page 204**

1  Q  Did you make any notes at all as you were watching
2  the testimony?
3  A  Yes.
4  Q  What did you do with those notes?
5  A  Those notes I simply kept.
6  Q  Are those in your office at Reinhart?
7  A  Yes.
8  Q  Do you recall the nature of the notes that you
9  made?
10  A  The nature of the notes I made was any objective
11  number or statistic that was provided by
12  Mr. Ottman or Mr. Foltz.  I wrote that down.
13  Q  Why did you write down any objective numbers that
14  they gave?
15  A  So that -- as, you know -- because I didn't have
16  access to any of that information, you know, from
17  the firm.
18  Q  When you say *the firm*, what firm do you mean?
19  A  Michael Best.
20  Q  All right.  You had access to it when you were
21  present at Michael Best in their offices; is that
22  correct?
23  A  Correct.
24  Q  But once you went outside of Michael Best's
25  offices, you did not have access to that

**Page 205**

1    information?
2 A That's correct.
3 Q And why did you want to have those numbers?
4 A My own personal knowledge.
5 Q Did you do anything with the numbers once you
6    wrote them down?  Did you make any calculations,
7    or did you provide those numbers to anyone else?
8 A Yes.
9 Q Did you make calculations?
10 A Calculations, no.
11 Q Did you provide those numbers to anyone else?
12 A Yes.
13 Q Who did you provide them to?
14 A The -- and I don't know the name of the group.
15    The Wisconsin Association of Lobbyists asked me to
16    give a presentation on this topic.
17 Q On redistricting?
18 A Yes.
19 Q On Acts 43 and 44?
20 A No, I don't believe I -- I don't believe Act 44
21    was a topic.
22 Q Okay.  So the presentation that you gave to the
23    Wisconsin Association of Lobbyists was on Act 43?
24 A Yes.
25 Q When did you give that presentation?

**Page 206**

1 A I don't remember the specific date.
2 Q Was it in the summer, over the fall?
3 A My recollection is it was in the early fall.
4 Q I'd like you to open Exhibit 19.  I'm going to
5    take you to a few specific passages in the
6    document, and I'll give you the page and a line.
7            MS. LAZAR:  Before you do that, I
8    think you made an error on the back of the
9    document.
10            MR. POLAND:  Oh.
11            MS. LAZAR:  There's some pages
12    that are disclosures that were previously
13    provided by the Department of Justice, at
14    least in my copy.
15            MR. POLAND:  Okay.
16            MS. LAZAR:  I don't know if
17    everyone else has that, but they don't belong
18    there.
19            MR. POLAND:  All right.  Well,
20    let's take them out then if they're in there.
21    It should end at the end of the -- there's a
22    Min-U-Script at the end and an index, and it
23    should end after that.  Why don't I just take
24    it back.  Thank you, Maria, for pointing that
25    out.

**Page 207**

1            MS. LAZAR:  Not a problem.
2            MR. POLAND:  So -- yeah.  Okay.  So
3    Maria is right.  At the back end of that
4    document of Exhibit 19 -- we'll recycle
5    those.
6            MS. LAZAR:  Super.
7            MR. POLAND:  Thanks.  Everybody
8    ready?  Okay.
9 Q I'd like you to take a look at page 4, and I'm
10    going to draw your attention to lines 9 through
11    12.  Have you looked at transcripts before?  Do
12    you understand how they work, that there will be
13    the name of the person who's giving the testimony,
14    and then it can sometimes go on for several pages?
15 A Okay.
16 Q Okay.  So if you look over on page 3 of the
17    transcript, you'll see it's Mr. Ottman who's
18    testifying.
19 A Yes.
20 Q Do you see that?  Okay.  So now if you look on
21    page 4, I'd like to draw your attention to line 9
22    and specifically Mr. Ottman's statement.  "There
23    are three core principles to any reapportionment
24    plan: equal population, sensitivity to minority
25    concerns, and compact and contiguous districts."

**Page 208**

1    Do you see that, that testimony there?
2 A Yes.
3 Q Do you agree with those statements?
4 A Not necessarily.
5 Q Okay.  What do you disagree with?
6 A Those principles stated do not relate to
7    reapportionment plans.
8 Q Okay.  What do they relate to?
9 A They relate to redistricting plans.
10 Q Okay.  And what is the difference between
11    redistricting and reapportionment?
12 A Reapportionment, my understanding, is the
13    allocation of congressional seats among the
14    states.  Redistricting is the subdivision of
15    districts within a state.
16 Q Other than that disagreement that you, that you
17    just identified, are there any other areas of
18    disagreement that you have with the statement that
19    Mr. Ottman made?
20 A Yes.
21 Q Okay.  What would that be?
22 A I believe a core principle -- my understanding is
23    a core principle is upholding the Voting Rights
24    Act.
25 Q Any other aspects of Mr. Ottman's statement that

Case: 3:15-cv-00421-bbc Document #: 119 Filed: 05/02/16 Page 53 of 89

**209**

```
 1    you disagree with?
 2  A No.
 3  Q Are there any other core principles in addition to
 4    the ones that Mr. Ottman mentions in this
 5    transcript?
 6         MR. KELLY:  Objection, form.  You
 7         may answer if you can.
 8  A Could you please restate the question?
 9         MR. POLAND:  Sure.  Can you read it
10         back?
11         (Question read)
12         MR. KELLY:  Same objection.  I'd
13         also like the same objection for the prior
14         two questions.
15  A Well, I already expressed, I believe, that a
16    principle is the Voting Rights Act.
17  Q Voting Rights Act.  Right.  Is there anything in
18    addition to the Voting Rights Act that you believe
19    is a core principle that was left omitted from
20    Mr. Ottman's -- yeah, Mr. Ottman's testimony?
21  A No.
22         MR. KELLY:  Objection, form.
23  Q Do you see Mr. Ottman mentions equal population in
24    his testimony on page 4?
25  A Yes.
```

**210**

```
 1  Q All right.  What is the standard that you use for
 2    equal population?
 3  A For what type of --
 4  Q For redistricting.
 5  A It depends.
 6  Q What would it depend on?
 7  A The level of government.
 8  Q And what about if we're looking at assembly
 9    districts; what would be the standard for equal
10    population in assembly districts?
11  A The standard for equal population in assembly
12    districts that was out -- that was outlined by the
13    Court in 2002 was approximately 1½ percent.
14  Q And that was the federal court in 2002 that set
15    that standard?
16  A I believe so, yes.
17  Q Is zero deviation from that ideal, no deviation at
18    all, is that an absolute requirement?
19         MR. KELLY:  Objection, form, but
20         you may answer if you can.
21  A Please state that question again.
22  Q Sure.  Is zero deviation from the ideal equal
23    population, is that an absolute requirement?
24  A Not to my knowledge.
25  Q Okay.  Now, you mentioned the Voting Rights Act a
```

**211**

```
 1    minute or two ago, correct?
 2  A Yes.
 3  Q All right.  What are the appropriate conditions
 4    for taking race or other protected class into
 5    account when you're drawing legislative districts?
 6         MR. MCLEOD:  I'm going to --
 7         MR. KELLY:  Object to form.
 8         MR. MCLEOD:  I'm going to assert an
 9         objection that it calls for a legal
10         conclusion.  And we've now confirmed from
11         Judge Stadtmiller's order Mr. Handrick is not
12         a lawyer, but I'll leave it at that.  If he
13         can answer, he's welcome to do so.
14  A Please state the question again.
15  Q Do you want to have her read the question back to
16    you?
17         (Question read)
18  A My understanding is that the district should give
19    minorities opportunity to elect representatives of
20    their choice but that race should not be a
21    predominant factor.
22  Q Now, in his testimony -- I'd like to draw your
23    attention to page 29.  In his testimony at
24    lines 22 and 23 of page 29, Mr. Ottman testified
25    "Under any reapportionment plan a certain amount
```

**212**

```
 1    of disenfranchisement is inevitable and
 2    avoidable."  Do you see that statement?
 3  A Yes.
 4  Q Okay.  And then I'd like you to take a look at
 5    page 30, lines 16 through 18.  Mr. Ottman makes
 6    the statement "What we've done here is tried to
 7    the best of our ability to minimize that
 8    displacement."  Do you see that testimony?
 9  A Yes.
10  Q All right.  Were you involved in -- strike that.
11         In the process of formulating the
12    redistricting plans that ended up in Act 43, were
13    you involved in analyzing the displacement of
14    voters?
15  A No.
16  Q Do you know how many residents in Wisconsin were
17    moved to a new legislative district under Act 43?
18  A No.
19  Q Do you have any opinion whether Act 43 minimized
20    the disenfranchisement of residents?
21         MR. KELLY:  Objection, form.
22         MR. POLAND:  Do you want to read
23         the question back?
24         (Question read)
25  A No.
```

**213**

1  Q  Is there any measure that you know of to, to
2     assess whether disenfranchisement of voters in the
3     redistricting process is acceptable?
4  A  Can you state that question again?
5           MR. POLAND:  Can you read it back?
6           (Question read)
7  Q  Strike that question.
8        Is there any standard that you know of to
9     measure whether the number of voters who are
10    disenfranchised in the redistricting process is an
11    acceptable number?
12 A  No.
13 Q  Did you ever have a discussion about the number of
14    voters who are disenfranchised by Act 43 with
15    anyone?
16 A  Yes.
17          MR. KELLY:  I'm sorry.  Could you
18       read that back question?  I apologize.
19          (Question read)
20          MR. KELLY:  I object to the extent
21       that the question calls for information
22       protected by the attorney-client privilege or
23       the work product doctrine.  And to that
24       extent, I instruct the witness not to answer.
25       However, if there are conversations you've

**214**

1        had that are with people other than counsel
2        or at the direction of counsel, then you may
3        answer.
4  Q  And with respect to the assertion of the
5     attorney-client privilege and work product
6     privilege, are you going to take counsel's
7     instruction to not answer the question?
8  A  Yes.
9  Q  All right.  Other than conversations that would be
10    covered by the attorney-client privilege or work
11    product privilege, were there any conversations
12    that you had about disenfranchisement of voters by
13    Act 43?
14 A  Yes.
15 Q  All right.  Who did you have those conversations
16    with?
17 A  Mr. Ottman.
18 Q  When did you speak with Mr. Ottman about
19    disenfranchisement of voters?
20 A  I don't recall that precise date.
21 Q  Was it -- was it sometime before Act 43 was
22    enacted?
23 A  Yes.
24 Q  What was the nature of the discussion that you had
25    with Mr. Ottman?

**215**

1  A  My recollection is I inquired as to the number and
2     percent that would be temporarily voter delayed.
3  Q  And do you recall what Mr. Ottman told you?
4  A  No.
5  Q  Do you recall any reaction you had at the time as
6     to whether the number, the percentage that he gave
7     you was one that you believed to be acceptable or
8     not?
9  A  No.
10 Q  Do you recall giving Mr. Ottman any advice on
11    whether it needed to -- Act 43 needed to
12    disenfranchise fewer voters?
13 A  No.
14 Q  Anyone other than Mr. Ottman that you had a
15    conversation about, subject of course to the
16    assertion of privilege?
17 A  No.
18 Q  I'm going to draw your attention to page 36 and
19    lines 20 to 22.  At the hearing Mr. Ottman was
20    asked why the statutes weren't built on ward lines
21    as the law requires.  And he responded in lines 20
22    to 22 here "technology has moved to the point
23    where it is much easier to draw these maps in
24    advance of the locals completing their process."
25    Do you see that testimony?

**216**

1  A  Yes.
2  Q  Do you agree with that statement by Mr. Ottman?
3  A  Yes.
4  Q  Okay.  Doesn't that make it -- or doesn't that
5     create difficulties for local governments?
6           MR. KELLY:  Objection, form.
7  Q  You can answer the question.
8  A  Not to my knowledge.
9  Q  I'd like to draw your attention to page 47.  And
10    then on lines 2 through 7 you see
11    Senator Erpenbach asked Mr. Ottman "Did the
12    partisan makeup of the districts come into play at
13    all when drawing the maps?"  And then Mr. Ottman
14    responds "The principles were the ones I
15    enumerated.  Those were the ones that drove
16    drawing the map."  Do you see that testimony?
17 A  Yes.
18 Q  And do you agree with that statement by
19    Mr. Ottman?
20 A  I can't answer as to Mr. Ottman's driving.
21          MR. POLAND:  I'm sorry.  Can you
22       read back the answer?
23          (Answer read)
24 Q  Okay.  I'm going to ask you to explain the answer.
25    Why can you not answer as to Mr. Ottman's

**Page 217**

1    statement about driving?
2  A  Because I did not direct Mr. Ottman to draw maps.
3  Q  All right.  In your opinion did the partisan
4    makeup of the districts come into play when
5    drawing the maps?
6         MR. KELLY:  Objection to form, but
7         you may answer.
8  A  In the maps that I drew, no.
9  Q  Did they come into play in the map that was
10    enacted in Act 43?
11  A  I don't know.
12  Q  Were partisan considerations a factor in the
13    drawing of the plan that was enacted in Act 43?
14  A  I don't know.
15  Q  When you were working during the redistricting
16    process, did you have any access to voting data
17    from past elections?
18  A  No.
19  Q  Has anyone provided you -- as part of the 2011
20    redistricting process, has anyone provided you
21    with any data on voting results from past
22    elections?
23         MR. KELLY:  Objection to the extent
24         the calls for information protected by the
25         attorney-client privilege or the work product

**Page 218**

1    doctrine.  And to that extent I instruct you
2    not to answer the question.
3         If there is material responsive to the
4         question that does not involve conversations
5         or data given to you by counsel or obtained
6         by you at counsel's direction, then you may
7         answer the question.
8  Q  Are you going to follow counsel's instruction not
9    to answer the question with respect to privileged
10    conversations?
11  A  Yes.
12  Q  All right.  Were there any non-privileged
13    conversations that you had or any non-privileged
14    relationships that you had where someone provided
15    you with data on voting results from past
16    elections?
17  A  No.
18  Q  How many hours in total did you spend working on
19    redistricting plans from the time you were engaged
20    as a consultant in February until the time the act
21    was passed?
22  A  I do not know.
23  Q  Was it more or less a full-time activity for you?
24  A  No.
25  Q  Any estimate of a percentage of your time that it

**Page 219**

1    occupied from February until Act 43 was passed?
2  A  I can't -- I can't even put a percentage on that.
3  Q  All right.  Do you know who decided to draw
4    districts based on census blocks before the
5    completion of the ward process?
6  A  No.
7  Q  That wasn't a decision that you made?
8  A  No.
9  Q  How many different maps did you personally draw
10    before settling on any final version of what you
11    were asked to draw?
12         MR. MCLEOD:  Object to the form of
13         the question.  You can answer if you can.
14  A  I recall drawing two maps.
15  Q  Okay.  What was represented in the maps that you
16    drew?
17  A  They were statewide redistricting plans.
18  Q  Did the statewide redistricting plans that you
19    drew -- strike that question.
20         Did Act 43 as enacted reflect the state
21    redistricting plans that you personally drew?
22  A  No.
23  Q  What were the differences between Act 43 as
24    enacted and the state redistricting plan that you
25    drew?

**Page 220**

1  A  That would be impossible for me to answer.
2  Q  Were there many differences?
3  A  Many differences.
4  Q  Without actually having a final version of Act 43
5    in front of you and the maps you drew, it would be
6    impossible for you to recall them all; is that
7    correct?
8  A  Yes.
9  Q  Fair statement?
10         What version of autoBound did you use to draw
11    the redistricting maps?
12  A  I -- I don't know.
13  Q  Do you know whether it was a relatively new
14    version?
15  A  I don't know.
16  Q  Did it have any new features from the previous
17    version that you'd used?
18  A  Not that I'm aware of.
19  Q  You mentioned before that you did have
20    conversations with Mr. Gaddie and you were present
21    with Mr. Gaddie during the redistricting process,
22    correct?
23  A  Yes.
24  Q  There -- are you aware there are two other expert
25    witnesses that have been identified by the

1  defendants?  One is a Mr. Diaz.  Are you aware of
2  Mr. Diaz?
3  A  Yes.
4  Q  Did you have any communications with Mr. Diaz
5     during the redistricting process?
6  A  No.
7  Q  So you did not communicate with Mr. Diaz while you
8     were drawing the redistricting plans from February
9     through, through the time that they were enacted?
10 A  That's correct.
11 Q  Did Mr. Diaz provide you with any information
12    during the redistricting process?
13 A  No.
14 Q  Did anyone provide you with information from
15    Mr. Diaz during the redistricting process?
16 A  No.
17 Q  You testified earlier that you -- let me start
18    over.
19        You testified earlier that you drew assembly
20    districts in the city of Milwaukee; is that
21    correct?
22 A  Yes.
23 Q  And that would include Assembly Districts 8 and 9,
24    correct?
25 A  Yes.

221

1      MR. POLAND:  Okay.  I want to
2  get -- I have to unplug here for one last
3  exhibit.
4      I've got two copies.  I'm going to have
5  to ask you to share.  I'm sorry.
6      MR. KELLY:  Is it just the Act 43
7  map?
8      MR. POLAND:  This is -- I'm just
9  going to use the Act 43 map, correct.
10     MS. LAZAR:  Are these the ones we
11 produced?
12     MR. POLAND:  These are the ones
13 that you produced.
14     MS. LAZAR:  Peter Earle might want
15 to ask, unless he's finishing up.
16     MR. POLAND:  That's fair.  Peter?
17     MR. EARLE:  Yes.
18     MR. POLAND:  Marie just raised a
19 good point, which is you had wanted to leave
20 at 5.  I probably have about 15 minutes of
21 questions left.  Do you want to go ahead and
22 ask your questions now?
23     MR. EARLE:  Sure.  I only have
24 about five minutes.  It's very short.
25     MR. POLAND:  Go ahead.

223

1  Q  Did you decide on specific percentages of voting
2     age population among Hispanics in Districts 8 and
3     9 in drawing those districts?
4  A  No.
5  Q  Do you know who did make a decision as to draw
6     specific percentages of voting age population
7     among Hispanics in Districts -- Assembly
8     Districts 8 and 9?
9  A  No.
10 Q  Between April 2011 and July 2011, did you spend
11    any time in Washington, DC?
12 A  No.
13 Q  Did anyone from outside the state of Wisconsin
14    ever show you any proposed or existing legislative
15    redistricting plans for Wisconsin?
16 A  No.
17 Q  Before Acts 40 -- before Act 43 was passed, did
18    you ever meet or talk to any representatives or
19    officials of the Republican National Committee
20    about the new Wisconsin legislative districts?
21 A  No.
22 Q  Do you know whether anyone at the
23    Republican National Committee has been tasked with
24    tracking the redistricting process in Wisconsin?
25 A  No.

222

1      MR. EARLE:  I appreciate the
2  courtesy.  Thank you.
3
4           EXAMINATION
5  By Mr. Earle:
6  Q  Mr. Handrick, you testified that you met with
7     Mr. Foltz and Mr. Ottman regarding Assembly
8     Districts 8 and 9.  Do you recall that testimony?
9  A  No, I don't.
10 Q  Well, under questioning earlier I thought I --
11    perhaps I heard wrong.  I understood that you
12    testified that you discussed Assembly Districts 8
13    and 9 with Mr. Foltz and Mr. Ottman, and you
14    compared a map that you'd drawn with a map that
15    they had drawn.  Was my understanding of your
16    testimony incorrect?
17 A  I -- I don't recall that.
18 Q  Okay.  Did you draw a map of the 8th and 9th
19    assembly district?
20 A  Yes.
21 Q  And when did you draw that map?
22 A  Between April and June.
23 Q  And did anybody help you?
24 A  No.
25 Q  Who did you show that map to?

224

**Page 225**

```
 1  A  That, that map, it was not shown to anybody.
 2  Q  Did Mr. Foltz and Mr. Ottman draw a map of the 8th
 3     and the 9th assembly districts, to your knowledge?
 4  A  Insofar as those are -- that's a portion of a
 5     broader map, the answer is yes.
 6  Q  Did you compare your map to any other map between
 7     April and June?
 8  A  No.
 9  Q  Now, it's my understanding that two maps were
10     presented to the assembly, is that correct, for
11     those two assembly districts?
12  A  That's not my understanding.
13  Q  What is your understanding?
14  A  My understanding is there was a bill introduced,
15     and it -- and it had a hearing, and then there was
16     an amendment at the hearing.
17  Q  Did you participate in the drawing of the map that
18     was ultimately adopted as part of the legislative
19     process?
20  A  Yes.
21  Q  Please describe your participation for me.
22  A  My participation was to -- when that map was
23     completed, I was asked in my role of assisting the
24     legal counsel to go in with that map and look for
25     areas to improve that map on its objective
```

**Page 226**

```
 1     criteria.
 2  Q  Who asked you to do that?
 3  A  That was part of the direction from legal counsel.
 4  Q  What legal counsel?
 5  A  I do not recall.
 6  Q  What law firm?
 7  A  I do not recall.
 8  Q  When did that direction -- when was that direction
 9     given to you?
10  A  I cannot recall that date.
11  Q  What objective criteria were you asked to improve
12     the map based on?
13  A  Population, deviation, municipal splits,
14     contiguity.
15  Q  Anything else?
16  A  Not that I can recall.
17  Q  Now, just so I'm clear, we're talking about the
18     8th and 9th assembly districts?
19  A  No.
20  Q  Is that what you were asked to improve upon?
21  A  No.
22  Q  I'm sorry.  Maybe it's because of the phone.  I
23     thought you were -- we were talking about the 8th
24     and 9th assembly districts.  All right.
25        Did you discuss the 8th and 9th assembly
```

**Page 227**

```
 1     districts with counsel?
 2  A  Yes.
 3  Q  What counsel?
 4  A  Jim Troupis.
 5  Q  Anybody else?
 6  A  My recollection is Eric McLeod.
 7  Q  Okay.  Anybody else?
 8  A  Not that I can recall.
 9  Q  When were those conversations with Mr. McLeod?
10  A  I can't recall that date.
11  Q  Did you take any notes during those conversations?
12  A  No.
13  Q  Were you given any instructions with regards to
14     the 8th and 9th during those conversations?
15  A  No.
16  Q  Did you discuss the 8th and 9th assembly districts
17     with Rick Esenberg?
18  A  No.
19  Q  How about Mandy Perez?
20  A  No.
21  Q  How about Zeus Rodriguez?
22  A  Yes.
23  Q  And when did you discuss the 8th and 9th assembly
24     districts with Zeus Rodriguez?
25  A  Pardon me.  Can you repeat that question?
```

**Page 228**

```
 1  Q  When did you discuss the 8th and 9th assembly
 2     districts with Zeus Rodriguez?
 3  A  I don't recall that date.
 4  Q  Was it before the map was adopted?
 5  A  Yes.
 6  Q  What was the content of that discussion?
 7  A  I can't recall specifics.
 8  Q  What do you recall about the conversation?
 9  A  There was a variety of different methods by which
10     the south side of Milwaukee could be drawn, and I
11     was asked to contact Mr. Rodriguez and ask him to
12     seek community input.
13  Q  Who asked you to contact Mr. Rodriguez and seek
14     community input?
15  A  My recollection is that would be Jim Troupis.
16  Q  This was before the ratification of the map?
17  A  Yes.
18  Q  And did you take any notes during your
19     conversations with Zeus Rodriguez?
20  A  No.
21  Q  Did you generate any e-mails during the course of
22     your interaction with Zeus Rodriguez?
23  A  Not that I can recall.
24  Q  Did you generate any e-mails during the course of
25     your interactions with Mr. Troupis about the 8th
```

**Page 229**

1 and 9th assembly districts?
2 A Not that I recall.
3 Q How about Mr. McLeod?
4 A Not that I can recall.
5 Q How about text messages?
6 A No.
7 Q How was the map that you drew different than the
8   map that was ultimately adopted with regard to the
9   8th and 9th assembly districts?
10 A I can't recall without, without knowing what
11   exactly my map did.
12 Q Did anybody working on the map to your knowledge
13   consider the percentage of citizenship of voting
14   age within the Latino community in the process of
15   drawing the 8th and 9th assembly districts?
16 A I do not know.
17 Q Did you consider citizenship?
18 A No.
19 Q Did you discuss the percentage of citizen --
20   voting age citizens within the Latino community
21   with anybody during the time you were working on
22   the maps?
23 A No.
24 Q So just so I'm clear, to your knowledge no one
25   involved in working on these maps considered the

**Page 231**

1   Michael Best; did I hear that accurately earlier?
2 A Yes.
3 Q Did you discuss the 8th and 9th assembly districts
4   with them?
5 A No.
6 Q Would you list for me all the people with whom you
7   discussed the Latino community of interest in the
8   course of the remapping process -- redistricting
9   process.
10 A Jim Troupis, Eric McLeod, Tad Ottman, Adam Foltz,
11   and the legislative leaders denoted earlier.
12 Q Anybody else?
13 A Zeus Rodriguez.
14 Q Now, I'm not there, so I can't tell whether you're
15   pondering or you've finished your answer.
16 A That's what I'm recalling.
17 Q Did you travel to Chicago in order to meet with
18   anybody related to the redistricting process?
19 A No.
20 Q Did you -- now, I forgot what you said. Did you
21   actually meet with Zeus Rodriguez, or did you
22   speak on the phone?
23 A Spoke on the phone.
24 Q How many times?
25 A I believe once.

**Page 230**

1   percentage of Latino citizens of voting age in the
2   course of drawing the 8th and 9th assembly
3   districts; is that an accurate statement?
4 A To my knowledge, yes.
5 Q Okay. Did you participate in any discussions
6   related to using the census blocks instead of
7   deferring to local government units drawing ward
8   lines?
9 A Can you please restate the question?
10 Q Sure. Do you recall discussing whether or not to
11   use census blocks in the drawing of the maps?
12 A No.
13 Q Do you know who made the decision to use census
14   blocks?
15 A No.
16 Q When you drew your map, did you use existing ward
17   lines?
18 A Perhaps.
19 Q Did anybody talk to you about the fact that you
20   used existing ward lines instead of census blocks?
21 A No.
22 Q Do you know Peter Morrison?
23 A No.
24 Q Now, you say you spoke with Mr. Foltz and
25   Mr. Ottman within 48 hours of their testimony at

**Page 232**

1 Q Would you identify for me the people that you
2   understand or have knowledge about having
3   participated in the drawing of the, of the lines
4   for the 8th and 9th assembly districts.
5 A The legislative leaders outlined earlier, myself,
6   Tad Ottman, Adam Foltz. That's what I can recall.
7     MR. EARLE: Okay. Those are all
8   the questions I have for now. I may have
9   other questions after this issue of privilege
10   is resolved.
11     MR. POLAND: Okay. This is
12   Doug Poland. I'm going to continue with my
13   examination then. I'd like to have --
14     MR. EARLE: And, Doug, I'm going to
15   hop off the line. Thank you for your
16   courtesy.
17     MR. POLAND: All right. Bye Peter.
18   (Discussion off the record)
19   (Exhibit Nos. 20 through 22 marked
20   for identification.)
21     MR. POLAND: I'm just going to mark
22   all three of them that you produced to us,
23   20, 21, and 22. So I've got two copies here
24   just because of the size. We can obviously
25   have full copies made for everyone, but I'm

1 going to have to ask that you look over
2 everybody's shoulders.
3        So for the record, I've marked
4 three oversized maps.  I'll try not to block
5 the camera.  These are three maps that were
6 produced to us by the defendants.  One,
7 Exhibit 20, is marked as *State of Wisconsin*
8 *Act 43 Assembly Districts*.  The second is
9 *2011 Act 44*.  And then a third, which is
10 marked Exhibit 22, the heading on that map is
11 *2011 Act 43*.  And that also depicts the set
12 of districts in addition to the -- in
13 addition to the assembly districts.
14
15            RE-EXAMINATION
16 By Mr. Poland:
17 Q  And, Mr. Handrick, I'm going to see if I can fold
18 this over and hand this to you here.  And I'm
19 going to ask you to look at some specific areas of
20 the map.  I need to look at one as well.
21        First of all, let me ask you -- because I
22 think we can get this out of the way first.
23 Exhibit No. 21, which is I believe Act 44, did you
24 have -- you had nothing to do with the drawing of
25 that map; is that correct?

233

1 A  That's correct.
2 Q  All right.  So I'd like to focus you on
3 Exhibit No. 20, and I'd like to have you take a
4 look at Kenosha County, please.  And do you see
5 Kenosha County includes three different assembly
6 districts, 61, 64, and 65?  Do you see that?
7 A  Yes.
8 Q  All right.  And then I'd also like you to look at
9 Racine County.  And do you see Racine County
10 includes portions of Assembly Districts 62, 63,
11 64, and 66?
12 A  Yes.
13 Q  All right.  Now, under the 2002 redistricting
14 plan, Racine was not split between assembly
15 districts; isn't that correct?
16 A  That's not correct.
17 Q  Racine, the city of Racine, was split among
18 assembly districts in the 2002 redistricting plan?
19 A  Yes.
20 Q  All right.  What districts was it split between?
21 A  I cannot recall those numbers off the top of my
22 head.
23 Q  Racine and -- no parts of the city of Racine and
24 Kenosha were contained within the same assembly
25 district under the 2002 redistricting plan; is

234

1 that correct?
2 A  To my knowledge, that's correct.
3 Q  All right.  And under 2011 Wisconsin Act 43,
4 portions of the city of Racine and the city of
5 Kenosha are both contained within Assembly
6 District 64, correct?
7 A  Please restate the question.
8            MR. POLAND:  Could you read it
9        back?
10            (Question read)
11 A  I cannot ascertain that from this map.
12 Q  Do you -- do you know even apart from the map, do
13 you know whether that's correct?
14 A  No.
15 Q  All right.  You see that Kenosha is split
16 between -- the city of Kenosha is split between
17 Assembly Districts 64 and 65, correct?
18 A  Yes.
19 Q  Do you know who made the decision to split Kenosha
20 between two different assembly districts?
21 A  The United States Census.
22 Q  Split Kenosha among two different assembly
23 districts?
24 A  Yes.
25 Q  How did the census decide to split Kenosha, the

235

1 city of Kenosha, between two different assembly
2 districts?
3 A  My understanding is the city of Kenosha is too
4 large to be contained within one assembly
5 district.
6 Q  Do you know who, who specifically decided where
7 the assembly district lines would be drawn with
8 respect to the city of Kenosha?
9 A  In Act 43, no.
10 Q  Do you know who made the decision to combine
11 portions of the city of Racine and Kenosha in
12 Assembly District 64?
13 A  No.
14 Q  When you drew your redistricting plans, did they
15 treat Racine and Kenosha Counties different than
16 where it ended up being included in Act 43?
17 A  My recollection is yes.
18 Q  All right.  And how did the redistricting plan
19 that you drew differ from what was enacted in
20 Act 43 with respect to Racine and
21 Kenosha Counties?
22 A  I could not answer that with any accuracy.
23 Q  Did the -- did the plan that you drew result in
24 less fracturing of the municipalities of Racine
25 and Kenosha?

236

**Page 237**

1   A   I can't answer that with any degree of accuracy.
2   Q   You'd need to have the plan that you prepared to
3       be able to compare it with this one to answer that
4       question?
5   A   Yes.
6   Q   Did you ever have discussions with anyone about
7       the splits in the cities of Racine and Kenosha?
8   A   Yes.
9   Q   And who did you discuss that with?
10  A   Mr. Ottman.
11  Q   What did you and Mr. Ottman discuss?
12  A   As I indicated a few minutes ago, when the map was
13      assembled, I was asked to go in and look for a
14      variety of things, non-continuous parcels, and
15      there, there were some identified in that area.
16  Q   You identified some splits in that area that, that
17      you thought were not necessary; is that correct?
18  A   There were splits in that area identified by a
19      splits report.
20  Q   Right.  And you pointed those out to Mr. Ottman?
21  A   Yes.
22  Q   Did you suggest that some of those splits be
23      eliminated?
24  A   I don't recall.
25  Q   The splits to which you're referring, are those

**Page 238**

1       identified in the handwritten notes that you
2       brought with you today?
3   A   They would not be.
4   Q   This was as part of Exhibit No. 2 then.  Do you
5       have Exhibit No. 2 in front of you?  And it was
6       the handwritten notes portion of it.
7           If we look at Kenosha on these handwritten
8       notes that are part of Exhibit No. 2, you
9       identified two splits with respect to
10      Kenosha County, correct?
11  A   Correct.
12  Q   All right.  And that was going to be split between
13      Kenosha and Somers; is that right?
14  A   No.
15  Q   What was the split?
16  A   This indicates that the city of Kenosha was split,
17      and the town, village, or Somers was split.
18  Q   Okay.  And so your handwritten report doesn't
19      indicate how many different splits there were in
20      the municipality; is that correct?
21  A   That's correct.
22  Q   All right.  You can set that down.
23          Do you know what the justification was for,
24      for splitting the municipalities of Racine and
25      Kenosha?

