UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

WILLIAM WHITFORD, et al.,

      Plaintiffs,

-vs-                       Case No. 15-CV-421-BBC

GERALD NICHOL, et al.,      Madison, Wisconsin
                             May 24, 2016
      Defendants.        9:05 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
HELD BEFORE THE HONORABLE JUDGE KENNETH RIPPLE,
THE HONORABLE JUDGE BARBARA B. CRABB, and
THE HONORABLE JUDGE WILLIAM GRIESBACH,

APPEARANCES:

For the Plaintiffs:
             Law Office of Peter G. Earle
             BY:  PETER EARLE
             839 North Jefferson Street, Ste. 300
             Madison, Wisconsin  53703

             Campaign Legal Center
             BY:  J. GERALD HEBERT
                  RUTH GREENWOOD
                  DANIELLE LANG
                  ANNABELLE HARLESS
             1411 K Street NW, Ste. 1400
             Washington, DC  20005

             Rathje & Woodward, LLC
             BY:  DOUGLAS POLAND
             10 East Doty Street, Ste. 800
             Madison, Wisconsin  53703

Lynette Swenson   RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

1   Continued appearances:

2   For the Plaintiffs:
                    University of Chicago Law School
3                   BY:  NICHOLAS STEPHANOPOULOS
                    1111 East 60th Street, Ste. 510
4                   Chicago, Illinois  60637

5   Also appearing:
                    Paul Strauss – Chicago Lawyers' Committee
6                     for Civil Rights Under Law, Inc.
                    Dan Brewer – Litigation specialist
7                   William Whitford – plaintiff
                    Helen Harris – plaintiff
8                   Jim Seaton – plaintiff
                    Allison Seaton – plaintiff
9                   Wendy Sue Johnson – plaintiff
                    Wayne Jensen – plaintiff
10
    For the Defendants:
11                  Department of Justice
                    BY:  BRIAN KEENAN
12                       ANTHONY RUSSOMANNO
                    17 West Main Street,
13                  Madison, Wisconsin  53703

14  Also appearing:
                    Jackie Righter – paralegal
15

16                         *  *  *  *  *

17                         **I-N-D-E-X**

18  Opening statement by Mr. Stephanopoulos          10-22
    Opening statement by Mr. Keenan                  23-26
19

20  PLAINTIFFS' WITNESSES          EXAMINATION          PAGES

21  WILLIAM WHITFORD        Direct by Ms. Greenwood     28-35
                           Cross by Mr. Russomanno      35-39
22                         Redirect by Ms. Greenwood    39
    RONALD GADDIE          (Video played)               40
23  ADAM FOLTZ             Adverse by Mr. Earle         46-102
                           Direct by Mr. Keenan        102-186
24                         Cross by Mr. Earle          186-201
                           Redirect by Mr. Keenan      201-202
25

1                    **E-X-H-I-B-I-T-S**

2    Plaintiffs' exhibits offered by stipulation:         Pg. 7

3        1-73, 81-97, 103-113, 126-130, 132-137, 139,
         140, 147, 161-182, 184-250, 259-284, 290-299,
4        311-322, 331, 334-343, 346-352, 354-356, 358-370

5    Defendants' exhibits offered by stipulation:         Pg. 27

6        501-506, 514-546, 547-569

7    <u>EXHIBITS</u>                                  <u>IDENTIFIED</u>/<u>RECEIVED</u>

8    Ex. 463     All access policy           76           ---
         467     Team map                    91           ---
9        475     Demonstrative               81           ---
         478     Demonstrative               86           ---
10       481     Demonstrative               88           ---
         485     Demonstrative               88           89

11

12                         *   *   *   *   *

13

14        (Proceedings called to order.)

15            JUDGE RIPPLE:  Well, a very good morning to

16   everyone.  The CSOs have asked me to announce that the

17   middle section of the seating area will be for people

18   with laptops, and you are permitted to take notes and

19   type on your laptops during the proceedings, but you

20   cannot, of course, take pictures or transmit pictures.

21        I have a few other just housekeeping matters that

22   I'd like to mention to you, if I may.  It is our hope

23   that we'll be able to go each day from 9 until about

24   12:30.  We'll take a break about halfway through that

25   period.  And then in -- we'll take about an hour for

1   lunch, and then we'll come back and proceed until about

2   5:30, and that way we're hoping we'll be able to progress

3   with the submission of evidence and allow counsel to make

4   the full trial record which they want to make.  So we'll

5   proceed along that way and we'll try to do everything we

6   can to facilitate the lawyers in their very difficult

7   task of presenting the case.  And if anything comes up

8   that we're not being as accommodating as you think,

9   please let me know and we'll try to do the best we can

10  for you.

11      The Court has had the benefit of very, very fine

12  trial briefs in this case and it is our inclination to

13  dispense with opening statements if -- unless counsel

14  feels a real need to do that.  We really feel that we are

15  fairly well briefed in the cases.  Does counsel have any

16  particular thing that they'd like to say?

17          MR. POLAND:  Yes, Your Honor.  Doug Poland

18  appearing on behalf of the plaintiffs.  Your Honor, we do

19  have a very brief opening statement about approximately

20  15 to 20 minutes in length.  We think we will have plenty

21  of time to finish the trial by Friday as Your Honor has

22  stated.  With the Court's indulgence, we would like an

23  opportunity to present an opening statement, if we may.

24          JUDGE RIPPLE:  That's fine.  You can proceed

25  with that.  And sir, when you address me in situations

1   like this, stay seated.

2           MR. POLAND:  I'm sorry, Your Honor?

3           JUDGE RIPPLE:  You can stay seated.

4           MR. POLAND:  Thank you, Your Honor.

5           THE COURT:  But if you'd like to proceed then

6   with an opening statement.

7           MR. POLAND:  Your Honor, if we may, we do have

8   -- thank you.  Thank you, Judge Crabb.  We do have -- I

9   would, with the Court's indulgence, I would like to

10  identify appearances of counsel, if I may.

11          JUDGE RIPPLE:  Please.

12          MR. POLAND:  I'm Doug Poland of Rathje &

13  Woodward appearing on behalf of the plaintiffs.

14          JUDGE CRABB:  Excuse me for interrupting.

15  Please use the microphone.

16          MR. POLAND:  Thank you, Judge Crabb.  Also

17  appearing as counsel for the plaintiffs are Gerry Hebert

18  and Ruth Greenwood of the Campaign Legal Center; Peter

19  Earle of The Law Offices of Peter Earle; Professor

20  Nicholas Stephanopoulos of the University of Chicago Law

21  School.  Also attorneys who have appeared as counsel for

22  the plaintiffs and are present in the courtroom today are

23  Annabelle Harless and Danielle Lang of the Campaign Legal

24  Center; Paul Strauss of the Chicago Lawyers' Committee

25  for Civil Rights Under Law, and Allison Stites is a legal

1    assistant in my firm who has been assisting us.

2        I would also like to acknowledge the plaintiffs who

3    are in the courtroom today.  They're seated over on the

4    far end of the courtroom.  We have six of our twelve

5    plaintiffs:  Professor Bill Whitford, Helen Harris, Jim

6    and Allison Seaton, Wendy Sue Johnson, and Wayne Jensen.

7            JUDGE RIPPLE:  Thank you, Counsel.  Perhaps we

8    should let the counsel for the defendants introduce

9    themselves as well.

10           MR. KEENAN:  Good morning, Your Honors.

11   Appearing on behalf of the defendants, Assistant Attorney

12   General Brian Keenan.  With me is Assistant Attorney

13   General Anthony Russomanno.

14           JUDGE RIPPLE:  Mr. Russomanno.

15           MR. KEENAN:  And then helping us out is our

16   paralegal, Jackie Righter.

17           JUDGE RIPPLE:  Ms. Righter.  Thank you.

18           MR. POLAND:  Your Honor, we did have a few

19   additional housekeeping matters that I would like to

20   raise at this time, if I may.  First of all, with respect

21   to trial exhibits, the parties have identified for the

22   Court in their joint final pretrial report their trial

23   exhibits and have presented the Court with electronic

24   copies of those.  In addition, the plaintiffs have filed

25   an amended trial exhibit list.  We did that yesterday.

1  It's Docket No. 139.  And we also provided electric

2  copies of those exhibits to the Court.

3      The parties have conferred and agree that any

4  exhibits that are not objected to in the pretrial order

5  may be received in evidence regardless of whether they

6  are the subject of testimony and at this time the

7  plaintiffs would like to move into evidence numbered

8  exhibits that I could read to the Court and identify the

9  numbers.

10      JUDGE RIPPLE:  Why don't you do that.

11      MR. POLAND:  Thank you, Your Honor.  That would

12  be -- and I'll read ranges.  I think it will make things

13  a little faster.  Exhibits 1 through 73, 81 through 97,

14  103 through 113, 126 through 130, 132 through 137, 139

15  through 140, 147, 161 through 182, 184 through 250, 259

16  through 284, 290 through 299, 311 through 322, 331, 334

17  through 342, 346 through 352, 354 through 356, and 358 to

18  370.

19      JUDGE RIPPLE:  Okay.

20      MR. POLAND:  And Your Honor, I've got a written

21  copy of that right here.  I'd be happy to hand that up to

22  the Court if that would be helpful.

23      JUDGE RIPPLE:  If you'd hand it to the clerk,

24  we'd appreciate it.

25      MR. POLAND:  Thank you, Your Honor.

1          JUDGE RIPPLE:  Now, is admission of those

2     acceptable to you?

3          MR. KEENAN:  I believe so.  Although he

4     mentioned -- Mr. Poland mentioned 368 through 370, I

5     believe there's no objection to 368.  I don't know that

6     369 or 370 are exhibits.  They're not on this list that

7     I'm looking at here, which I believe is the latest copy

8     of the plaintiffs' exhibit list; so...

9          JUDGE RIPPLE:  What are the --

10         MR. KEENAN:  Okay.  I don't have an objection to

11    those.  Those are fine.

12         JUDGE RIPPLE:  All right.  Then with that

13    objection, those exhibits are admitted.  Do you have

14    anything further, Counsel?

15         MR. POLAND:  I do, Your Honor, a few other

16    housekeeping matters.  Plaintiffs request sequestration

17    of fact witnesses under Federal Rule of Evidence 615.

18    But the parties -- that the parties -- of course the

19    parties and experts are not subject to the sequestration.

20    We've conferred with defendants' counsel on that and we

21    understand that they don't object to that request.

22         MR. KEENAN:  Yes, that's correct.

23         JUDGE RIPPLE:  All right.  Then we will order

24    sequestration of the fact witnesses as you stated.

25         MR. POLAND:  Thank you, Your Honor.  A third

preliminary matter.  Mr. Earle, as you can see, has a

sling.  He unfortunately suffered a fall over the weekend

and broke his a collar bone.  His doctor has advised that

he remain seated, and so he certainly means no disrespect

to the Court, but during witness examinations we would

request that he be allowed to remain seated.

JUDGE RIPPLE:  No problem at all.

JUDGE CRABB:  And you must remain seated also

unless you want to use the lectern.  But you have to be

at a microphone.

MR. POLAND:  Very good, Your Honor.  May we

conduct witness examinations from the podium here as

well?

JUDGE CRABB:  Oh, yes.  Yes.

MR. POLAND:  Thank you, Your Honor.  And then

the final preliminary matter we have, Your Honor, is

there is a pending Daubert motion that the plaintiffs

have filed seeking to exclude the testimony of one of the

defendants' experts, Mr. Trende.  The Court has heard

argument on that motion and reserved its ruling and

simply as a matter of trial preparation because the

Court's ruling will affect that trial preparation, the

plaintiffs would simply like to check in with the Court

at this time and ask whether the Court intends to rule on

that motion or to continue to take the motion under

1   advisement and rule later?

2           JUDGE RIPPLE:  We plan to continue and take the

3   motion under advisement.  We will permit Mr. Trende to

4   testify and we will rule on the motion in due course.

5           MR. POLAND:  Thank you, Your Honor.  That's all

6   the preliminary matters the plaintiffs have.

7           JUDGE RIPPLE:  Thank you, Counsel.  You may

8   proceed then with opening argument.

9           MR. POLAND:  Thank you.  The plaintiffs' opening

10  statement will be delivered why Professor Stephanopoulos.

11          JUDGE RIPPLE:  Professor Stephanopoulos.

12          MR. STEPHANOPOULOS:  Nicholas Stephanopoulos for

13  the plaintiffs.  May it please the Court.

14      Your Honors, this case is different in two respect

15  from previous gerrymandering lawsuits.  The first is that

16  no previous plaintiffs have carried out anything like the

17  comparative and historical analysis that plaintiffs here

18  will present to the Court.  This analysis brings to

19  litigation for the first time the advances in

20  conceptualization and measurement that have taken place

21  in law and political science over the last generation.

22      The second difference is that Wisconsin's Act 43,

23  unlike many of the plans challenged in previous cases,

24  actually is one of the worst gerrymanders in modern

25  American history.  It was designed to be an egregious

1  gerrymander.  That goal has been fully accomplished in

2  the two elections in which the plan has been in force and

3  that goal will continue to be accomplished for the

4  remainder of the decade unless this Court intervenes to

5  safeguard the state's democratic process.

6       As the Court knows, we've advanced a three-prong

7  test for partisan gerrymandering in this litigation.  The

8  test's first prong is discriminatory intent.  To satisfy

9  this prong, a plan must be enacted with the aim of

10 disadvantaging a party's voters because of their

11 political views or affiliations.

12      The test's second prong is discriminatory effect,

13 and to satisfy this prong, a plan must exhibit a large

14 and durable level of partisan asymmetry relative to

15 historical norms.

16      And the test's third prong is justification and this

17 prong is met if a plan cannot be justified on the basis

18 of the state's political geography or legitimate

19 redistricting objectives.  And we've explained in our

20 briefing why this proposed test is judicially discernible

21 and manageable, and I don't want to repeat those points

22 now.

23      What I'd like to do instead is focus on three

24 specific things in this opening statement:  The first is

25 to highlight some of the evidence that this Court will

1  hear over the next four days on the topics of intent,

2  effect and justification; the second is to anticipate and

3  respond to some of the factual assertions that we expect

4  defendants will make, and the third is to stress how

5  urgent the need is for judicial intervention in this

6  case.

7       Starting with discriminatory intent, the Court will

8  hear voluminous evidence that Act 43's drafters violated

9  their basic obligation to govern impartially and on

10  behalf of all of the public.  The Court will learn that

11  the entire line drawing process for Act 43 took place in

12  secret outside of the Legislature in a designated map

13  room at a private law firm's office.  The only people

14  with access to this room or unlimited access to that

15  room, as you can see from the access policy that's

16  excerpted here, were the Republican Speaker of the

17  Assembly, the Republican Majority Leader of the Senate,

18  and a handful of their aides.  These aides included Adam

19  Foltz, Joe Handrick and Tad Ottman, all of whom are

20  figures who will feature prominently in this litigation.

21       The Court will also hear that Foltz and Ottman met

22  separately with the 58 incumbent Republican members of

23  the Assembly to go over their new districts.  Each of

24  these members received a personalized memo, like this

25  one, showing them how their old and new districts had

1  performed in a series of statewide elections.  In

2  contrast, not a single Democratic member of the Assembly

3  was invited to meet with Foltz and Ottman; not a single

4  Democrat received a memo like this one, and not a single

5  Democrat even laid eyes on Act 43 before the bill was

6  introduced.

7       The Court will further learn that behind closed

8  doors, Foltz, Handrick and Ottman created and validated a

9  measure of partisanship which they then used to design

10 and to assess a series of maps with names like Adam

11 Aggressive and Joe Assertive.  Here you can see the

12 drafter's analysis of Joe Assertive.  And I'll just note

13 to the Court that while I'm going through these images

14 fairly quickly now, they'll be covered in much more

15 detail later in the trial.

16      In this table, there's an entry for each district

17 showing its predicted Republican vote share and how much

18 more or less Republican that vote share is than the

19 district's predecessor.  And at the end, there's also a

20 summary table listing the numbers of Republican,

21 Democratic and swing districts under the old and new

22 plans.  This particular plan, Joe Assertive, was expected

23 to increase the number of safe and lean Republican

24 districts in the Assembly by 11, from 40 all the way to

25 51.

1   The Court will hear as well that Act 43's drafters
2   didn't just rely on their own empirical skills.  They
3   also hired Professor Keith Gaddie, who is a professor at
4   -- political scientist at the University of Oklahoma to
5   help them with their work.  Professor Gaddie created a
6   sophisticated regression model to analyze the partisan
7   performance of the new districts.  This model, it's worth
8   noting, is virtually identical to the one used by one of
9   plaintiffs' experts, Professor Ken Mayer, in this
10  litigation.
11      And as you can see here, Professor Gaddie also
12  carried out what's known as *sensitivity testing* for the
13  drafts of Act 43 that he examined.  This means that he
14  shifted the expected vote in each district by several
15  points in each party's direction and then tracked whether
16  that district or each district became safe Republican,
17  that's red; lean Republican, which is orange; lean
18  Democratic, which is teal, or safe Democratic, which is
19  blue as a result of that shifting.  The only reason to
20  carry out this kind of testing is to make sure that a
21  gerrymander is durable and won't disappear under
22  different electoral conditions.
23      So a natural question at this point is how effective
24  Act 43's drafters thought they were and how large and
25  durable a Republican advantage they thought they were

1  attaining.  Over the course of discovery, plaintiffs have

2  managed to identify ten separate draft plans that Foltz,

3  Handrick and Ottman analyzed using their composite

4  measure of partisanship.  Typically these plans were

5  analyzed with spreadsheets like this one.  And over these

6  ten or so iterations, the predicted number of Republican

7  seats in the Assembly rose from 49 under the previous

8  decade's map all the way to 59 by the end of the

9  map-making progress.  And that's a dramatic change that

10 was accomplished through the ever more systematic

11 cracking and packing of Democratic voters.

12      Plaintiffs were also able to locate a series of five

13 of these S curves created by Professor Gaddie, all of

14 them looking pretty much like this one.  The S curve for

15 the previous decade's map showed that if the Republican

16 statewide vote shifted by three points in either

17 direction, the number of Republican seats in the Assembly

18 would vary all the way from 64 down to 36.  In contrast,

19 the S curves for all of the drafts of Act 43 had much

20 tighter seat ranges.  They never dropped below about 45

21 Republican seats over this set of elections.  And under

22 Professor Gaddie's final S curve, Democrats were expected

23 to need 54 percent of the statewide vote in Wisconsin in

24 order to capture a majority of the Assembly.

25      The last bit of evidence that I'll mention, of

1   intent evidence that I'll mention is the highly irregular

2   enactment of Act 43.  Tad Ottman told the Republican

3   members of the Legislature that they had an opportunity

4   and an obligation to draw these maps that Republicans

5   haven't had in decades.  Act 43 was then rushed to

6   passage on a party-line vote with just nine days going by

7   between the bill's introduction and its approval by both

8   legislative chambers.  And because municipalities hadn't

9   had time to design the wards yet, a companion bill to Act

10  43 was designed a few days later.  This companion bill

11  required municipalities to respect district boundaries

12  when designing their wards, but in every previous

13  redistricting in Wisconsin's history the process had

14  worked the other way around.  Wards had been designed

15  first and then districts had been drawn afterward to

16  respect the ward's boundaries.

17          Now, we don't expect defendants to challenge any of

18  this evidence over the next four days.  What we expect

19  them to say instead is that this is just par for the

20  course.  This is what always happens when redistricting

21  is carried out by the elected branches.  The defendants

22  will not show us that when political actors redrew

23  Wisconsin's maps in the 1970's or the 1980's that they

24  did so with the same secrecy or the same complete

25  exclusion of one party from the process or the same

1   sophisticated analysis of partisan consequences or the

2   same irregular enactment that marked Act 43.  Nor will

3   defendants be able to show that Act 43 was passed in this

4   way in order to benefit all of the people of Wisconsin

5   and not one particular partisan fraction of the public.

6       Your Honors, let me turn next to the evidence of

7   discriminatory effect that this Court will hear.  Much of

8   this evidence will involve a measure known as the

9   *efficiency gap*, which is a metric of partisan symmetry

10  that political scientists have devised over the last few

11  years.  The efficiency gap is based on the concept of

12  wasted votes, which are votes that don't contribute to

13  the election of a candidate.  And votes can be wasted

14  either because they're cast for a losing candidate or

15  because they're cast for a winning candidate but above

16  the threshold the candidate needed in order to prevail.

17  And the efficiency gap is simply one party's total wasted

18  votes across a plan, minus the other parties' total

19  wasted votes, divided by the number of votes cast in the

20  election.  And it captures in a single number all of the

21  cracking and packing of voters in a plan and it tells us

22  which party is benefited by a plan and by how much.

23      Plaintiffs' expert, Professor Simon Jackman,

24  calculated the efficiency gap for roughly 800 state House

25  plans from 1972 to 2014.  And here, Your Honors can see

the distribution of these plans' lifetime efficiency
gaps.  Most of them are relatively small and close to
zero, but there are a number of highly skewed plans on
both the Democratic and Republican sides.  Even among the
highly skewed plans though, Act 43 clearly stands out.
It had a pro-Republican efficiency gap of 13 percent in
2012 and a pro-Republican efficiency gap of 10 percent in
2014.  These scores mean that Act 43's average efficiency
gap is the fifth worst out of the hundreds of plans that
Professor Jackman studied.  It actually has a larger
partisan tilt than any plan in modern American history
prior to the current cycle.

       But Professor Jackman didn't only analyze the
magnitude of gerrymandering, he also analyzed its
durability in several ways, one of which was to compare
plans' initial efficiency gaps to their lifetime
efficiency gaps.  And as you can see from this chart
here, the relationship between these two variables is
quite strong.  A plan's initial efficiency gap explains
about 75 percent of the variation in its lifetime
efficiency gap.  And what this means for Act 43 is that
it's virtually certain to have a pro-Republican lifetime
efficiency gap and it's also virtually certain to have a
very large lifetime efficiency gap on the order of 10
percent.

1      So just as they intended, Act 43's drafters

2  succeeded in crafting an extreme and a durable

3  gerrymander.  And once again, we don't expect defendants

4  to dispute any of this evidence.  What we expect them to

5  do instead is to try to poke holes in the validity of the

6  efficiency gap as a measure of gerrymandering.  We expect

7  they'll say it's the product of forces other than

8  discriminatory intent; that it can shift from election to

9  election; that it requires choices about the data and the

10  methods to use and so on.  And the Court will hear

11  compelling responses to all of these critiques.

12      But rather than get into these weeds now, I want to

13  highlight two showings the defendants will not attempt to

14  make.  First, they won't try to show that the efficiency

15  gap is any more complicated or any harder to apply the

16  metrics that courts already use all the time in

17  redistricting cases.  In Voting Rights Act cases in

18  particular, courts routinely calculate racial

19  polarization in voting.  Racial polarization is a much

20  trickier concept to measure and to analyze than the

21  efficiency gap.  The efficiency gap can be calculated by

22  anyone with Microsoft Excel in about a minute, which is

23  in marked contrast to racial polarization.

24      Second, defendants will not be able to show that

25  their critiques distinguish between the efficiency gap

and other measures of partisan symmetry.  In fact, their

central point, which is that the efficiency gap is not

exclusively the product of discriminatory intent, applies

equally to any conceivable metric that's based on

election results.  But in that case, defendants' position

is simply that gerrymandering can't be measured at all,

which is not a tenable position for them to take.

Plaintiffs' final category of evidence addresses

whether Act 43's pro-Republican advantage can be

justified by Wisconsin's political geography or

legitimate redistricting objectives and several different

kinds of district maps will show the Court that the

answer is no.

First, we have defendants' own drafts of Act 43,

several of which were less tilted in Republicans favor

than the plan they ultimately enacted.  Act 43's skew

can't be justified if defendants themselves came up with

an array of fairer maps.

Next, we have Wisconsin's Assembly plans in previous

decades which complied with traditional criteria, at

least as well as Act 43, but had far smaller lifetime

efficiency gaps.  Act 43 actually splits 58 of

Wisconsin's 72 counties, which is significantly more than

any previous Assembly map.  And it does so even though

the preservation of county boundaries has been recognized

1  for generations as Wisconsin's most important

2  redistricting criterion.  Act 43's lifetime efficiency

3  gap is also more than 50 percent worse than any previous

4  Assembly maps in at least half a century.

5      And then third, there's the demonstration plan that

6  was designed by plaintiffs' other expert, Professor Ken

7  Mayer, and which the Court can see here.  Like Act 43,

8  the Demonstration Plan has a population deviation below 1

9  percent as well as 7 majority/minority districts.  The

10 Demonstration Plan is also more compact than Act 43 and

11 splits fewer political subdivisions.  However, the

12 Demonstration Plan has an efficiency gap of only 2

13 percent, which is about 10 percentage points lower than

14 that of Act 43.

15     So why is the Demonstration Plan's efficiency gap so

16 much lower than Act 43's?  The answer is that it was

17 drawn with partisan symmetry rather than asymmetry in

18 mind.  And here you can see the district distributions

19 for the two plans.  In Act 43, which is the top chart,

20 Democrats were cracked so they would win only 17

21 districts by less than 20 points compared to 42 such

22 districts for the Republicans.  But in the Demonstration

23 Plan, which is the bottom chart here, neither party is

24 disproportionately cracked and so both parties would win

25 between 27 and 29 competitive seats.

1    In response to this evidence, we expect defendants
2  to assert that Act 43 complies reasonably well with
3  traditional criteria, but the Court will hear that when
4  these criteria conflicted with partisan advantage, it was
5  partisanship that prevailed.  The Court also won't hear
6  from defendants why compliance with traditional criteria
7  should be dispositive in a world in which computers can
8  churn out gerrymanders while still keeping their
9  districts esthetically pleasing.
10    And the final topic, Your Honors, I'd like to cover
11  is what the evidence will show about the need for
12  judicial intervention here.  The evidence will show that
13  in the current cycle, the severity of gerrymandering
14  across the country has spiked to the highest level
15  recorded in modern American history.  The evidence will
16  also show that all of the plans with the worst lifetime
17  efficiency gaps in modern history are plans that are
18  currently in effect.  And the evidence will show as well
19  that these extreme plans are likely to stay skewed for
20  the remainder of the decade.
21    Conversely, the evidence will not show that
22  gerrymandered states have adopted redistricting
23  commissions or taken any other steps to improve their
24  maps.  Nor will the evidence show that the distorting
25  influence of gerrymandering on legislative outcomes is

1   offset by any other force.  And nor will the evidence

2   show that there's any better metric on the horizon than

3   the efficiency gap or that Act 43 is anything other than

4   the plaintiffs claim that it is, which is a deliberate,

5   severe, durable and unjustifiable gerrymander.

6       And so for these reasons, at the close of trial

7   plaintiffs will ask the Court to step in, to hold Act 43

8   unconstitutional, and in so doing, to vindicate democracy

9   in Wisconsin.  Thank you.    (9:36 a.m.)

10          THE COURT:  Thank you, Professor.

11      Counsel for the defendants, would you like to make

12  an opening statement at this time or would you prefer to

13  defer and make that decision at the close of the case --

14  of the plaintiffs' case?

15          MR. KEENAN:  I'll make a short opening statement

16  right now and then I'd like to move our exhibits in like

17  the plaintiffs did after that.

18          JUDGE RIPPLE:  Please.

19          MR. KEENAN:  There's been extensive pretrial

20  briefing, so I'll just be brief in our opening statement.

21  The plaintiffs' counsel say this is one of the worst

22  gerrymanders in the history of the country.  Of course,

23  what we won't see in this case is any evidence of actual

24  gerrymandering.  That term dates to the early time frame

25  of this country when Elbridge Gerry, the governor of

1  Massachusetts, drew a district that looked like a

2  salamander, thus was born the term gerrymandering.

