UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

WILLIAM WHITFORD, et al.,

      Plaintiffs,

−vs−                         Case No. 15-CV-421-BBC

GERALD NICHOL, et al.,       Madison, Wisconsin
                              May 25, 2016
      Defendants.        9:00 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF SECOND DAY OF COURT TRIAL
HELD BEFORE THE HONORABLE JUDGE KENNETH RIPPLE,
THE HONORABLE JUDGE BARBARA B. CRABB, and
THE HONORABLE JUDGE WILLIAM GRIESBACH,

APPEARANCES:

For the Plaintiffs:
                Law Office of Peter G. Earle
                BY:  PETER EARLE
                839 North Jefferson Street, Ste. 300
                Madison, Wisconsin  53703

                Campaign Legal Center
                BY:  J. GERALD HEBERT
                     RUTH GREENWOOD
                     DANIELLE LANG
                     ANNABELLE HARLESS
                1411 K Street NW, Ste. 1400
                Washington, DC  20005

                Rathje & Woodward, LLC
                BY:  DOUGLAS POLAND
                10 East Doty Street, Ste. 800
                Madison, Wisconsin  53703

              Lynette Swenson   RMR, CRR, CRC
          U.S. District Court Federal Reporter
             United States District Court
         120 North Henry Street, Rm. 520
           Madison, Wisconsin  53703
               608-255-3821

1  Continued appearances:

2  For the Plaintiffs:
            University of Chicago Law School
3           BY:  NICHOLAS STEPHANOPOULOS
            1111 East 60th Street, Ste. 510
4           Chicago, Illinois  60637

5  Also appearing:
            Paul Strauss – Chicago Lawyers' Committee
6             for Civil Rights Under Law, Inc.
            Dan Brewer – Litigation specialist
7           William Whitford – plaintiff
            Helen Harris – plaintiff
8           Jim Seaton – plaintiff
            Allison Seaton – plaintiff
9           Wendy Sue Johnson – plaintiff
            Wayne Jensen – plaintiff
10

11  For the Defendants:
            Department of Justice
            BY:  BRIAN KEENAN
12              ANTHONY RUSSOMANNO
            17 West Main Street,
13          Madison, Wisconsin  53703

14  Also appearing:
            Jackie Righter – paralegal
15

16                    *  *  *  *  *

17

18                    **I–N–D–E–X**

19  PLAINTIFFS' WITNESSES        EXAMINATION        PAGES

20  TAD OTTMAN          Adverse by Mr. Earle          5–46
                        Direct by Mr. Russomanno    47–117
21                      Cross by Mr. Earle          117–132
                        Redirect by Mr. Russomanno    132
22

23  KEN MAYER           Direct by Mr. Poland        136–295

24

25

1                      E-X-H-I-B-I-T-S

2    PLAINTIFFS' EXHIBITS                  IDENTIFIED/RECEIVED

3    Ex. 116     Mayer report - Table F      227       ---
         117     Mayer report - Table G      228       ---
4        156     Chen article                261       ---
         158     Chat Figure 3               264       ---
5        257     Agreement                     6       ---
         353     Transcript                   44       ---
6        357     1-5-11 letter               121       123
         394     Chen & Rodden article       257       ---
7        470     Emails                       37        39
         477     Spreadsheet                 126       ---
8        486     Mayer spreadsheet           194       199
         487     Demonstrative               127       ---

9

10   DEFENDANTS' EXHIBITS

11   Ex. 509     2011 Act 43                 105       ---

12

13            THE CLERK:  Case 15-CV-421.  *Whitford v. Gerald*

14   *Nichol* called for the second day of court trial.  Could

15   we have the appearances, please.

16            MR. POLAND:  Good morning, Your Honors.

17   Appearing on behalf of the plaintiffs we have the same

18   counsel who were appearing yesterday.

19            MR. KEENAN:  On behalf of the defendants we

20   still have me, Brian Keenan, and Anthony Russomanno.

21            JUDGE RIPPLE:  Good morning.  And thank you.

22   Before we get underway, I'd just like to inquire of

23   counsel if there are any housekeeping matters that they

24   would like to bring to our attention.

25            MR. EARLE:  Yes, Your Honor.  I'd like to move

into evidence Exhibits 475 through 481 which were the
demonstrative spreadsheets where the data was sorted in
descending order of Republican vote totals that
corresponded to the other sheets that were in evidence.

THE COURT:  Mr. Keenan.

MR. KEENAN:  We objected to these because they
weren't -- they were provided after the May 9th deadline
in the pretrial order and so they were just provided last
week.  So we have a timeliness objection to them.

JUDGE RIPPLE:  I think those should be admitted
and will be.  And Mr. Keenan, do you have any
housekeeping matters you'd like to bring to our
attention?

MR. KEENAN:  No.

THE COURT:  All right.  If I could inquire of
counsel for the plaintiffs, maybe you could give us some
idea of where you think you are pacewise.  Are you behind
pace?  Before pace?  How are we proceeding?

MR. POLAND:  Your Honor, I think that we are
behind pace at this point.  There was quite a bit of
testimony that came in yesterday that was actually part
of the defendants' case and it makes sense to do it at
that time.  It was much longer than we had anticipated.
It also has another effect.  We are going to have to
straighten out some of those things that happened

1  yesterday, we're going to have to do that today in what

2  is essentially rebuttal testimony of Dr. Mayer.  So I

3  regret to inform the Court, but I do think that we're a

4  little bit behind pace here.

5      THE COURT:  That was our sense as well.  Okay.

6  Thank you very much.  All without further adieu, I think

7  we better get on with things and allow the plaintiffs to

8  proceed with their case.

9      MR. POLAND:  Thank you, Your Honor.

10     MR. EARLE:  We call Tad Ottman, Your Honor.

11     JUDGE RIPPLE:  I'm sorry?

12     MR. EARLE:  We call Tad Ottman.

13     **TAD OTTMAN, PLAINTIFFS' WITNESS, SWORN,**

14     JUDGE RIPPLE:  Good morning, Mr. Ottman.

15     THE WITNESS:  Good morning.

16     JUDGE RIPPLE:  Counsel, your witness.

17     MR. EARLE:  Thank you.

18                 ADVERSE EXAMINATION

19  BY MR. EARLE:

20  Q    Good morning.

21  A    Good morning.

22  Q    Would you state your full name and spell your last

23  name for the record.

24  A    Tad Ottman.  O-t-t-m-a-n.

25  Q    Now, during the redistricting at issue in this case

TODD OTTMAN - ADVERSE

1  you worked for Senator Fitzgerald; correct?

2  A    That's correct.

3  Q    And you were one of three people, along with Adam

4  Foltz and Joseph Handrick who actually drew the various

5  drafts of maps that ended up being Act 43; correct?

6  A    We drew the drafts of the maps that we presented to

7  the legislative leadership that they selected as part of

8  the maps that became Act 43.

9  Q    Thank you.  And you did this under the direction of

10  Michael Best & Friedrich; isn't that true?

11  A    We worked in consultation with attorneys at Michael

12  Best & Friedrich who advised us on various legal

13  standards.

14  Q    You were under their control and direction, weren't

15  you, sir?

16  A    I wouldn't characterize it that way.

17  Q    Okay.  I would draw your attention to Exhibit 28 --

18  I'm sorry, 257.  Have you seen this exhibit before?

19  A    Yes, I have.

20  Q    If we could call out the first two sentences of the

21  first paragraph.  Would you read those two sentences into

22  the record, please.

23  A    "Michael Best & Friedrich, LLP, is currently engaged

24  to represent the Senate Republican leadership,

25  (Republican leaders) in connection with matters relating

TODD OTTMAN - ADVERSE

1  to the reapportionment of the Wisconsin Senate, Assembly,

2  and congressional districts arising out of the 2010

3  census, the representation.  This letter will confirm our

4  understanding concerning work performed by you in

5  connection with the representation."

6  Q    Okay.  Now, let's look at the rest of that

7  paragraph, the remainder and the highlighted portion.

8  Would you read that into the record, beginning with the

9  sentence that says "All work."

10 A    "All work performed by you in connection with the

11 representation shall be for the sole purpose of assisting

12 MBF in rendering legal advise to the Republican leaders.

13 Said work contemplates services of a character and

14 quality that are adjunct to our services as lawyers and

15 you shall perform said work at our direction.

16 Accordingly, all communications between you and MBF as

17 well as communications with the Republican leaders and

18 work performed by you in connection with the

19 representation shall be confidential and made solely for

20 the purpose of assisting counsel in rendering legal

21 advice."

22 Q    And then let's go to the second paragraph, if we

23 could call out the second paragraph.  Would you read the

24 second paragraph into the record.

25 A    "You will not discuss with or otherwise disclose to

TODD OTTMAN - ADVERSE

1    anyone or with any entity other than MB&F and the

2    Republican leaders without our written authorization the

3    nature or content of any oral or written communications

4    or of any information or work performed related to the

5    representation.  You will not disclose or permit

6    inspection of any papers or documents related to the

7    representation without our written authorization in

8    advance.  All work papers, records or other documents or

9    other things regardless of their nature and the source

10   from which they emanate, which are related to the

11   representation, shall be held by you solely for our

12   convenience and subject to our own qualified right to

13   instruct you with respect to the possession and control.

14   Any work papers or materials prepared by you, or under

15   your direction, belong to the Republican leaders pursuant

16   to the representation and every page must be sealed or

17   otherwise stamped attorney/client work product privilege

18   confidential."

19           MR. EARLE:  Let's go to the signature block,

20   please.  The signature block below that one.

21   Q    You signed this on July 27, 2010; correct?

22   A    That's correct.

23   Q    And what you signed was approved and agreed upon;

24   correct?

25   A    That's correct.

                    TODD OTTMAN - ADVERSE

1  Q     Okay.  Now, about six months later you and Adam

2  Foltz moved into Michael Best's offices into the mapping

3  room where you performed all of the mapping functions;

4  correct?

5  A     That's correct.

6  Q     And that mapping room was almost adjacent to

7  Mr. McLeod's office; is that correct?

8  A     It was just down the hall from his office, yes.

9  Q     And Mr. McLeod was one of the people with an all

10 access pass to get in and out of the map room; correct?

11 A     That's correct.

12 Q     And he, in fact, entered and consulted with you in

13 the map room with frequency; correct?

14 A     Yes.

15 Q     Thank you.  Now, you used autobound software to draw

16 the maps; right?

17 A     That's correct.

18 Q     And while drawing those maps, you needed an accurate

19 partisanship metric so you could understand the partisan

20 consequences of the line you drew; correct?

21 A     We didn't need it for the drawing of the maps.  We

22 did have a partisan metric that we used in helping to

23 evaluate the maps.

24 Q     It was -- you had it right there on the screen,

25 didn't you?

TODD OTTMAN - ADVERSE

1    A    The partisan metric was available as part of the

2    data that we could see when drawing.

3    Q    All right.  So you and Adam Foltz and Joe Handrick

4    created a composite average of various statewide

5    elections to serve as that metric; isn't that correct?

6    A    I'm sorry, I didn't hear the question.

7    Q    Sure.  So you and Adam Foltz and Joe Handrick

8    created a composite average of various statewide election

9    results to serve as that metric; isn't that right?

10   A    That's correct.

11   Q    And we've established that that partisan metric was

12   loaded into your autobound software; right?

13   A    That's correct.

14   Q    And so you had to ensure that that metric was

15   accurate before you started making assignments; isn't

16   that true?

17   A    We actually started making some assignments before.

18   We had a couple of different metrics that we looked at

19   and we had started making some assignments.  But at some

20   point we shared various metrics with Professor Gaddie and

21   he indicated to us that the metric that we ultimately

22   used was the one that we went forward with.

23   Q    Let's put that in chronological context.  You

24   started experimenting with various combinations of

25   statewide races in early April, correct, of 2011?

TODD OTTMAN - ADVERSE

1   A    I believe that's the time frame, yes.

2   Q    And then along about mid-April you decided to check

3   the accuracy of that metric with Professor Gaddie;

4   correct?

5   A    I can't speak to the exact time frame, but that

6   sounds about right.

7   Q    Well, let's call up Exhibit 226.  I'm sorry, let's

8   call up your deposition at -- where are the lines here.

9   I want to get the liens right.  At page 73, lines 1

10  through 17.  You testified about this.  We have a video

11  of it.

12  A    Okay.

13       (Video played.)

14  Q    Now, drawing your attention to Exhibit 238, page

15  two, this is an email chain between yourself and Andy

16  Speth, Chief of Staff to Congressman Dan Ryan; correct?

17  A    Congressman Paul Ryan.

18  Q    Paul Ryan.  Sorry.  Would you please read

19  Mr. Speth's email to you on April 5th, 2011 at, 3:42 p.m.

20  and your immediate response at 3:45 p.m.

21  A    "Again, excuse my ignorance if I am asking the wrong

22  question and please set me straight if I am.  Which set

23  of data and what races should I be using to create our

24  political baseline numbers?  I want to make sure we are

25  using the exact same data and races to draw our districts

TODD OTTMAN - ADVERSE

1    that you are."

2    Q     And your response?

3    A     And my response is "Not a problem.  We are using a

4    shorthand that appears to work, with the caveat that we

5    are scheduling our political expert to come in and see if

6    he agrees or would recommend different races.  For now,

7    we're using a three-race composite of GOP presidential in

8    2008 and 2004, plus Attorney General for 2010.  I'll let

9    you know if that changes for any reason."

10   Q     Now, in that email you say "we are scheduling our

11   political expert."  Who is the *we* in that sentence?

12   A     I don't know if that was myself and Joe and Adam or

13   if I just meant the law firm and myself, Joe and Adam.

14   Q     So that possibly included the law firm Michael Best

15   & Friedrich as well?

16   A     It could have, yes.

17   Q     And the political expert in that sentence is

18   Professor Gaddie; correct?

19   A     That's correct.

20   Q     And the composite did change; correct?

21   A     It did.

22   Q     And you ultimately used a composite that included

23   all statewide races from '04 to '10; isn't that correct?

24   A     That is correct.

25   Q     Now, you settled on this proxy because Professor

TODD OTTMAN - ADVERSE

1  Gaddie found it was very accurate and highly correlated

2  with the outputs of his regression model; isn't that

3  true?

4  A    As Joe and I looked at the composite that's

5  discussed in this email here, it didn't seem to jive with

6  kind of our impression of how different races had

7  performed in the state in the previous decade.  So Joe

8  and I talked about it and discussed trying a composite of

9  all those statewide races from '04 to '10.  So we made

10 that composite, looked at it, it seemed to be a better

11 comparison, and then we forwarded it to Professor Gaddie

12 and that's when he responded and said it seemed to have a

13 pretty good correlation.

14 Q    So in other words, you wanted to test the accuracy

15 of it at that point in time and that's why you send it to

16 Professor Gaddie; right?

17 A    Right.  We wanted to see if he agreed with our

18 assessment.

19 Q    Okay.  So the entire time that you were using this

20 proxy drafting maps, you believed that that proxy was

21 accurate and reliable, correct, sir?

22 A    While we're drafting maps, we thought it was a good

23 evaluation.

24 Q    Thank you.  You also calculated this proxy, this

25 composite score down to the ward level allowing you to

TODD OTTMAN - ADVERSE

1    have the most detailed measures you had available to

2    draft your districts; right?

3    A    When working with LTSB, we told them what we were

4    doing and they broke the data down to the ward level and

5    provided it to us.

6    Q    Okay.  Now, you then used those composite scores to

7    analyze each draft of the statewide plans with

8    spreadsheets that compared the pre-existing map with the

9    new draft statewide plan you were working on; isn't that

10   true?

11   A    Yeah, that was one of the reports that was generated

12   on any statewide map that we laid down.

13   Q    And we have an example of one of those.  Let's call

14   up 364.  Now, this report is -- can you read what the

15   title of this map is, this spreadsheet is?

16   A    TadMayQandD.

17   Q    This is a spreadsheet you prepared; correct?

18   A    I don't believe I prepared this one, no.

19   Q    You prepared the map that the data on this

20   spreadsheet represents; correct?

21   A    That's correct.

22   Q    Okay.  Who prepared that spreadsheet?

23   A    This looks like a format that Adam Foltz used.

24   Q    Okay.  Let's go down and look at the seat tallies.

25   You reviewed these seat tallies at the bottom of the

TODD OTTMAN - ADVERSE

1  spreadsheet?

2  A     I looked at them, yes.

3  Q     And they are organized -- would you tell us how the

4  tallies are organized?

5  A     The tallies are organized -- broken out on different

6  groupings of percentages that range from 55 percent and

7  above, 52 -- basically 52.1 to 54.9, and then 48 to 52,

8  45.1 to 47.9, and less than 45.  And then they are

9  labeled safe GOP, lean GOP, total GOP, seat safe lean,

10  swing, lean DEM, safe DEM and total DEM seat, safe and

11  lean.

12  Q     Now, how many total GOP seats safe plus lean did

13  this spreadsheet show for the Assembly map?

14  A     40 under the current map.

15  Q     And how many swing seats?

16  A     19.

17  Q     And comparing those two numbers to the new map that

18  you had just drawn called TadMayQandD, how many total GOP

19  safe and lean seats were the result of that map?

20  A     54.

21  Q     And how many swing seats?

22  A     6.

23  Q     Thank you.  Those seat tallies -- so you took

24  partisan data into account as you evaluated draft

25  districts and maps as demonstrated by this exhibit;

TODD OTTMAN - ADVERSE

1  correct?

2  A     It was one of the things that we evaluated maps on,

3  yes.

4  Q     And in fact, isn't it true that your goal throughout

5  the redistricting process was to draw an assertive map in

6  favor of the Republicans?

7  A     That is not how I would characterize it, no.

8  Q     Well, let's see.  Let me call your attention to a

9  document called tad_senate_assertive_curve.  That's

10 Exhibit 278.  You've seen this document before; right?

11 A     I've seen documents like this.  I'm not certain if

12 I've seen this exact one.

13 Q     Well, perhaps let's go over to the responses to the

14 WRK 32587 responsiveness spreadsheet detail report.

15 Let's see who -- you see the title; right?  It's

16 TadMayQandD.xlsm.

17 A     I see that, yes.

18 Q     And do you see the titles below that,

19 tad_senate_assertive_curve?

20 A     I do.

21 Q     Okay.  You're the Tad that's referred in those

22 titles; correct?

23 A     Certainly in TadMayQandD, and I believe so in

24 tad_senate_assertive.  And I believe so in

25 tad_senate_assertive.

TODD OTTMAN - ADVERSE

1    Q    Drawing your attention to 69 through 78, if we could

2    scroll over and see to the right there, could you tell us

3    who the authors are of those spreadsheets?

4    A    Some of them are authored by myself and some of them

5    are authored by Ronald Keith Gaddie.

6    Q    No, sir.  I'm sorry.  I think they were all authored

7    by Mr. Gaddie; correct?

8    A    Last saved by -- yeah, authored are Ronald Keith

9    Gaddie.

10   Q    But you correctly noted that you saved the majority

11   of them, didn't you?

12   A    Yes.

13   Q    And you don't dispute that they were on your

14   computer?

15   A    I do not.

16   Q    Okay.  Now -- and you authored the map that is

17   analyzed by these curves; right?

18   A    I believe so, yes.

19   Q    Now, what does the assertive in the title mean?

20   A    I don't know.  I didn't make that title.

21   Q    Had you ever -- well, you've seen the title.

22   A    I have.

23   Q    It was on your computer.

24   A    Yes.

25   Q    You didn't ask anybody how come there's a map or a

TODD OTTMAN - ADVERSE

1    document on my computer that has my name on it next to

2    the word assertive?

3    A    I did not.

4    Q    And how long were you -- we'll stop with that.

5    Let's go back to the curve.  You refer to these documents

6    as responsiveness curves, don't you?

7    A    I'm not sure how they're termed.  I believe that is

8    how Professor Gaddie may have described them.

9    Q    Okay.  I think -- well, let's go back to your

10   deposition.  Lines -- page 68, lines 6 through 17.

11       (Video played.)

12       What do these responsive curves or S curves,

13   depending on how you call them, what do they represent?

14   A    To my recollection, as Professor Gaddie explained,

15   it represents shifts in results based on election waves

16   where either there's larger Democrat turnout or larger

17   Republican turnout.

18   Q    So in other words, you could tell what the

19   consequence of a wave election one way or the other would

20   be for the given map that you drew; correct?

21   A    I don't know that it would have a predictive effect

22   or if it's a looking backward effect.

23   Q    Okay.  So you're not sure?

24   A    Not entirely, no.

25   Q    Let's go to your deposition at page 89, lines 9

TODD OTTMAN - ADVERSE

1    through 15.

2         (Video played.)

3         Now, those were 1 percent increments either way off

4    the 50 percent line; right?

5    A    Well, with the exception of 50 to 48 there, it looks

6    like that, yes.

7    Q    So in other words, these curves were helpful because

8    you wanted to see how the map responded to changes;

9    right?  That's basically the sum of what we're saying

10   here.

11   A    I did not use these curves so I can't say how they

12   were helpful.

13   Q    Okay.  Well, you saved them on your computer many

14   times; right?

15   A    Yes.

16   Q    And you printed them, didn't you?

17   A    Yes.

18   Q    Okay.  And they were in the map room; right?

19   A    Some of them were.

20   Q    After you prepared a number of draft maps, at some

21   point in early June you met with the leadership and

22   presented them with alternatives; right?

23   A    That is correct.

24   Q    And during those meetings, the leadership made

25   choices that resulted in Act 43; correct?

                    TODD OTTMAN - ADVERSE

1    A     That is correct.

2    Q     And before they made those choices, you presented

3    the leadership with your data regarding the partisan

4    scores for those alternatives; right?

5    A     They saw different regional alternatives and they

6    saw the partisan scores for the maps that we presented to

7    them in those alternatives.

8    Q     So the S-curves analysis was available to the

9    leadership as well; right?

10    A     I think it was in the room.  I don't know if it was

11    out on display.

12    Q     You show -- I want to show you a document called

13    *summaries.xlsx*.  Exhibit 283.  You've seen this document

14    before?

15    A     I believe so, yes.

16    Q     Let's scroll across the top so we can -- slowly so

17    we can see what the contents are.  There was a series of

18    regional quadrants; correct?

19    A     Right now I only see south Milwaukee as a region.

20    Q     Okay.  And let's scroll across.  What's the title

21    there?  It says *Tale of the Tape*.  Do you see that?

22    A     Tale of the Tape, yes, I see that.

23    Q     And there's Current Map.  Team Map.  Let's keep

24    going across.  There's a Tad Assertive.  Let's keep going

25    across.  There's Good Outcomes and Bad Outcomes.  Let's

TODD OTTMAN - ADVERSE

```
 1    keep going across.  Illinois border, that's a region;
 2    correct?
 3    A    That's correct.
 4    Q    Okay.  Let's go across.  Lakeshore, another region?
 5    A    Yes.
 6    Q    Fox Cities, another region?
 7    A    Yes.
 8    Q    And for each of these regions, we see current,
 9    aggressive, alt, alt; correct?  Various maps?
10    A    Yes.
11    Q    Let's keep going across.  Northwest corner, is that
12    a region?
13    A    It is.
14    Q    West Coast, is that referring to western Wisconsin?
15    A    It is, yes.
16    Q    Let's keep going across.  Eau Claire area.  Do you
17    see that?  That's a region?
18    A    Yes.
19    Q    Keep going across.  Alt Central.  Is that a region?
20    A    It is.
21    Q    Let's keep going across.  Southwest, another region?
22    A    It is.
23    Q    East Central another region?
24    A    Yes.
25    Q    Let's keep going across.  Team map for northeast
```

1   Wisconsin.  Is that another region?

2   A    Yes.

3   Q    Can we continue?  Is that it?  Okay.  Good.  Now,

4   pulling up the metadata for this document, if we can,

5   it's on line 17 of WRK 32864 of Exhibit 225.  Now, this

6   document was initially created on May 25, 2011; correct?

7   A    Yes.

8   Q    And that was prior to the meetings with the

9   leadership; is that correct?

10  A    That's correct.

11  Q    The metadata in front of you says it was printed on

12  June 9, 2011; correct?

13  A    Yes.

14  Q    And that was during the leadership meetings;

15  correct?

16  A    I'm not certain of the exact dates.

17  Q    Okay.

18  A    It would be around that time.

19  Q    Okay.  Which exhibit number are we on then?  Let's

20  go to the -- let's go to -- go back to the -- where are

21  we?  Let's go to the regions printout from Exhibit 225,

22  WRK 32564 folder, spreadsheet named *regionsprintoutxls*.

23  Got it there?  Do you see the dates?

24  A    Yes.

25  Q    Okay.  So those meetings started on June 6?

TODD OTTMAN - ADVERSE

1   A      Appears so, yes.

2   Q      And as we scroll down, we can see the various

3   regions.  That were different days.  Let's go down to the

4   bottom.  Those meetings ended on June 10th when you

5   talked about Dane County; correct?

6   A      That's when they were scheduled to end.  I don't

7   know if we may have concluded earlier.

8   Q      Okay.  All right.  So now let's go back to the

9   spreadsheet for the metadata for the summaries document

10  we were just looking at.  The Tale of the Tape.  I'm

11  sorry, the metadata.

12          JUDGE RIPPLE:  Counsel, it would be very helpful

13  to the Court if you could use exhibit numbers --

14          MR. EARLE:  Certainly, Your Honor.

15          THE COURT:  -- on these documents and frankly

16  perhaps raise your voice slightly when you do.  We are

17  having difficult tracking you on these documents and

18  making note of the exhibit numbers.

19          MR. EARLE:  Okay.  Thank you, Your Honor.  It's

20  Exhibit 225.

21          JUDGE RIPPLE:  Thank you.

22          MR. EARLE:  And let's go back to the metadata.

23          JUDGE CRABB:  I will assume that it's not in

24  evidence yet.  I have a whole list of exhibits that I

25  know are unobjected to.

                    TODD OTTMAN - ADVERSE

24

```
 1           MR. EARLE:  This is one of them, Your Honor.
 2   This exhibit is in evidence.  All of 225 is in evidence,
 3   which is a large compilation of the contents of
 4   Mr. Ottman's computers, Mr. Foltz's computers and
 5   Mr. Handrick's computers.
 6   BY MR. EARLE:
 7   Q    All right.  Let's go back.  So can you tell us what
 8   date this was last accessed?
 9   A    It appears it was last accessed on 6-13 of 2011.
10   Q    That would have been after the meetings were over;
11   correct?
12   A    Yes.
13   Q    Okay.  Now, I want to go back to something you
14   testified a few moments ago.  You said you couldn't
15   remember who was in the room with you when you were
16   looking at the S curves?
17   A    That's correct.
18   Q    Do you recall if Mr. Foltz was in the room when he
19   was looking at those S curves with you?
20   A    He probably was.  I don't have specific recollection
21   of it.
22   Q    All right.
23           MR. EARLE:  Let's go back to Exhibit 283,
24   please.  There are two sections I want to focus on in the
25   spreadsheet in particular.  The first, I want to look at
```

TODD OTTMAN - ADVERSE

1    the section that's got the header *Good Outcomes* and *Bad*

2    *Outcomes* and we prepared a PDF of this section so we can

3    call it out for the convenience of the Court.  If we

4    could have that up on the screen.  And we've done this

5    so, for the -- in order to -- for mercy of the eyes of

6    the Court and counsel at table.

7    Q     So please list for the Court the good outcomes that

8    are listed on Exhibit 283?

9    A     It says there "statistical pickup above the top 55

10   percent and below, 45 percent and over," and then on the

11   next lines "statistical pickup, GOP, INC strengthened,

12   DEM incumbent weakened and GOP donors."

13   Q     Okay.  Now, there are four types of bad outcomes

14   too; right?

15   A     Yes.

16   Q     And could you list what those are?

17   A     It says "45 percent and above, 55 percent and

18   below," and then underneath it says "DEM incumbent

19   strengthened, GOP income weakened, statistical loss, GOP

20   nondonors."

21   Q     And the 45 percent and above has immediately below

22   it "DEM incumbent strengthened"; correct?

23   A     Yes.

24   Q     And the 55 percent and below has "GOP incumbent

25   weakened"; correct?

                    TODD OTTMAN - ADVERSE

1    A    Correct.

2    Q    Now, each of these outcomes are defined right below

3    where they are listed; isn't that true?

4    A    Yeah, there's a definition listed below.

5    Q    Okay.  So let's start with the good outcomes.  Can

6    you read the definition for the statistical pickup?

7    A    "Statistical pickup equals seat that is currently

8    held by DEM that goes to 55 percent or more (example if

9    number 13 Cullen goes from 44 percent to 58 percent)."

10   Q    And when they say DEM a seat -- a seat that is

11   currently held by a DEM that goes to 55 percent or more,

12   you're talking about a Republican; correct?  55 percent

13   or more Republican vote share; correct?

14   A    Yeah.  The percentage refers to the Republican

15   percentage.

16   Q    Right.  And so the example is if -- who is Cullen?

17   A    Cullen was a state representative from the, I

18   believe, 13th Assembly District.

19   Q    And what party did Mr. Cullen -- who was he

20   affiliated with?

21   A    He is or was a Democrat state representative.

22   Q    So an example of a statistical pickup is if you

23   design a map where you take a Democratic incumbent's seat

24   from 44 percent Republican vote share to 58 percent

25   Republican vote share; right?  That's the definition;

TODD OTTMAN - ADVERSE

1    correct?  That's an example for the definition that's

2    being laid out here on this spreadsheet; right?

3    A    It refers to the seat number.  The incumbent may or

4    may not continue to reside in that seat in the new map.

5    Q    Um-hmm.  Okay.  But you would expect to win that

6    seat in the following election; correct?

7    A    I don't know that I would -- what expectation I

8    would have.

9    Q    You have no expectation if you shift the numbers

10   from 44 percent Republican vote share to 58 percent

11   Republican vote share?

12   A    I didn't look at future outcomes or what may happen.

13   That was just information that we presented to

14   legislative audit leadership.

15   Q    I see.  Okay.  How many -- how is incumbent -- GOP

16   incumbent strengthened defined?

17   A    GOP incumbent strengthened equals positive movement

18   on composite.

19   Q    Okay.  So that means you get positive increase in

20   the Republican vote share; correct?

21   A    I would assume so.  I didn't create these

22   definitions.

23   Q    Okay.  And how is DEM incumbent weakened defined?

24   A    DEM incumbent weakened equals positive GOP movement

25   on composite.

1   Q    And how are GOP donors defined?

2   A    GOP donors equals those who are helping the team.

3   Q    Okay.  Now, the team is the Republican team; right?

4   A    I assume so.  Again, I didn't create these

5   definitions.

6   Q    Okay.  It was -- okay.  It was a term for those

7   Republican legislators in safe seats with over 55 percent

8   partisan scores whose scores were reduced; isn't that

9   correct?

10  A    I'm not certain.

11  Q    Okay.  Let's call up your videotape here from your

12  deposition.  It's Exhibit 226, page 110, lines 14 through

13  25.

14          JUDGE RIPPLE:  226?

15          MR. EARLE:  Yes.  Exhibit 226 is the deposition.

16          JUDGE RIPPLE:  Thank you.

17       (video played.)

18          MR. RUSSOMANNO:  Your Honors, we object to

19  completeness on this excerpt.  There's a beginning part

20  of the answer that they cut off that we think it matters

21  to this excerpt.

22          MR. EARLE:  That's fine.  No objection to it.

23  What line?

24          MR. KEENAN:  Page 110/7 it should start.

25       (Video played.)

                    TODD OTTMAN - ADVERSE

29

1        MR. EARLE:  I believe the witness had already

2  said that.

3        JUDGE RIPPLE:  Mr. Russomanno, are you

4  satisfied?

5        MR. RUSSOMANNO:  Thank you.

6  BY MR. EARLE:

7  Q    So a GOP donor gives up some Republican voters in

8  his or her district in order to redistribute those voters

9  to surrounding districts in order to help Republicans

10 pick up more seats statewide; correct?

11 A    I wouldn't characterize it that way.

12 Q    Okay.  They donate some of their score to the

13 Republican team, don't they?

14 A    I don't know that that's entirely what it meant, no.

15 Q    Okay.  How would you characterize it?

16 A    It would simply indicate a seat that had a lower

17 percentage under that partisan metric than it started

18 with.

19 Q    I see.  Well, let's define the bad outcomes.  How is

20 DEM incumbent strengthened defined?

21 A    DEM incumbent strengthened equals DEM over 45

22 percent who has negative movement on composite.

23 Q    How is GOP incumbent weakened defined?

24 A    GOP incumbent weakened equals those 55 percent and

25 below who have negative movement on composite.

TODD OTTMAN - ADVERSE

1  Q    And how is statistical loss defined?

2  A    Statistical loss equals seat that is currently held

3  by GOP that goes to 45 percent or below. (Example: If

4  number 47 goes all Dane County we lose the number, but

5  not the incumbent.)

6  Q    And how is GOP nondonors under bad outcome defined?

7  A    GOP nondonors equals those over 55 percent who do

8  not donate points.

9  Q    Now, let's go to the next PDF, which is under -- the

10 section under the Tale of the Tape?

11        MR. EARLE:  If we could pull up 283, Tale of the

12 Tape PDF.  Again, Your Honors, this is a PDF of the

13 spreadsheet we were reviewing before that has been made

14 so that we can see it enlarged.  It's No. 283.  We got

15 it?  Oh.  Okay.  Tale of the Tape.

16 Q    This section shows comparisons of various partisan

17 outcomes for five draft maps; correct?

18 A    Yes.

19 Q    Would you read what those maps were?

20 A    Current map, team map, Joe Assertive, Tad

21 Aggressive, Adam Aggressive, team map.

22 Q    Now, drawing your attention to the title *Tad*

23 *Aggressive*, what does the word *aggressive* mean in this

24 context?

25 A    I don't know.

TODD OTTMAN - ADVERSE

31

1    Q    Okay.  So you worked with Joe Handrick on

2    redistricting in one room for months at Michael Best and

3    you never thought to ask; right?

4    A    I don't know when that title was created, but no, I

5    did not ask.

6    Q    Well, we have a document here that's used with the

7    regional meetings with the leadership and that's how it's

8    characterized.  Did the leadership ask you what you meant

9    by Tad Aggressive?

10   A    We didn't present them complete statewide maps so

11   there was no label like that that was presented to them

12   as among the regional alternatives.

13   Q    Did Mr. Foltz ever ask you or ask Mr. Handrick what

14   the term aggressive meant in your presence?

15   A    Not in my presence.

16   Q    Now, you discussed these maps between the three of

17   you; correct?

18   A    We had discussions about all the maps that we were

19   working on, yes.

20   Q    And you had discussions amongst you prior to going

21   into the leadership meetings in order to manage your

22   presentation of the leadership at the meetings; right?

23   A    Right.  We had several discussions, including

24   which -- under each region which map alternatives to

25   present to them.

TODD OTTMAN - ADVERSE

1    Q    And in those discussions, you referenced maps by

2    titles; correct?  Because you were talking about multiple

3    maps.

4    A    No, we didn't really reference them by titles.

5    Q    Okay.  So each of these maps, the 99 Assembly

6    districts are tallied across five categories; correct?

7    A    It appears so, yes.

8    Q    And those strong categories are strong GOP 55

9    percent plus; right?

10   A    Yes.

11   Q    Lean GOP 52.1 to 54.9 percent; correct?

12   A    Yes.

13   Q    Swing; correct?

14   A    Correct.

15   Q    Lean DEM 41 -- 45.1 percent to 47.9 percent;

16   correct?

17   A    Correct.

18   Q    Strong DEM 45 percent and below; correct?

19   A    Correct.

20   Q    Now, these tallies are based on the composite score

21   we've been discussing up to this point; right?

22   A    That's correct.

23   Q    We then see that the larger box in the middle

24   compares the 2000's map to the team map on the basis of

25   how many seats have partisan scores above 50 percent for

TODD OTTMAN - ADVERSE

1   Republicans, don't they?

2   A    Yes.

3   Q    How many seats were 50 percent or better for

4   Republicans in the current map?  And by current map,

5   we're referring to the map that was in effect prior to

6   the enactment of Act 43; correct?

7   A    That's correct.

8   Q    And how many were?

9   A    49 seats.

10  Q    And how many seats were generated by the team map

11  that emerged from that meeting with the leadership?

12  A    59 Assembly seats.

13  Q    We then see the team map refers to a final or near

14  final version of the map created on the basis of the

15  decisions; right?

16  A    Yes.  It was near completion at that point.

17  Q    And before we leave this document, does the tale --

18  the title Tale of the Tape have any significance to you?

19  A    I did not create that title.  I'm not sure what it

20  signifies.

21  Q    That's not the question.  Does it have any

22  significance to you?  I know you said earlier that

23  you --

24  A    I'm not sure what the significance was.

25  Q    Okay.  Are you aware that Tale of the Tape is a

TODD OTTMAN - ADVERSE

1    phrase that refers to pre-fight -- in boxing matches,

2    pre-fight measurements of the boxer's reach?

3    A    I've heard the expression, yes.

4    Q    And that didn't -- okay.  You had heard that

5    expression though; right?

6    A    Yes.

7    Q    Good.  Now, on that note, let's look at the metadata

8    listed for Trial Exhibit 225, WRK 32864, responsive

9    spreadsheets file detail report, call your attention to

10   line 19, a document called summary.xlsx.  Got it up

11   there?

12   A    Yes.

13   Q    Do you see that?

14   A    Yes.

15   Q    The metadata shows this document was authored by Joe

16   Handrick; right?

17   A    It says so, yes.

18   Q    And it was last saved by you; correct?

19   A    It says last saved by Tad.

20   Q    And Tad is you; right?

21   A    Not necessarily.

22   Q    That's because you shared a computer with Joe

23   Handrick; right?

24   A    I set up the log-in password for him and I believe

25   that was the log-in that I used for his computer.

                        TODD OTTMAN - ADVERSE

1    Q    But you access his computer as well; right?

2    A    On occasion.

3    Q    Yeah.  So you shared that computer; right?

4    A    If that's how you want to term it.  I accessed it

5    some of the time.

6    Q    Now, let's look at the actual document itself.  It's

7    Exhibit 284.

8              MR. EARLE:  We're pulling up a PDF version of

9    this document for the Court's convenience once again.  We

10   can enlarge it.

11   Q    Can you read the definition of GOP donors to the

12   team here?

13   A    "Incumbents with numbers above 55 percent that

14   donate to the team."

15   Q    Okay.  Those are all Republicans; correct?

16   A    I believe so, yes.

17   Q    Now, let's look at Exhibit 239.  Please identify

18   this document.

19   A    It is an email from Leah Vukmir to myself on

20   Wednesday, May 4 of 2011.

21   Q    Who is Leah Vukmir?

22   A    I believe she is a state Senator, Republican state

23   Senator who I believe had just been elected the prior

24   election.

25   Q    And the date is May 4, 2011; right?

                    TODD OTTMAN - ADVERSE

1   A    That's correct.

2   Q    This is an email that you produced in response to

3   discovery in the *Baldus* case's order to compel; correct?

4   A    That's correct.

5   Q    Can you please read the last paragraph of that email

6   through to the end for the Court.

7   A    "If you need a way to take the Staskunas seat, put a

8   little bit of my Senate seat into New Berlin.  Two to

9   three wards could make that a GOP Assembly seat.

10  Western, West Allis, Eastern BKFD and New Berlin are

11  areas of like interest.  (The previous Duff seat had

12  parts of New Berlin, Elm Grove, BKFD and West Allis).

13  Hope that helps."

14  Q    Staskunas was a Democratic member of the Assembly;

15  correct?

16  A    That is correct.

17  Q    He's no longer there; correct?

18  A    I don't believe so.

19  Q    Now, let's look back at summary.xlsx 284 again.  We

20  have statistical pickup; right?  It says "currently held

21  DEM seats that move to 55 percent or better"; correct?

22  A    Correct.

23  Q    And if we look at District 15, can you tell us what

24  District 15 says there?

25  A    It says "District 50, old 48.2, new 55.5 percent."

TODD OTTMAN – ADVERSE

1   (and then Staskunas)

2   Q    Okay.  Now, let's look at Exhibit 351.  Who is this

3   email addressed to and who is it from?

4   A    It is addressed to myself and Adam Foltz from Jim

5   Troupis.

6   Q    What is the date of the email?

7   A    Monday, June 13, 2011.

8   Q    Can you read the first three lines of that email.

9   A    "Good morning Tad and Adam.  Sounds like the latest

10  map went well with the leadership.  Congratulations on

11  walking that fine line."

12  Q    Now, this refers to your meetings that we just went

13  over in June with the leadership; right?

14  A    I believe so, yes.

15  Q    And June 13 was the same date that we established

16  the Tale of the Tape document was modified; isn't that

17  right?

18  A    I believe so, yes.

19  Q    After -- and that was after that -- that document

20  was printed at that point; correct?

21  A    I don't know if it was printed.

22  Q    I think the record speaks for itself in that regard.

23  Let's go to 470.  This is a series of emails on June 24,

24  2011, between yourself, Jim Troupis, Eric McLeod and Ray

25  Taffora with Adam Foltz cc'd; right?

TODD OTTMAN - ADVERSE

1  A    That's correct.

2  Q    On June 24, 2011, at 2:52 p.m. you sent an email to

3  Jim Troupis, Eric McLeod and Ray Taffora with the subject

4  line *Legislative Drafts* that says "This is the draft that

5  arrived today."  And you can see that; right?

6  A    Yes.

7  Q    And you can see that right below that email is your

8  response to Mr. Troupis; right?  I mean Mr. Troupis's

9  response to you; correct?

10  A    There is an email from Mr. Troupis above that email.

11  Q    I'm sorry.  Where are we?  I lost my place.  Can you

12  read Jim Troupis's response at 4:02 p.m.?

13  A    "Like the summary at the outset and the numbers look

14  good.  Interesting that the census tracks read quite

15  reasonably.  Any issues to date with members?"

16  Q    Can you read Eric McLeod's response at 4:03?

17  A    "I think all the members are very happy with their

18  new districts based on Tad's and Adam's reports to date."

19  Q    The reports that Mr. McLeod is referencing are your

20  meetings with the individual senators and Adam Foltz's

21  meetings with the individual representatives; correct?

22  A    That's my belief, yes.

23  Q    Who were the leaders that participated in your

24  meetings with the individual senators?

25  A    There were two rounds of meetings with the

TODD OTTMAN - ADVERSE

1    individual senators, one at the very beginning of the

2    process and then another one after we were preparing to

3    introduce the map.  Senator Zipperer sat in on some of

4    those meetings, but not all of them.

5            MR. EARLE:  Your Honor, at this point I would

6    like to move Exhibit 470 into evidence.

7            JUDGE RIPPLE:  Mr. Keenan?

8            MR. EARLE:  These are these emails here.

9            MR. KEENAN:  Our objection was that it was

10   untimely under the pretrial order.  It was disclosed

11   after the May 9th deadline; so...

12           JUDGE RIPPLE:  I think we can admit that.

13           MR. EARLE:  You can admit?  Thank you.

14   BY MR. EARLE:

15   Q    Let's look at Exhibit 348.  Could you tell us who is

16   it addressed to and who is it from?

17   A    That is from Jim Troupis is Eric McLeod.

18   Q    And who was cc'd?

19   A    Adam Foltz, myself and Sarah Troupis.

20   Q    And what is the subject line of this email?

21   A    Experts.

22   Q    Can you read the email starting with the third

23   sentence of the first paragraph through to the end of the

24   paragraph?

25           MR. EARLE:  We'll highlight that part there.

                  TODD OTTMAN - ADVERSE

1    Third sentence.  "I strongly" -- I'm sorry.  Let's start

2    right there.

3    A      Through the end of the paragraph?

4    Q      Yes, please.

5    A      "I strongly believe Professor Grofman is essential

6    to our efforts as he brings to any three-judge panel

7    three decades of national and international redistricting

8    work on both sides of the aisle.  He's been recognized by

9    courts as perhaps the single-most respected political

10   scientist addressing matters of redistricting.  There is

11   no doubt we will end up in court of whatever is passed

12   and so having a stable of powerful experts is essential.

13   Without Grofman in 2001, we would not have succeeded in

14   getting the map we did as Easterbrook followed his

15   direction in drawing the map.  We will need to put

16   everyone under the confidentiality and retention

17   agreements which will require retainers.  Let's discuss

18   this tomorrow and get folks under contract before the map

19   becomes public.  They will want to review it ASAP."

20   Q      Thank you.  And now prior -- there was a public

21   hearing on Act 43; correct?

22   A      There was a public hearing on the Senate bill which

23   became Act 43.

24   Q      Right.  Right.  And you spoke to the Republican

25   caucus at that hearing; correct?

1   A     I spoke to members of the committee at that hearing.

2   Q     I'm sorry, yes.  Let's look at 241.  These are your

3   notes in preparation for speaking to the caucus, the

4   members of the Republican caucus; right?

5   A     I'm not certain which notes -- which meeting I

6   prepared these in advance of.

7   Q     But you recognize the exhibit; right?

8   A     I do.

9   Q     You're the author of this exhibit?

10  A     I believe so, yes.

11  Q     Yeah.  Now, can you read for the Court the last line

12  of the second paragraph.

13  A     "The maps we pass will determine who's here ten

14  years from now."

15  Q     Now, can you read the following paragraph?

16  A     "Today we are going to walk through the proposed

17  maps and talk about how we got there.  We have an

18  opportunity and an obligation to draw these maps that

19  Republicans haven't had in decades."

20  Q     Let's look at Exhibit 362.  This is an email from

21  yourself to Jim Troupis, Ray Taffora and Adam Foltz on

22  July 12, 2011, the date before the sole hearing on the

23  bill that became Act 43; correct?

24  A     That's correct.

25  Q     Would you please read the contents for the Court.

TODD OTTMAN - ADVERSE

1  Start with the first paragraph.

2  A      "Attached is most of the information for the memos

3  for the hearing tomorrow.  Adam will be sending another

4  sheet.  The idea is to print each section as a separate

5  memo and label them SB 148 memo 1 through X."

6  Q    Let's go to the second paragraph.

7  A      "One thing I would recommend changing is the

8  enumeration of the county splits since it doesn't tell a

9  great story and there is not information from ten years

10  ago to compare it to.  The municipal splits are a better

11  comparison and a higher priority."

12  Q    Let's go to third paragraph.

13  A      "The other attachment that isn't provided here is

14  the summary of population changes in deviations.  This is

15  simply a printout from the LRB analysis that we will

16  submit."

17  Q    Thank you.  Now, let's go to Exhibit 237.  You

18  drafted these notes in preparation for your testimony at

19  the hearing on the bill that became Act 43; correct?

20  A      Yes.

21  Q    And you've testified about this previously in your

22  deposition; right?

23  A      I have, yes.

24  Q    Can you read for the Court the first paragraph of

25  this document, including the list 1 through 3.

TODD OTTMAN - ADVERSE

1   A    "Questions and responses:  Every question can be

2   traced back to the principles that guide redistricting:

3   Number 1, equal population.  Number 2, sensitivity to

4   minority concerns.  Number 3, compact and contiguous

5   districts.  Different choices can be made along the way,

6   but those criteria must be followed.  SB 148 meets these

7   criteria."

8   Q    This question demonstrates that you had a deliberate

9   strategy to evade any questions or discussion about

10  partisanship by always deflecting those questions with a

11  reference to those traditional redistricting principles;

12  isn't that true, sir?

13  A    I don't know that I would characterize it that way.

14  Q    Okay.

15          MR. EARLE:  Your Honors, at this time I'd like

16  to move Exhibit 237, the exhibit we were just dealing

17  with into evidence.

18          JUDGE RIPPLE:  Mr. Keenan.

19          MR. KEENAN:  I don't think there was an

20  objection to that one.

21          MR. EARLE:  It's already in?  Okay.  I'm sorry.

22          JUDGE RIPPLE:  I'm sorry, sir?

23          MR. KEENAN:  There was never an objection to

24  that one.  It's already in.

25          JUDGE RIPPLE:  Thank you.  The exhibit is

                    TODD OTTMAN - ADVERSE

1  admitted.

2  BY MR. EARLE:

3  Q    You actually -- and you did, in fact, testify at the

4  hearing; right?

5  A    I did, yes.

6  Q    Do you remember exactly what you -- what you

7  testified about when you were asked directly about

8  partisan considerations in your map drawings?

9  A    I don't remember.

10 Q    Okay.  Let's refresh your recollection.  We can look

11 at the transcript because we have a transcript of that.

12 That's Exhibit 353.  To refresh your recollection, and

13 let's look at page 46 where Senator Erpenbach asked you

14 directly if partisanship was considered when drawing the

15 maps.  And I'd like you to read your response to his

16 question beginning at line 20.

17 A    "That information was available.  I do not have that

18 information here with you.  It was available, but the

19 principles by which the maps were drawn were those that I

20 enumerated earlier:  Equal population, sensitivity to

21 minority concerns, and compact and contiguous districts."

22 Q    Continuing on, read Senator Erpenbach's response to

23 that.

24 A    "Did the partisan makeup of the districts come into

25 play at all when drawing the maps?"

TODD OTTMAN - ADVERSE

45

1    Q    Now read your response to that question.

2    A    "The principles were the ones I enumerated.  Those

3    were the ones that drove drawing the map."

4    Q    Now, Read Senator Erpenbach's response.

5    A    "So the answer is no?"

6    Q    And how did you answer that question?

7    A    "The answer is that we followed those three legal

8    principles."

9    Q    Thank you.

10          MR. EARLE:  Your Honor, I'd like to move --

11   sorry.  We're done, I'm sorry.  We do -- I thought so.

12   Your Honor, we would move Exhibit 353 into evidence.

13          THE COURT:  Any objection?

14          MR. EARLE:  That's a transcript.

15          MR. KEENAN:  We had an objection to the

16   transcript as hearsay.  I mean there's a lot in that

17   transcript beyond what they just read.  So I mean to the

18   extent that Mr. Ottman's actual testimony is there, we're

19   not objecting to that being in the record here.  But, you

20   know, the statements made by Senator Erpenbach or whoever

21   about the map can't be taken for being true.  That was

22   our objection.

23          JUDGE RIPPLE:  We can admit it for the limited

24   purpose then.

25          MR. EARLE:  Your Honor, our response would be

TODD OTTMAN - ADVERSE

1    that it's a public record.  It's an exception to the

2    hearsay rule.  It's part of the legislative history of

3    Act 43.

4              THE COURT:  Counsel.

5              MR. KEENAN:  It is.

6              MR. EARLE:  You don't think the hearing --

7              MR. KEENAN:  We still have the transcript.  I

8    mean where did you get it from?  If you can establish

9    that, then we can.  But I mean until then, I don't think

10   it's appropriate to let it in in its entirety.

11             JUDGE RIPPLE:  Well, we'll admit it for the

12   limited purpose I just stated and we'll take under

13   advisement the suggestion that it's a public document.

14   We'll rule on that with the case.

15             MR. EARLE:  Thank you, Your Honor.

16             JUDGE RIPPLE:  Thank you.  (10:09 a.m.)

17             MR. EARLE:  With that, we pass the witness.

18             JUDGE RIPPLE:  Counsel.

19             MR. RUSSOMANNO:  Good morning, Your Honors.

20             JUDGE RIPPLE:  Good morning.

21             MR. RUSSOMANNO:  As we did yesterday with

22   Mr. Foltz, our plan was to go ahead and do the direct of

23   Mr. Ottman and I believe that's okay with the plaintiffs'

24   counsel, if that's okay with the Court.

25             JUDGE RIPPLE:  It is.

                    TODD OTTMAN - ADVERSE

1          MR. RUSSOMANNO:  Of course that means it will be

2  a bit longer than it otherwise would have been.

3          JUDGE RIPPLE:  Understood.

4                    DIRECT EXAMINATION

5  BY MR. RUSSOMANNO:

6  Q    Good morning, Mr. Ottman.

7  A    Good morning.

8  Q    I'd like you to talk a bit more about your

9  background, so I'll start with some questions in that

10  area.  Do you have a college degree?

11  A    I do.

12  Q    And what is it?

13  A    I have a bachelor's of science degree in Political

14  Science and English.

15  Q    Any degrees beyond that?

16  A    I do not.

17  Q    And starting with after college, can you walk us

18  through your employment at that point?

19  A    At the end of my college career I was working for

20  Senator Jim Harsdorf.  That would have been the end of

21  1988.  I continued working for him for several months.

22  Then I worked for Representative Bill Berndt,

23  Representative Sheila Harsdorf for several months, and

24  then I worked for State Senator -- I'm sorry, State

25  Representative Mary Panzer and Steve Foti, who shared

                    TADD OTTMAN - DIRECT

48

1  staff.  I worked for the two of them until Senator Panzer

2  was elected to the State Senate in, I believe, '95 and

3  then I continued working for her until she was defeated

4  in 2004.  And then in 2005, I began working for Senator

5  Scott Fitzgerald where I've worked ever since.

6  Q    Let me just walk you back.  So the first time period

7  ended -- you worked for a series of people until 2004; is

8  that right?

9  A    That's correct.

10 Q    Can you describe if your duties -- were your duties

11 different for each person?  Were they the same?  And if

12 so, can you give us an idea of what you did?

13 A    Sure.  Earlier on in my career my duties were

14 largely constituent relations, assisting with some minor

15 drafting of legislation.  As I moved on in my legislative

16 career, I became more involved with policy-matter

17 research, more drafting of legislation, particularly

18 being involved with the state budget and the process of

19 putting together the state budget as well as some

20 involvement with other significant policy issues

21 including some involvement in redistricting in following

22 both the 1990 census and the 2000 census.

23 Q    Okay.  Can you describe in particular what you did

24 with regard to your redistricting in each instance?

25 A    Sure.  In the censuses following 1990 and 2000, my

TADD OTTMAN - DIRECT

1    duties were largely the same.  I kind of came in, as the

2    people who had been principally working on it had been

3    working on it for awhile, and I assisted in different

4    exercises, looking at ways to, for example, reduce

5    population deviations, checking for errors to make sure

6    that there were no unassigned areas in certain regions of

7    the state, and just that sort of checking, looking if

8    there were opportunities to reduce splits in

9    municipalities, things like that.

10   Q    And is that -- for the second time in the 2000's,

11   what were your duties then?

12   A    My duties were largely the same then.  I also

13   participated in discussions with leadership, in both

14   Republican leadership and both Houses as well as some

15   consultants as they were preparing trial submittals.

16   Q    Where were you located when you were doing this

17   redistricting work first in the 90's?

18   A    In the 90's the work took place over at the law firm

19   of Michael Best & Friedrich.

20   Q    And how about the 2000 one?

21   A    That also took place over at the law firm.

22   Different office, but same law firm.

23   Q    Did you have -- as part of your background you're

24   describing, did you work with the legislative process

25   more generally?

                    TADD OTTMAN - DIRECT

1    A     Yes.   I assisted in drafting legislation, I assisted

2    in building support among with caucus members to get

3    legislation passed, particularly when Senator Panzer and

4    then Senator Fitzgerald were both in leadership positions

5    and even to an extent when they were members of the

6    Finance Committee which is also sort of a leadership

7    position.   So I helped build support for different

8    proposals as they moved through the Legislature.

9    Q     Did your duties change in 2004 in your new position?

10   A     Yes.   At that time Senator Panzer was in a

11   leadership position, so I assisted in kind of floor

12   scheduling for legislation as well as just kind of

13   working more directly with members of the caucus on

14   different -- both administrative and policy matters.

15   Q     And when did you start your current position?

16   A     In 2005.

17   Q     2005.   And at that point what were your duties for

18   that new position?

19   A     For that new position, Senator Fitzgerald had been

20   named chair on the Joint Committee on Finance, so I was

21   involved with kind of putting together the state budget

22   while he was chair.   Subsequent to that he became Senate

23   Republican Leader, and so my duties had to do with

24   building support among caucus members for different

25   initiatives that the Republican caucus was putting

TADD OTTMAN - DIRECT

1   forward.

2   Q    Can you describe -- it might be helpful for

3   everyone -- what the typical process, a bill becomes a

4   law.  What are the steps, at least from your experience?

5   A    Sure.  It varies somewhat depending on how

6   significant the policy matter is.  But on -- what happens

7   is largely legislators will work either on their own or

8   with drafters or with a small group of people to develop

9   legislation.  Usually it's developed among members of

10  your own party, if not just the individual legislator.

11  They create a proposal with the assistance of the

12  Legislative Reference Bureau.  At that point, the bill is

13  often, but not always, circulated among other legislators

14  to see if anybody else would want to sign on.  For major

15  policy pieces of legislation sometimes that doesn't

16  occur, for example, various budget amendments are not

17  necessarily circulated.

18      The bill is then circulated.  At some point it is

19  introduced.  Not all bills that are circulated are

20  introduced.  And then once they are introduced, they are

21  assigned to a committee.  The committee chairman or

22  chairwoman can choose to hold a public hearing on that

23  piece of legislation.  Most of the time a public hearing

24  is held.  There are instances when it is not.  And then

25  that legislation is forwarded to the full body, either

TADD OTTMAN - DIRECT

52

1   the Senate or the Assembly, for debate and then it is

2   passed over to the other House where a similar process

3   occurs.

4   Q     Thank you.  How many years total now have you worked

5   in the Wisconsin Legislature?

6   A     I've worked -- I started as a page while I was still

7   in college so that would have been '84.  So 32 years now.

8         JUDGE CRABB:  How many of these plans that you

9   worked on were passed by the Legislature?

10        THE WITNESS:  I believe all of the plans that I

11  worked on were passed by at least one House.  The most

12  recent plan following the 2010 census is the first plan

13  I've worked on that's been passed by -- that an identical

14  plan has been passed by both Houses.

15        JUDGE CRABB:  So the others never were adopted

16  by the whole Legislature; is that correct?

17        THE WITNESS:  My recollection is that each House

18  passed a version that was not identical and that no

19  identical version was passed through the whole

20  Legislature.

21        MR. RUSSOMANNO:  Thank you.

22  BY MR. RUSSOMANNO:

23  Q     During your years of employment with the

24  Legislature, were you ever working for the minority

25  party?

TADD OTTMAN - DIRECT

1   A    Yes, for several years.

2   Q    Can you recall, estimate about when that was?

3   A    That would have been early on from '89 on through --

4   I believe I was already working for the State Senate when

5   the Republicans took control of the State Assembly, so it

6   probably would have been -- there may have been a brief

7   window when the Senate Republicans controlled it in the

8   late 1990's or early 2000's and then for much of the

9   post-2000, with the exception of, I believe, one or two

10  sessions more Democrats were in control of the Senate.  I

11  was in the minority then, but otherwise for the majority

12  party.

13  Q    In your experience when you were working for the

14  minority party, did the majority party always provide the

15  minority party with legislation in the drafting process?

16  A    Not during the drafting process.  Typically the

17  first time the minority party, and frankly most of the

18  majority party sees legislation, is when a bill is

19  circulated, either electronically or prior to that paper

20  copies were handed out.

21  Q    And in your past experience with redistricting in

22  particular, the two prior times, do you know if the

23  Democratic Party created draft maps?

24  A    It's my understanding, yes, they did create draft

25  maps.

TADD OTTMAN - DIRECT

54

1    Q     And did the Democratic Party provide the Republican

2    Party with those maps during the drafting process?

3    A     Not that I'm aware of, no.

4    Q     Now, moving on from your background, can you talk a

5    bit about what you were doing leading up to the process,

6    the redistricting process for the 2010 census?

7    A     Prior to the 2010 census, I was working with --

8    along with my other duties, I was working with the

9    legislative service agencies: the Legislative Reference

10   Bureau, Legislative Technology Services Bureau, kind of

11   preparing for what was going to happen with

12   redistricting.

13         The census information is sent to our Legislative

14   Technology Services Bureau.  We worked with some of the

15   other service agencies, including, I believe, the

16   legislative counsel who also advises the Legislature

17   where we discussed what equipment the Legislature would

18   need to purchase, how that equipment would be distributed

19   to all four of the partisan caucuses, two in each House,

20   any ancillary equipment that was going to be needed,

21   printers, plotters.  The maps that are produced on these

22   plotters are a large size and the Legislature didn't

23   maintain file cabinets that were large enough to do that,

24   so we had to explore where we could obtain cabinets that

25   would hold those maps.

                     TADD OTTMAN - DIRECT

1   Q     If I could back you up a little bit.  How did you

2   become involved?  Did someone ask you?

3   A     Senator Fitzgerald asked me to kind of participate

4   in that effort and eventually head up the redistricting

5   effort for the Senate for him.

6   Q     Do you know why he asked you?

7   A     I believe it was because of my prior involvement in

8   redistricting in the previous decades.

9   Q     And the process you were just describing, when

10  abouts was that in 2010?

11  A     It started, I believe, relatively early in 2010

12  while the census was still going on.

13  Q     And during this earlier 2010 time period, was there

14  involvement of law firms, outside law firms?

15  A     Yeah.  At some point -- I believe Senator Decker was

16  the majority at that time.  At some point -- a lot of

17  times or most times for any retention of outside legal

18  counsel it's done through what's called the Senate

19  Organization Committee Ballot, which is made up of

20  leadership of both parties of the Senate with three of

21  the majority party and two of the minority party, and

22  they vote by ballot to approve expenditures for funds.

23  So we got a ballot that Senator Decker was requesting to

24  hire legal counsel for the Senate Democrats related to

25  redistricting, so Senator Fitzgerald either had me

TADD OTTMAN - DIRECT

1   request from Decker's office or spoke to Senator Decker

2   himself to see if Republicans could also retain counsel.

3       So Senator Decker agreed, and then there was another

4   ballot circulated approving counsel for Senate

5   Republicans to hire as it related to redistricting.

6   Q   And did the Senate Republicans hire counsel?

7   A   We did, yes.

8   Q   Who did you hire?

9   A   We retained Michael Best & Friedrich.

10  Q   Do you know if the Democrats hired outside counsel?

11  A   They did.

12  Q   Do you recall who they hired?

13  A   I don't recall all the names on the law firm.  I

14  believe Cannon, DeJong were two of the named partners in

15  the firm.

16  Q   Do you know what the law firm hired by the

17  Republicans was doing during this time period, this early

18  2010?

19  A   There was very little that the law firm did at that

20  time.  I think they were doing some of the preparation,

21  looking at what redistricting cases across the country

22  occurred in the previous decade that might have bearing

23  on our redistricting.  We'd also discussed with them

24  about kind of the physical process potentially of drawing

25  the maps in the provided room for the state Senate where

TADD OTTMAN - DIRECT

1  we could locate our redistricting computer when it

2  arrived.

3  Q    Do you know what the Democrats' counsel was doing

4  during this time period?

5  A    I do not.

6  Q    Did you try to find out?

7  A    Subsequently later on Senator Fitzgerald made an

8  open records request of Senator Miller asking for records

9  of what the law firm retained by the Senate Democrats had

10  done as part of redistricting.  I believe they had billed

11  the State Senate somewhere close to $200,000 for legal

12  bills, so we made a -- Senator Fitzgerald made an open

13  records request to get some more information about that,

14  but Senator Miller never fulfilled that request.

15  Q    So moving later into 2010, did something change with

16  this arrangement of counsel?

17  A    Yes.

18  Q    What was that?

19  A    After the elections of 2010, Republicans elected a

20  majority in both Houses of the Legislature and Republican

21  Governor Walker was elected as Governor and so it became

22  clear that a legislatively passed redistricting plan was

23  a possibility.

24  Q    And then did something formal happen to change

25  outside legal counsel's status?

TADD OTTMAN - DIRECT

1    A    Yes.  After new legislators and the Governor were

2    sworn in this January, the Senate Organization Committee

3    passed a new ballot terminating the previously existing

4    relationship that the Democrat state senators had had

5    with their law firm and kind of reauthorizing a new

6    contract with Michael Best & Friedrich.

7    Q    And could we put up Exhibit 355, please.  Can you

8    see the exhibit up on your screen there, Mr. Ottman?

9    A    Yes, I can.

10   Q    Do you recognize that?

11   A    Yes.

12   Q    What is it?

13   A    It was a ballot that was circulated to members of

14   the Senate Organization Committee that provided for the

15   hiring of Michael Best & Friedrich as well as the

16   termination of the previous agreement that had been

17   signed with O'Neil, Cannon, Hollman, DeJong.

18   Q    Is this the document you were just describing, the

19   document that relates to it?

20   A    It is.

21   Q    At this point now, did the Democrats have counsel

22   after this document came to be?

23   A    The only counsel was Michael Best at that point.

24   Q    And what was different now when this document was

25   created than earlier in 2010 when both parties had

TADD OTTMAN - DIRECT

59

1  counsel?

2  A    What was different now was that there was one party

3  in control of all three branches, which hadn't occurred

4  for a long time, which led Senator Fitzgerald and others

5  to conclude that a legislatively enacted redistricting

6  plan was possible.

7  Q    And why is that relevant to counsel?

8  A    At that point in prior -- in prior redistrictings

9  after the census in the prior year without unified

10 control by one party of both Houses of the Legislature,

11 those redistricting efforts all ended in front of a court

12 and there was no legislatively enacted plan.

13 Q    So still in late 2010/2011, what changed about what

14 you were doing?

15 A    At that point, Senator Fitzgerald asked me to kind

16 of be responsible for working on redistricting for the

17 State Senate and the Legislature.

18 Q    And did you -- where were you located during this

19 time period?

20 A    At the end of the year I was still in the Capitol

21 office, and then at some point, I believe in either late

22 December or early January, I moved over to the office

23 space that Michael Best & Friedrich had provided to the

24 State Senate.

25 Q    Is this similar or different than what you described

TADD OTTMAN - DIRECT

earlier about the last two redistricting arrangements?

A    It's pretty typical from my experience of how the previous two legislative redistricting arrangements that I had been involved with worked.

Q    Can you explain why you moved over to Michael Best in this particular instance?

A    It was beneficial to have both myself and Adam Foltz, who was also working on redistricting, in the same room as well as kind of having proximity to the lawyers if we had questions about legal standards that may apply there, as well as there was an interest in protecting the confidentiality of the process that the -- operating out of the Capitol, it's a little less conducive to.

Q    Why were you hoping to keep things more confidential?

A    We expected litigation to occur as part of this, so we knew it was going to be important to be able to talk about with certainty who had access to what and when and who may also have saw it.

        JUDGE RIPPLE:   Continue your answer.

Q    As well as there's some benefit to kind of controlling the discussions with other legislators at different stages of the process.  They're obviously very interested in what's going on and we wanted to kind of have a little bit more kind of defined relationship about

                   TADD OTTMAN - DIRECT

1  when they could see it and what they could see.

2          JUDGE RIPPLE:  Did the Democratic leadership

3  voice any objection to the termination of funds for their

4  counsel?

5          THE WITNESS:  I believe they voted no on the

6  ballot that terminated their counsel and hired Michael

7  Best.

8          JUDGE RIPPLE:  Thank you.

9          JUDGE CRABB:  I'm sorry, I didn't quite

10  understand that.  The Democrats voted no on what?

11          THE WITNESS:  On the ballot we circulated.  It

12  was a singular ballot that both retained Michael Best and

13  terminated the relationship with the counsel that the

14  Democrats had previously hired.

15          JUDGE CRABB:  Oh, okay.

16          JUDGE RIPPLE:  If this would be a convenient

17  time, I think we could take our morning recess at this

18  time for about 15 minutes.

19          MR. RUSSOMANNO:  Yes, Your Honor.

20          JUDGE RIPPLE:  Thank you very much.

21      (Recess    10:31-10:50 a.m.)

22          THE CLERK:  This Honorable Court is again in

23  session.  Please be seated and come to order.

24          JUDGE RIPPLE:  You can continue, please.

25          MR. RUSSOMANNO:  Thank you.

                    TADD OTTMAN - DIRECT

BY MR. RUSSOMANNO:

Q    Mr. Ottman, when we left off I believe you had described that you had moved to a new location at the beginning of 2011; is that correct?

A    That's correct.

Q    So now you're located in Michael Best in a room. Can you describe that room in general terms?

A    Sure.  It was an interior room.  It was set up at that point with two redistricting computers, two desks, a conference table, there was a set of map drawers, and then there was a colored printer and a plotter, which is essentially a printer for large documents or maps.

Q    Was one of those computers your computer to use?

A    Yes, it was.

Q    And on your computer what was your -- did you have something set up on that at that point on your computer?

A    At that point autobound had been set up on my computer.

Q    What is autobound?

A    Autobound is the redistricting software that we used for drawing the maps.

Q    As well as you can, can you describe -- paint a picture of what autobound would look like if you had it up on the screen.

A    Sure.  Once I opened up the program, you would

TADD OTTMAN - DIRECT

1    select the map that you wanted, you know, select

2    Wisconsin or whatever, select the districts you wanted to

3    draw, which were the assembly districts.  So what would

4    happen, we each had two monitors set up.  So on one

5    screen you would have just a geographical representation

6    of the state, and then on the bottom, either on the

7    bottom of the screen or you could take -- it was kind of

8    a floating box that had different demographic

9    information.  You could either look at either the bottom

10   of the screen or on the second screen or sometimes I

11   would have an internet browser open on the second screen

12   or something.

13   Q    And that had what you said was a demographic data

14   box.  What kind of data in particular?  What was in that

15   kind of box?

16   A    That box was configured with census data as well as

17   some custom data.  For example, it would have total

18   population and then we, you know, created kind of fixed

19   numbers for the ideal population for each Senate and

20   Assembly seat, which is just the census data for the

21   entire state divided by 99 and 33 respectively.  So as

22   you were drawing, you would pick a district that you

23   wanted to work on, assign it a different color, and then

24   as you populated, it would show the number of people in

25   that district, your range of deviation from the ideal

TADD OTTMAN - DIRECT

1  population in that district, and then there was a series

2  of other census demographic information, voting-age

3  population, different minority group populations, you

4  know, black, Hispanic, you know, Asian, Native American,

5  all different sorts.  And then at some point you were

6  able to custom figure and we had a column with the

7  partisan metric on the screen as well.

8  Q    Thank you.  And at this point in early 2011 what

9  were you doing with that autobound software?

10  A    At the early part of 2011 we didn't have the census

11  data yet so it was largely just kind of familiarizing

12  ourselves with how the software worked, how to make

13  assignments, kind of what sort of reports were available

14  to generate there, just kind of playing around and making

15  sure once we got the census data, we were kind of ready

16  to go and knew how to use the software.

17  Q    Why did you need to wait for the census data?  What

18  was its importance to you?

19  A    The census data is the key data that reflects the

20  adjusted population that is the basis for redistricting

21  the state.

22  Q    When you were describing just now, you custom

23  loaded?  Is that -- what term did you use you customized

24  the demographic data?

25  A    Yeah.  There was different -- there was ability

TADD OTTMAN - DIRECT

1    within autobound to create custom fields and one of the

2    fields that we did that with, the data that came along

3    was largely raw data so any time you wanted to create a

4    percentage, you had to go in and do the math within the

5    program.  So even if you wanted different minority

6    percentages or whatever percentages, you would have to do

7    that, as well as the partisan information which was

8    information that the Government Accountability Board

9    provided to the Legislative Technology Services Bureau,

10   then they provided it to us.  And when we created the

11   composite, we had to go in and kind of tell the software

12   how to create a percentage of that and then display it as

13   a column alongside the other data.

14   Q    When you say *we* created the composite, who does we

15   refer to?

16   A    There I'm talking about Joe Handrick, Adam Foltz and

17   myself.

18   Q    Did you load into autobound a metric from Professor

19   Gaddie?

20   A    No.

21   Q    Now, at some point was another computer added to

22   that room?

23   A    Yeah.  A few months later we did add another

24   computer to the room.  The Senate ended up purchasing

25   that computer and that was the computer that Joe Handrick

                    TADD OTTMAN - DIRECT

1  ended up using.

2  Q    Was there anything different about how that computer

3  was set up?

4  A    It was set up with the same software and

5  configurations.  The only difference is because Joe was

6  not a state employee and Joe wasn't over there all the

7  time, I just created the log-in ID and password for that

8  computer when it was set up.

9  Q    If we could bring up Exhibit 225, and this is the

10 exhibit that the parties had stipulated to from the

11 plaintiffs' forensic analyst that opposing counsel

12 discussed a bit earlier.  And if we could pull up WRK

13 32864 spreadsheet which was discussed earlier with you,

14 Mr. Ottman.  I'll give you a second just to put eyes on

15 that.

16 A    Okay.

17        MR. RUSSOMANNO:  And now if we could go over to

18 the right a bit, please.  One more click maybe.  Okay.

19 That's good.

20 Q    Mr. Ottman, you see here there's comment that says

21 *Author* and one says *Last saved by*.  The first dozen, what

22 do those say?

23 A    They said Tad under both, yes.

24 Q    But do you know what that means?

25 A    I believe that was just the identity that the

TADD OTTMAN - DIRECT

1  computer had been logged in as.

2  Q    So do you know were these your files?

3  A    No.  I believe that computer was left on the

4  majority of the time.  So whenever Joe would use it,

5  that's how it would record the author.

6  Q    So whose files do you believe these to be, the ones

7  that say T-a-d?

8  A    I believe those to be Joe's.

9         MR. RUSSOMANNO:  And if we could click back over

10  all the way to the left, please.

11  Q    You were asked earlier about Exhibit 283 called

12  *Summaries*, and if you see over on the file name column,

13  do you see a summaries there?

14  A    Yes.

15  Q    What numbers are those?

16  A    17 and 18.

17         MR. RUSSOMANNO:  Apologize, but can we click

18  back over to the right again?

19  Q    So for 17 and 18, can you tell who the author and

20  last saved by are?

21  A    The listed author and last saved by both say Tad.

22  Q    Was that you?

23  A    I don't believe so, no.

24  Q    Okay.  We can go back to our timeline.  What

25  happened next in your process?  I believe you said you're

                    TADD OTTMAN - DIRECT

1    waiting for census data.  Did that arrive at some point?

2    A    Yes.  That arrived some time in March or April, I

3    believe.  Once it arrived, it came to the Legislative

4    Technology Services Bureau and then they did some

5    processing of it to make sure that it imported correctly.

6    They had a copy of autobound software as well, so I think

7    they loaded it onto their machine, made sure it all

8    functioned correctly.  And I don't know, at some point

9    they had all the election information that they added to

10   it.  I don't know if that was all done at that time.  I

11   know different elections for whatever reason weren't all

12   loaded at the same time, so they kind of prepared the

13   information and then came over and installed it on the

14   computers where we were working.

15   Q    And then what?  Were you ready to go?

16   A    Then we were pretty much ready to go, yes.

17   Q    And so when you get that new census data, what does

18   it say to you?  What do you do next?

19   A    The next thing we did is we can -- just kind of

20   poking around familiarizing ourselves with the data.  One

21   of the first things we did was that we had the current

22   map of the state that had already been loaded up, so we

23   looked at every Assembly and Senate district and compared

24   the current population or I should say the census

25   population to the ideal population that we discussed

TADD OTTMAN - DIRECT

1  earlier for each Senate and Assembly district to see how

2  far over or under each Senate and Assembly seat was,

3  which is an indication of kind of what changes were going

4  to be needed to make -- that we were going to have to

5  make to those districts in order to move them closer to

6  equal population.

7  Q    Why did you need to make those changes?

8  A    Equal population is one of the core redistricting

9  principles.  It's the directive of the census to

10 reapportion, to bring statewide maps closer to the

11 one-person, one-vote standard.

12 Q    Could you have chosen not to make changes based on

13 the new census data?

14 A    I don't believe so, no.

15 Q    Now, I'm going to put up what's been marked as

16 Defendants' Exhibit 505.  Can you identify what that map

17 shows?

18 A    Yes.  This is a map of the Assembly districts as

19 they existed at the time with an indication of how far

20 above or below the new ideal population each district

21 was.

22         JUDGE CRABB:  What time was this?

23         THE WITNESS:  This was right after we got the

24 census data, so this would have been in April, I believe.

25 April of 2011.

                    TADD OTTMAN - DIRECT

1            JUDGE CRABB:  2011?

2            THE WITNESS:  Yes.

3    BY MR. RUSSOMANNO:

4    Q    Maybe you can just give us an example.  What you do

5    you see in that box there?  Can you identify that?

6    A    That is a blowup of the Milwaukee County region of

7    the districts in that region.

8    Q    Are there any examples there of the over/under you

9    were just speaking of?

10   A    Yeah.  There's several examples there, including the

11   18th Assembly District which I believe is one of, if not

12   the most underpopulated compared to ideal districts in

13   the --

14   Q    What does that show if you can see it?

15   A    It shows that that district is more than 9,000

16   people short of an ideal census population.

17   Q    So as a practical matter, what does that mean to you

18   as a map drawer?  What do you need to do?

19   A    So as a map drawer, that indicates to me that for

20   that district and all the districts around there that we

21   need to make those districts larger and add more

22   population to them.

23   Q    Okay.  And what -- is there an example -- well, let

24   me show you another exhibit here.  This one has been

25   marked as Defendants' Exhibit 506.  Are you able to

                    TADD OTTMAN - DIRECT

1  identify what this map shows?

2  A    Yes.  This is a similar map with the Senate

3  districts that shows each Senate district and its

4  deviation from ideal population, either plus or minus.

5  Q    Do you know what's the relationship between the

6  first map I showed you and this map?

7  A    Each Senate district contains three nested Assembly

8  districts within it.

9  Q    And are you able on this map to give an example of

10 your overpopulation issue that you discussed a moment

11 ago?

12 A    Yes.  Here I think the largest overpopulated

13 district was the 27th Senate District, which is just --

14 at that time it was kind of the far west side of Madison

15 and counties to the south which was overpopulated by more

16 than 25,000 people.

17 Q    And what did that fact mean to you as a map drawer?

18 A    That indicated to me that that district was going to

19 either have to shrink or its boundaries were going to

20 have to change significantly so that whatever new

21 district resulted contained closer to an ideal

22 population, far fewer than it did at present.

23 Q    Thank you.

24      MR. RUSSOMANNO:  And just for the Court's

25 benefit, the exhibits I referenced so far have all been

TADD OTTMAN - DIRECT

1    admitted at the beginning of the case.

2              JUDGE RIPPLE:  Yes.

3    BY MR. RUSSOMANNO:

4    Q    Okay.  So you have received the census data; you see

5    what we just looked at on those maps.  What do you do

6    next?

7    A    Then we begin drawing some draft maps.

8    Q    Okay.  What does that process look like?

9    A    Basically what you do and -- we drew at the Assembly

10   map level since they all kind of feed into the Senate

11   districts.

12   Q    And I'm going pause you there.  Who are you

13   referring to by *we*?

14   A    By we, at that point it was Adam Foltz and myself.

15   A little bit later Joe Handrick also entered into the

16   process.

17   Q    Thank you.  Please continue with your process.

18   A    Yes.  So what you would do is you would sit down at

19   your computer, you would open up your statewide map, you

20   would open up a plan that you'd been working on or label

21   a new plan and assign it the Assembly district that you

22   wanted to work with and then you could also pick a color

23   that you wanted that Assembly district to be.  It's sort

24   of like a color-by-number exercise.  So you pick a color.

25        You also determine what other layers that you want

                     TADD OTTMAN - DIRECT

1   to look at on the screen.  There were a number of

2   different overlays that you have, anywhere from existing

3   Senate and Assembly districts, you could have that as an

4   overlay, counter boundaries, municipal boundaries, ward

5   boundaries all the way down to census block boundaries.

6   As a practical matter what you tried to do is you would

7   zoom in the region of your screen to the area that you're

8   looking at to the smallest amount that you could see and

9   then have kind of the fewest layers displayed that you

10   would need because the more information that you were

11   requiring it to display slows down the computer speed a

12   lot and makes it really slow to render.

13       Every time you move -- if you take your mouse and

14   shift the map over a quarter of an inch, it has to redraw

15   the entire screen.  So you tried to have as few layers as

16   you needed to work with at the time displayed.

17       And then what you would do is there were a couple

18   different ways that you could add population to the

19   district.  You could either -- let's say, for example,

20   you were working at -- in the City of Milwaukee, for

21   example, you were probably working at the ward level, the

22   old ward level.  So you would have the wards displayed

23   and you would literally draw a circle, click on it, and

24   it would assign it to the map and fill it in.  And then

25   it would give you an idea of okay, this is how much

TADD OTTMAN - DIRECT

1  population you'd go, and depending on how close you were

2  to an Assembly district, you would then draw further

3  circles and add more.

4       In other parts of the state, for example, in the

5  northwest part of the state, you might do that at the

6  county level because it's so sparsely populated so you'd

7  grab three or four counties at the time.  Or maybe the

8  municipal level and you could click on a city and add it

9  or a village and add it.  So you would start on that.

10 You would work getting closer to your ideal population.

11      My personal preference as I drew was to kind of draw

12 in clusters of three Assembly districts.  So I would kind

13 of have three Assembly districts in mind and I would

14 maybe add to one or the other and then switch between

15 them.  And part of the reason I did that was we didn't

16 get the zero population deviation on any Assembly

17 district, so if I would have one Assembly district that

18 maybe was a little bit over ideal population, then I

19 would kind of make a note that okay, one of these other

20 two Assembly districts I'm going to try to make sure it's

21 a little bit under ideal population so that when I got to

22 the end and had three Assembly districts that were going

23 to make up a Senate seat that that Senate seat was then

24 closer to ideal population.

25 Q    Did you, in fact, start in a particular place on the

1    map in your process?

2    A    When we started, we spent a lot of time early on

3    working in the City of Milwaukee, almost exclusively in

4    the City of Milwaukee.

5    Q    And this is Exhibit 505 still if it's helpful for

6    you to kind of see the Milwaukee area.  Why Milwaukee?

7    A    We knew there were going to be more redistricting

8    criteria, including I believe the voting rights

9    application that was going to apply there.  So what we

10   wanted to do was make sure we spent a lot of time there,

11   drew those districts correctly and had some things to

12   show both the lawyers and the political consultants,

13   Professor Gaddie that we had hired at that time, to look

14   at what we were doing and get some feedback and advice

15   from them on were we doing this the right way?  Are there

16   other things we need to look at?  Is there more

17   information you need to evaluate?  With the idea that

18   eventually we wanted to kind of get those Milwaukee

19   districts drawn in such a way that the lawyers advised us

20   was kind of in a good place and then we just kind of

21   wanted to lock that in and leave it alone before we drew

22   the rest of the map.

23   Q    Can you go back.  You said you consulted with

24   lawyers and your expert.  Who in particular, if you're

25   able to name the people you consulted with.

TADD OTTMAN - DIRECT

1  A    Consulted primarily with Eric McLeod.  Jim Troupis,

2  I believe, was involved in some those discussions, and

3  Professor Gaddie.

4  Q    And what was the subject matter of those

5  consultations?

6  A    The subject matter was largely Voting Rights Act

7  compliance.

8  Q    And this regards Milwaukee?

9  A    Correct.

10 Q    Did any of the people you consulted with draw any of

11 the map districts or lines?

12 A    None of those people I mentioned, no.

13 Q    Did they tell you what lines to draw?

14 A    They did not, no.

15 Q    And just to clarify, you said at this point you were

16 also working with Adam Foltz?

17 A    That's correct.

18 Q    Were you working together on one map?  Separately?

19 Can you describe what the working meant at that point?

20 A    Sure.  Each of us had our own workstation and we

21 each kind of did our own thing.  We were in the same

22 room, so sometimes we would have discussions about hey,

23 you know, I'm in a box over here.  What did you do over

24 here?  Or maybe we'd go and look at each other's computer

25 and say okay, what are you doing there?  Whatever.  But

                    TADD OTTMAN – DIRECT

1  largely it was just us each working on our own coming up

2  with our own different draft maps.

3  Q    Why not work together?  Why work separately?

4  A    We knew all along that this was going to have to be

5  something that legislative leadership was going to have

6  to make some decisions on about what they wanted to do

7  and it was just helpful to have kind of different

8  alternatives for -- to present to leadership.  In the

9  case of -- Milwaukee was a little bit of a different

10 situation, but largely the idea was, you know, let's

11 develop our own alternatives and then maybe you'll think

12 of something that I didn't think of and vice versa and

13 then compare later.

14 Q    At some point did you finish and move away from

15 Milwaukee?

16 A    Yes.  At some point we kind of got sign off from the

17 lawyers that okay, we think this is in a good place.  And

18 then what we actually did or what I actually did is kind

19 of took those boundaries for the Assembly districts and

20 there's an ability within autobound to kind of lock and

21 unlock districts so that you don't inadvertently alter

22 them.  So I kind of locked these districts so I wouldn't

23 alter them, saved that portion of the map, and then any

24 subsequent draft maps that I worked on I just kind of

25 loaded that saved map in Milwaukee and then worked on

TADD OTTMAN - DIRECT

1  other areas of the state.

2  Q    Where did you move to next?

3  A    It varied.  Sometimes I would work out from those

4  maps to the suburbs of Milwaukee.  Other times I would

5  start in different corners of the state and work there

6  and build maps in kind of different directions.

7  Q    Did you draw a full map?

8  A    Eventually I drew some complete statewide maps.  I

9  drew a lot of partial maps that did not include the whole

10  state.

11  Q    Those partial maps, did you ever abandon some maps?

12  A    Sure.  Sure.  Some of them were abandoned.

13  Q    Do you know why?

14  A    Sometimes as you're drawing, you'll get kind of a

15  good chunk across the state, for example, and you may

16  have some districts that you really like and then you

17  find out you're over in another corner of the state where

18  you don't have anywhere else to go and you're not left

19  with another -- with enough territory to add to a new

20  district without that district being a really odd shape.

21  You know, it might be one township wide for seven

22  townships or something, or just leaves you with a odd

23  configuration.

24  Q    Why do you care if it was an odd configuration?

25  A    That kind of played into our evaluation of when we

TADD OTTMAN - DIRECT

1  were evaluating several things, including compact,

2  contiguous, as well as core retention for current

3  districts.

4  Q    What does that mean, core retention?

5  A    Core retention refers to the amount of territory

6  that is in the current district at that time compared to

7  the new district; how much is territory that was in that

8  district before and how much is new territory.  So

9  sometimes when you would get to that point, you're just

10 left with the choice of okay, either I can go back and

11 unwind a lot of what I've already done which may

12 necessitate changes all across the state or I can just

13 start from a new map.

14 Q    And during this larger -- moving out of Milwaukee

15 now during this process, did anyone tell you what lines

16 to draw?

17 A    No.

18 Q    Did attorneys at Michael Best tell you what lines to

19 draw?

20 A    No.

21 Q    Did Professor Gaddie tell you what lines to draw?

22 A    No.

23 Q    And during this initial drafting process did you

24 have any meetings with legislators?

25 A    Yes.  During the early part of the drafting process

TADD OTTMAN - DIRECT

1    I met with all the Senate Republican legislators with the

2    exception of Senators Fitzgerald and Zipperer.

3    Q    And what did these meetings entail?

4    A    Those meetings were primarily to kind of sit down

5    with each Senator, let them know okay, here is what the

6    census data shows for your district.  Your district is

7    either underpopulated or overpopulated.  Here are some

8    changes that are going to have to -- as a result your

9    district is going to have to change.

10        To the extent I could, I explained to them that not

11   only are the population changes in your district going to

12   have an impact on how your new district looks, but things

13   going on in other parts of the state are going to have an

14   impact on your district.  For example, any of the

15   legislators surrounding Milwaukee could say okay, even if

16   your district were perfect population, the Milwaukee

17   districts have to get bigger and that's necessarily going

18   to impact how your district looks.  So I wanted to

19   explain to them kind of that principle.

20        Another thing I wanted to do was verify where they

21   lived.  We had geographic -- we had graphical

22   representation that LTSB had plotted about each Senator's

23   home address and so we wanted to verify; show them a map,

24   is this actually where you live or whatever and if it

25   needed to be corrected then we did so.  And then it was

TADD OTTMAN - DIRECT

1    just kind of an open-ended question of okay, tell me a

2    little bit about your district.  Tell me, you know, are

3    there areas you like, are there areas you don't like, are

4    there areas surrounding your district that you like.  It

5    was a fairly open-ended question of just tell me what

6    you'd like to about your district.

7    Q    Were requests made to you about what to do?

8    A    There were a couple of requests; not a lot, but

9    there were a few.

10   Q    Do you recall if you made any changes based on a

11   request from these meetings?

12   A    Not specific changes as a request from those

13   meetings.  Once we were further along in the map process,

14   we'd go back and check and say okay, were we able to

15   accommodate some of the interests that the legislators

16   had indicated.

17            MR. RUSSOMANNO:  If we could pull up Exhibit

18   239, please.  And if you -- are you able to get the text

19   more centered.

20   Q    Do you recall a bit earlier being asked about this

21   email --

22   A    Yes.

23   Q    -- from a Senator?  Is this a request made after one

24   of these meetings?

25   A    I received this after one of the meetings, yes.

                    TADD OTTMAN - DIRECT

82

1   Q    Did you go back and redraw something because of

2   these requests?

3   A    I did not.  At that point -- this was one of --

4   Senator Vukmir's district is right on the edge of

5   Milwaukee.  In fact, I believe her whole district

6   included wards in the City of Milwaukee.  So given what

7   was going on in Milwaukee, this was one of those areas

8   where there was simply less flexibility in how we could

9   draw that district than in some other areas of the state.

10  Q    Do you know what happened with -- to the reference

11  to a Staskunas seat?

12  A    I don't recall specifically what happened with that

13  seat.

14  Q    Did you make a change because of this request?

15  A    I did not, no.

16  Q    Did you meet with the Democratic Senators during

17  this time?

18  A    I did not.

19  Q    Why not?

20  A    It wasn't typical to meet with members of the other

21  party on major policy legislation, including this.  Also

22  at some point the former Senate Democrat Majority Leader

23  had filed a lawsuit against the state saying that the

24  districts were unconstitutionally malapportioned, so

25  there was that pending at the same time.  And we

TADD OTTMAN - DIRECT

1    anticipated that this was going to be a legislatively

2    enacted plan and there was no expectation that the

3    Democrats were likely to wind up voting for that plan.

4    Q    Did any Democrats approach you with requests?

5    A    No.

6    Q    Did any Democrats approach you with proposed maps?

7    A    No.

8    Q    Do you know if the Democratic Party had access to

9    districting computers during this time?

10   A    Yes.  The redistricting computers and software was

11   provided to all four partisan caucuses, the Senate and

12   Assembly Democrats as well as the Senate and Assembly

13   Republicans.

14   Q    Now, you've already alluded to this, but can you

15   walk through the considerations while drafting the map?

16   I suppose outside of Milwaukee since you already

17   addressed that.  What were your considerations when you

18   were drawing the map districts?

19   A    Sure.  The first thing we looked at was population,

20   trying to get a close-to-ideal population.

21   Q    What else did you consider?

22   A    We also looked at just kind of an eyeball test of

23   how does this district look in terms of, you know,

24   compactness and contiguousness.  Then we would also --

25   Q    Can I stop you there?  I'm sorry.  What does

TADD OTTMAN - DIRECT

1  contiguous mean to you?

2  A    Contiguous just means that every portion that you've

3  included in that district is connected to the rest of the

4  district so there's not a gap where you're jumping over

5  something.

6  Q    And you said you looked for compactness.  How do you

7  understand compactness to look?

8  A    At that point when you're in the initial drawing

9  stages, it's just a matter of looking at it and basically

10  looking at the size and the shape to see if it's

11  reasonably configured.  There are reasons based on

12  population that it may not be, but it's just kind of an

13  eyeball test to see if the shape is reasonable or not.

14  Q    Did you have numerical compactness scores as you

15  went along in this process?

16  A    Not as we went along.  There was a report that you

17  could generate within autobound, but I never ran that on

18  anything except a fully completed statewide map.

19  Q    Is there a reason you didn't run it as you went

20  along?

21  A    The information isn't particularly useful unless you

22  have a completed statewide map because every place that

23  hasn't been assigned as a district is, you know, saying

24  it's not compact and it would show as discontiguous.  So

25  it's really incomplete information at that point.

TADD OTTMAN - DIRECT

Q    I interrupted you.  What else did you consider?

A    Sure.  We also looked at the partisan scores of the
districts that we had drawn.  You'd look at kind of where
the incumbents lived.

Q    Let me stop you there.  So when you say you looked
at the partisan score is it?

A    Yes.

Q    What do you mean?  Did you -- in what way did you
look at it?

A    It was just kind of a point of reference to -- the
information was there on the screen.  You'd say okay,
I've got these districts and it would have the percentage
Republican score on there.  So it was just something of
note.  Until you have either a complete statewide map or
a nearly statewide map, it's not entirely useful data.
Because as you go in the process of refining the
districts, all of those factors change and those numbers
all change at the end.  But it's just something that was
displayed there that you could look at.

Q    Did you change maps based on the score you saw in
your process?

A    Not just based on the score, no.

Q    Okay.  Go ahead.  Your other considerations?

A    Sure.  We looked at kind of what the core of the
existing district was compared to the new district.  We

1    -- or I looked at municipalities that were split -- and

2    because I had worked for the Senate, I had more of a

3    sense of areas where there would be delayed voting by

4    voters moving between Senate districts so that they

5    would, if they were scheduled to vote in the upcoming

6    election in a Senate seat and they were moved to a

7    district that was not scheduled for election, I was able

8    to eyeball that a little bit just because I was familiar

9    with the Senate seats.

10   Q    Is there a term for that?

11   A    Disenfranchisement is the term.

12   Q    And I believe you testified earlier that you looked

13   at where incumbents lived?

14   A    That's correct.

15   Q    Can you explain that a little bit more?

16   A    Sure.  We looked at where incumbents lived and kind

17   of were they drawn in the same district that they

18   continued to represent or were they being presented with

19   a lot of new territory under the proposed map.

20   Q    Why did that matter?

21   A    That mattered because in the end this was a map that

22   we were going to ask the Legislature to vote for and we

23   knew that that was one of the considerations that was

24   going to be very important to the people being asked to

25   vote for this.

                    TADD OTTMAN - DIRECT

1   Q    And why would it be important to them?

2   A    Because most of them I think intended to continue to

3   run for election and I think it was important to them to

4   know many things comparing their old district to their

5   new district and kind of evaluate whether or not they

6   were happy with it.

7   Q    Does the term pairing mean anything to you?

8   A    Yes.

9   Q    Did that come up?

10  A    Yeah, it's something we looked at.  If there were

11  instances where two legislators were paired in the same

12  seat under the new proposed map.

13  Q    And do you remember how much pairing ended up in the

14  map, the final map?

15  A    If I could recall correctly, I think there were 22

16  legislators paired in the final map.

17  Q    Do you know how that divided up between Republicans

18  and Democrats?

19  A    I believe that was split right down the middle, 11

20  of each.

21  Q    And during this drafting process did you have it as

22  a goal to pair Democrats?

23  A    No.  That was never a goal.

24  Q    Do you know, could you have paired more Democrats

25  than ended up being paired?

TADD OTTMAN - DIRECT

1  A    Certainly.  One example in particular that springs

2  to mind, as I was drawing the maps for the City of

3  Madison, on the west side of Madison there were two

4  incumbent Democrat legislators at the time.  I believe it

5  was Representative Terese Berceau and Representative

6  Brett Hulsey that happened to live one ward apart from

7  each other, and I just happened to notice that all three

8  wards were of virtually identical population and by

9  simply flipping two wards, you could either pair them in

10 the same seat or unpair them in the same seat.

11 Q    Do you know if they ended up paired?

12 A    They did not.

13 Q    Is there anything else you considered that you

14 haven't stated?

15 A    Like I say, we looked at some of the natural

16 boundaries.  For example, you would look at if there were

17 a lake or a river, we considered whether or not you would

18 cross some of those natural boundaries.  We also, as

19 you'd map, you'd look at some of the maps you've created

20 and say okay, are there communities of interest maybe

21 that are created by this.

22    Madison is another example where I looked at.  At

23 the time it was split between three different Senate

24 seats, when the city was, when the population of the city

25 did not -- was not enough to sustain two full state

TADD OTTMAN - DIRECT

89

1    Senate seats.  So things like that were among the factors

2    that we looked at.

3    Q    And did these factors all work together all the

4    time?

5    A    No, absolutely not.  They were often -- you were

6    often unable to accommodate both factors.  One good

7    example is in municipal splits, sometimes you could have

8    a whole municipality in one district, but it may result

9    in that district being further away from the ideal

10   population, whereas if you split that municipality, you

11   could make perhaps two districts closer to equal

12   population.

13       There were other times where the current map split a

14   municipality.  The example that always popped in my head

15   is the city or village of Oregon just south of Madison,

16   which I believe it's one ward or a very small segment is

17   split off into a separate Senate seat.  It would have

18   been very easy to reunite that village in one Senate

19   seat, but it would have caused a disenfranchisement

20   issue.  So in the end it was decided to kind of leave

21   that split as it was under the old map in order to avoid

22   that.  So sometimes those principles just don't work

23   together.

24   Q    So what did you do when they didn't work together?

25   How did you decide?

TADD OTTMAN - DIRECT

1  A      That was one of the things that we discussed with

2  legislative leadership and just kind of made a decision.

3  Sometimes they decided in favor of one criteria,

4  sometimes it was decided in another -- in favor of

5  another.

6  Q      Did you use a measure created by Professor Gaddie in

7  this process?

8  A      Not that I recall, no.

9         JUDGE RIPPLE:  If I may, when you were involved

10  in this process, you testified that at times you gave

11  state maps along the way, as I understand it.  Can you

12  give me some idea of how frequently, as you went through

13  the process of creating these new districts, you

14  referenced them to a state map while creating a state map

15  to see how it would fit in?

16         THE WITNESS:  I believe in total I myself

17  created maybe three or four complete statewide maps where

18  I went to the trouble of filling in the entire state and

19  then going back and zeroing it out so I made sure I had

20  no unassigned blocks and that there were no other errors

21  that the plan --

22         JUDGE RIPPLE:  With respect to regional maps,

23  how frequently did you reference the regional situation

24  while working on the particular Assembly district?

25         THE WITNESS:  I had a number of partially

                    TADD OTTMAN - DIRECT

completed state maps which had varying levels of the

state in there.  As we were preparing maps to discuss

with legislative leadership, I looked at a lot of those

maps.

JUDGE RIPPLE:  Thank you.

BY MR. RUSSOMANNO:

Q    During this drafting process, did anyone tell you to

draw maps for districts to reach a certain partisan

score?

A    No.

Q    Did you draw maps to achieve a certain partisan

score?

A    No.

Q    So the drafting process comes to an end at some

point; is that correct?

A    That's correct.

Q    And can you explain what happened?

A    At some point Senator Fitzgerald called me and said

we want to be prepared to act on a redistricting plan.

When can you have something ready for us to look at?  And

then we kind of talked about it and kind of worked

backwards in terms of okay, we're going to need to do

some things to finish up some map alternatives.  The

amount of time, we're going to need some time for -- to

meet with legislative leadership for you, meaning Senator

TADD OTTMAN - DIRECT

1    Fitzgerald and other members of leadership, to decide on

2    what you want the final map to look like.  And then we're

3    going to need to build in some time once that's done and

4    we have that map completed to meet with legislators and

5    get an idea if we have enough support to go forward with

6    that map, get it drafted mechanically, hold a hearing and

7    be on the floor.  So we kind of created a timeline for

8    action that way.

9    Q    And do you know about when that was, this shift into

10   out of drafting?

11   A    It was some time, I believe, in June that we kind of

12   started that process.

13   Q    Did that timing have any impact related to wards and

14   census blocks?

15   A    Yes.

16   Q    What was that?

17   A    we were anticipating acting in that time frame,

18   that June/July time frame.  The municipals are not

19   typically completed in a redistricting process until the

20   end of the year, so we wrote -- we also drafted

21   legislation that allowed the state to act and draw out

22   the census block level in advance of municipalities

23   completing their ward drawing.

24   Q    Did that difference change anything about the

25   considerations you've been speaking about in the map

TADD OTTMAN - DIRECT

1  drawing?

2  A    It didn't really change any of the considerations.

3  The only thing it did do was allow us in some areas to

4  draw at the census block level where it may have split

5  preexisting wards or wards that municipalities might

6  otherwise have drawn.

7           JUDGE RIPPLE:  Can you explain census block

8  level?

9           THE WITNESS:  Sure.  My understanding of census

10 block level, it's the smallest unit that the census

11 collects information on.  It's literally as you would

12 think of, typically a city block as they define it.

13 BY MR. RUSSOMANNO:

14 Q    Do you know how long you would have needed to wait

15 to get all the ward data in?

16 A    From my experience in previous redistrictings, that

17 data largely came in by December of the year following

18 the census.  So my expectation would be if that process

19 had continued, that information wouldn't have been

20 available until December of 2011.  And I seem to recall

21 that at least in the prior redistricting there was some

22 municipalities that still hadn't completed their ward

23 drawing process at that point, maybe even including

24 Milwaukee.  I seem to recall there was at least one

25 larger municipality that hadn't finished it.  And what

                    TADD OTTMAN - DIRECT

1   that means is that if you wait until that point, any maps

2   that you've worked on that are built off of the ward

3   layer, you then have to go back and basically redraw with

4   the new ward information.

5   Q    From your past experience in the Legislature, do you

6   know was this idea of using census blocks instead of

7   wards ever floated in the past redistricting processes?

8   A    Yes.   I specifically recall a discussion following

9   the 2000 census that I believe Senator Chvala had drafted

10  a bill that it made changes that would allow the state to

11  act earlier or put a deadline for municipalities to act.

12  But there were discussions between the Houses about

13  moving forward at that legislation.   Ultimately it did

14  not move through both Houses.   But when we drafted

15  legislation, we kind of referred to that bill draft when

16  we drafted the bill that we ultimately did, allowing the

17  state to act in front of municipalities completing their

18  wards.

19  Q    Who was Senator Chvala was it?

20  A    He was the Democrat Senate Majority Leader at the

21  time of the previous redistricting.

22  Q    So after your drafting process, how did the

23  selection process proceed?

24  A    After we had made a number of draft maps and set up

25  meetings for legislative leadership to come over, Joe

TADD OTTMAN - DIRECT

1   Handrick, Adam Foltz and myself kind of sat down,

2   discussed how to kind of break up the states in regions

3   to discuss with the legislative leadership, and then we

4   each kind of printed off maps that we had been working on

5   for those different regions.  We kind of broke them out

6   by Assembly districts and just kind of printed them out

7   and discussed amongst ourselves okay, let's take this map

8   of Tad's, this map of Joe's and this map of Adam's or

9   maybe we'll take two of the alternatives Joe has drafted

10  and one of Adam's and put that in part -- as part of the

11  packet to show --

12  Q    When you say map, are you talking about a whole map,

13  statewide map?

14  A    No, I'm talking about individual.  We had broken it

15  down by Assembly districts.  So it was individual

16  Assembly district maps at that point.

17  Q    When you referred to regions, can you give an

18  example of a region if you're looking at regions?

19  A    Sure.  We prepared alternatives for them for

20  everything except the City of Milwaukee.  So we had

21  regions in southeast Wisconsin, central Wisconsin, maybe

22  Eau Claire, the Fox Valley area, the Illinois border.

23  Some of those titles that were discussed earlier, just

24  different regions or corners of the state.

25  Q    Do you know how many maps total you were selecting

TADD OTTMAN - DIRECT

1  from?

2  A    I don't know the total number.  Each -- Joe, Adam

3  and myself each just kind of, you know, printed out some

4  different alternatives and then we just kind of sat down

5  and looked at them and selected these will go in the

6  packets.

7  Q    Were the regions alternatives that you were

8  selecting all from complete maps?

9  A    I don't believe so, no.  I know at least some of the

10 maps that I included or forwarded for consideration in

11 the packet were not from a complete statewide map.

12 Q    So did they all come from any particular map?

13 A    Not to my recollection, no.

14 Q    Did you limit which maps you were pulling from based

15 on when they were drafted?

16 A    No.

17 Q    Did you know the partisan score for these regions as

18 you were doing this process?

19 A    We knew the partisan score for each of the Assembly

20 districts.

21 Q    I'm referring to your score right now.  The one you

22 created.

23 A    Yes.

24 Q    Are we clear?  Okay.

25 A    Yes.  For each of the Assembly districts we knew

1  what the partisan score of that Assembly district.  We

2  didn't have separate partisan scores for the regions and

3  because all three of us had drawn differently, there

4  wasn't like a regional boundary that matched up because a

5  map I may have drawn may have gone north of the region

6  that Joe or Adam may have drawn.  So it wasn't like a

7  perfect fit within the region, which is kind of why we

8  selected them based on Assembly districts so that we

9  would be considering the same Assembly seats but not

10  necessarily the exact geographic boundary -- same exact

11  geographic boundary.

12  Q    To the extent you could see the partisan score for

13  something, did you only select the highest scores?

14  A    No.

15  Q    And what did you do with these selections?

16  A    Once -- we kind of tried to narrow it down to a

17  manageable number of alternatives in each region for the

18  leadership team to look at and then we kind of prepared

19  packets of each region.  And then when we sat down with

20  legislative leadership, we kind of went through

21  region-by-region, kind of talked in general about okay,

22  here's what this map does.  Here are the Assembly

23  numbers.  Here are the current seat holders in their

24  Assembly and Senate seats.  We discussed it for both the

25  Senate seats that made up the region as well as the

TADD OTTMAN - DIRECT

1   Assembly seats; discussed a little bit about okay, here

2   are some of the things that either the Representative or

3   the Senator had to say about that in our earlier meeting

4   with them and then discussed some of the different -- we

5   discussed the partisan scores for those Assembly seats we

6   had, as well as looked at okay, this does this, but, you

7   know, it splits a county or splits a municipality or

8   something like that.  So we just kind of had a general

9   discussion.

10  Q    Can you explain what you mean -- you said manageable

11  number.  Do you know about how many alternatives of each

12  region you presented?

13  A    I think we tried to limit it to three or four per

14  region.  It could have been more, but typically it

15  wasn't -- it wasn't too many.

16  Q    Did you present a partisan score for a whole

17  statewide map?

18  A    No, not as part of that selection process.

19  Q    Why not?

20  A    We were asking them to choose among various

21  statewide maps.  We asked them to make selections within

22  each region, and then after they did that, after the

23  conclusion of each day's meetings, then we would sit down

24  and kind of try and stitch together to the best of our

25  ability the alternatives they selected.  Because even

TADD OTTMAN - DIRECT

1   within the regions it wasn't like all the maps, all the

2   choices that they liked were not mutually exclusive.

3   They required some redrawing to kind of do our best to

4   cobble together what they had agreed to.

5   Q    If I could step back to the meetings with the

6   regional maps just to be clear, did you present choices

7   between statewide maps called MayQandD?

8   A    Not a complete statewide map.  There were some

9   districts from within that map that made up part of the

10  selection.

11  Q    What about a map called *aggressive*, the whole map

12  called aggressive?

13  A    I'm not sure what map that refers to.

14  Q    What about a whole map called aggressive or

15  assertive?  Sorry.

16  A    Again, I'm not sure which map that refers to.

17  Q    Did you present any statewide map to the leadership?

18  A    I believe we -- there were some on display there,

19  but as part of the meetings we only discussed by region.

20          MR. RUSSOMANNO:  And if we could pull up Exhibit

21  364, please.  And if you could zoom to the top.

22  Q    You see the title there?

23  A    Yes.

24  Q    Do you recall being asked about this document

25  earlier today?

TADD OTTMAN - DIRECT

1   A    Yes.

2   Q    And what does this say at the top there?

3   A    It says *TadMayQandD*.

4        MR. RUSSOMANNO:  And if we could go down to the

5   bottom where there's data.  All the way down if you can.

6   Q    While she's doing that, does this data on this

7   document correspond to a statewide map that was presented

8   as part of these meetings?

9   A    No.  There was no statewide map presented for them

10  to select from.

11  Q    And so same question.  At the bottom here you were

12  asked about these numbers.  Do these numbers represent

13  data from a statewide map that was presented to the

14  leadership to select from?

15  A    They do not.

16       MR. RUSSOMANNO:  If we could pull up Exhibit

17  283, please.

18  Q    You were also asked about this Exhibit 283 earlier

19  by opposing counsel.  Do you remember being asked about

20  this?

21  A    Yes.

22  Q    Did you create this document?

23  A    I did not, no.

24       MR. RUSSOMANNO:  And maybe, Jackie, if you

25  wouldn't mind scrolling to the right, just kind of get an

TADD OTTMAN - DIRECT

1  idea what's there.  It goes on for quite awhile.

2  Q    Maybe that's enough to give you the flavor.  Did you

3  present this as part of your meeting?

4  A    No.

5  Q    Was the leadership ever given a choice between

6  partisan scores for complete statewide map?

7  A    No.

8  Q    And you had begun to talk about what happened next.

9  So going back to that, you said you started stitching a

10 map together?

11 A    That's correct.

12 Q    Can you explain what you mean?

13 A    Yeah.  Each day, at the end of each day where we met

14 with legislative leadership, we'd take what had been

15 discussed and the decisions they had made at those

16 meetings and we began building what eventually became the

17 map that was introduced to the Legislature.  So we would

18 take the decisions they made in each region, try to draw

19 them, and then where the selections they made did not

20 match up with each other, then we just kind of made

21 decisions about okay, this is what we, you know, think

22 they talked about here, so let's draw this that way and

23 then that's going to mean we have to make some other

24 changes in the rest of the map so that we have a complete

25 map that either -- that doesn't have unassigned territory

TADD OTTMAN - DIRECT

1   and doesn't have territory assigned to two districts at

2   the same time.

3   Q    As part of that stitching-together process, were you

4   asked to move lines just to increase the partisan score?

5   A    No.

6   Q    And did you?

7   A    No.

8   Q    At some point did you have a full map then, a final

9   map?

10  A    Eventually, yes, we did have a final map.

11  Q    What did you do then?

12  A    Then at that point we began meeting with individual

13  legislators.

14  Q    Actually maybe I skipped a question here.  Did you

15  run data on that stitched-together map?

16  A    Yes.  Yes, we did.  We did generate some reports on

17  that map.

18  Q    Do you recall what kind of reports?

19  A    Sure.  There were reports that measured compactness.

20  There were reports that generated the partisan score.

21  There were also reports that talked about

22  discontiguities.  One of the features of the -- two of

23  the main features that we had to check on any completed

24  state map were discontiguities and unassigned territory.

25  So first of all, you would run a report to make sure that

TADD OTTMAN - DIRECT

103

1    you didn't forget to assign some block somewhere to a

2    district, and so you'd run through and make sure that

3    every census block was assigned to a district.  Then it

4    would generate a contiguity report, and that would be a

5    long list of discontiguous territory.

6         What we did is I would go through and look at every

7    instance that the report said was discontiguous and

8    determine if it were a legal discontiguity or something

9    that we needed to fix.

10   Q    What do you mean by that?

11   A    Certain town islands are part of the town even

12   though they're disconnected from each other, and we were

13   informed by legal counsel that that -- even though

14   they're not physically contiguous, it's a legal

15   discontiguity to allow them to be in the same district

16   even if maybe they don't physically touch each other.  So

17   we went through every instance that the report --

18             JUDGE CRABB:  Would you say that again?  It's

19   illegal to have these little islands in the same area?

20             THE WITNESS:  It's my understanding that it is

21   legal for a town, even if it has territory that's not

22   physically adjacent to the rest of the town -- like the

23   City of Madison, I know there's Town of Madison that has

24   little islands in the city; that having those islands in

25   the same district as the rest of the town, even if it's

TADD OTTMAN - DIRECT

1    entirely surrounded by a separate district that's in a
2    another district is a legal discontiguity that doesn't
3    need to be in the same district.

4            JUDGE CRABB:  Are you saying it is a legal --
5            THE WITNESS:  I'm sorry.  It is a legal
6    discontiguity as opposed to an illegal.

7            JUDGE CRABB:  Okay.

8            MR. RUSSOMANNO:  Thank you for that
9    clarification.

10           THE WITNESS:  Sorry.  So I would go through that
11   report and make sure -- and you would come across some
12   things.  I would fix them, then I would generate the
13   report again and go through it all again until there was
14   nothing that needed any changes.
15   BY MR. RUSSOMANNO:
16   Q    And did you run a population deviation at that time
17   too?
18   A    Yeah, that was also a report.  That was kind of
19   self-generated at the time, but yeah, you were also able
20   to generate a total population.

21           The other thing that we looked at was
22   disenfranchisement numbers.  I was not able to -- LTSB
23   had tried to find a way to automatically do that
24   calculation.  For whatever reason I couldn't get that to
25   work on my computer, so I just did a manual total of the

                    TADD OTTMAN - DIRECT

1   disenfranchisement number.

2   Q    What was your conclusion?

3   A    The conclusion is we ran the number, saw what the

4   total was, discussed it with legal counsel and said does

5   this, you know, cause any, you know, legal concern at

6   this number.  I believe it fell within the range of

7   previous disenfranchisements under court-drawn plans in

8   the previous decades.

9   Q    What about population deviation?  Did you have any

10  reaction to that number that -- conclusions based on that

11  number you ran?

12  A    Yeah.  We again, you know, ran those numbers,

13  discussed them with legal counsel, and they felt it was

14  sufficiently within legal standards.

15          MR. RUSSOMANNO:  If we could put up Exhibit 509,

16  please.  Come out a little more, please.

17  Q    Do you see what it says in the right-hand column

18  there at the top?

19  A    *2011 Act 43.*

20  Q    And if you look down at the bottom of the screen, do

21  those numbers mean anything to you?

22  A    Yeah.  That, I believe, reflects the range of

23  population deviations in the final map.

24  Q    What you were just referring to?

25  A    Correct.

TADD OTTMAN - DIRECT

1   Q    And do you know how it related to the prior plans?

2   A    It was close to, if not a little better, than the

3   prior plans.

4              MR. RUSSOMANNO:  And if we could pull up -- this

5   is actually a stipulated fact in Docket 125, page 46,

6   paragraph 221.

7   Q    And you said you ran compactness scores.  Do you

8   recall what your conclusion was from that?

9   A    I don't know that I made personal conclusions with

10  that, but I did forward them to the legal team and

11  Professor Gaddie and they seemed to indicate as far as I

12  could tell that they were within acceptable range.

13  Q    Do these numbers on this stipulated fact ring a bell

14  for you as far as compactness numbers consistent with

15  what you were turning at the time?

16  A    Yeah, those appear to be what we had generated at

17  the time.

18  Q    And you also said that you generated a partisan

19  score for the whole map?

20  A    Yes.

21  Q    What did you understand that score to tell you?

22  A    That was just kind of a reflection of how the old

23  map compared to the new map in terms of a partisan

24  metric.

25  Q    Did you understand the partisan score to predict the

TADD OTTMAN - DIRECT

1  future going forward?

2  A    That was not my understanding, no.  It was just a

3  tool to compare how the new districts under the old

4  elections compared to the old districts under the same

5  set of elections.

6  Q    What did you do next with this map, old map?

7  A    At that point we began the meetings with various

8  legislators.

9  Q    And who did you meet with?

10 A    I met with all the Republican Senators, again with

11 the exception of Senators Fitzgerald and Zipperer.

12 Q    What did those meetings involve?

13 A    Those meetings involved me showing them their Senate

14 district as well as some information about how their

15 district had changed, number of new constituents, as well

16 as a selection of races from the previous decade in their

17 Senate seat.  I didn't always use the same races, and

18 sometimes it was a percentage and sometimes it was a raw

19 number of voters like, for example, it might say

20 something like there are, you know, 500 more Scott Walker

21 voters in your new district than in your old district.

22 Q    Did you present that information in a certain form,

23 in a certain way?

24 A    Yeah.  I had prepared kind of a talking point for

25 each of the Republican Senators' districts that I met

TADD OTTMAN - DIRECT

```
 1  with.
 2          MR. RUSSOMANNO:  Can we pull up Exhibit 242,
 3  please.
 4  Q    Can you identify what this is?
 5  A    Yes.  This is one of those talking points for my
 6  meeting with at the time Senator Kinsey for Senate
 7  District 11.
 8  Q    Did you present the partisan score for the district
 9  being discussed at these meetings?
10  A    I did not, no.
11  Q    Does it appear on your memo?
12  A    I don't see it, no.
13  Q    Did you present the partisan score for the whole map
14  at these meetings?
15  A    I did not.
16  Q    Did any Senators make requests at these meetings?
17  A    Not at these meetings, no.
18  Q    Were there any requests made to change the map at
19  any point along here?
20  A    Not as part of my meetings with the state Senators,
21  no.
22  Q    Just returning for a moment to the partisan score
23  that you generated for the whole map, do you know was
24  that the highest score out of the statewide maps that
25  were drafted?
```

                    TADD OTTMAN – DIRECT

1   A      The team map score?

2   Q      Right, correct.  If that's a final map score.

3   A      No, that was not the highest of the draft maps I had

4   worked on.

5          MR. RUSSOMANNO:  And if we could pull up Exhibit

6   364 again, please.  And if you could zoom to the top so

7   we can see what we're looking at.

8   Q      Can you identify what we're looking at here?

9   A      That is the partisan scores on the map titled

10  TadMayQandD.

11         MR. RUSSOMANNO:  And then can we go down to the

12  bottom where that dataset is.  Zoom in when you get

13  there, please.

14  Q      Was this MayQandD, the map that this data

15  represents, was that whole map ever presented to the

16  leadership or the membership of the Republican Party as a

17  choice?

18  A      No, this was never presented as a choice.

19  Q      I'll draw your attention to the bottom right box,

20  three lines down.  What were those words there?

21  A      *Total GOP seats safe and lean*.

22  Q      What does it say under the Assembly column?

23  A      54.

24         MR. RUSSOMANNO:  If we could pull up Exhibit

25  172, please, page three.

TADD OTTMAN - DIRECT

1    Q    Can you identify what this spreadsheet pertains to?

2    A    This is a measure of the partisan scores on the

3    final map.

4    Q    The map you were just talking about that you

5    stitched together?

6    A    Yes.

7         MR. RUSSOMANNO:  And if we could go down to the

8    data box here, please.  Over to the right, please.

9    Q    And can you see what's the number there for the

10   total GOP seats under the Assembly column?

11   A    52.

12   Q    How does that compare to what we just looked at in

13   the MayQandD spreadsheet?

14   A    It's fewer.

15   Q    After the meetings what happened next?

16   A    After the meetings with the Senators?

17   Q    Correct.

18   A    The Assembly took a little bit longer to complete.

19   There were a couple of changes that were made coming out

20   of those Assembly meetings.  But after that, then the --

21   I took the final map that we put together and took it to

22   the Legislative Reference Bureau to have drafted as a

23   bill for introduction to the Legislature.

24   Q    Maybe I'll stop you and back you up one step.  The

25   changes you just described, were those changes to

TADD OTTMAN - DIRECT

1   increase the partisan score?

2   A      No.

3   Q      Do you know what the changes were?

4   A      The changes that I'm recalling had to do with in or

5   around the Appleton seat.  Within Senator Ellis's

6   district there -- he had concerns.  I believe,

7   Representative Crawford, who was one of the

8   representatives that made up his Assembly seat, had some

9   concerns about how his map was drawn.  So we kind of

10  redrew the Assembly boundaries a little bit in that area

11  to address those concerns.

12  Q      Do you know what the concerns were?

13  A      I believe he was paired with another representative

14  in there and had -- did not kind of like where the

15  boundary of where his old seat was on the proposed map.

16  Q      And what happened next then you were about to say.

17  A      So then after that point the map was finalized, we

18  checked it for completeness, and then I took it over to

19  the Legislative Reference Bureau and asked them to draft

20  it up in bill draft form for introduction to the

21  Legislature.

22  Q      At this point had -- before that step, had any

23  Democrats seen the map?

24  A      Not prior to that point, no.

25  Q      Had Republican Senators, nonleadership Republican

1    Senators seen the whole map?

2    A    No.  They had only seen their own districts.

3    Q    Okay.  What happened next?

4    A    Then we got the draft back from LRB and I believe it

5    was on a Friday, we sent out a -- I don't know if it was

6    a ballot that we were coming through, but we made the map

7    publicly available and a hearing -- a public hearing was

8    scheduled for the following week on the map.

9    Q    Did you speak at that hearing?

10   A    I did.

11   Q    And what was the general -- why did you speak at

12   that meeting?

13   A    I spoke at that meeting, I believe it was a joint

14   hearing between a Senate committee and an Assembly

15   committee to kind of describe the map, describe some of

16   the changes that had been made and answer any questions

17   that the committee members had about the maps.

18   Q    And what was the next step?

19   A    The next step then after the public hearing, I

20   should mention that at the public hearing we also offered

21   an amendment for Assembly Districts 8 and 9, which were

22   the Hispanic seats in the City of Milwaukee, and then I

23   believe even subsequent to that a second amendment was

24   offered.  So the committee, after the public hearing,

25   within a couple of days voted the map and approved it.

TADD OTTMAN - DIRECT

1   This was the Senate committee approved it.  And then it

2   was scheduled for a floor debate on the Senate the

3   following week, at which point the Senate took up the

4   legislation, debated it, passed the map, and then it went

5   over to the Assembly where a similar process was

6   followed.

7   Q    Okay.  I'll back up a little bit to get more detail.

8   Was there a caucus meeting at some point in here?

9   A    Yes.  I believe it was after the public hearing.

10  I'm not 100 percent sure of when it happened, but there

11  was a caucus.  Both the Senate Republicans and the

12  Assembly Republicans had a caucus.

13  Q    What is a caucus meeting?

14  A    A caucus is just a meeting of members of the same

15  party where they get together to discuss legislation

16  that's going to be on the floor.

17        MR. RUSSOMANNO:  And if we could put up Exhibit

18  241, please.  And if we could zoom into that text.

19  Q    Do you recall being asked about these notes earlier

20  today?

21  A    I do.

22  Q    I'll direct your attention to about mid-page and you

23  were asked to read a line at the end of the second

24  paragraph.  Can you read that line again?

25  A    "The maps we pass will determine who's here ten

TADD OTTMAN - DIRECT

1  years from now."

2  Q    What did you mean by that?

3  A    Simply that these were the maps that were going to

4  be in place for the next decade.

5  Q    In the next paragraph, the second sentence, what

6  does that say?

7  A    "We have an opportunity and an obligation to draw

8  these maps that Republicans haven't had in decades."

9  Q    What did you mean by that?

10  A    What I meant there was that it's a legislative --

11  one of the Legislature's duties is to redistrict after

12  each census and -- because in my recollection, the

13  Democrats had a chance to do it in the 1980's.  I don't

14  believe that Republicans had ever had that opportunity

15  since at least the 50's or 60's.

16  Q    Moving to the public hearing, were the Democrats

17  allowed to speak at that hearing?

18  A    Yes.

19  Q    Did they?

20  A    Yes.

21  Q    Did the Democrats offer any alternative maps at that

22  hearing?

23  A    No, they did not.

24  Q    And I believe you testified that the map would have

25  been gone -- the bill would have gone to a committee?

1    A    That's correct.

2    Q    What was that committee?

3    A    I believe it was Senator Zipperer's committee.  I

4    can't remember if it was titled judiciary at that time.

5    Q    Were any Democrats on that committee?

6    A    Yes.

7    Q    Are they allowed to offer amendments in committee?

8    A    They are.

9    Q    Did they?

10   A    Not to my knowledge, no.

11   Q    Did they offer any alternative maps at this stage?

12   A    Not at this stage, no.

13   Q    And then how did it get out of committee?

14   A    The committee, after the public hearing, they

15   scheduled what's called an executive session, which is a

16   session where they vote on the proposal, and they voted,

17   I believe it was along party lines to recommend the

18   proposal for passage.

19   Q    And then remind me what you said happened next.

20   A    Then after it was voted out, then the Senate

21   scheduled for action on the proposal for the following

22   week.

23   Q    Was there debate in the Senate?

24   A    There was, yes.

25   Q    Was there any limit on debate in the Senate?

TADD OTTMAN - DIRECT

1  A     There were no limits placed on the debate.

2  Q     Did the Democrats offer any debate in the Senate?

3  A     They did debate it, yes.

4  Q     Were any amendments offered?

5  A     Outside of the amendment I discussed on the Hispanic

6  district that Republicans had put forward, there were no

7  other amendments in the Senate that were offered that I

8  recall.

9  Q     Did the Democrats offer any amendments?

10  A     Not that I recall, no.

11  Q     Could they have?

12  A     Absolutely.

13  Q     You testified earlier you've worked for how many

14  years in the Wisconsin Legislature?

15  A     In some capacity for 32 years now.

16  Q     Based on your experience was the process you just

17  described unusual?

18  A     It was unusual in that there was single-party

19  control that allowed to pass a redistricting map, but in

20  terms of the actual process of how legislation,

21  particularly major policy legislation is passed, it was

22  fairly typical, with the exception of the map-drawing

23  process or the bill-drafting process, if you will, being

24  in the law firm across the street, which is typical to

25  redistricting but not other legislation.

                    TADD OTTMAN - DIRECT

1          MR. RUSSOMANNO:  That's all I have.  Thank you.

2          JUDGE RIPPLE:  Thank you.  Cross-examination?

3          MR. EARLE:  I have some more questions.

4          JUDGE RIPPLE:  Yes, please.

5          MR. EARLE:  May I proceed.  (12:08 p.m.)

6          JUDGE RIPPLE:  Yes.

7                      CROSS-EXAMINATION

8    BY MR. EARLE:

9    Q    Let's just start with that last statement you made

10   that the bill, the legislation, Act 43, was not unusual

11   in terms of how legislation is normally done.  You said

12   Act 43 was typical in the sense that both caucuses had

13   the ability to develop legislation, introduce it and

14   vote; correct?

15   A    I said something to that effect, yes.

16   Q    Right.  And you said that both the Democrats and

17   Republicans could hire historically -- we're going back

18   to 2000; right?  The 2000 cycle.

19   A    Okay.

20   Q    You said that both Democrats and Republicans could

21   hire outside counsel through funds allocated from the

22   chamber; right?

23   A    In practice the leadership of each House determines

24   that, so in the past Democrats had been in charge of

25   either one House or the other and had done that.

                     TADD OTTMAN - CROSS

1    Q     During the 2000 cycle, both Republicans and

2    Democrats had counsel financed through the chamber;

3    correct?

4    A     The Assembly, if I recall correctly after 2000, the

5    Assembly Republicans had counsel financed through the

6    chamber and Senate Democrats hired counsel that was

7    financed through the Senate chamber.

8    Q     All right.  And you said that -- okay.  So let's

9    follow this carefully here.  I've got my notes here.  You

10   testified that the sole reason that Michael Best &

11   Friedrich was hired as sole counsel for the entire

12   Legislature and for the entire Senate was because there

13   was unified control by the Republicans and that made it

14   different; right?

15   A     That's correct.

16   Q     Okay.  But wasn't it true that in 2010 -- as a

17   matter of fact we can go -- let's go to the letter and we

18   can call up Exhibit 257.  We can focus -- can you

19   highlight the date there on 257?  The date that you sign

20   this agreement with Michael Best & Friedrich giving them

21   direction and control over your activities in

22   redistricting and agreeing to be bound by confidentiality

23   controlled by them on July 27 of 2010, we had Governor

24   Doyle; correct?

25   A     Correct.

TADD OTTMAN - CROSS

1    Q     And we had Senator Decker, correct, as the leader of

2    -- the Majority Leader of the Senate?

3    A     That's correct.

4    Q     And we had Sheridan as the Speaker of the Assembly;

5    correct?

6    A     That's my recollection, yes.

7    Q     Okay.  And at that point in time, Michael Best was

8    hired by the Republicans financed through the

9    Legislature; right?

10   A     Financed through the State Senate.

11   Q     Yeah, through the Senate.  Yes.  Correct.  All

12   right.  So then -- okay.

13          MR. EARLE:  Now, can we call up uncontested fact

14   No. 20.

15   Q     Would you read into the record the uncontested fact

16   that's not in dispute in this legislature -- I mean in

17   this litigation.  Sorry.

18   A     "In January 2011, Scott Fitzgerald, Republican

19   member of the Wisconsin State Senate and Wisconsin Senate

20   Majority Leader, and Jeff Fitzgerald, Republican member

21   of the Wisconsin State Assembly and Speaker of the

22   Assembly, hired Attorney Eric McLeod, McLeod, and the law

23   firm of Michael Best to represent the entire Wisconsin

24   State Senate and Wisconsin State Assembly in connection

25   with the reapportionment of the state legislative

                    TADD OTTMAN - CROSS

1  districts after the 2010 census."

2  Q    And as soon as that happened, you moved over to

3  Michael Best, you created a map room, you imposed an

4  access restriction policy, and you swore everybody who

5  entered into that mapping room to secrecy and you

6  proceeded to do the whole map -- mapping process to the

7  exclusion of the Democrats; isn't that right?

8  A    We ask every Senate and Republican member of the

9  Assembly as well to sign a confidentiality agreement and

10 no Democrats were allowed into the room.

11 Q    You didn't ask any Democrats to sign any

12 confidential agreements in order to give them access, did

13 you?

14 A    I did not.

15 Q    Okay.  Now, earlier today Judge Ripple asked you

16 whether the Democrats objected to only hiring Michael

17 Best and your response was they voted no on the ballot,

18 referring to Exhibit 355; correct?

19 A    That's correct.

20 Q    What you didn't tell Judge Ripple was that

21 Representative Barca and Senator Miller sent a letter to

22 protest and object; isn't that right?

23 A    They -- they may have.

24 Q    Let's call up --

25 A    I don't recall that.

TADD OTTMAN - CROSS

1   Q    Call up Exhibit 357.  What is the date of that

2   letter?

3   A    January 5, 2011.

4   Q    Okay.  Let's go to the first paragraph there.  Could

5   you read what they wrote in that letter?

6   A    "Dear Majority Leader Fitzgerald and Speaker

7   Fitzgerald:  We write today to urge you to reconsider

8   your recent actions to retain outside, exclusive legal

9   counsel for Republicans in the Senate and Assembly for

10  purposes of legislative redistricting."

11  Q    And then could we go to the second paragraph, if you

12  could read that paragraph in.

13  A    "At our inaugural just this Monday, the Governor and

14  you spoke of working together, focusing on jobs, and

15  changing business as usual.  Yet just minutes after the

16  Senate adjourned, a paper ballot began circulating to

17  provide a blank check for partisan legal counsel

18  exclusive to Republicans.  The Assembly Organization

19  Committee acted yesterday to adopt a similar partisan

20  political position."

21  Q    Let's go to the next paragraph.  Can you read that?

22  A    "Your actions raise serious concerns."

23  Q    And let's find out what those concerns are.  Let's

24  go to the next paragraph.

25  A    "We can only conclude from the partisan nature of

                    TADD OTTMAN - CROSS

1   your actions that your intention is to gerrymander

2   legislative districts to gain an unfair political

3   advantage."

4   Q    And let's go to the next paragraph.

5   A    "Your actions are counter to the needs of the

6   citizens of this state who are counting on us to get to

7   work on the issues they care about like jobs and the

8   economy.  Instead you've begun the legislative session

9   with raw partisan politics and back-room dealing."

10  Q    Let's go to the next paragraph.

11  A    "In difficult fiscal times one of your first

12  official actions in the majority is to give a blank check

13  to outside lawyers for redistricting.  Rather than

14  continue down this road, we ask you to join us in

15  authorizing our legislative counsel to take on additional

16  staff to serve the Legislature in a nonpartisan fashion

17  to meet our duty and fashion a redistricting plan."

18  Q    And could you read the final paragraph.

19  A    "If you are truly interested in living up to the

20  standards called for by Governor Walker and yourselves in

21  your inaugural speeches, we ask you to rescind your

22  actions and join us in creating a fair, responsible and

23  frugal redistricting process."

24  Q    Now, did Scott Fitzgerald respond to this letter?

25  A    I don't recall.

TADD OTTMAN - CROSS

1    Q    The answer -- okay.  Did the Legislature take any

2    actions to assuage these concerns?

3    A    I don't know.  Not that I'm aware of.

4         MR. EARLE:  Your Honor, we move that Exhibit --

5    what is it -- 357 be received into evidence.

6         MR. RUSSOMANNO:  We object to that, Your Honors.

7    It's an out-of-court statement.  It's hearsay.  It's not

8    admissible for the truth of the matter.

9         MR. EARLE:  It's legislative correspondence,

10   Your Honor.

11        JUDGE RIPPLE:  Well, again --

12        MR. EARLE:  It's not offered for the truth of

13   the matter asserted and so it's not hearsay in the first

14   instance.

15        MR. RUSSOMANNO:  What is it offered for?

16        MR. EARLE:  The effect on the leadership and

17   it's something that's part of the record of this case and

18   it's directly responsive to a question did --

19        JUDGE RIPPLE:  The letter is admitted.

20        MR. EARLE:  Huh?

21        JUDGE RIPPLE:  The letter is admitted.

22        MR. EARLE:  Thank you.

23   BY MR. EARLE:

24   Q    Let's continue.  Now, we talked about wards.  SB

25   139, that was the legislation that changed the sequencing

                    TADD OTTMAN - CROSS

1  of wards, the timing of how they were drawn; correct?

2  A    I don't recall the exact number, but it probably

3  was, yes.

4  Q    And that was part of this process to put Act 43 into

5  place; correct?

6  A    It was -- I believe it was necessary for that to

7  pass as part of the Act 43 process.

8  Q    Let me correct my prior question.  I meant -- I

9  should have referred to SB 150 and Act 39.

10  A    Okay.

11  Q    You remember Act 39; right?

12  A    Not specifically.

13  Q    Okay.  Now, traditionally in Wisconsin the

14  sequencing of redistricting was that municipalities went

15  first and drew their districts and designed the wards as

16  part of that process; correct?

17  A    They went in advance of the Legislature, yes.

18  Q    And traditionally the Legislature waited until after

19  that occurred and then did the statewide redistricting;

20  correct?

21  A    That's how it's operated in the past, yes.

22  Q    We could say that's the historical tradition in

23  Wisconsin codified; correct?

24  A    I don't know how you -- if you'd like to

25  characterize it that.  As I've said, it was the existing

TADD OTTMAN - CROSS

1    process at the time.

2    Q    Now, Act -- SB 150 was introduced on July 11 of

3    2011; correct?

4    A    That's my recollection, yes.

5    Q    And that's two days before the public hearing at

6    which you testified on July 13, 2011; correct?

7    A    I believe so, yes.

8    Q    And it was passed on July 19, 2011; correct?

9    A    I believe so, yes.

10   Q    And it was published and went into law on August 8,

11   2011; correct?

12   A    I don't remember the exact date, but that sounds

13   about right.

14   Q    Do you think it's coincidental that 13 recall

15   elections were scheduled beginning later that month into

16   August?

17   A    I don't know how I'd characterize that.

18   Q    Well, recall -- one recall election was scheduled

19   for July 19 of 2011.  You know that; right?

20   A    I don't recall the dates.

21   Q    Six -- you don't recall that six recall elections

22   were scheduled for August 9th of 2011?

23   A    I know they happened that summer.  I don't recall

24   the specific dates.

25   Q    And it's your testimony that you don't know whether

                    TADD OTTMAN - CROSS

126

1   that event had anything to do with the rush to change the

2   sequencing for the drafting of the wards?

3   A    I don't know that I would term it a rush, and the

4   timing was the decision of legislative leadership.

5   Q    Okay.  Okay.  Now, I'm going to address here the --

6   your response to a series of questions suggesting that

7   you, in fact, drew a more aggressive map than Act 43.

8   That was the essence of your testimony; right?

9   A    I think my testimony was I drew a map under that

10  metric that measured total Republican seats had a higher

11  number than the final map.

12  Q    Okay.  And you were referring to the TadMayQandB --

13  D spreadsheet that was on the screen; right?

14  A    Yes.

15  Q    And so your testimony is that that was more

16  pro-Republican than the final map that was passed; right?

17  A    That had more total Republican seats in that chart

18  than the final Republican map.

19  Q    Okay.  So we're going to put on the screen here --

20  let's put your TadMayQandD sorted by -- up on the screen.

21  It's 477.  This is a sorted version of your spreadsheet

22  in which -- it's a sorted version of the spreadsheet in

23  descending order of partisan scores.

24       Do you see that there?

25  A    Yes.

TADD OTTMAN - CROSS

1          MR. EARLE:  And the column to the left where it

2     says "1," let's go down -- okay.  Is the sequencing

3     here -- let's go and you can see the column that says

4     *new*.  Let's go and highlight the column that says *new*.

5     I'm sorry.  Right there.  And let's take that column down

6     with the highlighter to the 50 percent demarcation line.

7     Now, let's take the other column down -- just highlight

8     that.  There you go.

9     Q    Could you tell the Court how many seats above 50

10    percent are in your map?  Republican.  Republican seats.

11    A    I'm sorry, it's a little small.

12          MR. EARLE:  Can we expand it for Mr. Ottman?

13    Not much more?

14          THE WITNESS:  I believe the number on that is

15    57.

16          MR. EARLE:  Thank you.  So -- and now let's go

17    to the final map.  And we have a new demonstrative, Your

18    Honors, for the final map.  It's Exhibit 487.  And where

19    are we here?  And this is sorted in descending order of

20    pro-Republican vote share.  And let's go down to the 50

21    percent demarcation line.  Could we highlight that?

22    There we go.

23    BY MR. EARLE:

24    Q    How many seats are above the 50 percent demarcation

25    line on the final map?

TADD OTTMAN - CROSS

1   A    It looks like 59 from what I can read.

2   Q    Do you have a marker up there, sir?  Do we have a

3   pen here?  I mean a large marker.  Could you go to the

4   board there and put a big red circle on the 59 line at

5   the very end of the -- see that line there ascending?

6   A    There?

7   Q    If you go out a little further --

8            MR. RUSSOMANNO:  Your Honors, we object to this.

9   What's the foundation for using the witness in this way?

10           MR. EARLE:  I would like the record to reflect

11  that, in fact, the final map had 59 seats and his

12  representation, there is testimony he was incorrect with

13  regards to him having drawn a more aggressive

14  pro-Republican map.

15           JUDGE RIPPLE:  He can do this without using the

16  map, I think.

17           MR. EARLE:  Okay.  That's fine.  Your Honor, may

18  I have Attorney Lang record that on our chart since we're

19  tracking seat shares on that map?  Thank you.  And

20  Attorney Lang, could you write final map underneath the

21  circle up there.  Thank you.

22       Your Honor, we're done at this point with the

23  witness.

24           JUDGE RIPPLE:  I would suggest that you might

25  want to clarify these recall, you mentioned these recall

                    TADD OTTMAN - CROSS

1   elections.

2           MR. EARLE:  Yes, Your Honor.

3           JUDGE RIPPLE:  Would you perhaps with a colloquy

4   with the witness just clarify what these recall elections

5   were for those of us who are not from the Badger state?

6           MR. EARLE:  Yes, Your Honor.  Okay.  Thank you,

7   Your Honor.

8           JUDGE RIPPLE:  And nine other people a thousand

9   miles away.

10          MR. EARLE:  Yes, Your Honor.

11  BY MR. EARLE:

12  Q     You recall that there were recall elections that

13  happened in Wisconsin in 2011; correct?

14  A     That's correct.

15  Q     Do you know why those recall elections happened?

16  A     They -- well, there's a petition process to recall

17  any legislator within a certain amount of time after the

18  election.

19  Q     Now, let's go back to -- do you recall Act 10?

20  A     I do.

21  Q     And Act -- would you describe this in two or three

22  sentences what Act 10 was.

23  A     Act 10 was a redefinition of public bargaining in

24  Wisconsin.

25  Q     Basically took collective bargaining rights away

                TADD OTTMAN - CROSS

1   from public sector unions in Wisconsin; correct?

2   A    It narrowed them to, I believe, wages only.

3   Q    Cost of living; isn't that right?

4   A    I believe so, yes.

5   Q    Yes.  And it imposed onerous recertification

6   requirements on those unions as well; correct?

7   A    I don't know if I would characterize them as

8   ownership.

9   Q    Onerous I said.  Not ownership.  Onerous.

10  A    I don't know that I would characterize them as

11  onerous.  It did impose requirements.

12  Q    And how would you characterize the public reaction

13  in Wisconsin to Act 10?

14  A    There was a lot of protest as a result of some of

15  those actions, yes.

16  Q    And tens of thousands, if not more than a hundred

17  thousand people descended on the capitol in protest;

18  correct?

19  A    There were thousands, yes.  I don't know how many.

20  Q    The capitol was occupied, correct, around the clock?

21  A    I believe so for a period of time, yes.

22  Q    And did some Senators leave the state?

23  A    Yes.

24  Q    How many Senators left the state?

25  A    I believe 14 Senators left the state.

                    TADD OTTMAN - CROSS

1    Q      And what party did those Senators belong to?

2    A      Democratic Party.

3    Q      And why did they leave the state?

4    A      They left the state -- it's my understanding that

5    they left the state to prevent a quorum of the Senate

6    from acting.

7    Q      Regarding the enactment of Act 10; correct?

8    A      I believe so.  I don't know that they stated

9    specifically, but I believe so.

10   Q      And as a result of that did voters from the

11   Democratic Party react to that as well?

12   A      I'm sorry, as a result of what?

13   Q      As a result of the presentation of Act 10, I mean of

14   the legislative process leading to Act 10, did voters in

15   the State of Wisconsin react by initiating recall

16   petitions to recall Republican Senators?

17   A      It's my recollection that citizens of the State of

18   Wisconsin petitioned to recall Senators, some of both

19   parties, mostly Republicans.

20   Q      And you recall -- and that was -- and recalling a

21   Senator means removing that Senator from office; correct?

22   A      That's correct, yes.

23   Q      And then there was a recall election as a result of

24   that process that was scheduled for July 19th; correct?

25   A      I don't remember the dates of the recall elections.

                    TADD OTTMAN - CROSS

1    Q    Okay.  That's right.  We asked that question.  I

2    forgot that you had answered that.  But the recall

3    elections happened very closely after the passage of Act

4    -- of Act 43; correct?

5    A    Some of them did.

6    Q    All of them did; right?

7    A    No.  There were some Senators who weren't able to be

8    recalled in that cycle because of the proximity of the

9    previous election.

10   Q    Thank you.  Well, the recall elections presented the

11   prospect that the partisan control of the Senate would

12   change; correct?

13   A    To the extent that any election presents that

14   opportunity.

15   Q    Enough Republican Senators were the targets of

16   recall elections that had those elections been

17   successful, control of the Senate would have flipped;

18   isn't that correct?

19   A    If -- it's my recollection that if all of the

20   Republican Senators who were petitioned for recall in

21   that cycle were recalled and replaced with Democrats, it

22   would have resulted in a shift in the partisan makeup of

23   the State Senate from Republican to Democrat.

24            MR. EARLE:  Thank you.

25            JUDGE RIPPLE:  Thank you, Counsel.

                    TADD OTTMAN - CROSS

1  Mr. Russomanno.

2          MR. RUSSOMANNO:  I just have something very

3  quick.

4          JUDGE RIPPLE:  What are your plans in terms of

5  more examination?

6          MR. RUSSOMANNO:  I have three very quick

7  questions.

8          JUDGE RIPPLE:  I think we'll go ahead with that

9  so the witness will be free to leave.

10          MR. RUSSOMANNO:  Thank you, Your Honor.  I'll

11  just stay here if that's okay.

12          JUDGE RIPPLE:  Certainly.

13                  REDIRECT EXAMINATION

14  BY MR. RUSSOMANNO:

15  Q    There was some discussion about Senate recall

16  elections.  Did Republicans maintain control of the

17  Senate after those recall elections?

18  A    They did.

19  Q    And who won the recall vote for Governor after that?

20  A    Governor Walker won that recall as well.

21  Q    And who won the Governor race in 2014?

22  A    Governor Walker.

23          MR. RUSSOMANNO:  That's all I have.

24          JUDGE RIPPLE:  Thank you, Counsel.  If there's

25  nothing further -- sir, you are free to leave then.

                    TADD OTTMAN - REDIRECT

1   Thank you for your testimony.

2        (Witness excused at 12:31 p.m.)

3        JUDGE RIPPLE:  It is time for us to take a lunch

4   break.  The Court will resume at 1:35 central daylight

5   time.

6        MR. EARLE:  I'm sorry.  We'll take it up when we

7   get back from lunch.  Sorry, Your Honors.

8        (Noon recess    12:31-1:35 p.m.)

9        THE CLERK:  This Honorable Court is again in

10  session.  Please be seated and come to order.

11       JUDGE RIPPLE:  Good afternoon everyone.  The

12  plaintiff, I believe, is ready to present its next

13  witness.

14       MR. EARLE:  Your Honor, there are three minor

15  housekeeping details we'd like to present to the Court at

16  this point.  The parties have agreed that we can move

17  into evidence Exhibit 257 and 463, and we'd ask that

18  those be received.

19       JUDGE RIPPLE:  Without objection they are

20  received.

21       MR. EARLE:  And the plaintiff would like to move

22  into evidence over the objection of untimeliness from the

23  defendants Exhibit 487, the final map which was sorted as

24  a demonstrative for purposes of illustrating the number

25  of Republican vote share seats above 50 percent.

TADD OTTMAN - REDIRECT

1        JUDGE RIPPLE:  Mr. Keenan.

2        MR. KEENAN:  I've made a timeliness objection to

3   these demonstratives because they weren't in the pretrial

4   order and I just -- I haven't had a chance to look at

5   them to see if they're accurately actually ordering them

6   the right way on the document.  So that's why I've been

7   objecting to these demonstratives.

8        JUDGE RIPPLE:  Why don't you take some time

9   after court today to take a look at them and then,

10  Counsel, you can renew your motion tomorrow.

11       MR. EARLE:  Thank you, Your Honor.  And then the

12  final housekeeping detail is that the parties have

13  conferred and are prepared to stipulate that Russ Decker

14  was the -- when he was the Majority Leader of the Senate

15  was a Democrat.  That detail was omitted from my

16  questions earlier.  And that Jim Doyle, the Governor, was

17  a Democrat as well at the times addressed in the

18  testimony.  And Mike Sheridan was the Assembly Speaker

19  and he was also a Democrat.

20       JUDGE RIPPLE:  And Mr. Keenan, you have no

21  objection that stipulation?

22       MR. KEENAN:  Yes, those are true facts.  I

23  thought it might have been clear in the testimony, but I

24  guess we're clarifying that.

25       JUDGE RIPPLE:  In that case, the stipulation is

1    accepted.

2              MR. EARLE:  Thank you, Your Honor.

3              JUDGE RIPPLE:  Mr. Poland.

4              MR. POLAND:  Thank you, Your Honor.  Your

5    Honors, the plaintiffs call to the stand Professor

6    Kenneth Mayer.

7          **KENNETH MAYER, PLAINTIFFS' WITNESS, SWORN,**

8              JUDGE RIPPLE:  Good afternoon, Professor Mayer.

9              THE WITNESS:  Good afternoon.

10                     DIRECT EXAMINATION

11   BY MR. POLAND:

12   Q    Professor Mayer, would you please introduce yourself

13   to the Court.

14   A    My name is Kenneth Mayer and I'm a professor of

15   political science at the University of Wisconsin-Madison.

16   Q    Dr. Mayer, you were retained as an expert witness in

17   the litigation by the plaintiffs; correct?

18   A    That's correct.

19   Q    And you prepared an expert report in this case?

20   A    I did.

21             MR. POLAND:  Could we please pull Exhibit No. 2

22   up on the screen.

23   Q    Dr. Mayer, you have -- I've given you two notebooks

24   that are in front of you.  One is a notebook that

25   contains exhibits.  Could you please turn to the tab

                     KENNETH MAYER - DIRECT

1   that's Exhibit 2.

2   A    Okay.

3   Q    Can you identify Exhibit 2, please.

4   A    This is the initial expert report that I prepared in

5   July of 2015.

6         MR. POLAND:  And so the Court will know, the

7   exhibits that I'll refer to are exhibits that are not

8   objected to, so we've already moved them into evidence.

9   If an exhibit comes up that has been objected to, I'll

10  raise it with the Court and I will formally move it into

11  evidence.

12        JUDGE RIPPLE:  Thank you.

13        MR. POLAND:  Thank you, Your Honor.

14  BY MR. POLAND:

15  Q    Dr. Mayer, have you prepared any other reports in

16  this case?

17  A    I did.  I prepared a rebuttal report and an amended

18  rebuttal report.

19  Q    Let's start out with your first rebuttal report.

20  When did you prepare that report, sir?

21  A    I prepared that in December of 2015 in response to

22  the expert reports of Dr. Goedert and Mr. Trende.

23        MR. POLAND:  And would you please pull out

24  Exhibit 104 up on the screen.

25  Q    And Dr. Mayer, would you take a look, please, at

KENNETH MAYER - DIRECT

1  Exhibit 104 in the exhibit binder in front of you.

2  A    This is a copy of my rebuttal report.

3  Q    Now, Dr. Mayer, you testified a minute ago that you

4  prepared an amended rebuttal report; is that correct?

5  A    That's correct.

6  Q    And when did you prepare that rebuttal report?

7  A    I prepared that in, I believe, March of 2015.

8  Q    Why did you prepare an amended rebuttal report?

9  A    Because I discovered that I had made a small number

10 of transcription errors in moving data from one

11 spreadsheet to another and wanted to correct that to make

12 sure that the Court had accurate information.

13          MR. POLAND:  Could we pull Exhibit 114 up on the

14 screen, please.

15 Q    Dr. Mayer, would you please turn to Exhibit 114 in

16 the trial binder in front of you.

17 A    Okay.

18 Q    Can you identify for the Court, Dr. Mayer, the

19 amendments and the corrections that you made to your

20 rebuttal report.

21 A    So subsequent to preparing this report, I discovered

22 that I had made a couple of transcription errors in the

23 course of responding to preparing the swing analysis

24 where I had inadvertently copied in the incorrect numbers

25 from one spreadsheet to another and so I went ahead and

KENNETH MAYER - DIRECT

1    identified the correct information and redid the

2    calculations with the correct information.

3    Q    Dr. Mayer, when did you discover those errors?

4    A    I discovered those errors during my deposition.

5    Q    And that was on March 30th of this year; correct?

6    A    I believe so.

7    Q    And when did you correct those errors and prepare

8    your amended rebuttal report?

9    A    It was immediately.  I recall doing it that day and

10   the next day.

11   Q    Can you please look, what's the date on the front of

12   Exhibit No. 114?

13   A    March 31ST.

14   Q    And that was the very next day, wasn't it,

15   Dr. Mayer?

16   A    That's correct.

17   Q    Was that -- do you know whether that document was

18   provided to counsel for the defendants?

19   A    It was.

20   Q    Now, Dr. Mayer, is Exhibit No. 114, does that

21   contain the accurate numbers that reflect your opinions?

22   A    It does.

23        MR. POLAND:  Your Honors, at this time I would

24   like to move Exhibit 114 into evidence.

25        JUDGE RIPPLE:  Mr. Keenan.

                    KENNETH MAYER - DIRECT

1          MR. KEENAN:  We had objected basically because

2    the pretrial order required leave of court to do an

3    amended expert report and they just had never sought

4    leave of court.  So I mean now that they're seeking leave

5    of court, I think it will probably come in so I'm not

6    really going to object.  But that was the basis of the

7    objection.

8          JUDGE RIPPLE:  The exhibit is admitted.

9          MR. POLAND:  Thank you very much, Your Honor.

10   BY MR. POLAND:

11   Q    Now, Dr. Mayer, in your expert reports, and I'll

12   refer now to your original report which we have as

13   Exhibit No. 2 and I'll refer to your amended rebuttal

14   report which is Exhibit 114, you rely on a number of

15   scholarly articles for your opinions; correct?

16   A    I do.

17   Q    Do you know how many articles there are that you've

18   cited?

19   A    I would have to look at the bibliography, but it's a

20   fairly large number.  I'm not entirely sure.  I'd have to

21   look at the bibliography.

22   Q    Dr. Mayer, have we -- for the purpose of your

23   testimony here today, have we prepared for you a binder

24   that contains a number of the articles that you've cited?

25   A    You have.

1          MR. POLAND:  Your Honor, may I approach?

2          JUDGE RIPPLE:  Please.

3          MR. POLAND:  I've actually provided Dr. Mayer

4  with a copy of the binder.  If I could give a copy to

5  opposing counsel, and I have copies for the Court as

6  well, one for each of the judges.  May I approach?

7          JUDGE RIPPLE:  Yes.

8  BY MR. POLAND:

9  Q    Dr. Mayer, if you open the binder that I've handed

10 you, it says "Kenneth Mayer Reliance Material" on the

11 front.  Do you see that?

12 A    I do.

13 Q    And do you see that there's an index the 12

14 articles; correct?

15 A    Correct.

16 Q    Are each of these articles scholarly publications on

17 which you've relied for your opinions?

18 A    They are.

19 Q    And if you go through each of the articles, you'll

20 see that there is highlighting on each of the articles;

21 correct?

22 A    That's correct.

23 Q    And are those statements in those articles on which

24 you have relied for your opinions?

25 A    They are.

                    KENNETH MAYER - DIRECT

1          MR. POLAND:  Your Honor, I'd like to move into

2    evidence, not the articles themselves, but under Federal

3    Rule of Evidence 803.18 the highlighted statements in

4    each of those articles.  The statements themselves can be

5    read into the record and come into evidence as learned

6    treatises even if the articles may not be admitted

7    themselves as exhibits.

8          JUDGE RIPPLE:  Mr. Keenan.

9          MR. KEENAN:  I think in a learned treatise

10   you're supposed to actually go through and read it off,

11   not just mark a binder with highlighting and then get

12   maybe 15 articles in.  So I don't think it's a proper use

13   of the learned treatise rule.

14         JUDGE RIPPLE:  We'll -- we will allow counsel to

15   refer and the witness to refer to both the articles and

16   the underlined material subject to your objection,

17   Mr. Keenan, and we'll take that -- we'll rule on that

18   objection in due course.

19         MR. POLAND:  Thank you, Your Honor.

20   BY MR. POLAND:

21   Q    Dr. Mayer, you have prepared a current curriculum

22   vitae; correct?

23   A    I have.

24         MR. POLAND:  Could we have Exhibit 103 up on the

25   screen, please.

KENNETH MAYER - DIRECT

1   Q    Dr. Mayer, is Exhibit 103 a copy -- a true and

2   accurate copy of your current curriculum vitae?

3   A    It is.  There may be a couple of minor things that

4   I've added since I submitted this, but this is for all

5   practical purposes a current copy of my CV.

6   Q    Thank you.  Dr. Mayer, what were you asked to do in

7   your engagement as an expert witness for the plaintiffs?

8   A    What I was asked to do was to determine whether it

9   was possible to draw a Demonstration Plan for Wisconsin

10  Assembly districts using 2010 census data that had an

11  efficiency gap close to zero and which treated members of

12  the political parties symmetrically and fairly.

13  Q    Is that reflected anywhere in your expert report?

14  A    It is reflected in my initial expert report, the

15  analysis of that report and of Act 43.

16        MR. POLAND:  Could we pull up Exhibit 2, please,

17  at page one.  I'm sorry, I didn't mean of the table of

18  contents, I mean of the first actual page.

19  Q    And that reflects what you were asked to do in this

20  case or your expert report does?

21  A    Yes.  That is reflected in the second paragraph on

22  this page.

23  Q    Were you also asked to do anything with respect to

24  the traditional redistricting criteria?

25  A    I was.  I was also asked to ensure that the district

                    KENNETH MAYER - DIRECT

1    plan that I drew, the Demonstration Plan that I drew

2    complied with the statutory and constitutional

3    redistricting criteria which are population, equality

4    compactness, respect for political subdivisions, and

5    compliance with the Voting Rights Act.

6    Q    Dr. Mayer, you used a term a minute ago, *efficiency*

7    *gap*, and certainly that has appeared in the pleadings and

8    argument before this court.  But could you briefly

9    describe what the efficiency gap is as you examined it?

10   A    The efficiently gap is a metric that is set out in

11   what I believe is a forthcoming article in the University

12   of Chicago Law Review and in effect the efficiency gap is

13   a measure, given any particular districting plan, it's a

14   measure of the net wasted votes that are cast by

15   Democrats and Republicans and is a metric of the partisan

16   bias that exists in a plan.

17   Q    Dr. Mayer, after you prepared your initial report,

18   expert report, were you subsequently asked to do further

19   tasks?

20   A    I was.

21   Q    And what were those?

22   A    I was asked to prepare a response to the expert

23   reports of Mr. Trende and Dr. Goedert as well as respond

24   to some of the criticisms that they leveled at my

25   original report.

KENNETH MAYER - DIRECT

1    Q    Thank you.  Now, your curriculum vitae reflects many

2    publications, research grants, honors, other activities.

3    We don't have time to go through them all this afternoon.

4    But can you briefly describe your qualifications from

5    your previous work that most closely relate to your work

6    in this case?

7    A    I've been studying elections and election

8    administrations in Wisconsin for decades.  I've served as

9    an expert witness in two federal redistricting trials.  I

10   was an expert in the 2001/2002 *Baumgart* case.  And I was

11   also an expert witness in the 2011/2012 *Baldus* case.  In

12   2003 I was appointed by the Chief Justice of the

13   Wisconsin Supreme Court to co-chair a special committee

14   on redistricting to devise procedures that the Court

15   might use in the event that there was a legislative

16   impact -- impasse.  And then this case.

17   Q    Have you worked at all in your role as a professor

18   at the University of Wisconsin with the Government

19   Accountability Board?

20   A    I have.  In 2008 -- 2009, I and three other

21   colleagues in the Political Science Department were

22   retained by the Government Accountability Board to assist

23   them in implementation of a grant from the U.S. Election

24   Assistance Commission and to prepare some reports to

25   evaluate their compliance with some of the federal data

KENNETH MAYER - DIRECT

1  reporting requirements, and we did a number of studies

2  coming out of that.

3  Q    I might have missed this in your first answer.  Have

4  you testified as an expert in any county redistricting

5  cases?

6  A    Yes.  In 2011, I served as an expert on behalf of

7  the City of Kenosha in a local redistricting dispute

8  between the City of Kenosha and the County of Kenosha.

9  Q    Thank you.  We'll go over this in more detail a

10  little bit later as well, but for now can you tell the

11  Court generally what you did to investigate the issues

12  you were asked to examine in this case?

13  A    So my overall aim was to draw a plan that had an

14  efficiency gap as low to zero as I could get it.  In

15  order to do that, I had to come up with a methodology for

16  evaluating the baseline partisanship of Wisconsin,

17  applying the standard political science methodologies of

18  evaluating alternative redistricting plans or comparing

19  different district configurations.  So the first step of

20  that was preparing an estimate of the baseline

21  partisanship of different geographies in Wisconsin.

22  Q    Now, as you went through this investigation or after

23  you went through it, did you reach any opinions based on

24  your investigation?

25  A    I did.  My opinions are set out in my report, and if

KENNETH MAYER - DIRECT

1   I could refer to it.

2   Q     Certainly.

3   A     So my overall opinions are set out on page five of

4   my initial report.  I concluded, first of all, based on

5   my analysis of ward-level partisanship that the

6   redistricting plan in Act 43 was significantly biased

7   against the Democrats and I calculated an open-seat

8   baseline efficiency gap measure of 11.69 percent.  My

9   analysis of Act 43 allowed me to identify how that

10  efficiency gap was achieved.  It was primarily through

11  the classic techniques of packing and cracking; in the

12  event of packing Democrats into a small number of

13  districts where they had overwhelming support, and then

14  cracking Democrats so that they would have below 50

15  percent and a sufficient number of districts to allow

16  Republicans to win a larger number of districts than they

17  would have had under a fairer map.

18      I also compared my measure to the composite measure

19  or the baseline measure that Professor Gaddie had

20  prepared or evaluated and I created a Demonstration Plan

21  that had an efficiency gap of 2.2 percent, applying again

22  the consistent open-seat baseline method to evaluate the

23  partisanship of the plan.

24  Q     Did you also reach opinions in your rebuttal report?

25  A     I did.

KENNETH MAYER - DIRECT

1  Q    And can you summarize for us very briefly the

2  opinions you set forth in your rebuttal report.

3  A    My opinions in my rebuttal report largely consisted

4  of two things:  One was a criticism of the overall

5  approaches that Mr. Trende and Dr. Goedert used in their

6  analysis of the partisanship of Act 43 and of the

7  political geography of the state, but in response to some

8  of the criticisms that Dr. Goedert and Mr. Trende made

9  criticizing me for not doing certain types of analysis.

10  I went ahead and did that analysis and found that it

11  didn't alter my conclusions at all.

12  Q    Did you set forth any opinions in your rebuttal

13  report about whether the pro-Republican gerrymander was

14  necessary?

15  A    I did.  I concluded that it manifestly was not

16  necessary based on either the political geography of the

17  state or compliance with the traditional redistricting

18  principles.

19  Q    Now, Dr. Mayer, your opinions and the bases for

20  those opinions are set forth in your initial report and

21  your rebuttal report?

22  A    That's correct.

23  Q    Now, are your opinions based on the facts, data and

24  analyses set forth in those reports?

25  A    They are.

KENNETH MAYER - DIRECT

1   Q    Are your opinions based on reliable principles and

2   methods that you use in your field?

3   A    They are.

4   Q    Have you applied those principles and methods in

5   formulating your opinions in this case?

6   A    I have.

7   Q    And Professor Mayer, did you adhere to the same

8   standards of intellectual rigor in formulating your

9   opinion in this case that you -- that are demanded in

10  your professional work?

11  A    I did.

12  Q    Are your opinions to a reasonable degree of

13  scientific certainty?

14  A    They are.

15       MR. POLAND:  Your Honors, at this time I would

16  tender Dr. Mayer as an expert witness.

17       JUDGE RIPPLE:  Mr. Keenan.

18       MR. KEENAN:  We've never objected to Dr. Mayer

19  as an expert witness.

20       JUDGE RIPPLE:  Thank you.  He is accepted as an

21  expert witness.

22       MR. POLAND:  Thank you.

23  BY MR. POLAND:

24  Q    Now, Dr. Mayer, you testified a few moments ago that

25  you created a Demonstration Plan.

KENNETH MAYER - DIRECT

1   A      That's correct.

2   Q      Why did you prepare a Demonstration Plan?

3   A      Because I was asked to determine whether it was

4   possible to do so and create a district plan that

5   complied with the traditional redistricting criteria and

6   also had an efficiency gap of close to zero.

7   Q      Now, did you know at the time that you were asked to

8   create a Demonstration Plan what the efficiency gap of

9   Act 43 was?

10  A      I had seen an estimate or a calculation of the

11  efficiency gap in the 2015 article by Stephanopoulos and

12  McGhee.

13         MR. POLAND:  Could we pull up Exhibit 41,

14  please.  And Dr. Mayer and Your Honors, this is tab

15  number 5 in the binder of reliance materials that I

16  provided.

17  Q      Could we turn to page 882, please.

18  A      So this is a graph that shows the efficiency gap

19  calculations for state legislative district maps.  And

20  it's a little tough to see.  See if this works.

21  Wisconsin is right there and it shows roughly that

22  Wisconsin has an efficiency gap of about 12 percent.

23  Q      All right.  And you mentioned that that was a

24  starting point for you in your analysis; is that correct?

25  A      That was my starting point.

KENNETH MAYER - DIRECT

1   Q    All right.  Now, how did you go about creating your

2   Demonstration Plan?

3   A    The initial step was to come up with a methodology

4   for estimating partisanship, so that was the first task.

5   And then once I had completed that, I used a GIS

6   redistricting program called *Maptitude* for redistricting

7   to go ahead and complete the task of actually drawing the

8   Assembly district map.

9   Q    You mentioned a baseline -- a model baseline of

10  partisanship; correct?

11  A    Correct.

12  Q    Why did you do that?

13  A    The political science literature is quite clear that

14  if we are trying to estimate the effects of

15  redistricting, we need a way of reliably comparing

16  alternative configurations.  And in doing so, it's not an

17  appropriate methodology or an accurate method to simply

18  take the election, the votes that we observed, say, in

19  state Assembly races and then reconfigure, rearrange

20  those votes into a new district.  So the method that I

21  used was essentially identical to the method that

22  Professor Gaddie described in his deposition yesterday.

23  Q    And what were the data that you used for that?

24  A    The data that I used were 2012 election data and

25  census data that was prepared by the Legislative

KENNETH MAYER - DIRECT

1  Technology Services Bureau.

2  Q    Why couldn't you have just used the actual 2012

3  state Assembly election results?

4  A    So the primary problem, you can't simply reconfigure

5  the existing vote in Assembly contests is because we have

6  a large number of uncontested districts.  I think there

7  were 27, maybe 28 uncontested districts in 2012.  And

8  that does not give you an accurate measure of the

9  underlying partisanship because in a district that is

10  uncontested, only one candidate is on the ballot and

11  voters in that district only have an opportunity to

12  express a preference for one party and that will show up

13  as showing that there are no Republicans in a district

14  with only a Democrat on the ballot or no Democrats in a

15  district with no Republican on the ballot.  And we know

16  that's not true.  There are Republicans and Democrats in

17  every district, every geography in the state.  So it's

18  necessary to construct some measure of the underlying

19  partisanship of a geography, whether it's at the ward or

20  municipal, county, whatever geography you're working

21  with.  And the political science literature is

22  essentially unanimous on that being the appropriate

23  method.

24  Q    All right.  So it's a two-step process as you

25  testified.  First, you create a model of baseline

KENNETH MAYER - DIRECT

1  partisanship of Wisconsin wards; correct?

2  A    That's correct.

3  Q    And then second you integrate your Demonstration

4  Plan; correct?

5  A    That's correct.  There was an intermediate step

6  which is it was necessary to disaggregate the ward-level

7  partisanship estimates down to the census block level.

8          MR. POLAND:  If I may pause just a second, Your

9  Honors, I'm reminded that I forgot to tender Dr. Mayer as

10 an expert in specific fields and that's something that I

11 should do.  I would like to tender him as an expert in

12 legislative redistricting and in political and elections

13 analysis.

14         JUDGE RIPPLE:  That's done.

15         MR. POLAND:  Thank you, Your Honor.

16 BY MR. POLAND:

17 Q    Now, Dr. Mayer, in general terms what was your

18 approach to determining how alternative districts would

19 have performed in 2012?

20 A    So the primary methodology was to estimate the

21 relationship between the Assembly vote, the actual

22 Assembly vote that we observed in contested districts,

23 and the set of exogenous variables or variables that

24 didn't depend on any particular configuration of

25 districts.  And so I used a regression model to generate

                    KENNETH MAYER - DIRECT

1  those estimates.

2  Q    You just used a word *exogenous* which I think a lot

3  of us probably don't know what that is.  Would you please

4  explain what exogenous means.

5  A    So an exogenous variable is one that we can clearly

6  identify the direction of causality; that we know that

7  one variable causes another and that it is not caused by

8  that.  In this context if we're looking at the State

9  Assembly vote, we can consider things like the

10 presidential vote exogenous to the Assembly vote because

11 a person's -- the vote for president doesn't actually

12 depend on the things that affect Assembly elections like

13 the strength of Assembly candidates or which candidate is

14 the incumbent.

15      So we speak of presidential coattails.  We know that

16 the presidential vote affects the Assembly vote, but it's

17 not true that the Assembly vote actually has an

18 independent causal effect on the presidential vote.  So

19 an exogenous variable is one that is independent of

20 whatever variable that we are looking at.  It's not

21 caused by that variable, it is a causal factor of that

22 variable.

23 Q    So you came up with a baseline of the Assembly vote;

24 is that correct?

25 A    I did.

1    Q    And did you do that for comparison purposes or why

2    did you do that?

3    A    So the other reason why it's necessary to compare --

4    to construct a baseline partisanship measure that is

5    actually independent of any particular configuration of

6    Assembly votes is that once I have that baseline partisan

7    measure at a geography, I can reconfigure that into any

8    alternative redistricting plan and it gives me, in

9    effect, an apples-to-apples comparison.  I know what the

10   baseline partisanship is of my starting point of an

11   existing plan and I can compare that directly to the

12   partisanship of an alternative configuration of

13   districts.

14   Q    Now, once you had the estimate of votes, what could

15   you then do?

16   A    I generated my estimates of the open-seat

17   partisanship at the ward level because I had data at the

18   ward level and that gave me much larger "N."  I then used

19   those ward-level estimates and disaggregated those votes

20   to the census block based on -- each ward is comprised of

21   a number of census blocks.  The average is -- each ward

22   on average in Wisconsin has 40 census blocks in it and we

23   can observe the population of each census block because

24   that's recorded in the census.  And I assigned ward-level

25   vote totals to each census block based on that block's

KENNETH MAYER - DIRECT

1   percentage of the ward population.  So I essentially

2   uniformly distributed the ward-level vote to census

3   blocks based on that block's share of the ward-level

4   population totals.

5   Q    And then what did you do once you had done that?

6   A    At the end of that process, I actually had an

7   estimated baseline partisanship for each of Wisconsin's

8   -- there were roughly 225,000 populated census blocks in

9   the state and I could aggregate those census blocks to

10  whatever geography I needed to and then I used those

11  census blocks and at times I actually reaggregated those

12  census block data to the municipal level because there

13  was about 1,830 municipalities in the state.  It was much

14  easier if I was assigning complete township or complete

15  village to a district and then used that data, mostly

16  census blocks but occasionally municipal data and

17  constructed my districting plan, the Demonstration Plan,

18  using that data.  And at the end, I had two district

19  configurations that I could compare the partisanship of

20  those plans directly.

21  Q    Now, you spoke before about a regression model.

22  What's the regression model you're talking about?

23  A    Regression is a technique where we can seek to

24  explain a dependent variable, the variable that we're

25  trying to account for.  And we use -- we attempt to

KENNETH MAYER - DIRECT

1    explain the values that a dependent variable takes with

2    what are called *independent variables* or underlying

3    causal variables.  Essentially the technique that

4    Dr. Gaddie used.

5    Q    Now, Dr. Mayer, is there support in the academic

6    literature for the approach that you used for your work

7    in this case?

8    A    Yes.

9          MR. POLAND:  Could we pull up Exhibit 102,

10   please.  This is Tab 2 that's in the binder in front of

11   you.

12   Q    Can you identify Exhibit 102?

13   A    This is an article written -- published in the

14   *Journal of the American Statistical Association* by Andrew

15   Gelman, who I believe at that point may have been in the

16   Ph.D. program at Harvard.  He has since moved to Columbia

17   University.

18   Q    Actually -- I'm sorry to interrupt you, Dr. Mayer.

19   We're actually looking at 102, which is Tab 2 in your

20   binder.

21   A    Oh, Tab 2.  Tab 2 is an article written by a

22   political scientist named Bruce Cain, who at the time

23   this was written he was at Caltech.  He has since moved

24   to the University of California-Berkley and it outlines a

25   general method of trying to evaluate alternative

                    KENNETH MAYER - DIRECT

1    redistricting plans.

2    Q    And is that an article that you had relied on?

3    A    Yes.

4    Q    And can we turn to Exhibit No. 100, please.  That is

5    Tab 1 in the binder.

6    A    So this is the 1990 article by Andrew Gelman and

7    Gary King, again laying out a general method for

8    evaluating alternative redistricting plans.  I should

9    note that this is a problem that has occupied political

10   scientists for decades.  People have really since the

11   1960's and 70's been trying to work out ways of

12   addressing this problem.

13   Q    And is Exhibit 100 an article on which you relied

14   for the approach you used in this case?

15   A    It is.

16   Q    Can you please look at Exhibit No. 148.  That's Tab

17   6 in your binder.  Can you identify the article?

18   A    This is a 1994 article, again written by Andrew

19   Gelman and Gary King, which is more or less the end point

20   of this journey.  They identified what they describe as a

21   universal and unified method of evaluating alternative

22   redistricting plans.

23   Q    Is that an article on which you relied for your

24   approach in this case?

25   A    It is.

KENNETH MAYER - DIRECT

1    Q    Now, Dr. Mayer, you talked a minute ago about the

2    model and you talked about some variables that you used.

3    I'd like to pull up Exhibit No. 3, please, on the screen

4    and have you explain in terms that we can understand the

5    basic aspects of your model.

6    A    I'll do my best.  So this is the regression model

7    that I used to try to come up with an estimate of the

8    baseline partisanship of geographies in Wisconsin.  The

9    Assembly vote subscript i, which is right here, that's

10   the quantity that I'm seeking to explain.  That's my

11   dependent variable.  And the variables to the right of

12   the equal sign are the independent variables that I use

13   to try to explain the Assembly vote, all of which are

14   exogenous in the sense that they are all variables that

15   we can expect to have a causal effect on the Assembly

16   vote but are not actually themselves determined by the

17   Assembly vote.

18   Q    Now, Dr. Mayer, what cases did your model include?

19   A    Two -- there we go.  Because I needed to have a good

20   estimate of partisanship where voters were able to

21   express their vote for candidates of both parties, this

22   portion of the analysis was limited to wards in the 72

23   Assembly districts that were actually contested in 2012

24   which I defined as races where there was both a

25   Republican and Democratic candidate on the ballot.

                     KENNETH MAYER - DIRECT

1   Q    Now, why did you go down to the ward level?

2   A    I went down to the ward level because that gave me

3   5,282 cases as opposed to 72 and it's as close to -- I

4   mean I guess I would describe this as a law, that all

5   other things being equal, your statistic estimates are

6   going to become more much precise and accurate as the

7   number of cases that you have as the end grows larger.

8   And so I had basically over 70 times as many wards as I

9   had districts.

10  Q    Referring back to Exhibit 3, Dr. Mayer, could you

11  identify for us the variables that you used in your

12  model?

13  A    So there are three general categories:  The

14  variables in the first line:  Total VEP, black VEP and

15  Hispanic VEP, these are all census-level estimates of the

16  voting-eligible population at the ward level.  These are

17  basically the voting-age population of each ward and I

18  applied an adjustment to remove ineligible adult

19  populations, which in Wisconsin are either noncitizens or

20  people who were residing in correctional -- federal/state

21  correctional institutions serving felonies.  And so

22  that's my baseline measure of the demographics of each

23  ward.

24       The second line are two variables which capture the

25  Democratic and presidential vote in each ward, and these

KENNETH MAYER - DIRECT

1    are my primary independent variables.

2        The third line shows variables capturing the effect

3    of whether the Assembly candidate in a ward was a

4    Democratic or Republican incumbent because we know that

5    incumbents will do better than nonincumbents and will

6    outperform races that are open seats when there is no

7    incumbent running.

8        And that last set of variables, the Sigma with the 1

9    to 71, that's what's known as a fixed effect.  There's a

10   dummy variable for 71 of Wisconsin's 72 counties and that

11   picks up geographic effects that might not be captured in

12   some of the other variables.  We know that some counties

13   are more Democratic, other counties are more Republican,

14   and this is a way of picking up variation in the

15   dependent variable that is not otherwise accounted for.

16   Q    Dr. Mayer, how powerful was the model that you

17   constructed?

18   A    It was very, very precise.

19   Q    And how do you know that?

20   A    Because if we look at the actual results of the

21   model, we can see both in terms of the values of the

22   coefficients but the overall diagnostics of the model

23   show that they pick up almost all of the variation in the

24   dependent variable.

25   Q    Could we pull up Exhibit 18, please.

KENNETH MAYER - DIRECT

1   A    This is the table where I set out --

2   Q    Doc -- if you could just wait a minute, Dr. Mayer,

3   we just want to put it up on the screen and make sure

4   it's here.  Okay.  Terrific.  I'm sorry.  Go ahead.

5   A    This is a table that shows the regression results

6   for all the substantive coefficients.  I actually didn't

7   include the 71-county level --

8             JUDGE CRABB:  Excuse me.  I thought we had 72.

9             THE WITNESS:  Good point, Your Honor.  The

10  reason I had 71 is that when we have an exhaustive set of

11  dummy variables, that if you add up all those dummy

12  variables you would effectively create a coefficient that

13  is identical to the constant and you have what's called

14  multi-colinearity.  So the practice is that when you have

15  an exhaustive set of dummies that captures all of the

16  data, you need to remove one case, which I think the case

17  I described in the report, the one county I didn't count

18  is Dunn County.  So that's why there's 71 rather than 72.

19  BY MR. POLAND:

20  Q    All right.  Dr. Mayer, this is Table 1 from your

21  expert report we're looking at now; correct?

22  A    That's correct.  So for the purposes of looking at

23  the overall accuracy of the model, one of the most

24  important diagnostics is what's called the *R squared* and

25  that's a measure that tells me what percentage of the

KENNETH MAYER - DIRECT

1   variation in the dependent variable my model is picking

2   up.  So this is in effect a percent, and it ranges from

3   zero when the model doesn't pick up any of the variation

4   in the dependent variable to 1, when it's picking up 100

5   percent of the variation in the dependent variable.

6   Q    So you mentioned the number the R squared; correct?

7   A    Correct.

8   Q    And is the .9903, is that large R squared?

9   A    I would actually regard that as ridiculously high.

10  It's the kind of number you almost never see in social

11  science research.  And what that shows is that this model

12  picks up over 99 percent -- over 99 percent -- explains

13  almost 99 percent of the variation in the Republican

14  Assembly vote.

15       There's actually one other point I need to make here

16  is that because my underlying model is not based on

17  percentages, I'm actually generating predictions of the

18  actual number of votes that are going to be cast for

19  Democratic and Assembly candidates.  I had to run

20  separate regressions for both Democratic and Republican

21  Assembly candidates, so that's why there are two

22  regressions.  If all I was interested was picking up the

23  share of the two-party vote, I would only need to run one

24  because we know one candidate share, one party's share of

25  the two-party vote we can immediately calculate the other

KENNETH MAYER - DIRECT

1  by subtracting it from 1.

2  Q     And we also had an R squared for the Assembly

3  Democratic votes shown on Table 1; correct?

4  A     That's correct.

5  Q     And what's that R squared?

6  A     .9843.

7  Q     What's the significance of that number?

8  A     That means that I'm picking up 98.43 percent of the

9  variation.  Again, this is an absurdly high R squared

10 that is rarely seen in social science research.

11 Q     And Dr. Mayer, how about the accuracy of your model?

12 Did you prepare anything that shows the accuracy?

13 A     I did.  I prepared a number of charts that show the

14 accuracy of the ward-level and district-level estimates.

15        MR. POLAND:  Could we bring up Exhibits 7 and 8,

16 please.  And could we put those on the screen side by

17 side.

18 Q     Dr. Mayer, can you identify -- I'll state for the

19 record these are Figure 4 and Figure 5 from your expert

20 report; is that correct?

21 A     That's correct.

22 Q     Could you explain these, please.

23 A     Figure 4 shows the observed and predicted values of

24 the Democratic and Republican vote totals, the actual

25 vote level counts for the 2012 elections and I plot the

KENNETH MAYER - DIRECT

1    actual Assembly vote along the x-axis.  You can see

2    ranges from between 0 to about 1,400, and the predicted

3    Assembly vote, which is what the model generated on the

4    y-axis.  The line is the 45-degree line which is where

5    the points would fall if they were exactly equal.  And

6    you can see that all of the points are clustered pretty

7    tightly right around the 45-degree line, which means I'm

8    exactly picking that up.

9         The other thing to point out about this chart, there

10   are actually almost 11,000 individual data points on this

11   chart and most of them are clustered so tightly around

12   the 45-degree line that you can't make out the individual

13   points and that's the sort of left side of the graph;

14   that this is -- has a very, very high degree of

15   predictive accuracy in estimating the actual vote

16   outcomes at the ward level.

17   Q    And how about Exhibit 8 which is Figure 5?

18   A    So Figure 5 shows what happens if I take these wards

19   and aggregate them up to the district level.  So now I

20   have an estimate of what the actual vote totals were in

21   the 72 contested Assembly races.  And again, you can see

22   that all of the points are very, very tightly bunched

23   around the 45-degree line which means that I'm predicting

24   the correct outcome almost all the time.

25   Q    Dr. Mayer, how accurately did your model predict

KENNETH MAYER - DIRECT

1  district outcomes?

2  A    Of the 72 contested Assembly districts, my model

3  accurately predicted the winner in 70 of those districts.

4          MR. POLAND:   Could we bring up Exhibit 19,

5  please.

6  Q    And Dr. Mayer, can you identify Exhibit 19?

7  A    This is Table 2 in my initial report, and what it

8  shows, it's a spreadsheet that shows the actual two-party

9  percent of the GOP vote in 2012 and each contested

10 Assembly district.  It shows the result of my model

11 aggregated to the district level, and then the third

12 column shows whether I forecast the correct winner, which

13 is essentially if I'm on the right side of 50 percent.

14 Q    And how often did you forecast or predict the

15 correct winner?

16 A    I identified the correct winner or predicted the

17 correct winner in 70 of the 72 districts.

18 Q    And what were the two where you did not predict the

19 winner, correctly predict the winner?

20 A    I think the first one is District 50 -- 51.  In

21 District 51, the Republican candidate received 51.9

22 percent of the Assembly vote and my model predicted that

23 the Republican candidate would get 49.9 percent of the

24 votes.  This is a close election that the model did not

25 pick up.

1  Q    And what does this tell you about the accuracy of

2  your model?

3  A    Well, there's -- it shows that the only races that

4  it missed were actually very, very close and that I came

5  within a tenth of a percentage point or so of actually

6  picking up the right winner.

7       I think the other district I missed was the 70th

8  where the Republican candidate actually received 49.7

9  percent of the vote and the model generated a prediction

10 of 50.1 percent of the vote.  So again, it was very

11 close, but I was basically one-tenth of a percentage

12 point away from identifying or predicting the correct

13 winner.

14 Q    Dr. Mayer, what did you do next in your analysis

15 after you ran your model and attained these results?

16 A    The next thing I did is that I had a model that told

17 me what was going to happen or what happened in contested

18 districts and I applied this model, the coefficients, to

19 all Assembly districts essentially applying the model to

20 generate estimates of what would happen in all 99

21 Assembly districts, including the 27 uncontested

22 districts in 2012.

23 Q    Did you at some point in time remove the incumbent

24 advantage?

25 A    Well, in generating the baseline partisanship, that

1  was the next step.  So I generated my baseline

2  partisanship or that generated an estimate of the vote in

3  each district, and then to convert that into a baseline,

4  I had to remove the incumbency advantage.  So I

5  essentially calculated the partisanship of every

6  district, all 99 districts of what the baseline

7  partisanship would be assuming that the district was

8  contested and that there was no incumbent running.

9  Q    Why did you assume the race would be contested?

10 A    Because that's what -- when I'm reconfiguring

11 districts, I'm interested in the baseline partisanship

12 and we don't know under an alternative district

13 configuration which districts are going to be contested

14 or even which districts will have an incumbent.  So this

15 is the way of doing a true apples-to-apples comparison

16 from one district configuration to an alternative.

17 Q    Dr. Mayer, is there support for this approach in the

18 academic literature and in practice?

19 A    There is.  I mean this is how the district plans

20 are, in the academic literature, this is how alternative

21 district plans are compared and analyzed.

22 Q    And in the notebook in front of you, can you

23 identify any of the academic literature that supports

24 this approach?

25 A    Well, all three of the articles that we had gone

over earlier:  Exhibit 100, the Gelman and King; Exhibit

102, the Cain article; and Exhibit 148, these sources all

outline general approaches and they sometimes use

somewhat different mathematical calculations, but they

all rely on the method of generating a baseline estimate

of partisanship that doesn't depend on the -- that

removes the effect of election-specific factors.  So all

three of them support this as a general rule.

Q    And in practice, are there other practical

applications of the approach that you followed?

A    Sure.  This allows you to identify any hypothetical

or alternative configuration and it's actually how it's

done in practice.  It's what's Professor Gaddie did in

his analysis leading up to the preparation of Act 43.

Q    When you were -- were you present in the courtroom

on Tuesday when we played the videotape or the video, it

wasn't a tape, a video of Dr. Gaddie's testimony in this

case?

A    I was.

Q    And you listened to his testimony about his

regression model that he created?

A    I did.

Q    And is the approach that you followed in this case

similar to what Dr. Gaddie did?

A    I would say other than the fact that we used

KENNETH MAYER - DIRECT

170

1    different -- somewhat different independent variables, I

2    would say that my method is -- was identical to his in

3    broad outline.

4    Q    Now, Dr. Mayer, after you generated your baseline

5    partisan estimates for each ward what did you do next?

6    A    The next step was to disaggregate those baseline

7    partisan estimates to the ward level which then gave me a

8    estimate of the partisanship of every census block in the

9    state that I could use to develop an alternative map

10   configuration and compare it directly to what we see in

11   Act 43.

12   Q    Why did you engage in that disaggregation process?

13   A    So the normal practice in Wisconsin up until 2011

14   had been that the municipalities had drawn their wards

15   first and then those wards were used as the building

16   blocks for districts.  This time that practice was

17   reversed.  The districts were drawn first and then

18   municipalities were required to draw their ward lines in

19   ways that matched the district boundaries.  And what that

20   did is that meant I couldn't use the wards as my building

21   blocks because those wards were actually dependent on Act

22   43.  Whatever bias that we observe in Act 43 is in effect

23   baked into those wards because the districts were drawn

24   first and then the wards were drawn to comply with those

25   districts.

KENNETH MAYER - DIRECT

171

1        And so the normal practice would have been to use

2    wards, but I couldn't do that us because that meant that

3    I would simply be replicating the partisan bias in Act 43

4    and so I disaggregated down to the census block level.

5    Census blocks, they generally don't change from one

6    decennium to another.   Sometimes the boundaries will

7    change a little bit, but for all practical purposes those

8    boundaries are fixed.   And in any event, they're not

9    altered in response to any elections.   They're fixed by

10   six census and so that we can regard them as completely

11   independent of any political geographies.

12   Q    Now, Dr. Mayer, can you use your open-seat baseline

13   to predict what actually happened in 2012?

14   A    Actually you can't.

15   Q    Why not?

16   A    Because it's not designed for that.   The purpose of

17   the open-seat baseline is not -- is actually not to

18   explain what actually happened.   We know the model is

19   accurate because of the earlier diagnostics.   What the

20   open-seat baseline is designed to do is allow you to

21   directly compare alternative map configurations and so

22   you can't look at the open-seat baseline estimates and

23   say that oh, you missed that election or you missed this

24   election because what you actually observe is a function

25   of incumbency and things that are election specific.

KENNETH MAYER - DIRECT

1          I think Professor Gaddie described it accurately

2     yesterday when he said that the purpose of this method is

3     to generate an underlying measure of the basic

4     partisanship of a ward, which is the starting point of

5     what happens next.  But it doesn't actually explain any

6     particular outcome.  We use it to compare alternative

7     district configurations.

8     Q    So Dr. Mayer, with your open-seat estimates in

9     place, what line drawing criteria did you use to create

10    your Demonstration Plan?

11    A    So there were the traditional redistricting criteria

12    which is to draw districts that have equal population, to

13    draw districts that are compact, to draw districts that

14    respected municipal boundaries, to draw districts that

15    complied with the Voting Rights Act.  But because I had

16    my baseline partisan estimates, I knew what the

17    partisanship was of different areas and I made an effort

18    to draw a balanced map that treated the two political

19    parties symmetrically and fairly.

20    Q    Would we refer to that as competitiveness?

21    A    That's one measure.  It's not the only one, but in

22    the context of how I did it, one of the decision rules

23    that I used is that when it was possible to draw a

24    district that was actually competitive and while still

25    complying with these other criteria, I did so.

                        KENNETH MAYER - DIRECT

1    The other element is that I attempted to draw a

2    roughly equivalent number of competitive Republican and

3    Democratic districts so that I wasn't actually cracking

4    one party.

5    Q    But why -- so you used the term cracking.  How does

6    competitiveness relate to cracking?

7    A    Well, so one of the -- one of the -- probably the

8    most efficient way of creating a gerrymander is that you

9    want to distribute the other side's partisans in a way so

10   that they form a substantial minority of a district, 40,

11   43, 44 percent, but I'm basically ensuring that they will

12   not have a meaningful opportunity to contest an election.

13   The other side of that, if I create lots of

14   districts where my party has a comfortable meaningful

15   majority, the numbers we can quibble with could be 53,

16   54, 57 percent.  That means that I am distributing my

17   party's voters much more efficiently, and if I do it

18   well, I might be able to draw a map when the other party

19   might have 40 percent of a lot of different districts,

20   10, 15, 20 districts, but they won't be able to win any

21   of them.  And the way to do that, the way not to draw a

22   biased map is that you really are not going to be able to

23   draw every district 50/50, but you draw an equivalent

24   number of districts so that a Republican competitive

25   district or competitive district is going to be matched

KENNETH MAYER - DIRECT

1    against an equivalent number of Democratic competitive

2    districts.

3    Q    Is competitiveness a normative value in drawing

4    maps?

5    A    It's not one of the traditional criteria, but from

6    the standpoint of political theory and the way we think

7    about representation, it's very important because one of

8    the things that competitive races do is it gives members

9    of both parties and candidates from both parties a chance

10   to compete for seats and compete for representation and

11   it has the effect of making a districting plan responsive

12   to changes in voting behavior, changes in the statewide

13   vote.

14   Q    Dr. Mayer, did you consider incumbents' addresses in

15   designing your Demonstration Plan?

16   A    I did not.

17   Q    Why not?

18   A    Well again, in using the baseline partisan

19   estimates, I'm assuming every seat is open and so I did

20   not incorporate incumbency in those maps for the --

21   because for the purposes I was -- I was drawing the maps

22   it was irrelevant.  I wanted to compare directly how the

23   partisanship of Act 43 compared to the partisanship of

24   the Demonstration Plan.

25   Q    In drawing your demonstration plan, did you consider

KENNETH MAYER - DIRECT

1  how Assembly districts would be grouped into Senate

2  districts?

3  A    I did not.

4  Q    Why not?

5  A    Because my aim was simply to draw an Assembly plan.

6  I was not asked to draw a Senate plan.

7  Q    Could a valid configuration of Senate districts be

8  formed based on your Demonstration Plan?

9  A    Certainly.

10  Q    How so?

11  A    Well, as people have testified, that Wisconsin

12  Senate districts are made up on three nested Assembly

13  districts and so you could take the Demonstration Plan

14  map of 99 Assembly districts and group them into any

15  number of valid Senate plans.  The numbering of my plan

16  was essentially arbitrary.  I didn't do it in a way that

17  matched up to Act 43.  But you could take those 99 Senate

18  districts and group them into a valid Senate plan.

19  Q    And could you make at least one lawful configuration

20  of Senate districts from your Demonstration Plan?

21  A    You can make many more than one.

22  Q    How many configurations could you make?

23  A    I actually haven't worked out the math.  It's

24  probably possible, but my guess is it's probably in the

25  hundreds or thousands, if not more.

KENNETH MAYER - DIRECT

1  Q    Now, you've talked a bit about your Demonstration

2  Plan.  Why don't we take a look at it.

3         MR. POLAND:  Could we please pull Exhibits 11

4  and 12 up on the screen and display those side by side.

5  Q    Dr. Mayer, we have Exhibits 11 and 12 up on the

6  screen now.  Exhibit 11 is labeled Figure 8.  Exhibit 12

7  is labeled Figure 9.  Can you identify and explain those,

8  please.

9  A    Figure 8 is the statewide Demonstration Plan that

10  shows all 99 districts in the plan.  Figure 9 shows the

11  districts in the Milwaukee area, primarily Milwaukee

12  County, Waukesha County, Racine and Kenosha County.

13  Q    Looking at Figure 8, which is your full state -- the

14  statewide map of your Demonstration Plan, how does that

15  plan compare to Act 43 in terms of population deviation?

16  A    I believe those metrics are set out in my -- I think

17  it's Table 5 in my initial report.  The population

18  deviation in Act 43 is .86 -- or .76 percent.  The

19  population deviation of the Demonstration Plan is .86

20  percent.

21         MR. POLAND:  I'm actually going to ask if we can

22  pull up here the joint pretrial report and ask that we

23  look at page 47 and paragraph 226.  Okay.  There we go.

24  Q    So I'm sorry, Dr. Mayer, I'm going to ask you the

25  question again.  Can you identify how your Demonstration

                    KENNETH MAYER - DIRECT

1    Plan compares to Act 43 in terms of the population

2    deviation?

3    A    So the first row of data in this table shows that

4    Act 43 has a population deviation of .76 percent whereas

5    the Demonstration Plan has a population deviation of .86

6    percent.

7    Q    Dr. Mayer, how does your Demonstration Plan compare

8    with Act 43 in terms of its compliance with the Voting

9    Rights Act?

10   A    It is equivalent.

11   Q    Same number of majority black districts?

12   A    Yes.  In Act 43 there are six African American

13   majority/minority districts in the Milwaukee area, and

14   while I didn't use the precise boundaries of those

15   districts, all of the overall African American percentage

16   population and percentage of the voting-age population

17   are equivalent to what we see in Act 43.

18   Q    So the same number of majority African American

19   districts is in Act 43?

20   A    Yes.  There are six.

21   Q    How about majority Latino districts?

22   A    So there's one majority/minority Hispanic district

23   in the state which is the 8th Assembly District.  Because

24   that was drawn by the federal court in *Baldus*, I left it

25   intact.  So the boundaries of Assembly District 8 in the

KENNETH MAYER - DIRECT

1  Demonstration Plan are the same as the boundaries of

2  Assembly District 8 in Act 43.

3  Q    Dr. Mayer, who actually drew the boundaries of

4  District 8 in Milwaukee, the majority Latino district?

5  A    So the actual boundaries were drawn by the federal

6  court in response to a proposal by the plaintiffs.  They

7  accepted the map that the plaintiffs submitted in that

8  case for District 8.

9  Q    And that was a map that you drew, that you proposed

10 and submitted to the Court that the Court adopted;

11 correct?

12 A    That's correct.

13 Q    How did your Demonstration Plan compare with Act 43

14 in terms of compactness?

15 A    The score that I used to or I've actually heard this

16 pronounced about four different ways:  Reock, Reock or

17 Reock, but we can call it the smallest circumscribing

18 circle.  So it's the measure of the smallest circle that

19 contains the ratio of a district area to the smallest

20 circle that contains it.  The Demonstration Plan had a

21 score of .41.  Act 43 had a score of .39.  So the

22 Demonstration Plan is slightly more compact on average.

23 Q    How does your Demonstration Plan compare with Act 43

24 in terms of splits of political subdivisions?

25 A    So the number of splits also shown here, that the

KENNETH MAYER - DIRECT

Demonstration Plan has three fewer county splits, 55

compared to 58, and two more municipal splits, 64

compared to 62.

Q    Dr. Mayer, did you calculate an efficiency gap for

Act 43 based on your model?

A    I did.

Q    How did you go about doing that?

A    I applied the methodology in the Stephanopoulos and

McGhee article and what I did is using the baseline

partisan estimates, I generated estimates for the number

of Democratic and Republican votes that were cast in each

district and I used that to calculate the number of

surplus and lost votes.  According to that methodology,

votes cast for the losing candidate are all lost.  Votes

cast for the winning candidate, anything in excess of

what was needed to capture that district is called the

surplus vote.  You add those two together.  Those are the

wasted votes.  So I was able to actually do those

calculations for every district in Act 43.

        MR. POLAND:  Could we bring up Exhibit 25,

please.

Q    Dr. Mayer, can you identify Exhibit 25?

A    This is Table 8 on my initial report.

Q    All right.  And again, what does Table 8 show?  What

does it demonstrate?

KENNETH MAYER - DIRECT

1    A    It shows the efficiency gap calculations.  Again,
2    just going through it quickly, I have the first two
3    columns are the predicted number of Democratic and
4    Republican Assembly votes, and the columns that are A
5    through F tabulate the number of lost and surplus votes;
6    leading to column E, which is the total number of wasted
7    Democratic votes; column F, the total number of wasted
8    Republican votes; and then the last column is the net
9    numbers of wasted votes.  So these are all calculated
10   directly from the district-level vote estimates, again
11   using the open-seat partisan baseline model.
12   Q    Dr. Mayer, what efficient gap did you calculate for
13   Act 43 based on your model?
14   A    That's set out in my report.  The efficiency gap
15   that I calculated was 11.69 percent.
16         MR. POLAND:  Could we bring up Exhibit 27,
17   please.
18   Q    Now, Dr. Mayer, is this Table 10 from your report?
19   A    It is.
20   Q    And does it reflect your efficiency gap calculation
21   for Act 43?
22   A    It does.
23   Q    All right.  Can you explain where that is, please?
24   A    It's the middle column called the *Act 43 Baseline*
25   and it shows the results of the calculations and

KENNETH MAYER - DIRECT

1    estimates in Table 8.

2    Q    Now, did you calculate an efficiency gap for your

3    Demonstration Plan?

4    A    I did, and that is shown in the first column, the *My*

5    *Plan Baseline*, shows an efficiency gap of 2.2 percent.

6    Q    How did you calculate the efficiency gap for your

7    plan?

8    A    In exactly the same way as I did for Act 43, and

9    that's set out, I believe, in Table 7 of my report.

10   Q    All right.  And we just looked at Table 7 a minute

11   ago.  I'm sorry, we hadn't actually.

12            MR. POLAND:  Could we bring up Exhibit 24,

13   please.

14   Q    Can you identify Exhibit 24, Dr. Mayer?

15   A    This is Table 7 in my report which shows the

16   efficiency gap calculations for the Demonstration Plan.

17   Q    Now, could we go back to Table 10, which is Exhibit

18   27.  What's the efficiency gap that you calculated for

19   your plan?

20   A    2.2 percent.

21   Q    Again, that's right next to the efficiency gap you

22   calculated for your Act 43 baseline?

23   A    That's correct.

24   Q    Once you had calculated efficiency gaps for Act 43

25   and your Demonstration Plan, you compared these two

                        KENNETH MAYER - DIRECT

182

1  efficiency gaps; correct?

2  A    That's correct.

3  Q    What kind of comparison is this of the efficiency

4  gaps?  Is this a true comparison?

5  A    It's a direct comparison.  It's using the same

6  underlying data.  It's simply reconfigured into different

7  district configurations.  So the underlying method is the

8  same.  It's an open-seat baseline, and it shows the

9  Demonstration Plan has an efficiency gap that's more than

10  five times smaller than what we observe in Act 43.

11  Q    Now, Dr. Mayer, we heard some testimony this morning

12  from Mr. Ottman about the traditional redistricting

13  criteria that he claims they employed in drafting Act 43.

14  Were you present for that testimony?

15  A    I was.

16  Q    Do you have an opinion about whether Act 43's large

17  efficiency gap is justified by federal and state

18  redistricting criteria?

19  A    It's not remotely.  First of all, we know that the

20  Demonstration Plan complied in an equivalent way with all

21  of those criteria resulting in a much lower efficiency

22  gap.  So that alone demonstrates that the efficiency gap

23  in Act 43 was not required by those criteria because if

24  it were, the efficiency gap and the baseline would be

25  accomplished with a much higher number of municipal

KENNETH MAYER - DIRECT

1    splits, a much higher or much lower compactness and

2    probably a much higher population deviation.

3    Q    Would it have been possible for you to come up with

4    something like your Demonstration Plan if the traditional

5    redistricting criteria justified Act 43?

6    A    Not in a way that was equivalent to Act 43 on those

7    criteria.  No, it wouldn't be possible.

8    Q    Now, Dr. Mayer, what accounts for the Demonstration

9    Plan's traumatically lower efficiency gap as compared to

10   the Act 43 baseline?

11   A    So the primary way that the efficiency gap was

12   lowered in the Demonstration Plan was drawing a roughly

13   equivalent number of competitive Democratic and

14   Republican districts.

15            MR. POLAND:  Could we pull up Exhibits 15 and

16   17, please, and put those side by side.  For reference,

17   Figure 12 is Exhibit 15 and Figure 14 is Exhibit 17.

18   Q    And do you see those on the screen in front of you,

19   Dr. Mayer?

20   A    I do.

21   Q    All right.  Can you explain the answer that you just

22   gave with reference to Exhibits 15 and 17?

23   A    So Exhibit 15, which is Figure 12 in my report,

24   shows the baseline partisan measure for Act 43 and this

25   is a histogram which classifies each of the 99 districts

KENNETH MAYER - DIRECT

1    based on the underlying baseline partisanship.  And what

2    we see is a couple of patterns.  The primary reason that

3    Act 43 has such a large efficiency gap is the fact that

4    there is 42 Republican districts that are between 50 and

5    60 percent of the vote and the fact that equivalent is

6    only 17 Democratic districts where the Democratic

7    candidate would get between 50 and 60 percent of the

8    vote.  So that's the cracking right there and that means

9    that Republicans are distributed in a much more efficient

10   manner than Democrats.  These are districts that the

11   Republican -- again, this is a open-seat baseline, so

12   it's before we're factoring in incumbency that we see an

13   imbalance that there are 42 Republican leaning or even

14   safe Republican districts in Act 43 compared to only 17

15   leaning or comfortable Democratic districts.

16   Q    You used the term *cracking*.  What do you mean by

17   cracking when you're looking at Figure 12?

18   A    Well, the evidence of cracking is observed in the

19   number of Democratic districts or since we're looking at

20   the Republican share of the vote, cracking would occur if

21   we look at a district where the Republican candidate is

22   expected to get between 40 and 50 percent of the vote.

23   These are districts where -- I'm sorry, I'm getting

24   myself confused.

25        Cracking in this case is the number of districts

KENNETH MAYER - DIRECT

1   where Democrats have between 40, 45, 48, 47 percent of

2   the vote.   These are districts where they comprise a

3   substantial majority but they are still not going to be

4   able to, as a rule, win those districts.   And so

5   Republicans are going to win a large number of districts

6   with fewer votes.

7   Q     And could we look at Exhibit 17, please.   How does

8   Exhibit 17, your Demonstration Plan, differ?

9   A     The Demonstration Plan, you can see that the

10  distribution of most districts is much more symmetrical.

11  But again, the key is that we see 29 districts where

12  Republicans get between 50 and 60 percent of the vote

13  which is here -- arrows are kind of -- here and here as

14  opposed to 27 districts where the Democrats will get

15  between 50 and 60 percent of the vote.   So unlike the old

16  Act 43 which had an imbalance of 4217 and leaning and

17  moderate partisan districts, the Demonstration Plan has

18  an equivalent number of 29 and 27.   So it's much more

19  balanced.   It's also much more symmetrical and treats the

20  parties much more fairly.

21  Q     Now, Dr. Mayer, your Demonstration Plan efficiency

22  gap is still pro-Republican; correct?

23  A     That's correct.

24  Q     And why is that?

25  A     Well, it could have something to do with the fact

1    that the initial step that I used was at the ward level

2    and so we could see some element there.  I actually

3    didn't draw repeated maps trying to get the efficiency

4    gap as low as possible.  I suspect I probably could have.

5    Again, I was trying to draw a map that was balanced and

6    symmetric and fair, and when I got to the point where I

7    had an efficiency gap of 2.2 and a map that was

8    equivalent to Act 43, I stopped.

9    Q    Dr. Mayer, do you know whether Professor Gaddie and

10   the map drawers in 2011 performed any analyses of their

11   maps that is similar to your baseline partisanship

12   analysis?

13   A    Well, we know that Dr. Gaddie performed a --

14   performed, using his regression method, constructed a

15   measure of the underlying partisanship of the Act 43

16   districts.

17        We also know that the Act 43 map drawers had their

18   composite measure, which again according to Professor

19   Gaddie those two quantities correlated with the

20   correlation coefficient of .96, I believe.  And so they

21   had a measure of underlying partisanship of the Act 43

22   districts which turned out to be almost identical to what

23   I generated using my model.

24   Q    Had you seen any of Dr. Gaddie's data analyses

25   before your work in this case or as part of your work in

KENNETH MAYER - DIRECT

1    this case?

2    A    Well, I was familiar with the general approach.  I'm

3    trying to think of -- at the time that I generated my

4    model, I had actually not seen any of the partisan work

5    that Dr. Gaddie had done.

6    Q    Since that time have you?

7    A    Yes.

8    Q    All right.  You've seen some of Dr. Gaddie's

9    spreadsheets?

10   A    Yes.

11   Q    And you've seen some of the email correspondence?

12   A    Yes.

13         MR. POLAND:  Could we pull up Exhibit 172,

14   please.

15   Q    And we've seen it.  This has been on the screen in

16   the courtroom a number of times over the past two days.

17   Is Exhibit 172 a document that you have reviewed?

18   A    Yes.

19   Q    And how does Exhibit 172 relate to the analysis that

20   you performed?

21   A    So this exhibit is the spreadsheet of the final map

22   which Mr. Foltz yesterday and Mr. Ottman today testified

23   was what became Act 43.  So this map is actually an

24   analysis of the Act 43 districts.  Under the Assembly

25   portion of the chart, the column that is listed *New*, it's

KENNETH MAYER - DIRECT

1    a little hard to see, but it's the middle column there.

2    Each figure in those cells going down is the open-seat

3    baseline partisan estimate that is derived from the

4    04-2010 composite.  So this is the analysis that the Act

5    43 map drawers did of the baseline partisanship of the

6    Act 43 districts.

7    Q    And have you seen anything -- any of the material

8    that you've reviewed or heard in the courtroom that

9    identifies what Professor Gaddie did with respect to his

10   regression model?

11   A    So Professor Gaddie outlined his general approach.

12   I actually haven't seen the actual equation that he used,

13   but I don't think that it matters.  And we also know that

14   his analysis, comparing his open-seat regression analysis

15   to the 04-10 baseline, shows that they are almost -- they

16   co-vary almost exactly with a correlation coefficient of,

17   I think, .96 or .93.  So for all practical purposes,

18   these baseline estimates are the equivalent of what

19   Dr. Gaddie's regression model would have produced.

20            MR. POLAND:  Could we pull up Exhibit 175,

21   please.

22   Q    Dr. Mayer, Exhibit 175 is on the screen in front of

23   you, and this is a document again the Court has seen many

24   times here in the past few days.  Can you identify in

25   Exhibit 175 where Dr. Gaddie refers to the correlation

                    KENNETH MAYER - DIRECT

1  between his model and the partisan proxy or the

2  composite.

3  A    So the relevant point is in the second line where he

4  says "The expected GOP open seat Assembly vote using the

5  equations correlates at .96 with the 2004-2010

6  composite." So that tells us that the results of

7  Dr. Gaddie's open-seat regression model correlate almost

8  perfectly with the 04-10 composite that was used by the

9  Act 43 map drawers.

10 Q    What does that tell you about the accuracy of the

11 composite with respect to outcomes?

12 A    That tells you that it's extremely accurate.  Again,

13 these are the sorts of R squareds and correlation

14 coefficients that one rarely sees in social science

15 research.

16        MR. POLAND:  Could we go back to Exhibit 172,

17 please.  And could we go to the third page.  Okay.

18 Terrific.

19 Q    Dr. Mayer, now you had reviewed the spreadsheet, the

20 final map spreadsheet that's on the screen in front of

21 you?

22 A    I did.

23 Q    And does this appear to be the final map that was

24 included in Act 43?

25 A    Well, this is what Mr. Foltz and Mr. Ottman said was

KENNETH MAYER - DIRECT

1    the final map that was Act 43.

2    Q    Did you calculate the efficiency gap for the final

3    map that we see here in Exhibit 172?

4    A    I did.

5         MR. POLAND:  Could we pull up Exhibit 27,

6    please.

7    Q    What is the efficiency gap that you measured for the

8    final map?

9    A    So one of the differences between Dr. Gaddie's

10   method and mine is that he was actually estimating that

11   the two-party vote share and I had an estimate to compare

12   it directly to the previous two models.  I needed to come

13   up with a figure that estimated the actual number of

14   votes that you would see under this baseline partisan

15   measure.  So what I did is I had my Act 43 baseline

16   measure which told me how many votes were going to be

17   cast or estimated to be cast in every district and I

18   applied the two-party vote percentage in the final map

19   spreadsheet to those figures to generate an estimated

20   number of Democratic and Republican Assembly votes using

21   the -- it says here the Gaddie measure.  It's actually

22   the 04-10 composite measure because at the time I

23   prepared this report I hadn't seen the subsequent

24   testimony.

25        But the third column, the Act 43 Gaddie measure,

KENNETH MAYER - DIRECT

1  shows what the efficiency gap was using the baseline

2  partisanship method that the Act 43 map drawers used.

3  Q    And what is the efficiency gap that you calculated?

4  A    It shows down at the bottom.  It's 12.36 percent.

5  Q    Now, how does your open-seat baseline model compare

6  to what the map drawers and Professor Gaddie used for Act

7  43?

8  A    It turns out that they're almost identical, which is

9  remarkable given that we were using different data,

10 different elections, but we were both trying to estimate

11 the same underlying measure which is baseline

12 partisanship.

13       MR. POLAND:  Could we bring up Exhibit 10,

14 please.

15 Q    Dr. Mayer, displayed on the screen in front of you

16 is Figure 7 from your report, your expert report.  That's

17 Trial Exhibit 10.  Do you have that in front of you?

18 A    I do.

19 Q    And can you identify Figure 7, please.

20 A    This is Figure 7 of my report that directly compares

21 the Gaddie or composite baseline partisan estimates for

22 the districts to the district-level partisan baseline

23 estimates that my model produced.  And as you can see,

24 there's a very, very strong relationship.  The red line

25 in this chart is actually the bivariate regression line

KENNETH MAYER - DIRECT

1   that uses Gaddie's measure as an independent variable and

2   my model as the dependent variable and the R squared

3   between the two measures is .96.

4   Q    And what does that tell you?

5   A    That tells you that the two measures are almost

6   perfectly related; that Gaddie's baseline measure

7   explains 96 percent of the variation you see and the

8   estimates that my regression method produced.

9   Q    Does this tell you anything about what the map

10  drawers were doing in 2011 when they drew their map?

11  A    That tells me they knew exactly what they were

12  doing, that they had a very accurate estimate of the

13  underlying partisanship of the Act 43 maps.

14  Q    And that resulted --

15  A    Act 43 map.

16  Q    And that resulted in the efficiency gap for Act 43

17  that you calculated; correct?

18  A    That's correct.

19  Q    Now, Dr. Mayer, were you in the courtroom yesterday

20  when Adam Foltz was testifying?

21  A    I was.

22  Q    And you heard all the testimony that he gave?

23  A    I did.

24  Q    Now, do you remember that Mr. Foltz and his counsel

25  were going through a number of cells in a large

KENNETH MAYER - DIRECT

1    spreadsheet, Exhibit 556, showing that the number of

2    Republican votes in the 2006 gubernatorial election

3    exceeded the number of total votes in that election in

4    certain districts?

5    A    I did.

6    Q    And then there was very long testimony and I think

7    it was very confusing for a lot of us.  You heard that

8    testimony?

9    A    I did; right.

10   Q    Now, have you had an opportunity to look at Exhibit

11   556?

12   A    I have.

13   Q    Does Exhibit 556 contain data for races other than

14   the 2006 gubernatorial election?

15   A    It is.  It actually contains data on 17 separate

16   statewide elections.

17   Q    So 16 elections, in addition to the one that

18   Mr. Foltz and Mr. Keenan pointed out yesterday; correct?

19   A    That's correct.

20   Q    Now, Dr. Mayer, did you check to see if there are

21   the same kinds of impossible results in those other 16

22   races that there are for the 2006 gubernatorial election

23   that Mr. Foltz and Mr. Keenan pointed out yesterday?

24   A    I did.

25   Q    How did you do that?

KENNETH MAYER - DIRECT

1   A    I took that spreadsheet and imported that

2   spreadsheet into a statistical package called *Stata*,

3   which is one that I'm familiar with.  And I went through

4   and actually computed the Republican vote percentage of

5   all of the statewide races in that exhibit and examined

6   them for evidence that one would see the same sorts of

7   errors that one saw in the 2006 gubernatorial election.

8   Q    When did you do that, Dr. Mayer?

9   A    I did that this morning.

10  Q    And when you did that what did you find?

11  A    I found that in all of the others races there was no

12  evidence of any inaccuracies and that concluded that all

13  of the other district-level Republican vote percentages

14  were accurate.

15  Q    Have you prepared anything that demonstrates this?

16  A    I did.  I prepared a spreadsheet this morning.

17  Q    All right.

18       MR. POLAND:  Could we pull up Exhibit 486,

19  please.  And Your Honors, we had provided to your staff a

20  copy, an electronic copy of Exhibit 486.  That's the

21  Excel spreadsheet Dr. Mayer prepared this morning.  We

22  provided a copy to Mr. Keenan this morning at the break.

23  Q    Dr. Mayer, can you identify Exhibit 486?

24  A    This is the spreadsheet that I prepared after

25  performing the underlying calculations in Stata.  I then

KENNETH MAYER - DIRECT

1  exported the data into a spreadsheet which makes it a

2  little easier to display.

3  Q     You just used a term *Stata*.  What do you mean by

4  Stata?

5  A     Stata is a statistical package that is very commonly

6  used in social science.

7  Q     Can you walk us through this and the analysis that

8  you performed?

9  A     So the basic issue is that the column, the new

10  governor 06 percent, and this is also the case in the old

11  governor 06 percent, these are the aggregations and

12  reaggregations of a number of state -- of in this case

13  the 2006 gubernatorial election under the old districts

14  and under Act 43.  And as we saw yesterday, there were a

15  number of districts where the number of Republican votes

16  cast dramatically exceeded the total number of votes that

17  they were recorded.

18       So in District 1, for example, we see that the

19  Republican vote share in the first district was 587

20  percent.  I don't even think they'd try to get away with

21  that in Chicago.

22       District 2, Republican votes more than double or

23  actually more than triple.  The number of total votes 417

24  percent.  500 percent.  You go down, it looks like a lot

25  of these district totals are incorrect because it's not

KENNETH MAYER - DIRECT

1    possible that you have more votes cast for one party or

2    candidate than you have the total number of votes cast.

3    Q    And again, that's column G that you're looking at on

4    Exhibit 46; is that correct?

5    A    That's correct.  There's another column that shows,

6    I think it's later on, that shows the similar

7    calculations for the old districts and you see the same

8    sort of pattern.  And this is -- this is clearly an

9    error.

10   Q    That's the 2006 gubernatorial election; correct?

11   A    Correct.

12   Q    And that's the election -- the data that Mr. Keenan

13   and Mr. Foltz went through yesterday; correct?

14   A    That's correct.

15   Q    Now, what about the other elections that you looked

16   at that are reflected on Exhibit 486?

17   A    So again, I went through the spreadsheet and

18   calculated the Republican vote percentage in every

19   district for all of these elections and because we

20   actually can't observe, using the spreadsheet, the number

21   of votes that were cast for those offices in the new

22   districts, I have to rely on a validity check of those

23   figures and that's shown at the bottom and it gets -- at

24   the end.  So -- can you scroll down a little bit more?

25   That's as far as it goes?

KENNETH MAYER - DIRECT

1      All right.  So the bottom two rows -- that's

2  better -- for each race in this spreadsheet I calculated

3  the minimum and the maximum Republican vote percentage

4  that we observe.  And this will tell us if there is a

5  similar error.  We would know right away if there's any

6  Republican vote percentage that exceeds 100 percent, we

7  know right away there's an error.  If we see every

8  Republican vote percentage that's 0 or 100 percent, right

9  away we know there's an error.  But there's also a

10 plausible range that the Republican vote share can take

11 in these districts.  So even in the most heavily

12 Republican districts, the Republican is not going to get

13 100 percent.  Even in the most heavily Democratic

14 district in the state, the Republican candidate is not

15 going to get 0 percent.

16     So the plausible range of values are roughly -- we

17 would expect the Republican candidate to get in maybe the

18 high single digits, around 10 percent in the most

19 Democratic districts, and maybe 75, 80, 90 percent in the

20 most Republican districts.  So this will tell us if any

21 of the values are either objectively incorrect or

22 implausible.  And as we go through, there's no other

23 race, other that the 2006 gubernatorial race, where we

24 see an implausible set of values.

25 Q    So what Mr. Foltz and Mr. Keenan did yesterday was

KENNETH MAYER - DIRECT

1    an isolated incident; is that correct?

2    A    I regard it as entirely misleading, in part because

3    we're looking at a measure that is actually based -- the

4    04-010 measure, it's probably based on 13 races, maybe 14

5    races, and the exercise that Mr. Keenan and Mr. Foltz

6    went through yesterday would be to isolate errors in one

7    portion of that.  We're talking about probably 5, 6

8    percent of the underlying data and that does not by any

9    stretch mean that the entire composite index, which is

10   based on a much larger number of races, is incorrect.

11   Q    Does it alter in any way or change in any way the

12   efficiency gaps that you calculated for Act 43?

13   A    No, it doesn't.  And one of the reasons I can say

14   with certainty that it doesn't affect the overall

15   estimates is that we know that the baseline partisanship

16   estimates in Act 43 that we observe in the final map,

17   that those numbers are actually right; that we can

18   observe those numbers directly and the fact that there's

19   a little bit of noise, the fact that a small piece of

20   that estimate is based on an erroneous measure, all that

21   does is slightly increase the uncertainty of that final

22   measure.  But we can observe that directly and we know

23   that that estimate is actually very close to what I

24   produced using different data.

25            MR. POLAND:  Your Honors, at this time I'd like

KENNETH MAYER - DIRECT

1   to move Exhibit 486 into evidence.

2          JUDGE RIPPLE:  Mr. Keenan?

3          MR. KEENAN:  No objection.

4          JUDGE RIPPLE:  It is admitted.

5          MR. POLAND:  Thank you, Your Honor.

6   BY MR. POLAND:

7   Q    Now, Dr. Mayer, when Mr. Foltz and Mr. Keenan were

8   going through that exercise yesterday and identifying

9   that one set of errors, do you know where that electoral

10  data came from that they used?

11  A    It came from the LTSB or the Legislative Technology

12  Services Bureau.

13  Q    What is the Legislative Technology Services Bureau?

14  A    The LTSB is a nonpartisan unit of the Legislature

15  that provides technical and data support for the

16  Legislature.

17  Q    And where did they attain that data from?

18  A    The LTSB obtained -- my understanding is that they

19  obtained the population data from the Census Bureau and

20  did their own calculations of the ward-level election

21  data using information they received from the GAB or the

22  Government Accountability Board.

23          JUDGE CRABB:  You said this is something that's

24  produced in Wisconsin?

25          THE WITNESS:  So the sequence is that census

KENNETH MAYER - DIRECT

data is provided from the Census Bureau to states.  It's

the PL 94 171 process, and again, my understanding is

that when census provides that to the State of Wisconsin,

they actually provide that to the LTSB and they are the

ones who process it and make it available to others.

JUDGE CRABB:  Is that an organization under the

Legislature or is it independent?

THE WITNESS:  My understanding is the LTSB is

actually an agent of the Legislature.  It's part of the

Legislature.

JUDGE CRABB:  So no one knows.

THE WITNESS:  I'm not really sure.  But we also

know that the LTSB also receives data from the Government

Accountability Board and then they match those up and

produce it in a form that the Legislature -- actually

they make it publically available on a website.

JUDGE RIPPLE:  Perhaps the parties at some point

could enter into a stipulation with respect to the

Government Accountability Board and this other entity as

to exactly what they are so that it's a matter of record

on appeal.

MR. POLAND:  We'd be happy to do that, Judge

Ripple.

JUDGE RIPPLE:  I think that would be very

helpful.

KENNETH MAYER - DIRECT

1    BY MR. POLAND:

2    Q    Now, Dr. Mayer, are you familiar with the LTSB data?

3    A    I am.

4    Q    How?

5    A    I've worked with it quite extensively.  I've worked

6    with it in the 2001 redistricting case.  I worked with it

7    in the -- so that was in the *Baumgart* case.  I worked

8    with it in the 2011/2012 *Baldus* case.  I've actually used

9    it quite extensively in my own research on election

10   administration and voting in Wisconsin, and I used it in

11   this case.

12   Q    How essential is the LTSB data to your report in

13   this case?

14   A    It's absolutely essential.  It was absolutely

15   critical to my underlying estimates of baseline

16   partisanship.

17   Q    How did you obtain the LTSB data?

18   A    I obtained it from their public website.  So there's

19   a publicly available website that has all of the GAS or

20   Geographic Information Systems and underlying data that

21   they make available.

22   Q    Dr. Mayer, when you obtained the data from the LTSB,

23   did you check the LTSB data for any errors it might

24   contain?

25   A    Oh, yes.

KENNETH MAYER - DIRECT

202

1   Q     And did you find any errors in the LTSB data when

2   you obtained it?

3   A     Yes.  I outlined some of them.  I'll start out by

4   saying whenever I receive a large dataset, and it doesn't

5   matter who it's comes from, the only large dataset that

6   I've worked with that I've actually never identified an

7   error in comes from the United States Census Bureau.  So

8   they are the gold standard by which other things are

9   compared to identify errors.

10       I've worked with the LTSB data.  I've worked with

11  Department of Transportation data.  I've worked with the

12  Statewide Voter Registration System.  The pattern is that

13  large datasets will somewhere between frequently and

14  almost always have errors.

15       So the first thing I do when I receive or start

16  working with a large dataset is I subject it to

17  extensively reliability testing.  I start looking at the

18  data to convince myself or to learn how accurate the data

19  are, and also when I identify errors, to see if I can

20  correct them.  In my experience working with the LTSB, I

21  found errors in this case.  I found errors in 2011.  I

22  found errors in 2001.  So the LTSB data especially --

23  it's not the population data.  That generally is okay.

24  It's the underlying election data.

25       And the reason that this frequently goes unnoticed

KENNETH MAYER - DIRECT

1    is that, as far as I am aware, the LTSB election data has

2    no official status.  It's just sort of their numbers that

3    they make available.  But when I began working with the

4    data in this case, I began checking it against the GAB

5    and found quite a number of errors.

6    Q     What kinds of errors did you find?

7    A     So there were two errors -- two types of errors.

8    Primarily is that in a number of locations the ward-level

9    vote totals were actually incorrect.  And I know this

10   because I compared -- usually the way that you would

11   identify an error is that you would aggregate the

12   underlying ward data to some higher geography and compare

13   them to information that you would get from the GAB.  So

14   I would be able to tell how many votes were cast in

15   Milwaukee County or Dane County or Marathon County, and I

16   would compare that to what the GAB's totals were.  If

17   those two numbers didn't match, I knew there was a

18   problem I had to investigate.  And I kept working to a

19   higher and higher level of detail until I was actually

20   able to pinpoint the precise wards where there were

21   mistakes.

22         The other problem with the LTSB data is there were

23   times when the underlying data had errors of the sort --

24   there might be an uncontested race where according to the

25   GAB there was no Republican on the ballot, but you look

KENNETH MAYER - DIRECT

204

1   at the LTSB data, they have votes cast for Republican

2   candidate or vice versa.  Or races where it was a

3   contested race where one of the parties received -- was

4   recorded as having zero votes.  So I mean this wasn't a

5   large number of wards, but it was enough that I felt it

6   necessary to go in and actually correct them.

7   Q    All right.  So you did correct these, the errors in

8   the data before performing your analysis?

9   A    Every one that I could.  There was a small number of

10  votes that I was not able to allocate primarily because

11  the way that the GAB reports data and the geographies

12  they use are actually different than what the LTSB uses.

13  And that error comes in -- if you look at the LTSB data,

14  there are roughly 6,590 total wards in Wisconsin,

15  probably 6,530 that are populated, but if you look at the

16  GAB data, you'll see election data reported in only 3,600

17  wards.  The reason that happens is that municipalities in

18  Wisconsin that have smaller -- I believe the cut off is

19  35,000 population, they are actually allowed to aggregate

20  their individual wards into reporting units.

21      So instead the City of Madison will report election

22  data for all 110 of its wards.  A smaller municipality,

23  the Town of Madison, City of Mequon and so forth, I

24  identified some of these in my report, you won't see an

25  individual vote total, but you'll see City of Mequon

KENNETH MAYER - DIRECT

1  Wards 1, 2, 5 and 10, which is how they report their data

2  to the GAB and how the GAB reports it.

3       I actually had a conversation with an LTSB staffer

4  when I began work on this case and what I believe

5  happened is that when the LTSB disaggregated from the

6  reporting unit to the ward level, something went wrong.

7  I don't exactly know -- I don't think they know what

8  happened, but that was one of the common sources of

9  errors that I identified I was actually able to correct.

10 Q    And how did you correct them?

11 A    I corrected them primarily by when there was an

12 individual ward error, I actually manually entered the

13 GAB data for that ward.  And when there was a reporting

14 unit error, the way that I corrected that is that I had

15 the LTSB ward data that I aggregated back up to the

16 reporting unit level.  So I combined the wards the way

17 that the GAB had and now I was able to directly compare

18 the reporting unit totals to the reporting unit totals.

19 And when those were wrong, I manually fixed them and then

20 disaggregated back down to the ward level.  So it was a

21 way of identifying errors and then correcting them

22 ultimately; that the total votes, the district-level

23 votes that I had were -- with the exception of about

24 two-tenths of a percentage point of the total number of

25 votes that I wasn't able to identify where the errors

KENNETH MAYER - DIRECT

1    were, but apart from that all of the ward level totals I

2    have are correct.

3    Q    Dr. Mayer, do you know whether Mr. Foltz,

4    Mr. Handrick or Mr. Ottman carried out the same data

5    verification procedure that you did?

6    A    I don't know.  Certainly doesn't look like it.

7    Q    Why do you say that?

8    A    Because there's just no evidence that they had gone

9    through it.  If they had, they would have identified the

10   error in the 2006 gubernatorial.  They would have

11   noticed.

12   Q    Dr. Mayer, whatever errors there may have been in

13   the data that they used, Mr. Foltz, Mr. Handrick and

14   Mr. Ottman produced partisanship scores for the districts

15   in the draft of Act 43 called *final map*; correct?

16   A    Correct.

17   Q    And we saw that on Exhibit 172; correct?

18   A    Yeah.  Can we bring this pack up?  This is again the

19   final map partisan estimates in that middle column where

20   it shows for new, and again, each entry in that part of

21   the table is a two-party open-seat baseline vote

22   percentage for the Act 43 districts.  That's based on the

23   04-10 composite.

24   Q    Did you carry out any analysis involving these

25   scores?

KENNETH MAYER - DIRECT

1   A      I did.  If we go back to Figure 7 in my report, it

2   shows how these two line up.

3   Q      What did you seek to do?

4   A      Simply to compare the final map baseline partisan

5   estimates to what I -- the model that I used generated.

6   Q      And why did you do that?

7   A      Because I wanted to see whether the process that the

8   Act 43 map drawers and Professor Gaddie used to evaluate

9   the partisanship of Act 43 were consistent with what I

10  had done because I wanted to assess the level of accuracy

11  of the information that they had.

12  Q      And what did you find when you did that?

13  A      Well, as this chart shows, the two quantities lined

14  up almost exactly.  So even though there was an error in

15  one of the races that they used to generate the

16  composite, this shows that it doesn't make any

17  difference; that the final answer that they get, they

18  didn't show their work, but they had the right answer.

19  Q      And did you calculate an R squared for this?

20  A      Yes.  It's shown there.  It's .96.

21  Q      And did you calculate a correlation?

22  A      Well, the correlation would be the R squared -- the

23  square root of that, and actually I think the square root

24  of .96, I believe, is something like .979, .98.

25  Q      And what does an R squared of .96 mean in layman's

KENNETH MAYER - DIRECT

1   terms?

2   A    It means that for all practical purposes these

3   measures are statistically identical.

4   Q    How does the R squared that you calculated for this

5   correlation compare to what you usually find in the

6   social sciences?

7   A    As I testified, you'll almost never see an R squared

8   in this range.  Usually there's far more noise and

9   variation in the underlying data.

10  Q    And does this finding tell you anything about

11  whether the data errors that Mr. Foltz described

12  yesterday were meaningful?

13  A    It does.  It tells me that that data error was

14  immaterial to the accuracy of their final estimates.

15  Q    Do you also recall Mr. Foltz testifying yesterday

16  about discrepancies between the S curves prepared by

17  Professor Gaddie in the composite scores that he,

18  Mr. Handrick and Mr. Ottman prepared?

19  A    I did.

20  Q    Do you have any opinion about how Mr. Foltz's

21  comparisons of the S curves and the composite scores?

22  A    Well, it was a little difficult to follow, but my

23  understanding of what happened is that Mr. Foltz was

24  comparing what was the observed values in Professor

25  Gaddie's S curves to the open-seat baseline estimates.

KENNETH MAYER - DIRECT

1    And also, it wasn't clear to me which S curve went with

2    with which map, and so it's entirely possible that we are

3    comparing S curve estimates to something that was a

4    completely different map.  But the bottom line is it

5    doesn't matter because whatever errors there were in the

6    underlying data that they used, the final estimates that

7    they generated were dead on.

8    Q    Is the exercise that Mr. Keenan and Mr. Foltz went

9    through yesterday valid or meaningful in any way?

10   A    No.  Because what that amounted to was going through

11   what amounted to hundreds and hundreds of pieces of data

12   and cherry picking a small number that appeared to be --

13   that were incorrect and didn't match.  And I don't think

14   there's a statistician in the world who would say that

15   you can go through a huge dataset, look at nine or ten

16   discrepant values, and conclude from that -- draw the

17   inference that all of the data is incorrect.  It's just

18   not a valid practice.

19   Q    Do you know of any work that has examined the

20   correlation between Professor Gaddie's regression output

21   and the composite scores that Mr. Foltz, Mr. Handrick and

22   Mr. Ottman produced?

23   A    We have Professor Gaddie's email which shows that

24   they correlate at .96.

25          MR. POLAND:  Could we bring up Exhibit 175

                    KENNETH MAYER - DIRECT

1    again, please.

2            MR. KEENAN:  I'm just going to object.  This

3    isn't based on his firsthand knowledge and it's not in

4    his report.  I've let it go on for a while, but I mean,

5    like, what are we doing here?  He's talking about what

6    Professor Gaddie emailed?

7            MR. POLAND:  Your Honors, I can explain this.

8    We submitted a trial brief, a joint trial brief, several

9    weeks ago.  There was not a single proposed finding of

10   fact that went through -- that identified anything we

11   went through yesterday afternoon between Mr. Keenan and

12   Mr. Foltz.  Mr. Foltz testified the first that he heard

13   of this was two weeks ago when Mr. Keenan raised it.  So

14   what we're doing now is in the nature of rebuttal.  This

15   was sprung on us less than 24 hours ago.  We've worked

16   all night and all morning to explain to the Court why

17   that analysis was misleading.  This is important to get

18   to the truth of what went on here and that's why we're

19   presenting it to Your Honors.

20           JUDGE RIPPLE:  Mr. Keenan.

21           MR. KEENAN:  Well, they didn't know about it

22   because they didn't bother to go through the spreadsheet.

23   I assumed the score was right too until I actually

24   decided to add up the numbers myself and found the error.

25   That's why it wasn't raised and discovered until two

                    KENNETH MAYER - DIRECT

weeks ago because apparently I'm the only one who wants
to go and look at specific cells and spreadsheets and add
up numbers.  So I don't see why that's an excuse to not
have things in the expert report.

       This document that I was working off of was taken
from the computers by Mr. Lanterman, who is their expert.
They've had this document much longer than I have and no
one on their team decided to look at it.  No one on their
team decided to compare the Gaddie S curves, the actual
numbers in them, to the actual numbers in the final map.
I don't see why that allows you to go beyond the scope of
your expert report.

              JUDGE RIPPLE:  We'll let counsel make his record
and we'll rule on the matter in due course.

              MR. POLAND:  Thank you, Your Honors.
BY MR. POLAND:
Q    Dr. Mayer, because it's been raised now, how can you
tell from Exhibit 175 that's sitting in front of you what
the correlation was that Professor Gaddie identified?
A     Well, because of what it states.  And I can say I've
known Dr. Gaddie for 20 years and he's a very
well-respected political scientist and I will take him at
his word that if he says the correlation is .96, that it
means the correlation is .96.
Q    All right.  And do you have an opinion about the

                    KENNETH MAYER - DIRECT

1    relationship between Professor Gaddie's regression output

2    and Mr. Foltz, Mr. Handrick and Mr. Ottman's composite

3    scores?

4    A    Well, they line up almost exactly.  I will also say

5    that in the spreadsheet and in that matrix spreadsheet,

6    there is a column entitled *New 04-010 composite.*  I went

7    through that and compared the estimates in that column

8    with the estimates in the final map and they're almost

9    identical.  And so again, the bottom line is whatever

10   errors there were in the S curves are in the underlying

11   data, it doesn't matter because we can see the estimates

12   that they generated.  And the final estimates, the answer

13   that they had about the partisanship of Act 43 were

14   almost exactly what I got.  So even though there's a

15   little bit of murkiness about the actual how they did the

16   underlying calculations, the answers they got were

17   correct.

18   Q    Dr. Mayer, you're familiar with the work of

19   Professor Nicholas Goedert in this matter, aren't you?

20   A    Yes.

21   Q    Are you aware of Professor Goedert's criticism of

22   your analysis of Act 43, saying the similarities between

23   your analysis and Professor Gaddie's were just

24   coincidental?

25   A    I am.

1    Q    Are they merely coincidental?

2    A    No.  So here is the -- I've been thinking about how

3    to describe this and here's the best analogy I can come

4    up.  If I gave Your Honors a quarter and I had a quarter

5    and we flipped them, it's a 50 percent probability that

6    we would either both flip heads or both flip tails.  That

7    would be a coincidence.  There wouldn't be anything

8    exceptional to that.

9        But if we were to flip those coins 99 times, the

10   chances that we would get both heads and both tails all

11   99 times is zero.  It's actually 10 to the minus 30,

12   which is effectively saying there's no way that this is

13   an accident.  It's not possible for a random process or

14   erroneous process to produce numbers that are so close to

15   mine.

16   Q    Has Professor Gaddie provided any analysis to show

17   the similarities between your analysis and Professor

18   Gaddie's analysis are just coincidental?

19   A    No.  He just simply makes the argument without any

20   evidence or argument.

21   Q    So based on the materials that you've seen, do you

22   have an opinion whether the map drawers in 2011 were

23   using models that would forecast the partisan performance

24   in the districts they drew?

25   A    I am and they did.

KENNETH MAYER - DIRECT

214

1   Q     Now, your analysis of or I'm sorry.  Your

2   Demonstration Plan has been criticized by Professor

3   Goedert because it didn't take incumbency into account;

4   correct?

5   A     That's correct.

6   Q     Is there any validity to that criticism?

7   A     No.

8   Q     Why not?

9   A     Because it's misunderstanding the purpose of the

10  baseline estimate.  The purpose of that baseline estimate

11  was not to explain actual outcomes.  It's to give you a

12  method of comparing directly two alternative map

13  configurations.  And the way that's done in the

14  literature is that you have to remove the incumbency

15  advantage because you don't know when you draw a map with

16  incumbency, if you draw a different map, you're going to

17  have a different set of incumbents or the incumbents will

18  run in different districts.  So that's not an

19  apples-to-apples comparison.  You need to use a

20  consistent methodology that removes the incumbency

21  advantage.  So that's why it's called a *baseline partisan*

22  *estimate*.

23  Q     Did you do anything to respond to Professor

24  Goedert's criticism?

25  A     I did.  Just to -- I was convinced that it wouldn't

                    KENNETH MAYER - DIRECT

1    make any difference, but I decided to go ahead and do the

2    analysis anyhow.

3    Q      And what did you do?

4    A      So for Act 43, I didn't have to do anything because

5    I knew where the incumbents were.  We have the election

6    results.  For the Demonstration Plan, I needed to locate

7    or identify the districts where -- the districts in the

8    Demonstration Plan where incumbents resided.  The way

9    that I did that is I received from counsel a list of

10   street addresses of all the incumbents in the Legislature

11   in 2012.  And I used a web application that does what's

12   called *geocoding*.  This application actually can take a

13   street address and convert it into a longitude and

14   latitude coordinate that you can input directly into GAS

15   software.  So I did that, input it back into Maptitude so

16   I could see on a map where all of the incumbents --

17   actually all of the Assembly -- members of the Assembly,

18   their home residences, so I knew where incumbents

19   resided.

20         I did a couple of things after that.  I removed the

21   legislators who were not running for re-election.  There

22   were a couple of incumbent legislators who actually lost

23   in the primary.  I removed them.  And then I had to do an

24   adjustment for pairings, and the way that I did that, as

25   I explained in my rebuttal report, when I had incumbents

1  of both parties in a district, I counted that as an open

2  seat because in that situation the incumbency advantage

3  will basically cancel.  When I had two incumbents of the

4  same party, I coded that district as having -- as being

5  controlled by the incumbent of that party because

6  hypothetically if the two incumbents run against each

7  other in the primary, one of them will win.  They'll run

8  as an incumbent.  So now I had data on where incumbents

9  were running -- would run for re-election in the

10 Demonstration Plan so I was able to recalculate the

11 efficiency gap estimates going back and reinserting the

12 incumbency advantage and seeing the effect that it would

13 have on the vote.

14 Q    All right.  Now, after you took incumbency into

15 account, you calculated the efficiency gap?

16 A    I did, again using the same method that I did in

17 Figure 7 and 8 in my report for Act 43 in the

18 Demonstration Plan.

19 Q    Did you report your findings from that analysis?

20 A    I did.  They are set out in my rebuttal report.

21      MR. POLAND:  And could we pull up Exhibit 113,

22 please.

23 Q    Dr. Mayer, on the screen in front of you is Exhibit

24 113.  Could you identify that and explain it to the

25 Court?

KENNETH MAYER - DIRECT

1    A    So this is a recalculation of the efficiency gap

2    once you put incumbency back into effect or put

3    incumbency back into the model.  The first row of data is

4    the baseline efficiency gap and these will match the

5    table in my initial report.  When you put incumbency back

6    in and recalculate it, you see that the efficiency gap

7    does change a little bit.  It increases for both the

8    Demonstration Plan and for Act 43.

9    Q    And how do the numbers change?

10   A    For the Demonstration Plan, the efficient gap goes

11   from 2.2 percent to 3.89 percent, and for Act 43 it goes

12   from 11.69 percent to 14.15 percent.

13   Q    And what accounts for that small change?

14   A    There are two reasons why it changes.  One is that

15   there were twice as many Republican incumbents as there

16   were Democratic incumbents.  My recollection is that

17   there were 50 Republican incumbents who ran in 2012

18   compared to only 24 Democratic incumbents.  And so you

19   expect to see a change as the vote totals change.

20        It's also going to be the case that there are a few

21   districts that will actually switch party control where

22   you put the incumbency advantage back in, both Republican

23   and Democratic that will switch one seat -- switch party

24   control, and that's another reason why the efficiency gap

25   will change.

KENNETH MAYER - DIRECT

1  Q    Now, Dr. Mayer, does this analysis that you

2  performed taking incumbency into account tell you

3  anything about Professor Goedert's criticism that your

4  baseline model failed to take incumbency into account?

5  A    It means that taking incumbency into account doesn't

6  change my substantive conclusions at all.  The efficiency

7  gap for Act 43 actually gets bigger, larger and the

8  efficiency gap for the Demonstration Plan gets a little

9  bit larger but it's still significantly smaller than the

10 efficiency gap for the Demonstration Plan.

11 Q    Is there any merit to Professor Goedert's criticism?

12 A    No.

13         MR. POLAND:  Your Honors, this would be a

14 convenient breaking point in my exam if you'd like to

15 take a mid-afternoon break.

16         JUDGE RIPPLE:  We're just about to do so, so

17 thank you for giving us a heads up that it would be a

18 good time.  The Court will stand in recess for about 15

19 minutes.

20         MR. POLAND:  Thank you, Your Honor.

21     (Recess    3:29-3:49 p.m.)

22         THE CLERK:  This Honorable Court is again in

23 session.  Please be seated and come to order.

24         JUDGE RIPPLE:  Good afternoon everyone.  The

25 Court would like to ask a question of the witness at this

                    KENNETH MAYER - DIRECT

1    time if we may to clear up an ambiguity.  If we create an

2    ambiguity, we'll let you take care of that.

3              MR. POLAND:  Yes, please, Your Honor.

4              JUDGE RIPPLE:  Professor, we wondered with

5    respect to the calculation of the -- baseline

6    calculation, you said, as we interpret your testimony,

7    that it was not predictive.  Could you explain or

8    elaborate on that a little bit further, please?

9              THE WITNESS:  So what I meant by that was that

10   it was not designed to allow you to -- or the validity of

11   the baseline measure should not be determined by

12   comparing it against the actual outcomes that you

13   observe.  So there are -- so in my underlying regression,

14   I got 70 of the 72 districts correct.  But when you

15   extract the incumbency advantage, those numbers change a

16   little bit and so it becomes slightly less accurate.  So

17   I don't know, it's in the pretrial statement of facts

18   where there were a couple three or four other districts

19   where compared to the actual results, the open-seat

20   baseline actually did not pick the right winner and that

21   happens because we know that there are election-specific

22   effects that the open-seat baseline has already

23   extracted, things like incumbency and some other things

24   as well.

25             So I think the way that Professor Gaddie described

                    KENNETH MAYER - DIRECT

1    it is accurate, that it gives us an underlying

2    expectation of how the district will perform.  And to

3    assess the actual -- to assess the actual outcomes, you

4    need to do what I did in, I think it was Table 2,

5    whatever table in my report where I compare the actual

6    results with what the full model generated.  And the

7    reason we use a baseline is we're looking for an

8    apples-to-apples comparison of one district

9    configuration, in this case Act 43, and a different

10   district configuration which is the Demonstration Plan.

11   But it can be used, and the baseline is used, to evaluate

12   a huge number of alternative configurations.  So it's

13   more designed for a comparison across plans and it does

14   have some predictive value because we can observe what is

15   likely to happen over time, as Professor Gaddie

16   explained, that the further we go into the future,

17   there's going to be more and more error.

18       But the key is that the purpose of the baseline is

19   to serve as a methodology for comparing alternative

20   configurations.  One would use a different method if we

21   were trying to evaluate the underlying accuracy of the

22   model, which is what I did in that earlier table that

23   compared the full incumbency effect with what we actually

24   observe.

25            JUDGE RIPPLE:  Thank you.  Thank you very much,

                    KENNETH MAYER - DIRECT

1  Professor.  I think that's all the questions the Court

2  has at this time.

3         MR. POLAND:  Thank you, Your Honor.  And

4  certainly at any point in time if the Court has any

5  questions at all, I'm happy to accede the floor to the

6  Court for questions.

7         THE WITNESS:  I encourage my students to

8  interrupt me in class and they don't do it enough.  So

9  I'm happy to answer any questions that you have.

10        JUDGE RIPPLE:  I've had that experience.

11        MR. POLAND:  Thank you, Your Honor.

12 BY MR. POLAND:

13 Q   Dr. Mayer, just before we broke we were talking

14 about some of the criticisms that Professor Goedert has

15 of your analysis; correct?

16 A   Correct.

17 Q   I'd like to move on to another criticism.  Professor

18 Goedert criticized your analysis for not performing

19 sensitivity testing and for not analyzing what would

20 happen to the Demonstration Plan under different

21 statewide vote scenarios; correct?

22 A   That's correct.

23 Q   All right.  What does he say you should have done?

24 A   Well, he makes the criticism in a couple of

25 different places in his report.  Sometimes he calls it a

KENNETH MAYER - DIRECT

1    sensitivity analysis, at another location he says I need

2    to account for what might happen in future plausible

3    electoral environments.  What I interpreted him as

4    criticizing me for was for not doing what amounts to a

5    swing analysis.

6    Q    What is a swing analysis?

7    A    A swing analysis is roughly equivalent to the

8    S curves that Dr. Gaddie was referring to yesterday.  In

9    a uniform-swing analysis, the practice is that we can

10   observe or estimate a set of election outcomes in a

11   districting plan and those district-level results will

12   aggregate to a statewide total.  We would be able to

13   calculate or estimate the number of Assembly votes cast

14   statewide or any other race.  And so that gives us a

15   statewide percentage that is related to those individual

16   district percentages.

17        What a swing analysis does is ask the question what

18   is -- what might happen.  It's an estimate of what might

19   happen if that statewide vote changes, if it moves in one

20   direction or another.  And the way in which it's done is

21   one makes the assumption that we assume that if the

22   statewide vote percentage changes by some fixed amount,

23   most typically it's done in increments of one percentage

24   point.  So we change the statewide percentage by one

25   percentage point and we assume that that swing is going

KENNETH MAYER - DIRECT

1    to be equivalent in every district.  So if the statewide

2    vote percentage swings by one percent, we apply that one

3    percent -- we basically change the district vote

4    percentages by one percent or two percent and then we

5    observe what the overall outcome is.  It's a way of,

6    generally speaking, estimating what is a plausible

7    outcome given a change in the statewide vote, which in

8    this case a change in the statewide vote is a proxy for a

9    different election environment, what might happen if

10   there's a pro-Democratic swing or a pro-Republican swing.

11   Q    And we've seen a number of charts that have been

12   displayed with a bright colors:  The bright blue, the

13   aqua, the sort of orangish color, the red color.  You've

14   seen those displayed in the courtroom the last two days?

15   A    That's correct.

16   Q    And are those visual representations of a swing

17   analysis?

18   A    They are.  I'm actually not quite sure why Professor

19   Gaddie says that these are not equivalent to a swing

20   analysis.  As best I can tell, the difference is that

21   usually in a swing analysis you don't sort by district

22   and you don't color code.  But the underlying data in

23   those S curves is the result of a uniform-swing analysis.

24   Q    Now, why didn't you perform a swing analysis of your

25   Demonstration Plan or Act 43 when you prepared your

KENNETH MAYER - DIRECT

1  original report?

2  A    I didn't do a swing analysis because that was not my

3  aim.  My aim was to evaluate whether it was possible to

4  draw a districting plan in 2012 based on what we knew

5  about the 2012 election and to compare that to what we

6  actually observe or would be estimated to observe using

7  the baseline in 2012.  It was not my goal to do the swing

8  analysis.  Professor Jackman performed extensive analysis

9  on durability and how the statewide changes in the

10  statewide vote might be reflected in changes in the

11  efficiency gap.  So my aim was different.

12  Q    Did you do anything to respond to Professor

13  Goedert's criticism?

14  A    I did.  And I did not think there was much merit to

15  the criticism, but I decided to go ahead and actually

16  perform a uniform-swing analysis.  I suspected it

17  wouldn't make much difference in my substantive

18  conclusions, but I performed it in any case.

19  Q    Can you explain how you performed a uniform-swing

20  analysis for Act 43 in your Demonstration Plan?

21  A    So what I did is that I went back to -- so I'll

22  describe the overall goal.  I wanted to determine what

23  the likely outcomes would be under the largest plausible

24  swings that we might observe in Wisconsin.  I didn't want

25  to produce something that was like the S curve.  I mean

KENNETH MAYER - DIRECT

1   those are useful, but there's too much data there.  So

2   what I wanted to do was to explore what might happen if

3   we saw the largest swings that we have seen in Wisconsin

4   over the last couple of decades.

5        So under the -- what I did is I calculated directly

6   the Republican percentage of the statewide Assembly vote

7   from 2012 going back to 1992 and I observed the maximum

8   and minimum.  And what we saw -- I probably would need to

9   refer to my report -- but my recollection is that in

10  2012, that my model produced a Democratic statewide vote

11  share of 51.2 percent.  I think that was the total.  And

12  if we go back, all the way back to 1992, the largest

13  statewide vote share that the Democrats received in

14  Assembly elections was in 2006 and it was 54.2 percent,

15  54 -- it was 54 and change.  And the smallest statewide

16  vote share that the Democrats received was about 46

17  percent and we saw that in 2010.  So that gave me the

18  largest swings that we have observed in Wisconsin going

19  back 20 years.  And so I went ahead and performed a swing

20  analysis under the scenarios of a 3-point Democratic

21  swing and a 5-point Republican swing to see what effect

22  that would have on my efficiency gap calculations for the

23  Demonstration Plan.

24  Q    And did you take incumbency into account when you

25  did this?

KENNETH MAYER - DIRECT

1    A     Well, I did.  So the way I took incumbency into

2    effect -- now, I note that under a baseline partisan,

3    that that's the method that is used for comparing one

4    district configuration to another.  In the swing

5    analysis, we're actually using the same district

6    configuration, so we can actually add information back in

7    because the district lines aren't going to change.  And

8    so the method that I used is that I calculated for the

9    Demonstration Plan and for Act 43 -- actually observed

10   for Act 43 what we saw in 2012.  But for the

11   Demonstration Plan, I calculated the baseline partisan

12   estimates which gave me the winner in every district.  So

13   I knew which candidate was estimated to win.  I made the

14   assumption that every incumbent would run for

15   re-election, because we don't know exactly which ones

16   were, but most of them do.  And so the -- and I did the

17   same for Act 43.  So the swing analysis of the -- we'll

18   see when we show the data, that the underlying estimates

19   for Act 43 in the Demonstration Plan are actually the

20   incumbent baselines.  So I put incumbency back in.  And

21   then I, in performing the swing, I recomputed the

22   estimates, assuming that every incumbent would run for

23   re-election.  That's how I determined what the efficiency

24   gap would be under the maximum swings that we have

25   observed over the past 20 years.

KENNETH MAYER - DIRECT

227

1    Q    And you said that analysis is set out in your

2    rebuttal report; is that correct?

3    A    It's in the amended rebuttal report.

4         MR. POLAND:  Could we bring up Exhibits 116 and

5    117, please.  And why don't we look at Exhibit 116 first.

6    Q    Dr. Mayer, on the screen in front of you is Exhibit

7    116, which is Table F from your March 31st rebuttal

8    report.  Do you have that in front of you?

9    A    I do.

10   Q    And can you identify how that reflects the swing

11   analysis you performed?

12   A    So the middle column will see that the MyPlan

13   incumbent baseline, that's the incumbent baseline that we

14   took from the table we saw a little bit earlier that

15   recomputed the efficiency gap once you put incumbency

16   back in.  And the D plus 3 is what happens if the

17   statewide vote and the vote in each district swings 3

18   percentage points in the Democrats direction and it shows

19   the -- I performed those calculations in exactly the same

20   way as I did the original efficiency gap, I went into

21   those tables and actually adjusted -- I swung the

22   individual vote totals 3 percentage points in each

23   direction.

24       And we see that under a Democratic swing of plus

25   three, so a Democratic year similar to 2006, the

                    KENNETH MAYER - DIRECT

1  efficiency gap really doesn't change.  It goes from 3.89

2  percent to 3.75 percent, which is not a material change.

3  So under a democratic swing, the efficiency gap for the

4  Demonstration Plan remains low.  It actually goes down a

5  little bit.

6      If we swing in the Republican direction, so we

7  adjust the all-incumbent baseline five points in the

8  Republican direction, we see that the efficiency gap

9  actually becomes basically zero.  It drops from 3.89

10 percent to minus 0.1 percent, which is, if you look at

11 the efficiency gap, the primary quantity is the number of

12 wasted votes.  And we see that the number of wasted votes

13 under a five-point Republican swing is about 3,800 votes.

14 That's essentially zero.  So the conclusion or the

15 inference that I draw from this chart is the

16 Demonstration Plan is not affected by significant swings

17 either in the pro-Democratic or pro-Republican direction.

18 Q    And could we look at Exhibit 117, please.  That's

19 Table G from your rebuttal report.  What were your

20 findings when you performed a swing analysis on Act 43?

21 A    So again, this is the result of the equivalent

22 calculation observing the Act 43 actual results with

23 incumbency built back in.  And we swing that plus 3 in

24 the Democratic direction.  The efficiency gap goes from

25 14.15 percent, actually gets a little bit bigger.  And a

KENNETH MAYER - DIRECT

1    couple things to point out in this chart.  It's not only

2    does the efficiency gap increase to 14.88 percent, these

3    are actually important figures because in effect we've

4    swung the statewide democratic vote up to 54 percent.

5    And even under the estimates for Act 43, even when the

6    Democrats receive 54 percent of the statewide vote, they

7    still aren't even close to a majority of the Assembly.

8    The Republicans have a 54-45 majority in the Assembly

9    even when the Democrats capture 54 percent of the vote.

10   So that's significant.  If we swing it in the other

11   direction, we assume a Republican swing akin to 2010, the

12   efficiency gap drops from 14.15 percent to 6.09 percent.

13       The reason that happens, if you look at the seat

14   totals, we've swung the Republican vote percentage from

15   essentially 51 -- 49 percent to 54 percent, so we've

16   swung the Republican vote percentage up to 54 percent.

17   The number of seats doesn't change.  So the efficiency

18   gap, because it's a measure of that gap, actually goes

19   down.

20       My inference in looking at this chart is what that

21   tells me is that the way in which Act 43 has been drawn

22   has already secured what in practice amounts to the most

23   you can practically do.  So it is a confirmation that the

24   bias in Act 43 is about the maximum that you can get.

25       The other thing to note is that if I am -- if I'm

KENNETH MAYER - DIRECT

230

1   trying to produce a gerrymander, if I'm trying to produce

2   a map that is biased in my favor, I probably don't care

3   if my party does better and my seat total doesn't

4   increase dramatically.  Under a 49 percent baseline, I've

5   already captured 60 seats out of 99.  My vote goes up by

6   3 or 4 or 5 percentage points; my seat total doesn't go

7   up, but I don't really care because practically speaking

8   there's not a big difference between a 63-seat majority

9   and a 60-seat majority.  I'm still protected.

10      What I really want to do, my most important task is

11  to protect myself from a swing in the other direction.  I

12  want to make sure that my map stays in my favor even if

13  there's a significant swing in the other party's

14  direction.  And that's what we observe here, that even

15  under the largest Democratic swing that we've observed

16  since 1992 and in 2006 when that happened, Democrats

17  actually captured a majority of the Assembly, I'm still

18  looking at a Republican majority, a 9-seat Republican

19  majority.

20      So if I'm trying to produce a gerrymander and I'm

21  thinking carefully about the packing and cracking that I

22  have to do, that's ultimately my most important goal, to

23  protect that majority that swings -- that work in the

24  other parties' favor.

25  Q    And does the swing analysis that you performed on

KENNETH MAYER - DIRECT

1    the Demonstration Plan tell you anything about the

2    durability of the Demonstration Plan's relatively small

3    efficiency gap?

4    A    Well, what this tells me is that the efficiency gap

5    in the Demonstration Plan remains low under all plausible

6    scenarios and that the efficiency gap of Act 43 remains

7    large, but the key is that it gets even larger if the

8    vote goes in the Democrats' favor.  So it tells me that

9    the sensitivity analysis actually does not alter my

10   substantive conclusions at all.

11   Q    And what about a Republican wave scenario?

12   A    Well, in the Republican wave scenario, the

13   efficiency gap does go to 6.09 percent, but if I've

14   produced an efficient Republican map with a significant

15   Republican bias, I'm actually okay with that.  It's still

16   biased in the Republicans' favor, but the bias goes down

17   a little bit, but I still have that 60-seat majority.

18   Q    Dr. Mayer, would it make sense to conduct

19   sensitivity testing using the open-seat estimates in your

20   Demonstration Plan?

21   A    No.  And again, the distinction comes from what --

22   the purpose of the open-seat baseline is to explore what

23   happens in their alternative district configurations, and

24   in this case, we actually know what the district

25   configuration is.  And that's what distinguishes what I

KENNETH MAYER - DIRECT

1  did here from the swing analysis that Dr. Gaddie did.

2  What Dr. Gaddie was looking at was what would happen when

3  you compare the existing map in 2010 to a new map.  So in

4  my view, my reading of the literature is that a swing

5  analysis in this context that doesn't look at incumbency

6  is actually jettisoning important enough that you would

7  need to know for this purpose.

8  Q    All right.  Well, let's use the open-seat estimates

9  anyway.  Do you know what the vote swing was in the

10 Wisconsin Assembly between 2012 and 2014?

11 A    So I believe it was in the range of a 3.4 percent or

12 3.3 percent swing in the Republican's direction.

13 Q    And so if you were to apply that swing to your

14 Demonstration Plan using your open-seat estimates, how

15 many districts would flip from Democratic to Republican

16 control?

17 A    That's not an analysis that you would want to do or

18 you would want to with this, but if we did this analysis,

19 so I believe there were 15 -- there were 12 Democratic

20 districts where the Democrat under the open-seat baseline

21 got between 50 and 53.4 percent of the vote.  I think

22 that's right.

23 Q    All right.

24        MR. POLAND:  Can we pull up Exhibits 24 and 25,

25 please.

KENNETH MAYER - DIRECT

Q    Do these help you with the numbers?

A    Well, so I couldn't compute the percentages here directly and these are not sorted.  But if we -- so I think it was 12 Democratic seats between 50 and 53.4 percent.  It might be -- it was either -- one was 12, the other was 15.  I'm not -- I can't remember exactly which is which sitting here.

Q    Okay.  So you testified there were 15 districts with Democratic vote shares that would flip; is that correct?

A    So there were 15 seats --

Q    15 seats.

A    -- where the -- I think there are 15 seats where the Democrat received between 50 and 53.4 percent of the vote or in this case between 46.4 and 50 percent of the vote. And those would switch.

Q    Let's consider a swing in the opposite direction. What happens if we were to apply a swing of 3.4 percent in a Democratic direction to your Demonstration Plan?

A    So that would result in 12 Republican seats flipping from the Democrats to Republicans because there were 12 seats in the baseline where the Republican candidate got between 46.4 and 50 percent.  So those seats would flip.

Q    Okay.  15 and 12, that's a large number of seats and large and similar number of seats that would flip; correct?

KENNETH MAYER - DIRECT

1   A     That's correct.

2   Q     So what accounts for the large number of these

3   districts on both sides?

4   A     Well, what accounts for that is that in drawing the

5   Demonstration Plan, I attempted to draw a comparable

6   number of seats that were on the different ranges of

7   competitiveness.  And I didn't actually, when I was

8   drawing the map, I didn't look at the 53.4 and 46.6, but

9   -- in the context of drawing that map, in drawing a

10  roughly equivalent number of competitive and leaning

11  Democratic and Republican seats, what that means is that

12  as the -- as we do a swing up or down 3.4 percentage

13  points, the key in this context I think is that both

14  parties would benefit equally.  So the effect of a 3.4

15  swing is symmetrical; that if the Republican share goes

16  up, they get more seats.  If the Democratic share goes

17  up, they get more seats.

18  Q     Dr. Mayer, does the swing analysis that you

19  performed in response to Professor Goedert's criticism

20  tell you anything about that criticism of your original

21  decision not to perform that analysis?

22  A     Well, so again, the open-seat swing is not something

23  that you would normally do.  But in doing the analysis as

24  I did, taking incumbency into effect, the conclusion or

25  the inference that I draw is that the efficiency gap of

KENNETH MAYER - DIRECT

1  the Demonstration Plan is low and durable under maximum

2  swings and the efficiency gap of Act 43 is large and

3  durable under maximum swings that we've seen.  So it

4  doesn't alter my substantive conclusions.

5  Q    All right.  Dr. Mayer, I'd like to switch gears now.

6  Are you familiar with the state's argument that any high

7  efficiency gap that you observed in Act 43 is the result

8  of an alleged natural political geography in Wisconsin?

9  A    I am.

10  Q    All right.  And in the context of that criticism

11  what is political geography?

12  A    So in this context, political geography refers to

13  the distribution of Republicans and Democrats around the

14  state and the analysis of the spread and concentration

15  and differentials and how voters in the political parties

16  are distributed around the state.

17  Q    How does the state make the argument that the high

18  efficient gap of Act 43 is the result of political

19  geography?

20  A    So both Mr. Trende and Dr. Goedert make this

21  argument, and the claim is that Democrats are naturally

22  concentrated in certain parts of the state, primarily in

23  Milwaukee and Madison.  And again, I'm describing their

24  version of the argument because ultimately I think it's

25  incorrect.  The argument is that the concentration of

KENNETH MAYER - DIRECT

1  Democrats in Milwaukee and Madison means that if you drew

2  a perfectly neutral map without any consideration of

3  political phenomenon and the only thing that you looked

4  at were the population, equality, compactness, respect

5  for political subdivisions and Voting Rights Act, that a

6  perfectly neutral map would have a natural Republican

7  efficiency gap, or I guess to put it in more generic

8  terms, that any neutral redistricting plan would have a

9  natural Republican advantage built in due solely because

10 of the way that Republicans and Democrats are

11 distributed, concentrated and spread around the state.

12 Q    Let's take Professor Goedert's argument first.  Are

13 you familiar with his report in this case?

14 A    I am.

15 Q    How does Professor Goedert make the argument that

16 the high efficiency gap in Act 43 is the result of a

17 natural political geography?

18 A    So I will note from the outset that while both

19 Dr. Goedert and Mr. Trende make the political geography

20 argument, neither of them have actually done any analysis

21 that can connect differences in political geography to

22 changes in the efficiency gap.  So there's a crucial

23 elision here that the argument they make is a claim that

24 Republicans are distributed more efficiently.  So that's

25 an empirical claim that they make, and then they leap

KENNETH MAYER - DIRECT

1    directly to the conclusion that that natural geography

2    explains the efficiency gap that we see under Act 43 and

3    that neither of them have done any analysis that actually

4    demonstrates that or that actually can quantify any

5    effect that political geography has on actual calculation

6    of the efficiency gap.  So that's one thing to keep in

7    mind as a foundation.  They actually haven't demonstrated

8    that -- any relationship between political geography and

9    the efficiency gap.

10       But they do both make empirical claims.  And what

11   Dr. Goedert claims is that if you look at the

12   distribution of votes at the ward level, that the ward

13   level results indicate that Republicans are more

14   efficiently distributed than Democrats around the state

15   and that therefore there is a natural pro-Republican bias

16   built into any districting plan.

17   Q    Where does Professor Goedert present that analysis?

18   A    He lays it out in a figure in his report.

19   Q    All right.  I can help you out here, I think.  Can

20   we bring up Figure 136, please.  And do you have that on

21   the screen in front of you, Professor Mayer?

22   A    I do.

23   Q    What is 136?

24   A    So what Dr. Goedert has done here is that he has

25   looked at the Democratic share of the presidential vote

KENNETH MAYER - DIRECT

1    in 2012 at the ward level and he has actually conducted a

2    uniform-swing analysis where I think the Democratic

3    statewide vote share was about 52, 53 percent, I can't

4    remember exactly, but he has essentially conducted a

5    swing analysis shifting the vote for -- Democratic vote

6    percentage in every ward down to 50 percent.  So this is

7    the result of a uniform-swing analysis that observes or

8    makes a claim about what would happen in a tied election.

9         And the argument that Dr. Goedert makes is that

10   because -- that there is a large -- there is a large

11   number of wards that are between 40 and 50 percent of the

12   Democratic share of the vote and that this means that if

13   you neutrally -- if you had a neutral aggregation of

14   these wards into a districting plan, that that would

15   naturally produce a large number of Democratic districts

16   between 40 and 50 percent, ergo political geography can

17   explain the pro-Republican bias in the districting plan.

18            MR. POLAND:  I should note for the record that

19   on the screen we have Exhibit 136.  This is Figure 1 that

20   appears on page 22.

21   Q    Now, Dr. Mayer, is it appropriate to make a

22   statement about geographic distribution by looking at the

23   vote in wards?

24   A    Not in this context it is not.

25   Q    And why is that?

KENNETH MAYER - DIRECT

1    A     Well, the primary problem is that we go back to the

2    fact that the wards were drawn after districts.  And so

3    first of all, we have an issue that the wards are

4    actually a creature of Act 43.  So any bias that is built

5    into Act 43 is going to be reflected in some measure in

6    the ward-level results.

7          But there are two other features of this graph that

8    I think are a problem.  The first is that what

9    Dr. Goedert has done, he's actually collapsed 6,600 wards

10   into a histogram with nine bins.  So there are only nine

11   columns with nonzero data.  In displaying the data like

12   this, he's actually losing an enormous amount of

13   information because we're -- these wards are aggregated

14   in a way that there's a tremendous amount of variation

15   that we're losing here.  So in that sense there are

16   better ways to visually describe this data.

17         The bigger problem is that looking at wards is the

18   wrong level of geography because elections in Wisconsin

19   are actually not decided at the ward level.  Elections

20   are decided at the district level.  And so if you're

21   interested in looking at the political bias in districts,

22   you need to look at what happens when you aggregate the

23   wards into districts.

24         So the technical term for the fallacy or the problem

25   that Dr. Goedert has fallen into is what geographers call

the *modifiable aerial unit problem*.  And what that means

is that the relationships that we observe at one level of

geography and the way that demographers or the census

looks at it, we have data on demographics and information

on education and income and things like that at the

census block group and census track level.  We might

observe a relationship at the census tract or block group

level, but if we aggregate up to a higher level of

geography like municipality or county, frequently the

relationships that we observe at a lower level of

geography will either disappear or sometimes even change

direction when we aggregate up to higher levels of

geography.

Q    And is the modifiable aerial unit problem that you

mentioned reflected anywhere in the academic literature?

A    It's all over the academic literature.  I mean it's

a pervasive problem in the study of geography.

Q    And did we include one such article in the binder of

reliance materials that you have in front of you?

A    I did.  And again, this is just illustrative.  I

mean if you did a google search of modifiable aerial unit

problems, you would probably come up with hundreds of

thousands of hits.  So the article that I cited in here

is Number 12.  Gary King.  *Why Context Should Not Count*.

Q    And is that an article that was cited in the source

1   material for your report?

2   A     It is.

3   Q     Now, Dr. Mayer, is there a proper way to conduct the

4   analysis that Professor Goedert tries to perform?

5   A     There is.

6   Q     And how would you do that?

7   A     Well, you would have to look at what happens in

8   districts.  So what I did is actually recreate the

9   analysis that Dr. Goedert did using what I think is a

10  better and clearer way of showing the data and also

11  showing what happens when you aggregate from the wards up

12  to the districts.

13  Q     Does it avoid the problems you identified with

14  Professor Goedert's analysis?

15  A     It does, because if I'm making an inference about

16  districts that looks at districts, there is no modifiable

17  aerial unit problem because I'm looking at a constant

18  level of geography.

19  Q     So what did you do to perform this analysis?

20  A     Well, I took Dr. Goedert's analysis at the ward

21  level and simply displayed that information in a slightly

22  different way and then aggregated those wards up into

23  districts to look at what happens in districts in a tied

24  50/50 election to see what that relationship looks like

25  at the correct level of geography.

KENNETH MAYER - DIRECT

1    Q    How does the ward and district distributions

2    compare?

3    A    Well, it's set out in a figure in my rebuttal

4    report.

5           MR. POLAND:  Can we bring up Exhibit 107,

6    please.

7    Q    And Dr. Mayer, can you identify Exhibit 107?

8    A    This is Figure C in my rebuttal report.

9    Q    And what does Figure C demonstrate?

10   A    So there's two things going on here.  The red line

11   is a continuous version of Dr. Goedert's histogram.  This

12   is what's actually called a *kernel density graph*.  It

13   actually can take classification data or continuous data

14   and it tells us -- it reflects the true nature of the

15   full range of data.  But if you look at the shape of this

16   curve, it's not that much different than when -- what

17   Dr. Goedert demonstrates.  It's a little bit different in

18   part because in classifying wards into nine bins, he's

19   losing some information.  And we can see that the -- and

20   again, we've already adjusted down to a 50/50 election.

21   And you can see that the red curve is not perfectly

22   symmetrical, but it's mostly symmetrical.  There's a

23   little bit -- the tails look a little bit different, but

24   it's not too far from what would be considered something

25   looks kind of like a normal distribution or a bell curve.

KENNETH MAYER - DIRECT

1    There's a single peak.  It varies.  The mode of the graph

2    or the maximum value of the kernel density curve is about

3    49 percent and so it looks roughly, not perfectly, but

4    roughly symmetrical.

5        The blue dotted line shows what happens when we

6    aggregate those wards into districts and observing what

7    would happen in the Act 43 districts in a tied election.

8        And there are two things to note here.  One, that

9    the shape of the curves is radically different.  The blue

10   curve has -- it shifted to the left.  It's much less

11   symmetric.  The peak is much much higher.  And it also

12   shows -- we've already talked about my observation and

13   conclusion that much of the partisan bias in Act 43 is

14   the result of cracking, an unusually and excessively

15   large number of Democratic -- of districts where the

16   Democratic vote share is expected to be between 40 and 50

17   percent.  These are districts where the Republicans are

18   going to win.  Here we see what happens when you

19   aggregate the wards into districts and we see that the --

20   I'm losing my arrow here -- that the peak is no longer

21   around 49 percent.  The peak now is at about 42 percent.

22       The other issue is that this area right here, that

23   is the fingerprint of a gerrymander.  Because that is the

24   absolute DNA of cracking; that we're looking at what

25   happens in a tied statewide vote.  And in a tied

KENNETH MAYER - DIRECT

244

1   statewide presidential vote, there is an unusually large

2   number of districts where the Democrats will receive

3   between 40 and 50 percent and if you actually calculated

4   the mode of this curve, the mode of the density graphs

5   and districts, it's not at 50 percent.  So about a 41, 42

6   percent.  That's -- that is the fingerprint, the forensic

7   evidence of a -- of cracking.

8   Q    Would a neutral map have different distributions?

9   A    Yes.  A neutral map would be more symmetric and a

10  neutral map would have a mode or a maximum value that is

11  much much closer to 50 percent.

12  Q    Dr. Mayer, has --

13       JUDGE CRABB:  Dr. Mayer, would you go back over

14  that, why you think that that blue thing --

15       THE WITNESS:  Yes, Your Honor.  The difference

16  here is that when we aggregate from wards into districts,

17  what this shows is that Act 43 took what looks more or

18  less like a symmetric distribution of wards -- again,

19  it's not perfectly symmetric, but it takes the 6,600

20  wards, that is -- in a 50/50 election, that the mode of

21  that graph is really centered at 50 percent.  But as we

22  aggregate or as we -- as the Act 43 map drawers, as those

23  wards are aggregated into districts, the bias emerges

24  that the graph is no longer centered at 50 percent.  It's

25  no longer symmetric.  And so I can -- I can aggregate a

KENNETH MAYER - DIRECT

1  bunch of 52 and 48 percent Democratic wards or 56 and 44

2  Democratic wards where a neutral distribution would

3  combine them in ways that really got me reasonably close

4  to 50 percent if I wasn't looking at that political

5  information.

6      But because the map (sic) 43 map drawers were

7  looking at political information, the difference between

8  the density graph of the wards and the density graph

9  districts, the fact that it changes shape and that it

10 shifts to the left, the modal value, the curve looks much

11 less symmetric.  What that tells us is as the wards were

12 aggregated into districts, the bias emerges.

13      JUDGE CRABB:  Even though, as I understand it,

14 what you're saying that the wards went into the districts

15 afterwards.

16      THE WITNESS:  Right.  So that's the other

17 problem with this.  And one of the other reasons we see

18 this is that this is a demonstration of the modifiable

19 aerial unit problem; that Dr. Goedert is making an

20 observation or drawing an inference at wards.  That's the

21 wrong unit of geography.  You shouldn't even be looking

22 at wards for this context.  You need to look at

23 districts.  So it's a combination of those two things.

24      So I probably described it inaccurately by saying

25 the wards were aggregated into districts because they

KENNETH MAYER - DIRECT

1   weren't.  The wards were drawn after the districts were

2   drawn.  But as an inferential problem when you move from

3   the ward level to the district level, that's what I meant

4   by aggregating, not in terms of temporal sense, but in

5   terms of the thinking of it conceptually.

6           MR. POLAND:  May I proceed, Your Honor?

7           JUDGE CRABB:  Certainly.

8           MR. POLAND:  Thank you.

9   BY MR. POLAND:

10  Q    Now, Dr. Mayer, has Professor Goedert written any

11  articles that are relevant to his criticisms of your work

12  here?

13  A    He has.

14  Q    And what articles are those?

15  A    Dr. Goedert has written one peer-reviewed article

16  and an update that are both efforts to examine political

17  geography and the relationship between political

18  geography and the bias in districting plans.

19          MR. POLAND:  Could we bring up Exhibit 132,

20  please.

21  Q    Can you identify Exhibit 132.

22  A    This is an article that Dr. Goedert published in a

23  journal called *Research in Politics* in 2014 that examines

24  the relationship between political geography and

25  districting plan bias using the 2012 election.

KENNETH MAYER - DIRECT

1  Q    And there's a second article; is that correct?

2  A    There is.  Dr. Goedert has another manuscript, I

3  don't know if it's been published -- it hasn't been

4  published.  I don't know if he submitted it for

5  publication -- that updates the analysis he did here

6  incorporating the 2014 midterm election results.

7         MR. POLAND:  Could we bring up Exhibit 133,

8  please.

9  Q    Dr. Mayer, is Exhibit 133 the second article or

10 publication you were talking about?

11 A    It is.

12 Q    And generally in these articles what does Professor

13 Goedert do?

14 A    So what Dr. Goedert is trying to do in these pieces

15 is analyze the relationship between political geography,

16 which he actually classifies in terms of the percent of a

17 state's population that according to census lives in an

18 urban area and assess the relative effects of

19 urbanization and the way he defines Republican and

20 Democratic gerrymanders on the political bias in

21 congressional districting plans.

22 Q    Now, does Professor Goedert do anything in these

23 articles to code whether states are gerrymanders?

24 A    He does.  He uses the definition that when a state

25 has -- when there's unified party control of the

                  KENNETH MAYER - DIRECT

1   legislature and the governorship, he classifies that as a

2   gerrymander based on which party controls it.  So if

3   Democrats control the legislature and the governorship,

4   he codes that as a Democratic gerrymander.  If

5   Republicans have unified control, he codes that as a

6   Republican gerrymander.

7   Q    How does Professor Goedert code Wisconsin in these

8   works?

9   A    He codes Wisconsin as a Republican gerrymander.

10  Q    Are there any other ways in which Professor

11  Goedert's articles relate to his opinions in this case?

12  A    I guess in terms of the argument that we see a

13  differential effect between 2012 and 2014 so his

14  conclusions are actually quite sensitive to which year

15  we're looking at.

16  Q    Okay.  Anything about his opinions with respect to

17  unified control that are set out in these articles?

18  A    Well, he has a regression model which he uses to

19  explain the relative effect of unified party control

20  or -- which is how he defines a gerrymander and the other

21  effects of political geography.

22  Q    And does he have -- does he set forth anything in

23  the articles about percentage of urbanization and the

24  effects?

25  A    He does.  He has a variable which measures -- an

KENNETH MAYER - DIRECT

1   independent variable which measures the effect of

2   urbanization on the partisan bias of a congressional

3   district plan.

4   Q    How does that relate to his opinions in this case?

5   A    Well, in this context urbanization is a rough proxy

6   for Democratic concentration because large urban areas

7   tend to be more strongly Democratic, so it is generally

8   regarded as a rough approximation of Democratic

9   concentration.

10  Q    Can the models that Professor Goedert used in these

11  models be used to predict what would happen in a neutral

12  process?

13  A    Yes, they can.  And what you would do is insert

14  values into his model, setting both the variables for

15  Democratic and Republican gerrymanders to zero, which

16  under Dr. Goedert's model would be either a bipartisan

17  plan or a court-drawn plan, but would give us an estimate

18  of what we would expect to observe, what the model

19  produces assuming a neutral map.

20  Q    All right.  And can Professor Goedert's models be

21  used to make predictions for states with different

22  characterizations?

23  A    They certainly can by inserting or substituting

24  different values for the independent variables into the

25  model.

KENNETH MAYER - DIRECT

1    Q    And what would the predicted partisan bias be for

2    Wisconsin in 2012 if it had a neutrally drawn map?

3    A    Well, I set out an analysis of what that looks like

4    in my rebuttal report.

5    Q    Okay.

6         MR. POLAND:  Could we bring up Exhibit 110,

7    please.

8    Q    And Dr. Mayer, on the screen in front of you is

9    Table B from your rebuttal report?

10   A    That's correct.

11   Q    All right.  And can you explain to us how that --

12   how that relates to the opinions that you just expressed.

13   A    So I'm going to count on Your Honors to interrupt me

14   if I get too far into the weeds here.  This is a table

15   that shows the results of Dr. Goedert's model, but he

16   lays out in both his 2012 and 2014 result.  The first

17   column shows the independent variables, Democratic

18   gerrymander, Republican gerrymander, three variables that

19   capture the demographics of a state, the percent of a

20   state that is African American, the percent of a state

21   that's Hispanic, the percent urbanized, and then two

22   controlled variables, one for the statewide Democratic

23   congressional vote and the other for the number of seats

24   in the congressional apportionment plan.  This is a

25   linear regression, so if we're trying to generate an

1  estimate for different states, all we need to do is plug

2  in values -- substitute different values for the

3  independent variables and that will give us an estimate

4  of what he calculates here, the pro-Democratic bias in

5  the plan which is essentially equivalent to the

6  efficiency gap.

7  Q    Okay.  And how does this relate to opinions with

8  respect to Wisconsin in 2012?

9  A    Well, Dr. Goedert is making the argument that there

10 is a natural gerrymander or a natural pro-Republican bias

11 due to the distribution of Democrats and Republicans, and

12 there is a foundational assumption in that argument which

13 is that a neutral process would produce a pro-Republican

14 bias in a map.  So we can use Dr. Goedert's model here to

15 estimate what his own work shows would have happened in

16 Wisconsin if there were a neutral process; not a Democrat

17 gerrymander, not a Republican gerrymander.

18 Q    What does your analysis of that question show?

19 A    So in column B on this table, I substitute variable

20 values for Wisconsin.  The Democratic and Republican

21 gerrymanders are both dummy variables.  I set those to

22 zero.  The percent black, Hispanic and urbanized are all

23 taken directly from census figures for Wisconsin.  The

24 2012 statewide Democratic congressional vote we observed

25 directly, it's 50.8 percent.  There are eight

KENNETH MAYER - DIRECT

1    congressional seats.  We know what the constant is.  We

2    can multiple those across, sum them, and they show that

3    in 2012 Dr. Goedert's model shows that a neutral process

4    in Wisconsin would have produced a pro-Democratic bias in

5    the plan.

6    Q    And have you investigated what that would go to in

7    2014?

8    A    Dr. Goedert updated those estimates to take into

9    account what happened in 2014, so essentially reevaluated

10   the regression but using 2014 data.

11        JUDGE CRABB:  Could you back up and explain to

12   me how -- what shows that the Democrats would have had a

13   different result?

14        THE WITNESS:  So this is the value right here.

15   And under the way that Dr. Goedert defines the model, a

16   positive value is a pro-Democratic bias.  And basically

17   the values are simply column A multiplied by column B and

18   that gives us the effect of that variable or the effect

19   of that variable in Wisconsin and then we take the values

20   in column A times B and we add them together and that

21   gives us the estimate of the model for what the bias

22   would have been in Wisconsin or would be estimated to be

23   under a neutral process.

24        JUDGE CRABB:  This would show the whole state?

25        THE WITNESS:  This is the whole state.

KENNETH MAYER - DIRECT

1    BY MR. POLAND:

2    Q    So moving on to 2014, could we have Exhibit 133,

3    please, displayed and I'd like to look at Table 3 which

4    is on page 13.

5    A    So this is the table in Dr. Goedert's 2013

6    manuscript that re-estimates the model for 2014.  And my

7    understanding is that the handwritten parts of this are

8    the notations that Dr. Goedert made in his deposition.

9    And we can see that the 1.85 here is the equivalent to

10   what we see in the previous chart in my rebuttal report.

11   And if the model is re-estimates under the -- the

12   re-estimated model, if we observe what the model produces

13   or estimates for Wisconsin using 2014 data, it shows that

14   under a neutral process Wisconsin would have had a 4.39

15   percent pro-Democratic bias in its congressional

16   redistricting plan.

17   Q    In 2014?

18   A    In 2014.  The other thing to note here is the fact

19   that the coefficients, the effective urbanization, which

20   again in this context is the effect of the political

21   geography of the state in terms of the concentration of

22   Democrats and Republicans, in 2012, we see a value of

23   minus .72 and those two asterisks are a measure of

24   statistical significance.  It's a way of displaying the

25   precision of those estimates.  And so that means that we

KENNETH MAYER - DIRECT

1   know that that coefficient is negative and it's

2   statistically different from zero.  It's not zero.

3        If we look at the coefficient for 2014, minus .0 --

4   minus 0.35, that coefficient is no longer statistically

5   significant.  From the standpoint of the statistical

6   properties of that estimate, it is indistinguishable from

7   zero.  So that means whatever effect we observe based on

8   the concentration of Democrats in 2012, it goes away in

9   2014.  So the effects are not consistent and that's not

10  something that we would expect to observe if political

11  geography by itself was having a significant effect and

12  by itself could explain the bias in a plan.

13  Q    Do these findings affect your opinion about

14  Wisconsin's political geography?

15  A    Well, what this tells me is that it confirms my

16  conclusions from looking at Act 43 that it is not the

17  case that the political geography of Wisconsin naturally

18  produces or could be expected to naturally produce a

19  pro-Republican bias.

20  Q    Does it tell you anything about whether there might

21  be a slight Democratic advantage?

22  A    Well, I don't know that I would -- according to this

23  model, it would produce a Democratic advantage and so

24  that -- Dr. Goedert's own work contradicts his argument

25  about the political geography of Wisconsin.

KENNETH MAYER - DIRECT

1   Q    Now, Professor Goedert carried out his analysis at

2   the congressional level; correct?

3   A    That's correct.

4   Q    That's not the Assembly district level; correct?

5   A    That's correct.

6   Q    Does that affect your conclusions at all?

7   A    Not really.  So there is other work that has

8   examined the effects of political geography on district

9   plans and the best work that has been done on that

10  subject has concluded that the effects of political

11  geography don't change when the numbers of districts

12  change; that if we observe an affect with a small number

13  of districts, we expect to see the same effect at a

14  larger number of districts.  And overall, I don't think

15  there's any reason to expect the effects of political

16  geography to depart radically.  If we see -- if the

17  concentration of Democrats is having a significant effect

18  at one level, it is reasonable given what we know about

19  the relationship between the number of districts and bias

20  that that relationship is likely to be similar at larger

21  levels of geography.

22  Q    Dr. Mayer, are there any other arguments that

23  Professor Goedert makes about a natural pro-Republican

24  bias in Wisconsin?

25  A    Well, he cites an article written by Jowei Chen and

KENNETH MAYER - DIRECT

1    Jonathan Rodden that examine the effect of political

2    geography on geographic bias.

3    Q    Where does he do that?

4    A    He does it in several places in his report.  I think

5    he does it in at least three places in his report.  I

6    think it's pages 13, 18 and 21 or 22.

7            MR. POLAND:  Could we bring up Exhibit 136,

8    please.  And could we go to page 13, please.

9    Q    I know that's hard to read, but Dr. Mayer, can you

10   find where Professor Goedert cites to the Chen and Rodden

11   work?

12   A    It's at the very top.

13   Q    The very top?

14   A    The first paragraph.  Just right here.

15   Q    Okay.  And then you also mentioned on page 18; is

16   that correct?

17   A    I believe so.

18           MR. POLAND:  Could we go to page 18, please.

19   A    So there it is here.

20   Q    Okay.  And just above it as well?

21   A    Actually there's a specific citation right there.

22   Q    Okay.

23           MR. POLAND:  And can we go to page 21, please.

24   Q    And where is it said on page 21?

25   A    Right there.  (Indicating)

                 KENNETH MAYER - DIRECT

1  Q    All right.  Now, are you familiar with the article

2  written by Professors Chen and Rodden that Professor

3  Goedert relies on in several places in his expert report?

4  A    I am.

5        MR. POLAND:  And could we bring up Exhibit No.

6  394, please.  And this would be Tab 11 in the binder as

7  well in front of you in the reliance materials.

8  Q    Dr. Mayer, how are you familiar with this article

9  written by Professors Chen and Rodden?

10 A    I've actually know Professor Chen for a number of

11 years and I've seen him give presentations on this method

12 and I've had a number of conversations with him over the

13 years about this.  And I was familiar with this article

14 before this case.

15 Q    All right.  And are you familiar with the technique

16 that Professors Chen and Rodden use in this article that

17 Professor Goedert relies on?

18 A    Yes.

19 Q    Can you describe that technique?

20 A    It's basically a computer-generated map-drawing

21 technique where Professor Chen and Professor Rodden

22 basically use computers to generate districting plans

23 without any relevance or any reference to any data other

24 than ward-level population.  Actually like in the case of

25 this article, it's simply based on population and

1   compactness.  There's subsequent developments that

2   Dr. Chen has sort of enhanced the model so that it can

3   take municipality splits into effect and minimize the

4   number of municipal splits.

5        But basically the way this works, you have a

6   computer, you tell it to generate district-level plans

7   using just ward geographies without any reference to any

8   political data, and then you can use the results to draw

9   inferences by putting the political data in at that point

10  and seeing what happens with the effects of political

11  geography.  Basically what this tells you is that in a

12  perfectly neutral process in which the computer generates

13  a plan based solely on ward geography and population

14  whether that produces a bias.

15  Q    And what is the conclusion of this article by

16  Professors Chen and Rodden?

17  A    Well, they make a general argument that under some

18  circumstances, political geography can produce a bias,

19  which is not a surprise.  They do extensive level testing

20  in Florida and a number of other states where they draw a

21  large number of computer-generated maps.  When they

22  actually do fine, there actually is a relationship

23  between underlying political geography and bias in maps.

24  Q    And how does Professor Goedert use this article to

25  support his opinions in this case?

KENNETH MAYER - DIRECT

1    A    Well, both Dr. Goedert and Mr. Trende cite this

2    article to support their claim that there is a natural

3    pro-Republican bias in the political geography of the

4    state.

5    Q    Is that an appropriate use of the Chen and Rodden

6    article?

7    A    No.

8    Q    Why not?

9    A    Well, I know that for two reasons.  One, is that the

10   Chen and Rodden piece actually don't make the claim about

11   Wisconsin.  Wisconsin is actually not part of the testing

12   that they do.  The other is that Dr. Chen has told me

13   that this is an inappropriate citation.

14        MR. KEENAN:  I'm going to object to this line of

15   questioning about hearsay from Dr. Chen and it's not in

16   his report.  I have a feeling this is sneaking in to

17   getting into the documents that were rejected by the

18   Court, the potential amicus.  His report does not talk at

19   all about this; so -- the rebuttal report does not talk

20   at all.  I've let it go on about, like, you know,

21   generally what does the Chen and Rodden article say.

22   Fine.  But, I mean, this is getting well beyond anything

23   that's in his report.

24        JUDGE RIPPLE:  We may be getting further into

25   this, I'm not sure quite where we're going and this is a

1  serious matter.  Let's let the witness answer a few more

2  questions and then we'll see where we are.

3          MR. POLAND:  Thank you, Your Honor.  I would

4  note as well that Dr. Mayer is an expert.  He's been

5  qualified as an expert.  And of course the federal Rules

6  of Evidence allow experts to testify based on hearsay.

7          MR. KEENAN:  If it's in their report and it's

8  not, so that's --

9          MR. POLAND:  I would be able to get into that if

10 the point in time comes, Your Honor.

11         JUDGE RIPPLE:  Let's go on a little bit.

12 BY MR. POLAND:

13 Q    So Dr. Mayer, you just identified a couple of ways

14 in which or mentioned a couple of ways in which you know

15 that Professor Goedert's and Mr. Trende's citation to the

16 2013 Chen and Rodden article is inappropriate and you

17 identified a conversation you had with Professor Chen;

18 correct?

19 A    Correct.

20 Q    What's the other way that you know that?

21 A    There's actually a manuscript or actually

22 forthcoming article that Professor Chen has made

23 available on his University of Michigan website that is

24 forthcoming in the Election Law Journal.

25         MR. POLAND:  And could we bring up Exhibit 156,

                    KENNETH MAYER - DIRECT

1    please.

2    Q    And this is Tab 10 in the binder in front of you.

3    Can you identify this article, please?

4    A    This is the article that's forthcoming.  It doesn't

5    say it's forthcoming, but the version on Dr. Chen's

6    website indicates that it is forthcoming.  But this is

7    the manuscript.

8    Q    Okay.  And what did Professor Chen do in this

9    article?

10             MR. KEENAN:  Again, I'm going to object.  This

11   is not in his report.  This was never cited by him.

12             JUDGE RIPPLE:  What we're going to do on this

13   entire area is we're going to let the witness at this

14   time testify as to the -- with respect to the Chen

15   article and we are going to require briefs from both

16   sides on the matter of the admissibility of the Chen

17   articles and their views.

18             JUDGE CRABB:  Among other things.

19             JUDGE RIPPLE:  Among other things, yeah.

20             MR. POLAND:  I'm sorry, Your Honor.  I didn't

21   hear the last comment.

22             JUDGE RIPPLE:  I was talking to my colleague.

23   We will be more formal about stating precisely what we

24   want you to cover in those briefs.

25             MR. POLAND:  Thank you, Your Honor.  Excuse me

                    KENNETH MAYER - DIRECT

one second, please.  Your Honors, if Your Honors would

prefer that we not go over this with Dr. Mayer, we are

prepared to bring Professor Chen in himself as a rebuttal

witness to testify directly about this.

              MR. KEENAN:  That hasn't been disclosed on any

witness list.

              JUDGE RIPPLE:  I suggest right now you continue

with this witness and if by motion after this witness is

finished you want to bring up that possibility, we'll

rule on that.

              MR. POLAND:  Thank you, Your Honor.

BY MR. POLAND:

Q    Dr. Mayer, you have Exhibit 136 -- I'm sorry -- 156

on the screen in front of you?

A    I do.

Q    All right.  Now, what does Professor Chen do in this

article that's Exhibit 156?

A    What Professor Chen does is apply an updated version

of his automated computer-generated map-drawing software

to draw 200 simulated maps in Wisconsin, again looking

solely at either ward geographies or he has incorporated

the ability to assign entire municipalities or entire

counties as part of the underlying geography which has

the effect of controlling for municipal splits or

generating maps that reduce the number or takes municipal

KENNETH MAYER - DIRECT

1  boundaries into effect as the maps are being drawn.

2  Q     Did Professor Chen's analysis respect the

3  traditional redistricting criteria?

4  A     They did.  He left the Voting Rights Act, the

5  majority/minority districts intact in Milwaukee, both the

6  African American and Hispanic districts intact; his plans

7  or the maps have population deviations well within

8  acceptable limits, and are actually more compact with

9  fewer municipal splits than Act 43.

10 Q     I was going to just say how did Professor Chen's

11 maps perform in comparison with constitutional and state

12 redistricting requirements relative to Act 43?

13 A     They were at least as good and better on most

14 dimensions.

15 Q     Now, how did Professor Chen's maps perform in terms

16 of the efficiency gap relative to Act 43?

17 A     Well, probably the best way to display that is -- I

18 think it's Figure 3 in this manuscript which shows the

19 relationship between the efficiency gap and the number of

20 county splits, but it also gives an idea of what the

21 distribution of the efficiency gap of the 200

22 computer-generated maps.

23 Q     Okay.

24        MR. POLAND:  Could we pull up Figure 3 in

25 Exhibit 158, please.

KENNETH MAYER - DIRECT

264

1    A    So this is a chart in this manuscript that actually

2    plots the efficiency gap, again calculated using the 2012

3    presidential vote.  And each -- and on the x-axis and

4    y-axis is actually the number of counties that are

5    preserved, which is 72 minus the number of counties that

6    are split.  And for the purposes here, we can actually --

7    we don't have to worry so much about the vertical

8    dispersion of these points.  What's important is the

9    horizontal dispersion of these points.

10        Each red circle is a computer-generated map and for

11   each map that the computer drew, Professor Chen

12   calculated an efficiency gap.  And the important thing

13   here is that there is a range of the different districts,

14   but there's no districts that has -- and again, these are

15   neutral maps that are generated without any reference to

16   any political data.  There are some maps that have a

17   pro-Democratic bias.  Most of the maps have a small

18   pro-Republican bias.  And Professor Chen didn't actually

19   calculate an overall mean or average, but it looks like

20   the mean is sort of in this range at about 2 percent,

21   which is equivalent to what the Demonstration Plan drew.

22        Act 43 is down here.  So Act 43, according to this

23   calculation, has a much higher efficiency gap and

24   actually splits more counties than any of Professor

25   Chen's automated maps.

KENNETH MAYER - DIRECT

1              MR. POLAND:  And I think that I misspoke before

2    when I identified this article.  It says actually Exhibit

3    158, not Exhibit 156.

4    Q    Dr. Mayer, again, how did -- what data did Professor

5    Chen use to calculate the efficiency gaps?

6    A    This is the 2012 presidential election, the

7    Democratic -- actually this is calculated using the

8    actual votes, so it's not -- it's calculated the same way

9    I calculated the efficiency gap for the various plans.

10   Q    And did Professor Chen use the full

11   district-by-district method?

12   A    He did.

13   Q    Now, with respect to Professor Goedert's arguments

14   about the Chen and Rodden article, what does Professor

15   Chen's analysis demonstrate?

16   A    Well, what Professor Chen's analysis in my view

17   conclusively demonstrates is that these red circles are

18   the result of a perfectly neutral process.  There's no

19   reference to any underlying political data.  If there

20   were a natural pro-Republican bias that was built into

21   the plan, we would observe it here and what this

22   demonstrates is not only is there not a significant

23   pro-Republican bias built in, it's also the case that in

24   no sense, to the extent there is a differential effect,

25   that doesn't come close to explaining the large efficient

1  gap of Act 43.

2  Q    Does Professor Chen's article that's Exhibit 158

3  refute the reliance that Professor Goedert and Mr. Trende

4  place on it in their expert reports?

5  A    Conclusively.

6  Q    And does Professor Chen's analysis affect your

7  opinion about the justifiability of Act 43's efficiency

8  gap?

9  A    It confirms what I already knew which is that my

10 analysis showed that the large efficiency gap in Act 43

11 was not required or justified by traditional

12 redistricting principles and this graph here drives a

13 stake through the heart of that argument.

14          MR. POLAND:  At this time, Your Honors, I'd like

15 to move Exhibit 158 into evidence.

16          MR. KEENAN:  We've got our same objections.

17 This has been rejected by the Court.  It's not even

18 relied on him in his report and it's just hearsay.  I

19 mean he's talking about what someone else has done.  He

20 has no personal knowledge of this.

21          JUDGE RIPPLE:  We're going to defer making a

22 decision on this and rule on it with respect when we're

23 dealing with this entire matter as I indicated.

24          MR. POLAND:  I was just reminded I do need to

25 clarify to make sure that the record is correct.  Exhibit

KENNETH MAYER - DIRECT

1  156 is the full article, Exhibit 158 is the chart that's

2  Figure 3.  And I'd like to move 158, that's the chart is

3  what I'm moving into evidence.

4          JUDGE RIPPLE:  Which we will take up the chart

5  with the article in due course.

6          MR. POLAND:  Thank you, Your Honors.  Appreciate

7  it.

8  BY MR. POLAND:

9  Q    Now, Dr. Mayer, are you familiar with a report that

10 Mr. Trende submitted in this case?

11 A    I am.

12 Q    Does Mr. Trende also rely on the Chen and Rodden

13 article from 2013 that we just discussed?

14 A    He does.

15         MR. POLAND:  Could we pull up Exhibit 126,

16 please.  And I'd like to draw your attention to paragraph

17 89 on page 27.

18 Q    And is there a reference in -- this is Mr. Trende's

19 report?

20 A    That's correct.

21 Q    And there's a reference or reliance on the 2013 work

22 by Chen and Rodden there as well; correct?

23 A    That's correct.  Mr. Trende actually cites the

24 article in his list of reliance materials.

25 Q    What is your opinion -- I'm sorry -- strike that

                    KENNETH MAYER - DIRECT

1    question.   How does Mr. Trende use the Chen/Rodden

2    article?

3    A    In the same way as Dr. Goedert uses it to make a

4    claim that there is a natural concentration of Democrats

5    and distribution of Republicans that producing a natural

6    pro-Republican bias in any districting plan.

7    Q    What is your opinion about Mr. Trende's use of the

8    2013 Chen and Rodden article?

9    A    It's the same as my objections or my conclusions

10   about how Dr. Gaddie uses the article.

11   Q    Very good.   Now, shifting gears, Mr. Trende

12   criticizes you for not taking incumbency and other

13   election factors into account in your baseline analysis;

14   correct?

15   A    That's correct.

16   Q    And why didn't you take those factors into account

17   in your baseline analysis?

18   A    For the same reasons I explained in discussing

19   Dr. Goedert's criticism that the baseline partisan

20   analysis is designed to extract the election specific or

21   the district's level factors so that we have a baseline

22   that we can use to compare one plan to a plan with an

23   alternative configuration of districts.

24   Q    Mr. Trende also criticizes your work by arguing that

25   your vote model is biased because you have incorrectly

KENNETH MAYER - DIRECT

1    estimated the baseline vote in uncontested Assembly

2    districts; correct?

3    A    That's correct.

4    Q    And what is your opinion of Mr. Trende's critiques?

5    A    It's entirely unfounded.

6    Q    Why is that?

7    A    Well, if we look at the -- there are two figures in

8    my report that Mr. Trende is referring to and it's based

9    on both a misreading of these charts and a

10   misunderstanding of how multiple regression works.

11          MR. POLAND:  Why don't we bring up Exhibits 6

12   and 108, please.

13   Q    Can you explain your answer with respect to Exhibits

14   6 and 8 (sic), Dr. Mayer?

15   A    So Mr. Trende's objection or his claim about a bias

16   in my model is based on the fact that if you look at

17   Figure 3, which is a graph that shows the number of

18   Assembly district -- the number of votes that a

19   Democratic Assembly candidate receives and the number of

20   votes that a Democratic presidential candidate receives,

21   and the black line here is a 45-degree line which is

22   simply a reference line.  It's designed to show that --

23   give you a point of reference, and we see that there's a

24   very strong relationship between the number of Assembly

25   votes and the number of Democratic presidential votes and

KENNETH MAYER - DIRECT

1    this is one of the reasons I used it in my model.

2        Mr. Trende appears to believe that the fact that the

3    number of Assembly votes actually falls below the

4    45-degree line means that I'm building in a bias; that

5    when I'm trying -- when I'm estimating the number of

6    Assembly votes that are cast in uncontested wards, that I

7    am overestimating the number of votes because he appears

8    to believe that in uncontested districts, I actually set

9    the number of Assembly Democratic votes to be equal to

10   the number of Democratic presidential votes which is

11   incorrect.

12   Q    I was just about to ask that.  Is that what you did?

13   A    Not remotely.

14   Q    And can you --

15   A    So what I did was use the number of Democratic

16   presidential votes in the ward as an explanatory variable

17   to explain what the relationship is in calculating those

18   values for uncontested wards.  I didn't equate them, but

19   probably the better way to demonstrate the unfoundedness

20   of his criticism is that what multiple regression does or

21   indeed any regression, it doesn't assume that the

22   underlying values are equal.  What it does is that it

23   estimates the relationship by estimating the slope of a

24   line that relates to quantities and we can see -- and I

25   think it's Figure 4.

KENNETH MAYER - DIRECT

1   Q    So that would be Exhibit No. 7?

2   A    Right.  So actually it's best to put them side by

3   side.

4   Q    So could we have Exhibit 6 and 108 up side by side?

5   That's Figure 6 and Figure D.

6   A    So Figure 3 in my report and Figure D in my rebuttal

7   report, it's the same underlying data.  It's plotting the

8   number of Democratic Assembly votes in a contested ward

9   based on the number of presidential votes in a ward.  And

10  Mr. Trende is confusing the slope of the regression line

11  with the 45-degree line.

12        In Figure D, which is Exhibit 108, the red line is

13  actually the bivariate regression line.  And we can see

14  that it runs exactly down the middle of the points,

15  indicating that there is some dispersion; that the two

16  quantities are not equal, but the slope of this line is

17  actually less than one, which means that as the number of

18  presidential votes goes up by, say, ten votes, the number

19  of Assembly votes will go up by less than ten, which is a

20  function of the fact that the slope of this line is less

21  than one.

22        So my reading of this is that Mr. Trende has

23  misunderstood what I've done.  He is misstating and

24  misunderstands the nature of statistical bias.  It's a

25  misunderstanding of multiple regression.  And again, I

1    don't mean to be flip, but on this matter he has no idea

2    what he's talking about.

3    Q    Are there any other figures that you prepared that

4    help to illustrate this point?

5    A    Well, we can go back and look at the figures in my

6    original report which show the accuracy of the underlying

7    model.

8              MR. POLAND:   Could we bring up Exhibit 6 and 7,

9    please.

10   A    So Figure -- Exhibit 7 is the ward-level vote

11   totals.  This is how -- a demonstration of the accuracy

12   of the underlying model.  And if there were a bias in

13   this model -- statistical bias in this context means that

14   I am consistently overestimating or underestimating a

15   quantity; that if there were a bias, that we would see

16   more dots above this line or below this line, there would

17   be a systemic error that we could observe here and we

18   don't, that the dots are almost perfectly symmetrically

19   distributed around this line.  There is no bias in the

20   regression model.

21   Q    All right.  Dr. Mayer, moving on, is there a third

22   area where Mr. Trende criticizes your opinions in your

23   work in this case?

24   A    Well, he does make an argument about the natural --

25   the sort of political geography creating a bias.

                KENNETH MAYER - DIRECT

1   Q    And natural pro-Republican bias we were discussing?

2   A    Natural pro-Republican bias.

3   Q    And what is your opinion of that criticism?

4   A    I think he's incorrect.

5   Q    And why is that?

6   A    Well, we've already gone through a number of

7   exercises that contradict that argument.  I'll note that

8   there are a number of, even on its own terms, the

9   argument that he makes is incorrect on a number of

10  dimensions.

11  Q    Now, Mr. Trende uses congressional maps in southern

12  areas of the U.S. to support his opinion about political

13  geography; correct?

14  A    Correct.  That's the first problem.  About half of

15  Mr. Trende's argument about political geography is

16  actually looking at the congressional district vote in

17  states like Virginia, North Carolina, Texas and Louisiana

18  which is essentially irrelevant to the political

19  geography of Wisconsin.  That argument really gives us no

20  useful information about political geography in

21  Wisconsin.

22  Q    Does Mr. Trende use a metric or a measure called *the*

23  *partisan voting index* to criticize your work?

24  A    He does.

25  Q    What does he do there?

1    A    So the partisan vote index as Mr. Trende calculated

2    it is an application of what's -- really what's the Cook

3    political partisan vote index.  And the partisan vote

4    index is calculated by subtracting the Democratic or

5    Republican vote share in a geography, whether it's a

6    congressional district, state Assembly district, or as

7    Mr. Trende applies it, to the county, and it subtracts

8    the statewide share of the vote from that.  So basically

9    what the PVI does is take the -- we have a distribution

10   of the vote at some geography and the PVI merely

11   recenters that around the statewide average and it tells

12   us which areas are more Democratic or Republican than the

13   state as a whole and which areas are less Democratic or

14   Republican in the state as a whole.

15   Q    Is the PVI used by political scientists?

16   A    It is occasionally used.  You will see it cited in

17   the literature occasionally, but it's almost exclusively

18   in as a way of describing the competitiveness of a

19   congressional district.

20   Q    Have you ever seen it used before to study political

21   geography?

22   A    No.

23   Q    Do you have a opinion of the PVI's validity for

24   analyzing political geography?

25   A    Well, again it's used -- even I cite the description

                    KENNETH MAYER - DIRECT

1  of the Cook PVI in my report where Charlie Cook, who

2  developed it, says they developed this as a way of

3  measuring the competitiveness of congressional districts.

4  It's not a metric that is used in the study of political

5  geography that I've seen.  It's not a metric that's been

6  used in the study or evaluating redistricting plans, that

7  it is a metric of the competitiveness of congressional

8  districts that Mr. Trende has adapted to the study of

9  counties and wards in Wisconsin.

10 Q    Have you analyzed Mr. Trende's calculation of the

11 PVI?

12 A    I have.

13 Q    And what did you find?

14 A    I found that he actually made two substantive errors

15 that he hasn't corrected.  So Mr. Trende did do a

16 ward-level analysis of the PVI where in various years he

17 actually calculated the PVI by calculating the Republican

18 vote share -- the Democratic vote share in wards and

19 subtracting the statewide vote share of a race that's at

20 the top of the ticket.  But he actually made two crucial

21 mistakes in doing that.

22 Q    And what were the mistakes that he made?

23 A    The first is that in 2006, as I describe in my

24 report, during a presidential year -- during a

25 presidential year there's no dispute he used the

KENNETH MAYER - DIRECT

presidential race as the top of the ticket to get the
statewide percentage.  But in a midterm election where
there's no presidential election, there are a couple of
different possible candidates to use.  Mr. Trende most
years uses the gubernatorial election, but in one year,
in 2006, he actually switches and instead of using the
Governor race, he actually uses the U.S. Senate race.
And there is some disagreement in the literature about
which is the proper top of the ticket race.  You can make
a case for either the gubernatorial or the -- but there's
no justification whatsoever for switching, and that's an
error, if we actually look at the distribution of his
data has some consequence.

        The second is that he calculated it incorrectly for
2014.  If you look at the -- examine the R code that he
used to do the -- now this is the computer code, the
statistical package that he used to generate the
estimates.  And in 2014 what he did is he took the
ward-level share of the 2014, I believe gubernatorial
race, but instead of subtracting that from the 2014
statewide share, he actually subtracted that from the
2012 presidential election share and so he has seven
years in his analysis, from 2012 to 2014, two of them are
wrong and they actually have consequences.  These are
material errors that he has not corrected.

                    KENNETH MAYER - DIRECT

1    Q    What impact do Mr. Trende's errors in calculating

2    the PVI have on his analysis?

3    A    So the argument that Mr. Trende makes is that since

4    2002, Democratic wards have become more Democratic and

5    Republican wards have actually become more less

6    Republican.  So Democrats have become more concentrated,

7    Republicans have become less concentrated.  And there are

8    two graphs that he shows, I think it's paragraph 93 and

9    94 in his report that show the argument and also make

10   clear what the errors are.

11   Q    Let me stop you there.

12         MR. POLAND:  Can we pull up 126, please, and

13   look at paragraphs 93.

14   Q    And you said the other paragraph, Dr. Mayer, was

15   which one?

16   A    95.

17   Q    95.

18   A    So if we could blow up the chart in paragraph 93.

19   So what Mr. Trende has done here is that he has

20   calculated what he calls the partisan lean, which is the

21   PVI in a ward that is more than 50 percent Democratic.

22   And the -- what this is -- what he's attempting to show

23   here is that over time, Democratic wards have become more

24   Democratic, so that Democratic parts of the state have

25   become more Democratic and we'll follow up.  But we can

KENNETH MAYER - DIRECT

1    see that the errors that he made in 2006 and 2014 are

2    material because they're both outliers.

3         So in 2006, in using the Senate race rather than the

4    gubernatorial race, the Democratic gubernatorial

5    candidate was Jim Doyle and he won in 2006, which I

6    believe he won with about 53 percent of the vote.  The

7    Republican -- the Senate race was Herb Kohl and I can't

8    even remember who he was running against, but he won with

9    61 percent of the vote.  So this means there's an 8-point

10   difference between the gubernatorial election and the

11   Senate election, and that's why this point -- that's why

12   this point is an outlier.  He's using the wrong metric.

13   If he was using the gubernatorial race instead of the

14   Senate race, this figure would be shifted down by 8

15   points rather than up.

16        JUDGE RIPPLE:  I wonder if I might interpose a

17   question to the witness.  You mentioned a few moments

18   ago, Professor, that you believed that it was a given

19   that in a presidential year one uses the presidential

20   figures as the governing metric.

21        THE WITNESS:  That's correct.

22        JUDGE RIPPLE:  That has, in reading the material

23   of the case, that just seemed to me to be

24   counterintuitive; that the presidential election would

25   not necessarily be a good measure of support for a

KENNETH MAYER - DIRECT

1    particular party in a particular state with respect to

2    state issues.  And that if I were trying to identify the

3    Democrats in a particular part of my state or Republicans

4    in a different part of my state with respect to state

5    governments, it wouldn't necessarily be how those people

6    voted for the President of the United States but how they

7    voted for state officers.

8        So my question -- it seemed to me -- my question to

9    you is why not use state officers as the governing metric

10   all of the time rather than the president?

11          THE WITNESS:  Well, there are two reasons, Your

12   Honor.  One is that the literature is quite clear that if

13   we are interested in a baseline measure of partisanship,

14   the presidential election is the best measure of that

15   because we're trying to extract election-specific factors

16   and it's actually correlated very closely with other

17   measures.

18          JUDGE RIPPLE:  That to me sounds like ipse

19   dixit.  In other words, all the scholars say it but I

20   don't know why they say it if they're trying to measure

21   partisan adherence within the state.

22          THE WITNESS:  Well, it's not merely a matter of

23   assertion.  It's been demonstrated by looking at the

24   relationship between that vote and other indicators.  For

25   example, the baseline partisanship model that I used to

KENNETH MAYER - DIRECT

1   estimate the Assembly vote, that the presidential vote is

2   overwhelmingly strongly related to that.  And in fact,

3   most of the -- probably one of the -- there are scholars

4   who study redistricting.  It's actually a common

5   shorthand to simply use the presidential vote as the

6   baseline partisanship.

7         But the other issue with respect to Wisconsin is

8   that statewide officers in Wisconsin are elected in

9   midterm years, the Governorship for the statewide

10  offices.  And so if we're interested in the partisanship

11  in 2012, there actually isn't a statewide race.  In two

12  out of the -- in four years out of six or two elections

13  out of three, there would be U.S. Senate election, but

14  again, that's also going to be distinct from statewide

15  issues.

16        JUDGE RIPPLE:  Thank you very much.

17        THE WITNESS:  Okay.

18        JUDGE RIPPLE:  I hope my interruption did not

19  come at an inopportune time.  I was trying to gauge when

20  best to do it.

21        MR. POLAND:  Thank you, Your Honor.  Not

22  inopportune at all.

23  BY MR. POLAND:

24  Q   Dr. Mayer, you were explaining the table that we

25  have on the screen from paragraph 93 of Mr. Trende's

KENNETH MAYER - DIRECT

1    report.  And you were explaining what you've described

2    for 2006.  Do you recall that testimony?

3    A    I do.  So basically what would happen is if

4    Mr. Trende in this case used the gubernatorial race

5    rather than the Senate race, the point that he has would

6    be right about there.  It's not exactly right.  So that

7    point would be shifted down.  He actually makes the

8    reverse error in 2014 by using the presidential race to

9    calculate the 2014 estimates rather than the -- using the

10   2012 statewide share to calculate the PVI as opposed to

11   the 2014 gubernatorial share.  This line should actually

12   be shifted up, I believe, and so basically the line,

13   instead of going more like this, would actually flatten

14   out.  And he hasn't corrected these errors and I believe

15   my conclusion is that they are material and I have other

16   reasons to not have a lot of confidence in the work that

17   he had done.

18        You can also see this for the gubernatorial election

19   when the patterns would be reversed.

20            MR. POLAND:  Could we pull up paragraph 95,

21   please.  And blow that up on the screen.

22   A    So he makes the reverse error in 2006 where he's

23   normalizing the race, not around 40 percent Democratic

24   but around 50 percent Democratic.  Let me make sure I can

25   do the math in my head.  That that makes all of the

1    values smaller than they would otherwise be.  So that

2    means that this point should actually be -- let me make

3    sure I have this correct in my head.  Right.  So this

4    point should actually be larger and I think this point

5    should be larger too.  So again, the line should flatten

6    out when he uses the correct --

7            JUDGE CRABB:  You're saying 2006.  And what's

8    the other one?

9            THE WITNESS:  2014 where he uses the

10   presidential vote rather than the 2014 gubernatorial race

11   which was -- he's going to be miscalculating that.  But

12   in any event, this is not the sole reason why I

13   questioned his analysis.

14   BY MR. POLAND:

15   Q    Dr. Mayer, do you have -- what are your other

16   reasons that you questioned his analysis?

17   A    Well, the bulk of his geographic concentration

18   analysis is what he calls his nearest neighbor analysis

19   where he's attempting to make the claim that since 2002,

20   pro-Democratic wards have become closer together in

21   distance whereas pro-Democratic -- pro-Republican wards

22   have become farther apart.  And that's part of an

23   argument that he makes that over time Democrats have

24   become more concentrated and Republicans have become less

25   concentrated.

                    KENNETH MAYER - DIRECT

1          MR. POLAND:  Could we pull up paragraph 98 of

2    Exhibit 126, please.

3    Q    Now, Dr. Mayer, is this where Mr. Trende sets out

4    his nearest neighbor analysis?

5    A    This is the beginning of that analysis.

6    Q    Okay.  Now, is there any support for the technique

7    that he uses, this nearest neighbor analysis?

8    A    Not that I can see.  It's not a technique that I've

9    ever seen in the context of studying redistricting nor is

10   it, as he uses it, a technique that I found in the

11   literature on political geography.  And I note that

12   Mr. Trende didn't cite any sources in support of this

13   method either in his report and I understand in his

14   deposition he couldn't cite any either.  It's something

15   that he came up with.

16   Q    Do you have any opinions about Mr. Trende's use of

17   the nearest neighbor analysis here?

18   A    I do, and my conclusion is that it's not a reliable

19   method that tells us anything about political geography

20   in Wisconsin.

21   Q    And what criticisms do you have of the use of that?

22   A    Well, there are two -- well, three main criticisms.

23   We've already talked about the fact that I don't think

24   the PVI is the right quantity of interest.  If you're

25   trying to look at the partisanship of wards, we ought to

                    KENNETH MAYER - DIRECT

1   look at the partisanship of wards.  And I actually did

2   that calculation and presented that chart in my rebuttal

3   report.  Rather than going through this convoluted set of

4   calculations where I'm recentering ward-level vote around

5   statewide averages, we have the ward-level votes.  We can

6   compute that quantity directly.

7   Q    And where is that set out in your rebuttal report?

8   A    It's in my rebuttal report.  I think it's one -- I

9   can't remember what the figure is.

10            MR. POLAND:  Can we bring up Exhibit 105,

11   please.

12   A    Figure A.

13   Q    And what does Figure A show?

14   A    This shows directly the Democratic and Republican

15   ward vote percentages in the top of the ticket.  So I

16   used the gubernatorial race in midterm years and the

17   presidential race in presidential years, and I divided

18   the wards into two categories.  Democratic wards are

19   wards where the Democrats receive more than 50 percent

20   and Republican wards are wards where Republicans receive

21   more than 50 percent.  So the number of wards each year

22   will change depending on which wards vote which way, but

23   it tells us what the average Republican and Democratic

24   vote percentage was in Democratic and Republican wards.

25   Q    And what does this tell you from your analysis?

KENNETH MAYER - DIRECT

A     What it tells me is that both Democratic and
Republican wards have become more Democratic and
Republican.  If we look at the starting point in 2002,
the average pro-Democratic ward was about 61.3 percent
Democratic.  The average Republican ward was about 60.5,
and so this is actually exaggerating the difference
because the y-axis goes from 55 to 64, it's not 0 to 100.

     If we look at what happens in 2014, the average
Republican -- the Republican vote in an average
Republican ward goes from 60.5 to about 63.5 and the
average Democratic ward goes from about 61.3 to 63.5.
And so there is a little bit of variation, but I look at
this and say that both the Democrats and Republicans over
the full time period between 2002 and 2014 have increased
in their partisanship in almost exactly equal measure.

Q     And what does that tell you about Mr. Trende's use
of the PVI?

A     Well, it tells me that the PVI obscures what the
actual pattern we're interested in shows.  That if I'm
interested in the partisanship of a ward, I'm interested
in the partisanship of the ward.  I'm less interested in
what the ward partisanship is in relation to some other
quantity, especially since we can measure it directly.

Q     Now, are there any other problems with Mr. Trende's
nearest neighbor analysis?

                    KENNETH MAYER - DIRECT

1   A      There are.  So there are two major flaws in how he

2   performed the analysis.  We probably want to bring up the

3   chart, the two graphs that he uses to make this claim.

4   Q      Could we look at -- there we go.  We've got it on

5   the screen right now.

6   A      So these are a little difficult to interpret, but

7   what he's -- the top graphs, the y-axis here is the

8   distance between ward centroids, basically the geographic

9   center of a ward, and the y-axis or the x-axis is a

10  measure of partisanship, which is basically the partisan

11  lean.  And as we go -- the difficulty here is that as we

12  move from right to left, that's where partisanship

13  increases.  So these wards here and here, these are the

14  most partisan Democratic and Republican wards.

15        And the argument that he's making is that as

16  Democratic wards become more Democratic, they become

17  closer together.  The distance between ward centroids

18  shrinks and the way that he calculates this is that for

19  each ward he calculates his PVI for that ward.  And then

20  he calculates the distance between a ward of a particular

21  PVI quintile, basically between 90 and 95.  It's not

22  exactly 5 percentage points, but he classifies them and

23  he identifies the classification of a ward based on its

24  PVI and he calculates the distance between that ward and

25  the nearest ward with the same classification of the PVI.

1    So we're basically looking -- we have a ward that's 90

2    percent Democratic.  We're looking for the nearest ward

3    that's also 90 percent Democratic.  It's not precisely

4    right because it's the PVI rather than the unadjusted

5    presidential vote or the unadjusted vote.  And he's

6    making the claim that over time that as Democratic wards

7    become more Democratic, the distance between them shrinks

8    and that as Republican wards become more Republican, the

9    difference between them grows.  And so that's part of his

10   argument about geographic concentration.

11          MR. POLAND:  I do want to note for the record

12   this is Exhibit 109.

13   Q    And Dr. Mayer, did you have the opportunity to

14   check --

15          MR. POLAND:  I'm sorry, this is paragraph 98

16   that's displayed on the screen right now.  I apologize.

17   Q    Did you have an opportunity to evaluate Mr. Trende's

18   analysis?

19   A    I did and I found two errors in it.  The first is

20   that if we were calculating the distances between wards,

21   it's crucial, it's critical to note that wards in

22   Wisconsin are not uniform size.  The size of wards in

23   Wisconsin actually varies by a factor of 32,000.  The

24   largest ward in this state is 32,000 times as large as

25   the smallest ward in the state.

KENNETH MAYER - DIRECT

1          MR. POLAND:  Could we bring up Exhibit 109,

2    please.

3    A    So when political geographers do a nearest neighbor

4    or a version of nearest neighbor, it is universal that

5    whatever unit of geography you're looking at you have to

6    be cognizant of the fact that sizes might not be

7    constant.  And so the reason this is crucial is that the

8    distance between two wards is going to depend on how

9    large the wards are.  All other things being equal, the

10   largest ward in the state is -- I think in Sawyer County

11   it's 227 square miles and the distance between the

12   centroid of that ward and an adjacent ward is going to be

13   measured in -- it's going to be a large number.  It's

14   going to be many miles.  Whereas the distance between two

15   smaller wards, other things being equal, it's going to be

16   much smaller.  So irrespective of any issue of how close

17   two wards are together, our measure of how close they are

18   is going to depend critically on how large they are.  And

19   Mr. Trende doesn't adjust for that.

20         And we can see -- the other reason is that ward size

21   is actually correlated with the quantity of interest,

22   which is how Republican or how Democratic a ward is and

23   that's what this table demonstrates.  It shows that the

24   average statewide -- the average ward statewide is 8.4

25   square miles.  It's basically three miles by three miles,

KENNETH MAYER - DIRECT

1  and that's counting everything:  Wards in cities, wards

2  in rural areas.

3        JUDGE CRABB:  I'm not sure I understood this

4  last thing that you were talking about, the quantity of

5  interest.

6        THE WITNESS:  I'm sorry, I revert to my default.

7  What we are interested in in examining is the

8  partisanship of the ward.  So Mr. Trende is making a

9  claim about the partisanship of wards and that means we

10  need to be aware of the fact that that value, the

11  partisanship of a ward varies depending on the size of

12  the ward.  And so there's actually a bias built into his

13  analysis because ultimately we can see the pro-Democratic

14  wards are actually about half the size of pro-Republican

15  wards, and that's not a function of anything other than

16  the fact that the wards are different size and that there

17  are -- wards in cities tend to be smaller than wards in

18  rural areas.

19        JUDGE CRABB:  And if you took this ward in

20  Sawyer County, for example, it's how many miles?

21        THE WITNESS:  I cite in my report I think it's

22  227 square miles.

23        JUDGE CRABB:  So you're saying there's likely to

24  be a smaller quantity of interest in a ward that size?

25        THE WITNESS:  Well, so the issue is that if we

KENNETH MAYER - DIRECT

1    were interested in the distance between wards, that

2    distance is going to depend on the size of the ward.  So

3    if I have two wards that are 10 by 10, two 100 square

4    mile wards, the centroids of those wards, if they're

5    perfect squares that are lined up, it's going to be ten

6    miles irrespective of anything else.  And as the wards

7    grow larger, the distance between those centroids is also

8    going to grow.  And the way this is handled in the

9    literature on political geography is that you control for

10   it.  You know, you might normalize the distances based on

11   ward size or be aware of the fact that when we're looking

12   at things like density or the underlying partisanship of

13   a ward, we need to be aware of the fact that the wards

14   are different size and partisanship is actually dependent

15   on ward size.

16        JUDGE CRABB:  Which way?

17        THE WITNESS:  Larger wards are more Republican,

18   smaller wards are more Democratic.

19        JUDGE CRABB:  So it's not the extent of the

20   partisanship, it's the nature of the partisanship.

21        THE WITNESS:  That's correct.  So I'm not making

22   a claim that more Democratic wards are smaller than more

23   Republican wards.  What I went through, and I had the

24   underlying LTSB shape files, the GAS files, and I was

25   actually able to use that to calculate the area of every

KENNETH MAYER - DIRECT

1   ward in the state and I could also calculate vote

2   percentages and I knew which wards were more than 50

3   percent Democrat and which wards were more than 50

4   percent Republican.

5           JUDGE RIPPLE:  Mr. Poland, we're getting near

6   the end of our time.  Would this be a good place to stop

7   or do you have a few questions you'd like to ask to bring

8   us in for a soft landing?

9           MR. POLAND:  I think I've got -- thank you, Your

10  Honor.  I think I've probably got about seven to ten

11  minutes left on this topic and that would be a convenient

12  breaking place.

13          JUDGE RIPPLE:  Let's do that.

14          MR. POLAND:  Thank you, Your Honor.

15  BY MR. POLAND:

16  Q    Dr. Mayer, does -- what about adjacency?  Does

17  Mr. Trende's analysis take adjacency of wards into

18  account?

19  A    He does not.  And the distance between wards tells

20  us nothing about whether they are actually adjacent or

21  whether they're separated by municipal boundary or how

22  many wards are in between a ward and the nearest neighbor

23  of the same partisan lean.  So in that respect it doesn't

24  -- it also doesn't tell us how feasible it would be to

25  put these wards into the same district.

                    KENNETH MAYER - DIRECT

1        So again, it's not at all clear what this analysis

2   at the ward level tells us about district-level analysis.

3   Q    And contiguity is one of the requirements of drawing

4   an Assembly district; correct?

5   A    Absolutely.

6   Q    Now, Dr. Mayer, have you done anything to check

7   Mr. Trende's analysis?

8   A    Well, I did.  And so I want to make two other points

9   about his analysis.  The last two lines in this chart --

10  Q    I'm sorry, what chart are you referring to?

11  A    Table A.  Show that Republican wards are twice the

12  size of Democratic wards.  So we know that Mr. Trende did

13  not correct for ward size.  Mr. Trende -- so he's putting

14  his thumb on the scale.

15       He actually does it a second time where in

16  calculating the distances between wards he doesn't use

17  the mean.  He uses the median and does not have an

18  adequate justification for using the median.  And the

19  reason that's important is that on average, the average

20  size of a Republican ward is twice the size of a

21  Democratic ward.

22       If we look at the median, the median Republican ward

23  is more than six times as large as a Democratic ward.  So

24  basically the punch line here is that Mr. Trende's method

25  of analyzing this is guaranteed to show that Republican

1  wards are farther apart than Democratic wards.  So on a

2  baseline measure, we can't have any confidence that this

3  is actually a valid underlying measure and I was actually

4  able to replicate his analysis using mean distance

5  between wards rather than median distances between wards,

6  and the conclusions that we draw are completely

7  different.

8          MR. POLAND:  Could we bring up Exhibit 106,

9  please.

10 Q    And Dr. Mayer, do you see Figure B which is Exhibit

11 106 in front of you?

12 A    I do.

13 Q    And does this set out the analysis that you had

14 conducted?

15 A    It does.

16 Q    What did you find?

17 A    So the dotted lines here are actually a replication

18 of Mr. Trende's analysis for 2012 and actually the shape

19 of these curves is exactly what the shape of his curves

20 in paragraph 98 and 99 of his report are.  And so this is

21 the basis of Mr. Trende's claim that as again moving from

22 right to left is when wards become more partisan that

23 Republican wards get farther apart, Democrat wards get

24 closer together.  The solid lines red and blue shows what

25 happened if you replicate his analysis, not using the

                    KENNETH MAYER - DIRECT

1    median distance, but the average distance, the mean

2    distance.  And what it shows is the pattern is not only

3    completely the reverse of what he finds, it's identical

4    for Democrats and Republicans.  And again, the reason

5    Republican wards -- the reason the red line is above the

6    Democratic line, that is solely a function of average

7    ward area.

8        And so this, when you replicate -- there are two

9    issues going on here.  One, I think the mean is a much

10   more accurate measure of the underlying patterns rather

11   than median.  But this also shows that the conclusions

12   that Mr. Trende draws are entirely dependent on his

13   underlying measures.  They're not robust at all, and so

14   we can't have any confidence that he's actually

15   generating reliable inferences from this method.

16   Q    And does the analysis that you conducted lead you to

17   any conclusions about Mr. Trende's methodology?

18   A    It's completely unreliable.

19   Q    And does it inform you about conclusions you've

20   drawn about what Mr. Trende says it means?

21   A    It means he's wrong when he's making the claim that

22   there is a packing of Democrats and Republicans and that

23   it's not the case; that as wards become more Democratic,

24   they move closer together and Republicans more farther

25   apart.  It shows the distance between wards of similar

1   partisanship are exactly parallel.

2   Q     Does Mr. Trende's analysis meet the standards that

3   the University of Wisconsin Political Science Department

4   uses to evaluate its graduate students' work?

5   A     Not in my view.  If I had a graduate student who

6   turned in this work, I would make them redo it to account

7   for these factors.

8   Q     Have you reached any conclusions about Professor

9   Goedert's and Mr. Trende's argument that there is a

10  natural pro-Republican bias in Wisconsin?

11  A     Based on the arguments that they present, they

12  haven't made the case.  Their methods that they use don't

13  show at all that there is a natural pro-Republican bias

14  in Wisconsin's political geography.

15  Q     Do they show that there's any kind of a natural

16  political bias that explains the large efficiency gaps

17  that you found?

18  A     Not at all.

19        MR. POLAND:  Your Honors, this would be a very

20  convenient place to break.

21        JUDGE RIPPLE:  Thank you.  We will break our

22  examination of the witness at this point.  Before we

23  recess, Mr. Poland, may I ask you on behalf of your team

24  could you give me an estimate of how we're -- of our

25  pace, how we're doing?

                    KENNETH MAYER - DIRECT

1          MR. POLAND:  I have about 15 to 20 minutes left

2    with Dr. Mayer.  Depend on how long the cross-examination

3    is, I'm guessing probably a short redirect and then the

4    final witness that we'll be calling to the stand, we

5    estimate about two-and-a-half hours for Professor

6    Jackman, who will be the plaintiffs' final witness.

7          JUDGE CRABB:  So you're thinking possibly by the

8    end of the morning?  Or is that unrealistic?

9          MR. POLAND:  Possibly, but it depends, Your

10   Honor, on the extent of the cross-examination of

11   Dr. Mayer.

12         JUDGE CRABB:  But I'm just concerned is that

13   going to leave enough time for the defendants?

14         MR. POLAND:  I know the defendants have two

15   witnesses that they intend to present:  Mr. Trend and

16   Professor Goedert.

17         JUDGE RIPPLE:  Mr. Keenan, let's get your

18   perspective on this.

19         MR. KEENAN:  My case is half over and I have two

20   witnesses left, and this has been going longer than I

21   thought it would.  I was hoping I would get to my

22   cross-examination of Mr. Mayer today.  So I am worried

23   that I'm not going to have enough time.  I think I can

24   get both of my witnesses in like one in the morning and

25   one in the afternoon, but I know Dr. Goedert has a flight

1    scheduled on Friday evening and so at this point I'm a

2    little bit concerned but...

3         JUDGE RIPPLE:  Okay.  We'll get another reading

4    as the day goes on tomorrow for where we are at this

5    point.  Thanks to both the parties and we'll recess then

6    until tomorrow morning at nine o'clock.

7         MR. POLAND:  Thank you, Your Honor.

8         JUDGE RIPPLE:  How would the parties feel about

9    starting at 8:30?

10        MR. POLAND:  That would certainly be fine with

11   the plaintiffs, Your Honor.

12        MR. KEENAN:  That would be fine with the

13   defendants as well.

14        JUDGE RIPPLE:  All right.  We'll start at 8:30.

15        (Recess              5:40 p.m.)

16

17

18

19

20

21

22

23

24

25

1              I, LYNETTE SWENSON, Certified Realtime and

2    Merit Reporter in and for the State of Wisconsin, certify

3    that the foregoing is a true and accurate record of the

4    proceedings held on the 25th day of June 2016 before the

5    Honorables Circuit Judge Kenneth Ripple, District Judge

6    Barbara B. Crabb, and District Judge William Griesbach,

7    in my presence and reduced to writing in accordance with

8    my stenographic notes made at said time and place.

9    Dated this 6th day of June 2016.

10

11

12                    /s/_____

13                    Lynette Swenson, RMR, CRR, CRC
                      Federal Court Reporter

14

15

16

17

18   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
19   under the direct control and/or direction of the
     certifying court reporter.

20

21

22

23

24

25