UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

WILLIAM WHITFORD, et al.,

      Plaintiffs,

-vs-                                    Case No. 15-CV-421-BBC

GERALD NICHOL, et al.,                  Madison, Wisconsin
                                        May 27, 2016
      Defendants.                      8:34 a.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FOURTH DAY OF COURT TRIAL
HELD BEFORE THE HONORABLE JUDGE KENNETH RIPPLE,
THE HONORABLE JUDGE BARBARA B. CRABB, and
THE HONORABLE JUDGE WILLIAM GRIESBACH,

APPEARANCES:

For the Plaintiffs:
        Law Office of Peter G. Earle
        BY:  PETER EARLE
        839 North Jefferson Street, Ste. 300
        Madison, Wisconsin  53703

        Campaign Legal Center
        BY:  J. GERALD HEBERT
            RUTH GREENWOOD
            DANIELLE LANG
            ANNABELLE HARLESS
        1411 K Street NW, Ste. 1400
        Washington, DC  20005

        Rathje & Woodward, LLC
        BY:  DOUGLAS POLAND
        10 East Doty Street, Ste. 800
        Madison, Wisconsin  53703

Lynette Swenson   RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

```
1   Continued appearances:

2   For the Plaintiffs:
                    University of Chicago Law School
3                   BY:  NICHOLAS STEPHANOPOULOS
                    1111 East 60th Street, Ste. 510
4                   Chicago, Illinois  60637

5   Also appearing:
                    Paul Strauss - Chicago Lawyers' Committee
6                      for Civil Rights Under Law, Inc.
                    Dan Brewer - Litigation specialist
7                   William Whitford - plaintiff
                    Helen Harris - plaintiff
8                   Jim Seaton - plaintiff
                    Allison Seaton - plaintiff
9                   Wendy Sue Johnson - plaintiff
                    Wayne Jensen - plaintiff
10
    For the Defendants:
11                  Department of Justice
                    BY:  BRIAN KEENAN
12                     ANTHONY RUSSOMANNO
                    17 West Main Street,
13                  Madison, Wisconsin  53703

14  Also appearing:
                    Jackie Righter - paralegal
15

16                       *  *  *  *  *

17
```

**I-N-D-E-X**

| DEFENDANTS' WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| SEAN TRENDE | Direct by Mr. Keenan | 5-85 |
| | Cross by Mr. Hebert | 86-132 |
| | Redirect by Mr. Keenan | 132-138 |
| | Recross by Mr. Hebert | 140-142 |
| NICHOLAS GOEDERT | Direct by Mr. Keenan | 144-201 |
| | Cross by Mr. Poland | 202-248 |
| | Redirect by Mr. Keenan | 248-252 |

1                    **E-X-H-I-B-I-T-S**

2    <u>PLAINTIFFS' EXHIBITS</u>                    <u>IDENTIFIED</u>/<u>RECEIVED</u>

3    Ex. 128    Trende deposition            102        ---
         130    Goedert deposition           214        ---
4        156    Chen article                 113        113

5

6    <u>DEFENDANTS' EXHIBITS</u>

7    Ex. 497    Chart                        132        258
         546    Goedert report               144        ---
8        547    Trende report                 20        ---
         548    Article                      154        ---
9        575    Party A/Party B example        4        256
         576    Map                           72        ---
10       577    Map                           73        ---
         578    Chart                         54         54
11       579    Table                         58        ---
         580    Mayer Baldus report            4        ---
12       581    Census document                4        256

13

14                       * * * * *

15        (Proceedings called to order.)

16          THE CLERK:  15-CV-421.  *Whitford v. Gerald*

17   *Nichol* called for a fourth day of court trial.

18          JUDGE RIPPLE:  A very good morning to everyone.

19   Before we begin, let's ask counsel if there are any

20   matters, housekeeping matters we need to take up and

21   resolve at this point.

22          MR. POLAND:  Your Honors, plaintiffs do have one

23   that Mr. Hebert will address.

24          MR. HEBERT:  Your Honors asked earlier this week

25   when we had some testimony about the GAB and the

1    legislative -- whether we could reach a stipulation as to

2    the state agency and we have reached a stipulation.  We

3    will file it with the clerk's office today.

4           JUDGE RIPPLE:  Thank you.  And that stipulation

5    will be accepted and it will be very good to have that in

6    the record when it makes its journey eastward.

7           MR. HEBERT:  No other housekeeping matters from

8    us.

9           JUDGE RIPPLE:  Thank you.  Mr. Keenan.

10           MR. KEENAN:  The defendants just have a couple

11    things related to documents.  There were several

12    documents used yesterday which didn't have exhibit

13    numbers and it was requested they be added with exhibit

14    numbers, so I'll just list those three documents.

15    Exhibit 575 is the party A/party B 200 votes example that

16    was used with Dr. Mayer.  We've listed 580 as Professor

17    Mayer's *Baldus* report, which was put up on the screen.

18    And then 581 is the census document that had the formula

19    that we went over with Professor Mayer.  Some of those

20    may be used again with Professor Goedert later today.

21    There are also four new exhibits that we provided to

22    the plaintiffs that will be used with Mr. Trende, so

23    those will just come up as in the examination.  We just

24    provided those to the plaintiffs now.  That was our main

25    housekeeping matter.

1        JUDGE RIPPLE:  All right.  So those exhibits are

2  -- have they been entered in?

3        MR. KEENAN:  No, I haven't moved them in.  We'll

4  discuss them as we go.  I understand the plaintiffs will

5  probably object to them.  They can object now or at that

6  time when they're used.

7        MR. HEBERT:  We can wait, Your Honor.  That way

8  you'll see the context of the objection as well.

9        JUDGE RIPPLE:  All right.  Good.  Thank you.  I

10  think the floor is then yours, sir.

11        MR. KEENAN:  The defendants call Sean Trende.

12        JUDGE RIPPLE:  Mr. Trende.

13  **SEAN TRENDE, DEFENDANTS' WITNESS, SWORN,**

14        JUDGE RIPPLE:  Good morning, Mr. Trende.

15        THE WITNESS:  Good morning, Your Honor -- Your

16  Honors.

17                    DIRECT EXAMINATION

18  BY MR. KEENAN:

19  Q    Now, would please state and spell your name for the

20  record, please.

21  A    My name is Sean Trende.  S-e-a-n, T-r-e-n-d-e.

22  Q    Mr. Trende, where did you graduate from college?

23  A    I graduated from Yale University.

24  Q    And what degrees did you get there?

25  A    I had a bachelor's degree with a double major in

                    SEAN TRENDE - DIRECT

1  history and political science.

2  Q    And what did you go on to do when you graduated;

3  education after that?

4  A    I did.  I went to Duke University.  I earned a JD.

5  And Duke University had a joint degree program at the

6  time.  I also earned a master's degree in political

7  science while earning my JD.

8  Q    As part of the master's program in political

9  science, what types of statistical classes did you take?

10  A    So I took two courses.  There's a standard -- all

11  Ph.D. programs have standard statistical tracks that the

12  graduate students take and I took the first two semesters

13  of the Duke University Ph.D. track in statistics.

14  Q    How did that differ from what someone would have

15  taken if they went for the full Ph.D. track in terms of

16  the statistics courses?

17  A    My understanding was at the time it was three

18  semesters of statistics required for the Ph.D.

19  Q    And when did you graduate from those programs?

20  A    I graduated in 2001.

21  Q    What did you do after graduation?

22  A    I clerked for Chief Judge Deanell Tacha, that's

23  T-a-c-h-a, the Tenth Circuit Court of Appeals.

24  Q    And what years about was that?

25  A    That would have been 2001 to 2002.

SEAN TRENDE - DIRECT

1  Q    Can you just go through your professional history

2  after clerking?

3  A    So I worked at the DC office of Kirkland & Ellis

4  from 2002 to 2005.  Then I got married and we wanted to

5  move, so we moved to Richmond.  I worked for Hunton &

6  Williams there.  And then in 2009 I went to a small firm,

7  David, Kamp & Frank that allowed me to actually get into

8  court.  I was in court almost every day and it was great.

9        Then my oldest son was diagnosed with autism.  My

10  wife is also a practicing attorney and one of us needed

11  to have the job flexibility to take my son to and from

12  therapies and kind of -- I mean I use the term

13  providentially cautiously, but it wakes you up.  I got

14  the offer to write for Real Clear Politics a month and a

15  half after we got that diagnosis and that allowed me to

16  do those things.

17  Q    You mentioned Real Clear Politics.  What is Real

18  Clear Politics?

19  A    So Real Clear Politics is a online website.  We

20  aggregate polling and news data and we also produce

21  original data for audiences.

22  Q    What's your position at Real Clear Politics?

23  A    I'm the senior elections analyst.

24  Q    What do you do as the senior elections analyst?

25  A    I'm sort of the right-hand man to the CEO, John

SEAN TRENDE – DIRECT

1  McIntyre.  I follow -- my job is to basically know

2  everything that's going on with elections so that when he

3  asks me something or if I get asked something in an

4  interview, I have the answer at my fingertips.  I produce

5  original content for them.  I do a lot of research and

6  following of databases and the like.

7  Q    How long have you been the senior elections analyst

8  at Real Clear Politics?

9  A    I don't remember exactly when I got the title,

10  whether it was when I started with them.  I think it was

11  when I started full time in 2010, but it might have been

12  when I did some part-time writing in 2009.

13  Q    What type of writing do you do for the site?

14  A    It's mostly what would be considered kind of

15  long-form journalism.  Most of my pieces run into the

16  2000-word ranges, although sometimes you can cover what

17  needs to be covered in shorter time periods.  But it's

18  almost entirely covering U.S. elections.  I do some

19  Supreme Court coverage toward the end of the term just to

20  kind of keep those skills fresh.

21  Q    And what kind of things do you write about or what

22  would you -- how would you describe your -- the articles

23  you write?

24  A    Well, they tend to be -- they aren't journalism

25  pieces.  I'm not going out and interviewing candidates.

SEAN TRENDE - DIRECT

1   They're more data analysis of what's going on with

2   elections.  I do a lot of work in demographics, how

3   political coalitions are shifting over time.  Those are

4   probably my most prominent writings.

5   Q    Do you do anything with respect to the rating of

6   congressional districts?

7   A    Yes.  So Real Clear Politics, as does a lot of what

8   Charlie Cook and people like Stu Rothenberg, Larry

9   Sabato, the tracking and rating of Senate and House races

10  and then presidential races this year as well.

11  Q    What do you do with respect to those kind of things?

12  A    So I am in charge of assigning the writings.  I work

13  with the CEO on Senate races, but the House races are my

14  own, and it's a matter of kind of figuring out where

15  things sit on the ground, if you will, looking at the

16  fundamentals of the district, how the districts lean in

17  terms of partisanship, how they were drawn, and then

18  figuring out how that interacts with the candidates that

19  are running.

20  Q    Do you write for any other publications other than

21  Real Clear Politics?

22  A    I am still a senior columnist for Crystal Ball,

23  Larry Sabato's Crystal Ball.  Larry Sabato is a professor

24  at the University of Virginia; haven't published for them

25  in awhile because it's been a crazy year, but there's an

SEAN TRENDE - DIRECT

1    article under submission and planning on getting going

2    with that again as the election draws nearer.

3    Q    What is Crystal Ball?

4    A    So it's his name for his website, which is similar

5    to the type of stuff that I do at Real Clear Politics.

6    It rates the competitiveness of Senate and House races.

7    It's a little different than the Real Clear Politics

8    audience.  Because Dr. Sabato is a political scientist,

9    his audience tends to be a little bit more technical and

10   academic.

11   Q    Have you authored any other publications?

12   A    So I wrote a book, *The Lost Majority*:  *Why the*

13   *Future Government is Up for Grabs – and Who Will Take It*.

14   It was an analysis of the 2010 elections.  You go back to

15   2008 and a lot of people thought after the election of

16   Barack Obama that we were kind of entering a period of

17   one-party Democratic rule and that didn't pan out.  And

18   so the book kind of analyzes the question of why and it

19   was ultimately a revisionist take on a realignment theory

20   along the lines of what David Mayhew of Yale University

21   had written.

22        I'm also -- I coauthored the 2014 *Almanac of*

23   *American Politics*, which is this kind of standard text

24   for understanding congressional districts and the people

25   who represent them.  I had about 15 states where I had to

11

1    do kind of in-depth dives into the demographics and how

2    the states were changing, what their histories were and

3    so forth.  And then I've authored two chapters in books

4    published by Dr. Sabato.

5            JUDGE RIPPLE:  Excuse me just a minute.

6            THE WITNESS:  Yes, Your Honor.

7        (Pause)

8            JUDGE RIPPLE:  Counsel, you can proceed now.

9    BY MR. KEENAN:

10   Q    I just want to go back to the book that you

11   published, *The Lost Majority*.  What kind of research did

12   you do for that book?

13   A    Actually I used my JSTOR account, J-S-T-O-R, which

14   is the academic database I can get through my Yale

15   University alumni and just actually started with the

16   *Journal of Politics* in about 1920 and went through to

17   find everything I could find with elections and

18   realignment theory, and then went through *American*

19   *Political Science Review* -- I'm blanking out -- the

20   *Journal of American Politics*, *Our Journal of Politics*,

21   and read everything that was in the literature about

22   realignments and political coalitions.

23       I did a lot of county-level analysis of how

24   demographics or how political coalitions had shifted over

25   time in the states to see how that interacted with the

SEAN TRENDE - DIRECT

1  Democrats' ability to win the House.

2  Q     And what kind of conclusions did you draw from that

3  research?

4  A     Well, it was fairly obvious that the Democrats --

5  part of the problem -- there were a lot of problems the

6  Democrats had in 2010, but part of the problem was that

7  especially if you compared back to Bill Clinton's 1996

8  win, which was a similar national win to President

9  Obama's, about eight points -- seven or eight points the

10  Democrats' geographic coalition had shrunk.  It had grown

11  in the cities, you know.  It had become more prominent in

12  urban areas, but in rural areas in particular, the tide

13  had kind of receded.  So they had a deeper coalition, but

14  it was a narrower coalition.

15  Q     What kind of effects did that have for the

16  Democratic party that you found?

17  A     Well, it's in more detail in the report, but it just

18  made it more -- it made it more difficult for them to win

19  these congressional districts that necessarily covered

20  geographic areas.  And you can compare the number of

21  districts in areas won by President Clinton to those won

22  by President Obama, even when they were winning

23  nationally by the same amount.  And it's plain to see

24  that this shift in geography had hurt them.

25  Q     Are you aware of whether your book is relied upon in

SEAN TRENDE - DIRECT

1  political science departments?

2  A    Well, I haven't -- obviously I haven't done a

3  national test of syllabi.  I know that Professor Mayhew

4  at Yale has used my book in his course.  I've received

5  correspondence from professors saying that they've used

6  it.  I know that it's been used at Hope College in Ohio

7  Wesleyan.  So those are three that I know for certain.

8  Q    You also mentioned the *Almanac for American*

9  *Politics.*  Can you just explain what that is?

10  A    So this is a book that was started in 1971 by

11  Michael Barone.  It was actually designed as a guidebook

12  for student protesters to target their demonstrations of

13  congressmen.  It went through the districts and gave an

14  overview of the districts and it was actually meant to

15  give an idea of who was receiving money from defense

16  contractors.  But it's kind of grown into this deep --

17  each congressional district receives kind of a deep dive

18  treatment as to its history, its geography, how its

19  economy is based, and then there's also profiles of all

20  435 Democratic congressmen.  And my work was focused on

21  the first half of that, doing the deep dives into the

22  congressional districts for the states which I was

23  assigned.

24  Q    And how is the *Almanac of American Politics* regarded

25  amongst people that write about politics?

SEAN TRENDE - DIRECT

1   A     I think Chuck Todd referred to it as the Bible for

2   political analysts.  It's widely cited.  It's the premier

3   and I think now only source of its kind.

4   Q     Who's Chuck Todd?

5   A     He's the chief political analyst -- he's the host of

6   *Meet the Press*.

7   Q     You also mentioned some chapters in books published

8   by Dr. Sabato.  Could you explain a little bit more what

9   you wrote there?

10  A     So the first chapter I wrote was after the 2012

11  elections.  And his books are a collection of chapters by

12  commentators in academics and each chapter covers a

13  discrete topic in the election.  My first chapter in 2012

14  was whether 2012, the demographics we had seen in it,

15  represented a realigning election, a permanent shift in

16  American politics.  And I said well, first I don't really

17  believe in realignments, following Mayhew and some other

18  professors, the modern -- consider the modern take on it.

19  But even if we take the test that was set up for

20  realignments, 2012 doesn't count.

21        2014 was more of a look at the electoral college,

22  how the competitiveness of states interacts with the

23  popular vote and what we might expect to see in 2016.  Of

24  course that was a pre-Donald Trump analysis, which kind

25  of mixes up the apple cart, I think.

SEAN TRENDE - DIRECT

1   Q      Do you do speaking engagements?

2   A      I do.  I speak for a variety of think tanks.

3   Academic institutions and private banks and consultant

4   groups ask me to give speeches on elections.

5   Q      Is your work relied upon by others who write about

6   politics?

7   A      Absolutely.  It's widely cited, not only by

8   commentators, but also by academics.

9   Q      Can you provide some examples?

10  A      I know Alfred Cuzán at the University of Florida has

11  used it.  He asked me to hurry up and write a third part

12  of a statistical analysis I was writing on regression

13  analysis so he could use it in his course.  I did a

14  three-part series on statistics that he was using to

15  teach from.  I know that -- and I know, like I said,

16  Dr. Mayhew has used my book in his course.

17  Q      And what about, not academics, but some just people

18  who write about politics for a living?

19  A      Absolutely.  I think it's been cited in every major

20  news publication, cited on the news, yes.

21  Q      Do you do television and media appearances?

22  A      I do media appearances for anyone who invites me.

23  Oddly I've never been on CNN, but I've been on MS-NBC and

24  Fox News.

25  Q      What kind of things do you talk about when you're

SEAN TRENDE - DIRECT

doing these media appearances?

A    Demographics and elections.  In off years,
odd-numbered years it tends to be more big picture
demographic-type stuff.  In even-numbered years,
obviously the focus is more on the House race or horse
race.

Q    Have you provided expert testimony in any other
cases?

A    I have.

Q    Can you explain what those cases were?

A    So in -- my first case was 2012 in North Carolina
state court, a redistricting, a racial gerrymandering
litigation there.  My report was accepted without
objection and they did the case on the papers.  I
testified in the North Carolina -- not the voter ID
portion -- the early voting litigation.  And I testified
in Ohio for a similar litigation.

Q    You mentioned a North Carolina early voting case.
Has there been a decision in that case?

A    There has.

Q    When did that decision come out?

A    The decision came out probably a month ago.

Q    Did the decision rely on any of the opinions you
submitted in the case?

A    Yes, it did.

SEAN TRENDE - DIRECT

1          MR. KEENAN:  I understand there's a *Daubert*

2    motion pending.  I would tender Mr. Trende as an expert

3    in the study of elections and the history of elections.

4    I understand the Court is probably going to take that

5    under advisement, but we would do that now.

6          MR. HEBERT:  Your Honor, in response to that, we

7    will have questions about this witness's qualifications

8    during cross and I understand the Court is carrying that

9    motion until a later date.  So we would ask the Court to

10   reserve a ruling.

11         JUDGE RIPPLE:  That's correct, and the Court

12   will reserve a decision on the *Daubert* motion until a

13   later date.  Mr. Keenan, you can proceed with the

14   witness.

15   BY MR. KEENAN:

16   Q    Mr. Trende, what is the partisan index?

17   A    So the partisan index -- this was discussed a little

18   bit in the plaintiffs' case, but the partisan index is a

19   way to compare elections that might have occurred in

20   different environments.  I think the easiest way to

21   conceive of this, in 1984 Ronald Reagan narrowly wins

22   Massachusetts.  And so if you only look at that number,

23   you say wow, Massachusetts was a swing state in 1984.

24   And then you would look at -- shift to 1996 or 2008 when

25   Bill Clinton and Barack Obama were winning 60 percent of

1    the vote in Massachusetts and say wow, that state really

2    swung over time.  But, of course, that's not right.

3        What happened was in 1984 was a very good Republican

4    year and so states that were heavily Democratic were kind

5    of at the median or were 50/50 states.  And so what you

6    do to control for these swings in the national

7    environment -- there's different ways you can do it, but

8    the simplest way is to just simply subtract out the

9    national vote share.  So you say yes, Ronald Reagan won

10   51.2 percent of the vote in Massachusetts in 1984, but he

11   was winning nationally by 59 percent.  So Massachusetts

12   was eight points more Democratic than the country as a

13   whole.

14       You go to 1996 when Bill Clinton is winning 60

15   percent of the two-party vote in the state and you say

16   okay, but he was winning 54 percent of the vote,

17   two-party, and when I say two-party, I mean excluding

18   third-party candidates.  It's the standard way to deal

19   with the third-party candidates.  Nationally he was

20   winning 54 percent of the two-party vote, so that state

21   was D plus 6 in 1996.

22       And if you do that with Massachusetts, you actually

23   find a fairly stable partisan index of about eight points

24   more Democratic than the country as a whole, which of

25   course we know that's how Massachusetts really is top to

SEAN TRENDE - DIRECT

1   bottom.  It's a solidly Democratic state.

2        The same thing is true, you can do it the other way

3   with Republican states.  In 1996, South Dakota was fairly

4   close and in 2008 Montana was fairly close.  They both

5   went Republican.  But that's because those were good

6   Democratic years where the Democrats were doing well

7   nationally.  Those states were still substantially more

8   Republican than the country as a whole.  So it just

9   allows to make sure you're doing an apples-to-apples

10  comparison when you're comparing presidential elections.

11  You want to take a further level of abstraction and start

12  controlling for sea level, with the national vote share

13  being the sea level.

14  Q    Do you use the partisan index in your work?

15  A    Oh, absolutely.  It's kind of a foundational way to

16  do those comparisons across elections.

17  Q    In what ways do you use it in your work?

18  A    Well, as I said, it's a way to kind of normalize for

19  the national vote and so -- regularly use it for

20  assessing the competitiveness -- it's not quite right to

21  say I use it to assess the competitiveness of

22  congressional districts.  It's a test of partisanship.

23  It's the partisan voting issue -- index, not the

24  competitiveness voting index.  And so it's a way to

25  determine the partisan lean of political units and then

SEAN TRENDE - DIRECT

1    you can use that info in turn as part of your analysis of

2    the competitiveness of the congressional district.

3        And of course when you understand what the partisan

4    index is, there's no reason it can't be applied to other

5    units of political -- other political subdivisions to see

6    how counties compare to the country as a whole or even

7    demographic groups to the country as a whole.

8        MR. KEENAN:  I was going to ask permission to

9    approach Mr. Trende with two documents.  One is just a

10   copy of his report that he can refer to once we get into

11   it, and then also as part of his examination we are going

12   to look at some of the stipulated facts that have been

13   agreed to by the parties in the pretrial report.  So I'm

14   going to be providing him with a subsection of that very

15   long document that contains stipulated vote totals in

16   Wisconsin's history.  This document is paragraphs 257

17   through 287 of Docket 125, the joint pretrial report.

18   May I provide copies of those to the witness?

19       JUDGE RIPPLE:  The document has been marked as

20   an exhibit?

21       MR. KEENAN:  Exhibit 547.  His report.

22       JUDGE RIPPLE:  Thank you.  You can approach the

23   witness and hand him those documents.  I assume counsel

24   has a copy?

25       MR. HEBERT:  Yes, we do, Your Honor.

BY MR. KEENAN:

Q     And if we could pull up Exhibit 547, Mr. Trende's
report.  Look at paragraph 79.  Actually perhaps we could
go back a page and look at paragraph 78.  Mr. Trende,
could you explain what paragraph 78 and the chart in
paragraph 78 represent?

A     So paragraph 78 is the partisan index of Wisconsin
over the past, I guess, 40 years -- 36 years.  And so
again, this kind of illustrates the utility of the
partisan index.  You look at Wisconsin, which was a very
close state in 2002.  I think it was two points.  In 2012
or 8, it was a 12-point state.  In 2007 it was somewhere
between.  So you would look at that and say wow, this
state is really shifting radically between the parties.
But the answer to that is well, no, 2004, 2008 and 2012
took place in very different national environments.  So
when you control -- when you normalize for that
presidential vote share, you see that the state has
actually been fairly stable.  It's moved up and down with
the national tide, a point or two more Democratic than
the country as a whole.

Q     If you look at the dot for 1988, what does that
represent?

A     So 1988 is the Dukakis/Bush election.  And it was
back in the late 80's in particular, the state was pretty

Democratic.  You can see it reached a peak of six points

more Democratic than the country as a whole before

becoming a little bit more of a swing state in the 90's.

Q    If we could change to the stipulated facts in the

pretrial report and look at paragraphs 259 and 260.

These paragraphs contain some vote totals for the 1988

presidential election in Wisconsin and the country as a

whole.  Can you explain how you would go about

calculating the partisan index of Wisconsin in 1988?

A    Absolutely.  I have a calculator on my phone.  I

have done my best to ensure the ringer is turned off and

I don't think anyone will call me.  I don't know if

there's a legal pad.  Can I just -- the lawyer in me just

cannot write on documents in front of me.

Q    Sure.

A    Thanks, Brian.  So if you're trying to calculate the

partisan index, the first thing you need to know is the

national share of the two-party vote.  And so what you

would do is you would add -- you need to know the

Wisconsin share of the two-party vote.  So you would take

Michael Dukakis's 1,126,794 votes and you would divide

that by Dukakis's vote 1,126,794 plus George H.W. Bush's

vote 1,047,499 and that sum would give or that

dividing -- I'm blanking on the quotient -- would give

you the -- would give you Dukakis's share of the

SEAN TRENDE - DIRECT

two-party vote, which is 51.8 percent.

And then you would do the same thing nationally. You would say okay, what was the two-party vote nationally and so you'd do that analysis and it's -- Michael Dukakis won 46.1 percent of the two-party vote. And so then to calculate the partisan index, you would subtract it. So you'd subtract out the national vote total, 51.8 percent minus 46.1 percent is 5.7 percent. So Democratic PVI of approximately six points.

Q   What does that tell you about Wisconsin in 1988 then?

A   It tells me that it was a pretty Democratic state at the time. It was about as Democratic as Maine is today.

Q   If we could turn back to 157 in Mr. Trende's report. And now -- 547, and look at paragraph 79. There's a map here in paragraph 79. Can you explain what that map does?

A   So this shows the partisan index at the county level. And again, this allows you to normalize for national conditions to see how the counties in Wisconsin stack up against the national vote shares. So what you can see is that the northwestern portion of Wisconsin is pretty blue, and then you see these patches also of heavy Democratic strength, Dane County and the south middle. You have Milwaukee County. Menominee County up in the

northeast.  Those were places where -- and I had to, in

order to make this actually show anything useful, I had

to cap the PVI's on the -- or the partisan indexes on the

map at plus or minus 10 percent.  So once you get dark

blue, it's heavily Democratic.  Dark red is heavily

Republican.  Those are counties -- Menominee County was a

partisan index 27-point Democratic lead.  Douglas County

in the north was 22.  Milwaukee was Democrat plus 15.

Ashland up in the north was Democrat plus 15, and Dane is

Democrat plus 14, so heavily Democratic leaning.

Q     Just to be clear, what does the blue represent and

what does the red represent?

A     The blue is how heavy -- it's a scale -- how heavy

the Democratic lean of counties is and the red is a scale

of how Republican the scale is.  And if it's white, it

means it's close to 50/50 in terms of normalized for the

national vote share.

Q     Looking at this map, what does it tell you about the

State of Wisconsin in 1988?

A     Well, if you look at it, the Democrats actually had

a broad coalition at the time.  They were competitive in

most areas of the state.  They did have some clustering

occurring in Dane and Ashland, Superior, Milwaukee, but

they had strength in the rural areas as well, especially

in the northwest where David Obey was untouchable at the

1  time.

2  Q    If we could flip forward to paragraph 80 with the

3  map portion.  What did you do to study Wisconsin over

4  time in terms of its political leanings?

5  A    So what I did is I generated -- first I looked for

6  years that had similar partisan indices because we want

7  to compare apples to apples as much as possible.  And it

8  just so worked out that there were three states or three

9  years, 1996, 2004 and 2012 that were evenly spaced where

10  Wisconsin's partisan index was almost identical.  So

11  again, you have a very nice apples-to-apples comparison

12  looking at those four -- those three years.

13       And so then what I wanted to do, I computed the

14  partisan index for each county over time and it kind of

15  allows you to visually see how the Democrats' geographic

16  reach recedes into a few key counties.

17  Q    If we look at the map in 1996, what does this tell

18  you about Wisconsin's distribution of partisans?

19  A    So as we saw when I did the time series from 1980 to

20  2012, Wisconsin's overall partisan index drops between

21  '88 and 1996.  It becomes a swing state overall.  And so

22  we can see that the state is redder, it's less blue

23  especially -- I'm going to test this -- in the

24  northwestern part of the state.  But there's still some

25  real Democratic strength there.  And we see there is some

SEAN TRENDE - DIRECT

1  reddening here, but these other counties, Dane,

2  Milwaukee, and then Menominee do become more blue --

3  bluer.

4           MR. KEENAN:  If we could turn back to those

5  stipulated facts.  We will look at paragraphs 265 to 268.

6  We could just -- not look at 268 right now, 265 through

7  7.

8  Q    So if you just explain, like, the first step you do

9  in calculating a county's partisan index in this 1996

10 year.

11 A    Well, for a county partisan index you would have to

12 look at 268.

13 Q    Well, can we -- what about the national vote share?

14 Maybe we could just do that first and then go to the

15 counties.

16 A    So the national vote share is the same exercise that

17 we kind of went through before.  You would look at Bill

18 Clinton's vote, which is 1,071,971, you divide it by the

19 total number of votes cast, that 1,071,971 plus Bob

20 Dole's 845,029, and it turns out that Bill Clinton won

21 the state with 55.9 percent of the two-party vote.

22 Q    Then we're going to move on to the counties.  What

23 are you going to end up doing with Bill Clinton's 55.9

24 percent of the vote?

25 A    Well, nothing.  You would look at the national vote

1  share --

2  Q    Okay.

3  A    -- in paragraph 266.  So nationally Clinton wins

4  54.7 of the two-party vote.  You divide that with Bob --

5  you go through the same exercise to get that 54.7 percent

6  of the two-party vote nationally.  So you keep that

7  number in mind.  What you do is you do the same exercise

8  for the counties.  So, for example, in paragraph --

9  Q    Just hold on.  Let's go down --

10  A    I get excited.  Sorry.

11  Q    -- to the chart and let's do this exercise for Dane

12  County.

13  A    Sure.

14  Q    Here we see Dane on the somewhat bottom of the

15  screen here.

16  A    So Dane County, Bill Clinton wins 109,347 votes.

17  Okay?  And what you're going to do is you're going to

18  take that 109,347 and you're going to divide it by --

19  you've hopefully computed the two-party total, 168,834,

20  and it comes up with him winning 64.7 percent of the

21  two-party vote.  Now, that's just the absolute vote

22  total.  You have to normalize, you have to take account

23  of the fact that this was a good Democratic year, and so

24  nationally the environment is such that he's winning 54.7

25  percent of the vote.  It comes out.  You subtract that

1  and it comes out to D plus 10.

2  Q    So what does that tell us about Dane County?

3  A    Dane County is Democratic.

4  Q    And then why don't we go down to the next page and

5  run the same exercise for Milwaukee County.

6  A    So Milwaukee County, it's the same exercise.  Bill

7  Clinton wins 216,620 votes.  You divide that by 336,027

8  votes to get the two-party vote total, and I'll do that.

9  216,620 divided by 336,027, 64.4 percent.  You subtract

10 the national vote share of .547, you get a Democratic

11 plus 10, plus 9.7.

12 Q    Let's just take one other example.  Let's look at

13 Marathon County.  Can you do this for Marathon County?

14 A    So Marathon County, you have Bill Clinton wins

15 24,012 votes.  You divide that by the two-party vote

16 total of 43,886, and so Bill Clinton wins that state --

17 that county with 54.7 percent of the vote.  Of course,

18 that's almost identical to his national vote total.  It

19 comes out as a wash.

20 Q    Okay.

21 A    And so Marathon is kind of a swing county.

22 Q    Would that be like a 0 perhaps?

23 A    Yeah.  The label would be even.

24 Q    Okay.  Let's go back to Exhibit 547, the 1996 map

25 that we were just looking at.  So could you just perhaps

SEAN TRENDE - DIRECT

1   point out those counties on the map and then show how the

2   numbers we just calculated relate to the colors here?

3   A     So there is your Dane County.  There's Milwaukee

4   County.  And I believe this is Marathon County.  And so

5   you can see that Dane and Milwaukee are down.  I think I

6   accidently drew that line into Ozaukee, but it's the blue

7   county there.  And then Marathon is that almost box

8   county, the rectangular county in the middle of the state

9   that's white.

10  Q     Let's move ahead to 2004.  That's paragraph 81.

11  It's going to be the next page of the report.  Go down to

12  the next page, please, and blow up the map.  Can you

13  explain what this map is?

14  A     So this is the next year that there was a similar

15  partisan index overall to Wisconsin and so it shows how

16  the Democratic coalition shifted and the Republican

17  coalition shifted, and kind of the key thing is that this

18  area -- and even this area continues to get redder.  Now,

19  this area -- I just drew a bunch of arrows, I'm sorry --

20  becomes very blue and as we do the calculations, you'll

21  see some of these other areas also become very blue.  So

22  you can really see visually the Democrats' coalition, the

23  tide receding into these key counties for them.

24  Q     Let's go back to the stipulated facts.  Now we're

25  going to look at paragraph 573 and 4.

SEAN TRENDE - DIRECT

1    A     573?

2    Q     Sorry.   273.

3    A     Okay.

4    Q     Okay.   So in 273, what does this show us here,

5    paragraph 273?

6    A     So 273 is the overall -- 273 shows us the two-party

7    vote calculation for George W. Bush and John Kerry in the

8    2004 elections.   It's the same total.   You come up with

9    51.24 percent/48.76 percent.

10   Q     Okay.   And then how are we then going to end up

11   using that?

12   A     It's the same way.   You will subtract that out from

13   the county two-party vote total.   Again, that's to allow

14   you to compare meaningfully 1996, a very good Democratic

15   year, to 2004, more of a 50/50 year, and see the

16   underlying distribution of the partisans.

17   Q     When you said Wisconsin partisan index, the state

18   partisan index was similar between the years.   What does

19   that mean even though the '96 and 2004 elections were

20   different in terms of the national outcome?

21   A     Well, again, I kind of use the analogy that

22   Wisconsin is kind of consistently moving up and down with

23   the national environment.   The economy is very good for a

24   Democrat and the Democratic president is popular as in

25   1996.   The country as a whole becomes more Democratic and

SEAN TRENDE - DIRECT

1  Wisconsin has followed that.  It was a point more

2  Democratic than the country as a whole.

3       In 2004, you had a modestly popular Republican

4  president and an economy that was doing okay.  The

5  country was overall more Republican than it was in 1996

6  and Wisconsin moved in a similar direction, it was about

7  a .2 more Democrat than the country as a whole.

8  Q    Let's look at the chart here with the vote totals

9  and we'll look at Dane County again.

10  A    Okay.

11  Q    Why don't you calculate the partisan index for Dane

12  County in 2004.

13  A    So you take John Kerry's 181,052, you divide it by

14  the two-party vote total of 271,421, and you get 66.7

15  percent.  So John Kerry won 66.7 percent of the two-party

16  vote.  But you have to subtract out that nationally John

17  Kerry was winning 48.8 percent of the two-party vote.  I

18  did that wrong.  And in that year, Dane County was 17.9

19  percent more Democratic than the country as a whole.

20  Q    How did that compare with 1996?

21  A    So it's about eight points more Democratic in 2004

22  than it was in 1996.

23  Q    And let's do the same exercise for Milwaukee County.

24  A    So Milwaukee County, 297,653 divided by 477,940 --

25  try that again.  297,653 divided by 477,940.  62.27

1    percent for Kerry.

2    Q    And so then what's the partisan index of Milwaukee

3    County?

4    A    So you go back, you subtract out 48.767, you get

5    13.6.

6    Q    And then how did that compare with 1996?

7    A    It was D plus 10 in 1996, so Milwaukee County became

8    about four points more Democratic.

9    Q    Although not quite as much change as with Dane

10   County.

11   A    That's correct.

12   Q    Now, the City of Milwaukee Election Commission also

13   tabulates its vote totals separately, so we have a

14   convenient total right under that for the City of

15   Milwaukee itself.  Can you calculate the partisan index

16   for the City of Milwaukee in 2004?

17   A    Sure.  So 198,907 votes for Kerry divided by

18   274,653, for both candidates combined you get 72.4

19   percent for John Kerry.  You subtract out -- make sure I

20   have the right number -- 48.76, you get D plus 23.7.

21   Q    Okay.  So what does that say about the City of

22   Milwaukee compared to the County of Milwaukee?

23   A    It's more Democratic than the county as a whole by a

24   substantial margin.

25   Q    Okay.  And let's do Marathon County again.

1   A     Okay.  So Marathon County was 30,899 votes for John

2   Kerry divided by 67,293.  67,293.  You get John Kerry

3   wins 45.9 percent of the vote in Marathon County.  And to

4   turn that into the partisan index again, you control for

5   the national environment, you subtract out 48.76, .4876,

6   and at that point the County is -- has a 2.8 percent

7   Republican lean, so it's R plus 2.8.

8   Q     And how did that compare with 1996?

9   A     It was even in 1996.  So Marathon has become about

10  three points more Republican.

11  Q     Let's go back to Exhibit 547 and we'll look at the

12  map we were just looking at in paragraph 81.  You

13  mentioned that you had to scale these colors.  Can you

14  explain what that means in terms of Dane County and

15  Milwaukee County in this map?

16  A     Well, again, you have these counties, like, actually

17  Menominee County is like D plus 30.  And so if I were to

18  scale this over the entire course -- the entire spectrum

19  of counties, you would basically see a dark blue for

20  Menominee County, maybe a red for Ozaukee County, and

21  everything else would look white and it's because they're

22  such outliers.  So to make it so you can actually see

23  what's happening in the state as a whole, I kind of cap

24  the scale at negative 10 and plus 10.  So once it becomes

25  the darkest shade of blue, it's very Democratic or very

SEAN TRENDE - DIRECT

Republican and you can then see the movement in the

middle.

Q    Okay.  Let's move forward to 2012.  This is

paragraph or actually sorry, let's stop.  We'll go to

paragraph 83.  There's a map on the next page.  Can you

explain what that map shows?

A    So this just shows the county-by-county change from

1996 to 2004 and so this illustrates what we were just

talking about that Dane County becomes a lot bluer,

Milwaukee becomes with four points bluer, Menominee

County a lot bluer.  These three counties up here with

Superior, Ashland and Bayfield in them become a little

bit bluer.  And then you just see the rest of the state,

the rural areas.  There's some more in the southwest, but

overall the state, the counties, the geography becomes a

lot redder.

Q    Okay.  Now, let's move forward to paragraph 84.

Let's just focus on the top chart there.  Can you explain

what this chart represents?

A    So this is fast forwarding again to the next year

where we have an overall partisan index of somewhere

between D plus 1 and D plus 2, which is 2012.  And so

this year shows 2012 and we can see kind of -- this is

the current configuration where you have a heavily

Democratic cluster up in the northwest, you have

1    Milwaukee County, Menominee, and then a cluster around

2    Dane County.  And everything else -- the southwest corner

3    has become bluer, and you can see that -- keep want to

4    say Gunderson, but I guess it's Keen's district becoming

5    very Democratic.  Obviously Dane County would have a hard

6    time electing Scott Klug to Congress today, but the rest

7    of the state has become pretty Republican.

8    Q    Okay.

9    A    And the interesting thing is that we've kept the

10   overall partisan index of the state constant, so it's not

11   like the state's political orientation as a whole has

12   changed a lot.  It's just been tradeoffs.  Those clusters

13   I had circled became more Democratic, but it's been

14   offset by the rest of the state becoming more Republican.

15   Q    Let's go to the stipulated facts.  Go to paragraph

16   280.  Just explain what's referenced here in paragraph

17   280.

18   A    280 shows -- paragraph 280 shows the two-party vote,

19   again excluding third parties for presidential election

20   in 2012.  So President Obama wins re-election with 51.96

21   percent to Governor Romney's 48.04 percent.

22   Q    So now we're going to move on to the individual

23   counties.  Could we go down and look at Dane County.

24   A    Of course.

25   Q    Could you calculate the partisan index for Dane

SEAN TRENDE - DIRECT

1    County?

2    A    So Dane County, President Obama wins 216,071 votes

3    and you would divide that by the two-party vote total

4    which is 299,715 votes.   So President Obama wins 72

5    percent of the vote -- 72.1 percent of the vote in Dane

6    County.

7    Q    Then how do we go about calculating the partisan

8    index for that?

9    A    Well, you have to subtract -- we have to take into

10   account that this is now a better Democratic year, better

11   environment than Republicans had in 2004.   It's not quite

12   as good as Democrats had in 1996.   So to allow us to make

13   the comparison, you subtract out the national vote total

14   for President Obama, which is .5196, and so now Dane

15   County is 20 points more Democratic than the country as a

16   whole.

17   Q    How does that compare from '96 to 2004 to 2012?

18   A    About a 10-point shift towards the Democrats.

19   Q    In '96 what was it?

20   A    In '96 it was 10, in 2004 it was 17.9, and then here

21   in 2012 it's D plus 20.

22   Q    And then let's look at Milwaukee County first.

23   A    So it's the same exercise.   332,438 votes divided by

24   487,362 votes.   President Obama wins 68.2 percent of the

25   vote in Milwaukee County.   You would subtract out

SEAN TRENDE - DIRECT

1  President Obama's -- what did we say, I think I know the

2  answer -- 51.96, minus .5196, and you have D plus 16.

3  Q    So how does that compare from '96 to 2004 to 2012?

4  A    So 2004 to 2012, it's about a two-point shift

5  towards the Democrats for the county as a whole and from

6  1996 it's about a six-point shift towards the Democrats.

7  Q    Let's look at the City of Milwaukee subtotal there.

8  Can you do the same exercise?

9  A    227,384 divided by 283,937 would give us President

10  Obama winning 80.1 percent of the vote.  We subtract out

11  51.96 and you're left with D plus 28.

12  Q    How does that compare to -- 2004 was the only year

13  we've been able to do this City of Milwaukee comparison?

14  A    In 2004 we said, I think, 23.6, call it 24 rounded,

15  so about four points towards the Democrats.

16  Q    And that's after it was already 23 points favored to

17  the Democrats?

18  A    Yeah.  The City of Milwaukee became about four

19  points more Democratic from 2004 to 2012.

20  Q    So what do these changes between '96 and 2012 in

21  Milwaukee and Dane County tell you about the Democratic

22  Party in Wisconsin over that time?

23  A    Well again, it's increased its vote shares in these

24  heavily populated areas.  And since we looked at years

25  where the partisan index of the state as a whole were the

SEAN TRENDE - DIRECT

1   same, we know that that increased vote share in these

2   urban areas has to be offset somewhere else, which is the

3   nonurban areas as we'll see in the maps.

4   Q    Okay.  If we could look at -- let's go back to 547.

5   A    We can see that if we do Marathon County.

6   Q    Oh, yeah.  I forgot to have you do Marathon County.

7   Let's do Marathon County if we're going to complete our

8   exercise here.

9   A    So Marathon County is 32,363 votes for President

10  Obama.  You divide that by the two-party vote of 68,980.

11  You end up with President Obama winning 46.9 percent of

12  the two-party vote.  You subtract out his .5196 and you

13  end up with the Marathon County having a lean now, a

14  Republican lean, of 5 exactly.

15  Q    And how does that compare over this time period

16  we've been looking at?

17  A    Well, it goes from being evenly matched in 1996 to

18  having a 3-point lean, Republican lean in 2004, to having

19  a 5-point Republican lean in 2012.  So it goes from being

20  pure swing territory to being an area that has a

21  substantial Republican lean.  When we do congressional

22  district analysis, we find that once you get to a

23  partisan index of plus 5 or minus 5, that's where the

24  district ceases to be competitive more or less these days

25  and they're no longer winnable for both the parties.

SEAN TRENDE - DIRECT

1   Q    Go back to Exhibit 547 and look at paragraph 84.

2   But we'll look at the second map here at the bottom.

3   What does this map show?

4   A    So this is the partisan index change from 2004 to

5   2012.  Again, the bluer counties showed more of a shift

6   from 2004 to 2012 and the redder counties showed more of

7   a Republican shift from 2004 to 2012.

8   Q    And then if we could go to the next paragraph,

9   paragraph 85.  There's another map that we'll look at.

10  What does this map show?

11  A    So this is the overall shift from 1996 to 2012,

12  again, the two years that have the same overall statewide

13  partisan index.  And so it kind of reflects everything

14  that we've talked about so far.  Dane County has become

15  much more Democratic, gone from an area that can elect a

16  very moderate Republican in Congress to one where we

17  think it's mostly impossible in normal circumstances.

18  Milwaukee County has become substantially bluer.

19  Menominee has become bluer.  We have some slight blueness

20  up here.  The rest of the state, including Marathon

21  County, has mostly become redder.

22  Q    Going to paragraph 86, did you analyze the

23  comparison between President Obama's vote and Bill

24  Clinton's vote and how that compared across the counties

25  in the state?

SEAN TRENDE - DIRECT

A     Yeah.   To try to give some further perspective to
this, going back to 1988 or going back to 1992, the
largest Democratic vote margins in the state came from
Dane, Milwaukee and Rock Counties, and so I wanted to see
kind of how these -- how much of the Democrats' vote is
accounted for in the different years to again illustrate
the Democrats' vote share coming into these counties.

And so in 1996, you can look at them and he carries
these three counties combined with 64 percent of the
vote.  But he also carries the rest of the state overall
with 52 percent of the vote.  So there's a difference of
12 percent between these kind of three core Democratic
counties and the rest of the state.  But he's still
winning the state.

Fast forward to 2012.  Barack Obama wins the state
with a lower vote total in Wisconsin and nationally, but
he carries these three counties with 69 percent of the
vote.  So even though his overall vote total is falling,
it's going up in these three Democratic counties.  He's
doing better in Madison and Milwaukee and Janesville.
Moreover, he's losing the rest of the state to Mitt
Romney, 47 percent to 53 percent.  So the gap between
these three core Democratic counties and the rest of the
state has gone from 12 points to 22 points.

Q     Now, we've been talking about presidential election

SEAN TRENDE - DIRECT

results and this is a case about state legislative

election results.  What conclusions can we draw from

looking at the presidential vote totals as they would

apply to state legislative elections?

A    Well, as plaintiffs' experts demonstrated, there's a

correlation between Democratic vote share and state

legislative vote totals.  And so as the president's vote

share increases in an area, the legislator's vote

share -- the Democrats are going to have better

opportunity to win.  And as they demonstrated, as an area

becomes more Republican, the Republicans are going to

have a better opportunity to win.

     Now, since we don't have proportional representation

in this country where you get your congressional seats

allocated on your percentage of the vote -- there's a fun

academic debate over whether we should, but we don't;

there's a geographic basis to our representation.  And so

if you don't have an ability to win in a rural area in

this country, which covers a lot of geography, if it is

even marginally red, if it goes from being marginally

blue to marginally red, it becomes more difficult to win

areas.  If your core urban precincts go from being 10

points more Democratic to 20 points more Democratic,

you're going to win anyway.  But if the rest of the state

goes from being a slight Democratic lean to a slight

1  Republican lean, you start to lose seats out there.

2  Q    Now, through this time period we're looking at, '96,

3  2004 and 2012, what was happening with the Democratic

4  statewide vote totals as opposed to these county

5  analyses?

6  A    I'm sorry?

7  Q    The Democratic statewide vote from '96, 2004 and --

8  let's just compare '96 and 2012.  How is the comparison

9  between the statewide vote for Clinton and Obama?

10  A    Oh, President Obama in 2012 did, I think -- he did a

11  little bit worse than President Clinton.

12  Q    Okay.  But where was the nature of where those votes

13  came from?

14  A    Well again, the partisan index of the state doesn't

15  change, and so you can see, as I said in paragraph 86,

16  President Obama's vote total goes up in these three core

17  counties of Milwaukee, Dane, and Rock.  But in the rest

18  of the state, he actually flips from President Clinton

19  winning the rest of the state to President Obama losing

20  the rest of the state.

21  Q    Let's look at paragraph 87.  There's a map here

22  Can you explain what this map represents?

23  A    Sure.  So this takes us to a different level of

24  analysis.  We're going from the county level down to the

25  ward level, and unfortunately I don't have -- didn't have

SEAN TRENDE - DIRECT

1  ward-shape files going back to the 80's so I couldn't

2  reproduce the analysis there.  But you can again see at

3  the ward level there's a cluster here, there's a

4  Democratic cluster here, Menominee, the Lake Superior

5  shoreline.  But the rest of the state, there isn't a

6  whole lot of red to draw upon when you're drawing your

7  congressional districts.

8         JUDGE CRABB:  Did you mean red?

9         MR. KEENAN:  You said red.  Do you mean blue?

10        THE WITNESS:  Yeah, the rest of the state

11 there's not a blue to draw upon.  I'm sorry, Your Honor.

12 BY MR. KEENAN:

13 Q    We do see a cluster of red there, correct, in the

14 Waukesha area extending upwards; correct?

15 A    Correct.

16 Q    So is it your opinion that Republicans have no

17 clusters in the State of Wisconsin?

18 A    No, no, absolutely not.  It's one of the more

19 jarring things as an elections analyst how red the

20 Milwaukee suburbs are.  It's not something you really see

21 outside of the south.  I would love to know the reason

22 for it, why Milwaukee suburbs are so red and Chicago's

23 are more purple.

24      But setting that aside, the issue isn't so much that

25 Republicans have a cluster and Democrats have a cluster,

SEAN TRENDE - DIRECT

44

1  it's that the rest of the state has -- now has a slight

2  Republican lean to it.  So what would have been swing or

3  slightly Democratic-leaning districts in this area are

4  going to tend to be more Republican.

5  Q    If we could just go back to paragraph 84.  We'll

6  look at the 2012 map of the counties.  The top one,

7  sorry.  Now, Wisconsin's counties have different

8  populations; correct?

9  A    That's right.

10  Q    Okay.  And does this map provide any sort of, like,

11  numerical estimate as to what the precise level of

12  concentration of Democrats is?

13  A    No.  I mean the county lines are stable over time so

14  it allows you to make that sort of comparison.  And you

15  know that as the Democrats go into these counties,

16  they're not getting wiped out of Wisconsin, they're just

17  going into more heavily clustered urban areas.  You can

18  make maps that take account -- that distort the county

19  lines to let you see the state as a whole.  I don't think

20  they're very useful because everything is so blurred that

21  you can't make sense of heads or tails.  But again, I

22  don't doubt that the overall amount of red and blue in

23  Wisconsin has stayed the same over this time period.  In

24  fact, that's the point.  They have similar overall

25  partisan indexes.

SEAN TRENDE - DIRECT

1       The point is that the blue has become more

2   geographically concentrated, meaning that these wards

3   that are the building blocks of the districts are bluer

4   makes it harder to draw a bunch of Democratic districts.

5   Q    Well then talking about Wisconsin, have you seen a

6   similar trend like this in other areas of the country?

7   A    Absolutely.

8   Q    Can you provide some examples?

9   A    Well, if we go back, I have some similar maps that I

10  used for my books that I utilized here.

11  Q    Maybe we could turn to paragraph --

12  A    Paragraph 66.

13  Q    -- 66, the maps.

14  A    So this is one of the more fascinating maps that I

15  came across when I was doing my book research.  What this

16  shows is the counties that Bill Clinton won in blue in

17  1996 and that Bob Dole won in red in 1996 and then

18  compares it to Bush/Kerry and Obama -- Obama/McCain.  And

19  what makes the 1996 and 2004 comparisons so useful is

20  that again, they're years where the president --

21  Democratic presidents were winning by roughly the same

22  margin nationally.  So you have a control in place.  And

23  what you see is that you really have the same national

24  margin.  Bill Clinton has a pretty wide geographic reach

25  in this area.

SEAN TRENDE - DIRECT

1  Q    Mr. Trende, can I just interrupt?  What states does

2  this map represent?

3  A    So this is -- sorry.  Texas, Oklahoma, Arkansas,

4  Louisiana, Mississippi, Alabama, Nevada and Kentucky.

5  Q    Nevada?  I'm sorry?

6  A    Did I say Nevada?  Tennessee, Kentucky.  And so what

7  we find is that Bill Clinton, when he runs for

8  reelection -- and a lot of these -- back then a lot of

9  these congressional districts are drawn by Democrats.

10 They're meant to help Democrats.  But he wins over -- he

11 wins a majority of the congressional districts in the

12 region and the Democrats are able to win half of the

13 congressional districts.

14     Now, fast forward to 2008, and again, a lot of these

15 lines are drawn by Democrats.  Alabama was -- it's hard

16 to believe today, but Alabama and Tennessee and Kentucky

17 were Democratic gerrymanders.  Louisiana and Arkansas as

18 well.  These are areas where Barack Obama only won about

19 a quarter of the districts and that's part of why

20 Democrats got wiped out in the region in the 2010

21 elections, because these districts that were conceived of

22 originally as being kind of Democratic districts suddenly

23 had become red because the Democrats' vote coalition had

24 shrunk into these blue centers.

25 Q    So you've referenced both counties and districts.

SEAN TRENDE - DIRECT

1   What do the maps represent?

2   A     The maps represent counties.

3   Q     And you've talked about some statistics with respect

4   to counties.  Where did you get that information?  Or

5   with respect to congressional districts, where do you get

6   that information from?

7   A     That's in paragraphs 67 and 68 and that was taken

8   from *Almanac of American Politics*.

9   Q     If we also look at paragraph 70.  What do you see

10  here?

11  A     So this is Virginia.  It's a state that Bill Clinton

12  lost by, I think, six points in 1996 and Barack -- by two

13  points, and Barack Obama, I think, won by six.  And so

14  again, similar national environment.  The state as a

15  whole swings towards the Democrats, which surprises no

16  one who's followed Virginia politics over the past couple

17  decades.  But again, you see President Obama's coalition

18  doesn't have the geographic reach that President Clinton

19  had.  I mean by this point you get Blacksburg, which is

20  Virginia Tech.  There's some African American counties

21  here.  Charlottesville.  Henrico and Richmond.  And then

22  northern Virginia.

23       These are areas -- some of them, you know, Bill

24  Clinton didn't win Fairfax County.  Barack Obama did.

25  But Barack Obama sacrifices the western portion of the

SEAN TRENDE - DIRECT

1    state, which was -- and southern portion of the state

2    which was able to elect Democrats and keep them in power

3    for the 80's and 90's suddenly becomes a lot redder and

4    those areas have switched to Republicans.

5    Q    And again, what would this analysis tell us about a

6    party's ability to win legislative seats?

7    A    It's very tough.  I mean Democrats got to draw the

8    Virginia State Senate in 2011.  They tried their best,

9    but they could only draw one seat advantage for

10   themselves and that disappeared when a member from rural

11   Virginia retired.

12   Q    Now, you've read Professor Jackman's report;

13   correct?

14   A    Yes.

15   Q    Now, how do you see in his historical analysis of

16   that efficiency gaps over time?

17   A    I haven't looked at that report in awhile.

18   Q    You were here for his testimony yesterday; right?

19   A    I wasn't.

20   Q    Sorry.  We'll skip that.

21   A    Unfortunately.

22   Q    Well, let's shift to the nearest neighbor analysis.

23   A    Yes.

24   Q    And we'll go to Exhibit 547.  First we'll start at

25   paragraph 93, which is a preclude to the nearest neighbor

1    analysis.  Blow up the chart here.  What were you doing

2    with this part of your report?

3    A    So the idea was okay, I think it's plain just

4    looking at the map what's happened over time and given

5    what we've known nationally, what happened to the

6    Democratic coalition, it makes sense and I think it does

7    a nice job of answering Dr. Jackman's question of why you

8    see this efficiency gap starting to emerge in the 90's.

9    Well, it's because the Democrats' coalition starts to

10   shrink inwards and it's harder for them not to waste

11   votes.  But how do you -- what's another way to measure

12   this?

13        Well, we can look and see are these wards actually

14   becoming farther apart and there's this idea of nearest

15   neighbor analysis that measures the distance between one

16   group and the closest similarly situated group.  Now, a

17   lot of times when you do it, you'll use average nearest

18   neighbor, but looking at the map of Wisconsin and knowing

19   how these wards are utilized, I figured that a mean would

20   be distorted by outliers.

21        The first week of statistics you go through mean,

22   median, mode, the descriptor statistics.  And what you

23   learn is that if you have a skewed distribution, an

24   average is difficult to work with.  But the classic

25   example is income distribution.  If you look at the

United States income distribution, it shows the average
income actually being pretty high.  You say wow, I had no
idea.  Well, what's happening there?  Well, Bill Gates's
income and the tech billionaires out in Silicon Valley
and billionaires in general exert a tremendous amount of
pull on that average and distort the average.  So what
you almost always see reported is median household
income.  Because the way to keep those extremes from
exerting pull on the average and pushing you back, and
you can kind of see the distribution toward the center,
say, how is the center really doing.

So since looking at the map of Wisconsin, I could
see that the Democratic coalition, these places in
Menominee County and Ashland County are probably going to
match up somewhere in Milwaukee and skew the average.  I
said let's use the median instead, drawing on, again, the
basic statistics that I learned.

Q    And I think -- my mistake.  You jumped ahead.  I
wanted to start here at 93, the partisan lean of the
average Democratic lean.  What were you doing here?

A    So here when you're just looking at the -- you're
not concerned about districts, you're just saying has --
you're asking yourself have wards in Wisconsin become
more Democratic over time.  So since we're not looking at
distance, we're just looking at the overall distribution,

SEAN TRENDE - DIRECT

1    there was no reason not to utilize a median.  And so what

2    I did was I looked at the wards.  I said okay, what's the

3    average?  How are these wards that have Democratic leans

4    distributed and how are the wards that have Republican

5    leans distributed?  What I found was that over time, the

6    average Democratic ward had become about two-and-a-half

7    percent more Democratic than it was in 2002.

8         In 1995, I didn't quantify it because quite frankly

9    I saw this weird uptick in 2014 that looked like an

10   outlier and I didn't think it would be good.

11   Q    Let's just --

12   A    Okay.  Let's just stick with --

13   Q    Hold on.  Can you explain what the vertical and

14   horizontal axis mean on your chart here?

15   A    Yeah.  So the vertical -- in chart 93, the vertical

16   axis is the average, and if it's negative, it's more

17   Democratic; as it becomes positive it becomes

18   increasingly Republican.  And the horizontal axis, the

19   x-axis is the year.  And so that's what the axes mean.

20   Q    Okay.  Now, Professor Mayer criticized you for your

21   selection in 2006.  Do you recall some testimony about

22   that?

23   A    Yes.

24   Q    Can you first explain which race you used in 2006 to

25   establish the partisan lean?

                    SEAN TRENDE - DIRECT

1  A    I used the Senate race in 2006, the Kohl, I think it

2  was, Lorge Senate race.

3  Q    And what were you using that for in terms of then

4  looking at wards?

5  A    So this is the partisan index of wards, so it's --

6  this is actually normalized for the statewide vote.  You

7  can't normalize for the national vote in off-year

8  elections because there is no national vote.  So it's

9  normalized for statewide elections.  So what you would do

10  is you would say okay, Herb Kohl wins a precinct by 50

11  points or a ward by 50 points.  He's winning statewide by

12  50 points.  This is a swing precinct.  Its overall

13  Democratic lean is 0.

14  Q    Okay.  Now, what do you understand Professor Mayer's

15  criticism of you to be?

16  A    Professor Mayer said that I should have used the

17  more competitive gubernatorial race, the Green/Doyle race

18  in 2006.

19  Q    Do you find this criticism valid?

20  A    I don't.

21  Q    Why not?

22  A    Because you've normalized.  This is exactly why you

23  want to do that normalization for the statewide vote.

24  Because what we find is that -- this is actually a

25  wonderful example.  Even comparing the 7-point

1    Green/Doyle race to the 50-point Lorge/Kohl race, the

2    ward distribution just shifts up and down and so this

3    ward, this hypothetical ward that was 50 percent Doyle --

4    50 percent Kohl when he's winning 50 percent statewide

5    would be 53 Doyle when he's winning 53 percent statewide.

6    The distribution just shifts and it allows you to kind of

7    compare even to widely disparate elections.

8    Q    Now, this graph goes up in 2006?

9    A    Yes.

10   Q    Does that become more Democratic or less Democratic?

11   A    So the average Democratic ward in 2006, it shows it

12   becoming less Democratic.

13   Q    Well, have you recalculated this number using the

14   governor's race rather than the senator's race?

15   A    I have.

16        MR. KEENAN:    Okay.  If we could put up Exhibit

17   578.

18        MR. HEBERT:    And if I may object at this time,

19   Your Honor.  This is an exhibit that was prepared by

20   Mr. Trende and we did -- as you know, the sequence here

21   is that the plaintiffs did expert reports, the defendants

22   then did expert reports, then we did rebuttal reports and

23   then the depositions were taken of the experts.

24   Mr. Trende has come up with this exhibit, which is kind

25   of an amendment and correction to his report.  They could

                    SEAN TRENDE - DIRECT

1    have sought leave to file a rebuttal report or a

2    corrected report or an amended report and they failed to

3    do so.  I just want the record to reflect the objection

4    of the plaintiffs to this.

5         MR. KEENAN:  I just have to correct one thing

6    there is that the timing of this was plaintiffs did

7    experts, defendants did experts.  Defendants' experts

8    were deposed before the rebuttal reports and then there

9    were the rebuttal reports.

10    Secondly, the plaintiffs have done this numerous

11    times in this trial, so I don't see why there's a problem

12    with the -- the plaintiffs have done it numerous times.

13    I don't see how there could be a problem with the

14    defendants doing it.

15         MR. POLAND:  Your Honors, if I may address just

16    that because it's not specific to this witness.  There

17    was a process that the Court put in place, and what the

18    defendants have done so far with rebuttal testimony was

19    pure rebuttal to what Mr. Keenan put on with Mr. Foltz in

20    his examination, which was actually his case-in-chief.

21    We did Mr. Foltz entirely during the plaintiffs'

22    case-in-chief for the convenience of the parties and the

23    Court.  I think that's fine.  But what Dr. Mayer came up

24    with that was essentially new was truly rebuttal because

25    it came up for the first time during Mr. Foltz's direct

examination by Mr. Keenan.  So that was rebuttal.  I

think that the new things that we came up with yesterday

that we sent to the Court were in response to the Court's

questions.  So I do want to just clarify that point.

JUDGE RIPPLE:  We'll admit it subject to a later

ruling after we've had a chance to examine the record and

consult.

BY MR. KEENAN:

Q    Okay.  This is 578.  What do we see here on the left

-- we see the year on the far left.  But then in the

middle column what does that show?

A    That's the average -- the dot that you see in

paragraph 93 for 2006, the value of that dot is 7.5

percent on the old calculation.  And so if I were to use

the gubernatorial race, I don't concede this as an error,

but if you prefer to use the gubernatorial race this

year, the average D precinct would be 9.8 percent.  So

there would still be a bump there.  It would be less of a

bump.

But that's kind of what's amazing.  I was pleasantly

surprised it worked out this well.  By normalizing for

the statewide vote, even in these two radically different

elections the average precinct doesn't change that much.

It still has a Democratic -- the average Democratic

precinct has a Democratic lean of about, you know, 8

SEAN TRENDE - DIRECT

1  percent or 10 percent.

2  Q    Okay.  And was there also an error with respect to

3  your 2014 numbers?

4  A    Now that was a genuine error.  When you're doing

5  this in R, you're essentially writing a computer program,

6  and as I was writing the program to calculate the vote

7  share and then subtract out the map share, you have to

8  keep going like year 2002, duh, duh, duh, subtract map

9  2002 and then the two-party vote calculation.

10       For 2014, I think Dr. Mayer actually includes the

11  code that was written.  I subtracted out the 2012 map.

12  It's a mistake.

13  Q    Okay.  But have you accounted for that?

14  A    Yeah.  So actually if you use the proper 2014 map

15  normalization, it actually makes things a little worse

16  for plaintiffs.  This was an error in plaintiffs' favor.

17  In fact, when you compare 2014 to 2002, and this kind of

18  gets a little bit to Judge Griesbach's objection about

19  trying to compare gubernatorial race over time to

20  gubernatorial race over time, not any of the national

21  stuff.  In 2014, the average Democratic precinct under

22  the old calculations was two-and-a-half percent more

23  Democratic than it had been in 2002.  When I recalculated

24  in 2014, the average Democratic precinct is actually

25  almost 3 percent more Democratic in 2014 than it was in

SEAN TRENDE - DIRECT

57

1    2012.

2         So over time -- it's still the case over time the

3    average Democratic precinct has become more Democratic.

4    Q    Okay.  Did you perform a similar analysis on

5    Republican wards?

6    A    I did.

7    Q    Okay.  What did you find with respect to Republican

8    wards?

9    A    So I didn't quantify the change for Republican wards

10   because I saw the 2014 uptick and that looks like an

11   outlier.  So all I said was we don't have a similar

12   effect for Republican wards.  We don't see a three-point

13   shift over time and --

14   Q    Let's -- sorry.  Let's go to Exhibit 547.  Paragraph

15   95.

16        MR. KEENAN:  Sorry, let's go down.  There's a

17   similar graph of the Republicans.

18   Q    First, why don't you just -- let's explain the x-

19   and y-axis and everything that's here.

20   A    This is the same chart for Republicans.  You have

21   year on the horizontal axis, you have the average

22   Republican ward on the vertical axis, the y-axis, and you

23   see it kind of shifting over time but not dramatically.

24   Q    So we see 0 at the top and 15 at the bottom.

25   A    So 0 --

SEAN TRENDE - DIRECT

1    Q    What is positive -- what does getting bigger mean in

2    this sense?

3    A    So 0 would be the average Republican ward was

4    actually neutral.  Obviously it's not going to be that.

5    And 15 would be the average Republican ward was 15 points

6    more Republican than the state as a whole in a given

7    year.

8    Q    So the further down a dot is on this -- in this

9    graph shows more Republican ward?

10   A    That's right.  I wanted it to kind of move in tandem

11   with the Democratic scaling above.  So you can argue for

12   scaling it either way.  I like this way.

13   Q    All right.  So you mention something about this

14   uptick at 2014.  What is that showing?

15   A    It shows that in 2014, the average Republican ward

16   suddenly shifts and becomes more Democratic, becomes

17   neutral, and I thought that looks odd.  So again, I

18   didn't quantify the shift.  Now I know why it looks odd.

19           MR. KEENAN:  So let's put up Exhibit 579.

20   Q    First, did the errors or the error in 2014 that we

21   talked about on the Democratic side, did that apply to

22   your Republican analysis?

23   A    Right.  2006 and 2014, those objections were raised.

24   Q    Okay.  So then what change do you see when you

25   corrected the numbers here?

SEAN TRENDE - DIRECT

1    A    Well again, in 2006 you see almost no change when

2    you exchange from the Kohl -- when you change from

3    Kohl/Lorge to Green/Doyle.  It's actually six-tenths of a

4    point when you round it.  I think it rounded out for some

5    reason to seven-tenths.  So almost no change, even

6    comparing these widely disparate races.  That's the value

7    of doing the normalization.

8         Now, when you change 2014, you get rid of that

9    uptick and so it does a little more what you would have

10   expected it to do.  But still the change in the average

11   Republican precinct from 2002 to 2014 is just 1.1

12   percent.  It's a third of the change we saw in the

13   average Democratic precinct.  So the average Democratic

14   precinct becomes three times as much more Democratic as

15   the average Republican precinct over this time period.

16   Q    What was the average Republican precinct in 2002?

17   A    11 percent more Republican in the state as a whole.

18   Q    And then what do we see in 2010?

19   A    2010 it's 11 percent again.

20   Q    And 2012?

21   A    12.1 percent.

22   Q    And your corrected number here for 2014 is?

23   A    Oh, 2012.  I'm sorry.  That was eleven-and-a-half

24   and the corrected for 2014 is 12.1.

25   Q    Okay.  All right.  Now, let's go to the nearest

SEAN TRENDE - DIRECT

1   neighbor analysis.  Can you explain what you were trying

2   to do there?

3   A     Sorry, I got a little ahead of myself in explaining

4   what the nearest neighbor analysis was.  So this told me

5   how things changed over time and it kind of validated

6   what we had seen on the maps in the county level, that

7   these Democratic areas became a lot more Democratic and

8   the Republican areas kind of spread out.  Well, what I

9   wanted to then say is okay, over time let's bring the

10  geography in.  Over time, do we see the heavily

11  Democratic areas becoming more clustered?  And the same

12  thing with the Republican areas, do they show a similar

13  degree of clustering.

14       So what I used was a median nearest neighbor

15  analysis.  I think I explained why I used a median rather

16  than a mean, an average at this point.  And what this

17  analysis does, it's a computer program and it will take,

18  you know, ward A in Menominee, it will look at its

19  partisan lean and then it will find the closest precinct

20  that has a similar partisan lean.  And then it will take

21  ward B and do a similar thing and record it.  And it will

22  do that for all 6,600 counties.  It will make what we

23  call an i-by-j matrix.  It's going to be a 6,600-by-6,600

24  ward matrix, and it will record all of the average -- all

25  the distances ward to ward.  It will find the closest

1  neighbor for each ward and then it will take the median

2  of that.  So we can see as a general matter how far apart

3  are the Democratic wards and how far apart are the

4  Republican wards.

5  Q    You mentioned wards of similar partisanship.  Could

6  you explain, like, how you group the wards?

7  A    So I grouped -- we did the normalization.  We turned

8  it into partisan index and then we grouped them into

9  quantiles, which is the decimal expression of

10  percentiles.  So 0 to 3 percent quantiles is a grouping,

11  3 percent to 6 percent, 6 percent to 9 percent.  I would

12  have loved to have done it more granular than that, but

13  the computer would have none of it because you're doing a

14  million calculations already for each year.

15      So it allows you then to -- as you do those quantile

16  groupings and you compare them over time, this is obvious

17  from the R code, it gives you the distance.

18  Q    Okay.  If we could pull up --

19  A    Oh, I'm sorry.  On the group, we excluded -- the

20  defendants excluded .45 to .55 because those are even

21  parts and indexes.  So those are things in the middle.

22  They don't really -- they aren't really Democratic wards

23  or Republican wards, those are swing wards.  So we

24  excluded those from the analyses.

25          MR. KEENAN:  If we could go to Exhibit 547,

SEAN TRENDE - DIRECT

1  paragraph 99.  And we'll look at the top graph here.

2  Q    First, let's just set out what this is with the

3  vertical axis/horizontal axis.

4  A    Right.  So this is the x-axis or the horizontal axis

5  is the quantile.  So the .05 is the 5 percent most

6  Democratic wards and so forth and you can see the little

7  circles represent quantile calculations.  The vertical

8  axis or the y-axis is the median nearest neighbor

9  distance in miles for that quantile, and then we sorted

10  them by years.

11  Q    Okay.  So what do we see on this graph in terms of

12  the distances?

13  A    Well, we see sort of what we expected given what we

14  saw on the maps and from our analysis when we looked at

15  the maps of the wards in other counties.  If you look at

16  the 2004 and 2002, those wards -- I guess there's two

17  things you notice.  First, those wards are farther apart

18  than the 2014 wards.  So that tells you that over this

19  time period, the Democratic wards in each quantile grew

20  closer together.  What we also see is that as you go over

21  quantile, so going from left to right, as the wards

22  become more Republican, they become spread further out.

23  So not only is the most heavily Democratic ward closer --

24  group of wards closer together than the most heavily

25  Republican or Republican-leaning Democratic wards or the

1  swing-year Democratic wards, I guess, but over the years

2  they have become closer together.

3  Q    If we could pull up Exhibit 114, which is Professor

4  Mayer's rebuttal report.  Professor Mayer has a criticism

5  of you that your analysis doesn't take account for the

6  fact that wards have varying sizes across the State of

7  Wisconsin.  Do you understand that?

8  A    I do understand that.

9  Q    Okay.  How would you respond to that criticism?

10 A    Well, I think that's part of the problem; right?  I

11 mean the Democratic -- the ward sizes correlate with

12 urban areas and by saying that the Democrats are in these

13 small wards, he's proven the point.  The Democrats are in

14 these core urban areas.  You can't spread out and draw

15 Republican-leaning districts.

16 Q    We've put up on the screen Exhibit 114, page nine,

17 Table A.  This is Professor Mayer's calculation of the

18 size of the wards in the state.  What does this show you?

19 A    Well again, the City of Milwaukee wards are very

20 small.  I agree.  And the rest of the state has larger

21 wards.  Again, I agree.  The problem is the Democrats are

22 in these very small wards and have been increasingly in

23 these very small wards, which makes it harder to draw a

24 smaller precinct.

25      The other thing that I think is important is that

1    Dr. Mayer does a lot with 2012.  He isn't looking at so

2    much over the change over time.  And why that's crucial

3    is that these wards are consistent over a decade.  Okay?

4    And so if you see a change in the distances over the

5    course of a decade, which we do see, and these wards are

6    held stable, you can't explain change with a constant.

7    These ward sizes are constant, yet we still see the

8    Democrats' distances shrinking.  And so it has to be

9    something other than ward sizes.  It's the fact that the

10   Democrats are coming inwards, because again, these are

11   constants, so you can't explain the change with the

12   constant.

13   Q    And how does smaller distances between wards relate

14   to legislative districting?

15   A    Well again, if you have these heavily Democratic

16   wards packed together in the Democratic cities, you get

17   this natural packing that occurs in the state.  And so if

18   all your vote or most of your vote goes into Milwaukee

19   and Dane Counties, Milwaukee and Dane Counties are only

20   entitled to a certain number of districts and Milwaukee

21   and Dane Counties were leaning Democratic to begin with,

22   so the Democrats were already doing quite well in those

23   districts.  It becomes harder -- it becomes progressively

24   harder to draw Democratic precinct -- Democratic

25   districts elsewhere in the state.

SEAN TRENDE - DIRECT

1    Q    You mentioned there was a change over time within

2    consistent wards.  How do we see that on this graph here?

3    A    Well again, you can see the 2008 ward right here in

4    the middle, that line is lower than 2006 and 2004 and

5    2002.  2010 is lower than 2008.  So again, these were

6    drawn with wards of the same size.  You have these ward

7    sizes held constant and yet nevertheless you see things

8    -- you see the distances between Democratic wards

9    shrinking.  You can't explain that with ward sizes.

10   Q    Let's move down the page.  Did you have a similar

11   analysis with respect to the Republican wards?

12   A    Yes.

13   Q    Okay.  And can you explain what this graph shows

14   here in paragraph 98 of your report?

15   A    So this is the similar effect for Republicans or the

16   similar analysis for Republicans.  On the y-axis as we

17   move rightward, the quantiles become increasingly swingy,

18   I guess, to use a nonacademic term.  If you go on the

19   y-axis, the vertical axis, the distances grow larger.

20   Q    Okay.  And so what do we see here as we move from

21   heavily Republican over to, like, more Democratic or less

22   Republican wards?

23   A    It's actually the opposite of what we see with the

24   Democrats.  As you become -- as you get to these heavily

25   Republican wards, they become farther apart.  And it's

1   not just that as you go from here to here they become

2   farther apart, but as you go from year to year, they

3   become progressively farther apart.  So over the course

4   of this time period, even similarly situated quantiles

5   for Republicans have grown farther apart.

6           JUDGE CRABB:  I have a question.

7           THE WITNESS:  Yes, Your Honor.

8           JUDGE CRABB:  You said that the Democrats are

9   clustered into cities and as more and more of them come

10  in, there are going to be more and more in the district

11  and you can't increase the districts.  But you're not

12  saying that -- say two million people moved into Dane

13  County.  You're not suggesting that the number of

14  districts in Dane County would still be the same.

15          THE WITNESS:  Oh, no, Your Honor.

16          JUDGE CRABB:  What are you saying?

17          THE WITNESS:  Yes, Your Honor.  Actually during

18  a redistricting period they would be the same.  If two

19  million people moved into Dane County from 2002 to 2010,

20  it would be the same.  We still see that changing.  There

21  would be more districts put into Dane County.  I don't

22  know how many districts Dane County was entitled to in

23  2012 versus 2002.  What I do know is that Democrats were

24  winning those districts in Dane County to begin with, so

25  those votes that they get in, you're right, don't go into

1    an additional Assembly district or Senate district are

2    basically naturally wasted votes because a district

3    that's giving 60 percent of the vote to Democrats by the

4    end of the decade is giving 70 percent of the vote to

5    Democrats.  So that's a natural waste.

6         JUDGE CRABB:  When the new districting process

7    takes effect and, say, you have a lot of western states,

8    you have 50 or 60 percent of your population is living in

9    urban areas.

10        THE WITNESS:  Yes, Your Honor.

11        JUDGE CRABB:  So how do you account, if you say

12   a county can have only so many districts, how do you

13   account for that?

14        THE WITNESS:  Well, it's not -- in between

15   redistricting years there can be a change.  If you're

16   looking at some place -- Milwaukee County is a better

17   example where you don't have a population explosion.  I

18   was pleasantly surprised riding around Dane County

19   yesterday how much new construction there is.  It would

20   still be a problem for the Democrats there.

21        Now, that might be, as Dr. Jackman said, an area for

22   additional inquiry.  But this is something that

23   plaintiffs aren't accounting for.  We know that there's

24   this clustering and that the efficiency gap, ultimately

25   this is a question about the utilization of the

1  efficiency gap.  We know there's this clustering that's

2  occurring or I think it's obvious there's this clustering

3  occurring in Dane and Milwaukee County.  Maybe it would

4  be explained away by additional Assembly districts coming

5  into these counties.  But it's something that a measure

6  of gerrymandering is going to have to account for and the

7  efficiency gap just doesn't.

8        JUDGE CRABB:  I thought the idea of

9  redistricting was to try to eliminate the variances in

10  districts.  So you have a district that may be huge, but

11  it has approximately the same number of people as this

12  tiny city district in which people are in high rises and

13  whatever.

14        THE WITNESS:  I understand the point.  This

15  isn't just about people moving, it's about vote

16  preferences changing over time.  Now, it's -- it is a

17  perfect -- I understand your point.  It's a well --

18        JUDGE CRABB:  I don't understand --

19        THE WITNESS:  That's fair.  So there's two

20  things:  First, it doesn't necessarily have to be two

21  million people moving into Dane County to get this change

22  in the --

23        JUDGE CRABB:  I understand that.  My question is

24  your testimony seemed to indicate that there's nothing we

25  can do.  A lot of people move into one area.  They're all

SEAN TRENDE - DIRECT

1    one party.  There's nothing we can do about it.  But my

2    understanding of redistricting is that's when you try to

3    do something about that so the districts are relatively

4    the same number.

5              THE WITNESS:  Yes, Your Honor.

6              JUDGE CRABB:  Okay.  So if you're up in

7    Shullsburg, you may be in a district that's

8    geographically huge, but you're going to be a district

9    that has approximately the same number of people as of

10   the date of redistricting as this little tiny area in

11   Milwaukee or Madison.

12             THE WITNESS:  Well, there's two answers.  The

13   first is I'm not sure -- my answer isn't that people are

14   moving in and that's -- the Democrats move in to Dane

15   County and that's what makes it more Democratic.  I mean

16   I suppose that's a hypothetical possibility.  It's also

17   vote preference is changing.  The same people who live

18   here change --

19             JUDGE CRABB:  Of course.

20             THE WITNESS:  -- their votes, so that would not

21   affect the distribution of the Assembly or Senate

22   districts.  If people change their vote preferences,

23   there are still a similar number of people living in the

24   geographic area.

25        Now, people can also move in which would entitle an

                    SEAN TRENDE - DIRECT

1   area, as you say, to more Assembly districts.  That's

2   something -- the straightest answer is that is something

3   that this analysis doesn't account for that could explain

4   it away.  I would love to see the data on it.

5           JUDGE CRABB:  Okay.

6   BY MR. KEENAN:

7   Q    Professor Mayer criticizes you for using the median

8   distance rather than the mean.  Why did you choose to use

9   the median?

10  A    Well again, as I said, the first week of statistics

11  you're taught the difference between median, mean, mode,

12  standard deviation, variance, the general descriptive

13  statistics.  The problem with using a mean is that

14  outliers exert influence on it.

15          I use the example of income distribution.  The few

16  high income individuals skew the average income in the

17  United States.  They typically use a median.  And you see

18  the same thing in Wisconsin.  There are -- when you look

19  at the map, there are these clusters of Democrats across

20  the state and so when you're pairing up something in

21  Ashland County, there aren't a whole lot of other

22  Democratic precincts around Ashland County that could

23  easily match up with something in Menominee or Milwaukee

24  or Dane, which is going to give you a longer distance

25  than -- it's kind of a outlaying distance.  So instead of

1    average, I took the mean.

2    Q     This is Exhibit 114, Professor Mayer's amended

3    rebuttal report.  This is page ten, Figure B, which he

4    went over on his examination which shows his

5    recalculation of your analysis but using the mean or the

6    -- yes, the mean instead of the median.  Could you

7    explain what this shows?

8    A     So what Professor Mayer has done is taken --

9    replicated my analysis of median and then all -- for one

10   year, and then also done a similar -- and then done a

11   similar analysis using the mean nearest neighbor.

12   Q     And what do you think that Professor Mayer's

13   reconstruction of your analysis using the mean shows?

14   A     Well, what you see is that even the average

15   Republican ward is further apart than the average

16   Democratic ward.  It shifts things upward.  It shifts

17   things upward a lot by -- for the Democrats, which I

18   think reflects the pull that the outliers have when you

19   do an average as opposed to a median.  But I also noticed

20   that this isn't -- this might capture the shape in one

21   year, but there's no analysis over time, which is what I

22   do in my charts.  I'm not looking at one year and seeing

23   how the distribution changes, I'm seeing those

24   distributions change from 2002 to 2014.  They shifted

25   downward for Republicans and upwards for Democrats, and

SEAN TRENDE - DIRECT

1    Dr. Mayer doesn't capture that in this chart.

2    Q    Just to use this, what do you think this uptick here

3    you reference, what does that show?

4    A    Well, it shows that the average Republican ward is a

5    lot further apart than the median Republican ward, which

6    is probably the influence of outliers.  And the average

7    Democratic ward is a lot further apart than the median

8    Democratic ward.  Again, you probably have the influence

9    of outliers there.

10   Q    All right.

11         MR. KEENAN:  If we could put up Exhibit 576.

12   All right.

13   Q    This is a map.  Could you explain what this map

14   shows?

15         MR. HEBERT:  For the record, let me object to

16   this.  I think this is one of your new exhibits?

17         MR. KEENAN:  Right.  So if you want to make your

18   record.

19         MR. HEBERT:  The same objection as earlier.  And

20   I also object to the form of the question.  He just puts

21   up a map and says what does this show.  It would be good

22   to know who did it and what, you know --

23   BY MR. KEENAN:

24   Q    What is this map?

25   A    This is a map that I did, drawing upon the same data

SEAN TRENDE - DIRECT

1   that I used to generate the ward map of Wisconsin.  And

2   what this is is it's filtering out the top 10 percent

3   Democrat-lean precincts or wards in 2012.

4   Q    And so what do you see when you look at this map

5   showing the top 10 percent of Democratic wards?

6   A    Well, this is what I'm talking about with the

7   influence of outliers.  So you have this extreme cluster

8   of Democratic wards down in Milwaukee, the 10 percent

9   heaviest Democratic wards in the state.  You have this

10  cluster in Madison, in Dane County.  But when you're

11  doing this nearest neighbor analysis, these wards in

12  Ashland, Superior, Bayfield are going to have to get

13  paired with something else.  And so it's going to tend to

14  get paired across like this.  Maybe you get lucky and it

15  pairs with, you know, a ward there or something in

16  Menominee, but you have this potential for a skewed

17  distribution, and I was taught when you have the

18  potential for a skewed distribution, you use a median

19  rather than a mean.

20           MR. KEENAN:  Let's put up 577.  This is a

21  similar exhibit that was produced today, so I'll allow --

22           JUDGE RIPPLE:  So noted.

23  BY MR. KEENAN:

24  Q    Then can you explain what this map is?

25  A    So this is the same analysis that I made coming from

SEAN TRENDE - DIRECT

the chart of the ward-level map that's in my report,

paragraph 87, except it's filtered for the 10 percent

most Republican wards in the state.  And so, you know,

there's a similar risk of outliers.  It's not as dramatic

as it is for Democrats because the distribution isn't

quite as bunched up in a few different places.  I'm

having a fun time with this screen, I apologize.  But

there's still a potential for outliers, not as dramatic

as with the Democrats, but again, median rather than

mean.

Q    Okay.

A    If you don't have a skewed distribution, the median

and mean should be more or less the same.  So it only

should make a difference if there's some outlying

leverage exerted.

Q    All right.  We can take that exhibit down.  You

understand this case is about the efficiency gap;

correct?

A    That's right.

Q    Do you have any opinions about whether the

efficiency gap -- about the use of the efficiency gap to

measure partisan gerrymandering?

A    I think the efficiency gap is interesting.  I read

-- I really enjoyed this.  It's cool stuff.  But I don't

think -- I think the efficiency gap tells us a lot about

SEAN TRENDE - DIRECT

1   wasted votes and a lot about the efficiency gap itself.

2   I don't think it tells us much about gerrymandering.  I

3   think the real problem is the linkage between the

4   efficiency gap and gerrymandering.  It might be part of

5   an explanation, but it can't be -- maybe, but that's

6   tough to say.

7   Q    And why do you say that?

8   A    Well, there's a couple reasons.  But the biggest

9   reason is that it's underinclusive and it's

10  overinclusive.  And what I mean by that, and this is part

11  3 -- parts 3 through 6 of my report, but underinclusivity

12  and overinclusivity in part 3 is if you look at maps that

13  just about everyone has agreed is a partisan gerrymander,

14  there's a lot of them that the efficiency gap won't

15  trigger scrutiny of.  And if you look at maps that are

16  plainly not partisan gerrymanders, the 1992 and 2002

17  Wisconsin maps that were drawn by a court, some of the

18  maps that are drawn in Iowa by dependent redistricting

19  commissions, maps in New York that are drawn by Democrats

20  that nevertheless put out huge Republican efficiency

21  gaps, these show efficiency gaps going the opposite way

22  of what you would expect.  So it ignores maps that we --

23  I think you would find everyone agreeing is a

24  gerrymander, and it brings into its ambit maps that I

25  think it's very hard to claim are gerrymanders.

SEAN TRENDE - DIRECT

1            MR. KEENAN:  Let's focus on the underinclusive

2    aspect here.  If we could go to paragraph 117 of Exhibit

3    547.  Okay.  If we could blow up this map of Georgia

4    here.

5    Q    What does this map represent?

6    A    So this is the -- this is a map that I drew.  I

7    actually have drawn hand maps of every district going

8    back to 1789 because I wanted to learn about how

9    congressional districts were being drawn and how the

10   parties have done gerrymandering over time.  Even at

11   times when they were required to follow county lines,

12   they actually gerrymandered William McKinley out of his

13   district in 1890 by drawing it from down into Canton into

14   Holmes County.  You don't actually know that until you

15   actually draw the map and see what they did.

16           Anyway, this is Georgia in 2002.  It's a map that

17   was drawn by Democrats and virtually everyone agrees that

18   this was an aggressive Democrat gerrymander that was

19   intended to produce in a five-Democratic delegation in

20   what was at the time a Republican-leaning state.

21   Q    Is this a map of congressional districts or state

22   legislative districts?

23   A    This is congressional districts.

24   Q    And so what does this map show then, if we can just

25   look at a few of the districts.

                    SEAN TRENDE - DIRECT

1    A    Sure.  So you have this 13th district that kind of

2    looks like -- it's been described as a sick chicken.  You

3    kind of have the head there, some legs there, a tail

4    there that kind of wraps around Georgia -- around

5    Atlanta.  It's an African American plurality district,

6    it's not a majority district.  You do have African

7    American majority districts in the 4th and the 5th.

8         You have, say, the 11th district out here, which

9    actually starts up here, runs down.  It runs down -- it

10   runs down the west Georgia border.  It has -- all you're

11   missing there is a tongue in here, and there's another

12   tongue in there.  There's actually -- the hope was to

13   draw a Democrat district, but it didn't work.  The

14   technical term for this is a dummy mander.

15   Q    So what happened under elections in this plan?

16   A    It actually elected a lot of Republicans.

17   Q    And have you analyzed what it showed up in terms of

18   being an efficiency gap measure?

19   A    So this district -- this map, that everyone agrees

20   is a Democratic gerrymander, and not just comply with

21   racial terms, you have the 11th and you have the 12th,

22   which is also not of the area district, it has a

23   Republican efficiency gap of .01 -- I guess negative .01.

24   Q    What does that tell you about using the efficiency

25   gap to measure gerrymandering?

SEAN TRENDE - DIRECT

1   A     It gets -- it's not just whether it's a gerrymander,

2   it gets the sign wrong on this.  This says it's a

3   Republican-leaning map that the Republicans drew.

4   Q     Okay.  Now, you understand that the Stephanopoulos

5   and McGhee article that's the basis for the efficiency

6   gap suggest a different standard for using congressional

7   districts versus state legislative districts; is that

8   correct?

9   A     That's right.

10  Q     Okay.  Do you think that -- how does that affect

11  your analysis of using the efficiency gap to judge

12  gerrymandering?

13  A     Well, I thought I heard Dr. Mayer testify that for

14  gerrymandering there's no difference between

15  congressional districts and state legislative districts.

16  So I don't know why you would utilize a different test.

17  Maybe I misheard.

18      The other thing is that even if you have a different

19  test, if it's, you know, plus or minus .07 percent for

20  legislative districts and then two seats for

21  congressional districts, the efficiency gap calculation

22  is the same and so at the very least you would hope that

23  Democratic-drawn gerrymanders would show Democratic

24  efficiency gaps, which doesn't happen.  This is a

25  Republican efficiency gap map.

SEAN TRENDE - DIRECT

1   Q    If we could go to paragraph 120, we'll look at

2   another map.  What does this map show?

3   A    So this is the North Carolina -- and, of course, in

4   the report there's a lot of other examples of this.  But

5   these maps are just, you know, really, I think, striking.

6   This was a -- everyone agrees this is a Democratic

7   gerrymander in North Carolina in 2002.  It was a more

8   successful gerrymander than the Georgia map in that it

9   eventually got rid of Robin Hayes in the 8th District, it

10  protected Mike McIntyre in the 7th District.

11       You can see this district right here is not a voting

12  rights district.  The 2nd, it's been described as a

13  dragon in flight.  You have the wings, you have the head,

14  you have the tail.  And it's meant to elect a Democrat.

15  And yet in the 2002 election it presents with a marginal

16  Republican lean.  The efficiency gap is negative 2.6 or

17  2.6 using Dr. Mayer's convention.

18  Q    There's been some testimony about criticisms you had

19  about imputation methods.  Do you recall Professor Mayer

20  had some response to criticism he thought you made?  Have

21  you made any criticism of Professor Mayer's imputation

22  methods?

23  A    No.

24  Q    Can you explain what the criticism you actually were

25  making was?

SEAN TRENDE - DIRECT

1   A     Well, if you go to paragraph 132, if we can go there

2   in my report, the point I'm making is Dr. Jackman's

3   imputation strategy is problematic.  Now, this is what I

4   think Dr. Jackman's imputation strategy is.  We didn't

5   get the entire code until Friday, so I haven't been able

6   to work through it.  But from what I understood, he was

7   taking votes from -- presidential votes from Assembly

8   districts and imputing them to Assembly votes where he

9   didn't have contested races.  And it would make sense you

10  would try to do that.  And what I said was the only way

11  that Dr. Mayer's approach ties into this in paragraph

12  136, I say in and of itself it's not a problem if the

13  imputation strategy is correct.

14        But what Dr. Mayer shows on his thing, on his chart

15  is a line that represents a one-to-one ratio.  So I

16  knew -- I mean I say right here it's not a best-fit line.

17  I know he's not drawing a regression-analysis line.  It's

18  a 45-degree line as he described in his testimony.  And

19  there's a dropoff in votes.  And so if you're imputing

20  presidential votes to Assembly districts, you're going to

21  impute too many votes in districts that don't have

22  Assembly races because there's a dropoff in them.

23        I don't talk about Dr. Jackman -- Dr. Mayer's

24  regression analysis.  I frankly don't know what his

25  criticism was referring to.

                    SEAN TRENDE - DIRECT

1    Q    All right.  We'll just get into the rest of your

2    report.  We're coming to the end here so we can -- do you

3    have any opinions on things that the efficiency gap

4    metric ignores?

5    A    Well again, this gets into No. 5, and Dr. Mayer

6    interpreted this as being a criticism of him, but

7    actually I think it's -- I agree with him.  It's a

8    compliment for him.  I think he misread the report.  When

9    Dr. Mayer runs his efficiency gap analyses, he finds that

10   a number of things affect the efficiency gap.  So

11   incumbency, candidate quality, campaign spending,

12   recruiting advantages, those last two are in the

13   literature, not in Dr. Mayer's report.  But one of the

14   problems with the simplified efficiency gap,

15   Dr. Jackman's approach to the efficiency gap is that it

16   doesn't take account of any of these things.  And since

17   we know that -- and the fact that Dr. Mayer actually

18   takes account of these things when classifying his --

19   when doing his revised efficiency gap calculations proves

20   my point that if you just take the simple -- because we

21   know that incumbency and candidate quality of these

22   things can change votes and change the efficiency gap

23   somewhat, the fact that the simple equation .5 S minus,

24   et cetera, et cetera doesn't take any of this into

25   accounts.  It's missing things that can alter the

SEAN TRENDE - DIRECT

1  efficiency gap.

2  Q    And then do you have any opinions about the

3  efficiency gap sensitivity to changes?

4  A    Well, yes.  You can see I ran through an example, in

5  point heading 6 of situations -- of a situation where if

6  you just made a slight change in the state vote share and

7  did a uniform swing, you could produce a big change in

8  the efficiency gap.  Now, I'm not saying this is what

9  happened in Wisconsin.  I'm just saying that if this is

10 the national standard that's set up, you can have

11 situations where efficiency gaps are just kind of

12 determined by the roll of the dice of what kind of year

13 the redistricting plus two, if you will, is, the

14 2002/2012 is.

15     If it's a good Democratic year and a map that's

16 allocated like this chart, you're going to have a

17 different efficiency gap than if it happens to be a bad

18 Democratic year.  That make it is a little bit arbitrary.

19 Q    I'm sorry, you had referenced a chart.  We'll put it

20 up here on paragraph 153.  Could you just explain what

21 this is?

22 A    Yeah.  So in this chart here if everyone votes as

23 expects, you get a negative .06 efficiency gap.  So this

24 is kind of a neutral year where the percentages reflect

25 what the data have suggested or your regression analysis

1  or however you calculate it.

2  Q     Just to stop.  So we have a series of the districts.

3  How many districts?

4  A     There's 20 districts.

5  Q     What do the columns represent?

6  A     So this is just saying hypothetically if you

7  estimate going into redistricting, that District 1 will

8  give 10 percent to the Democrat and 90 to the Republican

9  and so forth and so on.  And District 20 would give 90

10 percent to the Democrat and 10 percent to the Republican.

11 If everyone votes as expected, you do your efficiency gap

12 analysis, you get a negative .06 efficiency gap.

13      But let's say that the first year actually turns out

14 to be a Republican wave year and Republicans fair two

15 points better across the board.  So the district they

16 expected to be 90 percent Republican is 92 percent

17 Republican, and District 12 that you expect to be 51

18 percent Democrat/49 percent Republican becomes 49

19 Democrat and 51 Republican.  You do that across the

20 board.  You get a negative 1.9 efficiency gap.  And so

21 whether or not court scrutiny is triggered is subject to

22 the vagaries of the National Election Cycle.  If it's a

23 wave year, you get a different answer than if it's a

24 neutral year.

25           MR. KEENAN:  We're going to put up Professor

                      SEAN TRENDE - DIRECT

1   Jackman's report, it's Exhibit 34.  And Jackie, what's
2   the table there?  It's page 55, Table 1.

3   Q    And just as we get -- move along, this is the list
4   of the 17 unambiguous -- plans that are unambiguous as to
5   the sign of their efficiency gap.

6   A    Right.

7   Q    And did you do some analysis of these 17 plans?

8   A    Yes.  So these plans I do some analysis of them
9   actually in my report at paragraph 109.  And what's
10  interesting is that these unambiguous plans, only 7 of
11  these 17 states were drawn in situations where there was
12  unified partisan control.

13       Ohio in 1992 has a partisan board, so that's not
14  what the legislative breakdown would show.  And there's
15  just some interesting, just anomalous things.  For
16  example, New York.  Plan 3.  1992.  The convention in
17  New York is that the Republicans draw the state Senate
18  districts because they control the state Senate and the
19  Democrats draw the Assembly districts.  Okay.  The
20  Democrats have drawn the Assembly districts since 1982
21  and yet they always show these massive pro-Republican
22  efficiency gaps.  Okay?  So part of that is just the
23  concentration of New York City.  You've got to draw a lot
24  of heavily Democratic districts in New York City.

25       What's also interesting is that these heavily

SEAN TRENDE - DIRECT

1   Republican efficiency gaps continue to produce

2   overwhelming Republican majorities in the Legislature.

3   So there's not even a linkage between partisan control

4   and the efficiency gap.

5   Q     You said they produce Republican --

6   A     Democratic majorities in the Legislature.  So

7   there's not even a linkage between partisan control and

8   efficiency gaps.

9   Q     All right.  And then have you done an analysis about

10  whether the efficiency gap might stay the same sign but

11  the control of the Legislature still changes hands?

12  A     Yes.  So that's at the very tail end of my report,

13  point heading 6.  And you can see an example, for

14  example, map 1, you can keep this chart up, map one in

15  New York.  Actually the Republicans, it's hard to believe

16  today, but they had control of redistricting in 1972.

17  They had the governorship in both Houses of the

18  Legislature.  They drew a map with a heavy Republican

19  efficiency gap, and yet there's this radical shift over

20  the decade from Republican control to Democratic control.

21  So Democrats were not locked out of the Legislature.

22      And you can go through, the 2002 map here is counted

23  as a Republican gerrymander.  The Democrats win the state

24  House in 2006 and 2008.  The Wisconsin 2002 map is a --

25  supposed to be Republican gerrymander, yet Democrats were

1    able to win control of the Assembly in 2008 as a

2    court-drawn map, of course.

3         California's 1992 map is counted as a Republican

4    gerrymander even though it's a court-drawn map.  And yet

5    Democrats managed to win unified control of the

6    Legislature in '96, '98 and 2000.  So we just don't see

7    the sort of linkage we would expect to see between the

8    efficiency gap and partisan control if the efficiency gap

9    were really a good measurement of gerrymandering.

10         MR. KEENAN:  I have no further questions.

11         JUDGE RIPPLE:  I think then this would be a very

12   good time for us to take a 15-minute break prior to the

13   cross-examination by the plaintiffs.  So the Court will

14   stand in recess for 15 minutes.

15         (Recess    10:35-10:55 a.m.)

16         THE CLERK:  This Honorable Court is again in

17   session.  Please be seated and come to order.

18         JUDGE RIPPLE:  I think we're ready then for the

19   plaintiffs' cross-examination of the witness.

20         MR. HEBERT:  Thank you, Your Honor.  Again, with

21   the Court's permission, I'll stay seated for the cross.

22                       CROSS-EXAMINATION

23   BY MR. HEBERT:

24   Q    Let's start, Mr. Trende, with a comment you made on

25   direct examination in response to a question about

                        SEAN TRENDE - CROSS

1  Dr. Jackman's imputation strategy is problematic.  Do you

2  remember that testimony?

3  A     Yes.

4  Q     And your report is Plaintiffs' Exhibit 126 and one

5  of the comments that you made on direct, if I understood

6  you correctly, is that you really couldn't tell what the

7  problem was because you didn't get the R codes until last

8  Friday; is that correct?  The statistical problem.

9  A     I wouldn't phrase it quite like that.  What my point

10  was was I think I know how Dr. Jackman was doing it.  I

11  wasn't entirely sure because I didn't have the entire R

12  code to go through.  I couldn't make the R code work

13  without some of the files until -- I didn't get them

14  until Friday.

15  Q     Okay.  So you couldn't tell what the actual problem

16  was?  Is that what you're saying?

17  A     If Dr. Jackman did his imputation the way that I

18  believe he did it, then there's a problem.  If he did it

19  otherwise, then it's not a problem.  But I did it to the

20  best of my ability given the data that I had.

21  Q     But you couldn't tell because you didn't have the R

22  code; correct?

23  A     I couldn't be completely certain how he did it

24  because I didn't have the code.

25            MR. HEBERT:  And let the record show, Your

                    SEAN TRENDE - CROSS

1    Honors, that the R code that Dr. Jackman had was given to

2    the defendants last November, not last Friday.  So the

3    record is clear on that point.

4             THE WITNESS:  We got additional files Friday.

5             MR. HEBERT:  Excuse me, sir.  I'm still

6    speaking.  And perhaps Mr. Keenan will stipulate to that.

7             MR. KEENAN:  I'll stipulate that we had a

8    version of the R code that didn't have some underlying

9    files that Mr. Trende needed.  Those files were given to

10   us first last Friday.  That's what Mr. Trende was trying

11   to say.

12            MR. HEBERT:  Thank you.  The stipulation I was

13   looking for was that the database that Dr. Jackman had

14   was given to them last --

15            MR. KEENAN:  That's not correct, so I'm not

16   going to stipulate to it.

17            MR. HEBERT:  All right.  Well, we'll move on.

18            JUDGE RIPPLE:  Maybe the two of you could work

19   out a stipulation that you could agree to.  I think there

20   is room for you to do that.  So we'll defer ruling on

21   that and let you try.

22            MR. HEBERT:  We'll confer.  Thank you, Your

23   Honor.

24   BY MR. HEBERT:

25   Q    So let's start at the beginning, Mr. Trende.  You

                      SEAN TRENDE - CROSS

1  testified, I believe, on direct that you had testified in

2  a case in North Carolina challenging a series of voting

3  rights laws, a case called *NAACP v. McCrory*; correct?

4  A    That's correct.

5  Q    All right.  And that was not a redistricting case;

6  right?

7  A    That was not.

8  Q    And you testified for the state of North Carolina in

9  that case?

10 A    That's correct.

11 Q    And they were defending against a Voting Rights Act

12 challenge to a variety of voting rights laws?

13 A    That's correct.

14 Q    All right.  Now, you testified also in a case out of

15 Ohio I believe you said?

16 A    Yes.

17 Q    All right.  And that case was also a case brought

18 challenging some closing of early voting sites under the

19 Voting Rights Act?

20 A    No.

21 Q    What was the subject of that lawsuit?

22 A    It had to do with the number of days of early

23 voting.

24 Q    Days of early voting.  Thank you.  And again, that

25 was a Voting Rights Act challenge to those -- that

SEAN TRENDE - CROSS

1   reduction?

2   A     I think that's right.

3   Q     And the plaintiffs recently prevailed in that case,

4   did they not?

5   A     On one of the counts.

6   Q     All right.  And you testified for the state of Ohio

7   in that case?

8   A     I did.

9   Q     Okay.  And you also mentioned that you testified in

10  a state court litigation involving redistricting in

11  North Carolina; correct?

12  A     I didn't testify.  It was done on the papers.

13  Q     I see.  And I believe you said that your expert

14  report was actually, and I wrote it down, received

15  without objection I believe you said?

16  A     That's correct.

17  Q     Isn't it true that the state of North Carolina

18  simply attached your report to the motion for summary

19  judgment and there was never a trial in that case?

20  A     I don't know.

21  Q     So you didn't testify at trial, did you?

22  A     No.  It was done on the papers.

23  Q     Okay.  And so do you know whether your report in

24  that case was offered into evidence at the trial?

25  A     It was part of the record that was accepted in the

SEAN TRENDE - CROSS

1    federal court version of that, so I assume it is in the

2    record as evidence but...

3    Q    Wouldn't a document attached to a motion for summary

4    judgment be part of the record?

5    A    I don't know.

6    Q    You don't know whether a motion -- you're an

7    attorney; correct?

8    A    I practiced in 2009.  I'm assuming the entire record

9    was transferred, but I didn't see it.

10   Q    And you don't know sitting here today whether your

11   report was accepted into evidence in the trial court in

12   the North Carolina redistricting litigation, do you?

13   A    The state or federal?

14   Q    The state.

15   A    My understanding is that it was accepted without

16   objection.

17   Q    All right.

18   A    As relayed to me by the attorney.

19   Q    Now, in the North Carolina case, the *NAACP v.*

20   *McCrory* case, you testified at trial and characterized

21   yourself as a psephologist; correct?

22   A    Yes.

23   Q    And you testified, I believe, that psephology

24   involved election predictions?

25   A    It's a study of campaigns and elections.

SEAN TRENDE - CROSS

1    Q    Okay.  Now, are there any peer-reviewed journals for

2    psephology?

3    A    Campaigns and elections are studied by political

4    scientists, but there's no journal of psephology just

5    like there's no journal of redistricting.

6    Q    So there's no specifically dedicated journal to

7    psephology.  You would agree with me on that?

8    A    I would agree with you on that.

9    Q    Okay.  Have you ever written an article that was

10   published in a peer-reviewed publication?

11   A    No.

12   Q    Have you ever written about partisan gerrymandering

13   in any peer-reviewed publication?

14   A    No.

15   Q    Can you get a degree in psephology from any

16   university in the United States?

17   A    You can certainly study campaigns and elections as

18   part of a degree in political science, but no, you can't

19   get a degree in psephology.

20   Q    Now, prior to your work on this case, you had never

21   done or studied any writings related to legislative --

22   state legislative districts in Wisconsin; correct?

23   A    I think that's right.

24   Q    Okay.  And prior to your work on this case, you had

25   never done any study or writing about geographic

SEAN TRENDE - CROSS

1    locations of Democratic or Republican voters in

2    Wisconsin; isn't that true?

3    A    I think that's right.

4    Q    Okay.  Now, you do not have a Ph.D.; correct?

5    A    Not yet.

6    Q    Your master's thesis that you wrote was on the

7    Supreme Court; correct?

8    A    That's correct.

9    Q    And it was not on partisan gerrymandering.

10   A    That's correct.

11   Q    It was not on elections.

12   A    No.

13   Q    It was not on geographic clustering.

14   A    It was not.

15   Q    It was not on state legislative redistricting.

16   A    It was not.

17   Q    Your master's thesis hasn't been published anywhere,

18   has it?

19   A    I haven't tried.  It has not.

20   Q    Have you ever taught any undergraduate- or

21   graduate-level classes on statistics or statistical

22   methods?

23   A    I have not.

24   Q    Have you ever taught any undergraduate or graduate

25   classes on election analysis?

SEAN TRENDE - CROSS

1    A    I have not taught any classes.

2    Q    Okay.  Now, you would agree as a general matter that

3    Professor Simon Jackman has greater expertise in

4    statistical analysis than you do, wouldn't you?

5    A    As a general matter, yes.

6    Q    Now, online articles at Real Clear Politics, they're

7    not peer reviewed like political science journals are,

8    are they?

9    A    Oh, no.

10   Q    Now, you've described in your deposition that Real

11   Clear Politics online articles are aimed at a lay

12   audience; correct?

13   A    That's right.

14   Q    Real Clear Politics doesn't have a separate page

15   that's summarizes the outcomes of state legislative

16   races, does it?

17   A    That's correct.

18   Q    Isn't it true that your main focus at Real Clear

19   Politics when you're writing tends to be on federal

20   races, presidential, congressionals, U.S. Senate?

21   A    That's correct.

22   Q    Not -- state legislatives races is not your focus,

23   is it?

24   A    That's not the major focus.

25   Q    Now, you have never been retained by any state or

SEAN TRENDE - CROSS

1  local government to actually draw a redistricting map,

2  have you?

3  A    That's correct.

4  Q    Now, you said in your report, your exhibit,

5  Plaintiffs' Exhibit 126, that you used Adobe Illustrator

6  to draw complete maps of every congressional district

7  ever drawn I believe; is that correct?

8  A    That's correct.

9  Q    All right.  But Adobe Illustrator doesn't contain

10  GIS data or shape files, does it?

11  A    No.  I based it -- I took the data at the back of

12  Kenneth Martis's Atlas of American Congressional

13  Districts where he gives the line-by-line description of

14  the districts and drew it based on those.  And it gives

15  the counties and you weren't allowed to split counties in

16  most states until 1964 or so.

17  Q    So you just took that information and just put it

18  into Adobe and drew the map?

19  A    You draw it by map effectively.

20  Q    I see.  So you didn't use GIS data to draw those

21  maps.

22  A    No.  This wasn't an electronic process or something

23  that was auto generated, these were drawn by hand so you

24  could actually learn the geography and how the maps were

25  drawn.

1  Q     Have you ever used Geographic Information System

2  software to draw a redistricting map?

3  A     I have not.

4  Q     Isn't it true you haven't done that because it's too

5  expensive you said to buy?

6  A     That's my understanding.

7  Q     Now, Judge Crabb asked you some questions about

8  drawing districts when a whole bunch of people move into

9  a particular county.  Do you remember that exchange with

10  the Court?

11  A     I do.

12  Q     Now, isn't it true, if you know, that when you draw

13  redistricting plans, that the first and major priority is

14  to equalize the population of the districts because

15  that's a constitutional requirement?

16  A     In the state legislation you have some wiggle room,

17  but yes.

18  Q     And the wiggle room is plus or minus 5 percent or an

19  overall deviation of 10 percent.  That's the wiggle room

20  you're talking about?

21  A     I think that's right, yes.

22  Q     Now, in your report in this case you did not draw

23  any conclusions, did you, about how you could draw

24  districts in Wisconsin given the alleged clustering of

25  Democratic and Republican voters that you claim exist in

SEAN TRENDE - CROSS

1    the state; correct?

2    A    Can you repeat that question?

3        MR. HEBERT:  Would you read it back for me,

4    please?

5        (Pending question read back)

6    A    So I made general claims that it becomes more

7    difficult to draw maps for Democrats as Democrats become

8    more clustered.  But I didn't engage in the sort of

9    analysis that Dr. Mayer engages in, if that's the thrust

10   of your question.

11   Q    No.  Let me see if I can do a better job of asking.

12   You did not actually set out to try to figure out,

13   notwithstanding the alleged clustering of voters that you

14   claim exist, how you could draw districts in a different

15   way.

16   A    Exactly.  I didn't do the sorts of analyses that

17   Dr. Mayer did.  I didn't draw any actual districts.

18   Q    Now, in your report in this case, Exhibit 126, you

19   did not do any analysis of any kind to determine how much

20   of Wisconsin's efficiency gap is due to alleged

21   concentration of Democratic voters in Wisconsin; correct?

22   A    That's correct.

23   Q    So you don't know sitting here today what percent of

24   the efficiency gap under Wisconsin's current map is due

25   to the concentration of Democratic voters in Wisconsin;

                    SEAN TRENDE - CROSS

1    correct?

2    A    That's correct.

3    Q    Now, you've never done any work to determine how

4    much of the current map's efficiency gap is due to

5    intentional gerrymandering, have you?

6    A    That's correct.

7    Q    You've never done any work to determine how much of

8    the efficiency gap is due to the natural clustering of

9    Democratic voters.

10   A    That's correct.  At least doing a formal -- I think

11   it's more than 0, but as far as doing a formal putting it

12   on the 1-to-100 percent spectrum, I haven't done that.

13   Q    So again, you don't know if 10 percent or 1 percent

14   of the efficiency gap under Wisconsin's current map is

15   due to the concentration of Democratic voters in the

16   state?

17   A    Or 100 percent.  It's very difficult to tease out.

18   Q    You can't determine with any precision; correct?

19   A    That's correct.

20   Q    You've never done any analysis to determine how much

21   of any other measure of partisan symmetry -- and here I'm

22   using terms like partisan bias or mean/median difference

23   or whatever the other measures of partisan symmetry

24   are -- you've never done any analysis to determine how

25   much of any other measures of partisan symmetry is due to

SEAN TRENDE - CROSS

1  alleged clustering of Democrats in Wisconsin; correct?

2  A   That's a lot in that question, but I think the

3  answer is no, I haven't done it.

4  Q   If you didn't understand it, I'll repeat it for you.

5  A   I haven't done a direct analysis of any other metric

6  of partisan symmetry besides the efficiency gap.

7  Q   Okay.  Now, do you believe that the current

8  Wisconsin map for the Assembly was drawn by Republicans

9  with a partisan intent?

10  A   I haven't engaged in that analysis.  I would guess

11  since there was uniform control there was some partisan

12  intent.  It's just trying to quantify it is very

13  difficult.

14  Q   Do you know, in fact, that the congressional map in

15  Wisconsin was drawn with partisan intent?

16  A   Again, I would suspect that there was some partisan

17  intent involved.  I mean the districts are largely

18  reflective of districts that have been in Wisconsin since

19  it lost a seat, I think, in 2000.  But -- and -- but I

20  don't doubt that there was some work done on the lines to

21  shore up Republicans in Obey's district, for example.

22  Q   Now, you gave a deposition in this case, and when

23  you were asked about that question, you, in fact, stated

24  that you knew that partisan intent played a role in the

25  congressional redistricting; correct?

SEAN TRENDE - CROSS

1    A    Like I said, I don't doubt that there was some

2    measure of intent in there.  It's also -- they also do --

3    the districts do reflect longstanding maps.  There's been

4    a northwestern Wisconsin district for a very long time

5    and there still is one.

6    Q    How did you know that partisan intent played a role

7    in developing and enacting the congressional map in

8    Wisconsin?

9    A    That just stems from having followed the

10   redistricting closely.  I didn't interview anyone or

11   anything of that nature.

12   Q    Now, in your report in paragraph 66 to 70 --

13          MR. HEBERT:  And again, for the record your

14   report is Plaintiffs' 126.

15   Q    -- you showed a map of Virginia, the west and

16   southwest, central regions of the state in those

17   paragraphs; correct?

18   A    Which paragraph are we in?

19   Q    Let's look at your report, paragraph 66 to 70.

20   A    Okay.

21   Q    And in those paragraphs you looked -- 66 you talked

22   about -- let's see.  Number 70.  Let's focus on 70.

23   A    Okay.

24   Q    In paragraph 70 you talk about Virginia and focused

25   on the west/southwest/central region of Virginia;

SEAN TRENDE - CROSS

1    correct?

2    A    Correct.

3    Q    And you used that to discuss maps of counties that

4    were won by the presidential candidate in '96, '04, and

5    '08; correct?

6    A    That's right.

7    Q    All right.  You could have done more states than

8    just Virginia; correct?

9    A    That's correct.

10   Q    Why did you just limit it to Virginia?

11   A    Well, I didn't.  There's the map in paragraph 66

12   that includes eight additional states.  I think it's

13   eight.  So that's nine.  I took these maps because I'm

14   under a budget and these were maps I had already done for

15   my book.

16   Q    So you felt it was more efficient use of your time.

17   A    It was an efficient use of my time and it made the

18   point that I thought needed to be made.

19   Q    Now, you did an analysis of geography clustering of

20   Democrats and Republican voters by looking at trends in

21   counties using presidential vote shares; correct?

22   A    Are we still talking about these maps?

23   Q    Yes, we are.

24   A    Yes.

25   Q    And that would hold true for the Texas, Arkansas,

SEAN TRENDE - CROSS

1  Louisiana, Tennessee, Kentucky, Alabama, Mississippi maps

2  you also depicted?

3  A    Yeah.  Let's call it the west/south/central region.

4  Q    Isn't it true that there's not a single

5  peer-reviewed study that has analyzed geographic

6  clustering of Democratic and Republican voters by

7  examining trends in counties won by each political

8  party's presidential candidate?

9  A    I don't know whether that's true or false, but I

10  think it makes the point pretty clearly.

11  Q    All right.  So you don't know one way or the other?

12  A    That's right.  I don't know whether anyone has ever

13  done this.

14        MR. HEBERT:  Could we bring up Exhibit 128 at

15  page 51, which is your deposition, sir.  Lines 6 through

16  11.

17  Q    You were asked the following question:

18      "Question:  Can you identify any peer-reviewed

19  studies that have analyzed the geographic clustering of

20  Democratic and Republican voters by examining trends in

21  counties won by each parties' presidential candidate?"

22        And what answer did you give, sir?

23  A    "No, I can't identify them."  I still can't identify

24  them.  I don't know one way or the other.

25        JUDGE RIPPLE:  Excuse me, Counsel.  What page of

SEAN TRENDE - CROSS

1    the deposition were you on?

2              MR. HEBERT:  That was page 51.  I'm sorry, Your

3    Honor?

4              JUDGE RIPPLE:  Thank you.

5    BY MR. HEBERT:

6    Q    So essentially was it you who came up with the idea

7    and thought it would be good to analyze geographic

8    clustering of Democratic voters in this way?

9    A    Yes.

10   Q    And you weren't writing for a litigation audience

11   when you did that, were you?

12   A    These maps?

13   Q    Yes.

14   A    No.

15   Q    So you don't know whether other political scientists

16   might have methodological problems if they looked at your

17   maps and your analysis --

18   A    Well --

19   Q    -- do you?

20   A    -- having read the reply briefs, there's at least

21   one.  But at the time that I did the maps, no.

22   Q    Now, in each of these maps with the county numbers

23   on them, county shadings, you don't display any margin of

24   victory or quantitative indication, do you?

25   A    That's right.

                    SEAN TRENDE - CROSS

1  Q    All right.  And the reason you didn't do that was

2  because it's time consuming?

3  A    Yes.  These are coded by hand.  It takes a long time

4  to recode these.

5  Q    You didn't take into account the population for each

6  county in the maps you presented for your regional maps

7  as well as your Wisconsin maps because you don't know how

8  to do that, do you?

9  A    Oh, I'm sure I could figure it out in R.  There's an

10 R package for everything.  I just don't think those maps

11 are particularly useful.

12 Q    All right.  Let's turn -- same exhibit, which is 128

13 at page 53, lines 17 to 24.

14 A    Where are we?  I'm sorry.

15 Q    You're going to see your deposition coming up on the

16 screen.

17 A    Gotcha.

18 Q    Page 53, line 17 to 24.  You were asked the

19 following question:

20     "Question:  Why didn't you take into account the

21 population of each county in the maps you presented?"

22     And would you read your answer, please.

23 A    "I don't know how I would do that.  I guess I could.

24 There's a map type that skews the size of the counties.

25 I'm blanking on the term for it, but I find that most

SEAN TRENDE - CROSS

1  people" -- most people -- that's a garbled sentence.  "I

2  find that most people -- I find that for most people are

3  not particularly useful because you lose sight of what it

4  is you're usually looking at.  So I'm sure I could figure

5  out how to do it.  There's a R package for everything.

6  But I don't know how to do it as I'm sitting here."

7      Same answer.

8  Q   Now, before your deposition in this case you had

9  never heard of an analysis called *Global Moran's I*?

10 A   That's correct.

11 Q   And before your deposition or before your appearance

12 in this case, you had never heard of the isolation index;

13 correct?

14 A   That's correct.

15 Q   Now, are you aware of the fact, sir, that these are

16 two of the most widely used measures of spatial

17 concentration in social science?

18 A   I couldn't testify to that one way or the other.

19 Q   Because you don't know; is that correct?

20 A   I have never done any measurement of that sort.

21 Q   I'm not asking you whether you did any measurement.

22 You don't know whether it is in the literature the most

23 common widely used measure.

24 A   Right.  I've never done a measurement of how

25 commonly used the test is, so I don't know the answer to

1   it.

2   Q    Now, you used the partisan vote index to study state

3   legislative districts; correct?

4   A    Correct.

5   Q    And sitting here today, you can't name a single

6   peer-reviewed article that has used a partisan vote index

7   to study or describe state legislative districting?

8   A    That's correct.

9   Q    Isn't it true that there are no peer-reviewed

10  studies that analyze the geographic clustering of

11  Democratic and Republican voters by looking at trends in

12  county partisan indices?

13  A    It's the same as before.  There may be, but I can't

14  identify any.

15  Q    Sitting here today you can't; correct?

16  A    Same answer.  Yes, that's correct.

17  Q    Now, in your report, Plaintiffs' Exhibit 126, at

18  paragraph 25 --

19          MR. HEBERT:  Could you turn to that, please.

20  Q    Now, in this paragraph you indicate that a "simple

21  visual inspection," and I want to put those in quotes --

22  that you use the "simple visual inspection" to evaluate

23  your county partisan index maps; correct?

24  A    Yes.

25  Q    Okay.  Now, you testified in your deposition, in

SEAN TRENDE - CROSS

1   fact, that a court could just look at the map and see the

2   clustering; correct?

3   A    I think these maps are stark enough that yes, it's

4   fairly obvious.

5   Q    And you testified that a court could just look at a

6   map and see the clustering; correct?

7   A    As I said, I think the maps are stark enough that

8   it's fairly obvious to a court.

9   Q    The court could look at it and they would know it

10  when they see it; correct?

11  A    I wouldn't have used those terms, but I think you --

12  if those are the terms that plaintiffs want to use, I

13  don't think -- it's not necessarily I'll know when I see

14  it, but it's there in these maps.  I'm not going to argue

15  with you about -- if we wanted to use an analogy, there's

16  a point at which stubble becomes a beard.  I don't know

17  exactly where that is, but I still know what a beard is

18  and what clean shaven is.

19  Q    Because you know it when you see it?

20  A    There might be close enough -- there might be

21  close-enough calls where you wouldn't know it.  I don't

22  know what the test would be there, but in Wisconsin it's

23  obvious from looking at the maps.

24  Q    When you say it's obvious, you mean by a simple

25  visual inspection?

SEAN TRENDE - CROSS

1    A    Simple visual inspection of the maps.

2    Q    Let's refer to that for a few minutes as the eyeball

3    test.  Okay?  So --

4    A    I'll call it a visual inspection, you can call it an

5    eyeball test.

6    Q    Okay.  Well, my question is -- they mean the same

7    thing in these questions, okay?

8    A    Fair enough.

9    Q    Is the eyeball test that you proposed here the

10   subject of any peer-reviewed literature?

11   A    I don't know if any peer-reviewed literature has

12   relied on an inspection of maps, although I would guess

13   that they have used maps in this manner in the past.  But

14   I don't know.

15   Q    You don't know sitting here today; correct?

16   A    That's correct.

17   Q    Do you know -- you would agree with me though that

18   the eyeball test or the simple visual inspection test

19   does not incorporate a statistically valid metric;

20   correct?

21   A    I think there may be cases where you wouldn't want

22   to do it from a visual inspection where it's hard to

23   tell.  But I think there are cases where it's stark

24   enough as in Wisconsin that you can look at the maps and

25   see exactly what's going on.

1   Q     Well, in order to actually evaluate the specifics of

2   clustering, would you not need to calculate something

3   involving numbers?

4   A     And I do calculate things involving numbers to

5   validate what we see.  But --

6   Q     But the conclusion -- I'm sorry.

7   A     But again, I think in this instance what you see on

8   the maps is stark enough that it's obviously valid.

9   Q     So your conclusion about the clustering is that it's

10  based on looking at the maps; correct?

11  A     Yes.  If you have a state -- you can look at a

12  partisan map of the United States in 1996 when West

13  Virginia went for Bill Clinton by 13 points and it's blue

14  and then look at it today when it went for Mitt Romney by

15  20 points and it's red.  And just by looking at the

16  colors on the maps, you can say yes, the state changed

17  dramatically.  There are instances where it's so dramatic

18  that I think you can just look at a map and determine

19  what's going on, and this is one of them.

20  Q     So let's pull up the map that follows paragraph 84

21  of your report, your report again, Exhibit 126.  At the

22  map at the top that is entitled *Wisconsin County PI 2012*.

23  A     Yes, sir.

24  Q     Do you see that?  Now, there are about ten or so

25  adjacent red counties in the southeast corner of the

SEAN TRENDE - CROSS

1    state?

2    A    That's correct.

3    Q    But you can't identify any clusters of ten very blue

4    counties anywhere in the state, can you?

5    A    No.  That's actually a problem for Democrats.

6    Q    So let's look at paragraph 87.  Again, the map here,

7    this is the 2012 ward map; correct?

8    A    That's correct.

9    Q    And what would you say is the largest single

10   partisan cluster in Wisconsin?  Is it the suburban area

11   around Milwaukee?

12   A    Yes.

13   Q    Now, is that bigger than the cluster around Dane and

14   La Crosse Counties or would you have to measure it?

15   A    I'd say it's bigger because you do get some white in

16   the middle here.

17   Q    But without measuring it, it's hard to say if it is

18   the largest.  Would you agree with that?

19   A    I don't think it's that hard to say actually looking

20   at it.

21   Q    All right.  Let's pull up page 65 of your

22   deposition.  Line 18.

23        MR. HEBERT:  This is Exhibit 128 for the record,

24   Your Honors.  Trende deposition.

25        JUDGE RIPPLE:  So noted.

SEAN TRENDE - CROSS

1  BY MR. HEBERT:

2  Q     Page 65, line 18.  And this is going to continue to

3  spill over to page 66, line 2.

4        "Question:  Looking at the 2012 ward map that goes

5  with paragraph 87, what would you say is the largest

6  single partisan cluster in Wisconsin?

7        "Answer:  Well, there's a large partisan cluster in

8  the southeast in the Republican suburbs."

9        I've read that correctly?

10 A     Yes.

11 Q     Can you move on to the next -- top of the next page.

12 "And that's the largest partisan cluster in this state?"

13 you were asked.  And your answer was "Without measuring

14 it, it's hard to say, but I think it's probably larger

15 than the cluster that's in the southwest around Dane and

16 La Crosse."

17       You gave that answer; correct?

18 A     Correct.

19 Q     So you did indicate that without measuring it, it

20 would be hard to say which cluster was largest.

21 A     Yes.

22 Q     Okay.  Now, in paragraph 89 of your report, you

23 refer to an article by Chen and Rodden.  Do you see that?

24 A     Yes.

25 Q     Okay.  Now -- and then you present a chart from Chen

SEAN TRENDE - CROSS

1   and Rodden's article claiming that the chart shows that

2   there's Democratic clustering; correct?

3   A    I show a chart that shows the relationship between

4   Bush's vote share and population density.

5   Q    Are you looking at the chart --

6   A    Yes.

7   Q    -- at the very top of -- above paragraph 90?

8   A    Yes.

9   Q    Okay.  So does that show -- and you have each state

10  there represented -- I know it's a little hard to read.

11          MR. HEBERT:  Can we blow up Wisconsin perhaps?

12  Q    So do you claim that that chart shows Democratic

13  clustering?

14  A    It shows that as the -- as you get into more urban

15  areas, the Democrats become stronger and in the less

16  urban areas there's less Democratic vote totals.

17  Q    Are you aware that Professor Chen has done an

18  analysis for Wisconsin finding there's no Republican

19  clustering in the state?

20  A    I heard the testimony from Dr. Mayer.

21  Q    Were you aware of it until you heard that?

22  A    I know that there was an amicus brief filed as well

23  that I didn't read.

24  Q    And did -- are you aware of the fact that Professor

25  Chen actually drew hundreds of maps that complied with

SEAN TRENDE - CROSS

1   traditional redistricting principles?

2           MR. KEENAN:  I'm going to object to the line of

3   questioning.  He said he didn't read the report and this

4   report is like -- it was denied entry by the Court and so

5   I don't understand what this line of questioning goes to.

6   If they wanted to hire Chen as an expert, they could have

7   hired him and submitted a report which Mr. Trende could

8   have responded to, but they didn't do that.

9           MR. HEBERT:  I'll rephrase the question.  I

10  think I can clear this up.

11          JUDGE RIPPLE:  Try to do that.

12  BY MR. HEBERT:

13  Q    So you haven't read Chen's article; correct?

14  A    That's correct.

15  Q    Okay.  And you haven't read the --

16          MR. KEENAN:  Object.  I'm sorry, which article?

17          MR. HEBERT:  Okay.  This is the article that I

18  was referencing I thought you objected to.

19          MR. KEENAN:  Well, that's not an article.  That

20  was a report filed with the Court.

21          MR. HEBERT:  This is an article, Your Honors,

22  that's Exhibit 156.  It is a forthcoming article in the

23  *Election Law Journal*, a peer-reviewed journal by

24  Professor Chen, and it was identified in Professor

25  Mayer's testimony.  It's also publicly available on

SEAN TRENDE - CROSS

1  Professor Chen's website.

2          JUDGE RIPPLE:  The Court will accept it subject

3  to a future ruling.

4  BY MR. HEBERT:

5  Q    So since you haven't read it and you haven't read

6  the amicus brief that was submitted, I believe, on his

7  behalf, you're not aware about any contention by

8  Professor Chen that it's possible to draw hundreds of

9  maps that comply with traditional redistricting

10 principles but have a much smaller efficiency gap than

11 the current plan?  You're unaware of that?

12 A    Beyond what Dr. Mayer testified to, I don't know

13 anything about this article or this -- I guess it's a

14 working paper.  There will be an article.

15 Q    I'm sorry, I didn't hear that.

16 A    I guess it's a working paper.  That will be an

17 article when it's published.

18 Q    Now, you also performed an analysis that you called

19 the *nearest neighbor analysis*; correct?

20 A    I called it *median nearest neighbor*, yes.

21 Q    I'm sorry, you call it median nearest neighbor?

22 A    Correct.

23 Q    Okay.  Sorry.  I thought you had the term nearest

24 neighbor in there.  How did you determine which wards

25 lean Democratic and which ones leaned Republican?  Did

                    SEAN TRENDE - CROSS

1  you look at the partisan index in the state for that?

2  A    That's my recollection, yes.

3  Q    Now, you remember that Mr. Keenan, counsel for the

4  state, was asking you questions about your median

5  neighbor analysis; correct?

6  A    Yes.

7  Q    And you testified that wards are held constant

8  within a decade; correct?

9  A    I believe that's correct.

10 Q    But Wisconsin's wards were redrawn prior to the 2012

11 and 2014 elections; correct?

12 A    That's correct.

13 Q    All right.  So Wisconsin's wards were not constant

14 over the entire time period that you studied; correct?

15 A    That's correct.

16 Q    All right.  And you didn't make any adjustments for

17 the new ward boundaries in 2012 or 2014, did you?

18 A    That's correct.

19 Q    So you don't know how your results would change, if

20 at all, if you had actually kept the ward lines constant

21 in your analysis; correct?

22 A    That's correct.

23 Q    Now, you did not take ward size into account in your

24 median neighbor analysis; correct?

25 A    Not directly, no.

                    SEAN TRENDE - CROSS

1  Q    And you're aware that Wisconsin wards vary widely in

2  size; correct?

3  A    Correct.

4  Q    You didn't do any analysis to determine that

5  Republican wards are systematically larger than

6  Democratic wards?

7  A    I didn't do any analysis along those lines, no.

8  Q    So this means that in your analysis, Democrat wards

9  will always be closer to each other than Republican

10  wards, whether it's because they're clustered or because

11  it's a function of the ward area; correct?

12  A    Well, that's part of the problem is that they're

13  clustered into these tiny precincts in the city which

14  makes it harder to draw districts for them.  And of

15  course I also look at change over time, which matters.

16  But no, I didn't directly do the analysis you're talking

17  about.

18  Q    Okay.

19       MR. HEBERT:  May I have a moment, Your Honor?

20       JUDGE RIPPLE:  Please.

21  BY MR. HEBERT:

22  Q    Now, in your report you discussed a set of 17 plans

23  in Professor Jackman's original report that are "utterly

24  unambiguous with respect to the sign of the efficiency

25  gap estimates recorded over the life of the plan."

SEAN TRENDE - CROSS

1       Do you remember that?

2   A    Where are we?

3   Q    I'm sorry.  In your report, you actually discuss the

4   set -- this was questions from Mr. Keenan.  He asked you

5   about the set of utterly ambiguous -- paragraph 109 I

6   think of your report there was a table?

7   A    And I'm not trying to slow things down.  You had a

8   quote and I wanted to make sure that --

9            JUDGE RIPPLE:  Let's let the witness focus on

10  the paragraph.

11           MR. KEENAN:  I believe it's utterly unambiguous

12  as to sign.  I think you said ambiguous.

13           MR. HEBERT:  Must be my pronunciation.  Sorry.

14           THE WITNESS:  I see unambiguous history.  Maybe

15  the utterly is in there, but I don't see it.

16  BY MR. HEBERT:

17  Q    Now, that's Professor Jackman's original report that

18  uses the unambiguous language; correct?

19  A    I believe that's right.

20  Q    Now, in his report you realize that that's a set of

21  plans for which the probability, according to Professor

22  Jackman, that the efficiency gap has the same sign over

23  the life of the plan is 100 percent; correct?

24  A    That's correct.

25  Q    And it's also true that Professor Jackman never

SEAN TRENDE - CROSS

1  states that those plans were enacted with discriminatory

2  intent, does he?

3  A    I don't believe he does, but I think that's still a

4  problem with the test is a national test.

5  Q    Now, he never states that these plans, Professor

6  Jackman that is, never states in his analysis that these

7  plans exceeded any efficiency gap threshold in the first

8  election, does he?

9  A    I don't recall that.

10 Q    And do you know whether Professor Jackman never

11 states that these plan -- these efficiency gaps can't be

12 justified by legitimate considerations?

13 A    Oh, they may well be, but half of the plans that are

14 unambiguous I think are patently justifiable and so it

15 just makes me question the utility of the metric if half

16 of what it finds have unambiguous efficiency gaps are

17 pretty clearly not gerrymanders.

18 Q    Let me see if I can focus my question a little

19 better.  Professor Jackman in his report never stated

20 that the plan's efficiency gaps can't be justified by

21 legitimate considerations, does he?

22 A    No, because I think there's a missing nexus -- this

23 illustrates what I think is a missing nexus between the

24 efficiency gap and gerrymandering.

25 Q    I understand your position.  I just asked whether he

did or not.  Now, isn't it true that Professor Jackman

never uses the term gerrymander or gerrymandering with

reference to these 17 plans?

A    I have -- I don't know whether that's true.

MR. HEBERT:  And Your Honor, the record on that

will show Professor Jackman's report, which is Exhibit 34

at paragraph 53.

JUDGE RIPPLE:  So noted.

MR. HEBERT:  I'll now move on.

BY MR. HEBERT:

Q    Now in your report, Exhibit 126, Plaintiffs'

exhibit, you refer to these 17 plans as states that would

be included in the definition of a gerrymander, don't

you?  It's paragraph 109.

A    Correct.

Q    And in paragraph 110 you refer to this set of plans

as a list of gerrymandered districts, don't you?

A    Gerrymander states.

Q    Gerrymander states.  I'm sorry.  Correct.  And you

also refer in paragraph 111 that these plans, you refer

to them as "poor candidates for gerrymanderers"; don't

you?

A    At least as commonly understood, yes.

Q    And you also refer to these plans in paragraph 114

of Exhibit 126 as potential gerrymanders, don't you?

SEAN TRENDE - CROSS

1    A     Correct.

2    Q     Now, Professor Jackman's reports in this case

3    address only state House plans across the country;

4    correct?

5    A     Correct.

6    Q     And Professor Mayer's reports in this case address

7    only Wisconsin state House plans; correct?  Not

8    congressional plans?

9    A     Correct.

10   Q     And in paragraphs 115 to 124 of your report, Exhibit

11   126, you only discuss in those paragraphs congressional

12   maps; correct?

13   A     That's correct.

14   Q     And in fact, in those paragraphs you discuss ten

15   separate congressional maps and not a single state House

16   plan; correct?

17   A     I will accept that there's ten.

18   Q     Okay.  Now, you're familiar with -- I believe you

19   testified that you're familiar and have read the

20   Stephanopoulos and McGhee article?

21   A     Yes.

22   Q     Okay.

23          MR. HEBERT:  That's Exhibit 141, Your Honor.

24   And I have a series of questions about that.  It's

25   actually the quote, for the record, is page 868 that I'll

SEAN TRENDE - CROSS

1  be referring to here.

2  Q     Now in that article it states "We considered

3  congressional plans only for states that had at least

4  eight districts at some point during this period because

5  redistricting in smaller states has only a minor

6  influence on the national balance of power."

7        Correct?

8  A     I'll accept your characterization.

9  Q     But in paragraph 115 of your report, you discuss

10 Alabama's plan which had only seven congressional

11 districts; correct?  Less than the eight threshold that

12 they mentioned in their article.

13 A     That's correct.

14 Q     Okay.  And in paragraphs 116 and 122, you discuss

15 Colorado's 2010 plan which both had only seven

16 congressional districts; correct?

17 A     That's correct.

18 Q     And in paragraph 119, in discussing Iowa's map, they

19 only had five districts in Iowa; correct?

20 A     In 2002, yeah.

21 Q     Okay.  Now, in that same article Stephanopoulos and

22 McGhee write "We report the efficiency gap --

23        MR. HEBERT:  And again, this is at 868 to 869.

24 Q     "We report the efficiency gap in seats for

25 congressional plans and in seat shares for state House

SEAN TRENDE - CROSS

1  plans."

2      You don't disagree with that, correct, that that's

3  what the article states?

4  A    I'll assume that you're reading it correctly, yes.

5  Q    And they also stated that what matters in

6  congressional plans is their impact on the total number

7  of seats held by each party at the national level;

8  correct?  You don't disagree with that?  You don't

9  disagree that that's what the article says?

10  A    I see that here in the call out, yes.

11  Q    Conversely state Houses -- this was continuing on

12  with the article, "State Houses are self-contained bodies

13  of varying sizes for which seat shares reveal the scale

14  of a parties' advantage and enable temporal and spatial

15  comparability."  Correct?  That's what the article says?

16  A    Correct.

17  Q    And then they also write, and I believe this is on

18  page 887, that "We recommend setting the bar at two seats

19  for congressional plans."

20  A    Correct.

21  Q    Are you reading that?  Okay.  Now, in paragraphs 115

22  to 124 of your report, Exhibit 126, you don't report

23  efficiency gaps in terms of actual seats; correct?

24  A    No.

25  Q    You report it only in percentage points; correct?

SEAN TRENDE - CROSS

1    A    That's right.  So if the Court were to adopt a

2    different standard for states and congressional seats,

3    then it wouldn't look at the negative .07 to .07 cutoff,

4    although the signs are often going differently than you

5    would expect as well.

6    Q    Let's look at the math for a minute, Mr. Trende.

7    Let's start with your statement in paragraph 115 that

8    Alabama's congressional plan had an efficiency gap of

9    minus 12.5 percent in 2002.  Do you see that?

10   A    Yes.

11   Q    Now, if you multiplied that by the seven

12   congressional seats, do you know what that would

13   translate into for an efficiency gap?  Do you have your

14   calculator with you?

15   A    We'll call it less than a seat.

16   Q    0.9 seats.

17   A    That sounds right, although the sign is still going

18   the opposite way of what you would expect.

19   Q    But that's below the Stephanopoulos and McGhee's

20   two-seat threshold, isn't it?

21   A    It's below the two-seat threshold, but it's still

22   showing an obvious Democratic gerrymander as having a

23   Republican gap.

24   Q    Let's take another state.  We won't belabor this,

25   but let's take one more state.  Colorado, paragraphs 116

SEAN TRENDE - CROSS

1   and 122 of your report.

2   A    That's right.

3   Q    And you report that Colorado's plans had an

4   efficiency gap of minus 9 percent in 2002 and minus 9.9

5   percent in 2012?  This is paragraph 116 and 122, sir.

6   A    Oh, 122, yes.

7   Q    Do you agree?

8   A    Yes.

9   Q    Now, multiplied by Colorado's seven congressional

10  seats, those would translate into efficiency gaps of

11  minus 0.6 seats and minus 0.7 seats; correct?

12  A    Right.  So if you had -- if you utilized a different

13  test for congressional districts and state House

14  districts, these wouldn't invite court scrutiny, although

15  you still have Democrat gerrymanders that are showing

16  Republican efficiency gaps.

17  Q    We could repeat this exercise for all of the other

18  congressional efficiency gaps in your reports, paragraphs

19  115 to 124.  For example, in Georgia if we did the same

20  calculation, we would come out with minus 0.1 seats,

21  Illinois minus 1.7 seats, Iowa minus 1.0, North Carolina

22  minus 0.3, Arizona 1.4, Illinois 1.0 in 2012, and

23  Pennsylvania in 2006 and 2008 minus 4 percent -- I'm

24  sorry -- minus 0.8 seats in '06 and plus 0.6 seats in

25  2008.  You wouldn't disagree with those numbers as they

SEAN TRENDE - CROSS

1  would come out based on the calculation we've been

2  employing; correct?

3  A    It doesn't, but I think in at least one instance

4  here it's a little misleading because in paragraph 123,

5  for Illinois in 2011 my point is actually that everyone

6  agrees that's a Democrat gerrymander, yet it doesn't

7  trigger court scrutiny.  So the fact that it doesn't

8  trigger court scrutiny under the seats metric either

9  doesn't change the analysis.

10  Q    When you say *court scrutiny*, do you mean in the

11  legal sense?

12  A    As I understand it, if it's a two-seat standard,

13  Illinois would not meet that standard in 2011 whether

14  you're using the seat standard or the .07/07 cutoff, and

15  that's a problem.

16  Q    So, in fact, sitting here today, you can't identify

17  a single congressional efficiency gap in any of those

18  paragraphs, 115 to 24, that exceeds the two-seat

19  threshold when it's converted from percentage points to

20  seats; correct?

21  A    But that's a problem because a lot of these are

22  obvious gerrymanders.  It's the -- you're proving that

23  the metric is underinclusive.

24  Q    But none of those states that we just mentioned, if

25  you could answer my question, none of those sitting here

SEAN TRENDE - CROSS

1    today, you can't identify a single efficiency gap that

2    exceeds the two-seat threshold identified by

3    Stephanopoulos and McGhee; is that correct?

4    A    The answer is that's correct and that's a problem.

5    You're proving my point that the efficiency gap is

6    underinclusive because these should be gerrymanders.

7    Everyone agrees they're gerrymanders.  They're obvious

8    gerrymanders.  Even the *Veith v. Jubelier* map, which the

9    Supreme Court said was written as it was partisan

10   redistricting plan, doesn't come out as gerrymander under

11   your standard.

12       In 2008, the efficiency gap points the wrong way.

13   It points as if it has a Republican lean.  That's the

14   problem with the efficiency gap as a national standard.

15   Q    In the Stephanopoulos and McGhee article, Exhibit

16   141, they constructed models to estimate party vote

17   shares in uncontested districts, didn't they?

18   A    That's correct.

19   Q    And in this case Professor Jackman also constructed

20   models to estimate party's vote shares in uncontested

21   districts, didn't he?

22   A    That's my understanding.

23   Q    And Professor Mayer similarly constructed a model to

24   estimate the party's actual votes in uncontested

25   districts; correct?

SEAN TRENDE - CROSS

1    A      They did.

2    Q      Okay.  Now, when you were faced with uncontested

3    congressional districts, you didn't create any kind of a

4    model, did you?

5    A      I used presidential vote shares.  I would have liked

6    to have used Dr. Jackman's metric.  But again, I didn't

7    get the files I needed to make the R code work until

8    Friday.

9    Q      Well, this is congressional we're talking about.

10   A      Oh, I know.

11   Q      Okay.  You literally just took the districts'

12   presidential vote shares and just plugged them in;

13   correct?

14   A      That's right.

15   Q      You didn't make any adjustment whatsoever to the

16   presidential vote shares before using them to calculate

17   efficiency gaps, did you?

18   A      Correct.

19   Q      Now, it's true, isn't it, that there can be voter

20   roll off from presidential to the congressional level?

21   A      That's right.

22   Q      It's also true voters might have different

23   presidential and congressional preferences.  You might

24   vote for one party for president and a different party

25   candidate for congressional; correct?

SEAN TRENDE - CROSS

1    A    It's much less common today than in the past.  I

2    think the plaintiffs' reports demonstrate that.  But yes,

3    it's possible.

4    Q    Now, political scientists -- tell me if you can

5    answer this question.  Maybe not.  Political scientists

6    take presidential results and use them as the input to a

7    regression model that predicts the outcome of uncontested

8    congressional races; correct?

9    A    Yes.

10   Q    Okay.  Indeed in the political science literature

11   that's the preferred approach; correct?

12   A    Yes.

13   Q    And that was the approach employed by Professor

14   Jackman in his report, Exhibit 34; correct?

15   A    That's correct.

16   Q    But presidential results simply can't be plugged in

17   without making any adjustments, can they?

18   A    I don't know.  As I said at the time when I was

19   writing this, I thought that maybe what Dr. Jackman was

20   doing was plugging them in because I didn't have the data

21   to replicate it and I didn't think it was obvious from

22   his report.

23   Q    But you just agreed with me, I thought, that he used

24   the presidential results as an input to create a

25   regression model that predicted the outcome of

SEAN TRENDE - CROSS

1  uncontested congressional races.

2  A    That was my understanding after the deposition and

3  after receiving the dataset on Friday and doing some

4  exploration through it.

5  Q    Presidential results simply can't be plugged in

6  without making any adjustments, but that's exactly what

7  you did; correct?

8  A    I don't know whether they can't be directly plugged

9  in.  I know that's not what Dr. Jackman did.

10  Q    So -- now this may take a few minutes.  Let me see

11  if I can find the exhibits and everything and go through

12  this.  But Mr. Trende, you remember that Mr. Keenan

13  walked you through a lengthy series of PVI calculations?

14  A    That's correct.

15  Q    You'll need your computer for this so you may want

16  to pull that out.

17        MR. HEBERT:  If we could pull up paragraph 281,

18  the stipulated facts in the joint pretrial report.  I'm

19  not going to go through the long slog.  And I am winding

20  down, for the Court's information.

21        MR. KEENAN:  What paragraph?

22        MR. HEBERT:  281.  Paragraph 281, please.  May I

23  approach the paper on the side, Your Honors?

24        JUDGE RIPPLE:  Yes.

25        MR. HEBERT:  Your Honor, I've asked my

SEAN TRENDE - CROSS

1  co-counsel to stay there so I don't have to come back and

2  forth and maybe speed this up a little bit, with the

3  Court's permission.

4  BY MR. HEBERT:

5  Q    So can you write -- can you tell us, Mr. Trende,

6  what you calculated for Dane and Milwaukee Counties, the

7  PVI's that you calculated for those two counties in the

8  most recent presidential election 2012?  That's the year

9  we're going to focus on.

10  A    So I hope you'll correct me if I'm wrong because

11  this isn't the most organized table I made, but I believe

12  2012, Dane County, was D plus 20.1 and Milwaukee was D

13  plus 16.

14  Q    Correct.  Okay.  So let's write Dane plus 20.1 or

15  20.1 percent and Milwaukee you said 16.3 percent, I

16  think?

17  A    Sure.  Yes.  I jotted down 16, but I'll accept 16.3.

18  Q    Now, can you calculate the 2012 PVI for Ozaukee

19  County?  And Ms. Harless will write it on the board for

20  us.

21  A    So you take 19,159 and you divide by 55,236, and so

22  President Obama won 34.6 percent of the vote in Ozaukee.

23  And then you subtract out his national vote total of

24  51.96 and it comes out to R plus 17, I believe.  We can

25  say 17.3.

Q     17.3.  Correct.  Exactly.  Now, can you calculate
the 2012 PVI for Washington County and write it on the
board -- we'll have her write it on the board.

A     So you take President Obama received 23,166 and you
divide it by the total two-party vote of 77,931 and you
come up with President Obama winning 29.7, et cetera,
percent of the vote and you subtract out .5196.  And I
believe that would be then R plus 22.2?

Q     Correct.

        MS. HARLESS:  Say it again.

        THE WITNESS:  22.2.

BY MR. HEBERT:

Q     And now the last one I want you to calculate is the
2012 PVI for Waukesha County.

        MR. HEBERT:  And though I'm not from Wisconsin,
I hope the Court appreciates I've worked hard on my
pronunciation of those counties.

A     Always seems to be at the enter of things in this
state.  241 -- so you divide 78,779 by 241,577 and you
come up with President Obama winning 32.6 percent of the
vote.  You subtract out again 51.96 and you come up with
PVI Republican 19.3.

Q     Correct.  So looking at this chart that we have
here, it's true, isn't it, that in 2012, Washington
County had the largest PVI of this set of five counties;

                    SEAN TRENDE - CROSS

1   correct?

2   A     This set of five, yes.

3   Q     And it was a pro-Republican PVI; correct?

4   A     Correct.

5   Q     And it's also correct, isn't it, that in 2012

6   Ozaukee and Waukesha Counties had larger PVI's than

7   Milwaukee County; correct?

8   A     Yes.

9   Q     And that these PVI's were pro-Republican.

10  A     That's correct.

11  Q     Now, one final question.

12        MR. HEBERT:  We're going to mark that as the

13  next exhibit, which is Plaintiffs' Exhibit 497, Your

14  Honors.  And we'll put a sticker on that, take a picture

15  of it so we have it electronically, and we will move that

16  into evidence at the appropriate time.

17  Q     One final question, sir.  You're being paid $300 an

18  hour for your testimony; correct?

19  A     That's correct.

20        MR. HEBERT:  Thank you.  No further questions.

21        JUDGE RIPPLE:  Thank you, Counsel.  (11:52 a.m.)

22        MR. KEENAN:  I have some redirect and then I

23  think for just housekeeping I should formally move,

24  although I understand there will be objections to the

25  exhibits, formally move into evidence Exhibit 547,

SEAN TRENDE - CROSS

1  Mr. Trende's report; Exhibits 576 and 577, those were the

2  maps of the highest 10 percent Democrat and highest 10

3  percent Republican wards; and Exhibits 578 and 579 were

4  the revised tables calculating the average partisan lean

5  of wards for both parties.  We've discussed these before,

6  I just hadn't formally moved them in.

7          MR. HEBERT:  And those are the ones, Your Honor,

8  we've objected to and they're largely incorporated also

9  by the *Daubert* motion as well as the cross-examination

10 today.

11         JUDGE RIPPLE:  That is correct, and they will be

12 decided in due course.

13                REDIRECT EXAMINATION

14 BY MR. KEENAN:

15 Q    I'm just going to take off from this here.  Can you

16 start a running tally here?  How many -- what's the total

17 votes that were cast in Waukesha in 2012 election, the

18 two-party vote total in the column?  We're on

19 paragraph --

20 A    281.  Can you bring the exhibit back up?

21 Q    This is the stipulated facts and we're in paragraph

22 281, the long table.  Let's go down to Waukesha at the

23 bottom.  It's like two pages down.  What's the total

24 vote, the two-party vote total there?

25 A    Waukesha is 241,577.

                    SEAN TRENDE - REDIRECT

1   Q    Why don't you write that down on your paper.  We're

2   going to do some addition here.

3   A    Got it.

4   Q    What is Washington County's two-party vote total?

5   A    Washington is 77,931.

6   Q    And then let's move up a page to Ozaukee.  I was not

7   originally from here, now I am, so I know how to

8   pronounce them.  What's the vote total in Ozaukee County?

9   A    55,236.

10  Q    Can you add those all together?

11  A    I come up with 374,744.

12  Q    Okay.  Now let's shift to the Democratic side.  Can

13  you go up to the Milwaukee County total votes?  What's

14  that?

15  A    Milwaukee County is 487,362.

16  Q    Then can you -- we'll go up a page to Dane County.

17  What's the two-party vote total there?

18  A    299,715.

19  Q    And when you add those two together, what do you

20  get, Dane and Milwaukee?

21  A    787,077.

22  Q    And then what do you get for the three Republican

23  Counties?

24  A    It was 374,744.

25  Q    Let's do it again.  Let's add just the Democratic

SEAN TRENDE - REDIRECT

1    vote totals in Dane and Milwaukee; not the two-party,

2    just the Democrat votes.

3    A    So 216,071 plus 332,438 and you come up with 548 --

4    or I come up 548,509 votes.

5    Q    Then why don't you add the Republican votes that are

6    in Ozaukee, Washington and Waukesha Counties.

7    A    So Ozaukee is for Republicans 36,077, plus crucial

8    Waukesha County 162,798, plus Washington County 54,765,

9    you come up with 253,640.

10   Q    So that shows there's more than twice as many

11   Democratic votes in Madison and Milwaukee than in all

12   three of those Republican counties?

13   A    That's correct.

14   Q    Okay.  Let's move on.  You were asked some questions

15   about your qualifications and you said you don't have a

16   Ph.D. yet.  What were you referring to there?

17   A    I'm enrolled in Ohio State University's political

18   science Ph.D. program.

19   Q    Have you started your classes yet?

20   A    I have not.

21   Q    When are you going to start?

22   A    In the fall.

23   Q    When would you expect to complete that program?

24   A    Hopefully in four years.

25   Q    Why did you decide to get your Ph.D.?

SEAN TRENDE - REDIRECT

1    A     Just because the field of election analysis,

2    especially online, is becoming more Ph.D. heavy.  We're

3    getting people like Dr. Jackman working with pollsters.

4    So Real Clear Politics thought to keep up we would need

5    to have some Ph.D -- I'm also getting as part of the

6    program a master's in applied statistics.

7    Q     And what do you intend to do after you get your

8    Ph.D.?  Are you going to do any sort of different work?

9    A     I'm going to continue to write for Real Clear

10   Politics.

11   Q     Now, Real Clear Politics, what type of readership do

12   your articles have on that website?

13   A     We get between two million and seven million page

14   views a day.

15   Q     And then is Real Clear Politics -- why don't you

16   just explain what it is in terms of a business, not just

17   a website.

18   A     So that's the common misconception.  I probably

19   shouldn't have presented it as a website because that

20   kind of gives a certain feel.  We're a company of 60

21   people, employees.  We have offices on K Street.  The

22   employees get salary, benefits, full package.

23   Q     You were asked some questions about serving as an

24   expert for the state as a defendant in some other cases.

25   Would you have any issue representing a plaintiff in a

                        SEAN TRENDE - REDIRECT

1  case against the state?

2  A    Absolutely not.  And if I could testify truthfully

3  to the matters that I was asked to testify, zero.

4  Q    Have you made any political donations this year?

5  A    I donated in Hillary Clinton.

6  Q    We were -- Mr. Hebert went through a series of

7  congressional districts in your report and then comparing

8  it to the Stephanopoulos and McGhee article.  Do you

9  recall that testimony?

10 A    That's right.

11 Q    Do you think the fact that there's a -- that

12 Stephanopoulos and McGhee set out a different test based

13 on seats rather than on a strict number with respect to

14 congressional seats affects your analysis of the

15 efficiency gap using congressional elections?

16 A    It doesn't, because in most instances the point was

17 that these maps that we agree are gerrymanders didn't

18 trigger scrutiny.  Now, if you use the state legislative

19 standard, a lot of times they trigger scrutiny going the

20 opposite direction.  But even if they don't trigger -- in

21 other words, you have a Democrat -- under the state

22 legislative test, a lot of these maps, these

23 congressional maps that were drawn by Democrats would

24 draw scrutiny as a Republican gerrymander.  Even if you

25 adopt a different test, the point still remains that

1    these are Democratic gerrymanders that don't draw any

2    scrutiny.  They don't meet their standard as they ably

3    pointed out.

4    Q    And there was some questions about imputations.  Do

5    you think your use of just presidential vote share

6    instead of regression model that impute the congressional

7    vote share based on the presidential vote share would

8    affect that conclusion?

9    A    I don't believe it was because there's just kind of

10   off -- there's discrete districts where it makes a

11   difference, but I don't think it changes the overall

12   efficiency gap or it could make a difference.

13   Q    And then Mr. Hebert ended up going to part of your

14   report, if we could turn to 547, paragraph 123, that we

15   hadn't gone over.  And you were making a slightly

16   different point with this paragraph and I wanted to let

17   you just explain what you were referring to with respect

18   to this 2011 Illinois plan.

19   A    I'm sorry, which -- I'm sorry, which page are we on?

20   Q    123 is it?

21   A    So Illinois is a map where again virtually everyone

22   would agree it's an aggressive Democratic gerrymander.

23   The *Almanac of American Politics* reports that under heavy

24   pressure from party leaders, desperate to offset

25   Republican gains in other states, Democrats on May 11

SEAN TRENDE – REDIRECT

1    released a map designed to eliminate up to six Republican

2    seats.  And Republicans were unhappy about this.  Yet you

3    get an efficiency gap of plus 0. or .058 which doesn't

4    trigger scrutiny, and as we noted, wouldn't trigger

5    scrutiny under a congressional seat analysis either.

6    Q    Okay.  So why is that a problem?

7    A    Because this is something -- you know, if we're

8    trying to design a test for gerrymanders, we want to be

9    able to capture what happened in Illinois.  Because

10   everyone agrees that's a gerrymander, but the efficiency

11   gap doesn't capture it.  It would never get subjected to

12   court scrutiny.  It would get a pass.

13           MR. KEENAN:  There's all my questions.

14           MR. HEBERT:  May I have one minute? (12:03 p.m.)

15           JUDGE GRIESBACH:  Mr. Trende, every election we

16   hear that --

17           MR. HEBERT:  I'm sorry?

18           JUDGE GRIESBACH:  I didn't mean to interrupt.

19           MR. HEBERT:  I didn't mean to distract you.

20           JUDGE GRIESBACH:  Mr. Trende, every year we hear

21   that the election will be determined by Independents.  No

22   one ends up voting for Independents, that's not -- maybe

23   this year we'll see something different.  I know some

24   states want to do none of the above.  But how -- you

25   know, this is a binary determination.  It's either

SEAN TRENDE - REDIRECT

1   Republican or Democrat.  But how many people identify

2   themselves?  Is there a statistic that shows how many

3   people identify themselves as Independents?  And then

4   what is the significance of that in this determination of

5   what is a, you know, of partisan gerrymandering?

6        THE WITNESS:  So that's something that's

7   difficult to sort out.  I mean if you look at the exit

8   polls, there's a fairly -- and polling in general, about

9   a third, you know, quarter of the country

10  self-identifies.

11       JUDGE GRIESBACH:  As Independents.

12       THE WITNESS:  As Independents.  But what we find

13  and what political scientists have found is that most of

14  these people really aren't Independents.

15       JUDGE GRIESBACH:  They're lying.

16       THE WITNESS:  Well, some of the standard

17  supporters will identify as Independents, but that

18  doesn't mean they're swing voters.  They just think the

19  Democratic Party is too moderate.  You'll get some on the

20  right who are the same.

21      And then there are people who are Independents, but

22  they're maybe, you know, two ticks leftward of the

23  Republican Party.  So when push comes to shove, they're

24  open to a Democratic candidate, but they're going to vote

25  for the Republican most of the time.  You end up with a

SEAN TRENDE - REDIRECT

1   slice of maybe 10 percent of the electorate that's truly

2   Independent.  And it does make this sort of, you know,

3   trying to project out on the basis of political

4   orientation difficult.  It's very hard to untangle that.

5            MR. HEBERT:  Just a couple of recross questions.

6                    RECROSS-EXAMINATION

7   BY MR. HEBERT:

8   Q    Do you know, Mr. Trende, what Illinois's

9   congressional efficiency gap was in 2010?

10  A    I don't know in 2010.

11  Q    Do you know that in 2010 the Stephanopoulos and

12  McGhee article calculated a congressional efficiency gap

13  for Illinois of 3. -- minus 3.4 seats?

14  A    Well, that's a problem because in 2002 it was a

15  joint plan between Republicans and Democrats.  That

16  should have been a neutral plan and yet you're subjecting

17  it to court scrutiny.

18  Q    Did you know that Stephanopoulos and McGhee

19  calculated a congressional efficiency gap in Illinois of

20  0.5 seats in 2012?

21  A    I didn't know how they calculated it.  But as I

22  understand, that still doesn't trigger scrutiny even

23  though it's a Democratic gerrymander.

24  Q    So the change in the efficiency gap, in the

25  congressional efficiency gap for Illinois, is actually

                  SEAN TRENDE - RECROSS

1    about plus four seats?

2    A    That's right.   That's right.   But it's not enough to

3    trigger scrutiny under your plan.

4    Q    Now, you indicate in response to a question on

5    redirect from counsel for the state that you had made a

6    contribution to Hillary Clinton?

7    A    That's correct.

8    Q    Now, according to *opensecrets.org*, you've made four

9    other campaign contributions in '07 for a candidate named

10   Oganowski?

11   A    That's right.

12   Q    And in 2000 you made a contribution to the George W.

13   Bush campaign?

14   A    I had no idea I had done that in 2000, but I'll

15   accept that.

16   Q    And in 2008 you gave money to John McCain?

17   A    And Rudy Giuliani.

18   Q    And Rudy Giuliani in 2007 according to

19   opensecrets.org.   You don't dispute any of that?

20   A    No.

21   Q    And they're all Republican candidates?

22   A    People might bicker on Giuliani/McCain, but in 2008

23   they were running under the Republican banner.

24   Q    When you donated to them, you donated to them and

25   they were running as Republicans; correct?

SEAN TRENDE - RECROSS

A    Very moderate to liberal Republicans, which is what

appealed to me.  But yes.

Q    Now, just one last question.  In between 2000 and

2012, the presidential elections that you voted in,

you've only voted for Republicans; correct?

A    At the presidential level.  At the gubernatorial and

Senate level I've tended to vote Democrat.

          MR. HEBERT:  That's all I have, Your Honors.

Thank you.

          JUDGE RIPPLE:  Thank you.  I think we are then

finished with the witness.

          MR. KEENAN:  Yes, we are.

          JUDGE RIPPLE:  And you may step down, sir.

Thank you for your testimony.

     (Witness excused at 12:08 p.m.)

          MR. KEENAN:  Do we call our next witness?  I

don't know if it's easier to break a little bit early for

lunch and come back early or we put him on right away.

Or if want to just start and just put him on.

          JUDGE RIPPLE:  How long do you anticipate this

witness?

          MR. KEENAN:  I think it would be a similar

amount to what we've seen with Mr. Trende.

          JUDGE GRIESBACH:  Why don't you start.  Start

back up, please.

                    SEAN TRENDE - RECROSS

1          JUDGE RIPPLE:  We would like to start, please.

2          MR. KEENAN:  The defendants call Nicholas

3     Goedert.

4          **NICHOLAS GOEDERT, DEFENDANTS' WITNESS, SWORN,**

5          JUDGE RIPPLE:  Good afternoon, Mr. Goedert.

6          THE WITNESS:  Good afternoon, Your Honor.

7                    DIRECT EXAMINATION

8     BY MR. KEENAN:

9     Q    Good afternoon.  Could you just state and spell your

10    name for the record, please.

11    A    My name is Nicholas Goedert.  Nicholas spelled N-i-h

12    -- N-i-c-h-o-l-a-s.  Last name is spelled G-o-e-d-e-r-t.

13    Q    And I notice you took a piece of paper up to the

14    podium with you.  Can you just identify what that is?

15    A    This is a copy of my report.

16    Q    Okay.

17    A    It was submitted on December 2nd of 2015.

18         MR. KEENAN:  And that has been marked as Exhibit

19    546.

20    Q    Dr. Goedert, what's your current employment

21    position?

22    A    I am currently completing a term as a visiting

23    professor of government and law at Lafayette College in

24    Easton, Pennsylvania.

25    Q    What do you do in that position?

                    NICHOLAS GOEDERT - DIRECT

1  A     I do political science research and also I teach

2  classes in American politics and constitutional law.

3  Q     What will you be doing next year?

4  A     I will be beginning a position as an assistant

5  professor at Virginia Tech in the political science

6  department.

7  Q     Is that a tenured-track position?

8  A     It is a tenured-track position, yes.

9  Q     What do you expect to be doing -- types of classes

10 do you expect to start teaching next year at Virginia

11 Tech?

12 A     I expect it to be similar to what I was teaching at

13 Lafayette with the exception I will also be teaching

14 statistical and research methods in political science.

15 Q     Okay.  Let's go backwards a little bit.  And where

16 did you go to college?

17 A     I got my undergraduate degree at Harvard University.

18 Q     What did you study there?

19 A     I majored in a field called social studies, which is

20 in interdisciplinary honors major where you take classes

21 in a number of different subjects but also take

22 specialized seminars in political and social theory and

23 write a senior honors thesis.

24 Q     What year did you graduate?

25 A     I graduated in 2001.

NICHOLAS GOEDERT - DIRECT

1    Q    And what did you do after graduating from Harvard?

2    A    I worked for two years in Washington D.C. working

3    for a political polling firm doing writing and analyzing

4    polls for mostly Democratic Senate and gubernatorial

5    candidates.  Also the presidential campaign of John

6    Edwards.

7    Q    Following that what did you do?

8    A    I attended law school at Georgetown University Law

9    Center.

10   Q    When did you graduate from Georgetown Law?

11   A    2006.

12   Q    What did you do after law school?

13   A    For one year after law school I worked as a

14   legislative analyst and bill drafter for the Maryland

15   General Assembly, which was a nonpartisan position, a

16   nonpartisan bureau.

17   Q    Then did you go out and do some further graduate

18   education?

19   A    Yes.  I received a Ph.D. in political science at

20   Princeton University where -- I suppose it's called

21   politics at Princeton University.  Also an incidental

22   master's degree as part of that process.

23   Q    And what year did you get that degree?

24   A    The Ph.D?

25   Q    Correct.

NICHOLAS GOEDERT - DIRECT

1    A    2012.

2    Q    What did you -- did you have a focus of your study

3    at Princeton in the political science department?

4    A    I focused in American politics and formal and

5    quantitative methods, basically statistics and game

6    theory.  I wrote my dissertation on legislative

7    redistricting, various aspects of that.

8         MR. HEBERT:  If we could turn -- pull up Exhibit

9    546, Mr. Goedert's report, and then if we could go to the

10   CV that's listed at the end.  If we could pull up the

11   education part of it.

12   Q    And I see here it says *dissertation title*.  What was

13   the title of your dissertation?

14   A    "Gerrymandering, Electoral Uncertainty and

15   Representation."

16   Q    And what did you write about in the dissertation?

17   A    Well, various aspects of mostly congressional

18   redistricting.  I think a large part of it that would be,

19   I suppose, relevant to this case was that I looked at

20   effects of wave elections or changes in -- large-scale

21   changes in public opinion in election outcomes in

22   different years and how they affect what people expect to

23   happen under various types of redistricting institutions,

24   or in many cases unexpected results of a particular

25   gerrymander, a particular map as a result of, say, having

NICHOLAS GOEDERT - DIRECT

1  an unexpected partisan tide, unexpected shift in vote

2  outcome, say, within a particular decade.  So I think

3  that's probably the most relevant part of my dissertation

4  to this case.

5  Q   Have you published any articles in political science

6  journals?

7  A   I have.

8          MR. KEENAN:  If we could move down.

9  Q   There's a list of peer-reviewed publications.  Okay.

10 So can you explain some of the articles you've had

11 published?

12 A   Sure.  So the most recent one which is the

13 *Pseudo-Paradox of Partisan Mapmaking and Congressional*

14 *Competition*, listed as conditionally accepted.  At this

15 point it could be listed as a forthcoming article, as a

16 definitely accepted article in *State Politics and Policy*

17 *Quarterly*.  This would be part -- it's a version of a

18 piece of my dissertation which I think is fairly close to

19 what I was just describing, the effects of specifically

20 shifts in public opinion and shifts in vote outcome over

21 time and how they influence where we see competitive

22 elections especially; when do we see a lot of close

23 elections; when do we see a whole lot of noncompetitive

24 elections, and how does both the gerrymander -- how does

25 both the method that the districts were drawn and the

NICHOLAS GOEDERT - DIRECT

149

1    particular overall partisan tide in a particular year,

2    how do those things interact with each other to produce,

3    for instance, close elections in some cases or not close

4    elections in another case.

5    Q    Would you be able to summarize your findings in that

6    article briefly?

7    A    Sure.  One thing that I do find -- so for one thing,

8    I find that, for instance, maps that are drawn by

9    nonpartisan commissions, they tend to be very, very

10   responsive to partisan tide.  So maybe we see huge shifts

11   in the partisan composition of a state as a result of

12   relatively modest changes in the electoral -- in the

13   overall vote outcome under, say, nonpartisan commissions.

14        But in contrast, under partisan maps we actually see

15   many of these maps backfire in the case of adverse

16   partisan tides.  So we see many cases, and a

17   statistically significant number of cases, where we see

18   an unexpected number of close elections.  For instance,

19   in Republican-drawn maps when you have a Democratic tide,

20   for instance, in 2006 or 2008 or I go back 40 years into

21   the 1970s.  So, for instance, the biggest partisan tide

22   for the Democrats would be in 1974, the post-Watergate

23   election where you saw huge shifts in, for instance, I

24   believe, say, the map drawn in New York, which was drawn

25   by Republicans in the 70's, essentially a backfire of

NICHOLAS GOEDERT - DIRECT

1  this map.  And analogously you see big backfires in maps

2  drawn by Democrats in, for instance, many southern states

3  in the 1990's, for instance, in response to the 1994 wave

4  election and even in, say, the 2010 Republican wave

5  election, you see a lot of these backfiring maps in the

6  case of -- well, only a couple maps drawn by Democrats.

7  Q     When you say backfire, what are you trying to imply?

8  A     Sure.  I'm implying that in the case of, for

9  instance, Republican maps, Republican-drawn maps, that

10  Democrats won many seats that were drawn to be narrowly

11  Republican; all right?  So maybe drawn with a baseline

12  52, 53, 54 percent Republican majority.  I observed that

13  in, say, 1974 or 19 -- sorry, 2006 or 2008, many of these

14  seats were actually won by Democrats.  And I think the

15  *Vieth* case that I think the last witness testified to was

16  a really good example of this, the Pennsylvania map that

17  was at issue in a previous Supreme Court case where we

18  saw a very clear example of a backfire.

19     Now, I should mention that this particular article

20  is only measuring the competitiveness of elections, so

21  whether elections are close or won by huge margins.  But

22  in my dissertation I expand on this and also look at the

23  actual sort of partisan balance and I find very similar

24  results to what I'm describing.

25  Q     And then we'll skip the 2015 article there and come

NICHOLAS GOEDERT - DIRECT

1   back to it.  What about the one in 2014 about women

2   deliberating with a distinctive voice?  Can you describe

3   that briefly?

4   A     This is an article that I coauthored with a couple

5   of other authors where it's an experiment in which -- my

6   coauthors actually ran the experiments, I did a lot of

7   the data analysis here.  It was related to small group

8   deliberation and it was looking at when women are more

9   likely to participate in deliberation and political

10  debates, depending on whether women constitute the

11  majority of a group or only constitute, say, one member

12  of a group; interacted with what the decision rule for

13  the group was, do they decide based on unanimity or pure

14  majority rule.

15  Q     That's probably enough.  What journal was that

16  published in?

17  A     This was published in the *American Journal of*

18  *Political Science*.

19  Q     How respected is that journal?

20  A     I would say it's highly respected.  It's certainly

21  one of the most respected journals in political science.

22  Q     Going on to this 2014 article, *Redistricting Risk*

23  *and Representation*.  What was that article about?

24  A     So this article is in some sense an article

25  published in the *Election Law Journal* which introduces a

NICHOLAS GOEDERT - DIRECT

1    lot of the themes in my dissertation through a series of

2    case studies in the 2000's decades.  So I both look at,

3    say, the competitiveness of elections under these

4    different case studies.  I think I used two partisan

5    gerrymanders, one nonpartisan commission, and one

6    bipartisan gerrymander.  This is where Legislature --

7    parties on both sides of the Legislature agree to, say,

8    protect incumbents.  And I look at how these maps respond

9    to, again, changes in partisan tides and I also look at

10   different aspects of how people might want to be

11   represented and how they're maybe better represented

12   under different -- under one sort of map as opposed to

13   another.

14   Q    Okay.  Then if we go to the next page.  We see one

15   in 2014 *Gerrymandering and Geography*.  Can you explain

16   what that argument is?  Or article.  Sorry.

17   A    This is a short article that I published which takes

18   a first cut at trying to tease out how much of the bias

19   towards the Republicans that we observed in the 2012

20   election outcome, and what I mean by bias here is that in

21   the congressional -- national congressional races in

22   2012, we did see an unusual outcome in that Republicans

23   won a majority of congressional seats, but Democrats won

24   a majority of the popular vote.  What I'm asking is was

25   this more due to the fact that Republicans controlled the

NICHOLAS GOEDERT - DIRECT

1    seat-drawing process in more states or was it due to the

2    fact that, say, we have this geographic concentration

3    which narrowly biases a lot of states in favor of the

4    Republicans, a geographic concentration where Democrats

5    are very concentrated in cities and Republicans are more,

6    say, efficiently spread out in more rural areas.

7    Q     And what did you find?

8    A     Well, I found that both of these factors have a

9    significant impact and that actually either one of them

10   alone would have been enough to create this, in some

11   sense, counter majoritarian outcome, but that both of

12   them are important to consider.

13   Q     We'll go into the article itself in a little more

14   detail later.  But if we could go up again to the 2015

15   and this is the case of the disappearing bias.  What was

16   that article about?

17   A     Yes.  This is also a short article that uses the

18   same method that I used in the previous article to

19   analyze the 2014 congressional election outcome.  And

20   what I noticed about the 2014 congressional elections is

21   that we did not observe the same amount of pro-Republican

22   bias.  We also did not observe the counter majoritarian

23   outcome.  In this election the Republicans won a

24   substantial majority of the national congressional

25   popular votes.  However, they didn't win really that many

NICHOLAS GOEDERT - DIRECT

1    more seats than they won in 2012.

2         So a lot of the bias that we saw in 2012 kind of

3    disappears and I'm trying to answer was that due to the

4    fact that the geographic bias disappeared or was that due

5    to, you know, the Republican gerrymanders were less

6    effective.

7    Q    And here it says *Forthcoming at Research & Politics.*

8    At this point has that been published?

9    A    That has been published and is publicly available.

10   Q    Okay.  Let's pull up Exhibit 548 which we were

11   talking about.  This is your 2014 *Research in Politics*

12   article, *Gerrymandering or Geography.*

13        MR. KEENAN:  If we could move down to the next

14   page.

15   Q    You mentioned bias.  How did you measure -- what

16   were you measuring as for bias?

17   A    I'm measuring against a historical average of

18   congressional election results over the past 40 years.

19   So I'm saying given a certain vote share, how much does

20   the seat share in 2012 compare to what we might expect

21   given how elections have turned out over the last 40

22   years on average.  I run a very simple regression model

23   to determine what that average is.  Then I compare 2012

24   against that regression model.

25   Q    And then what is the slope of that bias line, if you

NICHOLAS GOEDERT - DIRECT

1    understand what I'm saying?

2    A    I do understand what you're saying.  So the actual

3    model that I use is not what we might call a linear

4    regression where you have a clear linear slope.

5    However -- so I use what we call a probit model, which

6    compares -- uses a normal distribution as opposed to a

7    linear model.  However, I think it's fair to say that

8    within the range of relatively close elections outcomes,

9    say where each party wins at least 40 percent of the

10   vote, that the model that I use have something that's

11   very close to a slope of 2-to-1 in the sense that parties

12   tend to win about two percent more seats for every one

13   percent more of the vote that they win.

14        Now, this only holds with respect to that range of

15   election outcomes between, say, 40 and 60.  My model,

16   which I think is better adapted to more extreme election

17   results than a linear model, would have different results

18   if, say, a party wins 75 percent of the vote in a

19   particular election year.

20   Q    And how does that compare with what the efficiency

21   gap does?

22   A    So the efficiency gap is a linear model that

23   always -- that always compares the actual election

24   outcome to a 2-to-1 slope, regardless of the actual

25   number of votes that a particular party won.  So it uses

NICHOLAS GOEDERT - DIRECT

1   this 2-to-1 slope throughout the entire range of possible

2   vote outcomes.

3   Q    Now, are you measuring the bias based on any sort of

4   -- that two slope for any sort of reason that parties are

5   supposed to get that number of seats as a legal matter?

6   A    No.  I am only measuring it because that's what we

7   observed, we have observed as a historical average.  So

8   I'm trying to explain why was 2012 -- why did it deviate

9   so much from the historical average.  Why was it so

10  unusual.  So comparing it to what we have observed in the

11  past.  I'm not saying this is what we should observe or

12  this is the right election outcome.

13        MR. KEENAN:  If we could just go to the next

14  page of this article.  And if we could blow up this chart

15  here.

16  Q    Could you explain what this shows?

17  A    Sure.  So this shows for the last 40 years, from

18  1972 to 2012, each of the blue dots is -- the x-axis is

19  the percentage of vote that the Democrats won in the

20  national congressional popular vote.  That's the

21  aggregate all votes for Democratic candidates over all

22  congressional districts compared to the total number of

23  votes that both Democrats and Republican won.  So it's

24  the two-party vote share.  So that's the x-axis.

25        Then the y-axis is the percentage of seats the

NICHOLAS GOEDERT - DIRECT

1   Democrats won in that actual congressional outcome.  So

2   the blue dots are all of the last 40 years of

3   congressional election outcomes.

4        Do you want me to explain the lines as well?

5   Q    Yes.  Sure.

6   A    So the lines are the historical average from 1972 to

7   2012 if you run a very simple regression model that would

8   predict, based on this historical data, how many votes

9   would we expect a party usually to win if they win a

10  certain given vote share.  And I've shown two lines here.

11  One of them is the actual linear model -- I forget off

12  the top of my head which one is which because they're so

13  close.  It's actually in the article.  But one of them is

14  the linear model, the 2-to-1 vote share, and one is the

15  probit model that I actually use.  You can see that they

16  are very, very close to each other, within the range of

17  actual national observed election outcomes that we see.

18  Q    Okay.  Now -- so I'm just trying to see.  So if we

19  see 2006 in the middle here, what does that represent?

20  A    So 2006, I don't know, should I be highlighting

21  that?  It's right there.  Okay.  So this is, of course,

22  an election in which you would normally consider this to

23  be a Democratic wave election, right?  So Democrats won a

24  rather large percentage of the national vote share, about

25  55 percent.  And in this case they did win a majority of

NICHOLAS GOEDERT - DIRECT

1    seats.  So you can see down here 55 percent, that's

2    the -- I'm a little off -- but that's the amount of the

3    vote share that they won on the x-axis.  And then I think

4    they won about 54 percent of the seats.  That's on the

5    y-axis.

6         Now, we wouldn't consider this a counter

7    majoritarian outcome because the Democrats won a majority

8    of the vote and they also won a majority of the seats.

9    However, given this 2-to-1 slope that we've historically

10   observed, we would actually expect, if 2006 was

11   historically average over the last 40 years, we would

12   expect Democrats to actually win, say, 59 percent of the

13   seats.  So the reason that 2006 falls below both of those

14   lines is that they won fewer seats than expected

15   according to the historical average.

16   Q    Okay.  And then I see, for example, 2008 is above

17   that?

18   A    Sure.  Right here.

19   Q    What would that signify?

20   A    In this case the Democrats won a slightly larger

21   percentage of the vote than in 2006, so it's a little bit

22   shifted over to the right in terms of the x-axis.  But

23   they won a much larger share of the vote in terms -- I'm

24   sorry -- much larger share of the seats, and, in fact,

25   2008 is much closer to the historically average line.  So

NICHOLAS GOEDERT - DIRECT

I would describe this as having less Republican bias in

2008 compared to 2006 if we're defining Republican bias

as this deviation from historical average.

Q     But if it's under the line, is that showing

Republican bias?

A     Under the line would be showing some sort of

Republican bias.  How far it is from the line would be

how much Republican bias.

Q     And on the other side of the line what would that

show?

A     Right.  If it's above the line, that means that it

would have Democratic bias.  In these elections the

Democrats won more seats than expected from the

historical average.

Q     From your graph, what's the last time the

congressional elections showed a Democratic bias?

A     It's difficult for me to read.  It looks like it

might be 2002.  It was right on the line.  So that would

be essentially 0 bias.  It looks like 1994 is actually

the last election where there's a perceptible Democratic

bias.

Q     What happened in 1994?

A     1994 was the Republican wave election where

Republicans for the first time won control of Congress

in, I believe, almost 40 years.  And in this case, the

NICHOLAS GOEDERT - DIRECT

1    Republicans did win a majority of the vote and they won a

2    majority of the seats, but they actually didn't win quite

3    as many seats as what we expect from the historical

4    average.  So again, it's not a counter majoritarian

5    outcome, but it actually is slightly based toward the

6    Democratic outcome.

7    Q    This one has a slope of 2.  What would the slope be

8    if you looked at just the elections since the 1990's

9    round of redistricting?

10   A    Yeah.  So I have calculated this for 1992 through

11   2014, the most recent election, and the slope was

12   actually much closer to 1.5.  So we see a much less

13   responsive curve just over the last, I guess that's 12

14   election results.

15   Q    Is that because we see -- in the recent years we see

16   more of the dots below the line; in the older series the

17   dots are above the line?

18   A    Yeah.  You also see a little bit of just overall

19   bias in favor of the Republicans.  So if you actually

20   calculated this for just 1992 through 2014, the line

21   would both shift over to the right reflecting the --

22   overall the election outcome has become more biased in

23   favor of Republicans.  It's not an enormous shift, it's

24   about 2 percent on a nationwide basis.  And it would also

25   sort of be less steep.  It would look a little bit like

NICHOLAS GOEDERT - DIRECT

1  that.  So move that way and that way.

2          JUDGE CRABB:  Wait.

3          JUDGE RIPPLE:  Mr. Keenan, could you --

4          THE WITNESS:  So the line would move slightly to

5  the right and the line would become less steep.

6  BY MR. KEENAN:

7  Q    Would you be able to sort of draw it on the screen?

8  Is that what --

9  A    Oh, sure.  So it would probably look something

10 like -- I mean this is not going to be an exact drawing

11 at all.  But like that, if that makes sense; right?  And

12 I don't know if that actually perceptibly moves over to

13 the right in terms of where we might call the intercept

14 might be.

15         JUDGE RIPPLE:  Mr. Keenan, would you try to help

16 me come in for a soft landing?

17         MR. KEENAN:  This is actually a good breaking

18 point.  We can stop here.

19         JUDGE RIPPLE:  All right.  Thank you, sir.  The

20 Court will then stand in recess until 1:35.

21     (Recess    12:31-1:34 p.m.)

22         MS. GREENWOOD:  Your Honor, I just have a quick

23 moment of housekeeping.  Judge Ripple, you had asked that

24 we talk about the database issues that were raised during

25 Mr. Trende's examination.  We've met and conferred and I

NICHOLAS GOEDERT - DIRECT

1   have a stipulation as to that.  So the parties have

2   agreed to stipulate that the imputation method for

3   uncontested elections use by Professor Jackman is valid,

4   reliable and methodologically sound.  Thanks.

5           JUDGE RIPPLE:  Thank you.  That stipulation will

6   be accepted.  And Mr. Keenan, you were in the middle of

7   examining your witness.

8   BY MR. KEENAN:

9   Q   Good afternoon, Professor Goedert.  We've pulled up

10  Exhibit 546.  Could you identify that for us?

11  A   This is my report in this case.

12  Q   Have you developed any opinions about the use of the

13  efficiency gap to measure partisan gerrymandering?

14  A   Yes, I have.

15  Q   Can you identify what those opinions are?

16  A   Well, I think I advanced a number of opinions in the

17  report.  Some of them include the idea that the

18  efficiency gap would codify a certain standard of

19  proportionality, which although it over some span of

20  history has been somewhat similar to what we've observed,

21  is not necessarily what we would observe in the future.

22  Additionally, I feel that or it is my opinion that there

23  are various normatively good reasons why a state might

24  choice to draw a map in a certain way and even under

25  these normatively good reasons we could and actually do

1   observe very high efficient gaps in various different

2   elections.  And I include a number of examples of cases,

3   for instance, where states try to draw competitive

4   districts or states try to get proportional

5   representation and yet in certain elections we either see

6   very large fluctuations in the efficiency gap or we see

7   just single examples of very high efficiency gaps well

8   beyond the threshold advocated by the plaintiffs.

9        In general, I feel the efficiency gap is a very

10  chaotic and highly fluctuating measure for which it's

11  inappropriate to judge the bias in a map based on one

12  particular election result over the efficiency gap

13  observed in one particular election result because this

14  particular measure is so unstable and so does in

15  particular elections.  Again, very sensitive to the

16  overall make-up of the electorate overall shifts in

17  partisan trends we can see huge shifts in the efficiency

18  gap in a single election.  So I think it is somewhat

19  extra dangerous to use the efficiency gap based

20  especially on a single election to measure that.

21  Q    Okay.  Let's start off you mentioned it would codify

22  a particular seats-to-votes relationship.  What's the

23  basis for your opinion of that?

24  A    Well, just the way that the efficiency gap is

25  defined, it is defined in both the article, the academic

NICHOLAS GOEDERT - DIRECT

1   literature on efficiency gap and I believe in reports

2   submitted by the or complaint submitted by the plaintiff

3   as prescribing that a party should win 2 percent of seats

4   for every 1 percent of the vote that they win, or at

5   least 2 percent more seats over 50 percent for every 1

6   percent more vote that they win.  And the plaintiffs do

7   rightly comment that this is in line with long-term

8   historical averages, as I showed in the graph that you

9   put up related to my 2012 gerrymander article.

10      Nevertheless, as I've also found, if you look at,

11  say, recent history, this 2-to-1 responsiveness curve, as

12  I would call it, this 2-to-1 responsiveness curve does

13  not hold over, say, the last 20 or 25 years.  And so

14  whether it will continue to become less steep in slope

15  over time, whether it will continue to be, say, a 1.5

16  curve over the next several decades or whether it will

17  revert back to a 2-to-1 curve in future decades is

18  entirely uncertain.  So I think for us to declare that

19  constitutionally it is constitutionally mandated that an

20  election result follow this 2-to-1 curve is, you know --

21  I would be pretty caution about doing that.

22  Q    You also mention that there might be some normative

23  good reasons to draw particular districts and the effect

24  of the efficiency gap on that.  Can you explain what you

25  meant by that?

NICHOLAS GOEDERT - DIRECT

1  A      Sure.  Well, many of the exhibits that I think the

2  witnesses have presented so far in this case have been

3  examples where one party controlled the redistricting

4  process.  We might call that a party gerrymander.

5  Presumably that party was trying to win seats for their

6  party.  But this is not the only motivation, of course,

7  that motivates people drawing maps.  There are various

8  other motivations that we might consider normatively

9  good, that might be considered something that we would

10  value in an electoral system regardless of what party we

11  belong to.

12      For instance, we might think that drawing

13  competitive districts where everyone's vote has the

14  potential to be decisive is a normatively good thing that

15  we might want to achieve in our districting process.  Or

16  on the other hand, we might believe that achieving some

17  sort of proportional representation where if 60 percent

18  of the voters belong to a certain party, they should

19  generally get about 60 percent of the representation in

20  the legislatures.  There's lots of countries that use

21  explicit proportional representation to structure the

22  partisan makeup of their legislatures.

23      Now, the United States does not do that.  But if we

24  find that a map has -- that a legislature has constructed

25  a map which has the effect of achieving proportional

NICHOLAS GOEDERT - DIRECT

1   representation, I don't think we should think that's a

2   bad thing or that it's a presumptively unconstitutional

3   thing because we observe a very high efficiency gap in a

4   particular election.

5   Q    Are you offering an opinion that any of those were

6   the intent of the Wisconsin Legislature in this case?

7   A    No, I'm not.

8   Q    So why do you think that's still important for this

9   case though?

10  A    Well, this case is asking us to adopt a new standard

11  that presumably will be the standard used to judge future

12  cases involving the constitutionality of a gerrymander.

13  So I think if the Court does choose to adopt the

14  standard, it should be one that is applicable to future

15  cases where the motives might be different or the make-up

16  of the Legislature might be different or even, say, the

17  body that's being gerrymandered might be different.  So I

18  think looking at examples from other contexts is useful.

19  Q    You also mentioned competitive -- designed for

20  competitiveness can result in various efficiency gaps.

21  If we could go to Table 1 of your report on page eight.

22  Can you just explain why competitive activities will

23  yield large efficiency gaps?

24  A    Right.  So if you draw, say, for instance, you draw

25  all of your seats -- you live in a state that is 50/50

NICHOLAS GOEDERT - DIRECT

Democrat -- 50 percent Democrat, 50 Republican in a

typical election year and so you draw all of your

districts to be similarly evenly balanced, and in an

election year where both parties win about 50 percent of

the vote, you would expect a lot of close elections.  And

maybe the Republicans would win some and the Democrats

would win some.

But now let's say in one particular election cycle

the Democrats win 55 percent of the vote.  And I don't

think that's an unrealistic swing.  I think it's the sort

of swing we see actually relatively often in, say,

congressional elections.  Say the Democrats won 55

percent of the vote statewide.  They might also win 55

percent of the vote in almost all of those seats.  All

right?  And so that increase in five percent of the vote

would translate to a much larger than 10 percent increase

in the number of seats.  They might win 55 percent of the

vote, but they would win, say, 80 percent of the seats,

just in my very hypothetical example here.

On the other hand, if the Republicans won 55 percent

of the vote, they would also win 80 percent of the seats.

So if you're asking -- if you're evaluating this under a

partisan symmetry standard, we wouldn't say that that map

is unfair or unsymmetric.  Nevertheless, that example

where the Democrats won 55 percent of the vote but 80

NICHOLAS GOEDERT - DIRECT

1    percent of the seats would present an enormous efficiency

2    gap, I believe, of 20 percent, which would be three times

3    the threshold suggested by the plaintiffs for presumptive

4    unconstitutionality.

5    Q    Has anything like this been seen in the United

6    States?

7    A    Well, so the table that you've brought up here on my

8    screen is an example from the Arizona -- recent history

9    of the Arizona congressional election results.  So

10   Arizona is unusual among states in the United States in

11   that it draws its congressional districts through a

12   nonpartisan commission, not done by the legislature, and

13   it is especially unusual in that the law creating this

14   commission also requires the commission to try to draw

15   competitive districts when possible right within the

16   constraints of other legal constraints like Voting Rights

17   Act constraints and equal population districts.  So

18   Arizona is very unusual among states in that they are

19   actually legally required to draw competitive districts.

20   So that's why you've used this example here.

21   Q    What does the experience in Arizona show?

22   A    So what the experience in Arizona shows is that

23   relatively small fluctuations in the total vote for the

24   Republicans can result in very wide fluctuation in the

25   numbers of seats because they have drawn so many

NICHOLAS GOEDERT - DIRECT

1   competitive districts.  So, for instance, in the first

2   election cycle following the 2000 census, the

3   Republicans -- and I'm showing this on this year, 2002 --

4   the Republicans won 55, 56 percent of the two-party vote

5   and yet they won three-quarters of the seats.  So this

6   would result in an efficiency gap of 14 percent in favor

7   of the Republicans.  But because they have so many

8   competitive districts, we see wide fluctuations in this

9   efficiency gap over the course of the decade.

10        In the next map, 2012, where the Republicans also --

11  I'm sorry, the nonpartisan commission also drew a

12  different map, we saw almost the opposite result.  We saw

13  that the Republicans still win a narrow majority of

14  seats, but they actually won a minority -- I'm sorry, a

15  narrow majority of the vote.  But they actually won a

16  minority of the seats resulting this time in a 14 percent

17  efficiency gap in favor of the Democrats.

18        In between those two election results, we actually

19  saw the sign of the efficiency gap at the direction of

20  bias flip three different times because you had so many

21  competitive elections and slight fluctuations in the vote

22  could have produced fairly significant fluctuations in

23  the seat share.

24  Q    You also mentioned about proportional

25  representation.  How does the efficiency gap differ from

NICHOLAS GOEDERT - DIRECT

1   proportional representation such that it might cause a

2   problem?

3   A    Right.  So I describe the efficiency gap as

4   codifying hyperproportional representation.  So

5   proportional representation would suggest if you win 50

6   percent of the votes, you should win 50 percent of the

7   seats.  Now uniquely, the efficiency gap also says 50

8   percent of the votes you should win 50 percent of the

9   seats.  That's the only point at which the efficiency gap

10  is the same as proportional representation.

11       As you deviate from 50 percent of the vote,

12  proportional representation gets more and more different

13  from the efficiency gap.  So while under the ideal of

14  proportional representation, you'd say if you win 60

15  percent of the vote, you should win 60 percent of the

16  seats.  Efficiency gap would codify the concept that if

17  you win 60 percent of the vote, you should actually win

18  70 percent of the seats, and given 60 percent of the vote

19  if you only won 60 percent of the seats, if you only

20  achieve proportional representation, that would actually

21  be a presumptively unconstitutional gerrymander against

22  the party that won the majority of votes and seats.

23  Q    Do you have any opinions about the historical

24  instability or fluctuations in the efficiency gap?

25  A    Well, I generally think that the efficiency gap is

NICHOLAS GOEDERT - DIRECT

1    rather unstable and that historically over the last 40

2    years this sort of range of elections that has been

3    studied by Professor Jackman in his testimony, also the

4    range of election study in the Stephanopoulos and McGhee

5    article, I believe almost half of all plans, something

6    like 40/45 percent of plans at some point exceed the

7    prescribed threshold for presumptive unconstitutionality.

8    And also, you know, among those plans that exceed this

9    threshold, a fairly high percent, I think approaching

10   30/35 percent just of the plans that exceed this

11   threshold, also within the same decade observe an

12   efficiency gap that has the opposite sign, is biased in

13   favor of the opposite party.  I believe it is actually --

14   I'm sorry, go ahead.

15   Q    I was going to stop and just clarify that.  When you

16   say it exceeds the constitutional threshold, is that just

17   in any election over the course of the plan?

18   A    Right.  It exceeds either the 8 percent threshold

19   advocated by Stephanopoulos and McGhee for State Assembly

20   seats or the 7 percent threshold advocated by Professor

21   Jackman in some election that was held under the plan,

22   yes.

23   Q    Now, the plaintiffs test conditions on the first

24   election in the plan.  Do you have an opinion on that?

25   A    Yes.  So I think -- so I would say while I have a

NICHOLAS GOEDERT - DIRECT

very high regard for the analysis that was done by

Professor Jackman, one deep limitation I think it has is

that it relies on a very limited dataset in one very

important regard and in almost all of his analysis

conditions its results just on the first election that

was conducted under a map, usually the first election

cycle following the redistricting; all right?

So while it may look in this dataset like we have

several hundred examples of maps crossed with election

results, we have several hundred data points of

efficiency gap calculations, we actually only have five

examples of first election cycles.  And what's

particularly important is that in my own research, I find

that where we see the greatest fluctuation or we see the

greatest number of unpredictable results is in large

national wave elections.

So I gave the example of, say, 1994 or 2010 in favor

of the Republicans where we see a lot of backfiring

Democratic gerrymanders.  1974, 2008 in favor of the

Democrats where we see a lot of backfire Republican

gerrymanders.

What's important here, and I think this is largely

coincidental, I don' think it's intentional on the part

of Professor Jackman or any of the analysis presented by

the plaintiffs, but what's important is that none of

1   these major wave elections happened to occur in this

2   first election cycle.  And especially we've done so much,

3   we've seen so much analysis related to 2012.  2012 is a

4   very unusual election in that it was so closely balanced

5   between Democrats and Republicans.  This is really the

6   exception rather than the rule.

7       But actually most of these first election cycles

8   were fairly evenly balanced.  And so in these election

9   cycles, yeah, maybe we can closely predict what the

10  efficiency gap will be based on some sort of partisan

11  baseline calculation that we've made.  But if we actually

12  try to apply this to a wave election, all of these

13  calculations are going to be way out of whack.  And so in

14  the future, if, for instance, this Court were to adopt a

15  standard of efficiency gap conditioning on the first

16  cycle's election results; all right?  And, say, in 2022

17  we saw a big wave election either in favor of the

18  Democrats or in favor of the Republicans, we could see an

19  enormous number of plans radically exceeding the

20  prescribed threshold for no other reason than they were

21  an unpredictable result related to the actual electoral

22  wave we saw because we've only been conditioning in the

23  data that we've so far been presented on nonwave election

24  years and only on five data points.

25  Q    Could you just explain in a little bit more detail

NICHOLAS GOEDERT - DIRECT

about what it means to condition on the first election?

A    Right.  So, for instance, the sensitivity analysis

that was done by Professor Jackman, at least as I read

his rebuttal report in particular, what he's looking at,

and I think this is also contained a little bit in his

initial report, what he asks is well, given what happened

in the first election, how likely is it that we'll see,

for instance, an opposite sign of the efficiency gap in a

future election?  But if all of those first election

cycles are relatively evenly balanced elections like we

observed in 2012 or like we observed in 1992 or in 2002,

all right?  You're going to get a very different result

for how big a fluctuation we might see in the future than

if you actually included wave elections in that

conditioning, if that makes sense.

Q    So what does this mean for, like, going forward in

terms of, like, a standard that would be in place in

2022, for example?

A    Right.  So as I think I mentioned, if you were to

adopt this standard going forward and we saw a wave

election of the magnitude of, for instance, 1974 or, for

instance, 2008 in a first election, then you might see

all sorts of, say, backfiring partisan gerrymanders or

all sorts of huge fluctuations in nonpartisan or

bipartisan maps or really deep differentiations in

efficiency gaps in bipartisan maps designed to achieve

proportional representation.  The sorts of exaggerated

efficiency gaps that you wouldn't observe just by looking

at close elections.

And I mean one thing I do want to accentuate is that

in some sense I think wave elections are the norm rather

than the exception; right?  When I go back in my own

research and I look at the national popular vote in

congressional elections over the part 40 years, much more

often than not one party wins by 5 percent or more.  So

this very close election that we saw in 2012, that's

unusual.

I think it is -- again, I think it is fairly

coincidental that most of these conditioning elections,

these first election cycles, it's mostly coincidental

that most of them have been relatively close and not wave

elections.  But that does influence the results that

you're going to see going forward and it's certainly not

necessarily going to hold true in the future.

JUDGE CRABB:  I'm sorry, what is not going to

hold true in the future?

THE WITNESS:  Oh, the fact that we might -- the

fact that we will consistently see very close elections

in the first election following a redistricting cycle.

So what I'm saying is that there's no reason to expect

NICHOLAS GOEDERT - DIRECT

1    that 2022 will be as close as 2012.  It could be a wave

2    election like 2010 or like 1974.

3    BY MR. KEENAN:

4    Q    Do you have any opinions about using sensitivity

5    testing with respect to the first election seen in a plan

6    using the efficiency gap?

7    A    Well, I think at a very minimum, right, you need to

8    have some sort of robust sensitivity testing that would

9    be codified if you were going to use the efficiency gap

10   in any way.  I think that there's a lot of sort of

11   different ideas about sensitivity testing that have been

12   presented.  One thing that I think would be important

13   would be to acknowledge, for instance, that a particular

14   election cycle falls within the range of possible

15   election cycles.  So you don't necessarily just want to

16   do sensitivity testing based on doing a uniform swing

17   from one -- from the actual observed, say, 2012 results.

18   You would probably want to position that in the line of

19   plausible election results or in the range of plausible

20   election results and do some sort of shift away from

21   there.  I think it's just a slightly more complicated

22   process than any of the evidence that's presented so far

23   to really be a sufficient -- sufficient way to anticipate

24   future efficiency gaps.

25        Also I don't think, as far as I know, the plaintiffs

NICHOLAS GOEDERT - DIRECT

1   haven't actually presented any sort of proposed legal

2   standard for sensitivity testing.  It seems completely

3   absent to me from the --

4   Q    And where is there a proposal that sensitivity

5   testing should be incorporated?

6   A    It is in the Stephanopoulos and McGhee article that

7   I think has been discussed throughout the case.

8   Q    And you've had a chance to review the Demonstration

9   Plan, Mr. Mayer's Demonstration Plan?

10  A    In broad -- you know, broadly speaking, yes.

11  Q    Sure.

12  A    I have not reviewed the actual specifics of where

13  the lines are drawn.

14  Q    Exactly.  You've read his report though.

15  A    Yes, I have.

16  Q    You said that Mr. Mayer had access to information

17  that the drafters of the plan did not.  What do you mean

18  by that?

19  A    Well, most importantly he had access to what the

20  actual result of the 2012 elections were.  So the

21  efficiency gap doesn't describe a map, it describes a

22  particular election result.  And you can only know what

23  the efficiency gap of a plan will be after you already

24  know what happened in the election.  So if you're

25  instructing a legislature to draw a map with a 0

NICHOLAS GOEDERT - DIRECT

1  efficiency gap or draw a map with an efficiency gap

2  within this range, I wouldn't really know how to instruct

3  a legislature to do that unless I could tell them what

4  was going to happen in the future.  All right?  There's

5  no necessary -- there's no data they can rely on that's

6  going to tell them are we going to have a wave election

7  in favor of one party or another two years in the future

8  which will tell us what the efficiency gap will look like

9  in this first election cycle.

10      So Professor Mayer knew what the actual election

11  outcome was and could retrospectively use that to

12  construct a plan that would have a 0 efficiency gap, but

13  there's no way the Legislature could have known that that

14  map or any map they could have drawn would have a

15  particular efficiency gap when they drew it.

16  Q   Professor Mayer says that the observed efficiency

17  gap was very close to one that -- he used the Gaddie

18  measure, but was predicted, he says, by the Gaddie

19  measure.  What do you say to that?

20  A   Well, I think that's precisely because 2012 was

21  so -- such a close election in terms of partisan balance

22  between the Democrats and the Republicans.  The Gaddie

23  measure, I believe, is establishing some sort of baseline

24  partisanship of what we should expect in a close

25  election.  So yes, if you have a very close election, if

NICHOLAS GOEDERT - DIRECT

1    you actually observed an election which was 50 point

2    something percent for one side and 49 point something

3    percent for the other side, yes, it will match up very

4    closely.  But there's no way the Legislature could have

5    known that prior to drawing the map.

6         And as I also mentioned, that sort of almost exact

7    partisan balance is the exception rather than the rule.

8    Q    Professor Mayer, in response to your report,

9    performed some uniform swings on the Demonstration Plan.

10   And there's been testimony that what he did was he took

11   account for incumbency and then calculated an efficiency

12   gap and then after doing that, he then treated every seat

13   winner as an incumbent, incorporated an incumbency

14   advantage to whoever the winner was and then ran his

15   uniform swing.  Do you think this is a valid method of

16   doing the uniform swing?

17   A    No.

18   Q    Why not?

19   A    Because I think that when we're thinking about

20   prospectively applying this test in the future, we want

21   to know is this going to appropriately apply to this like

22   the election cycle where the case might actually occur.

23   So, say, for the first election cycle following

24   redistricting.  So I think the more appropriate way to do

25   the sensitivity testing would be to ask what would have

NICHOLAS GOEDERT - DIRECT

happened in that 2012 election if the Democrats had won

by 4 or 5 percent rather than, say, less than 1 percent;

not well, let's assume all the Republicans run for

reelection and all of the Republicans have this built-in

incumbency advantage which can naturally overcome a

Democratic swing of three-and-a-half percent.

I think if you didn't automatically assume that all

these Republicans were going to win -- run for

re-election, which of course is an unrealistic

assumption, you would see a lot more responsiveness to a

moderate-size Democratic swing.

Q     Do you have any opinion on why the efficiency gap

has tended to favor Republicans and also bias in

congressional elections has tended to favor Republicans

in the recent history?

A     Yeah.  I think this does speak to some of my own

research which suggests that the way that Democrats and

Republicans are actually concentrated or dispersed across

geographic areas does naturally favor the drawing of very

heavily concentrated Democratic districts and much more

dispersed, less concentrated Republican districts.  And

specifically in an election cycle like 2012 that is very

evenly balanced, this is going to produce a lot of

marginal Republican seats and a smaller number of very

heavily Democratic seats, and that's the type of

NICHOLAS GOEDERT - DIRECT

1    distribution that's going to produce a Republican -- a

2    pro-Republican efficiency gap regardless of who drew the

3    map.

4    Q    Did you do an analysis of Wisconsin to see if this

5    was the case in this state?

6    A    I've not specifically done an analysis of Wisconsin.

7    Q    Did you analyze the wards in Wisconsin?

8    A    Oh, right.  Yes.

9    Q    Okay.

10   A    I'm sorry, I thought you were talking about the

11   elections --

12   Q    I'm sorry.

13   A    Yes, I did.  I did look at the distribution of

14   partisanship of the wards in Wisconsin.

15   Q    If we could pull up Figure 1 on the report.  Page

16   22.  Could you explain what this chart represents?

17   A    All right.  So what I did here was I used a measure

18   of baseline partisanship for each ward in Wisconsin.  I

19   think it's about 6,000 wards, that's a rough estimate.

20   And the way I developed this baseline partisanship

21   measure is I took Obama's 2012 vote share and I shifted

22   it down 3. something percent uniform swing so that the

23   national average vote share would be 50 percent for the

24   Democrats and 50 percent for the Republicans.  And then

25   what I asked was given this uniform swing, 3 percent

NICHOLAS GOEDERT - DIRECT

1    uniform swing for each ward, what percentage of the vote

2    did the Democrats get in each ward and I sort of put them

3    into ten different bins based on what percentage of the

4    votes the Democrats would expect to get in a 50/50

5    election.  And I looked at both the absolute number of

6    wards, and because there's such a high variance in the

7    population of wards, I looked at the share of population

8    in Wisconsin that resided in the wards in each different

9    bin.

10   Q    Okay.  So what does the blue bar represent?

11   A    The blue bar is the total percentage of wards in

12   Wisconsin that, for instance, right, if I was going to

13   point to this blue bar right here, that would be the

14   percentage of wards in Wisconsin that vote between 30 to

15   40 percent Democratic.  Or in other words, they vote 60

16   to 70 percent Republican in a 50/50 election.  And it's

17   about 22 percent of wards in Wisconsin fall in that bin.

18   Q    And what does the red bar represent?

19   A    So the red bar is the share of population.  So if

20   you look at the same bar for the pink -- sorry, let's --

21   right there, this is the share of population that falls

22   in the same bin.  Now, because these Republican wards

23   tend to be somewhat rural and somewhat smaller, the share

24   of the population is also going to be somewhat smaller in

25   these narrowly Republican wards than the share of wards.

NICHOLAS GOEDERT - DIRECT

So here you see, I think it's something like 18 percent

of the total population of Wisconsin resides in wards

that are 60 to 70 percent Republican.

Q    Okay.  It says 30 to 40 percent --

A    30 --

Q    -- Democrat --

A    30 to 40 Democrat.  So this is a share of the

two-party vote.

Q    And then so the Republicans would then be 60 to 70

percent?

A    60 to 70 percent.

Q    And what does it show for the wards in the

population that are between 40 to 50 percent Democrat but

50 to 60 percent Republican?

A    Right.  So we'll see -- we see the largest number of

wards and the largest share of population resides in

wards, all right, basically voting precincts, that are

narrowly Republican.  So there is a much smaller share

that reside in wards that are narrowly Democratic.  So

the distribution of wards in Wisconsin, which presumably

is not politically motivated by how the wards are drawn,

does tend to favor narrowly Republican wards.  And if

you'll notice at the extremes, you'll have quite a few

wards that are 80 percent or more Democratic and

especially there's a fairly large percentage of the

NICHOLAS GOEDERT - DIRECT

1  population of Wisconsin that resides in wards that are 80

2  to 90 percent, 90 to 100 percent Democratic, and almost

3  no one lives in wards that are that extremely Republican.

4  Q    Now, how much of the population -- if we add the 80

5  to 90 percent Democrat, 90 to 100 Democrat, which of the

6  population is in wards of that level of Democratic

7  partisanship?

8  A    So 80 percent or more Democratic?

9  Q    Yes.

10  A    I believe it is about seven-and-a-half, 7 to 8

11  percent.

12  Q    And what's the 90 to 100 percent?

13  A    Oh, I'm sorry.  You're just looking at this.  I was

14  summing them up.  I think it's about 4 percent in the 80

15  to 90 percent bin and 3 percent in the 90 to 100 percent

16  bin.

17  Q    And it's seven-and-a-half when you add them

18  together?

19  A    It's something like that, yeah.

20  Q    What's the percentage on the other side of the map

21  that are -- looks like there's no Republicans in the 0 to

22  10 percent?

23  A    There's one ward, about 6,000.

24  Q    Okay.  And then what about the 10 to 20 percent,

25  what's the share of population?

NICHOLAS GOEDERT - DIRECT

1    A    It's slightly less than 1 percent.

2    Q    Okay.

3         MR. KEENAN:  If we could pull up Exhibit 114.

4    Actually could we go back to that.

5    Q    If we summarize, what does the distribution of wards

6    in Wisconsin show about the distribution of partisans in

7    Wisconsin?

8    A    It shows that many residents of Wisconsin, right,

9    live in wards that are very, very heavily Democratic and

10   many residents of Wisconsin live in wards that are

11   narrowly Republican, but almost no one in Wisconsin lives

12   in wards that are very, very heavily Republican, say,

13   more than 80 percent Republican.

14   Q    And how would that matter when wards are then, you

15   know, put together into districts?

16   A    Sure.  So the natural method for doing partisan

17   gerrymandering would be to pack as many of the opposing

18   partisans as possible into a very small number of

19   districts.  All right?  So if Republicans are going to

20   try to pack Democrats into a small number of districts,

21   it's fairly easy for them because there are so many wards

22   that are already so heavily packed, whereas they were

23   also going to try to disperse their own partisans as

24   widely as possible.  It's also easy for them to do that

25   because there are so many districts that are, you know,

NICHOLAS GOEDERT - DIRECT

1   similarly in these two bins.

2        And even if we were going to, say, draw a map that

3   would be not motivated by partisanship but, for instance,

4   motivated by respecting existing city lines, respecting

5   existing municipal subdivisions, so one example I found

6   is that Milwaukee as a whole, the City of Milwaukee as a

7   baseline votes, I believe it is, 78 percent Democratic.

8   Madison as a partisan baseline also votes right around 78

9   percent Democratic.  So if a nonpartisan gerrymanderer, a

10  nonpartisan redistricter was going to try to draw

11  districts that would respect those community lines,

12  they're going to naturally draw districts that are 78

13  percent Democratic in Milwaukee and in Madison, whereas

14  you just can't draw a district that's 78 percent

15  Republican.  Less than 2 percent of the wards and 2

16  percent of the population of Wisconsin lives in wards

17  that's 78 percent or more Republican and they're all

18  spread out over the state.  I think Mr. Trende's map

19  showed that to a certain extent.

20       So it's -- even if they were geographically

21  concentrated, you couldn't draw more than two Assembly

22  districts even if you were to not care with contiguity at

23  all.  So it's just much easier to draw packed Republican

24  districts and packed Democratic districts.

25            MR. POLAND:  Your Honors, I'm going to object

NICHOLAS GOEDERT - DIRECT

1  and move to strike the testimony to the extent it goes to

2  the justification prong.  Professor Goedert was never

3  tendered as an expert on traditional redistricting

4  criteria and he was just testifying about it and the

5  justification for the districting in Act 43.  I'd move to

6  strike.

7          MR. KEENAN:  I don't believe he was testifying

8  about specifically justifying the plan, he was just

9  explaining why these things happen when you see ward

10  distributions like that.

11          MR. POLAND:  Well, I heard testimony about

12  municipal splits and why things -- why lines were drawn

13  as they were.

14          JUDGE RIPPLE:  I think it goes more to the

15  weight than the scope, and we're going to let the

16  testimony stand.

17          MR. KEENAN:  We can take that down and we can go

18  to Professor Mayer's rebuttal report.  Blow up the graph.

19  BY MR. KEENAN:

20  Q    Are you familiar with Professor Mayer's Figure C

21  here?

22  A    I am.

23  Q    Okay.  Professor Mayer says that is in looking at

24  districts, we should study what the districts look like.

25  Do you think that's a valid criticism?  He says the

                    NICHOLAS GOEDERT - DIRECT

1  relevant line here is this blue one that looks at

2  districts, not the red one that looks at wards which is

3  yours?

4  A    Well, I think it is a relevant comment.  I don't

5  know that he is in any way contradicting anything that

6  I'm saying.

7  Q    Okay.  Why not?

8  A    Well, because -- so I don't know if this particular

9  graph has been explained in the court already.

10 Q    Why don't we re-explain it.  Professor Mayer did go

11 over it, but you can re-explain it.

12 A    So my understanding of the red line is it is

13 essentially a repeat of the graph that we just saw that

14 was in my report; right?  So this is the distribution of

15 wards in Wisconsin and it looks very similar to the graph

16 that we just saw; right?  So we have a large share of

17 wards that are slightly Republican that are over here,

18 and then we have a fairly decent share of wards that are

19 very, very Democratic that are right over here.  And we

20 have basically no wards that are very heavily Republican

21 over here.  All right?  So this is the data from my

22 report.  All right?

23     And then in contrast, Professor Mayer is showing the

24 distribution of districts under the Wisconsin plan that

25 was actually enacted, the Act 43 plan.  And I believe

NICHOLAS GOEDERT - DIRECT

1    what he's trying to show is that well, even though there

2    were a majority of wards that were slightly Republican,

3    there were even a greater majority of wards -- or

4    sorry -- even greater majority of districts that were

5    slightly Republican.  So this peak, say, is higher than

6    the peak in the data from my chart.  I think that's what

7    the intent of this graph is.

8        So he's showing that while actually it seems like

9    partisan intent did matter; right?  They in some way

10   reshaped the distribution of wards to the advantage of

11   Republicans.

12   Q    Do you think that's a valid criticism of your

13   method?

14   A    Certainly not necessarily.  I think we might

15   naturally expect, all right, that if the wards that are

16   very, very heavily Democratic are geographically

17   concentrated, that the districts that compose those wards

18   would also be similarly concentrated.  So one thing

19   you'll notice from this graph is that the blue line and

20   the red line in the heavily Democratic graphs -- I'm

21   sorry, I'm putting up arrows where I don't mean to -- are

22   very similar.  So I expect that these are the wards in,

23   for the most part, Milwaukee and Madison and maybe some

24   other very heavily Democratic cities.  In contrast if you

25   look at these heavy Republican wards that are over here,

NICHOLAS GOEDERT - DIRECT

1  very, very small number of --

2          JUDGE GRIESBACH:  Districts or wards.

3          THE WITNESS:  Sorry?

4          JUDGE GRIESBACH:  You mean districts or wards?

5          THE WITNESS:  I mean wards.  So in this case I

6  means wards.  The very heavily Republican wards, this

7  very small number of wards that are, looks like 80

8  percent Republican, because these are spread out over the

9  state, you can't draw a district that's 80 percent

10 Republican.  We shouldn't under any districting method

11 expect to see a district.  Rather what's probably going

12 to happen is you're going to have a district that's made

13 up of a couple wards that are here and a couple wards

14 that are here and on average probably a couple wards that

15 are over here.  On average the wards that are over on

16 this extreme of the graph, they are going to become,

17 because of sort of an average, sort of deviation to the

18 mean, on average they're going to move in this direction;

19 right?  And become slightly less Republican when they

20 form districts.

21 BY MR. KEENAN:

22 Q    Professor Mayer said the distribution of wards is

23 almost symmetrical, the red line here.  Do you think the

24 red line is symmetrical?

25 A    I don't think it's symmetrical.

                NICHOLAS GOEDERT - DIRECT

1   Q    Can you explain why not?

2   A    First of all, it's very obvious from the extremes,

3   right, that ten times as many people live in 80 percent

4   plus Democratic wards as live in 80 percent plus

5   Republican wards.  And I also note in my report that an

6   absolute majority of wards, so more than 50 percent of

7   all the wards in Wisconsin are in only two of the bins.

8   They're in the 30 to 40 percent Democratic bin and the 40

9   to 50 percent Democratic bin.  So if an absolute majority

10  are in just those two bins which are slightly to the

11  Republicans side of center, I don't think that's really

12  -- would be described as symmetrical.

13  Q    Now, Professor Mayer has employed a method of

14  analysis called the *isolation index*.  And he says that it

15  would refute the analysis that you provide here.  Do you

16  believe that to be the case?

17  A    I do not.

18  Q    At your deposition had you heard of the isolation

19  index?

20  A    I had not.

21       MR. POLAND:  I'm going to interpose an objection

22  right here as well and I'm going to object to this

23  testimony because this is new testimony that counsel had

24  an opportunity to provide rebuttal on as of the time of

25  Dr. Mayer's rebuttal report, which was tendered in

NICHOLAS GOEDERT - DIRECT

1   December.  This is the first time we've heard anything

2   about it.

3           MR. KEENAN:  When did we have an opportunity to

4   provide rebuttal expert reports?

5           MR. POLAND:  You could have moved for leave to

6   file a rebuttal report addressing that after Dr. Mayer's

7   rebuttal report he filed in December and you took his

8   deposition as well and you didn't do it.

9           MR. KEENAN:  The plaintiffs haven't been limited

10  to their expert reports and testimony.  It would be

11  unfair to limit the defendants.

12          MR. POLAND:  We certainly explained that to Your

13  Honors.  We believe the record will speak for itself on

14  that.

15          JUDGE RIPPLE:  We'll take it under advisement

16  and rule when we take a look at the record.

17  BY MR. KEENAN:

18  Q    Have you ever seen the isolation index in the

19  political science literature ever used to calculate the

20  distribution of partisans in a state or anywhere?

21  A    Not that I can recall.

22  Q    Okay.  Since your deposition have you looked into

23  the isolation index?

24  A    I have.

25  Q    Have you discovered why you had never seen it used

                    NICHOLAS GOEDERT - DIRECT

1  to measure the distribution of partisans?

2  A     Yes.

3  Q     And why is that?

4  A     Because it is an entirely inappropriate method to

5  use because -- in the way that the measure is defined as

6  part of the definition of the measure, if you are

7  measuring the relative isolation of two subpopulations

8  which each compose about 50 percent of the populations of

9  a greater population, so, for instance, if you're using

10 it to describe the isolation of Democrats as opposed to

11 Republicans within a state, by the definition of the

12 measure those two numbers, the isolation of Democrats and

13 the isolation of Republicans, if they're divided 50/50,

14 those two numbers will always be equal regardless of how

15 they're actually distributed.  Regardless how many

16 Democrats you put in one district and how many

17 Republicans you put in another district, under the

18 definition of isolation index those two numbers will

19 always be equal.  So the fact that Professor Mayer

20 observes that the isolation of Democrats and Republican

21 is very close to equal across a range of election cycles,

22 it actually has nothing to do with the dispersal of

23 Democrats and Republicans across districts.  The only

24 reason you see that is in some election cycles, Democrats

25 won a few more votes than Republicans across the state,

1    not because they're more isolated.

2         MR. KEENAN:  If we could pull up Exhibit 581.

3    Can we blow up the first page?

4    Q    Do you recognize this document?

5    A    I believe this is a document from the United States

6    Census which describes the definition of various measures

7    of population dispersal or isolation.  It says

8    residential segregation.

9         MR. KEENAN:  So if we can go down to I believe

10   it's page four.  And if we blow up No. 6 there in the

11   bottom right.

12   Q    What does this No. 6 describe?

13   A    This is the mathematical definition of an isolation

14   index.

15   Q    Can you explain what that equation means?

16   A    Yeah, sure.  Okay.  What this initial large Sigma

17   represents is that this isolation index is going to be

18   calculated by generating a quantity for each district or

19   each precinct; right?  It's each subdivision you're

20   trying to measure.  It's going to generate a quantity for

21   each precinct, and then it's going to sum over all of

22   these quantities for every precinct.  So that Sigma is

23   the sum over all precincts or all districts.

24        And then what these other two quantities represent

25   is that for each precinct, it's going to calculate this

NICHOLAS GOEDERT - DIRECT

1  as the product of two different numbers.  And these two

2  different numbers, we don't actually have the definition

3  up here, but I don't know if you want to --

4  Q    We can move over.  We can zoom out and move over

5  then.  Look at the definition.

6  A    It's going to be a little hard to view both at the

7  same time.  But the two different numbers here are

8  actually fairly easy to describe.

9  Q    Sure.  What is x(i) which is the enumerator in both

10  fractions?

11  A    So x(i) is the minority population in the particular

12  area, in the precinct or in the district.  That's the

13  total population of, and it says minority here, but we

14  might say here the population of Democrats or the

15  population of Republicans, whatever you're trying to

16  measure.

17  Q    And it says minority.  What do you understand that

18  the isolation index usually measures?

19  A    It usually measures the segregation of a minority of

20  an actual minority population that constitutes much less

21  than 50 percent of the population.

22  Q    Okay.  So then there's two fractions here that --

23  what's the first word, it says "x" divided by "x."

24  What's the denominator there, that "x"?

25  A    Yeah.  So that first -- that x(i) over big "X," that

NICHOLAS GOEDERT - DIRECT

1    represents the share of the group that is in a particular

2    district; right?  So what we will be asking here is what

3    percentage of all Democrats in the state reside in

4    district N or precinct N.  That's the first quantity; all

5    right?  So it's the share of partisans in the district,

6    the share of the group in the district.

7    Q    And then what's the second -- we have x(i) over

8    t(i).  What's that?

9    A    Yeah.  So the second is almost the exact converse.

10   It's the share of the district that is part of that

11   group.  So it's what percentage of that precinct is

12   Democratic; right?  Yeah.

13   Q    And then if we were going to do this for the

14   Republicans as well, how would that change?

15   A    Well, it would be the mirror image in each district;

16   right?  So it would be the total share of Republicans

17   statewide that are in that district multiplied by the

18   percent of that district that is Republican.  That would

19   be the product for each district, and then you'd sum over

20   all of the districts to create the total isolation index

21   for the state.

22   Q    Maybe we can do an example of this.

23        MR. KEENAN:  Can we pull up Exhibit 575 so we

24   see -- move down a little bit, please.

25   Q    So we have an example here.  Could you explain how

NICHOLAS GOEDERT - DIRECT

1   you would go about calculating -- first, just explain

2   what the distribution here is of party A and party B.

3   A     Sure.  So this is a hypothetical state that has been

4   divided into four districts.  And in this hypothetical

5   state, you have 400 voters, and 200 members are party A

6   and 200 are members of party B.  And the way that they've

7   been divided into districts or precincts or whatever, I

8   guess we've labeled them districts here, is that one

9   district is very heavily concentrated with party A.  So

10  80 members of party A and only 20 members of party B.

11       Well, the other three districts are more dispersed,

12  but they have a relatively narrow majority of party B's

13  partisans.  So the other three districts are 40 percent

14  party A and 60 percent party B.

15  Q     Okay.  How would you describe this configuration of

16  partisans with respect to converting votes into

17  legislative seats?

18  A     Well, I would expect that unless there is an

19  enormous swing in favor of party A, that party B, despite

20  only winning 50 percent of the vote in a typical year,

21  would win three seats and party A would win one seat.

22  And party A would win that one seat by a huge majority

23  and party B would win the other three seats by relatively

24  more narrow majorities.

25  Q     Can you show how you calculate the isolation index

NICHOLAS GOEDERT - DIRECT

1    for party A?

2    A    Sure.  Okay.  So we have to go district by district;

3    right?

4    Q    Sure.  Why don't we do District 1 then.

5    A    Okay.  So in District 1, again we have those two

6    quantities that we need to know.  The first one is what

7    percent of all members of party A reside in District 1.

8    We know there's 200 members of party A, 80 of them reside

9    in District 1.  So I guess we could say -- can I write on

10   the screen here?

11   Q    Sure.

12   A    So point -- that didn't work. .4 -- points are

13   arrows; right?  .4 or 40 percent of all A's reside in

14   District 1.  That's the first of the two quantities that

15   we're interested in.

16   Q    Then what's the second quantity then?

17   A    The second quantity is what percent of the voters in

18   District 1 are members of party A, and we can see fairly

19   obviously that is 80 percent.  So the second quantity

20   would be .8, and then we want to take the product of

21   these two; right?  And so that would equal .32.

22   Q    Actually -- and then so we have .32 for District 1.

23   Maybe we should clear off this.  And then would the

24   score, the district score for 2, 3 and 4 be the same?

25   A    Well, the district score for 2 would be the same as

NICHOLAS GOEDERT - DIRECT

1    for 3 and 4.

2    Q    Correct.  That's --

3    A    Right.

4    Q    So why don't you calculate the score for District 2

5    and then we can just, you know, know it's the same for 3

6    and 4.

7    A    Sure.  So for District 2, the first question we want

8    to ask is what share of Democrats reside in District 2.

9    It's 40 out of 200.  So that would be .2.  And the second

10   quantity, what share of District 2 residents are members

11   of party A, so I refer to Democrats instead of party A.

12   So -- and it's 40 percent.  So that's .4.  And we take

13   the sum of these and we would get .16; right?  No, I'm

14   sorry.  .08.  And that would be the same for 2, 3 and 4.

15   Q    And so we'd have .32, .08 and .08?

16   A    Right.

17   Q    And then what do we do with all those numbers?

18   A    You take the sum of all that numbers.

19   Q    What does that equal?

20   A    I believe it's .56.

21   Q    Okay.  So why don't we clean that off and then we'll

22   run through the same exercise for party B.

23   A    Sure.

24   Q    So did you calculate the sum or the total for

25   District 1 for party B?

NICHOLAS GOEDERT - DIRECT

1  A    Okay.  So in District 1, it's again what share of

2  B's are in District 1.  It's 20 out of 200, so that would

3  be .1.  And then the second quantity is what percentage

4  of residents of District 1 are members of party B, and

5  that would be 20 percent, so that would be .2.  And we

6  take the product here and we've got .02.  That would be

7  the quantity for District 1 for Republicans.

8  Q    And then how do we go about doing that for Districts

9  2, 3 and 4?

10 A    So again, it would be the same for 2, 3 and 4.  The

11 first question is what percentage of members of party B

12 reside in District 2.  It's 60 out of 200.  So that would

13 be .3.  30 percent.  The second quantity is what

14 percentage of District 2 are members of party B.  That

15 would be .6.  Again, this is hard to show on the screen

16 with all the arrows.  You take the product of these two

17 numbers and you would get .18.  That would be for

18 District 2.

19      It would be the same number for Districts 3 and 4.

20 Q    Okay.  So then what would we do?

21 A    So you'd sum over those four districts; right?  So

22 .18 three times, and then that previous calculation of

23 .02, you take the sum of those four numbers and you again

24 get .56, which is the same as the number that we got for

25 the Democrats.  So despite the fact that the Democrats

NICHOLAS GOEDERT - DIRECT

1   appear very heavily concentrated in one district; right?

2   Maybe this is a state that has one city in District 1

3   which is very heavily concentrated with Democrats, the

4   isolation index is identical for Republicans and

5   Democrats and, in fact, it doesn't matter how you

6   distribute Democrats or Republicans across these four

7   districts as long as there's 200 party A members in the

8   state and 200 party B members in the state.  The

9   isolation index will always be identical for party A and

10  party B regardless of the dispersion.

11  Q    So you think the isolation index is a valid way to

12  measure the concentration of partisans in a state?

13  A    No.

14         MR. KEENAN:  I have no further questions.

15         JUDGE CRABB:  Can I ask you to do that again?

16  You're saying that if there are 200 Republicans, 200

17  Democrats and you put them into four different districts,

18  it doesn't matter how you do it?

19         THE WITNESS:  It doesn't matter how you do it.

20  In any population, if the number of Democrats and the

21  number of Republicans is equal regardless of how they're

22  distributed across the districts, the isolation index for

23  Democrats and Republicans will be equal.

24         JUDGE CRABB:  But the votes will not be equal.

25         THE WITNESS:  Right.  So -- well, the total

NICHOLAS GOEDERT - DIRECT

1    number of votes, we're presuming they get an equal number

2    of votes.  But certainly the seats will not be equal.  So

3    even though the distribution is highly asymmetrical, the

4    isolation index makes it look like these two parties are

5    equally concentrated.

6              JUDGE CRABB:  I see.

7              MR. POLAND:  May I proceed with

8    cross-examination, Your Honor?

9              JUDGE RIPPLE:  You may.   (2:30 p.m.)

10                     CROSS-EXAMINATION

11   BY MR. POLAND:

12   Q    Professor Goedert, before your deposition about six

13   months ago you had never heard of the isolation index,

14   had you?

15   A    I certainly was not aware of its definition.  I mean

16   I might have run across it casually.

17   Q    Now, when did you first look up the isolation index

18   after you heard about it in your deposition?

19   A    I believe it was about ten days ago.

20   Q    And the simple calculation you just walked through

21   with Mr. Keenan, when was the first time that you

22   actually went through that calculation with him?

23   A    I think it was somewhere between a week, slightly

24   more, seven to ten days ago.

25   Q    Seven to ten days ago?  All right.  Now, you said

                    NICHOLAS GOEDERT - CROSS

1   you weren't aware of any work using the isolation index

2   to analyze political parties; correct?

3   A    Correct.

4   Q    I'm going to hand you a binder of exhibits.

5        MR. POLAND:  I'd like us to pull up Exhibit No.

6   118, please.

7   Q    And the binder that I'm going to bring you is a

8   binder -- the Court has copies of it.

9        MR. POLAND:  These are Dr. Mayer's reliance

10  materials.  These are the articles that he had cited.

11  Q    I'd like you to open that binder, please, to Exhibit

12  No. 118 and that's Tab No. 3 in the binder in front of

13  you.

14  A    Okay.

15  Q    This is an article called *Myths and Realities of*

16  *American Political Geography* by Edward Glaeser and Bruce

17  Ward.  Have you seen this before?

18  A    I don't recall that I have.

19  Q    I'd like you to read the abstract into the record,

20  please.  I'm sorry.  I'm sorry, wrong page.  I'd like you

21  to turn to page six and I'd like you to read the first

22  full paragraph into the record.  That's the one that says

23  following Klinkner.

24  A    "Following Klinkner (2004), we calculate

25  dissimilarity indices and isolation indices for

NICHOLAS GOEDERT - CROSS

Republicans and Democrats based on voting in the last

presidential election between 1840 and today.  In all

cases, we have eliminated individuals who voted for

neither Republican nor Democratic candidates.  We use

counties as the units of observation.  Figure 2 shows the

time patterns of these indices."

Q    Now, Professor Goedert, you just went through a

simple example of calculating the isolation index with

Mr. Jackson; correct?

A    Yes.

Q    In your example you reported what's known as the *raw*

or *unadjusted isolation index*, didn't you?

A    I reported the isolation index as defined by the

United States Census.

Q    Do you know the difference between the raw isolation

index and unadjusted isolation?  Or I'm sorry.  Do you

know the difference between the isolation index and the

raw or unadjusted isolation index?

A    No.

Q    You didn't adjust your isolation index that you

calculated here for either groups' share of the

population, did you?

A    Both groups' share of the population is equal.

Under this condition the isolation index will be equal

for both parties.

NICHOLAS GOEDERT - CROSS

1    Q    All right.  I'd like you next to turn to Tab No. --

2    Exhibit No. 119.  That's in the binder in front of you,

3    Tab 4.  I'd like you to turn to page three.  And that's

4    the number page three in the bottom right-hand corner.

5    And I'd like you to read the first full paragraph on page

6    three.  It begins "The isolation index."

7    A    I'm sorry, I'm looking at page three and it says

8    "Following every census enumeration."

9    Q    This is page three in the bottom right.

10   A    Oh, okay.

11   Q    Page 11 of 36 in the caption and header.

12   A    Okay.  Sure.  Can you repeat the question?

13   Q    Certainly.  Would you please read the first full

14   paragraph on page three.  It begins "The isolation

15   index..."

16   A    "The isolation index is designed to distinguish this

17   sort of scenario from one where neighborhoods have

18   dramatically different racial character.  It measures the

19   tendency for members of one group to live in

20   neighborhoods where their share of the population is

21   above the city-wide average.  In this hypothetical

22   example, black residents live in a neighborhood that is 2

23   percent black, which is just 1 percentage point higher

24   than what we would expect under perfect integration.  The

25   isolation index would therefore be on the order of 1

NICHOLAS GOEDERT - CROSS

1   percent rather than 50 percent.

2   Q     Now, this is an article written by Edward Glaeser,

3   if you look at the title page.

4   A     Yes.

5   Q     Have you ever seen this article before?

6   A     I don't believe that I have.

7   Q     Now, in this passage that you just read, Glaeser and

8   Vigdor are using the adjusted isolation index, aren't

9   they?

10  A     I don't know.

11  Q     And they're deducting each group's share of the

12  population from its raw isolation index score, aren't

13  they?

14  A     I don't know.

15  Q     Now, I'd like you to take a look or could we pull up

16  Exhibit 114, please.

17        MR. POLAND:  We're going to pull it up on the

18  screen here because we don't have a separate copy of it.

19  Q     And you've read Dr. Mayer's rebuttal report;

20  correct?

21  A     I have.

22  Q     I'd like you to turn --

23        MR. POLAND:  Actually, could we have page number

24  16 of Dr. Mayer's rebuttal report up on the screen,

25  please.

NICHOLAS GOEDERT - CROSS

1   A    Is this report in the binder?

2   Q    It's not going to be in your binder.  We'll pull it

3   up on the screen for you.  And I'm going to ask you to

4   turn to page 16, please.  Are you there?

5   A    I'm sorry, I don't have the report.

6   Q    No, no.  We're going to pull up the right part of

7   the screen.  I want to make sure you're looking at the

8   screen.

9   A    I'm on page 16.  Sorry.

10  Q    Terrific.

11         MR. POLAND:  Could we pull up the third

12  paragraph, please.  Highlight the third paragraph.  Can

13  we zoom in on the third sentence?  It begins "The

14  isolation index..."  Right there.  Yeah.

15  A    "The isolation" --

16  Q    I'm sorry.  I was going to highlight the second --

17  the sentence that follows as well.  And this is Dr.

18  Mayer's rebuttal record -- rebuttal report.  Could you

19  please read that into the record?

20  A    "The isolation index indicates for the average

21  member of a group residing in a certain geographic unit

22  (such as a ward) what share of the member's neighbor in

23  the unit belonged to the same group.  It measures how

24  geographically isolated a group is and it can easily be

25  adjusted by deducting a group's share of the statewide

NICHOLAS GOEDERT - CROSS

1   population to show how much more isolated a group is than

2   we would expect given its statewide share.

3   Q    So in his rebuttal report, Professor Mayer reported

4   an adjusted isolation index, not the raw isolation index;

5   correct?

6   A    I believe that's correct.

7   Q    All right.  Now, let's go back to the simple example

8   that you gave us before.  Isn't it correct that if we

9   changed a single number, the Democratic and Republican

10  isolation index scores would stop being equal?

11  A    I'm sorry, which number are you proposing to change?

12  Q    Any one.

13  A    If you move Democrats from one district to another,

14  the isolation index would still be the same for Democrats

15  and Republicans.  It would change or the number for both

16  Democrats and Republicans would be different than it had

17  been previous, but it would still -- they would still be

18  equal to each other and that's the important thing that

19  Professor Mayer is measuring, whether they're different

20  from each other.

21  Q    What if you change one voter -- what if you change

22  one voter -- one voter changed parties or ten voters

23  changed parties or 100 voters changed parties?

24  A    Yes.  If a voter -- if you have more members of one

25  party than another, then the isolation index for the two

1  different parties might be different.  But it would be

2  different because one party composes a larger share of

3  the statewide population and not because that party is

4  more isolated on a district-by-district basis.

5  Q    Now, let's also turn to the Global Moran's I which

6  we covered earlier.  You'd never heard of Global Moran's

7  I prior to your deposition; right?

8  A    No, I haven't.

9  Q    And it's true that Global Moran's I does not have

10  the property you identified for the isolation index which

11  is that it's equal for both parties when they're both 50

12  percent of the population?

13  A    I actually believe that it does, but the Global

14  Moran's I, it's a more complicated calculation.  It's

15  hard to -- it would be much more complicated to

16  simplistically show.  I don't feel like I have done

17  enough research into Global Moran's I to confidently

18  answer the question.

19  Q    And at the time of your deposition, you had not

20  heard of the Global Moran's I, had you?

21  A    That's correct.

22  Q    And you'd never heard of the Local Moran's I either,

23  had you?

24  A    That's correct.

25  Q    Now, Professor Goedert, you received your Ph.D.

NICHOLAS GOEDERT - CROSS

1  three years ago; correct, sir?

2  A    Four years ago.  20 -- I guess it was slightly more

3  than three years.  It was in 2012.

4  Q    All right.  Now, you're being paid $175 an hour for

5  your testimony here today; correct, sir?

6  A    Yes.

7  Q    Now, in your opinion, Professor Jackman has an

8  excellent reputation in political science, particularly

9  in dealing with quantitative methodology in developing

10  statistical packages for use in political science; isn't

11  that correct?

12  A    Yes, I would agree with that.

13  Q    You consider his reputation in the field to be

14  excellent; correct?

15  A    I do.

16  Q    His peers consider him to be an authority in his

17  field; correct?

18  A    Yes.

19  Q    And you've relied on his work in constructing your

20  own models, haven't you?

21  A    I have.

22  Q    And in your opinion, Professor Mayer is experienced

23  in the political science field of elections; correct?

24  A    I am less specifically acquainted with Professor

25  Mayer's work, but I am aware of him by reputation.

NICHOLAS GOEDERT - CROSS

1   Q    Let me ask it again.  In your opinion, Professor

2   Mayer is experienced in the political science field of

3   elections; correct?

4   A    Yes, I would say he's experienced.

5   Q    And you consider him qualified and experienced to

6   render opinions in this case, don't you?

7   A    I have no reason to believe he's not qualified.  I

8   am unaware of his specific research into congressional

9   districting, if he has any.

10  Q    And so you do --

11  A    Or I'm sorry, legislative districting.

12  Q    So you do consider him to be qualified and

13  experienced to render opinions in this case; correct?

14  A    I suppose so, yes.

15  Q    Now, your published work on redistricting has

16  focused on congressional, not state legislative

17  redistricting; correct?

18  A    Yes.

19  Q    And in fact, you've only examined congressional

20  elections in your redistricting; correct?

21  A    That's correct in terms of the data that I relied

22  on, yes.

23  Q    Now, at the time of your deposition you weren't

24  familiar with the work of Roland Fryer and Richard Holden

25  in simulating plans with compact districts; were you?

NICHOLAS GOEDERT - CROSS

1   A    I believe that's correct.

2   Q    At the time of your deposition, you weren't familiar

3   with the work of Adam Cox, John Freedman or Richard

4   Holden on optimal gerrymandering, were you?

5   A    I believe that's correct.

6   Q    At the time of your deposition, you didn't know what

7   Wisconsin's state constitutional requirements were for

8   state legislative redistricting plans, did you?

9   A    I don't believe that I could recall specifically

10  during the deposition.  I think that's correct.

11  Q    And you've never written anything about clustering

12  analysis; correct?

13  A    No, I have not.

14  Q    Now, the definition of partisan gerrymandering that

15  you use in your work is a redistricting plan which is

16  done under the complete control of one party; isn't that

17  correct?

18  A    This is how I code for whether a state is considered

19  a partisan gerrymander.  It's the process under which the

20  lines were drawn.  This is certainly not a legal

21  conclusion as to whether I think it is a constitutional

22  gerrymander.  It is certainly also not a conclusion as to

23  the effectiveness of the gerrymander or the intent behind

24  the drawing of the lines --

25  Q    Is that --

NICHOLAS GOEDERT - CROSS

1    A        -- or the procedural definition.

2    Q      Professor Goedert, the definition of partisan

3    gerrymandering that you use in your professional work

4    outside of the courtroom is a redistricting plan which is

5    done under the complete control of one party, unified

6    party control; isn't that correct, sir?

7    A      Yes, that's correct.

8    Q      Now, in the context of how you code partisan

9    gerrymandering in your work, and this your academic work

10   outside of the courtroom, you code Wisconsin's plan Act

11   43 as a partisan gerrymander, don't you?

12   A      Well, because my academic work deals with

13   congressional elections, I don't code the State Assembly

14   plan because it's not part of my dataset.  But I would

15   code it, if I was going to use that definition, as a

16   Republican gerrymander if I was going to do -- based on

17   what I know about the facts, which I have no particular

18   inside knowledge of.

19   Q      Now, you believe the impact of a map is the result

20   of intentional acts by the people who were drawing the

21   map in addition to several other variables; isn't that

22   true?

23   A      I think that's a fair characterization, but there

24   are many variables which impact the effectiveness of a

25   map.

NICHOLAS GOEDERT - CROSS

1  Q    And you also believe there's intent behind the

2  drawing of legislative maps and you're sure that's true

3  in the case of Act 43 as well; isn't that true?

4  A    I'm not sure why you would conclude that I would say

5  that I'm sure that there's a particular intent behind the

6  drawing of Act 43.  I don't think I've offered any sort

7  of opinion as to that one way or the other.

8  Q    Do you recall having your deposition taken?

9  A    I do.

10 Q    And you remember that you were sitting in a

11 conference room and you were being asked questions by

12 Mr. Earle?

13 A    I do.

14 Q    And you were under oath when you did that; right?

15 A    Yes.

16        MR. POLAND:  I'd like the record to reflect I'm

17 going to hand Professor Goedert a copy of his deposition

18 transcript.  For the record, Professor Goedert's

19 deposition transcript is Exhibit 130.  And Counsel, I'm

20 going to draw your attention to page 42.

21 Q    And there's a little bit of a Q and A here.  Begins

22 at line 42 -- I'm sorry, page 43, line two.  And this is

23 a question being read back:

24        "Question:  And you're not going to be rendering any

25 opinion as to whether the impact of Act 43 was the

NICHOLAS GOEDERT - CROSS

1    intentional result of the design of Act 43; correct?

2        "Answer:  Certainly I believe that the impact of a

3    map is the result of intentional acts by the people who

4    were drawing the map in addition to several other

5    variables.  I believe there is intent behind the drawing

6    of legislative maps and I'm sure that's true in this case

7    as well."

8        Professor Goedert, were you asked that question?

9    Did you give that testimony?

10   A    Yes.

11   Q    Now, Professor Goedert, in this case we've heard

12   about two ways to calculate the efficiency gap:  The full

13   district-by-district method and a simplified method.  You

14   would agree that the simplified method is an appropriate

15   and useful shortcut measure of the efficiency gap; isn't

16   that correct?

17   A    Yes, I would in most contexts.

18   Q    And, in fact, in your report in this case you use

19   the simplified method to calculate the efficiency gap,

20   don't you?

21   A    Yes.

22   Q    You would characterize a responsiveness of 2 as the

23   average responsiveness compared to historical trends or

24   historical averages; isn't that correct?

25   A    This is what I have found in my research over the

1    past 40 years.

2    Q     And the linear method you used in your work

3    estimates an average slope or responsiveness of 2.02 for

4    the past 40 years; isn't that true?

5    A     Yes.  Again, in my own work for the most part I

6    don't use the linear method, but when I do calculate the

7    linear method, it does generate a slope over the last 40

8    years that is very close to 2.0.

9              MR. POLAND:  Could we bring up Exhibit 132,

10   please.  I'm sorry, could we bring up Exhibit 548,

11   please.  Same thing.  Better copy.  And could we turn to

12   Figure 1 in 548, Exhibit 548.  It should be on the third

13   page of the document.  There we go.  Could we bring the

14   slope up.  Not quite that far.

15   Q     Now here you've coded different plans, correct, or

16   plotted different plans?

17   A     Well, this is not a plot of different plans, this is

18   a plot of the national vote share in a given

19   congressional election compared to the national seat

20   share that a party won.

21   Q     And these are congressional elections; right?

22   A     These are congressional elections.

23   Q     Where would Act 44 fall?

24   A     Well, it wouldn't fall anywhere on this map because

25   this is a -- this is coding congressional elections and

1    thus it's producing an average slope for congressional

2    elections, not for state legislative elections.  I mean

3    if you're asking me where would a congressional election

4    where the seat share was the same as the seat share under

5    the legislative Assembly election in Wisconsin compared

6    to the vote share, is that what you want me -- I'm sorry.

7    Are you asking me where a congressional election with the

8    same vote and seat share that was produced as the

9    legislative outcome in 2012 in Wisconsin would appear on

10   this map?

11   Q    I'm asking you where Act 44 would fall.

12   A    I'm not sure I can answer that because this is a

13   chart of national congressional election results.

14   Q    Do you know what Act 44 was?

15          MR. KEENAN:  Object.  It's confusing.  Act 44.

16   BY MR. POLAND:

17   Q    Do you know what 2011 Wisconsin Act 44 is?

18          MR. KEENAN:  Act 43?

19          MR. POLAND:  I'm asking about Act 44.

20          THE WITNESS:  I do not know what Act 44 is.

21   BY MR. POLAND:

22   Q    So you don't know that that was the statute that was

23   adopted in Wisconsin that adopted congressional

24   districts.

25   A    Okay.  I was unaware of the number of the Act.

NICHOLAS GOEDERT - CROSS

1  Q   Okay.  So you are not familiar with that Act; is

2  that correct?

3  A   I was not -- I am familiar with the congressional

4  districts in Wisconsin.  I was not familiar with the

5  number of the Act that adopted them.

6  Q   Okay.  And you weren't familiar with the litigation

7  that happened a few years ago over Act 44 as well?

8  A   I am vaguely aware that there was some litigation,

9  but I'm not -- not in any detailed way.

10  Q   Do you know where Act 44 would fall on your slope?

11  Would it fall above or below the line?

12  A   Well, I believe that I have a table that shows

13  Wisconsin's electoral results, if Wisconsin is a "y" in

14  the table, later in the article which shows the result of

15  Wisconsin's congressional elections.  So if you're

16  talking about 2012, that would be found in this article

17  later on in the article.  If you're talking about 2014,

18  that would be found in the subsequent article that I

19  published.  I don't know what the numbers are off the top

20  of my head.  If you bring up the table, I would be happy

21  to locate it.

22  Q   On page four of the same article --

23      MR. POLAND:  Could we bring up -- I think it's

24  Table I or Roman Numeral I.  And could we enlarge --

25  that's right.  At the very top.  Table I.  Just the top

NICHOLAS GOEDERT - CROSS

1    portion of it.  There we go.

2    Q    All right.  So Professor Goedert, you see where

3    Wisconsin falls on the table?

4    A    Yes.

5    Q    All right.  And you code Act 44 as a Republican

6    gerrymander, don't you?

7    A    Yes.

8    Q    And it's a negative 15 percent; correct?

9    A    Yes.

10   Q    All right.  So on the slope that we had identified,

11   and we can go back to Figure 1 that we were just on, it

12   would fall below that line; correct?

13   A    Yes, it would fall below the line.

14   Q    Republican advantage.

15   A    Yes.

16   Q    You've coded it as a Republican gerrymander;

17   correct?

18   A    Yes.

19   Q    Now, are you aware that in the *Baldus v. Government*

20   *Accountability Board* lawsuit that was filed and tried in

21   the federal court in Milwaukee in 2012 that there were

22   certain plaintiffs that filed a constitutional claim over

23   Act 44?

24   A    I am aware that that litigation existed.

25   Q    And are you aware that one of their allegations was

NICHOLAS GOEDERT - CROSS

1   that Act 44 gave Democrats or gave Republicans an unfair

2   electoral advantage in an attempt to preserve their

3   political majorities?

4   A    I'm not specifically aware --

5          MR. KEENAN:  I'm just going to object to the

6   relevance of these questions.  Is this going anywhere?  I

7   mean there was a lawsuit in 2012 on the congressional

8   districts?

9          JUDGE RIPPLE:  I think we will allow it.  The

10  objection is overruled.  We'll allow the train of

11  questioning to continue.

12         MR. POLAND:  And then Your Honors, I'm reading

13  from the published *Baldus* opinion.  This is 849 Fed.

14  Supp. 2d. 840 and I'm going to read from page 854.  And

15  then the *Baldus* court held the following:  "To the extent

16  that the point is about process rather than results, we

17  add that our review of the drafting of Act 44 leads us to

18  believe that it was a significantly more biased partisan

19  process than that associated with the drafting of Act

20  43."

21       Were you aware of that?

22  A    I was unaware of that part of the opinion.

23  Q    All right.  Do you know where Act 43 would fall in

24  this line?

25         MR. KEENAN:  Object as vague.

NICHOLAS GOEDERT - CROSS

1   BY MR. POLAND:

2   Q    Do you know where Act 43 would fall in relation to

3   the slope that you've --

4           MR. KEENAN:   There's been two elections under

5   Act 43.

6   BY MR. POLAND:

7   Q    Do you know where it would fall?

8   A    Well, these are data points for single-election

9   cycles, single-election results.  So are you asking about

10  a specific year?

11  Q    I'm asking for the first year after --

12  A    In 2012.

13  Q    -- 2012.

14  A    Well, if you --

15          JUDGE RIPPLE:   For the record your objection is

16  overruled.  You can train -- the questioning can

17  continue.

18          THE WITNESS:   If you were to plot the statewide

19  vote share in Wisconsin for Assembly districts against

20  the statewide seat share, it would fall below the line.

21  But this line is for average of national congressional

22  elections and not for State Assembly elections.

23  BY MR. POLAND:

24  Q    Now, Professor Goedert, you only submitted the one

25  report in this case; correct?

NICHOLAS GOEDERT - CROSS

1    A      Correct.

2    Q      And that was in December of 2015?

3    A      Correct.

4    Q      You never asked to -- you were never asked -- I'm

5    sorry -- strike that.

6           You never asked to prepare a supplemental report,

7    did you?

8    A      I guess that's correct.

9    Q      And you never were asked by counsel to prepare a

10   supplemental report, were you?

11   A      Correct.

12   Q      That was after you had both Dr. Mayer's and

13   Dr. Jackman's rebuttal reports; correct?

14   A      Yes.

15   Q      You've repeatedly yourself calculated plans' biases

16   by comparing the parties' actual seat shares to their

17   expected seat shares given the responsiveness of 2;

18   correct?

19   A      That's not exactly correct given that my model does

20   not use the linear model.  It uses a probit model, which

21   again is similar to the linear model within a particular

22   range of election results.

23   Q      Let me ask the question again:  You have yourself

24   repeatedly calculated plans' biases by comparing the

25   parties' actual seat shares to their expected seat shares

NICHOLAS GOEDERT - CROSS

1   given a responsiveness of 2; correct?

2   A    That is not precisely correct.

3   Q    All right.  I'd like you to pick up your deposition

4   transcript again.  This is Exhibit 130.  Let's go to page

5   72.  And begin reading from line 20.

6        "Question:  Okay.  And you have yourself repeatedly

7   calculated plans' biases by comparing the parties' actual

8   seats to their expected seat shares given a

9   responsiveness of 2; correct?

10       "Answer:  Yes.

11       "Question:  And that is essentially identical to the

12  efficiency gap; correct?

13       "Answer:  Yes."

14       You were asked that question and you gave that

15  answer, didn't you?

16  A    Yes.

17  Q    And you were under oath when you gave that answer;

18  correct?

19  A    Yes.

20  Q    Now, Professor Goedert, for reasonably competitive

21  elections, your measure of bias is nearly identical to

22  the simplified form of the efficiency gap, isn't it?

23  A    Yes.

24  Q    Now, you testified in your direct examination that

25  in recent years the responsiveness exhibited by

1    congressional plans has shrunk; correct?

2    A    Yes.

3    Q    Do you know what responsiveness Stephanopoulos and

4    McGhee find for congressional plans since 1992?

5    A    Off the top of my head this is -- I'm sorry, can you

6    repeat the question?

7    Q    Certainly.  Do you know what responsiveness

8    Stephanopoulos and McGhee find for congressional plans

9    since 1992?

10   A    I don't know off the top of my head.  I believe that

11   it's -- they find that it's close to 2.

12   Q    So do you know that the responsiveness is 2.20?

13   A    I believe that that's what they find, if that's what

14   you're telling me.

15   Q    And you don't have any reason to disagree with that;

16   correct?

17   A    I don't have any reason to believe that their

18   calculation is wrong.

19   Q    All right.  Do you know what responsiveness

20   Stephanopoulos and McGhee find for congressional plans

21   since 2002?

22   A    I do not off the top of my head.

23   Q    Do you know that this responsiveness is 2.19?

24   A    I don't know that, but I don't dispute that.

25   Q    Do you know what responsiveness Professor Jackman

1  finds for state legislative plans since 1992?

2  A    I believe that he finds that it's close to 2.

3  Q    And do you know whether it's 2.18?

4  A    That is very plausible.

5  Q    You have no reason to dispute that; correct?

6  A    I have no reason.

7  Q    Do you what responsiveness Professor Jackman finds

8  for state legislative plans since 2002?

9  A    I don't know that.

10  Q    Do you know that response is 2.11?

11  A    I would believe that.

12  Q    Do you have any reason to dispute that?

13  A    I don't have any reason to dispute that.

14  Q    Now, in your work that you went over before,

15  gerrymander or geography, you assume that a party should

16  expect to win a proportion of seats in line with

17  historical patterns found in modern congressional

18  elections; isn't that true?

19  A    Well, it depends what you mean by should.  I

20  observed that the parties want a different share of seats

21  than we might expect given historical averages and so the

22  article is in some ways trying to unpack that or explain

23  it.  It is not a sort of a normative judgment that a

24  party should win "X" number of seats given "Y" amount of

25  vote, merely that given historical averages it is outside

NICHOLAS GOEDERT - CROSS

1    of the historical average if they don't conform to that

2    particular expectation.

3            MR. POLAND:  Could we bring a copy of Exhibit

4    132 up on the screen, please.  And I'd like to turn to

5    page two.  It's actually three of the document, but it's

6    page two and --

7            JUDGE RIPPLE:  Would you say what Exhibit 132

8    is?

9            MR. POLAND:  Yes, it's Exhibit 132, Your Honor.

10            JUDGE RIPPLE:  And what it is?

11            MR. POLAND:  Yes.  This is Dr. Goedert's article

12    called *Gerrymander or Geography*.

13            JUDGE RIPPLE:  Thank you.

14            MR. POLAND:  And could we zoom in on the

15    right-hand column.  There we go.  And I'd like to scroll

16    a little further down, starting at the sentence that

17    begins "Rather."  Could you highlight the sentence that

18    begins "Rather."

19    BY MR. POLAND:

20    Q    Can you read that sentence, Professor?

21    A    "Rather, we will assume that a party should expect

22    to win a proportion of seats in line with historical

23    patterns found in modern congressional elections."

24    Q    In fact, why don't we have you read the first part

25    of that paragraph beginning with *Tufte*.

                    NICHOLAS GOEDERT - CROSS

1   A       "Tufte proposed that a system of districting must

2   pass two tests to be minimally Democratic.  First, it

3   must be responsiveness" -- sorry -- "responsive such that

4   an increase in votes for one party will translate into an

5   increase in seats; and secondly, it must be unbiased in

6   treating both parties alike.  We will" -- should I

7   continue.

8   Q       Yes, please.

9   A       "We will therefore start from the premise that a

10  fair assignment of seats to parties will not be biased in

11  favor of one party but will also not require proportional

12  representation."

13  Q       And so your analysis that you're setting out there

14  starts from the principle that a system of redistricting

15  must be responsive; correct?

16  A       Yes.

17  Q       And that it also must be unbiased in terms of

18  treating both parties alike.

19  A       Yes.

20  Q       Now, Professor Goedert, in your view if you were

21  being asked what the likelihood is that an efficiency gap

22  would persist throughout potential future elections in

23  the decade, you would want to develop some sort of

24  measure for the plausibility of overall electoral

25  environments; isn't that correct?

NICHOLAS GOEDERT - CROSS

1    A    I think that's fair.

2    Q    And you'd also recommend applying a uniform-swing

3    assumption to determine the plausibility of future

4    electoral environment; isn't that true?

5    A    I think that would be a reasonable assumption.  I

6    don't think that's a necessary assumption.  I think

7    there's other methods that could be used for that, but I

8    think that's reasonable.

9    Q    All right.  You'd recommend it though; correct?

10   A    Again, I think it's a reasonable assumption.

11   Q    And it's something you would recommend; correct?

12   A    It's something I have done in my own research.

13   Q    And that you would recommend.

14   A    Sure.

15   Q    Now, in performing your uniform-swing assumption,

16   you would base that analysis on past election data;

17   correct?

18   A    Yes.

19   Q    And if you were asked the empirical question of what

20   the likelihood is that an efficiency gap will endure to

21   be the same sign in future election results, you would

22   want to figure out the range of possible overall

23   statewide election results; isn't that correct?

24   A    Yes.

25   Q    In working out those results, you might want to

1  deviate more in one direction than another; isn't that

2  correct?

3  A    Yes.  Given one particular election result where it

4  falls in the range of possible election results, I think

5  you might want to deviate more in one direction than the

6  other.

7  Q    And you'd want to come up with some sense of where

8  that particular election result lay on the range of

9  possible election results; isn't that correct?

10  A    Yes.

11  Q    And if you did this sensitivity testing, you would

12  think the results give you a fairly accurate estimate for

13  the likelihood that an efficiency gap would persist

14  through the decade; isn't that correct?

15  A    Yes.  I think that would be the best way to do that

16  sort of sensitivity testing.

17  Q    Now, you would agree that the partisan score used by

18  the map drawers and Professor Gaddie in 2012 was based on

19  prior election indicators of future election performance;

20  correct?

21  A    I believe that's true.

22  Q    All right.  So Professor Goedert, I'd like to go

23  back to your articles and I'm going to have you get

24  exhibits -- I'm sorry, we'll be ready with Exhibits 132

25  and 133.  We'll have to pull them up on the screen.

NICHOLAS GOEDERT - CROSS

1      Now, your articles, both your 2012 article and your

2   2014 article, they both include certain models; correct?

3   A    Yes.

4   Q    And your models reflect modern political science

5   techniques; correct?

6   A    Yes.

7   Q    Now, your model makes predictions or covers

8   predictions for 2012 and 2014; correct?

9   A    I don't know that I would describe them as

10  predictions because the election had already happened.

11  So they are measures of average effects of variables on

12  this election.

13  Q    Let me ask it a different way:  Predictions for 2012

14  and 2014 are covered by the model; correct?

15  A    Those are the election cycles that are covered by

16  the model.  I wouldn't describe them as predictions.

17  Q    Could we take a look -- get your deposition out

18  again.  Exhibit 130, please.  I'd like you to turn to

19  page 77.  Are you there, sir?

20  A    Yes.

21  Q    Page 77.  Beginning at line four:

22       "Question:  So predictions for 2012, 2014 are

23  covered by the model; right?

24       "Answer:  Yes.  That is what is covered" -- I'm

25  sorry.  "That is what covered" -- I think there should be

1   an is in there.  "That is what is covered by the model."

2        Were you asked that question and did you give that

3   testimony?

4   A    Yes.

5   Q    Now, you would characterize your model as reliable

6   for 2012 and 2014; correct?

7   A    Yes.

8   Q    Your model includes a number of independent

9   variables; isn't that correct?

10  A    Yes.

11  Q    All right.  Now, I'd like you to go to -- let's keep

12  Exhibit 132 up on the screen.  And if we could turn to

13  page seven, Table 2.

14       Now, one of the independent variables is Democratic

15  control over redistricting; isn't that correct?

16  A    Yes.

17  Q    And that's under the line here *Democratic*

18  *gerrymander*; correct?

19  A    Yes.

20  Q    And it's gerrymander because you have used unified

21  control and coded that as a gerrymander; correct?

22  A    Yes.

23  Q    Now, in your 2012 analysis you find that Republican

24  control over redistricting is a predictor of bias in only

25  two of your three models; isn't that correct?

                    NICHOLAS GOEDERT - CROSS

1  A    It is a significant predictor of bias in two of the

2  three models.

3  Q    And you find that Democratic control over

4  redistricting is a statistically significant predictor in

5  all three models; correct?

6  A    It depends on your standard of statistical

7  significance, but yes, under the lowest level standard of

8  statistical significance -- under the P is less than .10

9  standard, it is significant in all three models.

10  Q    And you've laid that out.  In fact, you've

11  identified your standards of statistical significance

12  right below Table 2; correct?

13  A    Yes.

14  Q    Now, your model suggests that holding political

15  geography constant, both parties benefited themselves

16  through gerrymandering in 2012; isn't that correct?

17  A    Yes.

18  Q    Now, Professor Goedert, when the vote share is

19  between 40 percent and 60 percent, the dependent variable

20  in your model will be fairly close to the efficiency gap;

21  isn't that correct?

22  A    Yes.

23       MR. POLAND:  I'd like to bring up the joint

24  final pretrial report, please.  And I'd like to bring up

25  paragraphs 257 and 258 and display those two on the

1   screen.  And we'll just represent to the Court that it is

2   a stipulated fact that the vote share in Wisconsin in

3   2012 and 2014 was between 40 and 60 percent.  And if we

4   look at paragraph 257, in 2012 it was 51.4 percent and in

5   2014, it was 48 percent.

6   Q    And do you see both of those on the screen in front

7   of you, Professor Goedert?

8   A    I do.

9   Q    Now, the bias that your model predicts in 2012 and

10  2014 if Wisconsin had a bipartisan court-drawn plan would

11  be Democrat in both years; isn't that correct?

12  A    Well, the model wouldn't apply to the State Assembly

13  map, the model is for congressional seats.

14  Q    Professor Goedert, you certainly cannot confidently

15  say there was a Republican bias generated from your

16  model; isn't that correct?

17          MR. KEENAN:  Object as vague.

18          THE WITNESS:  I don't understand the question.

19  I don't know how to answer it.

20          JUDGE RIPPLE:  Please rephrase.

21  BY MR. POLAND:

22  Q    You cannot confidently say that there is a

23  Republican bias generated from your model; isn't that

24  correct?

25  A    Which model are you referring to?

NICHOLAS GOEDERT - CROSS

1    Q      2012 and 2014.

2    A      But which model?

3    Q      The model that's reflected in your analysis in your

4    paper.

5    A      There are multiple models in each paper.

6    Q      Let's go to your deposition.

7           MR. POLAND:  Exhibit 130, please.  And we're

8    going to go to page 86.  Now, I'm referring to your

9    model's prediction for Wisconsin in 2012 and 2014, if we

10   assume a court-drawn or bipartisan plan was in place.

11   And reading, beginning page -- this is page 86, beginning

12   line 17.

13   Q      "Question:  There is no Republican bias?

14          "Answer:  I certainly could not confidently say that

15   there is a Republican bias generated from the model,

16   yes."

17          You were asked that question and you gave that

18   answer; correct?

19   A      This is in response to the attorney from your side

20   asking me to impute numbers from the State Assembly

21   results in Wisconsin onto my model of congressional

22   elections which I repeatedly stated in the deposition was

23   not an appropriate use of the model.

24   Q      Right.

25   A      I did state this, yes.

NICHOLAS GOEDERT - CROSS

1  Q    Let's go up to the top then or let's begin -- let's

2  begin at the top of page 86.

3         JUDGE CRABB:  Well, that's -- I think that's not

4  going to be helpful either because that just talks about

5  your models.

6         MR. POLAND:  All right.  Let me go on to a

7  different question here.

8  BY MR. POLAND:

9  Q    It's true, isn't it, that in 2012 Wisconsin was 6.6

10  percent black, 6.5 percent Hispanic, 70.2 percent

11  urbanized, had a statewide Democratic congressional vote

12  share of 51 percent and had eight districts; correct?

13  A    That sounds accurate to me.  What was the --

14  I'm sorry -- what was the vote share variable you stated?

15  Q    51 percent.

16  A    Was that congressional vote share?

17  Q    Correct.

18  A    Okay.  That sounds correct.

19  Q    And in 2014, all of these figures were the same, but

20  Wisconsin had a statewide Democratic congressional vote

21  share of 48 percent; correct?

22  A    Well, the minority share of the population might be

23  slightly different, but I think it's reasonable

24  simplification, yes.

25  Q    And if we plug these values into your models and if

1  we assume that Wisconsin's map was drawn by a court, a

2  commission or by a divided government, we get a small

3  pro-Democratic bias, don't we?

4  A    Yes.  This is for the model of congressional

5  elections; right?  So this would be for seats that are as

6  large as congressional seats.  That's what the model is

7  intended to predict.

8  Q    And you wouldn't say we get a pro-Republican bias;

9  correct?

10  A    That's correct, for imputing that data into my model

11  of congressional elections.

12  Q    Now, Professor Goedert, at the time you were deposed

13  in December, you had no idea what the relative

14  contribution to Republican bias in Wisconsin is as a

15  result of political geography; correct?

16  A    I don't believe I had a precise estimate in mind or

17  had calculated that specifically.

18  Q    And it wasn't in your expert report, was it?

19  A    No.

20  Q    And at the time that you were deposed in December,

21  you hadn't tried to determine what portion of Wisconsin's

22  efficiency gap is due to political geography and what

23  portion is due to greater Republican control of the

24  redistricting process; correct?

25  A    That's correct.

NICHOLAS GOEDERT - CROSS

1   Q    In the report that you submitted in December in this

2   case, you did not attempt to simulate nonpartisan

3   districts, did you?

4   A    That's correct.

5   Q    In your report you presented the distribution of

6   2012 presidential election results at the ward level;

7   correct?

8   A    Correct, with the uniform-swing assumption applied.

9   Q    You anticipated my next question.

10  A    Sorry.

11  Q    To present your distribution, you used the

12  uniform-swing assumption to simulate a tied election;

13  correct?

14  A    Yes.

15  Q    And that analysis is set out in your report;

16  correct?

17  A    Yes.

18  Q    And in fact, we looked at that when Mr. Keenan was

19  questioning you; correct?

20  A    That's correct.

21       MR. POLAND:  Let's bring up Exhibit 136, please.

22  And I'd like to go to -- I believe it's on page 21.  I'm

23  sorry, page 22, Figure 1.  Now, could we also bring up

24  Exhibit 15, that's Dr. Mayer's -- I'm sorry, that's a

25  chart.  And could we put those side by side?

NICHOLAS GOEDERT - CROSS

1    Q    Professor Goedert, do you recognize the document

2    that is now appearing on the screen -- should be on the

3    left -- it's identified as Exhibit 136?

4    A    I do.

5    Q    And that's the chart from your report, correct, on

6    page 22?

7    A    That's correct.

8    Q    Do you identify -- do you recognize the document

9    that's on the right side of the screen that's labeled

10   Figure 12?

11   A    I believe this was shown to me at my deposition.  It

12   looks like a figure that was shown to me at my

13   deposition, so I believe I do.

14   Q    Do you understand that comes from Dr. Mayer's

15   report?

16   A    I believe that's right.

17   Q    Do you know what Dr. Mayer is portraying there?

18    A    I do.

19   Q    Okay.  And so you know that that is Act 43 baseline

20   partisan measure?

21   A    That sounds correct, yes.

22   Q    Is it fair to say that the district distribution

23   under Act 43 does not look like the ward distribution in

24   your histogram which is Exhibit 136?

25   A    I believe they're similar in many ways and different

NICHOLAS GOEDERT - CROSS

1   in some ways.

2   Q    And it's fair to say that the distribution under Act

3   43 does not look like the ward distribution on your

4   chart; correct?

5   A    Again, I believe they're similar in some ways and

6   different in others.

7   Q    Now, you would agree that the district distribution

8   has a substantially more pro-Republican direction than

9   the ward distribution, wouldn't you?

10  A    Okay.  The table has disappeared.  I wasn't sure

11  if --

12  Q    Can we bring those back up on the screen, please?

13  A    There are a greater share of districts which fall

14  into the very marginally Republican bin or two bins in

15  Professor Mayer's diagram than there are a share of

16  wards.  I believe this was already discussed in my -- in

17  the testimony I gave in response to Mr. Keenan.

18  Q    And so you agree with me that there's a greater

19  percentage of districts that -- strike that question --

20  that the district distribution is substantially more

21  skewed in the Republican direction; correct?

22  A    In the sense that there are more -- a greater

23  percentage of districts which fall to the Republican side

24  of the 50 percent line than there is share of the wards,

25  I believe that is correct.

NICHOLAS GOEDERT - CROSS

240

1   Q    Now, Wisconsin's underlying geography is not

2   accurately reflected in the current districts of Act 43;

3   isn't that true?

4          MR. KEENAN:  Object as vague.

5          JUDGE RIPPLE:  Could you rephrase that for us,

6   please.

7          MR. POLAND:  Sure.

8   BY MR. POLAND:

9   Q    Wisconsin's underlying geography is not accurately

10  reflected in the current districts of Act 43; isn't that

11  true?

12         MR. KEENAN:  Object as vague.

13         JUDGE RIPPLE:  The same question?

14         MR. POLAND:  It was answered at the deposition.

15  He answered it there.  I'd be happy to go to the

16  deposition transcript if we need to.

17         THE WITNESS:  I'm not sure how I would respond

18  to that question.

19  BY MR. POLAND:

20  Q    Why don't we get your deposition up.

21  A    Sure.

22         MR. POLAND:  This is Exhibit 130.

23         MR. KEENAN:  I note that in this deposition I

24  note as vague.  So I renew my objection at the time of

25  trial.

NICHOLAS GOEDERT - CROSS

1          JUDGE RIPPLE:  Let's look at the deposition in
2    context.
3          MR. POLAND:  That's fine or -- that's fine.  If
4    you would like me to rephrase the question, I could do
5    it, Your Honor.
6          JUDGE RIPPLE:  I think it probably would be a
7    good idea, yeah.
8    BY MR. POLAND:
9    Q    It's true, isn't it, that the distribution of
10   partisanship in the districts in Wisconsin is not
11   identical to the distribution of partisanship of the
12   wards?
13   A    That's true.
14   Q    And the district distribution is noticeably more
15   skewed in the Republican direction than the ward
16   distribution as we just established; correct?
17   A    Yes.  I think I already answered that question.
18   Q    Do you know when Wisconsin's current wards were
19   drawn?
20   A    I do not.
21   Q    Isn't it true that Wisconsin's current wards were
22   drawn after Wisconsin's current districts were drawn?
23   A    I was not aware of that, but I believe it.
24   Q    In fact, isn't it true that municipalities were
25   ordered by law for the first time in Wisconsin history to

                    NICHOLAS GOEDERT - CROSS

1  draw their wards to comply with preexisting district

2  lines?

3  A    I don't know.

4        MR. POLAND:  Could we bring Exhibit No. 136 back

5  up on the screen and go again to page 22.  Could we pull

6  that up?

7  Q    Professor Goedert, in your direct examination you

8  talked quite a bit about packing, didn't you?

9  A    Yes.

10  Q   I didn't hear you mention the term cracking.  Is

11  that a term you're familiar with?

12  A    Well, yes, it is.

13  Q    Now, I think that you had identified that in the

14  chart that we see -- in the bar chart that we see on the

15  screen in front of you, the histogram, if we look at the

16  40 to 50 percent range, we see -- I think your testimony

17  was that the highest number of Democrats there are in a

18  ward that is marginally Republican; correct?

19  A    I'm sorry.  The highest number of Democrats are in a

20  ward --

21  Q    Most concentration.

22  A    This doesn't show the share of Democrats in a

23  particular ward, it shows the number of wards that are a

24  particular share Democratic.

25  Q    And the highest level is in the 40 to 50 percent

NICHOLAS GOEDERT - CROSS

1    range; correct?

2    A    It's showing that the greatest number of wards and

3    the greatest share of population is in wards that are 40

4    to 50 percent Democratic in a tied national election.

5    Q    And those are wards that I believe that your

6    testimony was are marginally Republican; right?

7    A    Right.

8    Q    And that could be evidence of cracking right there;

9    correct?

10   A    I'm sorry, these are -- these are wards.  I don't

11   understand how wards would be cracked.

12   Q    I'll withdraw the question.

13       Now, you're familiar with the work of Professors

14   Chen and Rodden on unintentional gerrymandering; correct?

15   A    I am.

16   Q    And in fact, you have cited their work in your

17   expert report in this case; correct?

18   A    Yes.

19   Q    Now, you've never produced simulated plans like

20   Professors Chen and Rodden, have you?

21   A    That's correct.

22   Q    But you do agree that one way to analyze the

23   partisan implications of a state's political geography is

24   through district simulations like those conducted by

25   Professors Chen and Rodden; correct?

NICHOLAS GOEDERT - CROSS

1    A    That's correct.

2    Q    In your expert report, you cite to Chen and Rodden

3    for the proposition that political geography explains

4    large efficiency gap in Wisconsin in 2012; correct?

5    A    I believe so, yes.

6    Q    And that's in your report; correct?

7    A    Yes.

8    Q    Are you aware that Professor Chen has prepared a

9    paper, currently publicly available and forthcoming in

10   the *Election Law Journal*, that concludes with high

11   statistical certainty that neutral nonpartisan

12   districting criteria combined with Wisconsin's natural

13   political geography would not have produced a districting

14   plan as electorally skewed as the Act 43 Assembly plan?

15   A    I am aware of his paper.

16   Q    And have you read it and are you aware of those

17   conclusions?

18   A    I became aware of it just a few days ago.  I don't

19   know how recently it was posted.  I have skimmed over it

20   and I am generally aware of the conclusions.  I have not

21   inspected it in any, you know, great detail.

22          MR. POLAND:  Could we bring up Exhibit 156,

23   please.  Can we go to page 11, please.

24          JUDGE RIPPLE:  For the record, would you please

25   identify the exhibit?

NICHOLAS GOEDERT - CROSS

1          MR. POLAND:  This is Exhibit 156, Your Honor.

2          JUDGE RIPPLE:  No, what it is.

3          MR. POLAND:  I'm sorry?

4          JUDGE RIPPLE:  What it is.

5          MR. POLAND:  This is the Chen paper, the

6   forthcoming publication.

7          MR. KEENAN:  We have an objection to the

8   admission of this exhibit.  But I'm not objecting to

9   asking the witness questions about the existence of the

10  paper.

11         JUDGE RIPPLE:  Understood.

12         MR. POLAND:  Could we go to the last sentence of

13  the second paragraph, please.  Could we highlight that

14  sentence.

15  BY MR. POLAND:

16  Q   Professor Goedert, could you read that into the

17  record, please.

18  A   "The improbable nature of the Act 43 efficiency gap

19  allows us to conclude with high statistical certainty

20  that neutral nonpartisan districting criteria, combined

21  with Wisconsin's natural political geography, would not

22  have produced a districting plan as electorally skewed as

23  the Act 43 Assembly plan."

24         MR. POLAND:  Can we bring up Exhibit 158,

25  please.

NICHOLAS GOEDERT - CROSS

1          MR. KEENAN:  Are there any questions about this

2     or is he going to read the paper into the record?

3          MR. POLAND:  I've asked to have Exhibit 158

4     brought up.

5          MR. KEENAN:  Okay.

6     BY MR. POLAND:

7     Q    Now, do you recognize -- this as Figure 3 from the

8     Chen paper, which is Exhibit 156?

9     A    It does look like a figure that was in the paper.

10    Again, I didn't read the paper in any great detail yet.

11    Q    So even though you had cited their earlier work, you

12    didn't think to go back and see if Professor Chen had

13    done any followup work?

14    A    I am unsure if whether the paper was available at

15    the time that I submitted the report.

16    Q    Well, you were able to look up the isolation index

17    two weeks ago; correct?

18    A    Correct.

19    Q    Do you know whether Professor Chen's paper was

20    available two weeks ago?

21    A    It probably was.  I don't know when it was

22    available.  It's listed as forthcoming in 2017, I

23    believe.

24    Q    Do you know whether it's publicly available?

25    A    I believe, yes.  That's where I found it on his

                    NICHOLAS GOEDERT - CROSS

1    website.

2    Q      When did you find it on his website?

3    A      Couple days ago.

4    Q      Did you even look for it before then?

5    A      I was unaware of its existence.

6    Q      Did you think it might be relevant to look and see

7    whether Professor Chen had done any followup work on

8    Wisconsin specifically when you had cited his earlier

9    work from other states?

10   A      At some point I did look to see if he had done any

11   specific work on Wisconsin and at that point he had not.

12   I don't check daily to see whether a specific person has

13   done work on a specific state.

14   Q      Have you ever talked to Professor Chen?

15   A      I have talked to him.

16   Q      Do you know him?

17   A      Only a little bit.

18   Q      Could you have called him up and asked him about his

19   work and whether it was appropriate to use it in this

20   case?

21   A      I suppose I could have called a number of people.

22   Q      Okay.  Let's take a look at Figure 3.  This is

23   Exhibit 158 that's on the screen in front of you.  Do you

24   see that?

25   A      Yes.

NICHOLAS GOEDERT - CROSS

1   Q    And under this chart, Act 43 is an outlier from the

2   200 simulated plans that Professor Chen has drawn;

3   correct?

4   A    That looks like what this table is showing.  Again,

5   I don't -- I'm only vaguely aware of the paper, so you're

6   asking me about specifics of a table I don't know the

7   specifics of.

8            MR. POLAND:  No further questions at this time.

9            JUDGE RIPPLE:  Thank you, Mr. Poland.  Do you

10  anticipate a long redirect?

11           MR. KEENAN:  No, it's a short redirect.  We

12  probably could finish it, then take the normal afternoon

13  break.

14           JUDGE RIPPLE:  Sure.  Mr. Keenan, go ahead.

15                   REDIRECT EXAMINATION

16  BY MR. KEENAN:

17  Q    Professor Goedert, some deposition testimony came in

18  that said -- you gave an answer, I'm just going to read

19  it, this is page 43, line six to nine of your deposition.

20  I guess you have it there, you can read it.

21  A    I do.

22           MR. POLAND:  I'm sorry, Counsel, what page?

23           MR. KEENAN:  Page 43.  Lines six to nine was an

24  answer to a question that you had gone over with

25  Professor Goedert.

                  NICHOLAS GOEDERT - REDIRECT

1          MR. POLAND:  I'm sorry, is there a question

2    pending?

3          MR. KEENAN:  I just wanted him to read the

4    answer.

5          THE WITNESS:  You want me to read the answer?

6    BY MR. KEENAN:

7    Q    Yes.

8    A    "Certainly I believe that the impact of the map is

9    the result of intentional acts by the people who were

10   drawing the map, in addition to several other variables."

11   Q    Okay.  What were the other variables that you think

12   go into the effect, the impact of a map?

13   A    Well, sure.  Obviously geography would be one.

14   Obviously various legal constraints would be another.

15   Certainly the actual electoral tide or overall electoral

16   environment in a specific election.  The candidates that

17   are running for office, whether they're incumbents,

18   whether they're high quality candidates.  There are

19   almost, you know, there are potentially a thousand

20   variables that could come into the effectiveness of a map

21   when it comes to electoral results.

22   Q    We're going to pull up your gerrymander, your

23   geography article which we've marked at Exhibit 548.  I

24   believe the plaintiffs have been referring to a different

25   number.  But you had been asked some questions about how

                    NICHOLAS GOEDERT - REDIRECT

1   you code things as gerrymanders and I believe you were

2   trying to explain what you meant by that.  Maybe it

3   hasn't gotten out.  Can you explain what you mean when

4   you code something as a gerrymander?

5   A    Right.  So I am referring to something as a

6   gerrymander, not in any sort of -- with any sort of moral

7   judgment or even evaluating its effectiveness, I'm simply

8   coding it as a gerrymander to reflect the process under

9   which it was drawn.  So any map in which one party

10  controlled the Legislature, in, say, both Houses of the

11  Legislature, if it was a legislatively drawn map and

12  presumably the governorship would be coded as a partisan

13  gerrymander regardless of the actual intent behind the

14  map, regardless of the effectiveness behind the map, and

15  regardless of any sort of legal conclusion that I would

16  draw about the map.

17  Q    And I notice we have -- the table you looked at with

18  Mr. Poland here, it's Table 1, I believe, on page four.

19  I see you also refer to bipartisan or court gerrymanders.

20  What do you mean by that?

21  A    Well, so bipartisan, I take a court gerrymander is

22  somewhat self-explanatory.  It's a map that's drawn by a

23  court.

24  Q    And those usually aren't referred to as

25  gerrymanders, but you're still coding that as a

NICHOLAS GOEDERT - REDIRECT

1  gerrymander?

2  A    Right.  I call everything a gerrymander.  It's just

3  shorthand.  A bipartisan gerrymander would be a map that

4  is typically drawn by a legislature, drawn by the normal

5  legislative process.  But, for instance, where there is

6  bipartisan control of the various Houses, for instance,

7  the Democrats control the lower House and the Republicans

8  control the upper House or the Democrats control both

9  Houses and the Republicans control the governorship,

10  where it is necessary for both parties to agree to a map

11  before it can be passed.

12  Q    Okay.  And then Mr. Poland -- this is the last

13  series of questions.  Mr. Poland asked you about the

14  models in this article and then there's also a 2014

15  article.  You recall that?

16  A    Yes.

17  Q    And there's the variables of the racial minorities

18  and urbanization and things like that.  Do you think

19  those models used to predict, not predict maybe, but used

20  to explain congressional elections can be used to explain

21  state legislative elections?

22  A    Certainly the actual model that I use in this

23  article would not be appropriately applied to state

24  legislative elections.

25  Q    And why not?

NICHOLAS GOEDERT - REDIRECT

1  A    Well, for one thing congressional seats are much

2  much larger than State Assembly seats in most states.

3  Certainly in Wisconsin I believe a congressional district

4  is more than ten times as large as a State Assembly seat.

5  So if you're looking at, for instance, the impact of

6  urbanization; right?  A city needs to be fairly large in

7  order to encompass almost an entire congressional

8  district.  So there's really only one city, for instance,

9  in Wisconsin, Milwaukee, that is going to encompass

10  almost an entire congressional district.  So most

11  congressional districts are going to have to have a whole

12  lot of different small cities in Wisconsin, whereas in a

13  larger state with larger cities you might have multiple

14  cities that would compose single congressional districts;

15  you might have cities that are large enough to compose

16  multiple congressional districts, and so the impact of

17  urbanization that you would observe in Wisconsin might be

18  different for congressional maps than it is for State

19  Assembly maps because most of the cities in Wisconsin are

20  much closer, I think, to the size of a State Assembly

21  district than they are to a congressional district.  And

22  so where you might not see a huge impact of urbanization

23  in congressional maps in Wisconsin, you might see a much

24  larger impact when it comes to State Assembly maps.

25          MR. KEENAN:  Those are all my questions.

NICHOLAS GOEDERT - REDIRECT

1          JUDGE GRIESBACH:  Professor, in that exhibit,

2    Figure 1 in your report, where you show the Democratic

3    vote share of wards, I take it you got the data or the

4    data for those consists of the actual ward votes for the

5    2014, 2012 election?

6          THE WITNESS:  That's right.

7          JUDGE GRIESBACH:  Is that part of -- is that

8    part of the record here?

9          THE WITNESS:  So I actually took those from the

10   datasets that were submitted by Professor Mayer.  So I

11   believe they are in the record.

12         JUDGE GRIESBACH:  And those are pretty much

13   publicly available, aren't there?

14         THE WITNESS:  They should be publicly available,

15   yes.

16         JUDGE GRIESBACH:  As well as the 2010 wards, we

17   can see what the wards look like on the previous --

18   before they were redrawn under Act 43?

19         THE WITNESS:  I would imagine so, but I don't

20   know.  I haven't --

21         JUDGE GRIESBACH:  Are those part of the record,

22   Counsel?  And do you have any objection to our taking

23   notice of them if they're publicly available?

24         MR. POLAND:  I don't know, Your Honor, whether

25   they are part of the record.  But we certainly have no

1  objection if the Court --

2        MR. KEENAN:  I would have the same answer.  I

3  think some of that data, like Professor Mayer created,

4  was provided to us and then provided to Professor Goedert

5  to do this.  I don't know that it's ever been provided to

6  the Court.  I just don't know.  But I would have no issue

7  with the Court having it or taking notice of it.

8        JUDGE GRIESBACH:  Well, you have these graphic

9  descriptions of actual votes.  It might be helpful for us

10  to see what the wards actually look like.

11        MR. POLAND:  I know that we did have that

12  certainly in the *Baldus* litigation, Your Honor.

13        JUDGE GRIESBACH:  Could we ask counsel to advise

14  us or make it part of the record?  I think the two --

15  both since the wards were redrawn, it might be helpful to

16  see what they looked like before and after.

17        MR. POLAND:  I'm sorry, Your Honor, I don't mean

18  to interrupt.  I believe Dr. Mayer had those and probably

19  still does have them.  We would need to know the specific

20  data in which the Court would like to have the data.

21        MR. KEENAN:  I believe they're Excel

22  spreadsheets and then there's like 6,600 lines, one for

23  each ward, and then there's a lot of data in them.

24        MR. POLAND:  We would need to do some validity

25  testing on the data, as we saw the other day, Your Honor,

1  but I think we could obtain that.

2      JUDGE GRIESBACH:  You know, particularly in the

3  districts that you've been discussing in the concentrated

4  areas, it might be more helpful than other areas.  I

5  realize that wards are different sizes and different

6  populations but...

7      MR. POLAND:  Yes, we can do that, Your Honor.

8      JUDGE RIPPLE:  I think we'll take our 15-minute

9  break.  We'll recess, be back in 15 minutes.  My

10  colleague reminds me that the Court has one thing it

11  needs to discuss.  So let's make this a 20-minute break

12  at least or 20 to 25-minute break to let the Court

13  discuss a matter we may have to discuss with counsel.

14      (Recess     3:34-4:02 p.m.)

15      THE CLERK:  This Honorable Court is again in

16  session.  Please be seated and come to order.

17      JUDGE RIPPLE:  Mr. Keenan, you are finished with

18  that witness?  Do you have something else?

19      MR. KEENAN:  I just have one small housekeeping

20  thing is that we had a couple of exhibits we used that I

21  never moved into evidence that I'd like to do now.

22  Exhibit 575 was the party A/party B isolation index

23  example, and then 581 was the document from the U.S.

24  Census that had the formula for the isolation index.  So

25  those two documents I'd move into evidence.

1          MR. POLAND:  No objection, Your Honor.

2          MR. KEENAN:  And with that we would rest our

3    case.

4          JUDGE RIPPLE:  With that objection the exhibits

5    are admitted.  You rest your case.  Do the plaintiffs

6    plan on a rebuttal case?

7          MR. POLAND:  Your Honor, we've been looking at

8    the clock and we might have some rebuttal.  That would be

9    primarily to respond to some of the materials we received

10   this morning from Mr. Trende, some of that new analysis.

11   This is what we would propose to do as we sort of weighed

12   the value of rebuttal versus closing arguments.

13     Our preference would be for each side to do about a

14   45-minute closing argument and if we -- I saw Your Honor

15   wince.  Okay.  Let me address rebuttal first.  We'd like

16   to evaluate that.  To the extent that we have any

17   rebuttal, it appears the Court intends to take some

18   written submissions.  If we have any, we'd prefer to ask

19   the Court's leave to be able to submit that as part of

20   the written submission.

21         JUDGE RIPPLE:  That being rebuttal?

22         MR. POLAND:  Rebuttal, Your Honor, correct.

23         JUDGE RIPPLE:  As part of the written

24   submission.

25         MR. POLAND:  Yes, Your Honor.

1           JUDGE RIPPLE:  We very definitely do anticipate

2  asking the parties for trial briefs -- post-trial briefs

3  with written submissions.  Mr. Keenan, how about you?

4  How do you feel about all this?

5           MR. KEENAN:  About them doing a written

6  rebuttal?

7           JUDGE RIPPLE:  Um-hmm.

8           MR. KEENAN:  That's fine.

9           JUDGE RIPPLE:  You would not have an opportunity

10  to cross-examine.

11           MR. KEENAN:  As long as I'd have a chance to

12  also respond in writing, I think that would be fine.  I

13  mean if they submit something before the final pretrial

14  brief is due or something like that where we'd get a

15  chance to respond to it, but wouldn't have cross, that

16  would be fine.

17           JUDGE GRIESBACH:  What do you have in mind for

18  rebuttal that we would see in writing?

19           MR. POLAND:  Your Honor, I'm not exactly sure.

20  I think what we'd need to do is look at some of the new

21  material that we received this morning.  There are some

22  things that we can address over the lunch break and other

23  things that we need a little bit more time to digest.

24           MR. HEBERT:  And Your Honors, if I could pipe

25  in, just one suggestion:  The way we've done this in

1    other three-judge court cases is if we were to submit

2    some rebuttal evidence, it would be in the form of a

3    sworn declaration and if Mr. Keenan decided he needed to

4    take a post-trial deposition of that witness, we could

5    let him do that.  That's the kind of thing that's been

6    done in many, many other cases.  That would be acceptable

7    to us.

8            JUDGE RIPPLE:  We will proceed that way then.

9    We would like to proceed to closing arguments then today?

10           MR. POLAND:  We would, Your Honor.  There is one

11   other housekeeping matter that we have and that is to --

12   the plaintiffs would like to formally move into evidence

13   Exhibit 497, which were the last of the charts that were

14   created from the flip chart.

15           MR. KEENAN:  No objection.

16           JUDGE RIPPLE:  That -- that exhibit is admitted.

17           MR. POLAND:  Thank you, Your Honor.

18           JUDGE RIPPLE:  We would, first of all on trial

19   briefs, we would prefer that we have trial briefs within

20   14 days and we will allow for simultaneous replies ten

21   days thereafter.  And we -- were you about to say

22   something?

23           MR. POLAND:  I was going to ask a couple

24   questions actually just on the logistics.  Are there

25   specific issues that the Court would like to have

1 addressed in the trial briefs?

2      JUDGE RIPPLE:  The Court would like to have

3 addressed what we have called the Chen issue and we would

4 like that addressed in writing for sure.  And we invite

5 you to use your discretion with respect to other matters,

6 particularly if there are other legal matters that you

7 want to give us a more fulsome explanation of or update

8 on, you should feel free to do that.

9      MR. POLAND:  Does the Court anticipate something

10 beyond addressing specific legal issues?  I'm just

11 thinking in terms of are there proposed findings of fact

12 from the trial record that the Court is expecting to

13 receive from the parties?

14      JUDGE RIPPLE:  We're going to, I think, leave

15 that at your discretion and -- but we certainly -- I

16 think one of the things we would anticipate you would

17 help us with is the evidentiary record.  The organization

18 of this trial has been somewhat different because several

19 of the fact witnesses were presented at one time and we

20 did not have such a clean situation of having the

21 plaintiffs' case or the defendants' case and that is a

22 situation that we have to wrestle with on unbundling the

23 record and dealing with it and evaluating it.  And to the

24 extent that you were able to help us do that, it would be

25 most appreciated.

1          MR. POLAND:  Very well, Your Honor.

2          JUDGE RIPPLE:  My colleagues tell me they would

3   appreciate it if you could limit your closing arguments

4   to 30 minutes a side.  Do you think that's -- so let's

5   try to keep it at that.  Okay?

6          MR. POLAND:  Very well, Your Honor.

7          JUDGE RIPPLE:  And I'll let you proceed.

8          MR. POLAND:  Thank you, Your Honor.

9          JUDGE CRABB:  Let me just say one thing.  The

10   exhibit lists will be at the clerk's desk so if you want

11   to check them over afterwards and see whether there are

12   omissions or things that you think are not correct.

13          MR. POLAND:  Thank you, Your Honor.

14      Your Honor, the plaintiffs' closing argument will be

15   given first by Professor Stephanopoulos.  We'd like to

16   split the time between Professor Stephanopoulos and

17   Mr. Hebert.  (4:10 p.m.)

18          JUDGE RIPPLE:  Professor.

19          MR. STEPHANOPOULOS:  Your Honors.  So in his

20   opening statement a few days ago, Mr. Keenan said a

21   couple things that struck me.  First, he mentioned his

22   grandfather's criticism of "people using statistics as a

23   drunk using a lamppost for support rather than

24   illumination."  And second, he observed that plaintiffs'

25   statistics are actually very illuminating.  What

Mr. Keenan left unsaid though was a third point, which is the one I want to focus on now.  And this is about plaintiffs' statistics do illuminate the intent of Act 43's drafters, the severity and the durability of Act 43's partisan asymmetry, and the unjustifiability of this asymmetry.  I don't believe that we can say the same about the statistics we've heard from defendants.  I would say that their statistics have been aimed at obfuscating, rather than illuminating, and I'll be providing the Court with some examples of that.

Before I get into any of the data about how any of the prongs of our proposed tests have been discussed over the course of trial, I want to just note at the outset that skepticism for statistics really has no place in this area in the context of redistricting.  When you're dealing with the aggregation of millions of voters into dozens of districts, numbers are going to be a central part of the picture.  That's true in the one-person one-vote context, it's true in voting rights cases where racial polarization in voting is a complicated and central inquiry.  It's also why the drafters of Act 43 prepared these elaborate partisan composites, these very sophisticated S curves, and it's also why any tests for partisan gerrymandering, I think, will have to have some kind of quantitative component.

1    With that preliminary, let me begin by reviewing

2    some of the technical issues that arose in the case with

3    respect to discriminatory intent.  There are a couple of

4    these, but in the interests of time, I'll focus on one.

5    And this is Mr. Foltz's testimony that when he,

6    Mr. Handrick and Mr. Ottman were calculating their

7    composite, they made all kinds of mistakes and therefore

8    the composite wasn't very trustworthy.

9        As Your Honors probably remember from the hours we

10   spent going through this file, the problem was that a

11   single one of the 17 races that were included in the

12   composite had some faulty data in it.  Now, I'm not sure

13   why it matters whether Mr. Foltz, Mr. Handrick and

14   Mr. Ottman were sloppy rather than careful

15   gerrymanderers.  If a burglar trips over his feet when he

16   breaks into a home, he still intends to break into the

17   home, and that's what's critical here.

18       In addition, when plaintiffs examined this supposed

19   error, it turned out to be completely immaterial.

20   Professor Jackman showed that when you remove the one bad

21   race from the composite, the

22   original-flawed-and-then-you-fixed composite are

23   perfectly correlated.  Professor Mayer showed the same

24   thing with respect to how the original flawed composite

25   is related to his baseline estimates using new correct

1   data from the 2012 elections.

2       Let me turn next to discriminatory effect, and in

3   particular, to the main metric of partisan symmetry the

4   plaintiffs advanced in this case, which is of course the

5   efficiency gap.  I don't believe the defendants have

6   disputed that Act 43 is, in fact, one of the most

7   asymmetric plans in modern American history and I don't

8   believe they dispute that this partisan skew by every

9   analysis that we've tried to conduct can be reliably

10  expected to persist for the remainder of the decade.

11      What they've done instead is to raise a couple --

12  actually several technical issues, and in the interest of

13  time I'll just focus on volatility and durability which I

14  took to be the main point that Professor Goedert raised

15  in his testimony.

16      So with respect to durability, the main point that

17  both Mr. Keenan and Professor Goedert have made is that

18  when you consider the possibility of a plan with a

19  certain efficiency gap flipping efficiency gap signs over

20  the course of the decade, that likelihood is reasonably

21  high for certain pro-Democratic plans.  Now, I'll note

22  that the probability of a signed flip for Act 43 is more

23  or less 0.  And I'd also note that this extremely

24  stringent analysis, as Professor Jackman described it, is

25  only one of about half a dozen separate durability

1   analyses that he carried out.

2        To run through a few of them, which I think are

3   powerful indications of the reliability of this metric,

4   the confidence rate associated with an efficiency gap

5   threshold of 7 percent is about 95 percent.  So in other

6   words, about 95 percent of plans fall either below this

7   threshold or above it and then never flip signs over

8   their lifetimes.

9        Even more intuitively, a plan's first efficiency gap

10  is an excellent predictor of its lifetime average

11  efficiency gap.  If all we know, if the only information

12  we have is a plan's first efficiency gap, we can account

13  for about three-quarters of the total variation in the

14  lifetime efficiency gap.

15       And this is a confusing chart.  I'll just summarize

16  the takeaway.  If we subject the plans in effect today to

17  shifts of up to five points in either party's direction

18  which applies to large efficiency gaps, their efficiency

19  gaps are virtual certain to have the same sign for their

20  lifetimes and to also be large in magnitude.

21       Now, I would note that this sort of sensitivity

22  testing fully addresses all of the concerns that

23  Professor Goedert raised about not knowing what future

24  electoral environments might look like, not knowing what

25  elections might take place when.  We shift to cover the

1    entire range of plausible electoral environments and we

2    can draw robust conclusions about whether the large

3    efficiency gap we initially observed is going to remain

4    in effect for those kinds of plans for the rest of the

5    decade.

6         Now, I'd note too this robustness of the sensitivity

7    testing substantially exceeds any that has appeared in

8    the academic literature and in my opinion based on

9    knowing this literature it is the most systematic,

10   extensive sensitivity testing that has yet been conducted

11   in this area.  I think its results ought to be extremely

12   reassuring to the Court.

13        There's more to say on the issue of the efficiency

14   gap, but I think the next topic I'd like to address is

15   that of justification, so the third prong of plaintiffs'

16   proposed test.  And here there are really two kinds of

17   arguments the defendants make.  One is to try to argue

18   that Wisconsin has a natural pro-Republican political

19   geography, and the other is to criticize various aspects

20   of Professor Mayer's Demonstration Plan.  And so I think

21   I'll try to hit those two points before turning the floor

22   to Mr. Hebert.

23        So let's run through -- I'll focus on the highlights

24   here with respect to political geography.  One thing I

25   would note is that every time we got an analysis of

political geography in Wisconsin from defendants and
their experts, this analysis disintegrated upon more
proper examination.  We heard from Mr. Trende that
Democratic wards are becoming more Democratic over time;
in fact, they're not when this analysis -- they are, but
so are Republican wards when this analysis is properly
carried out.

     We heard from Mr. Trende that as highly partisan
wards on the Democratic side -- as wards get more
partisan, that they also grow closer together and that
has some inference that we're supposed to draw about
geographic clustering.  It turns out the premise of that
analysis is flawed as well.  When we use correct data,
not PVI's, and when we focus on the mean, which is the
single most reliable statistic here, we, in fact, find
the exact opposite pattern from the one claimed by Mr.
Trende.

     The same thing -- actually before I get to this, the
same thing happened today when we had counsel and
Mr. Trende marching through many, many examples of
Wisconsin counties' PVI scores.  We only heard about,
from defendants, about the PVI's in Dane County and
Milwaukee Counties.  As soon as we also expanded our
field of vision to the collar counties of Milwaukee, we
found out that those collar counties are every bit as

1  Republican as Madison and Milwaukee are Democratic.

2      Same pattern with Professor Goedert.  He conducted

3  an analysis of the distribution of partisanship in the

4  wards currently in effect and concluded this was a

5  pro-Republican skew in the ward distribution.  I won't

6  disagree that there was some minor skew in the ward

7  distribution, but that skew completely pales compared to

8  the pro-Republican skew that jumps off the page when you

9  compare the ward distribution to the district

10  distribution.

11      And let me just note what I think is quite an

12  important point about political geography here that this

13  chart helps to illustrate.  So there likely is some

14  natural packing, especially of minority voters in places

15  like Milwaukee.  Voting Rights Act districts often have

16  to be drawn in those areas as well.  And you can see this

17  region of the chart here.  But there's a crucial point

18  about these kinds of districts, which is that these

19  constituencies, in the area of 75 percent Democrat or so,

20  do not move the efficiency gap at all in a pro-Republican

21  direction.  And that's because in these districts, yes,

22  Democrats are wasting 25 percent or so of their votes,

23  but that's the exact same proportion of votes that the

24  Republicans are also wasting there.  There's no

25  difference in the wasted votes in those packed --

1   supposedly packed 75 percent or so districts.

2        The real way you get gerrymandering, the real way

3   you generate an extreme efficiency gap is with these

4   kinds of districts.  So when you have the

5   disproportionate cracking of parties' voters, when you

6   have lots more districts where Democrats are receiving 40

7   to 45 percent of the vote and wasting all of that vote

8   and Republicans are getting 55 to 60 percent of the vote

9   and only wasting a small smidgen of that vote, that

10  disproportionate cracking is the real essence of

11  gerrymandering.  And to quote Professor Mayer from

12  yesterday, "That DNA is all over Act 43."

13       I note also that disproportionate cracking has no

14  conceivable roots in the political geography of

15  Wisconsin.  That you have a lot of Democratic or minority

16  voters in central Madison and central Milwaukee says

17  nothing about how you draw the other 90 districts in the

18  plan and to the extent which you have to

19  disproportionately crack one parties' supporters over the

20  others.

21       Let me turn next to defendants' criticisms of

22  Professor Mayer's Demonstration Plan, which I think also

23  are somewhat misleading.  Their main criticism of the

24  partisan performance of the plan seems to be that if you

25  carry out the wrong kind of sensitivity testing, then it

1    appears that the plan could result in quite a few more or

2    less Republican or Democratic seats being won for

3    reasonable shares -- shifts in the share of the statewide

4    vote.  Professor Mayer explained at length this is not

5    the right way to do sensitivity testing.  I don't know

6    how to quite remove these -- bottom left.

7         So I would point out the overlap, the impressive

8    similarity between Professor Mayer's sensitivity testing,

9    to which defendants have objected, and Professor

10   Jackman's sensitivity testing which, as mentioned

11   earlier, is the new gold standard for sensitivity testing

12   in this area.  They both generate essentially identical

13   results for Act 43 over an extremely wide range of

14   electoral environments, and that's revealed here.

15        Now, we also heard criticisms of the Demonstration

16   Plan on the grounds of noncompactness and splitting

17   political subdivisions.  This was one of the odd-looking

18   districts that defendants highlighted.  Now, this is just

19   a particular cherry-picked district.  It's a stipulated

20   fact in this case that the Demonstration Plan is more

21   compact on average than Act 43 and that it splits fewer

22   political subdivisions overall.  So we genuinely can't

23   reach any conclusions from this pair of districts or

24   other similar examples.  Defendants also raise the issues

25   of incumbent pairings and core retention, and those are

1   the last ones I'll talk about.

2       So their analysis proceeded again by highlighting

3   individual districts in the map and noting how many

4   incumbents were paired or for one or two districts out of

5   99 what percentage of a former district was in the new

6   district.  They didn't reveal to the Court the full

7   picture here.  What is the full picture?  First of all,

8   incumbent pairings and promoting core retention, neither

9   one of those is a Wisconsin legal requirement.  With

10  respect to incumbent pairings, when the drafters of Act

11  43 thought about incumbent pairings, they didn't try to

12  minimize them.  What they tried to do instead is to

13  deliberately pair Democratic and Republican incumbents in

14  heavily overwhelmingly Republican districts, and there's

15  nothing like this methodical targeting of one side's

16  incumbents in the Demonstration Plan.

17      Furthermore, as far as plaintiffs have been able to

18  tell there's not a single document on the hard drives of

19  Mr. Foltz, Mr. Ottman or Mr. Handrick about core

20  retention.  This appears to be the classic case of a

21  pretextural justification generated after the fact.

22      And finally, the broader picture is that the *Baldus*

23  court specifically addressed the topic of core retention,

24  and here is what it said:  Only about 300,000 people

25  needed to be moved from one Assembly district to another

1    in order to equalize the populations numerically, but

2    instead Act 43 moves more than seven times that number,

3    almost 2.5 million people in order to comply with

4    population equality.  Same thing at the Senate level.

5    Only 200,000 people had to be moved, but Act 43 instead

6    moved more than a million.

7         And I'll just close with this final point, Your

8    Honors, which is that all of the analytical tools that

9    plaintiffs have used in this case, they might seem

10   complex, they might seem dense to any observer, but these

11   methods of open-seat baselines, imputations for

12   uncontested races, sensitivity testing, these are the

13   exact same methods that the drafters of Act 43 themselves

14   employed and they're also the exact same methods that

15   drafters around the country employed when they're trying

16   to craft a partisan gerrymander.  The difference here is

17   that plaintiffs have been trying to use these tools to

18   detect gerrymandering and to curb gerrymandering, not to

19   perpetuate it.  The mission is exactly the opposite, the

20   promotion of democracy, not the undermining of democracy.

21        I would say to the Court this project of promoting

22   democracy like this lies at the very heart of why we have

23   an independent judiciary in this country.  We have a

24   situation here in Wisconsin where democracy really is

25   ailing because of this unprecedented partisan

gerrymandering, and in the face of the legislative

passivity and inaction that we're observing, the only way

that this problem is going to be solved is through

judicial intervention.

        And so with that, I'll turn the table over to

Mr. Hebert.

                JUDGE RIPPLE:  Thank you, Professor.

                MR. HEBERT:  Your Honors, I think I have about

12 minutes left and I will apologize in advance, Lynette,

that I may -- I'll try to pace myself.

        Plaintiffs' three-part test:  Intent, effects, and

justification or the lack thereof.  That's our Fourteenth

Amendment theory.

        On the intent issue quickly, during the oral

argument on summary judgment in response to a question

from Judge Crabb, counsel for the defendants was asked:

"Do you contest partisan intent for purposes of summary

judgment?"  The answer was "No."  And he added "And we

will not dispute intent at trial either" he didn't

envision.  So it's essentially been uncontested.  And

rightfully, so I might add.  You have the Ottman memo,

Exhibit 241, where he says we have the opportunity and

the obligation to determine who's going to be here in ten

years.  But that goes to intentional durability of a

gerrymander.

1       On the intent issue we have the secrecy policy.  We
2   had the rush to nine day legislative process, the very
3   "aggressive legislative agenda," the hiring of the
4   Michael Best law firm and replacing the Democratic
5   counsel and leaving them without funding.  You have the
6   incredible testimony of Joe Handrick, who testified in
7   *Baldus* that he didn't even use partisan data.  And you
8   heard two witnesses from the state come in and contradict
9   that testimony.  I mean that's just unbelievable when
10  somebody testifies under oath that they were in the map
11  room using partisan intent with Professor Gaddie and data
12  to draw a map and then testifies under oath that they did
13  not?  And we're going to take action on that after this
14  hearing, Your Honor, with the United States Attorney.
15      And that's why the *Baldus* court decided that it was
16  laughable when people came in, like the witnesses that
17  came into this court and talked about intent.  They
18  deviated from the normal process.  This is a typical
19  standard in intent cases.  First time in a century that
20  they actually didn't draw the wards first and then do the
21  districts.  And you know why they didn't?  Because they
22  needed to rush it through because of the recall election
23  and they were afraid they were going to lose power.
24      They hired Professor Gaddie to run S curves.  Why do
25  you run S curves?  The only reason you do that is to see

1   the durability of the partisan gerrymander.  And they

2   printed out the S curves.  They showed them to the

3   legislative leadership.  For heaven's sake, we had the

4   Tale of the Tape which shows they were targeting

5   Democrats.  That was Exhibit 283 and 284.

6       Each plan they drew along the way increased the

7   partisan advantage for Republicans and disadvantaged

8   Democrats.  And even their equal population data, when

9   they gave it to the legislators individually, it didn't

10   just contain the number of people in your district or how

11   many you lost, how many you have to pick up, it had the

12   partisan scores on it.  So even their equal population,

13   so-called one-person one-vote data was looked at through

14   a partisan lens.

15       Look at the effects.  They're extreme and they're

16   durable.  Efficient scores, you've heard those.  Worst

17   gerrymander in modern history from 1972 to 2010.  Exhibit

18   35, the original report of Simon Jackman, Figure 1.

19   Exhibit 90, the lifetime average versus the efficiency

20   gap scores.  Exhibit 158, worst on the efficiency gap and

21   preservation of county boundaries.

22       Then even if you look at Exhibit 172, you can

23   compare the number of swing districts in the old plan to

24   the number of swing districts in the new plan and they

25   drop down from 19 to 10.  And they increase the number of

1   strong GOP districts from 27 to 38.  I mean I'm going to

2   -- in a minute I'm going to show the Court how you

3   gerrymander.  As somebody who has represented state and

4   local governments throughout my entire career as a lawyer

5   and having done hundreds, if not thousands of

6   redistricting plans, I'm going to show you in an

7   illustration right here in the courtroom how they did

8   what they did.

9        And even Professor Gaddie's detailed definition of

10  durability, as he said, it's virtually certain to bias

11  Republicans throughout the entire cycle.

12       And the justification.  I mean really, the state's

13  trial brief concession at page 26 was that the

14  Demonstration Plan performs just as well as the Act 43

15  with traditional redistricting principles.  Well, if

16  that's the case, then that's a concession that they

17  really can't justify their plan because we have a plan

18  that has less partisan bias than theirs and follows the

19  traditional redistricting criteria.  That's on page 26 of

20  their trial brief.

21       Then they have the series of draft maps that

22  increasingly showed partisanship.  Well, if you've got

23  other plans you've drawn along the way that doesn't have

24  that partisan bias and you've been following the

25  so-called redistricting principles, well then for

heaven's sake when you final adopt the worst plan, you've

already created four or five demonstration plans that

meet the same requirement.

And then you finally have the Professor Chen's

hundreds of simulated plans that do the same thing.

The First Amendment injury here -- and the

plaintiffs have been in this courtroom every day.  Their

right to vote is fundamental.  It's our voice in the

government.  It's the only voice many of us have.  It's

at its pinnacle, the First Amendment, when it involves

political speech in voting.  The past voting history,

when you go to the polls and you record your political

vote, you're recording your political value, as Professor

Whitford said.  It's not right to target people and harm

them because of their voting history.  Burdening and

penalizing people for the fact that what did they do?

They had the nerve to participate in the political

process and go to the polls, so we're going to use their

voting history to minimize and cancel out their vote as a

group?

Our test is grounded.  The gerrymander test we

proposed is grounded in five decades of constitutional

law principally arising out of the one-person one-vote

cases.  We would only capture extreme and enduring

gerrymanders.  In *Vieth*, one of the cases I worked on,

1    *Vieth v. Jubelier*, all nine justices agreed that

2    excessive partisan gerrymanders were unconstitutional.

3    We think they meant it.

4         We have a record that is complete for this Court.

5    We have a record, as Judge Griesbach noted, that is even

6    going to be complete for eight or nine justices thousands

7    of miles away.  We have a case that fits the elusive test

8    we think that the Court has been looking for.  Decisions

9    in *LULAC* and *Vieth*, you know what they did to partisan

10   gerrymanderers?  *LULAC* in 2006, *Vieth* in 2003, both of my

11   cases.  What they did is they gave the green light to

12   partisan gerrymanderers to say this is an opportunity for

13   you.  Sky's the limit because we have no standard.  And

14   they took advantage of that.

15        Now, how many legislative leaders came before the

16   court in Wisconsin and justified or defended what they

17   did?  As many as are sitting in that witness chair.

18   None.  State's theory of this case is that no

19   constitutional limits to partisan gerrymandering really

20   exist because they say there's no test.  Well, what that

21   would mean is it's not justiciable and we already know

22   that five justices think it is and I guess we think this

23   is a case where the Court ought to just dish it finally

24   and once and for all.

25        Partisan gerrymandering cases today masquerade as

1  racial cases.  And why?  Because we lack a robust

2  partisan gerrymandering juris prudence and so everybody

3  has to take their challenges and awkwardly fit them into

4  a racial sphere, creating a doctrinal mess frankly in the

5  racial gerrymandering field and perversely encouraging

6  legislators to boast about their partial gerrymandering

7  so that they don't have to get caught up in a racial

8  gerrymander.

9       Representatives and their parties today are armed

10  with more sophisticated computers and fine-grained voting

11  data than ever before.  And what do they use it for?

12  Eliminating political competition, predetermining who's

13  going to win and lose, and wresting unjustified political

14  power from those voters who oppose them and opposing them

15  by packing them and cracking them.

16       And what does all this have to do with the public?

17  The public's opinion today, they've lost faith.  They've

18  lost faith in the integrity of our elections and our

19  elected officials.  Public confidence -- this is the

20  Supreme Court just a couple terms ago in *Crawford v.*

21  *Marion County.*  Public confidence in the integrity of the

22  electoral process has independent significance because it

23  encourages citizen participation in the electoral

24  process.  And just last term in another one of the cases

25  I was involved in, the Arizona State legislative case,

1    the Supreme Court reaffirmed the view that "partisan

2    gerrymanders are incompatible with democratic

3    principles."  That's got to be a hint.  That's got to be

4    a signal that we've got to do something about this, and

5    the court is looking for a case.

6         Now, I said finally that I would demonstrate what a

7    partisan gerrymander -- how you accomplish that.  And I'm

8    going to use water as an example.  So when I tell my

9    clients we want to draw districts, we can draw the

10   districts so that the water is down to here so that in a

11   big rainstorm when the water comes up, it won't go over

12   your head.  But if we draw it down there where the water

13   is low, are we really creating a safe district for your

14   political party and we're not maximizing the use of our

15   voters because we've got too many of them?  So what we

16   really need to do is not draw districts up to here where

17   the water is up to here because in that vote swing we

18   heard about, if it goes up, all of you are going to

19   drown.  You're all going to drown in a big swing or even

20   a small swing.

21        So here's what you do.  We're going to draw it to

22   here so that it -- and we're going to measure how high it

23   can go up historically so that it always stays below your

24   chin.  That is exactly what Wisconsin did in this case.

25   They drew it right at chest deep.

1    Now, since the Supreme Court hasn't settled on a

2    standard, the task falls to this three-judge court to

3    develop them, we believe, and the plaintiffs have tried

4    to shoulder this obligation.  A decision here that this

5    gerrymander, this partisan intent, this extreme, this

6    unjustified, if you can't find a partisan gerrymander in

7    this case, then it's tantamount to saying it lacks

8    justiciability.  We just can't get there.  So this case

9    is not at the margins and we ask the Court to declare it

10   unconstitutional.

11   Finally, I'm reminded of my home state of Virginia,

12   James Madison and Federalist No. 37 who said "the genius

13   of Republican liberty seems to demand not only that all

14   power should be derived from the people, but that those

15   entrusted with it should be kept in dependence on the

16   people."  And even Alexander Hamilton, quoted by the

17   Supreme Court in 1969 in *Powell v. McCormick* said "the

18   true principal of a republic is that the people should

19   choose whom they please to govern them."  Don't we wish

20   that was the case.

21   The United States of America continues to be the

22   leading democracy in the world.  But if we're going to be

23   able to spread democracy throughout the world, we have

24   the duty to first correct the remaining imperfections of

25   our democracy here at home.  As we get ready this weekend

to celebrate Memorial Day, remembering those brave women

and men who fought for our country's ideals of freedom,

justice, equality, let us honor their memory by holding

our government accountable to those worthy and lofty

ideals.  What the evidence shows is we now know the way,

we need only the will.

Thank you, Your Honors, for your courtesies

throughout this trial.     (4:40 p.m.)

JUDGE RIPPLE:  Thank you, Counsel.  Mr. Keenan.

MR. KEENAN:  I'll try to be brief.  The Court

unfortunately scheduled the first day of trial on my

wife's birthday, obviously unbeknownst to you, so I've

got to get home and take care of the kids because she's

going to Door County with a friend this weekend.  And

this case has consumed so much of my life, the sad thing

is that all I think of is Door County is in Assembly

District 1.

I do want to say that the plaintiffs and

Mr. Stephanopoulos and the efficiency gap, they do raise

an interesting issue of political science and I think

Mr. Trende and Mr. Goedert testified to that.  And I

follow politics, I was a poly-sci undergrad and I think

it's interesting.  But at the same time, anyone who has

followed politics since the 1990's, has seen that the

Republican Party has had a great advantage of winning the

1    Congress, and if you follow Wisconsin politics, you've

2    seen the Wisconsin party has had a great advantage in

3    winning the State Assembly.  It's pretty much every year

4    except in really good wave Democratic scenarios where

5    that has changed.  And I think that a standard that's

6    going to adopt the efficient gap and see that as some

7    sort of partisan gerrymandering just isn't in touch with

8    the underlying political gerrymander of this country.

9        In the opening, I said that we wouldn't see any

10   evidence of gerrymandering as what you think of

11   gerrymandering.  For example, the sick chicken or the

12   dragon in flight or Elbridge salamander.  We didn't see

13   any evidence of Act 43's districts.  That's because they

14   aren't gerrymandered.  This is just districting that has

15   a partisan advantage for one side and that's not

16   unconstitutional.

17       We've seen that Act 43 is comparable with past plans

18   instituted by courts.  It's also comparable with

19   Mr. Mayer's Demonstration Plan.  The plaintiffs simply

20   haven't met the burden that has been placed on them if

21   you would adopt one of the tests or the thoughts in the

22   concurrences or dissents that we've seen partisan

23   gerrymandering claims.  For example, Justice Kennedy in

24   *Vieth* or the dissenting justices in *Vieth* or in *LULAC*,

25   those justices thought you have to show -- the plaintiff

1  has a burden to show a lack of compliance with

2  traditional districting principles.  At most, the

3  plaintiffs have shown that they can draw a comparable

4  plan that has a better result for the party not in

5  control.  That just doesn't meet what the dissenters and

6  Justice Kennedy have thought is required of a partisan

7  gerrymandering claim.

8      Moving to intent, Mr. Hebert is right.  We aren't

9  contesting that there was intent, at least as defined by

10  the plaintiffs' minimal requirement in their test.  I

11  would say to the extent you're going to evaluate how much

12  intent there was, how much the intent invaded the

13  process, that it isn't any different than what you would

14  expect under any partisan districting process.  And I

15  think a lot of the things that the plaintiffs try to

16  attempt to paint as bad frankly are just part of the

17  normal legislative process.

18      For example, Mr. Ottman, who has much experience in

19  both the minority and the majority of the state Senate,

20  says it's common for major pieces of legislation to first

21  be introduced without the minority party ever having seen

22  it.  That has been held out as an example of invasion of

23  partisanship into the districting process.  Well, that's

24  just how major legislation works in Wisconsin.

25      We've heard about how the Republicans drew the

1    districts before the wards were completed and that this

2    was a radical change from past practice.  Well,

3    Mr. Ottman explained how he based that legislation off an

4    idea that was proposed by Chuck Chvala in the last decade

5    who was a Senate Democrat leader.  This is actually --

6    it's a good idea.  Why is the state waiting to put its

7    legislative districts in for a full year while every

8    municipality in the state draws their wards, at which

9    point perhaps the state can start drawing districts.  In

10   this case it would have been January of 2012 when we're

11   going to have elections in November of 2012?  In fact,

12   the Democrats filed their lawsuit in *Baldus* in June of

13   2011.  So in essence what the plaintiffs would have the

14   Republican Legislature do is have a lawsuit pending

15   that's saying the current districts are unconstitutional,

16   asking the court to draw them, but have the Republicans

17   sit around and wait, not draw any districts, and then

18   wait for the municipalities and then draw the districts

19   in 2012.  That always worked in the past because courts

20   drew the districts in 2002, in 1992, in 1982.  At that

21   point, the Court is going to be drawing the districts in

22   the middle of 2012 because there's going to be a lawsuit.

23   It's really not a good idea though when you're going to

24   district with unified partisan control where a

25   legislative plan is going to be implemented and to force

1  them to wait a full year to draw the districts.

2      We've heard about the Republicans hiring a law firm.

3  Well, redistricting is often done with law firms.  There

4  are legal concerns involved.  There's the Voting Rights

5  Act.  Every piece -- every districting plan eventually

6  goes to litigation.  I think that's a reasonable

7  anticipation.  So it's not all that uncommon that you

8  would expect the Legislature to hire counsel.

9      The plaintiffs have said -- taken issue with the

10  cutting off of the Democrats' funds to hire counsel.  But

11  as a lawyer for the state, it seems to me like I don't

12  see why that's wrong because essentially you'd be funding

13  the litigation against the state.  You'd be paying the

14  Democratic lawyers to challenge the plan.  That doesn't

15  seem like a good use of taxpayer funds to me.

16      And then we come to the partisan score.  I think the

17  plaintiffs might misunderstand what the point is with the

18  error in the partisan score.  The point is that how much

19  can we really trust these numbers to show what reality is

20  going to be?  Yogi Berra said predictions are hard,

21  especially about the future.  And I think that's true,

22  especially about political races.  How do you determine

23  what the race is going to be?  How much faith can you

24  really have in this number?  Well, it turns out the

25  number they were using was based on erroneous data.  I

1   don't think a court can look at that number now and say

2   well, because all these districts show 55 percent

3   Republican or 52 percent Republican, the Democrats have

4   no chance of winning.  Or that it's going to have to have

5   an efficiency gap of a certain amount.

6        And the plaintiffs say well, Mayer's model

7   correlated well with it.  But when you go into Mayer's

8   model, you see that the districts don't seem to add up

9   with the districts.  The scores for the districts don't

10  seem to add up with the scores for the districts under

11  the composite.  Why is that?  I don't know.  Professor

12  Gaddie doesn't remember what he did.  And frankly these

13  models are only accurate in so far as they're projecting

14  what would happen in a district.  If you have these two

15  scores mismatching by 20 points, what good are these

16  scores?  And they frankly can't be used as evidence that

17  someone is going to be -- one party is going to be locked

18  out of the political process.

19       When I started this case, I kind of thought there

20  would be more to these scores than they are and you

21  actually find there's less than meets the eye.  And I

22  think the main thing is -- Judge Ripple has asked several

23  times about an intent to control throughout the whole

24  ten-year process.  I think it's clear that this score

25  cannot be used to show anything like that.  It's a simple

1  average of races from 2004 to 2010 and it's not even a

2  correct one at that.  Whatever use it has, it keeps

3  losing value as you move further and further into the

4  future.  At this point, all that data is at least six

5  years old.  It's really not, frankly, all that useful

6  right now.

7        Now, the plaintiffs have said they corrected the

8  error because if you take out the 2006 governor's race,

9  it looks the same.  Of course I would ask if you're going

10 to do an average of all the races, why would you exclude

11 one of the most important races.  The 2006 Governor's

12 race is one of the two Governor's races that took place

13 during that time frame.  It's a very importance data

14 point.  If you'd want to measure what the partisanship of

15 a district is, you'd want to see how Governor Doyle ran

16 that year, and he ran very strong.  So when you take it

17 out, without that number and with that number showing,

18 you know, 1,000 percent Republican votes, it's inflating

19 the score to make it look more Republican because it's

20 taking out a pretty favorable Democratic result.

21        And I think another thing on the intent is even if

22 you think this score is determinative or very, very

23 important, we saw in the evidence that the Republicans

24 didn't even enact the most favorable plan to themselves.

25 We saw Tad Ottman had a plan that had lean and safe seats

at 54.  The final map says 52.  That seems to me to show
that partisanship wasn't the only factor that went into
this plan.  There were many other considerations.

So then we move to the plaintiffs' attempt to use
the efficiency gap as a partisan effect or a
discriminatory effort.  I think the evidence has been
pretty unanimous that since the 1990's, there's been a
trend, even in the absence of partisanship, of efficiency
gaps trending in the Republicans' direction.  We've seen
this in Professor Goedert's analysis of congressional
elections, with the last election on the left side of his
line was 1994 where the Republicans actually won control
of the Congress for the first time in many years.  We saw
this in Professor Jackman's analysis of Wisconsin where
the last positive efficiency gap was 1994 where
Republicans again won control of the Assembly for the
first time in many years.

And then we saw Professor Trende -- or not Professor
Trende, Mr. Trende.  His maps and their numbers explain
why this is happening.  What we see is that in 1996,
President Clinton had a pretty broad-based coalition in
Wisconsin and you can understand why there's a 0, plus 2,
minus 2 efficiency gap, because the parties are
relatively balanced all around the state.  We see that
the statewide vote share stays constant over that time,

1   yet the location of those votes changes greatly.  We

2   walked through how the Democrats became increasingly

3   concentrated in Milwaukee and Dane Counties, yet their

4   statewide vote share stays the same.  The effect of this

5   is that essentially they're getting the same number of

6   statewide votes, but it's less able to translate into the

7   legislative seats because you're getting the votes in

8   places you're already winning and you're losing the votes

9   in places where you were winning and you're no longer

10  winning, like the example we saw from Marathon County.

11      And I think that's why we see the substantial

12  negative efficiency gaps under the prior court plan.

13  Since 1998, every EG in Wisconsin has been negative, and

14  they have been pretty substantially negative.  And yet

15  now when we have a legislatively enacted plan, the test

16  is supposed to be a certain level of EG, which we have

17  seen three times under a court plan.  And that level, the

18  negative 7, is set based on an expectation of what kind

19  of level would we need to see to have an election that

20  flips positive at some point in this plan.  That's how

21  Jackman, Professor Jackman, calculated his threshold.

22  That threshold just doesn't seem to make any sense in

23  Wisconsin.  If we've had two straight court plans where

24  you had seven elections, that neither one of them was

25  positive.  And in fact, they're so negative that the

1   confidence intervals didn't even go to the positive.

2       So why now, when the Republicans win and are able to

3   district, they're expected to enact a plan that would be,

4   one, less than the EG's seen under court plans, and two,

5   at a level where there would expect to be a positive

6   efficiency gap.  It's just not connecting with

7   gerrymandering.  It's trying to take a lot of things that

8   are coming into play here and turning it into this

9   discriminatory effect.  So that might be appropriate in a

10  race discrimination case where race discrimination just

11  is wrong in and of itself.  It isn't appropriate here

12  where its partisan intent, something that is accepted,

13  lawful and not even -- it's not even wrong and it's just

14  understood that it will happen.

15      And the reason it's not wrong is that districting is

16  given to the Democratic branches.  We've heard a lot of

17  talk about democracy.  Well, what is democracy?  It's

18  having elections.  Who won the elections?  In 2010, the

19  Republican Party won these elections.  That gave them the

20  right to district.  There's Democratic legitimacy in

21  these actions.  And then you would think well, if this

22  was so undemocratic, wouldn't you have seen a response?

23  Well, we haven't seen that response.

24      Governor Walker was recalled and survived handily.

25  Governor Walker won re-election in 2014.  The Republicans

won a majority of the statewide Assembly vote in 2014.
The only year where the Republicans haven't won the
majority is 2012 where there was a narrow Democratic
majority.  There just isn't an antidemocratic, small "d",
aspect here.  This is actually -- democracy is that the
people vote for their representatives.  The Republicans
won the 2010 elections under a plan drawn by a court.
The Constitution gives them the right to district.

There has to be a strong burden for a court to come
in and disrupt that process.  The plaintiffs simply
haven't offered a standard by which that should occur.

Going to the burden-shifting prong, the plaintiffs
seem to interpret their test to say that as long as they
can draw one plan that has less bias, they've met this
prong.  I think this is inconsistent with the way the
Court has framed the burden shifting in the summary
judgment decision where there has to be more than just
one hypothetical alternative plan.

But I think going through the Demonstration Plan was
instructive.  It showed that Professor Mayer didn't
consider a lot of things that a court would have to
consider when districting, that the Legislature did
consider when districting.  For example:  Core retention;
incumbents; disenfranchisement.  When you aren't
constrained by those factors, you can draw a lot of

1   different maps.  The Republican Legislature was

2   restrained by those factors.  You're not comparing apples

3   to apples, you're comparing apples to oranges.

4        And I think what we saw from those examples that we

5   went through was that given Wisconsin's geography, you

6   have to affirmatively set out to narrow the efficiency

7   gap in order to do it.  You have to try to draw those

8   districts like Fond du Lac through Oshkosh.  The reason

9   we see the efficiency gap is the federal courts aren't

10  trying to do that, they're just taking Fond du Lac and

11  taking the surrounding area.  We got the hallmark of

12  gerrymandering, a 58 Republican district.  You have to

13  try to avoid that.  That's fine as an academic exercise.

14  I don't think it's something that we should require a

15  legislative body to do.  They should be able to be free

16  to apply traditional districting principles the way they

17  see fit and not district -- not be forced to district in

18  a way just looking at one number, the efficiency gap.

19       I was thinking as Professor Goedert said, frankly I

20  don't even know how you would issue a remedy in this

21  case.  What are you going to direct the Legislature to

22  do?  Draw a plan that's going to have an efficiency gap

23  of a certain amount?  How would they know what it's going

24  to have?  They could try to draw a plan that had that and

25  it wouldn't.  They could try to draw a plan that had a

1  certain efficiency gap and be on the other side.  We

2  don't really know.  It's an after-the-fact test that just

3  says what happened happened in this election.

4       So to wrap up, in *Vieth* the late Justice Scalia's

5  plurality opinion said that these standards would set

6  courts out on a sea of imponderables and nothing in this

7  case has convinced me that he was wrong.  We've seen how

8  many elements go into these things.  We've seen there's a

9  lot of uncertainty.  We've seen just the difficulty of

10 dealing with this and they're -- just frankly, the

11 efficiency gap does not provide a way to manage these

12 things.  And perhaps Mr. Hebert I think said that justice

13 has greatest justiciable.  I think this trial will show

14 that perhaps that it truly isn't justiciable.  There just

15 is no way to determine partisan gerrymanders.

16      Thank you.  (4:59 p.m.)

17      JUDGE RIPPLE:  Thank you, sir.  I think we are

18 -- have completed the proceedings.  On behalf of the

19 court, I'd like to thank all of the lawyers for a really

20 wonderful job they did.  Thank you very much for all of

21 your cooperation.  It was really a wonderful experience

22 to work with all of you.  I very much appreciate it.  I'm

23 looking forward to the remainder of the briefing and

24 we'll certainty give this thing our full attention.

25      So we'll rise and we'll conclude the proceedings.

1        (Proceedings concluded at 5:00 p.m.)

2

3                          * * * * *

4

5        I, LYNETTE SWENSON, Certified Realtime and

6    Merit Reporter in and for the State of Wisconsin, certify

7    that the foregoing is a true and accurate record of the

8    proceedings held on the 27th day of June 2016 before the

9    Honorables Circuit Judge Kenneth Ripple, District Judge

10   Barbara B. Crabb, and District Judge William Griesbach,

11   in my presence and reduced to writing in accordance with

12   my stenographic notes made at said time and place.

13   Dated this 9th day of June 2016.

14

15

16                          /s/_____

17                          Lynette Swenson, RMR, CRR, CRC
                            Federal Court Reporter
18

19

20   The foregoing certification of this transcript does not
     apply to any reproduction of the same by any means unless
21   under the direct control and/or direction of the
     certifying court reporter.
22

23

24

25