IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WILLIAM WHITFORD, et al.,

      Plaintiffs,

    v.                          Case No. 15-cv-421-bbc

GERALD NICHOL, et al.,

      Defendants.

## DEFENDANTS' POST-TRIAL BRIEF

The plaintiffs simply have not justified a court overturning a democratically enacted districting plan like Act 43, particularly based on the same asymmetry seen in prior court-drawn plans. The *undisputed* evidence presented by the defendants established that Act 43 is consistent with all of the relevant traditional districting criteria. As even the Justices who would recognize a partisan gerrymandering claim make clear, a plan that does not depart from these neutral criteria is simply not an unlawful gerrymander.

The plaintiffs' proposed standard is the opposite of the "limited and precise rationale" sought by Justice Kennedy in *Vieth v. Jubelirer*, 541 U.S. 267, 308 (2004) (Kennedy, J., concurring). Under this proposed approach, even a plan that complies with all neutral districting criteria, and whose efficiency gap is consistent with prior court-drawn plans, can be held invalid. Accepting

the plaintiffs' standard would ignore Justice Kennedy's warning that courts should act with "great caution" in partisan gerrymandering claims. *Id.*

## ARGUMENT

As a threshold matter, the trial established that Act 43 is consistent with traditional districting criteria, with scores practically identical to prior court-drawn plans. That is enough, standing alone, to uphold the plan.

The trial established that the plaintiffs' proposed standard provides no way to judge partisan gerrymandering claims. The evidence revealed problems with the intent element, the use of the efficiency gap ("*EG*") as a "discriminatory effect," and with the plaintiffs' burden-shifting step.

The evidence showed that, as one would expect, partisanship played a role in the districting process. The evidence, however, also showed that partisanship was only one among many criteria like equal population, compactness, contiguity, avoiding municipal splits, avoiding disenfranchisement, maintaining core retention, respecting Assembly members' wishes with respect to their districts, and avoiding the pairing of incumbents. While partisan intent may be a necessary condition for a partisan gerrymandering claim, the mere presence of partisan intent does not help to distinguish between lawful partisan plans and unconstitutional partisan gerrymanders. The trial did not show a level of partisanship beyond that seen in prior partisan gerrymandering cases like *Vieth*, *Davis v. Bandemer*, 478 U.S.

109 (1986), or *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) (*LULAC*).

Likewise, the trial showed that large *EG*s do not show unconstitutional partisanship. As a legal matter, partisan symmetry is not a constitutional command; at most, a few Justices said it might be a factor to be considered along with more important things like divergence from traditional districting criteria. *LULAC*, 548 U.S. at 420 (Kennedy, J.); *id.* at 483 (Souter, J.). The evidence at trial showed that partisan symmetry should not be used at all in evaluating partisan gerrymandering claims. Professor Jackman's research revealed an asymmetry across the country favoring Republicans that emerged in the middle of the 1990s, which was undisputedly not caused by gerrymandering. This trend produced large *EG*s in Wisconsin from 1998 onwards under two different court-drawn plans. Using the efficiency gap to measure partisan gerrymandering mistakes a change in the Democratic Party's political coalition that made it more difficult to win legislative seats for "gerrymandering" demanding court intervention.

Lastly, the plaintiffs' claim would fail at the burden shifting stage even if their standard were accepted. The plaintiffs' sole argument at this stage is that the Demonstration Plan would have had a lower efficiency gap while having similar scores on some traditional districting metrics. The trial showed, however, that the Demonstration Plan achieved its result with the benefit of

hindsight and by specifically targeting a lower *EG* at the expense of traditional considerations like core retention, incumbent residences, disenfranchisement, and, in some instances, even regularly-shaped districts.

The plaintiffs' reasoning is inconsistent with Supreme Court precedent and this Court's summary judgment ruling. It would make the efficiency gap the most important factor in districting because a plaintiff can always retroactively design a plan with a lower *EG* that comes close on a few hand-picked traditional districting criteria. It would also allow attacks on many plans even when they are consistent with traditional districting criteria.

## I.    The undisputed evidence showed Act 43 is not a gerrymander.

As a matter of law, the plaintiffs bear the burden of proving that Act 43 does not comply with traditional districting principles as part of their case-in-chief. They utterly failed in that task.

