# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| WILLIAM WHITFORD, ROGER ANCLAM, EMILY BUNTING, MARY LYNNE DONOHUE, HELEN HARRIS, WAYNE JENSEN, WENDY SUE JOHNSON, JANET MITCHELL, ALLISON SEATON, JAMES SEATON, JEROME WALLACE, and DONALD WINTER,<br><br>    Plaintiffs,<br><br>v.<br><br>GERALD C. NICHOL, THOMAS BARLAND, JOHN FRANKE, HAROLD V. FROEHLICH, KEVIN J. KENNEDY, ELSA LAMELAS, and TIMOTHY VOCKE,<br><br>    Defendants. | No. 15-cv-421-bbc |

---

## PLAINTIFFS' POST-TRIAL REPLY BRIEF

---

Peter G. Earle
LAW OFFICE OF PETER G. EARLE
839 North Jefferson Street, Suite 300
Milwaukee, WI 53202
(414) 276-1076
peter@earle-law.com

J. Gerald Hebert
Ruth Greenwood
Annabelle Harless
Danielle Lang
CAMPAIGN LEGAL CENTER
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200
ghebert@campaignlegalcenter.org
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org
dlang@campaignlegalcenter.org

Dated: June 20, 2016

Michele Odorizzi
MAYER BROWN, LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
modorizzi@mayerbrown.com

Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 E. 60th St., Suite 510
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

Douglas M. Poland
RATHJE & WOODWARD, LLC
10 East Doty Street, Suite 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com

**TABLE OF CONTENTS**

**INTRODUCTION** ........................................................................................................................1

**I. RESPONSES TO DEFENDANTS' CLAIMS** ..................................................................3

    A.    Defendants' Approach to Traditional Criteria Would Immunize Egregious Gerrymanders ................................................................................. 3

    B.    Defendants' Approach to Discriminatory Intent is Incoherent ........................ 4

    C.    Defendants' Approach to Discriminatory Effect Would Nullify the Cause of Action for Partisan Gerrymandering.................................................. 6

    D.    Defendants' Approach to Justification Appears to Be the Same as Plaintiffs' ........................................................................................................ 10

**II. THE NEED FOR JUDICIAL INTERVENTION** ............................................................ 12

    A.    Partisan Gerrymandering Increasingly Threatens American Democracy ...................................................................................................... 12

    B.    Redistricting Law Requires a Viable Partisan Gerrymandering Claim ......... 14

    C.    If the Current Plan is Lawful, Then No Plan is Unlawful ............................. 15

**CONCLUSION** ..........................................................................................................................16

## TABLE OF AUTHORITIES

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ariz. State Legis. v. Ariz. Indep. Redist. Comm'n*,
   135 S. Ct. 2652 (2015) .......................................................................................... 7

*Baldus v. Wisc. Gov't Accountability Bd.*, (*Baldus II*)
   849 F. Supp. 2d 840 (E.D. Wis. 2012) ......................................................... 2, 14, 15

*Chapman v. Meier*,
   420 U.S. 1 (1975) .................................................................................................. 11

*Cox v. Larios*,
   542 U.S. 947 (2004) ................................................................................................ 5

*Davis v. Bandemer*,
   478 U.S. 109 (1986) ........................................................................................ 5, 6, 7

*Harris v. Ariz. Indep. Redist. Comm'n*,
   136 S. Ct. 1301 (2016) ............................................................................................ 5

*Holder v. Hall*,
   512 U.S. 874 (1994) .............................................................................................. 15

*In re Senate Joint Res. of Legis. Apportion.*,
   83 So.3d 597 (Fla. 2012) ...................................................................................... 12

*Kilgarlin v. Hill*,
   386 U.S. 120 (1967) .............................................................................................. 11

*League of Women Voters of Fla. v. Detzner*,
   172 So.3d 363 (Fla. 2015) .................................................................................... 12

*LULAC v. Perry*,
   548 U.S. 399 (2006) ........................................................................................ 6, 7, 9

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ........................................................................................ 13, 15

*Shapiro v. McManus*,
   136 S. Ct. 450 (2015) .............................................................................................. 7

*U.S. v. Carolene Prods. Co.*,
   304 U.S. 144 (1938) .............................................................................................. 14

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004) .................................................................................... 3, 4, 5, 7

**Page(s)**

**Other Authorities**

Christopher S. Elmendorf et al., *Racially Polarized Voting*, 83 U. Chi. L. Rev. (forthcoming 2016) ..................................................................................................15

John Hart Ely, Democracy and Distrust (1980)...........................................................................14

**INTRODUCTION**

Plaintiffs' three-part test for partisan gerrymandering is both judicially discernible and judicially manageable. The test's discernibility stems from its deep roots in core First and Fourteenth Amendment principles, including the value of partisan symmetry. The test's manageability follows from its reliance on intent and justification prongs already widely used by federal courts, as well as the inherent measurability of partisan symmetry. Under this test—or any plausible variant of it the Court might adopt—there is no real dispute that Wisconsin's Act 43 (the "Current Plan") is unconstitutional. Defendants concede that the Plan was enacted with discriminatory intent; its partisan asymmetry is extraordinarily severe and durable relative to historical norms; and this asymmetry is entirely unjustified by Wisconsin's redistricting requirements or political geography.

