IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WILLIAM WHITFORD, ET AL.,

      Plaintiffs,

    v.                          Case No. 15CV0421

GERALD NICHOL, ET AL,

      Defendants.

---

## DEFENDANTS RESPONSE BRIEF ON REMEDIES

---

The Court should follow the standard procedure of providing the Legislature the opportunity to pass a revised plan. The Supreme Court mandates this procedure because "a state legislature is the institution that is by far the best situated to identify and then reconcile traditional state policies" with constitutional commands, whereas federal courts "possess no distinctive mandate to compromise sometimes conflicting state apportionment policies in the people's name." *Connor v. Finch*, 431 U.S. 407, 414–15 (1977). Courts only take on the task of districting themselves in circumstances not present here, such as when a legislature fails to enact a remedial plan or when it is impractical due to upcoming elections.

With respect to the timing of when a legislative plan should be completed, the defendants' opening brief explained why the Court should not require a plan until the Supreme Court decides the case. The novelty of this

Court's decision makes it extremely likely that the Supreme Court will either reverse entirely or provide substantial additional guidance, which guidance would then shape whatever new plan the Legislature would adopt (and this Court would thereafter review). It would thus be a needless waste of judicial and State resources to require the creation of a new plan before the Supreme Court acts.

But to the extent this Court sets any date for when the Legislature must submit a new plan, and—to be clear, it should not do so—there is no need to require the Legislature to act before early 2018, especially because the Supreme Court may well may decide the case before that time. The 2018 primary elections are 18 months away. So long as a plan is in place a reasonable amount of time before the June 1, 2018, deadline for submitting paperwork for ballot access, no prejudice will befall any party. Wis. Stat. §§ 8.15(1), 8.21(1). Requiring a plan to be finalized by April 1, 2017, as the plaintiffs propose, is inconsistent with the federal court practice of dismissing or staying litigation regarding post-census redistricting until the year elections will occur.

The Court should reject the plaintiffs' request for "detailed instructions" for a remedial plan because it is merely an attempt to extend the Court's decision beyond what it actually requires. Should this Court draw its own plan, it is not required to achieve partisan symmetry and must only change the

current plan as much as necessary to remedy the alleged constitutional violation.

Lastly, the plaintiffs' request for discovery is both premature and excessive.

## ARGUMENT

## I. The Court should allow the Legislature the opportunity to draw a remedial map.

The Court should follow the mandated procedure of allowing the Wisconsin Legislature the opportunity to pass a replacement plan. Courts only bypass the legislature if it has refused to remedy the constitutional problem or upcoming elections require immediate action, neither of which applies here. Further, the Wisconsin Constitution does not prevent the Legislature from passing a revised plan after its initial plan has been found to be unlawful.

### A. The plaintiffs' brief shows there is no valid reason to depart from the normal procedure.

The plaintiffs offer no valid reason for this Court to depart from the standard procedure of giving "the elected branches a reasonable opportunity to enact a map that complies with all legal requirements." (Pls.' Br. 5.) The Supreme Court mandates this procedure because "legislative reapportionment is primarily a matter for legislative consideration and determination." *Connor*, 431 U.S. at 414 (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)). Federal courts leave the remedy to the state

legislature because courts "lack[] the political authoritativeness that the legislature can bring to the task." *Id.* at 415. It is only "when those with legislative responsibilities do not respond, or the imminence of state election makes it impractical for them to do so," *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (plurality opinion), that federal courts take on the "'unwelcome obligation,'" *id.* (quoting *Connor*, 431 U.S. at 415), of devising a remedial plan.

The plaintiffs rely on four decisions that do not support deviating from the mandated procedure in this case. One case involved a legislature that repeatedly refused to change a plan in the face of multiple injunctions, *Hays v. Louisiana*, 936 F. Supp. 360 (W.D. La. 1996),[1] while the others involved elections that could not proceed in the normal course without a court-implemented plan. *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1991); *LULAC v. Perry*, 457 F. Supp. 2d 716 (E.D. Tex. 2006); *Johnson v. Miller*, 929 F. Supp. 1529 (S.D. Ga. 1996). Neither of these concerns applies here.

