# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| WILLIAM WHITFORD, ROGER ANCLAM, | ) | |
| EMILY BUNTING, MARY LYNNE DONOHUE, | ) | |
| HELEN HARRIS, WAYNE JENSEN, | ) | |
| WENDY SUE JOHNSON, JANET MITCHELL, | ) | No. 15-cv-421-bbc |
| ALLISON SEATON, JAMES SEATON, | ) | |
| JEROME WALLACE, and DONALD WINTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BEVERLY R. GILL, JULIE M. GLANCEY, | ) | |
| ANN S. JACOBS, STEVE KING, DON MILLIS, | ) | |
| and MARK L. THOMSEN. | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' RESPONSE BRIEF ON REMEDIES

---

Peter G. Earle
LAW OFFICE OF PETER G. EARLE
839 North Jefferson Street, Suite 300
Milwaukee, WI 53202
(414) 276-1076
peter@earle-law.com

J. Gerald Hebert
Ruth Greenwood
Annabelle Harless
Danielle Lang
CAMPAIGN LEGAL CENTER
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200
ghebert@campaignlegalcenter.org
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org
dlang@campaignlegalcenter.org

Michele Odorizzi
MAYER BROWN, LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
modorizzi@mayerbrown.com

Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 E. 60th Street, Suite 510
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

Douglas M. Poland
RATHJE & WOODWARD, LLC
10 East Doty Street, Suite 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com

Dated: January 5, 2017

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................1

ARGUMENT ..............................................................................................................2

    A.  Under the Established Doctrinal Framework, the Court Should Not Stay the Remedial Process Pending Appeal ..................................................................2

    B.  The Supposed Novelty of This Court's Decision Is Not a Reason to Postpone the Remedy Phase ........................................................................................7

    C.  Supreme Court Precedent Does Not Support Staying Remedial Proceedings .............9

CONCLUSION.........................................................................................................10

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Abrams v. Johnson*,
   521 U.S. 74, 98 (1997)............................................................................................10

*Baldus v. Members of Wis. Gov't Accountability Bd.*,
   862 F. Supp. 2d 860, 862 (E.D. Wis. 2012)..........................................................4

*Bandemer v. Davis*,
   603 F. Supp. 1479, 1496 (S.D. Ind. 1984), *rev'd on other grounds*, 478 U.S. 109
   (1986)....................................................................................................................8

*Bartlett v. Stephenson*,
   535 U.S. 1301, 1304 (2002)................................................................................10

*Cane v. Worcester Cty.*,
   874 F. Supp. 695, 698 (D. Md. 1995)...............................................................3, 6

*Cousins v. McWherter*,
   845 F. Supp. 525, 528 (E.D. Tenn. 1994)...........................................................6

*Covington v. North Carolina*,
   No. 1:15-CV-399, Slip Op. at 8 (M.D.N.C. Jan. 4, 2017) .................................6

*Davis v. Bandemer*,
   478 U.S. 109 (1986)..............................................................................................5

*Etherly v. Schwartz*,
   590 F.3d 531 (7th Cir. 2009) ............................................................................3, 5

*Gingles v. Edmisten*,
   590 F. Supp. 345, 376, 384 (E.D.N.C. 1984), *aff'd in part, rev'd in part*, 478
   U.S. 30 (1986)......................................................................................................8

*Graves v. Barnes*,
   405 U.S. 1201, 1203 (1972)................................................................................10

*Harris v. McCrory*,
   2016 WL 6920368, at *1 (M.D.N.C. Feb. 9, 2016)..........................................3, 6

*Hays v. Louisiana*,
   839 F. Supp. 1188, 1209 (W.D. La. 1993), *vac'd on other grounds*, 512 U.S.
   1230 (1994)...........................................................................................................8

*Hilton v. Braunskill,*
    481 U.S. 770, 776 (1987) ................................................................3, 5

