**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| WILLIAM WHITFORD, GRAHAM ADSIT, | ) | |
| ROGER ANCLAM, WARREN BRAUN, | ) | |
| HANS BREITENMOSER, JUDITH BREY, | ) | |
| BRENT BRIGSON, EMILY BUNTING, SANDRA | ) | No. 15-cv-421-jdp |
| CARLSON-KAYE, GUY COSTELLO, TIMOTHY B. | ) | |
| DALEY, MARGARET LESLIE DEMUTH, | ) | |
| DANIEL DIETERICH, MARY LYNNE DONOHUE, | ) | |
| LEAH DUDLEY, JENNIFER ESTRADA, | ) | |
| BARBARA FLOM, HELEN HARRIS, | ) | |
| GAIL HOHENSTEIN, WAYNE JENSEN, | ) | |
| WENDY SUE JOHNSON, MICHAEL LECKER, | ) | |
| ELIZABETH LENTINI, NORAH MCCUE, | ) | |
| JANET MITCHELL, DEBORAH PATEL, | ) | |
| JANE PEDERSEN, NANCY PETULLA, | ) | |
| ROBERT PFUNDHELLER, SARA RAMAKER, | ) | |
| ROSALIE SCHNICK, ALLISON SEATON, | ) | |
| JAMES SEATON, ANN E. STEVNING-ROE, | ) | |
| LINEA SUNDSTROM, MICHAEL SWITZENBAUM, | ) | |
| JEROME WALLACE, DONALD WINTER, | ) | |
| EDWARD WOHL, and ANN WOLFE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Three Judge Panel Requested |
| v. | ) | 28 U.S.C. 2284(a) |
| | ) | |
| BEVERLY R. GILL, JULIE M. GLANCEY, | ) | |
| ANN S. JACOBS, JODI JENSEN, DEAN KNUDSON, | ) | |
| and MARK L. THOMSEN, | ) | |
| | ) | |
| Defendants. | ) | |

---

## AMENDED COMPLAINT
---

NOW COME Plaintiffs William Whitford, Graham Adsit, Roger Anclam, Warren Braun,

Hans Breitenmoser, Judith Brey, Brent Brigson, Emily Bunting, Sandra Carlson-Kaye, Guy

Costello, Timothy B. Daley, Margaret Leslie DeMuth, Daniel Dieterich, Mary Lynne Donohue,

Leah Dudley, Jennifer Estrada, Barbara Flom, Helen Harris, Gail Hohenstein, Wayne Jensen,

Wendy Sue Johnson, Michael Lecker, Elizabeth Lentini, Norah McCue, Janet Mitchell, Deborah

Patel, Jane Pedersen, Nancy Petulla, Robert Pfundheller, Sara Ramaker, Rosalie Schnick, Allison Seaton, James Seaton, Ann E. Stevning-Roe, Linea Sundstrom, Michael Switzenbaum, Jerome Wallace, Donald Winter, Edward Wohl, and Ann Wolfe, by their undersigned attorneys, and complain of Defendants Beverly R. Gill, Julie M. Glancey, Ann S. Jacobs, Jodi Jensen, Dean Knudson, and Mark L. Thomsen, not personally, but solely in their official capacities as members of the Wisconsin Elections Commission, as follows:

## INTRODUCTION

1.      Plaintiffs seek both a declaratory judgment that the Wisconsin State Assembly district plan adopted in 2011 (Act 43, or the "Current Plan") violates the First and Fourteenth Amendments of the United States Constitution and an order permanently enjoining the implementation of the Current Plan in the 2020 election. As explained in greater detail below, the Current Plan is, by any measure, one of the worst partisan gerrymanders in modern American history. In the first election in which it was in force (2012), the Current Plan enabled Republican candidates to win sixty of the Assembly's ninety-nine seats even though Democratic candidates won a *majority* of the statewide Assembly vote. The evidence is overwhelming that the Current Plan was adopted to achieve precisely that result: indeed, before submitting the map for approval, the Republican leadership retained an expert (at State expense) who predicted the partisan performance of each proposed district—as it turned out, with remarkable accuracy.

2.      This kind of partisan gerrymandering is both unconstitutional and profoundly undemocratic. It is unconstitutional because it treats voters unequally, diluting their voting power based on their political beliefs, in violation of the Fourteenth Amendment's guarantee of equal protection, and because it unreasonably burdens their First Amendment rights of association and free speech. Extreme partisan gerrymandering is also contrary to core democratic values because

it enables a political party to win more legislative districts—and thus more legislative power—than is warranted by that party's popular support. By distorting the relationship between votes and assembly seats, it causes policies to be enacted that do not accurately reflect the public will. In the end, a political minority is able to rule the majority and to entrench itself in power by periodically manipulating election boundaries.

3.      Partisan gerrymandering has increased throughout the United States in recent years as a result of both a rising tide of partisanship and greater technological sophistication, which enables maps to be drawn in ways that are likely to enable the party in power to remain in power even if it no longer represents the views of the majority of voters. This nationwide trend threatens a "'core principle of republican government,' namely, 'that the voters should choose their representatives, not the other way around.'" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015).

4.      The United States Supreme Court has recognized that partisan gerrymandering can be unconstitutional. Nevertheless, a constitutional challenge has yet to succeed on that ground because plaintiffs have been unable to offer a workable standard to distinguish between permissible political line-drawing and unconstitutional partisan gerrymandering. In this case, plaintiffs propose a new test that *is* workable, based on the concept of partisan symmetry—the idea that a district plan should treat the major parties symmetrically with respect to the conversion of votes to seats and that neither party should have a systematic advantage in how efficiently its popular support translates into legislative power. Plaintiffs also propose a distinct, workable test based not on vote dilution but rather on the First Amendment associational injuries suffered by voters, candidates, representatives, and other supporters of the victimized party.

5.      One way to measure a district plan's performance in terms of partisan symmetry is to determine whether there is an "efficiency gap" between the performances of the two major parties and, if so, to compare the magnitude of that gap to comparable district plans in the modern era nationwide. The efficiency gap captures in a single number all of a district plan's *cracking* and *packing*—the two fundamental ways in which partisan gerrymanders are constructed. Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one. Packing means concentrating one party's backers in a few districts that they win by overwhelming margins. Both cracking and packing result in "wasted" votes: votes cast either for a losing candidate (in the case of cracking) or for a winning candidate but in excess of what he or she needed to prevail (in the case of packing). The efficiency gap is the difference between the parties' respective wasted votes in an election, divided by the total number of votes cast.

6.      When the efficiency gap is relatively small and roughly equivalent to the efficiency gaps that have traditionally existed, the map should not be deemed unconstitutional. In such cases, there may be no intent to treat voters unequally; in any event, the effects of any gerrymandering are likely to be redressable through the political process. But where the efficiency gap is large and much greater than the historical norm, there should be a presumption of unconstitutionality. In such a case, an intent to systematically disadvantage voters based on their political beliefs can be inferred from the severity of the gerrymander alone. And because such severe gerrymanders are likely to be extremely durable as well, it is unlikely that the disadvantaged party's adherents will be able to protect themselves through the political process. Where partisan gerrymandering is extreme, the process itself is broken: current legislators have

no incentive to alter it, and adherents of the disadvantaged party are unable to do so because their votes have been unfairly diluted.

7.      Wisconsin's Current Plan is presumptively unconstitutional under this analysis. In the 2012 election, the Current Plan resulted in an efficiency gap of roughly 13% in favor of Republican candidates. Between 1972 and 2014, fewer than *four percent* of all state house plans in the country benefited a party to that extent. In the 2014 election, the efficiency gap remained extremely high at 10%. Between 1972 and 2010, not a *single* plan anywhere in the United States had an efficiency gap as high as the Current Plan in the first two elections after redistricting. A district plan this lopsided is also highly unlikely ever to become neutral over its ten-year lifespan. Indeed, we can predict with nearly 100% confidence that, absent this Court's intervention, Wisconsin's Current Plan will continue to unfairly favor Republican voters and candidates—and unfairly disadvantage Democratic voters and candidates—throughout the remainder of the decade.

8.      There are three additional facts that reinforce the conclusion that the Current Plan is unconstitutional. First, the Current Plan was not the result of an ordinary political process, where a bill is formulated through a give-and-take between political adversaries and subject to open debate. Instead, it was drawn up in secret by the Legislature's Republican leadership, without consultation with Democratic leaders or rank-and-file members of either party, with the purpose and intent of altering what was already a favorable map to maximize the Republican Party's partisan advantage. Then the proposal was rammed through the Assembly, without any opportunity for real debate.

9.      Second, the Current Plan is also an outlier by another measure of partisan symmetry—partisan bias. Partisan bias is the difference in the share of seats that each party

would win if they tied statewide, each receiving 50% of the vote. In 2012, there was a 13% bias in favor of Republicans; in a tied election, Republicans would have won 63% of the Assembly seats, with Democrats winning only 37%. In 2014, there was a 12% bias in favor of Republicans.

10.     Third, the Current Plan's extreme partisan skew was entirely unnecessary. Plaintiffs have designed a Demonstration Plan that complies at least as well as the Current Plan with every legal requirement—equal population, the Voting Rights Act, compactness, and respect for political subdivisions—but that is almost perfectly balanced in its partisan consequences. Thus, defendants cannot salvage the Current Plan on the theory that adherence to redistricting criteria or the State's underlying political geography made an unfair plan unavoidable.

11.     The Current Plan is also unlawful under plaintiffs' separate proposed test based on the First Amendment associational injuries they have suffered. Due to the Plan, plaintiffs and other supporters of the Democratic Party in Wisconsin have experienced severe "difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Gill v. Whitford*, 138 S. Ct. 1916, 1938 (2018) (Kagan, J., concurring). These harms are onerous enough to trigger strict scrutiny for the Plan, which it cannot survive. The Plan's pursuit of partisan advantage is not a compelling—or even a legitimate—governmental interest. And the Plan's nonpartisan goals can all be met by a map that treats the major parties fairly, meaning that the Plan is not narrowly tailored to achieve these aims.

12.     To be clear, plaintiffs do not seek to replace a pro-Republican gerrymander with a plan that is gerrymandered to be pro-Democratic. Rather, plaintiffs seek as a remedy the creation of a neutral plan that is not gerrymandered to give either side an unfair partisan advantage.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 2284. It also has jurisdiction under 28 U.S.C. §§ 2201 and 2202, the Declaratory Judgments Act, to grant the declaratory relief requested.

