# In The Matter Of:

*William Whitford, et al. vs*
*Beverly R. Gill, et al.*

---

*Videotaped Deposition of PATRICK E. FULLER*
*March 29, 2019*

---



## Verbatim Reporting, Limited

2 East Mifflin Street, Suite 102
Madison, Wisconsin  53703
www.Verbatim-Madison.com
Office@Verbatim-Madison.com
608.255.7700

"Excellence in Reporting Since 1988"

*Min-U-Script® with Word Index*

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF WISCONSIN

= = = = = = = = = = = = = = = = = = = = = = = = = = =

WILLIAM WHITFORD, ET AL.,

        Plaintiffs,

  -vs-        Case No. 3:15-cv-421-jdp

BEVERLY R. GILL, ET AL.,

        Defendants.

= = = = = = = = = = = = = = = = = = = = = = = = = = =

Videotaped Deposition of:

PATRICK E. FULLER

Madison, Wisconsin
March 29, 2019

Reported by:  Taunia Northouse, RDR, CRR, CCP

---

Videotaped Deposition of PATRICK E. FULLER 3-29-19     Page 3

| No. | Description | Identified |
|-----|-------------|-----------|
| Exh 16 | Plan for District 63 | 94 |
| Exh 17 | Plan for District 67 | 96 |
| Exh 18 | Plan for District 86 | 97 |
| Exh 19 | Plan for District 88 | 98 |
| Exh 20 | Plan for District 93 | 99 |
| Exh 21 | Plan for District 10 | 101 |
| Exh 22 | Plan for District 13 | 101 |
| Exh 23 | Plan for District 18 | 103 |
| Exh 24 | Plan for District 62 | 104 |
| Exh 25 | Plan for District 70 | 104 |
| Exh 26 | Plan for District 77 | 106 |
| Exh 27 | Plan for District 80 | 107 |
| Exh 28 | Plan for District 94 | 108 |
| Exh 29 | Plan for District 95 | 110 |
| Exh 30 | Senate Bill 148 | 127 |
| Exh 31 | Assembly Substitute Amendment 1 to 2011 Senate Bill 148 | 129 |
| Exh 32 | Senate Bill 148 Table Amendment | 133 |
| Exh 33 | Emails re Public Records Request | 156 |

(Attached to the original transcript
and copies provided to all counsel)

(Original transcript filed with Attorney Harless,
copies provided to all counsel)

---

Videotaped Deposition of PATRICK E. FULLER 3-29-19     Page 2

       I N D E X

WITNESS                 Page(s)

PATRICK E. FULLER

    Examination by Ms. Harless     10
    Examination by Mr. St. John    161


       E X H I B I T S

| No. | Description | Identified |
|-----|-------------|-----------|
| Exh 1 | Subpoena | 11 |
| Exh 2 | Response to Plaintiffs' Requests for Production | 73 |
| Exh 3 | Plan for District 21 | 77 |
| Exh 4 | Plan for District 22 | 79 |
| Exh 5 | Plan for District 23 | 81 |
| Exh 6 | Plan for District 24 | 83 |
| Exh 7 | Plan for District 26 | 84 |
| Exh 8 | Plan for District 29 | 85 |
| Exh 9 | Plan for District 31 | 86 |
| Exh 10 | Plan for District 35 | 87 |
| Exh 11 | Plan for District 38 | 88 |
| Exh 12 | Plan for District 42 | 89 |
| Exh 13 | Plan for District 4 | 90 |
| Exh 14 | Plan for District 50 | 92 |
| Exh 15 | Plan for District 56 | 93 |

---

Videotaped Deposition of PATRICK E. FULLER 3-29-19     Page 4

    VIDEOTAPED DEPOSITION of PATRICK E. FULLER,
a witness of lawful age, taken on behalf of the
Defendants, wherein William Whitford, et al., are
Plaintiffs, and Beverly R. Gill, et al., are
Defendants, pending in the United States District
Court for the Western District of Wisconsin, pursuant
to notice and subpoena, before Taunia Northouse, a
Registered Diplomate Reporter and Notary Public in
and for the State of Wisconsin, at the offices of the
Urban Land Interests, 10 East Doty Street, in the
City of Madison, County of Dane, and State of
Wisconsin, on the 29th of March 2019, commencing at
8:58 in the forenoon.

      A P P E A R A N C E S

ANNABELLE HARLESS, Attorney
CAMPAIGN LEGAL CENTER
   73 West Monroe, Suite 322, Chicago, Illinois 60603,
   appearing on behalf of the Plaintiffs.
     aharless@campaignlegalcenter.org   312-561-5508

DOUGLAS M. POLAND, Attorney
RATHKE WOODWARD, LLC
   10 East Doty Street, Suite 507, Madison, Wisconsin
   53703, appearing on behalf of the Plaintiffs.
     dpoland@rathkewoodward.com  608-960-7453

KEVIN ST. JOHN, Attorney
BELL GIFTOS ST. JOHN, LLC
   5325 Wall Street, Suite 2200, Madison, Wisconsin
   53718-7980, appearing on behalf of Defendant
   Wisconsin State Assembly.
     kstjohn@bellgiftos.com  608-216-7990

---

```
 1              APPEARANCES CONTINUED

 2
    BRIAN P. KEENAN, Assistant Attorneys General
 3  STATE OF WISCONSIN DEPARTMENT OF JUSTICE
      17 West Main Street, Madison, Wisconsin, appearing
 4  on behalf of Wisconsin Election Commission
    defendants.
 5      keenanbp@doj.state.wi.us  608-266-0020

 6  Also present:  Jon Hansen, videographer

 7  = = = = = = = = = = = = = = = = = = = = = = = = =

 8

 9            THE VIDEOGRAPHER:  Good morning.  We

10      are on the record.  This is the videotape

11      deposition, Wisconsin State Assembly, taken

12      on March 29, 2019.  The time, 8:58.  This

13      deposition is taking place at 10 East Doty

14      Street, Madison, Wisconsin.  This is the case

15      of William Whitford, et al., versus

16      Gerald Nichol, et al., 15-cv-421-bbc,

17      United States District Court,

18      Western District of Wisconsin.

19            My name is Jon Hansen, CLVS,

20      videographer with Verbatim Reporting.

21            At this time if counsel could please

22      state their appearances for the record, after

23      which our reporter will swear the witness and

24      we can proceed.

25            MS. HARLESS:  Annabelle Harless
```

```
 1      with the Campaign Legal Center in Chicago

 2      representing the Whitford individual

 3      plaintiffs.

 4          MR. POLAND:  Doug Poland of

 5      Rathje Woodward, representing the plaintiffs.

 6          MR. ST. JOHN:  Kevin St. John,

 7      Bell Giftos St. John representing the

 8      Wisconsin State Assembly.

 9          MR. KEENAN:  Assistant Attorney

10      General Brian Keenan from the Wisconsin

11      Department of Justice representing the

12      Wisconsin Election Commission defendants.

13

14          PATRICK FULLER,

15      called as a witness, being first duly sworn,

16      testified on oath as follows:

17          MR. ST. JOHN:  Counsel, before we

18      begin, if you don't mind, I'd like to state a

19      couple of general objections to the notice

20      topics and put them on the record.

21          First, we communicated by counsel by

22      letter dated March 15, 2019, that our

23      objection to the deposition notice insofar as

24      it defines the terms "you" and "your" refer

25      to the Republican Assembly Caucus.  We
```

```
 1      explained that the subpoena's addressed to

 2      the Wisconsin State Assembly, and we're

 3      providing a witness today to testify about

 4      what is known to the Wisconsin State

 5      Assembly, not to another entity.

 6          The Wisconsin State Assembly's knowledge

 7      is not an amalgam of all the knowledge

 8      possessed by individual legislators.  For

 9      example, as we pointed out in the same

10      letter, the Wisconsin State Assembly has no

11      discoverable knowledge about campaign

12      activities.  Whatever campaign related

13      associational activities are engaged in by

14      Assembly members or staff in their unofficial

15      capacity, regardless of their party

16      affiliation, such activities are not

17      performed for the benefit of or on behalf of

18      the Wisconsin State Assembly.

19          Second, the Assembly is a unique

20      organization.  Its members are 99 elected

21      officers.  They do not serve the body.  They

22      are not appointed by the body.  Instead, they

23      are elected by their constituencies and they

24      serve their constituencies.  Those members

25      are equal to one another, having the same
```

```
 1      voting power.

 2          As we stated in our responses to the

 3      document requests, those elected officials

 4      are the custodians of their own records under

 5      Wisconsin law.  Those records are not the

 6      Assembly's but the members'.  Similarly, the

 7      knowledge that individual members possess

 8      belongs to the individual members, not the

 9      State Assembly.

10          The State Assembly cannot waive a

11      member's privileges.  In general, the State

12      Assembly is a corporate entity, knows no more

13      about an individual member's discussion with

14      that member's staff or other legislators as

15      it knows about an individual member's

16      discussion with his or her spouse.

17          The Assembly's knowledge of a member's

18      legislative activity and those of member's

19      personal staff are limited to what is

20      disclosed to and placed before the body.

21          Third, we object to Topics 6 and 14 as

22      being vague and overbroad and ambiguous.  As

23      we stated in our written objections to

24      requests for documents, we have not

25      interpreted the term "associational
```

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 9

1      activities" to include work on legislative
2      bills or enactments.  To the extent
3      plaintiffs intended that, that's unclear and
4      it would make those requests overbroad as it
5      would suggest that the deponent would need to
6      become familiar with the identities of, at a
7      minimum, every legislator and every
8      legislative staffer that has worked in the
9      Assembly over the past 17 years.
10         We reserve the right to make additional
11     objections to the scope and breath of the
12     30(b)(6) topics during this deposition, as
13     well as of course privilege and form
14     objections.  We reserve the right to make or
15     assert evidentiary objections at trial of
16     course.  And by providing the 30(b)(6)
17     witness today, the Assembly is not intending
18     to waive any privilege possessed by its
19     members.
20         Thank you for allowing me to put that on
21     the record.
22             MS. HARLESS:  No problem.
23
24
25

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 10

1              EXAMINATION
2  By Ms. Harless:
3  Q  So good morning, Mr. Fuller.  My name is
4     Annabelle Harless and I represent the individual
5     plaintiffs in this case.  I'm going to be asking
6     you some questions today.  But before I do, I
7     wanted to ask if you've ever been deposed before.
8  A  No.  Yes, yes, I have.
9  Q  In your official capacity?
10 A  Yes.
11 Q  Okay.  So we'll just go over a few ground rules
12    before we start just as a refresher.  The court
13    reporter is transcribing everything we say.  So
14    the court reporter can get everything on the
15    record, please wait for me to finish asking my
16    question before you give an answer.  And then I'll
17    try to do the same for you so that we're not
18    speaking over each other.
19         The court reporter can only record verbal
20    responses.  So I would just ask instead of shaking
21    your head or nodding your head, you give me a
22    verbal response.
23         And we can take a break at any time.  I only
24    ask you do not take a break while a question is
25    pending.

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 11

1          Does that make sense?
2  A  Yes.
3  Q  Could you please state your full name for the
4     record.
5  A  Patrick E. Fuller.
6  Q  And do you understand you're under oath today?
7  A  Yes.
8  Q  Is there any reason why you cannot give truthful
9     answers to my questions today?
10 A  No.
11 Q  And you're here pursuant to a subpoena; correct?
12 A  Yes.
13         MS. HARLESS:  Okay.  Let's mark an
14     exhibit.
15             (Exhibit No. 1 marked for
16              identification)
17 Q  So, Mr. Fuller, I'm handing you a document that
18    has been marked Exhibit 1 to this deposition.
19    Have you seen this document before?
20 A  Yes.
21 Q  What is Exhibit 1?
22 A  Say again?
23 Q  What is Exhibit 1?  What is this document?
24 A  Exhibit 1's a subpoena.
25 Q  Since this is a specific kind of subpoena under

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 12

1     Rule 30(b)(6) of the Federal Rules of Civil
2     Procedure, you're here in a representative
3     capacity testifying on behalf of the Wisconsin
4     State Assembly.  Do you understand that?
5  A  Yes.
6  Q  Do you recall when you first saw a copy of the
7     subpoena?
8  A  I don't recall, no.
9  Q  Okay.  Do you remember who gave you the subpoena?
10 A  The Assembly's attorney.
11 Q  Mr. St. John?
12 A  Yes.
13 Q  And what did you do to prepare for this deposition
14    today?
15 A  I talked to -- we did an electronic search of all
16    our records and paper copies of our records.  I
17    coordinated with my journal clerk, my records
18    clerk, my business legislative specialist and my
19    officer manager, and I conferred with the Assembly
20    attorneys.
21 Q  Did you meet with any of those people in person?
22 A  Yes.
23 Q  Let's just take, I guess, the first -- you said
24    you conferred with your business and legislative
25    specialist.  Who was present at that meeting?

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 13

1  A   Who was present?  Me and my -- me and my business
2      legislative specialist.
3  Q   What is that person's name?
4  A   Doris Vande Loo.
5  Q   And what did you discuss at that meeting?
6  A   I asked her to check her records, both electronic
7      and paper, and records that were -- requests that
8      were produced to my office.
9  Q   Anything else you talked about at that meeting?
10 A   No.
11 Q   Okay.  And you said you had a meeting with your
12     office manager?
13 A   Office manager.
14 Q   Who is the office manager?
15 A   Office manager is Carol Redell.
16 Q   And what did you discuss with Carol?
17 A   To do a search of her electronic and paper records
18     of requests that I received.
19 Q   Okay.  Any other people you met with that I forgot
20     on that list?
21 A   The journal clerk.
22 Q   Okay.  What did you discuss with the journal
23     clerk?
24 A   I had the journal clerk give me the -- the journal
25     for Senate Bill 148 and the bill history for

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 14

1      Senate Bill 148.
2  Q   And what's the journal clerk's name?
3  A   Julie Martyn.
4  Q   And did you review any documents in preparation
5      for this deposition?
6  A   Yes.
7  Q   What were those documents?
8  A   I reviewed the journal, the official record of the
9      Assembly.  I reviewed the bill history for Senate
10     Bill 148.  I reviewed a number of documents that
11     were requested before I produced them, before I
12     gave them to my attorneys.
13 Q   Okay.  And did you meet with Speaker Vos in
14     preparation for this deposition?
15 A   No.
16 Q   Did Speaker Vos or his staff give you any
17     documents to review?
18 A   No.
19 Q   Did you discuss your deposition with Speaker Vos
20     at all?
21 A   No.
22 Q   With any member of Speaker Vos's staff?
23 A   No.
24 Q   Did you meet with Senator Fitzgerald in
25     preparation for this deposition?

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 15

1  A   No.
2  Q   Did Senator Fitzgerald or his staff give you any
3      documents to review?
4  A   No.
5  Q   Did you discuss your deposition with
6      Senator Fitzgerald at all?
7  A   No.
8  Q   Did you meet with Adam Foltz in preparation for
9      this deposition?
10 A   No.
11 Q   Did you discuss your deposition with Mr. Foltz at
12     all?
13 A   No.
14 Q   Did Mr. Foltz give you any documents to review?
15 A   No.
16 Q   Did you meet with Todd Ottman in preparation for
17     this deposition?
18 A   No.
19 Q   Did you discuss this deposition with Mr. Ottman?
20 A   No.
21 Q   Did Mr. Ottman give you any documents to review?
22 A   No.
23 Q   A moment ago you said you also met with the
24     records clerk in preparation for this deposition.
25     What did you discuss with the records clerk?

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 16

1  A   I had the records clerk do electronic search and
2      paper search of her records regarding Senate
3      Bill 148, the Assembly rules, and the state
4      constitution as it relates to the legislature
5      Article IV.
6  Q   And what is the records clerk's name?
7  A   The records clerk's name is -- let me think here
8      for a second.  Kay Inabnet, I-N-A-B-N-E-T.
9  Q   And how long did that meeting last?
10 A   Probably five, ten minutes.
11 Q   Any other meetings that you can think of that you
12     had to prepare for this deposition?
13 A   Other -- other -- other than the meetings with my
14     attorneys.
15 Q   How many meetings did you have with your
16     attorneys?
17 A   One meeting was 40 minutes, another meeting was
18     approximately four hours, and another meeting was
19     30 to 40 minutes.
20 Q   When did those meetings happen?  Let's just take
21     the one 40-minute meeting.  When did that meeting
22     occur?
23 A   That was yesterday.
24 Q   And then the four-hour meeting, when was that?
25 A   Tuesday.

1 Q   And then the 30- to 40-minute meeting?
2 A   I don't know the exact date.  Sometime last week
3     or the week before.
4 Q   And only your attorneys were present at that
5     meeting?
6 A   That's correct.
7 Q   And who was there?  Which attorneys?
8 A   Kevin St. John, and I can't remember one of the
9     other attorneys.  I don't remember her name.
10 Q   Was it Taylor Meehan?
11 A   I met two of them:  one male, one female.  It was
12     an attorney from Bartlit.
13 Q   Bartlit Beck?
14 A   Right.
15 Q   Was it Josh Ackerman?
16 A   I met him a week prior before that.
17 Q   Okay.
18 A   Josh was one of them, yes.
19 Q   Okay.  Besides those meetings, are there any other
20     conversations you had to prepare for this
21     deposition?
22 A   No.
23 Q   Are there any other communications you've had with
24     anyone to prepare for this deposition?
25 A   No.

1 Q   About how long total do you think you've spent
2     preparing for this deposition?
3 A   About seven hours, approximately seven hours.
4 Q   And did you bring any documents with you today?
5 A   No.
6 Q   What is your position with the Wisconsin State
7     Assembly?
8 A   I'm Assembly chief clerk.
9 Q   How long have you held that position?
10 A   I've been the Assembly chief clerk since
11     January of 2003.
12 Q   What did you do before you were the chief clerk of
13     the Wisconsin State Assembly?
14 A   I was the assistant chief clerk from 2001 to 2003.
15 Q   What did you do before you were the assistant
16     chief clerk?
17 A   I worked for the Department of Veterans Affairs as
18     a troop director of the Troops for Teachers
19     program and a veterans benefits specialist.
20 Q   What are your job duties as the chief clerk of the
21     Assembly?
22 A   I'm responsible for -- I'm the chief financial
23     officer, chief administrative officer.  I maintain
24     the official record of the Assembly, which is the
25     Journal.  There's about two pages of my duties

1     that are in the Assembly rule book under Assembly
2     Rule 5.  I can't remember all of them.  But
3     primarily chief financial officer, chief
4     administrative officer.  We track all the
5     legislation from cradle to grave.
6 Q   What do you do as chief financial officer?
7 A   The chief financial officer, I maintain the budget
8     for the Assembly.  I ensure all members, to
9     include legislators and their respective staffs,
10     are paid.  And I work with the Legislative Fiscal
11     Bureau on the Assembly budget.
12 Q   Anything else you do as chief financial officer?
13 A   Those are the things that come off the top of my
14     mind right now.
15 Q   And what do you do as the administrative officer?
16 A   Chief administrative officer, I maintain all the
17     records, the official record of the Assembly, that
18     being the Journal for the Assembly.  That's the
19     primary -- one of the primary duties as the chief
20     administrative officer.  We maintain all the
21     personnel records of all members of the Assembly,
22     to include their legislative 99 elected officials.
23     And that's primarily as the administration.
24 Q   Any other job duties you can think of besides
25     those that you've listed?

1 A   I don't -- I don't remember off the top of my
2     head, but you can review Assembly Rule 5 in the
3     Assembly rule book.  There's a large number of
4     duties that I'm required to do.  I don't know them
5     off the top of my head.  But if you want to review
6     those, you can.  They're online or we can provide
7     one for you.
8 Q   Okay.  Do you interact with the speaker of the
9     Assembly as the chief clerk?
10 A   Yes.  As I do with all legislators.
11 Q   What do those interactions entail?
12 A   Staffing mainly for all legislators, both -- for
13     both parties, budget.  I brief the -- I don't
14     brief the speaker per se, but I brief his chief of
15     staff on the budget, where we are on a monthly
16     basis, staffing on a monthly basis.
17 Q   And do you interact with the majority leader of
18     the Senate as chief clerk of the Assembly?
19 A   No.
20 Q   Have you been involved in any other litigation in
21     your role as chief clerk?
22 A   Yes.
23 Q   What -- what litigation was that?
24 A   Act 10 and the caucus investigation.
25 Q   So let's start with Act 10.  How were you involved

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 21

1      in that litigation?
2   A  I was deposed by attorneys for the protesters on
3      what I knew was going on with the meetings with
4      DOA and the Capitol police and so on.
5   Q  Did you -- was there a trial in that case?
6   A  I'm not sure if there was a trial or not.  I
7      wasn't involved in a trial.
8   Q  Okay.  You didn't testify at trial?
9   A  No.
10  Q  Do you remember what the gist of your testimony
11     was at your deposition?
12  A  Yeah.  They were looking for notes regarding any
13     meetings that the governor's chief of staff had
14     with members of the Capitol police and so on.
15  Q  And then you were also involved in the caucus
16     investigation litigation?
17  A  Yes.
18  Q  What was your involvement with that litigation?
19  A  I was brought to trial and asked -- I was asked
20     about the policy manual, the Assembly's policy
21     manual, how it came about.  Since I was just
22     coming on board when that -- when that
23     investigation trial came about, my involvement is
24     how the policy was formulated, what are the
25     procedures for the Assembly.

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 23

1      amendments to the Assembly.
2   Q  That was the first time you heard about it or knew
3      about it?
4   A  Well, I knew that the Senate had -- had the bill.
5      It was Senate Bill 148.  And it was introduced
6      into the Senate by the Senate Organization
7      Committee on 11 July 2011.  We knew that bill
8      would be coming over to the Assembly sometime.
9   Q  Okay.  So let's take a look again at Exhibit 1
10     that you have in front of you.  And if you flip
11     back a couple pages, there's a section that says
12     Exhibit A.  And so I'll refer to that as
13     Exhibit 1-A because it's part of Exhibit 1.
14     Have you seen Exhibit 1-A before?
15  A  Yes.
16  Q  What is Exhibit 1-A?
17  A  Well, it's a number of definitions regarding
18     Senate Bill -- or Act 43, and just an
19     understanding of what the definitions are going
20     forward in this deposition.
21  Q  Okay.  And then if you turn to page 2 of
22     Exhibit A, do you see that there's a list of
23     topics there?
24  A  Yes.
25  Q  Have you had an opportunity to review the topics

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 22

1   Q  Were you deposed in that case?
2   A  I was brought to the trial.
3   Q  But not deposed?
4   A  No.
5   Q  Any other cases you can think of that you were
6      involved in?
7   A  That's the only ones I can think off -- those are
8      the ones that come to the top of my mind.  I don't
9      remember any other ones where I was deposed.
10  Q  Are you familiar with 2011 Wisconsin Act 43?
11  A  Yes.
12  Q  And if I just call it Act 43 going forward, will
13     you understand --
14  A  Yes.
15  Q  -- what I'm saying?  Okay.  What is Act 43?
16  A  Act 43 is the requirement by the constitution
17     Article IV Section 6 that the legislature do
18     reapportionment every ten years.  Act 43 was the
19     bill or -- Act 43, previously Senate Bill 148 --
20     to bring about the requirement by the constitution
21     for redistricting.
22  Q  When did you first become aware of Act 43?
23  A  When it was -- actually when the Assembly received
24     Senate Bill 148 from the Senate on July 20th,
25     2011.  It was messaged from the Senate with

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 24

1      that are identified in Exhibit 1-A for your
2      deposition today?
3   A  Yes.
4   Q  Were you asked to do any research or investigation
5      regarding these topics?
6         MR. ST. JOHN:  I'm going to object
7         to that to the extent that it calls for
8         communications between the deponent and the
9         attorney -- his attorneys.
10  Q  You can answer yes or no.
11  A  I think my attorney already answered for me.
12  Q  I'm only -- so a yes or no answer isn't asking for
13     privileged information.
14  A  Yes, I did do research.
15  Q  And what was that research?
16  A  I talked to my staff, as I previously mentioned,
17     and we did electronic search and paper search of
18     our records.
19  Q  Okay.  And so we'll talk a little bit about the
20     records search later, but I just want to get an
21     idea of what you did to prepare to testify about
22     each of these topics today.  So let's start with
23     the very first topic on page 2 here which is
24     Topic 1.  And the topic is "The objectives and/or
25     motivations for the drawing of each district in

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 25

1      2011 Wisconsin Act 43, including earlier drafts."
2          Do you see that?
3  A   Yes.
4  Q   Are you prepared to testify about this topic
5      today?
6  A   Yes.
7  Q   What did you do to prepare specifically to testify
8      on Topic 1?
9  A   Once again, we did a search of our records and --
10     and my staff -- both paper and electronic.  And I
11     talked to the journal clerk specifically.  And I
12     also looked at the bill history.
13 Q   So the only person you met with to prepare for
14     this is the journal clerk?
15         MR. ST. JOHN: Object.  Form.
16 Q   Is the only person you met with to prepare to
17     testify about this topic today is the journal clerk?
18 A   The journal clerk and the records clerk.
19 Q   And did you take any notes at any of the meetings
20     you had with those individuals?
21 A   Yes.
22 Q   Do you still have those notes?
23 A   Yes.  They're on my desk.
24 Q   And did you do anything else to prepare to testify
25     about Topic 1 today?

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 26

1          MR. ST. JOHN: I'm going to just
2      object to the extent that your question is
3      seeking the content of communications that
4      Mr. Fuller had with his attorneys.
5          I'm going to instruct you not to
6      disclose the content of those communications,
7      but you are free to disclose the fact of
8      those communications.
9  Q   So besides any conversations you had with your
10     attorneys, is there anything else you can think of
11     that you did to prepare to testify on Topic 1?
12 A   No.
13 Q   Let's turn to Topic 2.  So this topic is "The
14     identity of the persons involved in the drawing of
15     each district in 2011 Wisconsin Act 43, including
16     earlier drafts."
17         Are you prepared to testify about this topic
18     today?
19 A   Yes.
20 Q   What did you do to prepare to testify on Topic 2
21     specifically?
22 A   Once again, we did talking to my staff.  We did an
23     electronic search and a paper search of any of our
24     records regarding No. 2.
25 Q   And you met with your staff; correct?

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 27

1  A   Correct.
2  Q   Who were those individuals?
3  A   Once again, the journal clerk and the records
4      clerk.
5  Q   What did you talk about with the journal clerk?
6  A   I had the journal clerk once again bring me the
7      bill history and the Journal for Senate Bill 148
8      which became -- later became Act 43.
9  Q   And what did you talk about with the records
10     clerk?
11 A   We just went over to make sure everything in the
12     Journal matched up with the -- with the bill
13     history, which it did.
14 Q   And did you review any documents at that meeting?
15 A   No.  There was no documents.  We did a search of
16     paper documents and electronic documents.  And the
17     only documents I received from my staff,
18     specifically the journal clerk, was the bill
19     history and the Assembly Journal.
20 Q   Did you have any conversations with anyone else to
21     prepare to testify?
22 A   No.  Other than my -- other than my Assembly
23     attorneys.
24 Q   Okay.  And at the meeting you had with the journal
25     clerk, did you take any notes?

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 28

1  A   No.  I made notes right on the Journal.
2  Q   And do you still have those notes?
3  A   We still have the Journal.  The Journal's online,
4      yes.
5  Q   So your notes were -- how did you take notes on
6      that?
7          MR. ST. JOHN: Form.  Objection.
8      Form.
9  Q   If the Journal's online, how did you take notes?
10 A   I had it printed out.
11 Q   So you wrote notes on the paper?
12 A   Yes.
13 Q   And in your meeting with the records clerk, did
14     you take notes?
15 A   No, no notes from the records clerk other than her
16     giving me the constitution, Article IV Section 6.
17 Q   Anything else you can think of that you did to
18     prepare to testify about Topic 2?
19 A   No.  That's it.
20 Q   So let's go to Topic 3.  This topic is "The
21     objective facts that any Assembly Persons had
22     access to or relied on when drawing each district
23     in 2011 Wisconsin Act 43, including earlier
24     drafts."
25         Are you prepared to testify about this topic

1      today?
2 A    Yes.
3 Q    What did you do to prepare to testify on Topic 3?
4 A    Once again, I talked to the journal clerk.  I
5      talked to the records clerk, had them do -- and my
6      office manager do a search of records, both paper
7      and electronic, regarding Senate Bill 148 and
8      Wisconsin Act 43.
9 Q    And do you have any notes from your meeting with
10     the journal clerk?
11 A   No, just as I previously stated, those notes were
12     put on the Assembly Journal.
13 Q   But the Assembly Journal was printed out; correct?
14 A   Correct.
15 Q   And you wrote on that?
16 A   Yes.
17 Q   So do you still have that copy of the paper that
18     you wrote on?
19 A   Yes.
20 Q   And do you have any notes from your meeting with
21     the records clerk?
22 A   The only thing from the records clerk was the
23     constitution.
24 Q   A printed-out version of the constitution?
25 A   Yes.

1 Q    And you didn't write on that paper?
2 A    No.
3 Q    Did you review any documents in preparation to
4      testifying on Topic 3?
5 A    Just the Assembly Journal, the bill history, and
6      Wisconsin State Constitution as it deals with the
7      Assembly, or the legislature Act 4 (sic)
8      Section 6.
9 Q    Anything else you can think of that you did to
10     prepare to testify about Topic 3?
11 A   Other than talking to my attorneys, no.
12 Q   So let's look at Topic 4, still on page 2.  That
13     topic is "Your involvement, if any, with the
14     drawing, passage and/or enactment of 2011
15     Wisconsin Act 43."
16         Are you prepared to testify about that topic
17     today?
18 A   Yes.
19 Q   What did you do to prepare to testify on Topic 4?
20 A   Once again -- once again I just reviewed, after
21     speaking with the journal clerk and the records
22     clerk, just reviewing the -- the Journal
23     specifically and Wisconsin Act 43 as it relates to
24     the Journal.
25 Q   Did you take any notes at any of those meetings?

1 A    I'm sure I did.  There's -- the notes that I've
2      taken were probably, most likely on the -- the
3      bill history and the Assembly Journal.
4 Q    And just so I can understand, did you have
5      separate meetings to discuss each of these topics,
6      or was it one meeting?
7 A    One meeting.
8 Q    Was that -- earlier we referred -- you referred to
9      a couple meetings you had.  Which meeting would
10     that have been?
11 A   No.  Those are separate.
12 Q   Okay.  So how long was this meeting that you had
13     to discuss these topics?
14 A   I don't know; 30, 40 minutes maybe.
15 Q   So in the 30 to 40 minutes you met with the
16     journal clerk and the records clerk, you discussed
17     all 14 of the topics?
18         MR. ST. JOHN: Objection.  Form.
19 Q   You can answer if you understand the question.
20 A   Repeat the question again.
21 Q   Did you -- when you met with the records clerk and
22     the journal clerk, did you discuss all of the
23     topics?
24 A   Yes.
25 Q   So if I ask you what you did to prepare for each

1      of these topics, are any of your answers going to
2      be different?
3 A    No.
4 Q    You did the same thing to prepare for every single
5      one of these topics?
6 A    Yes.
7 Q    Let's turn to Exhibit B then of Exhibit 1.  Have
8      you seen this document before?
9 A    Yes.
10 Q   What is this document?
11 A   This is a document that requests -- looking for
12     documents regarding -- as it relates to Wisconsin
13     Act 43.
14 Q   When did you first see this document?
15 A   Probably -- and I'm speculating here -- either
16     late January, first part of February of 2019.
17 Q   Who gave you this document?
18 A   The Assembly -- my Assembly attorneys.
19 Q   Generally, what did you do to comply with these
20     document production requests?
21         MR. ST. JOHN: Before Mr. Fuller
22     answers, I just want to make one note or
23     objection, which is that the response to
24     discovery request of the Wisconsin State
25     Assembly is not one of the noticed topics for

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 33

1    the deposition of Mr. Fuller.  To that end,
2    he is not -- under no obligation to prepare,
3    have no response for the State Assembly as to
4    how the State Assembly responded to those
5    documents.  I'm not going to restrict him
6    from giving you information about his
7    personal knowledge about those topics, but I
8    did want to note that that is beyond the
9    scope of the topics noticed for 30(b)(6)
10   deposition.
11 Q  With that objection on the record, generally to
12   the extent you're aware, what did you do to comply
13   with these document production requests?
14 A  I had my -- I did an electronic search and a -- a
15   paper search of any requested documents, as well
16   as I had my office manager do the same thing.  She
17   also did an electronic search and a paper search
18   of any documents that were requested.
19 Q  Were you given instructions on how to comply with
20   these document production requests?
21       MR. ST. JOHN:  I'm going to object
22   to that question.  It calls for the content
23   of communications between the attorney --
24   Mr. Fuller's attorney or the State Assembly's
25   attorney and the State Assembly's chief

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 34

1    clerk.  So to the extent that that question
2    calls for the content -- requires the answer
3    the content of communication -- I think that
4    the way the question is formed it does -- I
5    am going to object and instruct the witness
6    not to answer.  If you want to try the
7    question again to make sure that you're not
8    asking for content, I can --
9        MS. HARLESS:  I'm not asking for
10   content.
11 Q  I'm just asking:  Were you given instructions at
12   all on how to comply with these document
13   production requests, yes or no?
14 A  Yes.
15 Q  And who gave you those instructions?
16 A  My Assembly attorneys.
17 Q  Were they written instructions or were they given
18   to you orally?
19 A  Orally.
20 Q  And who -- did you show the subpoena itself to
21   anyone in your office?
22 A  No.
23 Q  And you said you did a search of electronic files
24   and paper files; correct?
25 A  That's correct.

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 35

1 Q  How did you do the search of paper files?
2 A  Paper files were done on anything dealing with
3    Senate Bill 148 or Act -- Assembly Act 43.
4 Q  I want to understand a little bit better how you
5    did the search.  Did you manually search through
6    papers?
7 A  Yes.
8 Q  Where are those papers kept?
9 A  They're kept in the Assembly chief clerk's office.
10 Q  Are there any other paper files that you searched
11   through?
12 A  I don't understand the question.
13 Q  Besides the paper files kept in your office, are
14   there any other paper files that you looked
15   through?
16 A  No.
17 Q  What about your office manager?
18 A  Office manager, yes.  She has paper copies.  When
19   you answered -- when you asked the question in my
20   office, the office manager is my -- part of my
21   office.
22 Q  Earlier you told me that you did an electronic and
23   paper search and that your office manager did an
24   electronic and paper search.
25 A  That's correct.

