# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WILLAIM WHITFORD, et al.,

     Plaintiffs,

     v.

BEVERLY R. GILL, et al.,

     Defendants.

15-cv-421-jdp

_____

THE WISCONSIN ASSEMBLY DEMOCRATIC
CAMPAIGN COMMITTEE,

          Plaintiff,

     v.

18-cv-763-jdp

BEVERLY R. GILL, et al.,

     Defendants

## **Expert Report of Sean P. Trende**

I, Sean P. Trende, do hereby declare the following:

1.    I am over 18 years of age and am competent to testify regarding the matters discussed in this declaration.

2.    My areas of expertise include political history, United States voting laws, redistricting, and the study of campaigns and elections.

3.    I am compensated at a rate of $300 per hour, excluding travel time. All opinions contained in this declaration are offered to a reasonable degree of professional certainty.

## EXPERT CREDENTIALS

4.     I have studied and followed United States elections on both a part-time and full-time basis for two decades.

5.     I received a B.A. from Yale University in 1995, with a double major in history and political science.

6.     I received a J.D. from Duke University in 2001.

7.     I also received an M.A. from Duke University in 2001, in political science. My coursework was entirely at the graduate level, meaning that I was evaluated under the same expectations as Ph.D. students. As part of this coursework, I took two semesters of graduate level statistics.

8.     I am currently enrolled as a doctoral candidate in political science at The Ohio State University. I have passed qualifying examinations in both the American Politics and Political Methodology subfields.  I am concurrently enrolled in the Department of Statistics, and am pursuing a Master's Degree in Applied Statistics.  Most of my graduate coursework has been in the Department of Statistics, and has included courses in regression analysis, probability theory, non-parametric statistics, survey design and methodology, multivariate analysis, public opinion, redistricting, complex systems, GIS implementation, and experimental design.

9.     I joined RealClearPolitics in January of 2009 as their Senior Elections Analyst. I assumed a fulltime position with RealClearPolitics in March of 2010.

10.     RealClearPolitics is a company of around 40 employees, with offices in Washington D.C.  It produces one of the most heavily trafficked political websites in the world, which serves as a one-stop shop for political analysis from all sides of the political spectrum and is recognized as a pioneer in the field of poll aggregation. It produces original content, including

2

both data analysis and traditional reporting. It is routinely cited by the most influential voices in politics, including David Brooks of *The New York Times*, Brit Hume of *Fox News*, Michael Barone of *The Almanac of American Politics*, Paul Gigot of *The Wall Street Journal*, and Peter Beinart of *The Atlantic*.

11.     My main responsibilities with RealClearPolitics consist of tracking, analyzing, and writing about elections. I collaborate in rating the competitiveness of Presidential, Senate, House, and gubernatorial races. As a part of carrying out these responsibilities, I have studied and written extensively about demographic trends in the country, exit poll data at the state and federal level, public opinion polling, and voter turnout and voting behavior.

12.     I am currently the Gerald R. Ford Visiting Scholar at the American Enterprise Institute, where my publications will focus on demographic changes and American elections.

13.     As part of familiarizing myself with how parties have drawn lines over the decades, as well as learning the political geography of the United States, I drew, using Adobe Illustrator, complete maps of every congressional district ever drawn, dating back to 1789. These maps were plotted on county maps of each state, tracing over images of maps taken from various Almanacs of American politics, or from my copy of Kenneth Martis' *The Historical Atlas of United States Congressional Districts: 1789-1983* (1982).

14.     I served as a Senior Columnist for Dr. Larry Sabato's "Crystal Ball" from January 2014 through the end of 2016.  I had to stop writing for the Crystal Ball because schoolwork was taking up too much of my time.

15.     I am the author of *The Lost Majority: Why the Future of Government is up For Grabs and Who Will Take It.* The book offers a revisionist take on realignment theory. It argues that realignments are a poor concept that should be abandoned. As part of this analysis, it conducts

3

a thorough analysis of demographic and political trends beginning around 1920 and continuing through the modern times, and notes the effect that the Democrats' increasingly compact coalition has on their prospects for the House.

16.     I also authored a chapter in Dr. Larry Sabato's *Barack Obama and the New America: The 2012 Election and the Changing Face of Politics*, which discussed the demographic shifts accompanying the 2012 elections. I further authored a chapter in Dr. Sabato's *The Surge: 2014's Big GOP Win and What It Means for the Next Presidential Election*, which discusses demographics and Electoral College shifts.  I authored a chapter in Dr. Sabato's *Trumped: The 2016 Election That Broke All The Rules.*  I authored a chapter in David Schultz and Rafael Jacob's *Presidential Swing States*, covering Ohio politics and its political subdivisions.  Finally, I have been asked to author a chapter for Dr. Sabato's forthcoming book on the 2018 elections.

17.     I co-authored the 2014 *Almanac of American Politics*. The Almanac is considered the foundational text for understanding congressional districts and the representatives of those districts, as well as the dynamics in play behind the elections. PBS's Judy Woodruff described the book as "the oxygen of the political world," while NBC's Chuck Todd noted that "[r]eal political junkies get two *Almanacs*: one for the home and one for the office." My focus was researching the history of and writing descriptions for many of the newly-drawn districts.

