UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

WILLIAM WHITFORD, et al.

    Plaintiffs,

v.

BEVERLY R. GILL, et al.,

    Defendants,

and

THE WISCONSIN STATE ASSEMBLY,

    Intervenor-Defendant.

Case No. 3:15-CV-00421-jdp

## THE WISCONSIN STATE ASSEMBLY'S MOTION FOR ATTORNEYS' FEES

For decades, the Supreme Court confirmed that politicians need not take the politics out of redistricting. *See, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 285 (2004) (plurality op.); *Gaffney v. Cummings*, 412 U.S. 735, 752-53 (1973). But the Court left "unsettled" and "unresolved" the question of whether partisan gerrymandering claims are justiciable. *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).

Then came two partisan gerrymandering cases from North Carolina and Maryland. *See Rucho v. Common Cause*, No. 18-422; *Lamone v. Benisek*, No. 18-726. Parties to partisan gerrymandering cases nationwide were about to get an answer to the justiciability question. Because the North Carolina and Maryland district courts struck down redistricting plans as unconstitutional even after *Gill*, the Supreme Court had no choice but to finally resolve whether the Constitution permitted federal courts to remedy alleged partisan gerrymandering.

On January 4, 2019, the Supreme Court agreed that *Rucho* and *Lamone* would get plenary review, postponed a decision about whether the Court had jurisdiction, and scheduled the cases for argument in March. *See* Order List, 586 U.S. ___ (Jan. 4, 2019). The same day, the Assembly asked Plaintiffs to agree to stay proceedings in this partisan gerrymandering case until the Supreme Court decided *Rucho* and *Lamone*. Plaintiffs refused. From that point onward, Plaintiffs bore the risk of forging ahead with costly litigation. That risk included an award of attorneys' fees, for at that point Plaintiffs' decision to continue litigating—prolonging and expanding discovery until the eve of trial—became unreasonable. *See Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422 (1978); *Hermes v. Hein*, 742 F.2d 350, 358 (7th Cir. 1984).

Now that the Assembly has prevailed, the Assembly requests an award of reasonable attorneys' fees beginning on January 4, 2019. 42 U.S.C. § 1988(b).

## BACKGROUND

In October 2018, the Wisconsin State Assembly successfully moved to intervene in this lawsuit for the primary purpose of moving to dismiss Plaintiffs' amended complaint. *See* Assembly's Br. in Supp. of Mot. to Intervene, ECF 210. The Assembly attached its motion to dismiss and supporting brief to its intervention papers, arguing Plaintiffs' claims were nonjusticiable and failed to state a claim. *See* Assembly's Mot. to Dismiss, ECF 210-1 (refiled as ECF 224); Assembly's Br. in Supp. of Mot. to Dismiss, ECF 210-2 (refiled as ECF 225).

The Assembly's motion to dismiss anticipated the Supreme Court's *Rucho* decision at every turn: Had the framers "intended for courts to take politics out of

2

the districting process, surely they would not have vested the political branch with the responsibility of drawing lines." *See* Br. in Supp. of Mot. to Dismiss at 1, ECF 225 ("Mot. to Dismiss"); *compare Rucho v. Common Cause*, No. 18-422, slip op. at 12 (June 27, 2019). Moreover, unlike racial gerrymandering cases, "there is no fixed constitutional principle informing a political gerrymandering claim," "no constitutionally prescribed ideal votes-to-seats ratio," and no constitutional right to "proportional representation." Mot. to Dismiss at 69; *compare Rucho*, slip op. at 19-20. As for Plaintiffs' First Amendment claim, the Assembly argued "Act 43 does not have any of the hallmarks of burdening expressive activity" because it "does not regulate the internal affairs of the Democratic party, its relationship with supporters, or its supporters' relationship with one another" or otherwise "require Plaintiffs to forego a right or tangible benefit in order to associate." Mot. to Dismiss at 74. "In fact," the Assembly argued, "Act 43 does not impose any restriction, impairment, or regulation of voter-plaintiffs' speech." *Id.* at 77; *compare Rucho*, slip op. at 26 ("The plaintiffs are free to engage in those activities no matter what the effect of a plan may be on their district.").