**Page 239**

1       Amongst assembly seats?
2   Q   Correct.
3   A   Yes.
4   Q   Okay.  And what was the justification for --
5       strike that.
6           I assume the justification for splitting
7       Kenosha was, as you identified before, the
8       population was too large to fit within one?
9   A   That is correct.
10  Q   Were there any other justifications for the split
11      in Kenosha?
12  A   Not that I can recall.
13  Q   All right.  Do you know what the justification was
14      for splitting Racine?
15  A   Yes.
16  Q   And what was that?
17  A   Racine is too large to be confined in a single
18      assembly district.
19  Q   Do you know what the justification was for drawing
20      Assembly District 64 as it's drawn?
21  A   No.
22  Q   All right.  Did you solicit any comments from any
23      legislatures who are representing municipalities
24      that were most significantly changed by Act 43?
25  A   No.

**Page 240**

1   Q   Now, according to Mr. -- strike that question.
2           Have you read Mr. Gaddie's expert report?
3   A   Yes.
4   Q   Professor Gaddie I should say.  And according to
5       his report, there are 11 new assembly districts
6       where incumbents are paired.  Is that your
7       understanding?
8   A   As a result of Act 43?
9   Q   Correct.
10  A   No, that's not my understanding.
11  Q   Okay.  What's your understanding about how many
12      assembly districts, new assembly districts where
13      incumbents are paired?
14  A   My understanding as a result of Act 43 is that
15      there are ten assembly districts where incumbents
16      are paired.
17  Q   Do you know who made the decision to make those
18      pairings?
19  A   No.
20  Q   And there are two republican incumbents who are
21      paired in the new assembly districts, correct?
22  A   My recollection is there are six.
23  Q   There are six republicans that are republican
24      incumbents paired against each other?
25  A   That's my recollection, yes.

**Page 241**

1 Q Do you know who decided to district -- redistrict
2   in a way that would pair those republican
3   incumbents?
4 A No.
5 Q Did you solicit or did any of the affected
6   republicans who are -- republican incumbents who
7   are paired contact you about those pairings?
8 A No.
9 Q In any of the earlier versions of the
10   redistricting plan that you saw that ended up
11   being Act 43, were any of the republican pairings,
12   incumbent pairings different than in Act 43 as it
13   was passed?
14 A Please restate the question.
15 Q That's a terrible question.  All right.
16     In any of the earlier versions of the
17   redistricting plans that you saw, were any of the
18   republican incumbent pairings different than in
19   Act 43 as passed?
20 A Yes.
21 Q And how are they different?
22 A I recall in one of my maps there was a three-way
23   pairing.
24 Q And what was that three-way pairing?
25 A I don't recall the specific legislatures.

**Page 242**

1 Q Do you recall the districts or approximately where
2   the districts were?
3 A My recollection is between Milwaukee and Madison.
4 Q Why was that three-way pairing changed?
5 A On my map it wasn't changed.
6 Q All right.  But it was changed in the subsequent
7   map that was enacted as Act 43, correct?
8 A It wasn't changed.
9 Q Why -- there's no longer a three-way pairing with
10   2011 Wisconsin Act 43, correct?
11 A As far as I know, there's not.
12 Q Okay.  And why is there not when there was with
13   your map?
14 A Apparently my map was not adopted as Act 43.
15 Q That aspect of your map was not adopted, correct?
16 A Correct.
17 Q Do you know why that aspect of your map was not
18   adopted?
19 A No.
20 Q Did you ever have discussions with anyone about
21   that three-way pairing that had been in your map?
22 A No.
23 Q I'd like to draw your attention to the city of
24   Beloit.  The city of Beloit is split between
25   Assembly Districts 31 and 45, correct?

**Page 243**

1 A Yes.
2 Q Do you know why Beloit is split into two different
3   assembly districts?
4 A No.
5 Q Did you ever have any conversations with anyone
6   about why Beloit is split?
7 A No.
8 Q Do you know what the justification is for
9   splitting Beloit into two different assembly
10   districts?
11 A I do not, no.
12 Q Do you have a suspicion?
13 A Yes.
14 Q Okay.  Why do you -- why do you suspect it was
15   split into two different assembly districts?
16     MR. KELLY:  Objection, form.  You
17   may answer.
18 A Equal population.
19 Q Who would have made that decision to split Beloit
20   among two different assembly districts?
21 A I don't know.
22 Q Do you know whether Beloit was split into two
23   different assembly districts under the 2002
24   redistricting plan?
25 A I do not know.

**Page 244**

1 Q All right.  I'd like to draw your attention up to
2   Appleton.  And Appleton is split among multiple
3   assembly districts, correct?
4 A Yes.
5 Q Actually, let me go back and ask you one question.
6   In the -- in the redistricting plan that you drew,
7   was Beloit split between assembly districts?
8 A I do not recall.
9 Q Back up to Appleton.  Do you know why it is split
10   among multiple assembly districts?
11 A I believe so.
12 Q And why do you believe it was split among multiple
13   assembly districts?
14 A I believe Appleton is too large to be confined in
15   a single assembly district.
16 Q Do you know why it wasn't split into fewer
17   districts?
18 A No.
19 Q Did you ever have any conversations with anyone
20   about how Appleton should be split among assembly
21   districts?
22 A Yes.
23 Q And who did you speak with about that subject?
24 A Mr. Foltz and Mr. Ottman.
25 Q All right.  And what were -- what was the nature

**Page 245**

```
 1    of those conversations?
 2  A To my recollection it was an understanding that
 3    the city of Appleton was split multiple ways under
 4    the 2002 court map.
 5  Q Okay.  And that was the justification for
 6    splitting it multiple -- into multiple districts
 7    in this plan as well?
 8  A I do not know what the justification was this time
 9    as well.
10  Q Okay.
11  A Or if that was the justification this time as
12    well.
13  Q It's just the historical fact that had been done
14    in the 2002 plan?
15  A Yes.
16  Q Did -- do you know whether Mr. Foltz or Mr. Ottman
17    would have decided to split Appleton in this way?
18  A Can you restate the question?
19  Q Yes.  Do you know whether Mr. Foltz or Mr. Ottman
20    made the decision to split Appleton in the way
21    that's reflected in Act 43?
22  A I do not know that.
23  Q Was Appleton split in the same way in the map that
24    you drew?
25  A I do not recall the map that I drew for that, that
```

**Page 246**

```
 1    particular area.
 2  Q I'd like to draw your attention up to the city of
 3    Marshfield.  And Marshfield is split into
 4    two assembly districts as well, correct?
 5  A Yes.
 6  Q Do you know why Marshfield is split into
 7    two assembly districts?
 8  A No, I do not.
 9  Q Did you ever have any conversations with anyone
10    about splitting Marshfield into two different
11    assembly districts?
12  A Yes.
13  Q Okay.  Who did you speak with about that topic?
14  A Mr. Ottman.
15  Q And what was that -- what was the nature of that
16    conversation?
17  A In my assigned work to attempt to -- or to look at
18    different splits and unassigned people,
19    discontinuous territory, et cetera, I was unable
20    to -- that was a split that I was not able to
21    address.
22  Q All right.  So you attempted to keep Marshfield
23    within a single assembly district in the map that
24    you were drawing?
25  A In my maps, I do not recall if Marshfield was in
```

**Page 247**

```
 1    one assembly district or two.
 2  Q This was the -- this was the version of Act 43
 3    that they asked you to look at the splits and see
 4    if you could fix the splits; is that correct?
 5  A Yes.
 6  Q All right.  And you attempted to do that with the
 7    city of Marshfield?
 8  A I looked at it.
 9  Q Okay.  Did you actually use the software to
10    attempt to put Marshfield all within one assembly
11    district?
12  A I used the software to look at the populations
13    involved but did not attempt to put it in one.
14  Q All right.  When you -- when you looked at the
15    populations involved with the city of Marshfield,
16    were you able to draw any conclusions from looking
17    at that data about whether you could include
18    Marshfield within a single assembly district?
19  A Marshfield -- my understanding is Marshfield can
20    be contained within a single assembly district.
21  Q Do you know why it was not?
22  A I do not know why.
23  Q And did anybody ever tell you why it was not?
24  A No.
25  Q All right.  You can set the maps aside.
```

**Page 248**

```
 1        Mr. Handrick, we had discussed a little bit
 2    earlier about communications that you had with
 3    people by e-mail.  Do you recall those questions
 4    and the answers?
 5  A Yes.
 6  Q All right.  Did you save any copies of the e-mail
 7    communications that you had with respect to
 8    redistricting?
 9  A Yes.
10  Q Okay.  And where are those e-mail communications
11    saved?
12  A On my -- in my -- in my electronic folder.
13  Q Okay.  Does the Reinhart law firm have a document
14    management system?
15  A I don't know.
16  Q Is there -- is there some kind of a central system
17    at Reinhart that saves e-mails and documents?
18  A I don't know.
19  Q And when you say that your e-mails are saved, do
20    you know if they're saved on your computer itself
21    or on your BlackBerry or in some other location at
22    Reinhart?
23  A I do not believe they are saved on the device
24    themselves.
25  Q So to the extent that they're saved, they'd be
```

**Page 249**

1     saved in some kind of central repository for
2     electronic documents at Reinhart?
3 A That would be my guess.
4 Q Did you retain copies of any communications,
5     e-mail communications, that you sent on your own
6     computer?
7 A State the question again, please.
8 Q Sure. Did you retain any copies of any e-mail
9     communications that you sent on your own computer?
10 A Copies, no.
11 Q Do you have your own computer at Reinhart?
12 A Yes.
13 Q Do you have a separate computer at home?
14 A No.
15 Q Do you save any text messages on your BlackBerry
16     device?
17 A If I do, I'm not aware that I do.
18 Q Okay. Do you know whether Reinhart has any kind
19     of a centralized system that saves any text
20     messages that you send?
21 A I don't know.
22 Q Do you have a physical paper file that you keep at
23     your office at Reinhart?
24 A State the question again, please.
25 Q Sure. Do you keep any -- not many of us do this

**Page 250**

1     anymore, but do you keep any hard copies of
2     documents in your office at Reinhart?
3 A Yes.
4 Q Did you keep any hard copies of documents
5     pertaining to the legislative redistricting work
6     that you did?
7 A No.
8 Q Were there any voicemail messages that were left
9     on your phone, either your cell phone or your
10     phone at the Reinhart law firm, pertaining to
11     legislative redistricting?
12           MR. KELLY: Objection. Do you want
13     to limit that temporally?
14           MR. POLAND: Let's just -- let's
15     just say generally first.
16           MR. KELLY: All right. Then I
17     object to the extent that the question calls
18     for information protected by the
19     attorney-client privilege and work product
20     doctrine. And I instruct the witness not to
21     answer. That instruction pertains to any
22     such voicemails on or after November 22,
23     2011.
24         If there were any voicemails prior to
25     that point that is responsive to the

**Page 251**

1     question, you may answer.
2 Q And so with respect to any attorney-client or work
3     product communications, are you going to follow
4     your counsel's instructions and not answer the
5     question?
6 A Yes.
7 Q All right. With respect to any other
8     communications that are -- would not -- are not
9     arguably covered by the work product or the
10     attorney-client privilege, did you have any such
11     voicemails left for you pertaining to legislative
12     redistricting?
13 A I would have no way of recalling that.
14 Q Do you know whether the -- whether Reinhart has a
15     system that archives any of the voicemails that
16     you receive either on the phone at your desk or on
17     your cell phone?
18 A I don't know.
19           MR. POLAND: Those are all the
20     questions that I have for now subject to the
21     stipulation that we put -- that Eric put on
22     the record before.
23           MR. MCLEOD: Okay.
24           MR. POLAND: Anyone else?
25           MR. HASSETT: Couple questions.

**Page 252**

1                 EXAMINATION
2 By Mr. Hassett:
3 Q I just wanted to reiterate briefly. You said you
4     had nothing to do with Act 44?
5 A That's correct.
6 Q Legislative redistricting. And I believe you
7     said --
8           MR. KASPER: Clarification.
9     Act 44, you said legislative redistricting.
10           MR. HASSETT: I'm sorry. Thanks
11     for the correction, congressional
12     redistricting.
13 Q And you said Tad Ottman, Ottman had nothing to do
14     with it, as far as you know?
15 A As far as I know.
16 Q As far as you know. And Adam Foltz, do you know
17     if he had any involvement in congressional
18     redistricting?
19 A Not as far as I know.
20 Q What's your understanding of who drew those lines,
21     the congressional lines for Act 44?
22 A I don't know.
23           MR. HASSETT: All right. I have
24     nothing further.
25           MR. KELLY: Nothing from us.

```
1              MR. POLAND:  Okay.  I think then
2      we're off the record.
3              (Adjourning at 5:36 p.m.)
```

                                                    253

```
1     interested in the action.
2              In witness whereof I have hereunto set my
3      hand and affixed my notarial seal this 22nd day of
4      December 2011.
5
6      _____
7      Notary Public, State of Wisconsin
       Registered Professional Reporter
8      My commission expires
       10/6/2013
```

                                                    255

```
1     STATE OF WISCONSIN )
                         ) ss.
2     COUNTY OF DANE     )

3         I, CARMEN HARDER, a Registered Professional Reporter
4     and Notary Public duly commissioned and qualified in
5     and for the State of Wisconsin, do hereby certify
6     that pursuant to subpoena, there came before me on
7     the 20th day of December 2011, at 9:25 in the
8     forenoon, at the offices of Godfrey & Kahn, S.C.,
9     Attorneys at Law, One East Main Street, the City of
10    Madison, County of Dane, and State of Wisconsin, the
11    following named person, to wit:  JOSEPH W. HANDRICK,
12    who was by me duly sworn to testify to the truth and
13    nothing but the truth of his knowledge touching and
14    concerning the matters in controversy in this cause;
15    that he was thereupon carefully examined upon his
16    oath and his examination reduced to typewriting with
17    computer-aided transcription; that the deposition is
18    a true record of the testimony given by the witness;
19    and that reading and signing was not waived.
20            I further certify that I am neither
21    attorney or counsel for, nor related to or employed
22    by any of the parties to the action in which this
23    deposition is taken and further that I am not a
24    relative or employee of any attorney or counsel
25    employed by the parties hereto or financially
```

                                                    254

**$**

**$5,000** [3] - 36:4, 86:15, 86:23

**'**

**'92** [1] - 69:8
**'client'** [1] - 35:11

**1**

**1** [19] - 3:12, 12:15, 12:16, 12:19, 12:25, 13:7, 13:13, 13:14, 13:24, 15:22, 15:25, 16:18, 17:7, 17:10, 19:17, 87:7, 161:14, 163:7, 163:9
**1-19** [1] - 5:7
**1-22** [1] - 5:6
**1/25/2011** [1] - 3:25
**10** [15] - 4:4, 91:2, 91:5, 91:13, 91:16, 91:21, 96:4, 96:5, 98:14, 156:6, 156:8, 156:13, 156:16, 159:3
**10/6/2013** [1] - 255:8
**1000** [1] - 7:10
**104** [1] - 4:6
**106** [1] - 4:8
**108** [1] - 4:10
**11** [13] - 4:6, 92:23, 93:13, 97:6, 104:15, 104:18, 104:22, 105:1, 107:7, 157:1, 157:8, 157:9, 240:5
**11-CV-1011** [1] - 2:11
**11-CV-562** [1] - 1:12
**12** [10] - 3:13, 4:7, 93:24, 94:14, 97:11, 106:16, 106:20, 157:1, 159:4, 207:11
**12/13/2011** [1] - 3:12
**12/2/2011** [1] - 4:20
**13** [19] - 4:9, 13:7, 13:10, 94:22, 94:25, 95:3, 97:23, 108:4, 108:7, 108:13, 108:18, 157:2, 197:19, 198:12, 201:21, 202:11, 203:5, 203:24
**14** [10] - 4:11, 94:22, 98:23, 100:2, 157:2, 188:9, 188:12, 188:13, 188:15, 190:9

**15** [24] - 4:13, 21:22, 26:5, 26:11, 35:1, 35:15, 37:6, 40:9, 41:16, 42:9, 68:6, 86:17, 86:19, 94:22, 99:13, 100:6, 121:6, 147:8, 157:2, 188:9, 188:13, 188:14, 190:3, 223:20
**16** [12] - 4:14, 94:22, 101:16, 157:2, 190:24, 191:1, 191:3, 191:24, 192:13, 193:25, 194:1, 212:5
**17** [17] - 3:15, 3:17, 4:17, 7:7, 21:21, 37:3, 37:7, 37:18, 94:22, 102:6, 157:2, 157:9, 194:9, 194:11, 194:14, 194:17, 195:19
**18** [21] - 4:20, 21:20, 37:20, 104:25, 168:3, 168:4, 168:21, 168:23, 168:24, 169:4, 194:9, 194:11, 194:14, 195:25, 196:1, 196:8, 196:11, 196:21, 197:5, 212:5
**188** [2] - 4:12, 4:13
**19** [6] - 3:16, 4:22, 197:14, 202:19, 206:4, 207:4
**190** [1] - 4:16
**194** [1] - 4:19
**195** [1] - 4:21
**197** [1] - 4:23
**1990** [5] - 63:14, 63:19, 63:20, 63:23, 69:7
**1990s** [3] - 64:4, 70:20, 72:5
**1991** [1] - 25:9, 63:20, 69:7, 85:24
**1991-1992** [1] - 71:21
**1992** [1] - 25:9, 64:8, 64:14
**1994** [2] - 58:17, 62:23
**1995** [3] - 58:21, 63:2, 189:20
**1996** [2] - 53:21, 63:6
**1998** [1] - 63:6
**1½** [1] - 210:13

**2**

**2** [35] - 3:14, 17:21, 17:23, 18:1, 18:11,

18:21, 19:15, 19:24, 20:20, 20:22, 21:13, 21:15, 21:19, 22:4, 24:2, 26:4, 26:10, 58:22, 58:25, 87:11, 87:12, 87:14, 88:8, 88:10, 90:10, 93:17, 161:3, 161:6, 170:6, 172:2, 172:11, 216:10, 238:4, 238:5, 238:8
**2/15/2011** [1] - 3:18
**2/17/2011** [1] - 3:20
**2/18/2011** [1] - 3:21
**20** [11] - 1:20, 4:24, 72:8, 147:8, 187:17, 215:19, 215:21, 232:19, 232:23, 233:7, 234:3
**2000** [4] - 25:2, 58:15, 58:17, 59:11
**2001** [3] - 25:8, 58:22, 58:25, 59:18, 61:6, 61:9, 61:13, 62:8, 62:14, 65:13, 65:15, 65:21, 65:24, 66:9, 67:12, 69:13, 73:6, 77:12, 189:20
**2002** [18] - 48:4, 58:15, 66:9, 69:14, 81:1, 83:10, 83:14, 85:24, 123:8, 123:16, 210:13, 210:14, 234:13, 234:18, 234:25, 243:23, 245:4, 245:14
**2003** [2] - 58:3, 59:2
**2003-2004** [2] - 57:25, 58:6
**2004** [4] - 58:3, 67:16, 75:1, 75:3
**2005** [3] - 55:24, 57:7, 57:19
**2006** [2] - 56:2, 56:4
**2009** [4] - 57:5, 75:8, 75:13, 75:24
**2009-2010** [1] - 57:4
**2010** [30] - 26:25, 40:3, 49:9, 54:9, 56:5, 57:6, 57:7, 57:19, 74:15, 74:23, 75:5, 75:11, 75:19, 76:5, 76:7, 76:17, 76:24, 77:5, 85:8, 85:17, 92:2, 93:3, 96:8, 96:20, 97:3, 97:8, 99:13, 124:23, 175:14
**2011** [100] - 1:20, 5:3, 5:4, 6:13, 21:11, 23:16, 25:3, 25:16,

26:5, 26:11, 32:21, 35:1, 35:16, 37:3, 37:7, 41:16, 41:17, 42:9, 42:10, 52:18, 55:5, 55:12, 56:16, 76:7, 76:8, 81:1, 83:10, 83:17, 86:5, 86:17, 87:21, 88:18, 91:25, 102:25, 104:25, 110:2, 111:25, 114:16, 115:10, 115:13, 115:22, 115:23, 116:23, 117:2, 120:2, 120:5, 120:19, 121:6, 121:10, 123:18, 124:7, 124:11, 126:3, 126:6, 126:11, 126:24, 127:2, 127:19, 128:20, 130:15, 130:24, 137:5, 137:16, 137:20, 137:22, 138:4, 139:9, 139:12, 141:15, 141:18, 141:22, 142:1, 142:12, 144:3, 144:9, 144:12, 144:17, 144:20, 146:11, 146:17, 146:23, 147:3, 199:18, 201:25, 211:24, 215:19, 215:22, 232:19, 232:23, 233:10, 250:22
**2012** [2] - 36:6, 86:19
**20th** [2] - 6:13, 254:7
**21** [4] - 5:3, 191:6, 232:23, 233:23
**2100** [1] - 7:11
**22** [78] - 5:4, 14:24, 15:5, 15:6, 15:10, 30:24, 31:7, 31:8, 33:11, 40:12, 41:17, 42:10, 81:2, 81:4, 87:23, 87:25, 88:17, 102:25, 111:3, 112:9, 113:2, 114:5, 114:8, 115:3, 115:10, 115:22, 116:23, 117:2, 117:18, 117:19, 118:24, 120:2, 120:5, 120:18, 120:19, 121:7, 126:3, 126:6, 126:11, 126:23, 127:1, 127:19, 128:8,

128:19, 129:7, 130:15, 130:24, 137:16, 137:20, 137:22, 138:3, 139:9, 139:12, 140:7, 140:8, 141:15, 141:18, 141:22, 142:1, 142:12, 144:8, 144:9, 144:12, 144:17, 144:20, 146:11, 146:17, 146:23, 147:3, 199:18, 201:25, 211:24, 215:19, 215:22, 232:19, 232:23, 233:10, 250:22
**224** [1] - 3:5
**22nd** [1] - 255:3
**23** [2] - 21:7, 211:24
**232** [3] - 4:24, 5:3, 5:4
**25** [1] - 55:12
**252** [1] - 3:6
**26** [2] - 14:24, 156:7
**26(a** [2] - 4:4, 91:10
**26(a)(1** [1] - 93:17
**262** [1] - 7:24
**28** [1] - 194:19
**29** [2] - 211:23, 211:24
**2A** [17] - 3:16, 19:8, 19:10, 19:13, 19:20, 25:23, 25:25, 26:6, 26:9, 31:14, 47:23, 48:14, 168:7, 168:13, 169:21, 170:2

**3**

**3** [15] - 3:17, 17:22, 17:23, 18:3, 18:11, 18:21, 19:15, 31:24, 32:3, 32:6, 56:2, 56:4, 68:1, 90:10, 207:16
**30** [3] - 55:5, 147:8, 212:5
**300** [1] - 6:23
**30th** [2] - 187:18, 187:19
**31** [2] - 21:11, 242:25
**34** [5] - 3:19, 3:20, 3:22, 63:3, 63:9
**36** [1] - 215:18

**4**

**4** [15] - 3:18, 34:5, 34:14, 34:17, 34:18, 34:20, 34:23, 34:25,

38:19, 67:24, 68:22,
84:16, 207:9, 207:21,
209:24
  **40** [1] - 222:17
  **400** [1] - 7:4
  **417** [1] - 7:23
  **43** [58] - 4:24, 5:4,
25:3, 25:17, 92:5,
96:11, 96:23, 109:10,
124:3, 124:14,
127:17, 127:21,
128:15, 128:21,
145:16, 154:11,
154:21, 155:4,
155:18, 155:21,
156:18, 175:3,
197:10, 205:19,
205:23, 212:12,
212:17, 212:19,
213:14, 214:13,
214:21, 215:11,
217:10, 217:13,
219:1, 219:20,
219:23, 220:4,
222:17, 223:6, 223:9,
233:8, 233:11, 235:3,
236:9, 236:16,
236:20, 239:24,
240:8, 240:14,
241:11, 241:12,
241:19, 242:7,
242:10, 242:14,
245:21, 247:2
  **44** [32] - 5:3, 25:3,
25:17, 92:5, 96:11,
96:24, 109:10, 124:4,
125:6, 125:7, 125:9,
125:10, 125:15,
155:18, 155:22,
155:24, 156:4,
156:11, 156:18,
156:23, 157:4,
157:17, 157:24,
158:22, 197:10,
205:19, 205:20,
233:9, 233:23, 252:4,
252:9, 252:21
  **447-2199** [1] - 7:24
  **45** [1] - 242:25
  **47** [2] - 68:11, 216:9
  **48** [2] - 200:8, 230:25
  **4m** [1] - 188:19

## 5

  **5** [15] - 3:20, 34:9,
34:14, 37:11, 37:12,
37:15, 37:17, 38:2,
38:20, 91:15, 96:6,
108:15, 156:8, 189:1,

223:20
  **500** [1] - 6:20
  **53** [1] - 3:23
  **53021** [1] - 7:23
  **53202** [3] - 6:24,
7:11, 7:14
  **54** [3] - 3:25, 70:5,
70:7
  **55** [1] - 71:11
  **57** [2] - 164:4, 164:5
  **58** [1] - 164:4
  **5:36** [1] - 253:3

## 6

  **6** [11] - 3:21, 34:9,
34:14, 37:11, 37:12,
37:16, 37:20, 38:2,
38:20, 86:9, 156:12
  **61** [1] - 234:6
  **62** [1] - 234:10
  **63** [1] - 234:10
  **64** [6] - 234:6,
234:11, 235:6,
235:17, 236:12,
239:20
  **65** [2] - 234:6, 235:17
  **66** [3] - 4:3, 72:11,
234:11
  **67** [2] - 72:10, 73:17
  **68** [3] - 72:9, 74:5,
74:6

## 7

  **7** [8] - 3:23, 53:1,
53:2, 53:5, 53:8,
159:10, 159:14,
216:10
  **7/13/2011** [1] - 4:23
  **700** [1] - 7:17
  **751** [1] - 4:13
  **751.035** [6] - 4:14,
4:19, 188:25, 190:5,
190:10, 190:14
  **777** [1] - 7:14

## 8

  **8** [10] - 3:24, 54:19,
54:22, 151:9, 151:10,
221:23, 222:2, 222:8,
224:8, 224:12
  **8/233** [1] - 3:4
  **801.17** [1] - 4:11
  **801.50** [1] - 188:18

  **801.50(4m** [4] - 4:15,
4:19, 189:11, 190:1
  **839** [1] - 6:23
  **8th** [15] - 224:18,
225:2, 226:18,
226:23, 226:25,
227:14, 227:16,
227:23, 228:1,
228:25, 229:9,
229:15, 230:2, 231:3,
232:4

## 9

  **9** [18] - 4:3, 56:16,
66:18, 66:20, 66:22,
67:1, 67:24, 69:25,
91:25, 151:9, 151:10,
207:10, 207:21,
221:23, 222:3, 222:8,
224:8, 224:13
  **91** [2] - 4:5, 23:6
  **9:25** [1] - 254:7
  **9:26** [1] - 6:13
  **9th** [15] - 224:18,
225:3, 226:18,
226:24, 226:25,
227:14, 227:16,
227:23, 228:1, 229:1,
229:9, 229:15, 230:2,
231:3, 232:4

## A

  **abbreviated** [1] -
10:25
  **abbreviating** [1] -
10:9
  **abbreviation** [1] -
161:19
  **abilities** [1] - 70:15
  **ability** [4] - 165:21,
166:1, 166:5, 212:7
  **able** [9] - 12:6, 71:2,
71:9, 166:11, 180:15,
184:2, 237:3, 246:20,
247:16
  **absolute** [2] -
210:18, 210:23
  **acceptable** [3] -
213:3, 213:11, 215:7
  **accepted** [1] - 38:6
  **access** [4] - 204:16,
204:20, 204:25,
217:16
  **according** [5] -
10:20, 72:3, 163:25,
240:1, 240:4
  **account** [2] - 117:6,

117:8, 117:10,
139:18, 139:19,
145:10, 177:13,
184:23, 184:25, 211:5
  **Accountability** [8] -
1:14, 2:2, 2:13, 2:16,
6:5, 14:13, 105:25,
106:4
  **accounts** [1] - 182:1
  **accuracy** [2] -
236:22, 237:1
  **accurate** [2] - 53:14,
230:3
  **accurately** [1] -
231:1
  **ACD** [1] - 161:16
  **acknowledge** [1] -
187:25
  **act** [2] - 169:17,
218:20
  **Act** [77] - 4:24, 5:3,
5:4, 124:14, 125:6,
125:7, 125:9, 125:10,
125:15, 127:17,
127:21, 128:15,
128:21, 145:16,
150:23, 151:3, 151:6,
154:11, 154:21,
155:4, 155:18,
155:21, 155:22,
155:24, 156:4,
156:11, 156:23,
157:4, 157:17,
157:24, 158:22,
175:3, 205:20,
205:23, 208:24,
209:16, 209:17,
209:18, 210:25,
212:12, 212:17,
212:19, 213:14,
214:13, 214:21,
215:11, 217:10,
217:13, 219:1,
219:20, 219:23,
220:4, 222:17, 223:6,
223:9, 233:8, 233:9,
233:11, 233:23,
235:3, 236:9, 236:16,
236:20, 239:24,
240:8, 240:14,
241:11, 241:12,
241:19, 242:7,
242:10, 242:14,
245:21, 247:2, 252:4,
252:9, 252:21
  **Action** [2] - 4:11,
4:16
  **action** [11] - 187:11,
188:22, 189:1, 189:4,
191:5, 191:12, 195:3,

195:22, 196:3,
254:22, 255:1
  **activity** [1] - 218:23
  **Acts** [11] - 25:3,
25:17, 92:5, 96:11,
96:23, 109:10, 124:3,
156:18, 197:10,
205:19, 222:17
  **acts** [1] - 118:6
  **Adam** [11] - 42:3,
45:22, 50:6, 50:24,
101:9, 150:14,
151:18, 160:13,
231:10, 232:6, 252:16
  **Adams** [3] - 163:17,
163:19
  **added** [1] - 164:7
  **addition** [6] - 66:11,
110:11, 209:3,
209:18, 233:12,
233:13
  **additional** [3] -
110:16, 133:16,
169:14
  **additionally** [1] -
98:11
  **address** [6] - 138:11,
138:14, 138:15,
138:18, 138:23,
246:21
  **addressed** [1] - 69:6
  **addressing** [1] -
190:22
  **Adjourning** [1] -
253:3
  **adopted** [7] - 73:11,
225:18, 228:4, 229:8,
242:14, 242:15,
242:18
  **adoption** [1] - 85:15
  **advance** [1] - 215:24
  **advice** [12] - 85:7,
85:14, 85:18, 85:20,
90:2, 101:21, 109:5,
125:1, 148:17,
175:13, 177:2, 215:10
  **affect** [1] - 75:14
  **affected** [1] - 241:5
  **affirmatively** [1] -
12:7
  **affixed** [1] - 255:3
  **African** [2] - 168:15,
168:25
  **African-American**
[2] - 168:15, 168:25
  **age** [8] - 6:2, 168:24,
169:1, 222:2, 222:6,
229:14, 229:20, 230:1
  **ago** [5] - 40:1,
128:14, 185:12,