3      So what gerrymandering traditionally has meant and

4  has been understood in even the dissents that would find

5  a cause of action for partisan gerrymandering is drawing

6  very strangely shaped districts and those strange shapes

7  indicate that the only reason they're being drawn is for

8  partisan advantage.  There aren't districts like that in

9  Act 43.  If you compare Act 43 to the prior plans and

10  even to the plaintiffs' Demonstration Plans, there's

11  really no difference.

12      In fact, what the plaintiffs are doing is a radical

13  conceptual change in the definition of gerrymandering

14  which is any partisan intent coupled with partisan

15  asymmetry at a certain level.  And they use for their

16  asymmetry measure, they use the efficiency gap.

17      In reading the plaintiffs' 91-page pretrial brief,

18  the thing that struck me the most was the equation of

19  partisan asymmetry with a constitutional command that

20  must be adhered to by states.  There is no authority for

21  this proposition.  Justice Kennedy in *LULAC* said that he

22  wouldn't discount its use as a -- possible use as one

23  element of a test.  The same thing with Justice Souter,

24  joined by Justice Ginsburg.  Frankly, the language in

25  that decision is closer to damning with thin praise than

1    making this some sort of constitutional command.

2         What the trial evidence will show is that these

3    partisan scores that Mr. Stephanopoulos put on the screen

4    are far from magic crystal balls that predict the future.

5    I think the Court will be surprised at not the

6    sophistication of the score, but the lack of

7    sophistication in these scores.  I've looked at these

8    numbers a lot.  District 1 has a score under the

9    composite under the new map of 51.22, and I was reminded

10   of a saying, that I'm not sure who said, that economists

11   put decimal points on their projections just to show they

12   have a sense of humor.  They don't know that this

13   district is 51.22 percent.  These numbers have a false

14   sense of certainty in them, which the evidence will show;

15   that frankly these are just educated guesses and they

16   surely don't predict the future for six, eight and ten

17   years in the future.

18        The evidence of partisan intent that the plaintiffs

19   will show isn't anything beyond what would be expected

20   when a partisan body districts.  Does anyone think that

21   the Indiana Legislature in *Bandemer*, the Pennsylvania

22   Legislature in the *Vieth* case or the Texas Legislature in

23   the *LULAC* case invited the opposite party into the room,

24   discussed how to do a fair districting plan and put it

25   out for debate, and then put it out on the floor with --

debating the other side before that and then putting the
plan forward?  Does anyone think any of those
legislatures in those cases did not have some sort of
partisan score that they looked at districts on?
Frankly, it was assumed in the *Bandemer* case that that's
what the Indiana Legislature did even without any
evidence of it.

I think in the end, this case remained me of a
phrase, a saying my grandfather had which he would
criticize people for using statistics as a drunk uses a
lamppost for support rather than illumination.  I believe
that the plaintiffs' statistics actually are very
illuminating.  They just don't provide any support for a
constitutional violation.

Professor Jackman's work is consistent with the
findings of our experts which show that the efficiency
gap has increased markedly since the 1990's.  This isn't
a result of partisan gerrymandering, this is a result in
the change of the nature of the political coalitions in
this country in trying to use an effect that is seen as a
result of that as a sign of partisan gerrymandering.

I believe that's all I have for an opening
statement.  I'll just read some of the exhibits that we
-- have not been objected today and then we'd be ready to
start the case.

1          JUDGE RIPPLE:  Thank you, Counsel.

2          MR. KEENAN:  I believe the unobjected exhibits

3     on the defendants' list are 501.  502.  There was an

4     objection to 503.  We had marked Wisconsin Act 43.  The

5     parties have agreed to a change in that exhibit that now

6     marks Chapter 4 of the Wisconsin statutes, so that's been

7     substituted, and with that substitution there's no

8     objection to 503.  Exhibits 504 to 506.  Exhibits 514

9     through 546.  Exhibit 547 is a report of Sean Trende.

10    The plaintiffs don't have any objection to that.  That's

11    -- but they are preserving their motion in limine, so to

12    the extent the Court would rule on that.  Then Exhibits

13    548 through 569.  There were a few exhibits which the

14    plaintiffs were reserving pending some further

15    verification and those are 507, 509, 512, 513 and 570.

16    And then I'll just note that we had Exhibits 571 through

17    '73 listed but have withdrawn those and don't intend to

18    offer them.

19          MR. POLAND:  Your Honor, I can represent for the

20    plaintiffs that for those exhibits Mr. Keenan read for

21    which the plaintiffs had reserved objections pending

22    verification, we withdraw those objections and so those

23    may be admitted into evidence as well.

24          JUDGE RIPPLE:  That's the entire list?

25          MR. KEENAN:  Of the plaintiff -- of the

1  defendants' unobjected-to exhibits, yes.

2         JUDGE RIPPLE:  Counsel, any objection or --

3         MR. POLAND:  No, Your Honor.  Thank you.

4         JUDGE RIPPLE:  Thank you.  In that case, those

5  exhibits will be admitted.  I think then we are ready for

6  the presentation of the case.

7         MR. POLAND:  Thank you, Your Honor.  The

8  plaintiffs would like to call to the stand as their first

9  witness Professor William Whitford.

10        **WILLIAM WHITFORD, PLAINTIFFS' WITNESS, SWORN,**

11        MS. GREENWOOD:  Your Honor, I'm Ruth Greenwood

12  for the plaintiffs.

13                    DIRECT EXAMINATION

14  BY MS. GREENWOOD:

15  Q    Professor Whitford, would you please introduce

16  yourself to the Court.

17  A    My name is William Whitford.  I'm 76 years old.  I

18  was born in Madison and mostly been a resident of Madison

19  all my life.  I'm retired.  For nearly 49 years I was a

20  Professor at the University of Wisconsin Law School;

21  appointed in '65.  Fully retired January 2014.  On leave

22  for a few years in the interim, but pretty much here.

23  Q    Thank you.  Professor Whitford, are you registered

24  to vote in Wisconsin state elections?

25  A    Yes, I am.

                    WILLIAM WHITFORD - DIRECT

1   Q     Which state assembly district do you live in?

2   A     I live in the 76th.

3   Q     What is your address?

4   A     1047 Sherman Avenue, Madison.

5   Q     Do you ordinarily vote in state elections?

6   A     I think I don't miss an election in which there's a

7   contest on my ward's ballot.

8   Q     When were you first registered to vote in Wisconsin?

9   A     I don't have a clear vision of actually registering,

10  but I'm certain it was very shortly after my 21st

11  birthday.  21 was the voting age in those days.  I had

12  been a very active young Democratic as a college student.

13  I worked very hard in the 1960 elections for a variety of

14  Democratic candidates but was unable to vote, so I know I

15  was very anxious to register at the first opportunity.

16  Q     And since then have you voted in Wisconsin state

17  elections regularly?

18  A     Yes.  With possible exceptions in a few years when I

19  was on leave and out of state or in law school in

20  Connecticut.  I don't really remember some of those

21  times.  I probably voted absentee, but I don't really

22  remember.

23  Q     Did you vote for State Assembly candidate in the

24  2012 general election?

25  A     Yes, I did.

WILLIAM WHITFORD - DIRECT

1    Q    What was the party of the candidate you voted for?

2    A    Democratic.

3    Q    Did you vote for a State Assembly candidate in the

4    2014 general election?

5    A    I did.

6    Q    What was the party of the candidate you voted for?

7    A    Democrat.

8    Q    How often have you voted for Democratic candidates

9    in Wisconsin State Assembly elections?

10   A    Well, I'm quite certain I've never voted for a

11   Republican.  It is possible that I once or twice voted

12   for an Independent or third-party candidate.  I do not

13   recall.

14   Q    How would you describe your political affiliation?

15   A    Well, I'm a member of the Democratic Party, as I

16   mentioned.  I was chairman of the Young Democrats on the

17   campus here as an undergraduate.  I very definitely

18   affiliate of the Democratic Party.

19   Q    How long have you been affiliated with the

20   Democratic Party?

21   A    Well, since I can first remember.  My mother was

22   very active as well.

23   Q    Aside from voting, are you otherwise active in

24   politics?

25   A    Oh, yes.  I've been an active campaigner.  I've

WILLIAM WHITFORD - DIRECT

1  never been a candidate, but I've been an active

2  campaigner and all the things you can do: canvassing,

3  phone banking, accompanying candidates, driving

4  candidates around, holding -- donating, bundling, holding

5  fundraisers at my house, recruiting other people to work

6  on campaigns since before I was old enough to vote.

7  Q   Have you donated to Democratic candidates for the

8  Wisconsin State Assembly?

9  A   Yes.

10 Q   Have you donated to candidates for the Wisconsin

11 State Assembly outside of your 76th District?

12 A   Yes, I do.

13 Q   Did you make donations to districts outside of the

14 76th District for the State Assembly races from 2011

15 through 2014?

16 A   Yes, I did.

17 Q   Approximately how many Democratic candidates for

18 State Assembly outside the 76th District did you make

19 donations to?

20 A   Well, I haven't checked my records, but best of my

21 recollection I'd say three to five in the 2012 cycle.

22 Probably fewer in the 2014 cycle.

23 Q   Have you helped to raise money for Democratic

24 candidates for State Assembly?

25 A   Yes, I do that.

WILLIAM WHITFORD - DIRECT

1   Q     Professor Whitford, why do you actively support

2   Democratic candidates for State Assembly in Wisconsin?

3   A     Well, I have a set of beliefs on public policy

4   issues that I've had all my life that I don't want to say

5   they never changed over time, but they're ones I feel

6   strongly.  I describe myself as a passionate person when

7   it comes to public policy preferences and it's been my

8   judgment, in Wisconsin at least, that the Democratic

9   Party more closely represents my policy preferences than

10  the Republican Party.

11  Q     What are some of the issues that are close to you?

12  A     Well, there are many, but let me mention some.

13  There's what's now called the *equality issue* in current

14  politics, trying to reduce the income gap.  I'm a big

15  partisan of progressive taxation.  I care deeply about

16  public education, especially educational opportunities

17  for -- at the elementary, secondary, university levels

18  for children who are born in circumstances where it might

19  be deemed they have lesser opportunities than others.

20  I'm a big supporter of a clean environment.  I'm

21  particularly fond of Wisconsin's wonderful waters, lakes,

22  streams, wetlands and prefer that those waters be

23  unpolluted.

24  Q     When you donate money to Democratic candidates

25  statewide for the Wisconsin State Assembly, what is your

WILLIAM WHITFORD - DIRECT

1   personal goal?

2   A    Well, my goal is to get legislative bodies, the

3   Assembly and Senate, that will produce a legislative

4   product consistent with my policy preferences.  In

5   Wisconsin over the last 20 years, the only way

6   practically to accomplish that in my judgment is to get a

7   legislative majority for Democrats because the

8   Legislature works through a caucus system.  The votes

9   that matter are where there's some debate and discussion

10  are mostly within the party caucuses.  Once the party

11  caucuses come to a majority result, the other members of

12  the party are expected to follow the party line, as it

13  were.  In other words, it's extremely difficult to put

14  together a bipartisan coalition to pass something in

15  either body of either the Assembly or the Senate.  It

16  doesn't make any sense for me to find some Republican

17  candidate from some other district who might join a

18  bipartisan coalition that's not very likely to happen.

19  The only practical way to accomplish my policy objectives

20  is to get a majority of the Democrats in the Assembly and

21  the Senate ideally in order to get the legislative

22  product I prefer.

23  Q    As a plaintiff in this case, you are alleging that

24  you're harmed by Act 43.  Can you describe how you're

25  harmed by the Act?

WILLIAM WHITFORD – DIRECT

1   A    Well, in my judgment, in my judgment it's virtually

2   impossible under this apportionment for the Democrats to

3   achieve a majority in the Assembly at any time over the

4   duration of the apportionment and almost impossible in

5   the State Senate.

6   Q    Do you believe that you, as a Wisconsin Democrat,

7   have the same opportunity to elect candidates of your

8   choice to the State Assembly as Republican voters across

9   Wisconsin have?

10  A    Well, I have one vote and they only have one vote

11  and we can each vote for one candidate.  In that respect

12  of course we're obviously equal.  But if you engage in

13  the kind of campaign activity that I do, trying to

14  achieve a majority for my party in one of the legislative

15  bodies, I have lesser opportunity than a similarly

16  situated Republican because a considerable majority of

17  the seats in the Assembly, for example, are simply beyond

18  reach for any Democratic candidate.

19  Q    Why do you think they're beyond reach for any

20  Democratic candidate?

21  A    Because the apportionment is such that unless

22  there's a very radical shift in partisan preferences

23  within that district, which we don't normally see or

24  we'll never see that as radical as would be required,

25  apportionment is such that the Democrats can't win.  The

WILLIAM WHITFORD - DIRECT

1    results in too many of the districts in Wisconsin are

2    decided by the apportionment, not by the voters.

3              MS. GREENWOOD:  Thank you.  I tender the witness

4    for cross-examination.  (9:54 a.m.)

5                        CROSS-EXAMINATION

6    BY MR. RUSSOMANNO:

7    Q    Good morning, Professor.  My name is Anthony

8    Russomanno and I just have a few questions for you today.

9    A    Morning.

10   Q    You testified that you live in the 76th Assembly

11   District; is that correct?

12   A    That's correct.

13   Q    Do you know who your current Assembly representative

14   is?

15   A    Yes.

16   Q    What is her name?

17   A    Chris Taylor.

18   Q    And that person is a Democrat; correct?

19   A    Correct.

20   Q    Professor, you're aware that your expert, Professor

21   Mayer, has produced a Demonstration Plan; right?

22   A    I am.

23   Q    And you're aware that that Demonstration Plan shows

24   an 82 percent Democratic vote share for your district,

25   the 76th?

                    WILLIAM WHITFORD - CROSS

1  A    No.  I'm afraid I haven't studied Mr. Mayer's

2  Demonstration Plan carefully enough to know that.

3  Q    You haven't looked at your expert's Demonstration

4  Plan?

5  A    Well, not closely enough to have picked up that

6  detail.

7  Q    Would it surprise you that Democrats have a large

8  vote share in the 76th district?

9  A    No, it would not.

10 Q    Are you aware that according, again, to your

11 expert's calculations, that under Act 43, the current

12 plan, your district has an 81.9 percent Democratic vote

13 share?

14 A    It doesn't surprise me.  I'm not aware of that.

15 Q    So under the Demonstration Plan and under Act 43,

16 the Democratic vote share in your district is almost

17 identical; right?

18 A    That's what you're telling me.  I don't know it

19 from --

20 Q    Would that surprise you?

21 A    No, it would not surprise me.

22 Q    Under the old plan in Wisconsin prior to Act 43, are

23 you aware that your district had a very strong Democratic

24 vote share as well?

25 A    I'm aware of that.

WILLIAM WHITFORD - CROSS

1   Q    So Act 43 hasn't affected your ability to vote for

2   and elect a Democrat in your district; right?

3   A    Correct.

4   Q    So your alleged harm relates to other people's

5   districts; is that correct?

6   A    It alleges to my ability to -- relates to my ability

7   to engage in campaign activity to achieve a majority in

8   the Assembly and the Senate, activities I've been engaged

9   in.

10  Q    But you just vote in one assembly district; right?

11  A    I do, but -- go ahead.

12  Q    And you testified that you believe you've donated to

13  perhaps three to five other Assembly candidates; is that

14  correct?

15  A    Well, that was in one biennium, you know.  I haven't

16  prepared to talk about all my political contributions

17  over my lifetime.

18  Q    Let's -- taking that one, you're aware there are 99

19  districts total; correct?

20  A    I am.

21  Q    Professor, as part of your complaint, you assert

22  that you, as one of the plaintiffs, are a supporter of

23  the public policies espoused by the Democratic Party and

24  of the Democratic Party candidates.  Does that sound

25  right to you?

1  A    You know, I would put it the other way around.  I

2  don't know if it makes an important difference that the

3  Democratic Party is much more likely than the Republican

4  Party to favor the policies that I prefer.

5  Q    Well, does it surprise you that your complaint says

6  what I just said?  I was reading from your complaint,

7  sir.

8  A    Were you?  Let me surprise you, Mr. -- let me

9  surprise you that the plaintiffs don't draft the

10  complaint.

11  Q    But either way it's arranged, you would agree with

12  that general -- that's your general view, Professor?

13  A    Yeah, you know, generally true.  I prefer to say

14  that the Democratic Party is more likely to support my

15  positions than that I am a supporter of the Democratic

16  Party, whatever they say, because that's not the way I

17  feel or look at it.

18  Q    So you would -- you don't agree with every position

19  taken by every Democratic candidate in every district in

20  Wisconsin; right?

21  A    That is absolutely so.

22  Q    You do not agree with all of them?

23  A    I'm sure I don't.  If you asked me for a specific

24  example, I'd be hard pressed to come up with it for the

25  moment.

WILLIAM WHITFORD - CROSS

1  Q    And you admit your own views change over time;

2  correct?

3  A    They do change in detail, yes.

4  Q    And you agree that policy positions by Democrats

5  aren't always going to be exactly the same among

6  Democrats; right?

7  A    No.  That's what gets ironed out in the party

8  caucuses, as I mentioned.

9        MR. RUSSOMANNO:  That's all I have.  Thank you.

10  (9:59 a.m.)

11        MS. GREENWOOD:  Thank you, Your Honors.  I just

12  have one followup question.

13                REDIRECT EXAMINATION

14  BY MS. GREENWOOD:

15  Q    Professor Whitford, have you donated to the Assembly

16  Democratic Campaign Committee?

17  A    Yes, I have.

18        MS. GREENWOOD:  Thanks.

19        JUDGE RIPPLE:  Any recross?  Thank you,

20  Professor.

21     (Witness excused at 9:59 a.m.)

22        MR. EARLE:  Good morning, Your Honors.  Peter

23  Earle.  Our next witness resides in Oklahoma.  As a

24  result, he is outside the subpoena reach of this court

25  and we deposed him there and have prepared a videotape to

                WILLIAM WHITFORD - REDIRECT

1   present to the Court of his testimony.  And Your Honors,

2   at this point I just want to make sure that the

3   sequestration order is being enforced.  Are the fact

4   witnesses from the -- out of the room?

5           MR. KEENAN:  I don't see them here.

6           MR. EARLE:  Okay.  With that clarification, we

7   may proceed with a video clip that is, I guess,

8   calculated to last about an hour-and-a-half, I believe,

9   from Professor Keith Gaddie, Ronald Keith Gaddie, Ph.D.

10  of Oklahoma City, Oklahoma.  That deposition was taken on

11  March 9th, 2016.  The full transcript is in the record.

12          JUDGE RIPPLE:  At some point we will interrupt

13  during the progress of this to take a break.

14          MR. EARLE:  Certainly, Your Honor.

15          JUDGE RIPPLE:  Counsel, do you have any

16  objection to this?

17          MR. KEENAN:  No.  We've agreed on the portions.

18  I believe Mr. Earle might just be able to clarify, we did

19  some counterdesignations that will be played after the

20  plaintiffs' designations are played.

21          MR. EARLE:  That's correct, Your Honor, and the

22  transcript will scroll along with the video.

23          JUDGE RIPPLE:  Are we going to be seeing the

24  witness or is this --

25          MR. EARLE:  Yes, Your Honor.  It is a videotape

WILLIAM WHITFORD - REDIRECT

1    live presentation -- a videotape of a live deposition.

2              JUDGE RIPPLE:  All right.  Please proceed.

3              MR. EARLE:  Your Honor, Professor Gaddie was

4    sworn on oath at the commencement of the deposition.

5    That is in the transcript.

6              JUDGE RIPPLE:  Yes.

7        (Keith Gaddie video played    10:00-10:18 a.m.)

8              MR. EARLE:  Do we have the sequestration order

9    in place here?

10             JUDGE RIPPLE:  Is there a problem?

11             MR. EARLE:  No, Your Honor.  I was informed that

12   by somebody who thought that the next witnesses had

13   entered the room, but apparently I'm wrong.  I was

14   misinformed.

15             JUDGE RIPPLE:  Proceed.

16        (Gaddie video continued  10:18-10:40 a.m.)

17             JUDGE RIPPLE:  Suppose we take our break at this

18   point.  We'll take 15 minutes.

19        (Recess       10:40- 10:59 a.m.)

20             THE CLERK:  This Honorable Court is again in

21   session.  Please be seated and come to order.

22             JUDGE RIPPLE:  We can proceed with the

23   deposition.

24             MR. EARLE:  Thank you, Your Honor.

25        (Gaddie video continued   10:59-11:15 a.m.)

1          MR. EARLE:  Your Honor, just by way of

2   information for the Court for purposes of judicial

3   efficiency and understanding what's happening here, the

4   testimony has referenced various hard drives and those

5   hard drives, there were three computers.  And this has

6   been -- this is an uncontested fact.  But Exhibit 225

7   consists of five files that are these sheets that are on

8   the screen now and they list -- and they have a list of

9   every single Excel spreadsheet that was recovered by

10  Mr. Lanterman, a computer expert, from all of the hard

11  drivers that were used in the redistricting.  And those

12  are coded WRK 32586, and there's a sequence of those in

13  that file, in Exhibit 225.  And so any spreadsheet that

14  existed is in that file and all of those files are in a

15  folder immediately below each.  So that represents the

16  entire universe of Excel spreadsheets on the computers

17  that were used.  So as we -- when this kind of a file

18  appears, that is the background on that so you can

19  understand that -- I think it's important for

20  contextualizing the evidence that's before the Court.

21          JUDGE RIPPLE:  Thank you, Mr. Earle.

22      (Gaddie video continued    11:16-11:44 a.m.)

23          MR. EARLE:  Your Honor, if I may interrupt,

24  Professor Gaddie just testified that that file was

25  created on July 14, 2011.  Earlier I called the Court's

1    attention to the spreadsheets that had all the metadata

2    and he was referring to that metadata on a monitor as he

3    was just testifying.  And we wanted to clarify to the

4    Court that -- and if we could pull that up at this point,

5    I'll wait until we have it on the screen here -- it's the

6    metadata spreadsheet for computer WRK 32864.  And this

7    detail report was generated by Mr. Lanterman, as I

8    indicated before.  And if we could perhaps scroll over,

9    the office create date says May 2nd, 2011.  If we could

10   scroll a little further, and there's a last saved date of

11   July 14, 2011.  We believe that Professor Gaddie was

12   reading that line and we wanted full candor to the Court

13   that we think that's just an oversight in the record.

14          JUDGE CRABB:  What did you say?  I didn't hear

15   the last part of your sentence.

16          MR. EARLE:  In full candor to the Court -- I

17   need to sit down actually, Your Honor.  I'm not supposed

18   to be standing.  In full candor to the Court, we wanted

19   to point out that Mr. Gaddie had cross juxtaposed the

20   columns he was reading in response to the question in the

21   deposition.  It's actually the other date, which is May

22   2nd, 2011, at 6:15 p.m.  That's all.  Just a minor

23   detail.

24          JUDGE RIPPLE:  Thank you, Mr. Earle.

25          MR. EARLE:  Thank you.

1      (Gaddie video continued      11:45-11:50 a.m.)

2           MR. EARLE:  Your Honor, that concludes our

3  portion of the tape.  For the convenience of the Court,

4  we would draw the Court's attention to Exhibit 290, which

5  is the plaintiffs' supplemental unopposed finding of

6  fact.  The parties had met and conferred on May 18th by

7  phone and agreed that the following proposed finding of

8  fact would be deemed uncontested, and it's a portion, a

9  very brief portion of the transcript of Joe Handrick,

10 which is pertinent to the testimony you just heard.  I'd

11 like to read that to the Court.  And the question at that

12 point is:

13      "Question:  All right.  In your opinion did the

14 partisan makeup of the districts come into play when

15 drawing maps?"

16      This is from the *Baldus* litigation, his deposition

17 in that case.  Mr. Kelly, an attorney, in that case

18 answered:  "Objection to form, but you may answer."

19      "Answer:  In the maps that I drew, no.

20      "Question:  Did they come into play in the map that

21 was enacted in Act 43?

22      "Answer:  I don't know.

23      "Question:  Were partisan considerations a factor in

24 the drawing of the plan that was enacted in Act 43?

25      "Answer:  I don't know.

1      "Question:  When you were working during the

2  redistricting process, did you have any access to voting

3  data from past elections?

4      "Answer:  No."

5      With that, I tender the witness at this point,

6  Mr. Guy.

7          MR. KEENAN:  Mr. Keenan.  The plaintiff said

8  that their trial person would be able to play -- I think

9  we have 15 minutes of counterdesignations, not very much.

10         JUDGE RIPPLE:  Thank you, Mr. Keenan.

11     (Gaddie video continued      11:52-12:09 p.m.)

12         MR. KEENAN:  As Mr. Earle did, I would like to

13  state for the record that the pretrial report that was

14  being referred to in the last clip of testimony was the

15  *Baldus* pretrial report, and that's relevant to the extent

16  that Professor Mayer relied on that for his compactness

17  score of the Act 43 districts.

18         JUDGE RIPPLE:  Thank you.

19         MR. EARLE:  That concludes the testimony of

20  Professor Gaddie.

21         JUDGE RIPPLE:  Thank you.  Mr. Earle, you can

22  proceed with the next witness.

23         MR. EARLE:  Our next witness, Your Honor, will

24  be Adam Foltz.  We'd like to call Adam Foltz to the

25  stand.

1          MR. KEENAN:  He's up in the room due to the

2    sequestration order, so it might be a little bit of time

3    before he comes down.

4          JUDGE RIPPLE:  Understood.

5          **ADAM FOLTZ, PLAINTIFFS' WITNESS, SWORN,**

6                    ADVERSE EXAMINATION

7    BY MR. EARLE:

8    Q    Good morning.  Would you please state your full name

9    and spell your last name for the record.

10   A    Adam Richard Foltz.  Last name is F-o-l-t-z.

11   Q    And during the redistricting at issue in this case,

12   you worked for Speaker Fitzgerald; correct?

13   A    That's correct.

14   Q    And your position was legislative aide?

15   A    Yes.

16   Q    And you were one of the three people who actually

17   drew the draft map that eventually ended up being Act 43?

18   A    I think that's a fair summary of my job duties.

19   Q    And who were the other two people who helped you

20   draft the plans?

21   A    Tad Ottman with Senator Fitzgerald's office and Joe

22   Handrick.

23   Q    Where was that redistricting work performed?

24   A    Primarily at the office of Michael Best & Friedrich

25   in Madison.

                    ADAM FOLTZ - ADVERSE

1    Q     This in a room called the *map room*?

2    A     I think that's a way we used to describe the room,

3    yes.

4    Q     The defendants in this case have stipulated that you

5    and your colleagues examined past partisan performance of

6    voters in the existing legislative districts as well as

7    expected future partisan performance of voters in various

8    configurations of potential new districts.  So my

9    question to you, Mr. Foltz, is you examined partisan

10   performance using a composite partisan metric that

11   averaged various election results; correct?

12   A     There was a composite that took into account past

13   elections at, I guess, top of the ticket for lack of a

14   better term that was averaged to produce a number to

15   measure a district.

16   Q     And that also included expected future -- that

17   measure was used to evaluate expected future partisan

18   performance; isn't that correct, sir?

19   A     I would take -- I wouldn't agree with that

20   classification of it.  I believe it's an average of past

21   elections applied to the new districts and I wouldn't

22   necessarily agree that it had a forward-looking component

23   to it.

24   Q     Okay.  Professor Gaddie was hired in the

25   redistricting process to, among other things, create a

ADAM FOLTZ - ADVERSE

1    sophisticated regression analysis to model the partisan
2    makeup of the potential districts; isn't that true?
3    A    He did create a regression analysis, that's correct.
4    Q    And that was a sophisticated regression analysis;
5    correct?
6    A    I wouldn't know how to classify sophisticated versus
7    a simple regression analysis.
8    Q    Have you ever referred to it as a sophisticated
9    analysis?
10   A    I may have at some point.
11   Q    In fact, in your deposition you referred to it as a
12   sophisticated analysis; isn't that true, sir?
13   A    I'll take your word for it.
14   Q    You will?  Okay.  That's consistent with your
15   recollection and thinking of it, isn't it?
16   A    Like I said, sophisticated might not have been a
17   word to choose there, but it was a regression model.
18   Whether it's sophisticated or simple regression I really
19   couldn't testify to that.
20   Q    But you acknowledge you in the past have referred to
21   it as a sophisticated regression analysis.
22   A    Fair enough.
23   Q    Good.  Okay.  Drawing your attention to Exhibit 175,
24   please, it should appear on the monitor in front of you
25   there.  Have you previously seen this email chain in

1  front of you?