The plaintiffs' theory that the defendants should have the burden to justify a democratically enacted redistricting plan goes well beyond anything Justice Kennedy or even the dissenting justices in *Vieth* would have allowed. Justice Kennedy stated that a plaintiff would have to prove that political classifications "were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Vieth*, 541 U.S. at 307 (Kennedy, J. concurring). Justice Stevens proposed a test under which "*if no neutral criterion can be identified to justify the lines drawn*, and if the only possible

explanation for a district's bizarre shape is a naked desire to increase partisan strength, then no rational basis exists to save the district from an equal protection challenge." *Id.* at 339 (Stevens, J., dissenting) (emphasis added). Justice Souter, joined by Justice Ginsburg, would have allowed district-by-district claims in which, among other things, "a plaintiff would need to show that the district of his residence . . . *paid little or no heed to those traditional districting principles* whose disregard can be shown straightforwardly: contiguity, compactness, respect for political subdivisions, and conformity with geographic features like rivers and mountains." *Id.* at 347–48 (Souter, J., dissenting) (emphasis added). Justice Breyer likewise would have required, absent entrenchment, a plaintiff to show that "the boundary-drawing criteria *depart radically from previous or traditional criteria.*" *Id.* at 366 (Breyer, J., dissenting) (emphasis added).

The plaintiffs showed none of these things. The evidence established that Act 43 is consistent with, and not a radical departure from, prior plans with respect to traditional districting principles. Act 43's compactness scores were almost identical to the *Baumgart* plan: differences of 0.02 on the Reock/Smallest Circle test (0.41 to. 0.39) and 0.01 on the Polsby-Popper/Perimeter-to-Area test (0.29 to 0.28). (Dkt. 125 ¶ 221.) The number of municipal splits was right in between *Prosser* and *Baumgart*. (Dkt. 125 ¶ 221.) The plaintiffs have not even alleged any problems with

contiguity. Act 43 also complied with constitutional requirements of equal population and the level of disenfranchisement. *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 852 (E.D. Wis. 2012). Its population deviation (0.76%) is less than the *Baumgart* (1.59% deviation) and *Prosser* (0.91%) plans. (Dkt. 125 ¶¶ 200–01.)

That Act 43 matches court-drawn plans shows the Legislature did not sacrifice neutral state interests for partisan gain. Put another way, the plaintiffs did not show Act 43 was "invidious" or "unrelated to any legitimate legislative objective." *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring). Article IV, Section 4 of the Wisconsin Constitution requires districts "to consist of contiguous territory and be in as compact form as practicable." The *Prosser* court recognized that "compactness and contiguity are desirable features in a redistricting plan," as was having district boundaries follow municipal boundaries so far as possible. *Prosser v. Elections Bd.*, 793 F. Supp. 859, 863 (W.D. Wis. 1992). Further, "[c]ompactness and contiguity greatly reduce, although they do not eliminate, the possibilities of gerrymandering." *Id.* Act 43 achieved these neutral goals at least as well as courts did in the past.

In contrast, the plaintiffs put forward no evidence that Act 43 violated any traditional districting principle. There was no evidence of districts with "bizarre shape[s]," *Vieth*, 541 U.S. at 339 (Stevens, J., dissenting), that Act 43 "paid little or no heed to . . . traditional districting principles," *id.* at 347–48

(Souter, J., dissenting), or that "the boundary-drawing criteria depart radically from previous or traditional criteria." *Id.* at 366 (Breyer, J., dissenting). As such, their partisan gerrymandering claim must fail.

## II.   There was no evidence that the districting process was "so substantially affected by the excess of an ordinary and lawful motive as to invalidate it."

The defendants do not dispute that the plaintiffs have satisfied the intent element as they define it. But they provide no wrongful motive underlying Act 43 because partisan intent is constitutional in districting.

Adam Foltz and Tad Ottman testified that they and legislative leadership used the composite partisan score when evaluating draft maps. As the defendants noted in their pre-trial brief, the plaintiffs' intent element functions solely to distinguish partisan plans from those enacted by courts, nonpartisan commissions, or divided government.

But partisan districting is lawful. The *Vieth* plurality held that "partisan districting is a lawful and common practice." *Vieth*, 541 U.S. at 286. Justice Kennedy agreed that the fact that "that political classifications were applied" did not constitute a gerrymander. *Id.* at 307 (Kennedy, J., concurring). Justice Breyer said "political considerations will likely play an important, and proper, role in the drawing of district boundaries." *Id.* at 358 (Breyer, J., dissenting).

The plaintiffs did not prove that Act 43 was "so substantially affected by the excess of an ordinary and lawful motive as to invalidate it." *Vieth*, 541 U.S.

at 286 (plurality opinion). Legislative staff used a partisan score that was a simple average of 13 state and federal races held between 2004 and 2010. (Ex. 175:2; Dkt. 147:119.) The trial showed this average was not even correct and that it inflated the Republican score due to an error in the data for the 2006 Governor's race. (Ex. 486; Dkt. 147:124, 129–32.)

Notably, the composite scores for Act 43 were not as favorable to the Republicans as at least one draft statewide plan. Ottman drafted a plan that had 54 districts with a score over 52% Republican (Ex. 364), whereas the final map had only 52 such seats. (Ex. 172:3; Dkt. 148:109–10.) The plaintiffs' story that the legislative staff produced plans of steadily increasing advantage to the Republicans does not hold water. Foltz, Joseph Handrick, and Ottman did not present statewide maps to the leadership; instead, they presented pieces of maps for various regions that resulted in a stitched-together "team map." (Dkt. 147:162–65; Dkt. 148:98–99.)