In their post-trial brief, as throughout this litigation, defendants make a host of misleading empirical and legal arguments. Plaintiffs have identified these arguments' flaws in previous rounds of briefing. Rather than repeat these points and counterpoints, plaintiffs therefore focus this short brief—limited by the parties' agreement to fifteen pages—on the broader implications of defendants' positions as well as the urgent need for judicial intervention.

With respect to defendants' positions, they claim that any test for gerrymandering must include noncompliance with traditional criteria as an element. But this approach is *precluded* by Supreme Court precedent, and is foolish given technological advances that make it easy to design aesthetically pleasing but highly biased plans. Defendants' stance on discriminatory intent is also hopelessly confused. They agree it must be an element, they admit it is present here, but they maintain that it is perfectly lawful for a State to legislate on behalf of a single political party rather than the public as a whole.

In contrast, defendants' stance on discriminatory effect has the benefit of clarity. But it is the counsel of despair. In defendants' view, partisan symmetry has no place in a test for gerrymandering because it seeks to measure the unmeasurable: a district plan's partisan impact. This radical skepticism is at odds with generations of social science research showing that it is possible to gauge partisan impact reliably. It would also block the most promising escape route from the doctrinal limbo in which courts now find themselves. As for justification, defendants never explain how they think the prong should operate, and so presumably share plaintiffs' position: that the dispositive issue is whether a plan's asymmetry can be explained by legitimate factors. This is a showing defendants do not even try to make. While they tout their map's compliance with traditional criteria, they offer no evidence at all that the map's asymmetry was *caused* by their effort to abide by these requirements.

Turning to the need for judicial intervention, there are several reasons why it is imperative for courts to confront the most undemocratic feature of modern American politics. First, the severity of gerrymandering is worsening, thanks to the same technological progress that has relegated odd district shape to obsolescence as a line-drawing technique. Second, gerrymandering's harm to the polity can no longer be doubted. In Wisconsin, as elsewhere, the practice has led to the enactment of laws that fail to reflect the will of the people. Third, there is no sign that gerrymandered legislatures, like Wisconsin's, will fix the problem on their own. Indeed, they have every incentive *not* to disrupt the activity that is the key to their hold on power.

Fourth, courts' non-enforcement of the ban on excessive partisan gerrymandering distorts the rest of redistricting law. As in the *Baldus* litigation, parties are forced to shoehorn partisan grievances into other doctrinal categories. Fifth, defendants' objections to judicial involvement are essentially identical to the dissenters' claims in the early malapportionment and VRA cases. Those claims turned out to be wrong, and they have just as little merit here. Lastly, if courts are

2

ever to put teeth into the gerrymandering ban, it is hard to imagine a stronger case than this one. Defendants have conceded discriminatory intent, the Current Plan is a true outlier in the extent of its asymmetry, and several analyses confirm the lack of any justification for this asymmetry.

## RESPONSES TO DEFENDANTS' CLAIMS

### A. Defendants' Approach to Traditional Criteria Would Immunize Egregious Gerrymanders.

Defendants lead off their post-trial brief with an argument they raised in their motion to dismiss, shelved at the summary judgment stage, and revived at trial. This is that plaintiffs' test is deficient because noncompliance with traditional criteria is not one of its prongs. Defs.' Post-Tr. Br. (Dkt. 153) at 4-7. In plaintiffs' post-trial brief, they explained that such noncompliance cannot be an element because it has been rejected, *twice*, by the Supreme Court. Pls.' Post-Tr. Br. (Dkt. 155) at 16-17. Plaintiffs also explained that noncompliance *does* play a role in their test's intent and justification prongs, and that mapmakers are now adept at designing districts that follow traditional criteria while still blatantly handicapping one party's voters. *Id.* at 17-18.