This case is nothing like *Hays*, in which the Louisiana Legislature twice failed to adequately revise a congressional district found to be a racial gerrymander. 936 F. Supp. at 372. In response to the *Hays* district court's first

---

[1] The plaintiffs claim that the defendants have "extensively cited [*Hays*] in their earlier briefing." (Pls.' Br. 7.) The defendants relied on the Supreme Court's holding in *United States v. Hays*, 515 U.S. 737, 745 (1995), that a plaintiff must live in the alleged racially gerrymandered district in order to have standing to sue, but have not relied on the numerous district court decisions in the *Hays* litigation.

finding of a racial gerrymander, the legislature enacted a new district that was "physically modified but conceptually indistinguishable" and that "again violat[ed] historical political subdivisions and ignor[ed] other traditional redistricting criteria." *Hays,* 936 F. Supp. at 372. After the revised district was struck down as a racial gerrymander, the Legislature again refused to "adopt a constitutionally defensible congressional redistricting plan." *Id.* It was only after the Louisiana Legislature twice failed to enact a valid replacement plan and "persist[ed] in defending the indefensible," that the district court enacted its own plan. *Id. Hays* does not support the plaintiffs' argument here, where the Wisconsin Legislature has not had even one chance to revise its plan— notably, to conform to a legal standard that did not exist when it passed the initial plan.

Similarly, the *Johnson* decision provides no support to the plaintiffs because the court chose *legislative plans* as the interim remedy. The plaintiffs in *Johnson* challenged a 1992 districting plan, but the Georgia Legislature adopted a revised plan "to cure the constitutional violations . . . in a 1995 special session." 929 F. Supp. at 1540. The district court then adopted the 1995 plan's districts as an interim remedy for the districts it found to be unconstitutional and retained the 1992 plan with small modifications for three districts that were not unconstitutional. *Id.* at 1562–67. The court's use of legislative plans as the interim remedy supports giving the Wisconsin

5

Legislature the opportunity to pass a replacement plan and provides no support for bypassing the Legislature in this case.

The two remaining cases cited by the plaintiffs imposed interim plans due to the timing of upcoming elections, and one case explicitly allowed the legislature to supersede the interim plan by passing an acceptable permanent plan. In *Terrazas*, the court implemented an interim plan in order "to provide for the holding of elections in Texas without delay and in accordance with existing state law." 789 F. Supp. at 838. The court, however, made clear that its judgment "does no more than provide for the holding of 1992 elections as scheduled" and that the court "in no way intends to limit the efforts of the Legislature in adopting acceptable permanent plans at any time it sees fit." *Id.* at 840–41. In *LULAC*, the court had no opportunity to give the legislature a chance to draw a remedial plan because the court ruled in August of 2006 "[w]ith the election looming." 457 F. Supp. 2d at 718. No time crunch necessitates an interim plan here.

The plaintiffs incorrectly contend that federal courts may bypass legislative remedial plans because of allegedly "objectionable" records. But the cases relied on by the plaintiffs did not impose court-drawn plans due to a legislature's alleged "objectionable" record or its consideration of politics in the districting process. (Pls.' Br. 7.) Instead, as just discussed, they imposed plans

6

due to factors that are not present here: either (1) a failure of the legislature to enact an adequate replacement plan or (2) upcoming elections.

In any event, the record here is not so objectionable that it would somehow override the Supreme Court's command to give the elected branches the first opportunity to revise a plan. The Legislature passed a state redistricting plan that survived a comprehensive set of challenges, except for two districts that needed to be slightly modified to comply with the Voting Rights Act. *See generally Baldus v. Brennan*, 849 F. Supp. 2d 840 (E.D. Wis. 2012). While this Court held that the plan was an unconstitutional partisan gerrymander, it did so using a standard that did not exist when the Legislature drafted the plan. Further, this Court found that the alleged secrecy on which the plaintiffs rely to be "par for the legislative course." (Dkt. 166:71 n. 227.)