*Johnson v. Mortham,*
    926 F. Supp. 1540, 1543 (N.D. Fla. 1996) ...................................................3

*Karcher v. Daggett,*
    455 U.S. 1303, 1306-07 (1982) .................................................................9

*Karcher v. Daggett,*
    466 U.S. 910, 910 (1984) ........................................................................9

*Larios v. Cox,*
    305 F. Supp. 2d 1335 (N.D. Ga. 2004) ...................................................4, 6

*Latino Pol. Action Comm. v. City of Bos.,*
    716 F.2d 68, 70-71 & n.3 (1st Cir. 1983) ..................................................9

*LULAC v. Perry,*
    548 U.S. 399 (2006) ..............................................................................5

*Mahan v. Howell,*
    404 U.S. 1201, 1203 (1971) ...................................................................10

*One Wis. Inst., Inc. v. Thomsen,*
    2016 WL 4250508, at *4 (W.D. Wis. Aug. 11, 2016) ....................................7

*One Wis. Inst., Inc. v. Thomsen,*
    Nos. 16-3091 & 16-3083 (7th Cir. Aug. 22, 2016) .......................................7

*Perez v. Texas,*
    891 F. Supp. 2d 808, 812 (W.D. Tex. 2012) ...............................................4

*Personhuballah v. Alcorn,*
    155 F. Supp. 3d 552, 560 (E.D. Va. 2016) ...............................................3, 6

*Reynolds v. Sims,*
    377 U.S. 533 (1964) .............................................................................6, 7

*Romo v. Detzner,*
    2014 WL 4261829 (Fla. Cir. Ct. Aug. 22, 2014), *rev'd on other grounds,*
    172 So. 3d 363 (Fla. 2015) ......................................................................8

*Shaw v. Reno,*
    509 U.S. 630 (1993) ..............................................................................8

*Thornburg v. Gingles,*
  478 U.S. 30 (1986)............................................................................8

*Travia v. Lomenzo,*
  381 U.S. 431 (1965)..........................................................................10

*Vera v. Bush,*
  933 F. Supp. 1341, 1352-53 (S.D. Tex. 1996)..................................5

*Vieth v. Jubelirer,*
  541 U.S. 267 (2004)............................................................................7

**Other Authorities**                                                          **Page(s)**

*Featured Dataset – PE-US-2016*, The Electoral Integrity Project,
  https://electoralintegrityproject.squarespace.com/featured-dataset ......................10

Fed. R. Civ. P. 62 ........................................................................................2

**INTRODUCTION**

For three consecutive elections, the architects of Wisconsin's Act 43 (the "Current Plan") have enjoyed the fruits of their unconstitutional partisan gerrymander: many more state assembly seats won by Republican candidates, control of the chamber even when the electorate prefers Democrats, and the enactment of numerous policies opposed by the public. In their brief on remedies, defendants argue that this streak of three straight unlawful elections should be extended to four. That would be the most likely result were this Court to accept defendants' invitation to stay all remedial proceedings until the Supreme Court decides defendants' appeal: the remedy phase would not begin until the summer of 2018—and would not conclude in time for the 2018 election. Like almost all courts that have considered similar efforts at delay, this Court should reject defendants' dilatory approach, start the remedial process at once, and avoid condemning Wisconsin' voters to yet another election held under an illegal map.

Tellingly, defendants do not even *mention* the factors that apply to the issuance of a stay pending appeal. And for good reason, because these factors—especially injury to the plaintiffs and harm to the public interest—weigh unequivocally against staying the case's remedy phase. Instead, defendants stress the supposed novelty of the Court's decision, which they claim makes a stay more appropriate here. But in every other area of redistricting law, courts have not proceeded so gingerly when finding themselves in new terrain. To the contrary, they have immediately launched remedial proceedings, just as in more familiar contexts. Defendants also rely on a lone opinion, by a single Justice, staying a district court's redistricting injunction in 1982. But the Supreme Court has no regular practice of staying redistricting remedies, and indeed frequently denies motions for such relief.