14.     Pursuant to 28 U.S.C. § 2284(a), a three-judge panel should be convened to hear this case.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b). At least one of the defendants resides in the Western District of Wisconsin. In addition, at least 21 of the plaintiffs reside and vote in this judicial district.

## PARTIES

16.     The 40 plaintiffs are qualified, registered voters in Wisconsin who reside in various Assembly districts and who support the election of Democratic candidates and the implementation of Democratic policies. As explained in detail below, 33 of these plaintiffs' votes have been unlawfully diluted by the Current Plan. These plaintiffs each live in districts that *were* cracked or packed by the Plan, but that did not *have* to be cracked or packed, as demonstrated by an alternative map generated by a computer algorithm without consideration of partisan data. For each of these plaintiffs, "the particular composition of the voter's own district" thus "causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Whitford*, 138 S. Ct. at 1931.

17.     In addition to having had their votes unlawfully diluted, the plaintiffs have suffered a range of associational harms as a result of the Current Plan's adoption. They have been deterred from, and hindered in, turning out to vote, registering voters, volunteering for campaigns, donating money to candidates, running for office, appealing to independents, and advocating and implementing their preferred policies. Because the Plan has "ravaged the party

7

[they] work[] to support," it "has burdened the[ir] ability . . . to affiliate in a political party and carry out that organization's activities and objects." *Id.* at 1938-39 (Kagan, J., concurring).

18.     Plaintiff Sara Ramaker lives at 2545 Oakwood Avenue, Green Bay, WI 54301, which is located in the ward Allouez – V4 in Brown County.[1] Plaintiff Ramaker is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Ramaker's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

19.     Plaintiff Ramaker's home is in District 4 of the Current Plan. District 4 is located southwest of Green Bay and avoids that city's concentration of Democratic voters. To create District 4, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Ramaker. According to the drafters' partisan composite, District 4 was expected to have a Republican vote share of 54%.[2] The drafters also labeled District 4 as a "GOP seat" that was "strengthened." As the drafters predicted, the Republican candidate prevailed in District 4 in the 2012, 2014, and 2016 elections.

20.     The Current Plan's cracking of Democratic voters such as Plaintiff Ramaker was unnecessary. Plaintiffs' expert used a computer algorithm to generate an alternative Assembly map (the "computer-generated map") that beats the Current Plan on every one of its nonpartisan objectives but that treats the major parties almost perfectly symmetrically. Specifically, this map has more equally populated districts than the Current Plan, has the same number of black-majority and Latino-majority districts, splits fewer counties and municipalities, has more

---

[1] The ward listing for each plaintiff refers to the wards created with the Current Plan in 2011.

[2] All references to the drafters' partisan composite are based on plaintiffs' recalculation of the composite using more accurate data.

compact districts on average, and pairs fewer incumbents—but has an efficiency gap of exactly zero. In this map, Plaintiff Ramaker's home is in a district that includes part of Green Bay and that has a Democratic vote share of 50.2% according to the drafters' partisan composite. Plaintiff Ramaker thus could have been placed in a Democratic district rather than cracked into a Republican district.

21.    Plaintiff Linea Sundstrom lives at 1320 E. Lake Bluff Boulevard, Shorewood, WI 53211, which is located in the ward Shorewood – V12 in Milwaukee County. Plaintiff Sundstrom is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Sundstrom's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

22.    Plaintiff Sundstrom's home is in District 10 of the Current Plan. District 10 is located mostly in Milwaukee and contains many of that city's Democratic voters. To create District 10, the Plan's drafters intentionally packed Democratic voters such as Plaintiff Sundstrom. According to the drafters' partisan composite, District 10 was expected to have a Democratic vote share of 86%. As the drafters predicted, the Democratic candidate prevailed in District 10 without even being challenged in the 2012, 2014, and 2016 elections.

23.    The Current Plan's packing of Democratic voters such as Plaintiff Sundstrom was unnecessary. In the computer-generated map, Plaintiff Sundstrom's home is in a district that includes parts of both Milwaukee and its northern suburbs, and that has a Democratic vote share of 63% according to the drafters' partisan composite. Plaintiff Sundstrom thus could have been placed in a less packed, more competitive Democratic district.

24.    Plaintiff Warren Braun lives at 8220 Harwood Avenue, Apt. 341, Wauwatosa, WI 53213, which is located in the ward Wauwatosa – C5 in Milwaukee County. Plaintiff Braun is a

qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Braun's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

25.     Plaintiff Braun's home is in District 13 of the Current Plan. District 13 is located west of the city of Milwaukee, extending from (more Democratic) Milwaukee County into (more Republican) Waukesha County. To create District 13, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Braun. According to the drafters' partisan composite, District 13 was expected to have a Republican vote share of 60%. The drafters also labeled District 13 as a "Statistical Pick Up." As the drafters predicted, the Republican candidate prevailed in District 13 in the 2012, 2014, and 2016 elections.

26.      The Current Plan's cracking of Democratic voters such as Plaintiff Braun was unnecessary. In the computer-generated map, Plaintiff Braun's home is in a district that stays within Milwaukee County and that has a Democratic vote share of 60% according to the drafters' partisan composite. Plaintiff Braun thus could have been placed in a Democratic district rather than cracked into a Republican district.

27.     Plaintiff Sandra Carlson-Kaye lives at 511 N. 33rd Street, Milwaukee, WI 53208, which is located in the ward Milwaukee – C197 in Milwaukee County. Plaintiff Carlson-Kaye is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Carlson-Kaye's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

28.     Plaintiff Carlson-Kaye's home is in District 18 of the Current Plan. District 18 is located in Milwaukee and contains many of that city's Democratic voters. To create District 18, the Plan's drafters intentionally packed Democratic voters such as Plaintiff Carlson-Kaye.

According to the drafters' partisan composite, District 18 was expected to have a Democratic vote share of 83%. As the drafters predicted, the Democratic candidate prevailed in District 18 without even being challenged in the 2012, 2014, and 2016 elections.

29.     The Current Plan's packing of Democratic voters such as Plaintiff Carlson-Kaye was unnecessary. In the computer-generated map, Plaintiff Carlson-Kaye's home is in a district that includes parts of both Milwaukee and its southwestern suburbs, and that has a Democratic vote share of 60% according to the drafters' partisan composite. Plaintiff Carlson-Kaye thus could have been placed in a less packed, more competitive Democratic district.

30.     Plaintiff Guy Costello lives at 1320 Manitowoc Avenue, South Milwaukee, WI 53172, which is located in the ward Milwaukee – C12 in Milwaukee County. Plaintiff Costello is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Costello's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

31.     Plaintiff Costello's home is in District 21 of the Current Plan. District 21 is located south of Milwaukee and avoids that city's concentration of Democratic voters. To create District 21, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Costello. According to the drafters' partisan composite, District 21 was expected to have a Republican vote share of 53%. The drafters also labeled District 21 as a "GOP seat" that was "strengthened a lot." As the drafters predicted, the Republican candidate prevailed in District 21 in the 2012, 2014, and 2016 elections.

32.     The Current Plan's cracking of Democratic voters such as Plaintiff Costello was unnecessary. In the computer-generated map, Plaintiff Costello's home is in a district that includes Milwaukee's southern suburbs and that has a Democratic vote share of 52% according

to the drafters' partisan composite. Plaintiff Costello thus could have been placed in a Democratic district rather than cracked into a Republican district.

33.    Plaintiff Helen Harris lives at 6761 N. 109th Street, Milwaukee, WI 53224, which is located in the ward Milwaukee – C33 in Milwaukee County. Plaintiff Harris is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Harris's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

34.    Plaintiff Harris's home is in District 22 of the Current Plan. District 22 is located northwest of the city of Milwaukee, extending from (more Democratic) Milwaukee County into (more Republican) Waukesha and Washington Counties. To create District 22, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Harris. According to the drafters' partisan composite, District 22 was expected to have a Republican vote share of 66%. The drafters also labeled District 22 as a "Statistical Pick Up." As the drafters predicted, the Republican candidate prevailed in District 22 in the 2012, 2014, and 2016 elections.

35.    The Current Plan's cracking of Democratic voters such as Plaintiff Harris was unnecessary. In the computer-generated map, Plaintiff Harris's home is in a district that stays within Milwaukee County and that has a Democratic vote share of 70% according to the drafters' partisan composite. Plaintiff Harris thus could have been placed in a Democratic district rather than cracked into a Republican district.

36.    Plaintiff Elizabeth Lentini lives at 5525 N. Hollywood Avenue, Whitefish Bay, WI 53217, which is located in the ward Whitefish Bay – V4 in Milwaukee County. Plaintiff Michael Switzenbaum lives at 4907 N. Idlewild Avenue, Whitefish Bay, WI 53217, which is located in the ward Whitefish Bay – V9 in Milwaukee County. Plaintiff Jerome Wallace lives at

12

500 W. Bradley Road, Apt. B302, Fox Point, WI 53217, which is located in the ward Fox Point – V8 in Milwaukee County. Plaintiffs Lentini, Switzenbaum, and Wallace are qualified, registered voters in the State of Wisconsin and supporters of Democratic candidates and policies. Plaintiff Lentini's, Plaintiff Switzenbaum's and Plaintiff Wallace's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

37.     Plaintiff Lentini's, Plaintiff Switzenbaum's, and Plaintiff Wallace's homes are in District 23 of the Current Plan. District 23 is located north of the city of Milwaukee, extending from (more Democratic) Milwaukee County into (more Republican) Ozaukee County. To create District 23, the Plan's drafters intentionally cracked Democratic voters such as Plaintiffs Lentini, Switzenbaum, and Wallace. According to the drafters' partisan composite, District 23 was expected to have a Republican vote share of 57%. The drafters also labeled District 23 as a "GOP seat" that was "strengthened a lot." As the drafters predicted, the Republican candidate prevailed in District 23 in the 2012, 2014, and 2016 elections.

38.     The Current Plan's cracking of Democratic voters such as Plaintiffs Lentini, Switzenbaum, and Wallace was unnecessary. In the computer-generated map, Plaintiff Lentini's, Plaintiff Switzenbaum's and Plaintiff Wallace's homes are in a district that stays within Milwaukee County and that has a Democratic vote share of 63% according to the drafters' partisan composite. Plaintiffs Lentini, Switzenbaum, and Wallace thus could have been placed in a Democratic district rather than cracked into a Republican district.

39.     Plaintiff Deborah Patel lives at 9130 N. Spruce Road, Milwaukee, WI 53217, which is located in the ward River Hills – V3 in Milwaukee County. Plaintiff Patel is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies.