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 36

1 Q  So did your office manager search the same paper
2    files as you?
3 A  She searched the paper files that she has.
4 Q  Okay.  And those are contained within your office?
5 A  Yes.
6 Q  And what files did you search for the electronic
7    search?
8 A  If I'm -- correct me if I'm wrong.  What do you
9    mean, email?
10 Q  You told me earlier that you did an electronic
11   search.
12 A  That's correct.
13 Q  I'm just trying to understand what that electronic
14   search was.
15 A  Electronic search is of, once again, any documents
16   related to Wisconsin Act 43, mainly emails we
17   would receive -- would have received regarding
18   Act 43 or open records requests.
19 Q  Did you look through any of the individual
20   Assembly members' files?
21 A  No.
22 Q  As chief clerk of the Assembly, do you have access
23   to individual member's documents?
24 A  No.
25 Q  Do you have access to the files of individual

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 37

1      member's offices?
2   A  No.
3   Q  Could you access individual member's documents or
4      files?
5   A  No.
6   Q  Sitting here today, do you know whether any
7      individual member of the Assembly has any
8      documents responsive to any of these document
9      requests?
10  A  I couldn't tell you that one way or the other.
11  Q  Do you know whether any individual Assembly
12     member's offices have any documents responsive to
13     any of these document requests?
14  A  I don't know.
15  Q  Does your office -- you said your office played
16     some role with open records requests; correct?
17  A  Correct.
18  Q  What is that role?
19  A  All open records come through the clerk's office
20     for processing only.  Individual offices cannot
21     accept money for open records requests, so it
22     comes through the clerk's office.
23  Q  What does processing entail?
24  A  Processing is if an individual requests an open
25     records request, then that office sends it over to

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 38

1      us in paper copies by the policy 15 cents per page
2      if they want to pay for them, or they can come to
3      the office and review them and take whatever
4      they -- they would like as far as the open records
5      request goes.
6   Q  Does your office search through individual
7      member's files to respond to open records
8      requests?
9   A  No.
10  Q  Does your office prepare responses to open records
11     requests?
12  A  The only response we would say -- that we would
13     respond to an open records request, that the
14     open -- your open records request is ready for
15     pickup and this is the cost.  We do an invoice
16     form.
17  Q  Does your office do anything else relating to open
18     records request that you can think of?
19  A  No, not that I can think of.
20  Q  As chief clerk of the Assembly, do you maintain
21     custody of all of the Assembly records?
22  A  The official records of the Assembly, we maintain
23     about 99 percent of the Assembly records.
24  Q  Who maintains the other 1 percent that you don't
25     maintain custody of?

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 39

1   A  Most likely offices, because each office is their
2      own custodian of their own records.  And our H.R.
3      Department, which is part of legislative human
4      resources, maintains personnel files of all
5      members of the Assembly.
6   Q  So are the files that you maintain custody over
7      electronic files?
8   A  Electronic files as it deals with my office,
9      per diem in district miles, travel as an example,
10     Assembly rules.
11  Q  What about the Assembly Journal online?
12  A  Assembly Journal, we're responsible for that, the
13     official record and the Assembly policy manual.
14     That's online and we maintain that also.
15  Q  Does any other state office maintain custody of
16     Assembly records?
17  A  No.  The Assembly is the -- is the official
18     record.  We maintain all the records for the
19     Assembly.  And one of those is the official
20     record, that being the Journal.
21  Q  Does any other state office maintain custody of
22     individual member's records?
23  A  No.  Each representative is a custodian of his own
24     records.  They maintain them themselves.  The only
25     other records that are maintained are by our Human

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 40

1      Resource Department which supports the
2      legislature.
3   Q  Does the Legislative Technology Services Bureau
4      maintain any kind of records for individual
5      Assembly members?
6   A  Not individual Assembly members, other than the
7      inventory of computers and electronic equipment
8      assigned to each office.
9   Q  Were you involved in any document collection or
10     production in the Baldus litigation?
11  A  No.  No -- no documents were required from the
12     clerk's office.
13  Q  Have you ever seen any of the documents contained
14     on the nine legislative hard drives turned over by
15     the legislature in the Baldus litigation?
16  A  No.
17  Q  Now let's go through these document production
18     requests individually.  So the first request in
19     Exhibit 1-B asks for "All documents, including but
20     not limited to email, concerning any analyses,
21     data, plans, procedures, memos, and/or reports
22     used by state legislative staff -- state
23     legislators and/or any consultants or experts in
24     the planning, development, negotiation, drawing,
25     revision, or redrawing of the maps codified in

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

1    **2011 Wisconsin Act 43 or any other potential State**
2    **Assembly plan that was not adopted."**
3         MR. ST. JOHN: I'm just going to
4    restate my objection here that the response
5    to document productions is not one of the
6    topic -- not one of the noticed 30(b)(6)
7    topics. The deponent is under no obligation
8    to prepare a response on behalf of the
9    Assembly for how documents were gathered. I
10   am not instructing him not to answer. He's
11   free to answer on his personal knowledge.
12        With counsel's acceptance, I'd like an
13   acknowledgment that this standing objection
14   can be made to all of your questions that
15   relate to Exhibit B, that he's providing
16   testimony in his -- on his personal knowledge
17   about those topics.
18        MS. HARLESS: Sure. You can make
19   that standing objection.
20        MR. ST. JOHN: Do I have your
21   agreement that I don't have to interrupt
22   every single question that relates to this?
23        MS. HARLESS: Yes. I'd appreciate
24   that.
25        MR. ST. JOHN: Thank you.

1         MS. HARLESS: Thank you.
2    By Ms. Harless:
3  Q  **Did you search for any documents that meet this**
4    **request?**
5  A  Yes.
6  Q  **Did anyone help you search for documents that meet**
7    **this request?**
8  A  My -- I had my office manager go through her
9    electronic files and her paper copies.
10 Q  **How did you go about searching for documents that**
11   **were responsive to the subpoena?**
12 A  We did an email search and we did a paper search,
13   specifically by the -- by Act 43 or Assembly
14   Bill 148.
15 Q  **Are those the search terms you used?**
16 A  Yes. On the specific one, yes.
17 Q  **And did you produce any documents that met this**
18   **request to your attorney?**
19 A  No.
20 Q  **So sitting here today, do you know if any**
21   **individual member of the Assembly has any**
22   **documents that may be responsive to this request?**
23 A  I don't know if any legislator or staff member
24   representative have any information whatsoever.
25   The only thing I have is the bill -- the Journal,

1    the official -- official Journal for Wisconsin
2    Act 43 and the bill history.
3  Q  **So you also don't know if any individual member's**
4    **offices have any documents that may be responsive**
5    **to this request?**
6  A  No.
7  Q  **Let's move on to Request No. 2. I'll give you a**
8    **second to read that. And did you search for**
9    **documents that meet this request?**
10 A  Yes.
11 Q  **What did you do to search for those documents?**
12 A  Once again, I had my -- myself, I did an email
13   search of all my files, electronic search and
14   paper search, as well as I had my office manager
15   do the same thing. Mainly this would come up on
16   open records requests.
17 Q  **And were there any particular search terms that**
18   **you used to look for those documents?**
19 A  Wisconsin Act 43, Senate Bill 148.
20 Q  **Anything else?**
21 A  That's it. Once we come back, on No. 2 is the
22   Assembly Journal would come up and the bill
23   history for Senate Bill 148 or Wisconsin Act 43.
24 Q  **Did you produce any documents that met this**
25   **request to your attorney?**

1  A  No. He had already received the -- the bill
2    history and the Journal.
3  Q  **From you?**
4  A  He also went online and picked it up, but I gave
5    him an extra copy.
6  Q  **Do you know if any individual member of the**
7    **Assembly has any documents that might be**
8    **responsive to this request?**
9  A  No. I have no idea what each legislator or their
10   staff has.
11 Q  **What about any individual member's offices?**
12 A  That's the same thing. I wouldn't know what's in
13   their offices. It's not a requirement of the
14   Assembly to know that.
15 Q  **Besides the hard drives or the documents produced**
16   **in the Baldus litigation, are you aware of any**
17   **other documents in the Assembly's possession,**
18   **custody, or control that relate to the motives of**
19   **state lawmakers in the drawing of Act 43?**
20 A  No.
21        MR. ST. JOHN: I'm going to object
22   to form. You can answer the question.
23 A  No.
24 Q  **Let's turn back to Exhibit 1-B and turn to Topic**
25   **No. 3. Topic 3 requests "All documents, including**

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 45

1    but not limited to email, concerning the objective
2    facts that legislative staff and/or any experts or
3    consultants referenced, used or relied upon or had
4    available to them in the planning, development,
5    negotiation, drawing, revision, or redrawing of
6    the maps codified in 2011 Wisconsin Act 43 or any
7    other potential State Assembly plan that was not
8    adopted."
9        Did you search for documents that meet this
10   request?
11 A  Yes.
12 Q  And did anyone help you search for documents that
13   meet this request?
14 A  My office manager.
15 Q  For all of these document requests, did you search
16   for documents along with your office manager?
17 A  Office manager and I had the journal clerk.
18 Q  Which of these topics did the journal clerk also
19   search for?
20 A  I had the journal clerk check for any executive
21   branch reports that are required by the
22   legislature, and none of those turned up regarding
23   Act 43.
24 Q  For each of these topics or only for some of them?
25 A  I had her do a broad search.  I didn't have her go

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 46

1    down to each one of these.  I gave her a wide
2    search parameter and I had her search, and nothing
3    came up.
4 Q  And did you do anything different than what you've
5    told me you've done for the other topics --
6 A  No.
7 Q  -- in searching for documents?  And did you
8    produce any documents that met this request to
9    your attorney?
10 A  Not that I recall.  I don't think I -- No. 3, I
11   didn't produce any -- any documents for No. 3.
12   None were available.
13 Q  Are you aware of any other documents in the
14   Assembly's possession, custody or control that
15   relate to the objective facts considered by
16   legislative staff in the drawing of Act 43?
17 A  The Assembly does not have any information on what
18   individual offices or legislative staff have in
19   their possession.  But the Assembly does not have
20   any other documents.
21 Q  All right.  So let's look at the next one which is
22   No. 4.  That request asks for "Any and all
23   requests that you, your office, or anyone employed
24   by you or your office received to provide to the
25   requesting person or to release to the public a

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 47

1    copy of any engagement letter, contract,
2    agreement, or other document reflecting the
3    Wisconsin State Assembly's retention or engagement
4    of Bartlit Beck LLP to serve as its legal counsel
5    in Whitford versus Gill, Case No. 15-cv-421-jdp
6    pending in the U.S. District Court for the Western
7    District of Wisconsin."
8        Did you search for documents that meet this
9    request?
10 A  Yes.
11 Q  And did your office manager help you?
12 A  Yes.
13 Q  What did you do to search for documents that meet
14   this request?
15 A  Once again, we did an electronics -- electronic
16   search and paper search.
17 Q  And did you produce any documents that meet this
18   request to your attorney?
19 A  Yes.
20 Q  Do you know if your attorney produced any
21   documents responsive to this request to
22   plaintiffs' counsel?
23 A  I have no idea what my attorney produced.
24 Q  As chief clerk to the Assembly, were you involved
25   in any way with any requests asking for a copy of

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 48

1    the Assembly's engagement letter with the law firm
2    Bartlit Beck?
3 A  Yes.
4 Q  How?
5 A  On an open records request.
6 Q  And what -- what was your role in that open
7    records request?
8 A  To provide the contract to the requesting party
9    and any funds -- funds that were expended to pay
10   for the attorneys.
11 Q  The open records request asked about the funds
12   expended to pay for the attorneys?
13 A  Yes.
14 Q  And you had to give them a number?
15 A  Yes.
16 Q  Who was the requesting party?
17 A  A number of press -- press outlets.  I think there
18   were three or four of them.  I can't name them
19   all -- I think the Wisconsin State Journal was one
20   of them, and some private citizens that I don't
21   recall their names.  There were about six or seven
22   requests for the contract and the funds expended
23   to pay for those -- for those attorneys.
24 Q  Are any of those responses available publicly?
25 A  I don't understand what you mean.  If you want an

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 49

1     open records request, I can give that to you.
2  Q  Well, we asked for the open records requests as
3     part of this document production request.
4            MR. ST. JOHN:  Counsel, is there a
5     question?  Objection.  Form.
6            MS. HARLESS:  Yeah, I had asked a
7     question.
8  Q  So are the responses that the Assembly produced in
9     response to these open records requests publicly
10    available?
11           MR. ST. JOHN:  Can you please
12    repeat the question.
13          (Question read)
14           MR. ST. JOHN:  Objection.  Form.
15          The question --
16  Q  Do you understand the question?
17  A  No, I don't understand it.
18  Q  Did the Assembly respond to any of these open
19    records requests?
20  A  Yes.
21  Q  Are those responses publicly available?
22  A  They were available to the requester.  We provided
23    them to the requester.
24  Q  Does the Assembly post those responses online
25    anywhere?

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 50

1  A  No.
2  Q  So if I wanted to get a copy of those responses,
3     how would I get one?
4  A  You just send an email to me or request them for
5     me, and I would give them to you.
6  Q  And as chief clerk of the Assembly, was your
7     office involved in any way in the process of
8     retaining Bartlit Beck to represent the Assembly
9     in this litigation?
10  A  No.
11  Q  Let's turn to the next document request, which is
12    Request No. 5.  Request 5 asks for "Copies of
13    any and all documents that you, your office, or
14    anyone employed by you or your office provided to
15    the requesting person or released to the public in
16    response to any requests identified in paragraph 4
17    above."
18        I think we've covered this, but do you have
19    anything else to add about this document
20    production request?
21  A  No.
22  Q  What exactly was your involvement in responding to
23    any requests asking for a copy of the Assembly's
24    engagement letter?
25  A  What I recall is one of the news -- news outlet

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 51

1     asked -- initially asked for the contract, and my
2     initial response is I didn't have the contract.
3     And then I want to say ten days later, last part
4     of December, first part of July (sic), I received
5     the contract and a number of news agencies,
6     reporters requested it, and I provided it to them.
7  Q  Who did you receive the contract from?
8  A  I want to say Patrick Marley was one of them.
9  Q  Who did you receive a copy of the contract itself
10    from?
11  A  I received a copy of the contract from the
12    speaker's office.
13  Q  But before you got that copy from the speaker's
14    office, you didn't have one?
15  A  That's correct.
16  Q  Had you ever gotten any kind of invoice to pay in
17    relation to Bartlit Beck?
18  A  Yes.
19  Q  But you'd never seen the contract?
20  A  That's correct.
21  Q  So let's look at document production Request
22    No. 6.  This asks for "Copies of any and all
23    documents prepared by or transmitted by the
24    Republican National Committee, that relate or
25    refer to legislative redistricting, including but

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 52

1     not limited to the document attached hereto as
2     Exhibit 1."
3         Did you search for documents that met this
4     request?
5  A  Yes.
6  Q  With your office manager?
7  A  Yes.
8  Q  Did you use any particular search terms?
9  A  Republican National Committee, redistricting,
10    Senate Bill 148, Wisconsin Act 43.
11  Q  And did you produce any documents to your attorney
12    in relation to this request?
13  A  I'm not sure specifically on this one.  If any
14    documents came about, it was on an open records
15    request, somebody that my office was CC'd on.  But
16    as far as a document specifically regarding
17    redistricting and -- it was just an email that the
18    Assembly received from one of the offices.
19  Q  Does the Assembly have a policy on retaining open
20    records requests?
21           MR. ST. JOHN:  This is a slightly
22    different question than requesting for how
23    the document requests were responded to.  So
24    I'm just going to restate my scope of topic
25    objection to this last question which was

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 53

1     about policy for open records requests.  The
2     witness is not under a duty to prepare to
3     testify on behalf of the Assembly about the
4     Assembly's policies as they relate to open
5     records requests.
6         But to the extent that he knows in his
7     individual capacity what that is, go ahead
8     and answer the question.
9  Q  Do you know what the Assembly's policy is on
10    retaining open records requests?
11 A  The Assembly under Statute 16.61 (2)(b) is not
12    required to maintain any records on open requests
13    records.  If the information is available, we will
14    provide it.  Same thing with offices, the policy
15    is for the Assembly.  If an office receives an
16    open records request, they will gather the
17    information.  They will first acknowledge that
18    they have it.  They will gather information.  They
19    will send it to the chief clerk's office for
20    processing.  And if we have to receive any funds
21    for that open records request, we let the
22    requester know it's available for pickup.  They
23    can either pay for it or they can come and review
24    it and take what documents they want from the
25    request.

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 54

1  Q  You mentioned earlier that you produced a document
2     that was an open records request to us; right?
3  A  The question again?
4  Q  You mentioned earlier that you produced an open
5     records request document to us in relation to
6     these document production requests?
7  A  Yes.
8  Q  Why did you still have a copy of that?
9  A  The office manager had a copy of it.  It was part
10    of an invoice.
11 Q  Does your office maintain all invoices?
12 A  We maintain all invoices for the session.  After
13    the two-year session all those invoices are -- I
14    don't want to say destroyed, but we don't retain
15    them.
16 Q  Do you remember the date of the document that you
17    provided us with?
18 A  No, I don't remember the date.
19 Q  Do you know whether any individual Assembly
20    members have documents responsive to document
21    production Request No. 6?
22 A  No, I don't know if the offices have that.
23 Q  Do you know whether individual Assembly member's
24    office have any documents responsive to document
25    request --

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 55

1  A  I don't know.  The Assembly has no idea what
2     individual offices have or don't have.
3         THE WITNESS:  Before we go any
4     further, can we take a break to get a drink
5     of water?
6         MS. HARLESS:  Sure.
7         THE VIDEOGRAPHER:  Going off the
8     record at 10 o'clock.  Microphones are off.
9         (Recess)
10        THE VIDEOGRAPHER:  And we're back
11    on the record at 10:09.
12 By Ms. Harless:
13 Q  So before we took a break we were talking about
14    document production Request No. 6.  And I'd like
15    you to turn to the last page of Exhibit 1 that you
16    have in front of you.  And that is Exhibit 1 to
17    Exhibit B.  That was attached to the document
18    production request.  Do you see that document?
19 A  Page 2; is that correct?  At the top?
20 Q  Yes.
21 A  Yes.
22 Q  Have you seen this document before?
23 A  I can't say that I have.  I know I didn't produce
24    it.
25 Q  That's correct.  Do you know if you saw it

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 56

1     attached to the subpoena?
2  A  Oh, yes, yes.  Attached to the subpoena, correct.
3  Q  Okay.  Before you received this document with the
4     subpoena, had you ever seen this document before?
5  A  No.
6  Q  Are you aware of any similar documents that are in
7     the Assembly's possession, custody, or control?
8  A  No.
9  Q  As chief clerk of the Assembly, were you ever
10    involved in any conversations with the Republican
11    National Committee about redistricting?
12 A  No.
13 Q  Looking at Exhibit 1 to Exhibit B, there's a
14    section of this document titled Roman numeral III,
15    Legal Preparations.  Do you see that section?
16 A  Yes.
17 Q  I'd like to direct you to bullet B which is the
18    following: "Litigation is expensive.  Will
19    litigation be paid for using public or private
20    sources, or both?"
21        Have you ever had any conversations with any
22    member of the Assembly about the use of public
23    funds to pay for litigation over Act 43?
24 A  Yes.  We received a contract.
25 Q  Have you ever had any conversations with anyone?

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 57

1  A  Other than being told this is what the contract's
2     going to be and we will pay -- we will pay the
3     contract.
4  Q  And who told you that?
5  A  If I'm not mistaken, it was
6     Representative Fitzgerald's office who was the
7     speaker at that time.
8  Q  So you're referring to Jeff Fitzgerald?
9  A  Representative Fitzgerald who was in the Assembly.
10    I think it's -- I think it was Jeff.  He was the
11    speaker at the time.
12 Q  When did -- do you remember when he gave you a
13    copy of the contract?
14 A  I don't remember.
15 Q  And he -- did you have any other conversations
16    with him about how the contract would be paid for?
17 A  If I remember correctly, it was paid on a monthly
18    basis.  I think we paid -- I think the Assembly
19    paid -- I don't remember -- we didn't pay a large
20    amount of money, if I can remember correctly, as
21    compared -- when I compare it to the previous
22    redistricting of 2001.  It was minimal as far as I
23    was concerned, less than a million dollars -- less
24    than a half a million dollars if I'm not mistaken.
25    I want to say $200,000 I think the Assembly paid.

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 58

1  Q  Uh-huh.  Have you ever had any other conversations
2     with any member of the Assembly about the use of
3     public funds to pay for litigation over Act 43?
4  A  No.
5  Q  Not about this current case, Whitford v. Gill?
6  A  I get the -- repeat that question again.
7  Q  Have you ever had any conversations with any
8     member of the Assembly about the use of public
9     funds to pay for litigation over Act 43?
10 A  When the invoices come in, they go to the
11    speakers's office.  They review them.  They're
12    sent down to me to pay them.
13 Q  And have you had conversations with the speaker's
14    office about paying those invoices?
15 A  The only information I would get is by email from
16    the speaker's attorney that these are good and go
17    ahead and pay, pay our half, the Assembly's half
18    of the legal bills.
19 Q  Have you ever had any conversations with anyone at
20    the Republican National Committee about the use of
21    public funds to pay for litigation over Act 43?
22 A  No, no.
23 Q  And have you ever had any conversations with any
24    member of the Assembly about the use of private
25    funds to pay for litigation over Act 43?

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 59

1  A  No.
2  Q  What about any conversations with anyone at the
3     Republican National Committee about private funds
4     to pay for litigation over Act 43?
5        MR. ST. JOHN:  Object form.
6  Q  Do you understand the question?
7  A  Yes.  No.
8  Q  Now further down on this document we're looking
9     at, which is the very last page, Exhibit 1 to
10    Exhibit B, the last page of this exhibit, further
11    down in that document there's a section with the
12    header Roman numeral IV, Training.  Do you see
13    that section?
14 A  Yes.
15 Q  And subbullet "a" says "The RNC can train you on
16    the use of the Maptitude for Redistricting, but
17    you will need to pay the travel expenses to come
18    to Washington, D.C."
19       Do you know if public funds were used to pay
20    for any individual Assembly member to travel to
21    Washington, D.C., to be trained by the RNC to use
22    redistricting software?
23 A  So the question is for 2010?
24 Q  Yes.
25 A  No.  The Assembly did not pay for anybody to go to

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 60

1     Washington, D.C.
2  Q  What about any other years?
3  A  We sent one individual from the speaker's office
4     to Washington, D.C., for litigation in this case,
5     and I want to say it was in 2018.
6  Q  Why was an individual sent from the speaker's
7     office to Washington, D.C.?
8  A  It was to -- to watch the litigation regarding
9     this case.
10 Q  Was that Adam Foltz?
11 A  No.  Adam Foltz is not a member of the Assembly.
12 Q  Who was the --
13 A  It was Steve Fawcett.
14 Q  But specifically, do you know of any individual
15    Assembly member who has traveled to
16    Washington, D.C., to be trained to use
17    redistricting software?
18 A  No.  The Assembly has not sent anybody that the
19    Assembly paid for.
20 Q  So below that, bullet "b" says "CDs with the
21    training materials from the April 2010 RNC's GOP
22    Redistricting Conference are available on
23    request."
24       Do you know if the Assembly used public funds
25    to pay for such a CD?

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 61

1  A  No.
2  Q  You don't know?
3  A  No, we didn't pay for any, that I know of.
4  Q  But you don't know if any individual member paid
5     for such a CD?
6        MR. ST. JOHN: Object. Form.
7  Q  Do you know if any individual member paid for a
8     CD?
9  A  Used state funds? Used state funds for this?
10 Q  Yes.
11 A  No, I do not know.
12 Q  And then the last bullet point under the heading
13    Training says "If you have questions, please call
14    us at the RNC. That's what we're here for."
15       Underneath that five individuals and their
16    contacts are listed; correct?
17 A  Correct.
18 Q  Do you know any of the individuals listed here?
19 A  I don't know them personally, but I know that they
20    came up on an open records request.
21 Q  Have you ever had any conversations with any of
22    the individuals listed here?
23 A  No.
24 Q  And do you know of any individual member of the
25    Assembly who has had conversations with any of the

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 62

1     people listed here?
2  A  No. The Assembly would not know what goes on in
3     individual legislator's offices.
4  Q  And when you say you know they came up on an open
5     records request, is that the document that you
6     produced to us?
7  A  I don't know what was produced to you, but it's
8     what I produced to my attorneys.
9  Q  Okay. So let's flip back to Exhibit B which is
10    the document production request, and let's look at
11    No. 7. And this request asks for "Copies of any
12    and all communications, including email, that
13    relate or refer to legislative redistricting,
14    reflecting or referring to any of the following
15    people or email addresses." And these are the
16    same people that are listed on the back page,
17    Exhibit 1; right? Exhibit 1 to Exhibit B?
18 A  On No. 7, I have A, B, C, D, and E. Those
19    individuals? Yeah.
20 Q  Yes. Those individuals are the same individuals
21    listed at the bottom of the page you're
22    currently --
23 A  On page 2?
24 Q  Yes.
25 A  Yes.

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 63

1  Q  Did you search for documents that met this
2     request?
3  A  Yes.
4  Q  How did you search for documents that met this
5     request?
6  A  I used every individual's name here, A, B, C, D,
7     and E, and searched if we had any records relating
8     to these individuals, both paper and electronic.
9  Q  And what files -- I know you did a paper and
10    electronic search, but what files specifically did
11    you search?
12 A  Open records -- our open records file.
13 Q  And did you produce any open records requests that
14    used those names to your attorneys?
15 A  Yes.
16 Q  And do you know if those documents were produced
17    to plaintiffs' attorney?
18 A  I don't know if they were produced or given to --
19    given to you.
20 Q  Okay. Has the Assembly ever paid an invoice to
21    any of the individuals listed on that back page?
22 A  No.
23 Q  Sitting here today, do you know if any individual
24    member of the Assembly has any communications
25    referring to redistricting that also include any

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 64

1     of the individual names listed?
2  A  No.
3  Q  What about any individual member's staff?
4  A  I don't know what the staff --
5        MR. ST. JOHN: Object to form.
6  A  The Assembly has no knowledge of what individual
7     legislative staff have communicated with or what
8     they do in their offices, to include legislators.
9        MS. HARLESS: All right. I'd like
10    to mark an exhibit. We'll come back to this.
11       MR. ST. JOHN: Do you want to go
12    off the record?
13       MR. POLAND: Yes, let's go off the
14    record.
15       (Discussion off the record.)
16       MS. HARLESS: We can go back on the
17    record.
18 By Ms. Harless:
19 Q  Let's move on to document request No. 8, which
20    asks for "Any and all materials reflecting or
21    relating or referring to the April 2010 Republican
22    National Committee's GOP Redistricting Conference,
23    including any and all notes, summaries, minutes,
24    agendas, papers, documents, data, computer files,
25    CDs, training materials, or any other written or

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 65

1    electronic material prepared for, distributed at,
2    created at, or otherwise related to that
3    conference."
4          Did you search for documents that met this
5    request?
6  A  Yes.
7  Q  What did you do to search for documents that met
8    this request?
9  A  We did an electronic search and a paper search, my
10   office manager and I, Republican National
11   Conference, GOP, redistricting conference. Those
12   are the main search -- search names that we did.
13   And we received -- we don't think we had anything
14   if I'm not mistaken.
15 Q  And you looked through electronic files and paper
16   files?
17 A  Yes.
18 Q  And you don't think you produced any documents to
19   your attorney?
20 A  I don't believe we -- we produced any documents.
21   There may have been one or two email, I don't
22   remember, with GOP, GOP redistricting or
23   Republican National Committee. And I don't
24   remember specifically.
25 Q  Do you know if any individual member of the

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 66

1    Assembly has any documents responsive to document
2    request No. 8?
3  A  No.
4  Q  Do you know if any individual member's offices may
5    have any documents responsive to document request
6    No. 8?
7  A  No.
8  Q  All right. Let's go to No. 9. This asks for "Any
9    and all documents reflecting or relating or
10   referring to the Redistricting Majority Project,
11   commonly referred to as REDMAP."
12         Did you search for documents that met this
13   request?
14 A  Yes.
15 Q  What did you do to search for documents?
16 A  Did electronic and paper. My office manager and
17   myself.
18 Q  Any particular search terms that you used?
19 A  Specifically REDMAP.
20 Q  And did you produce any documents responsive to
21   this request to your attorney?
22 A  I do remember this specifically. We had one email
23   on an open records request that went to Nick --
24   Nick Probst.
25 Q  Okay. And we'll come back to that because that's

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 67

1    the document we need to reprint.
2  A  Okay.
3  Q  So we'll talk about it later.
4          Do you know if any individual member of the
5    Assembly has files that might be responsive to
6    document request No. 9?
7  A  No.
8  Q  What about, do you know if any individual member's
9    offices have documents responsive to document
10   request No. 9?
11 A  No.
12 Q  All right. Let's go to No. 10. No. 10 asks for
13   "Any and all documents reflecting or relating or
14   referring to meetings, communications, or
15   conversations from 2002 to the present regarding
16   or relating to recruiting Republican candidates
17   for the Wisconsin State Assembly."
18         Did you search for documents that met this
19   request?
20 A  Yes, but it's -- we would have nothing on
21   Republican -- recruiting Republican candidates
22   because it's against Assembly policy to do any of
23   that. It's considered campaign activity. And
24   it's part of the JCLO Rule of 11 October 2001 that
25   it's prohibited under the Assembly rules.

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 68

1  Q  But you searched -- you looked through your
2    documents anyway?
3  A  Yes.
4  Q  And did you find anything that was responsive?
5  A  No.
6  Q  Do you know who would have documents responsive to
7    this request?
8  A  No. I'm not going to speculate who would have
9    documents on this.
10 Q  Do you know if the Wisconsin Republican Assembly
11   Campaign Committee would have documents responsive
12   to this request?
13 A  Once again, I don't know what the Republican
14   committee has. I don't want to speculate. I
15   don't know one way or the other.
16 Q  Would Speaker Vos have documents responsive to
17   this request?
18 A  Once again I don't know what Speaker Vos has in
19   his office, what his staff -- staff have.
20 Q  So let's move to request No. 11. Did you search
21   for documents that met this request?
22 A  Yes.
23 Q  And did anyone help you search for documents
24   relating to this request?
25 A  My office manager.

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 69

1  Q  And did you search electronic and paper files?
2  A  Yes.  Yes, electronic and paper files.
3  Q  And did you use any particular search terms?
4  A  Yes.  RPW specifically, Republican candidate.
5  Q  And did you find any documents that were
6      responsive to this request?
7  A  No, I don't believe we found any documents.
8  Q  Do you know who would have documents responsive to
9      this request?
10 A  Once again, I'm not going to speculate.  No, I
11     don't.
12 Q  Would the Republican party of Wisconsin have
13     documents responsive to this request?
14 A  I'm not sure what the Republican party has.  It's
15     not part of the Assembly.
16 Q  Would Speaker Vos have documents responsive to
17     this request?
18 A  Once again, I don't know what Speaker Vos would
19     have in his office.  His -- his documents are not
20     part of the Assembly's documents.  They're part of
21     Representative Vos's office documents.
22 Q  All right.  Let's move to No. 12.  Did you search
23     for documents that met this request?
24 A  Yes.
25 Q  Did you do anything different to search for

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 70

1      documents under this request than any of the
2      others?
3  A  No, same.
4  Q  Did you use any different search terms?
5  A  Yes.
6  Q  What search terms did you use?
7  A  We used "volunteer."
8  Q  And did you find any documents that were
9      responsive to this request?
10 A  No.
11 Q  And do you know who would have documents
12     responsive to this request?
13 A  No, I would not.
14 Q  Would Speaker Vos have documents responsive to
15     this request?
16 A  Once again, I don't know what Representative --
17     what Speaker Vos has in his office, what documents
18     he retains.
19 Q  Let's move to request No. 13.  This request asks
20     for "Any and all documents reflecting or relating
21     or referring to voter registration activities that
22     were coordinated, arranged, carried out, or funded
23     by the RPW or Wisconsin State Assembly Campaign
24     Committee from 2002 to the present."
25         Did you search for documents that met this

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 71

1      request?
2  A  Yes.
3  Q  With your office manager?
4  A  With the office manager, yes.
5  Q  And did you do paper and electronic file search?
6  A  Yes.
7  Q  And did you use any particular search terms?
8  A  "Voter registration" and "WRACC."
9  Q  Did you find any documents that were responsive to
10     this request?
11 A  No.
12 Q  Do you know who would have documents responsive to
13     this request?
14 A  No.
15 Q  Would Speaker Vos have any documents responsive to
16     this request?
17 A  Once again, I don't know what Speaker Vos has in
18     his office.  It's not part of the Assembly's
19     requirement to maintain or know what Speaker Vos
20     has in his office.
21 Q  All right.  Let's move to No. 14.  Did you search
22     for documents that met this request?
23 A  Yes.
24 Q  Did you do anything different to search for
25     documents under this request than any of the

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 72

1      others?
2  A  No.  Both paper and electronic.
3  Q  And what search terms did you use?
4  A  We used "Republican Assembly Caucus, RPW."  Those
5      were the main terms that we used.
6  Q  Okay.  And did you produce any documents to your
7      attorney in relation to this request?
8  A  No.
9  Q  Do you know who would have documents responsive to
10     this request?
11 A  No, I would not.
12 Q  Would Speaker Vos have documents responsive to
13     this request?
14 A  Once again, I don't know what Speaker Vos has.
15 Q  All right.  Let's look at the last one, No. 15.
16     Did you search for documents that met this
17     request?
18 A  Yes.
19 Q  Did you do anything different to search for
20     documents under this request than any of the other
21     requests?
22 A  No, other than having the journal clerk do a
23     search on Act 43 as the records clerk also.
24 Q  And did you use any specific search terms?
25 A  We used "Act 43, communications."  Those were the

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 73

1     two big ones, and "districts."

2  Q  Did the journal clerk use the same search terms?

3  A  Yes.

4  Q  Did the records clerk use the same search terms?

5  A  Yes.

6  Q  And did you produce any documents to your attorney

7     in relation to this request?

8  A  The only record came from the -- actually from the

9     journal clerk and the records clerk.  And what

10    came up with the search term is "district" came

11    up, the actual -- actual bill.

12 Q  Do you know who would have any documents

13    responsive to this request?

14 A  No.

15 Q  Would Speaker Vos have any documents responsive to

16    this request?

17 A  I don't know what Speaker Vos has.

18 Q  Are you aware of any other documents in the

19    Assembly's possession, custody or control that

20    relate to the Act 43 redistricting process in any

21    way that we've not discussed today?

22 A  No.

23        MS. HARLESS:  All right.  I'm going

24    to mark an exhibit.

25        (Exhibit No. 2 marked for

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 74

1        identification)

2        MR. ST. JOHN:  Can I have the

3     witness look at the exhibit itself?  It's

4     probably the same document, but it's the one

5     that's stamped.

6  Q  So the court reporter just handed you a document

7     that was marked as Exhibit 2.  Have you seen this

8     document before?

9  A  Yes.

10 Q  Is this a true and complete copy of your responses

11    to plaintiffs' document production requests?

12        MR. ST. JOHN:  I'm going to also --

13    same objection.  The witness is not being

14    produced to testify as to the Wisconsin State

15    Assembly's document responses.  It's not one

16    of the noticed topics.  Obviously the witness

17    can testify as to his personal knowledge

18    about the response.

19 Q  As far as you are personally aware, is this a true

20    and complete copy of your responses to plaintiffs'

21    document production requests?

22 A  Yes.

23 Q  All right.  You can set that document to the side.

24    So let's go back to Exhibit 1 and we'll go to the

25    list of topics in Exhibit 1-A.  So we'll start

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 75

1     with Topic No. 1.  Can you read that topic into

2     the record, please.

3  A  You want me to read it?  Is that the question?

4  Q  Yes, please.

5  A  "The terms 'you' or 'your' refer to the" --

6  Q  No, I'm sorry, Topic No. 1 on page 2 of the --

7     just the next page.

8  A  Okay.  "The objectives and/or motivations for the

9     drawing of each district in 2011 Wisconsin Act 43

10    including earlier drafts."