18.     I have spoken on these subjects before audiences from across the political spectrum, including at the Heritage Foundation, the American Enterprise Institute, the CATO Institute, the Bipartisan Policy Center, and the Brookings Institution.  In 2012, I was invited to Brussels to speak about American elections to the European External Action Service, which is the European Union's diplomatic corps. I was selected by the United States Embassy in Sweden to discuss the 2016 elections to a series of audiences there, and was selected by the United States Embassy in Spain to

4

fulfil a similar mission this fall. I was invited to present by the United States Embassy in Italy, but was unable to do so because of my teaching schedule. In the winter of 2018, I taught American Politics and the Mass Media at Ohio Wesleyan University. I am currently teaching Introduction to American Politics at The Ohio State University for the second time.

19.     It is my policy to appear on any major news outlet that invites me, barring scheduling conflicts, and I have appeared on both Fox News and MSNBC to discuss electoral and demographic trends. I have been cited in major news publications, including *The New York Times*, *The Washington Post*, *The Los Angeles Times*, *The Wall Street Journal*, and *USA Today*.

20.     I sit on the advisory panel for the "States of Change: Demographics and Democracy" project. This project is sponsored by the Hewlett Foundation and involves three premier think tanks: The Brookings Institution, the Bipartisan Policy Center, and the Center for American Progress. The group takes a detailed look at trends among eligible voters and the overall population, both nationally and in key states, in an attempt to explain the impact of these changes on American politics, and to create population projections, which the Census Bureau abandoned in 1995. In 2018, I authored one of the lead papers for the project: "In the Long Run, We're All Wrong," available at https://bipartisanpolicy.org/wp-content/uploads/2018/04/BPC-Democracy-States-of-Change-Demographics-April-2018.pdf.

21.     I previously authored an expert report in *Dickson v. Rucho*, No. 11-CVS-16896 (N.C. Super Ct., Wake County), which involved North Carolina's 2012 General Assembly and Senate maps. Although I was not called to testify, it is my understanding that my expert report was accepted without objection. I also authored an expert report in *Covington v. North Carolina*, Case No. 1:15-CV-00399 (M.D.N.C.), which involved almost identical challenges in a different forum.

22.    I authored two expert reports in *NAACP v. McCrory*, No. 1:13CV658 (M.D.N.C.), which involved challenges to multiple changes to North Carolina's voter laws, including the elimination of a law allowing for the counting of ballots cast in the wrong precinct.  I was allowed to testify at trial.  My testimony was solely on the "effect" prong of the Voting Rights Act claim. I did not examine the issues relating to intent.

23.    I authored reports in *NAACP v. Husted*, No. 2:14-cv-404 (S.D. Ohio), and *Ohio Democratic Party v. Husted*, Case 15-cv-01802 (S.D. Ohio), which dealt with challenges to a variety of Ohio voting laws. I was allowed to testify at trial.  The judge in the latter case ultimately refused to consider one opinion, which is not relevant to this report.

24.    Although I do not testify in defense of voter identification laws, I served as a trial consultant in *Lee v. Virginia Board of Elections*, No. 3:15-cv-357.

25.    I authored an expert report in *Feldman v. Arizona*, No. CV-16-1065-PHX-DLR, which dealt with an attempt to ban the collection of absentee ballots by third parties in Arizona. I had an opinion struck in that case for reasons unrelated to the merits of the opinion; counsel for the state elicited it while I was on the witness stand.

26.    I authored expert reports in *A. Philip Randolph Institute v. Smith*, No. 1:18-cv-00357-TSB, and *Common Cause v. Rucho*, NO. 1:16-CV-1026-WO-JEP, which were efficiency gap-based redistricting cases filed in Ohio and North Carolina.

## OPINIONS

### Dr. Mayer's Data Show Little Correlation Between Fundraising and the Implementation of Act 43

27.    Using the same source as Dr. Mayer, I have recreated the data he uses for fundraising in Wisconsin, with what appear to be rounding errors. However, I have extended the inquiry over the lifespan of the data, which extend back to 1998.

28.    Republican Assembly Committee fundraising does improve relative to the Democrats. But this is only correlation, and a rough one at that. Republican fundraising improves in 2014, not 2012 as we might expect with a redistricting-related effect, or as an effect of Republican winning control of the Assembly in 2010. Republican fundraising, relative to the Democrats, was about the same in 2012 as it was in 2006, 2000, and 1998.