The Court granted the Assembly's motion to intervene, noted there was "no reason to treat the Assembly as less than a full party," and ordered Plaintiffs to respond to the Assembly's motion to dismiss. Op. & Order at 4, ECF 223. Plaintiffs then used their response to argue that the Assembly was "derail[ing]" proceedings by raising "superfluous issues" about justiciability that were outside of the scope of the Supreme Court's mandate in *Gill*. *See* Pls.' Opp'n to Mot. to Dismiss at 4-6, 24-

25, ECF 229. As if an issue going to the court's very power to entertain the case could ever be outside the scope of a mandate. The unreasonableness of Plaintiffs' position speaks for itself.

Meanwhile, defendants in partisan gerrymandering cases in North Carolina and Maryland appealed decisions striking down redistricting maps to the Supreme Court. For the Supreme Court to decide either case, it first had to decide whether federal courts could remedy an alleged partisan gerrymander. *Rucho*, in particular, presented the same unresolved threshold questions at issue in this case—whether partisan gerrymandering plaintiffs have standing and whether their claims are justiciable. *See* Jurisdictional Statement at i, *Rucho v. Common Cause*, No. 18-422 (Oct. 1, 2018); *see also* Jurisdictional Statement at i, *Lamone v. Benisek*, No. 18-726 (Dec. 3, 2018) (asking whether district court's adopted test was "unmanageable"). On January 4, 2019, the Supreme Court deferred deciding those jurisdictional questions and scheduled both cases for argument. *See* Order List, 586 U.S. ___ (Jan. 4, 2019).

The same day, counsel for the Assembly asked Plaintiffs' counsel to agree to stay proceedings in this case pending *Rucho* and *Lamone*. *See* Ex. 1 (1/5/19 Email from J. Ackerman to R. Greenwood). Plaintiffs refused. *See id.* (1/6/19 Email from R. Greenwood to J. Ackerman).

Plaintiffs' refusal forced the Assembly's hand. The Assembly could not accept Plaintiffs' invitation to waste tremendous resources on continued discovery and a second trial mere months before the Supreme Court would decide whether federal

4

courts could even entertain partisan gerrymandering claims. The Assembly therefore asked this Court to stay the case for at most five months until the Supreme Court decided *Rucho* and *Lamone*. The Assembly explained that "judicial economy strongly counsels in favor of a stay" given the "significant overlap" with the North Carolina and Maryland cases. *See* Assembly's Br. in Supp. of Mot. to Stay at 2, ECF 231. In response to Plaintiffs' argument that a temporary stay would deny Plaintiffs the opportunity to "obtain any meaningful relief for the 2020 elections," the Assembly explained that a temporary stay would leave ample time to complete remaining discovery, pretrial tasks, and trial. *See* Assembly's Reply Br. in Supp. of Mot. to Stay at 8-9 & n.7, ECF 242. There was "no reason to proceed with discovery (including additional expert reports and more than 30 depositions)" when the Supreme Court had yet to announce "the ground rules that govern the claims" and could well decide the claims were nonjusticiable. *Id*. at 2.

Faced with Plaintiffs' refusal to stay this case, this Court took a middle path. The Court delayed trial until after the Supreme Court decided *Rucho* and *Lamone* based on the accurate prediction that "holding a trial and taking full briefing" before *Rucho* and *Lamone* "would almost certainly lead to a significant waste of resources for the parties and the court." Op. & Order at 2-4, ECF 243. But weighing the Assembly's arguments against the Plaintiffs' obstinance that the case continue, the Court permitted discovery to proceed while acknowledging that "the parties' work will have been for naught" if the Supreme Court ruled partisan gerrymandering claims were nonjusticiable. *Id*. at 4.

5

During a February scheduling conference, and again at Plaintiffs' insistence, the Court reset the trial for July 15, fewer than three weeks after the anticipated Supreme Court decisions. *See* Pls.' Status Report at 2, ECF 245; Scheduling Conference Tr. at 10:8-12:23, ECF 303-6. During that scheduling conference, Plaintiffs' counsel represented that Plaintiffs' depositions "should be completed in the month of February in a couple weeks" and that "any third-party discovery could be taken promptly as well within the span of probably the next month or two." *Id.* at 5:21-6:5. Months before, Plaintiffs' counsel told the Court to expect supplemental "discovery of the plaintiffs themselves and then also some supplemental expert discovery that would go to the standing issue," but not "the discovery of the historical background facts." Pretrial Conference Tr. 7:24-8:3, 10:17-22, ECF 215. The next five months proved otherwise.