2

211:1, 237:12
**agree** [4] - 74:2, 208:3, 216:2, 216:18
**agreed** [3] - 8:19, 158:5, 186:24
**agreement** [3] - 8:11, 188:3, 188:5
**ahead** [7] - 8:13, 34:7, 78:9, 104:14, 193:9, 223:21, 223:25
**aided** [1] - 254:17
**airport** [1] - 147:18
**al** [4] - 6:3, 6:5, 6:21, 6:25
**allegations** [1] - 107:6
**Alliance** [1] - 58:10
**allocation** [1] - 208:13
**allowing** [1] - 10:23
**almost** [1] - 72:8
**Alternative** [1] - 4:15
**Alvin** [2] - 6:3, 6:21
**ALVIN** [1] - 1:3
**ambiguous** [15] - 43:10, 43:23, 44:20, 49:22, 60:23, 84:6, 96:14, 97:19, 109:13, 111:11, 112:17, 113:9, 113:23, 116:2, 154:14
**Amended** [9] - 4:4, 4:6, 4:8, 4:21, 91:10, 104:23, 106:23, 107:8
**amended** [5] - 106:1, 106:5, 106:14, 196:2
**amendment** [1] - 225:16
**American** [2] - 168:15, 168:25
**amount** [1] - 211:25
**AMY** [1] - 1:7
**analysis** [12] - 72:20, 86:2, 86:4, 159:15, 159:21, 160:7, 160:12, 160:18, 160:21, 160:24, 165:15, 165:20
**analytic** [1] - 70:15
**analyzing** [1] - 212:13
**Anesthesiologists** [1] - 57:22
**anesthesiologists** [1] - 59:2
**answer** [187] - 12:1, 12:8, 20:15, 27:18, 30:2, 31:2, 31:4, 31:5, 33:7, 33:18, 40:19, 40:22, 40:23, 41:6,

41:9, 41:11, 41:14, 43:11, 43:13, 43:24, 49:21, 49:23, 60:25, 79:13, 79:15, 80:16, 80:17, 82:3, 82:6, 82:24, 83:1, 83:6, 84:8, 89:19, 89:21, 90:1, 90:22, 92:18, 92:20, 93:20, 93:22, 94:17, 95:21, 96:15, 97:1, 97:20, 98:10, 98:16, 98:21, 99:9, 99:11, 99:23, 99:25, 102:2, 102:4, 102:15, 102:17, 103:3, 103:15, 103:17, 105:12, 105:21, 105:22, 106:9, 106:11, 106:13, 107:13, 107:15, 109:4, 109:6, 110:25, 111:6, 111:12, 111:13, 111:14, 111:15, 112:7, 112:10, 112:18, 112:25, 113:6, 113:11, 113:12, 114:3, 114:6, 114:8, 115:4, 115:5, 115:8, 116:2, 119:12, 119:15, 119:17, 120:9, 121:1, 121:3, 122:19, 122:22, 122:23, 123:1, 126:3, 126:7, 127:10, 127:12, 127:14, 129:1, 129:2, 129:11, 129:17, 129:21, 131:6, 131:10, 131:15, 133:24, 134:3, 134:5, 134:14, 134:20, 135:1, 137:13, 137:15, 137:17, 137:19, 142:20, 145:23, 146:8, 154:14, 156:13, 161:12, 173:13, 177:1, 177:3, 181:11, 181:13, 182:13, 182:15, 183:19, 183:21, 185:7, 185:25, 186:6, 187:5, 191:22, 192:2, 192:5, 192:18, 192:22, 193:11, 193:17, 193:20, 195:9, 195:11, 196:17, 196:19, 199:2, 199:6, 199:8, 202:3, 202:5, 209:7, 210:20, 211:13,

213:24, 214:3, 214:7, 216:7, 216:20, 216:22, 216:24, 216:25, 217:7, 218:2, 218:7, 218:9, 219:13, 220:1, 225:5, 231:15, 236:22, 237:1, 237:3, 243:17, 250:21, 251:1, 251:4
**Answer** [4] - 4:7, 106:22, 216:23
**answered** [2] - 44:25, 130:1
**answers** [8] - 107:5, 145:20, 145:25, 146:1, 146:2, 146:5, 146:6, 248:4
**anticipated** [1] - 73:12
**anticipation** [1] - 9:22
**apart** [2] - 20:10, 235:12
**apologize** [2] - 112:11, 213:18
**appeal** [2] - 10:17, 187:7
**appeals** [1] - 190:6
**appear** [3] - 23:2, 23:4, 170:24
**appearing** [8] - 6:20, 6:24, 7:4, 7:8, 7:11, 7:14, 7:18, 10:18
**appellate** [1] - 187:12
**appended** [1] - 194:22
**Appleton** [9] - 244:2, 244:9, 244:14, 244:20, 245:3, 245:17, 245:20, 245:23
**application** [2] - 23:14, 166:2
**apply** [1] - 55:17
**Appointment** [2] - 4:14, 4:18
**apportionment** [3] - 124:22, 188:22, 189:2
**appreciate** [2] - 10:22, 224:1
**approached** [1] - 77:7
**appropriate** [9] - 92:3, 96:9, 96:21, 129:13, 156:21, 172:13, 187:2, 188:2, 211:3
**April** [6] - 27:2, 27:3, 222:10, 224:22, 225:7

**archives** [1] - 251:15
**area** [12] - 28:11, 28:13, 28:18, 29:1, 75:16, 75:18, 75:22, 76:21, 237:15, 237:16, 237:18, 246:1
**areas** [3] - 208:17, 225:25, 233:19
**arguably** [1] - 251:9
**argue** [3] - 73:3, 73:14, 74:18
**arguments** [2] - 11:6, 11:12
**arise** [1] - 75:7
**arrangement** [1] - 38:7
**arrived** [1] - 18:9
**artisan** [1] - 74:12
**ascertain** [1] - 235:11
**Ashland** [1] - 163:23
**aside** [4] - 37:10, 174:10, 178:25, 247:25
**ASM** [3] - 161:15, 161:16, 161:18
**aspect** [1] - 242:15, 242:17
**aspects** [1] - 208:25
**aspirations** [2] - 75:3, 75:7
**assembled** [1] - 237:13
**assembly** [85] - 9:21, 48:25, 58:17, 58:20, 58:25, 60:6, 60:7, 60:13, 62:21, 62:25, 63:17, 73:19, 73:21, 118:1, 122:6, 151:11, 151:15, 151:19, 151:23, 152:1, 152:12, 152:19, 152:24, 153:4, 154:6, 154:11, 154:20, 161:19, 164:20, 210:8, 210:10, 210:11, 221:19, 224:19, 225:3, 225:10, 225:11, 226:18, 226:24, 226:25, 227:16, 227:23, 228:1, 229:1, 229:9, 229:15, 230:2, 231:3, 232:4, 233:13, 234:5, 234:14, 234:18, 234:24, 235:20, 235:22, 236:1, 236:4, 236:7, 239:1, 239:18, 240:5, 240:12, 240:15,

240:21, 243:3, 243:9, 243:15, 243:20, 243:23, 244:3, 244:7, 244:10, 244:13, 244:14, 244:20, 246:4, 246:7, 246:11, 246:23, 247:1, 247:10, 247:18, 247:20
**Assembly** [19] - 4:24, 7:19, 35:9, 63:3, 84:22, 121:15, 151:9, 151:10, 221:23, 222:7, 224:7, 224:12, 233:8, 234:10, 235:5, 235:17, 236:12, 239:20, 242:25
**assert** [23] - 16:21, 27:12, 27:13, 29:23, 33:3, 33:8, 40:16, 41:21, 96:25, 97:17, 113:8, 115:25, 119:6, 122:14, 133:20, 134:11, 134:17, 181:6, 182:9, 183:15, 185:4, 187:1, 211:8
**asserted** [4] - 131:14, 185:18, 192:3, 193:4
**asserting** [1] - 10:7
**assertion** [3] - 199:9, 214:4, 215:16
**assess** [1] - 213:2
**assessment** [1] - 86:1
**assigned** [2] - 170:23, 246:17
**Assignment** [2] - 32:2, 190:5
**Assignments** [1] - 3:17
**assist** [12] - 29:18, 51:2, 59:10, 66:7, 85:20, 96:9, 96:21, 97:23, 98:23, 101:16, 102:6, 148:16
**assistance** [6] - 39:21, 84:11, 85:6, 100:4, 124:20, 124:24
**Assistant** [1] - 7:6
**assistant** [1] - 43:17
**assistants** [1] - 50:6
**assisted** [4] - 92:2, 95:6, 97:4, 101:20
**assisting** [5] - 9:19, 30:7, 50:23, 135:7, 225:23
**associated** [1] - 72:23
**Association** [7] -

56:13, 56:19, 57:4, 57:12, 58:12, 205:15, 205:23

**assume** [3] - 13:9, 50:24, 239:6

**assumption** [1] - 187:6

**attach** [2] - 196:5, 196:7

**attached** [5] - 3:12, 4:20, 5:6, 21:20, 191:7

**attempt** [2] - 246:17, 247:10, 247:13

**attempted** [2] - 246:22, 247:6

**attended** [1] - 53:25

**attention** [19] - 15:21, 36:3, 70:4, 70:8, 72:9, 73:16, 74:4, 91:15, 159:4, 188:17, 190:4, 207:10, 207:21, 211:23, 215:18, 216:9, 242:23, 244:1, 246:2

**attorney** [88] - 8:23, 9:16, 9:17, 10:10, 27:16, 29:25, 30:1, 30:25, 33:5, 36:23, 40:18, 41:10, 89:18, 89:25, 92:17, 93:19, 94:16, 95:20, 98:8, 98:12, 99:7, 99:21, 101:25, 102:14, 103:1, 103:13, 105:10, 105:18, 106:7, 107:11, 109:2, 110:23, 112:5, 113:5, 114:24, 119:9, 119:11, 120:7, 120:24, 122:17, 125:24, 127:5, 128:24, 131:4, 137:11, 176:21, 179:14, 181:8, 181:9, 182:11, 183:17, 185:5, 185:6, 185:15, 187:3, 187:8, 191:20, 192:16, 195:6, 196:15, 196:23, 198:22, 199:9, 202:1, 213:22, 214:5, 214:10, 217:25, 250:19, 251:2, 251:10, 254:21, 254:24

**Attorney** [8] - 5:25, 6:19, 6:22, 7:6, 7:9, 7:13, 7:16, 133:22

**attorney-client** [65] - 9:16, 10:10, 27:16, 29:25, 30:25, 33:5, 40:18, 41:10, 89:18, 89:25, 92:17, 93:19, 94:16, 95:20, 98:8, 98:12, 99:7, 99:21, 101:25, 102:14, 103:1, 103:13, 105:10, 105:18, 106:7, 107:11, 109:2, 110:23, 112:5, 113:5, 114:24, 119:9, 119:11, 120:7, 120:24, 122:17, 125:24, 127:5, 128:24, 131:4, 134:1, 137:11, 176:21, 181:8, 182:11, 183:17, 185:5, 185:15, 187:3, 187:8, 191:20, 192:16, 195:6, 196:15, 196:23, 198:22, 199:9, 202:1, 213:22, 214:5, 214:10, 217:25, 250:19, 251:2, 251:10

**attorneys** [1] - 8:21

**Attorneys** [9] - 6:11, 6:19, 6:23, 7:3, 7:3, 7:10, 7:13, 7:17, 254:9

**attractive** [1] - 71:5

**attributing** [1] - 70:25

**audibly** [4] - 12:1, 12:9, 161:12, 173:13

**August** [3] - 21:11, 91:25, 124:2

**authored** [1] - 67:6

**autoBound** [23] - 24:16, 24:18, 24:19, 24:21, 24:23, 24:24, 25:1, 25:5, 25:12, 25:16, 25:19, 26:1, 62:7, 152:2, 152:12, 152:16, 166:4, 166:6, 166:9, 168:9, 169:7, 172:7, 220:10

**automatically** [1] - 169:10

**available** [4] - 25:12, 26:22, 26:24, 187:20

**Avenue** [1] - 7:14

**avoidable** [1] - 212:2

**aware** [20] - 14:19, 45:3, 100:12, 173:3, 173:7, 173:9, 173:20, 185:11, 190:17, 194:4, 195:21, 197:1, 197:8, 198:5, 198:11, 199:14, 220:18, 220:24, 221:1, 249:17

## B

**Baldus** [2] - 6:3, 6:21

**BALDUS** [1] - 1:3

**BALDWIN** [1] - 1:10

**ballpark** [4] - 44:10, 135:13, 135:15, 147:25

**Barbara** [3] - 123:10, 123:12, 123:13

**BARBERA** [1] - 1:3

**BARLAND** [2] - 1:16, 2:15

**Barron** [1] - 163:23

**based** [8] - 72:22, 98:7, 98:13, 98:15, 99:6, 99:20, 219:4, 226:12

**basis** [7] - 89:24, 94:15, 95:19, 112:4, 130:9, 201:25, 202:3

**Bay** [1] - 164:13

**Bayfield** [1] - 163:23

**Bear** [1] - 57:12

**became** [6] - 26:22, 63:25, 70:15, 75:13, 124:14, 125:15

**BECHEN** [1] - 1:3

**become** [2] - 26:24, 175:3

**becoming** [1] - 75:10

**beforehand** [1] - 121:13

**began** [2] - 55:24, 86:17

**begin** [4] - 9:5, 11:15, 56:1, 109:9

**beginning** [3] - 36:5, 75:8, 87:20

**begins** [2] - 21:6, 72:18

**behalf** [20] - 6:2, 6:20, 6:24, 7:4, 7:8, 7:11, 7:14, 7:18, 8:15, 8:21, 44:2, 57:3, 57:8, 58:5, 64:1, 83:23, 91:23, 93:2, 94:2, 95:6

**BELL** [1] - 1:7

**Beloit** [8] - 242:24, 243:2, 243:6, 243:9, 243:19, 243:22, 244:7

**belong** [1] - 206:17

**below** [1] - 163:16

**BEST** [1] - 7:17

**Best** [94] - 15:19, 27:20, 28:2, 29:17, 30:11, 30:14, 30:18, 31:10, 31:18, 32:10, 32:13, 32:15, 33:24, 34:22, 38:14, 39:10, 39:19, 40:14, 41:18, 42:11, 43:6, 43:19, 44:8, 44:12, 46:18, 47:3, 47:12, 49:11, 49:15, 49:18, 51:16, 51:21, 51:24, 59:9, 59:18, 59:21, 60:10, 61:7, 61:17, 62:2, 62:16, 65:18, 84:10, 87:3, 88:4, 100:22, 110:10, 113:17, 114:21, 116:9, 119:2, 119:21, 120:14, 121:10, 122:12, 124:20, 125:13, 131:20, 132:7, 132:11, 133:14, 133:19, 134:10, 135:5, 135:10, 142:16, 143:9, 144:5, 146:13, 146:20, 148:9, 148:21, 149:12, 154:19, 160:15, 160:19, 172:19, 174:14, 174:21, 175:5, 175:7, 175:10, 178:12, 178:19, 178:22, 179:13, 179:19, 180:1, 182:20, 183:6, 200:11, 204:19, 204:21, 231:1

**best** [7] - 52:1, 53:15, 86:10, 110:5, 124:23, 150:6, 212:7

**Best's** [12] - 32:17, 32:22, 33:1, 136:23, 137:1, 146:24, 155:3, 166:16, 167:10, 178:5, 182:24, 204:24

**between** [30] - 24:7, 27:15, 37:6, 38:25, 40:11, 41:16, 58:24, 83:9, 115:16, 139:4, 153:3, 169:16, 171:24, 176:22, 189:20, 208:10, 219:23, 222:10, 224:22, 225:6, 234:14, 234:20, 235:16, 235:20, 236:1, 238:12, 242:3,

242:24, 244:7

**beyond** [2] - 54:3, 80:17

**BIENDSEIL** [1] - 1:3

**bill** [1] - 225:14

**bills** [7] - 88:24, 142:25, 143:12, 143:17, 201:1, 201:5, 201:9

**bio** [5] - 53:9, 53:11, 53:14, 53:17, 54:5

**Bio** [1] - 3:23

**bit** [4] - 34:4, 155:16, 156:9, 248:1

**Black** [5] - 168:3, 168:12, 168:14, 168:21

**black** [1] - 168:23

**BlackBerry** [4] - 177:20, 177:22, 248:21, 249:15

**Block** [2] - 3:17, 32:1

**block** [1] - 233:4

**blocks** [9] - 170:7, 170:10, 171:3, 171:8, 219:4, 230:6, 230:11, 230:14, 230:20

**Board** [8] - 1:14, 2:2, 2:13, 2:16, 6:5, 14:13, 105:25, 106:4

**bodies** [5] - 91:22, 93:1, 94:1, 95:5, 159:16

**BOERNER** [1] - 7:10

**Boerner** [1] - 14:6

**book** [16] - 4:3, 66:12, 66:15, 66:24, 66:25, 67:5, 67:19, 68:8, 68:20, 68:23, 69:6, 70:1, 72:3, 75:1, 83:19

**BOONE** [2] - 1:4

**Born** [2] - 4:3, 67:5

**bottom** [5] - 24:13, 55:4, 170:6, 170:24, 190:10

**boundaries** [15] - 92:4, 95:10, 95:11, 96:10, 96:22, 98:1, 98:3, 125:18, 126:13, 126:25, 129:14, 136:8, 156:22, 158:17, 184:7

**boundary** [2] - 170:17, 170:19

**break** [7] - 69:22, 138:2, 155:7, 155:10, 155:11, 185:22, 186:15

**BRENNAN** [2] - 1:15,

2:14
**BRETT** [1] - 1:5
**briefly** [1] - 252:3
**bring** [4] - 13:21, 16:9, 16:11, 16:12
**broad** [1] - 191:17
**broader** [1] - 225:5
**broke** [2] - 69:24, 174:11
**broken** [3] - 50:11, 50:13, 50:15
**brought** [6] - 16:22, 17:17, 31:23, 90:8, 143:1, 238:2
**Brown** [1] - 164:12
**BS** [1] - 53:17
**building** [2] - 117:17, 117:22
**built** [1] - 215:20
**BUMPUS** [1] - 1:4
**burden** [1] - 9:25
**Bureau** [1] - 79:22
**Burnett** [1] - 163:23
**bye** [2] - 178:25, 232:17

### C

**calculations** [4] - 149:9, 205:6, 205:9, 205:10
**calendar** [1] - 23:16
**Calumet** [4] - 162:13, 163:3, 163:5, 164:22
**camera** [1] - 233:5
**campaign** [1] - 122:5
**Campbell** [2] - 7:22, 7:22
**candidates** [1] - 72:24
**CANE** [2] - 1:15, 2:14
**cannot** [7] - 110:16, 117:23, 138:9, 140:17, 226:10, 234:21, 235:11
**capacity** [2] - 1:14, 2:13
**capitol** [2] - 117:17, 117:22
**Caption** [1] - 1:17
**care** [3] - 33:11, 130:13, 191:14
**Career** [1] - 72:16
**career** [1] - 25:6
**carefully** [1] - 254:15
**CARLENE** [1] - 1:3
**Carmen** [2] - 1:21, 6:8
**CARMEN** [1] - 254:3

**case** [12] - 15:1, 77:19, 77:23, 81:8, 103:25, 104:10, 104:12, 105:15, 107:19, 108:1, 114:2, 190:22
**Case** [1] - 2:11
**categories** [9] - 15:22, 15:24, 16:5, 16:16, 16:20, 96:3, 168:1, 169:19, 170:13
**category** [4] - 168:18, 192:8, 199:20
**CATES** [1] - 7:3
**caucus** [1] - 73:18
**cavern** [1] - 191:14
**cc** [1] - 37:24
**cc'd** [1] - 39:14
**CD** [5] - 3:17, 17:22, 18:4, 31:25, 136:25
**CECELIA** [1] - 1:7
**cell** [6] - 116:16, 140:18, 140:21, 140:24, 250:9, 251:17
**Census** [3] - 24:4, 24:14, 235:21
**census** [39] - 26:20, 26:22, 26:24, 26:25, 27:4, 27:19, 28:3, 49:9, 59:11, 63:23, 75:5, 75:12, 75:20, 76:17, 76:24, 77:5, 85:8, 85:17, 92:2, 93:3, 93:4, 96:8, 96:20, 97:3, 97:7, 97:8, 99:14, 100:7, 124:23, 170:10, 171:3, 171:8, 175:14, 219:4, 230:6, 230:11, 230:13, 230:20, 235:25
**central** [2] - 248:16, 249:1
**centralized** [1] - 249:19
**certain** [3] - 132:21, 164:6, 211:25
**certainly** [3] - 16:25, 41:19, 103:23
**certify** [2] - 254:5, 254:20
**cetera** [2] - 10:11, 246:19
**chair** [5] - 55:22, 56:1, 56:3, 63:22, 76:16
**chairman** [2] - 75:23, 76:11
**challenge** [2] - 188:22, 189:1

**challenges** [1] - 155:21
**chance** [2] - 68:21, 185:16
**change** [2] - 95:25, 186:15
**changed** [6] - 96:2, 239:24, 242:4, 242:5, 242:6, 242:8
**changes** [1] - 187:15
**changing** [1] - 185:22
**Chapter** [4] - 4:11, 4:13, 67:24, 68:22
**chapter** [2] - 67:23, 68:22
**charge** [1] - 130:6
**charging** [1] - 86:14
**check** [2] - 88:20, 88:21
**Chicago** [1] - 231:17
**choice** [1] - 211:20
**chose** [1] - 76:23
**CINDY** [1] - 1:3
**Circuit** [1] - 194:19
**circumstances** [2] - 72:24, 187:24
**cities** [1] - 237:7
**citizen** [1] - 229:19
**citizens** [2] - 229:20, 230:1
**citizenship** [2] - 229:13, 229:17
**City** [2] - 6:11, 254:9
**city** [22] - 28:22, 29:2, 161:22, 164:24, 164:25, 221:20, 234:17, 234:23, 235:4, 235:16, 236:1, 236:3, 236:8, 236:11, 238:16, 242:23, 242:24, 245:3, 246:2, 247:7, 247:15
**civil** [3] - 161:18, 161:20, 162:22
**claiming** [1] - 199:15
**claims** [2] - 91:20, 155:18
**CLARENCE** [1] - 1:5
**clarification** [6] - 9:11, 11:8, 87:10, 128:7, 186:20, 252:8
**clarify** [1] - 104:12
**class** [1] - 211:4
**cleaned** [1] - 22:21
**cleaner** [1] - 34:4
**cleanup** [1] - 119:24
**clear** [4] - 14:22, 19:9, 226:17, 229:24
**CLEEREMAN** [1] -

1:4
**clerk** [1] - 189:3, 189:5
**clicking** [1] - 45:12
**client** [70] - 9:16, 10:10, 27:16, 29:25, 30:25, 33:5, 39:21, 39:23, 40:18, 41:10, 84:13, 84:25, 89:18, 89:25, 92:17, 93:19, 94:16, 95:20, 98:8, 98:12, 99:7, 99:21, 101:25, 102:14, 103:1, 103:13, 105:10, 105:18, 106:7, 107:11, 109:2, 110:23, 111:3, 112:5, 113:5, 114:24, 119:9, 119:11, 120:7, 120:24, 122:17, 125:24, 127:5, 128:24, 131:4, 134:1, 137:11, 176:21, 181:8, 182:11, 183:17, 185:5, 185:15, 187:3, 187:8, 191:20, 192:16, 195:6, 196:15, 196:23, 198:22, 199:9, 202:1, 213:22, 214:5, 214:10, 217:25, 250:19, 251:2, 251:10
**Client** [1] - 84:19
**clients** [5] - 8:22, 9:21, 54:11, 54:12, 85:22
**clipped** [1] - 21:4
**CLVS** [1] - 7:22
**COCHRAN** [1] - 1:4
**collecting** [1] - 79:18
**collection** [3] - 18:2, 21:3, 21:14
**column** [10] - 48:20, 48:21, 48:22, 49:2, 49:5, 49:6, 168:11, 168:14, 168:16, 169:4
**columns** [4] - 168:2, 168:12, 168:20, 170:2
**combine** [1] - 236:10
**commence** [1] - 191:4
**Commence** [1] - 4:15
**commenced** [2] - 77:14, 195:22
**Commencement** [1] - 4:11
**commencing** [1] - 6:13

**comment** [3] - 105:25, 106:4, 158:7
**commentary** [3] - 105:14, 105:20, 125:15
**comments** [3] - 82:16, 105:7, 239:22
**commission** [1] - 255:8
**commissioned** [1] - 254:4
**Committee** [2] - 222:19, 222:23
**committee** [3] - 201:2, 203:12, 203:14
**communicate** [30] - 116:19, 116:24, 117:2, 137:3, 138:21, 139:6, 139:11, 139:17, 140:3, 140:10, 140:12, 141:6, 141:9, 141:11, 141:17, 142:2, 142:5, 142:6, 144:4, 144:16, 144:20, 144:25, 145:3, 181:15, 181:18, 181:24, 184:9, 184:12, 184:21, 221:7
**communicated** [1] - 138:25
**communicating** [2] - 45:25, 46:4
**communication** [2] - 179:10, 183:18
**communications** [17] - 27:14, 137:23, 138:4, 139:22, 139:25, 158:21, 182:6, 185:1, 221:4, 248:2, 248:7, 248:10, 249:4, 249:5, 249:9, 251:3, 251:8
**communities** [3] - 94:6, 97:16, 102:8
**community** [5] - 228:12, 228:14, 229:14, 229:20, 231:7
**compact** [3] - 99:16, 100:9, 207:25
**compactness** [2] - 100:14, 100:23
**Company** [1] - 7:22
**compare** [5] - 153:3, 172:12, 173:1, 225:6, 237:3
**compared** [1] - 224:14
**comparison** [1] - 153:9

compel [1] - 188:1
compensated [1] - 60:21
Complaint [7] - 4:6, 4:8, 4:17, 4:21, 104:23, 106:23, 107:8
complaint [15] - 81:8, 81:11, 103:24, 104:8, 104:10, 106:1, 106:5, 106:14, 191:10, 191:11, 194:18, 194:24, 195:18, 196:2, 197:1
complaints [2] - 104:3, 104:5
completed [1] - 225:23
completing [1] - 215:24
completion [1] - 219:5
computer [19] - 45:8, 50:21, 148:24, 152:5, 163:13, 166:21, 173:2, 173:11, 173:16, 173:19, 174:3, 203:21, 248:20, 249:6, 249:9, 249:11, 249:13, 254:17
computer-aided [1] - 254:17
concerning [6] - 9:12, 41:3, 186:19, 187:3, 187:8, 254:14
concerns [1] - 207:25
conclusion [1] - 211:10
conclusions [1] - 247:16
conditions [2] - 38:7, 211:3
conduct [1] - 67:18
conducting [1] - 145:16
conducts [1] - 82:22
Conduit [1] - 74:7
confined [2] - 239:17, 244:14
confirmed [1] - 211:10
confirms [1] - 35:5
confused [1] - 130:6
congressional [21] - 96:10, 96:23, 155:24, 156:3, 156:17, 156:22, 157:4, 157:13, 157:16, 157:22, 158:3,

158:14, 158:18, 158:22, 188:23, 188:24, 189:2, 208:13, 252:11, 252:17, 252:21
Congressional [1] - 92:4
congressmen [1] - 158:5
conjunction [1] - 156:13
connection [1] - 35:6
consider [2] - 229:13, 229:17
considerations [1] - 217:12
considered [2] - 154:8, 229:25
consist [1] - 167:21
consists [2] - 194:23, 196:1
consolidated [1] - 104:12
constitutes [4] - 119:7, 181:8, 182:10, 183:16
constitutional [5] - 85:17, 92:3, 96:9, 96:22, 156:21
consult [3] - 198:1, 198:8, 198:14
consultant [4] - 35:6, 73:20, 189:23, 218:20
consultants [1] - 176:24
consultation [1] - 35:24
consulting [5] - 35:20, 59:17, 74:13, 74:22, 189:22
contact [3] - 228:11, 228:13, 241:7
contained [11] - 19:14, 21:19, 22:4, 90:10, 107:6, 169:24, 170:1, 234:24, 235:5, 236:4, 247:20
containing [1] - 32:7
content [1] - 228:6
contest [2] - 74:20, 74:24
context [2] - 81:7, 83:18
contiguity [1] - 226:14
contiguous [1] - 207:25
continuation [1] - 187:22
continue [2] - 75:23,

232:12
Continued [4] - 1:17, 4:1, 5:1, 7:1
continues [1] - 70:24
continuing [2] - 9:6, 36:6
continuous [1] - 237:14
contract [4] - 56:21, 56:22, 56:25, 59:12
contracted [1] - 73:19
control [2] - 16:4, 16:17, 17:6
controlled [1] - 60:12
controversy [1] - 254:14
conversation [12] - 128:4, 128:7, 128:11, 176:17, 200:12, 200:18, 200:20, 201:3, 201:15, 215:15, 228:8, 246:16
conversations [72] - 94:12, 111:2, 113:20, 114:1, 114:12, 114:16, 114:19, 115:2, 115:9, 115:17, 115:23, 116:4, 116:16, 120:18, 120:22, 126:20, 127:8, 127:11, 127:20, 128:19, 129:3, 129:6, 129:7, 129:9, 131:8, 131:12, 131:13, 136:12, 142:10, 142:15, 142:18, 146:11, 146:12, 147:12, 150:24, 157:15, 158:2, 174:12, 176:22, 178:18, 180:15, 181:3, 191:23, 193:12, 193:15, 193:20, 195:17, 196:21, 198:24, 199:5, 199:16, 199:19, 199:22, 201:24, 202:6, 202:9, 213:25, 214:9, 214:11, 214:15, 218:4, 218:10, 218:13, 220:20, 227:9, 227:11, 227:14, 228:19, 243:5, 244:19, 245:1, 246:9
conveyed [4] - 80:6, 80:13, 80:14, 81:23

copied [1] - 37:23
copies [14] - 5:7, 17:20, 107:17, 139:3, 172:21, 223:4, 232:23, 232:25, 248:6, 249:4, 249:8, 249:10, 250:1, 250:4
copy [27] - 12:25, 13:24, 15:17, 21:4, 21:21, 22:10, 22:15, 23:21, 23:24, 32:2, 50:21, 50:22, 54:21, 84:17, 100:25, 103:24, 104:9, 104:17, 105:1, 106:13, 106:18, 108:6, 108:13, 190:23, 191:1, 191:4, 206:14
core [7] - 94:5, 97:14, 207:23, 208:22, 208:23, 209:3, 209:19
corner [3] - 24:15, 162:2, 164:3
correct [198] - 12:12, 14:7, 14:10, 14:16, 15:7, 15:14, 18:24, 19:1, 21:3, 21:16, 21:17, 22:1, 22:24, 26:7, 26:8, 30:11, 30:16, 31:19, 32:14, 32:23, 35:21, 36:7, 36:10, 36:11, 37:18, 37:21, 38:22, 39:5, 40:1, 44:14, 47:24, 48:1, 48:2, 48:5, 48:23, 48:24, 49:12, 50:25, 51:17, 52:8, 52:20, 52:21, 52:23, 53:14, 53:19, 53:23, 53:24, 54:6, 54:17, 55:13, 55:22, 55:25, 57:23, 58:17, 58:18, 60:10, 60:13, 60:17, 60:19, 60:21, 62:23, 63:4, 63:6, 63:14, 64:2, 64:5, 64:9, 64:19, 65:25, 66:2, 66:5, 66:6, 66:13, 67:6, 67:21, 68:4, 68:14, 69:2, 70:21, 71:8, 71:22, 71:25, 72:6, 73:2, 75:2, 76:13, 77:12, 83:15, 85:25, 86:15, 86:16, 86:17, 87:8, 87:9, 88:12, 88:13, 88:15, 88:16, 88:18, 88:19, 88:24, 88:25, 94:10,

95:14, 109:21, 111:17, 113:18, 113:19, 119:21, 120:15, 122:2, 122:6, 125:11, 131:21, 131:24, 132:9, 132:12, 132:14, 132:22, 138:23, 140:19, 146:25, 152:7, 153:17, 154:8, 155:25, 161:4, 162:9, 162:11, 162:12, 163:1, 163:2, 164:21, 165:1, 165:2, 165:4, 165:5, 165:10, 165:11, 165:16, 165:18, 166:13, 167:12, 168:4, 170:3, 170:18, 171:4, 172:22, 172:23, 173:24, 174:5, 174:24, 176:15, 179:3, 179:16, 180:7, 190:2, 197:24, 197:25, 198:12, 204:22, 204:23, 205:2, 211:1, 220:7, 220:22, 221:10, 221:21, 221:24, 223:9, 225:10, 233:25, 234:1, 234:15, 234:16, 235:1, 235:2, 235:6, 235:13, 235:17, 237:17, 238:10, 238:11, 238:20, 238:21, 239:2, 239:9, 240:9, 240:21, 242:7, 242:10, 242:15, 242:16, 242:25, 244:3, 246:4, 247:4, 252:5
correction [2] - 87:13, 252:11
correspondence [2] - 139:3, 145:13
Counsel [2] - 2:1, 2:16
counsel [73] - 5:7, 8:17, 8:24, 9:19, 10:3, 14:2, 16:23, 17:13, 18:10, 27:15, 30:7, 30:8, 41:8, 46:5, 46:6, 46:7, 61:16, 61:22, 78:21, 78:23, 84:11, 85:6, 85:15, 89:3, 97:4, 98:16, 105:15, 105:24, 106:3, 111:2, 113:2, 113:3, 113:11, 114:2, 114:5, 115:3, 115:18, 124:21,