2  A    Yes, I have.

3  Q    Would you identify it for us, tell us who the sender

4  was and who the recipients were?

5  A    It appears that it is forwarded to me by a Joe

6  Handrick and that the original email that is being

7  forwarded is from Dr. Gaddie.

8  Q    And you received this email; correct?

9  A    It appears that way, yes.

10  Q    And you remember receiving this email; correct?

11  A    I don't specifically remember receiving it, but I'm

12  sure I did and looked at it.

13  Q    Okay.  Well, Exhibit 175 indicates that Professor

14  Gaddie empirically verified that your composite partisan

15  metric had a high degree of correlation with his

16  sophisticated regression analysis; isn't that right?

17  A    That appears to be the summary of the point he's

18  trying to convey.

19  Q    And that high degree of correlation assured you and

20  your fellow mapmakers that your composite partisan metric

21  was accurate and usable as a proxy for measuring partisan

22  performance of districts you were designing; isn't that

23  true?

24  A    Yeah, I think that's an accurate way of summarizing

25  it.  Obviously we're looking for a singular statistic to

1   describe a district or draft district and that this

2   ensured their help to determine that it was, in fact,

3   accurate.

4   Q    And you and your fellow mapmakers, you, in fact,

5   used that composite partisan proxy to evaluate draft

6   districts and draft plans; right?

7   A    I think that's a fair way of classifying it.  You

8   would draw districts and there would be a partisan

9   composite assigned and then when you would have an entire

10  map, there would be a way of summarizing the sum total of

11  the various composite scores for the districts.

12  Q    In fact, your partisanship proxy was actually loaded

13  into your autobound mapping software so you could see

14  that proxy score as you were designing districts

15  real-time; correct?

16  A    I'm trying to remember how the software would work

17  with that.  It probably would give you a rolling number

18  of that, but if you have a malapportioned district at

19  that point, it's probably not the most accurate.  Well, I

20  mean it wouldn't be accurate.  It would be to a

21  malapportioned district.  So I would say that once the

22  district is finalized -- and finalize is a word I don't

23  like using just because it was a moving process -- that

24  you would have a partisan score for that district.

25  Q    But as you moved the line on the map, you could see

1   how that movement of that line changed in terms of the

2   partisan score; isn't that true, sir?

3   A    I think that's a fair way of describing how the

4   software would work with regard to that.

5   Q    And you also, as you indicated before, you prepared

6   summaries after you completed a map where you tabulated

7   all of that partisan performance into the map that you

8   were drawing; correct?

9   A    I would export or copy and paste.  I can't remember

10  exactly how the function worked, the data out of the

11  autobound matrix, and then put it into an Excel file that

12  summarized the partisan scores.

13  Q    Now, showing you Exhibit 467, that's a document that

14  was saved at plancomparisons.xlsm.  And this is metadata

15  associated from that.  It's from Exhibit 222 at line 13.

16  You see the title, it says plancomparisons.xlsm?

17  A    I do see that, yes.

18  Q    Let's move over to the author.  See the author is A.

19  Foltz.  Who is A. Foltz?

20  A    That would be me.

21  Q    That's you.  Okay.  And it was last saved by --

22  where did it go.  It disappeared.

23        MR. EARLE:  Could you highlight that column

24  again?  I'm sorry.

25  Q    By Tad.  That would be Tad Ottman; correct?

ADAM FOLTZ – ADVERSE

1   A     It appears that way, yes.

2   Q     And that document was created on May 2nd, 2011;

3   correct?

4   A     Yes.

5   Q     Okay.  Thank you.  Now, drawing -- let's call up the

6   Excel version of that map.  There we go.  Okay.  There

7   are -- we now have in front of you Exhibit 467, and

8   drawing your attention to the bottom of the -- the bottom

9   tab, there's a name there in green.  Do you see that?

10  Put the cursor on it there.

11  A     I do see that, yes.

12  Q     What is the name of that map?

13  A     Joe Aggressive.

14  Q     And what is the name of the next map?  There's

15  several tabs here.

16  A     The next tab over is Joe Aggressive, in parens the

17  number 2.

18  Q     And then lets identify the third map on the

19  spreadsheet you created.

20  A     I'm sorry, is this a spreadsheet I created?  Is this

21  the associated one?  Because in my prior production, the

22  tabs I had were different than this, and in my prior

23  deposition the tabs at the bottom of my version of this

24  were different.

25  Q     Well, Mr. Foltz, this is the document that was found

ADAM FOLTZ - ADVERSE

53

1   by Mr. Lanterman on your computer, the metadata --

2           MR. KEENAN:  I'm going to object to that

3   question because it's false but...

4           MR. EARLE:  Well, in what way?

5           MR. KEENAN:  Why don't you look at the computer

6   it was found on.

7           MR. EARLE:  We have the computer list on the

8   screen.  The witness just testified and identified that

9   he had created this document on May 2nd.

10          MR. KEENAN:  The spreadsheet lists him as the

11  author.  You said it was on the computer he had.

12          MR. EARLE:  Oh.  Counsel is referring to the

13  fact that the WRK number for that computer was Joseph

14  Handrick's computer and the document was imported into

15  that computer.  Therefore, the office create date is

16  material.

17          MR. KEENAN:  I didn't say it wasn't material.  I

18  objected to your question.

19          MR. EARLE:  And it was created by A. Foltz.

20  Anyways --

21          JUDGE RIPPLE:  We'll have the witness testify.

22          MR. EARLE:  -- I think the point has been made.

23  BY MR. EARLE:

24  Q    Let's go to the third tab, sir.

25  A    The third tab is team map 6-15-11.

                    ADAM FOLTZ - ADVERSE

54

1    Q    Okay.  Now, let's go back to the Joe Aggressive tab.

2    Got it there?  Under the column that says *Assembly*,

3    there's a column that's captioned *current*.  Do you see

4    that there on the left?

5    A    I do.

6    Q    Okay.  That refers to the map that was in existence

7    prior to the enactment of Act 43; correct?

8    A    Yes.

9    Q    And under that column you list the proxy scores for

10   the districts that preexisted Act 43; correct?

11   A    Again, this isn't my production, so although the

12   template may have came from me and been moved over to

13   Mr. Handrick's computer, this again is not my production

14   of the plan comparison sheet.  So I just want to be clear

15   on that.

16   Q    The question was -- okay.  But the proxy scores for

17   the map that pre-existed Act 43 are listed under that

18   current column; right?

19   A    Yes.

20   Q    Okay.  Now, under the column captioned *new*, now that

21   refers to the new map that is being evaluated at that

22   given point in time; correct?

23   A    Yes.

24   Q    So those are the partisan proxy scores for the

25   Republican share of the map that you were evaluating at

ADAM FOLTZ - ADVERSE

1  that point in time on that map; right?

2  A    I'm sorry, say that again.

3        MR. EARLE:  Maybe the court reporter can read

4  the question back.

5        (Last question read by reporter.)

6        THE WITNESS:  Again, pointing out that I

7  wouldn't be evaluating it because this is not my

8  production, but I think that's a fair way of summarizing

9  what the spreadsheet is intending to do here.

10 BY MR. EARLE:

11 Q    Okay.  Would you like to pull up your computer's

12 version of this map?

13 A    I just want it to be clear that this isn't my

14 production; that I have a similar production that I've

15 spoken about in depositions a few times now, but I just

16 want to be clear this is not my production.

17 Q    Mr. Foltz, we have your production.  We have your

18 hard drive.  Would you like me to pull that up so it will

19 refresh your recollection?

20 A    It's up to you.

21 Q    Okay.  Let's pull it up.  We have it here.  Drawing

22 your attention to the screen, plan comparisons, do you

23 see the map there?

24 A    I see the Excel file, yes.

25 Q    At the bottom we have Gaddie 4-16-11 version 1B.

ADAM FOLTZ - ADVERSE

1    A    Yes.

2    Q    So basically what we have here is a situation where

3    you produce a map, you shift it over to your colleagues,

4    and they take it and they do some work on it and then

5    they save it in their computer.  Is it your explanation

6    that that's how your name appears on it?

7    A    No.  There was no shifting of maps.  There may have

8    been a shifting of this template to provide it to others

9    if they wanted to choose to use this to summarize their

10   work product, but there was not shifting of maps.

11   Q    Okay.  Let's go back to 467.  There we go.  We're

12   back to Joe Aggressive.  Okay.  So the next column over

13   is Delta.  Tell the Court what Delta means.

14   A    That would be a change in the composite from current

15   to new.

16   Q    And the partnership scores on this spreadsheet, they

17   come from the same proxy metric that was checked for

18   accuracy by Professor Gaddie's regression analysis;

19   correct?

20   A    I believe so, yes.

21   Q    And so when we use the term proxy, we could use the

22   term composite.  We're referring to the same thing;

23   correct?

24   A    Yes.

25   Q    Now, drawing your attention to the bottom of the

ADAM FOLTZ - ADVERSE

1   page where you tally the number of districts, could you

2   tell the Court what your categories were?

3   A    Well again, I keep drawing attention back to this.

4   I didn't tally this.  It's not my production.   The

5   spreadsheet has a formula that tallies districts based on

6   classifications based off of the composite ranges, so 55

7   plus being strong GOP, lean being 52 to 54.9, and then

8   there's a swing metric in there as well and then

9   comparable lean and safe metrics for the Democrats.

10  Q    Now, you use these same categories on the

11  spreadsheets that you generated on your computer;

12  correct?

13  A    Yes, I did.

14  Q    So if we went back to the other one, we'd see

15  exactly the same thing?

16  A    Yes, you would.

17  Q    Okay.  And strong GOP (55 percent plus) that means

18  that the district is expected to have at least a 55

19  percent Republican share; correct?

20  A    I would disagree with that classification.  Going

21  back to the prior discussion about expectations and the

22  forward projecting element of what is essentially an

23  average, I don't agree that it is forward looking.

24  Q    So you, Mr. Foltz, you had no forward-looking

25  interest at all in the course of drawing these maps; is

ADAM FOLTZ - ADVERSE

58

1  that what your testimony is, sir?

2  A    My testimony is the composite is simply an average.

3  It is taking the share of Republican votes cast and

4  dividing them by the total votes cast in those given

5  elections that created this composite, the All 04-10

6  composite.  And that averages are averages.  The math is

7  fairly straightforward.

8  Q    Well, the interest here is in the extent to which

9  this partisan metric that was developed was used to look

10  forward and anticipate how districts would perform in the

11  future?

12  A    I don't agree with that classification.

13  Q    I see.  Okay.  So let's go back to strong GOP (55

14  percent plus).  So what's the purpose of the adjective

15  *strong*?

16  A    I think it's just a back-of-the-napkin way of

17  describing districts that are 55 percent or greater.

18  Q    That they're stronger in what way then?

19  A    Stronger in Republican leaning in a generic general

20  sense.

21  Q    All right.  Now, how many seats were tallied in that

22  category in this under the current map?

23  A    27.

24  Q    Now, the new map here that was under consideration,

25  Joe Aggressive, how many seats were tallied under that

1  map under strong GOP?

2  A    I would take issue with *under consideration*.   I

3  don't know if this draft map was where Mr. Handrick was

4  pulling regional alternatives from the leadership

5  ultimately decided.  So I don't know if this was a map

6  that was simply internal that he was looking at or if it

7  was something that eventually went to the members of

8  leadership to evaluate on a regional basis.

9  Q    And so Joe Handrick was considering this, is that

10  what your testimony is?

11  A    Again, I don't know if this map went to the broader

12  leadership team is the point I'm trying to make.

13  Q    Okay.  All right.  So how many seats -- so there

14  were 38 seats.  You would agree that's more,

15  substantially more than in the current map; right?

16  A    I would agree it's 11 more.

17  Q    Okay.  Well, let's go to the -- let's flip over to

18  the third tab there where it says *team map*.

19         JUDGE RIPPLE:  Mr. Earle, would this be a good

20  time to break?  How long do you plan to keep --

21         MR. EARLE:  Oh, we have an extensive

22  examination, Your Honor, so this would be a very good

23  time.

24         JUDGE RIPPLE:  In that case, I think since we're

25  going to a new exhibit, this would be a good time to

ADAM FOLTZ - ADVERSE

1    stop.

2            MR. EARLE:  Thank you.

3            JUDGE RIPPLE:  The Court will stand in recess

4    for an hour.  We'll reconvene at 1:30.

5        (Recess      12:30-1:35 p.m.)

6            THE CLERK:  This Honorable Court is again in

7    session.  Please be seated and come to order.

8            JUDGE RIPPLE:  Very good afternoon to everyone.

9    And Mr. Earle, you were conducting direct examination and

10   I think we can take up right there.

11           MR. EARLE:  Thank you, Your Honor.

12   BY MR. EARLE:

13   Q    Mr. Foltz, your composite was designed to tease out

14   a potential estimated vote for a legislator in a

15   district; isn't that true?

16   A    I wouldn't agree with that classification of the

17   composite for a few reasons.

18   Q    Sir, excuse me, I didn't ask the reasons.  I asked

19   you whether it was designed to tease out a potential

20   estimated vote for a legislator in a district and you

21   said no.  That's your answer?

22   A    Yeah, I would say no, that that --

23   Q    Okay.  Thank you.  Your composite also allowed you

24   to look at an entire map and ascertain the extent to

25   which you have moved the partisan balance one way or the

ADAM FOLTZ - ADVERSE

1   other; isn't that correct?

2   A     There was a summary that classified the composite

3   for the individual districts by the categories we

4   described before lunch.

5   Q     So it allowed you to ascertain the extent to which

6   you move the partisan balance in a map once you completed

7   the draft of a map; isn't that right?

8   A     I think that's fair.

9   Q     And again, since you had the proxy on your computer

10  screen while you were operating the autobound program,

11  you could see how you were progressing in that direction

12  along the way; correct?

13  A     Yeah, you could classify it as that.  There was --

14  the score was generating with each individual assignment.

15  Q     And your proxy would also allow you to assess the

16  partisan impact of the map that you drew; isn't that

17  true, sir?

18  A     I think that's a fair way of classifying it.

19  Q     Okay.  All right.  So I'd like to draw your

20  attention to Exhibit 172, Tab 3, a map called *Final Map*.

21  Do you see it there?

22  A     Yes, I do.

23  Q     Okay.  Drawing your attention to the bottom of the

24  page where you tally the number of districts in the

25  category of strong GOP, how many districts were strong

ADAM FOLTZ - ADVERSE

1  GOP in that map?

2  A    Current or new?

3  Q    Under the new.

4  A    38.

5  Q    Okay.  And how many were new lean GOP?

6  A    14.

7  Q    And how many were total GOP seats (strong plus

8  lean)?

9  A    52.

10  Q    Okay.  And good.  Now, let's go over to the *current*.

11  Let's compare that to how that map -- this is one you

12  drew; right?

13  A    I'm sorry?

14  Q    This is one you drew?

15  A    No.  A final map would have been after the leaders

16  got together and made the regional decisions and they

17  were then merged together.

18  Q    Okay.  So is your testimony that this is the final

19  map?

20  A    It may not be.  There may have been some additional

21  changes.  If it's not the final map that ultimately

22  became Act 43, it's probably fairly close in the

23  progression of the process.

24  Q    I see.  But this spreadsheet, you agree, came from

25  your computer; right?

ADAM FOLTZ - ADVERSE

1   A     I believe so.

2   Q     Okay.

3   A     The tabs look familiar.

4   Q     Okay.  Thank you.  All right.  Now, this format that

5   we're seeing here:  Current map, new map, strong GOP,

6   lean GOP, total GOP seats (strong plus lean), lean DEM,

7   strong DEM, total DEM, swing, these -- this format was

8   used on many spreadsheets; correct?

9   A     I believe all the tabs in this spreadsheet would be

10  the ones that I ran.

11  Q     But this format appeared in all of these types of

12  spreadsheets that were produced by all three of you;

13  isn't that true?

14  A     I don't know that for a fact.  I mean obviously

15  earlier today we were talking about similar spreadsheets

16  that were based off this tablet or this template from

17  Mr. Handrick.  I don't know if Mr. Ottman produced

18  similar spreadsheets as well.

19  Q     Okay.  All right.  Well -- now -- well, let's find

20  out.  Exhibit 364, can we zoom in.  This is called

21  *TadMayQandD*.  Who do you suppose drafted this map?

22  A     Mr. Ottman.

23  Q     Okay.  And let's look at the manner in which the

24  districts were tabulated down there.  Same format; right?

25  A     Yes.

1   Q     Okay.  Except here we substitute the word *safe* for

2   the word *strong* when it came to GOP districts with a

3   percentage more than 55 percent; correct?

4   A     It appears that way, yes.

5   Q     So the three of you used the term safe and the term

6   strong interchangeably; is that correct?

7   A     I don't know why there's that change reflected.  I

8   know that my spreadsheet had a different header for that

9   category.

10  Q     Well, do you recall using the word safe seats when

11  you were talking strong seats?

12  A     Not specifically, but like I said, I had a different

13  header for that category than Tad did.

14  Q     Okay.  All right.  Let's look at Exhibit 176.  Take

15  a look at the caption there, *Team Map*.

16          MR. EARLE:  Can we pull up the metadata for this

17  map?  It may be more -- technically more complex than my

18  request.  Why don't we move on.

19  Q     So I want to go back to Exhibit 467, the spreadsheet

20  produced by Joe Handrick with the adjective Joe

21  Aggressive.  What does the word *aggressive* mean in that

22  spreadsheet?

23  A     Joe would have labeled that, so I couldn't testify

24  to that.

25  Q     This is not something you discussed in the mapping

1    room amongst the three of you?

2    A    The label for the tab in the spreadsheet?

3    Q    Well, when you referred to maps that you were

4    working on.

5    A    No.  I mean my file names were much more convoluted.

6    There was a longer string of characters, as I think you

7    saw on the tabs for the spreadsheet --

8    Q    What -- sir, what is your understanding of the word

9    aggressive in this context?

10   A    If I were to make an assumption, it would be

11   probably that it was a more aggressive map with regard to

12   GOP leaning.

13   Q    With regard to GOP?

14   A    Leaning.

15   Q    Leaning?  Okay.  Thank you.  Now, Dr. -- Professor

16   Gaddie, he also provided you with documents that he

17   created called S curves.  Do you recall that?

18   A    Yes.  The red and blue curves.

19   Q    Yes.

20   A    Yes.

21   Q    And those reflected the partisan analysis of draft

22   maps as well; correct?

23   A    I'm not fully sure what those curves reflected.  I

24   know it was something that Dr. Gaddie produced, but I

25   don't really -- we didn't spend a whole lot of time with

ADAM FOLTZ - ADVERSE

1   him so I don't really understand the nuts and bolts of

2   what they are.

3   Q    Well, you discussed those S curves with Professor

4   Gaddie, didn't you?

5    A   I'm sure he showed them to me at some point when he

6   was in town, but I don't specifically recall spending

7   much time talking about them.

8   Q    Okay.  You looked at them with -- so your testimony

9   is that you looked at this with Professor Gaddie; right?

10  A    I'm sure we did at some point.

11  Q    Okay.  Let's take a look at one of these S curves.

12  It's Exhibit 272, and it's metadata.  So let's start with

13  the metadata first, which is 225, worksheet 86, line

14  seven.  Would you read the name of the S curve on the

15  screen in front of you?

16  A    Column A.

17  Q    Huh?

18  A    Column A, line 7.

19  Q    Yes, column A, line 7; that's correct?

20  A    Composite_Adam_assertive_curve.xlsx.

21  Q    Who's the Adam in the name of that spreadsheet?

22  A    That would be me.

23  Q    And let's go over to the author.  Who is the author

24  of the spreadsheet?

25  A    That would be Dr. Gaddie, Ronald Keith Gaddie.

ADAM FOLTZ - ADVERSE

1    Q    What happened here is Dr. Gaddie produced an S curve

2    off of a map that you produced; correct?

3    A    That appears to be the case, yes.

4    Q    So this is your map; right?

5    A    It seems to be, yes.

6    Q    Yeah.  And who was the last person to save it?

7    A    That would be me.

8    Q    Okay.  And what was the date that this map was

9    created?

10   A    The office created date, which I'm not sure if

11   that's different than the general creation date, is 5-28

12   of '11.

13   Q    And this is created on your computer; correct?

14   A    I don't agree -- no.  Dr. Gaddie would have created

15   it and then handed it over, for lack of a better term.

16   Q    Got it.  Okay.  Now, what does the word assertive

17   mean in the context of your composite map that was dated

18   May 28th?

19   A    Well, again, I didn't name this file.

20   Q    Well, sorry, but I didn't ask you who named it.  I

21   asked you what does the word assertive mean in the

22   context of that name.

23   A    I'm assuming Dr. Gaddie was implying that there is a

24   more assertive Republican lean to the map.

25   Q    And you wouldn't disagree with Dr. Gaddie on that

1  point, would you, sir?

2  A    I wouldn't guess why Dr. Gaddie names things the way

3  he does.

4  Q    Well, do you disagree with the descriptor that

5  Professor Gaddie put on your map?

6  A    Well, like I said, I'm not going to speculate as to

7  why Dr. Gaddie labeled things the way he did.  I had a

8  system for labeling files, he had a system for labeling

9  files, and I don't want to speculate as to why he chose a

10  certain word.

11  Q    But you saved it on your computer with the title

12  assertive.  You didn't change the name.

13  A    I didn't change the name.

14  Q    Okay.  All right.  Let's go to the exhibit itself

15  and take a look at that S curve, Exhibit 272, please.

16  And I'm going to draw your attention to column -- the

17  column -- are we on the column composite page of that?

18  Yeah.  Okay.  All right.  So I'm going to draw your

19  attention to the column Index *48*.  *All 48*.

20  A    All 48?

21  Q    Stay at the top there for a second.  It says

22  composite; right?  So this is an S curve based on the

23  composite proxy as opposed to the regression model;

24  correct?

25  A    I don't know that.

1  Q    Okay.  Let's go -- so let's follow 48, All 48.  That

2  means -- I guess let me start.  Two rows over from All

3  48, there's a row that says *All 50*; correct?

4  A    Yes.

5  Q    That's 50 percent vote total; right?  50 percent

6  Republican, 50 percent Democrat; right?

7  A    I don't know.

8  Q    You don't know?

9  A    I don't know.

10 Q    Okay.  Let's go to 48.  If you look at that, you see

11 the row across the bottom, the horizontal row there?

12 A    Which one?

13 Q    I can't see it on my computer.  The one -- the 50th

14 -- let me ask you this:  How many seats are blue and teal

15 in row 48?

16 A    I wouldn't know without -- I don't know.

17 Q    Can we get the row in there?

18 A    And you're asking blue and teal in the All_48

19 column.

20        JUDGE CRABB:  Can you enlarge that at all?

21        MR. EARLE:  I'm trying -- do we have a PDF for

22 this?  There we go.  Thank you, Your Honor.  Can we go

23 over to the left more so we can get the numbers.  There

24 we go.  Are those in order?  Yes.  Okay.  So let's start

25 at the top where the numbers are there.

                    ADAM FOLTZ - ADVERSE

BY MR. EARLE:

Q    Go all the way to the top so we can see -- I appreciate your patience in bearing with me, Mr. Foltz. We're trying to arrange it so you can answer the question I'm about to ask you.

Can we go up to the top so we can see how many numbers are off of -- so you see the number 1 on the far left is equal to the caption.  So we have to subtract a number; correct?  Do you see that there?

A    Um-hmm.

Q    We have to adjust the number.  Now, let's go down to the cross row, we'll be able to see how many Democratic seats, assuming a 48 percent Republican vote total in that election.

JUDGE CRABB:  Okay.  So we're now looking at line -- what says on the exhibit line 49, that's actually line 48 because of the way the numbers start up?

MR. EARLE:  That's correct, Your Honor.  On the left hand, the far left column, and we're looking -- and in the column we're going to cross index here is the column that projects what would happen with a 48 percent Republican share of the statewide Republican vote -- on the statewide vote in all Assembly races across the straight.  So if Republican vote -- get 48 percent of the vote, Mr. Foltz is going to tell us, I think, how many

ADAM FOLTZ - ADVERSE

1   seats the Democrats would get.

2           JUDGE CRABB:  Do you have that question in mind?

3           THE WITNESS:  So we're looking at the

4   combination of blue and teal at --

5   BY MR. EARLE:

6   Q    48, which is column M.

7   A    Okay.  Wait.  Column M or column K?

8   Q    I'm sorry, K.  You're right.

9   A    So column K where the teal terminates and turns into

10  orange would be in Excel line 49 minus one, 48.

11  Q    Excuse me?

12  A    48.  So 49 minus one for the header row.

13  Q    I believe it's -- that's correct.  Okay.  All right.

14  So let's go on to the next.  Would you agree with the

15  statement, sir, that these S curves -- these S curves are

16  visual representations of seat tallies under an ascending

17  scale of Republican statewide vote totals ranging from 40

18  percent to 60 percent?

19  A    I wouldn't.  I really don't know.

20  Q    I see.

21          JUDGE CRABB:  Let me ask, does the 4 in the

22  first line to the right of the so-called number, does

23  that refer to a district, a particular district?

24          MR. EARLE:  I'm sorry, Your Honor.

25          JUDGE CRABB:  Okay.  If you go down to row 49.

ADAM FOLTZ – ADVERSE

1            MR. EARLE:  49.

2            JUDGE CRABB:  And there's a 4.  What is that

3   number?

4            MR. EARLE:  That's the district number, Your

5   Honor.

6            JUDGE CRABB:  Okay.  That's what I thought.

7            MR. EARLE:  They are sorted according to the

8   distribution.

9   BY MR. EARLE:

10  Q    Okay.  Would you agree that these S curves help

11  explain to your team what the partisan analysis looked

12  like, assuming different statewide totals for Republicans

13  overall?

14  A    Like I said, we really didn't -- I'm sure Dr. Gaddie

15  showed this to me at some point, but he never really

16  walked me through, that I can recall, what we're trying

17  to interpret here.  So I really don't know how to

18  interpret this.

19  Q    Well, were you in the room with the leadership when

20  they discussed these S curves?

21  A    These S curves were never discussed with leadership.

22  Q    Were they printed out in the map room at Michael

23  Best & Friedrich?

24  A    I don't remember a specific instance them being

25  printed.  They may have been, but I don't remember.

                    ADAM FOLTZ - ADVERSE

Q    Okay.   Did you participate in any meetings between
you and Mr. Gaddie and your two co-workers where these
S curves were discussed?

A    I don't think we ever had a sit-down with all three
of us and Dr. Gaddie to go through the curves.   Like I
said, we really didn't look at them much.   That's why I'm
not really able to interpret what's going on here.

Q    Did you have a large printout, approximately half
the size of this table, in the map room at Michael Best
that you and Professor Gaddie and Tad Ottman and Joe
Handrick talked about?

A    It may have been plotted at some point.   Again, it
was five years ago.   I don't remember a plot of it.   It
may have been plotted.   But again, I don't remember any
meeting where the three of us and Dr. Gaddie would have
sat down and gone over this.

Q    So throughout the entire mapping process, it's your
testimony here today that these documents on your
computer, you had no idea what they meant?

A    Like I said, Dr. Gaddie I'm sure showed me at some
point and probably took a lap through them, but I don't
have enough familiarity with them to really be able to
describe what they are trying to explain.

Q    How many S curves did you save on your computer?