Nor can one conclude that the partisan scores were a crystal ball with predictive powers ensuring that Act 43 would lock Democrats out from seats that leaned Republican. The average is not even forward-looking: Foltz testified that "it's an average of past elections applied to the new districts and I wouldn't necessarily agree that it had a forward-looking component to it." (Dkt. 147:47.) The score was intended to be a simple average of 13 statewide races for state and federal offices from 2004 to 2010.

The trial showed the composite is an incorrect average given the error in the Governor's 2006 race, making the 2004 to 2010 average seem more Republican than it really was. The error results in a substantial change in the score—the trial showed the score for the prior map's District 1 would have changed from 51.15% to a number around 47.72%. (Dkt. 147:128–30.) An examination of the score in the new District 1 shows similar results:

| Race | Republican Votes | Total Votes |
| --- | --- | --- |
| 2004 President | 17,678 | 33,790 |
| 2004 U.S. Senate | 15,942 | 33,497 |
| 2006 Governor | 13,005 | 2,217 |
| 2006 AG | 13,661 | 26,943 |
| 2006 Treasurer | 12,685 | 25,927 |
| 2006 Sec'y of State | 9,594 | 26,304 |
| 2006 U.S. Senate | 6,901 | 27,227 |
| 2008 President | 14,240 | 33,439 |
| 2010 Governor | 13,795 | 25,845 |
| 2010 AG | 15,428 | 25,402 |
| 2010 Treasurer | 13,636 | 24,932 |
| 2010 Sec'y of State | 11,764 | 24,799 |
| 2010 U.S. Senate | 14,036 | 26,180 |
| **Totals** | **172,365** | **336,502** |

(Ex. 556.) Dividing the 172,365 Republican votes by the 336,502 total votes yields 51.22%, the score shown on the Final Map. (Ex. 172:3.) Adding 25,000 votes to the erroneous Governor's 2006 total would put the total vote around the number cast in the 2006 U.S. Senate Race. This lowers the composite from 51.22% to 47.68% (172,365 divided by 361,502).

The composite partisan score, however, does not equate with elections as they actually occur because it does not measure factors like incumbency, a candidate's connection with voters, and fund-raising. (Dkt. 147:201–03.) The score was often far from the actual result of Assembly elections held between 2004 and 2010. (Ex. 558; Dkt. 147:140–47.) District 2 under the prior plan had a composite score of 54.93%, but actual results swung 14 points around that number in just two years. A Republican incumbent won only 47.82% in 2008 (7.11% less than the composite), but a Republican won 62.23% just two years later (7.30% above composite). (Ex. 537:10; Ex. 538:10; Ex. 558; Dkt. 147:140–43.) Foltz testified about how Representative Brett Davis, his former boss, consistently won a district that had only a 42.15% composite score by being "a very, very hard worker, always knocking on doors, always raising dollars, always working hard to connect with the voters in his district." (Dkt. 147:145.) Further examples were shown in Assembly Districts 5, 90 and 96 of seats won even though the score favored the other party. (Ex. 558; Dkt. 147:140–47.)

The plaintiffs take issue with the process that lead to Act 43, but the alleged "irregularities" were not even irregular when Wisconsin legislative procedure is properly understood. Ottman explained that major policy legislation is frequently not shared with the minority party until it is introduced on the floor (or shortly before introduction). (Dkt. 148:116.) With

respect to Act 43, no limitations were placed on the amount of amendments or debate. Democrats could offer amendments and debate the bill as long as they liked. (Dkt. 147:184–85; Dkt. 148:115–16.) Though much was made about the fact that the maps were drafted at a local law firm, the Republicans conducted past redistricting activity in the same manner. (Dkt. 148:49.) At trial, the plaintiffs provided no reason why the Legislature was required to wait for each and every municipality to draw its wards before proceeding with legislative districting, particularly when Democrats filed a lawsuit challenging the lack of a districting plan on June 10, 2011 (one month before Act 43 was introduced). *See Baldus v. Brennan*, No. 2:11-cv-562-JPS (E.D. Wis.), Dkt. 1. In any event, a change from past practice does not violate the Constitution because the Legislature is not "bound to follow its prior districting practices indefinitely." *Session v. Perry*, 298 F. Supp. 2d 451, 466 (E.D. Tex. 2004).[1]

## III.   The trial showed the efficiency gap should not be used as part of a legal test for partisan gerrymandering.

Contrary to the claims in the plaintiffs' pre-trial brief, the Court in *LULAC* did not adopt partisan symmetry as a constitutional command. Justice Kennedy would not "altogether discount[] its utility in redistricting planning and litigation" but concluded that "asymmetry alone is not a reliable measure

---

[1] This district court decision was vacated after *Vieth*, but the district court was later upheld in *LULAC*.

of unconstitutional partisanship." 548 U.S. at 420 (Kennedy, J.) Justice Souter, joined by Justice Ginsburg, merely would not "rule out the utility of a criterion of symmetry as a test." *Id.* at 483 (Souter, J., concurring in part and dissenting in part). The trial showed why asymmetry, as measured by the efficiency gap, coupled with the mere "conclusion that political classifications were applied," *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring), is not a reliable measure of unconstitutional partisanship.