Two more points are important at this juncture. The first is that Justice Kennedy's concurrence in *Vieth*, which defendants cite in support of their claim, actually stands for the opposite proposition. In a key passage, Justice Kennedy wrote that a plan is unlawful when "[political] classifications . . . were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Vieth v. Jubelirer*, 541 U.S. 267, 307 (2004) (Kennedy, J., concurring in the judgment). "Political classifications" refer here to the use of electoral data to craft districts. These classifications are applied "in an invidious manner" when their aim is partisan advantage rather than the public welfare. And the classifications are "unrelated to any legitimate legislative objective" when they cannot be justified by any valid goal.

Properly construed, this passage is thus perfectly consistent with plaintiffs' test, which includes prongs for "invidious" intent as well as whether a plan's discriminatory effect is "unrelated to any legitimate legislative objective." The passage also in no way suggests that a plan must disregard traditional criteria in order to be unconstitutional. In fact, the passage does not even *mention* traditional criteria, and it *links* legitimate legislative objectives to political classifications in exactly the same way as the justification prong of plaintiffs' test.

Second, both the *Vieth* plurality and Justice Kennedy grasped the fact that eludes defendants: namely, that plans can be both gerrymandered and compliant with traditional criteria. The plurality observed that plans drawn on the basis of "compactness and respect for the lines of political subdivisions" may nevertheless disadvantage certain "political groups." *Id.* at 290 (plurality opinion). Similarly, Justice Kennedy commented that mapmakers who employ "contiguity and compactness" may still "benefit one political party over another." *Id.* at 308-09 (Kennedy, J., concurring in the judgment). This possibility is why defendants' approach is so unwise; it would insulate the most egregious gerrymanders solely because of their aesthetics.

**B.     Defendants' Approach to Discriminatory Intent is Incoherent.**

After trying and failing to graft an additional element onto plaintiffs' test, defendants articulate their position on discriminatory intent. This position consists of a grudging acceptance of the irrefutable evidence, as well as an adherence to certain precepts that are not good law. Once these precepts are removed from the picture, it is evident that there is no material dispute here: the Current Plan was enacted with discriminatory intent.

Starting with defendants' reluctant admissions, they state that "partisan intent [is] a necessary condition for a partisan gerrymandering claim," that "partisanship played a role in the districting process," and that "plaintiffs have satisfied the intent element as they define it." Defs.' Post-Tr. Br. (Dkt. 153) at 2, 7. So far, so good—though plaintiffs note that it is not *their*

4

definition of intent that is satisfied here, but rather the *Bandemer* plurality's. *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality opinion) (requiring "intentional discrimination against an identifiable political group").

But defendants' argument goes off the rails when they latch onto the *Vieth* plurality's dictum that "partisan districting is a lawful and common practice." 541 U.S. at 286 (plurality opinion); Defs.' Post-Tr. Br. (Dkt. 153) at 7. In their pretrial brief, plaintiffs pointed out that this statement was criticized by a *majority* of the *Vieth* Court—including Justice Kennedy, who condemned "law[s] that ha[ve] the purpose . . . of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Id.* at 314 (Kennedy, J., concurring in the judgment). Plaintiffs also pointed out that in a pair of post-*Vieth* cases, *Cox v. Larios*, 542 U.S. 947, 947 (2004), and *Harris v. Ariz. Indep. Redist. Comm'n*, 136 S. Ct. 1301, 1310 (2016), the Court barred malapportionment for the sake of bare partisan advantage. Pls.' Pretr. Br. (Dkt. 134) at 43-44. Defendants do not even acknowledge, much less rebut, these rejoinders.

Defendants' argument takes an even stranger turn when they quote the *Vieth* plurality's line about a map being "so substantially affected by the excess of an ordinary and lawful motive as to invalidate it"—and then proceed to assess the Current Plan based on this line. 541 U.S. at 286 (plurality opinion); Defs.' Post-Tr. Br. (Dkt. 153) at 7-11. This is a bizarre tactic because the *Vieth* plurality held that predominant intent is an *unmanageable* formulation, too "indeterminate" and "[v]ague" to be used reliably by courts. 541 U.S. at 284-85 (plurality opinion). Yet defendants treat this formulation as if it were the law, applying it to the Plan and concluding that it passes muster. Defendants' analysis lacks any legal basis and so is irrelevant here.

Since raw partisan advantage is not a lawful motivation, and since predominant intent is not a legally available standard, defendants have offered no alternative to plaintiffs' (and the

*Bandemer* plurality's) intent requirement. It is undisputed that the Current Plan satisfies this requirement. That should be the end of the matter as far as this prong is concerned.