There is simply no justification or legal support for preventing the Legislature from enacting a remedial plan.

### B. The Wisconsin Legislature may enact a revised redistricting plan after a court holds that the initial plan was unconstitutional.

The plaintiffs' argument that a position taken by the defendants in *Baldus* precludes a legislative remedial plan is a distraction. Federal law is clear that a federal court is "to afford a reasonable opportunity for the legislature to meet the constitutional requirements by adopting a substitute measure." *Wise*, 437 U.S. at 540 (plurality opinion). The Court should therefore

provide the Legislature the opportunity required by federal law. The Legislature can decide how it will respond to any alleged issue with state law.

In any event, the Wisconsin Constitution does not prevent the Legislature from redistricting in the circumstances of this case, and the defendants in the *Baldus* litigation never took such a position. The *Baldus* defendants contended that the Legislature could not redraw the map as part of a settlement *prior to a finding by a court that the current map was unlawful*. The *Baldus* defendants never contended that the Wisconsin Constitution bars the Legislature from passing a remedial map to cure constitutional problems found by a court.

The plaintiffs' argument is based on a misrepresentation of the *Baldus* defendants' position, omitting the context necessary to understand how this issue came to be raised in the case. The trial in *Baldus* was expected to "begin on February 21, 2012. That morning, however, the court urged the parties to make one last good-faith effort to settle." *Baldus*, 849 F. Supp. 2d at 847. The brief and the transcript the plaintiffs cite, dated February 22, 2012, directly relate to the court's urging of a pre-trial settlement. The brief addressed the Legislature's legal authority to pass a replacement plan as part of a pretrial settlement agreement before a court ruled on the lawfulness of the plan. (Pls.' Br. Ex. A.) The defendants' position related to whether, prior to trial

8

and any ruling by a court, the Legislature could legally pass another legislative districting plan.

The *Baldus* defendants never contended that the Legislature could not revise a plan that was found to be unlawful by a court. Because that brief was filed at the start of trial, there could not have been a court decision on the plan. Rather, the defendants' position was that such a finding would be necessary to a settlement, as shown by the defendants' consideration of a possible settlement by consent decree. (Pls.' Br. Ex B:82:11–14.) In fact, after the court held that the 8th and 9th Districts violated the Voting Rights Act, the *Baldus* defendants—the members of the Government Accountability Board— submitted proposed replacement plans. *Baldus v. Brennan*, 862 F. Supp. 2d 860, 862 (E.D. Wis. 2012) ("The defendants have presented two maps.") The plaintiffs provide no citation for their claim that "according to defendants, for the elected branches to have passed a new map in response to a court order would have violated the Wisconsin Constitution," (Pls.' Br. 9), because it is false and belied by what occurred in that litigation.

The plaintiffs fail to mention that the *Baldus* court explained that the reason the Legislature did not present a revised plan for the two districts had nothing to do with the Wisconsin Constitution. Instead, a legislative plan was not passed because

> Republicans no longer hold a majority in the Senate, and now find
> themselves in a 16–16 deadlock with their Democrat counterparts. That
> shift in control leaves the prospect of a legislative solution—even if
> limited to addressing the VRA violations—becoming virtually
> impossible, particularly in the highly charged political environment
> which currently prevails across much of Wisconsin politics.

*Baldus v. Brennan*, 849 F. Supp. 2d 862, 863–64 (E.D. Wis. 2012).