Accordingly, this Court should manage the case's remedy phase as discussed in plaintiffs' brief on remedies. The first step of this phase should be enjoining any further use of the Current Plan. The next step, though, should not be doing nothing for eighteen months, but rather taking prompt measures to ensure that a proper remedial map is in place for the 2018 election.[1]

## ARGUMENT

### A.   Under the Established Doctrinal Framework, the Court Should Not Stay the Remedial Process Pending Appeal.

Defendants do not label their request a motion for a stay pending appeal pursuant to Fed. R. Civ. P. 62, but that is exactly what it is. They would like the Court to enjoin the Current Plan and then to sit on its hands for the year and a half, more or less, that it will take the Supreme Court to decide their appeal. *See* Defs' Br. (Dkt. 169) at 1 ("the Court should not require a revised plan until after the Supreme Court has ruled on the case"); *id.* at 8 ("the Court's injunction should not require the Legislature to formally redraw the districts until the Supreme Court has clarified the law"). As noted above, defendants never cite the factors that govern the

---

[1] In addition to claiming that the case's remedy phase should be postponed until the Supreme Court decides their appeal, defendants assert that Wisconsin's elected branches should be given an opportunity to enact a remedial plan. *See* Defs' Br. (Dkt. 169) at 5-8. However, defendants never address the reasons why this approach is inappropriate here: namely, the elected branches' abysmal record in passing and defending the Current Plan, and their own position that they are barred by the Wisconsin Constitution from redistricting again until the 2020 cycle. *See* Pls' Br. (Dkt. 170) at 5-9. Because defendants fail to discuss these reasons, plaintiffs do not supplement their earlier argument on this subject.

Defendants also contend that the Court's injunction should "direct[] the Legislature to devise a new plan." Defs' Br. (Dkt. 169) at 1; *see also, e.g., id.* at 5 ("The proper remedy is for the Court to enter an injunction directing the Legislature to draft a new map consistent with its opinion."). This too is incorrect and contrary to precedent. Even if the Court grants the elected branches an *opportunity* to enact a remedial plan, it should not *require* them to do so. Rather, consistent with many earlier cases, the Court should simply impose its own remedy if the elected branches fail to produce a proper remedial map within a reasonable timeframe. *See* Pls. Br. (Dkt. 170) at 5-21.

Plaintiffs further note that David Nir has submitted a letter to the Court asking about submissions of draft plans by the public. As plaintiffs have previously explained, if the Court chooses to impose its own remedy, it should permit interested parties to make submissions. *See* Pls' Br. (Dkt. 170) at 20-21. If the Court gives the elected branches an opportunity to try to enact a remedial plan, interested parties may also submit proposals to the Legislature.

issuance of a stay pending appeal. These factors, though, are well-established and doom defendants' implicit motion for such relief.

The first factor is "whether the stay applicant has made a strong showing that he is likely to succeed on the merits." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also, e.g.*, *Etherly v. Schwartz*, 590 F.3d 531, 532 (7th Cir. 2009) (same). Defendants cannot possibly make this showing because they have already *lost* on the merits. After extensive discovery and a four-day trial, the Court held that the Current Plan is an unconstitutional partisan gerrymander. Obviously, the Court would not have reached this judgment if it thought that defendants were actually likely to *prevail* on appeal. *See, e.g.*, *Harris v. McCrory*, 2016 WL 6920368, at *1 (M.D.N.C. Feb. 9, 2016) (declining to stay the remedy phase where "the Court has already found that [certain districts] as presently drawn are unconstitutional"); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 559 (E.D. Va. 2016) (same where "we have twice found the [challenged district] as presently drawn to be unconstitutional").