13

Plaintiff Patel's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

40.     Plaintiff Patel's home is in District 24 of the Current Plan. District 24 is located northwest of the city of Milwaukee, extending from (more Democratic) Milwaukee County into (more Republican) Ozaukee and Washington Counties. To create District 24, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Patel. According to the drafters' partisan composite, District 24 was expected to have a Republican vote share of 58%. As the drafters predicted, the Republican candidate prevailed in District 24 in the 2012, 2014, and 2016 elections.

41.      The Current Plan's cracking of Democratic voters such as Plaintiff Patel was unnecessary. In the computer-generated map, Plaintiff Patel's home is in a district that stays within Milwaukee County and that has a Democratic vote share of 75% according to the drafters' partisan composite. Plaintiff Patel thus could have been placed in a Democratic district rather than cracked into a Republican district.

42.     Plaintiff Jennifer Estrada lives at 919 537th Street, Manitowoc, WI 54220, which is located in ward Manitowoc – C10 in Manitowoc County. Plaintiff Estrada is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Estrada's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

43.     Plaintiff Estrada's home is in District 25 of the Current Plan. District 25 is located in Calumet and Manitowoc Counties, and splits the adjacent concentrations of Democratic voters in Manitowoc and Two Rivers. To create District 25, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Estrada. According to the drafters' partisan composite,

14

District 25 was expected to have a Republican vote share of 53%. The drafters also labeled District 25 as a "GOP seat" that was "strengthened." As the drafters predicted, the Republican candidate prevailed in District 25 in the 2012, 2014, and 2016 elections.

44.    The Current Plan's cracking of Democratic voters such as Plaintiff Estrada was unnecessary. In the computer-generated map, Plaintiff Estrada's home is in a district that includes both Manitowoc and Two Rivers, and that has a Democratic vote share of 50.1% according to the drafters' partisan composite. Plaintiff Estrada thus could have been placed in a Democratic district rather than cracked into a Republican district.

45.    Plaintiff Mary Lynne Donohue lives at 418 Saint Clair Avenue, Sheboygan, WI 53081, which is located in the ward Sheboygan – C13 in Sheboygan County. Plaintiff Donohue is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Donohue's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

46.    Plaintiff Donohue's home is in District 26 of the Current Plan. District 26 splits the concentration of Democratic voters in Sheboygan. To create District 26, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Donohue. According to the drafters' partisan composite, District 26 was expected to have a Republican vote share of 56%. The drafters also labeled District 26 as a "GOP seat" that was "strengthened a lot." As the drafters predicted, the Republican candidate prevailed in District 26 in the 2012, 2014, and 2016 elections.

47.    The Current Plan's cracking of Democratic voters such as Plaintiff Donohue was unnecessary. In the computer-generated map, Plaintiff Donohue's home is in a district that keeps Sheboygan intact and that has a Democratic vote share of 51% according to the drafters' partisan

15

composite. Plaintiff Donohue thus could have been placed in a Democratic district rather than cracked into a Republican district.

48.    Plaintiff Barbara Flom lives at N7198 190th Street, Knapp, WI 54749, which is located in the ward Lucas – T1 in Dunn County. Plaintiff Flom is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Flom's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

49.    Plaintiff Flom's home is in District 29 of the Current Plan. District 29 splits the concentration of Democratic voters in Dunn County. To create District 29, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Flom. According to the drafters' partisan composite, District 29 was expected to have a Republican vote share of 51%. As the drafters predicted, the Republican candidate prevailed in District 29 in the 2012, 2014, and 2016 elections.

50.     The Current Plan's cracking of Democratic voters such as Plaintiff Flom was unnecessary. In the computer-generated map, Plaintiff Flom's home is in a district that includes the Democratic areas of Dunn County and that has a Democratic vote share of 50.2% according to the drafters' partisan composite. Plaintiff Flom thus could have been placed in a Democratic district rather than cracked into a Republican district.

51.    Plaintiff Roger Anclam lives at 7928 S. Butterfly Road, Beloit, WI 53511, which is located in ward Turtle – T2 in Rock County. Plaintiff Anclam is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Anclam's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

16

52.     Plaintiff Anclam's home is in District 31 of the Current Plan. District 31 splits the concentration of Democratic voters in Beloit and avoids the Democratic cluster in Janesville. To create District 31, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Anclam. According to the drafters' partisan composite, District 31 was expected to have a Republican vote share of 56%. As the drafters predicted, the Republican candidate prevailed in District 31 in the 2012, 2014, and 2016 elections.

53.      The Current Plan's cracking of Democratic voters such as Plaintiff Anclam was unnecessary. In the computer-generated map, Plaintiff Anclam's home is in a district that keeps Beloit intact and that has a Democratic vote share of 57% according to the drafters' partisan composite. Plaintiff Anclam thus could have been placed in a Democratic district rather than cracked into a Republican district.

54.     Plaintiff Hans Breitenmoser lives at W6982 Joe Snow Road, Merrill, WI 54452, which is located in ward Scott – T2 in Lincoln County. Plaintiff Breitenmoser is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Breitenmoser's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

55.     Plaintiff Breitenmoser's home is in District 35 of the Current Plan. District 35 avoids the concentrations of Democratic voters in the Menominee Reservation and Rhinelander. To create District 35, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Breitenmoser. According to the drafters' partisan composite, District 35 was expected to have a Republican vote share of 52%. The drafters also labeled District 35 as a "GOP seat" that was "strengthened." As the drafters predicted, the Republican candidate prevailed in District 35 in the 2012, 2014, and 2016 elections.

17

56.    The Current Plan's cracking of Democratic voters such as Plaintiff Breitenmoser was unnecessary. In the computer-generated map, Plaintiff Breitenmoser's home is in a district that includes Rhinelander and that has a Democratic vote share of 50.4% according to the drafters' partisan composite. Plaintiff Breitenmoser thus could have been placed in a Democratic district rather than cracked into a Republican district.

57.    Plaintiff Graham Adsit lives at 314 Spring Street, Cambridge, WI 53523, which is located in ward Cambridge – V3 in Dane County. Plaintiff Adsit is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Adsit's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

58.    Plaintiff Adsit's home is in District 38 of the Current Plan. District 38 is located east of Madison, extending from (more Democratic) Dane County into (more Republican) Jefferson and Waukesha Counties. To create District 38, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Adsit. According to the drafters' partisan composite, District 38 was expected to have a Republican vote share of 60%. As the drafters predicted, the Republican candidate prevailed in District 38 in the 2012, 2014, and 2016 elections.

59.    The Current Plan's cracking of Democratic voters such as Plaintiff Adsit was unnecessary. In the computer-generated map, Plaintiff Adsit's home is in a district that stays within Dane and Jefferson Counties and that has a Democratic vote share of 55% according to the drafters' partisan composite. Plaintiff Adsit thus could have been placed in a Democratic district rather than cracked into a Republican district.

60.    Plaintiffs James and Allison Seaton live at W11435 Bay Drive, Lodi, WI 53555, which is located in ward Lodi – T3 in Columbia County. Plaintiffs James and Allison Seaton are

18

qualified, registered voters in the State of Wisconsin and supporters of Democratic candidates and policies. Plaintiffs James and Allison Seaton's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

61.     Plaintiffs James and Allison Seaton's home is in District 42 of the Current Plan. District 42 is located north of Madison and avoids that city's concentration of Democratic voters as well as the smaller Democratic cluster in Portage. To create District 42, the Plan's drafters intentionally cracked Democratic voters such as Plaintiffs James and Allison Seaton. According to the drafters' partisan composite, District 42 was expected to have a Republican vote share of 55%. The drafters also labeled District 42 as a "GOP seat" that was "strengthened a lot." As the drafters predicted, the Republican candidate prevailed in District 42 in the 2012, 2014, and 2016 elections.

62.     The Current Plan's cracking of Democratic voters such as Plaintiffs James and Allison Seaton was unnecessary. In the computer-generated map, Plaintiffs James and Allison Seaton's home is in a district that comes closer to Madison and includes Portage, and that has a Democratic vote share of 51% according to the drafters' partisan composite. Plaintiffs James and Allison Seaton thus could have been placed in a Democratic district rather than cracked into a Republican district.

63.     Plaintiff Judith Brey lives at 2101 Winfield Drive, Reedsburg, WI 53959, which is located in ward Reedsburg – C7 in Sauk County. Plaintiff Brey is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Brey's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

19

64.     Plaintiff Brey's home is in District 50 of the Current Plan. District 50 is located northwest of Madison and avoids the clusters of Democratic voters in Adams County and Wisconsin Dells. To create District 50, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Brey. According to the drafters' partisan composite, District 50 was expected to have a Republican vote share of 52%. As the drafters predicted, the Republican candidate prevailed in District 50 in the 2012, 2014, and 2016 elections.

65.     The Current Plan's cracking of Democratic voters such as Plaintiff Brey was unnecessary. In the computer-generated map, Plaintiff Brey's home is in a district that includes both Adams County and Wisconsin Dells, and that has a Democratic vote share of 52% according to the drafters' partisan composite. Plaintiff Brey thus could have been placed in a Democratic district rather than cracked into a Republican district.

66.     Plaintiff Michael Lecker lives at 401 E. Broadway Drive, Appleton, WI 54913, which is located in ward Grand Chute – T16 in Outagamie County. Plaintiff Lecker is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Lecker's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

67.     Plaintiff Lecker's home is in District 56 of the Current Plan. District 56 is located northwest of Lake Winnebago and avoids the concentration of Democratic voters in Appleton. To create District 56, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Lecker. According to the drafters' partisan composite, District 56 was expected to have a Republican vote share of 58%. As the drafters predicted, the Republican candidate prevailed in District 56 in the 2012, 2014, and 2016 elections.

68.     The Current Plan's cracking of Democratic voters such as Plaintiff Lecker was unnecessary. In the computer-generated map, Plaintiff Lecker's home is in a district that includes Appleton, and that has a Democratic vote share of 50.3% according to the drafters' partisan composite. Plaintiff Lecker thus could have been placed in a Democratic district rather than cracked into a Republican district.