11 Q  What do you understand the word "gerrymander" to

12    mean?

13 A  Gerrymandering, is that the question?

14 Q  Yes.

15 A  My definition of gerrymandering is a term that

16    reflects a certain party has drawn the lines to

17    their advantage.

18 Q  Do you think Act 43 is a gerrymander?

19 A  It's not for me to make that decision.

20 Q  Do you personally think Act 43 is a gerrymander?

21        MR. ST. JOHN:  If you would like to

22    pay for Mr. Fuller's opinion testimony, you

23    can write a check.  He can agree to take it

24    or not.  But this is a fact deposition.  He's

25    not an expert witness for us and he's not an

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 76

1     expert witness for you.

2        MS. HARLESS:  Well, he said -- I'm

3     not going to argue with you about it on the

4     record.

5  Q  But do you have an answer to that question, or no?

6  A  No.  I never sat down and really studied Act 43

7     and all the districts.

8  Q  Was County 43 motivated by partisan factors?

9  A  I don't know.  I don't know what the individual

10    representative's motives are.  It's not part of

11    the Assembly -- part of the Assembly what we need

12    to know, what we need to do as far as information

13    or documents.

14 Q  Do you have any understanding of what the term

15    "cracking" means in the context of legislative

16    redistricting?

17 A  No, I have no idea.

18 Q  Do you have any understanding of what the term

19    "packing" means in the context of legislative

20    redistricting?

21 A  What I've heard as packing is that a number of

22    like-minded individuals are put into one district.

23    They all vote one party or another.  That's what I

24    understand as packing means.

25 Q  All right.  So let's go through -- this topic says

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 77

1    "The objectives and/or motivations for the drawing
2    of each district in 2011 Wisconsin Act 43";
3    correct?
4  A  Is that No. 1?
5  Q  Yeah.
6  A  Yes.
7            MS. HARLESS: I'm going to
8       introduce another document. We're going to
9       mark it as Exhibit 3.
10
11           (Exhibit No. 3 marked for
12            identification)
13 Q  So I've handed you a document and it's marked as
14    Exhibit 3. Do you recognize this document?
15 A  No, not really unless it was in the actual bill.
16    And I never went through the actual Senate
17    Bill 148 to look at the whole contents of that
18    bill. So as far as seeing plan for District --
19    Assembly District 21, no.
20 Q  Okay. But you understand this to be a map of
21    Assembly District 21?
22 A  Yes.
23 Q  And do you know whether this document was created
24    by the Assembly?
25 A  No, I don't know if it was created by the

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 78

1    Assembly.
2  Q  Do you know whether some other state office
3     created this document?
4  A  If this document was in the Senate Bill 148, then
5     it came over to the Assembly on July 20th, 2011,
6     as part of the bill, the bill, with the bill
7     history.
8  Q  Do you know why this document was created?
9  A  Well, it's created because of Article IV Section 6
10    of the constitution as far as the legislature's
11    requirement to redistrict every ten years.
12 Q  So I'm going to represent to you that this
13    document was taken from an external hard drive
14    assigned to Adam Foltz in 2010 and the computer he
15    used for the drawing of the districts that would
16    become Act 43. And I'm also going to represent to
17    you that the metadata for this document shows that
18    the date of creation was June 18th, 2011. Do you
19    know what this document was used for?
20 A  It was used for redistricting.
21 Q  Does this document show the 2002 to 2010 version
22    of District 21 in a red outline?
23 A  I see red outline on there. I don't know what it
24    depicts.
25 Q  Okay. I'll represent to you that the red outline

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 79

1    is the district under the 2002 map, Assembly map,
2    and then the yellow shading is the proposed
3    district under Act 43.
4        Can you explain why the boundaries of
5     District 21 were changed from the red outline to
6     the yellow shading?
7  A  The Assembly would not know why they did that.
8     The Assembly has no knowledge of that. The
9     Assembly just has the bill when it came over from
10    the Senate -- when it was messaged to the Senate.
11    The Assembly is required to reapportion every ten
12    years. Why that was done, the Assembly would not
13    know.
14 Q  Do you know whether any district boundaries were
15    adopted in 2011 to ensure that a district would be
16    more likely to elect a Republican candidate than
17    the prior district?
18 A  No, unless it came over in the bill, Senate
19    Bill 148 when it was messaged from the Senate on
20    19 July 2011. We received it on the 19th and took
21    it up on the 20th of July 2011.
22 Q  Do you have any other information about the
23    motivation behind the drawing of Assembly
24    District 21?
25 A  No.

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 80

1  Q  All right. You can put that document to the side.
2            MS. HARLESS: I'm going to mark
3       another one.
4            (Exhibit No. 4 marked for
5             identification)
6  Q  I'm handing you a document that's been marked as
7     Exhibit 4. Do you recognize this document?
8  A  No, unless it was in the -- once again, I
9     don't, unless it was in the -- in the Senate
10    Bill 148, later Act 43. Once again, I never went
11    through the whole bill and looked at all the maps.
12    So no.
13 Q  Okay. Do you understand this to be a map of
14    Assembly District 22?
15 A  22? Yes.
16 Q  All right. So just like the previous document,
17    I'll represent to you that this is another
18    document that was taken from an external hard
19    drive assigned to Adam Foltz in 2010 in the
20    computer he used for drafting the districts that
21    would become Act 43. And just like the previous
22    document, it was created on June 18th, 2011.
23        Do you know what this document is used for?
24 A  It's used once again to meet the legislature's
25    requirement to redistrict, reapportion every ten

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 81

1    years.  And that's what this looks like.
2  Q  And just like the previous document, I'm going to
3    represent that the red outline is the Assembly
4    district in the 2002 map and then the yellow
5    shading is the Assembly district under Act 43.
6      Do you know why the boundaries of District 22
7    were changed from the red outline to the yellow
8    shading?
9  A  No.
10  Q  Do you have any other information about the
11    motivations behind the drawing of Assembly
12    District 22?
13  A  No.
14          (Exhibit No. 5 marked for
15            identification)
16  Q  The court reporter's marked this as Exhibit 5.  Do
17    you recognize this document?
18  A  No.  If you mean is this the first time I've ever
19    seen it?
20  Q  Yes.
21  A  Yes, this is the first time I've ever seen this
22    document.
23  Q  And do you -- do you understand it to be a map of
24    Assembly District 23?
25  A  Yes.

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 82

1  Q  And then again, just like the other documents, I'm
2    representing to you that this is a document that
3    was taken from an external hard drive assigned to
4    Adam Foltz in 2010, and the computer he used for
5    drafting the districts that would become Act 43.
6    And it was created on June 18th, 2011.  Do you
7    know what this document was used for?
8  A  It's for -- once again, it's for the legislature's
9    requirement under Article IV Section 6 of the
10    Wisconsin Constitution to redistrict every ten
11    years.
12  Q  And then do you understand the red outline to be
13    the previous Assembly district?
14  A  As what you mentioned previously that the red
15    outline is from what, 2002?
16  Q  Yeah, and the yellow shading is the proposed
17    Act 43 district.
18  A  Yes.
19  Q  Do you know why the boundaries of District 23 were
20    changed from the red outline to the yellow
21    shading?
22  A  No, I have no motive --I don't know what the
23    motivation of the individual doing this, no.
24  Q  I'm also going to represent to you that
25    Sandy Pasch represented the prior assembly

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 83

1    district in this area.  Do you know who
2    Sandy Pasch is?
3  A  Yes.
4  Q  Was she a Democratic member of the Assembly in
5    2011?
6  A  Yes.
7  Q  Do you know why Sandy Pasch was paired with
8    another incumbent in Assembly District 23 in
9    Act 43?
10  A  No idea.
11  Q  Do you have any other information about the
12    motivations behind the drawing of Assembly
13    District 23?
14  A  No.
15          (Exhibit No. 6 marked for
16            identification)
17  Q  I'm handing you a document that's been marked as
18    Exhibit 6.  Do you recognize this document?
19  A  This is the first time I've seen this document.
20  Q  Okay.  Do you understand it to be a map of
21    Assembly District 24?
22  A  Yes.
23  Q  And I'll represent to you again that this is
24    another document that was taken from an external
25    hard drive assigned to Adam Foltz in 2010 and the

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 84

1    computer he used for drafting the districts that
2    would become Act 43.  And I'll also represent to
3    you that the metadata shows the date of creation
4    of this document as June 18th, 2011.  And then
5    looking at this again, it's similar to the other
6    ones.  Do you understand the red outline to be the
7    boundaries of the 2002 Assembly District?
8  A  Yes, after you've explained it to me, yes.
9  Q  And the yellow shading is the proposed District 24
10    in Act 43?
11  A  Yes.
12  Q  Can you explain why the boundaries of District 24
13    were changed from the red outline to the yellow
14    shading?
15  A  No, other than it's the requirement of the
16    legislature to redistrict every ten years.  I
17    don't know what the motivation of the individual
18    that produced this.
19  Q  Do you have any other information about the
20    motivations behind the drawing of Assembly
21    District 24?
22  A  No.
23          (Exhibit No. 7 marked for
24            identification)
25  Q  I'm handing you Exhibit 7.  Do you recognize this

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 85

1   to be a map of Assembly District 26?
2 A   Yes.
3 Q   And I'll again represent to you that this document
4     was taken from an external hard drive assigned to
5     Adam Foltz in 2010, and I'm also representing to
6     you that the metadata shows the date of creation
7     of this document as June 18th, 2011.
8         And do you understand the red outline to be
9     the assembly district in the 2002 map?
10 A   Yes.
11 Q   And the yellow shading is the proposed Act 43
12     district for Assembly District 26?
13 A   Yes.
14 Q   Can you explain why the boundaries of District 26
15     were changed from the red outline to the yellow
16     shading?
17 A   No, I cannot.
18 Q   Do you have any other information about the
19     motivations behind the drawing of Assembly
20     District 26?
21 A   No.
22         (Exhibit No. 8 marked for
23         identification)
24 Q   I hope you like maps.  I'm handing you Exhibit 8.
25     And do you recognize this to be a picture of

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 86

1     Assembly District 29?
2 A   Yes.
3 Q   And I'll again represent to you that this was a
4     document that was taken from an external hard
5     drive assigned to Adam Foltz in 2010, and it was
6     created on June 18th, 2011.  Do you understand the
7     red outline to be the previous Assembly
8     district 29 under the 2002 map?
9 A   Yes.
10 Q   And the yellow shading is the proposed Assembly
11     District 29 under Act 43?
12 A   Yes.
13 Q   Can you explain why the boundaries of District 29
14     were changed from the red outline to the yellow
15     shading?
16 A   No, I cannot.
17 Q   And do you have any other information about the
18     motivations behind the drawing of Assembly
19     District 29?
20 A   No.
21         (Exhibit No. 9 marked for
22         identification)
23 Q   I'm handing you what the court reporter has marked
24     as Exhibit 9.  Do you recognize this be to be a
25     map of Assembly District 31?

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 87

1 A   Yes.
2 Q   And again, I'll represent to you that this
3     document was taken from an external hard drive
4     assigned to Adam Foltz in 2010 and 2011, and it
5     was created on June 18th, 2011.
6         Do you understand the red outline to be the
7     previous assembly district of District 31 under
8     the 2002 map?
9 A   Yes.
10 Q   And then the yellow shading is the proposed
11     District 31 under Act 43?
12 A   Yes.
13 Q   Can you explain why the boundaries of District 31
14     were changed from the red outline to the yellow
15     shading?
16 A   No, I cannot.
17 Q   And do you have any other information about the
18     motivations behind the drawing of Assembly
19     District 31?
20 A   No.
21         (Exhibit No. 10 marked for
22         identification)
23 Q   I'm handing you what has been marked as
24     Exhibit 10.  Do you recognize this to be a map of
25     Assembly District 35?

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 88

1 A   Yes.  Once again, as all the other exhibits, this
2     is the first time I'm seeing this.
3 Q   And I'll represent to you that this is another
4     document that was taken from an external hard
5     drive assigned to Adam Foltz in 2010 and was
6     created on June 18th, 2011.  And do you understand
7     that the red outline is the previous Assembly
8     District 35 under the 2002 map?
9 A   Yes.
10 Q   And the yellow shading is Assembly District 35 as
11     proposed in Act 43?
12 A   Yes.
13 Q   Can you explain why the boundaries of District 35
14     were changed from the red outline to the yellow
15     shading?
16 A   No, I cannot.
17 Q   And do you have any other information about the
18     motivations behind the drawing of Assembly
19     District 35?
20 A   No.
21 Q   All right.  You can set that one aside.
22         (Exhibit No. 11 marked for
23         identification)
24 Q   I'm handing you what the court reporter has marked
25     as Exhibit 11.  Do you recognize this to be a map

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 89

1    of Assembly District 38?
2  A   Yes.
3  Q   And I'll represent to you that this is another
4    document that was taken from an external hard
5    drive assigned to Adam Foltz in 2010, and it was
6    also created on June 18th, 2011.
7       And do you understand the red outline to be
8    the Assembly District 38 under the 2002 map?
9  A   Yes.
10 Q   And do you understand the yellow shading to be the
11   proposed Act 43 district of District 38?
12 A   Yes.
13 Q   Can you explain why the boundaries of District 38
14   were changed from the red outline to the yellow
15   shading?
16 A   No, I cannot.
17 Q   Do you have any other information about the
18   motivations behind the drawing of Assembly
19   District 38?
20 A   No.
21       (Exhibit No. 12 marked for
22       identification)
23 Q   I'm handing you what's been marked as Exhibit 12.
24   Do you recognize this to be a map of Assembly
25   District 42?

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 90

1  A   Yes.
2  Q   And I'll represent to you again that this was a
3    document that was taken from an external hard
4    drive assigned to Adam Foltz in 2010 and 2011, and
5    it was created on June 18th, 2011.
6       Does the red outline here show the 2002
7    version of District 42?
8  A   2002, correct?
9  Q   Yep.
10 A   Yes.
11 Q   And the yellow shading is the Act 43 proposed
12   District 42?
13 A   Yes.
14 Q   Can you explain why the boundaries of District 42
15   were changed from the red outline to the yellow
16   shading?
17 A   No.
18 Q   Do you have any other information about the
19   motivations behind the drawing of Assembly
20   District 42?
21 A   No.
22       (Exhibit No. 13 marked for
23       identification)
24 Q   All right.  I'm handing you what is marked as
25   Exhibit 13.  Do you recognize this to be a map of

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 91

1    Assembly District 4?
2  A   Yes.
3  Q   And I'll represent to you again that this is
4    another document that was taken from an external
5    hard drive assigned to Adam Foltz in 2010 and was
6    created on June 18th of 2011.
7       Is the red outline Assembly District 4 in the
8    2002 Assembly map?
9  A   Is it -- are you asking me or are you telling me?
10 Q   I'm asking you.
11 A   The only thing I can tell you is what you've told
12   me, that that's what District 4 looked like in
13   2002 --
14 Q   Okay.
15 A   -- which is depicted on the map, yes.
16 Q   And then the yellow shading is the proposed
17   District 4 in Act 43?
18 A   Yes.
19 Q   Can you explain why the boundaries of District 4
20   were changed from the red outline to the yellow
21   shading?
22 A   No.
23 Q   Do you have any other information about the
24   motivations behind the drawing of Assembly
25   District 4?

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 92

1  A   No.
2       THE WITNESS:  Do you want to take a
3    break here as you get that ready, put the --
4    can we take about five minutes?
5       MS. HARLESS:  Sure, we can take a
6    break.
7       THE VIDEOGRAPHER:  Going off the
8    record at 11 o'clock.  Microphones are off.
9       (Recess)
10
11       (Exhibit Nos. 14 through 29 marked
12       for identification)
13       THE VIDEOGRAPHER:  We're back on
14    the record at 11:10.
15 By Ms. Harless:
16 Q   So, Mr. Fuller, I'm handing you what's been marked
17   as Exhibit 14.  And do you recognize this as a map
18   of Assembly District 50?
19 A   This is the first time I've seen it.  And once
20   again, as with all the exhibits from 3 to 13,
21   first time I've seen it.  I understand that it's
22   the legislature's requirement at Article IV
23   Section 6 to redistrict every ten years.
24 Q   Do you understand this to be a map of
25   Assembly District 50?

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 93

1  A   Yes.
2  Q   And I'll represent to you that this is another
3      document that was taken from an external hard
4      drive assigned to Adam Foltz in 2010 and was
5      created on June 18th of 2011.
6          And as with all the previous documents, do
7      you still understand the representation that the
8      red outline is the Assembly District from the 2002
9      map?
10 A   Yes, which you've told me is correct.
11 Q   Yep.  And the yellow shading is the proposed
12     District 50 under Act 43?
13 A   Yes.
14 Q   Can you explain why the boundaries of District 50
15     were changed from the red outline to the yellow
16     shading?
17 A   No, I cannot.
18 Q   Do you have any other information about the
19     motivations behind the drawing of Assembly
20     District 50?
21 A   No.
22 Q   I'm going to hand you what's been marked as
23     Exhibit 15.  And do you understand this to be a
24     map of Assembly District 56?
25 A   Once again, this is the first time I've seen this,

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 94

1      and I understand that it's the legislature's
2      requirement under Act 4 Section 6 of the state
3      constitution to conduct reapportionment,
4      redistricting.
5  Q   Do you understand this to be a map of
6      Assembly District 56?
7  A   56 is written at the top of this, correct.
8  Q   And at the top left it says "Wisconsin Legislative
9      Redistricting Draft"?
10 A   Yes.
11 Q   Do you know what that refers to?
12 A   We don't -- the Assembly doesn't have drafts.  We
13     just deal with the bill.  But what this looks like
14     is it's a proposed plan for Assembly District 56.
15 Q   Okay.  And then like the other map districts, do
16     you understand that the red outline is the
17     Assembly District 56 under the 2002 map?
18 A   Yes.
19 Q   And the yellow shaded area is the proposed
20     district for Assembly District 56 under Act 43?
21 A   Yes.
22 Q   And can you explain why the boundaries of
23     District 56 were changed from the red outline to
24     the yellow shading?
25 A   The only way I can say it was done is under the

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 95

1      requirement of the state constitution Article IV
2      Section 6.
3  Q   Any other reasons why the boundaries were changed?
4  A   No, no.
5  Q   And do you have any other information about the
6      motivations behind the drawing of
7      Assembly District 56?
8  A   No.
9  Q   All right.  I hand you what's been marked as
10     Exhibit 16 by the court reporter.  And do you
11     recognize this to be a map of Assembly
12     District 63?
13 A   Once again, this is the first time I've seen this
14     document.  Looks like a proposed plan for
15     Assembly District 63.
16 Q   And I'll represent to you that this is a document
17     that was taken from an external hard drive
18     assigned to Adam Foltz in 2010 and was created on
19     June 18th of 2011.
20         Do you still understand that the red outline
21     is the previous version of District 63 under the
22     2002 map?
23 A   Yes.
24 Q   And the yellow shaded area is the proposed
25     District 63 under Act 43?

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 96

1  A   Yes.
2  Q   Do you know why the boundaries of District 63 were
3      changed from the red outline to the yellow
4      shading?
5  A   Once again, other than the legislature's
6      requirement to -- under the constitution to do
7      reapportionment, redistricting.
8  Q   Do you know any specific reasons why the
9      boundaries of District 63 were changed from the
10     red outline to the yellow shading?
11 A   No, once again, just because of the Article IV of
12     the state constitution Section 6.
13 Q   And do you have any other information about the
14     motivations behind the drawing of
15     Assembly District 63?
16 A   No.
17 Q   All right.  I'll hand you what's been marked as
18     Exhibit 17.  Do you recognize this to be a map of
19     Assembly District 67?
20 A   Once again, this is the first time I've seen this,
21     but what the paper is, it says "Plan For District
22     67," proposed plan.
23 Q   And I'll represent to you again that this is a
24     document that was taken from the external hard
25     drive assigned to Adam Foltz in 2010 and was

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 97

1    created on June 18th, 2011.
2        Do you understand the red outline to be the
3    boundaries of District 67 under the 2002 map?
4  A  Yes.
5  Q  And the yellow shaded area is the proposed
6    district outline for Assembly District 67 under
7    Act 43?
8  A  Yes.
9  Q  Can you explain why the boundaries of District 67
10    were changed from the red outline to the yellow
11    shading?
12  A  The only thing I could tell you is that it's
13    required that the legislature do reapportionment
14    under the state constitution Article IV Section 6.
15  Q  And do you have any other information about the
16    motivations behind the drawing of
17    Assembly District 67?
18  A  Other than what I just previously mentioned.
19  Q  Other than what you just previously mentioned?
20  A  No.
21  Q  I'll hand you what's been marked as Exhibit 18.
22    Do you understand this to be a map of
23    Assembly District 86?
24  A  This is a proposed plan for Assembly District 86.
25    This is the first time I've seen this document.

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 98

1  Q  And I'll represent to you again that this is a
2    document that was taken from an external hard
3    drive assigned to Adam Foltz in 2010 and was
4    created on June 18th of 2011.
5        Do you understand the red outline to be the
6    version of District 86 under the 2002 map?
7  A  Yes.
8  Q  And then the yellow shaded area is the proposed
9    District 86 under Act 43?
10  A  Yes.
11  Q  Can you explain why the boundaries of District 86
12    were changed from the red outline to the yellow
13    shaded area?
14  A  The legislature's required to do redistricting,
15    reapportionment by the state constitution
16    Article IV Section 6.  That would seem to me
17    that's why we are doing redistricting.
18  Q  Do you have any other information about the
19    motivations behind the drawing of
20    Assembly District 86?
21  A  No.
22  Q  I'm going to hand you what's been marked as
23    Exhibit 19.  And do you understand this to be a
24    map of Assembly District 88?
25  A  Once again, this is the first time I've seen this

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 99

1    document, but it looks like a plan for -- a draft
2    for plan for District 88, yes.
3  Q  And I'll represent to you that this is another
4    document that was taken from an external hard
5    drive assigned to Adam Foltz in 2010 and was
6    created on June 18th, 2011.
7        Do you understand the red outline to be the
8    District 88 outline in the 2002 map?
9  A  Yes.
10  Q  And do you understand the yellow shaded area to be
11    the District 88 outline under Act 43?
12  A  Yes.
13  Q  Can you explain why the boundaries of District 88
14    were changed from the red outline to the yellow
15    shaded area?
16  A  The requirement by the legislature to do
17    redistricting every ten years under Article IV
18    Section 6, the requirement to redistrict, that's
19    why I see Assembly Bill -- Assembly District 88.
20  Q  Do you know any other reasons why the boundaries
21    were changed?
22  A  No.
23  Q  Do you have any other information about the
24    motivations behind the drawing of Assembly
25    District 86?

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 100

1  A  No.
2  Q  I'll introduce what has been marked as Exhibit 20.
3    And do you recognize this to be a map of
4    Assembly District 93?
5  A  From the paper once again, this is the first time
6    I've seen it, on the redistricting draft for
7    District 93.  Yes, this is the first time I've
8    seen it.
9  Q  But do you understand it to be a map of
10    Assembly District 93?
11  A  Yes.
12  Q  And I'll represent to you again that this is a
13    document that was taken from an external hard
14    drive assigned to Adam Foltz in 2010 and was
15    created on June 18th, 2011.
16        Do you understand the red outline to be the
17    version of District 93 under the 2002 map?
18  A  Yes.
19  Q  And the yellow shading is the proposed district
20    outline for District 93 under Act 43?
21  A  Yes.
22  Q  Can you explain why the boundaries of District 93
23    were changed from the red outline to the yellow
24    shaded area?
25  A  It's a requirement under state constitution

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 101

1     section -- Article IV Section 6.
2  Q  It's a requirement for the specific boundaries to
3     be changed the way that they've been drawn in this
4     picture?
5  A  I don't know what the motivation is to change the
6     boundaries.  I know that it's required under the
7     constitution to redistrict every ten years.  How
8     that's done, the Assembly would not know that.
9  Q  And do you have any other information about the
10    motivations behind the drawing of Assembly
11    District 93?
12 A  No.
13 Q  Okay.  I'll introduce what's been marked as
14    Exhibit 21.  And do you recognize this to be a map
15    of Assembly District 10?
16 A  This is the first time I've seen this document,
17    but from what it looks like, it looks like at the
18    top of the page it says proposed plan,
19    redistricting draft for Assembly District 10.
20 Q  And do you understand the red outline to be the
21    Assembly District 10 under the 2002 map?
22 A  Yes.
23 Q  And then the blue shaded area here is the proposed
24    Assembly District 10 under Act 43?
25 A  Yes.

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 102

1  Q  Can you explain why the boundaries of District 10
2     were changed from the red outline to the blue
3     shaded area?
4  A  Requirement under Article IV Section 6 that the
5     legislature redistrict every ten years.
6  Q  And do you have any other information about the
7     motivations behind the drawing of
8     Assembly District 10?
9  A  No.
10 Q  I'll hand you what's been marked as Exhibit 22.
11    And do you recognize this to be a map of
12    Assembly District 13?
13 A  This is the first time I've seen this proposed
14    plan for District 13.
15 Q  Do you understand it to be a map of
16    Assembly District 13?
17 A  Yes.
18 Q  And I'll represent to you again that this is a
19    document that was taken from the external hard
20    drive assigned to Adam Foltz in 2010 and was
21    created on June 18th, 2011.
22       Do you understand the red outline to be the
23    outline of District 13 under the 2002 Assembly
24    map?
25 A  Yes.

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 103

1  Q  And then the pink shaded area here is the proposed
2     District 13 under Act 43?
3  A  Yes.
4  Q  Can you explain why the boundaries of District 13
5     were changed from the red outline to the pink
6     shaded area?
7  A  Under the state constitution Section -- Article IV
8     Section 6, it's a legislature requirement to
9     redistrict/reapportion every ten years.
10 Q  Can you explain specifically why the boundary of
11    District 13 was changed?
12 A  No.
13 Q  And do you have any other information about the
14    motivations behind the drawing of Assembly
15    District 13?
16 A  No.
17 Q  All right.  I'll hand you what's been marked as
18    Exhibit 23.  And do you recognize this to be a map
19    of District 18?
20 A  This is the first time I've seen this map of the
21    draft for District 18.  And by looking at it, it
22    does look like a plan for District 18.
23 Q  All right.  And I'll represent to you that this is
24    another document that we pulled from the external
25    hard drive assigned to Adam Foltz in 2010 and was

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 104

1     created on June 18th, 2011.
2        Do you understand that the red outline is the
3     version of District 18 under the 2002 map?
4  A  Yes.
5  Q  And then the dark green shaded area is the
6     proposed district outline for Assembly District 18
7     under Act 43?
8  A  Yes.
9  Q  Do you know why the boundaries of District 18 were
10    changed from the red outline to the dark green
11    shaded area?
12 A  It's the legislature's requirement to do
13    redistricting every ten years under Article IV
14    Section 6 of the state constitution.
15 Q  Do you have any other information about the
16    motivations behind the drawing of Assembly
17    District 18?
18 A  No.
19 Q  All right.  I'll hand you what's been marked as
20    Exhibit 24.  And do you recognize this to be a map
21    of Assembly District 62?
22 A  Once again, this is the first time I've seen this
23    particular document map for District -- Assembly
24    District 62.
25 Q  And I'll represent to you that this is another

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 105

1     document that we pulled from an external hard
2     drive assigned to Adam Foltz in 2010 and was
3     created on June 18th, 2011.
4         Do you understand the red outline to be the
5     version of Assembly District 62 under the 2002
6     map?
7   A  Yes.
8   Q  And then the proposed District 62 under Act 43 is
9     in maroon shading here on the map?
10  A  Yes.
11  Q  Can you explain why the boundaries of District 62
12    were changed from the red outline to the maroon
13    shaded area?
14  A  Other than it's the legislature's requirement to
15    redistrict/reapportion every ten years under state
16    constitution Article IV Section 6.
17  Q  And do you have any other information about the
18    motivations behind the drawing of Assembly
19    District 62?
20  A  No.
21  Q  All right.  I'll hand you what's been marked as
22    Exhibit 25.  And do you recognize this to be a map
23    of Assembly District 70?
24  A  Once again, this is the first time I've seen this
25    map document for Assembly District -- proposed

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 106

1     district change for Assembly District 70.
2   Q  And I'll represent to you this is a document that
3     we pulled from an external hard drive assigned to
4     Adam Foltz in 2010 and that was created on
5     June 18th, 2011.
6         Do you understand the red outline to be the
7     version of District 70 under the 2002 map?
8   A  Yes.
9   Q  And then the Act 43 proposed District 70 appears
10    on this map in light purple shading; correct?
11  A  That's what it looks like on this paper, yes.
12  Q  Can you explain why the boundaries of District 70
13    were changed from the red outline to the light
14    purple shaded area?
15  A  It's the legislature's requirement under the
16    constitution to redistrict/reapportion every ten
17    years, and it's under the state constitution of
18    Article IV Section 6.
19  Q  And do you have any other information about the
20    motivations behind the drawing of Assembly
21    District 70?
22  A  No.
23  Q  I'll hand you what's been marked as Exhibit 26.
24    And do you recognize this to be a map of
25    Assembly District 77?

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 107

1   A  This is the first time I've seen this proposed map
2     document for Assembly -- proposed District
3     Assembly District 77.
4   Q  But you understand it to be a map of Assembly
5     District 77?
6   A  Yes.
7   Q  And I'll represent to you that this is a document
8     we pulled from the external hard drive assigned to
9     Adam Foltz in 2010 and that it was created on
10    June 18th, 2011.
11        Do you understand the red outline to be the
12    version of District 77 under the 2002 map?
13  A  Yes.
14  Q  And then the area outlined in purple shading is
15    the proposed District 77 under Act 43?
16  A  Yes.
17  Q  And can you explain why the boundaries of
18    district -- the boundary of District 77 was
19    changed from the red outline to the purple shaded
20    area?
21  A  Other than requirement by the state constitution
22    Article IV Section 6 that the legislature do
23    redistricting/reapportionment every ten years.
24  Q  And do you have any other information about the
25    motivations behind the drawing of Assembly

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 108

1     District 77?
2   A  No.
3   Q  I'll hand you what's been marked as Exhibit 27.
4     And do you understand this to be a map of
5     Assembly District 80?
6   A  First time I've seen this map document
7     redistricting draft for Assembly bill --
8     Assembly District 80.
9   Q  Do you understand it to be a map of
10    Assembly District 80?
11  A  Yes.
12  Q  And then I'll represent to you again that this was
13    taken from Adam Foltz's hard drive that was
14    assigned in 2010 and was created on June 18th of
15    2011.
16        Do you understand the red outline to be the
17    version of District 80 under the 2002 map?
18  A  Yes.
19  Q  And then do you understand the pink shaded area to
20    be the proposed Assembly District 80 under Act 43?
21  A  Yes.
22  Q  Can you explain why the boundaries of District 80
23    were changed from the red outline to the pink
24    shaded area?
25  A  Other than being required by the state

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 109

1    constitution Article IV Section 6, the
2    legislature's requirement to redistrict every ten
3    years, reapportionment.
4  Q  Do you have any other information about the
5    motivations behind the drawing of
6    Assembly District 80?
7  A  No.
8  Q  I hand you what's been marked as Exhibit 28.  Do
9    you recognize this to be a map of Assembly
10    District 94?
11  A  Once again, this is the first time I've seen this
12    draft for Assembly District 44 (sic), but as I
13    look at it, yes.
14  Q  And I'll represent to you that this is a document
15    that was taken from the external hard drive
16    assigned to Adam Foltz in 2010 and was created on
17    June 18th, 2011.
18      Do you understand the red to be the version
19    of Assembly District 94 under the 2002 map?
20  A  Yes.
21  Q  And then the dark purple shaded area is the
22    proposed district outline for Assembly District 94
23    under Act 43?
24  A  Yes.
25  Q  Why were the boundaries of District 94 changed

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 110

1    from the red outline to the dark purple shaded
2    area?
3  A  Requirement by the state constitution Article IV
4    Section 6 that the legislature do
5    redistricting/reapportionment every ten years.
6  Q  Do you have any other information about the
7    motivations behind the drawing of Assembly
8    District 94?
9  A  No.
10  Q  All right.  I'll hand you what's been marked as
11    Exhibit 29.  And do you understand this to be a
12    map of Assembly District 95?
13  A  Once again, this is the first time I've seen this
14    redistricting draft for Assembly District 95.  But
15    yes, by looking at the map for Assembly
16    District 95, yes.
17  Q  Okay.  And I'll represent that this was another
18    document taken from the external hard drive
19    assigned to Adam Foltz in 2010 and was created on
20    June 18th, 2011.
21      Do you understand the red outline to be the
22    version of District 95 under the 2002 map?
23  A  Yes.
24  Q  And then do you understand that the pink shaded
25    area is the proposed outline for Assembly

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 111

1    District 95 under Act 43?
2  A  Yes.
3  Q  Can you explain why the boundaries of District 95
4    were changed from the red outline to the pink
5    shaded area?
6  A  Other than the requirement by the state
7    constitution Article IV Section 6 that the
8    legislature do redistricting every ten years.
9  Q  And do you have any other information about the
10    motivations behind the drawing of Act 95?
11  A  No.
12  Q  Or drawing of District 95?
13      MR. ST. JOHN: Object to form.  Did
14    you want to ask the full question again for a
15    clean record?
16      MS. HARLESS: Sure.
17  Q  Do you have any other information about the
18    motivations behind the redrawing of District 95?
19  A  No.
20  Q  Besides what we've talked about today, do you have
21    any other information about the motivations for
22    the drawing of any of the assembly districts?
23  A  Other than it's required by the state constitution
24    Article IV Section 6 where it's required that the
25    legislature redistrict/reapportion every ten

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 112

1    years.
2      MR. ST. JOHN: May I ask the
3    reporter to read back just the last question
4    and answer.
5      (Question and answer read)
6  Q  Do you have any other information about the
7    motivations for the drawing of Act 43 as a whole
8    that we haven't talked about yet today?
9  A  No.
10      MS. HARLESS: Did you guys want to
11    take a lunch break?
12      MR. ST. JOHN: How are you feeling?
13      THE WITNESS: Whatever you guys
14    want to do.
15      (Discussion off the record)
16  By Ms. Harless:
17  Q  So let's look back at Exhibit 1 which is the
18    subpoena with the list of topics.  And if you want
19    to flip to the Exhibit A in there that lists the
20    topics out.  And can you read Topic No. 2, please.
21  A  "The identity of the persons involved in the
22    drawing of each district in 2011 Wisconsin Act 43,
23    including earlier drafts."
24  Q  What information do you have about the identity of
25    persons involved in drawing -- in the drawing of

---

William Whitford, et al. vs
Beverly R. Gill, et al.

1  Act 43 as a whole?
2  A   The Assembly does not know the identity of persons
3      involved in the drawing of each district.  The
4      Assembly does not keep a log of what every
5      legislator and legislative staff do in their
6      office.  The Assembly does not know and we do
7      not -- the Assembly does not know of any drafts.
8      The only -- the only thing that the Assembly knows
9      is the final draft that was introduced by the
10     Assembly Org on 11 July 2011.
11 Q   Did the Assembly pay any invoices to anyone
12     involved in the Act 43 redistricting process?
13 A   So the question is does the Assembly pay persons
14     or did they pay for a contract?
15 Q   Let's start with persons.
16 A   If they were a state employee, they were paid as a
17     state employee.  Out -- external individuals were
18     not paid by the Assembly.
19 Q   Who were external individuals paid by?
20 A   What was the question again?
21 Q   Who were external individuals paid by?
22 A   The Assembly didn't pay them.  I don't know who
23     paid them.
24          MR. ST. JOHN:  External individuals
25     paid by what, for whom?