Table 1: Republican vs. Democratic Assembly Campaign Fundraising, 1998-2018

|    | Year | Democratic Total | Republican Total | Difference | Percentage Democratic |
|----|------|------------------|------------------|------------|------------------------|
| 1  | 2018 | $1,438,377.00    | $3,014,155.00    | $1,575,778.00 | 32.30 |
| 2  | 2016 | $1,673,633.00    | $1,791,723.00    | $118,090.00 | 48.30 |
| 3  | 2014 | $630,166.00      | $803,342.00      | $173,176.00 | 44.00 |
| 4  | 2012 | $624,852.00      | $349,250.00      | -$275,602.00 | 64.10 |
| 5  | 2010 | $922,854.00      | $294,506.00      | -$628,348.00 | 75.80 |
| 6  | 2008 | $863,878.00      | $321,802.00      | -$542,076.00 | 72.90 |
| 7  | 2006 | $551,142.00      | $269,090.00      | -$282,052.00 | 67.20 |
| 8  | 2004 | $605,301.00      | $241,333.00      | -$363,968.00 | 71.50 |
| 9  | 2002 | $295,266.00      | $130,158.00      | -$165,108.00 | 69.40 |
| 10 | 2000 | $263,050.00      | $164,535.00      | -$98,515.00 | 61.50 |
| 11 | 1998 | $445,111.00      | $247,624.00      | -$197,487.00 | 64.30 |

29.    Moreover, this is at best a correlation. Drawing causal inferences is one of the most difficult tasks in social science, because we are unable to see the counterfactual universe where all other things are equal except the object of the inquiry. In other words, we cannot see what would have happened if everything had been the same in 2014, 2016, and 2018, save for the passage of Act 43. It is uniquely difficult to draw causal inferences on the basis of observational data, as opposed to experimental data, where researchers can randomize observations and impose some sort of control on what is observed. This is not to say that political scientists do not draw these inferences from observational data, but it must be done carefully, and is usually done with some attempt at blocking or other methods of imposing artificial control.

7

30.     One can, of course, always speculate upon the reasons for these types of events. It could be as Dr. Mayer suggests. It could also be that Republicans were aware of the fact that their campaign committee was perpetually outraised by Democrats, and sought to remedy this. It could simply be the Republican campaign committee fundraising advantage coming to reflect advantages in other areas of state fundraising. Whatever the case, we should be careful making statements about causation on the basis of a simple bivariate relationship.

31.     The candidate fundraising data illustrate different story. First, the largest Democratic dropoff in fundraising relative to Republicans occurs in 2010, not 2014. Democrats controlled the assembly in the 2010 midterms. One could create an explanation as to why this is the case, but here the simplest explanation would seem to be that fundraising is at least partly a function of overall enthusiasm, and Republican enthusiasm was high going into the 2010 midterms.

32.     Moreover, by beginning his inquiry in 2008, Dr. Mayer starts with a high point in Democratic fundraising relative to Republicans. This is entirely expected, given the high amount of Democratic enthusiasm surrounding the 2008 elections and the candidacy of Barack Obama.

Table 2: Republican vs. Democratic Candidate Fundraising, 1998-2016

|    | Year | Democratic Total | Republican Total | Difference | Percentage Democratic |
|----|------|------------------|------------------|------------|-----------------------|
| 1  | 2016 | $4,065,644.00 | $4,826,718.00 | $761,074.00 | 45.70 |
| 2  | 2014 | $2,562,080.00 | $4,843,172.00 | $2,281,092.00 | 34.60 |
| 3  | 2012 | $3,436,399.00 | $5,038,191.00 | $1,601,792.00 | 40.50 |
| 4  | 2010 | $3,091,446.00 | $4,365,762.00 | $1,27,4316.00 | 41.50 |
| 5  | 2008 | $4,325,944.00 | $4,419,238.00 | $93,294.00 | 49.50 |
| 6  | 2006 | $2,447,589.00 | $3,886,678.00 | $1,439,089.00 | 38.60 |
| 7  | 2004 | $2,192,361.00 | $3,736,585.00 | $1,544,224.00 | 37.00 |
| 8  | 2002 | $1,017,245.00 | $3,057,309.00 | $2,040,064.00 | 25.00 |
| 9  | 2000 | $2,226,827.00 | $4,406,154.00 | $2,179,327.00 | 33.60 |
| 10 | 1998 | $1,262,362.00 | $2,385,481.00 | $1,123,119.00 | 34.60 |

33.     If we extend the inquiry back farther, we see that Republican candidates have historically outraised Democratic candidates in Wisconsin. Indeed, in the late 1990s and early

8

2000s, well before Act 43, the Republican fundraising advantage for its candidates was larger than it is today.

34.    Indeed, the 2016 elections were the second-closest that Democratic candidates in Wisconsin came to Republican fundraising totals over the course of the past ten cycles. If we include the partial 2018 results, Democratic candidates raised 44.8 percent of the total amount of funds raised in 2018, their third-best showing in the past eleven cycles.

35.    There are other entities that raise funds in Wisconsin, such as the Democratic and Republican parties themselves.  Their fundraising totals over the years are set forth in the following table:

Table 3: Republican vs. Democratic Party Fundraising, 1998-2018

| Year | Democratic Total | Republican Total | Difference | Percentage Democratic |
|------|------------------|------------------|------------|------------------------|
| 2018 | $5,822,347.00 | $14,161,145.00 | $8,338,798.00 | 29.10 |
| 2016 | $3,225,044.00 | $3,550,022.00 | $324,978.00 | 47.60 |
| 2014 | $3,707,032.00 | $7,591,283.00 | $3,884,251.00 | 32.80 |
| 2012 | $5,221,209.00 | $7,323,083.00 | $2,101,874.00 | 41.60 |
| 2010 | $953,233.00 | $1,080,402.00 | $127,169.00 | 46.90 |
| 2008 | $410,837.00 | $1,114,931.00 | $704,094.00 | 26.90 |
| 2006 | $508,343.00 | $636,200.00 | $127,857.00 | 44.40 |
| 2004 | $384,230.00 | $1,433,188.00 | $1,048,958.00 | 21.10 |
| 2002 | $6,239,804.00 | $5,847,124.00 | -$392,680.00 | 51.60 |
| 2000 | $579,658.00 | $4,367,125.00 | $3,787,467.00 | 11.70 |
| 1998 | $1,636,113.00 | $2,651,076.00 | $1,014,963.00 | 38.20 |