While the parties waited for the Supreme Court, Plaintiffs used the extended schedule to pursue scorched-earth discovery well beyond Plaintiffs' earlier representations about what discovery remained. They demanded a 30(b)(6) deposition and documents. *See* Fuller Dep., ECF 267. They were unrelenting in their attempts to compel discovery from the Speaker of the Wisconsin State Assembly. *See* Op. & Order, ECF 275; Speaker Vos's Br. in Supp. of Mot. to Stay at 1-2, ECF 277 (noting Plaintiffs threatened to seek contempt sanctions). They again subpoenaed legislative aides, who already testified at trial, already turned over documents, and already were deposed. Plaintiffs required these witnesses to turn over even more documents and submit to their fifth depositions related to Wisconsin

6

redistricting. *See* Foltz Subpoena, ECF 272-1; Ottman Subpoena, ECF 272-2; *see also* ECF 109-113 (Foltz depositions); ECF 114-118 (Ottman depositions). In May, they served 316 requests for admission and related interrogatories. *See* Exs. 2-3. Also in May, long after Plaintiffs represented discovery would be complete, they identified four Democratic politicians as new witnesses with discoverable information. *See* Defs.' Mot. to Strike Pls.' Suppl. Disclosures at 2-4, ECF 282. At every turn, Plaintiffs refused to defer costly and time-intensive litigation until after the Supreme Court's *Rucho* decision and faulted the Assembly for asking Plaintiffs to do the same. *See*, *e.g.*, Pls.' Opp'n to Defs.' Mot. to Strike at 9, ECF 294.

Then in June, the Supreme Court held that the Assembly had it exactly right—partisan gerrymandering claims, whether framed as Equal Protection claims or First Amendment claims, are nonjusticiable. *See Rucho*, slip op. at 19-20. Partisan gerrymandering plaintiffs "seek an unprecedented expansion of judicial power…into one of the most intensely partisan aspects of American political life." *Id.* at 31. The federal judiciary, "the unelected and politically unaccountable branch of the Federal Government," has no business wading into that political thicket. *Id*. This Court accordingly dismissed Plaintiffs' complaint. Op. & Order at 2, ECF 318.

**ARGUMENT**

In civil rights actions like this one, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs…." 42 U.S.C. § 1988(b). Despite section 1988's clear language that a "prevailing party" (versus a "prevailing plaintiff") may be awarded fees, the Supreme Court has interpreted section 1988 to mean that a prevailing plaintiff

7

"ordinarily is to be awarded attorney's fees in all but special circumstances" but the standard for prevailing defendants is different. *Christiansburg*, 434 U.S. at 417. A prevailing defendant can recover fees only if the plaintiff's action was "frivolous, unreasonable, or groundless" or if "the plaintiff continued to litigate after it clearly became so." *Id.* at 422; *see also CRST Van Expedited, Inc. v. E.E.O.C.*, 136 S. Ct. 1642, 1652-53 (2016). But a prevailing defendant need not make any additional showing that a "plaintiff was motivated by bad faith in bringing the action." *Christiansburg*, 434 U.S. at 419.

Awarding fees to prevailing defendants, though subject to a different standard than that for prevailing plaintiffs, is consistent with an "equally important" objective underlying section 1988's fee-shifting provision. *Id.* at 420 (quotation marks omitted). The specter of a fee award to a prevailing defendant deters litigation that "needlessly bring[s] defendants through the costly and agonizing uncertainty of defending suit." *Hamilton v. Daley*, 777 F.2d 1207, 1211 (7th Cir. 1985); *see also LeFer v. Murry*, 978 F. Supp. 2d 1177, 1193 (D. Mont. 2013).