6

124:24, 127:8, 127:9,
127:25, 129:4, 129:9,
131:8, 131:10,
131:13, 133:22,
145:22, 148:16,
149:15, 150:3, 150:4,
155:5, 176:22,
191:14, 191:25,
192:1, 192:21,
193:12, 193:16,
198:25, 214:1, 214:2,
218:5, 225:24, 226:3,
226:4, 227:1, 227:3,
254:21, 254:24

**counsel's** [52] -
41:11, 79:14, 82:25,
83:7, 85:14, 89:20,
90:2, 92:19, 93:21,
94:18, 95:22, 98:20,
99:10, 99:24, 102:3,
102:16, 103:16,
106:10, 107:14,
109:5, 113:12, 115:7,
119:16, 120:10,
121:2, 122:25,
127:13, 129:5,
129:10, 131:15,
134:4, 134:13,
134:19, 135:1,
137:18, 177:2,
181:12, 182:14,
183:20, 186:3, 186:5,
193:13, 193:18,
195:10, 196:18,
199:1, 199:7, 202:4,
214:6, 218:6, 218:8,
251:4

**count** [1] - 123:15
**Counties** [2] -
236:15, 236:21
**counties** [7] - 24:6,
161:24, 161:25,
162:17, 163:25,
171:11, 171:24
**county** [2] - 162:19,
189:4
**COUNTY** [1] - 254:2
**County** [32] - 6:12,
151:8, 151:12,
151:15, 151:20,
151:23, 152:2, 152:9,
152:13, 152:19,
152:22, 152:25,
154:7, 154:20, 163:5,
163:19, 164:12,
164:22, 164:25,
190:19, 194:6,
194:18, 195:3,
195:21, 196:3,
196:22, 234:4, 234:5,

234:9, 238:10, 254:10
**couple** [7] - 69:4,
70:11, 135:13,
145:17, 167:2, 167:4,
251:25
**course** [7] - 10:5,
11:1, 215:15, 228:21,
228:24, 230:2, 231:8
**COURT** [2] - 1:1,
161:8
**Court** [10] - 4:13, 6:6,
11:12, 48:5, 185:12,
190:18, 190:22,
191:6, 194:19, 210:13
**court** [21] - 11:25,
12:2, 12:14, 34:11,
53:4, 66:20, 71:5,
73:8, 73:11, 73:12,
91:5, 106:19, 123:9,
187:12, 188:12,
189:5, 191:2, 194:13,
210:14, 245:4
**Court's** [4] - 10:17,
119:14, 122:21,
186:22
**courtesy** [2] - 224:2,
232:16
**courts** [3] - 71:18,
73:23, 189:3
**cover** [3] - 13:6,
115:5, 196:1
**covered** [10] - 30:25,
79:10, 80:8, 82:23,
92:16, 105:17, 127:5,
128:23, 214:10, 251:9
**craft** [4] - 71:3,
71:13, 71:16, 73:8
**crafting** [2] - 70:13,
73:10
**create** [9] - 23:8,
23:10, 23:12, 24:9,
24:11, 51:6, 51:8,
51:12, 216:5
**created** [14] - 23:16,
23:18, 26:10, 26:13,
26:15, 26:19, 26:20,
51:5, 73:13, 165:16,
166:24, 171:16,
171:20, 171:21
**creating** [3] - 51:3,
61:8, 61:12
**creation** [1] - 85:21
**criteria** [5] - 50:14,
183:11, 183:14,
226:1, 226:11
**crossed** [1] - 163:12
**current** [4] - 55:1,
55:9, 55:18, 56:25
**curriculum** [1] - 40:5
**custody** [3] - 16:4,

16:17, 17:6
**cuts** [1] - 88:20
**CV** [1] - 52:19

# D

**Dan** [1] - 15:4
**DANE** [1] - 254:2
**Dane** [3] - 6:12,
164:25, 254:10
**Daniel** [1] - 8:15
**DANIEL** [1] - 7:9
**data** [43] - 26:22,
26:24, 27:5, 27:19,
28:3, 47:20, 47:22,
48:14, 48:15, 48:16,
48:17, 48:19, 48:20,
78:18, 79:1, 79:5,
79:7, 79:18, 79:25,
80:24, 81:4, 81:6,
81:11, 86:2, 86:4,
93:3, 94:4, 96:8, 97:7,
97:13, 99:14, 100:7,
169:6, 169:19,
169:20, 169:24,
170:1, 217:16,
217:21, 218:5,
218:15, 247:17
**date** [31] - 26:5, 26:7,
26:11, 27:1, 36:5,
38:10, 40:12, 53:14,
62:22, 63:1, 67:16,
77:16, 82:15, 115:20,
117:23, 123:25,
127:17, 127:20,
128:15, 128:20,
157:23, 189:12,
202:20, 202:21,
206:1, 214:20,
226:10, 227:10, 228:3
**dated** [13] - 3:25,
13:7, 21:6, 21:10,
21:20, 21:21, 21:22,
37:2, 37:17, 37:20,
55:5, 104:24, 197:18
**dates** [2] - 52:15,
142:25
**David** [1] - 203:14
**DAVID** [2] - 1:15,
2:14
**DAVIS** [1] - 1:5
**days** [3] - 38:9,
148:8, 189:1
**DC** [1] - 222:11
**De** [2] - 6:25, 164:14
**DE** [1] - 2:8
**dealing** [1] - 20:19
**December** [10] -
1:20, 6:13, 13:7,

13:10, 40:3, 54:9,
76:5, 187:19, 254:7,
255:4
**decennial** [13] -
26:25, 63:23, 75:5,
75:19, 76:17, 92:2,
93:4, 96:8, 96:20,
97:3, 97:8, 99:14,
100:7
**decide** [2] - 222:1,
235:25
**decided** [7] - 76:16,
76:20, 155:1, 219:3,
236:6, 241:1, 245:17
**decision** [10] -
154:10, 186:19,
219:7, 222:5, 230:13,
235:19, 236:10,
240:17, 243:19,
245:20
**decisions** [1] - 154:2
**Declaratory** [7] - 4:6,
4:8, 4:16, 4:17, 4:21,
104:24, 106:24
**deem** [1] - 188:1
**deemed** [1] - 38:6
**defendants** [20] -
8:15, 14:25, 90:19,
91:19, 105:15,
106:14, 114:2, 127:9,
129:4, 131:9, 191:15,
191:25, 192:1,
192:21, 193:13,
193:16, 197:23,
198:25, 221:1, 233:6
**Defendants** [8] - 2:3,
2:6, 2:17, 6:5, 7:8,
7:11, 7:15, 159:12
**Defendants'** [4] -
4:4, 4:7, 91:10,
106:22
**defense** [1] - 102:24
**defenses** [2] - 91:20,
159:13
**Defenses** [2] - 4:8,
106:23
**deferred** [1] - 155:5
**deferring** [1] - 230:7
**defined** [2] - 54:12,
84:19
**defining** [1] - 50:10
**definition** [1] - 84:19
**degree** [6] - 53:23,
73:23, 132:24, 133:3,
133:12, 237:1
**degrees** [1] - 133:13
**DEININGER** [2] -
1:15, 2:14
**delay** [1] - 10:14
**delayed** [1] - 215:2

**democratic** [3] -
123:4, 123:19, 124:6
**democrats** [1] -
123:6
**demographic** [1] -
35:24
**demonstrated** [1] -
73:9
**denoted** [1] - 231:11
**Department** [1] -
206:13
**DEPARTMENT** [1] -
7:7
**depicts** [1] - 233:11
**deposed** [1] - 90:16
**DEPOSITION** [2] -
1:18, 6:1
**deposition** [27] -
5:24, 9:5, 9:7, 10:4,
10:6, 10:14, 11:2,
11:20, 11:24, 12:19,
12:22, 13:22, 13:25,
31:24, 53:5, 66:4,
89:2, 89:6, 90:5,
90:13, 106:19,
108:22, 110:9,
187:13, 187:22,
254:17, 254:23
**deprived** [1] - 99:1
**describe** [3] - 19:3,
41:4, 225:21
**Description** [3] -
3:11, 4:2, 5:2
**design** [1] - 73:12
**desire** [1] - 75:14
**desk** [1] - 251:16
**determine** [1] - 26:18
**determining** [5] -
92:3, 96:9, 96:21,
156:21, 158:17
**DEUREN** [1] - 7:10
**Deuren** [1] - 14:6
**develop** [8] - 44:4,
44:6, 60:9, 60:15,
73:22, 74:13, 74:21
**developing** [1] -
44:17, 124:13, 175:2
**development** [5] -
85:16, 124:22,
175:13, 189:10,
190:13
**deviation** [7] - 93:5,
97:9, 167:25, 210:17,
210:22, 226:13
**device** [3] - 177:19,
248:23, 249:16
**Diaz** [6] - 221:1,
221:2, 221:4, 221:7,
221:11, 221:15
**differ** [1] - 236:19

VIDEOTAPE DEPOSITION OF JOSEPH W. HANDRICK 12/20/2011

**Difference** [4] -
48:21, 49:3, 49:5,
49:6

**difference** [2] -
167:25, 208:10

**differences** [4] -
23:5, 219:23, 220:2,
220:3

**different** [23] - 76:22,
152:25, 155:17,
164:19, 219:9, 228:9,
229:7, 234:5, 235:20,
235:22, 236:1,
236:15, 238:19,
241:12, 241:18,
241:21, 243:2, 243:9,
243:15, 243:20,
243:23, 246:10,
246:18

**difficulties** [1] -
216:5

**dilution** [1] - 101:18

**direct** [5] - 51:8,
51:11, 148:10,
176:25, 217:2

**directed** [2] - 17:3,
114:4

**direction** [20] - 44:5,
44:6, 113:3, 115:3,
115:17, 129:5, 176:5,
183:10, 183:12,
184:6, 192:1, 192:22,
193:13, 193:17,
199:1, 214:2, 218:6,
226:3, 226:8

**directly** [2] - 75:21,
175:2

**Director** [3] - 2:1,
2:15, 105:17

**director** [2] - 56:12,
56:18

**disagree** [3] - 74:3,
208:5, 209:1

**disagreement** [2] -
208:16, 208:18

**disclosing** [1] -
79:12

**disclosure** [2] -
40:20, 93:17

**disclosures** [2] -
156:7, 206:12

**Disclosures** [2] -
4:5, 91:11

**discontinuous** [1] -
246:19

**discovery** [2] -
107:17, 107:21

**discrepancies** [1] -
173:6

**discuss** [31] - 89:15,

89:23, 92:11, 93:11,
98:5, 101:6, 103:10,
115:1, 117:16,
118:19, 119:3,
122:12, 123:3, 123:6,
123:7, 126:12,
126:16, 126:24,
130:17, 130:20,
144:6, 145:6, 147:16,
226:25, 227:16,
227:23, 228:1,
229:19, 231:3, 237:9,
237:11

**discussed** [25] -
69:11, 69:15, 89:1,
89:6, 89:9, 110:19,
112:2, 112:22, 120:4,
123:18, 125:17,
126:17, 130:11,
130:25, 142:24,
153:11, 186:18,
191:11, 192:9,
193:25, 195:2,
196:11, 224:12,
231:7, 248:1

**discussing** [3] -
31:6, 124:7, 230:10

**Discussion** [4] -
96:1, 159:1, 197:16,
232:18

**discussion** [7] -
8:17, 70:2, 158:8,
200:24, 213:13,
214:24, 228:6

**discussions** [9] -
95:16, 119:24,
135:21, 135:25,
145:13, 179:1, 230:5,
237:6, 242:20

**disenfranchise** [1] -
215:12

**disenfranchised** [3]
- 99:1, 213:10, 213:14

**disenfranchisemen
t** [5] - 212:1, 212:20,
213:2, 214:12, 214:19

**disk** [2] - 18:3, 32:7

**displacement** [2] -
212:8, 212:13

**distinction** [1] -
38:25

**DISTRICT** [2] - 1:1,
1:1

**District** [7] - 6:6, 6:7,
63:3, 63:9, 235:6,
236:12, 239:20

**district** [29] - 48:23,
50:13, 50:14, 95:9,
125:17, 126:12,
126:25, 167:23,

170:11, 175:17,
175:22, 176:2, 184:7,
188:24, 189:3,
211:18, 212:17,
224:19, 234:25,
236:5, 236:7, 239:18,
241:1, 244:15,
246:23, 247:1,
247:11, 247:18,
247:20

**districting** [2] -
99:14, 100:8

**districts** [111] - 24:8,
48:1, 48:3, 48:4,
48:25, 49:8, 71:3,
72:4, 92:4, 93:6, 94:6,
96:11, 96:23, 97:9,
97:15, 98:25, 99:15,
100:8, 102:7, 136:4,
136:9, 151:7, 151:11,
151:15, 151:19,
151:23, 152:1, 152:8,
152:13, 152:19,
152:24, 153:4, 154:6,
154:11, 154:20,
155:25, 156:3,
156:17, 156:22,
157:4, 157:13,
157:16, 157:17,
157:22, 158:3,
158:14, 158:18,
158:22, 164:20,
166:10, 171:25,
176:6, 178:7, 207:25,
208:15, 210:9,
210:10, 210:12,
211:5, 216:12, 217:4,
219:4, 221:20, 222:3,
222:20, 225:3,
225:11, 226:18,
226:24, 227:1,
227:16, 227:24,
228:2, 229:1, 229:9,
229:15, 230:3, 231:3,
232:4, 233:12,
233:13, 234:6,
234:15, 234:18,
234:20, 235:20,
235:23, 236:2, 240:5,
240:12, 240:15,
240:21, 242:1, 242:2,
243:3, 243:10,
243:15, 243:20,
243:23, 244:3, 244:7,
244:10, 244:13,
244:17, 244:21,
245:6, 246:4, 246:7,
246:11

**Districts** [14] - 4:24,
22:21, 151:9, 151:10,
221:23, 222:2, 222:7,

222:8, 224:8, 224:12,
233:8, 234:10,
235:17, 242:25

**divided** [2] - 24:7,
171:24

**division** [2] - 161:18,
161:20

**divisions** [1] -
162:22

**doctrine** [42] - 31:1,
79:11, 80:4, 80:9,
80:18, 81:21, 82:9,
82:20, 82:23, 98:9,
98:15, 99:8, 99:22,
102:1, 102:14, 103:2,
103:14, 105:11,
105:19, 106:8,
107:12, 109:3,
110:24, 112:6, 113:4,
114:25, 120:8,
120:25, 125:25,
127:6, 128:25, 131:5,
137:12, 191:21,
192:17, 195:7,
196:16, 198:23,
202:2, 213:23, 218:1,
250:20

**document** [53] -
12:18, 12:23, 13:9,
18:14, 19:14, 19:18,
19:20, 20:6, 20:7,
20:8, 20:9, 20:22,
20:24, 21:1, 21:25,
22:5, 22:19, 22:22,
24:5, 24:13, 24:14,
25:22, 30:20, 31:12,
31:13, 54:21, 66:21,
91:4, 91:9, 104:17,
104:21, 104:22,
105:1, 106:18,
106:21, 107:2, 107:4,
108:6, 108:18, 159:2,
159:5, 168:6, 191:2,
194:23, 194:25,
196:9, 197:17,
197:22, 206:6, 206:9,
207:4, 248:13

**Documents** [3] -
4:10, 108:10, 108:16

**documents** [45] -
3:14, 13:21, 15:23,
15:24, 16:5, 16:9,
16:11, 16:12, 16:16,
16:17, 16:19, 16:22,
17:2, 17:6, 17:9,
17:12, 17:16, 18:5,
18:7, 18:8, 18:11,
18:20, 18:22, 20:2,
20:4, 20:19, 22:3,
23:6, 34:12, 87:7,

90:4, 90:7, 90:8, 90:9,
90:12, 107:25,
108:23, 159:6,
159:12, 188:11,
194:13, 248:17,
249:2, 250:2, 250:4

**DOJ** [1] - 111:3

**Don** [5] - 3:18, 3:20,
3:22, 34:21, 37:16

**done** [8] - 30:23,
76:10, 83:16, 86:24,
154:1, 172:18, 212:6,
245:13

**donors** [1] - 122:5

**dot** [7] - 138:20,
138:23, 139:19,
145:9, 177:13,
181:25, 184:23

**Doty** [1] - 7:4

**Doug** [5] - 9:4, 11:4,
185:8, 232:12, 232:14

**Douglas** [2] - 3:12,
5:25

**DOUGLAS** [1] - 6:19

**down** [26] - 11:25,
12:3, 36:14, 40:8,
50:12, 50:13, 50:15,
65:6, 70:9, 71:1,
72:15, 73:4, 74:6,
75:25, 92:23, 138:2,
159:9, 159:14, 163:6,
165:9, 174:10,
188:18, 204:12,
204:13, 205:6, 238:22

**dozen** [5] - 135:13,
135:14, 167:2, 167:3,
167:4

**dozens** [4] - 44:11,
44:13, 46:25, 47:8

**DPW** [1] - 2:12

**draft** [5] - 68:21,
81:18, 82:13, 82:17,
159:17

**Draft** [3] - 3:17, 32:1

**drafting** [6] - 127:16,
189:24, 189:25,
192:13, 194:1, 197:4

**draw** [29] - 70:8,
72:8, 151:22, 151:25,
152:8, 152:12, 154:7,
159:4, 188:17, 190:4,
207:10, 207:21,
211:22, 215:18,
215:23, 216:9, 217:2,
219:3, 219:9, 219:11,
220:10, 222:5,
224:18, 224:21,
225:2, 242:23, 244:1,
246:2, 247:16

**drawing** [42] - 44:23,

8

45:2, 45:3, 45:5, 45:6, 45:8, 64:7, 72:4, 73:16, 91:24, 148:17, 151:14, 151:24, 152:16, 156:3, 157:12, 157:16, 158:13, 158:22, 166:10, 175:15, 175:16, 175:21, 176:1, 184:7, 211:5, 216:13, 216:16, 217:5, 217:13, 219:14, 221:8, 222:3, 225:17, 229:15, 230:2, 230:7, 230:11, 232:3, 233:24, 239:19, 246:24

**drawn** [10] - 119:5, 152:5, 152:6, 153:4, 175:17, 224:14, 224:15, 228:10, 236:7, 239:20

**drew** [27] - 44:22, 148:13, 151:7, 151:11, 151:18, 151:19, 152:1, 152:18, 152:22, 152:24, 153:1, 217:8, 219:16, 219:19, 219:21, 219:25, 220:5, 221:19, 229:7, 230:16, 236:14, 236:19, 236:23, 244:6, 245:24, 245:25, 252:20

**driving** [2] - 216:20, 217:1

**dropped** [1] - 183:7

**drove** [1] - 216:15

**du** [2] - 162:7, 163:5

**DUFFY** [1] - 2:5

**duly** [3] - 8:2, 254:4, 254:12

**during** [33] - 11:1, 32:25, 33:1, 41:16, 42:9, 43:4, 57:18, 65:15, 67:11, 77:11, 110:17, 143:14, 143:15, 155:10, 174:7, 174:22, 175:6, 178:22, 182:18, 187:20, 200:20, 217:15, 220:21, 221:5, 221:12, 221:15, 227:11, 227:14, 228:18, 228:21, 228:24, 229:21

**DVD** [3] - 17:22, 18:4, 31:25

# E

**e-mail** [42] - 137:5, 137:19, 137:23, 138:5, 138:7, 138:11, 138:14, 138:17, 138:23, 139:1, 139:3, 139:12, 139:18, 139:21, 139:25, 141:12, 141:17, 144:22, 145:2, 145:4, 145:13, 146:3, 146:7, 177:5, 177:12, 178:1, 181:16, 181:19, 181:25, 182:6, 184:9, 184:13, 184:22, 184:23, 184:25, 185:2, 248:3, 248:6, 248:10, 249:5, 249:8

**e-mailed** [3] - 145:6, 177:9, 181:22

**e-mailing** [2] - 177:8, 177:16

**e-mails** [10] - 138:10, 138:13, 177:19, 177:24, 179:4, 179:5, 228:21, 228:24, 248:17, 248:19

**EARLE** [11] - 6:22, 6:23, 185:8, 185:11, 185:14, 188:6, 223:17, 223:23, 224:1, 232:7, 232:14

**Earle** [4] - 3:5, 185:9, 223:14, 224:5

**earliest** [1] - 114:15

**early** [5] - 27:3, 64:4, 70:20, 72:5, 206:3

**earned** [1] - 53:21

**easier** [2] - 68:9, 215:23

**easiest** [1] - 115:21

**East** [5] - 6:11, 6:20, 7:4, 7:14, 254:9

**EASTERN** [1] - 1:1

**Eastern** [1] - 6:7

**easy** [2] - 105:23, 123:13

**ECKSTEIN** [1] - 1:5

**EDL** [1] - 162:3

**education** [1] - 54:3

**effective** [4] - 127:17, 127:20, 128:15, 128:20

**effort** [5] - 64:1, 64:8, 67:12, 75:4, 77:12

**efforts** [1] - 64:4

**either** [18] - 17:21, 18:4, 31:25, 47:14,

66:4, 111:2, 113:2, 129:3, 142:10, 179:9, 185:20, 190:18, 198:17, 199:23, 201:5, 201:8, 250:9, 251:16

**elect** [1] - 211:19

**elected** [4] - 62:21, 62:23, 63:2, 63:6

**elections** [8] - 125:18, 126:13, 127:1, 129:15, 130:8, 217:17, 217:22, 218:16

**electoral** [2] - 72:19, 74:12

**electronic** [3] - 160:22, 248:12, 249:2

**eliminated** [1] - 237:23

**ELVIRA** [1] - 1:4

**embodied** [1] - 109:10

**employed** [6] - 14:5, 14:9, 59:3, 59:6, 254:21, 254:25

**employee** [4] - 39:4, 42:24, 64:17, 254:24

**employer** [2] - 44:2, 50:7

**employers** [1] - 89:10

**employment** [1] - 76:21

**enacted** [9] - 189:14, 214:22, 217:10, 217:13, 219:20, 219:24, 221:9, 236:19, 242:7

**enactment** [2] - 189:12, 189:13

**enclosure** [1] - 38:8

**end** [11] - 73:5, 124:25, 187:10, 187:16, 189:15, 189:19, 206:21, 206:22, 206:23, 207:3

**ended** [4] - 64:5, 212:12, 236:16, 241:10

**ending** [1] - 87:23

**ends** [1] - 86:19

**engage** [2] - 177:6, 179:9

**engaged** [6] - 75:13, 83:16, 110:18, 111:21, 111:24, 218:19

**engagement** [14] - 35:5, 36:5, 38:17,

38:21, 38:22, 38:23, 39:8, 40:9, 54:12, 77:22, 78:1, 84:14, 86:7, 87:20

**engaging** [5] - 148:23, 148:24, 149:2, 178:6, 179:15

**enter** [3] - 87:15, 87:25, 109:20

**entered** [1] - 109:24

**entire** [3] - 25:6, 42:9, 66:24

**entitled** [4] - 4:24, 5:3, 5:4, 67:5

**entity** [3] - 56:23, 83:24, 88:20

**entries** [2] - 88:3, 88:14

**enumerated** [3] - 15:25, 49:8, 216:15

**equal** [10] - 162:8, 162:11, 162:15, 207:24, 209:23, 210:2, 210:9, 210:11, 210:22, 243:18

**equals** [2] - 163:4, 163:17

**equivalent** [1] - 172:14

**ERIC** [1] - 7:16

**Eric** [13] - 3:14, 3:19, 3:20, 3:21, 37:15, 42:3, 46:7, 61:20, 174:20, 186:17, 227:6, 231:10, 251:21

**ERICA** [1] - 2:9

**Erpenbach** [1] - 216:11

**error** [1] - 206:8

**Esenberg** [1] - 227:17

**established** [3] - 40:8, 83:13, 127:17

**estimate** [3] - 101:4, 147:9, 218:25

**et** [6] - 6:3, 6:5, 6:21, 6:25, 10:11, 246:19

**EVANJELINA** [1] - 1:4

**eventually** [1] - 125:15

**evident** [1] - 70:15

**exact** [6] - 47:7, 65:13, 77:16, 123:25, 128:13, 135:12

**exactly** [6] - 13:5, 49:16, 50:11, 56:20, 135:17, 229:11

**examination** [2] - 232:13, 254:16

**EXAMINATION** [4] - 8:5, 224:4, 233:15, 252:1

**Examination** [3] - 3:4, 3:5, 3:6

**examined** [1] - 254:15

**example** [5] - 84:16, 163:22, 168:8, 172:1, 172:3

**excerpt** [1] - 66:23

**Excerpts** [1] - 4:3

**excerpts** [2] - 66:25, 67:5

**exchanged** [1] - 177:24

**excuse** [1] - 94:16

**Executive** [1] - 105:16

**exhibit** [9] - 17:18, 17:20, 24:3, 34:3, 67:15, 68:10, 104:14, 196:7, 223:3

**Exhibit** [141] - 12:15, 12:16, 12:19, 12:25, 13:7, 13:13, 13:14, 13:15, 13:24, 15:22, 15:25, 16:18, 17:7, 17:10, 17:21, 17:22, 17:23, 18:1, 18:3, 18:11, 18:21, 19:8, 19:10, 19:13, 19:17, 19:20, 19:24, 20:20, 20:22, 21:13, 21:15, 21:19, 22:4, 24:2, 25:23, 25:25, 26:4, 26:9, 26:10, 31:14, 31:24, 32:3, 32:6, 34:5, 34:9, 34:17, 34:18, 34:20, 34:23, 34:25, 37:15, 37:16, 37:17, 37:20, 38:19, 47:23, 48:14, 53:1, 53:2, 53:5, 53:8, 54:19, 54:22, 66:18, 66:20, 66:22, 67:1, 67:24, 69:25, 84:16, 86:9, 87:7, 87:11, 87:12, 87:14, 88:8, 88:10, 91:2, 91:5, 91:13, 91:16, 96:4, 98:14, 104:15, 104:18, 104:22, 105:1, 106:16, 106:20, 107:7, 108:4, 108:7, 108:13, 156:6, 159:3, 161:3, 161:6, 161:14, 168:7, 168:13, 169:21, 170:2, 172:2, 172:11,

188:9, 188:15, 190:3, 190:9, 190:24, 191:1, 191:3, 191:24, 192:13, 193:25, 194:1, 194:9, 194:17, 195:19, 195:25, 196:1, 196:8, 196:11, 196:21, 197:5, 197:14, 202:19, 206:4, 207:4, 232:19, 233:7, 233:10, 233:23, 234:3, 238:4, 238:5, 238:8
**Exhibits** [11] - 5:6, 5:7, 19:15, 34:14, 37:11, 37:12, 38:2, 38:20, 90:10, 188:12, 194:14
**exhibits** [7] - 18:1, 34:8, 34:12, 191:7, 191:8, 194:23, 196:5
**exist** [1] - 136:15
**existing** [4] - 50:13, 222:14, 230:16, 230:20
**expect** [1] - 103:19
**expediting** [1] - 115:15
**Expert** [1] - 159:14
**expert** [6] - 77:18, 77:23, 176:23, 181:10, 220:24, 240:2
**experts** [1] - 176:23
**expires** [1] - 255:8
**explain** [1] - 216:24
**exposed** [1] - 70:13
**expressed** [1] - 209:15
**extent** [74] - 10:6, 14:22, 16:24, 27:13, 29:24, 30:22, 31:1, 33:4, 33:6, 33:6, 40:19, 41:9, 43:12, 60:24, 80:15, 82:5, 82:20, 84:7, 92:15, 94:4, 95:8, 95:10, 96:14, 97:1, 97:14, 97:19, 97:25, 98:2, 98:11, 102:21, 105:8, 105:13, 106:6, 109:13, 110:21, 111:11, 112:17, 112:25, 113:6, 113:10, 113:25, 114:3, 114:22, 114:25, 122:16, 122:19, 125:23, 125:25, 126:4, 127:6, 128:22, 128:25, 131:2, 131:6, 131:7,

133:24, 137:10, 137:14, 142:20, 154:14, 191:19, 192:14, 193:14, 195:4, 196:13, 196:16, 198:20, 198:23, 201:22, 213:20, 213:24, 217:23, 218:1, 248:25, 250:17

## F

**Facebook** [2] - 117:10, 117:13
**fact** [7] - 76:14, 87:5, 97:7, 97:11, 101:16, 230:19, 245:13
**factor** [2] - 211:21, 217:12
**failure** [2] - 38:8, 41:4
**fair** [3] - 86:1, 220:9, 223:16
**fall** [5] - 193:24, 196:23, 199:19, 206:2, 206:3
**falls** [2] - 122:19, 192:7
**fame** [1] - 68:6
**family** [4] - 121:22, 122:1, 122:4, 122:9
**fancy** [1] - 107:23
**far** [13] - 71:9, 86:22, 105:12, 110:1, 111:1, 131:12, 172:8, 178:9, 242:11, 252:14, 252:15, 252:16, 252:19
**fashion** [2] - 10:25, 71:5
**favorable** [2] - 60:16, 73:24
**FDL** [7] - 162:4, 162:5, 162:9, 162:15, 163:4, 163:9
**feature** [1] - 117:13
**features** [1] - 220:16
**February** [27] - 21:20, 21:21, 21:22, 35:1, 35:15, 37:3, 37:6, 37:7, 37:18, 37:20, 40:9, 41:16, 42:9, 83:22, 86:17, 87:20, 110:2, 110:6, 110:18, 111:21, 121:6, 169:16, 176:15, 218:20, 219:1, 221:8

**federal** [4] - 71:17, 73:8, 123:8, 210:14
**fee** [1] - 86:11
**feedback** [1] - 152:21
**fees** [1] - 86:14
**fell** [1] - 16:4
**few** [7] - 128:13, 147:8, 147:10, 147:11, 185:12, 206:5, 237:12
**fewer** [2] - 215:12, 244:16
**fiancee** [2] - 75:16, 75:17
**file** [4] - 26:18, 31:17, 52:22, 249:22
**File** [1] - 1:12
**filed** [19] - 5:24, 9:25, 11:7, 11:9, 78:3, 81:8, 81:11, 104:3, 104:10, 106:14, 186:21, 189:3, 189:4, 191:5, 194:5, 194:18, 196:2, 197:2
**Files** [1] - 32:2
**files** [9] - 19:19, 22:11, 29:9, 29:14, 29:15, 29:18, 29:20, 29:22, 30:8
**filing** [4] - 189:6, 191:9, 192:9, 195:2
**final** [5] - 73:5, 81:16, 154:10, 219:10, 220:4
**financially** [1] - 254:25
**finish** [1] - 185:21
**finished** [1] - 231:15
**finishing** [1] - 223:15
**firm** [35] - 14:6, 14:10, 14:25, 15:18, 15:19, 27:11, 27:19, 27:20, 27:23, 28:6, 35:16, 36:24, 39:4, 39:11, 55:21, 62:5, 64:14, 73:20, 76:25, 78:24, 78:25, 79:1, 79:3, 84:9, 89:11, 132:4, 132:14, 132:20, 140:22, 204:17, 204:18, 226:6, 248:13, 250:10
**firm's** [1] - 52:22
**First** [4] - 4:9, 4:10, 108:9
**first** [21] - 8:2, 11:23, 13:1, 21:7, 24:13, 25:5, 31:8, 33:23, 35:3, 35:19, 73:17,