A    Anything that Dr. Gaddie would have given over to me

ADAM FOLTZ - ADVERSE

1  would probably have been saved on my computer.

2  Q    I see.  Now, you mentioned several times a meeting

3  with the leadership; correct?

4  A    Yes.

5  Q    And you participated in those meetings?

6  A    I did.

7  Q    Why don't you tell us who was in the room with you

8  while you were participating in those meetings with the

9  leadership.

10  A    The leadership meetings would have been Tad Ottman

11  and I for sure, maybe Joe Handrick, maybe not.  I'm not

12  exactly sure when he would have been in the room.  There

13  also would have been legal counsel in the room as well.

14  And then members of leadership from both the Assembly and

15  the Senate.

16  Q    Let's identify who the folks are who were the legal

17  counsel who were in the room.

18  A    Jim Troupis, Eric McLeod for sure, and then the

19  roster gets a little fuzzy.  Possibly Ray Taffora from

20  time to time.  Maybe Sarah Troupis from time to time.

21  I'm trying to think if I'm missing anyone from the legal

22  team, but those were -- I think that's a pretty decent

23  summary of the legal counsel in the room.

24  Q    And who were the leaders who were in the room?

25  A    That would have been Representative Fitzgerald,

ADAM FOLTZ - ADVERSE

1    Representative Vos, Senator Fitzgerald, Senator Zipperer,

2    and Representative Suder.

3    Q    Anybody else?

4    A    Not that I recall.

5    Q    And those folks represent the leadership of both

6    Houses of the Legislature?

7    A    Yes.

8    Q    And those folks, were they all access folks?

9    A    I'm sorry, I don't follow.

10   Q    Well, not anybody -- these meetings all happened in

11   -- at Michael Best & Friedrich; correct?

12   A    Yes, they did.

13   Q    And you had to have access to the room in order to

14   participate in those meetings; right?

15   A    Yes.

16   Q    And you had three categories of access:  You had all

17   access, limited access, and all map access; is that

18   right?

19   A    I don't remember those categories.

20   Q    But there was restricted access to the room.  You

21   agree with that?

22   A    There was limited access.  I mean Tad and I had

23   keys.  I don't remember if Mr. Handrick did.  And then as

24   far as access for the leadership members, it was just

25   simply that they came over and we let them into the

ADAM FOLTZ - ADVERSE

1  office.  But to your point on the three different

2  categories, I don't remember those.

3  Q    Well, let's call up Exhibit 463.  We'll refresh your

4  recollection, sir.  Do you see the proposed map room

5  access policy at the top?

6  A    I do.

7  Q    Okay.  Now, I'm going to represent to you, sir, that

8  this exhibit and the contents of it are uncontested facts

9  in this case, so I just want to refresh your recollection

10 with the exhibit.  Do you see there's a category there

11 that says *all access pass*?

12 A    I do see that, yes.

13 Q    Okay.  You were in that category; right?

14 A    Yes, I am.

15 Q    Why don't you tell us who else was in that category.

16 A    Mr. Ottman, Speaker Fitzgerald, Major Leader

17 Fitzgerald, Eric McLeod, Jim Troupis, any legal staff

18 determined by Eric or Jim.

19 Q    Okay.  And then there's a second category of access

20 called *full map access*; correct?

21 A    Yes.

22 Q    And that's significant because individual

23 legislators, Republican legislators, could not -- did not

24 have access to the full map; isn't that right?

25 A    I'm not following that question.

ADAM FOLTZ - ADVERSE

1  Q    Well, individual legislators could only see their

2  own map; right?

3  A    Individual legislator -- well, there's a lot of

4  different meetings in different points in the process

5  that this refers to.  The legislators would have seen the

6  entire map upon introduction of the bill that became Act

7  43.

8  Q    Right.  I'm talking about the drafting process, sir.

9  A    Okay.

10 Q    All right?  When an individual legislator was

11 granted access to the mapping room, this policy said, and

12 it's uncontested in this case, that they could only see

13 their map.  You understand that; right?

14 A    I do.

15 Q    Okay.  Now, what I'm interested in here is the full

16 map access.  There's a limited number of people who had

17 access to the room that could see the full map during the

18 drafting process; correct?

19 A    That seems to be an accurate summary of the

20 document.

21 Q    And so you have the all access.  They had access to

22 the full map; right?

23 A    Yeah, that seems -- that seems reasonable.

24 Q    Okay.  And then you had the full map access.  Who

25 were those folks?

ADAM FOLTZ - ADVERSE

78

```
1    A    Senator Rich Zipperer.  Then what ended up being

2    Representative -- well, Representative question mark, but

3    as I testified to earlier, that was Representative Vos

4    who was kind of a comparable role in the Assembly caucus.

5    Q    And who was John Hogan?

6    A    At the time he was Chief of Staff to Senator

7    Fitzgerald.

8    Q    And how was Andrew Gustafson?

9    A    He was at the time Chief of Staff to Representative

10   Fitzgerald.

11   Q    Can you identify who the limited number of other

12   staff were?

13   A    There were no other staff.

14   Q    Okay.

15   A    And to be clear, Mr. Hogan and Mr. Gustafson never

16   were in the map room either.

17   Q    Okay.  So we have these what you call regional

18   meetings; is that correct?

19   A    I think that's accurate.

20   Q    And when these regional meetings occurred, all of

21   those -- all access people were there; right?

22   A    Yes.

23   Q    And plus Joe Handrick; right?

24   A    I don't remember if he was there for the entirety of

25   the regional meetings or if he was there sporadically.  I
```

ADAM FOLTZ - ADVERSE

1  don't remember exactly.

2  Q    All right.  Well, let's go to -- let's get some

3  understanding of this regional meeting here, okay?  If we

4  could call out the spreadsheet for Exhibit 225 for WRK

5  32564 computer, which was Joe Handrick's computer, and

6  there's a spreadsheet named regionsprintout.xlsx.  I just

7  want to refresh your recollection on the origin of this

8  document, sir.  It's on line 14.  Do you see that?  Do

9  you recognize the name regionsprintout?

10 A    Not by name, no.

11 Q    Okay.

12      MR. EARLE:  Let's move him over to author.  And

13 let's do -- there we go.

14 Q    Do you recognize the name of the author?

15 A    Tad.

16 Q    And what was the date of the creation of that

17 document?

18 A    Created 5-12 of '11.

19 Q    And what was the last time it was printed?

20 A    6-2 of '11.

21 Q    That's getting closer to the regional meeting's

22 time; right?

23 A    It seems to fit the pattern.  I don't remember

24 exactly when on the calendar the regional meetings were,

25 but I think it's reasonable.  It's reasonable to say

ADAM FOLTZ - ADVERSE

1    that.

2    Q    Decisions were made about which way -- in which

3    direction the map was going to go; right?

4    A    That's correct.

5    Q    All right.  Well, let's get the document up here.

6    Do you recognize this document?

7    A    Not particularly, no.

8    Q    Well, what was the date -- what is -- it says here

9    on Monday, June 6, there was a morning session to talk

10   about the Milwaukee DEM and Milwaukee GOP.

11        Do you see that there?

12   A    I do.

13   Q    Does that correspond to your recollection?

14   A    It seems to fit.  I don't recall this document

15   specifically, but it seems to be fairly self-explanatory.

16   Q    Okay.  Let's scroll down to see when the last

17   meeting was.  What was the last date?

18   A    Friday, June 10th.

19   Q    Okay.  All right.  So the draft map called team map

20   emerged as a result of the leadership's meeting -- the

21   leadership's choices at those meetings; isn't that right?

22   A    Yes, I believe that's accurate.

23   Q    Okay.  And so -- okay.  At this point I'd like to

24   review the projected Republican seats over 50 percent

25   based on your partisan metric for the various draft plans

1  that were on the table at that point in time.  Okay?

2        MR. EARLE:  And I'm going to ask or invite, with

3  permission of the Court, to have Attorney Lang approach

4  the board and we have an easel with a blank chart and

5  we're going to plot some results here so we can get an

6  understanding of what was going on here.

7        MS. LANG:  Can you see this?

8        THE WITNESS:  That's better.

9        MR. EARLE:  Your Honors, what we have here on

10  the bottom are -- and could we get -- could we have a

11  blank copy of this on the screen?  Can we get one of this

12  up on the screen?  One second, Your Honors.  Do you know

13  what number it is?  475.  I want to wait for the document

14  to get on the screen because I think it would be easier

15  to follow the presentation here, Your Honors.

16      That's not it.  Your Honors, if we could have one

17  moment.  We're going to put it on a flash drive and give

18  it to our IT helper here.

19        MR. KEENAN:  Can I just ask, does this have a

20  number that's been assigned to it?  Has it been provided

21  to us?

22        MR. EARLE:  No, this is just a chart.  It's a

23  blank chart.  It has no content.

24        JUDGE CRABB:  It will have a number.

25        MR. EARLE:  It's a demonstrative.

ADAM FOLTZ - ADVERSE

1          JUDGE CRABB:  It will have a number.

2          MR. EARLE:  It will have a number, yes.  What's

3   the last number?  Oh, it's 475.  Sorry.  So in order to

4   do this, Your Honors, what we've done is we've sorted the

5   partisan scores on the summary spreadsheets that were

6   created, the highest partisan score to the lowest is a

7   simple Excel sorting function.  And this will allow us to

8   determine the seat share by each of these maps because we

9   can't rely on the lower boxes because we have the swing

10  category in between and those need to be distributed in

11  order to understand the partisan -- the complete partisan

12  impact of a given map, draft map.  And that is the

13  purpose of this exercise, to see the progression that we

14  will be going through.

15  BY MR. EARLE:

16  Q    So let's first look at a document entitled *Joe Base*

17  *Map Numbers*.  That's Exhibit 465, which is already --

18  this has been received in evidence.  This document

19  provides the partisan scores for several iterations of

20  the map, correct, Mr. Foltz?

21  A    This document is new to me.

22  Q    Well, we can call up the Excel version of that very

23  quickly here so that you can see it.

24  A    Yeah.  I mean it appears to be a summary of some

25  percentage, possibly the composite used to summarize

ADAM FOLTZ - ADVERSE

1   various districts on a draft versus current, possibly the

2   composite, the All 04-10 composite for a draft of a Joe

3   Handrick map.

4   Q    Well, there are a whole series of maps across the

5   top there; right?

6        JUDGE CRABB:  May I suggest that if you're going

7   to be turning toward the chart, that you move your

8   microphone so you're still speak -- you don't have to

9   move it, just adjust it.  That's good.

10  BY MR. EARLE:

11  Q    All right.  So what I'd like you to do, sir, is

12  while we're getting the Excel version so you can refresh

13  your recollection here, if you could read what the names

14  are of the different iterations of the map that are on

15  this spreadsheet.

16  A    I'm sorry, what was the request again?

17  Q    If you could read the names of the maps that are

18  across the top.

19  A    Sure.  Current map.  Base map basic.  Base map

20  assertive.  Current map.  Base map basic.  And then

21  column S, base map assertive.

22  Q    Okay.  Thank you.  Now -- and a current map, that

23  means the 2000 map that was in effect before Act 43;

24  right?

25  A    I would assume.  But again, this is Mr. Handrick,

ADAM FOLTZ - ADVERSE

1  not me that put --

2  Q    Let's call up the sorted version of the Joe base map

3  numbers from highest to lowest.

4           MR. EARLE:  This is labeled Demonstrative 476,

5  Your Honor.  And the first column is simply a row of

6  numbers so we can keep track of the number of districts

7  above and below the 50 percent mark.  And I'm having

8  trouble seeing.  There we go.  All right.

9  Q    Now, calling your attention to the columns here, how

10  many districts have a partisan score of 50 percent or

11  more for Republicans?

12  A    It appears 49.

13  Q    Okay.  So under the current map, the map that was in

14  effect when you started drawing a draft for the Act that

15  eventually became Act 43, there were 49 -- the 50

16  Republicans had 49 of -- 49 seats, 50 percent or more

17  pro-Republican; right?

18  A    It appears that way, but what I'm not sure of is if

19  the current map number is the All 04-10 composite.

20  Again, this isn't my spreadsheet, so I'm assuming it's

21  the All 04-10 composite, but there could have been other

22  averages.  So I'm not 100 percent on that.

23  Q    Well, you did go through a series of exercises to

24  verify the accuracy of your composite with the assistance

25  of Professor Gaddie; right?  We've established that;

ADAM FOLTZ - ADVERSE

1  right?

2  A    Right.  And --

3  Q    Okay.

4  A    -- what I'm saying is I'm not sure if this composite

5  number is the one that was ultimately kind of circled or

6  if it is a different iteration of that composite.  Again,

7  this is not a sheet I put together so I don't know if

8  current maps composite is referring to *the* composite.  I

9  don't have --

10 Q    But you don't have any information that it is; isn't

11 that right, sir?

12 A    Insomuch as that there were other alternative

13 composites that were used.  So hypothetically if Joe was

14 early in the process with this, it could have been a

15 different version of that composite so I don't have

16 enough information here.

17 Q    We'll come back and check that with the metadata.

18 Let's proceed with the exercise here.

19 A    Okay.

20 Q    All right.  Calling your attention to base map

21 basic.  Could you look at the 50 percent line.  How many

22 seats for Republicans above 50 percent?

23 A    52.

24 Q    Okay.  Let's mark that.  Let's go to the base map

25 assertive.  The sorted version.  Got it there?  How many

ADAM FOLTZ - ADVERSE

1   districts have a partisan score above 50 percent for

2   Republicans in that map?

3   A    56.

4   Q    Okay.

5        MR. EARLE:  Let's move on to the map that's the

6   spreadsheet, and using the PDF version, which is -- its

7   Demonstrative Exhibit 477 captioned TadMayQandD.  And

8   let's call out -- let's pull out the sorted version, put

9   that next to it.  And this is labeled Demonstrative

10  Exhibit 477.  Now the blue line -- we got it.

11  Q    Can you see it, sir?

12  A    I cannot.

13  Q    All right.

14       MR. EARLE:  So can we zoom in a little bit so we

15  can see?  I'm having a little trouble seeing there.

16  There we go.

17  Q    So how many districts have a partisan score above 50

18  percent for Republicans on the TadMayQandD?

19  A    57.

20  Q    Thank you.

21       MR. EARLE:  Let's move on to one of several

22  spreadsheets entitled *plancomparisons.xlsm* was found in

23  -- in Exhibit 478.  It's a PDF.  That's a Demonstrative

24  Exhibit 478.  There you go.  Okay.  Good.

25  Q    First, can you tell us what the name of this map is?

ADAM FOLTZ - ADVERSE

1    A    Joe Assertive.

2    Q    Okay.  And under the *new* column, can you tell us --

3    can you see that there?

4    A    I can.

5    Q    Okay.  Yes.

6              MR. EARLE:  So let's pull up the sorted version

7    and put it next to it.  This is the sorted version.

8    Okay.

9    Q    How many -- how many seats in the new column have a

10   partisan score above 50 percent for Republicans?

11   A    58.

12   Q    Okay.  Let's pull up another more -- another

13   spreadsheet here.  This is 479.  It's a demonstrative

14   exhibit.  Now, this is also part of the

15   plancomparisons.xlsm in Exhibit 225 in the folder that

16   ends in 64.  What is the name of this map?

17   A    Joe Aggressive.

18   Q    And how many seats above 50 percent on this map?

19   A    59.

20   Q    And let's go over to Joe Aggressive 2, which is 480.

21   Can you see that there?  Can you tell us how many

22   districts have a partisan score for the Republicans above

23   50 percent on this map?

24   A    59.

25   Q    And let's go next to the team map dated June 15,

1   2011, which is Demonstrative Exhibit 481.  Under -- can

2   you tell me -- same exercise.  How many seats with a

3   partisan score above 50 percent for the Republicans?

4   A     59.

5   Q     And you previously testified that team map was the

6   map that came out of your leadership meetings; correct?

7   A     Yeah.  Like I said, it might not have been the final

8   final map that was ultimately put into drafting, but it

9   was probably very close.

10  Q     It wouldn't have moved the partisan share for

11  Republicans above 50 percent; isn't that right?

12  A     I don't believe it would have.

13          MR. EARLE:  At this point, Your Honors, we would

14  move the Court to receive our demonstrative exhibit here,

15  if we could -- we'd call it Demonstrative Exhibit 485 we

16  propose -- we'd ask the Court to receive.

17          THE COURT:  Mr. Keenan?

18          JUDGE CRABB:  Received -- I'm not sure he heard

19  you.

20          MR. KEENAN:  I was going to object because it's

21  not based on his personal knowledge.  They're just asking

22  him to read numbers off of spreadsheets.

23          MR. EARLE:  It's based on data, Your Honor.

24  It's stipulated data.

25          JUDGE RIPPLE:  On that basis we're going to put

ADAM FOLTZ - ADVERSE

1    it in.

2    BY MR. EARLE:

3    Q     All right.  Now, the final map also paired

4    Republican and Democratic incumbents together; correct?

5    A     There were pairings: bipartisan pairing,

6    single-party pairings.  There were pairings of members.

7    Q     But there were pairings of Democrats and Republicans

8    as a category; correct?

9    A     That's correct.

10   Q     And it's true, isn't it, that wherever a Democrat

11   was paired with a Republican, the partisan score for that

12   district was overwhelmingly Republican; isn't that true?

13   A     I don't remember all of the bipartisan pairings we

14   had on the map.

15   Q     Okay.  You testified about those pairings at a

16   hearing on July 13, 2011, at a joint hearing of the

17   Legislature where Act 43, the bill that became Act 43,

18   was presented.  Do you remember that?

19   A     Yes, I do.

20   Q     Okay.  And looking at that, if we could pull up that

21   transcript, that would refresh your recollection;

22   correct?

23   A     I'm sure it would.

24   Q     And you testified about pairings in that hearing;

25   right?

ADAM FOLTZ - ADVERSE

1    A      Yeah.   There was also a summary document put

2    together of the pairings for that hearing.

3    Q      Okay.   Well, let's call up Exhibit 5 -- 353

4    transcript of a hearing, line 25 of page 34 through line

5    4 of page 35.   Could you read into the record what you

6    said during that hearing at that time?

7    A      "Republican v. Democrat pairings you have

8    Representatives Ott and Pasch, Pridemore/Kessler,

9    Kerkman/Steinbrink, Kooyenga/Cullen, Nass/Jorgensen.

10   Q      That's five; right?

11   A      One, two, three, four, five, yes.

12   Q      Those were in Districts 14, 22, 33, 60 and 61; isn't

13   that right?

14   A      Yes.

15   Q      You want to be refreshed on that?   That's

16   reasonable.

17   A      My Assembly flash cards aren't quite what they used

18   to be with regard to the number.

19   Q      And I came here prepared to refresh your

20   recollection.

21   A      Thank you.

22   Q      Let's call up Exhibit 284.   This is an Excel

23   spreadsheet from Joe Handrick's computer.   You see --

24   there we go.

25               MR. EARLE:   I need my eyes -- can we zoom in on

ADAM FOLTZ - ADVERSE

1    -- there we go?

2    Q    So we see in the middle where it says pairings;

3    right?  And we've highlighted 22, 60, 61, 14, and 33;

4    correct?

5    A    22, 60, 61, 14, and 33, yes.

6    Q    Right.  And so Ott and Pasch is there, Pridemore and

7    Kessler is there, Kerkman and Steinbrink is there,

8    Kooyenga and Cullen are there, and Nass and Jorgensen are

9    there; correct?

10   A    Yes.

11   Q    And that's from an earlier version.

12   A    An earlier version.

13   Q    Of a map.

14   A    I don't know.

15   Q    Well --

16   A    I didn't author this spreadsheet, so I'm not sure.

17   Q    Okay.  Well, let's close 284 and look at the

18   partisan scores for those districts in the team map and

19   final map.  So that's Exhibit 467 and Exhibit 172.  We'll

20   place them side by side and we'll figure out what the

21   Republican partisanship score for those districts was.

22   So why don't you tell us what the score was, when we get

23   them so you can see them.  Now, you authored 172;

24   correct?

25   A    172, yeah, that would be one of my file names.

ADAM FOLTZ - ADVERSE

1  Q    Okay.  So let's put those together.  But we need to

2  go to --

3         MR. EARLE:  Another technical glitch, Your

4  Honor.  There we go.  We got it.  So here on the right we

5  have final map and on the left we have team map.  Put

6  them next to each other so we can see.  And what I'd like

7  you to do is tell me -- we'll get it called out here.

8  There we go.

9  Q    What is the partisanship score for District 14?

10  A    Sorry.  Things are moving right now.

11  Q    Can you see it there?  We're getting them both there

12  so you'll be able to see them right away.

13  A    So the top is 58.64 and the bottom is 58.64.

14  Q    Okay.  So what about District 22?

15  A    66.82 and 66.82.

16  Q    These are the final and the team maps, so the scores

17  are identical; correct?

18  A    Yes, they are.

19  Q    Okay.  And let's go to District 33.  Could you tell

20  us what the partisanship scores are for District 33?

21  A    61.81 on both occasions.

22  Q    And now we'll move to 60.  You have to move the

23  chart a little bit to get there.  Take a second.

24  A    Just a quick note on 60, I believe that was

25  mislabeled in Mr. Handrick's summary spreadsheet.

ADAM FOLTZ - ADVERSE

1    Q    Well, what is the -- let's get it up first.

2    A    Just quickly the pairing in question would not have

3    been in the 60th Assembly District is the point I'm

4    trying to make.

5    Q    Let's get into the record what the partisanship

6    score for District 60 is.

7    A    69.52 and 69.52.

8    Q    Okay.  And hold on one second.  (Pause)  Why do you

9    think that the pairing for District 60 is incorrect?

10   A    Could we jump back to that?  60, I believe, was

11   labeled with two reps that wouldn't be from that area, so

12   I think Mr. Handrick had a bad district number in there.

13   Q    Okay.  Well, let's finish the exercise then.  And

14   we'll go -- then we'll go back there.

15         MR. EARLE:  Let's go to District 61.  And

16   highlight District 61.

17   Q    Why don't you tell us what the partisanship score is

18   for District 61 is.

19   A    57.22.

20   Q    Now, if we can call up the initial exhibit which was

21   284.  Is this Pridemore and Kessler?

22   A    Yeah.  That's inaccurate.

23   Q    What district was Assembly person Pridemore?

24   A    I think it was 22.  Wait, I'm sorry.  That is Ott

25   and Pasch.  I think there's a couple errors here.  I

ADAM FOLTZ - ADVERSE

94

1  think Ott and Pasch would probably be 23, with

2  Pridemore/Kessler being 22.

3  Q    Okay.  Well, in any event, as tabulated both in

4  Joseph Handrick's spreadsheet and on the data in the

5  final map and the team map, we are -- none of the

6  districts were under 57 percent; isn't that true?

7  A    Yeah, notwithstanding the errors in the district

8  numbers that he --

9  Q    All right.  So you think that District 23 is missing

10 here; right?

11 A    I think 60 is mislabeled as -- 22 is mislabeled as

12 60 and 22 is actually 23, I believe.

13 Q    So let me get this straight.  23 instead of 22?

14 A    I believe so.

15 Q    Okay.  And what else?

16 A    I believe 22 instead of 60.

17 Q    And 22 -- so 22 stays, 60 goes out, and we replace

18 60 with 23?

19 A    No.  22 bumps down one, it replaces 60, and 22 in

20 that prior spot becomes 23.

21 Q    Okay.  So let's go to 23.  That's the data point we

22 need to add here; correct?

23 A    That seems to be where we are.

24 Q    All right.  Well, let's go there and we'll check on

25 the team map and final map what the partisan score is for

ADAM FOLTZ - ADVERSE

23.   Let's get both maps up first.  So what is the partisan score for 23?

A    57.64.

Q    So bottom line is that all five pairings of Democrats with Republicans were in districts that were 57 percent Republican or more; correct?

A    I don't have that summary in front of me for the bottom line of it, but I'll take your word for it.

Q    We're not here to -- for you to take my word, we're here to get your testimony, sir.

A    Fair enough.  Could I see the Handrick spreadsheet that had the error with the labeling of the districts?

Q    Yeah.  284?  Yeah.

A    Yes.  All the numbers are 57 percent or greater.

Q    Okay.  Thank you.  Now, the parties have stipulated that you and Robin Vos met with each and every of the 58 Republican members of the Assembly about their new districts, but you did not meet with any Democratic members of the Assembly.  That's a stipulation, so I'm not asking you a question about that.  I just want to establish when those meetings started happening.  They started on June 19, 2011; correct?

A    I don't remember the exact date.

Q    Okay.  Let's look at Exhibit 342.  Now, you prepared 58 memos like the one in front of you, didn't you?

ADAM FOLTZ - ADVERSE

1    A     I don't know if I produced one for everyone since

2    some of the members of leadership would have already been

3    apprised of their districts, but a majority of the caucus

4    would have received something like this.

5    Q     So your testimony is that everybody except the

6    leadership got one of these memos who was a Republican;

7    right?

8    A     Like I said, I don't know if I gave or if I produced

9    comparable memos for the Assembly leaderships since they

10   had already seen their districts.  I'm not sure without

11   refreshing recollection.

12   Q     Happily the record contains every single one of

13   them --

14   A     Okay.

15   Q     -- so we'll be able to figure that out later.  Okay?

16   But the date is June 19, 2011; correct?

17   A     It is.

18   Q     And it's true that those meetings began after all of

19   the meetings with the leadership had occurred and a final

20   map had been decided upon; correct?

21   A     Generally.  I would point out I'm not sure if this

22   date is when the meetings actually occurred or when the

23   mail -- this was all fed from a mail merge and there were

24   automated fields, so I'm not sure if the 6-19 is the

25   actual date of the meeting or a date where I would have

ADAM FOLTZ - ADVERSE

1   printed all of the memos that were given to the members.

2   Q    But the point, sir, is that after June 19 -- the

3   meetings with the individual legislators began after June

4   19; correct?

5   A    I think that's fair.  I am just putting the

6   appropriate context on this date and whatnot.

7   Q    And the meetings of the leadership deciding the

8   final map had occurred before that point in time;

9   correct?

10  A    Yes.

11  Q    Okay.  That's what we're trying to establish here.

12  The -- in fact, the parties have stipulated that each

13  legislator received a memo dated June 19, 2011, that

14  summarized the partisan performance data for their new

15  districts; right?  So in those memos, the question for

16  you, sir, is that those memos did not include any

17  information other than the map itself about compactness;

18  correct?

19  A    Correct.

20  Q    Included no information other than the maps -- map

21  itself about contiguity; correct?

22  A    Contiguity, you're going to see that on the map.  I

23  mean it's just a visual inspection of the map itself.

24  Q    That's what I said, other than the map itself.

25  A    Oh, I'm sorry.  That's correct.

ADAM FOLTZ - ADVERSE

1    Q    And those memos contain no information about

2    responsiveness to minority communities; correct?

3    A    That's correct.

4    Q    They contain no information about core retention;

5    correct?

6    A    The memos did not, no.

7    Q    Or any other traditional redistricting criteria;

8    right?

9    A    I think --

10   Q    Other than population deviation.

11   A    Yes.

12   Q    All right.  And those memos focused on partisan

13   performance, didn't they?

14   A    Well, there's population deviation and partisan

15   performance, so I would take issue with the focus.  But

16   it is part of the memorandum.

17   Q    Okay.  These memos were provided to the individual

18   Republican members prior to their -- well, these memos

19   actually were given to the members in the map room;

20   correct?

21   A    No, they weren't.

22   Q    No?

23   A    No.

24   Q    Okay.  They were emailed to them; right?

25   A    No, they weren't.

ADAM FOLTZ - ADVERSE

1  Q    Were they mailed by U.S. mail?  Delivered?  How did

2  they get them?

3  A    The second round of meetings with Senator Vos

4  largely occurred back in the Capitol.

5  Q    Okay.  Let's see.  Okay.  Now, let's go on to

6  Exhibit 208.  Can you identify this email?  Wait a

7  second.