### A.    The efficiency gap has no basis in the Constitution.

The defendants have extensively briefed their argument that the efficiency gap cannot be part of a judicially discernible standard because it has no basis in the Constitution. The trial made clear that the efficiency gap, in its "full form," simply treats all seats a party won as examples of "packing" and all seats that party lost as examples of "cracking." Even though past cases involved identical allegations of cracking and packing, the plaintiffs submit no authority for the proposition that the two major parties must have an equivalent number of "wasted votes" across a state. The *Vieth* plaintiffs based their standard on districts that "systematically 'pack' and 'crack' the rival party's voters," 541 U.S. at 286 (plurality opinion) (citation omitted), and *Bandemer* reversed a district court that had struck down a plan involving the "stacking" and "splitting" of Democrats. 478 U.S. at 116–17 (plurality opinion).

The trial also made clear that the "simplified form" of the efficiency gap measures plans against a baseline of how well they deliver hyper-proportional representation. Again, there is no basis in the Constitution for such a standard. If standards based on proportional representation are not grounded in the Constitution, *Vieth*, 541 U.S. at 288 (plurality opinion); *id.* at 308 (Kennedy, J.), then *a fortiori* a standard based on hyper-proportional representation is not, either. Further, Professor Goedert explained why, as a practical matter, it would be a bad idea to adopt a standard based in hyper-proportional representation because it would codify a particular seats-to-votes relationship that may not hold in the future and actually discourages proportional representation. (Dkt. 150:163–71.)

**B.    The evidence showed the efficiency gap does not measure the extent of gerrymandering and therefore is not a reliable measure of unconstitutional partisanship.**

Throughout this case, the defendants have argued the large, negative *EG*s Wisconsin experienced under two court-drawn plans shows the efficiency gap fails as a measure of unconstitutional partisan gerrymandering. From 1998 through 2010, Professor Jackman found Wisconsin had yearly *EG*s of –7.5, –6, –7.5, –10, –12, –5 and –4, for an average *EG* of –7.5. (Dkt. 125 ¶¶ 250–56.) Given that these high *EG*s appeared in plans drawn with no partisan intent, the defendants have consistently argued that the *EG* was not a meaningful measure of partisan gerrymandering.

At trial, the plaintiffs failed to provide any evidence refuting the defendants' long-standing argument. The plaintiffs' "evidence" seems to be speculation that the *Baumgart* court adopted a Republican plan. (Ex. 348.) The *Baumgart* court, however, said it "undertook its redistricting endeavor in the most neutral way it could conceive—by taking the 1992 reapportionment plan as a template and adjusting it for population deviations." *Baumgart v. Wendelberger,* No. 01-C-0121, 2002 WL 34127471, at *7 (E.D. Wis. May 30, 2002), *amended*, 2002 WL 34127473 (E.D. Wis. July 11, 2002). The plaintiffs have not shown how a large negative *EG* shows unconstitutional partisanship in Act 43 when Wisconsin saw large, negative *EG*s under neutrally drawn plans, including two (–10 in 2004 and –12 in 2006), about equal to Act 43.

The evidence showed Wisconsin was not an anomaly, but part of a nationwide pattern in which *EG*s trended in Republicans' favor in the mid-1990s. Professor Jackman proved this point. The lines for the 25th percentile, median, and 75th percentile *EG* all moved downwards starting in the mid-1990s. (Ex. 34, Fig. 20.) Only two of 41 states in Jackman's data set were controlled by Republicans in the 1990s, demonstrating that the trend was not due to gerrymandering. (Dkt. 149:252.) Since the year 2000, all three lines have remained fairly constant around this new, lower baseline.



Figure 20: Efficiency gap estimates, over time. The lines are smoothed estimates of the 25th, 50th and 75th quantiles of the efficiency gap measures, weighted by the precision of each *EG* measure.

There is little difference between the scores in 2000 and those in 2014. (Ex. 34, Fig. 20; Dkt. 149:254–55.) In addition to Wisconsin, this pattern was reflected in states like Minnesota and Missouri, which saw consistently negative *EG*s from the mid-1990s onwards when districted by non-partisan commissions. (Ex. 34, Fig. 7; Dkt. 149:266–67.)