### C. Defendants' Approach to Discriminatory Effect Would Nullify the Cause of Action for Partisan Gerrymandering.

Turning to discriminatory effect, defendants recycle a set of familiar but flawed claims: that the efficiency gap is overinclusive and underinclusive, that political geography explains the Current Plan's (and other maps') pro-Republican tilt, that the efficiency gap varies from election to election, and so on. In advancing these claims, defendants again fail to engage with the responses that plaintiffs—and the Court—have provided. The implications of the claims are also extreme: that partisan symmetry cannot be part of a test, that discriminatory effect cannot be measured, and thus that there can be no cause of action for partisan gerrymandering.

Beginning with the broader picture, it is important to recognize that defendants' criticisms are not confined to the efficiency gap, but rather extend to partisan bias, the mean-median difference, and indeed, *any* measure of symmetry that is based on election results. Any such metric might sometimes be large when discriminatory intent is absent and small when it is present. Any such metric might be the product of discriminatory intent *and* redistricting skill, political geography, electoral swings, and other factors. And any such metric might vary to some extent from election to election. There is nothing distinctive about the efficiency gap in these respects; they are simply properties that follow from the nature of elections themselves.

Defendants seem to realize the wide sweep of their critique, as they write that "partisan symmetry should not be used *at all* in evaluating partisan gerrymandering claims." Defs.' Post-Tr. Br. (Dkt. 153) at 3 (emphasis added). This position, though, is in tension with precedent since five Justices expressed interest in partisan symmetry in *LULAC*. A trial court should hesitate before discarding a concept that has been deemed promising by a majority of the Supreme Court.

6

Moreover, if partisan symmetry *were* discarded, there would be nothing left to take its place. In *Vieth* and *LULAC*, the Supreme Court rejected almost every other potential basis for a test: proportional representation, *Vieth*, 541 U.S. at 288 (plurality opinion); predominant or exclusive partisan intent, *LULAC v. Perry*, 548 U.S. 399, 417 (2006) (opinion of Kennedy, J.); *Vieth*, 541 U.S. at 285 (plurality opinion); noncompliance with traditional criteria, *Vieth*, 541 U.S. at 296 (plurality opinion); and minority party entrenchment, *Vieth*, 541 U.S. at 300 (plurality opinion).[1] Defendants also conspicuously fail to offer any alternative to partisan symmetry (other than their legally unavailable invocation of traditional criteria).

Accordingly, if this Court heeds defendants' claims, it would essentially negate the cause of action for partisan gerrymandering. This cause of action must include a discriminatory effect prong. *LULAC*, 548 U.S. at 418 (opinion of Kennedy, J.) ("a successful claim . . . must . . . show a burden . . . on the complainants' representational rights"); *Bandemer*, 478 U.S. at 127 (plurality opinion). Partisan symmetry is the only approach on the table—indeed, the only approach used by social scientists—for measuring discriminatory effect. So if partisan symmetry cannot form part of a test for gerrymandering, then it seems that no such test can be formed. But this result is impermissible given the Supreme Court's insistence that gerrymandering remains a viable claim. *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015) (viability of claim is "uncontradicted by the majority in any of our cases"); *Ariz. State Legis. v. Ariz. Indep. Redist. Comm'n*, 135 S. Ct. 2652, 2658 (2015) ("a suitable standard might be identified in later litigation").

Proceeding from the general to the specific, it is worth highlighting how defendants' objections to partisan symmetry fail to take into account either plaintiffs' or the Court's responses. First, defendants reiterate their argument that plans can have large efficiency gaps in

---

[1] Even Justice Kennedy's First Amendment theory in *Vieth* hinges on there being a reliable way to measure discriminatory effect: "Of course, all this depends first on courts' having available a manageable standard by which to measure the effect of the apportionment . . . ." 541 U.S. at 315 (Kennedy, J., concurring in the judgment).

7

the absence of discriminatory intent or small efficiency gaps in the presence of discriminatory intent. Defs.' Post-Tr. Br. (Dkt. 153) at 13-14, 20-21. This would, in fact, be a problem if the efficiency gap were the entirety of plaintiffs' test. But as the Court has repeatedly reminded defendants, that is not the case. In its motion-to-dismiss opinion, the Court noted that defendants' claim "simply . . . ignore[s] step one and step three of plaintiff's standard." Mot. to Dis. Op. (Dkt. 43) at 22. In its summary judgment opinion, the Court elaborated, "Plaintiffs are not arguing that . . . any plan with a large efficiency gap must be invalidated. Rather, they are arguing that they have a right to be free from being *intentionally disadvantaged* when they vote." Summ. Jdgmt. Op. (Dkt. 94) at 15. Defendants entirely ignore these admonitions.[2]

Second, defendants persist in arguing that pro-Republican efficiency gaps, in Wisconsin and elsewhere, are the product of a pro-Republican political geography. Defs.' Post-Tr. Br. (Dkt. 153) at 14-19. But in all of their extended discussion of this issue, defendants nowhere acknowledge plaintiffs' legal rejoinder: that the impact of political geography is already fully incorporated into the test's first and third prongs. A State that merely tried to follow the spatial contours of its political subdivisions and communities of interest would be exempt from liability since it was not motivated by partisan advantage. Likewise, a large efficiency gap that stemmed from the geographic distribution of a State's voters would be justified by this distribution, and so safe from judicial interference. Pls.' Pretr. Br. (Dkt, 134) at 53, 61-62.