Further, the cases cited by the *Baldus* defendants in their brief do not address the power of the Legislature to respond to a court ruling. Instead, the cases address whether the Legislature can pass a new redistricting plan when the first plan had not been declared unlawful. *See*, *e.g.*, *State ex rel. Thomson v. Zimmerman*, 264 Wis. 644, 649, 60 N.W.2d 416 (1953) (noting that the first redistricting plan "survived attack in the courts"). The cases therefore do not govern whether the Legislature can revise a plan that has been enjoined. Judge Wood distinguished the cases in *Baldus*, noting that

> Zimmerman, of course, was decided well before Baker versus Carr, a
> 1962 decision of the Supreme Court, and the enactment of the Voting
> Rights Act prior to which redistricting and reapportionment were
> thought to be non-justiciable political questions. After those measures,
> judicial review of redistricting statutes became not only permissible, but
> routine.

(Pls.' Br. Ex. B:69:4–10.) Now that judicial review of legislative districting is "routine," it would be a strange to interpret the language in Article IV, section 3 that the Legislature "shall apportion and district anew" in "its first session" as preventing the Legislature from revising the plan it passed in the first session to fix legal issues subsequently found by the courts. It would also be at

odds with past practice in the 1980s when Wisconsin Democrats redistricted in 1983 to replace a court-drawn map. (Dkt. 125 ¶ 189.)

In any event, there is no reason to apply a legal interpretation that was not even accepted by the *Baldus* court to the very different factual circumstances of this case.

## II.   The Court should not make the Legislature act on the plaintiffs' needlessly expedited schedule.

### A.   The Supreme Court has ample time to act well before the 2018 elections, especially if the Court believes the plaintiffs' claims are meritorious.

This Court should follow the procedure outlined in the defendant's initial brief, such that the Legislature should not be required to produce a replacement plan until after the Supreme Court has ruled. The plaintiffs would have the State of Wisconsin put an election plan in place, under which the 2018 elections might be held, when there is a high probability that either the new plan is unnecessary or drafted to meet a legal standard that was superseded by the Supreme Court. This is a unique case establishing a new legal standard; the last case finding an unconstitutional partisan gerrymander was reversed prior to the next general election. *Davis v. Bandemer*, 478 U.S. 109 (1986).

The cases the plaintiffs cite denying stays pending appeal in cases about equal population or racial gerrymandering simply do not apply. In those cases, the district courts had clear Supreme Court law to guide remedial proceedings.

Here, there is no legal standard and, even if the Supreme Court establishes one, it is likely to be different from the one announced by this Court.

Contrary to the plaintiffs' worst-case scenario timeline, (Pls.' Br. 22), the Supreme Court could easily act on this case well before the relevant deadlines for the *2018* elections, and would *very likely* do so if it believed the plaintiff's claim are meritorious. As a threshold matter, the Supreme Court may well simply summary reverse this Court's decision later this year. *See*, *e.g.*, *Sinkfield v. Kelley*, 531 U.S. 28 (2000) (per curiam). For example, the dissent here argued that the Supreme Court has *already* held that a partisan gerrymandering claim fails when the legislature complied with all traditional districting principles. (Dkt. 166:128–35.) If the dissent correctly understood the Supreme Court's prior holdings, as the defendants strongly believe, then summary reversal would be entirely appropriate given that there is no argument here that the plan violates any traditional districting principles.

And even if the Supreme Court decides that full merits briefing is warranted, oral argument could be held at the beginning of the Court's Fall 2017 Term, which would permit the Court to issue its decision well before any of the relevant deadlines for the 2018 elections. *See infra* Section II.C. The Supreme Court will be well aware of the upcoming 2018 deadline, so if the Supreme Court agrees with this Court that Wisconsin's current plan is unlawful, there would be every reason to believe that the Supreme Court would

act before the relevant dates for the 2018 elections. But if this Court is concerned about the possible length of Supreme Court proceedings, the defendants are happy to consent to any reasonable schedule that this Court would provide for filing their notice of appeal and jurisdictional statement. If the defendants were not to comply with that schedule—which would not happen—then this Court could revisit setting a schedule for the Legislature to draw a replacement map, as described below.

### B.  If this Court decides it must set a schedule for the Legislature, there is no reason to require any action until early 2018.