The second factor is "whether the applicant will be irreparably injured absent a stay." *Hilton*, 481 U.S. at 776; *see also, e.g.*, *Etherly*, 590 F.3d at 532 (same). Defendants nowhere assert that they will suffer such grave harm; rather, they merely complain that legislative resources will be dissipated if the elected branches enact a remedial map and the Supreme Court then reverses this Court's ruling that the Current Plan is unlawful. *See* Defs' Br. (Dkt. 169) at 2 (hoping to "avoid[] a waste of resources devising a plan that is a temporary placeholder"); *id.* at 9 ("it would waste judicial and legislative resources to proceed with replacement plans"). However, "the time and expense of implementing a new system" is an "injury [that] is *not* irreparable." *Cane v. Worcester Cty.*, 874 F. Supp. 695, 698 (D. Md. 1995) (emphasis added); *see also, e.g.*, *Johnson v. Mortham*, 926 F. Supp. 1540, 1542 (N.D. Fla. 1996) (having to

redistrict is a "mere administrative convenience"). If the need for the elected branches to pass new legislation *did* amount to an irreparable harm, then it would be present each time a court invalidated one or more districts. But in that case, stays would not be "'extraordinary relief,'" *Larios v. Cox*, 305 F. Supp. 2d 1335, 1337 (N.D. Ga. 2004), but rather par for the course in redistricting cases.

Moreover, it is quite possible that the elected branches will not have to expend much energy at all designing a remedial plan. If, as plaintiffs have argued is appropriate here, the Court imposes its own remedy in the first instance, then the elected branches will not be required to enact any new legislation. Even if the Court does give the elected branches the opportunity to pass a new map, it would be just that: an opportunity. The elected branches would be perfectly free *not* to act if they found acting to be too onerous, in which case the Court again would craft its own remedy. *See, e.g.*, *Baldus v. Members of Wis. Gov't Accountability Bd.*, 862 F. Supp. 2d 860, 861 (E.D. Wis. 2012) (judicially delineating two districts after "[t]he Wisconsin Legislature chose not to make any submission").

Furthermore, defendants exaggerate the difficulty of the changes that would have to be made if the Supreme Court reversed this Court's decision (or held that the Current Plan is unconstitutional under a different standard). *See* Defs' Br. (Dkt. 169) at 10. An outright reversal would simply mean that the Current Plan would be used again in the next election in which it was feasible to do so. *See, e.g.*, *Perez v. Texas*, 891 F. Supp. 2d 808, 812 (W.D. Tex. 2012) (ordering the use of a district plan resembling the original legislatively enacted map on remand after a Supreme Court reversal). Similarly, if the Current Plan were deemed invalid under a different test, there is no doubt that any remedial map approved by this Court would be permissible under that test. Any such remedy would treat the major parties reasonably

4

symmetrically over a range of plausible electoral conditions, and thus would lack the discriminatory effect that is the sine qua non of a partisan gerrymander. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 418 (2006) (opinion of Kennedy, J.) ("a successful claim . . . must . . . show a burden . . . on the complainants' representational rights").

Lastly, the third and fourth factors are, respectively, "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Hilton*, 481 U.S. at 776; *see also, e.g.*, *Etherly*, 590 F.3d at 532 (same). These factors both counsel against a stay for the same reason: A stay would likely postpone the imposition of any remedy until the 2020 election, thus substantially injuring both plaintiffs and all Wisconsin voters by causing yet another election to be held under the unconstitutional Current Plan. As explained in plaintiffs' brief on remedies, the Supreme Court will probably decide any appeal by June 2018. *See* Pls' Br. (Dkt. 170) at 21-22; *see also, e.g.*, *LULAC*, 548 U.S. at 399 (decided on June 28, 2006); *Davis v. Bandemer*, 478 U.S. 109, 109 (1986) (decided on June 30, 1986). As also detailed in plaintiffs' brief, anywhere from six to twelve months will be required to design a proper remedial map, depending on how exactly this process unfolds. *See* Pls' Br. (Dkt. 170) at 22-25. Plainly, if this process took place *after* rather than *alongside* any appeal, it would be very difficult to finalize a remedy in time for the 2018 election. Indeed, the only way to do so would be to ignore all of the deadlines set by state law, to discard all of the signatures gathered by candidates running in the old districts, and to craft new districts in an extremely rushed fashion. This might be *possible*, *see, e.g.*, *Vera v. Bush*, 933 F. Supp. 1341, 1352-53 (S.D. Tex. 1996) (redrawing thirteen congressional districts and rewriting election calendar on August 6, 1996), but it would hardly be *advisable*.