69.     Plaintiff Norah McCue lives at 1112 Russet Street, Racine, WI 53405, which is located in ward Racine – C27 in Racine County. Plaintiff McCue is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff McCue's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

70.     Plaintiff McCue's home is in District 62 of the Current Plan. District 62 splits the concentration of Democratic voters in Racine and then extends westward. To create District 62, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff McCue. According to the drafters' partisan composite, District 62 was expected to have a Republican vote share of 56%. The drafters also labeled District 62 as a "Statistical Pick Up." As the drafters predicted, the Republican candidate prevailed in District 62 in the 2012, 2014, and 2016 elections.

71.     The Current Plan's cracking of Democratic voters such as Plaintiff McCue was unnecessary. In the computer-generated map, Plaintiff 62's home is in a district that includes most of Racine and that has a Democratic vote share of 56% according to the drafters' partisan composite. Plaintiff McCue thus could have been placed in a Democratic district rather than cracked into a Republican district.

72.     Plaintiff Timothy B. Daley lives at 1202 Vine Street, Union Grove, WI 53182, which is located in ward Union Grove – V4 in Racine County. Plaintiff Daley is a qualified,

registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Daley's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

73.    Plaintiff Daley's home is in District 63 of the Current Plan. District 63 avoids the concentration of Democratic voters in Racine and then extends westward. To create District 63, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Daley. According to the drafters' partisan composite, District 63 was expected to have a Republican vote share of 58%. As the drafters predicted, the Republican candidate prevailed in District 63 in the 2012, 2014, and 2016 elections.

74.    The Current Plan's cracking of Democratic voters such as Plaintiff Daley was unnecessary. In the computer-generated map, Plaintiff Daley's home is in a district that includes some of Racine and that has a Democratic vote share of 54% according to the drafters' partisan composite. Plaintiff Daley thus could have been placed in a Democratic district rather than cracked into a Republican district.

75.    Plaintiff Janet Mitchell lives at 2411 Mount Pleasant Street, Racine, WI 53404, which is located in ward Racine – C15 in Racine County. Plaintiff Mitchell is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Mitchell's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

76.    Plaintiff Mitchell's home is in District 66 of the Current Plan. District 66 is located in Racine and contains most of that city's Democratic voters. To create District 66, the Plan's drafters intentionally packed Democratic voters such as Plaintiff Mitchell. According to the drafters' partisan composite, District 66 was expected to have a Democratic vote share of

67%. As the drafters predicted, the Democratic candidate prevailed in District 66 without even being challenged in the 2012, 2014, and 2016 elections.

77.     The Current Plan's packing of Democratic voters such as Plaintiff Mitchell was unnecessary. In the computer-generated map, Plaintiff Mitchell's home is in a district that includes parts of both Racine and areas to the city's west, and that has a Democratic vote share of 54% according to the drafters' partisan composite. Plaintiff Mitchell thus could have been placed in a less packed, more competitive Democratic district.

78.     Plaintiff Jane Pedersen lives at N7527 537th Street, Menomonie, WI 54751, which is located in the ward Red Cedar – T1 in Dunn County. Plaintiff Pedersen is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Pedersen's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

79.     Plaintiff Pedersen's home is in District 67 of the Current Plan. District 67 avoids the concentration of Democratic voters in Pierce County and splits the adjacent Democratic clusters in Eau Claire and Chippewa Falls. To create District 67, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Pedersen. According to the drafters' partisan composite, District 67 was expected to have a Republican vote share of 51%. As the drafters predicted, the Republican candidate prevailed in District 67 in the 2012, 2014, and 2016 elections.

80.     The Current Plan's cracking of Democratic voters such as Plaintiff Pedersen was unnecessary. In the computer-generated map, Plaintiff Pedersen's home is in a district that includes Pierce County and that has a Democratic vote share of 51% according to the drafters'

partisan composite. Plaintiff Pedersen thus could have been placed in a Democratic district rather than cracked into a Republican district.

81.     Plaintiff Daniel Dieterich lives at 1490 Evergreen Drive, Stevens Point, WI 54482, which is located in ward Hull – T3 in Portage County. Plaintiff Dieterich is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Dieterich's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

82.     Plaintiff Dieterich's home is in District 70 of the Current Plan. District 70 is located partly in Jackson County but avoids most of that county's Democratic voters as well as most of the Democratic concentration in Stevens Point. To create District 70, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Dieterich. According to the drafters' partisan composite, District 70 was expected to have a Republican vote share of 50.4%. The drafters also labeled District 70 as a "Currently held DEM seat" that was "weakened." As the drafters predicted, the Republican candidate prevailed in District 70 in the 2014 and 2016 elections.

83.      The Current Plan's cracking of Democratic voters such as Plaintiff Dieterich was unnecessary. In the computer-generated map, Plaintiff Dieterich's home is in a district that includes Stevens Point and that has a Democratic vote share of 58% according to the drafters' partisan composite. Plaintiff Dieterich thus could have been placed in a Democratic district rather than cracked into a Republican district.

84.     Plaintiff Leah Dudley lives at 2917 Wimbledon Way, Madison, WI 53713, which is located in ward Madison – C75 in Dane County. Plaintiff Dudley is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff

Dudley's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

85.     Plaintiff Dudley's home is in District 77 of the Current Plan. District 77 is located in Madison and contains many of that city's Democratic voters. To create District 77, the Plan's drafters intentionally packed Democratic voters such as Plaintiff Dudley. According to the drafters' partisan composite, District 77 was expected to have a Democratic vote share of 79%. The drafters also labeled District 33 as one featuring a "pairing" of "dem" and "dem" incumbents. As the drafters predicted, the Democratic candidate prevailed in District 77 without even being challenged in the 2012, 2014, and 2016 elections.

86.      The Current Plan's packing of Democratic voters such as Plaintiff Dudley was unnecessary. In the computer-generated map, Plaintiff Dudley's home is in a district that includes parts of both Madison and the city's southern and eastern suburbs, and that has a Democratic vote share of 64% according to the drafters' partisan composite. Plaintiff Dudley thus could have been placed in a less packed, more competitive Democratic district.

87.     Plaintiffs Ann Wolfe and Edward Wohl live at 6154 Brotherhood Lane, Ridgeway, WI 53582, which is located in ward Ridgeway – T2 in Iowa County. Plaintiffs Wolfe and Wohl are qualified, registered voters in the State of Wisconsin and supporters of Democratic candidates and policies. Plaintiff Wolfe's and Wohl's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

88.     Plaintiffs Wolfe's and Wohl's home is in District 80 of the Current Plan. District 80 is located southwest of Madison and contains most of that region's Democratic voters. To create District 80, the Plan's drafters intentionally packed Democratic voters such as Plaintiffs Wolfe and Wohl. According to the drafters' partisan composite, District 80 was expected to have

a Democratic vote share of 61%. As the drafters predicted, the Democratic candidate prevailed in District 80 by enormous margins (or was not even challenged) in the 2012, 2014, and 2016 elections.

89.    The Current Plan's packing of Democratic voters such as Plaintiffs Wolfe and Wohl was unnecessary. In the computer-generated map, Plaintiffs Wolfe's and Wohl's home is in a district that is centered further to the west of Madison, and that has a Democratic vote share of 55% according to the drafters' partisan composite. Plaintiffs Wolfe and Wohl thus could have been placed in a less packed, more competitive Democratic district.

90.    Plaintiff Nancy Petulla lives at 10185 S. County Road K, Merrill, WI 54452, which is located in ward Maine – T1 in Marathon County. Plaintiff Petulla is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Petulla's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

91.    Plaintiff Petulla's home is in District 86 of the Current Plan. District 86 is centered in Marathon County but avoids the concentration of Democratic voters in Wausau. To create District 86, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Petulla. According to the drafters' partisan composite, District 86 was expected to have a Republican vote share of 54%. The drafters also labeled District 86 as a "GOP seat" that was "strengthened." As the drafters predicted, the Republican candidate prevailed in District 86 in the 2012, 2014, and 2016 elections.

92.    The Current Plan's cracking of Democratic voters such as Plaintiff Petulla was unnecessary. In the computer-generated map, Plaintiff Petulla's home is in a district that includes Wausau and that has a Democratic vote share of 50.02% according to the drafters' partisan

26

composite. Plaintiff Petulla thus could have been placed in a Democratic district rather than cracked into a Republican district.

93.     Plaintiff Gail Hohenstein lives at 1823 Beethoven Drive, Green Bay, WI 54311, which is located in ward Green Bay – C4 in Brown County. Plaintiff Hohenstein is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Hohenstein's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

94.     Plaintiff Hohenstein's home is in District 88 of the Current Plan. District 88 is located mostly southeast of Green Bay and avoids that city's concentration of Democratic voters. To create District 88, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Hohenstein. According to the drafters' partisan composite, District 88 was expected to have a Republican vote share of 53%. The drafters also labeled District 88 as a "GOP seat" that was "strengthened a lot." As the drafters predicted, the Republican candidate prevailed in District 88 in the 2012, 2014, and 2016 elections.

95.     The Current Plan's cracking of Democratic voters such as Plaintiff Hohenstein was unnecessary. In the computer-generated map, Plaintiff Hohenstein's home is in a district that includes part of Green Bay and that has a Democratic vote share of 52% according to the drafters' partisan composite. Plaintiff Hohenstein thus could have been placed in a Democratic district rather than cracked into a Republican district.

96.     Plaintiff Robert Pfundheller lives at 1115 Sweetwater Close, Altoona, WI 54720, which is located in ward Washington – T9 in Eau Claire County. Plaintiff Pfundheller is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates

and policies. Plaintiff Pfundheller's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

97. Plaintiff Pfundheller's home is in District 93 of the Current Plan. District 93 traverses several counties in western Wisconsin and avoids most of the Democratic voters in Altoona and River Falls. To create District 93, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Pfundheller. According to the drafters' partisan composite, District 93 was expected to have a Republican vote share of 51%. The drafters also labeled District 93 as a "GOP seat" that was "strengthened a lot." As the drafters predicted, the Republican candidate prevailed in District 93 in the 2012, 2014, and 2016 elections.

98. The Current Plan's cracking of Democratic voters such as Plaintiff Pfundheller was unnecessary. In the computer-generated map, Plaintiff Pfundheller's home is in a district that spans fewer counties and includes Altoona, and that has a Democratic vote share of 54% according to the drafters' partisan composite. Plaintiff Pfundheller thus could have been placed in a Democratic district rather than cracked into a Republican district.