1          MS. HARLESS:  Well, that's what he
2      said.
3          MR. ST. JOHN:  Can the last
4      question, please, get repeated.
5          (Last question and answer read)
6  Q   And then you also mentioned -- you said individual
7      persons or contracts.  Who did the Assembly pay
8      under contract?
9  A   I don't know exactly who we paid in contract.  The
10     contract was produced.  I don't know exactly who
11     we paid for, what law firm we paid for
12     redistricting.
13 Q   Which contract are you referring to?
14 A   I'm referring to the contract for redistricting
15     act -- Senate Bill 148, Act 43.
16 Q   And who is that contract with?
17 A   I don't recall.
18 Q   Okay.  And you don't know the identity of any
19     persons involved with that contract?
20 A   No.  No, I don't.
21 Q   And you don't know the identity of any individual
22     Assembly members involved with the drawing of
23     Act 43?
24 A   No, I don't.
25 Q   Do you know the identity of any individual

1      member's staff involved in the drawing of Act 43?
2  A   No.  I don't know what the legislative staff, what
3      the representatives do to the legislative staff.
4      They're not required to log their daily activities
5      with the Assembly.
6  Q   And do you know if there are any other state
7      offices that were involved in the drawing of
8      Act 43?
9  A   No.
10 Q   Was Governor Scott Walker's office involved in the
11     drawing of Act 43?
12 A   He may have been, but this is -- by the
13     constitution Article IV Section 6 the legislature
14     has to do redistricting.  Whether Governor Walker
15     and his office -- the governor's office was
16     involved, I couldn't tell you that.
17 Q   Do you know the identity of any consultants who
18     were involved in the drawing of Act 43?
19 A   No, I don't.
20 Q   Do you know if anyone associated with the
21     Republican National Committee was involved in the
22     drawing of Act 43?
23 A   No.  The Assembly wouldn't know that.
24 Q   All right.  Now I want to know if there are
25     individuals involved in the drawing of particular

1      districts in Act 43.  And we can go through them
2      one-by-one.  Can you give me the name of every
3      individual involved in the drawing of
4      Assembly District 4?
5  A   No.
6  Q   Can you give me the name of every individual
7      involved in the drawing of Assembly District 10?
8  A   No.
9  Q   Can you give me the name of any individual
10     involved in the drawing of Assembly District 10?
11 A   No, I have no idea what the legislators and
12     legislative staff do.  The Assembly would not know
13     that.  They're not required to log in with the
14     Assembly.  And we don't -- the Assembly does not
15     maintain their work schedule.  Individual
16     representatives do that.
17 Q   Okay.  So if I go through this list and ask you
18     the same question for all these assembly
19     districts, would your answer be different?
20 A   It would be the same.
21 Q   Okay.  So let me just list out the numbers and you
22     can just tell me if your answer would be
23     different.  So Assembly District 13?
24 A   Same.
25 Q   Assembly District 18?

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19         Page 117

1  A   Same.

2  Q   **Assembly District 21?**

3  A   Same.

4  Q   **Assembly District 22?**

5  A   Same.

6  Q   **Assembly District 23?**

7  A   The same.

8  Q   **Assembly District 24?**

9  A   Would be the same.

10  Q   **Assembly District 25?**

11  A   The legislature would not know -- the Assembly

12      would not know.  The Assembly does not record what

13      individual staff or electors do.  They do not log

14      that with the Assembly.

15  Q   **Okay.  And that's the same --**

16  A   That's the same as at the beginning.  I just want

17      to make sure that we understand it hasn't changed.

18  Q   **Yeah.  So I'm just trying to ask for any of these**

19      **Assembly Districts if your answer would be**

20      **different.  But for the record, I just want to go**

21      **through each district.**

22  A   Okay.

23  Q   **So let me know if your answer would be different**

24      **for any of these districts than what you've said.**

25      **Would your answer be the same for Assembly**

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19         Page 118

1      **District 26?**

2  A   Yes.

3  Q   **Would your answer be the same for Assembly**

4      **District 29?**

5  A   Yes.

6  Q   **Would your answer be the same for Assembly**

7      **District 31?**

8  A   Yes.

9  Q   **Would your answer bee the same for Assembly**

10      **District 35?**

11  A   Yes.

12  Q   **Would your answer be the same for Assembly**

13      **District 38?**

14  A   Yes.

15  Q   **Would your answer be the same for Assembly**

16      **District 42?**

17  A   Yes.

18  Q   **Would your answer be the same for Assembly**

19      **District 50?**

20  A   Yes.

21  Q   **Would your answer be the same for Assembly**

22      **District 56?**

23  A   Yes.

24  Q   **Would your answer be the same for Assembly**

25      **District 62?**

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19         Page 119

1  A   Yes.

2  Q   **Would your answer be the same for Assembly**

3      **District 63?**

4  A   Yes.

5  Q   **Would your answer be the same for Assembly**

6      **District 66?**

7  A   Yes.

8  Q   **Would your answer be the same for Assembly**

9      **District 67?**

10  A   Yes.

11  Q   **What about District 70?**

12  A   My answer would be the same.  The Assembly does

13      not log what every individual in every office does

14      on a daily basis.  It's not the Assembly's

15      requirement to know that.

16  Q   **Would your answer be the same for Assembly**

17      **District 77?**

18  A   Yes.

19  Q   **Would your answer be the same for Assembly**

20      **District 80?**

21  A   Yes.

22  Q   **Would your answer be the same for Assembly**

23      **District 86?**

24  A   Yes.

25  Q   **Would your answer be the same for Assembly**

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19         Page 120

1      **District 88?**

2  A   Yes.

3  Q   **Would your answer be the same for Assembly**

4      **District 93?**

5  A   Yes.

6  Q   **Would your answer be the same for Assembly**

7      **District 94?**

8  A   Yes.

9  Q   **And would your answer be the same for Assembly**

10      **District 95?**

11  A   Yes.

12  Q   **Do you have any other information relating to this**

13      **topic that we haven't discussed yet today?**

14  A   No.  Just once again, I want to reiterate, the

15      Assembly does not log individual staff member's

16      day-to-day duties or operations or what electors

17      do.  It's not a requirement by the Assembly.

18  Q   **All right.  So let's go back to the list we have**

19      **here of topics.  And will you read Topic No. 3**

20      **into the record.  Can you read it into the record.**

21  A   "The objective facts that any Assembly Person had

22      access to or relied on each drawing -- when

23      drawing each district in 2011 Wisconsin Act 43,

24      including earlier drafts."

25  Q   **What information do you have about the objective**

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 121

1    fact that any Assembly Persons had access to or
2    relied on when drawing each district in 2011
3    Wisconsin Act 43?
4  A  The Assembly does not have any information on what
5    individual staff for individual electors do.
6    They're not required to log in with the Assembly.
7      So to answer your question, the Assembly
8    would have no knowledge of any of that.
9  Q  So you're saying you have no knowledge at all
10   about any of the objective facts that were
11   considered during the drawing of Act 43?
12 A  That's correct.
13 Q  All right.  And so if we went through a list of
14   single individual districts, would your answer be
15   the same?
16 A  It would be the same.  The Assembly is not
17   required and does not log what individual
18   legislators or their staff do on a daily basis.
19   That's not part of what the Assembly's required to
20   know.  And we don't maintain that information.
21 Q  Okay.  So if I went through a list similar to the
22   one we just went through, would your answer be the
23   same for each one?
24 A  The answer would be the same for each one.
25 Q  Okay.  All right.  Let's look at Topic No. 4.  And

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 122

1    can you read that topic into the record.
2  A  No. 4, "Your involvement, if any, with the
3    drawing, passage, and/or enactment of Wisconsin
4    Act 43."
5  Q  As chief clerk, were you involved in any way with
6    the drawing of Act 43?
7  A  No.  The Assembly is not -- was not involved in
8    the drawing.
9  Q  But were you as the chief clerk?
10 A  No.
11 Q  You didn't have any -- you in no way interacted
12   with the legislature in the drawing of Act 43?
13 A  No.  The chief clerk does not have anything to do
14   with drawing of the maps.
15 Q  Okay.  Did you ever receive any invoices relating
16   to the drawing of Act 43?
17 A  As previously mentioned, the only invoice I
18   received was one invoice -- I want to say six or
19   seven months -- that we paid.  I want to say we
20   paid $200,000 for those -- for redistricting.  And
21   that would be the only thing that the clerk was
22   involved in as far as -- we didn't even draw them
23   but paying for redistricting.
24 Q  Did you have any role in managing the legislative
25   computers that were used for the drawing of

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 123

1    Act 43?
2  A  The only -- computers were issued to the majority
3    and minority party through LTSB redistricting
4    computers.
5  Q  And did you ever maintain custody over any of
6    those computers?
7  A  I never had custody.  They were custody for the
8    majority and minority party.  The only custody
9    came about is when I had to pick up a computer
10   from Representative Kessler's office due to a
11   court case, the Baldus case.  I had to escort it
12   over to the LTSB cage to keep it locked up.
13 Q  Okay.  And did you ever observe anyone physically
14   damaging any of the nine hard drives associated
15   with the legislative redistricting computers?
16 A  No.
17 Q  Were you ever told any information about physical
18   damage to any of the nine hard drives associated
19   with the legislative redistricting computers?
20 A  No.
21 Q  Did you ever have any conversations with anyone
22   about the partisan consequences of any drafts of
23   Act 43?
24 A  No.
25 Q  Have you ever had any conversations with any of

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 124

1    your staff about the drawing of Act 43?
2  A  No.  When we -- are we talking the Assembly or the
3    chief clerk?
4  Q  Staff of your office.
5  A  No.
6  Q  What about staff of individual members of the
7    Assembly?
8  A  No.
9  Q  Did you ever have any conversations about the
10   drawing of Act 43 with any individual members?
11 A  No.
12 Q  Did you ever have any conversations with
13   individual members about the partisan consequences
14   of any drafts of Act 43?
15 A  No.
16 Q  Did you ever visit the map room in Michael Best &
17   Friedrich's law firm?
18 A  No.
19 Q  Did you ever see any printouts of draft maps?
20 A  No.
21 Q  Did you ever see any printouts of individual
22   district maps during the drafting process?
23 A  Give me that question again.
24 Q  Did you ever see any printouts of individual
25   district maps --

1 A  No.

2 Q  -- during the drafting process?  Besides what we

3      discussed, can you think of any other ways that

4      you were involved with the drafting of Act 43?

5           MR. ST. JOHN:  Do you mean you

6        being the state Assembly or you being chief

7        clerk with respect to this question?

8 Q  Let's start with you as the chief clerk.

9 A  No.

10 Q  Okay.  Besides what we discussed earlier, are

11     there any other ways that the Assembly was

12     involved with the drafting of Act 43?

13 A  The Assembly as an institution was not, other than

14     required by the state constitution to -- at

15     Section 6 to do redistricting.  As far as drafting

16     goes, the Assembly did not -- was not involved.

17 Q  As chief clerk, were you involved with the passage

18     of Act 43?

19 A  Yes.

20 Q  How?

21 A  We received the Senate Bill 148 from the Senate

22     on -- it was messaged over on July 19th, 2011.  On

23     July 20th, 2011, it was brought up on the floor of

24     the Assembly.  There were a number of motions.

25     There was one motion by Representative Zamarripa

1      to return it to a committee and that was defeated.

2      And then Representative Staskunas did a point of

3      order that the Senate bill was not properly -- was

4      not properly before us and it violated the

5      Voting Rights Act of 1965.  The speaker pro tem,

6      at that time presiding officer and

7      Representative Kramer voted against that.  And

8      that's in the Journal.  Representative Barca

9      introduced -- with a number of Democratic

10     legislators -- introduced Assembly substitute

11     amendment 1 and that was defeated by a vote of 59

12     to -- 58 to 49.  And then Representative Krusick

13     put in Assembly amendment 1 that was defeated

14     97 -- 96 to 1.

15         The bill was read a third time and brought up

16     for passage, and the final -- the final vote on

17     that bill was 59 -- 57 to 40.

18 Q  Okay.

19 A  After that, it was immediately messaged back to

20     the Senate.  So as far as passage goes, that was

21     the extent of the Assembly's involvement in

22     passage of the bill, Senate Bill 148.

23 Q  So let's talk a little bit about some of the stuff

24     you just mentioned.

25

1           (Exhibit No. 30 marked for

2            identification)

3 Q  And so this is Exhibit 30.  Do you recognize this

4      document?

5 A  This looks like the bill history for Senate

6      Bill 148.

7 Q  Okay.  And does this come from the Assembly

8      Journal?

9 A  Yes, it did.

10 Q  And do you maintain the Assembly Journal?

11 A  The clerk's -- this did not come from the Journal,

12     excuse me.  The bill history stays with the bill.

13 Q  Okay.

14 A  But this is produced by the clerk staff of both

15     the Senate and the Assembly.

16 Q  And have you seen this document before?

17 A  Yes, I have.

18 Q  All right.  And so I'd like you to take a look at

19     the section that's with the header history.  So

20     can you just generally tell me what the history

21     section tells us?

22 A  The history section tells you anything that

23     happened to the bill as it went through the

24     legislative process.  As you look at it, it was

25     introduced by the Assembly Org Committee on

1      July 19th, 2011.  When the committee met they put

2      an amendment on it.  Later on in the process it

3      had a public notice and Senator Zipperer put an

4      amendment 2 on it.  Executive action was taken,

5      and it went to the -- it was voted out of

6      committee on the 15th, and it was scheduled for

7      hearing on the Senate floor on the 19th.

8          Okay.  Go ahead.

9 Q  No.  Go ahead.

10 A  The Senate bill just gives you a good synopsis of

11     everything that happened to this piece of

12     legislation as it went through the legislative

13     process.

14 Q  All right.  So I want to look at the entries of

15     July 20th, 2011.  And so if we go to the third

16     entry that's dated July 20th, I think that's on

17     the next page, the second page of the document.

18     And can you read what that entry says?

19 A  "Point of order that the bill's not properly

20     before the Assembly because it violates

21     Voting Rights Act of 1965 and the United States

22     Constitution not well taken."

23 Q  You referred to this earlier.  Do you know what

24     this entry's referring to?

25 A  It's referring to Representative Staskunas

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 129

1    bringing up a point of order that the bill was not
2    properly before the Assembly, that it should be
3    sent back because it's violating the Voting Act
4    Rights of 1965 and the state -- and the
5    U.S. Constitution.
6  Q  And do you know why the point of order was made
7    besides what was written there?
8  A  I don't know what -- why Representative Staskunas
9    made that point of order.
10 Q  And what does this entry mean when it says the
11   "point of order was not well taken"?
12 A  The decision of the chair, that being
13   Representative Kramer, made the decision that as
14   he reviewed the point of order, he looked at the
15   prior precedent and he looked at the statute, and
16   he found that it was not well taken, that it does
17   not violate the U.S. Constitution.
18 Q  And which -- do you know which political party
19   Representative Kramer belonged to?
20 A  Representative Kramer -- there was a speaker
21   pro tem that was elected by the entire body.  He
22   was a Republican.
23 Q  So I'd like to move to the sixth entry that has
24   the date July 20th and it starts with Assembly
25   substitute amendment 1.  And it says that

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 130

1    substitute amendment was offered by various
2    representatives.
3        What was Assembly substitute amendment 1?
4  A  I couldn't tell you what Assembly substitute
5    amendment 1 was unless I pulled the actual bill
6    out and took a look at it.
7  Q  All right.  We can mark an exhibit.  Let her mark
8    it first and then I'll give it to you.  Sorry.
9            (Exhibit No. 31 marked for
10            identification)
11 Q  So I'm handing you what's been marked as
12   Exhibit 31.  Do you recognize this document?
13 A  I'm sure I do.  I don't remember it specifically.
14   It was brought up on the floor on the 20th of July
15   2011.
16 Q  And at the top there does it say "Assembly
17   Substitute Amendment 1 --
18 A  Yes.
19 Q  -- To 2001 Senate Bill 148"?
20 A  Yes.
21 Q  And do you understand it to be the text of
22   Assembly substitute amendment 1?
23 A  Yes.
24 Q  Okay.  And I'd like to direct you to the second
25   paragraph of the body underneath the heading

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 131

1    "Analysis By the Legislative Reference Bureau."
2    Do you see that second paragraph?
3  A  In section 1?
4  Q  On the first page under the heading "Analysis By
5    the Legislative Reference Bureau."
6  A  Yes.
7  Q  The second paragraph.  Can you read that second
8    paragraph into the record, please.
9  A  "This substitute amendment creates" --
10 Q  Yes.  Just do it slowly because she has to write
11   it down.  That's correct.  Just read it slower so
12   she can get it down.
13 A  "This substitute amendment creates a new procedure
14   for the preparation of legislative and
15   congressional redistricting plans.  This
16   substitute amendment requires the Legislative
17   Reference Bureau and the Government Accountability
18   Board to jointly develop standards for legislative
19   and congressional districts based on population
20   requirements under the Wisconsin Constitution and
21   U.S. Constitution and requirements under Section 2
22   of the voting acts right -- Voting Rights Act.
23   One of the standards must be electoral
24   competitiveness of the districts.  The substitute
25   amendment then directs the LRB and the GAB to draw

Videotaped Deposition of PATRICK E. FULLER  3-29-19      Page 132

1    redistricting plans for submission to the
2    legislature for approval in accordance with the
3    standards.  Under the substitute amendment, no
4    later than January 1 of the second year following
5    the decennial federal census, the LRB and GAB must
6    deliver to the majority party of the Senate and
7    the speaker of the Assembly identical bills
8    embodying a plan for legislative and congressional
9    redistricting."
10 Q  What is your understanding of that paragraph, of
11   substitute amendment 1?
12 A  My understanding of this paragraph is that
13   redistricting is taking it out of the
14   legislature's hands and giving it to two
15   organizations -- two other organizations, that
16   being the LRB and the GAB.
17 Q  And then it says there that substitute amendment 1
18   would have required that electoral competitiveness
19   of the districts be one of the standards
20   considered in the state's redistricting process;
21   correct?
22 A  That's what it says, yes.
23 Q  Okay.  So let's -- now let's go back to the
24   previous exhibit we were looking at, which I
25   believe was Exhibit 30, which is the legislative

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

1    history of the bill.  And then that same entry we
2    were looking at where amendment substitute 1 was
3    offered lists a series of representatives.  Are
4    all of those representatives -- were all of those
5    representatives Democratic members of the Assembly
6    at the time?
7  A  Yes.
8  Q  And then the very next entry following that --
9    still with the date July 20th, 2011 -- says
10   "Assembly substitute amendment 1 laid on the
11   table, ayes 58, nos 39"; is that correct?
12 A  That's correct.
13 Q  What does "laid on the table" in this context
14   mean?
15 A  That means that the bill's not voted on.  It's
16   just put aside for future consideration and it was
17   voted on.
18 Q  What was voted on?
19 A  To table the amendment.
20 Q  Did any Democrats vote to table Assembly
21   substitute amendment 1?
22 A  By looking above, no, because they all -- it looks
23   like they all were part of co-sponsors of the
24   substitute amendment.
25 Q  I'm going to introduce another exhibit.  She has

1    to mark it first and then we'll hand it to you.
2          (Exhibit No. 32 marked for
3          identification)
4  Q  And I'm handing you what's been marked as
5    Exhibit 32.  Do you know what this document is?
6  A  Yes.
7  Q  What is it?
8  A  It's the voting record for tabling Assembly
9    substitute amendment 1.
10 Q  And after referencing this document, can you
11   confirm that no Democrats voted to table Assembly
12   substitute amendment 1?
13 A  That's correct.
14 Q  And did every Republican that was present vote to
15   table substitute amendment 1?
16 A  Yes.
17 Q  Was substitute amendment 1 ever called up again
18   for a vote after being laid on the table?
19 A  No.
20 Q  All right.  Let's go back to Topic 4 which is what
21   we were talking about before.  And we were talking
22   about how as chief clerk you were involved with
23   the passage of Act 43.  And you said -- then you
24   explained the process of how the bill was
25   received; correct?

1  A  Correct.
2  Q  Were you involved with the public hearing that was
3    held regarding Act 43 on July 13th, 2011?
4  A  No.
5  Q  Do you know if the map drawers incorporated any
6    comments in that hearing into what became the
7    final Assembly map?
8  A  What was your question again?
9  Q  Do you know if the map drawers incorporated any
10   comments from that public hearing into what became
11   the final Assembly map?
12 A  No.  I didn't attend the public hearing, so I
13   wouldn't know.
14 Q  Besides what we discussed already, are there any
15   other ways you were involved with the passage of
16   Act 43?
17 A  No.
18       MS. HARLESS:  All right.  Is this a
19   good place for --
20       THE WITNESS:  Yes, yes.
21       THE VIDEOGRAPHER:  Going off the
22   record at 12:06.  Microphones are off.
23       (Recess for lunch)
24       THE VIDEOGRAPHER:  And we're back
25   on the record at 12:39.

1  By Ms. Harless:
2  Q  So before we took a quick lunch break, we were
3    talking about Topic No. 4 in Exhibit 1.  That
4    was -- it's Exhibit A to Exhibit 1 that lists the
5    topics.  Do you see that?
6  A  Topic 4?
7  Q  Yes.
8  A  Do you want me to read it?
9  Q  No.  You already read it, so that's great.  I just
10   wanted to remind you what we were talking about.
11   And we've gone over that asks for your involvement
12   in the passage or enactment.  And so I just wanted
13   to go over one more category, which is are there
14   any ways in which you were involved in the
15   implementation of Act 43?
16 A  The Assembly as far as implementation.  When the
17   bill was passed on the 20th of July 2011, we
18   messaged it back to the Senate.  As far as
19   enactment goes, the Senate took over from there
20   because it originated as a Senate bill.  So as far
21   as the Assembly goes, as far as enactment goes,
22   other than making sure the bill history is correct
23   and the Journal, once it's sent back to the
24   Senate, they enroll it, they send it to the
25   governor for signature.

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 137

1 Q   So your office isn't involved in sending the bill
2     to the governor for signature?
3 A   No, not in this time because it was a Senate bill.
4 Q   Okay.
5 A   We messaged it back to the Senate.
6 Q   Okay.  And then were you involved in the
7     implementation of Act 43 in any other way?
8 A   Not that I can think of as far as initially
9     enacting it.  We would know who -- the new
10    legislators out of the new districts would come to
11    us.  Other than that, no.
12 Q  When the new districts came to you, did you have
13    to do anything with them?
14 A  No, we would just put them -- we would find out --
15    and this is later on in the process -- who would
16    be running in those districts.  And after the
17    election we would know who the new representative
18    would be for 81st, 77th, whatever it is.
19        As far as enactment goes, actually the
20    Assembly enacting the legislation, no.
21 Q  Let's turn to Topic No. 5.  It's the next page in
22    that document, Exhibit 1-A.  Can you read that
23    topic into the record, please.
24 A  No. 5, "Information about any communications or
25    other interactions between the Assembly and

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 138

1     Republican National Committee GOP Redistricting
2     Conference or the organization known as the
3     Redistricting Majority Project (REDMAP)."
4 Q   Are you aware of any communications between the
5     Assembly and anyone associated with the Republican
6     National Committee about the Republican National
7     Committee's GOP Redistricting Conference?
8 A   We had one communication on an email that was sent
9     to Nick Probst in -- that I had.  I can't remember
10    the date.  I want to say 2003.  And that was the
11    only communication we had regarding REDMAP.
12 Q  And we'll discuss that in a little -- that
13    communication in a little bit, but do you know
14    whether there are any communications between any
15    individual members and the national -- Republican
16    National Committee about the GOP Redistricting
17    Conference?
18 A  No.
19 Q  And do you know whether there are any
20    communications between the staff of any individual
21    members and the Republican National Committee
22    about the GOP redistricting conference?
23 A  No.  Once again, as I mentioned before, staff and
24    legislators don't log with the Assembly on their
25    day-to-day operations.  So the answer to your

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 139

1     question is no.
2 Q   Do you know whether there are any communications
3     between the Assembly and anyone associated with
4     the Redistricting Majority Project or REDMAP?
5 A   No.  Other than that email that we were CC'd on
6     from Nick Probst.
7 Q   Is that the only document you found responsive to
8     that, to the document production request about
9     REDMAP, or did you find other documents?
10 A  That's the only document regarding REDMAP.
11 Q  And are you aware of any communications between
12    any individual member and the Republican National
13    Committee about the GOP Redistricting Conference?
14 A  No.
15 Q  What about between individual members about --
16    individual members and anyone associated with the
17    Redistricting Majority Project?
18 A  No.
19 Q  And then do you know whether there are any
20    communications between individual Assembly members
21    or their staff and the Republican state
22    legislative committee?
23 A  Give me that question again.
24 Q  Do you know if there are any communications
25    between individual Assembly members or their staff

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 140

1     and the Republican state legislative committee?
2 A   No.  Once again as I mentioned, the clerk -- the
3     Assembly does not know communications between
4     individual legislators and their staff.  It's not
5     a requirement of the Assembly to maintain records
6     of their communications or what they're doing on a
7     day-to-day basis.
8 Q   And do you know of any other interactions between
9     the Assembly and anyone associated with the
10    Republican National Committee about the Republican
11    National Committee's GOP Redistricting Conference?
12 A  No.
13 Q  Are you aware of any Assembly funds that were
14    expended for travel to the GOP Redistricting
15    Conference in April 2010?
16 A  No.  After doing a search, both electronically and
17    paper copy, with my business as a legislative
18    specialist, we found no -- no documents of anybody
19    traveling to that conference.
20 Q  Did any Assembly members attend the April 2010 GOP
21    Redistricting Conference in Washington D.C.?
22 A  Say that -- give me the date again.
23 Q  Did any Assembly members attend the April 2010 GOP
24    Redistricting Conference in Washington, D.C.?
25 A  If they did, the Assembly did not pay -- did not

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 141

1   use state funds to send anybody to that
2   conference.
3 Q  And are you aware of any contracts between the
4   Assembly and any members of the Republican
5   National Committee for redistricting purposes?
6 A  No.
7 Q  Okay.  Let's go back to the subpoena and let's
8   turn to the very last page of the subpoena again,
9   which is Exhibit 1 to Exhibit B.  It's says
10   "Redistricting Essentials" at the top.  And I'd
11   like to direct you back to the bottom of that
12   document where there's a set of names of five RNC
13   employees.  Do you see that list?
14 A  Yes.
15 Q  Did Tom Hofeller assist in any way with the
16   drawing of Act 43?
17 A  I would not know that.
18 Q  Was Tom Hofeller ever consulted by any individual
19   Assembly member in the drawing of Act 43?
20 A  The Assembly would not know that.
21 Q  Do you know whether any individual Assembly
22   member's staff consulted with Tom Hofeller about
23   Act 43?
24 A  Once again, the Assembly does not know what
25   individual staff or representatives do on a daily

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 142

1   basis.  It's not required for them to check in
2   with the Assembly or let us know.
3 Q  Did Dale Oldham assist in any way in the drawing
4   of Act 43?
5 A  Once again, I do not know that either.
6 Q  Do you know whether Dale Oldham has assisted in
7   any way with any of the litigation over Act 43?
8 A  Say that question again.
9 Q  Do you know whether Dale Oldham has ever assisted
10   in any way with any of the litigation over Act 43?
11 A  I do not know that.
12 Q  Has the Assembly ever retained Dale Oldham to
13   serve as counsel in the litigation that has
14   occurred over Act 43?
15 A  Not that I know of.  I don't remember paying any
16   legal bills for this individual.
17 Q  Do you know if the Assembly has ever retained
18   Dale Oldham as a consultant in the litigation that
19   has occurred over Act 43?
20 A  No.  The Assembly -- the Assembly has never paid
21   any funds to Dale Oldham, either as a consultant
22   or as a -- on a contract.
23 Q  That you're aware of or never -- or you just know
24   the Assembly has never paid Dale Oldham any funds?
25 A  The Assembly hasn't because I would have had to

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 143

1   write off on the voucher.  And going through all
2   my records, fiscal records, we never paid that
3   individual.
4 Q  Did Mike Wild assist in any way in the drawing of
5   Act 43?
6 A  I do not know.
7 Q  Was Mike Wild ever consulted by any individual
8   Assembly member in the drawing of Act 43?
9 A  The Assembly would not know that.  Once again,
10   legislative Assembly staff do not have to
11   coordinate with or let the Assembly know what
12   their day-to-day operations are, what they're
13   doing.
14 Q  Did John Phillippe assist in any way in the
15   drawing of Act 43?
16 A  No.
17 Q  And I'm assuming your answer would be the same
18   about whether any individual Assembly member has
19   consulted with John Phillippe?
20 A  That's correct.  Once again as I mentioned, the
21   Assembly it's not a requirement.  We don't require
22   staff to log what their day-to-day operations are,
23   activities are, as well as legislators to the
24   Assembly.
25 Q  And did Leslie Rutledge assist in any way in the

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 144

1   drawing of Act 43?
2 A  I do not know that.
3 Q  Has the Assembly ever retained Leslie Rutledge to
4   serve as counsel in any of the litigation that has
5   occurred over Act 43?
6 A  To my knowledge, the Assembly has never retained
7   him as far as paying state funds or Assembly funds
8   to this individual.
9 Q  Has the Assembly ever retained Leslie Rutledge as
10   a consultant in any of the litigation that has
11   occurred over Act 43?
12 A  The Assembly has not.
13 Q  All right.  Let's move to -- let's go back to the
14   list of topics which is in Exhibit A again.  And
15   let's go to Topic No. 6.  Can you read that topic
16   into the record, please.
17 A  No. 6, "The identity and duties of all Assembly
18   Persons who are involved in your associated
19   activities from 2002 to the present."
20         MR. ST. JOHN:  Can I just note for
21   the record we object to this topic as being
22   vague and ambiguous and overbroad.
23     But with that objection, go ahead.
24   Proceed.
25 Q  And let's -- I want -- so you can understand what

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 145

1     this topic is referring to, let's look back -- if
2     you flip back one page -- actually two -- no, one
3     page there's definitions right above the list of
4     topics and there's the letter H.  Can you read
5     that paragraph?
6  A  Letter H, "Associational activity meaning
7     recruiting candidates, registering voters, raising
8     campaign funds for Republican Assembly candidates
9     or the Republican Party of Wisconsin persuading
10    independents and other voters to vote for
11    Republican Assembly candidates, advocating and
12    implementing preferred legislative policies, and
13    organizing volunteers."
14 Q  Thank you.  With that definition in mind, do you
15    have any information about Topic 6?
16 A  Topic 6 is prohibited under the JCLO rule of
17    11 October 2001, as well as the ethics board at
18    that time memo to all legislators 5 November 2003.
19        It's also in the policy manual under the
20    ethics -- ethics tab of what is considered
21    campaign activity.  And your definition is all
22    related to campaign activity, and it's prohibited
23    in the Assembly rules.
24 Q  So you're saying that the Assembly does not engage
25    in any of the associational activities --

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 146

1  A  That's correct.
2  Q  -- listed here?
3  A  It's prohibited.
4  Q  Do individual Republican members of the Assembly
5     engage in any of these associational activities?
6  A  I don't know if individual Assembly members do or
7     staff.  If they do, they cannot be on -- they
8     cannot be on state time.
9  Q  Would any individual Republican members of the
10    Assembly have information about this topic?
11 A  Once again, I don't want to speculate one way or
12    the other.  I do not know.
13 Q  Besides what we discussed today, do you have any
14    other information about this topic?
15 A  No, other than it's -- I will reiterate it's
16    against Assembly rules and the JCLO rule of
17    11 October 2001, associated activities as defined
18    in No. H is prohibited.
19 Q  All right.  Let's move to Topic No. 7.  Will you
20    read that topic into the record, please.
21 A  No. 7, "The identity of Assembly persons who are
22    involved in recruiting Republican candidates for
23    the Assembly from 2002 to the present, the
24    prospective candidates those persons contacted for
25    recruitment purposes, whether such recruitment was

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 147

1     successful or unsuccessful."
2  Q  Do you know of any Republican Assembly members who
3     are involved in recruitment of Republican
4     candidates for the Assembly?
5  A  Once again, the Assembly is prohibited from any
6     type of recruitment under the JCLO rule
7     11 October 2001, the Assembly rules, as well as
8     the ethics board memo of 5 November 2003.
9  Q  Do you know of any individual Republican Assembly
10    members who are involved in the recruitment of
11    Republican candidates for the Assembly?
12 A  No.  Once again, I reiterate it's against the JCLO
13    rule 11 October 2001 to do any of this type of
14    activity on state time.
15 Q  Is Robin Vos involved in the recruitment of
16    Republican candidates for the Assembly?
17 A  I don't know what Robin Vos does.  It's not part
18    of what the Assembly needs to know.
19 Q  Is Robin Vos involved with the Wisconsin
20    Republican Assembly Campaign Committee?
21 A  I'm not -- I do not know what Robin Vos -- who
22    he's associated with.  Once again, the Assembly
23    does not need that information -- does not know
24    that information.
25 Q  Do you have any other information about this topic

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 148

1     that we haven't yet discussed today?
2  A  No.  I just want to reiterate once again,
3     recruiting candidates is against the Assembly
4     rule -- against the JCLO rule 11 October 2001.
5  Q  Let's turn to Topic No. 8.  And can you read that
6     into the record, please.
7  A  No. 8, "Meetings, communications or conversations
8     from 2002 to the present relating to recruiting
9     Republican candidates for the Assembly."
10 Q  What information do you have about this topic?
11 A  Once again, this falls -- recruiting candidates
12    falls under JCLO rule 11 October 2001.  It's
13    prohibited, also under the Assembly rules, also
14    under the ethics board memo of 5 November 2003.
15    That type of activity is prohibited.
16 Q  Do you know if any individual Republican members
17    of the Assembly would have information about this
18    topic?
19 A  No.
20 Q  Would Robin Vos have information about
21    communications relating to recruiting Republican
22    candidates for the Assembly?
23 A  I would not know what Robin Vos knows regarding
24    recruitment of candidates.  It's not an
25    Assembly -- it's not an Assembly requirement that

1    we know what Robin Vos is doing.

2  Q   **Besides what we've talked about today, do you have**

3      **any other information about this topic?**

4  A   No.  Once again, I reiterate, it's against the

5      Assembly rules.  It's against the JCLO rule of

6      11 October 2001.

7  Q   **Let's move to Topic No. 9.  And can you read that**

8      **topic into the record, please.**

9  A   No. 9, "Any criteria that you used from 2002 to

10      the present to access -- to assess whether a

11      candidate's qualified or highly qualified to run

12      for office."

13  Q   **Do you have any information about this topic?**

14  A   Once again, I'll go back to the JCLO rule of

15      11 October 2001.  We do not assess the quality of

16      a candidate, whether a candidate is -- can run for

17      office.  This is campaign-related activity which

18      is prohibited.

19  Q   **Do you know if any individual Republican members**

20      **of the Assembly would have information about this**

21      **topic?**

22  A   I would not speculate to guess if any legislator

23      would have any of this information, no.

24  Q   **Do you think it's likely that an individual member**

25      **of the Assembly has information about this topic?**

1  A   Once again, I'm not going to try to speculate one

2      way or the other what a legislator knows or does

3      not know.