36.    As you can see, the Republican Party of Wisconsin has routinely raised more money than Democrats over the past two decades; in fact, the party's largest advantages in fundraising in percentage terms occurred in 2000 and 2004, well before Act 43. In 2002, Democrats raised a majority of the funds in Wisconsin (as between the two parties); their second-best year in the dataset came in 2016, under the current plan.

37.    Indeed, it is not even clear we have correlations worth speaking of for the last two measurements.  If we try to test whether there is any difference in the Republican share of

9

fundraising pre- and post-2010 for assembly committees by using a Wilcoxon test (given the small number of observations), we do find substantial evidence of a correlation (p-value = .01). However, for candidate fundraising and party fundraising – which represents the bulk of the fundraising data in Wisconsin, we find no evidence of a difference between Republican advantages pre- and post-2010. The p-value is .567 for candidate fundraising (not including the 2018 results) and .7879 for committee fundraising.

### Dr. Mayer's Data Show Little Correlation Between Candidate Recruitment and Act 43

38.    Dr. Mayer suggests that the large jump in number of uncontested Republican seats in 2016 is a function of the futility of running in districts. Perhaps, but it is by no means obvious that this is the most likely answer. The 2014 elections occurred in a very favorable environment for Republicans, where Barack Obama's job approval was mired in the low-to-mid 40s. This could have depressed Democratic recruitment, or the environment could have interacted with the map. It is difficult to say, on the basis of these sparse data.

39.    As with the fundraising data above, the conclusions become more problematic when we take into account a more complete set of data. I have calculated the number of unopposed Republicans and Democrats for 2000-2018, using data available at elections.wi.gov/elections-voting/results.

Table 4: Uncontested Republicans and Democrats, 2000-2018

|    | Year | Uncontested by Ds | Uncontested by Rs |
|----|------|-------------------|-------------------|
| 1  | 2018 | 7                 | 29                |
| 2  | 2016 | 21                | 28                |
| 3  | 2014 | 29                | 23                |
| 4  | 2012 | 4                 | 23                |
| 5  | 2010 | 17                | 14                |
| 6  | 2008 | 6                 | 24                |
| 7  | 2006 | 14                | 25                |
| 8  | 2004 | 21                | 22                |
| 9  | 2002 | 28                | 24                |
| 10 | 2000 | 21                | 20                |

40.    In 2018, Democrats left their third-fewest number of seats uncontested in recent years, contesting all but seven of Republican's seats. Republicans, by contrast, left their largest number of seats uncontested in recent years.

41.    If we again divide the data up into pre- and post-2012 redistrict sets, and perform a Wilcoxon test on the data, we again find no difference in the number of seats left uncontested by Democrats pre- and post-2012 ($p = .9141$), left uncontested by Republicans pre- and post-2012 ($p = .2381$), or the net difference in seats left uncontested by Republicans and Democrats, pre- and post-2012 redistricting ($p = .4762$).

**Dr. Mayer's CCES Data Show Little Effect From the 2012 Redistricting**

42.    Dr. Mayer is appropriately cautious when interpreting the CCES data. Because of the relative "newness" of the CCES, the data series only date back to 2008.  This is problematic for measuring a trend in the data, because 2008 was a year of extremely high Democratic engagement given the candidacy of Barack Obama. The low amount of engagement in 2016 could reflect relatively low enthusiasm among Wisconsin Democrats for the candidacy of Hillary Clinton (as reflected in the presidential results), rather than an effect of an Assembly redistricting plan.  As Dr. Mayer appropriately notes, is important to remember here that these are numbers for engaging in *any* political campaign, not merely Assembly campaigns, which makes it all the more unlikely that this is a cause of Act 43.

43.    Even non-parametric tests such as the Wilcoxon test become problematic when one approaches very low numbers of observation.  It is still worth noting that running a one-sided Wilcoxon test splitting the data into pre-and-post 2012 show no significant effects for any of the data. The p-value is 0.2 for the "attended a local political meeting" question, 0.2 for "put up a political yard sign," 0.6 for the "donated money" question, and 0.2 for the "worked for a candidate

or campaign" question. Again, these p-values should be taken with skepticism, and probably the safest interpretation is that we lack the evidence necessary to draw conclusions about the observed effects of Act 43 on political participation in Wisconsin.

### The Effects of Act 43 on Policy Liberalism Are Unclear

44.     Finally, Dr. Mayer comments upon the effects of Act 43 on policy liberalism in Wisconsin. It is certainly incontestable that when Republicans gain control of legislatures, the policy agenda becomes more conservative. This is probably all the more true when the governor is someone like former Gov. Scott Walker, an unusually conservative governor by Wisconsin standards.