Applying those standards here, the Assembly is entitled to an award of reasonable attorneys' fees beginning on January 4, 2019, after the Supreme Court scheduled *Rucho* and *Lamone* for argument. At that point, there was no doubt that the Supreme Court would address the very "unresolved" threshold question in this case—whether partisan gerrymandering claims were judicially redressable (and how)—by June. Despite that certain intervening change in law, Plaintiffs demanded that the parties continue to litigate. Plaintiffs used this Court's decision to postpone

8

trial as an invitation to engage in unwarranted and harassing discovery. *See supra*, pp. 6-7. This litigation thus became unreasonable, even vexatious, when Plaintiffs' counsel refused to agree to stay proceedings until after the Supreme Court decided *Rucho*, and even more so when Plaintiffs pursued discovery well beyond what it told the Court was necessary to retry this remanded case. As a prevailing party, the Assembly therefore requests an award of reasonable attorneys' fees from January onward. *See* 42 U.S.C. § 1988(b).

I. **The Assembly is a "Prevailing Party."**

The Assembly, as a defendant-intervenor, became a "prevailing party" when this Court ruled "[t]here is no doubt that this case cannot succeed in federal court" and dismissed Plaintiffs' complaint. Op. & Order at 2, ECF 318. A defendant need not prevail "on the merits" to be considered a prevailing party. *See CRST*, 136 S. Ct. at 1651. "Plaintiffs and defendants come to court with different objectives," and a defendant "fulfill[s] its primary objective whenever the plaintiff's challenge is rebuffed, irrespective of the precise reason for the court's decision." *Id.*; *see also First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1015 (7th Cir. 1985) ("where there is a dismissal of an action, even where such dismissal is voluntary and without prejudice, the defendant is the prevailing party" (quotation marks omitted)). That is especially so here, where Plaintiffs' complaint has been dismissed for an irredressable jurisdictional defect. Such a dismissal awards the Assembly "the most sweeping victory for which it could have hoped." *Citizens for a Better Env't v. Steel Co.*, 230 F.3d 923, 929 (7th Cir. 2000). It does "not just put off

9

the evil day" for the defending party; it "terminate[s] this suit and bar[s] all others like it," absent some change in federal law. *Id.* at 930.

The Assembly's status as an intervenor does not foreclose an award of attorneys' fees. As an intervenor, the Assembly is nothing less than a "full party." Op. & Order at 4, ECF 223. And where, as here, the intervenor does not merely duplicate the efforts of another party, section 1988 permits the intervenor to recover reasonable attorneys' fees. *See King v. Ill. State Bd. of Elections*, 410 F.3d 404, 415 (7th Cir. 2005); *see, e.g., id.* at 425 (rejecting argument that "intervenors' efforts were so duplicative of those of the Department of Justice that the intervenors did not contribute materially to the outcome of the case"). Here, the Assembly alone filed a motion to dismiss and to stay the case—both of which predicted that Plaintiffs' claims would be ruled nonjusticiable. *Supra*, pp. 2-3. The Assembly offered experts with non-duplicative opinions rebutting Plaintiffs' claims—including opinions about the natural packing and cracking attributable to Wisconsin's political geography and the complicated nature of individual (versus aggregate) voting behavior. *See* Expert Report of James Gimpel, ECF 249; Expert Report of Brian Gaines, ECF 250. Among other things, the Assembly's counsel took 29 of the Plaintiffs' depositions, put together Defendants' trial exhibit list, and filed various pretrial briefs. *See* Defs.' Rule 26(a)(3) Pretrial Disclosures at 2, ECF 298; Defs.' Mot. to Strike, ECF 282; Defs.' Opp'n to Pls.' Mot. to Admit Dep. Test., ECF 311. And Plaintiffs themselves took advantage of the Assembly's involvement in the case—demanding a 30(b)(6) deposition, additional discovery from the Speaker and

10

legislative aides, and lengthy written discovery. *Supra*, pp. 6-7. The Assembly shared the burden of defending against Plaintiffs' claims and is entitled to fees as a prevailing party.