84:18, 93:15, 105:23, 109:23, 120:17, 191:16, 194:17, 233:21, 233:22, 250:15
**fit** [1] - 239:8
**Fitzgerald** [43] - 7:19, 7:19, 35:8, 35:10, 42:7, 42:8, 43:3, 43:17, 49:11, 49:12, 49:14, 49:17, 50:18, 50:20, 51:4, 51:8, 51:15, 51:20, 51:22, 51:23, 52:3, 52:4, 52:6, 52:13, 84:21, 84:22, 136:12, 137:4, 137:24, 141:9, 141:12, 141:17, 141:21, 142:1, 142:2, 142:6, 142:11, 143:5, 153:16, 154:2
**five** [5] - 13:18, 69:21, 147:25, 148:1, 223:24
**five-minute** [1] - 69:21
**fix** [2] - 69:22, 247:4
**flat** [1] - 86:21
**flip** [5] - 21:9, 67:14, 68:7, 108:17, 156:11
**fly** [1] - 147:20
**focus** [2] - 74:11, 234:2
**fold** [1] - 233:17
**folder** [1] - 248:12
**FOLEY** [1] - 7:13
**follow** [46] - 79:14, 82:25, 83:7, 89:20, 90:2, 92:19, 93:21, 94:18, 95:22, 98:20, 99:10, 99:24, 102:3, 102:16, 103:16, 106:10, 107:14, 109:5, 113:12, 115:7, 119:16, 120:10, 121:2, 122:25, 127:13, 129:10, 131:15, 134:4, 134:13, 134:19, 134:25, 165:6, 168:20, 181:12, 182:14, 183:20, 186:3, 186:5, 189:16, 192:4, 195:10, 196:18, 199:7, 202:4, 218:8, 251:3
**followed** [1] - 59:10
**following** [15] - 41:11, 49:8, 63:23, 75:11, 75:19, 77:5,

85:8, 85:16, 124:22, 157:1, 159:12, 175:14, 187:21, 193:18, 254:11
**follows** [3] - 8:3, 71:1, 73:7
**Foltz** [85] - 42:3, 45:22, 46:1, 46:14, 46:18, 46:22, 47:3, 47:11, 47:14, 50:25, 51:2, 51:11, 52:2, 52:7, 52:11, 119:19, 120:13, 120:19, 121:5, 121:9, 121:13, 121:24, 122:1, 122:4, 122:8, 122:9, 122:11, 137:4, 137:24, 139:11, 139:17, 140:3, 140:10, 140:12, 140:15, 141:2, 141:4, 141:6, 150:15, 152:11, 153:1, 153:6, 160:25, 165:17, 165:20, 166:17, 167:19, 169:13, 172:16, 175:20, 175:21, 175:25, 176:5, 178:5, 180:10, 180:13, 180:19, 183:24, 184:3, 184:6, 198:11, 198:14, 198:17, 199:23, 200:3, 200:4, 200:9, 200:13, 200:17, 201:16, 201:19, 202:10, 204:12, 224:7, 224:13, 225:2, 230:24, 231:10, 232:6, 244:24, 245:16, 245:19, 252:16
**Foltz's** [2] - 121:21, 203:12
**fond** [1] - 162:7
**Fond** [2] - 162:9, 163:5
**forenoon** [2] - 6:14, 254:8
**forget** [1] - 31:22
**forgot** [1] - 231:20
**form** [36] - 33:16, 33:17, 41:5, 43:8, 43:22, 44:18, 49:20, 60:22, 84:6, 90:21, 93:15, 96:13, 97:18, 109:11, 112:16, 113:8, 113:23, 116:1, 124:15, 125:8, 129:16, 129:20,

142:19, 154:12,
160:22, 165:23,
209:6, 209:22,
210:19, 211:7,
212:21, 216:6, 217:6,
219:12, 243:16
**formal** [1] - 54:3
**format** [2] - 166:20,
169:10
**former** [1] - 73:18
**formerly** [1] - 132:11
**forms** [1] - 179:9
**formulating** [1] -
212:11
**forth** [2] - 9:24,
181:22
**forward** [3] - 15:7,
111:4, 146:7
**forwarded** [1] -
71:17
**four** [3] - 164:13,
168:1
**fracturing** [1] -
236:24
**frame** [22] - 27:2,
33:22, 57:7, 57:19,
58:1, 58:3, 58:16,
58:19, 66:9, 67:12,
69:8, 78:7, 78:8,
87:19, 116:22,
116:23, 123:16,
125:20, 135:16,
137:7, 141:14, 142:5
**frames** [1] - 52:16
**Fredonia** [1] - 7:23
**Free** [1] - 58:9
**frequent** [1] - 184:15
**Friday** [1] - 187:18
**Friedrich** [62] -
15:19, 27:21, 28:2,
29:17, 30:11, 30:14,
30:18, 31:10, 31:18,
33:24, 34:22, 38:14,
39:10, 39:19, 40:14,
41:18, 42:11, 43:6,
43:19, 44:8, 46:18,
47:3, 47:12, 49:11,
49:15, 49:18, 51:17,
51:21, 51:24, 59:9,
59:21, 60:10, 61:7,
61:17, 62:17, 65:19,
84:10, 87:3, 88:5,
100:22, 110:10,
113:18, 119:21,
122:12, 124:20,
125:13, 131:20,
132:7, 132:12,
133:14, 133:19,
134:10, 135:6, 148:9,
149:12, 174:14,

175:6, 175:7, 175:10,
178:22, 179:14,
200:11
**FRIEDRICH** [1] -
7:17
**Friedrich's** [14] -
32:11, 114:21, 119:2,
120:14, 142:16,
143:9, 144:5, 146:13,
146:20, 148:21,
154:19, 160:15,
160:19, 172:19
**front** [14] - 11:11,
12:20, 18:5, 34:13,
53:6, 54:23, 84:17,
86:10, 91:6, 108:8,
159:3, 194:14, 220:5,
238:5
**FRONTERA** [1] - 2:8
**Frontera** [1] - 6:25
**full** [4] - 70:6, 72:18,
218:23, 232:25
**full-time** [1] - 218:23
**fully** [1] - 149:4
**functions** [1] - 82:21
**future** [2] - 74:13,
74:22

# G

**GAB** [1] - 105:16
**Gaddie** [60] - 4:3,
42:17, 46:13, 64:19,
64:21, 64:22, 64:24,
65:1, 65:3, 65:11,
65:18, 65:21, 65:24,
66:7, 66:11, 66:12,
67:6, 67:8, 67:19,
68:23, 69:6, 69:15,
70:23, 70:25, 77:11,
77:17, 77:22, 78:5,
78:14, 78:17, 78:25,
79:5, 79:8, 79:18,
80:1, 80:25, 81:4,
81:10, 81:13, 83:9,
83:14, 83:18, 146:10,
146:12, 146:16,
146:22, 147:2, 147:6,
147:13, 147:17,
148:2, 148:10, 149:9,
150:5, 150:7, 150:19,
220:20, 220:21, 240:4
**Gaddie's** [9] - 70:1,
71:12, 71:24, 72:3,
78:1, 82:13, 82:16,
83:4, 240:2
**galleys** [3] - 68:17,
68:18
**gather** [1] - 108:23
**general** [1] - 39:11

**General** [3] - 2:1,
2:16, 7:6
**generally** [15] - 69:5,
78:16, 78:17, 122:13,
126:20, 142:23,
143:22, 143:24,
144:2, 145:12,
147:16, 151:12,
159:25, 200:23,
250:15
**generate** [2] -
228:21, 228:24
**generated** [1] - 172:7
**geographical** [1] -
50:16
**geographically** [2] -
99:16, 100:9
**Geography** [2] -
24:4, 24:14
**geography** [7] -
170:15, 170:22,
170:24, 171:2, 171:6,
171:7, 171:10
**GERALD** [2] - 1:15,
2:14
**given** [17] - 11:20,
15:17, 102:23,
108:13, 110:8, 118:5,
118:12, 118:16,
167:7, 167:15,
193:25, 200:2,
201:20, 218:5, 226:9,
227:13, 254:18
**GLADYS** [1] - 1:6
**glean** [1] - 72:21
**GLORIA** [1] - 1:7
**Gmail** [1] - 138:18
**goal** [6] - 10:13,
124:13, 124:23,
125:3, 125:5, 125:6
**GODFREY** [1] - 6:19
**Godfrey** [2] - 6:10,
254:8
**good-bye** [1] -
178:25
**Google** [1] - 117:8
**Government** [8] -
1:13, 2:2, 2:12, 2:16,
6:4, 14:13, 105:25,
106:4
**government** [6] -
54:5, 77:1, 95:11,
98:3, 210:7, 230:7
**governments** [1] -
216:5
**great** [2] - 12:11,
21:18
**greatly** [1] - 130:6
**Green** [1] - 164:13
**Greg** [1] - 62:1

**GRON** [1] - 123:14
**Gronemus** [2] -
123:10, 123:12
**grounds** [11] - 9:23,
10:1, 10:8, 40:17,
89:17, 93:15, 96:13,
109:12, 111:10,
176:20, 187:5
**group** [3] - 17:20,
83:24, 205:14
**guess** [1] - 249:3
**guidance** [2] -
183:10, 183:12
**GWENDOLYNNE** [1]
- 1:10

# H

**half** [1] - 148:6
**halfway** [3] - 70:9,
72:14, 188:18
**hand** [14] - 17:25,
32:2, 34:7, 45:11,
48:20, 48:22, 66:20,
70:7, 88:9, 162:2,
164:3, 188:11,
233:18, 255:3
**handed** [9] - 18:8,
54:21, 66:21, 91:4,
106:18, 108:6, 191:1,
194:12, 197:17
**handful** [3] - 147:23,
147:24, 167:2
**handheld** [1] -
177:19
**handing** [4] - 12:18,
19:12, 53:4, 104:17
**Handrick** [59] - 3:12,
3:14, 3:17, 3:19, 3:23,
7:20, 8:7, 9:14, 9:18,
11:18, 12:18, 15:2,
16:23, 17:2, 17:25,
19:12, 27:15, 32:1,
33:18, 34:11, 35:6,
40:21, 53:4, 53:17,
54:21, 66:20, 68:12,
69:24, 70:12, 72:19,
73:9, 73:17, 74:12,
82:21, 89:1, 91:4,
96:2, 103:25, 104:17,
104:25, 106:18,
108:6, 109:8, 155:10,
159:2, 181:9, 187:14,
187:20, 188:11,
188:15, 190:17,
194:12, 197:8,
197:17, 202:14,
211:11, 224:6,
233:17, 248:1
**HANDRICK** [5] -

1:19, 3:3, 6:1, 8:1,
254:11
**Handrick's** [1] - 3:24
**handwritten** [14] -
22:5, 161:7, 161:14,
165:23, 172:1, 172:3,
172:10, 172:13,
172:25, 173:2, 238:1,
238:6, 238:7, 238:18
**hard** [2] - 250:1,
250:4
**Harder** [2] - 1:21, 6:8
**HARDER** [1] - 254:3
**HASSETT** [6] - 7:3,
8:25, 188:8, 251:25,
252:10, 252:23
**Hassett** [2] - 3:6,
252:2
**head** [4] - 11:23,
12:2, 234:22
**headed** [2] - 48:21,
49:2
**header** [1] - 13:14
**heading** [5] - 70:5,
72:15, 74:5, 159:5,
233:10
**headings** [1] - 170:2
**hear** [6] - 44:25,
69:18, 180:2, 180:15,
184:2, 231:1
**heard** [4] - 90:23,
91:1, 176:1, 224:11
**hearing** [16] -
145:16, 197:9,
197:12, 197:24,
198:2, 198:3, 198:6,
198:9, 198:12,
198:15, 198:19,
200:7, 201:21,
215:19, 225:15,
225:16
**Hearing** [1] - 4:22
**Heather** [1] - 7:23
**held** [8] - 54:8,
56:16, 57:16, 57:18,
58:2, 130:8, 130:14,
197:9
**hello** [1] - 178:25
**help** [2] - 143:25,
224:23
**helping** [1] - 85:19
**hereby** [1] - 254:5
**hereto** [1] - 254:25
**hereunto** [1] - 255:2
**high** [2] - 54:3, 73:23
**hired** [1] - 39:25
**Hispanic** [6] - 168:3,
168:4, 168:12,
168:18, 168:21, 169:4
**Hispanics** [2] -

11

222:2, 222:7
**historical** [1] -
245:13
**History** [1] - 190:11
**Hodan** [6] - 89:14,
89:23, 128:2, 128:4,
128:12, 128:16
**hold** [5] - 56:15,
130:17, 130:25,
132:24, 169:3
**holding** [2] - 133:13,
168:6
**home** [1] - 249:13
**hop** [1] - 232:15
**Hotmail** [1] - 138:19
**HOUGH** [1] - 1:5
**hours** [3] - 200:8,
218:18, 230:25
**Howard** [1] - 164:13
**Hubbard** [3] - 62:1,
62:2, 62:5
**Hunters** [1] - 57:12

**I**

**icon** [1] - 24:15
**idea** [4] - 101:2,
167:2, 174:7, 179:21
**ideal** [2] - 210:17,
210:22
**identification** [18] -
12:17, 17:24, 19:11,
34:6, 34:10, 53:3,
54:20, 66:19, 91:3,
91:18, 104:16,
106:17, 108:5,
188:10, 190:25,
194:10, 197:15,
232:20
**identified** [21] -
37:24, 40:13, 90:18,
93:13, 94:10, 94:14,
95:14, 156:12, 157:5,
159:10, 173:3,
173:16, 173:19,
208:17, 220:25,
237:15, 237:16,
237:18, 238:1, 238:9,
239:7
**Identified** [3] - 3:11,
4:2, 5:2
**identifies** [5] - 54:5,
92:24, 93:25, 94:25,
95:4
**identify** [9] - 34:17,
37:14, 41:24, 42:21,
53:8, 67:3, 158:16,
173:10, 232:1
**identifying** [3] -

127:7, 173:11, 173:12
**III** [1] - 1:5
**image** [1] - 136:21
**imagine** [1] - 45:15
**implicit** [1] - 72:22
**impossible** [2] -
220:1, 220:6
**impressions** [1] -
82:2
**improve** [3] - 225:25,
226:11, 226:20
**Inc** [1] - 6:25
**INC** [1] - 2:8
**include** [3] - 133:11,
221:23, 247:17
**included** [7] - 67:23,
151:7, 154:21, 155:4,
169:21, 172:11,
236:16
**includes** [3] -
151:10, 234:5, 234:10
**including** [2] - 91:25,
139:14
**incorporate** [1] -
11:6
**incorporates** [1] -
98:14
**incorporating** [1] -
11:12
**incorrect** [1] -
224:16
**increase** [2] - 125:3,
125:6
**incumbent** [2] -
241:12, 241:18
**incumbents** [7] -
240:6, 240:13,
240:15, 240:20,
240:24, 241:3, 241:6
**independent** [1] -
73:19
**index** [1] - 206:22
**indicate** [4] - 158:12,
163:19, 171:23,
238:19
**indicated** [2] -
173:20, 237:12
**indicates** [2] - 24:6,
238:16
**indicating** [8] - 20:6,
20:7, 20:8, 20:11,
20:13, 47:21, 194:11
**indicating)** [11] -
20:9, 20:16, 20:24,
21:1, 25:22, 30:20,
31:12, 161:2, 188:13,
188:14, 194:12
**individual** [1] - 10:7
**individually** [1] -
143:5

**Individuals** [4] -
91:21, 92:25, 93:25,
95:4
**individuals** [7] -
91:23, 92:1, 93:1,
94:2, 94:25, 95:5,
113:1
**inevitable** [1] - 212:1
**inform** [1] - 78:17
**information** [64] -
9:8, 9:13, 10:19,
29:25, 33:6, 40:20,
41:10, 41:13, 53:13,
72:20, 80:3, 81:20,
82:8, 82:19, 92:16,
93:18, 101:25,
102:13, 102:22,
103:13, 105:9,
107:10, 109:1,
110:22, 111:5, 112:5,
112:8, 113:3, 113:25,
114:4, 114:7, 114:23,
120:7, 120:24,
122:16, 125:23,
126:1, 126:5, 127:4,
128:23, 131:3,
137:10, 137:16,
166:3, 172:9, 173:4,
173:5, 173:18,
176:22, 182:12,
185:6, 191:19,
192:15, 195:6,
196:14, 198:21,
201:23, 204:16,
205:1, 213:21,
217:24, 221:11,
221:14, 250:18
**Initial** [2] - 4:4, 91:10
**initial** [1] - 93:17
**Injunctive** [4] - 4:6,
4:8, 104:24, 106:24
**input** [10] - 83:3,
107:5, 125:14,
148:13, 153:25,
192:12, 192:20,
194:1, 228:12, 228:14
**inquired** [1] - 215:1
**inside** [1] - 67:14
**insofar** [1] - 225:4
**instant** [13] - 117:3,
117:5, 117:12, 139:7,
140:4, 141:6, 142:7,
144:18, 144:22,
177:5, 179:8, 182:3,
186:11
**instead** [2] - 230:6,
230:20
**instruct** [53] - 31:3,
33:7, 40:21, 79:12,
82:24, 89:18, 90:1,

92:17, 93:19, 94:17,
95:21, 98:9, 99:8,
99:22, 102:2, 102:15,
103:2, 103:15,
105:11, 105:21,
106:9, 107:12, 109:3,
110:24, 112:7, 113:6,
114:5, 115:4, 119:12,
120:9, 121:1, 122:18,
126:6, 127:10, 129:1,
131:5, 134:2, 137:12,
139:24, 181:11,
182:12, 183:18,
185:7, 187:4, 191:22,
192:17, 195:8,
196:17, 199:2, 202:3,
213:24, 218:1, 250:20
**instructed** [5] - 41:8,
82:3, 98:16, 113:10,
193:10
**instruction** [38] -
41:11, 79:14, 82:25,
83:7, 89:20, 92:19,
93:21, 94:18, 98:20,
99:10, 99:24, 102:16,
103:16, 105:12,
107:14, 111:1, 114:1,
115:8, 119:16, 121:2,
127:9, 131:9, 134:4,
134:14, 134:20,
135:1, 181:12,
182:14, 186:4, 186:5,
192:5, 193:19,
195:10, 196:18,
202:4, 214:7, 218:8,
250:21
**instructions** [16] -
95:22, 102:3, 106:10,
113:12, 120:11,
123:1, 127:13,
129:11, 131:15,
137:18, 180:22,
183:20, 199:1, 199:7,
227:13, 251:4
**insure** [6] - 93:4,
97:8, 98:24, 99:15,
100:8, 102:7
**INSURE** [1] - 93:5
**insuring** [2] - 95:7,
97:24
**intended** [2] - 104:4,
173:22
**interaction** [1] -
228:22
**interactions** [1] -
228:25
**interchange** [1] -
123:9
**interest** [5] - 75:10,
94:7, 97:16, 102:8,

231:7
**interested** [1] - 255:1
**interpose** [1] -
116:22
**interposed** [1] -
98:12
**interposing** [1] -
8:18
**Interrogatories** [2] -
4:9, 108:9
**Intervenor** [4] - 1:11,
2:6, 7:5, 7:15
**Intervenor-**
**Defendants** [2] - 2:6,
7:15
**Intervenor-**
**Plaintiffs** [2] - 1:11,
7:5
**interviewed** [1] -
67:21
**interviews** [3] -
67:18, 69:10, 83:11
**introduced** [1] -
225:14
**introductory** [2] -
94:23, 159:11
**invade** [3] - 80:18,
82:8, 202:1
**invades** [4] - 89:25,
102:25, 106:7, 107:10
**invoice** [3] - 21:6,
21:10
**invoices** [9] - 21:3,
21:14, 87:2, 87:6,
88:4, 88:8, 88:11,
88:17
**involve** [5] - 112:25,
114:4, 126:4, 127:7,
218:4
**involved** [23] - 63:25,
72:2, 72:4, 75:10,
75:15, 75:18, 77:21,
77:25, 79:7, 79:17,
79:20, 91:24, 93:2,
94:3, 127:16, 157:12,
189:9, 190:13,
212:10, 212:13,
229:25, 247:13,
247:15
**involvement** [2] -
111:18, 252:17
**involves** [1] - 35:12
**iPhone** [1] - 177:20
**issue** [9] - 99:5,
130:11, 155:19,
159:18, 174:4, 232:9
**issued** [4] - 55:12,
140:21, 185:12, 187:1
**issues** [5] - 69:22,
72:23, 94:14, 185:15,

12

WWW.FORTHERECORDMADISON.COM - (608) 833-0392

Case: 3:15-cv-00421-bbc   Document #: 119   Filed: 05/02/16   Page 77 of 89

187:15
**item** [1] - 31:22
**items** [1] - 157:5
**itself** [7] - 28:23, 110:20, 138:18, 191:10, 194:24, 200:7, 248:20

## J

**JAMES** [2] - 2:4, 7:3
**January** [9] - 55:12, 56:2, 56:4, 58:21, 58:22, 58:25, 63:2, 76:7, 76:8
**JEANNE** [1] - 1:7
**Jeff** [23] - 7:19, 35:10, 42:7, 49:11, 49:14, 49:17, 50:18, 51:23, 52:3, 52:6, 52:12, 84:22, 136:12, 137:4, 137:24, 141:9, 141:12, 141:17, 141:21, 142:11, 143:4, 153:16, 154:2
**Jefferson** [1] - 6:23
**Jensen/Panzer** [1] - 60:4
**Jim** [8] - 42:3, 46:8, 61:20, 174:19, 175:1, 227:4, 228:15, 231:10
**job** [2] - 57:16, 201:1
**jobs** [4] - 56:6, 57:15, 57:18, 58:2
**Joe** [8] - 3:17, 3:24, 32:1, 68:2, 68:12, 71:12, 71:16, 74:12
**JOHNSON** [1] - 1:5
**join** [1] - 77:1
**joined** [2] - 55:21, 77:3, 77:8
**Joint** [1] - 4:22
**JOSE** [1] - 2:9
**Joseph** [7] - 3:12, 3:14, 3:19, 3:23, 4:20, 7:20, 35:6
**JOSEPH** [5] - 1:19, 3:3, 6:1, 8:1, 254:11
**Journal** [1] - 158:5
**JPS** [1] - 2:12
**JPS-DPW-RMD** [1] - 2:12
**JR** [2] - 2:4, 2:4
**Judge** [5] - 4:14, 4:18, 186:19, 187:7, 211:11
**judge** [1] - 73:13
**Judgement** [1] - 4:16
**judicial** [1] - 190:5

**JUDY** [1] - 1:7
**July** [9] - 118:8, 197:9, 197:19, 198:12, 201:21, 202:11, 203:5, 203:24, 222:10
**jump** [2] - 159:9, 159:14
**June** [8] - 26:5, 26:11, 52:18, 81:8, 81:11, 135:20, 224:22, 225:7
**jurisdiction** [2] - 191:5, 192:10
**Justice** [1] - 206:13
**JUSTICE** [1] - 7:7
**justification** [9] - 238:23, 239:4, 239:6, 239:13, 239:19, 243:8, 245:5, 245:8, 245:11
**justifications** [1] - 239:10

## K

**Kahn** [2] - 6:10, 254:8
**KAHN** [1] - 6:19
**KASPER** [3] - 7:13, 9:2, 252:8
**Kathleen** [1] - 4:20
**keep** [9] - 15:16, 19:8, 27:24, 173:25, 246:22, 249:22, 249:25, 250:1, 250:4
**keeping** [1] - 109:20
**Keith** [3] - 4:3, 42:17, 67:6
**KELLEN** [1] - 7:13
**Kelly** [6] - 8:15, 14:9, 40:12, 192:3, 193:3, 199:20
**KELLY** [95] - 7:9, 8:8, 8:11, 8:14, 14:21, 15:6, 15:11, 15:14, 30:21, 33:8, 78:7, 78:9, 79:9, 80:2, 80:8, 80:11, 80:15, 81:19, 81:25, 82:5, 82:18, 83:5, 87:18, 87:22, 89:24, 90:21, 92:15, 93:14, 94:15, 95:19, 98:7, 98:17, 99:6, 99:20, 101:24, 102:12, 102:21, 103:12, 105:8, 106:6, 107:9, 108:25, 110:21, 112:3,

112:24, 113:24, 114:22, 115:14, 116:21, 117:18, 120:6, 120:23, 124:15, 125:8, 125:19, 125:22, 127:3, 128:6, 128:22, 129:16, 129:20, 130:12, 131:2, 137:6, 137:9, 140:6, 141:14, 144:7, 191:13, 191:18, 192:14, 193:7, 193:10, 195:4, 196:13, 198:20, 199:4, 199:13, 201:22, 209:6, 209:12, 209:22, 210:19, 211:7, 212:21, 213:17, 213:20, 216:6, 217:6, 217:23, 223:6, 243:16, 250:12, 250:16, 252:25
**Kelly's** [1] - 33:12
**KENNEDY** [2] - 2:1, 2:15
**Kenosha** [24] - 234:4, 234:5, 234:24, 235:5, 235:15, 235:16, 235:19, 235:22, 235:25, 236:1, 236:3, 236:8, 236:11, 236:15, 236:21, 236:25, 237:7, 238:7, 238:10, 238:13, 238:16, 238:25, 239:7, 239:11
**kept** [3] - 95:8, 97:25, 204:5
**KEVIN** [2] - 2:1, 2:15
**keyboard** [1] - 45:12
**kind** [12] - 68:25, 71:3, 92:12, 108:16, 125:14, 136:21, 166:3, 170:1, 174:4, 248:16, 249:1, 249:18
**KIND** [1] - 1:10
**kinds** [3] - 170:13, 171:15, 171:19
**knack** [1] - 71:2
**knowing** [1] - 229:10
**knowledge** [20] - 51:12, 53:15, 72:21, 91:19, 96:4, 128:14, 132:25, 133:5, 167:14, 178:8, 205:4, 210:24, 216:8, 225:3, 229:12, 229:24, 230:4, 232:2, 235:2, 254:13

**known** [1] - 65:1
**KRESBACH** [1] - 1:6

## L

**LA** [1] - 2:8
**label** [1] - 32:1
**labeled** [1] - 3:17
**Lac** [2] - 162:7, 163:5
**Lane** [1] - 7:23
**LANGE** [1] - 1:6
**language** [9] - 38:11, 70:19, 72:25, 94:7, 94:23, 95:12, 96:19, 159:18, 189:7
**LARDNER** [1] - 7:13
**large** [5] - 47:20, 236:4, 239:8, 239:17, 244:14
**last** [12] - 13:3, 13:12, 13:14, 15:21, 21:11, 38:1, 38:3, 70:6, 159:9, 164:14, 185:25, 223:2
**late** [2] - 105:4, 195:16
**Latino** [4] - 229:14, 229:20, 230:1, 231:7
**latter** [1] - 119:10
**law** [41] - 14:6, 14:9, 14:25, 15:18, 15:19, 27:11, 27:19, 27:20, 27:23, 35:16, 36:23, 39:4, 39:11, 53:23, 53:25, 55:21, 62:5, 64:14, 73:20, 76:25, 78:24, 78:25, 79:1, 79:3, 84:9, 89:11, 91:25, 132:4, 132:14, 132:20, 132:24, 133:2, 133:4, 133:11, 133:13, 140:22, 143:13, 215:21, 226:6, 248:13, 250:10
**LAW** [1] - 6:23
**Law** [8] - 6:11, 6:19, 6:23, 7:3, 7:10, 7:13, 7:17, 254:9
**lawful** [1] - 6:2
**lawsuit** [7] - 14:16, 78:2, 90:16, 90:19, 155:19, 194:5, 196:22
**lawsuits** [2] - 190:18, 194:5
**LAWTON** [1] - 7:3
**lawyer** [5] - 62:2, 107:23, 132:17, 182:17, 211:12
**lawyers** [1] - 61:19,

131:20, 133:12, 150:8, 150:11, 174:13, 174:17
**LAZAR** [12] - 7:6, 33:19, 87:10, 98:18, 104:11, 206:7, 206:11, 206:16, 207:1, 207:6, 223:10, 223:14
**Lazar** [1] - 8:16
**Leader** [4] - 7:18, 35:8, 42:7, 84:20
**leaders** [4] - 153:11, 153:24, 231:11, 232:5
**leadership** [2] - 42:4, 42:5
**learned** [1] - 166:7
**least** [4] - 155:17, 189:17, 189:24, 206:14
**leave** [3] - 134:3, 211:12, 223:19
**Leave** [1] - 4:15
**Ledgeview** [2] - 164:16, 164:17
**left** [12] - 24:15, 48:20, 48:22, 58:25, 70:7, 162:2, 163:7, 165:8, 209:19, 223:21, 250:8, 251:11
**left-hand** [4] - 48:20, 48:22, 70:7, 162:2
**legal** [29] - 9:20, 30:7, 30:8, 46:5, 46:6, 46:7, 61:16, 61:22, 78:21, 78:23, 85:6, 85:14, 85:18, 85:20, 97:4, 101:20, 105:24, 124:24, 127:25, 145:22, 148:16, 149:15, 150:3, 155:5, 211:9, 225:24, 226:3, 226:4
**Legal** [1] - 7:22
**legislation** [1] - 100:19
**Legislative** [1] - 79:21
**legislative** [87] - 9:16, 19:6, 23:19, 24:8, 40:10, 42:4, 42:5, 43:5, 43:19, 44:13, 48:1, 48:3, 50:6, 54:14, 55:2, 55:10, 55:19, 56:12, 56:17, 57:4, 57:25, 58:6, 60:9, 60:16, 61:12, 62:13, 63:22, 69:6, 69:14, 71:13, 71:16, 72:4, 73:22,

76:24, 77:4, 77:8, 95:9, 98:1, 119:7, 119:13, 120:1, 122:20, 135:8, 153:23, 159:17, 160:1, 160:8, 171:25, 175:17, 175:22, 176:2, 176:6, 176:9, 176:12, 178:2, 178:7, 178:10, 179:6, 179:15, 180:1, 180:23, 181:1, 181:4, 181:16, 182:4, 182:7, 182:19, 183:5, 184:7, 184:10, 185:2, 186:9, 186:12, 188:24, 189:3, 211:5, 212:17, 222:14, 222:20, 225:18, 231:11, 232:5, 250:5, 250:11, 251:11, 252:6, 252:9

**Legislature** [7] - 91:22, 92:25, 94:1, 95:4, 95:7, 123:20, 159:16

legislature [26] - 9:21, 42:25, 58:16, 58:21, 84:12, 85:15, 97:24, 98:23, 101:17, 101:21, 102:6, 123:4, 124:6, 124:21, 125:2, 125:4, 133:23, 135:7, 143:1, 143:17, 148:17, 154:16, 157:25, 159:21, 159:22, 167:16