8  A    Yes.

9  Q    Excuse me.  Let's hold off on that exhibit.  Let's

10 go to Exhibit 205.  You did not change any map as a

11 result of your meetings with the individual legislators;

12 isn't that true?

13 A    There was a change that was driven from the Senate

14 -- I don't remember exactly how the timeline progressed

15 on this, but there was a change, but driven more from the

16 Senate.  But I don't remember when that change occurred

17 relative to the individual meetings and the date on that

18 memorandum.

19 Q    I'm just trying to find out the importance of the

20 individual meetings between you and the 58 Republican

21 legislators in terms of any consequences for the map

22 product that ended up happening.  You met with all

23 Republican legislators twice; right?

24 A    Yes.

25 Q    And you never changed a map as a result of your two

ADAM FOLTZ - ADVERSE

1    meetings with those 58 Republican legislators; isn't that

2    true, sir?

3    A    No, that's incorrect.

4    Q    Okay.  Let's go to Exhibit -- these are in-person

5    meetings I'm talking about now.  Where you in the map

6    room where you show them information?

7    A    I'm sorry?

8    Q    Is it your testimony that only the second meeting

9    occurred at the Capitol?  Is that what you're saying?

10   A    Yes.

11   Q    All right.  Okay.  Now, no map changed as a result

12   of that meeting; correct?

13   A    No, there was that change.

14   Q    Other than -- as a result of the meeting.

15        MR. KEENAN:  Objection.  Vague as to what

16   meeting.

17        THE WITNESS:  Yeah, I don't understand.

18        MR. EARLE:  I'm sorry, Your Honor.

19        JUDGE RIPPLE:  I'm having trouble here too.

20   Could you clarify that?

21        MR. EARLE:  Sure.

22   BY MR. EARLE:

23   Q    There were 58 meetings in the map room with

24   individual legislators where they were shown that memo;

25   correct?

ADAM FOLTZ - ADVERSE

1    A    No.

2    Q    Was it at the Capitol?

3    A    With regard to the memo, those were in the Capitol.

4    Q    I see.  Okay.  Did any map change as a result of

5    those?

6    A    Again, there was that change driven by the Senate

7    that --

8    Q    As a result of the meetings that you had.

9    A    I'm sorry?

10   Q    As a result of the meetings you had with the

11   individual legislators.

12   A    So you're referring to the second round of member

13   meetings at this point?

14   Q    Right.

15   A    Yeah, there was -- there was a change to the map, I

16   believe.

17   Q    All right.  We'll leave it at that.  Okay.  Let's go

18   to Exhibit 208.  You have it in front of you.  What's the

19   date of the email?

20   A    Wednesday, June 15 of 2011.

21   Q    You received this email, didn't you?

22   A    Yes, I did.

23   Q    Could you read the last sentence in the first

24   paragraph.

25   A    "Thanks for all the work you are doing to accomplish

ADAM FOLTZ - ADVERSE

1 a very aggressive legislative agenda this month."

2 Q    What is your understanding of the word aggressive in

3 that sentence?

4 A    I'm not sure what Mr. Speth is referring to there.

5 Q    Okay.  Thank you.

6          MR. EARLE:  No further questions, Your Honor.  I

7 pass the witness, Your Honor.  (2:40 p.m.)

8          MR. KEENAN:  Just for the Court, the plaintiffs

9 called Mr. Foltz adversely.  He's also on our witness

10 list.  The parties have agreed the defendants would do

11 kind of a normal direct examination/response to the

12 adverse examination here so Mr. Foltz doesn't have to

13 come back another time and then the plaintiffs would then

14 have an opportunity to do like a rebuttal

15 cross-examination.

16          MR. EARLE:  We're going to follow today with

17 your direct; right?

18          MR. KEENAN:  That's what I just said.

19          MR. EARLE:  Okay.

20          JUDGE RIPPLE:  That's fine.

21                    DIRECT EXAMINATION

22 BY MR. KEENAN:

23 Q    Good afternoon, Mr. Foltz.

24 A    Good afternoon.

25 Q    We kind of got to jump right into your examination

ADAM FOLTZ - DIRECT

on adverse without any background.  So why don't you tell

us about your education.  Where did you go to college?

A     University of Wisconsin-Whitewater.

Q     When did you graduate?

A     2005.

Q     And what was your degree in?

A     Finance and economics.

Q     After graduating from college, kind of just going to

go through your professional history.  What was your

first job after you graduated college?

A     I worked on a special election for Scott Newcomer in

the 33rd Assembly District.

Q     What part of the state is the 33th Assembly

District?

A     At the time that was western Waukesha County, kind

of a Delafield-based district.

Q     After working on that special election, what was

your next job?

A     I then went to work for the Republican Party of

Wisconsin.

Q     And what was your job title there?

A     I worked under the director of the Republican

Assembly Campaign Committee just performing various

entry-level tasks for them.

Q     How long did you have that job for?

ADAM FOLTZ - DIRECT

1    A     Through the election, little bit after, about a year

2    give and take.

3    Q     What election were you referring to there?

4    A     That would have been the 2006 general election.

5    Q     What was your next job then?

6    A     That's when I started in the Capitol.

7    Q     Who were you working for then?

8    A     First job in the Capitol was Representative Karl Van

9    Roy.

10   Q     What was your job title and what were your

11   responsibilities?

12   A     Legislative aide.  General job duties were kind of

13   entry-level legislative aide work, constituent outreach,

14   constituent services, miscellaneous policy work and the

15   like.

16   Q     What district did Mr. Van Roy represent?

17   A     That would have been the 90th at the time.

18   Q     And where in the state is the 90th Assembly

19   District?

20   A     Green Bay.

21   Q     How long did you work for Mr. Van Roy?

22   A     I worked for Representative Van Roy for less than a

23   year.

24   Q     And then where did you end up going after that?

25   A     I moved over to the office of Representative Brett

ADAM FOLTZ - DIRECT

1    Davis.

2    Q    What was -- what was your job title there and what

3    were your responsibilities?

4    A    My job title there again was legislative aide and

5    the job duties were very similar:  Policy, little bit of

6    a focus on education policy given that Representative

7    Davis was the chair, and then various constituent

8    outreach, constituent work, things like that.

9    Q    What assembly district did Mr. Davis represent?

10   A    That would have been the 80th Assembly District.

11   Q    What part of the state is the 80th Assembly District

12   in?

13   A    South central based largely out of Green County, but

14   then bleeding into Rock, Lafayette, and a little bit of

15   Dane as well.

16   Q    How long were you legislative aide for Brett Davis?

17   A    I worked for Representative Davis through the 2008

18   election, both in an inside and outside the building

19   capacity, inside and outside the Capitol capacity.  And

20   then it would have been January of '09 when I left and

21   went to work for Representative Fitzgerald.

22   Q    You mentioned inside and outside the Capitol.  When

23   you say outside the Capitol, what are you referring to?

24   A    It's common practice for legislative staff to take

25   unpaid leaves of absence and then go work on campaigns;

ADAM FOLTZ – DIRECT

1    sometimes for your boss in the Capitol, sometimes it's

2    not.  In this case it was.

3    Q     And so what was your role with the Brett Davis

4    campaign?  And that would have been in the 2008 election?

5    A     Yeah.  That would have been the 2008 election and

6    generally just the campaign manager for Representative

7    Davis's reelect.

8    Q     Was that reelection successful?

9    A     It was.

10   Q     You mentioned you then went to work for Speaker

11   Fitzgerald?

12   A     Minority Leader Fitzgerald at the time.

13   Q     Sorry.  And which, just to clarify between the two

14   brothers, which Fitzgerald was that?

15   A     This would have been Jeff.

16   Q     Okay.  And what was your title with Representative

17   Fitzgerald?

18   A     Legislative aide.

19   Q     And what were your duties?

20   A     Moving a little bit away from constituent work and

21   more into caucus outreach efforts and helping out various

22   offices.  We were in the minority, but policy work as

23   well, worked in there.

24   Q     How long did you work for Representative Fitzgerald?

25   A     I worked for Representative Fitzgerald from 2009

ADAM FOLTZ - DIRECT

1    through the -- I would have left his service some time in

2    2012.  Yeah, some time in 2012 I took an unpaid leave.

3    And then by 2013 I had left his service.

4    Q    And what did you do after working for Representative

5    Fitzgerald?

6    A    I then jumped over to the elder brother, Senator

7    Scott Fitzgerald.

8    Q    Is that your current position?

9    A    Yes, it is.

10   Q    And what are your duties with Senator Fitzgerald?

11   A    Largely policy work.

12   Q    And what's your title?

13   A    Legislative aide.

14   Q    So jumping back in time a little bit when you were

15   working for Speaker or Representative Fitzgerald, not yet

16   Speaker, when did you first learn that you were going to

17   be working on the redistricting that would occur

18   following the 2010 census?

19   A    I took some initial meetings at Representative

20   Fitzgerald's request some time in 2009, some very

21   preliminary meetings that happened at that point.  I

22   don't know if I had fully been designated as a person

23   that was going to work on redistricting, but I definitely

24   did take some meetings at that point.

25   Q    In 2009 was the Republican Party in the majority in

1  the State Assembly?

2  A    No.  They were in the minority.

3  Q    What type of things, starting in 2009 but before

4  there's any census data available, did you do with

5  respect to redistricting?

6  A    I believe the sequence of events there was that

7  Senator Decker allowed retention of legal counsel in

8  preparation for the 2010 census.  So I believe there was

9  some preliminary meetings with Michael Best & Friedrich,

10 just kind of introductory, I guess.  I can't really think

11 of any substantive discussions that happened at that

12 point given that it was well before the census data was

13 back to us.

14 Q    Were you assigned a computer to work on

15 redistricting?

16 A    Yes.

17 Q    And when did that occur about?

18 A    I want to say the computers were initially

19 dispatched in the summer of '10 I believe the computers

20 were initially available.

21 Q    And maybe I should just clarify.  You mentioned

22 Senator Decker.  Who was Senate Decker you mentioned?

23 A    He was the Senate Majority Leader at the time.

24 Q    At that time which party was in the majority?

25 A    Democrat.

ADAM FOLTZ - DIRECT

1   Q     When you were assigned the computer, who else got

2   redistricting computers at the same time that you did?

3   A     My understanding is at that time each caucus, each

4   partisan caucus receives one redistricting computer.

5   Q     When you say *each partisan caucus*, what does that

6   refer to?

7   A     So that would have been Assembly Republican,

8   Assembly Democrat, Senate Republican, Senate Democrat.

9   Q     Did you do actually any drawings of maps during the

10  year 2010?

11  A     2010, no.

12  Q     Why not?

13  A     The census data wasn't available at that point,

14  so -- I can't remember.  There was a dummy set of data in

15  the software that was available to us, but I can't

16  remember if I actually started trying to learn the

17  software in 2010 or not.

18  Q     What was the result of the 2010 elections in

19  Wisconsin with respect to the state Legislature?

20  A     The control of both Houses flipped to Republican

21  control.

22  Q     And then when did you -- there's been some testimony

23  about you working at Michael Best in the map room.  When

24  did you first go over to Michael Best to start working on

25  redistricting?

ADAM FOLTZ - DIRECT

1    A    I don't remember exactly.  It would have been early

2    in 2011, maybe January, more likely February, but

3    somewhere in that general time period.

4    Q    What type of work did you do when you first went

5    over to Michael Best & Friedrich?

6    A    Generally getting myself familiar with the software

7    was a big part of it, just figuring out how the autobound

8    redistricting software operated and worked.  And like I

9    said, there was a dummy set of data in there that you

10   could kind of play around with a little bit.  So there

11   was that.  And then there was also just kind of getting

12   myself up to speed on prior redistricting.

13   Q    And when you say getting up to speed on prior

14   redistricting, what kind of things did you do?

15   A    Wisconsin's specific re -- prior redistricting

16   decisions that were Wisconsin specific as well as take a

17   lap through cases in other redistricting outside of

18   Wisconsin that are relevant to the process.

19   Q    When you first went over to Michael Best to work on

20   redistricting, who else worked in that room with you?

21   A    I think Tad Ottman would have been over there at

22   that point.  I don't remember exactly when his start date

23   was relative to mine, but Tad and I were the initial two

24   that were over there in roughly that January to February

25   timeline.

ADAM FOLTZ - DIRECT

1   Q     In January and February, were you able to draw any

2   potential maps for the upcoming redistricting?

3   A     No.

4   Q     Why not?

5   A     The census data wouldn't have been available to us

6   at that point.

7   Q     When did you finally receive the census data such

8   that you could be able to start doing draft maps?

9   A     Well, I believe statutorily it's required to be back

10  to us from the Census Bureau's redistricting office a

11  year after census.  But then there's a process in which

12  LTSB, which is our technical support agency, they need

13  time to process that data and put it into a workable

14  format where it can then get plugged into the software

15  and enable you to meet the various assignments associated

16  with redistricting.

17        So there may have been -- the point I'm making is

18  that there was probably a lag from receipt of the PL data

19  to the actual being able to draw with the live data.

20  Q     About what time of the year would that have been in

21  2011?

22  A     April.

23  Q     What did you do after first receiving the census

24  data in a form you could use from the LTSB?

25  A     The first push was to get some understanding of

ADAM FOLTZ - DIRECT

where the state sat and what the decade of growth meant

as far as population, both obviously on a statewide basis

how much did the state grow, and then starting to look at

that with certain -- in lower levels of geography.  You

know, how did Marathon County grow over the decade,

things like that.  And then also looking at how the

population changes directly impacted legislative

districts; whether a district now with the census data

back was over/underpopulated.

Q    If we could call up Exhibit 363.  Defendant laptop.

Can you identify this document?  I guess maybe zoom in

and scroll down.

A    This appears to be an output of a spreadsheet that

compares the '02 legislative district's -- particularly

the assembly districts once the new census data is

applied and how that relates to the new ideal population

for those districts, whether they're over/underpopulated.

Q    And so we see a set of districts here on the top.

        MR. KEENAN:  And if you scroll down, Jackie, to

where the break point is.  Just keep scrolling.

Q    This first set of districts, what are these

districts?

A    These appear to be districts that at the time of

receipt of the census data were represented by Republican

incumbents of the Assembly.

                ADAM FOLTZ - DIRECT

1    Q    Okay.  So is this representative of the old map or

2    what's now the new map?

3    A    This would have been the old map.

4    Q    And these are categories by party.  What is the --

5    what does that party mean when it's represented as a GOP

6    overpopulation?

7    A    The party of the incumbent associated with that

8    district.

9    Q    Okay.  Now, if we scroll back up to the top so we

10   can see the headings here.  Okay.  What is -- district is

11   self-explanatory, but what does *TA persons* mean in that

12   column?

13   A    It's a designation for total population.  I think

14   the acronym was total all persons, but I'm not 100

15   percent on that.  But it's the total population of the

16   district.

17   Q    And then *target*, what does that mean?

18   A    Target is a reflection of the new ideal population

19   resulting from the 2010 census.  So that would have been

20   the new population of Wisconsin divided by the 99

21   assembly districts.

22   Q    And then there's a column that says *DEV*.  What does

23   that mean?

24   A    That appears to be deviation as a percentage of the

25   new ideal population.

ADAM FOLTZ - DIRECT

1   Q      And then there's a difference column.   What does

2   that mean?

3   A      That's the raw difference from ideal population.

4   Q      What does a negative number mean?

5   A      Negative number would imply that that district is

6   underpopulated.

7   Q      And then conversely what does a positive number

8   mean?

9   A      That that district is overpopulated.

10  Q      Now, you mentioned that -- why did you create this

11  spreadsheet?

12  A      Just to get an idea of where the various hotspots

13  were in the state for growth, particularly in this case

14  with the legislative districts, to see what areas of the

15  state were growing, what areas were shrinking, where you

16  would start to see, you know, over and underpopulation

17  with regard to legislative districts instead of counties

18  and some of those kind of more standard levels of

19  geography.

20  Q      If we look at Districts 29 and 30, what areas of the

21  state are those from?

22  A      29 and 30 would be western Wisconsin in the 10th

23  Senate District, so you're talking kind of the St. Croix

24  County-based area over there.

25  Q      What does this chart reflect with respect to the

ADAM FOLTZ - DIRECT

1  population growth in that area?

2  A    This chart would represent that there was

3  significant population growth in that area.

4  Q    Okay.  If you can scroll down just to the summary of

5  the GOP seats.  So what did you determine with respect to

6  the -- all the districts that are held by GOP incumbents?

7  A    That the sum total of the over and underpopulations

8  of district represented by Republicans would lead you

9  with an overpopulation of almost 43,000.  42,809.

10  Q    And there's one District 25.  What does that

11  represent?

12  A    That would be the 25th Assembly District which was

13  represented by then Representative Bob Ziegelbauer, who

14  was an Independent.

15  Q    Okay.  And then if we scroll down.  There's another

16  set of districts that carry on to the second page.  What

17  are these districts?

18  A    These would be the districts that were represented

19  by Democrat incumbents at the time of census data

20  receipt.

21  Q    Okay.  And we see, if you look at Districts 10, 11,

22  12, 13, 15, 16, 17 and 18, where are those districts

23  located?

24  A    Milwaukee proper.

25  Q    And what does the data reflect with respect to the

ADAM FOLTZ - DIRECT

1  districts in Milwaukee?

2  A    Generally you're seeing fairly substantial

3  underpopulation in those areas.

4        MR. KEENAN:  Jackie, if we could move to the

5  second page.

6  Q    Just direct your attention to District 79.  Where is

7  that located?

8  A    That was kind of the southwestern portion of

9  Madison, kind of the Fitchburg/Verona-based district.

10  Q    And what does this chart reflect with respect to

11  that district?

12  A    That it was very, very overpopulated upon receipt of

13  the census data.

14  Q    And then in terms of all the democratically held

15  districts, what did your analysis find?

16  A    That the sum total that they are underpopulated by

17  is 38,715.

18  Q    And that's with one district that was overpopulated

19  by 18,000 people?

20  A    Yes.

21  Q    With respect to a district that is overpopulated

22  under the old map, what is going to have to happen to

23  that district when it's redrawn with the new census data?

24  A    All things being equal, that district will have to

25  shed population, so will lose territory to shed

1   population.

2   Q      So the district will be smaller?

3   A      Yes, all things being equal.

4   Q      And what happens to districts that are

5   underpopulated under the old map with respect to when

6   they need to be redrawn with the new census data?

7   A      Those districts would have to grow to order to grab

8   more population to get closer to ideal.

9   Q      There's been a lot of testimony this morning and

10  this afternoon on the development of the partisan score.

11  Why did you and Mr. Handrick and Mr. Ottman develop a

12  partisan score for these districts?

13  A      You're looking for just a simple singular statistic

14  that you can use to convey to someone what a district is.

15  There's a lot of historical election data built into the

16  autobound dataset and it's pretty easy to get lost in the

17  numbers, so just having a simple singular statistic is

18  nice to have to -- if somebody asks you the question what

19  is this district, you can give them an answer instead of

20  a spiel over how the district performed at various points

21  throughout the decade.

22  Q      You mentioned there was election data as part of the

23  autobound program.  Who put that election data into the

24  autobound program?

25  A      LTSB, the Legislative Technology Services Bureau.

ADAM FOLTZ - DIRECT

1    Q    Was that same election data given to all the four

2    caucuses with respect to the redistricting?

3    A    Yes.

4         MR. KEENAN:  If we could pull up Exhibit 175

5    which we saw earlier.  And if we could go to just the

6    second email down from Professor Gaddie.  Just stop,

7    please.

8    Q    The second sentence there says "They expected" -- I

9    think it's supposed to say "The expected GOP open seat

10   Assembly vote using the equation correlates at .96 with a

11   2004-2010 composite and at a .93 level with a 2006-2010

12   state constitutional office composite."

13        Did you do any investigation of Professor Gaddie's

14   statement with respect to how strong the correlation was?

15   A    I mean we kind of took it at face value.  I don't

16   know really what investigation there would have been, but

17   we kind of took it at face value that this was an

18   accurate way of summarizing a district.

19   Q    Did you have access to Professor Gaddie's regression

20   model?

21   A    No.

22   Q    If we go to the next page and we can look at the

23   statement here from Mr. Handrick that says "There is a

24   composite with 2006 and 2010 state races and all the

25   federal races from '04 to 2010 (in other words all

ADAM FOLTZ - DIRECT

1  statewide races from '04 to 2010)."  Do you understand

2  what Mr. Handrick is describing there?

3  A     Yeah.  It seems fairly straightforward.

4  Q     And in your words what is he describing?

5  A     He's describing that -- in which part exactly?

6  Q     The part about the composite with the 2006/2010

7  state races and then the federal races.

8  A     Yeah.  He's just summarizing two different universes

9  of past races that could be averaged to come up with two

10 different composites.

11 Q     And when it references 2006 and 2010 state races,

12 what statewide races are there in Wisconsin that were

13 contested in 2006 and 2010?

14 A     You would have had a combination of -- 2006.  Oh,

15 you would have had a Governor, Attorney General,

16 Secretary of State and State Treasurer, I believe, at

17 that point.

18 Q     And then would those same offices have been up for

19 election in 2010 then?

20 A     Yes.

21 Q     And then the federal races that go from '04 to 2010,

22 what races are those?

23 A     Those would have been -- in this context would have

24 been races for U.S. Senate and President.

25 Q     Okay.

ADAM FOLTZ - DIRECT

1        MR. KEENAN:  If we could pull up Exhibit 556.

2  Q    And this document is a spreadsheet that was from the

3  Lanterman collection and it was titled *Merged Matrix*

4  *Output*.  Can you describe what that document is?

5  A    Sure.  This was, when I testified earlier to the

6  memos that were produced to the Republican members of the

7  Assembly, it all fed from a mail merge to try to automate

8  the process just because we had so many members to deal

9  with.  So by putting everything into a spreadsheet such

10 as this, I was able to automate that process instead of

11 handcraft each memo.  So the data in here would have been

12 pulled from autobound and dropped into Excel in order to

13 facilitate that mail merge.

14 Q    Okay.  Now, we see in column A here it says *old*

15 *district* and then there's a series of numbers.  What does

16 old district refer to?

17 A    That would have referred to the district number

18 under the 2002 plan.

19 Q    Okay.  And then if we could move over to the right,

20 this is a very large spreadsheet.  So we'll go --

21        MR. KEENAN:  Sorry, you went down to 98.  Okay.

22 Keep going until we get -- that's fine.

23 Q    Here again we see *Old District 1* in column M.  What

24 does that mean?

25 A    The district number as of the 2002 plan.

ADAM FOLTZ - DIRECT

1   Q     Okay.  Then there's some further columns.  For

2   example, in District N it says *Old Persons*.  What does

3   that refer to?

4   A     That would have been the population of the 02

5   District as of census day 2010.

6   Q     Where did these numbers come from that are on the

7   spreadsheet?

8   A     Autobound.

9   Q     How did you get them into the spreadsheet?

10  A     I can't remember if it was an actual export function

11  or if it was just a matter of copy and pasting, but

12  something along those lines.

13  Q     Okay.  If we could move along to column R; correct?

14  Right here.  It says *Old Pres Rep 08*.  What does that

15  refer to?

16  A     That would have been the number of Republican votes

17  cast for president in 2008 in the old assembly district.

18  Q     How do you understand that the partisan score worked

19  in terms of generating a percentage?

20  A     It was taking a series of races from 2004 to 2010,

21  summing the Republican votes cast, and then dividing it

22  by the total votes cast for the same universe of races.

23  Q     So we'll go through this spreadsheet and ask you to

24  read off a series of numbers.  Old Pres Rep 08 -- if we

25  move to the right to column U, it says *Old Pres 08 T*.

ADAM FOLTZ - DIRECT

1  What does that refer to?

2  A     That would have been the total number of votes cast

3  for president in the old First Assembly District.

4  Q     Okay.  And would that have then been part of the

5  composite score?

6  A     Yes.

7  Q     And if we move forward to column X, it says *Old Pres*

8  *Rep 04.*  What does that refer to?

9  A     That would have been the number of Republican votes

10  cast for president in the old district for president in

11  '04.

12  Q     If we just move to the right to column Y, it says

13  *Old Pres_T 004.*  What does that refer to?

14  A     The total number of Republican votes cast for

15  president in 2004 in the old First Assembly District.

16  Q     And if we keep going forward to column AA, it says

17  Old AGR Rep 10.  What does refer to?

18  A     Similar, but for the Attorney General's race in

19  2010.  So Republican votes cast in the old First Assembly

20  District for Attorney General in 2010.

21  Q     Okay.  If we go to column AB, it says *Old AG 10 T.*

22  What does that refer to?

23  A     The total for that race in that district.

24  Q     That's the Attorney General race?

25  A     Correct.

1  Q    Okay.  And column AC, it says *Old SOS 10 R*.  What

2  does that refer to?

3  A    Secretary of State Republican votes cast in the old

4  First Assembly District.

5  Q    And then moving along to AE, it says *Old SOS 10 T*.

6  What does that refer to?

7  A    Total number of votes cast for Secretary of State in

8  the old First Assembly District.

9  Q    Okay.  Then if we go to -- where are we at now.  AD.

10  We have to go backwards.  Sometimes these are out of

11  order.  It says *Old ST 10 R*.  What does that refer to?

12  A    That would have been the State Treasurer's race in

13  the First Assembly District for Republican votes cast.

14  Q    What is the vote there?

15  A    12,978.

16  Q    Okay.  If we go to AF, it says *Old ST 10 T*.  What

17  does that refer to?

18  A    That would have been the total number of votes cast

19  for the state treasurer in 2010 in the old First Assembly

20  District.

21  Q    If we move forward to AG, it says *Old Gov Rep 10*.

22  What does that refer to?

23  A    That would have been the number of Republican votes

24  cast for Governor in 2010 in the old First Assembly

25  District.

1    Q    If we just keep moving over, it says *Old Gov 10 T* in

2    column AH.   What does that refer to?

3    A    That would have been the total for the same race in

4    the First Assembly District.

5    Q    The total votes; correct?

6    A    The total votes cast for that spot on the ballot.

7    Q    If we go to column AI, it says *Old Gov_Rep 06*.   What

8    does that refer to?

9    A    That would have been Republican votes cast for

10   Governor in 2006 in the old First Assembly District.

11   Q    What is the total vote there?

12   A    12,339.

13   Q    If we go to AM, it says *Old Gov_TO 6*.   What does

14   that refer to?

15   A    That would have been the total number of votes cast

16   for Governor in 2006 in the old First Assembly District.

17   Q    What's the total there?

18   A    2,226.

19   Q    Does that total look correct to you?

20   A    No, it's not.

21   Q    Why not?

22   A    It's lower than the Republican votes cast in that

23   district.

24   Q    Okay.  So why would that be wrong?

25   A    You're not going to have more Republican votes cast

ADAM FOLTZ - DIRECT

1    than the total for any given election.

2    Q    Okay.  But for now we will just accept that.  If we

3    keep going to column AJ, it says *Old AG_Rep 06*.  What

4    does that refer to?

5    A    That's the Attorney General's race for 2006 in the

6    old First Assembly District for Republican votes cast.

7    Q    And then go to column AN.  What -- it says *Old AG 06*

8    *T*.  What does this refer to?

9    A    That would have been total number of votes cast for

10   the Attorney General's race in the old First Assembly

11   District in 2006.

12   Q    Okay.  And how many votes were cast there?

13   A    25,622.

14   Q    And how many votes did we have in the governor's

15   race in this spreadsheet in '06?

16   A    2,226.

17   Q    Okay.  And would you expect the governor's race

18   total to be about the same as the AG race total?

19   A    Within the ballpark, yes.

20   Q    If we go to column AL, it says *Old Sec_Rep 06*.  What

21   does this refer to?

22   A    Secretary of State, Republican votes cast in 2006 in

23   the old First Assembly District.

24   Q    And we go to A0 says *Old Sec 06 T*.  What does that

25   refer to?