Professor Goedert's research showed a similar pattern in congressional elections. The last year in which Democrats gained more seats than would be expected from historical averages was 1994. (Ex. 548, Fig. 1;

Dkt. 150:159–60.) The parallels with Wisconsin are striking—this is also the last year Wisconsin saw a positive *EG*. (Ex. 34, Fig. 35.) Notably, 1994 was the first year in which Republicans won control of the House of Representatives and the Wisconsin Assembly in many years. (Dkt. 125 ¶ 233.)

The findings of Professors Jackman and Goedert reflect a shift in the country's political coalitions, the result of which is that Republicans can more easily win legislative seats than Democrats with equivalent vote shares. Of the 17 plans that Professor Jackman finds "unambiguous" as to the sign of the *EG*, 16 favor Republicans, and the last one to favor Democrats occurred in the 1970s. (Ex. 34, Table 1; Ex. 546:12.) Jackman also finds the *EG* is asymmetrical with respect to Republicans and Democrats, especially so since the 1990s, in that more plans surpass various *EG* thresholds on the Republican side than on the Democratic side, and that plans with a Democratic advantage are more likely to flip signs than those with a Republican advantage. (Ex. 34:58, Figs. 27–30.) The reason is, in Professor Goedert's words, "Republican bias, where observed, is more likely to be due to a more permanent geographic distribution of partisans, rather than more temporary considerations of legislators in anticipation of a single election cycle." (Ex. 546:20.)

Sean Trende provided the explanation for why the trend seen in both Jackman's and Goedert's work emerged in the mid-1990s and continues today. A comparison of presidential vote share in Wisconsin's counties shows how the

- 16 -

Democratic Party went from a party with support in all areas of the State to one with support disproportionately contained in strongholds. As a result, its supporters are "systematically affected by what might be called a 'natural' packing effect." *Vieth*, 541 U.S. at 290 (plurality opinion). Trende's maps of Wisconsin since 1988 show the progressive shrinking of the Democratic Party's geographic reach in Wisconsin. (Ex. 547 ¶¶ 79–87.) As a result, Democrats in 2012 are not able to win the same number of Assembly seats they did in 1996, even with an equivalent statewide vote share.

The increased concentration in Milwaukee and Dane Counties, as measured by the partisan index and raw vote percentages, is remarkable:

| County/City | 1996 | 2004 | 2012 |
|---|---|---|---|
| Dane | PI:     D+10<br><br>D. Vote %: 64.8% | PI:     D+18<br><br>D. Vote %: 66.7% | PI:     D+20<br><br>D. Vote %: 72.1% |
| Milwaukee | PI:     D+10<br><br>D. Vote %: 64.5% | PI:     D+14<br><br>D. Vote %: 62.3% | PI:     D+16<br><br>D. Vote %: 68.2% |
| City of Milwaukee | n/a | PI:     D+24<br>D. Vote %: 72.4% | PI:     D+28<br>D. Vote %: 80.1% |

(Dkt. 150:27–38; Dkt. 125 ¶¶ 265–82.)

While the Democrats became increasingly concentrated in Milwaukee and Dane Counties, it is equally important to understand that they lost support in other areas of the State.  Had the Democrats increased their votes in Milwaukee and Dane Counties while maintaining their strength in the rest of the State, their position would have strengthened. The weakening in the rest

of the State, though, made it more difficult for Democrats to win Assembly seats in those areas. Marathon County's change from a neutral county in 1996 to an R+5 county in 2012 was the example used at trial. (Dkt. 150:27–38.) The map in paragraph 85 of Trende's report shows the change in the partisan index of counties from 1996 to 2012 and reveals similar shifts throughout the northern, central and eastern parts of the State, with most of the State becoming "redder," *i.e.*, more Republican-leaning (Ex. 547 ¶ 85).

## Wisconsin County PVI Change, 1996-2012



Lastly, the trial established that the Isolation Index and Global Moran's I are not valid tools for measuring the concentration of partisans in a state. As an initial matter, Professor Mayer is not an expert on these measures because he has no experience using them and could not perform a simple Isolation Index calculation at trial. (Dkt. 149:25–38.) Also, these do not find actual concentrations of partisans; they measure the state as a whole. Professor Goedert showed the Isolation Index is equal for equally sized groups and thus is not a meaningful measure of the distribution of Republicans and Democrats. (Dkt. 150:191–202.) Mayer used Global Moran's I, which treated the lack of Republicans in Democratic strongholds as a sign of correlation, not Local Moran's I, which is the way political scientists actually measure concentrations of partisans. (Ex. 550, Fig. 3; Dkt. 149:40–45.) These weaknesses explain why neither of these methods had been used in any peer-reviewed literature to measure the concentration of partisans.