Defendants also fail to grapple with most of the evidence indicating that Wisconsin's Democratic and Republican voters are roughly equally spatially allocated. They do not even

---

[2] Doctrinally, defendants also ignore the Supreme Court's repeated holdings in redistricting cases that discriminatory intent and discriminatory effect are distinct inquiries that should not be conflated. Pls.' Pretr. Br. (Dkt. 134) at 55-56. And empirically, defendants overlook the findings of both Professor Jackman *and their own expert* that unified control of redistricting (a good proxy for discriminatory intent) significantly boosts the efficiency gap in the direction of the line-drawing party. Ex. 83 at 18-20; Ex. 132 at 6; Ex. 133 at 13. These findings show that there is no *general* pattern (as opposed to a few cherry-picked examples, like Georgia and North Carolina in 2002) of plans enacted by Democrats failing to produce pro-Democratic efficiency gaps.

mention, much less refute: (1) the near-zero efficiency gaps of Assembly plans in the 1970s, 1980s, and 1990s, Ex. 69; (2) the near-zero efficiency gaps of most of Professor Chen's simulated Assembly maps, Exs. 156-60;[3] (3) the symmetric distributions of Wisconsin's wards in both the 2000s, Second Mayer Decl. (Dkt. 154-1) ¶¶ 10-12, and the 2010s, Ex. 107; (4) the nearly identical trend lines for Democratic and Republican wards from 2002 to 2014, Ex. 105; or (5) Professor Goedert's models' predictions that if Wisconsin's congressional map had been neutrally designed, it would have slightly favored the Democrats in 2012 and 2014, Ex. 110. Unfortunately for defendants, declining to cite these facts does not make them disappear.[4]

Lastly, defendants again object to focusing on the first election held under a plan because the efficiency gap can vary from election to election. Defs.' Post-Tr. Br. (Dkt. 153) at 22-23. But as in their previous briefing, defendants do not explain when litigants *should* sue, if not after the first election, given that Justice Kennedy ruled out pre-election suits in *LULAC*. 548 U.S. at 420 (opinion of Kennedy, J.) ("a challenge could be litigated if and when the feared inequity arose"). Startlingly, given the important role it played at trial, defendants also say nothing about sensitivity testing, the technique that fully addresses their concerns about the efficiency gap's variability. To reiterate, if sensitivity testing shows that a plan's large initial efficiency gap

---

[3] As to the admissibility of Professor Chen's analysis, several of defendants' misstatements on the subject cry out for correction. First, plaintiffs had no reason to identify Professor Chen as an expert by October 23, 2015, because *defendants' experts'* reliance on (and misuse of) his earlier work was not yet known. Defs.' Post-Tr. Br. (Dkt. 153) at 27-28. Second, defendants *did* have "the opportunity to take discovery of Professor Chen's work, including [through] a deposition," as they questioned Professor Mayer about it at his March 30, 2016 deposition, and could have had their experts talk directly with Professor Chen, but they declined to do either. *Id.* at 27; Tr. (IV) at 244-47. Third, Professor Chen's "methods" *have* "been subject to meaningful scrutiny by the defendants" since they are *identical* to the techniques he used in his previous article, which defendants and their experts have copiously praised. Defs.' Post-Tr. Br. (Dkt. 153) at 28. Fourth, while Professor Chen was not "named as a trial witness in the pretrial report," plaintiffs offered to call him as a *rebuttal* witness—a proposal that defendants opposed, leading plaintiffs to instead submit Professor Chen's conclusions through Professors Mayer and Goedert. *Id.;* Tr. (II) at 262. And fifth, it is galling for defendants to invoke "basic fairness" when it is their distortions of Professor Chen's earlier work that required plaintiffs to bring to the Court's attention his more recent analysis, and given that defendants tried to introduce new evidence with *zero* (as opposed to *two months'*) notice at trial. Defs.' Post-Tr. Br. (Dkt. 153) at 28.

[4] When discussing the pro-Republican trend in the efficiency gap nationwide, *id.* at 3, 14-15, defendants similarly decline to cite Professor Jackman's *undisputed* conclusion that the trend is *fully* explained by the change in party control over redistricting between the 1990s and the current cycle. Ex. 83 at 18-20.