To the extent the Court sets a schedule for the Legislature to submit a revised plan without regard to whether the Supreme Court has completed its work—*and it should not*—the schedule should be based on allowing the August 2018 partisan primaries and the November 2018 general elections to occur on their regular schedule.[2] Courts order legislatures to produce plans by dates under which elections can occur under current statutory deadlines; they do not impose schedules based on the number of days after the court issued its decision. There is no need to rush a plan because candidates for the Assembly

---

[2] The relevant statutes are Wis. Stat. § 5.02(5) (defining "General election" as "the election held in even-numbered years on the Tuesday after the first Monday in November to elect United States senators, representatives in congress, presidential electors, state senators, representatives to the assembly") and Wis. Stat. § 5.02(12s) (defining "Partisan primary" as "the primary held the 2nd Tuesday in August to nominate candidates to be voted for at the general election").

cannot even begin to circulate nominating papers until April 15, 2018. Wis. Stat. § 8.15(1). The pertinent date is June 1, 2018, which is the deadline for candidates to submit the requisite paperwork to appear on the partisan primary ballot. Wis. Stat. §§ 8.15(1), 8.21(1). There is no authority for requiring the Legislature to produce a replacement plan over one year before candidates can even begin to circulate nominating papers.

The plaintiffs' request that the Legislature produce a plan by April 1, 2017, is contrary to the federal court's practice of not even entertaining challenges to redistricting plans until the year in which elections will actually occur. *See*, *e.g.*, *Arrington v. Elections Bd.*, 173 F. Supp. 2d 856, 867 (E.D. Wis. 2001). In *Arrington*, the three-judge panel stayed all proceedings until February 2, 2002, because "comity requires that the court refrain from initiating redistricting proceedings with the remaining parties until the appropriate state bodies have attempted—and failed—to do so on their own." *Id.* at 867 (citing *Growe v. Emison*, 507 U.S. 25, 34 (1993)). It makes no sense to require a final plan to be in place by January 1, 2018, when federal courts go so far as to stay litigation until February of an election year, *id.* at 867, and do not issue a plan themselves until late May or early June of the election year. *Prosser v. Elections Bd.*, 793 F. Supp. 859 (W.D. Wis. 1992); *Baumgart v. Wendelberger*, No. 01-C-0121, 2002 WL 34127471, at *1 (E.D. Wis. May 30, 2002), *amended*, No. 01-C-0121, 2002 WL 34127473 (E.D. Wis. July 11, 2002).

If the Court feels the need to set a schedule, the Legislature should only be required to pass a replacement plan by a reasonable amount of time before June 1, 2018. Even this deadline is not strictly necessary, as Wisconsin has conducted elections when districts were put in place at about that time. The 1992 and 2002 elections occurred on schedule even though the plans were entered by courts on June 2, 1992, *Prosser*, 793 F. Supp. at 859, and May 20, 2002. *Baumgart*, 2002 WL 34127471, at *1. The schedule should not be based on an arbitrary number of days since the Court issued its decision, as the plaintiffs suggest, but rather on the timing of the 2018 election.

### C. There are no upcoming deadlines for elections that would justify a tight deadline for legislative action.

The plaintiffs rely on inapposite authority in which courts imposed tight deadlines for remedial plans because state law deadlines for elections were approaching, which required the Legislature to act quickly in order to allow elections to proceed under the normal schedule. The cases do not support requiring a Legislature to quickly enact a replacement plan when no elections will occur, and candidates cannot even collect signatures, for over one year.

For example, the court in *Johnson v. Mortham*, 926 F. Supp. 1460 (N.D. Fla. 1996) granted thirty-five days to the Florida Legislature because it decided the case on April 17, 1996, making "time . . . of the essence in this case" because "candidate filing deadlines are just a few months away." *Id.* at 1494. Likewise, the court in *Vieth v. Pennsylvania*, 195 F. Supp. 2d 672 (M.D. Pa. 2002) gave

15

the Legislature three weeks because it issued the decision on April 8, 2002, and the Legislature needed "to enact a new constitutional redistricting plan in time for the 2002 elections." *Id.* at 678.