Precisely so as to avoid these sorts of scenarios, district courts have nearly universally denied motions to stay remedial proceedings. The courts have recognized that stays threaten either to permit unlawful plans to be used in additional elections or to force the courts into acting more hastily and less deliberatively than they would like. *See, e.g.*, *Covington v. North Carolina*, No. 1:15-CV-399, Slip Op. at 8 (M.D.N.C. Jan. 4, 2017) (declining to stay the remedy phase because "prolonging the time during which Plaintiffs and other citizens are represented by legislators elected in . . . gerrymandered districts would serve only to exacerbate the irreparable harm the voters have already suffered by allowing an unconstitutionally constituted legislature to continue to act"); *Harris*, 2016 WL 6920368, at *1 (same because "[t]o force the plaintiffs to vote again under the unconstitutional plan . . . constitutes irreparable harm to them, and to the other voters in [the challenged districts]"); *Personhuballah*, 155 F. Supp. 3d at 560 (same because "[t]he effect would be to give the Intervenors the fruits of victory for another election cycle"); *Larios*, 305 F. Supp. 2d at 1344 (same because "the practical effect of a stay would be that the State of Georgia would conduct the 2004 elections again using unconstitutional apportionment plans"); *Cane*, 874 F. Supp. at 698 (same because "to delay to all citizens of the County their right to a voice in their government . . . . is a significant harm"); *Cousins v. McWherter*, 845 F. Supp. 525, 528 (E.D. Tenn. 1994) (same because "to prolong the creation of a plan by the Legislature would only serve to prolong the harm that plaintiffs have suffered for many years"). For its part, the Supreme Court has endorsed district courts' aversion to staying their remedies, commenting that "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

It is understandable, then, that defendants fail to mention the familiar doctrinal framework that applies to the issuance of a stay pending appeal. Virtually all courts employing this framework in redistricting cases have concluded that remedial proceedings should not be delayed.[2] The same result should follow here: the denial of defendants' implicit motion for a stay, and a remedy phase that proceeds simultaneously with any appeal.

### B. The Supposed Novelty of This Court's Decision Is Not a Reason to Postpone the Remedy Phase.

Although they do not engage with the existing law on stays, defendants do make a novel argument as to, well, novelty. They claim that postponing the remedial process is appropriate here because of the unsettled state of partisan gerrymandering doctrine. *See* Defs' Br. (Dkt. 169) at 1 (citing "the uncertain nature of the law on partisan gerrymandering"); *id.* at 8 (noting that "the substantive law regarding partisan gerrymandering is not clear"). But not only is there no authority for the proposition that stays are more justified in areas that happen to be in greater legal flux, district courts have repeatedly ruled to the contrary in other redistricting contexts. In these domains, the courts' actions have been "more reminiscent of Hannibal than of Hamlet," swiftly ordering remedies rather than staying remedial proceedings even when the relevant law was at its most indeterminate. *Vieth v. Jubelirer*, 541 U.S. 267, 302 (2004) (plurality opinion).