99. Plaintiff Brent Brigson lives at W3831 Southern Drive, West Salem, WI 54669, which is located in ward Hamilton – T3 in La Crosse County. Plaintiff Brigson is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Brigson's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

100. Plaintiff Brigson's home is in District 94 of the Current Plan. District 94 is located in La Crosse County but avoids the concentration of Democratic voters in the city of La Crosse. To create District 94, the Plan's drafters intentionally cracked Democratic voters such as Plaintiff Brigson. According to the drafters' partisan composite, District 94 was expected to have

28

a Republican vote share of 52%. The drafters also labeled District 94 as a "Currently held DEM seat" that was "weakened."

101.    The Current Plan's cracking of Democratic voters such as Plaintiff 94 was unnecessary. In the computer-generated map, Plaintiff Brigson's home is in a district that includes part of the city of La Crosse and that has a Democratic vote share of 55% according to the drafters' partisan composite. Plaintiff Brigson thus could have been placed in a Democratic district rather than cracked into a Republican district.

102.    Plaintiff Rosalie Schnick lives at 3039 Edgewater Lane, La Crosse, WI 54603, which is located in Campbell – T1 in La Crosse County. Plaintiff Schnick is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Schnick's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

103.    Plaintiff Schnick's home is in District 95 of the Current Plan. District 95 contains most of the Democratic voters in the city of La Crosse. To create District 95, the Plan's drafters intentionally packed Democratic voters such as Plaintiff Schnick. According to the drafters' partisan composite, District 95 was expected to have a Democratic vote share of 61%. As the drafters predicted, the Democratic candidate prevailed in District 95 without even being challenged in the 2012, 2014, and 2016 elections.

104.    The Current Plan's packing of Democratic voters such as Plaintiff Schnick was unnecessary. In the computer-generated map, Plaintiff Schnick's home is in a district that includes parts of both La Crosse and areas to the city's north and east, and that has a Democratic vote share of 55% according to the drafters' partisan composite. Plaintiff Schnick thus could have been placed in a less packed, more competitive Democratic district.

29

105.    Plaintiff William Whitford lives at 1047 Sherman Avenue, Madison, WI 53703. Plaintiff Whitford's home is in ward Madison – C45 in Dane County, which is located in District 76. Plaintiff Whitford is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. In fact, Plaintiff Whitford is a member of the Wisconsin Democratic Party, which reflects his preferences with respect to taxation, education, the environment, and other issues, and has never voted for a Republican legislative candidate. Plaintiff Whitford's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan. Because of the Plan, he has less opportunity than a similarly situated Republican to advocate for, and achieve, a legislative majority for his preferred party. His efforts to canvass voters, phone bank, recruit campaign volunteers, fundraise, and work with candidates are less likely to be successful, and he consequently has less incentive to engage in these activities.

106.    Plaintiff Emily Bunting lives at 13625 Goose Creek Road, Viola, WI 54664. Plaintiff Bunting's home is in ward Forest -T1 in Richland County, which is located in District 49. Plaintiff Bunting is a qualified, registered voter in the State of Wisconsin and a supporter of Democratic candidates and policies. Plaintiff Bunting's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

107.    Plaintiff Margaret Leslie DeMuth lives at N8016 County Road G, Lake Mills, WI 53551. Plaintiff DeMuth's home is in ward Waterloo – T1 in Jefferson County, which is located in District 38. Plaintiff DeMuth is a qualified, registered voter in the State of Wisconsin, a supporter of Democratic candidates and policies, and a member of the Wisconsin Democratic Party. Plaintiff DeMuth's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

108.     Plaintiff Wayne Jensen lives at 400 W. Main Street, Rochester, WI 53167.
Plaintiff Jensen's home is in ward Rochester – V1 in Racine County, which is located in District
63. Plaintiff Jensen is a qualified, registered voter in the State of Wisconsin, a supporter of
Democratic candidates and policies, and a member of the Racine County Democratic Party.
Plaintiff Jensen's ability to affiliate with like-minded Democrats and to pursue Democratic
associational goals has been impaired by the Current Plan.

109.     Plaintiff Wendy Sue Johnson lives at 507 Indian Hills Drive, Eau Claire, WI
54703. Plaintiff Johnson's home is in ward Seymour – T6 in Eau Claire County, which is located
in District 68. Plaintiff Johnson is a qualified, registered voter in the State of Wisconsin, a
supporter of Democratic candidates and policies, and a member of the Wisconsin Democratic
Party. Plaintiff Johnson's ability to affiliate with like-minded Democrats and to pursue
Democratic associational goals has been impaired by the Current Plan.

110.     Plaintiff Ann E. Stevning-Roe lives at 209 S. Columbus Drive, Marshfield, WI
54449. Plaintiff Stevning-Roe's home is in ward Marshfield – C13 in Wood County, which is
located in District 69. Plaintiff Stevning-Roe is a qualified, registered voter in the State of
Wisconsin, a supporter of Democratic candidates and policies, and a member of the Wisconsin
Democratic Party. Plaintiff Stevning-Roe's ability to affiliate with like-minded Democrats and to
pursue Democratic associational goals has been impaired by the Current Plan.

111.     Plaintiff Donald Winter lives at 1555 Lyon Drive, Apt. 113, Neenah, WI 54956.
Plaintiff Winter's home is in ward Neenah – C14 in Winnebago County, which is located in
District 55. Plaintiff Winter is a qualified, registered voter in the State of Wisconsin, a supporter
of Democratic candidates and policies, and a member of the Wisconsin Democratic Party.

Plaintiff Winter's ability to affiliate with like-minded Democrats and to pursue Democratic associational goals has been impaired by the Current Plan.

112.    Defendants Beverly Gill, Julie M. Glancey, Ann S. Jacobs, Jodi Jensen, Dean Knudson, and Mark L. Thomsen are all members of the Wisconsin Elections Commission and are named solely in their official capacity as such. The Wisconsin Elections Commission is a state agency under Wis. Stat. § 15.61, which has "general authority" over and "responsibility for the administration of . . . [the State's] laws relating to elections and election campaigns," Wis. Stat. § 5.05(1), including the election every two years of Wisconsin's representatives in the Assembly.

## BACKGROUND

### The Current Plan Was Intended To Discriminate Against Democrats

113.    The Current Plan was drafted and enacted with the specific intent to maximize the electoral advantage of Republicans and harm Democrats to the greatest possible extent, by packing and cracking Democratic voters and thus wasting as many Democratic votes as possible. Indeed, after a trial in prior litigation, a three-judge court characterized claims by the Current Plan's drafters that they had not been influenced by partisan factors as "almost laughable" and concluded that "partisan motivation . . . clearly lay behind Act 43." *Baldus v. Wisconsin Government Accountability Board*, 849 F. Supp. 2d 840, 851 (E.D. Wis. 2012).

114.    The "mapmakers' goals in formulating the entire statewide map . . . predictably carr[ied] down to individual districting decisions." *Whitford*, 138 S. Ct. at 1937 (Kagan, J., concurring). In particular, the same pursuit of partisan advantage that motivated the Current Plan as a whole drove the creation of each district that plaintiffs have standing to challenge on vote

dilution grounds. With respect to each of these districts, the Plan's drafters intentionally cracked or packed Democratic voters in order to benefit Republican candidates and voters.

115.    The Current Plan was drafted via a secret process run solely by Republicans in the State Assembly and their agents, entirely excluding from participation all Democratic members of the Assembly as well as the public, and preventing public knowledge of and deliberation about the parameters of the Plan.

116.    In January 2011, Scott Fitzgerald, Republican member of the Wisconsin State Senate and Wisconsin Senate Majority Leader, and Jeff Fitzgerald, Republican member of the Wisconsin State Assembly and Speaker of the Assembly, hired attorney Eric McLeod ("McLeod") and the law firm of Michael, Best & Friedrich, LLP ("Michael Best"), ostensibly to represent the entire Wisconsin State Senate and Wisconsin State Assembly in connection with the reapportionment of the state legislative districts after the 2010 Census. In fact, McLeod and Michael Best were retained to assist the Republican leadership in the Legislature in designing a pro-Republican partisan gerrymander.

117.    To accomplish this goal, McLeod and Michael Best supervised the work of the legislative aide to the Republican Speaker of the Assembly, Adam Foltz, and the legislative aide to the Republican Majority Leader of the Senate, Tad Ottman, in planning, drafting, negotiating, and gaining the favorable vote commitments of a majority of Republican legislators sufficient to obtain passage of the Current Plan through Wisconsin Act 43.

118.    In creating the Current Plan, McLeod, Michael Best, Foltz, and Ottman used past election results to measure the partisanship of the electorate and to design districts, through packing and cracking, that would maximize the number of districts that would elect a Republican and minimize the number of districts that would elect a Democrat. Thus, they intentionally

diluted the electoral influence of Democrats, including that of plaintiffs, and discriminated against Democrats, including plaintiffs, because of their political views.

119.    McLeod, Michael Best, Foltz, and Ottman were assisted in their work by Dr. Ronald Keith Gaddie, a professor of political science at the University of Oklahoma. Dr. Gaddie created a model that analyzed the expected partisan performance of all of the districts established by Act 43. Dr. Gaddie's model forecast that the Assembly plan would have a pro-Republican efficiency gap of 12%. When a common methodology is used to ensure an apples-to-apples comparison, this is almost exactly the efficiency gap that the Assembly plan actually exhibited in the 2012 election.

120.    Preparation of the Current Plan was done in complete secrecy, excluding Democrats and the public from any part of the process. Indeed, even Republican state legislators were prevented from receiving any information that would allow public discussion or deliberation about the plan. All redistricting work was done in Michael Best's office and the "map room" was located there. A formal written policy provided that only the Senate Majority Leader, the Speaker of the House and their aides Ottman and Foltz, and McLeod and legal staff designated by McLeod would have unlimited access to the map room.

121.    The access policy provided for limited access by rank-and-file legislators: "Legislators will be allowed into the office for the sole purpose of looking at and discussing their district. They are only to be present when an All Access member is present. No statewide or regional printouts will be on display while they are present (with the exception of existing districts). They will be asked at each visit to sign an agreement that the meeting they are attending is confidential and they are not to discuss it." But only Republican legislators were allowed even this limited access. After signing the secrecy agreements contemplated by the

34

policy, Republican legislators were allowed to see only small portions of the map: how their own districts would be affected and details of the partisan performance of voters in their districts in the past, showing that they would be reliable Republican districts.