4  Q   **And besides what we've talked about today, do you**

5      **have any other information about this topic?**

6  A   No.

7  Q   **All right.  Let's move to Topic 10.  Can you read**

8      **that topic into the record, please.**

9  A   "The identity and role of all Assembly Persons who

10      solicited campaign contributions for the Assembly

11      or individual Republican candidates for the

12      Assembly from 2002 to the present."

13  Q   **Do you have any information about this topic?**

14  A   Once again, we go back to the JCLO rule of

15      11 October 2001, ethics board memo of

16      5 November 2003, and Assembly rules.  And this is

17      campaign-related activity that's strictly

18      prohibited under our rules.

19  Q   **Do you know if any individual Republican members**

20      **of the Assembly would have information about this**

21      **topic?**

22  A   Once again, I do not want to speculate what

23      Republican candidates know or do not know.  So my

24      answer would be no.

25  Q   **No or I don't know?**

1  A   I don't know.  The Assembly doesn't know either.

2  Q   **Would Robin Vos have information about the**

3      **solicitation of campaign contributions for**

4      **Republican Assembly candidates?**

5  A   Once again, I would not want to speculate what

6      Speaker Vos knows or does not know.

7  Q   **Besides what we've talked about today, do you have**

8      **any other information on this topic?**

9  A   No.

10  Q   **All right.  Let's go to Topic 11.  Can you read**

11      **that topic into the record, please.**

12  A   No. 11, "The nature and number of communications

13      made by Assembly Persons between 2002 and the

14      present that solicited campaign contributions to

15      you, the RPW, or to any individual Republican

16      candidate.  The categories of communications as

17      used in this request include but not limited to

18      emails, mailings, photo solicitations,

19      person-to-person solicitations and fundraising

20      events."

21  Q   **Do you have any information about this topic?**

22  A   Once again, this is -- all these -- these

23      soliciting campaign contributions and

24      communications on state time is prohibited under

25      JCLO rule 11 October 2001, the Assembly rules, and

1      ethics board memo of 5 November 2003 that all

2      staff -- all staff members sign.

3  Q   **And do you know whether any individual Republican**

4      **members of the Assembly would have information**

5      **about this topic?**

6  A   I do not want to speculate what Assembly members

7      know or do not know or if they have any

8      information regarding these -- No. 11.

9  Q   **Would Speaker Vos have information about the**

10      **number of communications soliciting campaign**

11      **contributions to Republican candidates?**

12  A   Once again, I don't want to speculate what

13      Representative -- what Speaker Vos knows or does

14      not know as far as communication go regarding

15      fundraising activities.

16  Q   **And besides what we've talked about today, do you**

17      **have any other information on this topic?**

18  A   Just finally that it's all prohibited under JCLO

19      rule, no campaign activity on state time using

20      state resources.

21  Q   **Let's move to Topic No. 12, and can you read that**

22      **topic into the record, please.**

23  A   No. 12, "The ability and efforts of you to

24      fundraise for Republican Assembly candidates from

25      2002 to the present."

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 153

1 Q  Do you have any information about this topic?
2 A  No.  The Assembly is -- under JCLO rule
3     11 October 2001 is prohibited from doing any type
4     of fundraising on state time using state
5     resources.  Additionally, ethics board memo of
6     5 November 2003 states the same thing.  It's
7     prohibited and specifically states that one of
8     the illustrated -- illustrations there that
9     fundraising for campaigns is strictly prohibited.
10 Q  Would Robin Vos have information about the ability
11    to fundraise for Republican Assembly candidates
12    from 2002 to present?
13 A  What Speaker Vos knows, does not know, I will not
14    speculate regarding fundraising activities, if he
15    knows any of that.
16 Q  Besides what we've talked about today, do you have
17    any other information about this topic?
18 A  Just once again, reiterate fundraising is
19    prohibited under Assembly rules and JCLO rules of
20    11 October 2001.
21 Q  All right.  Let's go to Topic 13.  And can you
22    read that into the record, please.
23 A  No. 13, "The identity and role of all Assembly
24    persons who are responsible for organizing
25    volunteers in each Assembly election between 2002

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 154

1     to the present."
2 Q  Do you have any information about this topic?
3 A  Once again, this is prohibited under the JCLO rule
4     11 October 2001, ethics board memo of
5     5 November 2003, the Assembly rules, that
6     organizing is campaign related, and it's
7     prohibited under the rules using state time on
8     state resources.
9 Q  Do you know if Robin Vos would have information
10    about the organizing of volunteers in each
11    Assembly election between 2002 and the present?
12 A  I'll not speculate what Speaker Vos knows
13    regarding organizing volunteers for Assembly
14    elections.
15 Q  And besides what we've talked about today, do you
16    have any other information about this topic?
17 A  Once again, I'll reiterate it's against Assembly
18    rules, JCLO rule, and the ethics board of
19    organizing volunteers on state time using state
20    resources for election campaign activity.
21 Q  All right.  Let's go to the final topic which is
22    No. 14.  And can you read that into the record,
23    please?
24 A  No. 14, "All associational activities engaged in
25    by you or any Assembly persons from 2002 to the

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 155

1     present."
2        MR. ST. JOHN:  I just want to
3     repeat our objection that topic is
4     vague, ambiguous, and overbroad.
5 Q  Do you have any information about this topic
6     today?
7 A  Looking by -- looking at your definition of
8     associated activities, it's prohibited under
9     11 October 2001 JCLO rule, ethics board memo of
10    5 November 2003, and Assembly rules as they're
11    written in the policy manual.
12 Q  And do you know if Robin Vos would have any
13    information about the associational activities
14    engaged in by Assembly Republicans?
15 A  I will not speculate what Speaker Vos knows or
16    does not know regarding associated activities.
17 Q  Besides what we've talked about today, do you have
18    any other information about this topic?
19 A  Once again, I'll just reiterate under your
20    definition H of associated activities, it's
21    prohibited against -- by JCLO rule, ethics board
22    memo, and the Assembly policy manual of
23    campaigning on state time using state resources.
24 Q  So let's look -- still that document, but let's go
25    back to the document production requests which is

---

Videotaped Deposition of PATRICK E. FULLER  3-29-19          Page 156

1     Exhibit B.  And earlier we were discussing --
2        MR. ST. JOHN:  Counsel, for one
3     moment, I think you said document requests
4     are Exhibit B --
5        MS. HARLESS:  Exhibit B of
6     Exhibit 1.
7        MR. ST. JOHN:  Okay.  I just wanted
8     the record to be clear.  Thanks.
9        MS. HARLESS:  Yeah.
10 Q  Earlier we were talking about document request
11    No. 7 and No. 9, and I believe you mentioned that
12    you had produced a document, an open records
13    request in relation to those requests; is that
14    true?
15 A  That is correct.
16        MS. HARLESS:  I'm going to mark an
17    exhibit here.
18        (Exhibit No. 33 marked for
19         identification)
20 Q  And, Mr. Fuller, I'm handing you a document that
21    was marked as Exhibit 33.  Have you seen this
22    document before?
23 A  Yes.
24 Q  What is this document?
25 A  This is a document that was requested in an open

---

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 157

1    records request to produce any documents relating
2    to a number of different individuals, Republican
3    State Leadership Committee and so on.  If you read
4    on page 2 of this REDMAP, Paul Ray, and so on.
5  Q  And does your office keep all open records
6    requests that it processes?
7  A  No.
8  Q  Do you have a policy about which requests you keep
9    or not?
10 A  The policy in open records requests are anything
11   fiscal will be kept for three sessions, per diem
12   and district miles, travel.  All other open
13   records are retained for the session, and after
14   that they are not retained, after that session.
15 Q  So they're retained for the current session?
16 A  The current session, that's correct.
17 Q  And so this document is from 2013; correct?
18 A  That's correct.
19 Q  So why does your office still have this document?
20 A  This was -- I retained this.  This was on my
21   electronic documents, and I did not do a very good
22   job of policing all my open records.  When I found
23   this one from 2003 (sic), I had to beat myself up
24   a little bit because I wasn't following my own --
25   the Assembly's policy.

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 158

1  Q  How long has that policy been in place?
2  A  I want to say eight to ten years.
3  Q  All right.  Let's look at the bottom of the page
4    marked as WSA 0000001 because that is where the
5    first email in this chain starts.  And that email
6    is dated January 4th, 2012; correct?
7  A  Correct.
8  Q  What is Mr. Fischer requesting in this open
9    records request?
10 A  He's requesting "access to, and a copy of, all
11   records containing the following words:
12   Republican State Leadership Committee, RSLC,
13   Redistricting Majority Project, REDMAP,
14   Mark Braden, Paul Ray, Eric McLeod, Tom Hofeller,
15   Dan Oldham, Mark Jefferson, Mike Wild, American
16   Justice Partnership, Mike Grebe, Ed Gillespie."
17     He's asking "any and all correspondence with
18   individuals or organizations whose email address
19   ends in rnchq.org and whose email address ends
20   with mchq.org."
21 Q  And he's requesting those documents from the time
22   period of October 1, 2012, through January 4th,
23   2012; correct?
24 A  That's correct.
25 Q  Do you know if there are any open records requests

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 159

1    received that requested similar documents before
2    that time period?
3  A  No.
4  Q  All right.  Let's go back to the first page of the
5    document.  And let's look at the email at the top
6    that's dated January 21st, 2013.  This is a reply
7    email to Mr. Fischer's request; correct?
8  A  Correct.
9  Q  And in the "from" line of this email it says
10   "Probst, Nick." Who is Nick Probst?
11 A  Nick Probst at the time was the speaker's on-staff
12   attorney.
13 Q  And you're CC'd on this email; correct?
14 A  Correct.
15 Q  Why are you CC'd on this email?
16 A  Open records the clerk's office is always CC'd
17   just to know that if we have to -- if we have to
18   have that individual come and pay for records, we
19   can process the request and get payment for them.
20 Q  Okay.  And in the body of the email, in the second
21   paragraph, it says, "Your request is being
22   processed and a response will be prepared."
23     Do you see that?
24 A  Yes.
25 Q  Do you know if a response was ever produced to

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 160

1    Mr. Fischer regarding this public document
2    request?
3  A  I can't speculate one way or the other, but I
4    suspect -- and once again I don't want to
5    speculate, but if it wasn't -- if a response
6    wasn't prepared, the requester would have came
7    back and said something to Nick about it.
8  Q  And your office doesn't retain copies of any
9    produced responses; correct?
10 A  No.
11 Q  Do you know if any materials were withheld by
12   Speaker Vos's office in response to Mr. Fischer's
13   request?
14 A  No.
15       MS. HARLESS:  If we could just take
16   a couple-minute break.
17       MR. ST. JOHN:  Sure.  Of course.
18       THE VIDEOGRAPHER:  Going off the
19   record at 1:10.  Microphones are off.
20       (Recess)
21       THE VIDEOGRAPHER:  We're back on
22   the record at 1:19.
23       MS. HARLESS:  So I've had a chance
24   to go through my notes and I don't have any
25   additional questions for you.

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 161

1         MR. KEENAN: I have no questions.
2         MR. ST. JOHN: I just have a
3    couple, a couple of things I wanted to
4    clarify.
5
6         EXAMINATION
7    By Mr. St. John:
8  Q  Ms. Harless showed you a series of maps earlier in
9    your testimony; do you recall that?
10 A  Yes.
11 Q  Those maps were provided on Exhibits 3 through 29;
12   is that correct?
13 A  That's correct.
14 Q  You had testified, at least with respect to some
15   of them, that you had not seen them before.  Had
16   you seen any of the maps that were provided to you
17   today as Exhibits 3 through 29 before today?
18 A  No.  This is the first time I've seen any of those
19   maps.
20 Q  And Ms. Harless represented that those maps were
21   taken from a hard drive of Adam Foltz, and I
22   believe that she gave a date July 18?
23        MS. HARLESS: I think it was
24   July 18, yes.
25 Q  They were taken from a --

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 162

1  A  June 18th.
2  Q  June 18th, 2011.  That was taken from a hard drive
3    of Adam Foltz.  Would the Assembly as a whole have
4    seen those maps as taken from the hard drive of
5    Adam Foltz?
6  A  No.
7  Q  If there are graphic depictions such as maps that
8    reflect the language in either Senate bill 1 --
9    well, let me strike that and start over.
10       If there are graphic depictions such as maps
11   reflecting the language of Senate Bill 148, would
12   they have been attached to Senate Bill 148?
13 A  Yes.
14 Q  And would those maps then have been part of the
15   bill file?
16 A  Yes, they would have.
17 Q  And if there were maps that reflected the language
18   of Wisconsin Act -- or 2011 Wisconsin Act 43,
19   would those graphic depictions be attached to 2011
20   Wisconsin Act 43 as an appendix?
21 A  Yes.
22 Q  And in your capacity as chief clerk, you would
23   have seen the maps that would have been attached
24   to Senate Bill 148; is that correct?
25 A  That's correct.  They come over with the bill, the

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 163

1    bill jacket as it was -- once it's introduced to
2    the Senate, the Senate starts to take it up, it
3    goes on the Senate Insight, and anybody can get on
4    the Web page and see the maps, can see the whole
5    bill online.
6  Q  Ms. Harless asked a series of questions about
7    different districts that are reflected on
8    Exhibits -- that appear to be reflected on
9    Exhibits 3 --
10 A  Through 29.
11 Q  -- through 29; correct?
12 A  Correct.
13 Q  And 2011 Wisconsin Act 43 did change districts
14   from a map in 2002 until -- I'm sorry, did change
15   the districts -- Assembly legislative districts;
16   is that correct?
17 A  That's correct.  It's required by the constitution
18   Article IV Section 6.
19 Q  And with respect to each district that was
20   changed, is it the Assembly's testimony that it
21   was -- that those districts were changed to comply
22   with that constitutional requirement that it
23   redistrict?
24        MS. HARLESS: Objection to form.
25 Q  You can answer if you understand the question.

Videotaped Deposition of PATRICK E. FULLER  3-29-19       Page 164

1  A  The requirement is under the state constitution
2    Section 4 as -- Article IV Section 6 that the
3    legislature redistrict -- do a redistricting every
4    ten years.
5  Q  And then were the -- so were the new districts
6    drawn for the purpose of complying with that
7    constitutional requirement?
8  A  Yes.
9  Q  I'm going to ask you to take a look at Exhibit 1
10   which noticed certain documents -- I'm sorry,
11   noticed certain topics to be prepared to testify
12   about today.  And I want to draw your attention to
13   Topic No. 3.  Ms. Harless had asked you to provide
14   some testimony relating to objective facts that
15   Assembly persons had when drawing each district in
16   Act 43.  You see that, Mr. Fuller, that topic?
17 A  I see No. 3, yes.
18 Q  Would the Assembly have access to any objective
19   facts which were appended to Senate Bill 148 when
20   it came to the body of the Assembly?
21 A  Yes.  Every legislator, staff member that got on
22   the computer, as well as the public, can access
23   that bill history online and the appendix that
24   comes with it, whether it's population data,
25   whether it's the maps.  All that's available in

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 165

1   the bill jacket that the Wisconsin public can
2   review.
3          **MR. ST. JOHN:** Thank you.  I have
4   no further questions.
5          **MS. HARLESS:** I don't have any
6   additional questions.
7          **MR. ST. JOHN:** Thank you.
8          **THE VIDEOGRAPHER:** Going off the
9   record at 1:25.  Microphones are off.
10
11      (adjourning at 1:25 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 167

1   STATE OF WISCONSIN )
                       ) ss.
2   COUNTY OF DANE    )
3    I, Taunia Northouse, a Registered Diplomate Reporter
4   and Notary Public duly commissioned and qualified in and
5   for the State of Wisconsin, do hereby certify that
6   pursuant to notice and subpoena, there came before me on
7   the 29th day of March 2019, at 8:58 in the forenoon, at
8   the offices of Urban Land Interests, 10 East Doty
9   Street, the City of Madison, County of Dane, and State
10  of Wisconsin, the following named person, to wit:
11  PATRICK E. FULLER, who was by me duly sworn to testify
12  to the truth and nothing but the truth of his knowledge
13  touching and concerning the matters in controversy in
14  this cause; that he was thereupon carefully examined
15  upon his oath and his examination reduced to typewriting
16  with computer-aided transcription; that the deposition
17  is a true record of the testimony given by the witness;
18  and that reading and signing was not waived.
19      I further certify that I am neither attorney
20  or counsel for, nor related to or employed by any of the
21  parties to the action in which this deposition is taken
22  and further that I am not a relative or employee of any
23  attorney or counsel employed by the parties hereto or
24  financially interested in the action.
25

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 166

1              WITNESS CERTIFICATE
2
3      I hereby certify that I read the foregoing
4   transcript of my deposition given at the time
5   and place aforesaid, and I do again subscribe
6   and make oath that the same is a true,
7   correct, and complete transcript of my
8   deposition given, with corrections, if any,
9   appearing on the attached correction
10  sheet(s).
11
12  _____ correction sheet(s) attached.
13
14                 _____
15                 PATRICK E. FULLER
16
17  Subscribed and sworn to before me this _____
18  day of April 2019.
19
20                 _____
                   Notary Public, State of Wisconsin.
21
22
23
24
25

Videotaped Deposition of PATRICK E. FULLER  3-29-19        Page 168

1          In witness whereof I have hereunto set my
2   hand and affixed my notarial seal this 3rd day of April
3   2019.
4
5                              _____
6                              Registered Diplomate Reporter
                               Notary Public, State of Wisconsin
7
8   My commission expires
    May 17, 2019
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case: 3:15-cv-00421-jdp   Document #: 267   Filed: 04/10/19   Page 44 of 59

William Whitford, et al. vs                                    Videotaped Deposition of PATRICK E. FULLER
Beverly R. Gill, et al.                                                                    March 29, 2019

**$**

**$200,000 (2)**
57:25;122:20

**A**

**ability (2)**
152:23;153:10
**above (2)**
50:17;133:22;145:3
**accept (1)**
37:21
**acceptance (1)**
41:12
**access (10)**
28:22;36:22,25;37:3;
120:22;121:1;149:10;
158:10;164:18,22
**accordance (1)**
132:2
**Accountability (1)**
131:17
**Ackerman (1)**
17:15
**acknowledge (1)**
53:17
**acknowledgment (1)**
41:13
**Act (138)**
20:24,25;22:10,12,
15,16,18,19,22;23:18;
25:1;26:15;27:8;28:23;
29:8;30:7,15,23;32:13;
35:3,3;36:16,18;41:1;
42:13;43:2,19,23;
44:19;45:6,23;46:16;
52:10;56:23;58:3,9,21,
25;59:4;72:23,25;
73:20;75:9,18,20;76:6;
77:2;78:16;79:3;80:10,
21;81:5;82:5,17;83:9;
84:2,10;85:11;86:11;
87:11;88:11;89:11;
90:11;91:17;93:12;
94:2,20;95:25;97:7;
98:9;99:11;100:20;
101:24;103:2;104:7;
105:8;106:9;107:15;
108:20;109:23;111:1,
10;112:7,22;113:1,12;
114:15,15,23;115:1,8,
11,18,22;116:1;
120:23;121:3,11;
122:4,6,12,16;123:1,
23;124:1,10,14;125:4,
12,18;126:5;128:21;
129:3;131:22;134:23;
135:3,16;136:15;
137:7;141:16,19,23;
142:4,7,10,14,19;
143:5,8,15;144:1,5,11;

162:18,18,20;163:13;
164:16
**action (3)**
128:4;167:21,24
**activities (18)**
7:12,13,16;9:1;
70:21;115:4;143:23;
144:19;145:25;146:5,
17;152:15;153:14;
154:24;155:8,13,16,20
**activity (11)**
8:18;67:23;145:6,21,
22;147:14;148:15;
149:17;150:17;152:19;
154:20
**acts (1)**
131:22
**actual (5)**
73:11,11;77:15,16;
130:5
**actually (4)**
22:23;73:8;137:19;
145:2
**Adam (31)**
15:8;60:10,11;78:14;
80:19;82:4;83:25;85:5;
86:5;87:4;88:5;89:5;
90:4;91:5;93:4;95:18;
96:25;98:3;99:5;
100:14;102:20;103:25;
105:2;106:4;107:9;
108:13;109:16;110:19;
161:21;162:3,5
**add (1)**
50:19
**additional (3)**
9:10;160:25;165:6
**Additionally (1)**
153:5
**address (2)**
158:18,19
**addressed (1)**
7:1
**addresses (1)**
62:15
**adjourning (1)**
165:11
**administration (1)**
19:23
**administrative (5)**
18:23;19:4,15,16,20
**adopted (3)**
41:2;45:8;79:15
**advantage (1)**
75:17
**advocating (1)**
145:11
**Affairs (1)**
18:17
**affiliation (1)**
7:16
**again (89)**
11:22;23:9;25:9;

26:22;27:3,6;29:4;
30:20,20;31:20;34:7;
36:15;43:12;47:15;
54:3;58:6;68:13,18;
69:10,18;70:16;71:17;
72:14;80:8,10,24;82:1,
8;83:23;84:5;85:3;
86:3;87:2;88:1;90:2;
91:3;92:20;93:25;
95:13;96:5,11,20,23;
98:1,25;100:5,12;
102:18;104:22;105:24;
108:12;109:11;110:13;
111:14;113:20;120:14;
124:23;134:17;135:8;
138:23;139:23;140:2,
22;141:8;24;142:5,8;
143:9,20;144:14;
146:11;147:5,12,22;
148:2,11;149:4,14;
150:1,14,22;151:5,22;
152:12;153:18;154:3,
17;155:19;160:4
**against (10)**
67:22;126:7;146:16;
147:12;148:3,4;149:4,
5;154:17;155:21
**agencies (1)**
51:5
**agendas (1)**
64:24
**ago (1)**
15:23
**agree (1)**
75:23
**agreement (2)**
41:21;47:2
**ahead (5)**
53:7;58:17;128:8,9;
144:23
**allowing (1)**
9:20
**along (1)**
45:16
**always (1)**
159:16
**amalgam (1)**
7:7
**ambiguous (3)**
8:22;144:22;155:4
**amendment (26)**
126:11,13;128:2,4;
129:25;130:1,3,5,17,
22;131:9,13,16,25;
132:3,11,17;133:2,10,
19,21,24;134:9,12,15,
17
**amendments (1)**
23:1
**American (1)**
158:15
**amount (1)**
57:20

**analyses (1)**
40:20
**Analysis (2)**
131:1,4
**and/or (8)**
24:24;30:14;40:21,
23;45:2;75:8;77:1;
122:3
**Annabelle (1)**
10:4
**answered (2)**
24:11;35:19
**appear (1)**
163:8
**appears (1)**
106:9
**appended (1)**
164:19
**appendix (2)**
162:20;164:23
**appointed (1)**
7:22
**appreciate (1)**
41:23
**approval (1)**
132:2
**approximately (2)**
16:18;18:3
**April (5)**
60:21;64:21;140:15,
20,23
**area (25)**
83:1;94:19;95:24;
97:5;98:8,13;99:10,15;
100:24;101:23;102:3;
103:1,6;104:5,11;
105:13;106:14;107:14,
20;108:19,24;109:21;
110:2,25;111:5
**argue (1)**
76:3
**arranged (1)**
70:22
**Article (25)**
16:5;22:17;28:16;
78:9;82:9;92:22;95:1;
96:11;97:14;98:16;
99:17;101:1;102:4;
103:7;104:13;105:16;
106:18;107:22;109:1;
110:3;111:7,24;
115:13;163:18;164:2
**aside (2)**
88:21;133:16
**Assembly (434)**
6:8,25;7:2,5,10,14,
18,19;8:9,10,12;9:9,17;
12:4,19;14:9;16:3;
18:7,8,10,13,21,24;
19:1,1,8,11,17,18,21;
20:2,3,9,18;21:25;
22:23;23:1,8;27:19,22;
28:21;29:12,13;30:5,7;

31:3;32:18,18,25;33:3,
4;34:16;35:3,9;36:20,
22;37:7,11;38:20,21,
22,23;39:5,10,11,12,
13,16,17,19;40:5,6;
41:2,9;42:13,21;43:22;
44:7,14;45:7;46:17,19;
47:24;49:8,18,24;50:6,
8;52:18,19;53:3,11,15;
54:19,23;55:1;56:9,22;
57:9,18,25;58:2,8,24;
59:20,25;60:11,15,18,
19,24;61:25;62:2;
63:20,24;64:6;66:1;
67:5,17,22,25;68:10;
69:15;70:23;72:4;
76:11,11;77:19,21,24;
78:1,5;79:1,7,8,9,11,
12,23;80:14;81:3,5,11,
24;82:13,25;83:4,8,12,
21;84:7,20;85:1,9,12,
19;86:1,7,10,18,25;
87:7,18,25;88:7,10,18;
89:1,8,18,24;90:19;
91:1,7,8,24;92:18,25;
93:8,19,24;94:6,12,14,
17,20;95:7,11,15;
96:15,19;97:6,17,23,
24;98:20,24;99:19,19,
24;100:4,10;101:8,10,
15,19,21,24;102:8,12,
16,23;103:14;104:6,16,
21,23;105:5,18,23,25;
106:1,20,25;107:2,3,4,
25;108:5,7,8,10,20;
109:6,9,12,19,22;
110:7,12,14,15,25;
111:22;113:2,4,6,7,8,
10,11,13,18,22;114:7,
22;115:5,23;116:4,7,
10,12,14,14,18,23,25;
117:2,4,6,8,10,11,12,
14,19,25;118:3,6,9,12,
15,18,21,24;119:2,5,8,
12,16,19,22,25;120:3,
6,9,15,17,21;121:1,4,6,
7,16;122:7;124:2,7;
125:6,11,13,16,24;
126:10,13;127:7,10,15,
25;128:20;129:2,24;
130:3,4,16,22;132:7;
133:5,10,20;134:8,11;
135:7,11;136:16,21;
137:20,25;138:5,24;
139:3,20,25;140:3,5,9,
13,20,23,25;141:4,4,19,
20,21,24;142:2,12,17,
20,20,24,25;143:8,9,
10,11,18,21,24;144:3,
6,7,9,12,17;145:8,11,
23,24;146:4,6,10,16,
21,23;147:2,4,5,7,9,11,
16,18,20,22;148:3,9,

13,17,22,25,25;149:5,
20,25;150:9,10,12,16,
20;151:1,4,13,25;
152:4,6,24;153:2,11,
19,23,25;154:5,11,13,
17,25;155:10,14,22;
162:3;163:15;164:15,
18,20

**Assembly's (25)**
7:6;8:6,17;12:10;
21:20;33:24,25;44:17;
46:14;47:3;48:1;50:23;
53:4,9;56:7;58:17;
69:20;71:18;73:19;
74:15;119:14;121:19;
126:21;157:25;163:20

**assert (1)**
9:15

**assess (2)**
149:10,15

**assigned (26)**
40:8;78:14;80:19;
82:3;83:25;85:4;86:5;
87:4;88:5;89:5;90:4;
91:5;93:4;95:18;96:25;
98:3;99:5;100:14;
102:20;103:25;105:2;
106:3;107:8;108:14;
109:16;110:19

**assist (5)**
141:15;142:3;143:4,
14,25

**Assistant (3)**
6:9;18:14,15

**assisted (2)**
142:6,9

**associated (13)**
115:20;123:14,18;
138:5;139:3,16;140:9;
144:18;146:17;147:22;
155:8,16,20

**associational (7)**
7:13;8:25;145:6,25;
146:5;154:24;155:13

**assuming (1)**
143:17

**attached (7)**
52:1;55:17;56:1,2;
162:12,19,23

**attend (3)**
135:12;140:20,23

**attention (1)**
164:12

**Attorney (24)**
6:9;12:10;17:12;
24:9,11;33:23,24,25;
42:18;43:25;46:9;
47:18,20,23;52:11;
58:16;63:17;65:19;
66:21;72:7;73:6;
159:12;167:19,23

**attorneys (20)**
12:20;14:12;16:14,

16;17:4,7,9;21:2;24:9;
26:4,10;27:23;30:11;
32:18;34:16;48:10,12,
23;62:8;63:14

**available (10)**
45:4;46:12;48:24;
49:10,21,22;53:13,22;
60:22;164:25

**aware (12)**
22:22;33:12;44:16;
46:13;56:6;73:18;
74:19;138:4;139:11;
140:13;141:3;142:23

**ayes (1)**
133:11

## B

**back (34)**
23:11;43:21;44:24;
55:10;62:9,16;63:21;
64:10,16;66:25;74:24;
92:13;112:3,17;
120:18;126:19;129:3;
132:23;134:20;135:24;
136:18,23;137:5;
141:7,11;144:13;
145:1,2;149:14;
150:14;155:25;159:4;
160:7,21

**Baldus (8)**
40:10,15;44:16;
123:11

**Barca (1)**
126:8

**Bartlit (6)**
17:12,13;47:4;48:2;
50:8;51:17

**based (1)**
131:19

**basis (7)**
20:16,16;57:18;
119:14;121:18;140:7;
142:1

**beat (1)**
157:23

**became (4)**
27:8,8;135:6,10

**Beck (5)**
17:13;47:4;48:2;
50:8;51:17

**become (6)**
9:6;22:22;78:16;
80:21;82:5;84:2

**bee (1)**
118:9

**begin (1)**
6:18

**beginning (1)**
117:16

**behalf (4)**
7:17;12:3;41:8;53:3

**behind (28)**

79:23;81:11;83:12;
84:20;85:19;86:18;
87:18;88:18;89:18;
90:19;91:24;93:19;
95:6;96:14;97:16;
98:19;99:24;101:10;
102:7;103:14;104:16;
105:18;106:20;107:25;
109:5;110:7;111:10,18

**Bell (1)**
6:7

**belonged (1)**
129:19

**belongs (1)**
8:8

**below (1)**
60:20

**benefit (1)**
7:17

**benefits (1)**
18:19

**Besides (18)**
17:19;19:24;26:9;
35:13;44:15;111:20;
125:2,10;129:7;
135:14;146:13;149:2;
150:4;151:7;152:16;
153:16;154:15;155:17

**Best (1)**
124:16

**better (1)**
35:4

**beyond (1)**
33:8

**big (1)**
73:1

**bill (80)**
13:25,25;14:1,9,10;
16:3;22:19,19,24;23:4,
5,7,18;25:12;27:7,7,12,
18;29:7;30:5;31:3;
35:3;42:14,25;43:2,19,
22,23;44:1;52:10;
73:11;77:15,17,18;
78:4,6,6,6;79:9,18,19;
80:10,11;94:13;99:19;
108:7;114:15;125:21;
126:3,15,17,22,22;
127:5,6,12,12,23;
128:10;129:1;130:5,
19;133:1;134:24;
136:17,20,22;137:1,3;
162:8,11,12,15,24,25;
163:1,5;164:19,23;
165:1

**bills (9)**
9:2;58:18;132:7;
142:16

**bill's (2)**
128:19;133:15

**bit (5)**
24:19;35:4;126:23;
138:13;157:24

blue (2)
101:23;102:2

**board (12)**
21:22;131:18;
145:17;147:8;148:14;
150:15;152:1;153:5;
154:4,18;155:9,21

**body (7)**
7:21,22;8:20;129:21;
130:25;159:20;164:20

**book (2)**
19:1;20:3

**both (10)**
13:6;20:12,13;25:10;
29:6;56:20;63:8;72:2;
127:14;140:16

**bottom (3)**
62:21;141:11;158:3

**boundaries (35)**
79:4,14;81:6;82:19;
84:7,12;85:14;86:13;
87:13;88:13;89:13;
90:14;91:19;93:14;
94:22;95:3;96:2,9;
97:3,9;98:11;99:13,20;
100:22;101:2,6;102:1;
103:4;104:9;105:11;
106:12;107:17;108:22;
109:25;111:3

**boundary (2)**
103:10;107:18

**Braden (1)**
158:14

**branch (1)**
45:21

**break (9)**
10:23,24;55:4,13;
92:3,6;112:11;136:2;
160:16

**breath (1)**
9:11

**Brian (1)**
6:10

**brief (3)**
20:13,14,14

**bring (3)**
18:4;22:20;27:6

**bringing (1)**
129:1

**broad (1)**
45:25

**brought (5)**
21:19;22:2;125:23;
126:15;130:14

**budget (4)**
19:7,11;20:13,15

**bullet (3)**
56:17;60:20;61:12

**Bureau (5)**
19:11;40:3;131:1,5,
17

**business (4)**
12:18,24;13:1;

140:17

## C

**cage (1)**
123:12

**call (2)**
22:12;61:13

**called (2)**
6:15;134:17

**calls (3)**
24:7;33:22;34:2

**came (17)**
21:21,23;46:3;52:14;
61:20;62:4;73:8,10,10;
78:5;79:9,18;123:9;
137:12;160:6;164:20;
167:6

**Campaign (18)**
6:1;7:11,12;67:23;
68:11;70:23;145:8,21,
22;147:20;150:10;
151:3,14,23;152:10,19;
154:6,20

**campaigning (1)**
155:23

**campaign-related (2)**
149:17;150:17

**campaigns (1)**
153:9

**can (102)**
10:14,19,23;16:11;
19:24;20:2,6,6;22:5,7;
24:10;26:10;28:17;
30:9;31:4,19;34:8;
38:2,18,19;41:14,18;
44:22;49:1,11;53:23,
23;55:4;57:20;59:15;
64:16;74:2,17,23;75:1,
23,23;79:4;80:1;84:12;
85:14;86:13;87:13;
88:13,21;89:13;90:14;
91:11,19;92:4,5;93:14;
94:22,25;97:9;98:11;
99:13;100:22;102:1;
103:4,10;105:11;
106:12;107:17;108:22;
111:3;112:20;114:3;
116:1,2,6,9,22;120:20;
122:1;125:3;127:20;
128:18;130:7;131:7,
12;134:10;137:8,22;
144:15,20,25;145:4;
148:5;149:7,16;150:7;
151:10;152:21;153:21;
154:22;159:19;163:3,
4,25;164:22;165:1

**candidate (5)**
69:4;79:16;149:16,
16;151:16

**candidates (21)**
67:16,21;145:7,8,11;
146:22,24;147:4,11,16;

Case: 3:15-cv-00421-jdp   Document #: 267   Filed: 04/10/19   Page 46 of 59

William Whitford, et al. vs                                    Videotaped Deposition of PATRICK E. FULLER
Beverly R. Gill, et al.                                                          March 29, 2019

148:3,9,11,22,24;
150:11,23;151:4;
152:11,24;153:11
**candidate's (1)**
149:11
**capacity (5)**
7:15;10:9;12:3;53:7;
162:22
**Capitol (2)**
21:4,14
**carefully (1)**
167:14
**Carol (2)**
13:15,16
**carried (1)**
70:22
**case (9)**
10:5;21:5;22:1;47:5;
58:5;60:4,9;123:11,11
**cases (1)**
22:5
**categories (1)**
151:16
**category (1)**
136:13
**Caucus (4)**
6:25;20:24;21:15;
72:4
**cause (1)**
167:14
**CC'd (5)**
52:15;139:5;159:13,
15,16
**CD (3)**
60:25;61:5,8
**CDs (2)**
60:20;64:25
**census (1)**
132:5
**Center (1)**
6:1
**cents (1)**
38:1
**certain (3)**
75:16;164:10,11
**certify (2)**
167:5,19
**chain (1)**
158:5
**chair (1)**
129:12
**chance (1)**
160:23
**change (4)**
101:5;106:1;163:13,
14
**changed (35)**
79:5;81:7;82:20;
84:13;85:15;86:14;
87:14;88:14;89:14;
90:15;91:20;93:15;
94:23;95:3;96:3,9;
97:10;98:12;99:14,21;