45.     The change in policy liberalism as a result of the 2010 election under the old map (.15 points) is roughly the same as the change from the 2012 to 2013 legislatures (.17 points). The standard deviations for the dataset are large (on the order of .3 points), it is difficult to interpret this movement.

46.     We should also put this into some perspective. In the entire Caughey-Warshaw dataset (available at https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/ZXZMJB), the data span roughly a five-point range, from a most liberal score of -2.52545 (Mississippi in 2014) to a most conservative score of 2.81 (California in 2003). The average is roughly zero. Thus, compared to America over the past 80 years, Wisconsin is still a relatively liberal state.

47.     Moreover, 2014 is not an unusually conservative year for Wisconsin in recent times. The 1.04 score from 2010 is actually an anomaly; Wisconsin had not been that liberal since 1961. The 0.668 from 2014 is roughly the same degree of liberalism as the state showed in 2006 (.686), 2007 (.608) and 2008 (.634).

48.     Even within the 2014 year, Wisconsin ranks as the 34th most liberal state in the country, with roughly the same policy index scores as neighboring Iowa (.607) and Illinois (.915). To put this in further perspective, in 2010, Wisconsin had the 37th most liberal policy index in the country, for a total movement of three ranks. Whatever Act 43 has done, it has not transformed Wisconsin into Mississippi, South Carolina, or Georgia (the most conservative states); indeed it is entirely unclear, given the large standard deviations involved, that Wisconsin has been transformed at all.

### Dr. Chen's Maps Do Not Suggest a Zero E.G. Baseline in Wisconsin

49.     Dr. Chen produced thousands of computer-drawn random maps of Wisconsin, subject to certain constraints of producing an adequate number of minority-majority districts, compactness, and so forth.   He selects a single map that is close to a zero efficiency gap utilizing his metric (in 2012) as his baseline map.

50.     Taken as a whole, his maps also suggest that a map drawn free of partisan intent would produce substantial efficiency gaps.  In other words, the baseline in Wisconsin is not zero, possibly due to partisan clustering.

51.     For example, 95 percent of Dr. Chen's plans have efficiency gaps that fall between -.0171 and -0.097.  Using the reduced equation for the efficiency gap that Dr. Jackman defended in the first iteration of this case, this translates to Democrats winning between 49.8 seats (rounded to 50), and 41.8 seats under a neutral map.  The median map Dr. Chen's algorithm draws has an efficiency gap of -.0573, while the average map Dr. Chen's algorithm draws has an efficiency gap of -.0565.  This would translate to Democrats winning roughly 44 assembly seats under the average or median map.

52.    In other words, the range of neutral maps – accepting Dr. Chen's methodology – would include many situations where Democrats won a majority of the popular vote – perhaps even handily so – but failed to take control of the legislature. Or, put differently, while it is arguably true that a compact map with a certain number of minority-majority districts and few paired incumbents *exists* where Democrats would have gained the legislature, it is not entirely justified to conclude that this would have been the likely outcome of a neutral process. The overwhelming majority of the maps drawn by a neutral process would have resulted in Democrats failing to control the legislature in 2012, even with a random redistricting process.

### Districts With A Chen Score Below .5 Elect Republicans

53.    Dr. Chen seemingly counts any district with a score above .5 as a Republican win, while any district with a score below .5 counts as a Democratic win. There is obviously something to his approach: Scores above .6 never elect Democrats and scores below .43 never elect Republicans in this decade so far. But, as is apparent from the following table, districts in the middle flip with some regularity.

|  | District Number | Chen Metric | 2012 Winner | 2014 Winner | 2016 Winner | 2018 Winner |
|---|---|---|---|---|---|---|
| 1 | 64 | 0.44 | D | D | D | D |
| 2 | 43 | 0.44 | D | D | D | D |
| 3 | 92 | 0.44 | D | D | R | R |
| 4 | 20 | 0.44 | D | D | D | D |
| 5 | 81 | 0.45 | D | D | D | D |
| 6 | 57 | 0.45 | D | D | D | D |
| 7 | 51 | 0.46 | R | R | R | R |
| 8 | 96 | 0.46 | R | R | R | R |
| 9 | 7 | 0.46 | D | D | D | D |
| 10 | 54 | 0.47 | D | D | D | D |
| 11 | 85 | 0.48 | D | R | R | R |
| 12 | 49 | 0.49 | R | R | R | R |
| 13 | 68 | 0.49 | R | R | R | R |
| 14 | 1 | 0.50 | R | R | R | R |
| 15 | 70 | 0.50 | D | R | R | R |
| 16 | 29 | 0.51 | R | R | R | R |
| 17 | 93 | 0.51 | R | R | R | R |
| 18 | 72 | 0.51 | R | R | R | R |
| 19 | 75 | 0.51 | D | R | R | R |
| 20 | 67 | 0.51 | R | R | R | R |
| 21 | 94 | 0.52 | D | D | D | D |
| 22 | 50 | 0.52 | R | R | R | R |
| 23 | 35 | 0.52 | R | R | R | R |
| 24 | 87 | 0.53 | R | R | R | R |
| 25 | 21 | 0.53 | R | R | R | R |
| 26 | 25 | 0.53 | R | R | R | R |
| 27 | 88 | 0.53 | R | R | R | R |
| 28 | 30 | 0.53 | R | R | R | R |
| 29 | 36 | 0.53 | R | R | R | R |
| 30 | 5 | 0.53 | R | R | R | R |
| 31 | 69 | 0.54 | R | R | R | R |
| 32 | 4 | 0.54 | R | R | R | R |
| 33 | 28 | 0.54 | R | R | R | R |
| 34 | 86 | 0.54 | R | R | R | R |
| 35 | 2 | 0.54 | R | R | R | R |
| 36 | 41 | 0.54 | R | R | R | R |
| 37 | 3 | 0.54 | R | R | R | R |
| 38 | 34 | 0.55 | R | R | R | R |
| 39 | 89 | 0.55 | R | R | R | R |
| 40 | 42 | 0.55 | R | R | R | R |
| 41 | 55 | 0.55 | R | R | R | R |
| 42 | 27 | 0.55 | R | R | R | R |