II. **An Award of Attorneys' Fees Is Proper Under *Christiansburg*.**

An award of attorneys' fees is warranted if a plaintiff's decision to continue litigating is unreasonable. In *Hermes*, for example, the Seventh Circuit remanded a case to determine whether plaintiff's suit became "frivolous or vexatious at some point during the litigation" based on plaintiff's motion practice and discovery. 742 F.2d at 358. When plaintiffs engage in pointless discovery failing to uncover necessary facts for their claims, prevailing defendants may recover fees, even if the claim was reasonable at the beginning of litigation. *See, e.g.*, *Munson v. Friske*, 754 F.2d 683, 697 (7th Cir. 1985); *Crane-McNab v. Cty. of Merced*, 773 F. Supp. 2d 861, 881 (E.D. Cal. 2011). Similarly, intervening legal developments may render litigation unreasonable. *See Hamer v. Cty. of Lake*, 819 F.2d 1362, 1367-68 & n.12 (7th Cir. 1987); *see, e.g.*, *Werch v. City of Berlin*, 673 F. 2d 192, 196 (7th Cir. 1982) (intervening Supreme Court decision erased any doubt that plaintiff's action could not be maintained); *Hutcherson v. Bd. of Supervisors of Franklin Cty., Va.*, 742 F.2d 142, 146 (4th Cir. 1984) (same); *cf. Incantalupo v. Lawrence Union Free Sch. Dist. No. 15*, 829 F. Supp. 2d 67 (E.D.N.Y. 2010) (awarding fees after plaintiff failed to develop novel legal theory).

Applied here, this litigation became unreasonable as early as January, when the Supreme Court made clear it would be deciding whether partisan gerrymandering claims could be remedied by federal courts (and if so, how). Rather

than wait for instructions from the Supreme Court, Plaintiffs doubled down on their discovery efforts, went beyond what they told the Court they would do, and used the additional months of discovery to harass legislative aides, the Speaker of the Wisconsin State Assembly, and the Assembly itself. That scorched-earth discovery bore little relation to Plaintiffs' job on remand—to prove that each Plaintiff had suffered a concrete and individualized injury beyond a generalized political grievance. *See Gill*, 138 S. Ct. at 1934.

When this Court permitted discovery to proceed while the parties awaited the Supreme Court's decisions, Plaintiffs had previously represented that there would be supplemental discovery "of the plaintiffs themselves" and "some supplemental expert discovery" for the "standing issue," but that "discovery about the historical background facts" need not be revisited. Pretrial Conference Tr. 7:24-8:3, 10:17-22, ECF 215. And in February, Plaintiffs again represented to the Court that discovery would be complete by February or March, no different than if the trial were still scheduled for April. *See* Scheduling Conference Tr. at 5:24-6:5, ECF 303-6. Those representations were consistent with *Gill*: Plaintiffs could have a second chance, but "the question at this point is whether the plaintiffs have established injury in fact. That turns on *effect, not intent*…." 138 S. Ct. at 1932 (emphasis added).

It is impossible to reconcile *Gill*'s instructions with the last six months of protracted litigation. In January, Plaintiffs insisted that discovery continue so that the schedule would not be delayed and they could obtain "meaningful relief" before the 2020 election. *See* Assembly's Reply Br. in Supp. of Mot. to Stay at 6-7, ECF

12

242.[1] But there was no way for Plaintiffs' case to proceed until the Supreme Court announced the ground rules in *Rucho*. And Plaintiffs' lead counsel has now candidly admitted that they never expected to have a trial after *Rucho*. Mr. Stephanopoulos has publicly described *Rucho*'s outcome as "unsurprising": "Chief Justice Roberts is now the [Supreme] Court's fulcrum. And he never expressed any sympathy for Kennedy's views on gerrymandering (let alone joined any of his opinions). So it was unsurprising that Roberts was unmoved by the plaintiffs' arguments in *Rucho*, rejecting them in cursory terms….So *Rucho* wasn't really lost on June 27, *2019*. Defeat actually became certain one year earlier, on June 27, *2018*—the day Kennedy announced his retirement from the Court."[2] Plaintiffs' rationale for refusing to agree to stay this case was, at best, unreasonable and, at worst, pretext.