**Legislature's** [4] - 91:23, 93:2, 94:2, 95:6

legislatures [4] - 154:18, 175:13, 239:23, 241:25

**LESLIE** [1] - 1:5

less [7] - 147:24, 147:25, 148:1, 183:1, 184:19, 218:23, 236:24

letter [20] - 3:12, 3:18, 3:20, 3:21, 4:20, 13:6, 21:20, 21:21, 21:22, 34:21, 35:5, 36:5, 37:15, 37:17, 37:20, 38:8, 38:10, 38:18, 39:14, 196:1

letters [9] - 37:23, 38:2, 38:4, 38:15, 38:19, 39:15, 54:13, 84:14, 86:8

level [3] - 170:15, 171:2, 210:7

levels [2] - 171:7, 171:10

license [4] - 3:24, 55:12, 55:15, 55:17

licensed [6] - 54:16, 55:1, 55:9, 57:2, 57:5, 57:8

**Life** [1] - 68:1

light [1] - 119:14

likely [2] - 75:6, 75:8

likewise [1] - 11:6

limit [3] - 111:23, 126:10, 250:13

limitation [1] - 92:1

limited [1] - 33:20

limiting [1] - 80:25

line [9] - 36:11, 36:13, 36:15, 163:14, 163:18, 185:9, 206:6, 207:21, 232:15

lines [16] - 50:13, 50:14, 207:10, 211:24, 212:5, 215:19, 215:20, 215:21, 216:10, 230:8, 230:17, 230:20, 232:3, 236:7, 252:20, 252:21

list [6] - 110:8, 112:19, 112:21, 113:15, 153:14, 231:6

listed [4] - 92:9, 93:8, 164:7, 165:4

listing [3] - 161:15, 161:23, 161:25

litigation [18] - 9:22, 35:12, 59:19, 59:22, 60:2, 64:5, 66:2, 66:8, 77:14, 78:6, 81:7, 81:14, 82:22, 83:10, 83:15, 155:13, 195:21, 197:23

live [4] - 28:11, 28:21, 28:22, 28:25

lived [1] - 75:16

living [2] - 58:24, 75:17

**LLC** [1] - 6:23

**LLP** [2] - 7:13, 7:17

lobbied [1] - 58:6

lobby [1] - 55:1

lobbyist [6] - 3:24, 54:16, 57:2, 57:5, 57:8, 57:21

**Lobbyists** [2] - 205:15, 205:23

local [4] - 95:11, 98:2, 216:5, 230:7

locals [1] - 215:24

location [1] - 248:21

logistics [1] - 147:19

longest [1] - 148:7

look [49] - 12:5, 16:3, 17:5, 18:13, 34:2, 34:16, 35:3, 35:18, 37:11, 38:3, 55:4, 56:20, 68:21, 69:4, 69:25, 70:6, 84:16, 86:8, 86:10, 86:11, 88:7, 93:24, 104:19, 108:23, 136:7, 156:6, 157:6, 166:20, 185:20, 189:15, 194:17, 195:24, 207:9, 207:16, 207:20, 212:4, 225:24, 233:1, 233:19, 233:20, 234:4, 234:8, 237:13, 238:7, 246:17, 247:3, 247:12

looked [11] - 16:15, 16:16, 30:10, 54:13, 84:15, 86:7, 87:5, 87:6, 207:11, 247:8, 247:14

looking [10] - 48:12, 63:1, 136:18, 159:2, 189:18, 190:3, 196:8, 210:8, 247:16

looks [3] - 162:2, 162:4, 164:4

**Louis** [1] - 4:20

lower [1] - 24:15

lunch [4] - 155:9, 155:10, 155:11, 174:11

**M**

**Madden** [1] - 4:20

**Madison** [26] - 1:20, 6:12, 6:20, 7:4, 7:7, 7:17, 28:4, 28:5, 28:8, 29:7, 29:10, 32:14, 32:15, 32:16, 32:22, 33:1, 53:18, 59:7, 62:10, 62:19, 63:11, 63:14, 147:21, 148:2, 242:3, 254:10

mail [43] - 137:5, 137:19, 137:23, 138:5, 138:7, 138:11, 138:14, 138:17, 138:19, 138:23, 139:1, 139:3, 139:12, 139:18, 139:21, 139:25, 141:12, 141:17, 144:22, 145:2, 145:4, 145:13,

146:3, 146:7, 177:5, 177:12, 178:1, 181:16, 181:19, 181:25, 182:6, 184:9, 184:13, 184:22, 184:23, 184:25, 185:2, 248:3, 248:6, 248:10, 249:5, 249:19

mailed [3] - 145:6, 177:9, 181:22

mailing [2] - 177:8, 177:16

mails [10] - 138:10, 138:13, 177:19, 177:24, 179:4, 179:5, 228:21, 228:24, 248:17, 248:19

**Main** [4] - 6:11, 6:20, 7:7, 254:9

maintain [1] - 29:9

**Majority** [4] - 7:18, 35:8, 42:7, 84:20

makeup [2] - 216:12, 217:4

man [1] - 67:11

management [1] - 248:14

**Mandy** [1] - 227:19

**MANZANET** [1] - 1:6

**Map** [3] - 4:24, 5:3, 5:4

map [64] - 19:6, 24:6, 47:20, 50:3, 50:4, 71:13, 71:17, 73:10, 73:13, 85:16, 102:24, 124:13, 130:7, 130:8, 161:15, 163:20, 164:1, 164:17, 165:13, 173:22, 216:16, 217:9, 223:7, 223:9, 224:14, 224:18, 224:21, 224:25, 225:1, 225:2, 225:5, 225:6, 225:17, 225:22, 225:24, 225:25, 226:12, 228:4, 228:16, 229:7, 229:8, 229:11, 229:12, 230:16, 233:10, 233:20, 233:25, 235:11, 235:12, 237:12, 242:5, 242:7, 242:13, 242:14, 242:15, 242:17, 242:21, 245:4, 245:23, 245:25, 246:23

mapmakers [1] - 70:16

mapping [1] - 85:23

maps [74] - 32:7, 32:17, 44:5, 44:6, 44:17, 44:22, 44:23, 45:2, 45:3, 45:5, 45:6, 45:9, 45:14, 45:18, 45:21, 45:24, 46:2, 46:15, 48:13, 51:9, 51:13, 60:9, 60:16, 61:9, 61:12, 64:8, 70:13, 73:8, 73:22, 74:13, 85:8, 91:24, 95:8, 97:25, 99:15, 100:8, 123:8, 125:15, 136:8, 136:15, 136:18, 136:22, 136:25, 148:11, 148:13, 151:7, 152:18, 152:21, 159:17, 175:3, 175:16, 175:17, 175:22, 176:2, 178:6, 215:23, 216:13, 217:2, 217:5, 217:8, 219:9, 219:14, 219:15, 220:5, 220:11, 225:9, 229:22, 229:25, 230:11, 233:4, 233:5, 241:22, 246:25, 247:25

**Maps** [2] - 3:17, 32:1

**March** [3] - 21:7, 27:2, 56:16

**Maria** [4] - 8:16, 87:13, 206:24, 207:3

**MARIA** [1] - 7:6

**Marie** [1] - 223:18

mark [13] - 12:14, 17:18, 17:19, 17:21, 19:7, 34:8, 34:11, 53:1, 66:17, 104:14, 190:23, 232:21

marked [42] - 12:16, 12:19, 17:23, 18:1, 18:3, 18:20, 19:10, 19:13, 25:23, 26:6, 31:14, 31:24, 34:5, 34:9, 34:13, 53:2, 53:5, 54:19, 54:22, 66:18, 66:22, 67:1, 91:2, 91:5, 104:15, 104:18, 106:16, 106:19, 108:4, 108:7, 168:7, 188:9, 188:12, 190:24, 191:2, 194:9, 194:13, 197:14, 232:19, 233:3, 233:7, 233:10

married [2] - 75:21, 76:15

14

**Marshfield** [12] - 246:3, 246:6, 246:10, 246:22, 246:25, 247:7, 247:10, 247:15, 247:18, 247:19
**Mart** [2] - 56:9, 57:16
**master** [1] - 72:19
**material** [3] - 79:10, 126:2, 218:3
**materials** [5] - 16:3, 17:5, 19:24, 21:19, 23:22
**matter** [9] - 29:19, 35:11, 54:14, 87:5, 87:16, 109:24, 118:2, 133:21, 159:13
**matters** [24] - 14:23, 35:24, 41:18, 93:12, 101:21, 133:23, 133:25, 139:8, 139:15, 140:16, 141:13, 141:19, 141:23, 142:3, 142:8, 142:12, 144:17, 144:21, 145:4, 145:7, 147:3, 183:25, 184:10, 254:14
**MAXINE** [1] - 1:5
**MCD** [3] - 161:15, 161:16, 161:18
**McLeod** [49] - 3:14, 3:19, 3:20, 3:21, 11:9, 14:3, 17:14, 18:10, 18:12, 18:22, 19:15, 37:15, 38:13, 39:15, 42:3, 46:7, 61:20, 79:2, 89:4, 89:15, 131:23, 133:9, 134:7, 134:8, 149:16, 149:18, 150:4, 150:20, 174:20, 182:18, 182:23, 183:4, 183:9, 183:13, 183:23, 184:2, 184:5, 184:9, 184:12, 184:21, 185:2, 186:8, 186:11, 186:17, 227:6, 227:9, 229:3, 231:10
**MCLEOD** [54] - 7:16, 9:1, 9:4, 11:13, 16:21, 27:12, 29:23, 33:3, 33:15, 40:16, 41:1, 41:21, 43:7, 43:12, 43:21, 44:18, 49:19, 60:22, 83:25, 84:4, 89:16, 96:12, 96:25, 97:17, 109:11, 111:9, 112:11, 112:15,

113:7, 113:22, 115:25, 119:6, 122:14, 133:20, 134:11, 134:17, 134:23, 142:19, 154:12, 155:8, 160:3, 176:19, 180:2, 181:6, 182:9, 183:15, 185:4, 186:17, 188:4, 188:7, 211:6, 211:8, 219:12, 251:23
**McLeod's** [8] - 11:5, 15:18, 27:11, 35:16, 36:11, 38:18, 39:13, 78:24
**mean** [8] - 27:20, 31:13, 48:3, 50:5, 50:24, 78:19, 78:21, 204:18
**meaning** [2] - 161:21, 173:25
**means** [1] - 162:24
**meant** [2] - 75:22, 162:18
**measure** [2] - 213:1, 213:9
**meet** [12] - 65:7, 65:15, 65:18, 117:16, 117:21, 118:14, 120:13, 143:8, 146:16, 222:18, 231:17, 231:21
**Meet** [1] - 68:12
**meetings** [1] - 146:19
**member** [3] - 121:14, 123:4, 123:19
**members** [6] - 60:7, 106:3, 124:6, 141:11, 159:22, 167:15
**Members** [4] - 1:13, 2:12, 6:4, 105:16
**membership** [2] - 125:4, 125:7
**memorandum** [1] - 21:22
**memorialized** [5] - 92:5, 96:11, 96:23, 156:18, 156:23
**memory** [1] - 110:14
**Menasha** [3] - 164:23, 164:24, 164:25
**mental** [1] - 82:2
**mentioned** [26] - 42:13, 42:22, 47:9, 49:10, 51:15, 52:19, 57:17, 64:19, 77:11, 87:5, 100:3, 109:19, 113:16, 119:20,

131:18, 131:23, 132:8, 132:16, 132:22, 133:8, 174:19, 179:13, 182:17, 199:21, 210:25, 220:19
**mentions** [2] - 209:4, 209:23
**message** [4] - 182:3, 186:8, 186:11
**messages** [6] - 72:23, 179:8, 229:5, 249:15, 249:20, 250:8
**messaging** [21] - 116:20, 116:25, 117:4, 117:5, 117:13, 139:7, 140:4, 140:5, 140:13, 141:7, 141:18, 142:7, 144:18, 144:22, 144:23, 177:5, 177:6, 179:8
**met** [8] - 65:9, 65:11, 67:11, 77:11, 77:15, 121:9, 146:22, 224:6
**method** [1] - 144:25
**methods** [1] - 228:9
**Michael** [106] - 15:19, 27:20, 28:2, 29:17, 30:11, 30:14, 30:18, 31:10, 31:18, 32:10, 32:13, 32:15, 32:17, 32:22, 33:1, 33:24, 34:22, 38:14, 39:10, 39:19, 40:14, 41:18, 42:11, 43:6, 43:19, 44:8, 44:12, 46:18, 47:3, 47:12, 49:11, 49:15, 49:18, 51:16, 51:21, 51:24, 59:9, 59:18, 59:21, 60:10, 61:7, 61:17, 62:2, 62:16, 65:18, 84:10, 87:3, 88:4, 100:22, 110:10, 113:17, 114:21, 116:9, 119:2, 119:21, 120:14, 121:10, 122:12, 124:20, 125:13, 131:20, 132:7, 132:11, 133:14, 133:19, 134:10, 135:5, 135:10, 136:23, 137:1, 142:16, 143:9, 144:5, 146:13, 146:20, 146:24, 148:9, 148:21, 149:12, 154:19, 155:3, 160:15, 160:19,

166:16, 167:10, 172:19, 174:14, 174:21, 175:5, 175:7, 175:10, 178:5, 178:12, 178:19, 178:22, 179:13, 179:19, 180:1, 182:20, 182:24, 183:6, 200:11, 204:19, 204:21, 204:24, 231:1
**MICHAEL** [3] - 1:15, 2:14, 7:17
**microphone** [2] - 69:18, 69:22
**might** [3] - 91:19, 131:13, 223:14
**mike** [1] - 183:7
**Millis** [10] - 3:18, 3:20, 3:22, 34:21, 36:22, 36:23, 36:25, 37:16, 38:19, 39:15
**Millis's** [1] - 36:19
**Milwaukee** [38] - 6:24, 7:11, 7:14, 28:3, 28:7, 28:11, 28:13, 28:18, 28:22, 28:25, 29:7, 29:11, 32:14, 32:17, 75:16, 75:18, 75:22, 76:21, 76:23, 151:8, 151:12, 151:15, 151:20, 151:23, 152:2, 152:9, 152:13, 152:19, 152:22, 152:25, 154:6, 154:7, 154:20, 158:5, 221:20, 228:10, 242:3
**Min** [1] - 206:22
**Min-U-Script** [1] - 206:22
**minimize** [1] - 212:7
**minimized** [1] - 212:19
**minimum** [2] - 93:5, 97:8
**Minocqua** [13] - 28:16, 29:4, 55:22, 56:3, 56:10, 59:4, 68:2, 75:23, 76:11, 121:24, 122:1, 122:4, 122:9
**minor** [3] - 161:18, 161:20, 162:21
**minorities** [1] - 211:19
**minority** [2] - 101:18, 207:24
**minute** [6] - 58:24, 69:21, 96:5, 104:19,

157:6, 211:1
**minutes** [4] - 68:6, 223:20, 223:24, 237:12
**mischaracterizes** [1] - 93:16
**misstates** [1] - 49:21
**misunderstanding** [1] - 16:24
**misunderstood** [1] - 203:2
**moment** [2] - 22:18, 25:15
**moments** [1] - 128:14
**monitor** [1] - 44:21
**month** [10] - 36:4, 86:15, 86:23, 86:25, 110:5, 117:24, 117:25, 118:8, 124:1
**MOORE** [2] - 1:6, 1:10
**morning** [9] - 8:7, 11:18, 13:22, 16:10, 16:13, 17:17, 18:9, 19:25, 23:25
**Morrison** [1] - 230:22
**most** [2] - 104:9, 239:24
**motion** [8] - 9:10, 9:11, 9:12, 9:24, 11:8, 186:20, 186:22, 186:23
**mouse** [1] - 45:11
**move** [3] - 75:25, 76:4, 188:1
**moved** [3] - 76:11, 212:17, 215:22
**MR** [224] - 8:8, 8:10, 8:11, 8:13, 8:14, 8:25, 9:1, 9:2, 9:3, 9:4, 11:3, 11:13, 11:14, 14:21, 15:3, 15:6, 15:8, 15:11, 15:12, 15:14, 15:15, 16:21, 18:16, 27:12, 29:23, 30:4, 30:21, 33:3, 33:8, 33:15, 40:16, 41:1, 41:21, 43:7, 43:12, 43:21, 44:18, 49:19, 52:25, 60:22, 69:17, 78:7, 78:9, 78:11, 79:9, 80:2, 80:5, 80:8, 80:10, 80:11, 80:12, 80:15, 80:20, 81:19, 81:22, 81:25, 82:5, 82:18, 83:5, 83:25, 84:4, 87:12, 87:18, 87:22,

89:16, 89:24, 90:21, 92:15, 93:14, 94:15, 95:19, 96:12, 96:25, 97:17, 98:7, 98:17, 98:19, 99:6, 99:20, 101:24, 102:12, 102:21, 103:6, 103:12, 104:13, 105:8, 106:6, 107:9, 108:25, 109:11, 110:21, 111:9, 112:3, 112:11, 112:15, 112:24, 113:7, 113:22, 113:24, 114:22, 115:14, 115:19, 115:25, 116:21, 117:18, 119:6, 120:6, 120:23, 122:14, 124:15, 125:8, 125:19, 125:22, 127:3, 128:6, 128:22, 129:16, 129:20, 129:23, 130:12, 131:2, 133:20, 134:11, 134:17, 134:23, 137:6, 137:9, 140:6, 141:14, 142:19, 144:7, 154:12, 154:23, 155:6, 155:8, 158:24, 160:3, 176:19, 180:2, 181:6, 182:9, 183:15, 185:4, 185:8, 185:10, 185:11, 185:13, 185:14, 185:19, 186:2, 186:14, 186:17, 188:3, 188:4, 188:6, 188:7, 188:8, 191:13, 191:16, 191:18, 192:14, 192:24, 193:7, 193:9, 193:10, 195:4, 196:13, 198:20, 199:4, 199:13, 201:22, 202:24, 206:10, 206:15, 206:19, 207:2, 207:7, 209:6, 209:9, 209:12, 209:22, 210:19, 211:6, 211:7, 211:8, 212:21, 212:22, 213:5, 213:17, 213:20, 216:6, 216:21, 217:6, 217:23, 219:12, 223:1, 223:6, 223:8, 223:12, 223:16, 223:17, 223:18, 223:23, 223:25, 224:1, 232:7, 232:11,

232:14, 232:17, 232:21, 235:8, 243:16, 250:12, 250:14, 250:16, 251:19, 251:23, 251:24, 251:25, 252:8, 252:10, 252:23, 252:25, 253:1

**MS** [11] - 33:19, 87:10, 98:18, 104:11, 206:7, 206:11, 206:16, 207:1, 207:6, 223:10, 223:14

**MSN** [8] - 138:20, 138:21, 138:23, 139:19, 145:9, 177:13, 181:25, 184:23

**multiple** [6] - 244:2, 244:10, 244:12, 245:3, 245:6

**municipal** [1] - 226:13

**municipalities** [19] - 24:7, 95:9, 98:1, 162:19, 162:24, 163:20, 163:25, 164:7, 164:9, 164:13, 164:19, 165:4, 165:9, 165:10, 171:11, 171:23, 236:14, 238:24, 239:23

**municipality** [4] - 162:18, 173:23, 173:25, 238:20

# N

**name** [6] - 92:9, 93:8, 156:12, 157:2, 205:14, 207:13

**named** [2] - 90:24, 254:11

**names** [7] - 110:8, 110:12, 110:14, 110:16, 112:19, 112:21, 113:15

**narrow** [1] - 130:13

**National** [2] - 222:19, 222:23

**nature** [25] - 93:16, 120:22, 128:3, 128:4, 128:11, 135:25, 142:18, 145:12, 148:19, 150:24, 153:8, 158:2, 158:4, 160:24, 176:17, 181:3, 182:6, 183:12, 185:1, 200:23, 204:8, 204:10, 214:24,

244:25, 246:15

**necessarily** [2] - 116:15, 208:4

**necessary** [3] - 10:6, 11:1, 237:17

**need** [8] - 8:22, 12:1, 12:8, 31:21, 84:16, 110:14, 233:20, 237:2

**needed** [3] - 76:20, 215:11

**needs** [2] - 11:15, 78:18

**never** [2] - 149:4, 166:7

**new** [17] - 56:21, 93:6, 95:7, 97:9, 97:24, 99:15, 100:8, 102:7, 178:7, 187:21, 212:17, 220:13, 220:16, 222:20, 240:5, 240:12, 240:21

**next** [8] - 74:14, 74:22, 92:23, 162:9, 163:10, 163:24, 187:16, 187:18

**nice** [1] - 201:1

**NICHOL** [2] - 1:15, 2:14

**nine** [1] - 165:1

**non** [12] - 129:6, 150:8, 176:23, 181:10, 186:20, 193:23, 195:17, 199:12, 202:8, 218:12, 218:13, 237:14

**non-continuous** [1] - 237:14

**non-lawyers** [1] - 150:8

**non-parties** [1] - 186:20

**non-privileged** [6] - 129:6, 193:23, 195:17, 202:8, 218:12, 218:13

**non-testifying** [2] - 176:23, 181:10

**none** [3] - 58:4, 131:11, 158:23

**North** [2] - 6:23, 7:10

**Nos** [5] - 17:23, 34:9, 188:9, 194:9, 232:19

**notarial** [1] - 255:3

**Notary** [3] - 6:9, 254:4, 255:6

**noted** [1] - 180:6

**notes** [21] - 22:5, 22:8, 22:9, 22:10, 22:13, 22:15, 161:7,

161:14, 172:10, 189:16, 189:18, 204:1, 204:4, 204:5, 204:8, 204:10, 227:11, 228:18, 238:1, 238:6, 238:8

**nothing** [8] - 80:17, 125:10, 233:24, 252:4, 252:13, 252:24, 252:25, 254:13

**notice** [1] - 26:3

**notify** [1] - 189:5

**November** [78] - 14:24, 15:5, 15:6, 15:10, 30:24, 31:7, 31:8, 33:11, 40:12, 41:17, 42:10, 55:5, 81:2, 81:4, 87:23, 87:24, 87:25, 88:17, 102:25, 104:25, 105:4, 111:3, 112:9, 113:2, 114:5, 114:8, 115:3, 115:10, 115:22, 116:23, 117:2, 117:18, 117:19, 118:24, 120:2, 120:5, 120:18, 120:19, 121:7, 126:3, 126:6, 126:11, 126:23, 127:1, 127:19, 128:8, 128:19, 129:7, 130:15, 130:24, 137:16, 137:20, 137:22, 138:3, 139:9, 139:12, 140:7, 140:8, 141:15, 141:18, 141:22, 142:1, 142:12, 144:8, 144:9, 144:12, 144:17, 144:20, 146:11, 146:17, 146:23, 147:3, 191:6, 194:19, 199:18, 201:25, 250:22

**number** [21] - 23:6, 46:24, 47:7, 65:14, 108:17, 131:20, 135:12, 147:7, 164:7, 165:7, 165:8, 167:23, 167:24, 168:15, 170:23, 204:11, 213:9, 213:11, 213:13, 215:1, 215:6

**numbered** [1] - 13:18

**numbers** [11] - 22:20, 72:21, 148:23, 148:25, 149:2,

204:13, 205:3, 205:5, 205:7, 205:11, 234:21

# O

**oath** [2] - 8:3, 254:16

**Obey's** [1] - 203:14

**object** [35] - 30:21, 33:15, 33:19, 38:9, 43:7, 43:8, 43:21, 44:18, 49:19, 60:22, 82:18, 84:5, 89:16, 89:24, 96:12, 106:6, 107:9, 108:25, 109:11, 111:9, 112:15, 113:22, 113:24, 125:22, 142:19, 154:12, 176:19, 191:18, 195:4, 196:13, 201:22, 211:7, 213:20, 219:12, 250:17

**objected** [2] - 38:14, 129:10

**objection** [94] - 8:19, 8:20, 8:23, 9:7, 9:24, 10:4, 10:9, 10:23, 16:22, 17:1, 29:24, 33:4, 33:9, 33:12, 33:17, 33:18, 40:17, 78:7, 79:9, 80:2, 81:19, 83:5, 84:6, 87:18, 90:21, 92:15, 93:14, 94:15, 95:19, 97:1, 97:18, 98:7, 98:13, 98:15, 99:6, 99:20, 101:24, 102:12, 102:21, 103:12, 104:11, 105:8, 110:21, 112:3, 112:4, 112:24, 113:8, 114:22, 115:14, 116:1, 116:21, 119:7, 120:6, 120:23, 122:15, 124:15, 125:8, 125:19, 127:3, 128:6, 128:22, 129:16, 129:20, 130:12, 131:2, 133:21, 134:12, 134:18, 134:23, 137:6, 137:9, 140:6, 141:14, 144:7, 181:7, 182:10, 183:16, 185:5, 191:13, 192:14, 193:4, 198:20, 209:6, 209:12, 209:13, 209:22, 210:19,

211:9, 212:21, 216:6, 217:6, 217:23, 243:16, 250:12
**objections** [9] - 8:18, 10:7, 10:12, 10:16, 11:10, 41:2, 41:22, 185:18, 187:2
**objective** [5] - 183:10, 204:10, 204:13, 225:25, 226:11
**observe** [16] - 44:3, 44:21, 45:6, 47:11, 47:14, 51:19, 149:11, 175:19, 176:4, 178:13, 178:15, 179:24, 180:5, 180:9, 183:4, 183:23
**observed** [3] - 45:17, 175:25, 183:9
**obstruct** [1] - 10:13
**obtain** [1] - 55:15
**obtained** [3] - 102:23, 114:4, 218:5
**obviously** [5] - 10:18, 12:4, 66:24, 187:23, 232:24
**occasionally** [4] - 131:25, 132:1, 132:2, 132:3
**occupational** [1] - 53:19
**Occupational** [4] - 56:13, 56:18, 57:3, 58:11
**occupied** [1] - 219:1
**occur** [4] - 116:4, 142:15, 146:19, 187:16
**occurred** [7] - 31:6, 52:11, 52:16, 114:20, 115:2, 143:2, 202:20
**occurring** [2] - 114:1, 201:24
**odd** [1] - 98:24
**OF** [6] - 1:1, 6:23, 7:7, 254:1, 254:2
**OFFICE** [1] - 6:23
**office** [19] - 28:4, 28:5, 28:7, 28:8, 29:6, 29:11, 29:13, 32:18, 62:10, 62:14, 62:19, 65:6, 116:9, 177:16, 204:6, 249:23, 250:2
**Office** [1] - 121:14
**offices** [34] - 6:10, 30:9, 32:11, 32:13, 32:15, 32:22, 33:1, 114:21, 116:11, 119:2, 120:14,

136:23, 137:1, 142:16, 143:9, 144:6, 146:13, 146:20, 146:24, 148:22, 154:19, 155:3, 160:16, 160:19, 166:16, 167:10, 172:19, 175:8, 178:5, 178:12, 182:24, 204:21, 204:25, 254:8
**official** [2] - 1:14, 2:13
**officials** [1] - 222:19
**often** [12] - 138:7, 140:15, 145:6, 147:5, 174:3, 178:1, 180:12, 181:18, 182:23, 183:1, 184:12, 184:19
**Oklahoma** [3] - 64:23, 65:7, 147:20
**old** [3] - 19:5, 47:25, 48:3
**OLGA** [1] - 2:9
**Olson** [1] - 4:20
**OLSON** [1] - 7:3
**omitted** [1] - 209:19
**once** [5] - 143:11, 173:4, 204:24, 205:5, 231:25
**One** [4] - 6:11, 6:20, 7:17, 254:9
**one** [50] - 8:19, 9:15, 12:7, 18:1, 20:23, 23:6, 24:8, 25:15, 29:3, 29:4, 29:13, 31:22, 36:10, 42:1, 42:2, 57:22, 72:11, 74:11, 84:4, 86:10, 94:23, 95:2, 119:24, 123:13, 141:10, 154:7, 156:9, 159:9, 164:14, 164:15, 164:23, 167:22, 170:6, 171:24, 181:7, 196:5, 215:7, 221:1, 223:2, 229:24, 233:6, 233:20, 236:4, 237:3, 239:8, 241:22, 244:5, 247:1, 247:10, 247:13
**ones** [11] - 20:11, 51:6, 152:25, 154:21, 155:3, 209:4, 216:14, 216:15, 223:10, 223:12
**ongoing** [1] - 56:25
**oops** [1] - 69:17
**open** [1] - 206:4
**operate** [1] - 166:9
**opinion** [10] - 105:14, 129:13,

129:19, 130:5, 130:9, 130:14, 130:17, 130:25, 212:19, 217:3
**opinions** [3] - 101:13, 130:4, 130:5
**opportunities** [2] - 74:14, 74:22
**opportunity** [5] - 15:23, 68:16, 99:2, 185:20, 211:19
**opposed** [6] - 27:23, 38:23, 76:22, 81:1, 141:10, 152:5
**opposition** [1] - 11:8
**options** [16] - 50:3, 50:4, 50:7, 50:17, 51:3, 51:9, 51:12, 52:3, 52:8, 52:12, 153:13, 153:20, 153:22, 153:25, 154:4, 155:2
**order** [11] - 10:17, 10:21, 119:14, 122:21, 184:17, 185:12, 186:22, 186:25, 187:14, 211:11, 231:17
**orders** [1] - 187:7
**organization** [1] - 55:18
**organizations** [4] - 54:25, 55:8, 57:9, 58:5
**Original** [1] - 4:15
**original** [10] - 5:6, 5:7, 5:24, 38:18, 39:13, 47:1, 104:7, 104:8, 191:5, 192:9
**otherwise** [1] - 105:21
**Ottman** [130] - 42:3, 42:22, 42:23, 42:24, 43:18, 45:17, 45:20, 46:1, 46:14, 46:19, 46:23, 46:25, 47:4, 47:9, 47:13, 47:15, 50:25, 51:2, 51:11, 52:2, 52:7, 52:11, 113:16, 113:21, 114:13, 114:16, 114:19, 115:9, 115:12, 115:23, 116:8, 116:13, 116:19, 116:24, 117:3, 117:16, 117:21, 118:15, 118:18, 118:23, 119:1, 119:25, 120:5, 137:3, 137:23, 138:3, 138:7, 138:13,

138:22, 139:1, 139:4, 139:6, 150:15, 152:11, 153:1, 153:6, 157:20, 157:21, 158:3, 158:7, 158:12, 158:16, 158:20, 160:25, 165:17, 165:20, 166:17, 167:18, 169:14, 172:16, 174:11, 175:20, 175:25, 176:5, 178:6, 180:10, 180:13, 180:19, 183:24, 184:3, 184:6, 198:5, 198:8, 198:18, 199:23, 200:3, 200:16, 200:17, 201:16, 201:19, 202:10, 203:11, 204:12, 207:17, 208:19, 209:4, 209:23, 211:24, 212:5, 214:17, 214:18, 214:25, 215:3, 215:10, 215:14, 215:19, 216:2, 216:11, 216:13, 216:19, 217:2, 224:7, 224:13, 225:2, 230:25, 231:10, 232:6, 237:10, 237:11, 237:20, 244:24, 245:16, 245:19, 246:14, 252:13
**Ottman's** [7] - 158:10, 207:22, 208:25, 209:20, 216:20, 216:25
**outlined** [2] - 210:12, 232:5
**outside** [24] - 81:6, 83:11, 83:18, 88:24, 103:3, 111:20, 114:20, 116:9, 121:18, 127:11, 136:23, 142:16, 143:8, 144:5, 146:12, 146:20, 160:19, 192:7, 193:15, 193:24, 199:5, 199:20, 204:24, 222:13
**overhear** [2] - 178:18, 180:18
**oversee** [1] - 45:5
**oversized** [1] - 233:4
**own** [14] - 15:19, 22:11, 23:22, 27:23, 28:6, 62:10, 62:14,

132:14, 165:22, 167:13, 205:4, 249:5, 249:9, 249:11

**P**

**p.m** [1] - 253:3
**package** [1] - 23:13
**packet** [1] - 191:8
**Packet** [1] - 3:14
**page** [54] - 13:12, 13:14, 13:18, 15:22, 21:7, 21:9, 21:11, 24:13, 36:9, 38:1, 53:10, 67:14, 67:15, 68:1, 68:11, 70:5, 70:7, 70:8, 70:9, 71:11, 72:9, 72:10, 72:12, 73:4, 73:17, 74:5, 74:6, 91:9, 91:15, 92:8, 92:22, 94:9, 96:6, 98:23, 106:21, 108:8, 108:15, 156:8, 156:11, 156:12, 159:4, 170:6, 188:18, 206:6, 207:9, 207:16, 207:21, 209:24, 211:23, 211:24, 212:5, 215:18, 216:9
**pages** [14] - 19:1, 20:8, 22:4, 22:24, 22:25, 23:1, 23:8, 23:21, 68:8, 69:5, 101:4, 108:17, 206:11, 207:14
**Pages** [1] - 3:2
**paid** [4] - 36:4, 61:5, 86:23, 88:23
**pair** [1] - 241:2
**paired** [6] - 240:6, 240:13, 240:16, 240:21, 240:24, 241:7
**pairing** [5] - 241:23, 241:24, 242:4, 242:9, 242:21
**pairings** [5] - 240:18, 241:7, 241:11, 241:12, 241:18
**panel** [2] - 73:13, 190:5
**Panel** [2] - 4:14, 4:18
**paper** [10] - 17:20, 21:4, 31:17, 47:16, 47:19, 100:25, 136:19, 162:6, 152:9, 249:22
**papers** [2] - 11:7, 18:2

**paragraph** [38] - 35:4, 35:18, 35:25, 36:3, 38:3, 70:7, 72:18, 73:5, 73:17, 73:25, 74:2, 74:10, 84:18, 91:16, 91:21, 92:22, 92:23, 93:13, 93:24, 94:14, 94:25, 95:3, 95:24, 96:5, 97:5, 97:6, 97:11, 97:23, 99:13, 100:2, 101:16, 102:6, 156:8, 156:13, 156:16, 159:10