ADAM FOLTZ - DIRECT

A     That would have been the total votes cast for that
same race.

Q     And then going to column AK, it says *Old TRS_Rep 06*.
What does that refer to?

A     The state treasurer's race, Republican votes cast in
the '06 treasurer race.

Q     And then column AP, you have to move over a little
bit.  It says *Old TRS 06 T*.  What does that refer to?

A     That's the state treasurer's race in the old
district.  The total for the treasurer's race.

Q     Okay.  And if we go to column AY, says *Old USS_Rep
04*.  What does this refer to?

A     That's the U.S. Senate race in 2004.

Q     And what vote total is that?

A     Republican.  Sorry.

Q     And then if we go to column BC, it says *Old USS 04
T*.  What does that refer to?

A     That would have been the total for that race, the
U.S. Senate race in '04.

Q     And then if we go forward to AZ or back to AZ, I
guess, it says *Old Sen_Rep 06*.  What does that refer to?

A     That would have been the Republican votes cast in
that race.

Q     That would be the U.S. Senate in 2006?

A     Correct.

ADAM FOLTZ - DIRECT

1  Q    And then column BD, it says *Old Sen 06 T*.  What does

2  that refer to?

3  A    That is the total votes cast for the U.S. Senate

4  race in '06.

5  Q    And then if we go to USS 10 R, that's column BA,

6  says *Old USS 10 R*.  What does that refer to?

7  A    That would have been the U.S. Senate race in '10,

8  Republican votes cast.

9  Q    And then the column next is BB, *Old USS 10 T*.  What

10  does that refer to?

11  A    The total for that race.  The total votes cast for

12  that race.

13  Q    Okay.  And how would the partisan score work using

14  all of these vote totals?

15  A    The sum of the Republican votes in all of those

16  would be divided by the sum of the total for all of those

17  races.

18  Q    When you were doing any of these kind of

19  calculations, at the time though did you do this by hand,

20  like ordering, or how did it happen?

21  A    Autobound -- there's a function in autobound that

22  allowed for -- I don't know how to exactly describe it,

23  but user-defined calculations.  So it would have been

24  under that function that the composite would have been

25  generated.

ADAM FOLTZ - DIRECT

1  Q    I have -- so that you don't have to add all these

2  totals for you, I have tabulated the total of all the

3  votes that we've looked at in the spreadsheet.  Could I

4  ask you though -- you have your phone with you, don't

5  you?

6  A    Yes.

7  Q    Could you take the Republican votes, 163,739.

8  A    163,739.

9  Q    And then divide it by the total votes 320,113.

10  A    163,739 divided by 320,113.

11  Q    Correct.

12  A    .1515.  I'm sorry.  .5115.

13  Q    51.15 percent?

14  A    Yes.

15  Q    Converted to a percentage.  Okay.

16       MR. KEENAN:  I'm trying to get back to the

17  defendant laptop.  I'm afraid I might have messed

18  something up here on this machine.  All right.

19  Q    Now, we're at column L and we see a heading that

20  says *Old All 04-10*.  Do you see that?

21  A    I do.

22  Q    What does All 04-10 refer to?

23  A    That would have referred to the composite score for

24  that district -- I'm sorry.  For that district, the old

25  district, the 02 district, applying the composite score

ADAM FOLTZ - DIRECT

1    to that district.

2    Q    Okay.  We went through an exercise here of adding up

3    a bunch of totals of Republican votes and total votes.

4    So do you have an understanding now what all the races

5    that went into 04-10, that composite score?

6    A    I do.

7    Q    And what are those?

8    A    That would have been the -- all of the statewide

9    races, whether they be federal or state over the 2004 to

10   2010 timeframe.

11   Q    Okay.  We notice that discrepancy with respect to

12   the Governor '06 total.  At the time you were districting

13   in 2011, did you notice that?

14   A    I did not.

15   Q    Okay.  If you could take your calculator out again.

16   I'd ask you to take the Republican vote total of 163,739.

17   A    739?

18   Q    Correct.

19   A    Okay.

20   Q    And I'm going to add 23,000 votes to the total vote

21   column to get an approximation of what the Governor's

22   total would have been if it's close to the AG's race.  So

23   then could you divide by 343,113.

24   A    I'm sorry, the number again?

25   Q    Sure.  343,113.

                    ADAM FOLTZ - DIRECT

```
 1    A    I'm not too familiar with this calculator app here.

 2    I'm sorry, what was the denominator again?

 3    Q    343,113.

 4    A    So 186,739 --

 5    Q    Sorry.  163,739.

 6    A    Plus the 23?

 7    Q    No, that one stays the same.  163,739 stays the

 8    same.  Republican vote share was --

 9    A    I'm sorry.  Let's start from scratch.  The

10    enumerator?

11    Q    163,739.  But the denominator changes.  It's

12    343,113.

13    A    343,113.  Okay.

14    Q    What do you get?

15    A    47.72 percent.

16    Q    So if we could go to column AM, Old Gov T 06?

17    A    Um-hmm.

18    Q    And then we can also refer to column AI, Old Gov Rep

19    06, if we look at the second line, what do you see for

20    Old Gov Rep 06?

21    A    12,223.

22    Q    And what do you see for Old Gov T 06?

23    A    5,450.

24    Q    Does that number seem right to you?

25    A    No, it doesn't.
```

ADAM FOLTZ - DIRECT

1   Q      Again, why not?

2   A      That the Republican votes cast in that district is

3   higher than the total votes cast in that district for

4   that race.

5   Q      Look at the third district.  What is the Old Gov T

6   06 number?

7   A      I'm sorry, the total?  3,263.

8   Q      Okay.  Does that number seem right to you?

9   A      No, it doesn't.

10  Q      And why?

11  A      Again, it is far too low and is being exceeded by

12  just the one-party share of the Republican votes cast

13  there.

14  Q      Okay.  Let's look at, for example, line 23 here.

15  Old Gov Republican 06.  What do you see?

16  A      10,096.

17  Q      And then Old Gov total 06, what do you see?

18  A      11,035.

19  Q      Does that seem right to you?

20  A      No.

21  Q      Why not?

22  A      Far too many Republican votes cast relative to the

23  total.

24  Q      Have you had a chance to review the Old Gov TO 6 in

25  this column?

1   A     I've taken a look at it.

2   Q     What have you found with respect to its accuracy?

3   A     That it is inaccurate data.

4   Q     Okay.

5          MR. KEENAN:  If we could go back to -- sorry.

6   Go back -- keep that spreadsheet up but back to the row.

7   We can skip that.

8   Q     Dr. Gaddie told you that the composite correlated

9   well with his regression model; is that correct?

10  A     Yes.

11  Q     But you didn't do any investigation of that

12  correlation for yourself?

13  A     No.

14  Q     Okay.

15         MR. KEENAN:  If we could put up Exhibit 558.

16  Zoom in a little bit.

17  Q     Can you identify this document for me?

18  A     This is a document I put together that summarizes

19  various summaries, statistics from autobound, as well as

20  what appear to be two different proposed composites, the

21  deviation between the two, and then getting into a

22  history of who, which party, which party's incumbent

23  represented those districts over the course of the prior

24  decade.

25  Q     If we look towards the right on this screen it says

ADAM FOLTZ - DIRECT

1    *All 04-10.*  Do you see that?

2    A    I do.

3    Q    What does that score represent?

4    A    That's the score that we had gone through the

5    exercise of recomputing.

6    Q    Okay.  And I see there it says 51.15 percent;

7    correct?

8    A    Correct.

9    Q    That's familiar to us from before?

10   A    Right.

11   Q    Okay.

12        MR. KEENAN:  I'm going to approach and hand him

13   a copy of this document --

14        JUDGE RIPPLE:  Please.

15        MR. KEENAN:  -- for reference.

16        THE COURT:  Counsel, if it would not interfere

17   too much, we would prefer to take a break at this time.

18        MR. KEENAN:  That's perfectly fine.

19    (Recess      3:24-3:44 p.m.)

20        THE CLERK:  This Honorable Court is again in

21   session.  Please be seated and come to order.

22        JUDGE RIPPLE:  Mr. Keenan, you can proceed.

23   BY MR. KEENAN:

24   Q    Mr. Foltz, before we broke I had shown you a copy of

25   Exhibit 558 and I've given you a paper copy to look at

ADAM FOLTZ - DIRECT

1   because we're going to be doing some questions that

2   involve two different documents.

3        Up on the screen is Exhibit 553, which is a document

4   entitled *Composite Current Curve*, and I believe you, with

5   Mr. Earle, looked through several of these curve

6   documents with this blue and teal and orange and red

7   coloring.  Do you recall that?

8   A    I do.

9   Q    Okay.  And I will represent to you that Dr. Gaddie

10  testified that the Composite Current Curve referred to

11  what's now the old map but at the time was the current

12  map.  So could you -- we're going to look at district by

13  district here.  If you could look at the score for

14  District 6 on the Composite Current Curve, which is going

15  to be around the 50 percent point -- sorry.  First, I

16  guess, maybe go right back to the top and we can get the

17  headings.

18       Column K is what I'm going to be asking you about,

19  the composite.

20  A    Okay.

21  Q    And I'll just ask you, just to start off we'll look

22  at the first one there in row 2.  Could you just read

23  what the composite says there?

24  A    I'm sorry.  Composite -- so column K, row 2?

25  Q    Yeah.

ADAM FOLTZ - DIRECT

1   A      14.1412.

2   Q      And then going right one to 50, what does it say?

3   A      .1502.

4   Q      And then if you, in your head math, what's the

5   difference between those two numbers?

6   A      I'm sorry, say that again.

7   Q      You'll have to do this math in your head, but what's

8   the difference between those two numbers?

9   A      Less than a percent.

10  Q      Okay.  And is it .90 --

11  A      Yes.

12  Q      -- percent?  And then if you go to the 48, what's

13  the number there?

14  A      13.02.

15  Q      And then what's the difference between 48 and the

16  composite?

17  A      48 and then composite would be 1.02.

18  Q      Or 1.1, I believe?  Or is it --

19  A      I'm sorry.  1.1, yes.

20  Q      Okay.

21  A      My apologies.

22  Q      So I'm going to be asking about the column K

23  composite.

24  A      Okay.

25  Q      If we go down to District 6, what does column K say

ADAM FOLTZ - DIRECT

1    there?

2    A     .4946.

3    Q     Then looking at your -- the document I gave you,

4    Exhibit 558, what is the All 04-010 score for District 6?

5    A     59.77.

6    Q     In 2001, did you recognize that there was a 10-point

7    difference between the Professor Gaddie District 6 score

8    and the All 4 010 score?

9    A     No, I did not.  I'm sorry, 2011?

10   Q     2011.  Sorry.

11   A     2011 I did not.

12   Q     Now, if we could move to District 13 on the Gaddie

13   spreadsheet which is about 50 percent level.

14   A     I'm sorry, what was that district again?  13?

15   Q     Yeah.  It's right in the middle here.  It's got bars

16   around it so it helps.  What does column K say for this

17   one?

18   A     50.62.

19   Q     Then what does District 13 say on your Exhibit

20   04-10?

21   A     43.67.

22   Q     In 2011, did you notice there was a 7-point

23   difference between the scores for District 13?

24   A     No, I did not.

25   Q     Okay.  If we could go to District 26, which is going

ADAM FOLTZ - DIRECT

1   to be about 54-percent range.  Okay.  What is column K

2   there for District 26 under the Composite Current Curve?

3   A    35.62.

4   Q    Okay.  And then looking at your All 04-10, what is

5   the score?

6   A    45.42.

7   Q    Did you in 2011 recognize that there was a 9-point

8   difference between Professor Gaddie's curved document and

9   then the All 4 010 number?

10  A    No, I did not.

11  Q    If we could go to District 57, which is going to be

12  about in the 60 percent range, 64, what does column K say

13  for this District 57?

14  A    64.42.

15  Q    What is District 57 on your exhibit, the All 4 010?

16  A    47.26.

17  Q    In 2011, did you realize there was a 17-point

18  difference between District 57 under the Composite

19  Current Curve and then the All 04-010?

20  A    I did not.

21  Q    Go to District 60.  It's in the 52-percent range.

22  Okay.  What does column K say under the Composite Current

23  Curve?

24  A    52.2.

25  Q    And then on your All 04-10, what is District 60's

ADAM FOLTZ - DIRECT

1    score?

2    A      68.12.

3    Q      In 2011, did you notice there is a 68-point

4    difference between the Gaddie score and then the All

5    04-10 score?

6    A      No, I did not.

7    Q      Look at District 61.  What's column K say there on

8    the Composite Current Curve?

9    A      49.86.

10   Q      And what is District 61 under your All 04-10?

11   A      35.98.

12   Q      And did you recognize there was a -- I guess it's

13   13- or 14-point difference on District 61 between the

14   Gaddie Composite Current Curve and the All 04-10 model?

15   A      No, I did not.

16   Q      We'll go to District 65.  What's column K here for

17   District 65?

18   A      52.06.

19   Q      And then what is it on your All 04-10 sheet?

20   A      Sorry, lost my space there.  45.44.

21   Q      Okay.  And did you notice there was a 6 1/2 point

22   difference between -- in District 65 under the Gaddie

23   Composite Current Curve and the All 04-10 model?

24   A      No, I did not.

25   Q      If you go to District 89, it's about 50 percent.

ADAM FOLTZ - DIRECT

1  What does it say for District K under Composite Curve or

2  column K for District 89?

3  A    50.51.

4  Q    Okay.  And Mr. Earle walked through a series of

5  spreadsheets that had some categories of lean, swing,

6  strong.  Do you remember that?

7  A    Um-hmm.

8  Q    That would have been -- what column would that have

9  been in?

10 A    Under which number?

11 Q    89.  The 50.51 under Composite Current Curve?

12 A    That would have been a toss-up.

13 Q    And then what is your District 89 on the All 04-10?

14 A    89 is 55.76.

15 Q    Okay.  At the time, did you notice that 5-point

16 difference between the two scores?

17 A    No, I did not.

18 Q    And then under that rubric we saw about the strong

19 and the lean and swing districts.  Under the All 04-10,

20 how would District 89 be characterized?

21 A    On this exhibit?  It would have been a strong GOP.

22 Q    Okay.  Why did you not notice any of these

23 discrepancies at the time back in 2011?

24 A    We really didn't look at the composite curves.

25 Q    Did you do any comparison of the specific numbers in

ADAM FOLTZ - DIRECT

1    various districts, how they came out under the curve

2    documents and then under the All 04-10 score?

3    A    No.

4         MR. KEENAN:  If we could put up the exhibit, the

5    one you have, 558, we'll put it up on the screen.  And

6    here, if we could move over all the way to the right.

7    Okay.

8    Q    Now, here we see a series of columns that have the

9    years 2002 through 2010 and some red and blue coloring.

10   What do those represent?

11   A    Those would represent the incumbent party that held

12   the seat after the elections and the years up in the top

13   row.

14   Q    Okay.  So if we look at District 2, which is the

15   second one down, what is the All 04-10 score of that

16   district?

17   A    54.93.

18   Q    And what part -- we'll just look from '04 to '10 in

19   this because that's the years of the composite.  What

20   party won this seat over that time frame?

21   A    In 2004 and '6 it was Republican, and then it

22   flipped to Democrat in the 2008 election and then back to

23   Republican in 2010.

24   Q    Okay.  And who was the representative in District 2

25   for that -- the incumbent for that 2008 election?

                    ADAM FOLTZ - DIRECT

1    A    The incumbent was at the time Representative Frank

2    Lasee.

3    Q    And what party was he from?

4    A    He was a Republican -- he is a Republican.

5    Q    And it shows that he lost in the 2008 election;

6    correct?

7    A    That's correct.

8    Q    And what was the partisan score again?

9    A    54.93.

10   Q    Do you remember what percentage of the vote

11   Representative Lasee got in that election?

12   A    I don't remember what Representative Lasee had in

13   that -- yeah, I don't remember what it was.

14   Q    We can call up Exhibit 537, which is GAB election

15   results.

16            MR. KEENAN:  Go to page ten.  That's the next

17   page.  And Assembly District 2 is at the bottom.

18   Q    Can you tell us what the vote totals were in that

19   race?

20   A    Ted Zigmunt, Democrat, 52.1 percent.  Representative

21   Frank Lasee was 47.82.

22   Q    And this was a seat with a 55 percent partisan score

23   in the All 04-10?

24   A    That's correct.

25   Q    And then what happened in the 2010 -- subsequent

ADAM FOLTZ - DIRECT

1  2010 election?

2  A    That seat went back to Republican.

3  Q    Did Ted Zigmunt, who won in 2008, run as an

4  incumbent in 2010?

5  A    Yes.  Yes, he did.

6  Q    Do you know what the vote percentages were in the

7  2010 election?

8  A    Not off the top of my head, no.

9         MR. KEENAN:  We can go to Exhibit 538.  We can

10 go to page ten again.  And I guess we have to go up one

11 to see, it spans two pages.

12 Q    And can you read that?  Blow it up.

13 A    It's a little fuzzy.  Looks like 37.7, but it's a

14 little blurred.

15 Q    And go down to the bottom.  Okay.  So yeah, what

16 does that say?

17 A    37.7 percent.

18 Q    Okay.  Then if we go to the next page, what is the

19 Republican candidate's share of the vote?

20 A    André Jacque, 62.23 percent.

21 Q    Okay.  And that was running against an incumbent

22 Democrat?

23 A    That's correct.

24 Q    And the partisan score again was 55?  That was the

25 All 4 010 score there?

ADAM FOLTZ - DIRECT

1   A     Yes.

2   Q     Okay.  Turning back to Exhibit 553 or 558 -- sorry.

3         JUDGE RIPPLE:  Before you go to your next

4   exhibit, if I may, Mr. Keenan, I'd like one of my law

5   clerks to please get the IT person to come onto the bench

6   here and to fix the screen so we know what we're doing.

7   (Pause)  Thank you very much.

8       Mr. Keenan, you may proceed.

9   BY MR. KEENAN:

10  Q     We'll go back and look at Exhibit 558.  Can you tell

11  me what the partisan score of District 5 is under the All

12  04-10 score?

13  A     53.74.

14  Q     And which party won this seat from 2004 through

15  2010?

16  A     It was Democrat in 2004, '6 and '8 and Republican in

17  '10.

18  Q     Where is District 5 in the state?

19  A     That would be -- at this point this would have been

20  a Kaukauna/Little Chute base seat.

21  Q     And who was the Democrat representative who won that

22  seat three times?

23  A     Tom Nelson.

24  Q     Go to District 25, I guess.  For everyone looking

25  along that can't see the district on the left, it's the

ADAM FOLTZ - DIRECT

1    one that has an "I," the one Independent we see in 2010

2    about halfway down the page.  What's the partisan score

3    for this district?

4    A    52.79.

5    Q    And which party won this seat in -- from 2004

6    through 2010?

7    A    2002, '4, '6 and '8 were Democrat and then it flips

8    to Independent, but that was a flip in the person's party

9    affiliation, not in the individual.

10   Q    And who was the representative who won that seat

11   during that time frame?

12   A    That would have been Representative Ziegelbauer.

13   Q    And he was a Democrat but then ran as an Independent

14   in 2010?

15   A    Yes.

16   Q    Could we go to the next page, go to District 80.  I

17   guess I could ask you some questions while we wait for

18   the technology.  Who was the representative from District

19   80?

20   A    That was my former boss, Representative Brett Davis.

21   Q    And this one is about halfway down the screen here.

22   What's a partisan score --

23        MR. KEENAN:  I think I can highlight here for

24   the Court.  Oops.  It's right above my poorly made line.

25   Q    What's the partisan score for District 80?

ADAM FOLTZ - DIRECT

1    A    42.15.

2    Q    And what party won that seat?  I guess we can just

3    do this whole decade there.

4    A    It was Republican in 2002, '4, '6 and '8, and then

5    Democratic after the 2010 election.

6    Q    And you -- were you involved in that 2008 election?

7    A    I was.

8    Q    Okay.  What was your role?

9    A    I ran Representative Davis's reelect campaign.

10   Q    Okay.  What kind of year across the state was it for

11   Republicans in 2008?

12   A    Not a good one.

13   Q    What do you mean by that?

14   A    Pretty heavy losses at all levels of the ballot.

15   Q    How did Brett Davis manage to win a seat with a

16   42-percent partisan score in a bad year for Republicans?

17   A    Lot of reasons, but primarily all stemming from

18   Brett was -- Representative Davis was a very, very hard

19   worker, always knocking on doors, always raising dollars,

20   always working hard to connect with the voters in his

21   district.

22   Q    And what about Representative Davis's political

23   positions?

24   A    I mean Representative Davis was definitely more of

25   the moderate.  I would probably say it's safe to say he

ADAM FOLTZ - DIRECT

1    was more of a moderate Republican.

2    Q    Okay.  Can you name me the partisan score for

3    District 90?

4    A    49.59.

5    Q    That's a little bit above where I'm at.  Who was the

6    representative for District 90?

7    A    That was Karl Van Roy.

8    Q    And who -- which party won the seat through the

9    whole decade of the 2000's?

10   A    Republican.

11   Q    Was that Karl Van Roy for the whole time?

12   A    Yeah.  Yes, it would have been.  He retired after

13   going into 2012.  So it would have been Representative

14   Van Roy the entirety of the decade.  Actually I don't

15   know that for an absolute fact.  I don't remember when he

16   came in, so I don't know if it reaches all the way back

17   to '02.

18   Q    And then District 96, what's the partisan score of

19   -- on All 04-10 for District 96?

20   A    45.32.

21   Q    And what party won that district throughout the

22   whole decade of the 2000's?

23   A    Republican.

24   Q    Who's the assemblyperson that won those races?

25   A    It's currently Lee Nerison, but similar to the 90th,

                    ADAM FOLTZ - DIRECT

1    I can't remember if Representative Nerison was the

2    entirety of that decade.  Prior to that it would have

3    been Representative DuWayne Johnsrud.  But again, I don't

4    remember what year that handoff happened between the two

5    of them.

6    Q    Okay.

7              MR. KEENAN:  If we could scroll down to the

8    bottom of this page.

9    Q    We see some numbers here that list that describe --

10   the tabulation is at the bottom of this document.

11   A    Sure.  This is a tabulation of the number of seats

12   held by each party.  So that would account for the first

13   three rows for each election cycle over the decade.

14   Q    And then if you could just read how many seats the

15   Republicans won in each of the years in this decade.

16   A    Sure.  2002 there were 58 Republicans -- just

17   Republican seats?  Or do you want both?

18   Q    We can do both.

19   A    In 2002, 58 to 41 Republican to Democrat.  2004, 60

20   to 39 Republican to Democrat.  2006, 52 to 47.  In 2008,

21   46/52 with one Independent.  And then the 2010 cycle, 60

22   Republicans, 38 Democrats, 1 Independent.

23   Q    Okay.  And so this last column here, was that the

24   configuration of the Assembly in early 2011 when you said

25   about drafting districts for the new census?

ADAM FOLTZ - DIRECT

1    A    That's correct.

2    Q    Why don't we get back to that, to the process of

3    drafting.  What area of the state did you begin drafting

4    the districts for after the census data was complete?

5    A    Generally you would always start in Milwaukee.

6    There's obviously concerns in Milwaukee with regard to

7    sensitivity of minority districts and minority

8    representation that are unique to Milwaukee.  So you want

9    to make sure you get those right before you start

10   progressing elsewhere in the state.

11   Q    Okay.  Who did you consult with in drafting the

12   districts for Milwaukee?

13   A    Legal counsel and Dr. Gaddie.

14   Q    And why did you consult with them?

15   A    Expertise on issues related to the Voting Rights

16   Act.

17   Q    Mr. Earle got into some meetings with Republican

18   members of the Assembly.  When did you start meeting with

19   members of the Assembly with respect to the new

20   districts?

21   A    So there was that lag period we had discussed

22   between receipt of the census data and being able to put

23   it in a usable form.  So there was a bit of a lag there.

24   And then I had a bit of time where I was doing the

25   process that we had talked about earlier with regard to

ADAM FOLTZ - DIRECT

1  evaluating how the districts sat and the counties in some

2  of these other areas with regard to over and

3  underpopulation.  So once I was able to get that in a

4  usable form, I started meeting with the members right

5  away.

6  Q    What did you discuss with the members when you met

7  with them that first time?

8  A    Generally the discussions were to give them a

9  picture of where their district, their 02 district sat,

10  particularly with regard to over and underpopulation;

11  letting them know that their district was

12  over/underpopulated and by how much, and then got a sense

13  from them on what they would like to see the change in

14  their district configuration to be.

15  Q    How did you respond to whatever changes they would

16  request in their districts?

17  A    I mean generally you would take a meeting with a

18  member and then just attempt to draw a district that

19  accommodated that.

20  Q    What did you see your role with respect to what the

21  members of the Assembly were requesting from you for

22  their new districts?

23  A    Generally I think my role was -- there were a couple

24  of facets to it.  First off, it's as you're drawing a

25  district, attempting to accommodate the request of a

ADAM FOLTZ - DIRECT

1   member, you're always cognizant of some of the

2   constitutional requirements of redistricting.  First and

3   foremost, you're making sure that you're not running

4   afoul of any of those in order to accommodate a member.

5       And I think secondly kind of building off of that is

6   as you are drawing these districts and meeting with

7   members and starting to get a better feel of the overall

8   picture of the state or seeing where there are areas

9   where members may have disagreement or are looking to get

10  the same territory, things like that, I think a big part

11  of the job too was making membership aware of that,

12  particularly when we were doing the original meetings

13  with leadership, to say if you decide to go with option

14  A, this certain member is affected in a way that they

15  would prefer not to be.  So be -- you know, be cognizant

16  of that because you are going to be talking to that

17  member attempting to get their vote for this map.

18  Q    Why didn't you meet with the Democratic legislators

19  at this time?

20  A    I don't -- I didn't work for the Democrats.  I don't

21  work for the Democrats.

22  Q    What was the computer program called that you

23  drafted on?

24  A    Autobound.

25  Q    Can you just give us a description of how that

ADAM FOLTZ - DIRECT

1    computer program worked when drawing a map?

2    A    So the way we had it set up is that there were -- it

3    was dual monitors set up.  There was a left and a right

4    monitor.  Generally the way -- and there's some how users

5    choose to set it up.  But the way I set it up is on the

6    left, I would have the map of the State of Wisconsin, and

7    on the right, I would have the matrix, which is

8    effectively the Excel-like spreadsheet that accompanies

9    the map itself.  So I would have the map and kind of the

10   map-drawing tools, the palette for autobound, the buttons

11   and whatnot on the left.  And then on the right, it was

12   more -- there may have been some other buttons over

13   there, but generally it was the matrix, it was the output

14   of the matrix.

15   Q    So what kind of data is in that matrix?

16   A    It depends on the tab you're in.  It could be

17   population data, could be minority data kind of built off

18   of population, make it more focused.  Minority tab, I

19   believe, was standard.  And then another tab that had

20   political data with it as well.

21   Q    So when Mr. Earle was asking you some questions

22   about whether the partisan score was available, where was

23   that partisan score available when drafting?

24   A    I don't remember exactly where I set that up.  I

25   think it's a safe assumption to say that the tabs within

ADAM FOLTZ - DIRECT

1    the matrix, the political tab had the historical data and

2    then that user define column, which would have been the

3    All 04-10, probably sitting off to the right of that.

4    Q    Okay.  And focusing on the map part of it, how would

5    someone who is using this program go about drawing

6    districts?

7    A    Districts are drawn by assignment.  So you select --

8    so you're working in a given district.  Let's say the

9    First Assembly District, it's always easy to pick on that

10   one since it's a peninsula.  You're in the First Assembly

11   District.  It's the active assignment.  You select a

12   certain level of geography, whether it be census block at

13   the smallest or all the way up to multiple counties at

14   the largest.  So on the example of the First Assembly

15   District, right away you're taking Door County, selecting

16   that county level, and assigning it to the first.  And

17   the software does the various plugging and chugging and

18   turns it from kind of a blank white outline map to

19   colored coded for that First Assembly District

20   assignment.