In the face of the evidence the defendants presented, the plaintiffs have not justified using *EG* as a measure of partisanship at all, let alone instituting a legal standard judging plans against a zero *EG*.

## C.   The weakness of the *EG* measure does not justify the breadth of judicial review the plaintiffs' standard would impose.

On summary judgment, the defendants detailed the scope of judicial intervention that would be entailed by adopting the plaintiffs' proposed

standard. The trial confirmed the test is not the "limited and precise" test that Justice Kennedy hoped would emerge in *Vieth*. 541 U.S. at 306 (Kennedy, J.). The trial confirmed that nearly 21% of all plans (43 of 206) would be presumptively unconstitutional under the plaintiffs' 7% *EG* standard and that 10% of all plans (20 of 206) would be presumptively unconstitutional at a 10% level. (Dkt. 125 ¶ 121.)

As shown above, the plaintiffs' test sweeps so broadly because it treats differences in how efficiently the parties convert votes into seats as the consequences of gerrymandering. Given that a large source of inefficiency is a natural asymmetry in the geographic distribution of the parties' voters, a large number of plans surpass the plaintiffs' proposed threshold for constitutionality even when no partisanship was involved in districting: 13% of plans (27 of 206) had a 7% or greater *EG* in the first election without the presence of partisanship while almost 6% of plans (12 of 206) have had 10% *EG* in their first election with no partisan intent. (Dkt. 125 ¶ 121.)

### D.    The efficiency gap is under inclusive in detecting gerrymanders.

A further weakness of the efficiency gap as a measure of gerrymandering is its failure to detect partisan gerrymandering in many cases, usually when districts are drawn by Democrats. Sean Trende showed several examples of plans, such as the Georgia and North Carolina congressional districts from

2002, which are gerrymanders as commonly understood. (Ex. 547 ¶¶ 117, 120; Dkt. 150:75–79.) Even though these plans involved bizarrely-shaped districts, they would pass muster under an efficiency gap-based standard because these Democratic gerrymanders presented *EG*s that favored Republicans. (Ex. 547 ¶¶ 117, 120; Dkt. 150:75–79.) If a standard does not capture examples like these 2002 Georgia and North Carolina maps, and actually shows them as favoring the other party, then it is not a valid measure to use for partisan gerrymandering.

At trial, the plaintiffs did not respond to the substance of this critique, but instead focused on how the Stephanopoulos and McGhee article proposes a different test for congressional districts than for state legislative districts. (Dkt. 150:78.) The plaintiffs' distinction does not address Trende's point that pro-Democratic gerrymanders will go undetected, and raises the separate question of why courts should adopt different standards for partisan gerrymandering for different types of plans.

### E. The trial showed several problems with using the *EG* in the first election as the test for constitutionality.

The trial made clear that the plaintiffs' *EG* threshold is based on the level at which Professor Jackman thinks it is unlikely a plan will produce an election with an *EG* favoring the other party (*i.e.*, a "sign flip"). (Dkt. 149:286–87; Ex. 34:56.) Of course, a test based on a "sign flip" has no

basis in the Constitution. Further, as a practical matter, this test should not apply in Wisconsin. Wisconsin last saw a positive *EG* in 1994, with −4 being the most favorable *EG* for Democrats since 1996. (Ex. 34, Fig. 35.) When courts have produced plans with consistently negative *EG*s since 1998, it is not reasonable to use a test based on a plan's likelihood of producing a positive *EG*. In essence, the standard proposed by the plaintiffs would require Republicans to enact a map that is more favorable to Democrats than maps enacted by federal courts in 1992 and 2002.

While the "sign flip" test itself is problematic, the plaintiffs also erroneously base the test for constitutionality on a plan's first *EG*.  The first election produces one result from a large range of possibilities. The *Baumgart* plan produced *EG*s of −7.5, −10, −13, −5, and −4 (a range of nine points). Three elections exceeded the plaintiffs' threshold, but two of them were below. Which score comes first is simply a matter of luck. Had the "wave" elections of 2008 or 2010 occurred first, the plan would have escaped review even though it went on to produce larger *EG*s. Had the 2004 and 2006 results come first, the plan would have looked comparable to Act 43. Professor Goedert explained why it can be "somewhat dangerous" to base a test on one *EG* given that "we can see huge shifts in the efficiency gap in a single election." (Dkt. 150:163.) Goedert also explained why Jackman's historical analysis may not translate into the

future because there were no wave elections in 1972, 1982, 1992, 2002 or 2012, but there could easily be a wave election in 2022. (Dkt. 150:170–75.)

## IV.   The plaintiffs' case fails at the burden-shifting stage.

As discussed in Section I above, the burden should be on the plaintiffs and not the defendants. Regardless of which party has the burden, the plaintiffs' case fails because there is no question that Act 43 complies with traditional districting principles.