9

would evaporate under different electoral conditions, then the plan should be upheld. Pls.' Pretr. Br. (Dkt. 134) at 51-52. Nor do defendants in any way challenge Professor Jackman's elaborate analyses of durability. *All* of these analyses confirm that plans with large initial efficiency gaps are highly likely to remain skewed over their lifetimes. Exs. 66, 87, 90, 95, 495.[5]

### D.    Defendants' Approach to Justification Appears to Be the Same as Plaintiffs'.

This leaves only the justification prong of plaintiffs' test, as to which defendants' position is notable in four respects. First, beyond stating that "the burden should be on the plaintiffs and not the defendants," Defs.' Post-Tr. Br. (Dkt. 153) at 23, defendants are entirely silent as to how the prong should operate. Plaintiffs can thus only assume that defendants agree with their stance on the prong's operation—which, it bears noting, is borrowed directly from the Supreme Court's one-person, one-vote doctrine. Under this doctrine, the burden is unquestionably on the State, not the plaintiff. It is also a challenged plan's *partisan asymmetry* that must be justified by the State, not the plan's *general layout*. And alternative maps are the most probative evidence in this inquiry. Pls.' Pretr. Br. (Dkt. 134) at 74-75.

Second, defendants make no effort whatsoever to link the Current Plan's extreme asymmetry to either Wisconsin's redistricting requirements or the State's political geography. That is, they do not even try to claim that the asymmetry can be justified by any legitimate factor. Under the Court's one-person, one-vote cases, that should be the end of the matter. Defendants have defaulted on their obligation to explain their map's asymmetry.

Third, one tactic defendants *do* employ is to claim that the Current Plan complies reasonably well with traditional criteria. Defs.' Post-Tr. Br. (Dkt. 153) at 23-24. Crucially, though, defendants never *connect* this alleged compliance to the Plan's asymmetry. They simply

---

[5] As for defendants' point that a problematic plan might exhibit a sub-threshold efficiency gap in its first election, it is wholly inapplicable to the Current Plan, whose efficiency gaps to date exceed any plausible threshold. Ex. 69. Defendants' scenario is also unlikely thanks to the well-known phenomenon of regression to the mean; plans' initial efficiency gaps are generally larger than their lifetime average efficiency gaps. Ex. 83 at 15.

assert that the Plan should be upheld because of its compliance. This argument thus amounts to a recapitulation of defendants' view, rebutted above, that aesthetically pleasing maps cannot be struck down as partisan gerrymanders. The argument is also squarely at odds with the Court's one-person, one-vote precedents, which have routinely invalidated plans that abided by traditional criteria when this conformity did not justify the plans' large population deviations. *Chapman v. Meier*, 420 U.S. 1, 25 (1975); *Kilgarlin v. Hill*, 386 U.S. 120, 123 (1967).

And fourth, while plaintiffs showed that *four* kinds of plans demonstrate the unjustifiability of the Current Plan's asymmetry—Wisconsin's Assembly maps in previous decades, Ex. 122, the draft plans prepared by Foltz, Handrick, and Ottman, Exs. 364, 366, 465, 487, Professor Mayer's Demonstration Plan, Ex. 27; Joint Pretr. Rpt. (Dkt. 125) at ¶¶ 226-29, and Professor Chen's 200 simulated maps, Exs. 156-60—defendants criticize only the Demonstration Plan. Defendants actually state that "plaintiffs' *sole* argument at this stage" involves the Demonstration Plan, thus mischaracterizing plaintiffs' evidence while also confirming the limited nature of defendants' attempted rebuttal. Defs.' Post-Tr. Br. (Dkt. 153) at 3 (emphasis added).

Plaintiffs have previously explained why defendants' attacks on the Demonstration Plan fail, and do not repeat this analysis. Pls.' Pretr. Br. (Dkt. 134) at 81-84; Pls.' Post-Tr. Br. (Dkt. 155) at 19-22. But even if the attacks succeeded, plaintiffs' other three types of maps would remain unscathed. These other map types also highlight the strangeness of defendants' claim that "Plaintiff[s] can always reverse-engineer a plan with a better *EG* with similar superficial scores on several metrics they chose for themselves." Defs.' Post-Tr. Br. (Dkt. 153) at 23. A map like the Demonstration Plan cannot always be drawn. The U.S. Constitution, the Wisconsin Constitution, and the Voting Rights Act are far from "metrics [plaintiffs] chose for themselves." And even if this Court were to require more proof of unjustifiability than the supposedly

11

"reverse-engineer[ed]" Demonstration Plan, plaintiffs have provided it in spades.[6]