Similarly, *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016) was decided on February 2, 2016. The court used the two-week timeline for legislative action because of the need for a constitutional plan for the November 2016 election and because North Carolina state law requires that the Legislature be given two weeks to redraw maps that have been declared unconstitutional. *Id.* at 627 (citing N.C. Gen. Stat. § 120-2.4). *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) was decided on February 10, 2004, almost exactly the same time in the election cycle.

While these cases may have some relevance if the Court's injunction would issue in February or April 2018, with state law deadlines looming for an upcoming election, they have no bearing here when an injunction will issue more than one year before any relevant state election law deadline.

**D.    The plaintiffs' schedule contains numerous months of unnecessary time.**

As a purely practical matter, the plaintiffs' two proposed schedules—one for a legislative plan (Schedule 1) and one for a court-drawn plan (Schedule 2)—both include many months of unnecessary time.

Starting from their proposed end dates, there is no need for a final plan, whether court-drawn or legislatively drawn, to be in place on January 1, 2018. As noted above, candidates have until June 1, 2018, to submit signatures for ballot access and cannot even begin to gather signatures until April 15, 2018. Wis. Stat. § 8.15(1). The plaintiffs' plans add at least four-and-a-half months of unnecessary time.[3]

Likewise, the plaintiffs build in unnecessary time for the Court to determine the constitutionality of a legislative replacement plan. Under *Wise*, "[t]he new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution." 437 U.S. at 540. Thus, the standard procedure does not necessarily contemplate further court review of a remedial plan. To the extent this Court reviews a revised legislative plan, it will be narrowly focused on whether it complies with the Court's decision and need not take three months.

With respect to their schedules for court-drawn plans, the plaintiffs include many unnecessary months for the Court to produce a "draft" plan and then several more months to "finalize" the draft plan. Both schedules include

---

[3] The plaintiffs' plan contains several unnecessary months even under their own purported "rule of thumb." (Pls.' Br. 23.) This alleged "rule of thumb" has no basis in law because the article from which it comes cites no authority for this purported "rule." Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147 n.88 (2005). It also has no basis in fact because the author admits that "[r]arely does a court meet the timetable I am specifying here." *Id.*

three months for the Court to "produce a draft plan," and then, for no apparent reason, another three months (under Schedule 1) or six months (under Schedule 2) for the Court to "finalize" this draft plan. (Pls.' Br. 24.) The plaintiffs cite no authority for this two-step "finalization" procedure, likely because there is none. In fact, the cases they rely on elsewhere imposed plans that were implemented upon the decision on the plan being issued, *e.g.*, *Johnson*, 929 F. Supp. at 1567, as were the plans in *Prosser* and *Baumgart*.

There is also no practical reason to take months to "finalize" a plan, and the plaintiffs do not explain what would happen in the months of "finalization." The only conceivable purpose for this time seems to be to allow the plaintiffs a chance to alter the court-drawn plan. That, however, is entirely unnecessary. It would especially inappropriate here because court-drawn plan would eliminate the alleged constitutional issue in this case—partisanship in the districting process. The plaintiffs are not entitled to alter a constitutionally-drawn plan. This "finalization" procedure adds at least three unnecessary months to Schedule 1 and six unnecessary months to Schedule 2.

## III. The plaintiffs' request for "detailed instructions" is an attempt to extend the Court's decision.

The Court should not provide the plaintiffs' suggested "detailed instructions" to the Legislature on how to draft a revised plan. In the usual case, a court only provides that the Legislature issue a remedial plan consistent with its opinion. *E.g.*, *Harris*, 159 F. Supp. 3d at 627 (ordering

18

North Carolina Legislature "to enact a remedial districting plan"); *Vieth*, 195 F. Supp. 2d at 679 (ordering Pennsylvania Legislature to produce "a congressional redistricting plan in conformity with this opinion"). Here, this Court issued a 116-page majority decision; presumably, that lengthy decision contained this Court's conclusion as to what the Constitution requires of a lawful plan.