Take one-person, one-vote, the first federal cause of action to be recognized in the redistricting space. Before the Supreme Court even extended this theory to state legislatures, the district court in *Reynolds* struck down Alabama's state house and state senate plans and replaced them with maps devised by the court itself. *See Reynolds*, 377 U.S. at 537-52. Not only did the

---

[2] And in a notable case *outside* the redistricting context—but also involving unconstitutional electoral policies enacted by Wisconsin's elected branches—the court denied defendants' motion for a stay of its injunction ordering changes to Wisconsin's photo ID law and other electoral regulations. In language equally applicable here, the court commented that "[a] stay would irreparably injure plaintiffs and the public by abridging voters' constitutional rights." *One Wis. Inst., Inc. v. Thomsen*, 2016 WL 4250508, at *4 (W.D. Wis. Aug. 11, 2016); *see also One Wis. Inst., Inc. v. Thomsen*, Nos. 16-3091 & 16-3083 (7th Cir. Aug. 22, 2016) (also denying a motion to stay the district court's injunction).

court not stay the remedy phase, despite the doctrine's exceptional novelty, but the Supreme Court did not do so either. *See id.* at 553 (observing that "Mr. Justice Black refused to stay the District Court's order"). Likewise, consider Section 2 of the Voting Rights Act, which was transformed by congressional amendments in 1982 and definitively interpreted by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Again notwithstanding the lack of any Court-ratified standard, the district court in *Gingles* invalidated an array of districts, instructed North Carolina's elected branches to enact a new plan within six weeks, and then approved this remedial map. *See Gingles v. Edmisten*, 590 F. Supp. 345, 376, 384 (E.D.N.C. 1984), *aff'd in part, rev'd in part*, 478 U.S. 30 (1986).

The same pattern unfolded with respect to partisan gerrymandering in *Bandemer*. The district court held, for the first time ever, that state legislative plans were unconstitutional partisan gerrymanders. But rather than follow defendants' advice and stay remedial proceedings pending appeal, the court ordered Indiana's elected branches to design new maps, and warned that if they failed to do so, "this Court shall further act as it is deemed necessary and appropriate." *Bandemer v. Davis*, 603 F. Supp. 1479, 1496 (S.D. Ind. 1984), *rev'd on other grounds*, 478 U.S. 109 (1986).[3] And yet again in the racial gerrymandering context, just months after the Supreme Court created the cause of action in its cryptic decision in *Shaw v. Reno*, 509 U.S. 630 (1993), a district court held that Louisiana's entire congressional plan was overly racially motivated. *See Hays v. Louisiana*, 839 F. Supp. 1188, 1209 (W.D. La. 1993), *vac'd on other grounds*, 512 U.S. 1230 (1994). Once more, the court did not stay the remedy phase, and

---

[3] Similarly, after the Florida Constitution was amended in 2010 to ban partisan intent in redistricting, a Florida trial court struck down the State's congressional plan and then proceeded immediately to remedies. The court did *not* stay remedial proceedings pending appeal to the Florida Supreme Court. *See Romo v. Detzner*, 2014 WL 4261829 (Fla. Cir. Ct. Aug. 22, 2014), *rev'd on other grounds*, 172 So. 3d 363 (Fla. 2015).

the elected branches chose to pass a new map after their initial effort was found wanting. *See* 512 U.S. at 1230.

In every major area of redistricting law, then, district courts did not proceed nearly as warily as defendants now recommend, even at the moments when the areas first emerged. Instead, the courts resolutely—and immediately—commenced the remedial processes that were needed to cure the legal violations they had identified. This case's alleged novelty is therefore no reason for the Court to deviate from the usual judicial practice.