122.    Under the direction and supervision of McLeod, Ottman met with 17 Republican members of the Wisconsin State Senate. Each of them signed a secrecy agreement entitled "Confidentiality and Nondisclosure Related to Reapportionment" before being allowed to review and discuss the plan that Michael Best had been hired to develop. The secrecy agreement said that McLeod had "instructed" Ottman to meet with certain members of the Senate to discuss the reapportionment process and characterized such conversations as privileged communications pursuant to the attorney-client and attorney work product privileges—even though the assertion of the privilege was a part of an elaborate "charade" designed "to cover up a process that should have been public from the outset." *Baldus v. Wisconsin Government Accountability Board*, 843 F. Supp. 2d 955, 958-61 (E.D. Wis. 2012).

123.    Under the direction and supervision of McLeod, Foltz met with 58 Republican members of the Wisconsin State Assembly. Each of them signed the same secrecy agreement entitled "Confidentiality and Nondisclosure Related to Reapportionment" before being allowed to review and discuss the plan that Michael Best had been hired to develop, which also improperly described their conversations as privileged.

124.    On July 11, 2011, the plan was introduced by the Committee on Senate Organization without any Democratic members of the Legislature having previously seen their districts or the plan as a whole. As noted above, all Republican members of the Legislature had previously seen their individual districts along with visual aids demonstrating the partisan performance of these districts, but had not seen the overall map.

125.     Act 43 was passed in extraordinarily rushed proceedings with little opportunity for input by the public. A public hearing was held on July 13, 2011. The bill was then passed by the Senate on July 19, 2011, and by the Assembly the next day on July 20, 2011. Act 43 was published on August 23, 2011.

126.     McLeod and Michael Best were paid $431,000 in State taxpayer funds for their work on the plan, even though they worked solely for Republican leaders of the Legislature and for the benefit of Republicans, and even though they provided no services to Democrats, entirely excluded them from the process, and concealed their work from the public, preventing any public deliberation about the plan.

## The Current Plan Has The Effect of Discriminating Against Democrats

### The Efficiency Gap Reliably Measures Partisan Gerrymandering

127.     The Supreme Court has unanimously agreed that partisan gerrymandering can rise to the level of a constitutional violation. See *Vieth v. Jubelirer*, 541 U.S. 267, 293 (2004) ("[A]n ***excessive*** injection of politics is ***un***lawful") (emphasis added). To date, though, partisan gerrymandering plaintiffs have failed to propose a judicially manageable standard for deciding what constitutes an "excessive" injection of politics into the redistricting process.

128.     In *LULAC v. Perry*, 548 U.S. 399 (2006), a majority of the Justices expressed support for a test based on the concept of partisan symmetry. Partisan symmetry is a "require[ment] that the electoral system treat similarly-situated parties equally." *Id.* at 466 (Stevens, J., concurring in part and dissenting in part). In other words, a map is symmetrical when it creates a level playing field, giving neither major party a systematic advantage over its opponent in the conversion of electoral votes into legislative seats.

129.     In *LULAC*, the Court considered one particular measure of partisan symmetry, called partisan bias. As described above, partisan bias refers to the divergence in the share of seats that each party would win given the same share (typically 50%) of the statewide vote. *See id.* at 419-20 (opinion of Kennedy, J.); *id.* at 466 (Stevens, J., concurring in part and dissenting in part).

130.     Partisan bias is not the only measure of partisan symmetry. In the last few years, political scientists and legal academics have developed a new symmetry metric, called the efficiency gap, which improves on partisan bias in several respects. *See* Eric M. McGhee, *Measuring Partisan Bias in Single-Member District Electoral Systems*, 39 Legis Stud. Q. 55 (2014); Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 101 (2015); Expert Report of Prof. Kenneth R. Mayer (July 3, 2015) ("Mayer Report"); Expert Report of Prof. Simon D. Jackman (July 7, 2015) ("Jackman Report").

131.     The efficiency gap is rooted in the insight that, in a legal regime in which each district must have an approximately equal population, there are only two ways to implement a partisan gerrymander. First, a party's supporters can be cracked among a large number of districts so that they fall somewhat short of a majority in each one. These voters' preferred candidates then predictably lose each race. Second, a party's backers can be packed into a small number of districts in which they make up enormous majorities. These voters' preferred candidates then prevail by overwhelming margins. All partisan gerrymandering is accomplished through cracking and packing, which enables the party controlling the map to manipulate vote margins in its favor.

132.    Both cracking and packing produce so-called "wasted" votes—that is, votes that do not directly contribute to a candidate's election. When voters are cracked, their votes are wasted because they are cast for losing candidates. Similarly, when voters are packed, their votes are wasted to the extent they exceed the 50%-plus-one threshold required for victory (in a two-candidate race). Partisan gerrymandering also can be understood as the manipulation of wasted votes in favor of the gerrymandering party, so that it wastes fewer votes than its adversary.

133.    The efficiency gap is the difference between the parties' respective wasted votes in an election, divided by the total number of votes cast. Suppose, for example, that there are five districts in a plan with 100 voters each. Suppose also that Party A wins three of the districts by a margin of 60 votes to 40, and that Party B wins two of them by a margin of 80 votes to 20. Then Party A wastes 10 votes in each of the three districts it wins and 20 votes in each of the two districts it loses, adding up to 70 wasted votes. Likewise, Party B wastes 30 votes in each of the two districts it wins and 40 votes in each of the three districts it loses, adding up to 180 wasted votes. The difference between the parties' respective wasted votes is 110, which, when divided by 500 total votes, yields an efficiency gap of 22% in favor of Party A.

134.    The efficiency gap is *not* based on the principle that parties have a right to proportional representation based on their share of the statewide vote, nor does it measure the deviation from seat-vote proportionality. Instead, by aggregating all of a plan's cracking and packing into a single number, the efficiency gap measures a party's *undeserved* seat share: the proportion of seats a party receives that it would *not* have received under a balanced plan in which both sides had approximately equal wasted votes. In the above example, for instance, the 22% efficiency gap in favor of Party A means that it won 22% more seats—in this example, 1 more seat out of 5—than it would have under a balanced plan.

38

135.    Over the 1972-2014 period—since the end of the reapportionment revolution of the 1960s— the distribution of state house plans' efficiency gaps has been normal and has had a median of almost exactly zero. *See* Jackman Report at 61; Stephanopoulos & McGhee, *supra*, at 140-42. This indicates that neither party has enjoyed an overall advantage in state legislative redistricting during the modern era.

136.    However, recently the average absolute efficiency gap (*i.e.*, the mean of the absolute values of all plans' efficiency gaps in a given year) has increased sharply. This metric stayed roughly constant from 1972 to 2010. But in the current cycle, fueled by rising partisanship and greater technological sophistication, it spiked to the highest level recorded in the modern era: over 6% for state house plans. *See* Jackman Report at 47; Stephanopoulos & McGhee, *supra*, at 142-45. This means that the severity of today's partisan gerrymandering is historically unprecedented—as is the need for judicial intervention.

### *Wisconsin's Current Plan Is an Outlier*

137.    Between 1972 and the present, the efficiency gaps of Wisconsin's Assembly plans became steadily larger and more pro-Republican. The Current Plan represents the culmination of this trend, exhibiting the largest and most pro-Republican efficiency gap ever recorded in modern Wisconsin history. In the 1970s, the Assembly plan had an average efficiency gap close to zero. In both the 1980s and the 1990s, it had an average pro-Republican gap of 2%. The Republican advantage deepened in the 2000s to an average gap of 8%. And it then surged, thanks to the Current Plan, to an average gap of *11%* in 2012 and 2014. *See* Jackman Report at 34; Stephanopoulos & McGhee, *supra*, at 154-56.

138.    More specifically, using the same methodology as for all other states, the Current Plan produced a pro-Republican efficiency gap of 13% in 2012 and 10% in 2014. The 2012

figure represents the 28th-worst score in modern American history (out of nearly 800 total plans), placing the Current Plan in the worst 4% of this distribution, more than two standard deviations from the mean. Based on this historical data, there is close to a zero percent chance that the Current Plan's efficiency gap will ever switch signs and favor the Democrats during the remainder of the decade. Furthermore, prior to the current cycle, not a *single* plan in the country had efficiency gaps as high as the Current Plan's in the first two elections after redistricting. *See* Jackman Report at 63.

139.    Using a more detailed methodology available only for Wisconsin, the Current Plan produced a pro-Republican efficiency gap of 12% in 2012. This is a figure nearly identical to the one calculated using the national data. Using the Wisconsin-specific methodology as well as data compiled prior to 2012 by Dr. Gaddie, the expert retained by the Legislature's Republican leadership to assist them in drafting the Current Plan, that Plan was *forecast* to produce an efficiency gap of 12%. This figure also is nearly identical, and shows that the Current Plan performed precisely as its authors hoped and expected. *See* Mayer Report at 46.

140.    This extraordinary level of partisan unfairness was achieved through the rampant cracking and packing of Wisconsin's Democratic voters, which resulted in their votes being disproportionately wasted. The Mayer Report shows that Democratic voters were cracked so that Republican candidates were far more likely to prevail in close races (where the winner had 60% or less of the vote): Republicans were likely to win 42 such districts, while Democrats would win only 17.[3] Democrats were also packed into a number of districts where they would win

---

[3] In making this analysis, the Mayer Report used 2012 election results and further assumed that all districts had been contested and no incumbents had run.   These are both standard assumptions made by political scientists to determine a plan's underlying partisanship.

overwhelmingly (by getting 80% or more of the vote): there were eight districts where Democrats would win by this margin, compared to *zero* districts where Republicans would win such a lopsided victory. Thus, through gerrymandering, Republican votes were used more efficiently than Democratic votes to elect representatives, producing an undemocratic result that does not accurately reflect the preferences of the Wisconsin electorate. *See* Mayer Report at 38-41.

141.     The forecasts of Dr. Gaddie, the Republican consultant, prior to the 2012 election confirm that the Current Plan was expected and intended to crack and pack Wisconsin's Democratic voters to this extent. Dr. Gaddie predicted that Republicans would win 46 Assembly districts by a margin smaller than 60%-40%, compared to just 20 such victories for Democrats. He also predicted that Democrats would prevail in seven districts by a margin greater than 80%-20%, compared to zero such wins for Republicans. *See* Mayer Report at 38-41. These figures are nearly identical to plaintiffs' estimates, and further demonstrate that the Current Plan was intended to disadvantage Democrats and waste Democratic votes to the maximum extent possible.