100:23;101:3;102:2;
103:5,11;104:10;
105:12;106:13;107:19;
108:23;109:25;111:4;
117:17;163:20,21
**check (4)**
13:6;45:20;75:23;
142:1
**Chicago (1)**
6:1
**chief (37)**
18:8,10,12,14,16,20,
22,23;19:3,3,6,7,12,16,
19;20:9,14,18,21;
21:13;33:25;35:9;
36:22;38:20;47:24;
50:6;53:19;56:9;122:5,
9,13;124:3;125:6,8,17;
134:22;162:22
**citizens (1)**
48:20
**City (1)**
167:9
**Civil (1)**
12:1
**clarify (1)**
161:4
**clean (1)**
111:15
**clear (1)**
156:8
**clerk (69)**
12:17,18;13:21,23,
24;15:24,25;16:1;18:8,
10,12,14,16,20;20:9,
18,21;25:11,14,17,18,
18;27:3,4,5,6,10,18,25;
28:13,15;29:4,5,10,21,
22;30:21,22;31:16,16,
21,22;34:1;36:22;
38:20;45:17,18,20;
47:24;50:6;56:9;72:22,
23;73:2,4,9,9;122:5,9,
13,21;124:3;125:7,8,
17;127:14;134:22;
140:2;162:22
**clerk's (10)**
14:2;16:6,7;35:9;
37:19,22;40:12;53:19;
127:11;159:16
**codified (2)**
40:25;45:6
**collection (1)**
40:9
**coming (2)**
21:22;23:8
**comments (2)**
135:6,10
**Commission (1)**
6:12
**commissioned (1)**
167:4
**Committee (27)**

23:7;51:24;52:9;
56:11;58:20;59:3;
65:23;68:11,14;70:24;
115:21;126:1;127:25;
128:1,6;138:1,6,16,21;
139:13,22;140:1,10;
141:5;147:20;157:3;
158:12
**Committee's (3)**
64:22;138:7;140:11
**commonly (1)**
66:11
**communicated (2)**
6:21;64:7
**communication (5)**
34:3;138:8,11,13;
152:14
**communications (26)**
17:23;24:8;26:3,6,8;
33:23;62:12;63:24;
67:14;72:25;137:24;
138:4,14,20;139:2,11,
20,24;140:3,6;148:7,
21;151:12,16,24;
152:10
**compare (1)**
57:21
**compared (1)**
57:21
**competitiveness (2)**
131:24;132:18
**complete (2)**
74:10,20
**comply (5)**
32:19;33:12,19;
34:12;163:21
**complying (1)**
164:6
**computer (7)**
64:24;78:14;80:20;
82:4;84:1;123:9;
164:22
**computer-aided (1)**
167:16
**computers (7)**
40:7;122:25;123:2,4,
6,15,19
**concerned (1)**
57:23
**concerning (3)**
40:20;45:1;167:13
**conduct (1)**
94:3
**Conference (16)**
60:22;64:22;65:3,11,
11;138:2,7,17,22;
139:13;140:11,15,19,
21,24;141:2
**conferred (2)**
12:19,24
**confirm (1)**
134:11
**congressional (3)**

131:15,19;132:8
**consequences (2)**
123:22;124:13
**consideration (1)**
133:16
**considered (5)**
46:15;67:23;121:11;
132:20;145:20
**constituencies (1)**
7:23,24
**constitution (36)**
16:4;22:16,20;28:16;
29:23,24;30:6;78:10;
82:10;94:3;95:1;96:6,
12;97:14;98:15;
100:25;101:7;103:7;
104:14;105:16;106:16,
17;107:21;109:1;
110:3;111:7,23;
115:13;125:14;128:22;
129:5,17;131:20,21;
163:17;164:1
**constitutional (2)**
163:22;164:7
**consultant (3)**
142:18,21;144:10
**consultants (3)**
40:23;45:3;115:17
**consulted (4)**
141:18,22;143:7,19
**contacted (1)**
146:24
**contacts (1)**
61:16
**contained (2)**
36:4;40:13
**containing (1)**
158:11
**content (7)**
26:3,6;33:22;34:2,3,
8,10
**contents (1)**
77:17
**context (3)**
76:15,19;133:13
**contract (23)**
47:1;48:8,22;51:1,2,
5,7,9,11,19;56:24;57:3,
13,16;113:14;114:8,9,
10,13,14,16,19;142:22
**contracts (2)**
114:7;141:3
**contract's (1)**
57:1
**contributions (5)**
150:10;151:3,14,23;
152:11
**control (4)**
44:18;46:14;56:7;
73:19
**controversy (1)**
167:13
**conversations (21)**

17:20;26:9;27:20;
56:10,21,25;57:15;
58:1,7,13,19,23;59:2;
61:21,25;67:15;
123:21,25;124:9,12;
148:7
**coordinate (1)**
143:11
**coordinated (2)**
12:17;70:22
**copies (8)**
12:16;35:18;38:1;
42:9;50:12;51:22;
62:11;160:8
**copy (17)**
12:6;29:17;44:5;
47:1,25;50:2,23;51:9,
11,13;54:8;95:7;13;
74:10,20;140:17;
158:10
**corporate (1)**
8:12
**correctly (2)**
57:17,20
**correspondence (1)**
158:17
**co-sponsors (1)**
133:23
**cost (1)**
38:15
**Counsel (10)**
6:17,21;47:4,22;
49:4;142:13;144:4;
156:2;167:20,23
**counsel's (1)**
41:12
**County (3)**
76:8;167:2,9
**couple (5)**
6:19;23:11;31:9;
161:3,3
**couple-minute (1)**
160:16
**course (3)**
9:13,16;160:17
**court (10)**
10:12,14,19;47:6;
74:6;81:16;86:23;
88:24;95:10;123:11
**covered (1)**
50:18
**cracking (1)**
76:15
**cradle (1)**
19:5
**created (28)**
65:2;77:23,25;78:3,
8,9;80:22;82:6;86:6;
87:5;88:6;89:6;90:5;
91:6;93:5;95:18;97:1;
98:4;99:6;100:15;
102:21;104:1;105:3;
106:4;107:9;108:14;

William Whitford, et al. vs
Beverly R. Gill, et al.

Videotaped Deposition of PATRICK E. FULLER
March 29, 2019

109:16;110:19

**creates (2)**
131:9,13

**creation (3)**
78:18;84:3;85:6

**criteria (1)**
149:9

**current (3)**
58:5;157:15,16

**currently (1)**
62:22

**custodian (2)**
39:2,23

**custodians (1)**
8:4

**custody (13)**
38:21,25;39:6,15,21;
44:18;46:14;56:7;
73:19;123:5,7,7,8

**D**

**daily (4)**
115:4;119:14;
121:18;141:25

**Dale (7)**
142:3,6,9,12,18,21,
24

**damage (1)**
123:18

**damaging (1)**
123:14

**Dan (1)**
158:15

**DANE (2)**
167:2,9

**dark (4)**
104:5,10;109:21;
110:1

**data (3)**
40:21;64:24;164:24

**date (11)**
17:2;54:16,18;78:18;
84:3;85:6;129:24;
133:9;138:10;140:22;
161:22

**dated (4)**
6:22;128:16;158:6;
159:6

**day (1)**
167:7

**days (1)**
51:3

**day-to-day (5)**
120:16;138:25;
140:7;143:12,22

**DC (8)**
59:18,21;60:1,4,7,
16;140:21,24

**deal (1)**
94:13

**dealing (1)**
35:2

**deals (2)**
30:6;39:8

**December (1)**
51:4

**decennial (1)**
132:5

**decision (3)**
75:19;129:12,13

**defeated (1)**
126:1,11,13

**defendants (1)**
6:12

**defined (1)**
146:17

**defines (1)**
6:24

**definition (5)**
75:15;145:14,21;
155:7,20

**definitions (3)**
23:17,19;145:3

**deliver (1)**
132:6

**Democratic (3)**
83:4;126:9;133:5

**Democrats (2)**
133:20;134:11

**Department (4)**
6:11;18:17;39:3;
40:1

**depicted (1)**
91:15

**depictions (3)**
162:7,10,19

**depicts (1)**
78:24

**deponent (3)**
9:5;24:8;41:7

**deposed (5)**
10:7;21:2;22:1,3,9

**deposition (26)**
6:23;9:12;11:18;
12:13;14:5,14,19,25;
15:5,9,11,17,19,24;
16:12;17:21,24;18:2;
21:11;23:20;24:2;33:1,
10;75:24;167:16,21

**desk (1)**
25:23

**destroyed (1)**
54:14

**develop (1)**
131:18

**development (2)**
40:24;45:4

**diem (2)**
39:9;157:11

**different (13)**
32:2;46:4;52:22;
69:25;70:4;71:24;
72:19;116:19,23;
117:20,23;157:2;163:7

**Diplomate (1)**

167:3

**direct (3)**
56:17;130:24;141:11

**director (1)**
18:18

**directs (1)**
131:25

**disclose (2)**
26:6,7

**disclosed (1)**
8:20

**discoverable (1)**
7:11

**discovery (1)**
32:24

**discuss (12)**
13:5,16,22;14:19;
15:5,11,19,25;31:5,13,
22;138:12

**discussed (8)**
31:16;73:21;120:13;
125:3,10;135:14;
146:13;148:1

**discussing (1)**
156:1

**discussion (4)**
8:13,16;64:15;
112:15

**distributed (1)**
65:1

**district (234)**
24:25;26:15;28:22;
39:9;47:6,7;73:10;
75:9;76:22;77:2,18,19,
21;78:22;79:1,3,5,14,
15,17,24;80:14;81:4,5,
6,12,24;82:13,17,19;
83:1,8,13,21;84:7,9,12,
21;85:1,9,12,12,14,20;
86:1,8,11,13,19,25;
87:7,7,11,13,19,25;
88:8,10,13,19;89:1,8,
11,11,13,19,25;90:7,
12,14,20;91:1,7,12,17,
19,25;92:18,25;93:8,
12,14,20,24;94:6,14,
17,20,20,23;95:7,12,
15,21,25;96:2,9,15,19,
21;97:3,6,6,9,17,23,24;
98:6,9,11,20,24;99:2,8,
11,13,19,25;100:4,7,
10,17,19,20,22;101:11,
15,19,21,24;102:1,8,
12,14,16,23;103:2,4,
11,15,19,21,22;104:3,
6,6,9,17,21,23,24;
105:5,8,11,19,23,25;
106:1,1,7,9,12,21,25;
107:2,3,5,12,15,18,18;
108:1,5,8,10,17,20,22;
109:6,10,12,19,22,22,
25;110:8,12,14,16,22;
111:1,3,12,18;112:22;

113:3;116:4,7,10,23,
25;117:2,4,6,8,10,21;
118:1,4,7,10,13,16,19,
22,25;119:3,6,9,11,17,
20,23;120:1,4,7,10,23;
121:2;124:22,25;
157:12;163:19;164:15

**districts (25)**
73:1;76:7;78:15;
80:20;82:5;84:1;94:15;
111:22;116:1,19;
117:19,24;121:14;
131:19,24;132:19;
137:10,12,16;163:7,13,
15,15,21;164:5

**DOA (1)**
21:4

**document (138)**
8:3;11:17,19,23;
32:8,10,11,14,17,20;
33:13,20;34:12;37:8,
13;40:9,17;41:5;45:15;
47:2;49:3;50:11,19;
51:21;52:1,16,23;54:1,
5,6,16,20,24;55:14,17,
18,22;56:3,4,14;59:8,
11;62:5,10;64:19;66:1,
5;67:1,6,9;74:4,6,8,11,
15,21,23;77:8,13,14,
23;78:3,4,8,13,17,19,
21;80:1,6,7,16,18,22,
23;81:2,17,22;82:2,7;
83:17,18,19,24;84:4;
85:3,7;86:4;87:3;88:4;
89:4;90:3;91:4;93:3;
95:14,16;96:24;97:25;
98:2;99:1,4;100:13;
101:16;102:19;103:24;
104:23;105:1,25;
106:2;107:2,7;108:6;
109:14;110:18;127:4,
16;128:17;130:12;
134:5,10;137:22;
139:7,8,10;141:12;
155:24,25;156:3,10,12,
20,22,24,25;157:17,19;
159:5;160:1

**documents (127)**
8:24;14:4,7,10,17;
15:3,14,21;18:4;27:14,
15,16,16,17;30:3;
32:12;33:5,15,18;
36:15,23;37:3,8,12;
40:11,13,19;41:9;42:3,
6,10,17,22;43:4,9,11,
18,24;44:7,15,17,25;
45:9,12,16;46:7,8,11,
13,20;47:8,13,17,21;
50:13;51:23;52:1,11,
14;53:24;54:20,24;
56:6;63:1,4,16;64:24;
65:4,7,18,20;66:1,5,9,
12,15,20;67:9,13,18;

68:2,6,9,11,16,21,23;
69:5,7,8,13,16,19,20,
21,23;70:1,8,11,14,17,
20,25;71:9,12,15,22,
25;72:6,9,12,16,20;
73:6,12,15,18;76:13;
82:1;93:6;139:9;
140:18;157:1,21;
158:21;159:1;164:10

**dollars (2)**
57:23,24

**done (5)**
35:2;46:5;79:12;
94:25;101:8

**Doris (1)**
13:4

**Doty (1)**
167:8

**Doug (1)**
6:4

**down (7)**
46:1;58:12;59:8,11;
76:6;131:11,12

**Draft (10)**
94:9;99:1;100:6;
101:19;103:21;108:7;
109:12;110:14;113:9;
124:19

**drafting (8)**
80:20;82:5;84:1;
124:22;125:2,4,12,15

**drafts (10)**
25:1;26:16;28:24;
75:10;94:12;112:23;
113:7;120:24;123:22;
124:14

**draw (3)**
122:22;131:25;
164:12

**drawers (2)**
135:5,9

**drawing (76)**
24:25;26:14;28:22;
30:14;40:24;44:19;
45:5;46:16;75:9;77:1;
78:15;79:23;81:11;
83:12;84:20;85:19;
86:18;87:18;88:18;
89:18;90:19;91:24;
93:19;95:6;96:14;
97:16;98:19;99:24;
101:10;102:7;103:14;
104:16;105:18;106:20;
107:25;109:5;110:7;
111:10,12,22;112:7,22,
25,25;113:3;114:22;
115:1,7,11,18,22,25;
116:3,7,10;120:22,23;
121:2,11;122:3,6,8,12,
14,16,25;124:1,10;
141:16,19;142:3;
143:4,8,15;144:1;
164:15

drawn (3)
75:16;101:3;164:6
drink (1)
55:4
drive (28)
78:13;80:19;82:3;
83:25;85:4;86:5;87:3;
88:5;89:5;90:4;91:5;
93:4;95:17;96:25;98:3;
99:5;100:14;102:20;
103:25;105:2;106:3;
107:8;108:13;109:15;
110:18;161:21;162:2,4
drives (4)
40:14;44:15;123:14,
18
due (1)
123:10
duly (3)
6:15;167:4,11
during (4)
9:12;121:11;124:22;
125:2
duties (7)
18:20,25;19:19,24;
20:4;120:16;144:17
duty (1)
53:2

**E**

earlier (16)
25:1;26:16;28:23;
31:8;35:22;36:10;54:1,
4;75:10;112:23;
120:24;125:10;128:23;
156:1,10;161:8
East (1)
167:8
Ed (1)
158:16
efforts (1)
152:23
eight (1)
158:2
either (6)
32:15;53:23;142:5,
21;151:1;162:8
elect (1)
79:16
elected (5)
7:20,23;8:3;19:22;
129:21
Election (5)
6:12;137:17;153:25;
154:11,20
elections (1)
154:14
electoral (2)
131:23;132:18
electors (3)
117:13;120:16;121:5
electronic (35)

12:15;13:6,17;16:1;
24:17;25:10;26:23;
27:16;29:7;33:14,17;
34:23;35:22,24;36:6,
10,13,15;39:7,8;40:7;
42:9;43:13;47:15;63:8,
10;65:1,9,15;66:16;
69:1,2;71:5;72:2;
157:21
electronically (1)
140:16
electronics (1)
47:15
else (10)
13:9;19:12;25:24;
26:10;27:20;28:17;
30:9;38:17;43:20;
50:19
email (24)
36:9;40:20;42:12;
43:12;45:1;50:4;52:17;
58:15;62:12,15;65:21;
66:22;138:8;139:5;
158:5,5,18,19;159:5,7,
9,13,15,20
emails (2)
36:16;151:18
embodying (1)
132:8
employed (4)
46:23;50:14;167:20,
23
employee (3)
113:16,17;167:22
employees (1)
141:13
enacting (2)
137:9,20
enactment (6)
30:14;122:3;136:12,
19,21;137:19
enactments (1)
9:2
end (1)
33:1
ends (2)
158:19,19
engage (2)
145:24;146:5
engaged (3)
7:13;154:24;155:14
engagement (4)
47:1,3;48:1;50:24
enroll (1)
136:24
ensure (2)
19:8;79:15
entail (2)
20:11;37:23
entire (1)
129:21
entity (2)
7:5;8:12

entries (1)
128:14
entry (6)
128:16,18;129:10,
23;133:1,8
entry's (1)
128:24
equal (1)
7:25
equipment (1)
40:7
Eric (1)
158:14
escort (1)
123:11
Essentials (1)
141:10
ethics (12)
145:17,20,20;147:8;
148:14;150:15;152:1;
153:5;154:4,18;155:9,
21
even (1)
122:22
events (1)
151:20
evidentiary (1)
9:15
exact (1)
17:2
exactly (3)
50:22;114:9,10
EXAMINATION (3)
10:1;161:6;167:15
examined (1)
167:14
example (2)
7:9;39:9
excuse (1)
127:12
executive (2)
45:20;128:4
exhibit (106)
11:14,15,18,21,23,
24;23:9,12,13,13,14,
16,22;24:1;32:7,7;
40:19;41:15;44:24;
52:2;55:15,16,17;
56:13,13;59:9,10,10;
62:9,17,17,17;64:10;
73:24,25;74:3,7,24,25;
77:9,11,14;80:4,7;
81:14,16;83:15,18;
84:23,25;85:22,24;
86:21,24;87:21,24;
88:22,25;89:21,23;
90:22,25;92:11,17;
93:23;95:10;96:18;
97:21;98:23;100:2;
101:14;102:10;103:18;
104:20;105:22;106:23;
108:3;109:8;110:11;
112:17,19;127:1,3;

130:7,9,12;132:24,25;
133:25;134:2,5;136:3,
4,4;137:22;141:9,9;
144:14;156:1,4,5,6,17,
18,21;164:9
exhibits (6)
88:1;92:20;161:11,
17;163:8,9
expended (4)
48:9,12,22;140:14
expenses (1)
59:17
expensive (1)
56:18
expert (2)
75:25;76:1
experts (2)
40:23;45:2
explain (23)
79:4;84:12;85:14;
86:13;87:13;88:13;
89:13;90:14;91:19;
93:14;94:22;97:9;
98:11;99:13;100:22;
102:1;103:4,10;
105:11;106:12;107:17;
108:22;111:3
explained (3)
7:1;84:8;134:24
extent (7)
9:2;24:7;26:2;33:12;
34:1;53:6;126:21
external (28)
78:13;80:18;82:3;
83:24;85:4;86:4;87:3;
88:4;89:4;90:3;91:4;
93:3;95:17;96:24;98:2;
99:4;100:13;102:19;
103:24;105:1;106:3;
107:8;109:15;110:18;
113:17,19,21,24
extra (1)
44:5

**F**

fact (3)
26:7;75:24;121:1
factors (1)
76:8
facts (7)
28:21;45:2;46:15;
120:21;121:10;164:14,
19
falls (2)
148:11,12
familiar (2)
9:6;22:10
far (18)
38:4;52:16;57:22;
74:19;76:12;77:18;
78:10;122:22;125:15;
126:20;136:16,18,20,

21;137:8,19;144:7;
152:14
Fawcett (1)
60:13
February (1)
32:16
Federal (2)
12:1;132:5
feeling (1)
112:12
female (1)
17:11
few (1)
10:11
file (3)
63:12;71:5;162:15
files (28)
34:23,24;35:1,2,10,
13,14;36:2,3,6,20,25;
37:4;38:7;39:4,6,7,8;
42:9;43:13;63:9,10;
64:24;65:15,16;67:5;
69:1,2
final (6)
113:9;126:16,16;
135:7,11;154:21
finally (1)
152:18
financial (5)
18:22;19:3,6,7,12
financially (1)
167:24
find (6)
68:4;69:5;70:8;71:9;
137:14;139:9
finish (1)
10:15
firm (3)
48:1;114:11;124:17
first (40)
6:15,21;12:6,23;
22:22;23:2;24:23;
32:14,16;40:18;51:4;
53:17;81:18,21;83:19;
88:2;92:19,21;93:25;
95:13;96:20;97:25;
98:25;100:5,7;101:16;
102:13;103:20;104:22;
105:24;107:1;108:6;
109:11;110:13;130:8;
131:4;134:1;158:5;
159:4;161:18
Fiscal (3)
19:10;143:2;157:11
Fischer (2)
158:8;160:1
Fischer's (2)
159:7;160:12
Fitzgerald (5)
14:24;15:2,6;57:8,9
Fitzgerald's (1)
57:6
five (4)

16:10;61:15;92:4;
141:12
**flip (4)**
23:10;62:9;112:19;
145:2
**floor (3)**
125:23;128:7;130:14
**following (7)**
56:18;62:14;132:4;
133:8;157:24;158:11;
167:10
**follows (1)**
6:16
**Foltz (32)**
15:8,11,14;60:10,11;
78:14;80:19;82:4;
83:25;85:5;86:5;87:4;
88:5;89:5;90:4;91:5;
93:4;95:18;96:25;98:3;
99:5;100:14;102:20;
103:25;105:2;106:4;
107:9;109:16;110:19;
161:21;162:3,5
**Foltz's (1)**
108:13
**forenoon (1)**
167:7
**forgot (1)**
13:19
**form (14)**
9:13;25:15;28:7,8;
31:18;38:16;44:22;
49:5,14;59:5;61:6;
64:5;111:13;163:24
**formed (1)**
34:4
**formulated (1)**
21:24
**forward (2)**
22:12;23:20
**found (5)**
69:7;129:16;139:7;
140:18;157:22
**four (2)**
16:18;48:18
**four-hour (1)**
16:24
**free (2)**
26:7;41:11
**Friedrich's (1)**
124:17
**front (2)**
23:10;55:16
**full (2)**
11:3;111:14
**FULLER (11)**
6:14;10:3;11:5,17;
26:4;32:21;33:1;92:16;
156:20;164:16;167:11
**Fuller's (2)**
33:24;75:22
**funded (1)**
70:22

**fundraise (2)**
152:24;153:11
**fundraising (6)**
151:19;152:15;
153:4,9,14,18
**funds (22)**
48:9,9,11,22;53:20;
56:23;58:3,9,21,25;
59:3,19;60:24;61:9,9;
140:13;141:1;142:21,
24;144:7,7;145:8
**further (6)**
55:4;59:8,10;165:4;
167:19,22
**future (1)**
133:16

**G**

**GAB (3)**
131:25;132:5,16
**gather (2)**
53:16,18
**gathered (1)**
41:9
**gave (8)**
12:9;14:12;32:17;
34:15;44:4;46:1;57:12;
161:22
**General (3)**
6:10,19;8:11
**Generally (3)**
32:19;33:11;127:20
**gerrymander (3)**
75:11,18,20
**Gerrymandering (2)**
75:13,15
**Giftos (1)**
6:7
**Gill (2)**
47:5;58:5
**Gillespie (1)**
158:16
**gist (1)**
21:10
**given (6)**
33:19;34:11,17;
63:18,19;167:17
**gives (1)**
128:10
**giving (3)**
28:16;33:6;132:14
**goes (9)**
38:5;62:2;125:16;
126:20;136:19,21,21;
137:19;163:3
**good (5)**
10:3;58:16;128:10;
135:19;157:21
**GOP (14)**
60:21;64:22;65:11,
22,22;138:1,7,16,22;
139:13;140:11,14,20,

23
**Government (1)**
131:17
**Governor (4)**
115:10,14;136:25;
137:2
**governor's (2)**
21:13;115:15
**graphic (3)**
162:7,10,19
**grave (1)**
19:5
**great (1)**
136:9
**Grebe (1)**
158:16
**green (2)**
104:5,10
**ground (1)**
10:11
**guess (2)**
12:23;149:22
**guys (2)**
112:10,13

**H**

**half (3)**
57:24;58:17,17
**hand (14)**
93:22;95:9;96:17;
97:21;98:22;102:10;
103:17;104:19;105:21;
106:23;108:3;109:8;
110:10;134:1
**handed (2)**
74:6;77:13
**handing (14)**
11:17;80:6;83:17;
84:25;85:24;86:23;
87:23;88:24;89:23;
90:24;92:16;130:11;
134:4;156:20
**hands (1)**
132:14
**happen (1)**
16:20
**happened (2)**
127:23;128:11
**hard (32)**
40:14;44:15;78:13;
80:18;82:3;83:25;85:4;
86:4;87:3;88:4;89:4;
90:3;91:5;93:3;95:17;
96:24;98:2;99:4;
100:13;102:19;103:25;
105:1;106:3;107:8;
108:13;109:15;110:18;
123:14,18;161:21;
162:2,4
**HARLESS (39)**
9:22;10:2,4;11:13;
34:9;41:18,23;42:1,2;

49:6;55:6,12;64:9,16,
18;73:23;76:2;77:7;
80:2;92:5,15;111:16;
112:10,16;114:1;
135:18;136:1;156:5,9,
16;160:15,23;161:8,20,
23;163:6,24;164:13;
165:5
**head (4)**
10:21,21;20:2,5
**header (2)**
59:12;127:19
**heading (3)**
61:12;130:25;131:4
**heard (2)**
23:2;76:21
**hearing (5)**
128:7;135:2,6,10,12
**held (2)**
18:9;135:3
**help (4)**
42:6;45:12;47:11;
68:23
**hereby (1)**
167:5
**hereto (2)**
52:1;167:23
**highly (1)**
149:11
**history (20)**
13:25;14:9;25:12;
27:7,13,19;30:5;31:3;
43:2,23;44:2;78:7;
127:5,12,19,20,22;
133:1;136:22;164:23
**Hofeller (4)**
141:15,18,22;158:14
**hope (1)**
85:24
**hours (3)**
16:18;18:3,3
**HR (1)**
39:2
**human (2)**
39:3,25

**I**

**idea (7)**
24:21;44:9;47:23;
55:1;76:17;83:10;
116:11
**identical (1)**
132:7
**identification (18)**
11:16;74:1;77:12;
80:5;81:15;83:16;
84:24;85:23;86:22;
87:22;88:23;89:22;
90:23;92:12;127:2;
130:10;134:3;156:19
**identified (2)**
24:1;50:16

**identities (1)**
9:6
**identity (12)**
26:14;112:21,24;
113:2;114:18,21,25;
115:17;144:17;146:21;
150:9;153:23
**III (1)**
56:14
**illustrated (1)**
153:8
**illustrations (1)**
153:8
**immediately (1)**
126:19
**implementation (3)**
136:15,16;137:7
**implementing (1)**
145:12
**Inabnet (1)**
16:8
**I-N-A-B-N-E-T (1)**
16:8
**include (6)**
9:1;19:9,22;63:25;
64:8;151:17
**including (11)**
25:1;26:15;28:23;
40:19;44:25;51:25;
62:12;64:23;75:10;
112:23;120:24
**incorporated (2)**
135:5,9
**incumbent (1)**
83:8
**independents (1)**
145:10
**individual (94)**
6:2;7:8;8:7,8,13,15;
10:4;36:19,23,25;37:3,
7,11,20,24;38:6;39:22;
40:4,6;42:21;43:3;
44:6,11;46:18;53:7;
54:19,23;55:2;59:20;
60:3,6,14;61:4,7,24;
62:3;63:23;64:1,3,6;
65:25;66:4;67:4,8;
76:9;82:23;84:17;
114:6,21,25;116:3,6,9,
15;117:13;119:13;
120:15;121:5,5,14,17;
124:6,10,13,21,24;
138:15,20;139:12,15,
16,20,25;140:4;141:18,
21,25;142:16;143:3,7,
18;144:8;146:4,6,9;
147:9;148:16;149:19,
24;150:11,19;151:15;
152:3;159:18
**individually (1)**
40:18
**individuals (18)**
25:20;27:2;61:15,18,

22;62:19,20,20;63:8,
21;76:22;113:17,19,21,
24;115:25;157:2;
158:18
**individual's (1)**
63:6
**information (79)**
24:13;33:6;42:24;
46:17;53:13,17,18;
58:15;76:12;79:22;
81:10;83:11;84:19;
85:18;86:17;87:17;
88:17;89:17;90:18;
91:23;93:18;95:5;
96:13;97:15;98:18;
99:23;101:9;102:6;
103:13;104:15;105:17;
106:19;107:24;109:4;
110:6;111:9,17,21;
112:6,24;120:12,25;
121:4,20;123:17;
137:24;145:15;146:10,
14;147:23,24,25;
148:10,17,20;149:3,13,
20,23,25;150:5,13,20;
151:2,8,21;152:4,8,9,
17;153:1,10,17;154:2,
9,16;155:5,13,18
**initial (1)**
51:2
**initially (2)**
51:1;137:8
**Insight (1)**
163:3
**insofar (1)**
6:23
**Instead (2)**
7:22;10:20
**institution (1)**
125:13
**instruct (2)**
26:5;34:5
**instructing (1)**
41:10
**instructions (4)**
33:19;34:11,15,17
**intended (1)**
9:3
**intending (1)**
9:17
**interact (2)**
20:8,17
**interacted (1)**
122:11
**interactions (3)**
20:11;137:25;140:8
**interested (1)**
167:24
**Interests (1)**
167:8
**interpreted (1)**
8:25
**interrupt (1)**

41:21
**into (19)**
23:6;75:1;76:22;
120:20,20;122:1;
131:8;135:6,10;
137:23;144:16;146:20;
148:6;149:8;150:8;
151:11;152:22;153:22;
154:22
**introduce (4)**
77:8;100:2;101:13;
133:25
**introduced (6)**
23:5;113:9;126:9,10;
127:25;163:1
**inventory (1)**
40:7
**investigation (4)**
20:24;21:16,23;24:4
**invoice (6)**
38:15;51:16;54:10;
63:20;122:17,18
**invoices (7)**
54:11,12,13;58:10,
14;113:11;122:15
**involved (45)**
20:20,25;21:7,15;
22:6;26:14;40:9;47:24;
50:7;56:10;112:21,25;
113:3,12;114:19,22;
115:1,7,10,16,18,21,
25;116:3,7,10;122:5,7,
22;125:4,12,16,17;
134:22;135:2,15;
136:14;137:1,6;
144:18;146:22;147:3,
10,15,19
**involvement (7)**
21:18,23;30:13;
50:22;122:2;126:21;
136:11
**issued (2)**
123:2
**IV (26)**
16:5;22:17;28:16;
59:12;78:9;82:9;92:22;
95:1;96:11;97:14;
98:16;99:17;101:1;
102:4;103:7;104:13;
105:16;106:18;107:22;
109:1;110:3;111:7,24;
115:13;163:18;164:2

**J**

**jacket (2)**
163:1;165:1
**January (6)**
18:11;32:16;132:4;
158:6,22;159:6
**JCLO (18)**
67:24;145:16;
146:16;147:6,12;

148:4,12;149:5,14;
150:14;151:25;152:18;
153:2,19;154:3,18;
155:9,21
**Jeff (2)**
57:8,10
**Jefferson (1)**
158:15
**job (3)**
18:20;19:24;157:22
**John (45)**
6:6,6,7,17;12:11;
17:8;24:6;25:15;26:1;
28:7;31:18;32:21;
33:21;41:3,20,25;
44:21;49:4,11,14;
52:21;59:5;61:6;64:5,
11;74:2,12;75:21;
111:13;112:2,12;
113:24;114:3;125:5;
143:14,19;144:20;
155:2;156:2,7;160:17;
161:2,7;165:3,7
**jointly (1)**
131:18
**Josh (2)**
17:15,18
**journal (53)**
12:17;13:21,22,24,
24;14:2,8;18:25;19:18;
25:11,14,17,18;27:3,5,
6,7,12,18,19,24;28:1,3;
29:4,10,12,13;30:5,21,
22,24;31:3,16,22;
39:11,12,20;42:25;
43:1,22;44:2;45:17,18,
20;48:19;72:22;73:2,9;
126:8;127:8,10,11;
136:23
**Journal's (2)**
28:3,9
**Julie (1)**
14:3
**July (19)**
22:24;23:7;51:4;
78:5;79:20,21;113:10;
125:22,23;128:1,15,16;
129:24;130:14;133:9;
135:3;136:17;161:22,
24
**June (27)**
78:18;80:22;82:6;
84:4;85:7;86:6;87:5;
88:6;89:6;90:5;91:6;
93:5;95:19;97:1;98:4;
99:6;100:15;102:21;
104:1;105:3;106:5;
107:10;108:14;109:17;
110:20;162:1,2
**Justice (2)**
6:11;158:16

**K**

**Kay (1)**
16:8
**KEENAN (3)**
6:9,10;161:1
**keep (4)**
113:4;123:12;157:5,
8
**kept (4)**
35:8,9,13;157:11
**Kessler's (1)**
123:10
**Kevin (2)**
6:6;17:8
**kind (3)**
11:25;40:4;51:16
**knew (3)**
21:3;23:2,4,7
**knowledge (15)**
7:6,7,11;8:7;17;33:7;
41:11,16;64:6;74:17;
79:8;121:8,9;144:6;
167:12
**known (2)**
7:4;138:2
**knows (12)**
8:12,15;53:6;113:8;
148:23;150:2;151:6;
152:13;153:13,15;
154:12;155:15
**Kramer (4)**
126:7;129:13,19,20
**Krusick (1)**
126:12

**L**

**laid (3)**
133:10,13;134:18
**Land (1)**
167:8
**language (3)**
162:8,11,17
**large (2)**
20:3;57:19
**last (13)**
16:9;17:2;51:3;
52:25;55:15;59:9,10;
61:12;72:15;112:3;
114:3,5;141:8
**late (1)**
32:16
**later (8)**
24:20;27:8;51:3;
67:3;80:10;128:2;
132:4;137:15
**law (4)**
8:5;48:1;114:11;
124:17
**lawmakers (1)**
44:19