54.    In particular, Republicans win every election under Act 43 with a Chen score above

.5 with the exception of seven: Republicans lost District 70 in 2012, in western Wisconsin, where

five-term incumbent Amy Vruwink was able to hold on for a term. Republicans lost District 75 in

2012, in rural northwestern Wisconsin, after Republican incumbent Roger Rivard had made

controversial comments about date rape; they won it back in 2014. Republicans routinely lose District 94, near LaCrosse, where incumbent Steve Doyle has continued to win re-election. And Republicans lost District 14, a 60 percent Republican district under the Chen metric, as the voting patterns of the western Milwaukee suburbs begin to change.

55.    At the same time, Republicans have had substantial successes winning districts that the Chen metric would suggest are Democratic. Republicans have won roughly half (21 of 44) of the districts that have a Chen metric between .439 and .5, and two-thirds of the districts falling between .4585 and .489. Republicans have won half of the elections in District 92 (Chen metric .4396), and all of the elections in District 51 (.4585), 96 (.4625), 85 (.4773), 49 (.4861) and 68 (.489). All of these districts are located in rural Wisconsin, and most of them are located in southwestern Wisconsin, which is consistent with the trends toward Republicanization of rural Wisconsin that I describe in my initial report.

56.    Indeed, looking at the presidential results from 2016,    available at https://docs.google.com/spreadsheets/d/1LZ8fxG1VDbsgquN9i4jG11bt8z0c7O58Phkf4vTioCo/edit#gid=962573040, we can see that the unpredictability of American elections makes it difficult to project how these gerrymanders will play out over the long term. Dr. Mayer describes District 13 as an overwhelmingly Republican area of Waukesha County, with a Democratic baseline of 32 percent. Yet Hillary Clinton barely lost the district, by a point. The 22nd, 23rd and 24th Districts are described as cracked districts, yet only the 22nd was strongly Republican in 2016. Clinton lost the 24th by 4 points, and actually carried the 23rd by six points. The 29th District is described as a cracked Democratic area with a baseline of 49.5 percent. But Donald Trump carried it by over 15 points, making it more reminiscent of a packed Republican district. Likewise, District 67, which is described as having a Democratic baseline of 48.7 percent looks like a Republican "vote

sink" today, with Donald Trump carrying it by 22 points. District 93, another marginally Republican district under Dr. Chen's metric, went Republican by 18 points in 2016. Districts 70 and 82 both went for Donald Trump by over 20 points. District 50, a cracked district, went for Trump by 19 points, while District 95, a packed district, went for Clinton by 23.5 points, making them evenly matched today. It is difficult to see how a solid line between packing and cracking is maintained over the course of a redistricting map's lifespan.

57.    To get a sense of the true relationship between the Chen Metric and Republican chances of winning a district, we can perform logistic regression analysis, with the Chen metric as the predictor and a dummy variable with one indicating a Republican win as the response.

Table 5: Logistic Regression Coefficients, 2012 Election

|  | Dependent variable: |
| --- | --- |
|  | x2012 |
| Chen_Metric | 61.643*** |
|  | (14.848) |
| Constant | −29.748*** |
|  | (7.310) |
| Observations | 99 |
| Log Likelihood | −13.818 |
| Akaike Inf. Crit. | 31.635 |
| Note: | *p<0.1; **p<0.05; ***p<0.01 |

58.    The Chen metric is clearly related to Republican performance, but the "break even point" for Republicans winning a district lies below 50 percent. The following table illustrates Republican probabilities of winning districts by various levels of the Chen metric:

Table 6: Republican Win Probabilities Under Various Chen Metrics

| Chen Metric | Republican Prob |
|---|---|
| 0.4 | 0.6% |
| 0.405 | 0.8% |
| 0.41 | 1.1% |
| 0.415 | 1.5% |
| 0.42 | 2.1% |
| 0.425 | 2.8% |
| 0.43 | 3.8% |
| 0.435 | 5.0% |
| 0.44 | 6.7% |
| 0.445 | 8.9% |
| 0.45 | 11.8% |
| 0.455 | 15.4% |
| 0.46 | 19.9% |
| 0.465 | 25.2% |
| 0.47 | 31.4% |
| 0.475 | 38.4% |
| 0.48 | 45.9% |
| 0.48265 | 50.0% |
| 0.485 | 53.6% |
| 0.49 | 61.1% |
| 0.495 | 68.2% |
| 0.5 | 74.5% |
| 0.505 | 79.9% |
| 0.51 | 84.4% |
| 0.515 | 88.0% |
| 0.52 | 90.9% |
| 0.525 | 93.2% |
| 0.53 | 94.9% |
| 0.535 | 96.2% |
| 0.54 | 97.2% |

59.    Thus, Republicans become favorites at a Chen Metric of roughly .48265.  If we apply this cutpoint to Plan 43995, we would actually expect Republicans to be favored in 57 seats under that plan.  This is not unexpected, as Republicans' baseline position in the state has likely improved since the 2004 to 2010 timeframe.