It was unreasonable for Plaintiffs to refuse to stay proceedings after the Supreme Court scheduled *Rucho* and *Lamone* for argument. As stated in the Assembly's motion to dismiss, Plaintiffs' amended claims—still predicated on the "Efficiency Gap," which *Gill* already rejected as a measure of "the fortunes of political parties," 138 S. Ct. at 1933—stood no chance in light of the Supreme

---

[1] That rationale (even if it were credible) is no less convincing now than when Plaintiffs raised it in January. If Plaintiffs believed the clock was running out, that was a problem of their own making. Another set of plaintiffs raised (and abandoned) partisan gerrymandering claims years ago in the *Baldus* litigation. *See Baldus v. Members of the Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 848 (E.D. Wis. 2012). The *Whitford* Plaintiffs, meanwhile, waited four years to challenge Act 43 as an unconstitutional partisan gerrymander (indeed, most Plaintiffs waited seven years). *See* Compl., ECF 1 (filed July 8, 2015); Am. Compl., ECF 201 (adding 28 plaintiffs and filed Sept. 14, 2018).

[2] *See* Nicholas Stephanopoulos, *The Denouement of Kennedy's Retirement* (Election Law Blog), online at https://electionlawblog.org/?p=105881.

13

Court's precedents. *See supra*, p. 3. And then the Supreme Court scheduled *Rucho* for argument—involving the same threshold questions, the same attorneys, the same rejected "Efficiency Gap" arguments, and the same expert paid to generate thousands of pretend redistricting plans, *see* Br. of Appellee League of Women Voters, *Rucho v. Common Cause*, No. 18-422 (Mar. 4, 2019). At that point, there was no question that there would be an intervening change in law that would change the trajectory of this litigation. By June, one of two things would happen: either the Supreme Court would decide that federal courts could not entertain partisan gerrymandering cases (thus ending Plaintiffs' efforts here) or the Supreme Court would for the first time announce a judicially manageable standard (thus requiring the parties to start over on discovery and pretrial preparations). Until the parties received either instruction, they were "simply spinning [their] wheels." *See* Op. at 3 (Griesbach, J., dissenting), ECF 275. Plaintiffs' insistence that the parties forge ahead was wasteful, inefficient, and completely unreasonable.

It was also vexatious. Plaintiffs' prolonged discovery had nothing to do with their promised supplemental discovery on standing, and everything to do with harassment of political rivals. Plaintiffs levied repeated discovery requests regarding the Republican Assembly Caucus and Republican campaign activities. Plaintiffs subpoenaed the Speaker of the Wisconsin Assembly (eight years into Wisconsin redistricting-related litigation) for every document and communication "from 2002 to the present regarding or relating to advocating for or implementing legislative policies preferred by the RPW or the Republican Assembly Caucus." *See*

14

Op. & Order at 12 n.5, ECF 275. They demanded from Speaker Vos every communication regarding the recruitment of Republican candidates, every communication between the Republican Party and any current or former Assembly member regarding the impact of redistricting, and all documents related to the Republican Party's solicitation of campaign contributions or other "volunteer activities in support of Republican campaigns." *Id.* at 10 n.2, 12 n.5. Similarly, Plaintiffs subpoenaed legislative aides for all documents reflecting "communications with any current or former Republican Wisconsin State Assembly member or candidate" about the impact of redistricting. *See* Foltz Subpoena, ECF 272-1; Ottman Subpoena, ECF 272-2. And in June (including on a Saturday of all days), Plaintiffs deposed these legislative aides, despite that they had been deposed four previous times and testified at trial. *See* Meehan Decl. ¶ 9-10; *Whitford v. Gill*, 218 F. Supp. 3d 837, 858 (W.D. Wis. 2016). Similarly, Plaintiffs deposed the Chief Clerk of the Wisconsin State Assembly, despite the Assembly's objection that such discovery should wait until *Rucho*, despite the Assembly's repeated clarification that the Chief Clerk did not represent Plaintiffs' true target (the Republican Assembly caucus), and despite that he had no information regarding Plaintiffs' central request (information about Republican campaign activities). *See* Ex. 4 (3/15/19 Letter from T. Meehan to R. Greenwood); Ex. 5 at 3 (Assembly's Response to Pls.' Requests For Production).