**paragraphs** [5] - 13:18, 94:22, 156:25, 157:1, 157:6

**parameters** [3] - 103:4, 127:12, 199:6

**parcels** [1] - 237:14

**pardon** [1] - 227:25

**parens** [1] - 35:10

**part** [24] - 21:14, 23:18, 63:16, 77:2, 87:6, 96:7, 97:11, 97:12, 105:23, 150:25, 159:11, 159:22, 160:1, 160:7, 161:3, 161:6, 161:14, 166:24, 171:16, 217:19, 225:18, 226:3, 238:4, 238:8

**part-time** [1] - 63:16

**partially** [2] - 20:3, 203:9

**participate** [10] - 70:14, 77:4, 78:1, 125:9, 149:8, 151:14, 190:12, 197:4, 225:17, 230:5

**participated** [5] - 64:7, 151:17, 158:13, 158:17, 232:3

**participating** [1] - 75:4

**participation** [3] - 102:24, 225:21, 225:22

**particular** [22] - 24:9, 48:17, 55:18, 68:22, 72:24, 75:9, 77:18, 83:24, 86:25, 89:13, 95:18, 157:23, 165:12, 165:19, 166:1, 189:10, 189:25, 190:14, 191:11, 197:1, 201:4, 246:1

**parties** [5] - 107:18, 186:20, 187:25,

254:22, 254:25

**partisan** [3] - 216:12, 217:3, 217:12

**parts** [2] - 203:10, 234:23

**party** [2] - 60:12, 123:19

**passages** [1] - 206:5

**passed** [11] - 100:20, 124:4, 143:13, 143:16, 157:24, 169:17, 218:21, 219:1, 222:17, 241:13, 241:19

**past** [4] - 111:18, 217:17, 217:21, 218:15

**patience** [1] - 10:22

**Patrick** [2] - 89:14, 128:2

**PAUL** [1] - 2:4

**pending** [4] - 6:5, 11:11, 129:14, 190:17

**people** [29] - 12:5, 41:25, 42:12, 42:13, 42:22, 61:23, 61:25, 78:19, 91:18, 110:9, 111:18, 112:20, 131:19, 133:8, 133:12, 150:10, 168:24, 170:7, 170:23, 174:13, 193:3, 193:23, 193:24, 195:13, 214:1, 231:6, 232:1, 246:18, 248:3

**per** [3] - 36:4, 86:15, 86:23

**percent** [10] - 167:25, 168:3, 168:4, 168:21, 168:23, 168:25, 169:4, 210:13, 215:2

**percentage** [7] - 179:21, 215:6, 218:25, 219:2, 229:13, 229:19, 230:1

**percentages** [2] - 222:1, 222:6

**Pere** [1] - 164:14

**PEREZ** [1] - 2:9

**Perez** [1] - 227:19

**perform** [3] - 32:16, 33:24, 111:25

**performed** [4] - 32:10, 32:20, 32:21, 61:5

**performing** [2] - 47:13, 82:21

**perhaps** [5] - 115:15,

184:17, 185:16, 224:11, 230:18

**period** [4] - 25:6, 41:4, 42:9, 112:9

**person** [7] - 8:19, 83:24, 119:19, 142:13, 146:16, 207:13, 254:11

**personal** [4] - 130:10, 138:16, 167:14, 205:4

**personally** [8] - 14:17, 16:12, 79:25, 80:7, 141:10, 141:12, 219:9, 219:21

**persons** [1] - 167:24

**pertain** [1] - 155:18

**pertained** [1] - 165:13

**pertaining** [3] - 250:5, 250:10, 251:11

**pertains** [3] - 164:1, 164:18, 250:21

**pertinent** [1] - 185:17

**PETER** [2] - 6:22, 6:23

**Peter** [7] - 185:9, 185:10, 188:5, 223:14, 223:16, 230:22, 232:17

**Petition** [1] - 4:14

**petition** [2] - 191:4, 192:9

**PETRI** [1] - 2:4

**phone** [16] - 116:7, 116:17, 118:23, 140:18, 140:21, 140:24, 147:6, 176:12, 226:22, 231:22, 231:23, 250:9, 250:10, 251:16, 251:17

**phrase** [1] - 74:21

**physical** [3] - 47:15, 47:18, 249:22

**physically** [9] - 44:16, 45:6, 45:13, 85:23, 109:8, 116:10, 148:20, 148:23, 152:8

**pick** [1] - 147:18

**piece** [3] - 31:16, 152:6, 152:9

**pieces** [2] - 47:15, 47:18

**Pinckney** [1] - 7:17

**place** [2] - 48:4, 165:7

**Plaintiff's** [1] - 4:9

**plaintiffs** [1] - 11:4,

59:25, 60:1, 60:3, 60:6, 130:6

**Plaintiffs** [8] - 1:9, 1:11, 2:10, 6:3, 6:4, 6:21, 6:24, 7:5

**Plaintiffs'** [2] - 107:7, 108:8

**plaintiffs'** [1] - 10:3

**plan** [17] - 146:24, 158:6, 207:24, 211:25, 217:13, 219:24, 234:14, 234:18, 234:25, 236:18, 236:23, 237:2, 241:10, 243:24, 244:6, 245:7, 245:14

**planned** [2] - 74:13, 74:21

**plans** [25] - 74:25, 77:4, 82:2, 109:9, 110:11, 110:13, 119:4, 120:15, 124:22, 135:22, 148:18, 157:13, 175:14, 197:10, 208:7, 208:9, 212:12, 218:19, 219:17, 219:18, 219:21, 221:8, 222:15, 236:14, 241:17

**play** [3] - 216:12, 217:4, 217:9

**playing** [1] - 133:17

**pleasantries** [1] - 178:25

**point** [5] - 57:23, 119:24, 215:22, 223:19, 250:25

**pointed** [1] - 237:20

**pointing** [1] - 206:24

**Poland** [9] - 3:4, 3:12, 5:25, 8:6, 11:4, 11:17, 115:14, 232:12, 233:16

**POLAND** [62] - 6:19, 8:10, 8:13, 9:3, 11:3, 11:14, 15:3, 15:8, 15:12, 15:15, 18:16, 30:4, 52:25, 69:17, 78:11, 80:5, 80:10, 80:12, 80:20, 81:22, 87:12, 98:19, 103:6, 104:13, 115:19, 129:23, 154:23, 155:6, 158:24, 185:10, 185:13, 185:19, 186:2, 186:14, 188:3, 191:16, 192:24,

193:9, 202:24, 206:10, 206:15, 206:19, 207:2, 207:7, 209:9, 212:22, 213:5, 216:21, 223:1, 223:8, 223:12, 223:16, 223:18, 223:25, 232:11, 232:17, 232:21, 235:8, 250:14, 251:19, 251:24, 253:1

**political** [2] - 64:25, 71:4

**pondering** [1] - 231:15

**population** [31] - 19:5, 49:7, 93:3, 93:5, 94:3, 94:5, 97:7, 97:8, 97:13, 97:15, 167:20, 167:21, 167:23, 167:25, 168:8, 169:1, 169:7, 169:14, 170:4, 171:14, 207:24, 209:23, 210:2, 210:10, 210:11, 210:23, 222:2, 222:6, 226:13, 239:8, 243:18

**Population** [1] - 3:16

**populations** [2] - 247:12, 247:15

**Port** [5] - 29:2, 29:3, 75:25, 76:4, 76:12

**portion** [14] - 18:19, 18:22, 20:16, 20:17, 21:1, 24:2, 66:15, 88:7, 88:10, 190:9, 203:11, 203:13, 225:4, 238:6

**portions** [9] - 201:4, 201:8, 202:16, 202:18, 203:2, 203:5, 234:10, 235:4, 236:11

**posed** [1] - 146:3

**position** [9] - 9:13, 11:5, 54:8, 55:24, 56:15, 56:16, 76:10

**positions** [2] - 56:6, 57:17

**possesses** [1] - 133:2

**possession** [4] - 16:4, 16:17, 17:6, 159:15

**possible** [6] - 94:5, 95:8, 95:10, 97:14, 97:25, 98:2

**possibly** [3] - 100:21, 136:2, 177:8

**postdates** [1] - 15:5

**Postlegislative** [1] -

72:16

**potential** [4] - 35:12, 90:19, 90:25, 129:14

**Potentially** [1] - 159:6

**potentially** [2] - 99:4, 127:4

**practicable** [4] - 94:5, 97:14, 99:16, 100:9

**practice** [2] - 77:1, 77:2

**practicing** [1] - 133:4

**pre** [1] - 69:1

**pre-publication** [1] - 69:1

**precise** [1] - 214:20

**precisely** [4] - 168:18, 174:9, 200:6, 200:22

**predate** [1] - 88:17

**predominant** [1] - 211:21

**preliminarily** [1] - 10:24

**premises** [4] - 30:14, 30:17, 31:9, 31:18

**preparation** [3] - 85:7, 90:12, 148:11

**prepare** [7] - 87:2, 90:4, 159:20, 159:25, 160:7, 160:10, 172:25

**prepared** [1] - 237:2

**preparing** [1] - 66:7

**present** [58] - 7:22, 32:25, 40:13, 41:15, 41:20, 41:25, 42:6, 42:12, 42:15, 42:19, 43:4, 44:12, 46:9, 46:13, 46:17, 47:4, 47:5, 49:10, 49:14, 50:7, 50:17, 51:16, 52:3, 52:6, 110:9, 110:19, 113:17, 118:11, 119:1, 119:20, 131:19, 131:24, 132:1, 133:13, 135:9, 143:16, 148:21, 149:12, 154:18, 155:17, 174:23, 174:24, 175:16, 178:4, 178:12, 179:14, 179:18, 179:22, 179:25, 180:6, 182:18, 182:23, 197:12, 200:12, 200:15, 200:18, 204:21, 220:20

**presentation** [3] - 205:16, 205:22, 205:25

**presented** [16] - 50:18, 50:20, 50:22, 51:4, 52:2, 52:12, 153:10, 153:14, 153:15, 153:20, 153:22, 153:23, 154:1, 154:5, 155:3, 225:10

**presenting** [2] - 52:7, 201:1

**preserve** [1] - 94:4, 97:13

**preserved** [1] - 10:15

**presume** [1] - 71:10

**pretty** [1] - 94:23

**prevent** [1] - 101:17

**previous** [1] - 99:14, 100:7, 220:16

**previously** [4] - 34:23, 41:2, 181:7, 206:12

**primarily** [2] - 39:17, 167:20

**primary** [2] - 28:13, 28:15

**principal** [1] - 70:12

**principle** [4] - 208:22, 208:23, 209:16, 209:19

**principles** [4] - 207:23, 208:6, 209:3, 216:14

**print** [4] - 166:11, 167:19, 169:10, 169:14

**printed** [16] - 26:1, 48:13, 50:21, 50:22, 166:14, 166:20, 166:22, 166:23, 167:5, 168:8, 169:7, 169:22, 170:5, 171:16, 171:20, 172:16

**printing** [1] - 22:20

**printout** [2] - 55:4, 188:16

**priorities** [1] - 73:12

**privilege** [67] - 9:16, 9:17, 9:18, 10:9, 27:13, 27:17, 30:25, 33:17, 89:18, 89:25, 92:17, 93:19, 94:16, 95:20, 98:8, 98:12, 99:7, 99:21, 102:1, 102:14, 103:1, 103:14, 105:10, 105:18, 106:7,

107:11, 109:2, 110:23, 112:6, 113:5, 114:24, 119:8, 119:10, 119:13, 120:8, 120:25, 122:20, 125:24, 127:5, 128:24, 131:4, 131:14, 134:1, 137:11, 176:25, 185:15, 187:9, 191:20, 192:4, 192:16, 193:24, 195:7, 196:15, 198:22, 199:10, 199:15, 202:1, 213:22, 214:5, 214:6, 214:10, 214:11, 215:16, 217:25, 232:9, 250:19, 251:10

**privileged** [18] - 9:14, 10:8, 29:25, 41:10, 41:12, 79:11, 129:6, 131:12, 192:8, 193:19, 193:23, 195:17, 199:20, 202:5, 202:8, 218:9, 218:12, 218:13

**privileges** [6] - 9:15, 40:19, 40:21, 122:18, 187:4, 196:24

**problem** [2] - 41:5, 207:1

**proceed** [1] - 186:25

**Proceedings** [1] - 197:18

**proceedings** [4] - 202:22, 203:6, 203:8, 203:16

**process** [58] - 24:20, 78:2, 79:17, 79:20, 110:20, 111:16, 111:19, 112:2, 112:22, 113:21, 114:17, 114:20, 115:13, 115:24, 120:1, 123:19, 124:11, 135:5, 135:8, 135:11, 143:20, 148:15, 151:2, 151:17, 152:16, 155:12, 166:25, 169:16, 171:3, 171:17, 174:8, 175:6, 175:21, 176:1, 176:9, 176:12, 178:10, 179:2, 179:6, 181:1, 181:5, 212:11, 213:3, 213:10, 215:24, 217:16, 217:20, 219:5, 220:21, 221:5,

221:12, 221:15, 222:24, 225:19, 229:14, 231:8, 231:9, 231:18

**produce** [2] - 56:9, 107:25

**produced** [14] - 3:14, 9:9, 17:2, 19:24, 23:25, 48:11, 100:13, 100:15, 169:9, 197:22, 223:11, 223:13, 232:22, 233:6

**product** [64] - 9:17, 10:10, 27:17, 30:1, 31:1, 33:5, 40:18, 79:11, 80:3, 80:9, 80:18, 81:20, 82:9, 82:19, 98:8, 98:15, 99:7, 99:21, 102:1, 102:13, 103:2, 103:14, 105:11, 105:19, 106:8, 107:12, 109:2, 110:23, 112:6, 113:4, 114:25, 119:9, 119:11, 120:8, 120:25, 122:18, 125:25, 127:6, 128:25, 131:5, 134:2, 137:12, 176:21, 181:9, 182:11, 183:17, 185:6, 187:4, 187:9, 191:21, 192:17, 195:7, 196:16, 196:23, 198:23, 199:9, 202:2, 213:23, 214:5, 214:11, 217:25, 250:19, 251:3, 251:9

**production** [1] - 108:18

**Production** [3] - 4:10, 108:10, 108:16

**products** [2] - 85:20, 85:21

**professional** [1] - 56:6

**Professional** [4] - 1:22, 6:8, 254:3, 255:7

**professor** [2] - 64:22, 65:4

**Professor** [40] - 65:3, 65:11, 65:18, 67:8, 70:1, 70:23, 70:25, 71:12, 71:24, 72:3, 77:11, 77:17, 77:22, 78:1, 78:5, 78:14, 78:17, 78:25, 79:5, 79:8, 79:18, 80:1,

80:25, 81:4, 81:10, 81:13, 82:13, 82:16, 83:4, 83:9, 83:14, 83:18, 147:13, 147:17, 148:2, 149:9, 150:5, 150:7, 150:19, 240:4

**program** [3] - 23:14, 48:7, 166:2

**proposal** [1] - 71:17

**proposals** [1] - 73:10

**proposed** [6] - 71:13, 135:23, 136:7, 136:15, 197:9, 222:14

**protected** [27] - 80:3, 81:20, 82:8, 82:19, 93:18, 101:25, 102:13, 103:13, 105:9, 109:1, 110:22, 112:5, 113:4, 114:23, 120:7, 120:24, 125:23, 131:3, 137:11, 191:20, 192:16, 195:6, 196:14, 211:4, 213:22, 217:24, 250:18

**provide** [27] - 39:21, 79:5, 79:25, 80:24, 81:3, 81:6, 81:10, 82:16, 84:10, 84:11, 85:6, 100:3, 105:7, 105:14, 105:20, 107:5, 124:24, 146:6, 160:12, 160:14, 160:18, 205:7, 205:11, 205:13, 221:11, 221:14

**provided** [14] - 5:7, 17:13, 17:14, 85:7, 159:21, 160:13, 160:25, 161:1, 188:25, 204:11, 206:13, 217:19, 217:20, 218:14

**provider** [1] - 138:19

**provides** [1] - 188:21

**providing** [6] - 10:19, 35:23, 79:7, 85:14, 92:12, 94:13

**provision** [5] - 9:20, 101:20, 127:16, 173:21, 189:10

**Public** [4] - 4:22, 6:9, 254:4, 255:6

**publication** [3] - 67:16, 68:18, 69:1

**published** [2] - 68:20, 68:23

**pull** [1] - 84:15

**pulled** [1] - 27:7
**purely** [1] - 130:10
**purpose** [13] - 9:19, 15:8, 40:10, 67:19, 83:17, 86:4, 111:23, 117:13, 121:10, 146:23, 165:19, 166:10, 169:6
**purposes** [2] - 10:16, 115:15
**pursuant** [6] - 3:15, 6:7, 9:15, 12:12, 38:18, 254:6
**Pursuant** [2] - 4:14, 4:18
**pursuing** [1] - 187:6
**put** [9] - 8:9, 48:4, 137:6, 163:14, 219:2, 247:10, 247:13, 251:21

**Q**

**qualification** [1] - 112:1
**qualified** [1] - 254:4
**quash** [3] - 9:10, 9:12, 186:22
**questioning** [1] - 224:10
**questions** [21] - 12:9, 14:22, 107:23, 121:6, 141:25, 143:25, 145:17, 145:18, 145:21, 146:2, 146:8, 174:16, 185:21, 209:14, 223:21, 223:22, 232:8, 232:9, 248:3, 251:20, 251:25
**quickly** [2] - 20:18, 100:2
**quite** [1] - 164:14
**quotation** [2] - 71:6, 71:8
**quote** [2] - 70:24, 71:1

**R**

**race** [2] - 211:4, 211:20
**Racine** [16] - 234:9, 234:14, 234:17, 234:23, 235:4, 236:11, 236:15, 236:20, 236:24, 237:7, 238:24, 239:14, 239:17

**Radtke** [4] - 63:17, 63:21, 64:11, 64:17
**raised** [3] - 11:7, 41:2, 223:18
**RAMIREZ** [1] - 2:9
**RAMIRO** [1] - 2:9
**Randy** [1] - 63:17
**range** [1] - 121:6
**rate** [1] - 86:21
**ratification** [1] - 228:16
**Ray** [4] - 42:4, 46:8, 150:2, 174:20
**ray** [2] - 149:25, 179:13
**RE** [1] - 233:15
**re** [1] - 63:6
**re-elected** [1] - 63:6
**RE-EXAMINATION** [1] - 233:15
**reaction** [1] - 215:5
**read** [63] - 15:23, 18:16, 18:18, 30:4, 30:6, 33:13, 33:14, 38:4, 38:5, 40:25, 43:16, 44:1, 49:25, 61:3, 70:10, 78:11, 78:12, 80:20, 80:22, 82:11, 84:3, 103:6, 103:8, 109:17, 110:13, 111:8, 112:12, 112:14, 114:10, 124:18, 129:23, 129:25, 154:23, 154:24, 158:4, 159:11, 160:4, 160:5, 164:15, 180:4, 185:24, 186:1, 190:10, 192:24, 193:1, 202:13, 202:24, 203:1, 209:9, 209:11, 211:15, 211:17, 212:22, 212:24, 213:5, 213:6, 213:18, 213:19, 216:22, 216:23, 235:8, 235:10, 240:2
**reading** [2] - 71:15, 254:19
**reads** [2] - 73:7, 73:17
**ready** [1] - 207:8
**really** [2] - 96:18, 107:22
**reapportionment** [9] - 74:14, 74:23, 75:11, 148:18, 207:23, 208:7, 208:11, 208:12, 211:25
**reason** [4] - 11:22,

173:11, 173:16, 187:23
**recalling** [2] - 231:16, 251:13
**receive** [3] - 34:25, 179:5, 251:16
**received** [3] - 24:23, 27:4, 27:10
**recent** [1] - 104:9
**Recess** [3] - 69:23, 155:9, 186:16
**recognize** [1] - 98:2
**recognized** [1] - 95:10
**recognizing** [2] - 10:17, 122:21
**recollection** [37] - 35:14, 50:15, 52:1, 52:17, 60:3, 61:20, 62:9, 69:12, 79:24, 101:9, 118:21, 124:5, 128:2, 139:20, 145:21, 148:6, 148:8, 149:17, 149:20, 149:23, 150:1, 150:6, 177:15, 183:3, 184:24, 200:11, 201:14, 203:11, 206:3, 215:1, 227:6, 228:15, 236:17, 240:22, 240:25, 242:3, 245:2
**record** [25] - 8:12, 8:17, 9:6, 11:15, 14:21, 19:9, 31:25, 37:14, 66:23, 67:3, 95:25, 96:1, 104:22, 133:21, 158:25, 159:1, 186:18, 186:24, 197:16, 197:21, 232:18, 233:3, 251:22, 253:2, 254:18
**records** [1] - 19:19
**recount** [1] - 136:3
**recycle** [1] - 207:4
**red** [3] - 22:20, 23:7, 167:22
**redistrict** [1] - 241:1
**Redistricting** [1] - 4:23
**redistricting** [237] - 23:19, 24:20, 25:2, 25:6, 25:10, 25:17, 29:10, 29:14, 29:16, 30:15, 30:19, 31:11, 31:19, 32:21, 33:2, 33:25, 37:8, 39:19, 40:10, 40:15, 41:18, 43:5, 43:20, 44:13,

54:14, 59:10, 59:19, 60:2, 61:9, 61:12, 62:14, 63:22, 63:25, 64:4, 64:8, 64:15, 65:16, 65:22, 65:25, 66:8, 67:12, 69:7, 69:14, 71:22, 73:7, 73:21, 74:15, 74:23, 75:4, 75:15, 75:19, 76:17, 76:24, 77:4, 77:9, 77:12, 78:2, 81:1, 83:10, 83:14, 83:17, 83:22, 85:8, 85:16, 85:18, 85:25, 86:5, 87:16, 88:23, 91:24, 95:7, 96:7, 97:12, 97:24, 109:9, 109:24, 110:11, 110:13, 110:20, 111:16, 111:24, 112:2, 112:22, 113:21, 114:17, 114:20, 115:13, 115:24, 116:24, 117:3, 117:14, 117:17, 118:19, 118:23, 119:4, 120:1, 120:15, 120:20, 121:11, 122:13, 123:3, 123:7, 123:18, 124:7, 124:11, 125:14, 133:15, 133:18, 133:24, 134:9, 135:4, 135:11, 135:22, 136:7, 137:5, 138:5, 138:8, 138:22, 139:4, 139:8, 139:15, 140:1, 140:4, 140:16, 141:13, 141:19, 141:22, 142:3, 142:7, 142:12, 143:10, 143:20, 144:6, 144:12, 144:17, 144:21, 145:4, 145:7, 146:14, 146:17, 146:23, 147:3, 147:21, 148:3, 148:10, 148:15, 151:2, 155:12, 157:12, 159:23, 160:1, 160:8, 166:15, 166:25, 169:15, 171:3, 171:7, 171:17, 174:8, 174:15, 175:6, 175:14, 176:9, 176:12, 177:7, 177:10, 178:2, 178:10, 178:24, 179:2, 179:6, 179:11, 179:16, 180:1, 180:20, 180:23,

181:1, 181:5, 181:16, 182:4, 182:8, 182:20, 183:5, 183:11, 183:13, 183:24, 184:10, 185:3, 186:9, 186:12, 190:20, 194:6, 196:3, 197:10, 205:17, 208:9, 208:11, 208:14, 210:4, 212:12, 213:3, 213:10, 217:15, 217:20, 218:19, 219:17, 219:18, 219:21, 219:24, 220:11, 220:21, 221:5, 221:8, 221:12, 221:15, 222:15, 222:24, 231:8, 231:18, 234:13, 234:18, 234:25, 236:14, 236:18, 241:10, 241:17, 243:24, 244:6, 248:8, 250:5, 250:11, 251:12, 252:6, 252:9, 252:12, 252:18
**reduced** [1] - 254:16
**refer** [1] - 68:7
**Reference** [1] - 79:21
**reference** [3] - 35:20, 72:14, 189:18
**referenced** [1] - 190:9
**referred** [1] - 86:12
**referring** [4] - 21:2, 47:22, 70:20, 237:25
**refers** [2] - 156:17, 168:19
**reflect** [3] - 88:14, 172:9, 219:20
**reflected** [10] - 25:2, 53:13, 73:11, 88:3, 102:7, 136:22, 169:20, 172:4, 172:10, 245:21
**reflective** [1] - 148:18
**reflects** [1] - 47:25
**refresh** [2] - 35:14, 110:14
**refuse** [1] - 187:24
**regard** [1] - 229:8
**regarding** [14] - 85:18, 128:14, 139:25, 179:5, 182:4, 183:13, 184:10, 185:2, 186:9, 186:12, 197:9, 201:8, 202:10, 224:7

20

regardless [2] - 86:23, 162:25

regards [2] - 185:14, 227:13

region [5] - 50:8, 50:9, 50:10, 153:12, 154:7

regional [6] - 50:3, 50:4, 51:3, 136:15, 136:18, 136:22

regionally [1] - 136:10

regions [2] - 50:11, 136:11

Registered [4] - 1:22, 6:8, 254:3, 255:7

regular [1] - 181:21

REID [1] - 2:5

REINHART [1] - 7:10

Reinhart [60] - 3:23, 14:6, 14:9, 27:23, 28:6, 29:6, 29:17, 36:23, 38:21, 39:4, 39:9, 39:11, 39:20, 39:23, 39:25, 53:10, 55:21, 56:5, 76:25, 77:3, 77:8, 78:25, 79:1, 79:3, 84:9, 86:14, 86:23, 87:2, 88:1, 88:21, 88:24, 89:11, 89:13, 110:2, 110:18, 111:2, 124:19, 138:11, 138:14, 139:18, 140:22, 145:10, 177:12, 177:16, 181:25, 184:22, 184:25, 189:23, 204:6, 248:13, 248:17, 248:22, 249:2, 249:11, 249:18, 249:23, 250:2, 250:10, 251:14

Reinhart's [5] - 29:10, 38:22, 40:9, 109:20, 116:10

reiterate [1] - 252:3

relate [3] - 208:6, 208:8, 208:9

related [10] - 29:14, 29:15, 31:10, 113:25, 122:9, 133:23, 201:23, 230:6, 231:18, 254:21

relatedly [1] - 41:3

relates [5] - 30:18, 31:18, 71:21, 112:8, 119:13

relating [5] - 29:9,

30:14, 94:13, 120:20, 126:2

relation [1] - 186:21

relations [2] - 54:5, 77:1

relationship [2] - 121:16, 121:19

relationships [1] - 218:14

relative [1] - 254:24

relatively [1] - 220:13

relaying [1] - 114:7

relevant [2] - 159:6, 187:1

Relief [7] - 4:6, 4:8, 4:16, 4:18, 4:21, 104:24, 106:24

remainder [1] - 97:4

remapping [1] - 231:8

remarkable [1] - 73:9

remember [12] - 27:7, 41:25, 42:18, 59:21, 60:5, 118:9, 135:16, 147:14, 147:22, 157:23, 161:11, 206:1

remind [1] - 161:12

remove [1] - 30:8

repeat [9] - 43:14, 43:25, 47:1, 49:24, 78:10, 82:10, 103:5, 109:16, 227:25

repeating [1] - 8:23

report [41] - 24:6, 24:9, 25:25, 26:3, 26:6, 81:14, 81:16, 81:18, 82:14, 82:17, 83:4, 100:13, 100:15, 100:23, 101:6, 101:8, 101:11, 101:14, 165:15, 166:4, 166:14, 166:17, 167:20, 167:21, 167:23, 168:8, 169:7, 171:21, 171:22, 171:23, 172:4, 172:6, 172:13, 172:25, 173:1, 237:19, 238:18, 240:2, 240:5

Reporter [4] - 1:22, 6:9, 254:3, 255:7

reporter [11] - 11:25, 12:3, 12:14, 34:11, 53:5, 66:21, 91:5, 106:19, 188:12, 191:2, 194:13

REPORTER [1] - 161:8

reports [27] - 25:18, 159:14, 159:20, 159:25, 165:21, 166:1, 166:2, 166:6, 166:7, 166:12, 166:19, 166:23, 167:6, 167:15, 167:18, 169:9, 169:14, 169:21, 170:4, 171:14, 171:15, 171:19, 172:7, 172:9, 172:15, 172:22, 172:24

repository [1] - 249:1

represent [10] - 18:8, 49:5, 54:25, 55:9, 55:17, 66:22, 91:17, 186:21, 191:3, 197:21

representation [2] - 35:7, 48:14

Representative [1] - 123:9

representative [1] - 17:3

representatives [2] - 211:19, 222:18

represented [3] - 14:2, 161:13, 219:15

representing [11] - 14:12, 14:17, 15:1, 15:13, 59:22, 59:24, 59:25, 63:3, 63:9, 73:21, 239:23

represents [2] - 49:7, 168:14

Republican [4] - 70:15, 73:18, 222:19, 222:23

republican [13] - 60:12, 63:3, 63:9, 63:17, 63:22, 125:3, 125:7, 240:20, 240:23, 241:2, 241:6, 241:11, 241:18

Republicans [2] - 71:17, 73:24

republicans [5] - 60:17, 64:1, 72:5, 240:23, 241:6

Request [3] - 4:10, 108:9, 108:15

request [1] - 13:21

requested [2] - 16:18, 30:8

requests [7] - 19:18, 19:21, 107:18, 107:21, 107:24, 108:18, 108:24

required [1] - 10:20

requirement [2] - 210:18, 210:23

requires [4] - 31:2, 40:20, 115:1, 215:21

reread [2] - 71:14, 84:1

residence [4] - 28:13, 28:15, 28:17, 28:19

residences [1] - 29:3

residents [3] - 168:15, 212:16, 212:20

resolved [1] - 232:10

respect [45] - 8:18, 30:23, 31:2, 41:12, 69:13, 82:22, 95:24, 101:10, 102:23, 115:9, 122:13, 129:2, 129:9, 134:7, 134:16, 137:15, 137:19, 139:14, 141:25, 146:13, 151:2, 151:5, 154:10, 156:11, 157:3, 157:4, 170:20, 173:8, 175:1, 176:6, 177:7, 192:3, 193:3, 193:11, 193:19, 199:8, 202:5, 214:4, 218:9, 236:8, 236:20, 238:9, 248:7, 251:2, 251:7

respond [2] - 109:14, 128:16

responded [2] - 146:4, 215:21

responding [2] - 12:7, 15:9

responds [1] - 216:14

response [8] - 9:9, 11:23, 19:17, 30:22, 112:8, 126:4, 127:7, 158:10

responses [1] - 98:13

responsible [1] - 39:18

responsive [10] - 16:19, 17:7, 17:10, 19:21, 108:23, 111:4, 126:1, 193:14, 218:3, 250:25

rest [2] - 35:25, 121:15

restate [20] - 18:15, 30:3, 40:24, 41:2, 61:1, 80:19, 96:17, 111:7, 114:9, 124:16, 126:8, 129:22,

154:22, 192:23, 202:23, 209:8, 230:9, 235:7, 241:14, 245:18

restating [1] - 10:1, 10:25

result [5] - 187:13, 195:8, 236:23, 240:8, 240:14

results [2] - 217:21, 218:15

resume [2] - 40:5, 52:20

retain [17] - 22:10, 23:21, 25:18, 29:14, 29:15, 29:18, 29:20, 29:22, 139:3, 139:21, 139:25, 141:1, 167:9, 167:10, 172:21, 249:4, 249:8

retained [32] - 9:18, 14:25, 25:21, 26:19, 29:17, 33:23, 35:15, 37:7, 39:3, 39:10, 39:22, 39:23, 59:9, 59:14, 60:9, 64:14, 76:25, 83:21, 83:23, 84:9, 85:2, 85:4, 110:2, 124:19, 133:22, 167:6, 175:12, 176:14, 176:23, 181:10

retention [2] - 36:7, 60:15

reveal [1] - 41:9

reversal [1] - 187:14

review [11] - 68:16, 90:4, 90:7, 90:12, 96:8, 96:20, 97:7, 97:12, 99:13, 100:7, 185:16

reviewed [2] - 92:1, 97:3

reviewing [3] - 50:3, 93:3, 94:3

reviews [2] - 18:14, 104:21

RIBBLE [1] - 2:5

Rich [7] - 42:16, 133:1, 144:21, 145:1, 145:3, 153:19, 154:3

RICHARD [1] - 1:6

Rick [1] - 227:17

right-hand [1] - 164:3

Rights [8] - 150:23, 151:3, 151:6, 208:23, 209:16, 209:17, 209:18, 210:25

RISSEEUW [1] - 1:7

RMD [1] - 2:12

21

**Robert** [1] - 123:23
**Robin** [9] - 42:16, 132:22, 132:24, 137:25, 144:5, 144:11, 144:16, 153:17, 154:3
**ROBSON** [1] - 1:7
**ROCHELLE** [1] - 1:6
**Rodriguez** [9] - 227:21, 227:24, 228:2, 228:11, 228:13, 228:19, 228:22, 231:13, 231:21
**ROGERS** [1] - 1:7
**role** [13] - 85:14, 133:17, 134:8, 135:3, 135:4, 148:15, 148:16, 175:5, 175:9, 178:9, 189:21, 225:23
**RON** [1] - 1:4
**Ronald** [2] - 4:3, 67:6
**RONALD** [2] - 1:3, 1:10
**room** [3] - 45:16, 45:20, 46:9
**roughly** [6] - 27:2, 27:3, 52:15, 135:20, 147:24, 167:4
**RPR** [1] - 1:21
**Rule** [4] - 4:4, 91:10, 93:17, 156:7
**run** [7] - 165:21, 166:1, 166:3, 166:4, 166:6, 166:7, 166:17
**Run** [2] - 4:3, 67:6
**Running** [1] - 74:7
**RYAN** [1] - 2:4