21   Q    Okay.  And you mentioned that you had started

22   drawing Milwaukee.  Could you explain how Milwaukee ended

23   up getting districted by you, Mr. Foltz, and Mr. Ottman?

24   A    Milwaukee, because of the unique concerns, you're

25   very reliant on your experts.  You're talking to legal

ADAM FOLTZ - DIRECT

1    counsel, Dr. Gaddie, and just getting a sense of what

2    they believe the proper tolerances are, where you should

3    be shooting for with regard to the percentages of the

4    minority populations in the Milwaukee districts.

5    Q    Was the configuration for the Milwaukee districts

6    agreed upon before proceeding to the rest of the state?

7    A    Generally, but there were amendments offered to the

8    configuration of the Hispanic districts.

9    Q    Okay.  But in terms of actually drawing in the

10   autobound program, after Milwaukee was set did you go

11   back and try to change districts in Milwaukee?

12   A    Not that I can think of.  It was fairly locked in by

13   the time the leadership got together to go through the

14   regional alternatives.

15   Q    We saw in your document about over/underpopulation

16   that Milwaukee had lost population relative to the state.

17   What did that cause with respect to the districts in

18   Milwaukee?

19   A    Again, all things being equal, districts that are

20   underpopulated are going to bump out a level to grant

21   more population to make ideal.

22   Q    Okay.  Now, when you're drawing a draft map, what

23   kinds of things were you considering when you were

24   drawing a draft map?

25   A    Yeah.  It goes back to the member meetings.  As you

ADAM FOLTZ - DIRECT

1    are meeting with more and more members, you're getting a

2    feel of what they would like to see their districts look

3    like.  So first and foremost, you're always very

4    sensitive to population equality because it's just the

5    most accessible and easily digestible statistic while

6    you're drawing districts.  And also the member concerns.

7    And the member requests are, you know, the things that

8    you're really kind of looking at as you draw individual

9    districts.

10   Q    Okay.  In drawing individual districts, did you

11   consider the compactness of the various districts?

12   A    Compactness is a little bit of a -- is a little

13   different in the sense that compactness is evaluated on a

14   map-wide basis.  But that said, when you're drawing a

15   district, you kind of know just by eyeballing it if a

16   district is maybe getting a little bit less compact on

17   you.  So you don't have a running score of compactness in

18   the various metrics that are used, but you do just have a

19   visual sense of where a district is.

20   Q    And how would, in the autobound program, one figure

21   out the compactness of a plan once you had a full

22   completed state plan?

23   A    Right.  So you would have a full plan.  Let's assume

24   all 99 assembly districts in this case are assigned.  If

25   memory serves, the way the software would work is that

ADAM FOLTZ - DIRECT

1   you would run the compactness report and the software

2   would have to do various drawings on the map itself.

3   Because compactness is often a ratio of one shape versus

4   another shape, so the area of your district relative to

5   another area, like the smallest circumscribing circle,

6   things like that.  So the software would actually have to

7   go through and draw those various circles, and I think,

8   like, polygons like context halls and things like that so

9   it could then have the ability to compare the ratio,

10  depending on the measurement, the ratio of those shapes

11  versus another ratio, whether it be the area of the

12  district, the perimeter of the district, things like

13  that.

14  Q    And then what kind of data was generated after it

15  had run that analysis?

16  A    After it had run the shape drawing and the math that

17  kind of feeds off of it, it would then pop up a

18  proprietary report that was amenable to autobound.

19  Q    What did that report show?

20  A    It depended.  There were different versions of the

21  reports.  I can't remember which one I generally ran, but

22  there were a couple in there that would summarize the

23  common compactness measurements, the Reock score, the

24  Popper-Polsby, I think, is another one.  So it would go

25  through and it would generate scores for each individual

ADAM FOLTZ - DIRECT

1   district and then at the bottom it would give you a

2   summary saying your map's average is point whatever for

3   that given statistic.

4   Q    Did you print those out from the computer program?

5   A    Generally, no.

6   Q    Why not?

7   A    They were just there in the software.  So if I went

8   back into a plan that I had gone through, that process of

9   having the software generate that, it would just be kind

10  of sitting there so you could go back to it and it would

11  pop up on you.

12  Q    Did you consider contiguity in drafting the

13  districts?

14  A    Contiguity is a unique one in Wisconsin given prior

15  precedent with -- regarding geographic and literal

16  contiguity versus municipal contiguity.  I can't remember

17  if autobound actually gave you a report on contiguity or

18  if it was just an error in the software because Wisconsin

19  doesn't have a literal or geographic contiguity standard

20  as a municipal contiguity standard.  So if you have a

21  municipal annexation outside of the general boundary,

22  sewage treatment plant, airport, things like that, the

23  software is going to say this isn't contiguous.  This box

24  over here doesn't touch the rest of the city.  So it's

25  going to pop up and give you an error.  I can't remember

ADAM FOLTZ - DIRECT

1   if that was a report or more just an error message.  I

2   think it was an error message.

3       But with Wisconsin's unique standard on contiguity,

4   then you just kind of have to go through and say okay,

5   the Racine airport is an example, it's from the '02 map

6   of this rectangle doesn't touch the rest of the City of

7   Racine.  So as the map drafter, you need to just make

8   sure that that is, in fact, what you're intending to

9   assign in that given discontiguity.

10  Q    Did you consider -- first, what is

11  disenfranchisement?

12  A    Disenfranchisement in the context of redistricting

13  in the context of Wisconsin is that whenever you start

14  shifting district boundaries, there are going to be folks

15  that move between Senate districts.  And any time you

16  have that type of movement, in particular in Wisconsin in

17  2002 if you moved -- if voters were moving from even to

18  odd-numbered districts, instead of waiting four years

19  between Senate elections, there would be a two-year delay

20  in that process.  So again, specifically it's even-to-odd

21  movements when we were drafting that map in 2011.

22  Q    How did you go -- did you consider

23  disenfranchisement in drawing draft maps?

24  A    Disenfranchisements, you can notice it when you're

25  drawing individual districts.  But I think it's another

ADAM FOLTZ - DIRECT

1   one of those metrics where the back-end report is really

2   where you get a sense for where you're sitting.  You can

3   somewhat tell what's happening when you're drawing it,

4   but you're drawing Assembly districts, not Senate

5   districts.  So you need to constantly be thinking is this

6   an even or an odd Senate district and accounting for that

7   movement.  But you really don't see that in that kind of

8   stark number in front of you until you finalize a plan --

9   actually you finalize a plan, changed over to a Senate

10  plan.  So take Districts 1, 2 and 3, merge them together

11  to Senate District 1, and then run a report off of that

12  Senate version of the Assembly plan, then you get to see

13  the disenfranchisement number.

14  Q    Would you run disenfranchisement reports on your

15  plans?

16  A    Would we?

17  Q    Yes.

18  A    Yes.

19  Q    Okay.  How did you -- did you take into account the

20  residences of incumbents when districting?

21  A    Yes.

22  Q    How did you do that?

23  A    Part of the standard autobound dataset was a layer,

24  I don't know how else to describe a layer, but just a

25  geography that were the dots or diamonds of where LTSB

ADAM FOLTZ - DIRECT

1    had plotted members to be residing.  So you could turn

2    off that layer and just simply see little dots or

3    diamonds reflecting their residence.

4    Q    And why would you take incumbents' residences into

5    account when districting?

6    A    It's definitely something members care about,

7    whether or not they are still in their district when a

8    map is proposed and obviously it's something that

9    leadership needs to take into account as they're trying

10   to win votes for the product.

11   Q    Mr. Earle went into a number of pairings that

12   happened.  Was it an intention effort to pair Democrats

13   with Republicans or Democrats with each other?

14   A    No, not really.

15   Q    Okay.  Mr. Earle also listed off the names of

16   several Democrats who were paired with Republicans in

17   less favorable districts.  Do you recall that?

18   A    I do.

19   Q    Do you know if any of those Democrats remained in

20   the Assembly despite that pairing in the 2012 election?

21   A    Yeah.  A good number of them did.

22   Q    Do you know any specific members?

23   A    Representative Pasch was back in the Legislature

24   after that pairing.  Representative Jorgensen was as

25   well.  Representative Kessler.  There's a Senate pairing,

ADAM FOLTZ - DIRECT

1    Senate Wirch came back after a pairing.  I'm probably

2    missing somebody, but that's off the top of my head.

3    Q    I notice there was a pairing of André Jacque for the

4    Republicans.  Did he end up moving districts as well?

5    A    He did.

6    Q    Okay.  Now, if they were paired, how did they end up

7    still in the Legislature?

8    A    Change residence.

9    Q    Mr. Earle went into some questions about the

10   availability of the partisan score while drawing

11   districts.  Did you check on that partisan score as you

12   were making individual assignments of geographic areas to

13   districts?

14   A    Generally when you're assigning, you're in that --

15   we talked about the tabs in the autobound matrix.

16   Generally when you're assigning, you're looking at that

17   kind of more general population tab because you're really

18   trying to drill down that population to an acceptable

19   deviation.  So you're driving down that number, you're

20   driving down that number, and then by the time you're

21   feeling comfortable with where that deviation is or where

22   this member concerns -- where the member concerns or

23   requests are juxtaposed against the population deviation,

24   then you could jump over to a tab that would have the

25   political data in it which would be the historical

ADAM FOLTZ - DIRECT

1    reconstitution of the races and also the composite would

2    have been there.

3    Q    Did you draw districts where you clicked and

4    unclicked based on getting a higher partisan score?

5    A    Not really.  I mean you can -- when you draw a

6    district, you just simply have a district, but you know

7    perfectly well you're going to be back in that part of

8    the state drawing again and again and again as you have

9    more member concerns or as you get a better feel for

10   where the members are.  So it's not really about drawing

11   a district and undoing it, it's about drawing a district,

12   moving on, and knowing you're going to come back in

13   another week or two when you meet with more members of

14   the Assembly, or at least specifically for my kind of job

15   description where I was meeting with the members of the

16   Assembly you would just get more information every time

17   and go back to the map again and again and again.

18   Q    You've testified that the partisan score was used

19   more as a back-end analysis.  What did that mean?

20   A    I think back-end analysis has a context in both kind

21   of the micro to the district sense and the macro to the

22   overall map where in going back to kind of the tabs in

23   the autobound matrix, you draw a district and it is what

24   it is.  Then you can see what the partisan composite is.

25   If you have a district that's kind of still cooking and

ADAM FOLTZ - DIRECT

1    still underpopulated, the number doesn't mean much

2    because it's a malapportioned district.  So you really

3    don't get a sense for where the partisan composite truly

4    is until you get the district, then you can jump over to

5    that tab and get a better sense on the partisan number of

6    that new district, again whether it be historical, races

7    reconstituted or that composite number itself.

8    Q    And what about with respect to the map as a whole?

9    A    The map as a whole, so those would be the plan

10   comparison sheets, the red and blue enumeration.  So when

11   I say back-end analysis, with regard to those sheets,

12   that's kind of the macro.  It's -- again, I hate saying

13   like locked in, because the map was always changing, but

14   you get a statewide plan finalized, all 99 assembly

15   districts.  If you want to go as far as reconstituting

16   the Senate plan and then having that as well, you can

17   then take that composite column from autobound and then

18   move it over into those Excel spreadsheets that I was

19   talking about earlier with Mr. Earle.

20   Q    When you were drawing draft plans, did you have an

21   expectation that one of your plans would be adopted

22   wholesale by the Legislature?

23   A    No.

24   Q    Why not?

25   A    It was generally the understanding that each of the

ADAM FOLTZ - DIRECT

1  map drawers, so myself, Mr. Handrick and Mr. Ottman,

2  would pull regional alternatives from a map that we

3  were -- I don't want to say presenting a map, but we are

4  presenting regional alternatives from a broader map and

5  that leadership then would ultimately debate the

6  alternatives, weigh the pros and cons, select the

7  regional alternative, and then it would move on to that

8  process where you would try to mash together the various

9  regional alternatives and combine them into one map.

10 Q    We had some testimony about the regional

11 alternatives.  Can you just explain how you selected

12 regional alternatives to present to the leadership?

13 A    Generally I was pulling from the map that we've seen

14 the heading for earlier, it was the one file named

15 Milwaukee Gaddie 416 version 2B.  Generally I was pulling

16 regional alternatives from that map.  But I want to put

17 the copy out there.  I'm fairly sure that in a few

18 regions where differences could be fairly isolated

19 without rippling out and changing the Milwaukee broader

20 Gaddie 416 map, I think I was offering kind of A and B or

21 A, B and C versions within that broader plan to

22 leadership as well.  So if you had two members that were

23 wanting the same piece of turf, that I could present an A

24 version and a B version of that that wouldn't have

25 broader ripple effects on that Milwaukee Gaddie plan.  So

ADAM FOLTZ - DIRECT

164

the point being is that although I was generally pulling

from one map, I'm pretty sure that there were a few

instances where I was pulling kind of minor alterations

within that broader plan.

Q    Who else was presenting, with respect to, like, one

particular region, who else was presenting an option for

that region?

A    Options would also be presented by Mr. Ottman and

Mr. Handrick.

Q    And then we had some documents shown about the

meetings with the legislative leadership.  Could you

describe what happened in those meetings?

A    Generally the meetings were following, just taking a

region, everybody would submit a regional alternative or

possibly more than one, going back to that prior

testimony, and leadership would just talk through it and

make a decision ultimately on what region they wanted to

adopt -- or I shouldn't say adopt, but present as the

draft map for further debate.

Q    And then after the various regional alternatives had

been selected by leadership, what was the process then?

A    The memory is a little foggy on this one, but we had

the regional alternatives and then we had to consolidate

it down into one map.  And I can't remember which one of

us really took the lead on that because I would think at

ADAM FOLTZ - DIRECT

1    that point we were probably -- instead of trying to do

2    three separate maps on three separate computers, we were

3    probably trying to pull it together at that point.  But I

4    can't remember which one of us was actually sitting down

5    taking the various regional decisions and trying to mash

6    them together.

7    Q    You mention mash together.  Why was that necessary?

8    A    If you -- if leadership was determining -- was

9    picking between two regions from two different map

10   drafters' proposals, they wouldn't necessarily fit

11   together 100 percent.  So you could have one concept

12   adopted in northwestern Wisconsin and another in

13   northeastern Wisconsin and the boundaries of those two

14   options wouldn't necessarily merge 100 percent.  So you

15   tried to take those and put them together in a way that

16   would accommodate leadership's request in that area to

17   the best of your ability.

18   Q    We've seen reference to the team map.  What is the

19   team map?

20   A    If it isn't the final one that was pushed, put

21   forward in the public domain, it was very close to it,

22   and it was the result of that mashing process of taking

23   the various regional alternatives and putting them all

24   together.

25   Q    Okay.  After the team map has been developed, did

                    ADAM FOLTZ - DIRECT

1  you meet again then with individual Republican

2  legislators?

3  A    Yes.

4  Q    Okay.  If we could put up Exhibit 552.  And we saw

5  this with Mr. Earle, a version of this.  Who is

6  Representative Gary Bies?

7  A    Representative Bies was the representative for the

8  First Assembly District at the time we were drafting the

9  map.

10  Q    Okay.  Here, what kind of information were you

11  conveying in this memorandum?

12  A    Well, there's district population, old and new.

13  There's political races.  And also a reference to whether

14  or not the enumeration of the district remains the same

15  or if the enumeration changed.

16  Q    If we could just go down to the list of races.

17  Could you identify the races that you included on this

18  memo?

19  A    Sure.  Working top down:  Governor Walker 2010;

20  former Attorney General JB Van Hollen 2010; Senate John

21  McCain in 2008; former Attorney General JB Van Hollen in

22  2006, and former President Bush in 2004.

23  Q    Why did you choose this selection of races to

24  include?

25  A    I don't remember exactly why, but I think it's fair

ADAM FOLTZ - DIRECT

1  to say that this is a pretty decent cross section of how

2  things moved over the decade.  You had some 50/50 races

3  in there.  You had some good years, some bad years.  I

4  think also by having two races with Attorney General --

5  former Attorney General Van Hollen and Governor Walker, I

6  think it also shows kind of an incumbency aspect to it.

7  So you had a first-time candidate in a general statewide

8  election, Governor Walker in 2010, and you had JB

9  Van Hollen who had four years of incumbency.  So I think

10  less of a time series kind of look at things, but just

11  simply what name ID and familiarity -- how that can

12  hypothetically impact a district.

13  Q    Now, these five races, were these parts of the 04-10

14  composite?

15  A    Yes.

16  Q    Okay.  And what kind of range do we see for the

17  results here in the new district?

18  A    On the low end we have Senator McCain in 2008 at

19  42.59 and at the high end we have JB Van Hollen from 2010

20  at 60.74 percent.

21  Q    And if we go to the next page of the document.

22         MR. KEENAN:  Next page.  It repeats this page.

23  Okay.

24  Q    What do we see here?

25  A    I'm assuming this is the new -- actually could you

ADAM FOLTZ - DIRECT

1   scroll down a little bit to the southern boundary of

2   the -- okay.  So what we have here would be the new

3   district, which would be denoted by the light tan.  And

4   then it appears that the red would probably be the old --

5   the boundaries of the '02 plan overlaid on that.

6   Q    Okay.  We'll go back to the Merged Matrix Output,

7   Exhibit 556.  You mentioned that there was a mail merge

8   to create those memos.  Where did that come from?

9   A    The source data I believe is this sheet.

10  Q    Okay.

11  A    Or this Excel file.

12  Q    If we could go over to the new districts.

13       MR. KEENAN:  So we have to go over a ways.

14  There.

15  Q    So we see *new district* in column BG.  What does that

16  refer to?

17  A    BG.  New district is the district number.

18  Q    And is that the district -- that's the district in

19  the -- that would become Act 43?

20  A    Yes.

21  Q    Okay.  And then we see *new TA persons*.  What does

22  that mean?

23  A    That would have been the new total population for

24  the district.

25  Q    And then *new target*, what is that?

ADAM FOLTZ - DIRECT

1    A    That is ideal population.

2    Q    Move it over a few columns.  And then we see a few,

3    like, *new white*, *new black*, *new Hispanic*.  What are those

4    numbers?

5    A    The various racial -- the various racial populations

6    for that district.

7    Q    Okay.

8         MR. KEENAN:  And then if we go -- keep going

9    right.  Keep going.  Then we see -- keep going.  Okay.

10   Q    CN says *New Pre Rep 08*.  What does that stand for?

11   A    That would have been the Republican vote share from

12   the -- or the Republican votes cast in the new district

13   from the '08 presidential race.

14   Q    Then we go to the next column.  *New Pres 08 T*.  What

15   does that stand for?

16   A    The total for that same race for that district.

17   Q    We've gone over this.  With the old plan, are the

18   new plan numbers -- are the races in the new plan as part

19   of the composite the same as the ones that were used to

20   analyze the old plan?

21   A    Yes.

22   Q    Okay.

23        MR. KEENAN:  Why don't we move right to the Gov

24   '06 race.  Keep going for a little bit.  Okay.  Stop.

25   Q    And column DC is New Gov_Rep 06?  What's that

                    ADAM FOLTZ - DIRECT

1  column?

2  A    That's Republican votes cast in the '06

3  gubernatorial election.

4  Q    What's the vote total there?

5  A    13,005.

6  Q    Okay.  And then if we look at *New Gov T 06*, DG,

7  column DG, what do you see there?

8  A    2,217.

9  Q    And again, does that seem right to you?

10  A    No, it's --

11  Q    Why not?

12  A    The votes cast for the Republican, Mark Green in

13  this case, are higher than the total votes cast.

14  Q    We won't go through every one line-by-line, but if I

15  could have you do your calculator again.  And so the

16  total Republican votes of all of these columns are

17  172,365?

18  A    172,365.

19  Q    And if you could divide that by 346,502.

20  A    49.74 percent.

21  Q    Are you sure?  Maybe I added that wrong.

22  A    Did I -- I'm sorry.  Could you read back the

23  numbers?  I may have typed it in wrong.

24  Q    Scratch that.  I think I have an error in my

25  numbers.  Go back to the -- okay.  We'll just go through

ADAM FOLTZ - DIRECT

1    the Gov 06 column here again.  We see in District 2 it

2    says 5115.  Does that number appear right to you?

3    A    No, it doesn't.

4    Q    And then 2669 in the row 3, does that look right to

5    you?

6    A    No, it doesn't.

7    Q    And why do those numbers not seem right?

8    A    Again, the Republican votes casted are higher than

9    the total cast in those examples.

10   Q    And have you had a chance to look through that whole

11   column?

12   A    I have.

13   Q    And what's your understanding as to whether that

14   number is right in any of the districts?

15   A    It's wrong the whole way through.

16   Q    Okay.  Did you notice that there was an error in

17   this Gov TO 6 column at the time of districting in 2011?

18   A    No, I did not.

19   Q    If we could go to the race tabulation tab on the

20   bottom here.  It's like the fourth tab over.  And maybe

21   we could go to the top.  Can you just explain what this

22   represents?

23   A    So this is district by district, taking the votes

24   cast in any given election and then denoting whether it

25   was a Republican or a DEM win within that district for

ADAM FOLTZ - DIRECT

1  that race.

2  Q    And is this an actual reconstitution of the -- for

3  example, the Bush 2004 vote in the new District 1?

4  A    I'm sorry.  Say that again?

5  Q    Sure.  Is this like using the actual election

6  results from the George W. Bush 2004 election and showing

7  how that would -- those votes totaled up in the new

8  District 1?

9  A    Well, this is old -- are we looking at --

10 Q    Sorry.  Sorry.  I had a bad question.  Like the new

11 Bush '04, what does that represent?

12 A    That would have been the George W. Bush vote share

13 under the new First Assembly District.

14 Q    And then what is the old Bush '04 number?

15 A    52.08.

16 Q    What does it represent?

17 A    I'm sorry.  The race results for George W. Bush in

18 the old First Assembly District.

19 Q    Okay.  Then if we move over, it says *Old JB 06*,

20 which I assume refers to my old boss, JB Van Hollen.

21 What does that refer to?

22 A    That would have been JB Van Hollen's vote share in

23 the First Assembly District under the 2002 plan.

24 Q    Then we move over to the new JB 06.  What does that

25 refer to?

ADAM FOLTZ - DIRECT

1   A      That would be the vote share for JB Van Hollen under

2   the new map.

3   Q      If we go to the bottom of this document, we see it

4   tabulated here old JB 06.   What does that show?   This is

5   in red/blue boxes here?

6   A      You said old JB 06?

7   Q      Yes.   Correct.

8   A      51.48.

9   Q      What does that mean?

10  A      So 51 of the seats under the old map JP Van Hollen

11  would have won them, gotten more than 50 percent within

12  that Assembly or within that assembly district's

13  boundaries.

14  Q      What kind of election was the JB Van Hollen

15  election?

16  A      It was a outlier.   It was a bad year for Republicans

17  and JB Van Hollen was able to win.

18  Q      How big of a margin did he win by?

19  A      It was close if memory serves.

20  Q      Okay.   About a 50/50 type of election?

21  A      Right.

22  Q      Okay.   And then what does this show under the new

23  map?

24  A      It shows -- for that tabulation?

25  Q      Yes.

ADAM FOLTZ - DIRECT

174

1    A    54 JB Van Hollen seats and then 45.

2    Q    So that's an increase of three from the old plan to

3    the new plan?

4    A    That's right.

5    Q    Then if we move right.  Keep going to the old

6    McCain/new McCain.  What does old McCain 08 refer to?

7    A    That would have been the number of districts that

8    John McCain was able to prevail in in that presidential

9    election.

10   Q    And how many districts did John McCain win in 2008?

11   A    23.

12   Q    And then how many did President Obama win?

13   A    76.

14   Q    Under the new map, how many districts would McCain

15   have won?

16   A    25.

17   Q    And then how many would President Obama have won?

18   A    74.

19   Q    And then keep moving left so the next -- or right,

20   sorry.  Other right.  We have old JB 10.  Go down to the

21   bottom, please.  How many districts did JB Van Hollen

22   carry in 2010?

23   A    79.

24   Q    And how many did J -- would JB Van Hollen carry into

25   the new map?

1    A    78.

2    Q    Now, go over to the Walker 10.

3         MR. KEENAN:  If we could get old and new at the

4    same time.  And go down to the bottom.

5    Q    What does this show about how many assembly

6    districts Scott Walker won in 2010?

7    A    62.

8    Q    And how many seats did the Republicans win in the

9    2010 election?

10   A    I'm sorry, the actual Assembly?

11   Q    Assembly.

12   A    The 2010 election the Republicans had 60 Assembly

13   seats.

14   Q    All right.  So less than the number of districts

15   Walker carried?

16   A    Yes.

17   Q    Okay.  The new Walker 10 map, how many seats are for

18   the Republicans?

19   A    63.

20   Q    And then how many for the Democrats?

21   A    36.

22   Q    So that's a difference of 1?

23   A    Yes.

24   Q    There was some testimony --

25        MR. KEENAN:  We can take this document down.

                    ADAM FOLTZ - DIRECT

1    Q    There was some testimony with Mr. Earle about the

2    Adam Assertive curve?

3    A    Um-hmm.

4    Q    Did you name that document?

5    A    I did not.

6    Q    Acknowledging you didn't name that document, did you

7    have any thought that the Adam Assertive plan, whatever

8    the underlying plan was, would be adopted by the

9    Legislature as a whole?

10   A    No.

11   Q    Why was that?

12   A    Again, going back to the process that you were

13   pulling regional alternatives from within a broader

14   statewide plan and presenting to the leadership.

15   Q    You testified about the curves that Professor Gaddie

16   prepared.  Did you use the partisan scores on Professor

17   Gaddie's documents at all?

18   A    No.

19   Q    Why not?

20   A    Well, we didn't have -- my understanding is that

21   those are regression-based and we didn't have access to

22   the regression and we just didn't really look at them.

23   We had our own number.

24   Q    Okay.

25              MR. KEENAN:  If we could pull up Exhibit 554 and

ADAM FOLTZ - DIRECT

1    then we can also have ready Exhibit 175, if you could put

2    that up.  We're going to flip between the two.  Sorry.

3    Wrong exhibit.  172.  And if we could go to the page here

4    that's final map.  This one.  Okay.  So I don't have a

5    printout for you.  Unless you guys have a printout he

6    could use.  We'll flip between the two, so it won't be as

7    handy as the last one.  But starting with the Gaddie Team

8    Map Curve, the spreadsheet, and if you could find

9    District 6 on this spreadsheet.  It's about 48 percent.

10   Okay.  And we're looking at observed here.  Column B.

11   Q    What do you see for that number?

12   A    47.88.

13   Q    Okay.  And then if you -- let's just for reference

14   look at where it says an *Index 49*, what does that say?

15   A    I'm sorry, for the 6th District?

16   Q    Yeah.

17   A    49.  47.78.

18   Q    So what's the difference between those two numbers?

19   A    Fairly small.

20   Q    .001; correct?

21   A    Yep.

22   Q    Okay.  All right.  So now switching to Exhibit 172,

23   what is the new composite score for District 6?

24   A    I think that says 58.32.  It's kind of blurred.

25   58.33.

ADAM FOLTZ - DIRECT

1    Q    Okay.  Did you notice that there was an 11-point

2    difference between these two numbers back in 2011?

3    A    No, I did not.

4    Q    Okay.  If we could go to -- we'll just stay here and

5    flip back and forth.  The composite score for District

6    12, what do you see?

7    A    District 12, 27.51.

8    Q    Okay.  Going to the Gaddie Exhibit 553, District 12

9    would be down a little bit.

10           MR. EARLE:  Your Honor, may I object?  I don't

11   think we know that the team map and the final map are the

12   same map.

13           JUDGE CRABB:  Do you have an objection?

14           MR. EARLE:  There's no foundation laid if they

15   were.