The plaintiffs' case seems to rest on the contention that Act 43 must be overturned because the Demonstration Plan has a lower *EG* and slightly worse population deviation, a slightly better score on one compactness measure, and a comparable number of municipal splits. As an initial matter, the fact that the Demonstration Plan achieved similar marks on some traditional criteria does not show that Act 43 fails to comply with those criteria. If anything, the plaintiffs' reliance on a plan with similar characteristics to Act 43 shows that Act 43 does, in fact, comply with traditional districting principles.

Further, the plaintiffs' reasoning would make the efficiency gap the most important factor in districting. If a plaintiff can overturn a plan merely by providing an alternative plan with similar scores on some traditional districting criteria, then the determining factor becomes which plan has an *EG* closer to zero.  Plaintiff can always reverse-engineer a plan with a better *EG* with similar superficial scores on several metrics they chose for themselves.

The plaintiffs would have the Court ignore crucial facts like the Demonstration Plan's gerrymandered districts around Fond du Lac and its numerous pairings of Republican incumbents (Ex. 520; Dkt. 149:106–08), simply because the Demonstration Plan has a lower statewide *EG*.

In any event, the trial made clear that the Demonstration Plan is not an apples-to-apples comparison with Act 43. To begin with, the Demonstration Plan was drawn without regard to how well it preserved the core of the prior districts (which led to its large number of pairings) and without regard for disenfranchisement of State Senate voters (Dkt. 149:117–19), even though Professor Mayer thinks those are "traditional districting principles." (Ex. 580:6.) In contrast, Foltz and Ottman testified that they did consider these factors. (Dkt. 147:157–60; Dkt. 148:85–88.) These are likewise things that courts appropriately and necessarily consider when drawing districts. *Baumgart*, 2002 WL 34127471, at *7; *Prosser*, 793 F. Supp. at 871.

Further, the Demonstration Plan ignored factors that a Legislature will surely consider in districting: the residences of incumbents and the potential pairing of members. As was seen at trial, the Demonstration Plan results in a staggering number of pairings of Republicans (and even a pairing of Democrats in a minority-majority district). (Ex. 520; Dkt. 149:112–18.) While the plaintiffs claim this is not a factor to be considered, the *Prosser* court drafted a plan that

minimized incumbent pairings and rejected plans that would have paired more incumbents. 793 F. Supp. at 871.

Lastly, the trial revealed that the Demonstration Plan achieved its *EG* through 20/20 hindsight. Professor Mayer knew the results of the 2012 election and therefore could draw a map to get specific results, but results that would hold only for those specific election conditions. Had Mayer performed a traditional uniform swing analysis on his plan (like that performed by Professors Jackman and Gaddie), it would have revealed that Republicans would have won 63 seats in conditions like those of 2014—the precise results of the actual 2014 election under Act 43. (Dkt. 149:94–101; Ex. 561; Ex. 567.) Perhaps for this reason, Mayer did not construct a model of how the Demonstration Plan would have performed in 2014.

Instead, Mayer added an incumbency effect before performing his uniform swing. This made the Demonstration Plan non-responsive. Republicans would win, at most, 51 seats under any conditions and only 8 seats would change hands even when the vote share swung from 46.5% Republican to 54.5% Republican. (Ex. 114, Table F; Dkt. 149:70–71.)

Either way, the Demonstration Plan does not help the plaintiffs prove that Act 43 is unconstitutional. A proper application of the uniform swing shows that the Demonstration Plan would have had an identical result as Act 43 under 2014 electoral conditions: 63 Republican seats. Using Mayer's

incorrect application of the uniform swing, the Demonstration Plan constitutes a Democratic gerrymander that drastically limits the Republicans' ability to win seats.

## V.  The plaintiffs failed to establish their standing to bring this claim.

The plaintiffs offered no evidence at trial based on a harm to their individual rights to vote. The only plaintiff to testify, William Whitford, agreed that Act 43 has not harmed his ability "to vote for and elect a Democrat in [his] district." (Dkt. 147:37.) In other words, he agreed that his injury depends on others' votes. Thus, he merely has a "'special interest' in th[e] subject" that turns on indirect effects from others' votes. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992). While he also testified that he contributed to "three to five" Democratic candidates for the Assembly in the 2012 cycle, and fewer in 2014, (Dkt. 147:31, 37), Act 43 does not prevent him from donating to any candidates.