## THE NEED FOR JUDICIAL INTERVENTION

### A.     Partisan Gerrymandering Increasingly Threatens American Democracy.

In a typical case, no commentary beyond this point would be necessary. Plaintiffs have set forth a discernible and manageable test for partisan gerrymandering, and presented overwhelming evidence that the Current Plan is unlawful under this test. The Plan should thus be struck down. But as the Court is aware, this is not an ordinary case. Even though the Supreme Court has recognized for thirty years that the Constitution prohibits excessive partisan gerrymandering, this ban has been unenforced ever since it was announced. For the ban to finally take effect would therefore be a milestone for both redistricting law and American democracy.[7]

Because of these high stakes, plaintiffs devote the balance of this brief—their last word to the Court before it reaches its decision—to summarizing the case for judicial intervention. This case has three components: (1) the severity of the democratic harm inflicted by partisan gerrymandering; (2) the relationship between gerrymandering and the rest of redistricting law; and (3) the uniqueness of this litigation vis-à-vis earlier gerrymandering challenges.

To begin with, it is a regrettable reality that partisan gerrymandering has never been worse in modern American history than it is today. At the state legislative level, Professor Jackman found that the size of the typical state's efficiency gap spiked in 2012 and 2014 to the highest level in at least forty years. Ex. 56. Of the five plans with the largest lifetime efficiency gaps in the modern era, *all* of them are currently in effect (and one of them is Wisconsin's Act

---

[6] Moreover, Professor Mayer's 2012 open seat estimates had a correlation of *0.98* with the composite derived from 2004-2010 data. Ex. 10; Tr. (II) at 207-09. His conclusions would thus be *identical* if he had used the older data.

[7] However, the Florida Supreme Court recently held that Florida's congressional and state senate plans violated the *state* constitutional ban on partisan gerrymandering. *League of Women Voters of Fla. v. Detzner*, 172 So.3d 363 (Fla. 2015); *In re Senate Joint Res. of Legis. Apportion.*, 83 So.3d 597 (Fla. 2012). There is therefore precedent for courts striking down plans purely on partisan gerrymandering grounds.

43). Ex. 70. At the congressional level, similarly, Stephanopoulos and McGhee showed that the size of the typical state's efficiency gap reached its modern peak in 2012. Ex. 141 at 873.

The explanation for this surge in gerrymandering is growing technological sophistication, coupled with confidence that even the most egregious plans are safe from judicial interference. On the technological front, it is striking that the Current Plan's drafters employed essentially the same techniques as plaintiffs' experts. Both Professor Gaddie and plaintiffs' experts created regression models to predict districts' performances, used these models to impute outcomes for uncontested races and generate open seat estimates, and conducted extensive sensitivity testing. The difference, of course, is that Professor Gaddie relied on these techniques to help *construct* a gerrymander, while plaintiffs' experts harnessed them to *detect* and *curb* gerrymandering.

Next, it is important to remember that while gerrymandering can only be analyzed using abstract data, the injury it causes is far more concrete. In fact, it is the exact same injury that prompted the Supreme Court's intervention in the one-person, one-vote cases: the manipulation of district lines to prevent legislatures from being "collectively responsive to the popular will," often by stopping "a majority of the people in a State [from] elect[ing] a majority of that State's legislators." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). In 2012 alone, there were seven state house plans (including Wisconsin's) in which the gerrymandering party received a minority of the statewide vote but still retained control of the legislature. Ex. 46. Five congressional plans (also including Wisconsin's) met this criterion as well. Ex. 141 at 879.

In these states, there is no doubt that gerrymandering exacts a terrible democratic toll. Put bluntly, it enables the legislative enactment of laws that the people *oppose* and that could never have been passed under a neutral map. Even when gerrymandering does not affect majority control of the legislature, it still distorts the lawmaking process. It awards the gerrymandering

party more seats, and more influence over policy, than it otherwise would have had. Likewise, it unfairly dilutes the opposing party's ability to represent the interests of its supporters.

Furthermore, this is not a problem that legislatures will fix on their own. Intuitively, the officeholders who *benefit* from gerrymandering—who owe their positions and authority to it— are the *last* people who should be expected to limit the practice. And in fact, there is no sign that gerrymandered legislatures plan to adopt independent redistricting commissions or stringent mapmaking criteria. To the contrary, where progress has been made toward these reforms, it has occurred almost exclusively through the voter initiative (which is unavailable in Wisconsin and many other States). Gerrymandering thus represents a paradigm case of incumbents warping the electoral process to keep themselves in power. There are few circumstances that call as urgently for judicial intervention. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938); John Hart Ely, Democracy and Distrust 103 (1980).