The plaintiffs, rather, seek "detailed instructions" as a way to impose requirements on a remedial plan that go well-beyond the Court's decision. Contrary to the plaintiffs' approach, the decision does not require that the Legislature refrain from districting to any partisan advantage. (Dkt. 166:59 n.170.) Nor could it, when the Supreme Court has clearly held that "partisan districting is a lawful and common practice," *Vieth v. Jubelirer*, 541 U.S. 267, 286 (2004) (plurality opinion), and that a claim "must rest on something more than the conclusion that political classifications were applied." *Id.* at 307 (Kennedy, J., concurring). Instead, this Court's decision only requires that a districting body not act with "an intent to entrench a political party in power." (Dkt. 166:59.) A plan's discriminatory effect is not considered until the plaintiffs prove that "the drafters have evinced an intent to entrench their party in power." (Dkt. 166:89 n.314.)

Therefore, the Court's decision does not, as the plaintiffs contend, provide that a districting plan "must treat the major parties reasonably

symmetrically over a range of plausible electoral conditions." (Pls.' Br. 11.) Nor could the decision make symmetry a requirement when Justice Kennedy has held that "asymmetry alone is not a reliable measure of unconstitutional partisanship," *LULAC v. Perry*, 548 U.S. 399, 420 (2006) (opinion of Kennedy, J.), and the other Justices' discussion of partisan symmetry is "hardly a ringing endorsement of symmetry theory." (Dkt. 166:136.)

Further, the Court's decision does not allow a plan to be struck down based on predictions of discriminatory effect from regression models. The Court made clear that its discriminatory effect analysis was not subject to "the shortcomings that the *Bandemer* plurality identified" because it was based on actual results from "two elections under Act 43." (Dkt. 166:79.) Further, Justice Kennedy in *LULAC* warned against "adopting a constitutional standard that invalidates a map based on unfair results that would occur in a hypothetical state of affairs." 548 U.S. at 420 (opinion of Kennedy, J.) Yet the plaintiffs are now proposing that the Court predict a future discriminatory effect based on a regression model of hypothetical future elections.

The plaintiffs compound their erroneous interpretation of the Court's decision by attempting to impose the same requirement on court-drawn plans, contending that a court-drawn plan "must strive for almost perfect partisan symmetry." (Pls.' Br. 17.) The plaintiffs cite no case imposing such a requirement because no court has, and as shown above, the Supreme Court in

*LULAC* did not come close to endorsing this principle even though it expressly considered partisan symmetry.

Further, no court has ever districted Wisconsin in this manner. Neither the *Prosser* court nor the *Baumgart* court employed a partisan symmetry analysis and, in fact, *Baumgart* noted that it is not possible to district in this fashion while still respecting traditional districting principals. 2002 WL 34127471, at *6. The plaintiffs' position is particularly strange in that they have repeatedly argued that their standard does not attack asymmetry in court-drawn plans; yet, now they contend that courts act unconstitutionally if they do not purposely district to achieve symmetry. There is no requirement that courts district to achieve a particular partisan result.

The Court should not institute such a radical shift in the law of districting under the guise of additional instructions to the Legislature.

## IV. The plaintiffs omit important requirements for court-drawn plans.

The plaintiffs' discussion of requirements of a court-drawn plan is premature because the Court should allow the Legislature the opportunity to draw a remedial plan. The Court will only draw a plan if "those with legislative responsibilities do not respond." *Wise*, 437 U.S. at 540.

The defendants, however, must also point out that the plaintiffs omit perhaps the most crucial limitation on court-drawn remedial maps. Under *Upham v. Seamon*, 456 U.S. 37, 43 (1982), a "district court's modifications of a

21

state plan are limited to those necessary to cure any constitutional or statutory defect." When a state takes the opportunity to redistrict, "the discretion of the federal court is limited except to the extent that the plan itself runs afoul of federal law." *Lawyer v. Dep't of Justice*, 521 U.S. 567, 576–77 (1997). As a result, in the unlikely event the Court drafts a plan, it will not be drawing on a blank slate, free to redraw every district line. Instead, the Court should keep the existing districts as much as possible and change the districts only as far as is necessary to remedy the constitutional issue.