**C.    Supreme Court Precedent Does Not Support Staying Remedial Proceedings.**

Defendants' final rationale for suspending the remedy phase until the Supreme Court has decided their appeal is that, in 1982, a single Justice issued a stay of a district court injunction that had instructed New Jersey to design new congressional districts. *See* Defs' Br. (Dkt. 169) at 10-11; *Karcher v. Daggett*, 455 U.S. 1303, 1306-07 (1982) (Brennan, J., in chambers). Justice Brennan's grant of a stay in *Karcher*, however, was an atypical order at odds with the Supreme Court's usual tendency to reject such requests. Later in the *Karcher* litigation itself, when the district court took the *more* aggressive step of imposing its own remedial plan in the wake of the Supreme Court's decision on the merits, the Court *denied* the State's motion for another stay. *See Karcher v. Daggett*, 466 U.S. 910, 910 (1984). Shortly after Justice Brennan's ruling, the First Circuit also commented that it was an "exception" to the Supreme Court's pattern over the previous decade of disfavoring stays. *See Latino Pol. Action Comm. v. City of Bos.*, 716 F.2d 68, 70-71 & n.3 (1st Cir. 1983).

This pattern not only was evident at the time of *Karcher*, but has become clearer still in the years since. The Supreme Court has repeatedly turned down stay requests in redistricting cases, stressing the extraordinary nature of such relief and the need for deference to remedial

choices made by lower courts closer to the cases' facts. *See, e.g.*, *Bartlett v. Stephenson*, 535 U.S. 1301, 1304 (2002) (Rehnquist, C.J., in chambers) (observing in a Voting Rights Act case that the Court "'will grant a stay only in extraordinary circumstances'"); *Abrams v. Johnson*, 521 U.S. 74, 78 (1997) (noting the Court's refusal to stay a judicially crafted remedial map in a racial gerrymandering case); *Graves v. Barnes*, 405 U.S. 1201, 1203 (1972) (Powell, J., in chambers) ("Stays pending appeal to this Court are granted only in extraordinary circumstances. A lower court judgment, entered by a tribunal that was closer to the facts . . . is entitled to a presumption of validity."); *Mahan v. Howell*, 404 U.S. 1201, 1203 (1971) (Black, J., in chambers) (declining to stay a court-imposed map in a one-person, one-vote case where "the facts are complicated" and "[t]he case is difficult"); *Travia v. Lomenzo*, 381 U.S. 431, 431 (1965) (per curiam) (also denying a stay in a one-person, one-vote case).

Defendants, of course, are free to seek a stay from the Supreme Court if this Court proceeds with the remedy phase. But the one case they have located in which a stay was granted provides scant support for Supreme Court intervention—and no reason at all for this Court to delay remedial proceedings.

## CONCLUSION

According to a recent report, Wisconsin's electoral system is perceived to be the second-worst in America in terms of electoral integrity. *See Featured Dataset – PE-US-2016*, The Electoral Integrity Project, https://electoralintegrityproject.squarespace.com/featured-dataset. The Current Plan—an egregious partisan gerrymander that distorts and thwarts the will of the electorate—is a major reason why Wisconsin's system is deemed so poor. *See id.* (showing that Wisconsin's district maps are also considered the second-worst in the country). Having rightly held that the Plan is unconstitutional, the Court should ensure that it is replaced by a proper

remedial map in the 2018 election. This necessarily entails denying defendants' implicit motion for a stay pending appeal: an approach that would likely cause an illegitimate plan to taint Wisconsin's democracy for another two years.

Respectfully submitted,

s/ Nicholas O. Stephanopoulos
One of the attorneys for plaintiffs

Peter G. Earle
LAW OFFICE OF PETER G. EARLE
839 North Jefferson Street, Suite 300
Milwaukee, WI 53202
(414) 276-1076
peter@earle-law.com

J. Gerald Hebert
Ruth Greenwood
Annabelle Harless
Danielle Lang
CAMPAIGN LEGAL CENTER
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200
ghebert@campaignlegalcenter.org
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org
dlang@campaignlegalcenter.org

Michele Odorizzi
MAYER BROWN, LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
modorizzi@mayerbrown.com

Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 E. 60th Street, Suite 510
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

Douglas M. Poland
RATHJE & WOODWARD, LLC
10 East Doty Street, Suite 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com

11