***Examples of Cracking and Packing in the Current Plan***

142.     These plan-level statistics are the product of innumerable local cracking and packing decisions. Across Wisconsin, the Current Plan systematically alters prior district configurations to waste larger numbers of Democratic votes and smaller numbers of Republican votes. The following regional examples show how the Current Plan deliberately allocates Democratic voters less efficiently and Republican voters more efficiently. These are only illustrative examples; they do not show *all* of the ways in which Wisconsin's current pro-Republican gerrymander was achieved. In addition, the examples focus on: (1) the 2012 election

because it was the first one held after this cycle's redistricting; (2) the 2008 election because it was the most comparable prior election, featuring a similar share of the statewide Assembly vote for each party (53.9% Democratic in 2008, 51.4% Democratic in 2012) and also coinciding with a presidential election; and (3) Plaintiffs' Demonstration Plan, because it reveals the fair results that could have been, but were not, attained in 2012.

*Milwaukee, Ozaukee, Washington, and Waukesha Counties:*

143.    Under the prior Assembly plan that was in force from 2002-2010 (the "Prior Plan"), District 22 (home to Plaintiff Harris) included part of northeastern Milwaukee County; District 23 (home to Plaintiffs Lentini, Switzenbaum, and Wallace) included part of northern Milwaukee County and part of southern Ozaukee County; and District 24 (home to Plaintiff Patel) included part of Washington and Waukesha Counties. In the 2008 election, a Democratic candidate won District 22, and Republican candidates won Districts 23 and 24. Under the Demonstration Plan, a Democratic candidate would win District 22, and Republican candidates would win Districts 23 and 24.

144.    As a result of the Current Plan, Democratic voters who were in the old District 22 were cracked into the new Districts 23 and 24. Due to these changes, Districts 22, 23, and 24 were won by Republican candidates in 2012.

145.    The shift from one Democratic seat and two Republican seats in the Prior Plan and the Demonstration Plan in Milwaukee, Ozaukee, Washington, and Waukesha Counties, to zero Democratic seats and three Republican seats in the Current Plan, contributed to Wisconsin's current pro-Republican efficiency gap.

42

*Calumet, Fond du Lac, Manitowoc and Sheboygan Counties:*

146.    Under the Prior Plan, District 26 (home to Plaintiff Donohue) centered on the City of Sheboygan in the central eastern part of Wisconsin and District 27 consisted of the northern part of Sheboygan County as well as parts of Fond du Lac, Calumet, and Manitowoc Counties. In the 2008 election, a Democratic candidate won District 26 and a Republican candidate won District 27. Under the Demonstration Plan, a Democratic candidate would win District 26, and a Republican candidate would win District 27.

147.    As a result of the Current Plan, Democratic voters who were in District 26 were cracked so that roughly half of that district was distributed to District 27 and additional voters from south of Sheboygan County were added to District 26. Due to these changes, Districts 26 and 27 were won by Republican candidates in 2012.

148.    The shift from one Democratic seat and one Republican seat in the Prior Plan and the Demonstration Plan in Sheboygan County and southern Fond du Lac, Manitowoc and Calumet Counties, to zero Democratic seats and two Republican seats in the Current Plan, contributed to Wisconsin's current pro-Republican efficiency gap.

*Racine and Kenosha Counties:*

149.    Under the Prior Plan, Districts 61, 62 (home to Plaintiff McCue), 63 (home to Plaintiff Daley), 64, 65, and 66 (home to Plaintiff Mitchell) were almost entirely within Racine and Kenosha Counties in the southeastern edge of Wisconsin. Districts 61 and 62 centered on the City of Racine, with District 63 covering the western side of Racine County. Districts 64 and 65 centered on the City of Kenosha, with District 66 covering the western edge of Kenosha County. In the 2008 election, Democratic candidates won Districts 61, 62, 64, and 65, while Republican candidates won Districts 63 and 66. Under the Demonstration Plan, Democratic candidates

would win Districts 62, 63, 64, and 66, while Republican candidates would win Districts 61 and 65.

150. As a result of the Current Plan, Democratic voters who were in the old Districts 61 and 62 were packed into the new District 66, thus wasting more Democratic votes in the region. Due to these changes, Districts 64, 65, and 66 were won by Democratic candidates in 2012, while Districts 61, 62, and 63 were won by Republican candidates.

151. The shift from four Democratic seats and two Republican seats in the Prior Plan and the Demonstration Plan in Racine and Kenosha Counties, to three Democratic seats and three Republican seats in the Current Plan, contributed to Wisconsin's current pro-Republican efficiency gap.

*Buffalo, Chippewa, Eau Claire, Jackson, La Crosse, Pepin, Pierce, St. Croix, and Trempealeau Counties:*

152. Under the Prior Plan, most of Districts 67 (home of Plaintiff Pedersen), 68, 91, 92, 93 (home of Plaintiff Pfundheller), 94 (home of Plaintiff Brent Brigson), and 95 (home of Plaintiff Schnick) were spread across Buffalo, Chippewa, Eau Claire, Jackson, La Crosse, Pepin, Pierce, St. Croix, and Trempealeau Counties in northwestern Wisconsin. In the 2008 election, Democratic candidates won five of the seven Districts (68, 91, 92, 93, and 95), and Republicans won two of them (67 and 94). The district numbers in the Demonstration Plan are slightly different; instead of District 68, District 69 is in Eau Claire County. Under the Demonstration Plan, Democratic candidates would win six of seven Districts (67, 69, 91, 92, 94, and 95) and a Republican candidate would win one of them (93).

153. As a result of the Current Plan, Democratic voters who were in the old District 68 were packed into the new District 91, and Democrats in the rest of old District 68 as well as old

Districts 91 and 93 were cracked into the new Districts 68, 92, and 93. Due to these changes, Democratic candidates won only four of the seven districts in 2012 (91, 92, 94, and 95), and Republican candidates won three of them (67, 68, and 93).

154.    The shift from five or six Democratic seats, in the Prior Plan and Demonstration Plan respectively, and two or one Republican seats in the Prior Plan and Demonstration Plan respectively, to four Democratic seats and three Republican seats in the Current Plan, in Buffalo, Chippewa, Eau Claire, Jackson, La Crosse, Pepin, Pierce, St. Croix, and Trempealeau Counties, contributed to Wisconsin's current pro-Republican efficiency gap.

*Adams, Columbia, Marathon, Marquette, Portage, and Wood Counties:*

155.    Under the Prior Plan, most of Districts 42 (home to Plaintiffs James and Allison Seaton), 47, 69, 70 (home to Plaintiff Daniel Dieterich), 71, 72, 85, and 86 (home to Plaintiff Petulla) were spread across Adams, Columbia, Marathon, Marquette, Portage, and Wood counties in central Wisconsin. In the 2008 election, Democratic candidates won five of the eight Districts (42, 70, 71, 72, and 85), and Republicans won three Districts (47, 69, and 86). In the Demonstration Plan the district numbers are different (5, 40, 41, 42, 71, 72, 86, and 87), but of these eight Districts, Democratic candidates would win five (71, 86, 40, 41, and 42), and Republican candidates would win three (5, 72, and 87).

156.    As a result of the Current Plan, Democratic voters who were in the old Districts 42, 70, and 72 were cracked, and the new Districts 41, 42, 69, 70, 71, 72, 85, and 86 were created in areas of Adams, Columbia, Marathon, Marquette, Portage, and Wood Counties. Due to these changes, Democratic candidates won only three of the eight Districts (70, 71, and 85) in 2012, and Republican candidates won five of them (41, 42, 69, 72, and 86).

157.     The shift from five Democratic seats and three Republican seats in the Prior Plan and the Demonstration Plan in Adams, Columbia, Marathon, Marquette, Portage, and Wood Counties, to three Democratic seats and five Republican seats in the Current Plan, contributed to Wisconsin's current pro-Republican efficiency gap.

*Brown and Manitowoc Counties:*

158.     Under the Prior Plan, Brown and Manitowoc Counties were split to include parts of Districts 1, 2, 4 (home to Plaintiff Ramaker), 5, 25 (home to Plaintiff Estrada), 88 (home to Plaintiff Hohenstein), 89, and 90 in the Green Bay area of Wisconsin. In the 2008 election, Democratic candidates won Districts 2, 5, 25, and 88, and Republican candidates won Districts 1, 4, 89, and 90. Under the Demonstration Plan, Brown and Manitowoc Counties would include Districts 1, 2, 3, 25, 26, 88, 89, and 90. Under the Demonstration Plan, Democrats would win Districts 2 and 88, and Republicans would win the remaining six districts.

159.     As a result of the Current Plan, Democratic voters who were in the old Districts 2, 5 and 25 were cracked into the new Districts 2, 5, 25, and 88. Due to these changes, seven of the eight districts in the Brown and Manitowoc County area (1, 2, 4, 5, 25, 88, and 89) were won by Republican candidates in 2012, and one District (90) was won by a Democratic candidate in 2012.

160.     The shift from four or two Democratic seats in the Prior Plan and the Demonstration Plan, respectively, and four or six Republican seats in the Prior Plan and the Demonstration Plan, respectively, to one Democratic seat and seven Republican seats in the Current Plan, in Brown and Manitowoc Counties, contributed to Wisconsin's current pro-Republican efficiency gap.

*Wisconsin Does Not Need to Have a Gerrymandered Plan*

161.    Not only did the Current Plan exhibit extremely large efficiency gaps in 2012 and 2014, but this poor performance was entirely unnecessary and served no legitimate purpose. It would have been possible for Wisconsin to enact an Assembly plan that treated both parties symmetrically and did not disproportionately waste Democratic votes. To prove this point, plaintiffs' expert has designed a Demonstration Plan that would have had an efficiency gap of just *2%* in 2012 (assuming all contested districts and no incumbents). *See* Mayer Report at 46. This far better score is attributable to plaintiffs' efforts *not* to crack and pack Democratic voters, and instead to enable both parties to convert their popular support into legislative seats with equal ease.

162.    Plaintiffs' Demonstration Plan performs at least as well as the Current Plan on every other relevant metric. Both plans have total population deviations of less than 1%—far below the courts' 10% threshold for presumptive constitutionality. Both plans have six African American opportunity districts and one Hispanic opportunity district, and so are identical for Voting Rights Act purposes. The Demonstration Plan splits one fewer municipal boundary than the Current Plan (119 versus 120), and so is superior in that regard. And the Demonstration Plan's districts are substantially more compact than the Current Plan's (average compactness of 0.41 versus 0.28). *See* Mayer Report at 37.

163.    The Demonstration Plan proves that the Current Plan's extreme pro-Republican tilt cannot be blamed on either an effort to comply with legitimate redistricting criteria or Wisconsin's underlying political geography. Both of those factors were perfectly compatible with a neutral map.