**leader (1)**
20:17
**Leadership (2)**
157:3;158:12
**least (1)**
161:14
**left (1)**
94:8
**Legal (5)**
6:1;47:4;56:15;
58:18;142:16
**legislation (3)**
19:5;128:12;137:20
**legislative (43)**
8:18;9:1,8;12:18,24;
13:2;19:10,22;39:3;
40:3,14,22;45:2;46:16,
18;51:25;62:13;64:7;
76:15,19;94:8;113:5;
115:2,3;116:12;
122:24;123:15,19;
127:24;128:12;131:1,
5,14,16,18;132:8,25;
139:22;140:1,17;
143:10;145:12;163:15
**legislator (7)**
9:7;42:23;44:9;
113:5;149:22;150:2;
164:21
**legislators (15)**
7:8;8:14;19:9;20:10,
12;40:23;64:8;116:11;
121:18;126:10;137:10;
138:24;140:4;143:23;
145:18
**legislator's (1)**
62:3
**legislature (20)**
16:4;22:17;30:7;
40:2,15;45:22;84:16;
97:13;99:16;102:5;
103:8;107:22;110:4;
111:8,25;115:13;
117:11;122:12;132:2;
164:3
**legislature's (12)**
78:10;80:24;82:8;
92:22;94:1;96:5;98:14;
104:12;105:14;106:15;
109:2;132:14
**Leslie (3)**
143:25;144:3,9
**less (2)**
57:23,23
**letter (7)**
6:22;7:10;47:1;48:1;
50:24;145:4,6
**light (2)**
106:10,13
**likely (4)**
31:2;39:1;79:16;
149:24
**like-minded (1)**

76:22
**limited (5)**
    8:19;40:20;45:1;
    52:1;151:17
**line (1)**
    159:9
**lines (1)**
    75:16
**list (12)**
    13:20;23:22;74:25;
    112:18;116:17,21;
    120:18;121:13,21;
    141:13;144:14;145:3
**listed (10)**
    19:25;61:16,18,22;
    62:1,16,21;63:21;64:1;
    146:2
**lists (3)**
    112:19;133:3;136:4
**litigation (25)**
    20:20,23;21:1,16,18;
    40:10,15;44:16;50:9;
    56:18,19,23;58:3,9,21,
    25;59:4;60:4,8;142:7,
    10,13,18;144:4,10
**little (6)**
    24:19;35:4;126:23;
    138:12,13;157:24
**LLP (1)**
    47:4
**locked (1)**
    123:12
**log (10)**
    113:4;115:4;116:13;
    117:13;119:13;120:15;
    121:6,17;138:24;
    143:22
**long (5)**
    16:9;18:1,9;31:12;
    158:1
**Loo (1)**
    13:4
**look (23)**
    23:9;30:12;36:19;
    43:18;46:21;51:21;
    62:10;72:15;74:3;
    77:17;103:22;109:13;
    112:17;121:25;127:18,
    24;128:14;130:6;
    145:1;155:24;158:3;
    159:5;164:9
**looked (8)**
    25:12;35:14;65:15;
    68:1;80:11;91:12;
    129:14,15
**looking (12)**
    21:12;32:11;56:13;
    59:8;84:5;103:21;
    110:15;132:24;133:2,
    22;155:7,7
**looks (9)**
    81:1;94:13;95:14;
    99:1;101:17,17;

106:11;127:5;133:22
**LRB (3)**
    131:25;132:5,16
**LTSB (2)**
    123:3,12
**lunch (3)**
    112:11;135:23;136:2

## M

**Madison (1)**
    167:9
**mailings (1)**
    151:18
**main (2)**
    65:12;72:5
**mainly (3)**
    20:12;36:16;43:15
**maintain (23)**
    18:23;19:7,16,20;
    38:20,22,25;39:6,14,
    15,18,21,24;40:4;
    53:12;54:11,12;71:19;
    116:15;121:20;123:5;
    127:10;140:5
**maintained (1)**
    39:25
**maintains (2)**
    38:24;39:4
**majority (9)**
    20:17;66:10;123:2,8;
    132:6;138:3;139:4,17;
    158:13
**making (1)**
    136:22
**male (1)**
    17:11
**manager (25)**
    12:19;13:12,13,14,
    15;29:6;33:16;35:17,
    18,20,23;36:1;42:8;
    43:14;45:14,16,17;
    47:11;52:6;54:9;65:10;
    66:16;68:25;71:3,4
**managing (1)**
    122:24
**manual (6)**
    21:20,21;39:13;
    145:19;155:11,22
**manually (1)**
    35:5
**many (1)**
    16:15
**map (73)**
    77:20;79:1,1;80:13;
    81:4,23;83:20;85:1,9;
    86:8,25;87:8,24;88:8,
    25;89:8,24;90:25;91:8,
    15;92:17,24;93:9,24;
    94:5,15,17;95:11,22;
    96:18;97:3,22;98:6,24;
    99:8;100:3,9,17;
    101:14,21;102:11,15,

24;103:18,20;104:3,20,
23;105:6,9,22,25;
106:7,10,24;107:1,4,
12;108:4,6,9,17;109:9,
19;110:12,15,22;
124:16;135:5,7,9,11;
163:14
**maps (21)**
    40:25;45:6;80:11;
    85:24;122:14;124:19,
    22,25;161:8,11,16,19,
    20;162:4,7,10,14,17,
    23;163:4;164:25
**Maptitude (1)**
    59:16
**March (2)**
    6:22;167:7
**mark (11)**
    11:13;64:10;73:24;
    77:9;80:2;130:7,7;
    134:1;156:16;158:14,
    15
**marked (49)**
    11:15,18;73:25;74:7;
    77:11,13;80:4,6;81:14,
    16;83:15,17;84:23;
    85:22;86:21,23;87:21,
    23;88:22,24;89:21,23;
    90:22,24;92:11,16;
    93:22;95:9;96:17;
    97:21;98:22;100:2;
    101:13;102:10;103:17;
    104:19;105:21;106:23;
    108:3;109:8;110:10;
    127:1;130:9,11;134:2,
    4;156:18,21;158:4
**Marley (1)**
    51:8
**maroon (2)**
    105:9,12
**Martyn (1)**
    14:3
**matched (1)**
    27:12
**material (1)**
    65:1
**materials (4)**
    60:21;64:20,25;
    160:11
**matters (1)**
    167:13
**may (6)**
    42:22;43:4;65:21;
    66:4;112:2;115:12
**maybe (1)**
    31:14
**mchqorg (1)**
    158:20
**McLeod (1)**
    158:14
**mean (7)**
    36:9;48:25;75:12;
    81:18;125:5;129:10;

133:14
**meaning (1)**
    145:6
**means (4)**
    76:15,19,24;133:15
**Meehan (1)**
    17:10
**meet (14)**
    12:21;14:13,24;15:8,
    16;42:3,6;43:9;45:9,
    13;47:8,13,17;80:24
**meeting (22)**
    12:25;13:5,9,11;
    16:9,17,17,18,21,21,
    24;17:1,5;27:14,24;
    28:13;29:9,20;31:6,7,9,
    12
**meetings (13)**
    16:11,13,15,20;
    17:19;21:3,13;25:19;
    30:25;31:5,9;67:14;
    148:7
**member (25)**
    14:22;37:7;42:21,23;
    44:6;56:22;58:2,8,24;
    59:20;60:11,15;61:4,7,
    24;63:24;65:25;67:4;
    83:4;139:12;141:19;
    143:8,18;149:24;
    164:21
**members (38)**
    7:14,20,24;8:7,8;
    9:19;19:8,21;21:14;
    39:5;40:5,6;54:20;
    114:22;124:6,10,13;
    133:5;138:15,21;
    139:15,16,20,25;
    140:20,23;141:4;
    146:4,6,9;147:2,10;
    148:16;149:19;150:19;
    152:2,4,6
**members' (2)**
    8:6;36:20
**member's (21)**
    8:11,13,14,15,17,18;
    36:23;37:1,3,12;38:7;
    39:22;43:3;44:11;
    54:23;64:3;66:4;67:8;
    115:1;120:15;141:22
**memo (9)**
    145:18;147:8;
    148:14;150:15;152:1;
    153:5;154:4;155:9,22
**memos (1)**
    40:21
**mentioned (13)**
    24:16;54:1,4;82:14;
    97:18,19;114:6;
    122:17;126:24;138:23;
    140:2;143:20;156:11
**messaged (7)**
    22:25;79:10,19;
    125:22;126:19;136:18;

137:5
**met (25)**
    13:19;15:23;17:11,
    16;25:13,16;26:25;
    31:15,21;42:17;43:24;
    46:8;52:3;63:1,4;65:4,
    7;66:12;67:18;68:21;
    69:23;70:25;71:22;
    72:16;128:1
**metadata (3)**
    78:17;84:3;85:6
**Michael (1)**
    124:16
**Microphones (5)**
    55:8;92:8;135:22;
    160:19;165:9
**might (2)**
    44:7;67:5
**Mike (4)**
    143:4,7;158:15,16
**miles (2)**
    39:9;157:12
**million (2)**
    57:23,24
**mind (4)**
    6:18;19:14;22:8;
    145:14
**minimal (1)**
    57:22
**minimum (1)**
    9:7
**minority (2)**
    123:3,8
**minutes (7)**
    16:10,17,19;31:14,
    15;64:23;92:4
**mistaken (3)**
    57:5,24;65:14
**moment (2)**
    15:23;156:3
**money (2)**
    37:21;57:20
**monthly (3)**
    20:15,16;57:17
**months (1)**
    122:19
**more (3)**
    8:12;79:16;136:13
**morning (1)**
    10:3
**most (2)**
    31:2;39:1
**motion (1)**
    125:25
**motions (1)**
    125:24
**motivated (1)**
    76:8
**motivation (4)**
    79:23;82:23;84:17;
    101:5
**motivations (32)**
    24:25;75:8;77:1;

81:11;83:12;84:20;
85:19;86:18;87:18;
88:18;89:18;90:19;
91:24;93:19;95:6;
96:14;97:16;98:19;
99:24;101:10;102:7;
103:14;104:16;105:18;
106:20;107:25;109:5;
110:7;111:10,18,21;
112:7
**motive (1)**
82:22
**motives (2)**
44:18;76:10
**move (12)**
43:7;64:19;68:20;
69:22;70:19;71:21;
129:23;144:13;146:19;
149:7;150:7;152:21
**must (2)**
131:23;132:5
**myself (3)**
43:12;66:17;157:23

### N

**name (12)**
10:3;11:3;13:3;14:2;
16:6,7;17:9;48:18;
63:6;116:2,6,9
**named (1)**
167:10
**names (5)**
48:21;63:14;64:1;
65:12;141:12
**National (19)**
51:24;52:9;56:11;
58:20;59:3;64:22;
65:10,23;115:21;
138:1,6,6,15,16,21;
139:12;140:10,11;
141:5
**nature (1)**
151:12
**need (6)**
9:5;59:17;67:1;
76:11,12;147:23
**needs (1)**
147:18
**negotiation (2)**
40:24;45:5
**neither (1)**
167:19
**new (6)**
131:13;137:9,10,12,
17;164:5
**news (3)**
50:25,25;51:5
**next (6)**
46:21;50:11;75:7;
128:17;133:8;137:21
**Nick (8)**
66:23,24;138:9;

139:6;159:10,10,11;
160:7
**nine (3)**
40:14;123:14,18
**nodding (1)**
10:21
**none (2)**
45:22;46:12
**nor (1)**
167:20
**Northouse (1)**
167:3
**Nos (2)**
92:11;133:11
**Notary (1)**
167:4
**note (3)**
32:22;33:8;144:20
**notes (19)**
21:12;25:19,22;
27:25;28:1,2,5,5,9,11,
14,15;29:9,11,20;
30:25;31:1;64:23;
160:24
**notice (4)**
6:19,23;128:3;167:6
**noticed (6)**
32:25;33:9;41:6;
74:16;164:10,11
**November (8)**
145:18;147:8;
148:14;150:16;152:1;
153:6;154:5;155:10
**number (23)**
14:10;20:3;23:17;
48:14,17;51:5;76:21;
125:24;126:9;151:12;
152:10;157:2
**numbers (1)**
116:21
**numeral (2)**
56:14;59:12

### O

**oath (3)**
6:16;11:6;167:15
**object (12)**
8:21;24:6;25:15;
26:2;33:21;34:5;44:21;
59:5;61:6;64:5;111:13;
144:21
**objection (15)**
6:23;28:7;31:18;
32:23;33:11;41:4,13,
19;49:5,14;52:25;
74:13;144:23;155:3;
163:24
**objections (5)**
6:19;8:23;9:11,14,15
**objective (8)**
28:21;45:1;46:15;
120:21,25;121:10;

164:14,18
**objectives (3)**
24:24;75:8;77:1
**obligation (2)**
33:2;41:7
**observe (1)**
123:13
**Obviously (1)**
74:16
**occur (1)**
16:22
**occurred (4)**
142:14,19;144:5,11
**o'clock (2)**
55:8;92:8
**October (16)**
67:24;145:17;
146:17;147:7,13;
148:4,12;149:6,15;
150:15;151:25;153:3,
20;154:4;155:9;158:22
**off (19)**
19:13;20:1,5;22:7;
55:7,8;64:12,13,15;
92:7,8;112:15;135:21,
22;143:1;160:18,19;
165:8,9
**offered (2)**
130:1;133:3
**office (85)**
13:8,12,13,14,15;
29:6;33:16;34:21;35:9,
13,17,18,20,20,21,23;
36:1,4;37:15,15,19,22,
25;38:3,6,10,17;39:1,8,
15,21;40:8,12;42:8;
43:14;45:14,16,17;
46:23,24;47:11;50:7,
13,14;51:12,14;52:6,
15;53:15,19;54:9,11,
24;57:6;58:11,14;60:3,
7;65:10;66:16;68:19,
25;69:19,21;70:17;
71:3,4,18,20;78:2;
113:6;115:10,15,15;
119:13;123:10;124:4;
137:1;149:12,17;
157:5,19;159:16;
160:8,12
**officer (12)**
12:19;18:23,23;19:3,
4,6,7,12,15,16,20;
126:6
**officers (1)**
7:21
**offices (18)**
37:1,12,20;39:1;
43:4;44:11,13;46:18;
52:18;53:14;54:22;
55:2;62:3;64:8;66:4;
67:9;115:7;167:8
**official (10)**
10:9;14:8;18:24;

19:17;38:22;39:13,17,
19;43:1,1
**officials (2)**
8:3;19:22
**Oldham (8)**
142:3,6,9,12,18,21,
24;158:15
**Once (63)**
25:9;26:22;27:3,6;
29:4;30:20,20;36:15;
43:12,21;47:15;68:13,
18;69:10,18;70:16;
71:17;72:14;80:8,10,
24;82:8;88:1;92:19;
93:25;95:13;96:5,11,
20;98:25;100:5;
104:22;105:24;109:11;
110:13;120:14;136:23;
138:23;140:2;141:24;
142:5;143:9,20;
146:11;147:5,12,22;
148:2,11;149:4,14;
150:1,14,22;151:5,22;
152:12;153:18;154:3,
17;155:19;160:4;163:1
**one (56)**
7:25;16:17,21;17:8,
11,11,18;19:19;20:7;
31:6,7;32:5,22,25;
37:10;39:19;41:5,6;
42:16;46:1,21;48:19;
50:3,25;51:8,14;52:13,
18;60:3;65:21;66:22;
68:15;72:15;74:4,15;
76:22,23;80:3;88:21;
121:22,23,24;122:18;
125:25;131:23;132:19;
136:13;138:8;145:2,2;
146:11;150:1;153:7;
156:2;157:23;160:3
**one-by-one (1)**
116:2
**ones (5)**
22:7,8,9;73:1;84:6
**online (9)**
20:6;28:3,9;39:11,
14;44:4;49:24;163:5;
164:23
**only (28)**
10:19,23;17:4;22:7;
24:12;25:13,16;27:17;
29:22;37:20;38:12;
39:24;42:25;45:24;
58:15;73:8;91:11;
94:25;97:12;113:8,8;
122:17,21;123:2,8;
138:11;139:7,10
**on-staff (1)**
159:11
**open (45)**
36:18;37:16,19,21,
24;38:4,7,10,13,14,14,
17;43:16;48:5,6,11;

49:1,2,9,18;52:14,19;
53:1,4,10,12,16,21;
54:2,4;61:20;62:4;
63:12,12,13;66:23;
156:12,25;157:5,10,12,
22;158:8,25;159:16
**operations (4)**
120:16;138:25;
143:12,22
**opinion (1)**
75:22
**opportunity (1)**
23:25
**orally (2)**
34:18,19
**order (7)**
126:3;128:19;129:1,
6,9,11,14
**Org (2)**
113:10;127:25
**organization (3)**
7:20;23:6;138:2
**organizations (3)**
132:15,15;158:18
**organizing (6)**
145:13;153:24;
154:6,10,13,19
**originated (1)**
136:20
**others (2)**
70:2;72:1
**otherwise (2)**
65:2
**Ottman (3)**
15:16,19,21
**out (12)**
7:9;28:10;29:13;
70:22;112:20;113:17;
116:21;128:5;130:6;
132:13;137:10,14
**outlet (1)**
50:25
**outlets (1)**
48:17
**outline (65)**
78:22,23,25;79:5;
81:3,7;82:12,15,20;
84:6,13;85:8,15;86:7,
14;87:6,14;88:7,14;
89:7,14;90:6,15;91:7,
20;93:8,15;94:16,23;
95:20;96:3,10;97:2,6,
10;98:5,12;99:7,8,11,
14;100:16,20,23;
101:20;102:2,22,23;
103:5;104:2,6,10;
105:4,12;106:6,13;
107:11,19;108:16,23;
109:22;110:1,21,25;
111:4
**outlined (1)**
107:14
**over (31)**

9:9;10:11,18;23:8;
27:11;37:25;39:6;
40:14;56:23;58:3,9,21,
25;59:4;78:5;79:9,18;
123:5,12;125:22;
136:11,13,19;142:7,10,
14,19;144:5,11;162:9,
25
**overbroad (4)**
8:22;9:4;144:22;
155:4
**own (5)**
8:4;39:2,2,23;157:24

**P**

**packing (3)**
76:19,21,24
**page (26)**
23:21;24:23;30:12;
38:1;55:15,19;59:9,10;
62:16,21,23;63:21;
75:6,7;101:18;128:17,
17;131:4;137:21;
141:8;145:2,3;157:4;
158:3;159:4;163:4
**pages (2)**
18:25;23:11
**paid (25)**
19:10;56:19;57:16,
17,18,19,25;60:19;
61:4,7;63:20;113:16,
18,19,21,23,25;114:9,
11,11;122:19,20;
142:20,24;143:2
**paired (1)**
83:7
**paper (43)**
12:16;13:7,17;16:2;
24:17;25:10;26:23;
27:16;28:11;29:6,17;
30:1;33:15,17;34:24;
35:1,2,10,13,14,18,23,
24;36:1,3;38:1;42:9,
12;43:14;47:16;63:8,9;
65:9,15;66:16;69:1,2;
71:5;72:2;96:21;100:5;
106:11;140:17
**papers (3)**
35:6,8;64:24
**paragraph (9)**
50:16;130:25;131:2,
7,8;132:10,12;145:5;
159:21
**parameter (1)**
46:2
**part (20)**
23:13;32:16;35:20;
39:3;49:3;51:3,4;54:9;
67:24;69:15,20,20;
71:18;76:10,11;78:6;
121:19;133:23;147:17;
162:14

**particular (7)**
43:17;52:8;66:18;
69:3;71:7;104:23;
115:25
**parties (3)**
20:13;167:21,23
**partisan (3)**
76:8;123:22;124:13
**Partnership (1)**
158:16
**party (12)**
7:15;48:8,16;69:12,
14;75:16;76:23;123:3,
8;129:18;132:6;145:9
**Pasch (3)**
82:25;83:2,7
**passage (9)**
30:14;122:3;125:17;
126:16,20,22;134:23;
135:15;136:12
**passed (1)**
136:17
**past (1)**
9:9
**PATRICK (4)**
6:14;11:5;51:8;
167:11
**Paul (2)**
157:4;158:14
**pay (31)**
38:2;48:9,12,23;
51:16;53:23;56:23;
57:2,2,19;58:3,9,12,17,
17,21,25;59:4,17,19,
25;60:25;61:3;75:22;
113:11,13,14,22;114:7;
140:25;159:18
**paying (4)**
58:14;122:23;
142:15;144:7
**payment (1)**
159:19
**pending (2)**
10:25;47:6
**people (5)**
12:21;13:19;62:1,15,
16
**per (4)**
20:14;38:1;39:9;
157:11
**percent (2)**
38:23,24
**performed (1)**
7:17
**period (2)**
158:22;159:2
**person (7)**
12:21;25:13,16;
46:25;50:15;120:21;
167:10
**personal (2)**
8:19;33:7;41:11,16;
74:17

**personally (3)**
61:19;74:19;75:20
**personnel (2)**
19:21;39:4
**persons (18)**
26:14;28:21;112:21,
25;113:2,13,15;114:7,
19;121:1;144:18;
146:21,24;150:9;
151:13;153:24;154:25;
164:15
**person's (1)**
13:3
**person-to-person (1)**
151:19
**persuading (1)**
145:9
**Phillippe (2)**
143:14,19
**photo (1)**
151:18
**physical (1)**
123:17
**physically (1)**
123:13
**pick (1)**
123:9
**picked (1)**
44:4
**pickup (2)**
38:15;53:22
**picture (2)**
85:25;101:4
**piece (1)**
128:11
**pink (6)**
103:1,5;108:19,23;
110:24;111:4
**place (2)**
135:19;158:1
**placed (1)**
8:20
**plaintiffs (4)**
6:3,5;9:3;10:5
**plaintiffs' (4)**
47:22;63:17;74:11,
20
**plan (14)**
41:2;45:7;77:18;
94:14;95:14;96:21,22;
97:24;99:1,2;101:18;
102:14;103:22;132:8
**planning (2)**
40:24;45:4
**plans (3)**
40:21;131:15;132:1
**played (1)**
37:15
**please (19)**
10:15;11:3;49:11;
61:13;75:2,4;112:20;
114:4;131:8;137:23;
144:16;146:20;148:6;

149:8;150:8;151:11;
152:22;153:22;154:23
**pm (1)**
165:11
**point (8)**
61:12;126:2;128:19;
129:1,6,9,11,14
**pointed (1)**
7:9
**POLAND (3)**
6:4,4;64:13
**police (2)**
21:4,14
**policies (2)**
53:4;145:12
**policing (1)**
157:22
**policy (17)**
21:20,20,24;38:1;
39:13;52:19;53:1,9,14;
67:22;145:19;155:11,
22;157:8,10,25;158:1
**political (1)**
123:18
**population (2)**
131:19;164:24
**position (2)**
18:6,9
**possess (1)**
8:7
**possessed (2)**
7:8;9:18
**possession (5)**
44:17;46:14,19;56:7;
73:19
**post (1)**
49:24
**potential (2)**
41:1;45:7
**power (1)**
8:1
**precedent (1)**
129:15
**preferred (1)**
145:12
**preparation (8)**
14:4,14,25;15:8,16,
24;30:3;131:14
**Preparations (1)**
56:15
**prepare (22)**
12:13;16:12;17:20,
24;24:21;25:7,13,16,
24;26:11,20;27:21;
28:18;29:3;30:10,19;
31:25;32:4;33:2;38:10;
41:8;53:2
**prepared (9)**
25:4;26:17;28:25;
30:16;51:23;65:1;
159:22;160:6;164:11
**preparing (1)**
18:2

**present (7)**
12:25;13:1;17:4;
67:15;70:24;134:14;
144:19;146:23;148:8;
149:10;150:12;151:14;
152:25;153:12;154:1,
11;155:1
**presiding (1)**
126:6
**press (2)**
48:17,17
**previous (11)**
57:21;80:16,21;81:2;
82:13;86:7;87:7;88:7;
93:6;95:21;132:24
**previously (7)**
22:19;24:16;29:11;
82:14;97:18,19;122:17
**primarily (2)**
19:3,23
**primary (2)**
19:19,19
**printed (2)**
28:10;29:13
**printed-out (1)**
29:24
**printouts (3)**
124:19,21,24
**prior (4)**
17:16;79:17;82:25;
129:15
**private (4)**
48:20;56:19;58:24;
59:3
**privilege (2)**
9:13,18
**privileged (1)**
24:13
**privileges (1)**
8:11
**pro (2)**
126:5;129:21
**Probably (4)**
16:10;31:2;32:15;
74:4
**problem (1)**
9:22
**Probst (6)**
66:24;138:9;139:6;
159:10,10,11
**Procedure (2)**
12:2;131:13
**procedures (2)**
21:25;40:21
**Proceed (1)**
144:24
**process (12)**
50:7;73:20;113:12;
124:22;125:2;127:24;
128:2,13;132:20;
134:24;137:15;159:19
**processed (1)**
159:22

processes (1)
157:6
processing (4)
37:20,23,24;53:20
produce (12)
42:17;43:24;46:8,11;
47:17;52:11;55:23;
63:13;66:20;72:6;73:6;
157:1
produced (22)
13:8;14:11;44:15;
47:20,23;49:8;54:1,4;
62:6,7,8;63:16,18;
65:18,20;74:14;84:18;
114:10;127:14;156:12;
159:25;160:9
production (18)
32:20;33:13,20;
34:13;40:10,17;49:3;
50:20;51:21;54:6,21;
55:14,18;62:10;74:11,
21;139:8;155:25
productions (1)
41:5
program (1)
18:19
prohibited (20)
67:25;145:16,22;
146:3,18;147:5;
148:13,15;149:18;
150:18;151:24;152:18;
153:3,7,9,19;154:3,7;
155:8,21
Project (5)
66:10;138:3;139:4,
17;158:13
properly (4)
126:3,4;128:19;
129:2
proposed (34)
79:2;82:16;84:9;
85:11;86:10;87:10;
88:11;89:11;90:11;
91:16;93:11;94:14,19;
95:14,24;96:22;97:5,
24;98:8;100:19;
101:18,23;102:13;
103:1;104:6;105:8,25;
106:9;107:1,2,15;
108:20;109:22;110:25
prospective (1)
146:24
protesters (1)
21:2
provide (5)
20:6;46:24;48:8;
53:14;164:13
provided (6)
49:22;50:14;51:6;
54:17;161:11,16
providing (3)
7:3;9:16;41:15
public (17)

46:25;50:15;56:19,
22;58:3,8,21;59:19;
60:24;128:3;135:2,10,
12;160:1;164:22;
165:1;167:4
publicly (3)
48:24;49:9,21
pulled (5)
103:24;105:1;106:3;
107:8;130:5
purple (6)
106:10,14;107:14,
19;109:21;110:1
purpose (1)
164:6
purposes (2)
141:5;146:25
pursuant (2)
11:11;167:6
put (11)
6:20;9:20;29:12;
76:22;80:1;92:3;
126:13;128:1,3;
133:16;137:14

**Q**

qualified (3)
149:11,11;167:4
quality (1)
149:15
quick (1)
136:2

**R**

raising (1)
145:7
Rathje (1)
6:5
Ray (2)
157:4;158:14
read (29)
43:8;49:13;75:1,3;
112:3,5,20;114:5;
120:19,20;122:1;
126:15;128:18;131:7,
11;136:8,9;137:22;
144:15;145:4;146:20;
148:5;149:7;150:7;
151:10;152:21;153:22;
154:22;157:3
reading (1)
167:18
ready (2)
38:14;92:3
really (2)
76:6;77:15
reapportion (2)
79:11;80:25
reapportionment (6)
22:18;94:3;96:7;
97:13;98:15;109:3

reason (1)
11:8
reasons (3)
95:3;96:8;99:20
recall (7)
12:6,8;46:10;48:21;
50:25;114:17;161:9
receive (5)
36:17;51:7,9;53:20;
122:15
received (17)
13:18;22:23;27:17;
36:17;44:1;46:24;51:4,
11;52:18;56:3,24;
65:13;79:20;122:18;
125:21;134:25;159:1
receives (1)
53:15
Recess (4)
55:9;92:9;135:23;
160:20
recognize (24)
77:14;80:7;81:17;
83:18;84:25;85:25;
86:24;87:24;88:25;
89:24;90:25;92:17;
95:11;96:18;100:3;
101:14;102:11;103:18;
104:20;105:22;106:24;
109:9;127:3;130:12
record (50)
6:20;9:21;10:15,19;
11:4;14:8;18:24;19:17;
33:11;39:13,18,20;
55:8,11;64:12,14,15,
17;73:8;75:2;76:4;
92:8,14;111:15;
112:15;117:12,20;
120:20,20;122:1;
131:8;134:8;135:22,
25;137:23;144:16,21;
146:20;148:6;149:8;
150:8;151:11;152:22;
153:22;154:22;156:8;
160:19,22;165:9;
167:17
records (96)
8:4,5;12:16,16,17;
13:6,7,17;15:24,25;
16:1,2,6,7;19:17,21;
24:18,20;25:9,18;
26:24;27:3,9;28:13,15;
29:5,6,21,22;30:21;
31:16,21;36:18;37:16,
19,21,25;38:4,7,10,13,
14,18,21,22,23;39:2,
16,18,22,24,25;40:4;
43:16;48:5,7,11;49:1,2,
9,19;52:14,20;53:1,5,
10,12,13,16,21;54:2,5;
61:20;62:5;63:7,12,12,
13;66:23;72:23;73:4,9;
140:5;143:2,2;156:12;

157:1,5,10,13,22;
158:9,11,25;159:16,18
recruiting (8)
67:16,21;145:7;
146:22;148:3,8,11,21
recruitment (7)
146:25,25;147:3,6,
10,15;148:24
red (58)
78:22,23,25;79:5;
81:3,7;82:12,14,20;
84:6,13;85:8,15;86:7,
14;87:6,14;88:7,14;
89:7,14;90:6,15;91:7,
20;93:8,15;94:16,23;
95:20;96:3,10;97:2,10;
98:5,12;99:7,14;
100:16,23;101:20;
102:2,22;103:5;104:2,
10;105:4,12;106:6,13;
107:11,19;108:16,23;
109:18;110:1,21;111:4
Redell (1)
13:15
redistrict (11)
78:11;80:25;82:10;
84:16;92:23;99:18;
101:7;102:5;109:2;
163:23;164:3
redistrict/reapportion (3)
103:9;105:15;106:16
redistrict/reapportionment (1)
111:25
redistricting (63)
22:21;51:25;52:9,17;
56:11;57:22;59:16,22;
60:17,22;62:13;63:25;
64:22;65:11,22;66:10;
73:20;76:16,20;78:20;
94:4,9;96:7;98:14,17;
99:17;100:6;101:19;
104:13;108:7;110:14;
111:8;113:12;114:12,
14;115:14;122:20,23;
123:3,15,19;125:15;
131:15;132:1,9,13,20;
138:1,3,7,16,22;139:4,
13,17;140:11,14,21,24;
141:5,10;158:13;164:3
redistricting/reapportionment (2)
107:23;110:5
REDMAP (9)
66:11,19;138:3,11;
139:4,9,10;157:4;
158:13
redrawing (3)
40:25;45:5;111:18
reduced (1)
167:15
refer (5)
6:24;23:12;51:25;
62:13;75:5
Reference (3)

157:1,5,10,13,22;
158:9,11,25;159:16,18
referenced (1)
45:3
referencing (1)
134:10
referred (4)
31:8,8;66:11;128:23
referring (12)
57:8;62:14;63:25;
64:21;66:10;67:14;
70:21;114:13,14;
128:24,25;145:1
refers (1)
94:11
reflect (1)
162:8
reflected (3)
162:17;163:7,8
reflecting (7)
47:2;62:14;64:20;
66:9;67:13;70:20;
162:11
reflects (1)
75:16
refresher (1)
10:12
regarding (22)
16:2;21:12;23:17;
24:5;26:24;29:7;32:12;
36:17;45:22;52:16;
60:8;67:15;135:3;
138:11;139:10;148:23;
152:8,14;153:14;
154:13;155:16;160:1
regardless (1)
7:15
Registered (1)
167:3
registering (1)
145:7
registration (2)
70:21;71:8
reiterate (8)
120:14;146:15;
147:12;148:2;149:4;
153:18;154:17;155:19
relate (7)
41:15;44:18;46:15;
51:24;53:4;62:13;
73:20
related (6)
7:12;36:16;65:2;
145:22;154:6;167:20
relates (4)
16:4;30:23;32:12;
41:22
relating (14)
38:17;63:7;64:21;
66:9;67:13,16;68:24;
70:20;120:12;122:15;
148:8,21;157:1;164:14
relation (6)
51:17;52:12;54:5;

72:7;73:7;156:13
**relative (1)**
167:22
**release (1)**
46:25
**released (1)**
50:15
**relied (8)**
28:22;45:3;120:22;
121:2
**remember (20)**
12:9;17:8,9;19:2;
20:1;21:10;22:9;54:16,
18;57:12,14,17,19,20;
65:22,24;66:22;
130:13;138:9;142:15
**remind (1)**
136:10
**Repeat (4)**
31:20;49:12;58:6;
155:3
**repeated (1)**
114:4
**reply (1)**
159:6
**reporter (9)**
10:13,14,19;74:6;
86:23;88:24;95:10;
112:3;167:3
**reporters (1)**
51:6
**reporter's (1)**
81:16
**reports (2)**
40:21;45:21
**represent (31)**
10:4;50:8;78:12,16,
25;80:17;81:3;82:24;
83:23;84:2;85:3;86:3;
87:2;88:3;89:3;90:2;
91:3;93:2;95:16;96:23;
98:1;99:3;100:12;
102:18;103:23;104:25;
106:2;107:7;108:12;
109:14;110:17
**representation (1)**
93:7
**representative (20)**
12:2;39:23;42:24;
57:6,9;69:21;70:16;
123:10;125:25;126:2,
7,8,12;128:25;129:8,
13,19,20;137:17;
152:13
**representatives (7)**
115:3;116:16;130:2;
133:3,4,5;141:25
**representative's (1)**
76:10
**represented (2)**
82:25;161:20
**representing (6)**
6:2,5,7,11;82:2;85:5

**reprint (1)**
67:1
**Republican (60)**
6:25;51:24;52:9;
56:10;58:20;59:3;
64:21;65:10,23;67:16,
21,21;68:10,13;69:4,
12,14;72:4;79:16;
115:21;129:22;134:14;
138:1,5,6,15,21;
139:12,21;140:1,10,10;
141:4;145:8,9,11;
146:4,9,22;147:2,3,9,
11,16,20;148:9,16,21;
149:19;150:11,19,23;
151:4,15;152:3,11,24;
153:11;157:2;158:12
**Republicans (1)**
155:14
**request (107)**
32:24;37:25;38:5,13,
14,18;40:18;42:4,7,18,
22;43:5,7,9,25;44:8;
45:10,13;46:8,22;47:9,
14,18,21;48:5,7,11;
49:1,3;50:4,11,12,12,
20;51:21;52:4,12,15;
53:16,21,25;54:2,5,21,
25;55:14,18;60:23;
61:20;62:5,10,11;63:2,
5;64:19;65:5,8;66:2,5,
13,21,23;67:6,10,19;
68:7,12,17,20,21,24;
69:6,9,13,17,23;70:1,9,
12,15,19,19;71:1,10,
13,16,22,25;72:7,10,
13,17,20;73:7,13,16;
139:8;151:17;156:10,
13;157:1;158:9;159:7,
19,21;160:2,13
**requested (6)**
14:11;33:15,18;51:6;
156:25;159:1
**requester (4)**
49:22,23;53:22;
160:6
**requesting (8)**
46:25;48:8,16;50:15;
52:22;158:8,10,21
**requests (48)**
8:3,24;9:4;13:7,18;
32:11,20;33:13,20;
34:13;36:18;37:9,13,
16,21,24;38:8,11;
40:18;43:16;44:25;
45:15;46:23;47:25;
48:22;49:2,9,19;50:16,
23;52:20,23;53:1,5,10,
12;54:6;63:13;72:21;
74:11,21;155:25;
156:3,13;157:6,8,10;
158:25
**require (1)**