60.    Notably, this cutpoint also shifts over time.   Using the 2014 election results, Republicans would be expected to win once the Chen metric rose above .4702.  Using the 2016 election results, Republicans would be expected to win once the Chen metric rose above .4653. Using the 2018 election results, Republicans would be expected to win a district once the Chen metric rose above .4675.

61.    If we use these cutoffs instead, Republicans would be expected to be favorites in 60 seats in 2014, 2016, and 2018 under Plan 43995.

62.    These give some perspective to the plaintiffs' chances of winning under the simulated plans. For many of them, Republicans would still be strongly favored to win their districts, or Democrats would remain packed in heavily Democratic districts.

63.    Plaintiff Graham Adsit lives in District 8 of Simulated Plan 43995. A Republican would have had a 30 percent chance of winning this district in 2018.

64.    Plaintiff Roger Anclam lives in District 45 of Simulated Plan 43995. A Republican would have had a 17 percent chance of winning this district in 2018.

65.    Plaintiff William Braun lives in District 40 of Simulated Plan 43995. A Republican would have had a 56.1 percent chance of winning this district in 2018.

66.    Plaintiff Hans Breitenmoser lives in District 76 of Simulated Plan 43995. A Republican would have had a 78 percent chance of winning this district in 2018.

67.    Plaintiff Judith Brey lives in District 75 of Simulated Plan 43995. A Republican would have had a 68.5 percent chance of winning this district in 2018.

68.    Plaintiff Sandra Carlson-Kaye lives in District 15 of Simulated Plan 43995. A Republican would have had a 4 percent chance of winning this district in 2018.

69.    Plaintiff Guy Costello lives in District 8 of Simulated Plan 43995. A Republican would have had a 61.7 percent chance of winning this district in 2018.

70.    Plaintiff Graham Adsit lives in District 8 of Simulated Plan 43995. A Republican would have had a 30 percent chance of winning this district in 2018.

71.    Plaintiff Timothy B. Daley lives in District 16 of Simulated Plan 43995. A Republican would have had a 38.7 percent chance of winning this district in 2018.

72.    Plaintiff Dieterich lives in District 60 of Simulated Plan 43995. A Republican would have had a 9 percent chance of winning this district in 2018.

73.    Plaintiff Donohue lives in District 1 of Simulated Plan 43995.  A Republican would have had a 72.9 percent chance of winning this district in 2018.

74.    Plaintiff Dudley lives in District 2 of Simulated Plan 43995.  A Republican would have had almost no chance of winning this district in 2018.

75.    Plaintiff Estrada lives in District 70 of Simulated Plan 43995.  A Republican would have had a 80.8 percent chance of winning this district in 2018.

76.    Plaintiff Flom lives in District 86 of Simulated Plan 43995.  A Republican would have had an 80 percent chance of winning this district in 2018.

77.    Plaintiff Harris lives in District 72 of Simulated Plan 43995.  A Republican would have had almost no chance of winning this district in 2018.

78.    Plaintiff Hohenstein lives in District 96 of Simulated Plan 43995.  A Republican would have had a 64 percent chance of winning this district in 2018.

79.    Plaintiff Lentini lives in District 5 of Simulated Plan 43995.  A Republican would have had a 1.2 percent chance of winning this district in 2018.

80.    Plaintiffs McCue and Mitchell live in District 44 of Simulated Plan 43995.  A Republican would have had a 19.1 percent chance of winning this district in 2018.

81.    Plaintiff Patel lives in District 18 of Simulated Plan 43995.  A Republican would have had almost no chance of winning this district in 2018.

82.    Plaintiff Pedersen lives in District 86 of Simulated Plan 43995.  A Republican would have had an 80 percent chance of winning this district in 2018.

83.    Plaintiff Petulla lives in District 91 of Simulated Plan 43995.  A Republican would have had an 82 percent chance of winning this district in 2018.

84.    Plaintiff Pfundheller lives in District 82 of Simulated Plan 43995.  A Republican would have had a 36.7 percent chance of winning this district in 2018.

85.    Plaintiff Ramaker lives in District 37 of Simulated Plan 43995.  A Republican would have had an 80.2 percent chance of winning this district in 2018.

86.    Plaintiff Schnick lives in District 59 of Simulated Plan 43995.  A Republican would have had a 34 percent chance of winning this district in 2018.

87.    Plaintiffs Seaton live in District 87 of Simulated Plan 43995.  A Republican would have had a 74.83 percent chance of winning this district in 2018.