None of the above was necessary for Plaintiffs to establish standing, which turns on Act 43 "effect" on Plaintiffs, not the legislature's "intent." *Gill*, 138 S. Ct. at

15

1932. Plaintiffs' tactics compounded the "fundamental problem" with their case, improperly framed as one "about group political interests, not individual legal rights." *Id*. at 1933. The legislature, and Wisconsin taxpayers, need not foot the bill for such politically animated discovery. After all, "[c]ourts exist to settle disputes, not to settle scores." *Hamilton*, 777 F.2d at 1211. Recognizing the cost of such vexatious litigation, Congress "provid[ed] fees not just to prevailing plaintiffs but to prevailing parties." *Id.*; *see also*, *e.g.*, *Munson*, 754 F.2d at 697 ("plaintiff had used the judicial system to carry on a personal vendetta" against government officials).

Finally, this case is hardly the mine run of civil rights cases. It does not involve a private citizen whose chance or momentous encounter with a public official results in constitutional injury. Nor is the policy objective of encouraging "a plaintiff of limited means to bring a meritorious suit" implicated in cases such as this one—spearheaded by a public interest law firm that recruited Plaintiffs to become a part of the case at no cost to Plaintiffs.[3] *Christiansburg*, 434 U.S. at 420; *cf. Goldrich, Kest & Stern v. City of San Francisco*, 617 F. Supp. 577, 564 (C.D. Cal. 1985). Ordinarily, awarding fees against a one-time civil rights plaintiff makes little

---

[3] *See* Johnson Dep. 23:16-20, ECF 322 ("Q. Who's paying your lawyers in this case? A. I don't know. Q. Have you ever asked? A. There's funders. I know there's fundraising going on."); Whitford Dep. 18:21-20:11, ECF 323; Mitchell Dep. 26:24-27:4, ECF 324 ("Q. You're not paying [your lawyers]; correct? A. No. Q. Did you ever ask who's paying them? A. No. I don't get into finances."); Brigson Dep. 18:18-23, ECF 325 ("Q. Who's paying your lawyers? A. I have no idea."); Switzenbaum Dep. 5:21-7:13, ECF 291 (describing email "looking for people to be plaintiffs" and testifying that he "submitted an application to be a plaintiff"); Sundstrom Dep. 114:22-115:17, ECF 292 (describing email "call-out for additional plaintiffs…looking for people in a variety of different assembly districts").

16

sense, because it will not deter future suits. But here, where litigation is orchestrated and financed by a public interest law firm, and the unreasonableness of Plaintiffs' efforts are properly ascribed to their counsel's immunity from ordinary incentives of litigation, fees are appropriate.

## CONCLUSION

The Assembly's request for fees is a modest one. However a plaintiff might have interpreted the Supreme Court's partisan gerrymandering precedents leading up to this term, the ground shifted once *Rucho* was scheduled for argument. It was unreasonable for litigation to proceed as it did without waiting for the Supreme Court's forthcoming decisions about whether (and how) federal courts could remedy alleged partisan gerrymandering. Anticipating those decisions would put an end to this litigation, Plaintiffs used every last moment to harass the Speaker of the Wisconsin State Assembly, legislative aides, and the Assembly itself with meaningless discovery. In such circumstances, an award of fees is appropriate. The Assembly respectfully requests that this Court award the Assembly its reasonable attorneys' fees beginning January 4, 2019, in accordance with 42 U.S.C. § 1988(b).

July 15, 2019                    Respectfully submitted,

*/s/ Adam K. Mortara*
Adam K. Mortara, SBN 1038391
Joshua P. Ackerman
Taylor A.R. Meehan
BARTLIT BECK LLP
54 W. Hubbard Street
Chicago, IL 60654
Ph. 312-494-4400
Fax 312-494-4440
adam.mortara@bartlitbeck.com
joshua.ackerman@bartlitbeck.com
taylor.meehan@bartlitbeck.com

*/s/ Kevin St. John*
Kevin St. John, SBN 1054815
BELL GIFTOS ST. JOHN LLC
5325 Wall Street, Suite 2200
Madison, WI 53718-7980
Ph. 608-216-7990
Fax 608-216-7999
kstjohn@bellgiftos.com

*Attorneys for Wisconsin State Assembly*