## S

**S.C** [5] - 6:10, 6:19, 7:3, 7:10, 254:8
**SANCHEZ** [1] - 1:7
**SANCHEZ-BELL** [1] - 1:7
**Sarah** [13] - 42:16, 46:8, 132:16, 132:17, 133:10, 134:22, 149:22, 149:24, 174:20, 178:4, 178:9, 179:4, 179:10
**sat** [1] - 71:1
**save** [2] - 248:6, 249:15
**saved** [6] - 248:11, 248:19, 248:20, 248:23, 248:25, 249:1
**saves** [2] - 248:17,

249:19
**saw** [21] - 12:25, 13:9, 27:19, 28:3, 44:17, 45:13, 46:1, 46:14, 81:23, 81:24, 100:17, 100:22, 101:8, 150:5, 158:8, 178:16, 202:21, 203:2, 203:13, 241:10, 241:17
**scan** [1] - 136:21
**schedule** [1] - 86:11
**SCHLIEPP** [1] - 1:7
**school** [2] - 53:25, 54:3
**scientist** [1] - 64:25
**scope** [6] - 33:20, 122:20, 130:13, 133:25, 176:24, 199:14
**SCOTT** [1] - 7:3
**Scott** [2] - 7:19, 35:8, 42:8, 43:3, 43:17, 49:12, 51:15, 51:20, 51:23, 52:4, 52:6, 52:13, 84:21, 136:12, 137:4, 137:24, 142:1, 142:2, 142:6, 142:11, 143:5, 153:16, 154:2, 188:7
**scratched** [1] - 164:4
**screen** [2] - 50:21, 166:21
**Script** [1] - 206:22
**scrutiny** [1] - 73:23
**seal** [1] - 255:3
**SEAN** [1] - 2:5
**searched** [1] - 19:19
**seats** [2] - 208:13, 239:1
**Second** [5] - 4:6, 4:8, 104:23, 106:23, 107:7
**second** [5] - 35:18, 67:15, 72:10, 72:18, 74:9, 83:12, 84:4, 91:9, 92:22, 106:1, 106:5, 106:14, 106:21, 158:25, 233:8
**seconds** [1] - 185:12
**Section** [2] - 188:18, 190:5
**section** [1] - 190:8
**see** [112] - 12:5, 12:20, 13:6, 13:7, 13:13, 13:17, 15:15, 17:19, 22:22, 24:5, 24:14, 34:14, 35:4, 35:12, 35:19, 36:3, 36:9, 38:10, 44:7, 44:23, 45:2, 45:20,

46:17, 46:22, 55:4, 55:5, 67:15, 67:16, 67:24, 68:10, 68:11, 70:17, 71:3, 71:6, 71:11, 71:19, 72:16, 72:25, 73:25, 74:5, 74:7, 74:16, 81:18, 82:13, 84:18, 84:23, 86:12, 91:9, 91:11, 92:5, 92:8, 93:6, 93:8, 93:25, 94:7, 94:9, 94:24, 95:11, 105:3, 106:21, 106:24, 107:17, 107:25, 108:8, 108:10, 108:15, 108:17, 108:19, 108:20, 148:20, 150:7, 152:15, 152:18, 156:12, 156:14, 156:16, 156:18, 159:5, 159:6, 159:18, 163:13, 163:20, 170:25, 173:2, 180:12, 188:19, 189:7, 189:16, 190:6, 190:10, 190:11, 194:19, 195:25, 197:19, 202:18, 203:10, 207:17, 207:20, 208:1, 209:23, 212:2, 212:8, 215:25, 216:10, 216:16, 233:17, 234:4, 234:6, 234:9, 235:15, 247:3
**seeing** [1] - 104:7, 107:4
**seek** [3] - 173:6, 228:12, 228:13
**Seeking** [1] - 4:16
**segment** [1] - 115:16
**selecting** [1] - 155:2
**selection** [1] - 154:17
**self** [2] - 59:3, 59:6
**self-employed** [2] - 59:3, 59:6
**senate** [6] - 9:21, 98:25, 118:1, 125:18, 126:13, 126:25
**Senate** [3] - 7:18, 35:8, 84:20
**Senator** [4] - 43:3, 43:17, 123:23, 216:11
**send** [1] - 107:24, 138:10, 138:13, 146:1, 179:4, 249:20
**sends** [2] - 87:3, 88:24

**SENSENBRENNER** [1] - 2:4
**sensitivity** [1] - 207:24
**sent** [5] - 39:14, 136:23, 141:1, 249:5, 249:9
**sentence** [6] - 35:19, 70:9, 73:6, 73:7, 74:9, 74:10
**sentences** [1] - 70:11
**separate** [6] - 22:25, 23:1, 28:1, 34:3, 56:22, 249:13
**separated** [3] - 18:25, 19:4
**separately** [2] - 19:7, 151:24
**serve** [1] - 77:22
**served** [2] - 15:10, 107:18
**service** [1] - 138:19
**services** [1] - 9:20
**serving** [4] - 56:3, 56:17, 122:6, 123:20
**session** [7] - 55:2, 55:10, 55:19, 57:4, 57:25, 58:6, 143:15
**set** [15] - 9:24, 22:18, 25:14, 37:10, 73:10, 174:10, 190:16, 194:3, 197:7, 210:14, 233:11, 238:22, 247:25, 255:2
**Set** [2] - 4:9, 108:9
**sets** [1] - 153:3
**settling** [1] - 219:10
**several** [2] - 104:2, 207:14
**shakes** [1] - 12:1
**shall** [2] - 188:24, 189:4
**share** [1] - 223:5
**SHEILA** [1] - 1:4
**shifted** [1] - 98:24
**short** [4] - 11:10, 147:15, 203:13, 223:24
**shortcut** [1] - 94:20
**shorter** [1] - 196:6
**shortest** [1] - 148:5
**shorthand** [1] - 11:11
**shortly** [1] - 200:7
**shoulders** [1] - 233:2
**show** [6] - 167:23, 170:8, 170:11, 170:14, 222:14, 224:25

**showed** [1] - 172:2
**shown** [1] - 225:1
**side** [10] - 22:18, 25:14, 70:7, 72:11, 107:24, 168:1, 190:16, 194:3, 197:7, 228:10
**sign** [1] - 162:8
**signature** [6] - 36:11, 36:13, 36:14, 36:17, 36:20, 37:2
**signatures** [1] - 36:10
**signed** [1] - 91:25
**significance** [1] - 164:5
**significantly** [1] - 239:24
**signifies** [2] - 163:4, 165:8
**signify** [4] - 162:16, 163:10, 168:12, 168:22
**signing** [1] - 254:19
**simple** [2] - 80:16, 82:6
**simply** [4] - 10:14, 180:6, 194:23, 204:5
**single** [2] - 239:17, 244:15, 246:23, 247:18, 247:20
**sitting** [3] - 45:8, 148:24, 177:15
**six** [2] - 240:22, 240:23
**size** [2] - 162:25, 232:24
**skew** [1] - 71:4
**skill** [1] - 73:9
**skills** [2] - 85:24, 86:2
**slipped** [1] - 69:18
**smaller** [1] - 196:6
**Smoke** [1] - 58:9
**Society** [1] - 57:22
**software** [1] - 23:13, 24:19, 48:7, 62:8, 152:2, 152:12, 166:2, 166:8, 166:9, 247:9, 247:12
**solicit** [2] - 239:22, 241:5
**someone** [3] - 30:7, 75:21, 218:14
**Somers** [2] - 238:13, 238:17
**sometime** [3] - 37:6, 100:19, 214:21
**sometimes** [3] - 45:19, 138:12, 207:14

22

**somewhere** [1] - 153:15

**sorry** [26] - 8:8, 39:24, 43:8, 44:24, 69:20, 74:10, 84:1, 92:22, 95:2, 123:11, 146:2, 161:11, 161:16, 162:22, 170:20, 185:24, 188:6, 188:23, 199:3, 199:13, 202:23, 213:17, 216:21, 223:5, 226:22, 252:10

**sought** [1] - 9:14

**source** [1] - 173:24

**south** [1] - 228:10

**South** [1] - 7:17

**spatial** [3] - 47:21, 48:14, 70:14

**Speaker** [4] - 7:19, 35:9, 51:22, 84:22

**speaker** [2] - 42:7, 135:8

**speaking** [17] - 10:2, 17:1, 78:16, 78:17, 116:14, 149:14, 149:17, 149:20, 149:23, 150:5, 150:7, 150:10, 150:19, 150:22, 180:9, 180:12, 183:23

**specialist** [1] - 54:6

**specialty** [1] - 64:24

**specific** [26] - 9:23, 23:14, 48:7, 51:9, 51:12, 51:13, 61:23, 85:9, 85:12, 117:23, 119:4, 134:8, 135:22, 136:4, 136:8, 145:5, 147:7, 177:15, 201:8, 206:1, 206:5, 222:1, 222:6, 233:19, 241:25

**specifically** [34] - 23:15, 43:1, 51:6, 60:1, 60:15, 78:15, 91:16, 109:18, 109:25, 110:4, 114:18, 126:19, 128:1, 130:23, 138:9, 139:2, 139:14, 140:17, 142:22, 143:21, 145:8, 145:19, 147:14, 147:22, 149:3, 156:10, 177:11, 178:3, 180:14, 182:25, 184:14, 201:4, 207:22, 236:6

**specifics** [4] - 111:13, 118:20,

136:2, 228:7

**speed** [1] - 155:16

**spell** [1] - 123:11

**spelling** [1] - 123:15

**spend** [3] - 10:11, 218:18, 222:10

**split** [50] - 162:18, 162:20, 162:25, 163:21, 163:25, 164:10, 164:13, 164:18, 164:19, 164:23, 165:9, 173:12, 173:17, 173:19, 173:20, 173:24, 174:1, 174:5, 234:14, 234:17, 234:20, 235:15, 235:16, 235:19, 235:22, 235:25, 238:12, 238:15, 238:16, 238:17, 239:10, 242:24, 243:2, 243:6, 243:15, 243:19, 243:22, 244:2, 244:7, 244:9, 244:12, 244:16, 244:20, 245:3, 245:17, 245:20, 245:23, 246:3, 246:6, 246:20

**Splits** [2] - 24:4, 24:14

**splits** [31] - 161:15, 161:17, 165:1, 165:3, 171:21, 171:22, 172:4, 172:6, 172:7, 172:9, 172:13, 172:15, 172:24, 172:25, 173:1, 173:3, 173:5, 173:7, 173:8, 226:13, 237:7, 237:16, 237:18, 237:19, 237:22, 237:25, 238:9, 238:19, 246:18, 247:3, 247:4

**splitting** [6] - 238:24, 239:6, 239:14, 243:9, 245:6, 246:10

**spoken** [3] - 78:5, 119:25, 123:22

**Sportsmen's** [1] - 58:10

**ss** [1] - 254:1

**Stadtmiller** [1] - 186:19

**Stadtmiller's** [2] - 187:7, 211:11

**staff** [3] - 73:18, 121:14, 141:11

**stand** [3] - 8:20, 73:22, 162:5

**standard** [6] - 169:8, 210:1, 210:9, 210:11, 210:15, 213:8

**standing** [1] - 10:4

**stands** [1] - 161:18

**stapled** [2] - 21:3, 21:4

**start** [3] - 8:9, 11:19, 221:17

**started** [4] - 56:5, 59:1, 62:25, 110:3

**Stat** [2] - 4:14, 4:19

**state** [34] - 9:6, 11:15, 19:5, 42:24, 50:8, 50:9, 54:16, 58:17, 58:20, 58:21, 62:21, 62:25, 84:11, 92:4, 96:10, 96:22, 117:17, 117:21, 154:16, 156:17, 164:6, 188:23, 188:24, 189:2, 193:5, 208:15, 210:21, 211:14, 213:4, 219:20, 219:24, 222:13, 249:7, 249:24

**State** [15] - 4:24, 6:9, 6:12, 7:18, 35:7, 35:9, 84:20, 84:21, 121:15, 123:20, 188:16, 233:7, 254:5, 254:10, 255:6

**STATE** [2] - 7:7, 254:1

**statement** [22] - 11:23, 71:12, 71:19, 71:24, 71:25, 72:19, 73:2, 73:14, 74:16, 74:18, 74:20, 74:24, 207:22, 208:18, 208:25, 212:2, 212:6, 216:2, 216:18, 217:1, 220:9, 230:3

**statements** [1] - 208:3

**STATES** [1] - 1:1

**states** [11] - 35:4, 35:23, 36:4, 38:6, 53:17, 74:11, 91:21, 92:25, 93:25, 159:10, 208:14

**States** [3] - 6:6, 58:10, 235:21

**statewide** [2] - 219:17, 219:18

**statistic** [1] - 204:11

**Statute** [2] - 188:16, 188:17

**statute** [3] - 188:21, 189:25, 190:14

**statutes** [1] - 215:20

**stay** [4] - 148:3, 148:5, 148:7, 187:13

**staying** [1] - 147:19

**sticker** [2] - 24:3, 26:4

**still** [7] - 69:17, 80:8, 82:1, 135:19, 136:15, 140:24, 159:3

**stipulation** [1] - 251:21

**stocked** [1] - 56:9

**stopped** [1] - 200:25

**straight** [1] - 15:16

**Street** [8] - 6:11, 6:20, 6:23, 7:4, 7:7, 7:10, 7:17, 254:9

**strike** [26] - 20:21, 46:21, 55:15, 63:11, 71:14, 76:7, 95:1, 108:12, 119:23, 140:10, 144:15, 160:11, 162:22, 169:25, 170:25, 172:6, 177:25, 182:22, 193:6, 195:14, 195:16, 212:10, 213:7, 219:19, 239:5, 240:1

**student** [1] - 63:13

**studies** [1] - 54:2

**sub** [1] - 188:19

**subdivision** [1] - 208:14

**subject** [14] - 27:16, 27:17, 33:16, 40:20, 41:6, 89:17, 119:8, 122:16, 128:12, 190:19, 198:21, 215:15, 244:23, 251:20

**submitted** [1] - 81:13

**subpoena** [14] - 3:13, 3:15, 6:7, 9:9, 12:12, 12:15, 12:22, 13:25, 15:9, 15:18, 17:4, 19:18, 108:22, 254:6

**subpoenaed** [1] - 103:21

**subsequent** [10] - 9:11, 10:16, 14:23, 30:24, 113:1, 114:5, 115:2, 126:5, 199:17, 242:6

**substantive** [1] - 179:1

**successful** [1] -

124:25

**sufficient** [1] - 10:5

**suggest** [1] - 237:22

**Suite** [6] - 6:20, 6:23, 7:4, 7:11, 7:17, 7:23

**summer** [2] - 135:19, 206:2

**summons** [1] - 196:2

**Summons** [2] - 4:17, 4:21

**super** [1] - 207:6

**supplied** [2] - 112:19, 112:21

**support** [4] - 9:23, 91:19, 118:5, 159:13

**Supreme** [4] - 4:13, 190:18, 190:22, 191:6

**supreme** [1] - 189:5

**suspect** [1] - 243:14

**suspicion** [1] - 243:12

**sworn** [2] - 8:2, 254:12

**system** [6] - 87:25, 109:21, 248:14, 248:16, 249:19, 251:15

**T**

**Tad** [12] - 42:3, 42:22, 50:6, 50:23, 101:9, 150:12, 151:18, 157:20, 160:13, 231:10, 232:6, 252:13

**Taffora** [26] - 42:4, 46:8, 132:1, 132:4, 133:9, 134:16, 149:25, 150:2, 174:20, 179:13, 179:18, 179:22, 179:24, 180:9, 180:12, 180:18, 180:22, 180:25, 181:4, 181:15, 181:18, 181:21, 181:24, 182:4, 182:7, 183:1

**talented** [1] - 74:12

**TAMMY** [1] - 1:10

**tangible** [2] - 85:20, 85:21

**tape** [3] - 95:25, 96:2, 186:15

**target** [2] - 49:7, 167:24

**tasked** [2] - 85:19, 222:23

23

WWW.FORTHERECORDMADISON.COM  -  (608) 833-0392

**team** [1] - 101:20
**technical** [4] - 143:25, 166:11, 173:21, 174:4
**technology** [2] - 70:14, 215:22
**telephone** [12] - 6:24, 46:11, 115:13, 116:5, 118:18, 141:21, 142:2, 144:12, 144:22, 147:2, 175:24, 176:8
**temporally** [2] - 33:20, 250:13
**temporarily** [1] - 215:2
**ten** [5] - 38:9, 65:2, 147:23, 179:23, 240:15
**Ten** [1] - 7:4
**term** [1] - 161:21
**terminal** [1] - 71:2
**terminated** [1] - 36:7
**terms** [8] - 23:13, 38:7, 38:9, 38:15, 107:23, 153:25, 175:15
**terrible** [1] - 241:15
**territory** [1] - 246:19
**testified** [10] - 8:3, 65:24, 198:5, 198:11, 198:14, 211:24, 221:17, 221:19, 224:6, 224:12
**testify** [12] - 66:2, 77:18, 92:24, 93:12, 102:20, 103:11, 103:19, 103:21, 103:22, 197:24, 198:2, 254:12
**testifying** [9] - 95:17, 98:6, 99:5, 99:18, 101:22, 102:11, 176:23, 181:10, 207:18
**testimony** [38] - 66:8, 92:12, 94:13, 96:3, 118:5, 118:11, 118:16, 198:9, 198:15, 198:18, 199:17, 199:24, 200:1, 200:5, 200:10, 200:13, 200:21, 201:7, 201:17, 201:20, 202:10, 203:12, 203:14, 203:24, 204:2, 207:13, 208:1, 209:20, 209:24, 211:22, 211:23,

212:8, 215:25, 216:16, 224:8, 224:16, 230:25, 254:18
**text** [18] - 116:19, 116:25, 139:7, 140:4, 140:12, 140:15, 141:4, 141:18, 142:6, 144:17, 144:22, 177:5, 179:8, 182:3, 186:8, 229:5, 249:15, 249:19
**texting** [1] - 140:18
**texts** [1] - 141:1
**THE** [1] - 128:9
**themselves** [1] - 248:24
**therapy** [1] - 53:19
**Therapy** [4] - 56:13, 56:18, 57:3, 58:11
**thereto** [1] - 30:24
**thereupon** [1] - 254:15
**they've** [1] - 54:12
**thick** [2] - 101:2, 197:17
**thicker** [2] - 26:3, 191:8
**third** [3] - 36:3, 74:10, 233:9
**thirds** [1] - 74:6
**THOMAS** [5] - 1:15, 1:16, 2:4, 2:14, 2:15
**thoughts** [1] - 82:1
**three** [16] - 9:15, 34:12, 73:13, 135:15, 148:8, 151:22, 207:23, 232:22, 233:4, 233:5, 234:5, 241:22, 241:24, 242:4, 242:9, 242:21
**Three** [2] - 4:14, 4:18
**three-judge** [1] - 73:13
**three-way** [5] - 241:22, 241:24, 242:4, 242:9, 242:21
**throughout** [1] - 10:5
**Thursday** [1] - 22:22
**THYSSEN** [1] - 1:8
**TIMOTHY** [2] - 1:16, 2:15
**title** [2] - 56:20, 106:22
**titled** [1] - 104:23
**today** [15] - 11:2, 12:11, 12:23, 14:2, 14:17, 16:22, 31:23, 89:2, 90:5, 90:13, 157:1, 187:1, 203:3,

203:4, 238:2
**today's** [1] - 53:14
**Todd** [1] - 7:22
**together** [14] - 44:12, 47:12, 51:20, 51:23, 73:18, 122:11, 135:5, 136:8, 143:6, 143:7, 151:22, 151:25, 160:15, 164:8
**took** [1] - 31:17
**top** [12] - 13:13, 21:10, 24:4, 26:5, 68:9, 68:11, 70:5, 71:11, 73:16, 162:1, 162:3, 234:21
**topic** [12] - 31:3, 69:14, 99:19, 101:23, 102:11, 126:16, 126:21, 127:24, 128:5, 205:16, 205:21, 246:13
**topics** [1] - 95:18
**total** [4] - 19:5, 167:24, 168:15, 218:18
**totality** [1] - 72:23
**Totals** [1] - 3:16
**touch** [1] - 14:23
**touching** [1] - 254:13
**toward** [1] - 73:5
**town** [9] - 55:22, 56:1, 56:3, 75:23, 76:10, 76:16, 161:22, 163:5, 238:17
**tracking** [1] - 222:24
**trained** [1] - 24:23
**training** [1] - 24:24, 166:11
**Transcript** [2] - 4:22, 197:18
**transcript** [11] - 5:7, 5:24, 12:3, 12:6, 202:13, 202:19, 202:21, 203:3, 203:5, 207:17, 209:5
**transcription** [1] - 254:17
**transcripts** [1] - 207:11
**translate** [1] - 85:19
**transmitted** [1] - 88:4
**travel** [1] - 231:17
**TRAVIS** [1] - 1:8
**treat** [1] - 236:15
**trial** [16] - 65:24, 66:4, 90:20, 92:13, 95:17, 98:6, 99:5, 99:19, 101:22, 102:11, 102:20,

103:11, 103:19, 103:21, 103:22
**trick** [2] - 104:3, 104:4
**tried** [1] - 212:6
**triggered** [1] - 75:10
**Troupis** [43] - 42:3, 42:16, 46:8, 61:20, 132:8, 132:11, 132:16, 132:17, 133:9, 133:10, 133:17, 133:22, 134:22, 149:19, 149:21, 149:22, 149:24, 150:4, 150:20, 174:19, 174:20, 175:1, 175:2, 175:16, 175:19, 175:24, 176:4, 176:8, 176:11, 176:18, 177:6, 177:10, 177:17, 177:24, 178:1, 178:4, 179:4, 179:10, 227:4, 228:15, 228:25, 231:10
**Troupis's** [3] - 175:5, 175:9, 178:9
**true** [2] - 169:3, 254:18
**truth** [2] - 254:12, 254:13
**try** [4] - 155:15, 173:10, 173:25, 233:4
**trying** [3] - 17:1, 27:24, 112:12
**turn** [18] - 13:12, 36:2, 36:9, 38:1, 68:10, 69:4, 70:4, 74:4, 79:4, 91:8, 91:15, 92:8, 94:9, 96:6, 98:23, 106:20, 108:15, 156:8
**turning** [4] - 15:21, 71:11, 97:6, 100:2
**TV** [3] - 203:8, 203:10, 203:16
**two** [46] - 18:1, 19:1, 22:4, 22:24, 23:1, 23:6, 23:8, 23:21, 27:24, 29:3, 34:8, 36:10, 38:19, 39:1, 39:15, 74:6, 93:15, 135:15, 153:3, 185:21, 188:11, 194:13, 201:1, 209:14, 211:1, 219:14, 220:24, 223:4, 225:9, 225:11, 232:23, 235:20,

235:22, 236:1, 238:9, 240:20, 243:2, 243:9, 243:15, 243:20, 243:22, 246:4, 246:7, 246:10, 247:1
**two-thirds** [1] - 74:6
**type** [4] - 118:20, 136:2, 145:22, 210:3
**types** [1] - 167:18
**typewriting** [1] - 254:16
**typically** [1] - 166:16
**typing** [1] - 45:12

## U

**ultimately** [4] - 71:13, 71:16, 225:18, 229:8
**unable** [1] - 246:19
**Unassigned** [1] - 170:7
**unassigned** [6] - 170:8, 170:9, 170:11, 170:14, 170:16, 246:18
**unconstitutional** [2] - 101:18, 130:7
**under** [12] - 36:10, 59:12, 130:8, 179:23, 187:24, 212:17, 224:10, 234:13, 234:25, 235:3, 243:23, 245:3
**Under** [1] - 211:25
**undergraduate** [1] - 54:2
**underlying** [1] - 129:22
**understood** [2] - 16:2, 224:11
**unit** [2] - 170:22, 170:23
**United** [3] - 6:6, 58:10, 235:21
**UNITED** [1] - 1:1
**units** [2] - 171:6, 230:7
**University** [4] - 53:18, 63:13, 64:22, 65:7
**unless** [2] - 112:7, 223:15
**unnecessarily** [2] - 10:12, 98:25
**unnecessary** [1] - 101:17
**unplug** [1] - 223:2
**unveiled** [1] - 123:8

24

**up** [32] - 15:5, 22:21, 26:5, 56:10, 59:4, 64:5, 72:9, 72:11, 73:22, 83:12, 87:24, 108:18, 110:18, 118:1, 121:7, 143:1, 143:25, 147:18, 155:16, 162:1, 164:3, 170:8, 170:11, 170:14, 185:21, 212:12, 223:15, 236:16, 241:10, 244:1, 244:9, 246:2
**upholding** [1] - 208:23
**useable** [1] - 72:21
**utilized** [1] - 159:17
**UW** [1] - 63:11
**UW-Madison** [1] - 63:11

## V

**vague** [16] - 33:16, 43:9, 43:22, 44:19, 49:21, 60:23, 84:5, 96:14, 97:19, 109:12, 111:10, 112:16, 113:8, 113:23, 116:1, 154:13
**vagueness** [1] - 41:3
**Van** [1] - 14:6
**VAN** [1] - 7:10
**VARA** [1] - 2:9
**variance** [1] - 49:7
**varied** [1] - 148:4
**variety** [2] - 228:9, 237:14
**various** [8] - 50:7, 91:22, 93:1, 94:1, 95:5, 155:2, 159:16, 174:22
**Venue** [2] - 4:12, 188:21
**VERA** [1] - 1:4
**verbal** [1] - 160:22
**version** [8] - 69:1, 173:2, 219:10, 220:4, 220:10, 220:14, 220:17, 247:2
**versions** [2] - 241:9, 241:16
**versus** [1] - 78:24
**via** [1] - 3:14
**Video** [1] - 7:22
**videographer** [1] - 12:4
**VIDEOTAPE** [2] - 1:18, 6:1

**videotape** [1] - 185:23
**village** [2] - 161:22, 238:17
**vitae** [1] - 40:5
**Voces** [1] - 6:25
**VOCES** [1] - 2:8
**VOCKE** [2] - 1:16, 2:15
**voicemail** [1] - 250:8
**voicemails** [4] - 250:22, 250:24, 251:11, 251:15
**Vos** [18] - 42:16, 132:22, 132:24, 135:4, 135:7, 135:9, 135:21, 136:1, 136:5, 136:19, 137:4, 137:25, 144:5, 144:11, 144:16, 146:1, 153:17, 154:3
**Vos's** [1] - 135:3
**vote** [1] - 99:2
**voter** [2] - 101:18, 215:2
**voters** [9] - 98:24, 101:19, 212:14, 213:2, 213:9, 213:14, 214:12, 214:19, 215:12
**voting** [11] - 118:3, 143:17, 169:1, 217:16, 217:21, 218:15, 222:1, 222:6, 229:13, 229:20, 230:1
**Voting** [8] - 150:23, 151:3, 151:6, 208:23, 209:16, 209:17, 209:18, 210:25

## W

**waived** [1] - 254:19
**Wal** [2] - 56:9, 57:16
**Wal-Mart** [2] - 56:9, 57:16
**WARA** [1] - 2:9
**ward** [7] - 170:17, 170:21, 215:20, 219:5, 230:7, 230:16, 230:20
**wards** [3] - 95:8, 97:25, 170:17
**Washington** [6] - 29:2, 29:3, 75:25, 76:4, 76:12, 222:11
**watch** [1] - 203:8
**watched** [1] - 203:11
**watching** [5] -

203:15, 203:18, 203:20, 203:23, 204:1
**Water** [1] - 7:10
**Waukesha** [7] - 190:19, 194:6, 194:18, 195:3, 195:21, 196:3, 196:22
**ways** [1] - 245:3
**web** [1] - 53:10
**website** [3] - 3:23, 27:8, 52:22
**week** [5] - 13:4, 187:10, 187:17, 187:18, 187:21
**weekly** [2] - 184:17, 184:19
**welcome** [1] - 211:13
**West** [1] - 7:7
**wherein** [1] - 6:3
**whereof** [1] - 255:2
**whole** [2] - 95:9, 98:1
**WI** [1] - 7:23
**wife** [3] - 126:17, 126:18, 130:21
**winter** [1] - 135:19
**Wirch** [2] - 123:23, 123:24
**Wis** [2] - 4:14, 4:19
**WISCONSIN** [3] - 1:1, 7:7, 254:1
**Wisconsin** [61] - 1:13, 1:20, 2:1, 2:12, 2:16, 4:24, 6:4, 6:7, 6:10, 6:12, 6:20, 6:24, 7:4, 7:7, 7:11, 7:14, 7:14, 7:18, 7:18, 7:19, 25:3, 25:17, 35:7, 35:9, 35:24, 53:18, 54:17, 56:13, 56:18, 57:3, 57:12, 57:22, 58:9, 58:11, 63:14, 65:9, 65:12, 72:5, 84:20, 84:21, 109:10, 123:20, 161:24, 175:3, 188:16, 190:18, 191:6, 205:15, 205:23, 212:16, 222:13, 222:15, 222:20, 222:24, 233:7, 235:3, 242:10, 254:5, 254:10, 255:6
**Wisconsin-Madison** [2] - 53:18, 63:14
**WisconsinEye** [1] - 203:18
**wit** [1] - 254:11
**withdraw** [1] - 126:9
**Witness** [3] - 3:2,

18:14, 104:21
**WITNESS** [1] - 128:9
**witness** [51] - 6:2, 8:2, 14:18, 33:7, 77:18, 77:23, 79:13, 89:19, 90:1, 90:20, 90:25, 92:18, 93:12, 93:20, 94:17, 95:21, 98:9, 99:8, 99:22, 102:2, 102:15, 103:15, 103:22, 106:9, 107:12, 109:3, 110:24, 112:7, 120:9, 121:1, 122:18, 129:1, 131:5, 134:2, 137:13, 177:1, 182:13, 183:19, 185:7, 187:5, 191:22, 192:18, 195:8, 196:17, 199:2, 199:14, 202:3, 213:24, 250:20, 254:18, 255:2
**witnesses** [3] - 92:24, 198:2, 220:25
**wondering** [1] - 153:24
**word** [2] - 49:2, 74:21
**words** [1] - 81:7
**works** [4] - 43:1, 43:2, 132:6, 132:19
**write** [1] - 204:13
**writes** [1] - 88:20
**writing** [1] - 38:9
**written** [6] - 75:1, 160:21, 160:23, 160:24, 163:6, 165:9
**wrote** [2] - 204:12, 205:6

## Y

**Yahoo** [2] - 117:6, 138:18
**year** [7] - 23:16, 39:25, 83:22, 174:15, 187:21, 189:12, 189:17
**years** [3] - 65:2, 72:8, 168:24
**yourself** [1] - 167:9

## Z

**zero** [10] - 162:11, 162:15, 162:18, 163:4, 163:10, 163:12, 163:13, 163:17, 210:17,

210:22
**zeros** [1] - 163:24
**Zeus** [7] - 227:21, 227:24, 228:2, 228:19, 228:22, 231:13, 231:21
**Zipperer** [9] - 42:16, 133:1, 133:11, 144:21, 145:1, 145:3, 146:2, 153:19, 154:3
**Zipperer's** [1] - 146:7