16           JUDGE CRABB:  Mr. Earle, do you have an

17   objection to make to the Court?

18           MR. EARLE:  Yes.  I'm sorry, Your Honor.  I was

19   trying -- I would object at this point.  Lack of

20   foundation.

21           JUDGE RIPPLE:  Mr. Keenan, can you straighten

22   that out?

23           MR. KEENAN:  Sure.

24   BY MR. KEENAN:

25   Q    The team map, what is your understanding what the

ADAM FOLTZ - DIRECT

1   team map was?

2   A    That would have been the map that resulted from

3   mashing the various regional decisions made by

4   leadership.

5   Q    And how close was that to the final map?

6   A    If not the final map that was introduced, it was

7   very close.

8          JUDGE RIPPLE:  We will let you go on.

9   BY MR. KEENAN:

10  Q    Okay.  District 12 under Exhibit 554, what do we see

11  in the column B observed?

12  A    51.22.

13  Q    Okay.  At the time did you notice that there was an

14  over 20-point difference between the scores for Professor

15  Gaddie's model and the composite model for District 12?

16  A    No, I did not.

17  Q    If we could look at District 15 in this Team Map

18  Curve which will be up around the 30-percent range.

19  What's our -- what do you see here for the score for

20  District 15 in column B?

21  A    You're referring to the observed?

22  Q    Yes.

23  A    31.41.

24  Q    Now, flipping back to the Plaintiff comparison final

25  map, what's the composite score for District 15?

ADAM FOLTZ - DIRECT

1   A       55.48.

2   Q       At the time in 2011, did you notice there was a

3   24-point difference between these two numbers?

4   A       No, I did not.

5   Q       Staying here in District 21 --

6   A       Okay.

7   Q       -- what's the score there?

8   A       52.94.

9   Q       And using that chart at the bottom, where would that

10  fall in in terms of the strong, lean, that kind of thing?

11  A       That would have been greater than 52, so lean.

12  Q       Okay.  So lean Republican.  So let's flip back to

13  Exhibit 554.  What do we see District 21 at?

14  A       56.63.

15  Q       Okay.  At the time did you there was -- I mean a

16  three-and-a-half percent difference between these two

17  numbers?

18  A       No.

19  Q       Okay.  Now, using that lean, strong, swing

20  categorization, what would District 21 be under this Team

21  Map Curve number?

22  A       That would have been a strong GOP.

23  Q       Look at District 42 on the Team Map Curve.

24          MR. KEENAN:  You're going to have to go up.

25  Sorry.  It's in the 45's.  42.  It's line 33 here.

ADAM FOLTZ - DIRECT

1   Q     What's the score you see there?

2   A     45.04.

3   Q     Now, if we could go back to the planned comparisons

4   final map.  What's the composite score for District 42?

5   A     54.94.

6   Q     Okay.  At the time, as you notice, there was a

7   9-point difference between these two scores?

8   A     No.

9   Q     If we could look at District 48 under the planned

10  comparisons.  What is the partisan score you see there

11  for the new map?

12  A     27.56.

13  Q     Now, if we could go back to the Professor Gaddie

14  Exhibit 554, District 48, what do you see for column B?

15  A     41.58.

16  Q     At the time did you notice there was a 14-point

17  difference between these two numbers?

18  A     No.

19  Q     If we could look at District 51 under this document,

20  it's going to be at 55 percent.  All right.  What is the

21  score you see here in column B?

22  A     55.72.

23  Q     Using the safe/lean/swing nomenclature, what would

24  that be?

25  A     That would have been a safe or a strong.

ADAM FOLTZ - DIRECT

1   Q     Okay.   Now, if you could flip to the planned

2   comparisons document and see what the comparison score is

3   for District 54.

4   A     45.22.

5   Q     And what would that fall in under in terms of this

6   lean/swing/strong?

7   A     That would have been strong Democrat.

8   Q     What is District 57 on the planned comparisons with

9   your composite score?

10  A     57 is 44-and-a-half.   44.50.

11  Q     And if we go back to the Professor Gaddie team map

12  -- we're going to have to go down a little bit here.

13  What is District 57?

14  A     61.63.

15  Q     At the time, did you notice there was a 17-point

16  difference between these two numbers?

17  A     No.

18  Q     Was District 63 on here -- we'll have to go up.

19  What do you see in column B?

20  A     47.21.

21  Q     So that would be a seat that the Democrats would win

22  because it's under 50 percent Republican?

23  A     I would take issue with determining election results

24  by a spreadsheet.

25  Q     Sure.   It's under 50 percent Republican though.

ADAM FOLTZ - DIRECT

183

1    Then we go back to your planned comparisons.  District

2    63, what is the composite score there?

3    A    59.64.

4    Q    Did you notice that there was a 12-point difference

5    in these scores at the time?

6    A    No, I did not.

7    Q    District 75 will be our last one here.  What is the

8    composite score for District 75 here?

9    A    52.18.

10   Q    Okay.  Let's go back to Exhibit 554.  You're going

11   to have to go way up to the top.  What's the score for

12   District 75?

13   A    25.72.

14   Q    Okay.  Did you notice that there was over a 25-point

15   difference in these two scores?

16   A    No, I did not.

17   Q    Why didn't you notice all these discrepancies at the

18   time?

19   A    We really didn't look at these curves.  It was

20   something Dr. Gaddie felt he needed to produce, but we

21   never really went through them in any level of detail.

22   Q    So you didn't compare the individual scores for

23   districts with the All 4 10 and the Gaddie plan?

24   A    No.

25   Q    And did you -- so when you were -- strike that

ADAM FOLTZ - DIRECT

1  question.

2       Let's go back to the process of adoption of Act 43.

3  Who did you work for at that time?

4  A    Representative Jeff Fitzgerald.

5  Q    In the Assembly?

6  A    Yes.

7  Q    After that bill was introduced, did Democrats have

8  an opportunity to offer amendments on the bill?

9  A    They did.

10 Q    Yes, they had the opportunity?

11 A    Yes, they had the opportunity to offer amendments.

12 Q    And did they offer amendments?

13 A    There were, if memory serves, there were four

14 amendments.  I don't remember if there were committee

15 amendments though to the bill.

16 Q    So there were some amendments offered by the

17 Democrats?

18 A    That's correct.

19 Q    And was there any limitation placed on the

20 Democrat's ability to offer those amendments?

21 A    No.  There are, in Assembly rules, a two-minute

22 debate limit per person on tabling.  I don't know if

23 those were enforced.  So there were limits, but there

24 were no limits on just being able to introduce

25 amendments.

ADAM FOLTZ - DIRECT

1   Q     And then was the bill debated on the floor of the

2   Assembly?

3   A     Yes, it was.

4   Q     Was there any limit placed on the amount of debate

5   that could take place on the bill on the floor of the

6   Assembly?

7   A     I don't believe there was.

8   Q     Okay.  You mentioned in your testimony with

9   Mr. Earle that there was some changes to the plan made

10  based on considerations coming from the Senate?

11  A     Yes.

12  Q     And didn't really get to testify about what exactly

13  you were talking about there.  So could you please

14  explain what was there?

15  A     The instance I'm specifically referring to there, as

16  I've testified to in my prior depositions, Senator Mike

17  Ellis did not like the configuration of the Assembly

18  districts within his Senate district and refused to bring

19  the bill forward unless changes were made.

20  Q     So what type of changes did he request?

21  A     If memory serves, the original draft paired

22  Representative -- with then Representative Kaufert and

23  then Representative Litchens.  And Senator Ellis wasn't

24  happy about that.  So it required a reconfiguration

25  within that Senate district to decouple that pairing.

ADAM FOLTZ - DIRECT

1          MR. KEENAN:  I have no further questions.

2          THE COURT:  Thank you, Mr. Keenan (4:57 p.m.)

3                    CROSS-EXAMINATION

4     BY MR. EARLE:

5     Q    How did you learn about these data errors you've

6     been testifying about in the matrix that you were

7     pointing to?

8     A    So the error in the '06 gubernatorial was brought to

9     my attention by DOJ.

10    Q    By Mr. Keenan over here?

11    A    That's correct.

12    Q    And when did that occur?

13    A    Couple weeks ago.

14    Q    Couple weeks ago.  So the entire time that you were

15    creating these charts and these -- and having those

16    charts configured into S curves in order to understand

17    the partisan impact of it, you thought each of those were

18    based on accurate data; correct?

19    A    Well --

20    Q    That's correct?

21    A    There's a lot going on there because the S curves,

22    again, were a Dr. Gaddie production, not something that

23    we produced as the map-drawing staff; so...

24    Q    I'll withdraw the question.  I'll withdraw the

25    question and rephrase it.

                    ADAM FOLTZ - CROSS

1    A     Um-hmm.

2    Q     The entire time that you were engaged in the

3    redistricting process up to the final map, all the charts

4    that -- all the maps that you drew pursuant to your

5    proxy, you thought that those maps were accurate; isn't

6    that correct?

7    A     We did believe at the time that the partisan proxy

8    was an accurate way of describing an open seat number

9    that was accurate.

10   Q     And it was communicated to the leadership that this

11   data was reliable; correct?

12   A     I don't know if we ever communicated that -- we

13   communicated the number when they would ask for it.  That

14   absolutely happened.  But I don't remember ever talking

15   about the process of developing the average itself.

16   Q     But you went through the step of having Professor

17   Gaddie check out the accuracy the proxy; correct?

18   A     Mr. Handrick did.

19   Q     Okay.  And that information was shared with the

20   leadership, wasn't it?

21   A     I don't believe it was.  I mean we conveyed the

22   number, but I don't believe we ever really talked about

23   the process of how we got to that average.  That was

24   pretty nuts and bolts.

25   Q     So you're saying that you weren't paying attention

ADAM FOLTZ - CROSS

1   to what Professor Gaddie was doing in verifying the

2   accuracy of the proxy during the redistricting process?

3   Is that what you're saying?

4   A    No.  Wasn't your question about conveying to

5   leadership the process by which the average was

6   determined?

7   Q    No.  Conveying to leadership a belief that the proxy

8   was accurate.

9   A    I don't know if we ever conveyed a belief, we just

10  had a number that we could convey to them.

11  Q    Well, Professor Gaddie met with the leadership at

12  the mapping room when you were in the room; right?

13  A    I believe he came over for an introduction at some

14  point.

15  Q    He looked at data.  He participated with Scott

16  Fitzgerald in that mapping room with the regression

17  analysis or heat map, as he called it, on the table;

18  correct?

19  A    I don't recall any meeting along those lines.

20  Q    Let me find one exhibit here.  Give me one second

21  here.  I'm going to pull up a document.  In the meantime,

22  let me ask you a couple questions.  You were asked just

23  now what happened in subsequent elections with the

24  Democratic pairings and I have limited stuff available to

25  me here, but you said that several of the Democrats had

ADAM FOLTZ - CROSS

1  to move to other districts and they got re-elected;

2  correct?

3  A    That's correct.

4  Q    And the fact of the matter is they moved to other

5  districts that were Democratic districts and got elected

6  in a Democratic district; correct?

7  A    I don't remember the exact nature of the moves, both

8  Democrat and Republican of where they left and where they

9  ultimately landed.

10  Q    Well, you knew that Sandy Pasch lived in Whitefish

11  Bay; right?

12  A    We would have had that dot on the map, yes.

13  Q    And you knew that.  You know now; right?

14  A    I don't know that now, but it would have been

15  available to us in the autobound software.

16  Q    And you knew that by pairing her with Ott and

17  removing Shorewood from the district and increasing the

18  Republican concentration into the strong GOP column by

19  doing that, she would not be re-elected had she not

20  moved; right?

21  A    I don't know that with absolute certainty, no.

22  Q    All right.  And you know that Sandy Pasch then moved

23  into Shorewood so she could run in what was previously

24  a -- and Shorewood is combined with various areas in the

25  African American community; correct?

ADAM FOLTZ - CROSS

1  A     I know that she moved.  I don't know where she

2  moved.

3  Q     And she was only able to get re-elected after she

4  moved into a strongly Democratic district; correct?

5  A     Again, I don't know what district she moved into and

6  what the percentages are off the top of my head.

7  Q     Okay.  Now going back, I found our exhibit.

8        MR. EARLE:  Could we call up Exhibit 238,

9  please.  We've got it on the screen here.  Page two.

10  Q     I'm going to show you an exhibit which is an email.

11  Do you know who Andy Speth is?

12  A     Mr. Speth at the time was Chief of Staff to

13  Congressman Paul Ryan.

14  Q     And he was involved in the redistricting because he

15  was working on the congressional districts; correct?

16  A     Yes, he was working on the congressional districts.

17  Q     And so Mr. Speth -- where are we here.  Yes.  I draw

18  your attention to the email at the bottom of the page.

19  Tuesday, April 5th, at 3:45 p.m.  Mr. Ottman writes to

20  Mr. Speth after -- well, first let's look above that.

21  Mr. Speth writes to Mr. Ottman and says "Again, excuse my

22  ignorance if I'm asking the wrong questions, but please

23  set me straight if I am.  Which set of data and what

24  races should I be using to create our political baseline

25  numbers?  I want to make sure we are using the exact same

ADAM FOLTZ - CROSS

1   data and races to draw our districts that you are."

2       And then right below that Mr. Ottman responds "Not a

3   problem.  We are using a shorthand that appears to work,

4   with the caveat that we are scheduling our political

5   expert to come in and see if he agrees or would recommend

6   different races.  For now, we are using a three-race

7   composite of GOP presidential in '08 and 04 plus Attorney

8   General for 2010.  Let me know if -- I'll let you know in

9   that changes for any reason."

10      Mr. Ottman was referring here to Mr. Gaddie's April

11  visit where he developed -- he checked out the accuracy

12  of the proxy; correct?

13  A    No.  He checked out the accuracy of the proxy when

14  he was not in state, hence the email between Mr. Handrick

15  and Mr. Gaddie talking about the correlation.

16  Q    Okay.  That was in -- what was the date of that?

17  A    I don't remember.

18  Q    April 20, 2011; is that correct?  Drawing your

19  attention to -- the record will show and it has already

20  been testified to, I think you testified to it because

21  you received the email regarding the Gaddie exchange;

22  right?

23  A    It was forwarded to me by Mr. Handrick, yes.

24  Q    That happened after Professor Gaddie had been in

25  Milwaukee on Tax Day, April 15th; correct?

                    ADAM FOLTZ - CROSS

1  A    I don't remember --

2  Q    Madison, I'm sorry.  Madison.  I'm from Milwaukee.

3  A    Yeah, and I don't remember the date when Dr. Gaddie

4  would have been in for that period, but it seems it would

5  have been some time between April 5 and April 20.  But

6  again, I don't know exactly when.

7  Q    Okay.  Now, you discussed Defendants' Exhibit 556,

8  the Merged Matrix Output file; right?

9  A    Yes.

10  Q    This file has data at the district level; right?

11  A    It would appear, yes, district level.

12  Q    It has data for the 99 old districts and the 99 new

13  districts; right?

14  A    It appears that way, yes.

15  Q    It doesn't have data at the ward level, does it?

16  A    No, it does not.

17  Q    But the electoral data you started with was at the

18  ward level, wasn't it?

19  A    Yes and no.  The autobound software did not have

20  ward-level data available in anything other than just

21  simply being able to visualize prior wards.  I believe

22  that's a correct way of summarizing that.

23  Q    To get from the original ward-level data to the data

24  in Exhibit 556, the original data had to be disaggregated

25  down to census blocks, didn't it?  And then re-aggregated

ADAM FOLTZ - CROSS

1   back up to new districts; right?

2   A    I believe that's how it works under the hood.  The

3   disaggregation of data down was part of what LTSB

4   provided to us, so I'm not overly familiar with how that

5   actually works behind the scenes.

6   Q    And you don't know if the issues with the data that

7   you went through in Exhibit 556 also apply to the

8   original ward-level data, do you?

9   A    I'm not following the question.

10  Q    The problems that were identified with Attorney

11  Keenan just now in the data where you were pointing out

12  specific cells.

13  A    Right.

14  Q    You don't know if those problems also apply to the

15  original ward-level data, do you?

16  A    I mean this is aggregating up from some unit of

17  geography and leading to an incorrect total.

18  Q    But you don't know the extent to which those

19  discrepancies exist at the ward-level data

20  pre-reaggregation?

21  A    I mean you know -- you know that it's in error at

22  the block level because it's the block level data that is

23  getting re-aggregated to give you this number at the

24  district level.

25  Q    Slightly different topic here.  Incumbents tend to

ADAM FOLTZ - CROSS

1    do better in elections than nonincumbents; right?

2    A    Yes.

3    Q    And you went through a series of partisanship

4    estimates in Exhibit 558; right?

5    A    Oh, yes, 558.

6    Q    All of the partisan estimates in 558 are based on

7    statewide top-of-the-ticket races; right?

8    A    Yes.

9    Q    Those statewide top-of-the-ticket races are

10   unaffected by who the incumbent is in assembly districts;

11   right?

12   A    Unaffected by -- yeah, I guess that's fair.

13   Q    And all of the partisanship estimates in Exhibit 558

14   are based on statewide -- you don't know how the

15   partisanship estimates in Exhibit 558 would change if

16   they were updated to take into account incumbency, do

17   you?

18   A    No.  And I mean there's obviously a wide range --

19   Q    Thank you.  That was the question.  You went through

20   some comparisons of how old and new districts performed

21   under your composite measure and under Professor Gaddie's

22   S curves; right?

23   A    With Attorney Keenan, is that what you're referring

24   to?

25   Q    Yes.

ADAM FOLTZ - CROSS

1   A     Yes.

2   Q     You're aware that according to Professor Gaddie, his

3   regression output had a correlation of higher than 0.95

4   with your composite measure; right?

5   A     I believe that's the email that Joe Handrick

6   forwarded to me.

7   Q     And you can't determine a correlation between

8   Professor Gaddie's regression output and your composite

9   measure by just going through individual districts, can

10  you?

11  A     I don't understand the question.

12  Q     You can't determine whether the quality of the

13  correlation between Professor Gaddie's regression output

14  and your composite measure by going through individual

15  districts?

16  A     I don't know how Dr. Gaddie performed that analysis.

17  Q     Or a handful of districts I meant to say.

18  A     Again, I'm not following.  Dr. Gaddie was working

19  some regression or some correlation between his

20  regression and the partisan composite and reported back

21  that point whatever, nine whatever to us via that email

22  that Joe Handrick had received and forwarded to me.

23  Q     The correlation is based on all the districts, isn't

24  it?

25  A     Yeah, I think that's fair.

ADAM FOLTZ - CROSS

1  Q    Now, you'd have to compare --

2  A    The '02 districts in this case.

3  Q    Right.  So in other words, you'd have to compare all

4  of the districts, or even better, all of the wards to

5  figure out a correlation, wouldn't you?

6  A    I don't know that.

7  Q    I'm sorry, I'm working off of a different kind of

8  computer here.  You testified that you hired Professor

9  Gaddie for the voting rights analysis, but you also

10 specifically hired Mr. Gaddie to conduct -- Professor

11 Gaddie to conduct a partisan analysis; isn't that true?

12 A    I wouldn't say I hired him.  He was hired; not by

13 me.

14 Q    But you know he was hired specifically to develop a

15 partisan analysis, don't you?

16 A    That was part of his job description.

17 Q    Okay.  Exhibit 169.  Let's bring it up here.  In

18 Exhibit 169, that tells us what Mr. -- Dr. Gaddie was

19 hired for, doesn't it?

20 A    Okay.

21 Q    You've seen this; right?

22 A    I may have at some point, but five years ago at this

23 point.  Over five years ago at this point.

24 Q    It shows he was hired to conduct partisan analysis;

25 right?

ADAM FOLTZ - CROSS

1   A     Okay.

2   Q     You don't dispute that, do you?

3   A     No.  I mean we've got numerous emails from

4   Dr. Gaddie discussing the process of developing a

5   composite.

6   Q     Thank you.  And as we saw on the S curves and in his

7   emails about partisan baselines, he conducted that work,

8   didn't he?

9   A     Yes.

10  Q     Now -- okay.  Now, do you recall that you were

11  deposed on February 1 of 2012?

12  A     Yes.

13  Q     In the *Baldus* case?

14  A     Yes.

15  Q     And you were asked a series of questions about

16  whether you changed any maps as a result of the meetings

17  you had with the 58 legislators where that memo that was

18  up here in Exhibit -- that had the map attached and it

19  had partisan performance --

20        MR. EARLE:  Which exhibit was that?  Hold on a

21  second.  Maybe we can call it up for you.  552.  Is that

22  Defendants' 552?  There it is.  Okay.

23  Q     Now, you testified that as a result of the meetings

24  with the legislators where you had -- they were provided

25  with this memo and a copy of their map, during your

ADAM FOLTZ - CROSS

1  deposition you testified you did not change any

2  districts; right?

3  A    Right.

4  Q    But then you also said that apart from that, after

5  receiving -- regardless of where the feedback came from,

6  you never changed the districts either.  You don't recall

7  that?

8  A    I'm not following you.

9  Q    All right.  Well, let's go to the Foltz deposition

10  of 2001 -- the Foltz deposition of February 1st of 2012

11  at page 269, line 12 through line 18.  If we could call

12  up line 12 through line 18, please.  On page 269 I

13  said --

14       MR. EARLE:  Okay.  Let's focus in on -- if we

15  could call out line 12 through line 18, please.  Raise it

16  up there.  Yes.

17  Q    Here is the question you were asked at that

18  deposition:

19     "Question:  Regardless of whether the feedback would

20  have come as a result of receiving a memo like Exhibit

21  10, which was the memo we just saw -- 100, Exhibit 100 or

22  for some reason, were any of the Assembly districts that

23  you had drafted preliminarily changed as a result of

24  feedback from Republican members of the Assembly?"

25       And your answer was "No."

ADAM FOLTZ - CROSS

1    A    Yep.  Um-hmm.

2    Q    Now, the map that existed on June 19th, 2011, and

3    was distributed -- where the districts were distributed

4    to the individual members, that was the final map; right?

5    You just testified about that a little while ago.

6    A    Well, and again, I'm not exactly sure when the

7    change regarding Senator Ellis exactly happened.

8    Q    But that aside.

9    A    Yeah.  Again, I don't exactly when in the timeline

10   on what day relative to the member meetings with the

11   Assembly, but to this question specifically, change as a

12   result of feedback from members of the Assembly, Senator

13   Ellis is a Senator, not a Representative.  So I did not

14   meet with him, but that's where the feedback came from

15   that led to the change.

16   Q    Okay.  So I'm going to change the topic here.  So in

17   the questioning from Mr. Keenan, you were complaining --

18   comparing -- I'm sorry, I'm trying to read.  My notes

19   here are pretty bad.  So in the questioning from

20   Mr. Keenan, you were comparing observed election results

21   in 2010 with the Gaddie S curve to an open seat baseline

22   from elections across the decade, weren't you?

23   A    I really don't know if that's how it should be

24   classified.

25   Q    How would you classify it?

ADAM FOLTZ - CROSS

1   A    Well, again we didn't spend much time with those

2   Gaddie S curves.

3   Q    You just did the comparisons.  You were sitting here

4   testifying, comparing Professor Gaddie's S curve data for

5   specific districts with election results in 2010; right?

6   A    Election result --

7   Q    I'm sorry, in the open seat baseline.  I'm sorry.  I

8   got mixed up there.

9   A    Yes, that's the exercise Attorney Keenan and I

10  worked through while he was doing his direct.

11  Q    So are you eliminating the incumbency advantage by

12  using the open seat baseline?

13  A    I think it goes to the nature of an average of races

14  that are not at the level of the ballot that the

15  districts are drawn to.  I would -- so the All 04-10

16  composite is a series of races that are above the level

17  of the ticket of the State Assembly.  Absolutely.  So

18  would that not factor in an incumbent who has been there

19  for 20 years and has built up familiarity with his or her

20  constituency?  Yes.

21  Q    But over here you have data that has eliminated the

22  open seat incumbency through a -- and over here you have

23  -- over here you have a -- you have actual election

24  results; right?  And you're comparing those two.

25  Observed election results.

                    ADAM FOLTZ - CROSS

1    A    Again, are you referring to the exercise that

2    Attorney Keenan and I worked through?

3    Q    Yes.

4    A    Yes, we were comparing the observed that Gaddie had

5    relative to the All 04-10 composite.

6    Q    Right.  So don't you see that as an apples and

7    oranges comparison?

8    A    I don't know if Dr. Gaddie's regression had an

9    incumbency component built into it.

10   Q    I'm sorry.  Could you repeat that again?

11   A    I don't know if Dr. Gaddie's regression analysis had

12   an incumbency component built into it.

13   Q    Okay.  Thank you.

14          MR. EARLE:  We're done.  Thank you.  Pass the

15   witness.

16          THE COURT:  Thank you.

17          MR. KEENAN:  Just a few very brief questions.

18                    REDIRECT EXAMINATION

19   BY MR. KEENAN:

20   Q    There was talk here about the incumbency effect.  In

21   your understanding was the All 04-10 composite -- what

22   was that -- what was its relation to an incumbent-held

23   seat?

24   A    You start pulling in a lot of variables outside of

25   the All 04-10 composite.  We talked about my former boss,

ADAM FOLTZ - REDIRECT

1    Brett Davis, a person who through hard work and really

2    connecting with voters was able to transcend a 40

3    something percent district via hard work and that that

4    compounds itself over time with incumbency.  So when

5    you're looking at it from a perspective of a district,

6    you start -- if you're actually trying to take this off

7    of the paper and apply to how it could have potentially

8    effected representatives of the Assembly, you start

9    factoring in things like work ethic or fundraising

10   ability.  Did they take votes that were running contrary

11   or in line with members of -- or the constituency of

12   their districts.

13        And then I think from a redistricting perspective,

14   you also have to look at if you have a district that's at

15   a given percent, say 52, but one district at 52 carries

16   over with an incumbent 90 percent of the core from the

17   old district, that incumbency advantage is going to stay.

18   Let's say the person has been an incumbent for three

19   terms, whereas a similar incumbent in a 52 percent

20   district who brings over less of their core and let's

21   assume all things being equal and things like work ethic,

22   fundraising, connecting with the voters and whatnot, all

23   that being equal from just the redistricting perspective,

24   if let's say that 52 percent district brings over less of

25   his core retention, say 60 percent, then maybe that new

ADAM FOLTZ - REDIRECT

1   40 percent gets a little bit closer to an open seat.  So

2   you really have to -- you start thinking about things

3   like fundraising, work ethic, core retention, and they

4   all change the All 04-10 composite from a practical

5   standpoint.

6           MR. KEENAN:  No further questions.

7           JUDGE RIPPLE:  Thank you.  We are now close

8   enough, I think, to 5:30 that it would be appropriate for

9   us to recess for the day and to begin tomorrow at nine

10  o'clock.  We'll all be a bit fresher and we can start

11  with a new witness.  So the Court is adjourned until nine

12  o'clock tomorrow morning.

13          MR. POLAND:  Thank you, Your Honor.

14      (Proceedings concluded at 5:24 p.m.)

15

16

17                      *  *  *  *  *

18

19

20

21

22

23

24

25

1                    I, LYNETTE SWENSON, Certified Realtime and

2     Merit Reporter in and for the State of Wisconsin, certify

3     that the foregoing is a true and accurate record of the

4     proceedings held on the 24th day of May January 2016

5     before the Honorables Circuit Judge Kenneth Ripple,

6     District Judge Barbara B. Crabb, and District Judge

7     William Griesbach, in my presence and reduced to writing

8     in accordance with my stenographic notes made at said

9     time and place.

10    Dated this 1st day of June 2016.

11

12                           ___/s/_____

13                           Lynette Swenson, RMR, CRR, CRC
                             Federal Court Reporter

14

15    The foregoing certification of this transcript does not
      apply to any reproduction of the same by any means unless
16    under the direct control and/or direction of the
      certifying court reporter.

17

18

19

20

21

22

23

24

25