If the plaintiffs have standing, then all Democrats have standing to assert this claim. The defendants have outlined their disagreement with this legal theory on prior occasions and will not repeat those arguments here. (*See* Dkt. 39; Dkt. 42; Dkt. 133:26–29.) Whitford's testimony, however, showed the difficulty in granting standing to all members of a political party given that "[t]he two major political parties are both big tents that contain within them

people of significantly different viewpoints." *Baldus*, 849 F. Supp. 2d at 851. Whitford believes that the Democratic Party "*more closely* represents [his] policy preferences than the Republican party." (Dkt. 147:32 (emphasis added).) He is not "a supporter of the Democratic Party, whatever they say, because that's not the way I feel or look at it." (Dkt. 147:38.) He "absolutely" does not agree with every position taken by every Democratic candidate in Wisconsin districts, and his own views change over time. (Dkt. 147:38–39.) Yet the plaintiffs' theory extends standing to any and all members of the Democratic Party regardless of their district of residence.

## VI.   The plaintiffs improperly offered expert opinions from Professor Chen, either directly or through Professor Mayer.

The plaintiffs' attempt to have Professor Kenneth Mayer offer opinions based on the work of Professor Jowei Chen was improper, and the testimony should be stricken. The plaintiffs could have retained Professor Chen as an expert and had him prepare a report, which would have given the defendants the opportunity to take discovery of Professor Chen's work, including a deposition. Attempting to introduce Professor Chen's work through Professor Mayer is simply not allowed under the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Further, this Court already ruled that it would not consider Chen's opinions. (Dkt. 82, 85.)

The Federal Rules of Civil Procedure require parties to disclose experts that the party wishes to rely on at trial: "a party must disclose to the other parties the identity of any witness it may use at trial to present" expert testimony. Fed. R. Civ. P. 26(a)(2)(A). Retained experts must provide a written report. Fed. R. Civ. P. 26(a)(2)(B). This must be done as ordered by the court. Fed. R. Civ. P. 26(a)(2)(D). In this case, the Court ordered the plaintiffs to disclose their experts by October 23, 2015, with a rebuttal report due on December 16, 2015. (Dkt. 33:2.) The plaintiffs did not disclose Professor Chen on either occasion. Chen, since he was not properly disclosed, has never been deposed, and his methods or conclusions about Act 43 have not been subject to meaningful scrutiny by the defendants. Further, Chen was not named as a trial witness in the pretrial report.

Under the federal rules, the plaintiffs may not rely on Professor Chen to provide expert opinions on the issues being tried, either directly or by proxy. The plaintiffs' effort violates the federal rules, this Court's scheduling order, and basic fairness. The opinions expressed in the Chen article and the methods proposed (which are not even fully described in the article to begin with) have not been vetted by the adversarial process.

Likewise, the Court should disregard testimony from the plaintiffs' expert, Professor Meyer, to the extent he attempted to testify for Chen about the meaning or import of Chen's report. (Dkt. 148:256–68; Dkt. 149:22.)

- 28 -

Professor Meyer did not include any analysis of Chen's work in his initial report (Ex. 2), his first rebuttal report (Ex. 104), or his amended rebuttal report (Ex. 114). He therefore cannot offer opinions about the report at trial. Fed. R. Civ. P. 26(a)(2)(B). Further, Professor Mayer is not an expert on Professor Chen's work and has no firsthand knowledge of Chen's methods. Thus, Professor Mayer's testimony merely adds a layer of hearsay, lack of personal knowledge, and lack of relevant expertise.

For all of these reasons, the defendants respectfully move to strike all evidence related to Dr. Chen's work regarding Wisconsin from the record.

## CONCLUSION

The Court should dismiss this case because the plaintiffs' have not proven a gerrymander, let alone an unconstitutional gerrymander demanding court intervention. Act 43 matches prior court-drawn plans on traditional districting criteria; as a result, the plaintiffs cannot prove an unconstitutional gerrymander even under the tests offered by the dissenting Justices in *Vieth*.

The plaintiffs' proposed standard is the opposite of what Justice Kennedy hoped would arrive: a "limited and precise rationale . . . to correct an established violation of the Constitution in some redistricting cases." *Vieth*, 541 U.S. at 306 (Kennedy, J., concurring). An asymmetry in how the two major political parties can translate statewide vote totals into legislative seats is inherent in our system of electing representatives by district, not the

foundation for a constitutional violation. Since the 1990s, Democrats have faced a significant asymmetry in their ability to win legislative seats in Wisconsin and the country as a whole, even in the absence of partisanship. Using that asymmetry to judge partisan gerrymandering claims does not create a judicially discernible and manageable standard. Instead, the plaintiffs' standard "discovers" gerrymandering in a huge number of cases where it does not exist and misses gerrymandering where it does occur.

The Court should grant judgment in favor of the defendants.

Dated this 10th day of June, 2016.

Respectfully submitted,

BRAD D. SCHIMEL
Wisconsin Attorney General

*/s/Brian P. Keenan*

BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

ANTHONY D. RUSSOMANNO
Assistant Attorney General
State Bar #1076050

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-2238 (BPK)
(608) 266-0020 (ADR)
(608) 267-2223 (Fax)
keenanbp@doj.state.wi.us
russomannoad@doj.state.wi.us