### B. Redistricting Law Requires a Viable Partisan Gerrymandering Claim.

In addition to these broader democratic points, there are two reasons rooted in redistricting law why a meaningful cause of action for partisan gerrymandering is needed. The first is that, in the absence of a viable claim, litigants often try to squeeze partisan grievances into the available doctrinal categories: one-person, one-vote, the Voting Rights Act, racial gerrymandering, and so on. This was clearly the case in the *Baldus* litigation, and it is also true in many of the hundreds of suits that are filed each cycle. Ex. 78 at 630-31; Ex. 79 at 1608; Ex. 332. As a result, the rest of this legal domain is distorted. Partisanship infects doctrines that are meant to address distinct issues of race and representation.

Redistricting law also requires an operative gerrymandering claim because the arguments *against* such a claim are virtually identical to the now-discredited objections to the Court's one-person, one-vote and vote dilution rules. In both of these areas, the dissenters asserted that the

empirical challenges were too great, that courts would be imposing their own political theories on legislatures, that too many plans would be put in jeopardy, and so forth. *Holder v. Hall*, 512 U.S. 874, 893-945 (1994) (Thomas, J., concurring in the judgment); *Reynolds*, 377 U.S. at 590-625 (Harlan, J., dissenting). But these assertions did not carry the day, and properly not. In the decades since these debates, courts have proven their ability to fashion and apply tests for malapportionment and vote dilution. The same would be true in the closely related gerrymandering context—and so would harmonize this area with its adjacent fields.[8]

### C. If the Current Plan Is Lawful, Then No Plan Is Unlawful.

Finally, it must be stressed how different this case is from previous gerrymandering suits, and how these differences all support judicial intervention. As to intent, the Current Plan's drafters were compelled in *Baldus* to turn over an enormous volume of material that exposed their raw partisan motivation. It is unusual, to say the least, for such internal documents ever to see the light of day. As to effect, no previous plaintiffs have ever presented courts with *comparative* or *historical* data about partisan symmetry. This data makes possible findings like the one that is undisputed here: namely, that the Plan is one of the most skewed in modern American history. And as to justification, both plaintiffs' Demonstration Plan and Professor Chen's simulated maps are unique in the annals of gerrymandering litigation. They confirm beyond any doubt that the Current Plan's asymmetry cannot be justified.

In combination, this evidence dwarfs that presented in any prior gerrymandering case. It also establishes that the Current Plan is a true outlier in the extent of its asymmetry. If the Plan is nevertheless valid, plaintiffs cannot imagine how a map would ever be *in*valid.

---

[8] It is worth noting that it is much *easier* to measure partisan symmetry than racial polarization in voting, which courts do all the time in vote dilution cases. Polarization can be assessed only by making inferences about *individuals'* voting behavior from *aggregate* electoral data—a difficult (and sometimes impossible) endeavor. Christopher S. Elmendorf et al., *Racially Polarized Voting*, 83 U. Chi. L. Rev. (forthcoming 2016).

**CONCLUSION**

For the foregoing reasons, the Court should hold that the Current Plan is unconstitutional, and enjoin its use in future elections.

                                              Respectfully submitted,

                                              s/ Nicholas O. Stephanopoulos
                                              One of the attorneys for plaintiffs

| | |
|---|---|
| Peter G. Earle<br>LAW OFFICE OF PETER G. EARLE<br>839 North Jefferson Street, Suite 300<br>Milwaukee, WI 53202<br>(414) 276-1076<br>peter@earle-law.com | Michele Odorizzi<br>MAYER BROWN, LLP<br>71 South Wacker Drive<br>Chicago, IL 60606<br>(312) 782-0600<br>modorizzi@mayerbrown.com |
| J. Gerald Hebert<br>Ruth Greenwood<br>Annabelle Harless<br>Danielle Lang<br>CAMPAIGN LEGAL CENTER<br>1411 K Street NW, Suite 1400<br>Washington, DC 20005<br>(202) 736-2200<br>ghebert@campaignlegalcenter.org<br>rgreenwood@campaignlegalcenter.org<br>aharless@campaignlegalcenter.org<br>dlang@campaignlegalcenter.org | Nicholas O. Stephanopoulos<br>UNIVERSITY OF CHICAGO LAW SCHOOL<br>1111 E. 60th St., Suite 510<br>Chicago, IL 60637<br>(773) 702-4226<br>nsteph@uchicago.edu |
| Douglas M. Poland<br>RATHJE & WOODWARD, LLC<br>10 East Doty Street, Suite 507<br>Madison, WI 53703<br>(608) 960-7430<br>dpoland@rathjewoodward.com | |