Further, the plaintiffs misstate what it means for a court to act "free from any taint of arbitrariness or discrimination." (Pls.' Br. 17 (quoting *Connor*, 431 U.S. at 415).) This standard does not command courts to impose partisan symmetry when districting. Instead, the plaintiffs' own authority shows that the command to be "fastidiously neutral" means to be "free from all political considerations." *White v. Weiser*, 412 U.S. 783, 799 (Marshall, J., concurring in part). To properly apply this principle, the Court should not take politics into account at all should it be forced to draw a plan. If the alleged constitutional harm is excessive politics in districting, then the appropriate remedy is not to have federal courts become political districting bodies attempting to achieve particular political results.

Given the plaintiffs' position at trial that Wisconsin's political geography is neutral, it is surprising that they would now suggest that the Court would

need to focus on politics to draft a map. If they truly believed their contention, neutral judges drawing districts based purely on geography would produce a perfectly fair map. Similarly, if it is true that Wisconsin has only a "modest, pro-Republican political geography," (Dkt. 166:111), then neutral judges will likewise produce a fair plan that does not unconstitutionally burden Democratic voters without having to consider politics at all. If Republicans will benefit when a court does not consider politics, then it calls into question the entire basis of this lawsuit and the Court's decision because asymmetry in Wisconsin would not be due to partisan intent. The plaintiffs are essentially admitting that they need the Court to district in a way to offset their natural disadvantages due to the packing of their voters.

## V.  The Court should not issue preemptive rulings relating to discovery from the Legislature.

The plaintiffs' request that the Court enter a preemptive order regarding discovery from the Legislature is premature. None of the discovery requests are aimed at the defendants—the members of the Wisconsin Election Commission. To the extent discovery is requested on a replacement plan, the parties, the Court, and the entity to which the discovery is directed can deal with particular requests, and any objections to those requests, at the appropriate time.

As an initial matter, the Legislature is not a party to this case and discovery of a non-party would ordinarily occur through subpoenas.

23

*See* Fed. R. Civ. P. 45. The rules regarding subpoenas allow those subpoenaed to raise objections. Fed. R. Civ. P. 45(c)(2)(B). For example, the plaintiffs request communications with "attorneys . . . involved in designing the plan." (Pls.' Br. 14.) Depending on what types of information are sought, the Legislature may wish to object to particular requests or assert a privilege. This Court cannot preemptively find that the attorney-client privilege or the legislative privilege do not apply. *See Upjohn Co. v. United States*, 449 U.S. 383, 396 (1981) (noting that attorney-client privilege decided on a "case-by-case" basis).

With regard to the specifics, the plaintiffs' requests go well beyond what other courts have ordered when a legislature passes a replacement plan. The plaintiffs' authority required identification of people involved in districting, *League of Women Voters of Florida v. Detzner*, 179 So. 3d 258, 261–62 (Fla. 2015), and information necessary to judge the constitutionality of a plan. *Covington v. North Carolina*, No. 1:15-CV-399 (M.D.N.C. Nov. 29, 2016). These decisions do not support the plaintiffs' long list of demands, particularly orders to the non-party Legislature to make computers available for inspection and for having the leaders of each house of the Legislature swear to document production issues.

24

## CONCLUSION

For the reasons state in the defendants' opening brief, the Court should enter an injunction directing the Legislature to revise the Assembly districts to conform to the Court's decision, but should not require a replacement plan be enacted until a decision by the Supreme Court.

Dated this 5th day of January, 2017.

Respectfully submitted,

BRAD D. SCHIMEL
Wisconsin Attorney General

/s/Brian P. Keenan
BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 267-2223 (Fax)
keenanbp@doj.state.wi.us