## COUNT I – INTENTIONAL VOTE DILUTION

164.    Plaintiffs incorporate and re-allege paragraphs 1-163 of this Complaint as paragraphs 1-163 of this Count I.

165.    The Current Plan is a partisan gerrymander so extreme that it violates Plaintiffs' Fourteenth Amendment right to equal protection of the laws. The Current Plan intentionally and severely packs and cracks Democratic voters, thus disproportionately wasting their votes, even though a neutral map could have been drawn instead. Accordingly, Wisconsin's Act 43 deprives plaintiffs of their civil rights under color of state law in violation of 42 U.S.C. §§ 1983 and 1988.

166.    The efficiency gap provides a workable test to identify unconstitutional partisan gerrymandering similar to the two-part approach applied to state legislative reapportionment claims. In a reapportionment challenge, the first issue is whether a district plan's total population deviation exceeds 10%. If so, the plan is presumptively unconstitutional, and if not, it is presumptively valid. The second issue, which is reached only if the total population deviation is greater than 10%, is whether the malapportionment is necessary to achieve a legitimate state goal. The state bears the burden at this stage of rebutting the presumption of unconstitutionality. *See Voinovich v. Quilter*, 507 U.S. 146, 161-62 (1993); *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983); *Connor v. Finch*, 431 U.S. 407, 418 (1977).

167.    The same two-part approach should be applied to partisan gerrymandering claims, only with the efficiency gap substituted for total population deviation. The first step in the analysis is whether a plan's efficiency gap exceeds a certain numerical threshold. If so, the plan is presumptively unconstitutional, and if not, it is presumptively valid. The second step, which is reached only if the efficiency gap is sufficiently large, is whether the plan's severe partisan unfairness is the necessary result of a legitimate state policy, or inevitable given the state's

underlying political geography. The state would bear the burden at this stage of rebutting the presumption of unconstitutionality.

168.     The Current Plan is plainly unlawful under this two-part test. First, it was *forecast* to produce, and then *did* produce, an efficiency gap of approximately 13% in the 2012 election. This is an extraordinarily high level of partisan unfairness, more than two standard deviations from the mean: as noted above, the 2012 figure represents the 28th-worst score in modern American history (out of nearly 800 total plans), placing the Current Plan in the worst 4% of this distribution. This is also not a temporary or transient gerrymander. The Current Plan's efficiency gap means that there is close to a zero percent chance that the Plan will ever favor Democrats during its lifespan. *See* Jackman Report at 60. Given its severity and predicted durability, the Current Plan's efficiency gap far exceeds any plausible threshold for presumptive unconstitutionality.

169.     Indeed, even a 7% efficiency gap should be presumptively unconstitutional. A 7% efficiency gap is at the edges of the overall distribution of all state house plans in the modern era, making it indicative of uncommonly severe gerrymandering. See Jackman Report at 61. Historical analysis shows that with a 7% efficiency gap, the gerrymandering is also likely to be unusually durable—over its lifespan, a plan with an efficiency gap of that magnitude is unlikely ever to favor the opposing party. See Jackman Report at 61. However, this Court need not decide at what point an efficiency gap is large enough to trigger a presumption of unconstitutionality. In the state legislative reapportionment context, the applicable cutoff (10%) emerged over a series of cases, in which extreme population deviations (of 34%, then 26%, then 20%) were struck down and deviations of 8% and 10% were upheld before the 10% threshold was adopted. Here

too the Current Plan's extreme efficiency gap should be deemed presumptively unconstitutional, without the need to decide what the cut-off should be.

170.     Second, the State cannot rebut the presumption that the Current Plan is unlawful. Plaintiffs' Demonstration Plan would have had an efficiency gap of just 2% in 2012 while complying with all federal and state criteria at least as well as the Current Plan. *See* Mayer Report at 46. Accordingly, neither an attempt to achieve legitimate redistricting goals nor Wisconsin's underlying political geography could have necessitated the Current Plan's partisan imbalance.

171.     In addition to its extreme efficiency gap, the Current Plan exhibits a severe partisan bias. The Current Plan produced a partisan bias of 13% in 2012 and 12% in 2014—scores that in and of themselves demonstrate the unconstitutional effects produced by the Current Plan.

172.     Finally, there is no doubt that the Current Plan was specifically intended and indeed designed to benefit Republican candidates, and to disadvantage Democratic candidates, to the greatest possible extent. Thus, the Current Plan had both the purpose and effect of subordinating the adherents of one political party and entrenching a rival party in power, in violation of their right to equal protection under the law.

## COUNT II – BURDEN ON RIGHT TO ASSOCIATION

173.     Plaintiffs incorporate and re-allege paragraphs 1-172 of this Complaint as paragraphs 1-172 of this Count II.

174.     Party members, party officials, party organizations, and other party supporters enjoy the First Amendment associational rights "to affiliate in a political party and carry out that organization's activities and objects." *Whitford*, 138 S. Ct. at 1939 (Kagan, J., concurring); *see*

*also Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment) (noting "the First Amendment interest of not burdening or penalizing citizens because of . . . their association with a political party"). "By placing a state party at an enduring electoral disadvantage," a partisan gerrymander "weakens its capacity to perform all its functions" and thus burdens these associational rights. *Whitford*, 138 S. Ct. at 1938 (Kagan, J., concurring); *see also Common Cause v. Rucho*, ___ F. Supp. 3d ___, 2018 WL 4087220, at *96 (M.D.N.C. Aug. 27, 2018) ("partisan gerrymandering implicates First Amendment precedent dealing with . . . burden[s on] political speech or association"). Specifically, a partisan gerrymander causes "difficulties" for party supporters in conducting associational activities such as "fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Whitford*, 138 S. Ct. at 1938 (Kagan, J., concurring).

175.   A partisan gerrymander is not automatically unconstitutional if it burdens party supporters' associational rights. Rather, "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which [it] burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (a court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments"). "[W]hen those rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

(internal quotation marks omitted); *see also Common Cause*, 2018 WL 4087220, at *96 (noting that "'sliding-scale' scrutiny" applies to "state election regulations" such as district plans).

176.    The Current Plan is unlawful under this well-established framework. First, it imposes severe burdens on plaintiffs' associational rights. By subjecting supporters of the Democratic Party to an exceptionally large and durable pro-Republican partisan asymmetry, the Plan deters them from, and hinders them in, turning out to vote, registering voters, volunteering for campaigns, donating money to candidates, running for office, appealing to independents, and advocating and implementing their preferred policies. All of these activities have a sharply reduced likelihood of success because of the Plan's enormous and persistent pro-Republican skew. Supporters of the Democratic Party thus have a diminished ability to perform these vital functions.

177.    The Current Plan cannot survive the strict scrutiny that follows from the severe burdens it imposes on plaintiffs' associational rights. The Plan's pursuit of partisan advantage is not even a legitimate—let alone a compelling—governmental interest. *See Crawford v. Marion Cty. Elections Bd.*, 553 U.S. 181, 203 (2008) (observing that if "partisan considerations" are "the only justification" for an election law, that law is unconstitutional). And the Plan's valid nonpartisan goals (equal population, compliance with the Voting Rights Act, respect for county and municipality boundaries, and compactness) can be achieved to at least the same degree by an Assembly map that treats the major parties symmetrically. Indeed, both the computer-generated map and Professor Mayer's Demonstration Plan ***exceed*** the Current Plan's performance on these nonpartisan criteria while attaining almost perfect partisan symmetry. *See Common Cause*, 2018 WL 4087220, at *96 (holding that a North Carolina congressional map's "express partisan

favoritism excludes it from the class of 'reasonable, politically neutral' electoral regulations that pass First Amendment muster" (quoting *Burdick*, 504 U.S. at 438)).

178.   Accordingly, the Current Plan deprives plaintiffs of their civil rights under color of state law in violation of 42 U.S.C. §§ 1983 and 1988.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

179.   Declare Wisconsin's 99 State Assembly Districts, established by Act 43, unconstitutional and invalid, and the maintenance of these districts for any primary, general, special, or recall election a violation of plaintiffs' associational rights;

180.   In addition, declare the 29 State Assembly Districts in which plaintiffs with standing to allege vote dilution reside unconstitutional and invalid, and the maintenance of these districts for any primary, general, special, or recall election a violation of plaintiffs' rights not to be subjected to intentional vote dilution;

181.   Enjoin defendants and the Wisconsin Elections Commission's employees and agents, including the county clerks in each of Wisconsin's 72 counties, from administering, preparing for, and in any way permitting the nomination or election of members of the State Assembly from the unconstitutional districts that now exist;

182.   In the absence of a state law establishing a constitutional district plan for the Assembly districts, adopted by the Legislature and signed by the Governor in a timely fashion, establish a redistricting plan that meets the requirements of the U.S. Constitution and federal statutes and the Wisconsin Constitution and state statutes;

183.   Award plaintiffs their reasonable attorneys' fees, costs, and litigation expenses incurred in bringing this action; and

184.    Grant such further relief as the Court deems just and proper.

This the 14th day of September, 2018.

By: s/ Douglas M. Poland
*One of the attorneys for plaintiffs*

/s/ Douglas M. Poland
Douglas M. Poland
State Bar No. 1055189
Alison E. Stites
State Bar. No. 1104819
RATHJE WOODWARD LLC
10 East Doty St., Ste. 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com
astites@rathjewoodward.com

/s/ Ruth M. Greenwood
Ruth M. Greenwood
Annabelle E. Harless
CAMPAIGN LEGAL CENTER
73 W. Monroe St., Ste. 302
Chicago, IL 60603
(312) 561-5508
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org

/s/ Paul M. Smith
Paul M. Smith
J. Gerald Hebert
Danielle M. Lang
CAMPAIGN LEGAL CENTER
1411 K. St. NW, Ste. 1400
Washington, DC 20005
(202) 736-2200
psmith@campaignlegalcenter.org
ghebert@campaignlegalcenter.org
dlang@campaignlegalcenter.org

/s/ Peter G. Earle
Peter G. Earle
State Bar No. 1012176
LAW OFFICE OF PETER G. EARLE
839 N. Jefferson St., Ste. 300
Milwaukee, WI 53202
(414) 276-1076
peter@earle-law.com

/s/ Nicholas O. Stephanopoulos
Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 E. 60th St.
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

/s/ Michele L. Odorizzi
Michele L. Odorizzi
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 701-7309
modorizzi@mayerbrown.com

*Attorneys for Plaintiffs*