143:21
**required (20)**
20:4;40:11;45:21;
53:12;79:11;97:13;
98:14;101:6;108:25;
111:23,24;115:4;
116:13;121:6,17,19;
125:14;132:18;142:1;
163:17
**requirement (33)**
22:16,20;44:13;
71:19;78:11;80:25;
82:9;84:15;92:22;94:2;
95:1;96:6;99:16,18;
100:25;101:2;102:4;
103:8;104:12;105:14;
106:15;107:21;109:2;
110:3;111:6;119:15;
120:17;140:5;143:21;
148:25;163:22;164:1,7
**requirements (2)**
131:20,21
**requires (2)**
34:2;131:16
**research (3)**
24:4,14,15
**reserve (2)**
9:10,14
**Resource (1)**
40:1
**resources (6)**
39:4;152:20;153:5;
154:8,20;155:23
**respect (3)**
125:7;161:14;163:19
**respective (1)**
19:9
**respond (3)**
38:7,13;49:18
**responded (2)**
33:4;52:23
**responding (1)**
50:22
**response (14)**
10:22;32:23;33:3;
38:12;41:4,8;49:9;
50:16;51:2;74:18;
159:22,25;160:5,12
**responses (12)**
8:2;10:20;38:10;
48:24;49:8,21,24;50:2;
74:10,15,20;160:9
**responsible (3)**
18:22;39:12;153:24
**responsive (33)**
37:8,12;42:11,22;
43:4;44:8;47:21;54:20,
24;66:1,5,20;67:5,9;
68:4,6,11,16;69:6,8,13,
16;70:9,12,14;71:9,12,
15;72:9,12;73:13,15;
139:7
**restate (2)**

41:4;52:24
**restrict (1)**
33:5
**retain (2)**
54:14;160:8
**retained (9)**
142:12,17;144:3,6,9;
157:13,14,15,20
**retaining (3)**
50:8;52:19;53:10
**retains (1)**
70:18
**retention (1)**
47:3
**return (1)**
126:1
**review (14)**
14:4,17;15:3,14,21;
20:2,5;23:25;27:14;
30:3;38:3;53:23;58:11;
165:2
**reviewed (5)**
14:8,9,10;30:20;
129:14
**reviewing (1)**
30:22
**revision (2)**
40:25;45:5
**right (47)**
9:10,14;17:14;19:14;
28:1;46:21;54:2;62:17;
64:9;66:8;67:12;69:22;
71:21;72:15;73:23;
74:23;76:25;80:1,16;
88:21;90:24;95:9;
96:17;103:17,23;
104:19;105:21;110:10;
115:24;120:18;121:13,
25;127:18;128:14;
130:7;131:22;134:20;
135:18;144:13;145:3;
146:19;150:7;151:10;
153:21;154:21;158:3;
159:4
**Rights (4)**
126:5;128:21;129:4;
131:22
**RNC (4)**
59:15,21;61:14;
141:12
**rnchqorg (1)**
158:19
**RNC's (1)**
60:21
**Robin (11)**
147:15,17,19,21;
148:20,23;149:1;
151:2;153:10;154:9;
155:12
**role (7)**
20:21;37:16,18;48:6;
122:24;150:9;153:23
**Roman (2)**

56:14;59:12
**room (1)**
124:16
**RPW (4)**
69:4;70:23;72:4;
151:15
**RSLC (1)**
158:12
**Rule (23)**
12:1;19:1,2;20:2,3;
67:24;145:16;146:16;
147:6,13;148:4,4,12;
149:5,14;150:14;
151:25;152:19;153:2;
154:3,18;155:9,21
**rules (19)**
10:11;12:1;16:3;
39:10;67:25;145:23;
146:16;147:7;148:13;
149:5;150:16,18;
151:25;153:19,19;
154:5,7,18;155:10
**run (2)**
149:11,16
**running (1)**
137:16
**Rutledge (3)**
143:25;144:3,9

## S

**same (53)**
7:9,25;10:17;32:4;
33:16;36:1;43:15;
44:12;53:14;62:16,20;
70:3;73:2,4;74:4,13;
116:18,20,24;117:1,3,
5,7,9,15,16,25;118:3,6,
9,12,15,18,21,24;
119:2,5,8,12,16,19,22,
25;120:3,6,9;121:15,
16,23,24;133:1;
143:17;153:6
**Sandy (3)**
82:25;83:2,7
**sat (1)**
76:6
**saw (2)**
12:6;55:25
**saying (3)**
22:15;121:9;145:24
**schedule (1)**
116:15
**scheduled (1)**
128:6
**scope (3)**
9:11;33:9;52:24
**Scott (1)**
115:10
**se (1)**
20:14
**search (89)**
12:15;13:17;16:1,2;

24:17,17,20;25:9;
26:23,23;27:15;29:6;
33:14,15,17,17;34:23;
35:1,5,5,23,24;36:1,6,
7,11,14,15;38:6;42:3,6,
12,12,15;43:8,11,13,
13,14,17;45:9,12,15,
19,25;46:2,2;47:8,13,
16,16;52:3,8;63:1,4,10,
11;65:4,7,9,9,12,12;
66:12,15,18;67:18;
68:20,23;69:1,3,22,25;
70:4,6,25;71:5,7,21,24;
72:3,16,19,23,24;73:2,
4,10;140:16

**searched (4)**
35:10;36:3;63:7;
68:1

**searching (2)**
42:10;46:7

**Second (10)**
7:19;16:8;43:8;
128:17;130:24;131:2,
7,7;132:4;159:20

**Section (40)**
22:17;23:11;28:16;
30:8;56:14,15;59:11,
13;78:9;82:9;92:23;
94:2;95:2;96:12;97:14;
98:16;99:18;101:1,1;
102:4;103:7,8;104:14;
105:16;106:18;107:22;
109:1;110:4;111:7,24;
115:13;125:15;127:19,
21,22;131:3,21;
163:18;164:2,2

**seeing (2)**
77:18;88:2

**seeking (1)**
26:3

**seem (1)**
98:16

**Senate (53)**
13:25;14:1,9;16:2;
20:18;22:19,24,24,25;
23:4,5,6,6,18;27:7;
29:7;35:3;43:19,23;
52:10;77:16;78:4;
79:10,10,18,19;80:9;
114:15;125:21,21;
126:3,20,22;127:5,15;
128:7,10;130:19;
132:6;136:18,19,20,24;
137:3,5;162:8,11,12,
24;163:2,2,3;164:19

**Senator (4)**
14:24;15:2,6;128:3

**send (4)**
50:4;53:19;136:24;
141:1

**sending (1)**
137:1

**sends (1)**

37:25

**sense (1)**
11:1

**sent (7)**
58:12;60:3,6,18;
129:3;136:23;138:8

**separate (2)**
31:5,11

**series (3)**
133:3;161:8;163:6

**serve (5)**
7:21,24;47:4;142:13;
144:4

**Services (1)**
40:3

**session (6)**
54:12,13;157:13,14,
15,16

**sessions (1)**
157:11

**set (3)**
74:23;88:21;141:12

**seven (4)**
18:3,3;48:21;122:19

**shaded (23)**
94:19;95:24;97:5;
98:8,13;99:10,15;
100:24;101:23;102:3;
103:1,6;104:5,11;
105:13;106:14;107:19;
108:19,24;109:21;
110:1,24;111:5

**shading (32)**
79:2,6;81:5,8;82:16,
21;84:9,14;85:11,16;
86:10,15;87:10,15;
88:10,15;89:10,15;
90:11,16;91:16,21;
93:11,16;94:24;96:4,
10;97:11;100:19;
105:9;106:10;107:14

**shaking (1)**
10:20

**show (3)**
34:20;78:21;90:6

**showed (1)**
161:8

**shows (3)**
78:17;84:3;85:6

**sic (4)**
30:7;51:4;109:12;
157:23

**side (2)**
74:23;80:1

**sign (1)**
152:2

**signature (2)**
136:25;137:2

**signing (1)**
167:18

**similar (4)**
56:6;84:5;121:21;
159:1

**Similarly (1)**
8:6

**single (3)**
32:4;41:22;121:14

**Sitting (3)**
37:6;42:20;63:23

**six (2)**
48:21;122:18

**sixth (1)**
129:23

**slightly (1)**
52:21

**slower (1)**
131:11

**slowly (1)**
131:10

**software (2)**
59:22;60:17

**solicitation (1)**
151:3

**solicitations (2)**
151:18,19

**solicited (2)**
150:10;151:14

**soliciting (2)**
151:23;152:10

**somebody (1)**
52:15

**Sometime (2)**
17:2;23:8

**sorry (4)**
75:6;130:8;163:14;
164:10

**sources (1)**
56:20

**Speaker (31)**
14:13,16,19,22;20:8,
14;57:7,11;68:16,18;
69:16,18;70:14,17;
71:15,17,19;72:12,14;
73:15,17;126:5;
129:20;132:7;151:6;
152:9,13;153:13;
154:12;155:15;160:12

**speaker's (7)**
51:12,13;58:13,16;
60:3,6;159:11

**speakers's (1)**
58:11

**speaking (2)**
10:18;30:21

**specialist (5)**
12:18,25;13:2;18:19;
140:18

**specific (5)**
11:25;42:16;72:24;
96:8;101:2

**specifically (17)**
25:7,11;26:21;27:18;
30:23;42:13;52:13,16;
60:14;63:10;65:24;
66:19,22;69:4;103:10;
130:13;153:7

**speculate (15)**
68:8,14;69:10;
146:11;149:22;150:1,
22;151:5;152:6,12;
153:14;154:12;155:15;
160:3,5

**speculating (1)**
32:15

**spent (1)**
18:1

**spouse (1)**
8:16

**ss (1)**
167:1.5

**ST (43)**
6:6,6,7,17;12:11;
17:8;24:6;25:15;26:1;
28:7;31:18;32:21;
33:21;41:3,20,25;
44:21;49:4,11,14;
52:21;59:5;61:6;64:5,
11;74:2,12;75:21;
111:13;112:2,12;
113:24;114:3;125:5;
144:20;155:2;156:2,7;
160:17;161:2,7;165:3,
7

**staff (50)**
7:14;8:14,19;14:16,
22;15:2;20:15;21:13;
24:16;25:10;26:22,25;
27:17;40:22;42:23;
44:10;45:2;46:16,18;
64:3,4,7;68:19,19;
113:5;115:1,2,3;
116:12;117:13;120:15;
121:5,18;124:1,4,6;
127:14;138:20,23;
139:21,25;140:4;
141:22,25;143:10,22;
146:7;152:2,2;164:21

**staffer (1)**
9:8

**Staffing (2)**
20:12,16

**staffs (1)**
19:9

**stamped (1)**
74:5

**standards (4)**
131:18,23;132:3,19

**standing (2)**
41:13,19

**start (7)**
10:12;20:25;24:22;
74:25;113:15;125:8;
162:9

**starts (3)**
129:24;158:5;163:2

**Staskunas (3)**
126:2;128:25;129:8

**State (80)**
6:8,18;7:2,4,6,10,18;

8:9,10,11;11:3;12:4;
16:3;18:6,13;30:6;
32:24;33:3,4,24,25;
39:15,21;40:22,22;
41:1;44:19;45:7;47:3;
48:19;61:9;69:67:17;
70:23;74:14;78:2;94:2;
95:1;96:12;97:14;
98:15;100:25;103:7;
104:14;105:15;106:17;
107:21;108:25;110:3;
111:6,23;113:16,17;
115:6;125:6,14;129:4;
139:21;140:1;141:1;
144:7;146:8;147:14;
151:24;152:19,20;
153:4,4;154:7,8,19,19;
155:23,23;157:3;
158:12;164:1;167:1,5,
9

**stated (3)**
8:2,23;29:11

**States (3)**
128:21;153:6,7

**state's (1)**
132:20

**Statute (2)**
53:11;129:15

**stays (1)**
127:12

**Steve (1)**
60:13

**still (11)**
25:22;28:2,3;29:17;
30:12;54:8;93:7;95:20;
133:9;155:24;157:19

**Street (1)**
167:9

**strictly (2)**
150:17;153:9

**strike (1)**
162:9

**studied (1)**
76:6

**stuff (1)**
126:23

**subbullet (1)**
59:15

**submission (1)**
132:1

**subpoena (14)**
11:11,24,25;12:7,9;
34:20;42:11;56:1,2,4;
112:18;141:7,8;167:6

**subpoena's (1)**
7:1

**substitute (22)**
126:10;129:25;
130:1,3,4,17,22;131:9,
13,16,24;132:3,11,17;
133:2,10,21,24;134:9,
12,15,17

**successful (1)**

147:1
**suggest (1)**
9:5
**summaries (1)**
64:23
**supports (1)**
40:1
**sure (14)**
21:6;27:11;31:1;
34:7;41:18;52:13;55:6;
69:14;92:5;111:16;
117:17;130:13;136:22;
160:17
**suspect (1)**
160:4
**sworn (2)**
6:15;167:11
**synopsis (1)**
128:10

**T**

**tab (1)**
145:20
**table (7)**
133:11,13,19,20;
134:11,15,18
**tabling (1)**
134:8
**talk (5)**
24:19;27:5,9;67:3;
126:23
**talked (15)**
12:15;13:9;24:16;
25:11;29:4,5;111:20;
112:8;149:2;150:4;
151:7;152:16;153:16;
154:15;155:17
**talking (9)**
26:22;30:11;55:13;
124:2;134:21,21;
136:3,10;156:10
**Taunia (1)**
167:3
**Taylor (1)**
17:10
**Teachers (1)**
18:18
**Technology (1)**
40:3
**telling (1)**
91:9
**tells (2)**
127:21,22
**tem (2)**
126:5;129:21
**ten (23)**
16:10;22:18;51:3;
78:11;79:11;80:25;
82:10;84:16;92:23;
99:17;101:7;102:5;
103:9;104:13;105:15;
106:16;107:23;109:2;

110:5;111:8,25;158:2;
164:4
**term (5)**
8:25;73:10;75:15;
76:14,18
**terms (15)**
6:24;42:15;43:17;
52:8;66:18;69:3;70:4,
6;71:7;72:3,5,24;73:2,
4;75:5
**testified (2)**
6:16;161:14
**testify (22)**
7:3;21:8;24:21;25:4,
7,17,24;26:11,17,20;
27:21;28:18,25;29:3;
30:10,16,19;53:3;
74:14,17;164:11;
167:11
**testifying (2)**
12:3;30:4
**testimony (7)**
21:10;41:16;75:22;
161:9;163:20;164:14;
167:17
**Thanks (1)**
156:8
**thereupon (1)**
167:14
**Third (3)**
8:21;126:15;128:15
**three (2)**
48:18;157:11
**titled (1)**
56:14
**today (34)**
7:3;9:17;10:6;11:6,
9;12:14;18:4;24:2,22;
25:5,25;26:18;29:1;
30:17;37:6;42:20;
63:23;73:21;111:20;
112:8;120:13;146:13;
148:1;149:2;150:4;
151:7;152:16;153:16;
154:15;155:6,17;
161:17,17;164:12
**Todd (1)**
15:16
**told (8)**
35:22;36:10;46:5;
57:1,4;91:11;93:10;
123:17
**Tom (4)**
141:15,18,22;158:14
**took (5)**
55:13;79:20;130:6;
136:2,19
**top (11)**
19:13;20:1,5;22:8;
55:19;94:7,8;101:18;
130:16;141:10;159:5
**topic (85)**
24:23,24,24;25:4,8,

17,25;26:11,13,13,17,
20;28:18,20,20,25;
29:3;30:4,10,12,13,16,
19;41:6;44:24,25;
52:24;75:1,1,6;76:25;
112:20;120:13,19;
121:25;122:1;134:20;
136:3,6;137:21,23;
144:15,15,21;145:1,15,
16;146:10,14,19,20;
147:25;148:5,10,18;
149:3,7,8,13,21,25;
150:5,7,8,13,21;151:8,
10,11,21;152:5,17,21,
22;153:1,17,21;154:2,
16,21;155:3,5,18;
164:13,16
**topics (30)**
6:20;8:21;9:12;
23:23,25;24:5,22;31:5,
13,17,23;32:1,5,25;
33:7,9;41:7,17;45:18,
24;46:5;74:16,25;
112:18,20;120:19;
136:5;144:14;145:4;
164:11
**total (1)**
18:1
**touching (1)**
167:13
**track (1)**
19:4
**train (1)**
59:15
**trained (2)**
59:21;60:16
**Training (4)**
59:12;60:21;61:13;
64:25
**transcribing (1)**
10:13
**transcription (1)**
167:16
**transmitted (1)**
51:23
**travel (5)**
39:9;59:17,20;
140:14;157:12
**traveled (1)**
60:15
**traveling (1)**
140:19
**trial (8)**
9:15;21:5,6,7,8,19,
23;22:2
**troop (1)**
18:18
**Troops (1)**
18:18
**true (4)**
74:10,19;156:14;
167:17
**truth (2)**

17,25;26:11,13,13,17,
20;28:18,20,20,25;
29:3;30:4,10,12,13,16,
19;41:6;44:24,25;
52:24;75:1,1,6;76:25;
112:20;120:13,19;
121:25;122:1;134:20;
136:3,6;137:21,23;
144:15,15,21;145:1,15,
16;146:10,14,19,20;
147:25;148:5,10,18;
149:3,7,8,13,21,25;
150:5,7,8,13,21;151:8,
10,11,21;152:5,17,21,
22;153:1,17,21;154:2,
16,21;155:3,5,18;
164:13,16
**topics (30)**
6:20;8:21;9:12;
23:23,25;24:5,22;31:5,
13,17,23;32:1,5,25;
33:7,9;41:7,17;45:18,
24;46:5;74:16,25;
112:18,20;120:19;
136:5;144:14;145:4;
164:11
**total (1)**
18:1
**touching (1)**
167:13
**track (1)**
19:4
**train (1)**
59:15
**trained (2)**
59:21;60:16
**Training (4)**
59:12;60:21;61:13;
64:25
**transcribing (1)**
10:13
**transcription (1)**
167:16
**transmitted (1)**
51:23
**travel (5)**
39:9;59:17,20;
140:14;157:12
**traveled (1)**
60:15
**traveling (1)**
140:19
**trial (8)**
9:15;21:5,6,7,8,19,
23;22:2
**troop (1)**
18:18
**Troops (1)**
18:18
**true (4)**
74:10,19;156:14;
167:17
**truth (2)**

167:12,12
**truthful (1)**
11:8
**try (3)**
10:17;34:6;150:1
**trying (2)**
36:13;117:18
**Tuesday (1)**
16:25
**turn (10)**
23:21;26:13;32:7;
44:24,24;50:11;55:15;
137:21;141:8;148:5
**turned (2)**
40:14;45:22
**two (7)**
17:11;18:25;65:21;
73:1;132:14,15;145:2
**two-year (1)**
54:13
**type (4)**
147:6,13;148:15;
153:3
**typewriting (1)**
167:15

**U**

**unclear (1)**
9:3
**under (87)**
8:4;11:6,25;19:1;
33:2;41:7;53:2,11;
61:12;67:25;70:1;
71:25;72:20;79:1,3;
81:5;82:9;86:8,11;
87:7,11;88:8;89:8;
93:12;94:2,17,20,25;
95:21,25;96:6;97:3,6,
14;98:6,9;99:11,17;
100:17,20,25;101:6,21,
24;102:4,23;103:2,7;
104:3,7,13;105:5,8,15;
106:7,15,17;107:12,15;
108:17,20;109:19,23;
110:22;111:1;114:8;
131:4,20,21;132:3;
145:16,19;147:6;
148:12,13,14;150:18;
151:24;152:18;153:2,
7,19;154:3,7;155:8,19;
164:1
**Underneath (2)**
61:15;130:25
**unique (1)**
7:19
**United (1)**
128:21
**unless (5)**
77:15;79:18;80:8,9;
130:5
**unofficial (1)**
7:14

**unsuccessful (1)**
147:1
**up (20)**
27:12;43:15;22;44:4;
45:22;46:3;61:20;62:4;
73:10,11;79:21;123:9,
12;125:23;126:15;
129:1;130:14;134:17;
157:23;163:2
**upon (2)**
45:3;167:15
**Urban (1)**
167:8
**use (18)**
52:8;56:22;58:2,8,
20,24;59:16,21;60:16;
69:3;70:4,6;71:7;72:3,
24;73:2,4;141:1
**used (27)**
40:22;42:15;43:18;
45:3;59:19;60:24;61:9,
9;63:6,14;66:18;70:7;
72:4,5,25;78:15,19,20;
80:20,23,24;82:4,7;
84:1;122:25;149:9;
151:17
**using (6)**
56:19;152:19;153:4;
154:7,19;155:23

**V**

**vague (3)**
8:22;144:22;155:4
**Vande (1)**
13:4
**various (1)**
130:1
**verbal (2)**
10:19,22
**version (13)**
29:24;78:21;90:7;
95:21;98:6;100:17;
104:3;105:5;106:7;
107:12;108:17;109:18;
110:22
**versus (1)**
47:5
**Veterans (2)**
18:17,19
**VIDEOGRAPHER (9)**
55:7,10;92:7,13;
135:21,24;160:18,21;
165:8
**violate (1)**
129:17
**violated (1)**
126:4
**violates (1)**
128:20
**violating (1)**
129:3
**visit (1)**

124:16
**volunteer (1)**
70:7
**volunteers (5)**
145:13;153:25;
154:10,13,19
**Vos (33)**
14:13,16,19;68:16,
18;69:16,18;70:14,17;
71:15,17,19;72:12,14;
73:15,17;147:15,17,19,
21;148:20,23;149:1;
151:2,6;152:9,13;
153:10,13;154:9,12;
155:12,15
**Vos's (3)**
14:22;69:21;160:12
**vote (7)**
76:23;126:11,16;
133:20;134:14,18;
145:10
**voted (6)**
126:7;128:5;133:15,
17,18;134:11
**voter (2)**
70:21;71:8
**voters (2)**
145:7,10
**voting (7)**
8:1;126:5;128:21;
129:3;131:22,22;134:8
**voucher (2)**
143:1

## W

**wait (1)**
10:15
**waive (2)**
8:10;9:18
**waived (1)**
167:18
**Walker (1)**
115:14
**Walker's (1)**
115:10
**Washington (8)**
59:18,21;60:1,4,7,
16;140:21,24
**watch (1)**
60:8
**water (1)**
55:5
**way (21)**
34:4;37:10;47:25;
50:7;68:15;73:21;
94:25;101:3;122:5,11;
137:7;141:15;142:3,7,
10;143:4,14,25;
146:11;150:2;160:3
**ways (4)**
125:3,11;135:15;
136:14

**Web (1)**
163:4
**week (3)**
17:2,3,16
**Western (1)**
47:6
**what's (20)**
14:2;44:12;89:23;
92:16;93:22;95:9;
96:17;97:21;98:22;
101:13;102:10;103:17;
104:19;105:21;106:23;
108:3;109:8;110:10;
130:11;134:4
**whatsoever (1)**
42:24
**Whitford (3)**
6:2;47:5;58:5
**whole (6)**
77:17;80:11;112:7;
113:1;162:3;163:4
**whose (2)**
158:18,19
**wide (1)**
46:1
**Wild (3)**
143:4,7;158:15
**Wisconsin (56)**
6:8,10,12;7:2,4,6,10,
18;8:5;12:3;18:6,13;
22:10;25:1;26:15;
28:23;29:8;30:6,15,23;
32:12,24;36:16;41:1;
43:1,19,23;45:6;47:3,
7;48:19;52:10;67:17;
68:10;69:12;70:23;
74:14;75:9;77:2;82:10;
94:8;112:22;120:23;
121:3;122:3;131:20;
145:9;147:19;162:18,
18,20;163:13;165:1;
167:1,5,10
**wit (1)**
167:10
**withheld (1)**
160:11
**within (1)**
36:4
**witness (15)**
6:15;7:3;9:17;34:5;
53:2;55:3;74:3,13,16;
75:25;76:1;92:2;
112:13;135:20;167:17
**Woodward (1)**
6:5
**word (1)**
75:11
**words (1)**
158:11
**work (3)**
9:1;19:10;116:15
**worked (2)**
9:8;18:17

**WRACC (1)**
71:8
**write (4)**
30:1;75:23;131:10;
143:1
**written (6)**
8:23;34:17;64:25;
94:7;129:7;155:11
**wrong (1)**
36:8
**wrote (3)**
28:11;29:15,18
**WSA (1)**
158:4

## Y

**year (1)**
132:4
**years (23)**
9:9;22:18;60:2;
78:11;79:12;81:1;
82:11;84:16;92:23;
99:17;101:7;102:5;
103:9;104:13;105:15;
106:17;107:23;109:3;
110:5;111:8;112:1;
158:2;164:4
**yellow (37)**
79:2,6;81:4,7;82:16,
20;84:9,13;85:11,15;
86:10,14;87:10,14;
88:10,14;89:10,14;
90:11,15;91:16,20;
93:11,15;94:19,24;
95:24;96:3,10;97:5,10;
98:8,12;99:10,14;
100:19,23
**Yep (2)**
90:9;93:11
**yesterday (1)**
16:23
**you' (1)**
75:5
**your' (1)**
75:5

## Z

**Zamarripa (1)**
125:25
**Zipperer (1)**
128:3

## 0

**0000001 (1)**
158:4

## 1

**1 (50)**
11:15,18,21,23;23:9,

13;24:24;25:8,25;
26:11;32:7;38:24;52:2;
55:15,16;56:13;59:9;
62:17,17;74:24;75:1,6;
77:4;112:17;126:11,
13,14;129:25;130:3,5,
17,22;131:3;132:4,11,
17;133:2,10,21;134:9,
12,15,17;136:3,4;
141:9;156:6;158:22;
162:8;164:9
**1:10 (1)**
160:19
**1:19 (1)**
160:22
**1:25 (2)**
165:9,11
**10 (17)**
20:24,25;55:8;67:12,
12;87:21,24;101:15,19,
21,24;102:1,8;116:7,
10;150:7;167:8
**10:09 (1)**
55:11
**11 (24)**
23:7;67:24;68:20;
88:22,25;92:8;113:10;
145:17;146:17;147:7,
13;148:4,12;149:6,15;
150:15;151:10,12,25;
152:8;153:3,20;154:4;
155:9
**11:10 (1)**
92:14
**12 (5)**
69:22;89:21,23;
152:21,23
**12:06 (1)**
135:22
**12:39 (1)**
135:25
**13 (15)**
70:19;90:22,25;
92:20;102:12,14,16,23;
103:2,4,11,15;116:23;
121:3,23
**13th (1)**
135:3
**14 (7)**
8:21;31:17;71:21;
92:11,17;154:22,24
**148 (27)**
13:25;14:1,10;16:3;
22:19,24;23:5;27:7;
29:7;35:3;42:14;43:19,
23;52:10;77:17;78:4;
79:19;80:10;114:15;
125:21;126:22;127:6;
130:19;162:11,12,24;
164:19
**15 (4)**
6:22;38:1;72:15;
93:23

**15-cv-421-jdp (1)**
47:5
**15th (1)**
128:6
**16 (1)**
95:10
**16.61 (1)**
53:11
**17 (2)**
9:9;96:18
**18 (11)**
97:21;103:19,21,22;
104:3,6,9,17;116:25;
161:22,24
**18th (27)**
78:18;80:22;82:6;
84:4;85:7;86:6;87:5;
88:6;89:6;90:5;91:6;
93:5;95:19;97:1;98:4;
99:6;100:15;102:21;
104:1;105:3;106:5;
107:10;108:14;109:17;
110:20;162:1,2
**19 (2)**
79:20;98:23
**1965 (3)**
126:5;128:21;129:4
**19th (4)**
79:20;125:22;128:1,
7
**1-A (6)**
23:13,14,16;24:1;
74:25;137:22
**1-B (2)**
40:19;44:24
**1's (1)**
11:24

## 2

**2 (18)**
23:21;24:23;26:13,
20,24;28:18;30:12;
43:7,21;55:19;62:23;
73:25;74:7;75:6;
112:20;128:4;131:21;
157:4
**20 (1)**
100:2
**2001 (18)**
18:14;57:22;67:24;
130:19;145:17;146:17;
147:7,13;148:4,12;
149:6,15;150:15;
151:25;153:3,20;
154:4;155:9
**2002 (44)**
67:15;70:24;78:21;
79:1;81:4;82:15;84:7;
85:9;86:8;87:8;88:8;
89:8;90:6,8;91:8,13;
93:8;94:17;95:22;97:3;
98:6;99:8;100:17;

William Whitford, et al. vs
Beverly R. Gill, et al.

101:21;102:23;104:3;
105:5;106:7;107:12;
108:17;109:19;110:22;
144:19;146:23;148:8;
149:9;150:12;151:13;
152:25;153:12,25;
154:11,25;163:14
**2003 (12)**
18:11,14;138:10;
145:18;147:8;148:14;
150:16;152:1;153:6;
154:5;155:10;157:23
**2010 (32)**
59:23;60:21;64:21;
78:14,21;80:19;82:4;
83:25;85:5;86:5;87:4;
88:5;89:5;90:4;91:5;
93:4;95:18;96:25;98:3;
99:5;100:14;102:20;
103:25;105:2;106:4;
107:9;108:14;109:16;
110:19;140:15,20,23
**2011 (59)**
22:10,25;23:7;25:1;
26:15;28:23;30:14;
41:1;45:6;75:9;77:2;
78:5,18;79:15,20,21;
80:22;82:6;83:5;84:4;
85:7;86:6;87:4,5;88:6;
89:6;90:4,5;91:6;93:5;
95:19;97:1;98:4;99:6;
100:15;102:21;104:1;
105:3;106:5;107:10;
108:15;109:17;110:20;
112:22;113:10;120:23;
121:2;125:22,23;
128:1,15;130:15;
133:9;135:3;136:17;
162:2,18,19;163:13
**2012 (3)**
158:6,22,23
**2013 (2)**
157:17;159:6
**2018 (1)**
60:5
**2019 (3)**
6:22;32:16;167:7
**20th (10)**
22:24;78:5;79:21;
125:23;128:15,16;
129:24;130:14;133:9;
136:17
**21 (7)**
77:19,21;78:22;79:5,
24;101:14;117:2
**21st (1)**
159:6
**22 (6)**
80:14,15;81:6,12;
102:10;117:4
**23 (6)**
81:24;82:19;83:8,13;
103:18;117:6

**24 (6)**
83:21;84:9,12,21;
104:20;117:8
**25 (2)**
105:22;117:10
**26 (6)**
85:1,12,14,20;
106:23;118:1
**27 (1)**
108:3
**28 (1)**
109:8
**29 (12)**
86:1,8,11,13,19;
92:11;110:11;118:4;
161:11,17;163:10,11
**29th (1)**
167:7
**2b (1)**
53:11

**3**

**3 (18)**
28:20;29:3;30:4,10;
44:25,25;46:10,11;
77:9,11,14;92:20;
120:19;161:11,17;
163:9;164:13,17
**30 (6)**
16:19;31:14,15;
127:1,3;132:25
**30- (1)**
17:1
**30b6 (5)**
9:12,16;12:1;33:9;
41:6
**31 (8)**
86:25;87:7,11,13,19;
118:7;130:9,12
**32 (2)**
134:2,5
**33 (2)**
156:18,21
**35 (6)**
87:25;88:8,10,13,19;
118:10
**38 (6)**
89:1,8,11,13,19;
118:13
**39 (1)**
133:11

**4**

**4 (21)**
30:7,12,19;46:22;
50:16;80:4,7;91:1,7,12,
17,19,25;94:2;116:4;
121:25;122:2;134:20;
136:3,6;164:2
**40 (5)**
16:17,19;31:14,15;

126:17
**40-minute (2)**
16:21;17:1
**42 (6)**
89:25;90:7,12,14,20;
118:16
**43 (127)**
22:10,12,15,16,18,
19,22;23:18;25:1;
26:15;27:8;28:23;29:8;
30:15,23;32:13;35:3;
36:16,18;41:1;42:13;
43:2,19,23;44:19;45:6,
23;46:16;52:10;56:23;
58:3,9,21,25;59:4;
72:23,25;73:20;75:9,
18,20;76:6,8;77:2;
78:16;79:3;80:10,21;
81:5;82:5,17;83:9;
84:2,10;85:11;86:11;
87:11;88:11;89:11;
90:11;91:17;93:12;
94:20;95:25;97:7;98:9;
99:11;100:20;101:24;
103:2;104:7;105:8;
106:9;107:15;108:20;
109:23;111:1;112:7,
22;113:1,12;114:15,
23;115:1,8,11,18,22;
116:1;120:23;121:3,
11;122:4,6,12,16;
123:1,23;124:1,10,14;
125:4,12,18;134:23;
135:3,16;136:15;
137:7;141:16,19,23;
142:4,7,10,14,19;
143:5,8,15;144:1,5,11;
162:18,20;163:13;
164:16
**44 (1)**
109:12
**49 (1)**
126:12
**4th (2)**
158:6,22

**5**

**5 (16)**
19:2;20:2;50:12,12;
81:14,16;137:21,24;
145:18;147:8;148:14;
150:16;152:1;153:6;
154:5;155:10
**50 (6)**
92:18,25;93:12,14,
20;118:19
**56 (9)**
93:24;94:6,7,14,17,
20,23;95:7;118:22
**57 (1)**
126:17
**58 (2)**

126:12;133:11
**59 (2)**
126:11,17

**6**

**6 (37)**
8:21;22:17;28:16;
30:8;51:22;54:21;
55:14;78:9;82:9;83:15,
18;92:23;94:2;95:2;
96:12;97:14;98:16;
99:18;101:1;102:4;
103:8;104:14;105:16;
106:18;107:22;109:1;
110:4;111:7,24;
115:13;125:15;144:15,
17;145:15,16;163:18;
164:2
**62 (7)**
104:21,24;105:5,8,
11,19;118:25
**63 (8)**
95:12,15,21,25;96:2,
9,15;119:3
**66 (1)**
119:6
**67 (7)**
96:19,22;97:3,6,9,
17;119:9

**7**

**7 (7)**
62:11,18;84:23,25;
146:19,21;156:11
**70 (7)**
105:23;106:1,7,9,12,
21;119:11
**77 (8)**
106:25;107:3,5,12,
15,18;108:1;119:17
**77th (1)**
137:18

**8**

**8 (7)**
64:19;66:2,6;85:22,
24;148:5,7
**8:58 (1)**
167:7
**80 (8)**
108:5,8,10,17,20,22;
109:6;119:20
**81st (1)**
137:18
**86 (8)**
97:23,24;98:6,9,11,
20;99:25;119:23
**88 (7)**
98:24;99:2,8,11,13,
19;120:1

**9**

**9 (8)**
66:8;67:6,10;86:21,
24;149:7,9;156:11
**93 (8)**
100:4,7,10,17,20,22;
101:11;120:4
**94 (6)**
109:10,19,22,25;
110:8;120:7
**95 (10)**
110:12,14,16,22;
111:1,3,10,12,18;
120:10
**96 (1)**
126:14
**97 (1)**
126:14
**99 (3)**
7:20;19:22;38:23

Verbatim Reporting, Limited
(608) 255-7700