88.    Plaintiffs  Sundstrom, Switzenbaum and Wallace live in District 5 of Simulated Plan 43995.  A Republican would have had a 1.2 percent chance of winning this district in 2018.

89.    Plaintiffs Wohl and Wolfe live in District 21 of Simulated Plan 43995.  A Republican would have had a 35 percent chance of winning this district in 2018.

### Map 43995 Produces Wide Swings In Election Outcomes

90.    While Dr. Chen's map produces a roughly zero efficiency gap at "baseline," it is apparent from his Figure 3 that years that are marginally better for Republicans – or worse – produce substantial deviations in outcomes.  Republicans improving by one point over baseline would result in an efficiency gap of just under .075.  In other words, it would create almost as many wasted votes as an actionable map designed with partisan intent.

91.    For example, if Republicans were to drop five points below the baseline, Democrats would enjoy a 71-28 advantage in the Assembly.  Using 48.265 as the cutoff, that would be a 67-32 Democratic advantage.  A five-point swing the other direction would result in 70-29 and 75-24 Republican majorities, utilizing the respective baselines.

21

92.    The following table shows the number of seats Republicans would be expected to win utilizing different baselines calculated above, given a certain swing.  Using Dr. Chen's cutoff of 50 percent, Republicans could win between 38 and 58 seats in the Assembly, given a two-point swing in either direction.  Using the 2012 baseline estimated above, we would expect Republicans to win between 47 and 62 seats based off of a two point swing.  Notably, using the 2016 and 2018 baselines, a slight deviation in either direction still results in Republican majorities, potentially extending into the 70s.

Table 7: Seats Won By Republicans Using Various Uniform Swings, Using Chen Metric

| Swing: | -5 | -4 | -3 | -2 | -1 | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 Percent | 28 | 32 | 32 | 38 | 41 | 47 | 55 | 58 | 61 | 62 | 70 |
| 2012 | 32 | 37 | 39 | 47 | 54 | 57 | 60 | 62 | 70 | 73 | 75 |
| 2014 | 38 | 41 | 47 | 55 | 58 | 60 | 62 | 70 | 73 | 77 | 77 |
| 2016 | 39 | 46 | 53 | 56 | 59 | 60 | 66 | 73 | 75 | 77 | 78 |
| 2018 | 38 | 42 | 51 | 56 | 59 | 60 | 63 | 72 | 74 | 77 | 77 |

Dr. Chen Does Not Take Account of Incumbency

93.    It is important to recall that the enhanced ability of incumbents to retain seats for their parties is "perhaps the most well-known feature of contemporary legislative elections." Ken Mayer, Analysis of the Efficiency Gaps of Wisconsin's Current Legislative District Plan and Plaintiffs' Demonstration Plan," July 3, 2015.   Yet analysis of incumbency advantage is missing from Dr. Chen's metric.  This is important, because, as a result of the 2010 midterm elections, Republicans had more incumbents running than Democrats.

94.    It is difficult to estimate the precise effects of incumbency here, for two reasons.  First, we cannot untangle the counterfactual problem.  Some Democrats who opted to retire or run for different office probably would have run under this map, and the same is true for Republicans.  The converse is also true: Some Republicans who ran in 2012 would have retired.  Second, it is difficult to estimate the effect of Democratic incumbency.  Including Democrats in the regression

22

analysis does not return a significant value or substantially reduce the residual deviance of the model, unlike including Republicans; this could be a result of high numbers of unopposed Democratic candidates.

95.     Regardless, if we include the presence of a Republican incumbent, we return the following model:

|  | Dependent variable: |
| --- | --- |
|  | x2012 |
| Chen_Metric | 39.317*** |
|  | (9.934) |
| R_Inc | 1.710* |
|  | (0.966) |
| Constant | −19.004*** |
|  | (4.740) |
| Observations | 99 |
| Log Likelihood | −16.742 |
| Akaike Inf. Crit. | 39.484 |
| Note: | *p<0.1; **p<0.05; ***p<0.01 |

96.     Estimating the 2012 results (using Dr. Chen's placement of Republican incumbents), we would expect that Republicans would be favored in 65 districts. Again, this is complicated by the lack of consideration for Democratic incumbency. But Democrats only have incumbents running in five districts where Republicans are favored under the model; Republican probability of success is defined as 63.5 percent, 71.3 percent, 72.2 percent, 81.9 percent, and 96.7 percent in those districts. Even assuming that Democrats were to win all five, we would still expect for Republicans to be favorited in 60 districts as a baseline under this plan.

97.     Of course, there are many other ways we could estimate the 2018 elections. I chose this metric because it most clearly tracks the data plaintiffs seemingly wish the Court to draw inferences from.

## Conclusion

98.    Estimating the partisan effects of Act 43 is an enormously difficult task.   It is difficult to know how this law affected fundraising, recruitment, and the ideological direction of the legislature, to say nothing of the effect on Democrats' chances in individual districts.   Elections are enormously complicated events, which political scientists frequently struggle to unravel. The conclusions presents by plaintiffs' experts should be approached with caution, as substantial uncertainty surrounds them.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

This the 17th day of December, 2018.

_____

Sean P. Trende